IN THE U.S. COURT OF FEDERAL CLAIMS

\- - - - - - - - - - - - - - - - - - - x

YANKEE ATOMIC ELECTRIC CO., :
MAINE YANKEE ATOMIC POWER CO., :
CONNECTICUT YANKEE ATOMIC POWER :
CO., :
Plaintiffs: : No. 98-126C
vs. : 98-474C
UNITED STATES OF AMERICA : 98-154C
Defendant. :

\- - - - - - - - - - - - - - - - - - - x

CERTIFIED COPY

Washington, D.C.
Tuesday, August 26, 2003

Deposition of:

DR. JOHN BARTLETT

called for examination by counsel for the defendant, pursuant to notice and agreement, commencing at 9:30 a.m., at Department of Justice, 1100 L Street N.W., before Virlana Kardash, RPR, CSR, a Notary Public in and for the District of Columbia, when were present on behalf of the respective parties:

**you interpret it in another way?**

A. Well, at this point I can say no one ever expected OFF to be used as an actual implementation method.

**Q. Before we go any further with that, let me talk just about what the contract provides, and then I'm going to ask you about that.**

**Do you know whether the contract provides any other sequence by which spent fuel could be accepted?**

MR. SHAPIRO: Objection. Vague.

BY MS. HERRMANN:

**Q. Do you understand the question?**

A. I understand the question. I believe it does not.

**Q. I'm sorry. Your answer was it does not?**

A. I believe it does not specify any other approaches.

**Q. I'm going to refer you now to article IV B5 of the contract, Roman Numeral IV.**

A. Is that on page 10?

**Q. I believe that's on page 10.**

A. In a sense, yes. Yes. They are not meant to commit anybody. They were not a basis for program action or anything. It was just widely recognized that this would be a very inefficient way of doing things, and it would be far better to have a system where you, well, frankly, campaigned and made effective use of the resources of the system; but at the time it was all very qualitative, you know, how should this system run, because it was very premature to even think about those details because we didn't have an MRS. We didn't know what it was going to look like or what the reactor fleet was going to do.

**Q. So really while you were director, you didn't know one way or the other whether the OFF method was going to happen?**

A. That's right.

**Q. Did you do any studies or anything while you were director, or were you responsible for any studies as to whether the OFF system would work?**

A. Specific studies, no.

**Q. General studies?**

A. Well, I mean there were no reports or studies done. It was qualitative discussion of the inefficiency of the OFF system and an expectation that implementation would in fact involve some kind of a SWAPS system or something like that to make it more effective.

**Q. Have you reviewed the administrative record for standard contract rulemaking for this contract?**

A. No.

**Q. And I know you had already told me before that you weren't involved at all in drafting the contract?**

A. That's right.

**Q. All right. I'm going to move now to the next sentence in your report. I'm back on Exhibit 1, page 1. And the next sentence is, I have been asked to present my opinions on what the proper pace and schedule should have and would have been had the government not breached its obligation to start accepting spent fuel by January 31, 1991.**

**Are you with me?**

MR. SHAPIRO: I think you misread.

MR. MILLER: Yeah. You said '91.

MS. HERRMANN: I apologize. 1998. Thank you for correcting me.

BY MS. HERRMANN:

**Q. Can you tell me what you mean by "the proper pace" in that sentence?**

A. It's a pace to avoid inventories at reactors that would force them to shut down basically. That would be the core issue, taking it fast enough so that the inventories don't build up that the utilities have to add additional storage capacity or shut down. So "proper" in the broadest sense is to avoid disrupting the operation and the industry and generation of power.

**Q. So when you say "proper," you're not saying that that is required by the contract?**

A. No.

**Q. Would you consider your opinions on what is the proper pace expert opinions?**

A. I think so, yes.

Q. And on what do you base your expert



1825 I Street, N.W.
Washington, D.C. 20006

JABS REPORTING, INC.

(202) 296-6102
(888) 805-5227

opinion on that? Essentially what expertise are you relying on?

A. My knowledge of and ability to deal with system studies and this presumption, if you will, that the industry should not be disrupted as a result of failure to remove spent fuel at an adequate rate.

Q. When you say the industry should not be disrupted --

A. No shutdowns forced or reactors that are already shut down prevented from going into decommissioning.

Q. Do you -- is part of your opinion -- strike that.

Are you of the opinion that the standard contract requires DOE to prevent reactors from having to shut down?

MR. SHAPIRO: Objection. Vague.

BY MS. HERRMANN:

Q. Do you understand my question?

A. I have no -- no sense of that.

Q. I'm not sure which part you're answering,

so I'm going to make it more clear.

A. Please.

Q. Does the standard contract require DOE to ensure that reactors will not have to shut down?

MR. SHAPIRO: Objection. Vague.

BY MS. HERRMANN:

Q. Do you understand my question?

A. I'm sorry. Could you please repeat it again?

Q. Of course. Does the standard contract require DOE to prevent reactors from having to shut down?

MR. SHAPIRO: Same objection.

THE WITNESS: Does it require it?

MS. HERRMANN: Yes.

THE WITNESS: I'm not -- I don't think it addresses it.

MS. HERRMANN: Okay.

BY MS. HERRMANN:

Q. You also mentioned for shutdown reactors -- actually, why don't I ask you again. You gave me two reasons. One had to do with not

**having to shut down early. The other aspect was for shutdown reactors. Would you explain to me what the issue is for shutdown reactors?**

A. If the shutdown reactors are seeking to decommission and they still have spent fuel, they have to maintain the spent fuel storage capability, which is a very expensive proposition, and it prevents them from effectively decommissioning the site. They can tear down the reactor, perhaps, but they have to maintain security, safety, operability of the spent fuel storage facility at the site. And of course in each case it's a pool, and pool maintenance is very expensive and labor-intensive and security significant.

**Q. Where do you get your knowledge of the decommissioning requirements on utilities?**

A. One of the -- several of the studies I did while at SCNA for EPA and NRC were directed at requirements for decommissioning reactor plants.

**Q. Did you reference any of the material that you accumulated while you were doing that study in preparing this report?**

THE WITNESS: If no one made any exchanges, you're not necessarily left with the OFF schedule.

BY MS. HERRMANN:

Q **What are you left with, sir?**

A Going to the reactors in accord with a change in their need or desire for receipt as opposed to using strictly the OFF schedule. They don't have to exchange.

Q **Does the standard contract provide for what you've just told me?**

A The standard contract provides wiggle room on every aspect. It sets the OFF schedule as a paradigm, as a baseline, but it provides for swaps, it provides for shut-down reactors, et cetera.

All of those possibilities are there.

Q **Would you take a look at Exhibit No. 2, please, which is the contract, and point me to where it provides for the system that you've just told me about, where DOE -- I'm actually going to look back at it again on the record.**