# STANDARD CONTRACT ISSUE RESOLUTION PROCESS:
*An Overview and Status*

David C. Jones
E. R. Johnson Associates, Inc.
9302 Lee Highway, Suite 700
Fairfax, VA 22031
(703) 359-9355

Nancy S. Montgomery
U.S. Department of Energy
Office of Civilian Radioactive Waste Management
1000 Independence Ave., SW
Washington, DC 20585
(202) 586-8320

Billy M. Cole
E. R. Johnson Associates, Inc.
9302 Lee Highway, Suite 700
Fairfax, VA 22031
(703) 359-9355

**Abstract**

The Department of Energy has identified 35 issues associated with the Standard Contract for Disposal of Spent Nuclear Fuel and/or High-Level Waste (10 CFR Part 961) which need to be resolved to ensure that the waste management system can achieve maximum efficiency while attempting to ensure equity among the waste owners. This paper presents an overview of these issues and discusses the ongoing issue resolution process.

**Background**

The Nuclear Waste Policy Act of 1982, as amended (NWPA), assigns the Department of Energy (DOE) the responsibility of providing for the permanent disposal of spent nuclear fuel (SNF) and high-level waste (HLW). Specifically, Section 302(a) of the NWPA authorized the DOE to enter into contracts with the owners or generators of commercial SNF and/or HLW (primarily utilities) for disposal services. To be eligible for these disposal services, these owners or generators were required to sign the contract by June 30, 1983.

The NWPA required that this contract, like most other contracts, include routine provisions concerning fees, terms of payment, and administrative procedures. In addition, the NWPA mandated that the contract set forth the terms and conditions under which disposal services would be made available many years, and even decades, into the future. In essence, this contract was to establish the conditions for implementing a highly complex, technical process although very little information existed regarding such essential elements as the preferred geologic medium for disposal, or even the basic components of the waste management system. Further complicating this challenge was the need not only to establish such conditions in a contract, but also DOE's decision to develop this contract as part of the Code of Federal Regulations. This process included publishing a proposed rule, considering public comments, issuing a final rule, and signing a contract with every owner and generator of SNF in the country.

On February 4, 1983, DOE published a Notice of Proposed Rulemaking for this contract. Over the next two months, DOE received nearly 700 pages of comments on this proposed contract from nuclear utilities, industry trade associations, public interest groups, public utility commissions, and individuals. The extent of these comments was evidence of the significance attached to the terms, conditions, and provisions contained in the contract.

On April 18, 1983, the Standard Contract for Disposal of Spent Nuclear Fuel and/or High-Level Waste (10 CFR Part 961)

was issued as a final rule. By the June 30, 1983 deadline established in the NWPA, over 70 separate contracts had been signed by utilities and other owners and generators of SNF and HLW. Currently, there are 80 contracts (70 with utilities) representing 66 different waste owners (56 utilities) and 151 facilities.

The Standard Contract established the contractual mechanism for DOE acceptance and disposal of SNF and HLW. It establishes the requirements and operational responsibilities of the various parties in the areas of administrative matters, fees, terms of payment for disposal services, waste acceptance criteria, and waste acceptance procedures. The Standard Contract also provides for the acquisition of title to the SNF and/or HLW by DOE, its transportation to DOE facilities, and its subsequent disposal.

## Standard Contract Issues

Since the NWPA required that the contracting process be completed within six months, many outstanding issues still existed when these contracts were signed. DOE recognized that the Standard Contract contained insufficient detail in certain areas to effectively implement the waste acceptance process. In the 1987 Annual Capacity Report (ACR), DOE indicated that many contract-related issues will require resolution so that the waste management system can achieve maximum efficiency while attempting to assure equity among the waste owners.

