**CORRECTED COPY**

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| YANKEE ATOMIC ELECTRIC COMPANY,<br>Plaintiff,<br>v.<br>UNITED STATES OF AMERICA,<br>Defendant. | No. 98-126C<br>(Senior Judge Merow) |

YANKEE ATOMIC'S OPPOSITION TO GOVERNMENT'S MOTION FOR PARTIAL SUMMARY JUDGMENT REGARDING PRIORITY FOR SHUTDOWN REACTORS

JERRY STOUCK
Spriggs & Hollingsworth
1350 I Street, NW, Ninth Floor
Washington, DC 20005

Counsel for Plaintiff
YANKEE ATOMIC ELECTRIC COMPANY

Of counsel:

Robert Shapiro
SPRIGGS & HOLLINGSWORTH

April 7, 2004

# TABLE OF CONTENTS

**PAGE**

I. The Court Has Already Ruled That A Trial Is Necessary To Resolve Yankee Atomic's Damages Claim, Including Subsidiary Issues Such As Those Addressed In the Present Motion. ....1

II. The Government Mischaracterizes Yankee Atomic's Position On Shutdown Priority.......2

III. The Government's Motion Fails To Address The Relevant Issue: Damages....................6

IV. Evidence From The "Breach World" Reflects The Consequences Of The Government's Breach And Is Not Probative On Issues Pertaining To Yankee Atomic's Damages Or DOE's Performance Obligations. ....7

## INDEX TO APPENDIX

**Description** **PAGE**

Yankee Atomic's Response to Defendant's July 3,2003 Interrogatories, Request for Admission and Requests for Production Documents [Excerpts]........0001

Deposition Transcript of Robert L. Morgan (3/21/02, 3/22/02) [Excerpts]........0010

Picture of Yankee Atomic's Independent Spent Fuel Storage Installation (ISFSI)........0013

Rule 30(b)(6) Notice of Deposition of Susan Klein (4/18/02)........0014

Deposition Transcript of Susan Klein (4/25/02) [Excerpts]........0020

Spent Fuel Acceptance Scenarios Devoted to Shutdown Reactors: A Preliminary Analysis, September 1989 (PA-165043 to PA-165091)........0025

Deposition Transcript of John W. Bartlett (8/26/03) [Excerpts]........0074

Standard Contract Issue Resolution Process: An Overview and Status, (HQ0010103 to HQ0010118)........0083

Deposition Transcript of Nancy Slater-Thompson (6/13/2002) [Excerpts]........0091

Deposition Transcript of Billy M. Cole (3/13/2002) [Excerpts]........0096

Deposition Transcript of Lake H. Barrett (5/15/2002) [Excerpts]........0104

# TABLE OF AUTHORITIES

**PAGE**

**Cases**

*Commonwealth Edison Co. V. United States*, 56 Fed. Cl. 652 (2003) .................. 2, 3, 6, 7, 12, 13

*H.N.Wood Products, Inc. V. United States,* 2003 WL 23175395 (Fed. Cl., Dec. 19, 2003) .......... 6

*Indiana Michigan Power Co. V. DOE*, 88 F.3d 1272 (D.C. Cir. 1996) ........................................ 8

*Pacific Far East Line, Inc. V. United States,* 394 F.2d 990 (Ct. Cl. 1968)..................................... 6

*Roedler V. DOE*, 255 F.3d 1347 (Fed. Cir. 2001) ................................................................ 4, 13

**Other Authorities**

RCFC 56(A)........................................................................................................................ 1

48 Fed. Reg. 16590, 16593 (April 18, 1983)......................................................................... 5

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

YANKEE ATOMIC ELECTRIC COMPANY,

Plaintiff,

v.

UNITED STATES OF AMERICA,

Defendant.

No. 98-126 C
(Senior Judge Merow)

**YANKEE ATOMIC'S OPPOSITION TO GOVERNMENT'S MOTION FOR PARTIAL SUMMARY JUDGMENT REGARDING PRIORITY FOR SHUTDOWN REACTORS**[1]

The government's "motion for partial summary judgment" ("Mot.") on the shutdown plant priority issue is without merit and should be denied. In essence, the motion asks the Court to ignore an explicit contract provision that the government, in drafting the contract, acknowledged was important. Such an explicit and important contract provision cannot be ignored.

