IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - - - - - x

YANKEE ATOMIC ELECTRIC :
COMPANY, MAINE YANKEE ATOMIC : Certified Copy
POWER CO., and CONNECTICUT :
YANKEE ATOMIC POWER CO., : Case No. 98-126C
Plaintiffs : 98-474C, 98-154C
-v- : (Senior Judge
: Merrow)
UNITED STATES OF AMERICA, :
Defendant :

- - - - - - - - - - - - - - - - - - - - x

Washington, D.C.
Thursday, June 13, 2002

Deposition of NANCY SLATER THOMPSON, a witness herein, called for examination by counsel for the Plaintiff in the above-entitled matter, pursuant to notice, the witness being duly sworn, taken at the offices of Spriggs & Hollingsworth, 1350 I Street, N.W., Washington, D.C., at 9:40 a.m., Thursday, June 13, 2002, and the proceedings being taken down in Stenotype by DEBORAH K. WILKINS, RPR, and transcribed under her direction.

strategic significance.

Q. A government argument that I have heard made at times, and I will ask if you've heard this before, not necessarily from government counsel, have you ever heard an interpretation of the contract that would say that the government would meet its obligation by accepting one fuel element from one utility by January 31, 1998?

MS. SULLIVAN: Objection to the extent it calls for a legal conclusion.

A. I have never heard that.

Q. Has such an interpretation ever played a role in your work in the waste acceptance division?

MS. SULLIVAN: Objection, foundation. Objection, vague.

A. I have never heard it, and I don't recall even considering that.

MR. SHAPIRO: That's all the questions I have for you at this time, Ms. Slater Thompson. I appreciate your help.

I should note that there's a small chance that we may seek to talk to you yet again, there is an issue concerning some documents that we may or may not get which may or may not address

issues that relate to you. I am sure we will have to deal with Ms. Sullivan and the government on that, but except for that possibility I don't think we will have further questions for you.

A. I understand. Thank you.

MS. SULLIVAN: I have a couple questions.

EXAMINATION

BY MS. SULLIVAN:

Q. Ms. Thompson, do you recall your testimony in response to some questions from Mr. Shapiro as to whether you had any knowledge as to what the approved DCSs would be used for?

A. Yes, I do, and I believe I had indicated to him that I didn't have a real knowledge of what others were using those for.

Q. Sitting here today, do you have an understanding as to what aspects of the program would use approved DCSs for planning purposes?

A. I think it would be safe to say that the transportation group would probably find the most utility in the DCSs.

Q. Do you have or have you ever had responsibility for transportation planning for the program?

A. No.

Q. Ms. Thompson, while you were in the waste acceptance division, do you recall disapproving delivered commitment schedules delivered by utilities?

A. Yes.

Q. Given your testimony that delivery commitment schedules are largely for planning purposes only, why would you disapprove a delivery commitment schedule?

A. There could be multiple administrative reasons like the DCS not signed, signed by a person not identified as having ability to sign, but primarily for exceeding their allocation for a particular year.

Q. And do you have an understanding as to the effect of the utility's failure to submit a DCS in a year in which they have an allocation?

A. Yes. I believe it was always our intent that if a utility failed to submit a DCS in that year that it would be a waiver of their desire to deliver, and we would have reallocated that capacity to the next utility or utilities in the cue.

Q. I believe Mr. Shapiro has asked you

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - - - - - - -x

YANKEE ATOMIC ELECTRIC COMPANY :

(98-126C)(Merow, S.J.) :

CONNECTICUT YANKEE ATOMIC POWER COMPANY :

(98-154C)(Merow, S.J.) :

FLORIDA POWER & LIGHT COMPANY :

(98-483C)(Wilson, J.) :

CERTIFIED COPY

NORTHERN STATES POWER COMPANY :

(98-484C)(Wiese,J.) :

DUKE POWER, A Division of :

DUKE ENERGY CORP. :

(98-485C)(Sypolt,J.) :

INDIANA MICHIGAN POWER COMPANY :

(98-486C)(Hodges, J.) :

SACRAMENTO MUNICIPAL UTILITY DISTRICT :

(98-488C)(Yock, S.J.) :

SOUTHERN NUCLEAR OPERATING COMPANY, :

et al. :

(98-488C)(Yock, S.J.) :

COMMONWEALTH EDISON COMPANY :

(98-621C)(Hewitt, J.) :

BOSTON EDISON COMPANY :

(99-447C)(Allegra, J.) :

GPU NUCLEAR, INCORPORATED :

