**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| YANKEE ATOMIC ELECTRIC COMPANY,<br>Plaintiff,<br>v.<br>UNITED STATES OF AMERICA,<br>Defendant. | No. 98-126C<br>(Senior Judge Merow) |

YANKEE ATOMIC'S OPPOSITION TO DEFENDANT'S
MOTION *IN LIMINE* REGARDING TAKINGS DAMAGES

JERRY STOUCK
Spriggs & Hollingsworth
1350 I Street, N.W., Ninth Floor
Washington, DC 20005

Counsel For Plaintiff
YANKEE ATOMIC ELECTRIC COMPANY

Of Counsel:

Robert L. Shapiro
Vivek K. Hatti
SPRIGGS & HOLLINGSWORTH

April 16, 2004

# TABLE OF CONTENTS

**PAGE**

I. The Court Has Already Ruled That There Is Sufficient Evidence For Adjudicating Yankee Atomic's Takings Claim. .... 2

II. Yankee Atomic Has Properly Asserted A Permanent Takings Claim and Can Prove Damages By Introducing Evidence of Fair Market Value ("FMV"). .... 3

A. Yankee Atomic's Claim Is One For A Permanent Taking Because The Government Is Storing Nuclear Waste Indefinitely, and Perhaps Permanently, on Land Owned by Yankee Atomic in an ISFSI, Which is a Permanent, Fixed Structure .... 3

B. The Government's Motion is Moot With Respect To Evidence Regarding Fair Rental Value. .... 8

C. Yankee Atomic Is Entitled To Just Compensation Measured by Fair Market Value, and the Tax Bills In Question Are Admissible Supporting Evidence of Fair Market Value. .... 8

1. Thomas W. Bennet Can Testify Regarding Market Value of Yankee Atomic's Property .... 10

2. The tax records evidence is admissible as public records pursuant to Fed. R. Evid. 803(8). .... 11

3. The tax bills are admissible under the business records exception to the hearsay rule, Fed. R. Evid. 803(6). .... 14

III. Conclusion .... 16

# INDEX TO APPENDIX

**DESCRIPTION** **PAGE**


Deposition Transcript of Christopher A. Kouts (6/4/99) [Excerpts] …………….. 0001

Nuclear Waste: Technical, Schedule, and Cost Uncertainties of the Yucca Mountain Repository Project (GAO-02-191) …………………………….. 0006

Viability Assessment of a Repository at Yucca Mountain: Overview (PA-196032 to PA-196080) ………………………………………………. 0044

Photograph of Yankee Atomic Independent Spent Fuel Storage Installation……… 0093

# TABLE OF AUTHORITIES

PAGE

**Cases**

*Air Land Forwarders, Inc. v. United States,* 172 F.3d 1338 (Fed. Cir. 1999)........................ 14, 15

*Armijo v. United States,* 229 Ct. Cl. 34, 663 F.2d 90 (1981)........................................................ 4

*Bass Enters. Prod. Co. v. United States,* 133 F.3d 893 (Fed. Cir. 1998)...................................... 9

*Boise Cascade Corp. v. United States,* 296 F.3d 1339 (Fed. Cir. 2002) ....................................... 4

*Columbia First Bank, F.S.B. v. United States,* 58 Fed. Cl. 333 (2003) ................................ 11, 12

*District of Columbia Redevelopment Land Agency v. Thirteen Parcels of Land,* 534 F.2d 337 (D.C. Cir. 1976) ........................................................................................................ 10

*Federated Stores Realty, Inc. v. Huddleston,* 852 S.W.2d 206 (Tenn. 1993).............................. 12

*Goodwyn v. United States,* 32 Fed. Cl. 409 (1994)......................................................................... 5

*Graef v. Chemical Leaman Corp.,* 106 F.3d 112 (5th Cir. 1997)................................................. 11

*Hendler v. United States,* 952 F.2d 1364 (Fed. Cir. 1991) ........................................................ 4, 5

*Hughes v. United States,* 953 F.2d 531 (9th Cir. 1991)........................................................ 12, 13

*Korean Air Lines Disaster of September 1, 1983,* 932 F.2d 1475 (D.C. Cir. 1991).................... 11

*Loretto v. Teleprompter Manhattan CATV Corp.,* 458 U.S. 419 (1982)....................................... 5

*Maine Yankee Atomic Power Co. v. United States,* 225 F.3d 1336 (Fed. Cir. 2000) ..................... 2

