IN THE UNITED STATES COURT OF FEDERAL CLAIMS

YANKEE ATOMIC ELECTRIC COMPANY,

Plaintiff,

v.

UNITED STATES OF AMERICA,

Defendant.

No. 98-126 C
(Senior Judge Merow)

YANKEE ATOMIC'S OPPOSITION TO THE GOVERNMENT'S MOTION *IN LIMINE* TO PRECLUDE FRANK C. GRAVES EXPERT TESTIMONY REGARDING EXCHANGES

JERRY STOUCK
Spriggs & Hollingsworth
1350 I Street, N.W., Ninth Floor
Washington, D.C. 20005
(202) 898-5800
(202) 682-1639 (facsimile)

Counsel for Plaintiff,
YANKEE ATOMIC ELECTRIC COMPANY

Of Counsel:

Robert L. Shapiro
SPRIGGS & HOLLINGSWORTH

Dated: April 16, 2004

# TABLE OF CONTENTS

Page

I. YANKEE ATOMIC'S TRIAL PRESENTATION WILL PROVIDE AMPLE EVIDENCE FROM WHICH THE COURT CAN MAKE A FAIR AND REASONABLE ESTIMATE OF ITS DAMAGES....2

A. Yankee Atomic's Trial Presentation Will Provide Ample Evidence of It's Damages, and Mr. Graves' Testimony is Limited to a Narrow Area Supporting Yankee Atomic's Damages Claim. ....2

B. The Reasonable Certainty Test Is Inapplicable to Both Yankee Atomic's Claim for Damages And Mr. Graves' Model of Exchanges. ....6

II. THE GOVERNMENT'S SPECIFIC OBJECTIONS TO MR. GRAVES' MODEL OF EXCHANGES ARE WITHOUT MERIT....9

A. Mr. Graves Appropriately Did Not Attempt to Identify Specific Exchanges. ....9

B. The Ramp-up Rate Employed By Mr. Graves Is Reasonable. ....14

C. The Spent Fuel Storage Costs Used by Mr. Graves Are Reasonable. ....17

III. CONCLUSION....18

# INDEX TO APPENDIX


Description — Page

Expert Witness Report of Frank C. Graves .......... 0001

Expert Witness Report of Kenneth T. Wise 2003.......... 0048

Expert Witness Report of Dr. John W. Bartlett .......... 0068

Proceedings of the 1983 Civilian Radioactive Waste Management Information Meeting (Dec. 12-15, 1983).......... 0090

Expert Witness Report of Ivan F. Stuart.......... 0093

Civilian Radioactive Waste Management System Requirements Document, Revision 05, DOE/RW-0406 (Jan. 1995) [Excerpts].......... 0121

Deposition Transcript of Dr. John W. Bartlett (8/26/03) [Excerpts] .......... 0124

Letter from Dreyfus (DOE) to Kadak (Yankee Atomic), (YDK-006-1064) of 9/28/95 .......... 0128

Expert Report of R. Larry Johnson 2004 [Excerpts] .......... 0129

Frank C. Graves Deposition Transcript (11/12/01, 11/13/01, 11/14/01, 1/03/02) [Excerpts] .......... 0134

Hearing Transcript from August 6, 2001 [Excerpts] .......... 0169

Expert Witness Report of Charles W. Pennington.......... 0175

# TABLE OF AUTHORITIES

Page

Cases

*Ace-Federal Reporters, Inc. v. Barram*, 226 F.3d 1329 (Fed. Cir. 2000) .......................... 6, 13, 17

*Bluebonnet Sav. Bank v. United States*, 266 F.3d 1348 (Fed. Cir. 2001) ...................................... 7

*Castle v. United States*, 48 Fed. Cl. 187 (2000), *aff'd in part, rev'd in part*, 301 F.3d 1328 (Fed. Cir. 2002)........................................................................................ 9

*Commonwealth Edison Co. v. United States*, 56 Fed. Cl. 652 (2003) ........................................... 3

*Confederated Tribes of the Warm Springs Reservation of Oregon v. United States*, 248 F.3d 1365 (Fed. Cir. 2001)........................................................................................ 7

*Energy Capital Corp. v. United States*, 302 F.3d 1314 (Fed. Cir. 2002).............................. passim

*Fifth Third Bank of Western Ohio v. United States*, 55 Fed. Cl. 223 (2003)................................ 13

*Locke v. United States*, 283 F.2d 521 (Ct. Cl. 1960) ..................................................... 6, 7, 13, 17

*Massachusetts Bay Transp. Auth. v. United States*, 129 F.3d 1226 (Fed. Cir. 1997).................. 18

*Orange Cove Irrigation Dist. v. United States,* 28 Fed. Cl. 790 (1993) ..................................... 11