The list of 35 contract-related issues which require resolution prior to waste acceptance are as follows:

- What are the exceptions to the Oldest-Fuel-First (OFF) priority ranking?
- Should DOE consider another scheduling basis besides OFF?
- After the issuance of the Acceptance Priority Ranking (APR), how are newly identified wastes added to the acceptance queue?
- Should DOE and other Federal Agencies be treated identically as other Purchasers[1]?
- Should the allocation of acceptance capacity for HLW (particularly commercial HLW) be determined by MTUs or by number of canisters? When should HLW be included in the priority rankings and capacity allocations?
- What basis should Purchasers use in determining the quantity of waste to identify on their Delivery Commitment Schedules (DCS) and how far into the future should Purchasers predict their DCSs?
- Should the Purchasers be subject to sanctions for improperly described SNF after the waste has already been accepted by DOE?
- Is there a legitimate reason for the continued inclusion of the Purchasers' 2 month-20 percent flexibility clause in the Standard Contract?
- Are the Final Delivery Schedules (FDS) subject to the exchange provisions or must all exchanges be finalized before the submittal of the FDSs?
- How are DCS exchanges between Purchasers going to be implemented?
- Are the DCS forms sufficiently clear to the Purchasers so that they will be filled out as desired by DOE?
- How should DOE pursue "rounding" up or down to ensure shipment of full cask loads?
- Should a maximum response time be specified for a Purchaser's rejection of DOE's proposed schedules and the initiation of negotiations?
- What would constitute an emergency requiring the interruption of the regularly scheduled fuel shipments and how would these interruptions be handled?

[1] Owners and generators of SNF and HLW who have entered into agreements with DOE and/or have paid fees for disposal services are referred to as "Purchasers."

HQ0010104

was issued as a final rule. By the June 30, 1983 deadline established in the NWPA, over 70 separate contracts had been signed by utilities and other owners and generators of SNF and HLW. Currently, there are 80 contracts (70 with utilities) representing 66 different waste owners (56 utilities) and 151 facilities.

The Standard Contract established the contractual mechanism for DOE acceptance and disposal of SNF and HLW. It establishes the requirements and operational responsibilities of the various parties in the areas of administrative matters, fees, terms of payment for disposal services, waste acceptance criteria, and waste acceptance procedures. The Standard Contract also provides for the acquisition of title to the SNF and/or HLW by DOE, its transportation to DOE facilities, and its subsequent disposal.

## Standard Contract Issues

Since the NWPA required that the contracting process be completed within six months, many outstanding issues still existed when these contracts were signed. DOE recognized that the Standard Contract contained insufficient detail in certain areas to effectively implement the waste acceptance process. In the 1987 Annual Capacity Report (ACR), DOE indicated that many contract-related issues will require resolution so that the waste management system can achieve maximum efficiency while attempting to assure equity among the waste owners.

The list of 35 contract-related issues which require resolution prior to waste acceptance are as follows:

- What are the exceptions to the Oldest-Fuel-First (OFF) priority ranking?
- Should DOE consider another scheduling basis besides OFF?
- After the issuance of the Acceptance Priority Ranking (APR), how are newly identified wastes added to the acceptance queue?
- Should DOE and other Federal Agencies be treated identically as other Purchasers*?
- Should the allocation of acceptance capacity for HLW (particularly commercial HLW) be determined by MTUs or by number of canisters? When should HLW be included in the priority rankings and capacity allocations?
- What basis should Purchasers use in determining the quantity of waste to identify on their Delivery Commitment Schedules (DCS) and how far into the future should Purchasers predict their DCSs?
- Should the Purchasers be subject to sanctions for improperly described SNF after the waste has already been accepted by DOE?
- Is there a legitimate reason for the continued inclusion of the Purchasers' 2 month-20 percent flexibility clause in the Standard Contract?
- Are the Final Delivery Schedules (FDS) subject to the exchange provisions or must all exchanges be finalized before the submittal of the FDSs?
- How are DCS exchanges between Purchasers going to be implemented?
- Are the DCS forms sufficiently clear to the Purchasers so that they will be filled out as desired by DOE?
- How should DOE pursue "rounding" up or down to ensure shipment of full cask loads?
- Should a maximum response time be specified for a Purchaser's rejection of DOE's proposed schedules and the initiation of negotiations?
- What would constitute an emergency requiring the interruption of the regularly scheduled fuel shipments and how would these interruptions be handled?

*Owners and generators of SNF and HLW who have entered into agreements with DOE and/or have paid fees for disposal services are referred to as "Purchasers."