**I. The Court Has Already Ruled That A Trial Is Necessary To Resolve Yankee Atomic's Damages Claim, Including Subsidiary Issues Such As Those Addressed In the Present Motion.**

Initially, the government's motion is not really a motion for summary judgment, because it does not seek judgment in the government's favor "upon all or any part [of] a claim or counterclaim" as Rule 56 requires. *See* RCFC 56(a). Rather, this motion is simply another opportunity for the government to argue its view of one subsidiary issue bearing upon Yankee

[1] This Opposition should also be deemed applicable to *Connecticut Yankee v. United States*, No. 98-154C, and *Maine Yankee v. United States*, No. 98-474C.

Atomic's damages claim. The Court has already recognized, however, in rejecting the government's previous "motion for partial summary judgment" on the rate of acceptance issue, that Yankee Atomic's damages claim -- including subsidiary issues like those involved in these government motions -- must go to trial. Order of June 26, 2003. The present motion should be denied for this reason alone.

## II. The Government Mischaracterizes Yankee Atomic's Position On Shutdown Priority.

In any event, the government's motion rests on a complete mischaracterization of Yankee Atomic's position on shutdown priority. The government asserts, for example, that Yankee Atomic is claiming that the parties' contract *requires* DOE to grant priority acceptance to shut down plants. *See* Mot. at 3 ("Contrary to the Yankees' allegations, Article VI.B.1.(b) of the Standard Contract does not translate into a mandatory consideration of priority in the development of a schedule for acceptance of SNF."). The government's characterization of Yankee Atomic's position is wrong. The contractual language is "may" – "Notwithstanding the age of the SNF and/or HLW, *priority may be accorded* any SNF and/or HLW removed from a civilian nuclear power reactor that has reached the end of its useful life or has been shut down permanently for whatever reason." Contract, Art. VI.B.1.(b)(emphasis added).

The permissive nature of the provision for shutdown plant priority does not, however, permit the Court to ignore the explicit terms of Article VI.B.1.(b). Rather, as explained in "the well reasoned ruling in *Commonwealth Edison*," which this Court "adopted here," *see* Order of June 26, 2003, "[c]ourts should read contract provisions to 'effectuate the spirit and purpose' of the entire contract such that 'an interpretation which gives a reasonable meaning to *all of its parts* will be preferred to one which leaves a portion of it useless, inexplicable, inoperative, void, insignificant, meaningless, superfluous or achieves a weird and whimsical result.'"

*Commonwealth Edison Co. v. United States*, 56 Fed. Cl. 652, 662 (2003) (emphasis added) (citations omitted). Accordingly, the Court must recognize that the contract provision allowing shutdown priority is not "useless" or "superfluous," *id.*, but rather, that the provision has a meaning consistent with the "'spirit and purpose' of the entire contract.'" *Id.*

Overwhelming evidence shows that a significant purpose of the contract here, and of the underlying statute (the Nuclear Waste Policy Act – "NWPA"), was to help utilities avoid additional on-site storage costs after 1998. *See generally* DOE documents and deposition testimony cited in and appended to Yankee Atomic's opposition ("Rate Motion Opposition Brief") to the government's motion for partial summary judgment on the rate of acceptance, particularly at pp. 12-14 of that brief and at A2-5, 217-18, 275-82, 285-88, 354-59, 421-22, 1631, 3246, 3329 of the appendix to that brief. Indeed, as noted in *Commonwealth Edison*, in addition to comparable statements in DOE's draft "Mission Plan" from 1983, *see* 56 Fed. Cl. at 667, "[t]he deposition testimony of several DOE officials involved with the SNF program supports plaintiff's assertion that the intent of the NWPA and the parties was to avoid the construction by utilities of additional at-reactor storage." *Id.* That intent must be given effect in this case, and shutdown plant priority is one of the contractual tools available to DOE to help "avoid the construction by utilities of additional at-reactor storage."