(00-440C)(Bush, J.) :
WISCONSIN ELECTRIC POWER COMPANY :
(00-697C)(Merow, S.J.) :
POWER AUTHORITY OF THE STATE OF NEW YORK :
(00-703C)(Damich, J.) :
OMAHA PUBLIC POWER DISTRICT :
(01-115C)(Bush, J.) :
NEBRASKA PUBLIC POWER DISTRICT :
(01-116C)(Sypolt, J.) :
TENNESSEE VALLEY AUTHORITY :
(01-249C)(Bruggink, J.) :
Plaintiffs, :
v. :Discovery
THE UNITED STATES, :Judge:
Defendant. :(Judge
- - - - - - - - - - - - - - - - - - - - -xSypolt)

McLean, Virginia

Wednesday, March 13, 2002

Continued deposition of BILLY M. COLE, a witness, recalled for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to notice, the witness being duly sworn by CATHERINE S. BOYD, a Notary Public in and for the Commonwealth of Virginia, taken at the offices of Shaw Pittman, LLP, 1650 Tysons

draft.

A. No. I wasn't party to it, but --

Q. Do you know whether, during the course of your involvement with the standard contract, whether certain utilities objected to DOE the possibility that DOE would give priority to shutdown reactors?

A. Yes, I do. As part of the issue resolution process, one of the issues, I can't remember which number it was, should priority be given to shutdown reactors?

And since that was an equity issue, we tossed it across the table to the utility representatives.

They took it and met with -- sent it out to all utilities, and got a consensus back to DOE on it.

And the consensus was under no circumstances will priority be given to shutdown reactors. That was their finding.

Q. And when you say it was an equity issue --

A. If I take fuel away from a shutdown, then I can't take one away from operating if you've only got so much capacity.

Q. From DOE's standpoint, if it was fine with the utilities, it was fine with DOE?

A. That's right. DOE are truck drivers. They don't care.

That's right. And there was a memo that came back from DOE, I mean from the utilities by the chairman of that committee saying this is their position.

At that time, the chairman of that committee is now a DOE employee, Mr. David Zabransky.

Q. I'm going to hand you a memo dated June 28th, 1991, from Mr. McDuffie and Mr. Vance to Mr. Brownstein and Mr. Langstaff, and its subject is recommended DOE positions on 17 contract implementation issues.

A. Okay.

(The witness reviewed the document.)

THE WITNESS: Okay.

BY MR. MACDONALD:

Q. In your testimony, testimony a moment ago, you referred to the issue resolution process, and specifically the response that came back from the utilities on the shutdown reactor priority?

A. That's correct.

Q. Would you turn to the bottom of page 4, top of page 5?

A. Okay.

Q. This appears to be ID No. 15 or Issue No. 15, acceptance priority for shutdown reactors?

A. Um-hm.

Q. And the position has two, it has two elements, Phase 1 and Phase 2?

A. Um-hm.

Q. And Phase 1 says since this issue is primarily an equity issue among the purchasers an has no impacts on WMS performance or public safety, DOE concurs with purchasers' consensus view that no priority shall be afforded to shutdown reactors during the start-up phase of the WMS?

A. Correct.

Q. What does that, the last phrase mean, during the start-up phase of the WMS?

A. The first few years of operation, they're not going to sit there and impact the operating reactors.

Once we get to them, you know, as the

next phase says, in the first line, as the system matures, then we'll reconsider this thing where we can, we can start taking this stuff from shutdown reactors.

Q. And do you think that was, to your knowledge, was that DOE's position?

A. I don't know if they wound up formalizing that or not because these were recommendations to DOE, what we recommended be done with those positions.

I don't know where, I don't know whatever happened to the resolve of most of these.

I just don't know. I can't remember.

Q. And Phase 2 continues there and says, quote, when the WMS receipt rate exceeds the aggregate purchasers' annual discharge rates and all purchasers can be assured that they will not need additional add reactor storage, DOE may elect to allocate acceptance priority to shutdown reactors to facilitate the permanent closure of those sites as soon as possible?

A. That's true. That was a recommendation, that they consider that.

Q. Did you have discussions with Mr.

McDuffie or Mr. Vance while this recommendation was being developed?

A. The development process was going on prior to this date, yes.

We have had discussions on this many times, and I don't remember, you know, specifically on this date or this draft, but I'm very familiar with this, and we have discussed it, yes.

Q. And it was, was it your view that once the receipt rate or acceptance rate exceeded the discharge rate, that priority could be given to shutdown reactors?

A. It says, it says you may give it. The, the problem that's going to occur in that is you have to wait until your system is well along and fully matured and everybody is comfortable and fuel is being moved for a while.

Otherwise you with the shutdown reactor, and some guy has got an operating reactor and he's got a right to ship some fuel that year, he's not going to want to give up his rights for you to ship that fuel, not unless we have emptied sufficient amount away from him the previous years where he's not going to have a

problem.

He's going to be concerned about continue operating, so you have to wait for the system to mature well enough and everybody feels comfortable that it's all, it's over all the hiccoughs, it's not going to shut itself down, and it's moving along.