*McKay v. United States,* 199 F.3d 1376 (Fed. Cir. 1999)............................................................. 5

*Munoz v. Strahm Farms, Inc.,* 69 F.3d 501 (Fed. Cir. 1995)...................................................... 14

*Porter v. Resor,* 415 F.2d 764 (10th Cir. 1969).............................................................................. 4

*Rohmann v. United States,* 25 Cl. Ct. 274 (1992)........................................................................ 11

*Schmidt v. Internal Revenue Service,* 717 F. Supp. 763 (D. Kan. 1989).................................... 12

*Skip Kirchdorfer, Inc. v. United States,* 6 F.3d 1573 (Fed. Cir. 1993) ...................................... 4, 5

*Standard Havens Products, Inc., v. Gemcor Indus., Inc.,* 953 F.2d 1360 (Fed. Cir. 1992).......... 12

*State v. Foltin,* 930 S.W.2d 270 (Tex. App. 1996) ...................................................................... 12

*Tal'Wi-Wi Ranches v. United States,* 156 Ct. Cl. 700 (1962) ........ 4

*United States v. 10,031.98 Acres of Land,* 850 F.2d 634, 636 (8th Cir. 1988) ........ 10

*Upset Sale, Tax Claim Bureau of Montgomery County v. Whearcroft,* 278 A.2d 172 (Pa. Commw. Ct. 1971) ........ 12

*Yankee Atomic Elec. Co. v. United States,* 42 Fed. Cl. 223 (1998) ........ 2

**Rules**

Fed. R. Evid. 702 ........ 10

Fed. R. Evid. 802 ........ 9

Fed. R. Evid. 803(6) ........ 2, 9, 14

Fed. R. Evid. 803(8) ........ 2, 9, 11, 12

Fed. R. Evid. 902(1)-(2) ........ 13

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| YANKEE ATOMIC ELECTRIC COMPANY,<br>Plaintiff,<br>v.<br>UNITED STATES OF AMERICA,<br>Defendant. | No. 98-126 C<br>(Senior Judge Merow) |

**YANKEE ATOMIC'S OPPOSITION TO DEFENDANT'S**
**MOTION *IN LIMINE* REGARDING TAKINGS DAMAGES**

Yankee Atomic Electric Company ("Yankee Atomic") respectfully requests the Court to deny the government's February 19, 2004 Motion *In Limine* Regarding Takings Damages ("Motion") because (a) it is simply another attempt at getting rid of Yankee Atomic's takings claim without a trial, which this Court has rejected twice before; (b) it is moot with respect to the use of evidence regarding fair rental value ("FRV") because Yankee Atomic withdrew its FRV theory; and, (c) it is incorrect in arguing that Yankee Atomic cannot present certain evidence of fair market value ("FMV"), which is the measure of just compensation for its takings claim.[1]

The government's Motion mistakenly argues that Yankee Atomic's takings claim is one for a temporary taking, Motion at 6-8, and the government's evidentiary objections appear to be an afterthought in its Motion, *see id.* at 3-4. As explained more fully below, Yankee Atomic has properly asserted a claim for a permanent taking and can prove damages – measured by the property's FMV – through testimony of Thomas W. Bennet, Yankee Atomic's Vice-President

[1] Although the three Yankee utilities have typically submitted one, common pleading applicable to each of their cases, we are submitting separate responses because the government challenges distinct evidence proffered in each case.

and Chief Financial Officer, supported by local real estate tax assessments and other tax documents as further evidence of FMV. All the tax documents are admissible pursuant to Fed. R. Evid. 803(8), the public records and reports exception to the hearsay rule. All the tax documents are also admissible pursuant to Fed. R. Evid. 803(6), the business records exception to the hearsay rule. The evidence that will be presented in this regard will comprise a very small part of a seven-week trial.