*Pac. Far East Line, Inc. v. United States,* 394 F.2d 990 (Ct. Cl. 1968) ...................................... 11

*S. Nat'l. Corp. v. United States*, 57 Fed. Cl. 294 (2003) ........................................................... 13

*Seabord Lumber Co. v. United States*, 308 F.3d 1283 (Fed. Cir. 2002).......................... 6, 7, 8, 16

*Tyger Constr. Co., Inc. v. Pensacola Constr. Co.*, 29 F.3d 137 (4th Cir. 1994) .................... 15, 16

*Tymshare, Inc. v. Covell*, 727 F.2d 1145 (D.C. Cir. 1984)......................................................... 12

Regulations

48 Fed. Reg. 16590 (Apr. 18, 1983) ......................................................................................... 4, 5

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| YANKEE ATOMIC ELECTRIC COMPANY,<br>Plaintiff,<br>v.<br>UNITED STATES OF AMERICA,<br>Defendant. | No. 98-126 C<br>(Senior Judge Merow) |

YANKEE ATOMIC'S OPPOSITION TO THE GOVERNMENT'S MOTION *IN LIMINE* TO PRECLUDE FRANK C. GRAVES EXPERT TESTIMONY REGARDING EXCHANGES[1]

The government moves to preclude Yankee Atomic from presenting evidence from one of its experts, Frank Graves. Mr. Graves' expert report notes two parts to his analysis in this case: (1) an assessment of a reasonable aggregate acceptance rate for DOE's acceptance of spent fuel from all utilities,[2] and (2) a determination of the date by which DOE would be finished removing spent fuel from Yankee Atomic by modeling the performance of a market for exchanges of acceptance slots in which each participant pursues its own economic interest. *See* A2-3. The government's motion appears to only address the second part of Mr. Graves' analysis. Although acknowledging that Mr. Graves' analysis "is very appealing as a model of

[1] This Opposition should also be deemed applicable to Connecticut Yankee Atomic Power Co. v. United States, No. 98-154C and Maine Yankee Atomic Power Co. v. United States, No. 98-474C.

[2] As the Court is aware, Yankee Atomic's position is that DOE would have picked up the company's GTCC waste along with its spent fuel absent the breach. Consistent with that position, we will use the term "spent fuel" to refer to both spent fuel and GTCC waste.

*economic* performance by parties to the Standard Contract," Govt. Mot. at 12 (emphasis in original), the government nevertheless claims that Mr. "Graves' theory and model of exchanges is too speculative to support the award of damages . . ." *Id.* at 21. The government's motion, however, is less a serious effort to explain why the Court should not even hear testimony from Mr. Graves regarding his model of exchanges than it is a vehicle to air whatever gripes with Mr. Graves' model that the government has been able to muster. Moreover, the various gripes raised by the government are without merit.

## I. YANKEE ATOMIC'S TRIAL PRESENTATION WILL PROVIDE AMPLE EVIDENCE FROM WHICH THE COURT CAN MAKE A FAIR AND REASONABLE ESTIMATE OF ITS DAMAGES

### A. Yankee Atomic's Trial Presentation Will Provide Ample Evidence of It's Damages, and Mr. Graves' Testimony is Limited to a Narrow Area Supporting Yankee Atomic's Damages Claim.

At trial Yankee Atomic will present substantial evidence establishing its damages. Primarily, this evidence will consist of testimony and documentary evidence setting out the various expenditures Yankee Atomic has made to store its spent fuel due to the government's breach. These costs include the costs of operating its spent fuel pool for an extended period; the cost of building an Independent Spent Fuel Storage Installation ("ISFSI"), including the cost of transferring its spent fuel from its pool to the ISFSI; and the cost of maintaining the spent fuel in the ISFSI, including the cost of maintaining the existence of the company long after it otherwise could have completed its affairs. *See* A52-53. The great majority of these expenses have already been incurred, *id.* A53, and the government has been able to audit these expenses down to reviewing individual invoices.