HQ0010105

- Should priority be given to reactors which have permanently shutdown?
- Should Appendix F be modified to include an Appendix E based classification of the SNF being described?
- Should Appendix F be submitted with the FDS for DOE approval?
- Should the Appendix F submittals require approval/confirmation?
- How must nonfuel components be treated and packaged to be accepted for disposal by DOE? How will priority (capacity) be allocated to (for) nonfuel components?
- Does the Appendix E SNF classification system need clarification?
- Should either class NS-2 or NS-5 of Appendix E be modified to include the assembly hardware residuals from at-reactor rod consolidation?
- Will DOE accept SNF in dual purpose casks for disposal?
- Will DOE accept SNF in multi-element sealed canisters (MESC) for disposal?
- Will nonfuel components be accepted if they are not integral to the SNF?
- Should DOE promulgate canister specifications and acceptance criteria for consolidated fuel canisters?
- Should DOE promulgate canister specifications and acceptance criteria for failed fuel canisters?
- Under what conditions (if any) will nonstandard fuel be accepted as standard fuel?
- Should a clear definition of failed fuel be provided in Appendix E?
- Should the definition of a "year" as given in the Standard Contract be altered to conform with the expected shipping year (i.e., January 1 to December 31)?
- Should the Purchasers be indemnified by DOE against claims for public liability arising out of or in connection with contractual activities at the Purchasers' sites?
- Should credits or penalties be established to encourage waste packaging along DOE guidelines?
- Can Nuclear Waste Fund monies be used to pay for capital improvements at Purchaser sites to upgrade shipping cask handling capabilities?
- Which is the binding document -- the signed contracts or the published final rule? Should efforts be made to reconcile the two?
- Should DOE use receiving facility optimization requirements as a criteria for approving FDSs?
- What are the definitions of "routine" and "incidental" cask maintenance as used in the Standard Contract?

Basically, these issues can be categorized into two distinct groups -- equity and efficiency. The nature of these issues ranges from the need for simple clarification to complex analyses, although the end result, or recommended resolution to each issue will usually be based on economics. From the DOE perspective, it is the economics of providing an efficient waste management system to accomodate the industry as a whole. From the utilities' perspective, it is the economics of individual day-to-day operations, including impacts on power production and on-site spent fuel storage.

### ACR Issue Resolution Process

Through the ACR Issue Resolution Process, the Purchasers, represented by the Edison Electric Institute's Utility Nuclear Waste and Transportation Program (EEI/UWASTE) and the U.S. Council for Energy Awareness (USCEA), jointly representing 64 of the 66 owners or generators, established an ACR Committee to represent the Purchasers in staff-to-staff technical exchanges with DOE. The ACR committee is represented by an ACR Response Team in its interactions with DOE. DOE and the Purchasers' representatives initiated a cooperative effort in 1987, in response to an offer by DOE, to address and ultimately develop recommendations for

resolution of these Standard Contract-related issues. The dual objectives of this process are to retain SNF/HLW management flexibility and equity among the Purchasers while providing for the effective and economical functioning of the waste management system.

Presently, DOE expects to seek final resolution on the majority of these issues through the public rulemaking process. The end result of this will be modifications or clarifications made to the Standard Contract through notices printed in the Federal Register. As such, DOE is working diligently to develop its Positions to these issues. These DOE Positions will then serve as the basis for any proposed changes to the Standard Contract which would then proceed through the rulemaking process.

To this end, the ACR Response Team has already submitted their consensus opinions on a number of these issues for DOE's consideration in the development of the DOE Positions. It should be pointed out that DOE has the responsibility to resolve all of these issues, with or without utility input. In some cases, especially those strictly dealing with equity, the utilities positions would most likely be honored. DOE is using this utility input, as well as the results of contractor analyses, in the development of its positions on these issues.

## Status of Issue Resolution Process

DOE has prioritized the resolution of these issues based on how they impact, or potentially impact, the overall waste acceptance process which includes both the planning and physical activities associated with accepting SNF from Purchasers sites. In general, the waste acceptance process can be broken down into several stages: (1) the establishment of a priority ranking for all SNF discharged from commercial reactors and the resulting annual acceptance allocations to Purchasers based on this ranking, (2) the submittal of Delivery Commitment Schedules (DCS) by the Purchasers indicating the SNF intended to be delivered against a given allocation, (3) the submittal of DCS exchange requests by Purchasers whereby approved DCSs can be exchanged (optional), (4) the submittal of Final Delivery Schedules (FDS) providing additional specificity regarding proposed deliveries by Purchasers with approved DCSs, and finally (5) the physical operations associated with the acceptance of SNF from a Purchasers site.