The government's mischaracterization of Yankee Atomic's position on shutdown priority appears to be disingenuous because Yankee Atomic recently spelled out its position in interrogatory responses provided pursuant to the Court's August 29, 2003 Order, which in turn granted the government's motion seeking such responses. Those interrogatory responses explained that:

> Yankee Atomic contends that DOE would have had a duty to accord priority in the acceptance of spent fuel and HLW from

> utilities that have permanently shut down reactors, if such priority were necessary to avoid a situation where the utility would otherwise have to store spent fuel and HLW on-site for an extended period of time. In its damage claim, Yankee Atomic contends that if DOE had performed its obligations to accept SNF and HLW at a reasonable rate in 1998, utilities with shut down reactors would have been able to have exchanged acceptance allocations such that the grant of priority in the acceptance of spent fuel would not have been necessary. Yankee Atomic contends further that if the market for exchanges of acceptance allocations would not have sufficiently developed in the non-breach world to enable such prompt removal, DOE would have granted priority acceptance to utilities with permanently shut down reactors to the extent necessary to ensure such prompt removal.

A2-3 (Yankee Atomic Interrogatory Responses served October 1, 2003, Response No. 17); *see also* A4-9, *id.*, Responses 18-19, 21 (elaborating and citing documentary and other testimonial support).

This statement of Yankee Atomic's position was nothing new. It elaborated the position Yankee Atomic has taken from the outset in its pretrial submissions and proposed factual findings. For example, Yankee Atomic's proposed findings 81 and 82 state that both DOE and utilities "understood and intended" that DOE would implement priority acceptance from shut down reactors, as provided in the contracts, "if and as necessary" to carry out the intentions and objectives of the parties and the underlying statute, "including the understanding and intention that DOE would avoid, to the extent reasonably possible, imposing on Contracting Utilities incremental and avoidable costs of on-site storage of spent fuel." More fundamentally, Yankee Atomic's position on shutdown priority dovetails both with the "spirit and purpose" of the contract as recognized in *Commonwealth Edison*, and with the objectives of the parties and of the NWPA described in that decision and in Yankee Atomic's pretrial submissions. *See Roedler v. DOE*, 255 F.3d 1347, 1352 (Fed. Cir. 2001) (addressing one of the same contracts involved here, and instructing: "[f]or determination of contractual and beneficial intent when, as here, the

contract implements a statutory enactment, it is appropriate to inquire into the governing statute and its purpose").

Nor can the government legitimately dispute that, at the time of contract formation, DOE considered the contract provision for shutdown plant priority to be essential in order to carry out DOE program objectives. When the contracts were being developed, several utilities with operating plants requested that DOE omit the provision for shutdown plant priority. DOE rejected that request, explaining "[t]his type of priority is *necessary* to prevent reactors from waiting 20 or 30 years to be decommissioned after they finish generating electricity." 48 Fed. Reg. 16590, 16593 (April 18, 1983) (emphasis added). The first director of the DOE spent fuel program, Robert Morgan, testified that he agreed with this statement in 1983, explaining:

> Q. What did you mean, "necessary to prevent them from waiting 20 to 30 years"?
>
> A. We didn't want to hold up D and D of a reactor site.
>
> Q. "D and D" referring to?
>
> A. Decommissioning and . . . I don't remember the acronym. Shutting down the reactor.
>
> Q. Was that one of your objectives, to avoid --
>
> [objection]
>
> Q. -- to avoid holding up --
>
> A. a utility from D and D?
>
> Q. Yes.
>
> A. Decommissioning. We didn't want to do that.
>
> Q. That was an objective of yours?
>
> A. Yes.

A11-12 (Morgan Dep. Tr. at 314-15.

Where a contract provision is "necessary" to achieve DOE program objectives, and is plainly helpful in allowing one class of utilities avoid additional onsite storage costs – consistent with the "spirit and purpose" of the contract – the provision cannot be disregarded. And although the contractual provision for shutdown plant priority is permissive, settled law required the government to exercise its discretion reasonably. *E.g., Pacific Far East Line, Inc. v. United States,* 394 F.2d 990, 998 (Ct. Cl. 1968) ("A party vested with contractual discretion must exercise his discretion reasonably and may not do so arbitrarily or capriciously."); *H.N. Wood Products, Inc. v. United States,* 2003 WL 23175395 at *8 (Fed. Cl., Dec. 19, 2003) (same).