We just want a recognition that even though the utilities came back and said under no circumstances, as a consensus, should priority be to shut down reactors, we felt we still need to leave that door open and they may want to do that to help them in the decommissioning process.

Q. And when you say that the utilities came back with that view, do you know if SMUD or other shutdown reactors as of 1991 shared that view?

A. No, I do not. I would imagine the owners of the shutdown reactors did not share that view, but if you get a two-thirds consensus, I can tell you 90 percent were operating, and so it's not surprising.

Also I know even though I was not at those meetings, where they had private meetings

with the utilities to go over these things, I have a friends. I know that some of the things that came out of those meetings.

They had trouble even figuring out what was a consensus, and Commonwealth Edison got up and made the statement we agree two thirds should be consensus as long as we're part of the two thirds.

There's a lot of people involved in this. Unfortunately, it's not one contract.

Q. Was oldest fuel first considered an efficient way to deliver fuel?

A. No, not necessarily an efficient way to deliver it.

It was the efficient way to allocate capacity. To try to find a way -- you're honoring the fact that the guys who have the oldest fuel also have the oldest reactors and been operating the longest period of time, so they should have the first rights, so the age of the fuel established the priority for acceptance, not what fuel is going to be taken.

Now in a perfect world, it would be a nice way if you didn't have to worry about campaigning and things like that, age of the

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - x

YANKEE ATOMIC ELECTRIC :
COMPANY, MAINE YANKEE ATOMIC :
POWER CO., and CONNECTICUT :
YANKEE ATOMIC POWER CO., : Case No. 98-126C,
Plaintiffs, : 98-474C, 98-154C
vs. : (Senior Judge Merrow)
UNITED STATES OF AMERICA, :
Defendant. : VOLUME II

- - - - - - - - - - - - - - - - -X

Certified Copy

Washington, D.C.
Wednesday, May 15, 2002

Deposition of LAKE H. BARRETT, a witness herein, called for examination by counsel for Defendant in the above-entitled matter, pursuant to notice, the witness being previously duly sworn, taken at the offices of Spriggs & Hollingsworth, 1350 Eye Street, N.W., Washington, D.C., commencing at 9:05 a.m., Wednesday, May 15, 2002, and the proceedings being taken down by Stenotype by CAPPY HALLOCK, RPR-CRR, and transcribed under her direction.

CONTAINS CONFIDENTIAL INFORMATION
PURSUANT TO THE PROTECTIVE ORDER

Is that a fair characterization?
A. Yes.
Q. Okay. Number 1, "Granting priority can be shown to be lest costly to DOE's waste management system."
Do you believe that a shutdown utility could make that showing?
MS. HERRMANN: Objection. Speculation.
A. Possibly.
Q. Okay. Well, I mean the question is not whether this would always be true, but whether -- the question included possibly. Is it possible that a shutdown utility could make that showing? I'm not sure that "possibly" is a fair answer to that.
MS. HERRMANN: Objection. Speculation. Asked and answered.
A. What was the question?
Q. The question is could a shutdown reactor, is it possible that a shutdown reactor could show that granting priority acceptance to it would be less costly to DOE's -- would reduce the cost of the waste management system?
A. Yes.
Q. And is it possible that granting

priority acceptance -- this is Number 2 -- to a shutdown utility -- I'm paraphrasing -- could be shown to involve small enough quantities of fuel compared to the overall DOE acceptance rate so as not to jeopardize the timely removal of spent fuel from other sites. Is it possible that they could make that showing?

MS. HERRMANN: Objection. Speculation.

A. You use the word timely in an absolute sense. The answer is no.

Q. Okay. So it is your opinion that granting priority acceptance to a shutdown reactor would necessarily involve a schedule impact to some other utility or utilities? In other words, there is no play in the system. If you got priority for one, somebody else would necessarily have to move; is that your understanding?

A. Yes.

Q. And I take it you would agree that granting priority -- this is a different question -- not whether the showing could be made, but I take it you would agree that granting priority to a shutdown reactor can be shown, at least in some circumstances, to avoid the establishment of

otherwise unneeded reactor site storage facilities?

A. Yes.

MS. HERRMANN: Objection. Speculation.

Q. And Number 4, "Granting priority can be shown to be clearly cost-effective for consumers from the standpoint of timely decommissioning."

I take it you agree with that? We talked about that earlier.

MS. HERRMANN: Objection. Speculation.

A. Yes.

Q. All right. And Number 5 is an overall policy issue which I think we have also talked about. Okay.

I think we have exhausted that one, and I just have a couple more questions for you about your prior testimony and I hope we can wrap this up. So all my remaining questions, I believe, are going to concern either Exhibit Number 100 or Exhibit Number 97, which are the first two days of your testimony in this deposition, so you might want to have those handy.

Before we turn to those I do have one other question. Yesterday we talked about something, and I believe, Mr. Barrett, it concerned