## I. The Court Has Already Ruled That There Is Sufficient Evidence For Adjudicating Yankee Atomic's Takings Claim.

The government's Motion is its third attempt at getting rid of Yankee Atomic's takings claim without a trial, albeit on new grounds. The government initially moved on June 4, 1998, to dismiss the takings claim, along with Yankee Atomic's contract claim, basing its argument primarily on the disputes clause, but also attacking the merits of Yankee Atomic's takings claim. *See Yankee Atomic Elec. Co. v. United States,* 42 Fed. Cl. 223, 225, 229, 236 (1998). This Court denied the government's motion to dismiss, *id.* at 236, and the Federal Circuit affirmed that denial, *see Maine Yankee Atomic Power Co. v. United States,* 225 F.3d 1336 (Fed. Cir. 2000). Subsequently, this Court also denied the government's November 14, 2001 "Motion for Summary Judgment Upon Count III of Plaintiff's Complaint," *i.e.,* the takings claim, ("MSJ on Takings"), noting that an "examination of the evidence" made a dismissal of the takings claim "premature." Order of June 26, 2003, at 4-5.

In its current Motion, the government mischaracterizes the nature of Yankee Atomic's takings claim alleging, without any factual or legal support, that Yankee Atomic is asserting "a temporary taking, not a permanent taking." Motion at 6. The government's sole argument in support of this contention is that because Yankee Atomic "is claiming only a <u>partial</u> breach of contract," *id.* at 7 (emphasis in original), and its "damage model relies upon, and assumes,

DOE's future disposal of the waste . . . at some time in the future," *id.,* Yankee Atomic somehow is asserting only a temporary takings claim. This latter assertion (concerning Yankee Atomic's damages model) is not even true, as noted below at p. 5-7. More importantly, the government rested its failed MSJ on Takings on similar contract-based grounds, *see* MSJ on Takings at 2, 6-10, ignoring applicable case law on the issue, which fully supports Yankee Atomic's position, as discussed below. The Court, in its June 26, 2003 Order, already rejected essentially the same, contract-based arguments the government makes here, and concluded that "[t]he presence of issues regarding the government's long term policy with respect to the disposition of SNF and/or HLW . . . counsels against resolving the takings count in plaintiff's complaint prior to the conclusion of trial proceedings." Order of June 26, 2003, at 5.

## II. Yankee Atomic Has Properly Asserted A Permanent Takings Claim and Can Prove Damages By Introducing Evidence of Fair Market Value ("FMV").

### A. Yankee Atomic's Claim Is One For A Permanent Taking Because The Government Is Storing Nuclear Waste Indefinitely, and Perhaps Permanently, on Land Owned by Yankee Atomic in an ISFSI, Which is a Permanent, Fixed Structure

Yankee Atomic has asserted a permanent takings claim, not a temporary takings claim as alleged by the government. *See* Motion at 6-7. The gravamen of that claim is that the government has decided to store, indefinitely and perhaps permanently, Yankee Atomic's spent nuclear fuel ("SNF") and Greater-Than-Class-C ("GTCC") waste on about 12 acres of land owned by Yankee Atomic, in a permanent, fixed, dry storage structure, *i.e.,* an Independent Spent Fuel Storage Installation ("ISFSI"). *See* Appendix to Motion at 18-20.[2]

[2] The basis of Yankee Atomic's takings claim was fully briefed in its December 16, 2002 Opposition to the MSJ on Takings at 1-4, 11-18.

More than forty years ago, the Court of Claims held, unequivocally, that a taking that is "to be expected for the indefinite future . . . constitute[s] a permanent taking." *Tal'Wi-Wi Ranches v. United States,* 156 Ct. Cl. 700 (1962) (see paras. 25-26 of the decision); *see Armijo v. United States,* 229 Ct. Cl. 34, 663 F.2d 90, 93 (1981) (concluding that when a taking has "no prospect of going away in the foreseeable future" it is "the same as perpetuity"); *Porter v. Resor,* 415 F.2d 764, 765 (10th Cir. 1969) (stating in a takings case that an "indefinite period was permanent"). Thus, even if the government does remove the SNF and GTCC some day in the future, Yankee Atomic's claim remains one of a permanent taking because the ISFSI has been, is, and will remain for an *indefinite* period a substantial, major, physical intrusion on its land. Moreover, as discussed below, *see* pp. 5-7, DOE may *never* perform.

As the Federal Circuit explained in *Skip Kirchdorfer, Inc. v. United States,* 6 F.3d 1573, 1582 (Fed. Cir. 1993):

> A 'permanent' physical occupation does not necessarily mean a taking unlimited in duration. A 'permanent' taking can have a limited term. In *Hendler,* this court concluded that the distinction between 'permanent' and 'temporary' takings refers to the *nature of the intrusion,* not its temporal duration. A 'permanent' physical occupation, as distinguished from a mere temporary trespass, involves a substantial physical interference with property rights. (emphasis added).