The part of Mr. Graves' expert witness report challenged by the government's motion addresses a fairly narrow part of the inquiry into the timing of when Yankee Atomic's spent fuel

would have been removed absent the government's breach. Yankee Atomic need not and does not intend to establish precisely how much spent fuel DOE would have removed from utilities each year starting in 1998 or exactly the order in which DOE would accept such waste. But Yankee Atomic will present evidence establishing that its claimed damages are appropriately attributable to the government's breach. Among other evidence, Yankee Atomic will present evidence showing that, absent that breach, the government would have removed its spent fuel promptly after 1998, therefore obviating the need for additional spent fuel management expenses that constitute the bulk of Yankee Atomic's damages. This Court has already rejected the government's arguments that absent the breach it need only have accepted one fuel element from one utility, or that it need only have accepted as much spent fuel as the government chose to approve in delivery commitment schedules or that it only would have to accept spent fuel at a rate it set out in the last Annual Capacity Report ("ACR") it chose to publish. *See* Order of June 26, 2003, adopting opinion in *Commonwealth Edison Co. v. United States*, 56 Fed. Cl. 652 (2003). Instead, the Court held that the parties' contract did not set a rate of spent fuel acceptance or establish a date by which the government was required to complete accepting Yankee Atomic's spent fuel and that the Court must, therefore, supply a reasonable term. *Id.*

As evidence of such a reasonable term, Yankee Atomic will present substantial evidence, including: (1) testimony from Loring Mills, a negotiator of the Standard Contract on behalf of utilities; (2) testimony from John Bartlett, a former director of the Office of Civilian Radioactive Waste Management ("OCRWM"), A72-73; and (3) exhibits showing the understanding of other government officials, including Robert Morgan, the first acting director of the government's spent fuel program, that the parties intended that starting in 1998, DOE would accept spent fuel

from utilities at a sufficient rate to enable utilities to avoid incurring costs from either constructing additional spent fuel storage facilities at utility sites or extending the storage of spent fuel at the sites of shut-down reactors. *See, e.g.*, A91. Yankee Atomic will also present testimony from Mr. Graves and Dr. Bartlett that an acceptance rate of 3,000 MTU per year would generally have been efficient and would have enabled the avoidance of most of the utility costs noted above. *See* A76-77, A7-8. This testimony will be bolstered by testimony from Ivan Stuart, an expert on the transportation of spent fuel, and by numerous government reports attesting to the fact that an acceptance rate of 3,000 MTU per year would have been reasonable and readily attainable. *See, e.g.,* A94; *Civilian Radioactive Waste Management System Requirements Document*, *Revision 05*, DOE/RW-0406 (January 1999) ("*Requirements Document*") A123.

Yankee Atomic will also present substantial evidence that regardless of exactly how much waste DOE removed from utilities each year starting in 1998, DOE would have removed Yankee Atomic's spent fuel without delay. First, the parties' contract specifically provided for priority for shut down reactors. *See* Art. VI.B.1.(b). As DOE explained in its Final Rule promulgating the terms of the contract, such priority was important to ensure that shut down reactors would not have to wait extended periods to have all of their spent fuel accepted by DOE. *See* 48 Fed. Reg. 16590, 16593. (Apr. 18, 1983). *See also* Yankee Atomic's Opposition to Government Motion for Partial Summary Judgment Regarding Priority for Shutdown Reactors. Second and alternatively, the parties' contract provides for exchanges of approved delivery commitment schedules whereby Yankee Atomic would have purchased the rights to have DOE remove its spent fuel promptly after 1998. Art. V.E. Mr. Mills will present testimony that this

exchange provision was important to utilities and that it would have enabled utilities to arrange the acceptance of their spent fuel efficiently. Dr. Bartlett will testify that when he was director of OCRWM, he expected DOE to liberally approve such exchanges. *See* A80. He will also testify at trial (and has already done so at this deposition) that "no one ever expected [oldest fuel first] to be used as an actual implementation method" for spent fuel acceptance. *See* A125-126. Ivan Stuart will testify that DOE readily could have accommodated such exchanges in developing a program for actual spent fuel removal. *See* A101. And in its Final Rule promulgating the terms of the Standard Contract, DOE explained that the provision for such exchanges was sufficiently important and uncontroversial that its addition was one of the few changes made to the draft contract terms by the Final Rule. *See* 48 Fed. Reg. at 16592. Indeed, another former director of OCRWM explained the agency's view that these exchanges would have enabled utilities, including Yankee Atomic, to "optimize" the timing of DOE's removal of spent fuel from their plants. *See* A128.

The part of Mr. Graves' work challenged by the government's motion provides a reasonable estimate, based on established economic principles, of how such an exchange process would have influenced the timing of DOE's acceptance of Yankee Atomic's spent fuel.[3] Significantly, the government has elected not to present at trial any evidence of a competing estimate of how the exchange process would have worked absent the breach. As explained in his

---

[3] Mr. Graves' model also produces an estimate of the costs of exchanges absent the breach. The government implies that the net gains for such exchanges shown by Mr. Graves' model for Connecticut Yankee and Maine Yankee are part of these companies' claims for damages. Govt. Mot. at 6-7. That is wrong. Although such net costs are deducted from Yankee Atomic's claim for damages, the net gains from exchanges shown by Mr. Graves' model for Connecticut Yankee and Maine Yankee are *not* added to those companies' damage claims.

report, Mr. Graves' model of exchanges is based upon ordinary market structure and price formation prevalent throughout the economy whereby market participants pay up to their avoidable storage costs for improving their position in the acceptance sequence. *See* A13 ("Those Purchasers with the greatest impending, hence avoidable, costs will have the greatest willingness to pay and will buy slots to achieve earlier removal. Those with less pressing needs will wait and/or sell their slots.").