The first stage includes the annual publication by DOE of the Acceptance Priority Ranking (APR) and ACR as required by the Standard Contract. As this is an ongoing process and serves as the basis of all other waste acceptance planning activities, and as such, is currently the most prominent aspect of the overall waste acceptance planning process, DOE has placed a first priority on the resolution of all contract-related issues affecting or associated with the establishment of the priority ranking and the acceptance capacity allocations. DOE is planning to proceed with public rulemaking for these first priority issues beginning in 1993.

The second priority issues are those associated with the DCSs and FDSs. As the ACR serves as the basis for the submittal of DCSs from the Purchasers, it would not be prudent to attempt to fully resolve those issues associated with the DCSs and FDSs until all issues affecting the APR/ACR process are completely resolved. As such, DOE has assigned as second priority issues those dealing with the submittal of DCSs, the submittal of DCS exchange requests, and the submittal of FDSs.

All remaining issues are those associated with the physical activities related to waste acceptance. These issues include the packaging and canister specifications for various wastes, as well as issues associated with SNF classifications and verification upon receipt. These issues have been categorized as

HQ0010107

third priority issues by DOE and, as such, will be the final set of issues to be resolved.

## First Priority Issues

As stated above, all contract-related issues associated with the APR and ACR process have been given first priority in the ACR issue resolution process. This section will address the nature and background of these issues, as well as discussing some of the considerations and factors influencing their resolution.

- *What are the exceptions to the OFF priority ranking and should DOE consider another scheduling basis besides OFF?* Due to the similarity in the context of these two issues, they have been combined into a single issue. As required by the Standard Contract, the acceptance priority ranking for SNF is based on the date it was permanently discharged, with the owners of the oldest SNF, on an industry wide basis, given the highest priority. This approach is commonly referred to as oldest fuel first (OFF). Several citations in the Standard Contract refer to exceptions to the OFF acceptance priority. The resolution of this issue will focus on clarifying that the application of the OFF principle is used only in establishing the acceptance priority ranking, and as such, there should be no exceptions. Any basis other than OFF would result in inequitable assignment of acceptance capacity among the Purchasers. The Position being developed will also discuss further the options available to waste owners in adjusting their positions in the delivery queue. Additionally, it should be noted that the SNF delivered to DOE need not be the particular SNF that was the basis for a given Purchaser's acceptance capacity allocation, since allocations are "Purchaser specific" rather than "fuel specific".

- *How are newly identified wastes/Purchasers (including DOE and other Federal agencies) to be treated in terms of the overall waste acceptance process?* Again, this Position combines two of the 35 issues due to the similarity in their subject matter. The focus of this issue is the addition of waste which was not previously identified to the acceptance priority ranking. It should be noted that the APR includes all known SNF discharges from commercial reactors regardless of the owner (utilities, Federal agencies, etc.) and regardless of whether or not a contract or interagency agreement for disposal services has been executed. Further, the Standard Contract requires owners of SNF to report such wastes to DOE on an annual basis. The questions then becomes: "How should SNF which was previously discharged but not included in past APRs be added to the queue?" If this SNF has not been included due to an oversight by the owner of the SNF, is it fair to add it into the queue based on its actual discharge date when this would adversely impact all other Purchasers who have been properly following all the procedures and requirements set forth in the NWPA and Standard Contract? This Position will seek to resolve this issue and to emphasize that while all SNF qualifies for inclusion in the APR, DOE will not provide disposal services for SNF identified in the APR unless a contract or interagency agreement for disposal of the SNF is in place and all applicable fees paid.