**III. The Government's Motion Fails To Address The Relevant Issue: Damages.**

The government's motion is also fundamentally misdirected because, while acknowledging that "the issue before the Court is the measure of the damages," Mot. at 2, the motion does not address that issue. Instead, the government dwells on the contract's waste acceptance planning provisions, and persists in arguing for strained and incorrect interpretations of those provisions.[2]

As noted in *Commonwealth Edison* (and above), "[t]he deposition testimony of several DOE officials involved with the SNF program supports plaintiff's assertion that the intent of the NWPA and the parties was to avoid the construction by utilities of additional at-reactor storage." 56 Fed. Cl. at 667. In this case, Yankee Atomic *was not able* "to avoid construction . . . of additional at-reactor storage." Instead, Yankee Atomic was forced to spend millions to build a

---

[2] To the extent determination of Yankee Atomic's damages involves interpretation of the contract, the legal framework is straightforward and settled, and the government's motion adds nothing. As *Commonwealth Edison* recognizes, "[t]he purpose of contract interpretation is to carry out the intent of the parties . . . to 'effectuate the spirit and purpose' of the entire contract." 56 Fed. Cl. at 662.

spent fuel dry storage facility to allow it to decommission its nuclear plant in a cost-effective manner. *See* A13 (picture of Yankee Atomic's dry storage facility). Yankee Atomic's nuclear plant is shut down. Had DOE used the shutdown plant priority provision for its intended purpose, within the context of a waste acceptance program that otherwise was fully operational beginning in 1998 as intended – and contractually required – then Yankee Atomic would not have incurred the dry storage construction costs and other damages claimed in this case.

Ultimately, despite the government's efforts to confuse the issue, the damages determination in this case is quite straightforward. The basic question is whether costs that Yankee Atomic has incurred and will incur for extended on-site spent fuel storage would have been incurred if DOE had performed its contract obligations. Because the government has no real answer to that question, it has attempted to confuse the issue by harping on various contract provisions that address aspects of spent fuel removal scheduling. Those contract provisions are not the issue in this case. DOE's schedule for removal of spent fuel and HLW is not the issue in this case. The issue in this case is Yankee Atomic's damages – would the substantial costs that Yankee Atomic has incurred to store spent fuel have been incurred if DOE had performed as intended? The upcoming trial will appropriately focus on that issue, not on the various subsidiary "schedule issues" that *Commonwealth Edison* has already largely rejected, but that the government apparently continues to hope will distract the Court from the real damages issue.

## IV. Evidence From The "Breach World" Reflects The *Consequences* Of The Government's Breach And Is Not Probative On Issues Pertaining To Yankee Atomic's Damages Or DOE's Performance Obligations.

The government's motion is further misguided because it relies on evidence from the "breach" world that has no probative value regarding the likely behavior of DOE and utilities in the "non-breach" world, where DOE would have commenced spent fuel removal in January 1998, and "continued" removal thereafter, *see Commonwealth Edison*, 56 Fed. Cl. at 664

(quoting contract, Art. II), "without qualification or condition," *Indiana Michigan Power Co. v. DOE*, 88 F.3d 1272, 1276 (D.C. Cir. 1996). It is true that Yankee Atomic sought priority based on its shut down status in the mid-1990's, and DOE refused. But by that time DOE's inability to meet the 1998 date was palpable; DOE by then had given up on having a repository by 1998, and was struggling to develop an "MRS" -- Monitored Retrievable Storage facility -- which, assuming DOE could obtain a statutory change to "de-link" the MRS from the repository, might have been ready by 1998. *See* Rate Motion Opposition Brief at 45-46. In short, when Yankee Atomic requested shut down priority in the mid 1990's, DOE's spent fuel program was wholly inoperative and was sinking rapidly into default. To provide for shutdown priority in that context is akin to re-arranging the deck chairs on the Titanic. DOE naturally declined to expend time or effort doing so. Notably, Yankee Atomic's expert, Frank Graves, explains in his report (and will explain at trial) how and why DOE's breach has severely disrupted the behavior of utilities and DOE with respect to acceptance scheduling issues. *See* Expert Report of Frank C. Graves at 16-19.

The situation would have been entirely different in the "non-breach" world – where DOE would be performing "without qualification or condition," *Indiana Michigan,* 88 F.3d at 1276 -- as confirmed by the deposition testimony of Susan Klein, the government's Rule 30 (b)(6) witness on various scheduling issues, including "[t]he role and purpose of the provision on priority for shutdown reactors . . . ." *See* A18 (Notice of Rule 30(b)(6) Deposition at 5):

> Q. If DOE had begun accepting fuel in 1998 at a 3,000 MTU rate or . . . a reasonable ramp-up to a 3,000 MTU rate, do you have an opinion as to whether DOE could have given priority to shutdown reactors without harming or prejudicing the rights of operating utilities.
>
> [objection]

> A. *It could have given.* I think that would be policy considerations that would be looked at, but it would make it certainly –
>
> Q. Would have made it easier?
>
> A. Much easier, yes.