In *Hendler v. United States,* 952 F.2d 1364, 1376-77 (Fed. Cir. 1991), the Federal Circuit similarly explained, "permanent does not mean forever" and, conversely, "the term 'temporary' . . . logically refers to those governmental activities which involve an occupancy that is transient and relatively inconsequential, and thus properly can be viewed as no more than a common law trespass." The Federal Circuit applied the same reasoning of *Hendler* in *Boise Cascade Corp. v. United States,* 296 F.3d 1339, 1356 (Fed. Cir. 2002).

In *Hendler,* the Federal Circuit found a permanent taking because the government placed groundwater-monitoring wells on the plaintiff's property. 952 F.2d at 1375-77. In reaching its conclusion, the Court explained,

> There is nothing 'temporary' about the wells the Government installed on plaintiffs' property, in the sense in which we used it in referring to the parked truck of the lunchtime visitor. Years have passed since the Government installed the first wells. The wells are some 100 feet deep, lined with plastic and stainless steel, and surrounded by gravel and cement. Each well was capped with a cement casing lined with reinforcing steel bars, and enclosed by a railing of steel pipe set in cement. These surveillance wells are at least as 'permanent' in this sense as the CATV equipment in *Loretto,* which comprised only a few cables attached by screws and nails and a box attached by bolts. 458 U.S. at 422, 102 S.Ct. at 3168. Nothing in the Government's activities suggests that the wells were a momentary excursion shortly to be withdrawn, and thus little more than a trespass. Nor does the . . . Government's subsequent actions disclose any indication of a timetable for withdrawal.

*Id.* at 1376 (*citing Loretto v. Teleprompter Manhattan CATV Corp.,* 458 U.S. 419 (1982)); *see also McKay v. United States,* 199 F.3d 1376, 1381-82 (Fed. Cir. 1999) (concluding that the installation of groundwater monitoring wells which remained on plaintiff's property "for several years" constituted a permanent taking). In *Skip Kirchdorfer,* the Court concluded that a permanent taking took place when the Navy took possession of plaintiff's warehouse for about three years because it was a "permanent physical occupation." 6 F.3d at 1577, 1582-83. In *Goodwyn v. United States,* 32 Fed. Cl. 409, 416-18 (1994), this Court concluded that the government's construction of a dike on the plaintiff's land was a permanent taking because the dike had an estimated life of between 25 to 50 years and "although the dike could be removed in much the same manner as it was built . . . removal was as a practical matter for plaintiffs, impossible."

In this case, the storage of SNF and GTCC on Yankee Atomic's land will be for an indefinite period of time, perhaps permanently, given the uncertainty of (1) when (if ever) DOE's

repository at Yucca Mountain will be ready to accept and dispose Yankee Atomic's nuclear waste; and (2) when (if ever) DOE will comply with its statutory obligation to dispose of commercial GTCC waste. The government's Motion forthrightly acknowledges this uncertainty, stating, "DOE *intends* to dispose of Yankee Atomic's SNF and HLW." Motion at 3 (emphasis added). What DOE "intends," however, may not happen. Indeed, the government does not even propose, in its proposed factual findings included in its pretrial submissions, that the Court find as a fact that DOE will perform in 2010 *or at any other time*.[3] Ultimately, DOE may never remove Yankee Atomic's SNF and GTCC waste, or may only remove it well beyond the 2010 date, perhaps decades later. In fact, the government has stated, both in deposition testimony by its fact witnesses and in documents, that the 2010 date for removal of SNF is uncertain and increasingly unlikely. The following are two key examples:

1. The General Accounting Office, in "Nuclear Waste: Technical, Schedule, and Cost Uncertainties of the Yucca Mountain Repository Project," issued in December 2001, concludes, after examining the state of the Yucca Mountain project, "DOE is unlikely to achieve its goal of opening a repository at Yucca Mountain by 2010 and currently does not have a reliable estimate of when, and at what cost, such a repository can be opened." A11.

2. Christopher A. Kouts, Director, Office of Systems Analysis and Strategy Development, Office of Civilian Radioactive Waste Management ("OCRWM") at DOE, the government's witness designated to testify "about DOE's *plan* to begin waste acceptance in

[3] The Government's "Amended Proposed Stipulations of Fact" only assert that DOE "plans" to begin acceptance by 2010. *See* ¶¶196-199. DOE has been making that claim at least since its 1998 Report to Congress, *see* "Viability Assessment of a Repository at Yucca Mountain: Overview," A49, 51. Of course, DOE has encountered substantial obstacles in meeting the 2010 date.