B. The Reasonable Certainty Test Is Inapplicable to Both Yankee Atomic's Claim for Damages And Mr. Graves' Model of Exchanges.

The government argues that the requirements of "reasonable certainty" apply both to Yankee Atomic's claim of damages, *see* Govt. Mot. at 8-9, and to Mr. Graves' model of exchanges. *See* Govt. Mot. at 11. The government's argument is contrary to controlling legal precedent. The Federal Circuit and its predecessor have long and consistently held that "if a reasonable probability of damage can be clearly established, uncertainty as to the amount will not preclude recovery,' and the [court's] duty is to 'make a fair and reasonable approximation of the damages.'" *Ace-Federal Reporters, Inc. v. Barram*, 226 F.3d 1329, 1333 (Fed. Cir. 2000), *quoting Locke v. United States*, 283 F.2d 521, 524 (Ct. Cl. 1960); *see also Seabord Lumber Co. v. United States*, 308 F.3d 1283, 1302 (Fed. Cir. 2002).

Under the government's pretrial submissions directed by this Court's pretrial order, the government has already acknowledged that Yankee Atomic is entitled to very substantial damages in this case. The government's positions regarding Yankee Atomic's damages are set out in the February 19, 2004 Expert Report of R. Larry Johnson. The Summary Calculations in that report admit that Yankee Atomic is entitled to substantial damages under every scenario, except scenario 1. *See* A133. And scenario 1 is based on use of the same 1995 ACR rates that

this Court properly rejected in its June 26, 2003 Order denying the government's motion for partial summary judgment on the rate of spent fuel acceptance. *See* A131.[4]

Therefore, Yankee Atomic's evidence of damages "need only be 'sufficient to enable a court or jury to make a fair and reasonable approximation.'" *Seabord Lumber*, 308 F.3d at 1302, *quoting Specialty Assembling & Packing Co. v. United States*, 355 F.2d 554, 572 (Ct. Cl. 1966). The Federal Circuit has cautioned that "[t]he amount of damages need not be 'ascertainable with absolute exactness or mathematical precision.'" *Seabord Lumber*, 308 F.3d at 1302, *quoting Elec. and Missile Facilities, Inc. v. United States*, 416 F.2d 1345, 1358 (Ct. Cl. 1969). And the Federal Circuit has not hesitated to reverse trial court decisions refusing to award damages on grounds that damage would be speculative in the face of clear government liability. *See Bluebonnet Sav. Bank v. United States*, 266 F.3d 1348, 1355 (Fed. Cir. 2001) (reversing trial court award of no damages after finding government liable for breach of contract); *Confederated Tribes of the Warm Springs Reservation of Oregon v. United States*, 248 F.3d 1365, 1372 (Fed. Cir. 2001) (reversing trial court's determination that award of damages would be speculative after finding breach of fiduciary duty). Furthermore, the Federal Circuit has upheld cases where the trial court finds damages by drawing "reasonable inferences based upon the evidence." *Energy Capital Corp. v. United States*, 302 F.3d 1314, 1329 (Fed. Cir. 2002), *citing Locke*, 283 F.2d at 524 (" . . . we may act upon probable and inferential as well as direct and positive proof.").

---

[4] The Johnson report also references a possibility of no damages under scenario 2. But scenario 2 is based on something that hasn't happened – Yankee Atomic continuing to store its spent fuel in a wet pool, as opposed to having moved the spent fuel into an ISFSI. *See* A132.

Moreover, the "fair and reasonable approximation" standard applies to a damage claim as a whole, not to subsidiary facts contributing to such an estimate. *See Seaboard Lumber*, 308 F.2d at 1302 (affirming trial court's crediting of expert testimony to estimate impact of government changes applying "fair and reasonable approximation" standard to entire damage determination, not consideration of testimony by individual experts). Since Mr. Grave's model of exchanges has only a limited role in Yankee Atomic's fair and reasonable approximation of its damages, no specialized standard of proof is independently applicable to its admission into evidence and consideration. Instead, Mr. Graves' model is simply part of Yankee Atomic's showing, by a preponderance of the evidence, of when DOE would have completed removing Yankee Atomic's spent fuel absent the breach. And since the government proffers no alternative model of how the exchange process would have worked, Yankee Atomic should prevail on this issue.