- *What would constitute an emergency requiring the interruption of regularly scheduled fuel shipments as established through the APR/ACR process and how would these interruptions be handled?* Article V.D of the Standard Contract provides that "emergency deliveries of SNF and/or HLW may be accepted by DOE before the date provided in the delivery commitment schedule upon prior written approval by DOE." However, the Standard Contract does not define the term

HQ0010108

"emergency" or specify under what conditions this clause "may" be applied. Presently, the Position being developed by DOE to this issue focuses on the equitable treatment of all Purchasers. Any emergency delivery accepted by DOE may significantly impact the scheduled deliveries of SNF from all other Purchasers. Granting emergency delivery status for such conditions as a shortage of SNF storage space may result in a tremendous number of request for emergency deliveries from the Purchasers. All of these factors are being considered by DOE in establishing its Position to this issue.

- *Should priority be given to reactors which have permanently shutdown?*
  Article VI.B.1(b) of the Standard Contract provides that "priority may be accorded any SNF...from a civilian nuclear power reactor that...has been shutdown permanently for what ever reason." Again, the Position being developed by DOE to this issue focuses on the equitable treatment of all Purchasers. As waste acceptance capacity in any given year will be limited, providing for the priority acceptance of SNF from shutdown reactors offers the potential for significant impacts on the scheduled deliveries from other Purchasers as established through the APR/ACR process. However, the refusal of DOE to allow for priority acceptance from shutdown reactors may result in some reactors having to wait 20 to 30 years to be decommissioned after they finish generating electricity. This would require these reactors to maintain their storage pools and any additional on-site storage capacity over this period of time which would result in the associated costs incurred for these activities. This Position will address all of these factors while emphasizing that the Purchasers also have the option of trading "rights" through the DCS exchange process

- *What basis should Purchasers use in determining the quantity of waste to identify on their DCSs and how far into the future should Purchasers predict their DCSs?*
  Article V.B.1 of the Standard Contract requires Purchasers to submit DCSs "...which shall identify all SNF and/or HLW the Purchaser wishes to deliver to DOE beginning 63 months thereafter." As such, there has been some confusion associated with the phrases "all SNF and/or HLW" and "wishes to deliver." A given Purchaser may wish to deliver all of its SNF even though their allocation for a particular year restricts them to a much smaller MTU quantity. This issue has been included in the set of first priority issues, since the initial intent of the language in the Standard Contract was that the waste quantities specified in the ACR serve as the basis for DCS submittals. This Position will clarify this intent and also discuss how far into the future utilities should be planning in the submittal of their DCSs.

- *Should the definition of a "year" as given in the Standard Contract be altered to conform with the expected shipping year (i.e., January 1 to December 31)?*
  Article I, definition 20, of the Standard Contract defines a year as the period "...which begins on October 1 and ends on September 30" -- the Federal fiscal year. However, the ACR applies projected annual waste acceptance rates to the APR, resulting in individual Purchaser allocations for the first ten calendar years following the projected commencement of DOE facility operations. Thus, the waste acceptance planning process is based on calendar years, and Purchasers are required to submit DCSs for each calendar year in which they have an allocation in the ACR. This Position will clarify the definition of the term "year" in the Standard Contract.

- *How must nonfuel components and residual structural components from consolidated fuel be treated and packaged to be accepted*

HQ0010109

*for disposal by DOE? How will priority (capacity) be allocated to (for) nonfuel and structural components?*

This Position combines several related issues. Article VI.A.2(b) of the Standard Contract provides that "DOE's obligation for disposing of SNF under this contract also extends to other than standard fuel." Appendix E of the Standard Contract provides five classes of nonstandard fuel including nonfuel components and consolidated fuel. This Position will provide clarification on how nonfuel and structural components must be treated and packaged for acceptance by DOE and on how these packaged components will be treated in the APR and ACR process. This Position has been included in the set of first priority issues since the addition of nonfuel and structural components into the APR with the subsequent assignment of an acceptance allocation can have significant impacts on the overall delivery queue established through the APR/ACR process. Since many of these components classify as Class C or Greater-Than-Class-C (GTCC) wastes, it is unclear whether DOE should be accepting such components for disposal under the terms of 10 CFR Part 961. At a minimum, a better definition of what components are acceptable and how they should be packaged is needed.