A23 (Klein 30(b)(6) Dep. Tr. at 524-525) (emphasis added); *see* A22 (similar). Indeed, before the DOE program went seriously off course, the government commissioned studies to investigate which nuclear waste acceptance scenarios were the most reasonable and cost-effective. One such study in 1989, entitled, "Spent Fuel Acceptance Scenarios Devoted to Shutdown Reactors: A Preliminary Analysis," A25-73, analyzed "a class of acceptance schemes in which the acceptance capacity of the federal radioactive waste management system is allocated principally to shutdown commercial reactors. . . ." *Id.* at 29. That study reached conclusions that are comparable to the conclusions of Yankee Atomic's experts Dr. Bartlett and Mr. Graves, specifically, that significant program cost efficiencies could be realized by giving priority to spent fuel located at shutdown plants and at operating reactors with full fuel pools:

> An allocation scheme that combines shutdown reactor priorities with early priority for pools with imminent need for additional storage capacity could largely provide the best features of each scheme, and result in a combined at-reactor cost (for both additional storage capacity and operations after last discharge) about $1.3 billion lower than the reference OFF [oldest-fuel first] case.

*Id.* at 64. *See* Expert Report of Frank Graves at 11-12; Expert Report of John Bartlett at 10-12. Studies such as that quoted above demonstrate that DOE, back when its program was still afloat -- i.e., before it became clear that DOE would not perform by 1998-- was vitally interested *both* in an efficient schedule for nuclear waste acceptance *and* in avoiding additional costs to utilities for on-site waste storage.

Testimony of John Bartlett, DOE's spent fuel program director in the early 1990's, supports the same conclusion. In the course of explaining his opinion about the proper schedule for waste removal, Dr. Bartlett testified at his deposition as follows:

> Q. Can you tell me what you mean by "the proper pace" in that sentence?
>
> A. It's a pace to avoid inventories at reactors that would force them to shut down basically . . . .
>
> Q. When you say the industry should not be disrupted –
>
> A. No shutdowns forced or reactors that are already shut down prevented from going into decommissioning . . . .
>
> Q. . . . You gave me two reasons. One had to do with not having to shut down early. The other aspect was for shutdown reactors. Would you explain to me what the issue is for shutdown reactors?
>
> A. If the shutdown reactors are seeking to decommission and they still have spent fuel, they have to maintain the spent fuel storage capability, which is a very expensive proposition, and it prevents them from effectively decommissioning the site. . . .

A78, 79, 80-81 (Bartlett Dep. Tr. at 163, 164, 165-66).

In dismissing the relevance of such documentary and testimonial evidence, and the contractual provision for shutdown priority to which it relates, the government persists in mangling the actual contract language (in addition to disregarding the contract's "spirit and purpose"). The government's motion misstates the significance of the contract's "oldest fuel first" ("OFF") concept, asserting that the contract "provides that 'acceptance priority' for contract holder SNF and HLW" *shall* be based upon the age of the SNF and/or HLW as calculated from the date of discharge of such material from the civilian nuclear power reactor.'" Mot. at 4 (quoting Contract, Art. VI.B.1.(a)) (emphasis added by government's motion). That is

not what the contract provides. First, the contract's spent fuel removal planning provisions were not fully thought through in 1983, and are thus both incomplete and ultimately unclear. *See, e.g,* Yankee Atomic's Rate Motion Opposition Brief at 29-30. Nevertheless, as an early step in the planning process the contract does indicate that "the Purchaser shall submit to DOE the delivery commitment schedule(s) which *shall identify all SNF and/or HLW the Purchaser wishes to deliver to DOE* . . . ." Contract Art. V.B.1. (emphasis added). In the non-breach world, where DOE's nuclear waste disposal program would be operating "unconditionally" as intended, shut down plants would have "wish[ed] to deliver" *all* of their spent fuel and HLW. That is because, by delivering all such material to DOE, shutdown plants would have avoided precisely the additional costs that constitute Yankee Atomic's damages in this case: the costs of constructing on-site dry storage facilities to allow decommissioning to proceed, and, after decommissioning is complete, the costs of operating the on-site storage facilities for an indefinite period of time. Conversely in the non-breach world, operating utilities with ample available pool space would not have a reason to "wish" to deliver any spent fuel or HLW – they could just place it in their fuel pools at relatively little additional cost.