2010," *see* 02/19/04 Defendant's Witness List at 4-5 (emphasis added), testified at his deposition on June 4, 1999 as follows:

> Q. Do you believe it will be done by 2010?
>
> A. I can't really say.
>
> Q. Any particular reason why you can't say?
>
> A. It's predicated upon preceeding budgets, it's predicated upon many, many different variables. I think our schedules are reasonably based, but there are many variables associated with it.
>
> Q. What do you expect to happen? Do you expect that you will get the – budgetary all these variables will fall into the place and that the 2010 date will be met?
>
> A. I don't know. I couldn't say.

*See* 6/4/99 Kouts Tr. at 56:3-16, A3. Yankee Atomic, for its part, has never stated that DOE will remove its SNF on a date certain, but has only stated that removal of SNF could occur in "2010 at the earliest" based on the government's own pronouncements. *See* Appendix to Motion at 14 (¶145), 15 (¶162).

Like the monitoring wells in *Hendler* and *McKay*, and the dike in *Goodwyn*, the ISFSI that Yankee Atomic has built to store its SNF and GTCC waste is a permanent, physical structure. The ISFSI entailed significant up-front capital costs for its design, licensing, and construction, including dry storage casks. *See* Yankee Atomic Finding of Fact No. 174. Yankee Atomic's costs attributable to ISFSI construction and loading alone amount to more than $80 million. *See id.*

Thus, as far as can be ascertained at the present time, the government will require Yankee Atomic to use its land to store SNF and GTCC waste for the indefinite future, if not permanently, in an ISFSI, which is a large, concrete, fixed structure. *See* A93 (picture of Yankee Atomic's

ISFSI). Accordingly, Yankee Atomic has asserted a perfectly proper claim for a permanent taking.

B. The Government's Motion is Moot With Respect To Evidence Regarding Fair Rental Value.

The government's arguments urging the Court to "affirmatively dismiss Yankee Atomic's FRV claim from this litigation," Motion at 5-6, improperly characterizes a particular just compensation *theory* as a distinct claim. Moreover, this issue is a moot point. Yankee Atomic has withdrawn its FRV theory in its "Response to Defendant's July 3, 2003 Interrogatories, Requests for Admission And Requests for Production of Documents." *See* Response to Interrogatory 68, Appendix to Motion at 26-27. As the government acknowledges, *see* Motion at 5, Yankee Atomic unequivocally stated in its response to Interrogatory 68 that it has "decided not to pursue its fair rental value theory and will seek just compensation on its takings claim only in the amount of fair market value. Yankee Atomic will withdraw proposed stipulation 215 and amend proposed stipulation 217 to delete the phrase 'fair rental value or.'" Appendix to Motion at 26-27. This unequivocal response to a discovery request by the government constitutes a formal response regarding Yankee Atomic's intentions with respect to its FRV theory. Thus, the government's complaints that Yankee Atomic "has still not informed the Court of this fact," Motion at 5, or that it "declined to respond to the Government's discovery requests regarding this matter," *id.*, are unavailing and untrue. The issue is moot.

C. Yankee Atomic Is Entitled To Just Compensation Measured by Fair Market Value, and the Tax Bills In Question Are Admissible Supporting Evidence of Fair Market Value.

The government correctly notes that "[t]he just compensation for a permanent taking is generally the fair market value of the property." Motion at 6-7 (citing *Bass Enters. Prod. Co. v.*

*United States,* 133 F.3d 893, 895 (Fed. Cir. 1998)). As explained more fully below, Yankee Atomic, with Mr. Bennet as its representative, can offer testimony as to the value of its property. The government, moreover, is incorrect in arguing that a portion of Yankee Atomic's supporting FMV evidence, comprised of state real estate tax bills, Exhibit 1729, and an equalized valuation chart for Massachusetts's cities and town, Exhibit 1745 (together referred to as "tax evidence"), are not admissible. Motion at 8-11. All the tax documents evidence is admissible under Fed. R. Evid. 803(8), the public records exception to the hearsay rule, and the tax bills are admissible under Fed. R. Evid. 803(6), the business records exception to the hearsay rule.[4]