The government also wrongly seeks to apply standards from the *Winstar* cases to Mr. Graves' model of exchanges. *See* Govt. Mot. at 10. But as the government acknowledges, those *Winstar* claims were "often based solely upon the opinion presented by plaintiffs' experts and nothing more." As explained above, Yankee Atomic's damages claim bears no resemblance to such *Winstar* claims.

Also contrary to the government's claims, *see* Govt. Mot. at 20, Yankee Atomic is not precluded from including exchanges of spent fuel acceptance allocations in its approximation of its damages simply because the magnitude of the government's breach has led to an absence of actual experience of exchanges among utilities. The Federal Circuit has made clear that even claims for lost profits by new ventures (and Yankee Atomic is, of course, not presenting a lost

profits claim) are not inherently speculative. *See Energy Capital Corp.*, 302 F.3d at 1324-28 (affirming lost profits award based on complete facts and rejecting government contention that such profits are speculative as a matter of law for "a new business that had never been performed").[5]

## II. THE GOVERNMENT'S SPECIFIC OBJECTIONS TO MR. GRAVES' MODEL OF EXCHANGES ARE WITHOUT MERIT

The government makes three more specific objections to Mr. Graves' model of exchanges: (1) the absence of specific exchanges between Yankee Atomic and other contract holders, Govt. Mot. at 12, (2) the use of a particular ramp-up rate for the acceptance of spent fuel, *id.* at 16, and (3) the use of a single cost of continued storage of spent fuel to derive all utilities' willingness to pay for earlier removal of spent fuel by DOE. *Id.* at 18. None of these objections are meritorious, much less grounds for the Court to exclude testimony from Mr. Graves.

### A. Mr. Graves Appropriately Did Not Attempt to Identify Specific Exchanges.

The government claims that the "largest problem with Dr. Graves' model is the failure to model specific exchanges between the Yankees and other contract holder with allocations in the first years of SNF acceptance." *Id.* at 12. The government acknowledges that the parties' contract provides for exchanges of approved delivery commitment schedules among contract

---

[5] *Castle v. United States*, 48 Fed. Cl. 187 (2000), *aff'd in part, rev'd in part*, 301 F.3d 1328 (Fed. Cir. 2002), cited by the government, Govt. Mot. at 19, is not to the contrary. The court did not reject plaintiff's damage claim there because it was based upon a new venture. Rather, the claim was rejected because, after examining all of the evidence, the Court found that various assumptions in the damages model were contrary to the facts in the record. *E.g.,* 48 Fed. Cl. at 208 (rejecting assumption that credit quality of bank's loan portfolio would remain unchanged during period of significant downturn in the economy).

holders, but the government claims that Mr. Graves' model is not consistent with this structure. *Id.* The government describes Mr. Graves' model as one where "all the contract holder come together, dump their allocations into a common pool, and then reallocate them based upon the cost assumes that Dr. Graves has provided . . ." A13.

The government cites neither Mr. Graves' expert witness report nor his deposition transcript as support for these claims, and the government claims are wrong. Mr. Graves makes clear in his report his understanding that spent fuel acceptance "[s]lots would be bought and sold among Purchasers . . ." A12. And he explains that the results of his Economic Sequence Model for the Non-Breach World estimate "which Purchasers would have bought and sold the necessary swaps of acceptance slots, and the prices that would have been paid for those swaps . . ." A13. Mr. Graves explains further that "[a] market that performs in this manner [of his model] could be implemented by a last-bid auction procedure, or it could be the result of active, visible bilateral trading" (not a "dumping" of allocations). A14. Mr. Graves confirmed the nature of his model during his deposition, testifying that the particular sort of visible, bilateral trading consistent with his model could be characterized by "a web-based bulletin board to let partes interested in trading post bids and ask for swaps." A149. Mr. Graves testified further that this is "not an uncommon mechanism." A150-151. In short, Mr. Graves' expert witness report and deposition testimony makes clear (as will his trial testimony) that his opinions are fully in accord with the mechanisms for exchanges in the parties' contract.

The government also complains that the absence of specific swaps in Mr. Graves' model has hindered the government's ability to challenge his model based on non-economic factors, such as political opposition to swaps that could have influenced utility behavior. *See* Govt. Mot.

at 14.[6] Of course, Yankee Atomic is not obligated to structure its damage claim in a manner to facilitate government attacks. The government has been free to gather and develop whatever evidence it may deem relevant to argue, if it is so inclined, that the sorts of exchanges modeled by Mr. Graves are unrealistic. Indeed, after reviewing Mr. Graves' June 1999 expert witness report, the government indicated an intent to take discovery from other utilities as to whether they would have exchanged acceptance allocations with Yankee Atomic. *See* A172-173. Ultimately, however, either the government was unable to muster such evidence or decided not to pursue it, because there is no indication of such evidence from other utilities in the government's pretrial submissions.