HQ0010110

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

\- - - - - - - - - - - - - - - - x

YANKEE ATOMIC ELECTRIC :
COMPANY, MAINE YANKEE ATOMIC : Certified Copy
POWER CO., and CONNECTICUT :
YANKEE ATOMIC POWER CO., : Case No. 98-126C
Plaintiffs : 98-474C, 98-154C
-v- : (Senior Judge
: Merrow)
UNITED STATES OF AMERICA, :
Defendant :

\- - - - - - - - - - - - - - - - x

Washington, D.C.
Thursday, June 13, 2002

Deposition of NANCY SLATER THOMPSON, a witness herein, called for examination by counsel for the Plaintiff in the above-entitled matter, pursuant to notice, the witness being duly sworn, taken at the offices of Spriggs & Hollingsworth, 1350 I Street, N.W., Washington, D.C., at 9:40 a.m., Thursday, June 13, 2002, and the proceedings being taken down in Stenotype by DEBORAH K. WILKINS, RPR, and transcribed under her direction.

strategic significance.

Q. A government argument that I have heard made at times, and I will ask if you've heard this before, not necessarily from government counsel, have you ever heard an interpretation of the contract that would say that the government would meet its obligation by accepting one fuel element from one utility by January 31, 1998?

MS. SULLIVAN: Objection to the extent it calls for a legal conclusion.

A. I have never heard that.

Q. Has such an interpretation ever played a role in your work in the waste acceptance division?

MS. SULLIVAN: Objection, foundation. Objection, vague.

A. I have never heard it, and I don't recall even considering that.

MR. SHAPIRO: That's all the questions I have for you at this time, Ms. Slater Thompson. I appreciate your help.

I should note that there's a small chance that we may seek to talk to you yet again, there is an issue concerning some documents that we may or may not get which may or may not address

issues that relate to you. I am sure we will have to deal with Ms. Sullivan and the government on that, but except for that possibility I don't think we will have further questions for you.

A. I understand. Thank you.

MS. SULLIVAN: I have a couple questions.

EXAMINATION

BY MS. SULLIVAN:

Q. Ms. Thompson, do you recall your testimony in response to some questions from Mr. Shapiro as to whether you had any knowledge as to what the approved DCSs would be used for?

A. Yes, I do, and I believe I had indicated to him that I didn't have a real knowledge of what others were using those for.

Q. Sitting here today, do you have an understanding as to what aspects of the program would use approved DCSs for planning purposes?

A. I think it would be safe to say that the transportation group would probably find the most utility in the DCSs.

Q. Do you have or have you ever had responsibility for transportation planning for the program?

A. No.
Q. Ms. Thompson, while you were in the waste acceptance division, do you recall disapproving delivered commitment schedules delivered by utilities?
A. Yes.
Q. Given your testimony that delivery commitment schedules are largely for planning purposes only, why would you disapprove a delivery commitment schedule?
A. There could be multiple administrative reasons like the DCS not signed, signed by a person not identified as having ability to sign, but primarily for exceeding their allocation for a particular year.
Q. And do you have an understanding as to the effect of the utility's failure to submit a DCS in a year in which they have an allocation?
A. Yes. I believe it was always our intent that if a utility failed to submit a DCS in that year that it would be a waiver of their desire to deliver, and we would have reallocated that capacity to the next utility or utilities in the cue.
Q. I believe Mr. Shapiro has asked you

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - - - - - -x

YANKEE ATOMIC ELECTRIC COMPANY :
(98-126C)(Merow, S.J.) :
CONNECTICUT YANKEE ATOMIC POWER COMPANY :
(98-154C)(Merow, S.J.) :
FLORIDA POWER & LIGHT COMPANY :
(98-483C)(Wilson, J.) :
NORTHERN STATES POWER COMPANY :
(98-484C)(Wiese,J.) :
DUKE POWER, A Division of :
DUKE ENERGY CORP. :
(98-485C)(Sypolt,J.) :
INDIANA MICHIGAN POWER COMPANY :
(98-486C)(Hodges, J.) :
SACRAMENTO MUNICIPAL UTILITY DISTRICT :
(98-488C)(Yock, S.J.) :
SOUTHERN NUCLEAR OPERATING COMPANY, :
et al. :
(98-488C)(Yock, S.J.) :
COMMONWEALTH EDISON COMPANY :
(98-621C)(Hewitt, J.) :
BOSTON EDISON COMPANY :
(99-447C)(Allegra, J.) :
GPU NUCLEAR, INCORPORATED :

CERTIFIED COPY