Second, although the contract provision cited by the government (Article VI.B.1.(a); *see* Mot. at 4) does describe an oldest fuel first "queue," adherence to that queue is heavily qualified – *i.e.,* "[e]xcept as may be provided for" in the separate provision for shutdown priority and also "except as otherwise provided for" in the contract's provisions for "Exchanges" and "Emergency Deliveries." Contract, Art. VI.B.1.(a) & (b). This entire set of contract provisions only kicks in, however, if the delivery commitment planning process encounters a constraint -- specifically, in the situation where "[d]elivery commitment schedules for SNF and/or HLW may require the disposal of more material than the annual capacity of the DOE disposal facility (or facilities) can

accommodate." Contract, Art. VI.B.1. In that event, "[t]he following acceptance priority ranking will be utilized," namely the OFF "queue" with the explicit *exceptions* for exchanges, shutdown priority and emergency deliveries noted above.

Although the provisions in the contract for spent fuel removal planning are not a model of clarity, evidence that is both overwhelming *and uncontroverted* makes certain things clear. As Dr. Bartlett summarized the situation:

> A. Well, at this point I can say no one ever expected OFF to be used as an actual implementation method. . . .
>
> . . . It was just widely recognized that this would be a very inefficient way of doing things, and it would be far better to have a system where you, well, frankly, campaigned and made effective use of the resources of the system; but at the time it was all very qualitative, you know, how should this system run, because it was very premature to even think about those details. . . .
>
> . . . It was qualitative discussion of the inefficiency of the off system an expectation that implementation would in fact involve some kind of a SWAPs system or something like that to make it more effective.
>
> . . . . .
>
> A. The standard contract provides wiggle room on every aspect. It sets the OFF schedule as a paradigm, as a baseline, but it provides for swaps, it provides for shut-down reactors, et cetera.

A75, 76-77, 82 (Bartlett Dep. Tr. at 157, 161-62, 383).

Ultimately for present purposes, it is enough to recognize that the potential for shutdown priority is an explicit and important part of the contract. Through its adoption of *Commonwealth Edison,* this Court has already determined that the contract does not dictate a waste acceptance schedule. 56 Fed. Cl. at 663 ("[T]he Standard Contract, including specifically the ACR and DCS process, does not contain or create a SNF acceptance rate."). Thus, in determining Yankee Atomic's damages, the Court must recognize (1) that DOE's removal

schedule would have been a reasonable one that gave effect to all provisions of the contract that bear on the removal schedule, (2) that the schedule would have been consistent with the overwhelming evidence of the intentions of the parties and the objectives of the NWPA, *see Roedler*, 255 F.3d at 1352, and (3) that the schedule, ultimately, would thus have given effect to the "spirit and purpose" of the contract. *Commonwealth Edison*, 56 Fed Cl. at 662.

Indeed, even in breach world, if and when DOE ever begins performance and despite the disruptions already caused by DOE's breach, Ms. Klein testified that shutdown priority is possible:

> Q. You haven't prejudged and foreclosed the possibility; is that fair to say?
>
> A. That's fair to say.

A22 (Klein, 30(b)(6) Dep. Tr. at 516).

* * * * *

Consistent with the discovery record, the trial evidence will show that, from the inception of the DOE spent fuel program in 1983 right up to the present day, all parties recognized that utilities like Yankee Atomic with shut down plants should not have to incur additional costs of on-site storage in order to decommission their plants, or further costs for long-term on-site storage long after decommissioning is otherwise complete. The parties' contract, to the contrary, was designed and intended to allow Yankee Atomic to *avoid* those costs. And the explict contract provision for shutdown priority was an integral part of that contract design.

The government's motion for "partial summary judgment" on shutdown plant priority should be denied.

Respectfully submitted,

Dated: April 7, 2004

s/Jerry Stouck
JERRY STOUCK
Spriggs & Hollingsworth
1350 I Street, N.W., Ninth Floor
Washington, D.C. 20005
(202) 898-5800 (phone)
(202) 682-1639 (facsimile)

COUNSEL FOR PLAINTIFF,
YANKEE ATOMIC ELECTRIC COMPANY

Of Counsel:

Robert L. Shapiro
SPRIGGS & HOLLINGSWORTH