The tax evidence supports Yankee Atomic's claim that the fair market value of the land taken by the government for the construction of the ISFSI is "not less than $800 per acre." *See* Yankee Atomic Proposed Finding of Fact ¶216. Each tax bill, which assesses tax by legal parcel, provides information such as acres of land owned by Yankee Atomic and the dollar valuation placed on that particular parcel. *See* Appendix to Motion at 33-40. Adding the land values gives a total of $1,761,800. *Id.* Adding the acres owned gives a total of 2,230.11 acres. *Id.* Dividing the total land value by the number of acres gives a value of $790.05 per acre. The equalization chart, *Id.* at 41-54, indicates that the value given by the tax bills is the market value (Yankee Atomic's land is considered industrial property, which is also Class 4 property. *Id.* at 33-40, 41, 49. For the Town of Rowe, such land is assessed at an equalization ratio of 1.00 compared to other localities in Massachusetts, *id.* at 54, which is "market value," *id.* at 41.). Mr. Bennet's testimony will confirm, and build upon, this documentary evidence.

---

[4] Accordingly, the government's general hearsay objection to the tax bills under Fed. R. Evid. 802, *see* Motion at 8, is without merit.

1. Thomas W. Bennet Can Testify Regarding Market Value of Yankee <u>Atomic's Property</u>

Thomas W. Bennet, Yankee Atomic's Vice-President and Chief Financial Officer, who has been designated by Yankee Atomic to provide testimony regarding "valuation matters pertaining to the taking of Yankee Atomic's real property," *see* Yankee Atomic's Witness List at 1-2, will offer testimony regarding the value of the property taken by the government. As the property owner, it is axiomatic in American law that Yankee Atomic can offer such testimony. *See, e.g., United States v. 10,031.98 Acres of Land,* 850 F.2d 634 (8th Cir. 1988); *District of Columbia Redevelopment Land Agency v. Thirteen Parcels of Land,* 534 F.2d 337, 138 (D.C. Cir.1976). The Eighth Circuit observed, "[A]n owner, because of his ownership, is presumed to have special knowledge of the property and may testify as to its value. He may offer such testimony *without further qualification* [and] *is entitled* to the privileges of a testifying expert." *10,031.98 Acres of Land,* 850 F.2d at 636 (emphasis added). Moreover, in *10,031.98 Acres of Land,* the Court explained that corporate owners of land can offer testimony regarding land value through a designated corporate officer. 850 F.2d at 639, 639 n.4. In this case, the tax documents will provide one "basis" for Mr. Bennet's testimony, *id.* at 637, whether or not they are actually admitted into evidence. The advisory committee note to Fed. R. Evid. 702 fully incorporates property owners within the scope of expert testimony stating, "[W]ithin the scope of the rule are . . . 'skilled' witnesses, such as . . . landowners testifying to land values." The D.C. Circuit stated that there is a "policy in favor of permitting owners to testify as to the value of condemned property" because the owner "stands to gain or lose the most from the tribunal's determination of the value of his property." *Thirteen Parcels of Land,* 534 F.2d at 138. Accordingly, the government's objections to Mr. Bennet's testimony regarding the value of Yankee Atomic's land are without merit. *See* Motion at 9-11.

2. The tax records evidence is admissible as public records pursuant to Fed. R. Evid. 803(8)[5].

Yankee Atomic's tax records evidence is admissible pursuant to the public records exception to the hearsay rule, Fed. R. Evid. 803(8). In *Columbia First Bank, F.S.B. v. United States,* 58 Fed. Cl. 333, 339-40 (2003), this Court held that "[b]ecause public records are presumed to be trustworthy, '[t]he burden of proof concerning the admissibility of the public records is on the party *opposing* their introduction." *Id.*, 58 Fed. Cl. at 339 (emphasis added).[6] The government has completely failed to meet its burden here. The government has not presented even one argument on why the tax documents cannot be admitted as public records. It also does not question their authenticity. To the contrary, the government admits that the evidence "[a]rguably . . . could be admitted . . . pursuant to FRE 803(8) as public records/reports." Motion at 8-9.