The government also complains that the absence of specific exchanges hinders its ability to argue that DOE would not have approved such exchanges in the non-breach world, emphasizing that the contract grants DOE the right to approve or disapprove exchanges in its sole discretion. Govt. Mot. at 15. Mr. Graves testified, however, that he merely assumed that DOE would not unreasonably disallow exchanges. *See* A135-136. And the law is clear that even when a contract allows one party discretion to do something, the party "must exercise his discretion reasonably and may not do so arbitrarily or capriciously." *See, e.g., Pac. Far East Line, Inc. v. United States,* 394 F.2d 990, 998 (Ct. Cl. 1968); *see also Orange Cove Irrigation Dist. v. United States,* 28 Fed. Cl. 790, 800-01 (1993) (discretion must be exercised "honestly to effectuate the object and purpose the parties had in mind in providing for the exercise."), *see also*

[6] The government cites pages from Mr. Graves' deposition transcript, A164-167, as supposedly noting the sorts of factors to which the government is referring, but the cited pages do no address that issue.

*Tymshare, Inc. v. Covell*, 727 F.2d 1145, 1154 (D.C. Cir. 1984) (requiring that exercise of "sole discretion" not be made so as to deprive a contracting partner of a fairly agreed benefit under the parties' contract). The government is free at trial to present whatever evidence it can muster regarding its approval of exchanges, but such evidence ultimately goes to the weight of the evidence presented by Mr. Graves, not the admissibility of his opinion. *See Energy Capital Corp.*, 302 F.3d at 1329 (rejecting government argument that damage award was speculative because it depended, in part, upon the need for Fannie Mae approval of certain transactions as well as consent of third parties, holding that this Court could draw reasonable inferences based on all of the evidence to arrive at its findings regarding the consent of third-parties and Fannie Mae). As noted above, Yankee Atomic will present substantial testimony and documentary evidence at trial that exchanges would have been readily approved.

The government also complains that Mr. Graves' model does not consider "delayed acceptance of non-standard fuel" or DOE not accepting GTCC waste, *see* Govt. Mot. at 15.[7] But the government does not even make an argument as to how Mr. Graves' model should have differed on this issue.[8]

---

[7] Yet again, the citation to Mr. Graves' deposition transcript in the government's motion, A164-167, does not support this argument.

[8] The government also asserts that Mr. Graves acknowledged that a utility's demand for exchanges could be affected by a utility being required to store spent fuel for a longer period due to technical issues. Govt. Mot. at 15. Once again, however, the cited pages to the transcript of Mr. Graves' deposition, A139-146, do not address the government's claim. Rather, in this section of his transcript, Mr. Graves answers a government hypothetical question as to how the results of his model might differ if the parties' contract required spent fuel to "cool" for ten years (as opposed to the five year term in the contract, App. E.3.) after discharge before being accepted by DOE.

The government asserts that this Court has previously rejected damage models because they failed to identify specific transactions that would have been engaged in absent the breach. *See* Govt. Mot. at 15, *citing*, *Fifth Third Bank of Western Ohio v. United States*, 55 Fed. Cl. 223 (2003) and *S. Nat'l. Corp. v. United States*, 57 Fed. Cl. 294 (2003). The government has misread those decisions. As Judge Miller (the Judge in both cases) explained her *Fifth Third* decision in *S. Natl.*, the plaintiffs' damage expert "was not faulted for failing to name names; rather . . . he did not identify any type or category of activity, opportunity, or investment [in which the plaintiff would have engaged absent the breach]." 57 Fed. Cl. at 304. That is not the situation here, where Mr. Graves' analysis makes clear the type of activity – exchanges for earlier acceptance allocations, based on established economic principles – in which Yankee Atomic would have engaged absent the breach.

Indeed, the Federal Circuit and its predecessor has made clear on multiple occasions that a plaintiff's proof of damages need not specify exactly which transactions would have transpired absent a government breach. *See, e.g., Ace Federal Reporters*, 226 F.3d at 1333 (approving award of damages for hearing transcription services without any specification of which hearings plaintiff would have transcribed absent the breach); *Energy Capital*, 302 F.3d at 1329 (affirming award of damages based on lost profits from loaning money without identifying exactly what loans would have been made absent the breach); *Locke v. United States*, 283 F.2d at 524-525 (approving award of damages for lost typewriter-repair business without requiring proof of exactly which typewriters plaintiff would have repaired absent the breach).