In *Rohmann v. United States,* 25 Cl. Ct. 274, 282 (1992), the Claims Court, in several related tax refund cases filed by non-resident professional hockey players seeking a refund of taxes paid on income earned in Canada, admitted IRS certificates of assessment, which are comparable to Yankee Atomic's real estate tax bills at issue here, *see* Appendix to Motion at 33-

---

[5] Fed. R. Evid. 803(8) states, in pertinent part: "The following are not excluded by the hearsay rule, even though the declarant is available as a witness.... Records, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth (A) the activities of the office or agency, or (B) matters observed pursuant to duty imposed by law as to which matters there was a duty to report . . . or (C) in civil actions and proceedings . . . factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness."

[6] *See also Graef v. Chemical Leaman Corp.,* 106 F.3d 112, 117-118 (5th Cir. 1997), *as revised,* 1997 U.S. App. Lexis 12782 (finding, under both Fed. R. Evid. 803(8) and 803(6), that exclusion of an arbitration award as evidence was improper because appellee did not meet his burden of showing the award was untrustworthy); *In re Korean Air Lines Disaster of September 1, 1983,* 932 F.2d 1475, 1481-83 (D.C. Cir. 1991)(finding international agency's investigation report was properly admitted because appellant failed to carry its burden under Fed. R. Evid. 803(8) to demonstrate the report was untrustworthy).

40, pursuant to the public records exception of Fed. R. Evid. 803(8).[7] The Ninth Circuit, in *Hughes v. United States,* 953 F.2d 531, 539-40 (9th Cir. 1991), similarly admitted IRS certificates of assessment under Fed. R. Evid. 803(8)(B) of the public records exception because they qualify as "records, reports, . . . data compilations, in any form, of public offices or agencies, setting forth . . . matters observed pursuant to duty imposed by law as to which matters there was a duty to report . . . ."[8] Yankee Atomic's real estate tax bills, issued by the Massachusetts Office of the Collector of Taxes, and the equalized valuation chart, issued by the Massachusetts Department of Revenue, are unquestionably public records that are admissible pursuant to Fed R. Evid. 803(8). *See, e.g., Federated Stores Realty, Inc. v. Huddleston,* 852 S.W.2d 206, 215 (Tenn. 1993)(finding that a tax manual published by the Multistate Tax Commission was properly admitted pursuant to the public records exception to the hearsay rule); *State v. Foltin,* 930 S.W.2d 270, 271-73 (Tex. App. 1996)(finding that real estate tax statements should have been admitted by the trial court pursuant to the public records exception to the hearsay rule); *In re Upset Sale, Tax Claim Bureau of Montgomery County v. Whearcroft,* 278 A.2d 172, 175 (Pa. Commw. Ct. 1971)(admitting an application prepared by the Tax Claim Bureau pursuant to the public records exception to the hearsay rule).

Moreover, the government is simply wrong to argue that the tax records evidence can only be admitted by "a witness that can lay the proper foundation," Motion at 9, *i.e.,* "a representative of the Town of Rowe, Office of the Collector of Taxes" for the tax bills, *id.* at 10,

---

[7] *See also Standard Havens Products, Inc., v. Gemcor Indus., Inc.,* 953 F.2d 1360, 1371-72 (Fed. Cir. 1992) (affirming the admission of a Certificate of Correction as a public record because it was part of a patent); *Columbia First Bank, supra,* 58 Fed. Cl. at 339-40 (admitting a government regulator's report under the public records exception).

[8] *See also Schmidt v. Internal Revenue Service,* 717 F. Supp. 763, 764 (D. Kan. 1989)(finding that IRS certificate of assessments and payments was admissible evidence pursuant to Fed. R. Evid. 803(8)).

and “a representative of the Massachusetts Department of Revenue” for the Massachusetts equalized valuation chart, *id.* Domestic public records, such as Yankee Atomic’s tax evidence here, are self-authenticating pursuant to Fed. R. Evid. 902. *See, e.g., Hughes, supra,* 953 F.2d at 540; Fed. R. Evid. 902(1) (under seal); Fed. R. Evid. 902(2) (not under seal). Thus, no witness is required to authenticate public records like the tax records evidence. *See* Fed. R. Evid. 902(1)-(2).[9]

The tax records evidence, accordingly, can be admitted into evidence pursuant to the public records exception to the hearsay rule and is self-authenticating.

[9] If necessary, Yankee Atomic will obtain the proper seal or certification of the tax records prior to admitting them into evidence. However, Yankee Atomic hopes that the government will cooperate and make that exercise unnecessary.