Finally, the government complains (without any support) that the absence of specific exchanges in Mr. Graves' model and the lack of consolidation of the spent fuel cases makes it

impossible to account for changes in the timing of DOE's acceptance of different utilities' spent fuel due to the exchanges modeled by Mr. Graves. *See* Govt. Mot. at 16 and n.7. Primarily, this government argument is a complaint with the Chief Judge's January 30, 2004 decision denying the government's requests for consolidation, not a complaint with Mr. Graves' model or Yankee Atomic's damage claim. More fundamentally, however, as Yankee Atomic has explained numerous times (opposing the government's multiple requests for consolidation), exchanges of acceptance allocations would not have required utilities exchanging away early acceptance allocations to bear greater costs for spent fuel storage, because many utilities had ample storage space for their spent fuel during the time when Yankee Atomic would have purchased early acceptance allocations under Mr. Graves' model. Mr. Graves' model recognizes that utilities not facing imminent additional storage costs would have exchanged away early acceptance allocations, because their economic objectives would be satisfied so long as DOE, at a later time, removed their spent fuel before they faced imminent additional costs.

B. The Ramp-up Rate Employed By Mr. Graves Is Reasonable.

The government argues that Mr Graves provides no rationale for the so-called "ramp-up rates" used in his analysis. *See* Govt. Mot. at 17. The government is wrong. First, there is nothing in the parties' contract to suggest that the parties' intended for there to be distinct "steady state" and "ramp up" rates for DOE's acceptance of spent fuel from utilities. Instead, this Court's June 26, 2003 Order appropriately interprets the parties' contract as requiring DOE to commence spent fuel acceptance services at a reasonable rate not later than January 31, 1998. Thus, whatever "ramp up" or other preparation may have been necessary to achieve a reasonable acceptance rate starting by January 31, 1998 should have been completed prior to that time.

Nevertheless, for purposes of presenting a reasonable approximation of its damages, Yankee Atomic has not assumed that DOE's acceptance of spent fuel would have been at a full performance level in 1998. Contrary to the government's argument that Mr. Graves has "no basis for his choice of ramp up rates over any other set of ramp up rates," *see* Govt. Mot. at 18, however, the acceptance rate used in Yankee Atomic's damages analysis and Mr. Graves' model is not random. First, Mr. Graves explains that "[t]he appropriateness of this acceptance rate can be seen by comparing it with the aggregate quantity of Must-Move spent fuel" calculated earlier in his analysis. *See* A8. Second, Mr. Graves notes that the opinions of Ivan Stuart, which Yankee Atomic will present at trial, support the feasibility of this acceptance rate. Third, Mr. Graves notes that DOE has recently used this same acceptance rate for some of its own planning in the *Requirements Document.* A123. Finally, but perhaps most importantly, Mr. Graves notes that this acceptance rate has been found reasonable by Dr. Bartlett in his expert witness report. Dr. Bartlett explains the substantial basis for his conclusion regarding a reasonable acceptance rate in his report. On the specific issue of ramp up rate, he explains that DOE should not and would not have needed a substantial ramp up to achieve a reasonably efficient, full-performance level because DOE had more than 15 years to prepare to perform and the tasks at issue are very familiar to DOE. *See* A75. Regarding the Centralized Interim Storage Facility noted in DOE's *Requirements Document*, Dr. Bartlett explains that "[t]his type of facility is indicative of the system DOE should have and could have developed to have met its obligation to begin accepting spent fuel by January 31, 1998." A76. In short, there is ample basis for the acceptance rate used by Mr. Graves. Thus, *Tyger Constr. Co., Inc. v. Pensacola Constr. Co.*, 29 F.3d 137, 143 (4th Cir. 1994), cited by the government, *see* Govt. Mot. at 18, is inapposite. In that case, the court

held that expert testimony should not be heard where there is *no* evidence to support its underlying assumptions (and in *Tyger*, the assumptions were apparently directly contrary to uncontradicted evidence). 29 F.3d at 143.

More fundamentally, the government appears to argue that it is not sufficient for Yankee Atomic to merely establish a reasonable acceptance rate at trial, but that damages are somehow speculative unless Yankee Atomic can establish that the acceptance rate used in Mr. Graves' analysis is the one and only reasonable acceptance rate that could be used. The government cites the following testimony from Mr. Graves' deposition, presumably because the government believes that it reveals an inadequate analysis:

> Well in order to put a price tag and a schedule into the damage calculations, we need to have a scenario that's representative of what we think would happen in the uncertain world.
>
> So I could have run lots of scenarios. I would still have to choose one or choose the average of a bunch of them to describe, in order for Dr. Wise to calculate the damages that would ensure from not being in that world.
>
> So, we have to get specific at some point just so that as a matter of practice to be able to do calculations of what damages are.
>
> And so what I've done is take a value that I think is illustrative of reasonable performance and lacking any reason to believe that there's noise around that that would bias it, I would use that as my representative value.