3. The tax bills are admissible under the business records exception to the hearsay rule, Fed. R. Evid. 803(6).

The government's arguments that the tax bills cannot be admitted pursuant to the business records exception to the hearsay rule, Fed. R. Evid. 803(6), [10] because "proper foundation," Motion at 9, can only be given by "a representative of the Town of Rowe, Office of the Collector of Taxes," Motion at 10, are also wrong. The Federal Circuit has squarely held that pursuant to Fed. R. Evid. 803(6), "a document prepared by a third party[, here Massachusetts,] is properly admitted as part of the business entity's records[, here Yankee Atomic,] if the business integrated the document into its records and relied upon it." *Air Land Forwarders, Inc. v. United States,* 172 F.3d 1338, 1342 (Fed. Cir. 1999). In *Air Land Forwarders,* the Federal Circuit held,

> "Rule 803(6) does not require that the document actually be prepared by the business entity proferring the document. Rather . . . two factors indicating reliability . . . would allow an incorporated document to be admitted based upon the foundation testimony of a witness with first-hand knowledge of *the record keeping procedures of the incorporating business*, even though the business did not actually prepare the document. The *first factor* is that the incorporating business rely [sic] upon the accuracy of the document incorporated and the *second* is that there are other circumstances indicating trustworthiness of the document.

172 F.3d at 1343 (emphasis added).[11] Indeed, in *Rohmann v. United States,* 25 Cl. Ct. 274, 281-82 (1992), the Claims Court admitted into evidence IRS certificates of assessment, notices of disallowance, and other IRS documents under Fed. R. Evid. 803(6).

---

[10] Fed. R. Evid. 803(6) states, in pertinent part: "A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record or data compilation, all as shown by the testimony of the custodian or other qualified witness, or by certification that complies with Rule 902(11), Rule 902(12), or a statute permitting certification, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. . . ."

[11] *See also Munoz v. Strahm Farms, Inc.,* 69 F.3d 501, 503 (Fed. Cir. 1995) (admitting photographs produced by a third party pursuant to Fed. R. Evid. 803(6) because they were

Here, the tax bills are part of the business records of Yankee Atomic, and both of the reliability factors required by *Air Land Forwarders* have been met. First, Yankee Atomic relied on the accuracy of the tax bills in the regular course of its business operations and paid the tax bills. *See* Appendix to Motion at 33-54. The bills contain detailed information including a legal description of the land, its size, and its value. Each of the bills were stamped "Received" and each of them also contains a handwritten note, "OK to pay," the initials of the authorizing person, "AJJ," and presumably the date of authorization to pay, "4/8/01." Second, real estate tax bills issued by the Massachusetts Office of the Collector of Taxes are clearly and unquestionably public records. *See discussion supra* at Section II.C.2. These records, issued by a state government, are reliable and satisfy the second reliability factor of *Air Land Forwarders.* Moreover, as discussed previously on p. 11, the government has not questioned the authenticity of the tax bills.

Mr. Bennet will testify regarding "the record keeping procedures of the incorporating business," *Air Land Forwarders,* 172 F.3d at 1343, *i.e.,* of Yankee Atomic. Mr. Bennet has been designated by Yankee Atomic to provide testimony regarding the "general management of Yankee Atomic" including "finance and accounting matters" and "valuation matters pertaining to the takings of Yankee Atomic's real property." *See* Yankee Atomic's Witness List at 1-2.

Accordingly, the tax bills are admissible pursuant to the business records exception to the hearsay rule.

(continued)

"reliable[]" and "sufficient foundational testimony to satisfy the requirements of the exception" were provided by the testimony of the custodian of the photos).

## III. Conclusion

Accordingly, for the reasons set forth above, Yankee Atomic respectfully requests the Court to deny the government's "Motion *in Limine* Regarding Takings Damages," and permit Yankee Atomic to introduce evidence regarding the fair market value of its takings damages.

Respectfully submitted,

s/ Jerry Stouck

Date: April 16, 2004

JERRY STOUCK
Spriggs & Hollingsworth
1350 I Street, N.W., Ninth Floor
Washington, D.C. 20005
(202) 898-5800 (phone)
(202) 682-1639 (fax)

COUNSEL FOR PLAINTIFF
YANKEE ATOMIC ELECTRIC COMPANY

Of Counsel:

Robert L. Shapiro
Vivek K. Hatti
SPRIGGS & HOLLINGSWORTH