*See* Govt. Mot. at 17, *citing* A162-163. In fact, Mr. Graves' testimony explains well how his analysis is part of an appropriate means of making a "fair and reasonable approximation" of Yankee Atomic's damages. *See Seaboard Lumber*, 308 F.3d at 1302. The government's argument for anything more exact is without support or merit.

The government asserts that if Mr. Graves had used a different acceptance rate in his analysis, then the results of his analysis would be different. *See* Govt. Mot. at 17. This claim may be true (although once again the government provides no discussion of how the results of his model would be different using different acceptance rates on the deposition transcript pages cited by the government), but it does not make Mr. Graves' analysis or Yankee Atomic's damage claim speculative. Consistent with *Ace-Federal Reporters*, *Locke*, and *Energy Capital Corp.*, Yankee Atomic need only present *a* fair and reasonable estimate of its damages, not a mathematically precise determination.

Furthermore, the government has not proposed any other acceptance rate as reasonable. Ultimately, if the government presents evidence that an acceptance rate other than the one used by Mr. Graves would have been reasonable and that such an acceptance rate would lead to a somewhat different damage calculation for Yankee Atomic (and it may be too late to do so since the government has not even proposed any rate as reasonable in its proposed findings of fact), the Court may have to decide which acceptance rate would have been the most reasonable and, therefore, the amount of damages to which Yankee Atomic is entitled. But the fact that a determination of Yankee Atomic's damages could vary using different reasonable acceptance rates does not make Yankee Atomic's damages speculative or otherwise unrecoverable.

C. <u>The Spent Fuel Storage Costs Used by Mr. Graves Are Reasonable</u>.

The government claims that Mr. Graves assumes that all utilities face the same costs of continued storage to determine different utilities' willingness to pay for earlier acceptance allocations. *See* Govt. Mot. at 18. The government then notes that Yankee Atomic, Connecticut Yankee and Maine Yankee have claimed different costs for spent fuel storage and that each of those claimed costs are somewhat different than those used by Mr. Graves in his analysis. *Id.*

The government's complaint misses the mark. In his deposition testimony, Mr. Graves explained that the cost data "is more of a generic number than an attempt to represent the costs of those three specific [Yankee Utilities]." A154. In his expert witness report, Mr. Graves notes that he relies on a report from an expert at NAC International for the spent fuel storage cost figures used in his analysis. *See* A14, n.14. This expert explains that NAC has developed "a substantial body of knowledge concerning dry storage systems" and is also "in the business of collecting data on the management of spent fuel by nuclear utilities" and that information derived from that work served as the basis for the cost figures used by Mr. Graves. *See* A177, A180.[9] More fundamentally, Mr. Graves has testified and will explain at trial, that the results of his model are not sensitive to even substantial changes in these underlying cost figures, much more substantial than the different cost experiences among Yankee Utilities. *See* A155-161.

III. CONCLUSION

The exchange provision is an important part of the parties' contract. Yankee Atomic is entitled to damages sufficient to place it in "as good a position as it would have been in" had the government not breached the parties' contract. *See, e.g., Massachusetts Bay Transp. Auth. v. United States*, 129 F.3d 1226, 1232 (Fed. Cir. 1997). Such damages cannot be awarded if an important part of the parties' contract is ignored during the determination of damages. Through the expert opinion of Frank Graves, Yankee Atomic will present ample evidence providing a reasonable estimate of how the exchange provision would have affected the timing of the removal of its spent fuel. Nothing more exact is required. And, thus, the government's

[9] Mr. Graves' report cites reliance on James P. Malone, then employed by NAC. By Order of September 4, 2001, the Court permitted Yankee Atomic to substitute Mr. Pennington, also employed by NAC, to provide the same opinions as Mr. Malone.

acknowledgment that Mr. Graves' analysis "is very appealing as a model of *economic* performance by parties to the Standard Contract," Govt. Mot. at 12 (emphasis in original), is dispositive. For these reasons, the Court should deny the government's motion *in limine* and hear Mr. Graves' testimony.

Dated: April 16, 2004

Respectfully submitted.

s/ Jerry Stouck

JERRY STOUCK
Spriggs & Hollingsworth
1350 I Street, N.W., Ninth Floor
Washington, D.C. 20005
(202) 898-5800
(202) 682-1639 (facsimile)

Counsel for Plaintiff,
YANKEE ATOMIC ELECTRIC COMPANY

Of Counsel:

Robert L. Shapiro
SPRIGGS & HOLLINGSWORTH