IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| YANKEE ATOMIC ELECTRIC COMPANY,<br>Plaintiff,<br>v.<br>UNITED STATES OF AMERICA,<br>Defendant. | No. 98-126 C<br>(Senior Judge Merow) |

APPENDIX TO
YANKEE ATOMIC'S OPPOSITION TO
THE GOVERNMENT'S
MOTION *IN LIMINE* TO PRECLUDE
FRANK C. GRAVES EXPERT TESTIMONY OF EVIDENCE

JERRY STOUCK
Spriggs & Hollingsworth
1350 I Street, N.W., Ninth Floor
Washington, D.C. 20005
(202) 898-5800
(202) 682-1639 - Fax

Counsel for Plaintiff,
YANKEE ATOMIC ELECTRIC COMPANY

Of Counsel:

Robert L. Shapiro
SPRIGGS & HOLLINGSWORTH

April 16, 2004

**INDEX TO APPENDIX**


| **Description** | **Page** |
|---|---|
| Expert Witness Report of Frank C. Graves | 0001 |
| Expert Witness Report of Kenneth T. Wise 2003 | 0048 |
| Expert Witness Report of Dr. John W. Bartlett | 0068 |
| Proceedings of the 1983 Civilian Radioactive Waste Management Information Meeting (Dec. 12-15, 1983) | 0090 |
| Expert Witness Report of Ivan F. Stuart | 0093 |
| Civilian Radioactive Waste Management System Requirements Document, Revision 05, DOE/RW-0406 (Jan. 1995) [Excerpts] | 0121 |
| Deposition Transcript of Dr. John W. Bartlett (8/26/03) [Excerpts] | 0124 |
| Letter from Dreyfus (DOE) to Kadak (Yankee Atomic), (YDK-006-1064) of 9/28/95 | 0128 |
| Expert Report of R. Larry Johnson 2004 [Excerpts] | 0129 |
| Frank Graves Deposition Transcript (11/12/01, 11/13/01, 11/14/01, 1/03/02) [Excerpts] | 0134 |
| Hearing Transcript from August 6, 2001[Excerpts] | 0169 |
| Expert Witness Report of Charles W. Pennington | 0175 |

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| YANKEE ATOMIC ELECTRIC COMPANY<br>Plaintiff,<br>v.<br>UNITED STATES OF AMERICA<br>Defendant. | No. 98-126 C<br>(Senior Judge Merow) |

FRANK C. GRAVES EXPERT WITNESS REPORT

## I. INTRODUCTION

I have been asked to prepare this report to address the performance of the United States Department of Energy (DOE) in accepting spent nuclear fuel and high-level waste (together, "spent fuel") under the terms of its contract with the Plaintiff, Yankee Atomic Electric Company. This contract is one of approximately 50 similar contracts (each sometimes referred to as a Standard Contract) between the government and commercial nuclear power producers ("Purchasers").

Due to the government's failure to commence acceptance of spent fuel by January 31, 1998, the Plaintiff is incurring and will continue to incur economic damages. The damages are equal to the costs the Plaintiff actually incurs, in excess of the costs that would have been incurred had the government commenced and continued acceptance in accordance with its contract obligations. To quantify this difference, cost models must be constructed that describe the Plaintiff's economic operations in a Non-Breach World (a calculated world in which the government honors its contract obligations) and in the Breach World (the actual world, in which the government's contract obligations are not fulfilled).

The Plaintiff's costs are heavily influenced by the timing of the completion of spent fuel removal from its site. The contract does not specify the date by which the government was required to complete removal of spent fuel from Plaintiff's site. The purpose of my report is to determine the date of completion of spent fuel removal from the Plaintiff's site, had the government commenced spent fuel acceptance by January 31, 1998. In order to do this, I applied economic principles and cost evaluation tools to characterize what the government's performance in this Non-Breach World would have looked like and how it would and should have operated. Based on this, I determined the date on which the government would and should have completed removing the spent fuel from the Plaintiff's site pursuant to the parties' contract. I also endeavored, to the extent possible, to understand the spent fuel removal schedule in the Breach World.

The key results of my analysis are the timing of spent fuel removal at Plaintiff's facility and the net cost of swaps, *i.e.*, the cost to buy acceptance allocations (or "slots") to alter a Purchaser's position in the acceptance queue (as discussed later). These results, in turn, affect the timing and in some cases the magnitude of spent fuel storage and other costs at Plaintiff's facility. Accordingly, my results are incorporated into the cost models that provide the basis for the damages calculation in the expert report of Dr. Kenneth T. Wise.

## II. Summary of Approach and Results

My analysis of DOE's spent fuel acceptance program consists of two parts: 1) an assessment of a reasonable aggregate acceptance rate for DOE's acceptance of spent fuel from all Purchasers; and 2) given this aggregate acceptance rate, determination of the sequence in which spent fuel would be removed from individual plants. This basic structure applies in principle to analysis of both the Non-Breach and Breach Worlds.

Under the contract, the government has provided for an initial allocation of spent fuel acceptance rights, or "slots," depending on the date of the discharge of spent fuel from each Purchaser's reactor. This initial allocation is frequently referred to as "Oldest Fuel First," or "OFF." The contract states

that swaps of acceptance slots within the OFF queue are allowed. By this mechanism, plant owners may voluntarily exchange removal slots among themselves (subject to DOE approval), for a mutually-agreed price.

Because of the possibility of swaps of acceptance slots among Purchasers, it is essential to draw a distinction between the initial allocation of acceptance slots and the actual sequence of spent fuel acceptance that would occur. Since Purchasers are able to exchange acceptance slots, a Purchaser's initial acceptance allocation need not determine the schedule of removal at its facility. By buying and/or selling acceptance slots, a different position in the sequence could be arranged. Swaps of acceptance slots would allow Purchasers (and not insignificantly, DOE also) to realize substantial savings in cost and efficiency as compared with the initial allocation of acceptance slots under OFF. The costs associated with buying and/or selling acceptance slots are determined and accounted for in my analysis.

I model the performance of a market for acceptance slots, in which each participant pursues its own economic interest in swapping slots. The market would include payments for swaps, and earlier acceptance slots would in general be more valuable than later slots. For example, a Purchaser who swaps away later acceptance slots in exchange for earlier slots would have to pay for the exchange. The Purchaser would be willing to pay for this swap because the cost of the swap payment is less than the storage costs it would incur by waiting until a later date for the government to remove spent fuel. Similarly, a different Purchaser with less urgent need for spent fuel removal would be willing to relinquish its earlier slots in exchange for later slots, because the payment received is at least as great as the storage cost incurred by waiting until the later date.

My analysis shows that in the Non-Breach World, had DOE commenced acceptance of spent fuel by January 31, 1998 with a reasonable aggregate acceptance rate, it should and would have completed removal of spent fuel from Plaintiff's facility by January 1999. In order to achieve removal by this date, Plaintiff would need to swap removal slots with other Purchasers, and these swaps would occur at a price. The estimated net cost of the swaps required for the Plaintiff to achieve this removal date is $11.8 million, in 1999 present value. That is, Yankee Atomic would

pay a net cost of $11.8 million to exchange its initial OFF allocation of slots for the slots needed to remove all of its spent fuel by January 1999. The economic foundations for swaps are discussed in detail in Section IV.

Even though it did not occur, efficient government performance in the Non-Breach World is easier to describe and evaluate than is DOE's future performance in the Breach World. In the Breach World, it is not possible to estimate with confidence the date by which DOE will complete spent fuel removal from Plaintiff's facility. This is primarily because of significant, currently unresolvable uncertainty in DOE's future actual performance. The most obvious missing fact in the Breach World is the rate at which spent fuel will be accepted, particularly the start date of acceptance. In addition to this uncertainty (and partly because of it), it is much harder to characterize with confidence how acceptance slots may be traded, if at all, and thus what the cost and availability might be for swaps. These difficulties are explored further after the discussion of the more straightforward Non-Breach World.

In forming my opinions, I rely on data input and facts from available documentary evidence and expert opinion from other witnesses. I have considered the expert witness report of John W. Bartlett, former Director of the Office of Civilian Radioactive Waste Management, for how the government should and would have structured its spent fuel acceptance program. In particular, I rely on Dr. Bartlett's expertise and experience to determine the overall acceptance rate for efficient performance. Documentary evidence in the form of DOE publications also supports this acceptance rate. The amount and timing of spent fuel generated and stored by each Purchaser also affects the demand for spent fuel acceptance and the removal date of any particular Purchaser. James P. Malone of NAC International has provided information on spent nuclear fuel inventory and projected discharges. I rely for Purchasers' spent fuel storage capacity on parameters taken from DOE's most recent published study on this topic.[1] As discussed later, the cost of spent fuel storage at the Purchasers' facilities also affects removal. Data on storage cost has been supplied by Mr. Malone. I also rely on the expert witness report of Ivan F. Stuart of NAC International to establish parameters describing



[1] *Spent Fuel Storage Requirements 1994-2042*, U.S. DOE, June 1995, Appendix A.

spent fuel transportation. A complete listing of the data and other information I considered in reaching my opinions is contained in Exhibit 1.

## III. AGGREGATE ACCEPTANCE RATE OF SPENT FUEL DISPOSAL PROGRAM

### A. Must-Move Analysis

It is useful to begin with an aggregate analysis of overall demand for acceptance slots. Aggregate demand is determined as the amount of spent fuel that is in a "Must-Move" condition at any point in time. "Must-Move" spent fuel is spent fuel that must be removed from a Purchaser's facility or else the facility will incur significant costs that are otherwise avoidable. There are two classes of Must-Move spent fuel:

1. Full Pool: Discharges in excess of spent fuel pool capacity,[2] and
2. Shutdown: Spent fuel at permanently shut down facilities.[3]

"Full-Pool" Must-Move spent fuel, *i.e.*, discharges from the reactor in excess of the storage pool's capacity, would necessitate installing a dry storage facility at considerable expense unless spent fuel were removed from the site.[4] "Shutdown" Must-Move spent fuel, if not removed, would require the continued operation of the spent fuel pool beyond the time it could be decommissioned, incurring significant ongoing operations and maintenance (O&M) expenditures. Note that spent fuel held at an operating facility that has not reached pool capacity is *not* considered Must-Move. Such a pool must continue to be operated regardless of the quantity of spent fuel it contains, so the reduction or removal of existing spent fuel in the pool creates essentially no savings of operating cost.[5]

---

[2] Available pool capacity is net of full-core reserve (FCR) capacity. Only the amount in excess of pool capacity is considered Must-Move.

[3] Spent fuel at a shutdown facility is not considered Must-Move until all of the spent fuel has cooled in the pool for at least 5 years, as required by the Standard Contract.

[4] In certain instances, a utility can expand the capacity of its pool through re-racking, a process in which additional racks are added to the pool or existing racks are replaced with new racks that store spent fuel more compactly. Re-racking imposes a considerable expense.

[5] Pool operating costs are essentially fixed, as there are no significant requirements or operations that vary with (continued...)

In order to determine the quantity of Must-Move spent fuel in a given year, one must identify each storage facility's capacity, future discharges, and shutdown date to determine when each facility would exceed its pool storage capacity or become eligible for spent fuel removal because of shutdown. This requires detailed descriptions of the pool capacities, inventories and reactor discharge rates for all the spent fuel facilities in the United States. I have obtained pool capacity data from DOE, using 1995 as the reference point.[6] In addition, I have relied on Mr. Malone for the most recent available data on spent fuel inventory and projections of future spent fuel discharges.

The aggregate annual results of my Must-Move analysis are displayed in Figure 1. The figure distinguishes the cumulative quantity of Must-Move spent fuel by type—the lower region showing discharges in excess of pool capacity at Full Pools and the upper region showing the additional quantities due to Shutdown pools. Total Must-Move spent fuel is shown as the sum of these two. This graph of total Must-Move spent fuel offers a picture of the demand for acceptance slots, showing for each year the total amount of spent fuel that will impose additional, avoidable storage costs unless it is removed.

---

5 (...continued)
size of the inventory in the pool. It is only operating the pool as a whole that can be avoidable, or the need to expand storage capacity once the pool becomes full.

6 *Spent Fuel Storage Requirements: 1994-2042*, DOE, June 1995. The year 1995 is an appropriate reference point because it slightly pre-dates the time at which the contract obligated DOE to begin accepting spent fuel. As it became evident that the program would not begin accepting spent fuel in 1998, several utilities began to expand the capacity of their pools through re-racking. Some of these expansions would not have been necessary had DOE been on track to commence spent fuel acceptance at a sufficient aggregate rate by January 31, 1998. The 1995 data provides a better representation of the Non-Breach capacity than would 1999 capacity estimates.

**Figure 1**
**Must-Move Analysis**
**Demand for Acceptance Slots**




**B. Implications of Must-Move Analysis for Aggregate Acceptance Rate**

My Must-Move analysis, together with the opinions of John W. Bartlett, support the aggregate rate for spent fuel acceptance that DOE would and should have followed to meet its contract obligations. In his report, Dr. Bartlett states that DOE's obligation, though not detailed in the contract, was to deal effectively and efficiently with the commercial nuclear industry's spent fuel. Substantial other evidence also supports this conclusion. The aggregate acceptance rate that he concludes would and should have been followed is in part derived from and corroborated by my analysis of Must-Move spent fuel discussed above. This acceptance rate shows that DOE's acceptance of spent fuel begins in 1998, according to the contract requirement that DOE begin accepting spent fuel not later than January 31, 1998. The annual aggregate acceptance amounts found to be reasonable by Dr. Bartlett

and supported by my analysis are shown in Table 1.[7] The opinions of Ivan F. Stuart support the feasibility of this acceptance rate.

**Table 1**
**Aggregate DOE Acceptance Rate**
**Non-Breach World**

| Year | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | ... |
|---|---|---|---|---|---|---|---|---|---|
| Acceptance (MTU) | 1,200 | 1,200 | 2,000 | 2,000 | 2,700 | 3,000 | 3,000 | 3,000 | ... |

The appropriateness of this acceptance rate can be seen by comparing it with the aggregate quantity of Must-Move spent fuel, in Figure 2. The acceptance rate has a steady-state acceptance rate of 3,000 MTU per year, which corresponds closely to the annual rate at which spent fuel must be removed from pools that become full and pools eligible for shutdown in order to avoid unnecessary storage cost. Further, acceptance ramps up to this steady state in such a fashion that within the first several years, the aggregate acceptance catches up to the Must-Move backlog (the cumulative demand for spent fuel removal). After this "crossover" point, the annual acceptance rate closely approximates the average creation of new Must-Move spent fuel over time, staying somewhat ahead of the production of Must-Move spent fuel. Any DOE acceptance rate that accepts spent fuel from Purchasers at a rate significantly lower than the incremental demand would impose additional unnecessary storage requirements and costs on Purchasers, a result that would be uneconomic. As Dr. Bartlett confirms, such uneconomic performance would not achieve the DOE's objectives nor meet its contract obligation.

0008

[7] DOE has recently used this same acceptance rate for its own planning purposes in *Civilian Radioactive Waste Management System Requirements Document, Revision 05*, DOE/RW-0406 (January 1999) at 13, Table 3, confirming the reasonableness of this rate.

**Figure 2**
**Supply and Demand for Acceptance Slots**
**Non-Breach World**




## IV. ANALYSIS OF SEQUENCE OF SPENT FUEL ACCEPTANCE IN THE NON-BREACH WORLD

### A. Implications of Must-Move Analysis for Sequence of Spent Fuel Acceptance

The foregoing Must-Move analysis offers some preliminary answers to the question of when any given Purchaser, and in particular the Plaintiff, would have its spent fuel completely removed. Figure 2 above compares the cumulative acceptance by DOE (the supply of spent fuel acceptance) with the cumulative quantity of Must-Move spent fuel (the demand for spent fuel acceptance). As can be seen in the figure, the supply of acceptance slots is initially below the total demand of Must-Move spent fuel, indicating that for the first few years, it is not possible to remove all of the Must-Move spent fuel as soon as it achieves Must-Move status. There would be a backlog of Must-Move

spent fuel; that is, either 1) spent fuel would exceed pool capacity, requiring dry storage, and/or 2) spent fuel at shutdown facilities would require extended pool operation. Because aggregate acceptance would be less than the total quantity of Must-Move spent fuel prior to 2002, it would be necessary for some Purchasers to incur otherwise-avoidable storage costs in these early years.

However, the balance of supply and demand changes in year 2002. At this point, the cumulative aggregate acceptance would have caught up to the cumulative Must-Move spent fuel, and thereafter supply always would exceed demand. This means that as of approximately 2002, the aggregate acceptance rate would have been able to remove *all* spent fuel that had by then achieved Must-Move status. Going forward from this "crossover" point, aggregate acceptance always would be sufficient to remove all additional spent fuel at or before the time it became Must-Move, *i.e.* before it caused any avoidable storage cost. Thus, by approximately year 2002 and thereafter in the Non-Breach World, all Must-Move spent fuel could have been removed, and no Purchaser would have needed to incur avoidable storage costs.[8]

The economic implication of this supply-demand balance is that before the crossover date, acceptance slots would exchange at a positive price, reflecting the costs that unsatisfied Purchasers would be forced to incur by not having their spent fuel removed. After the crossover point, the price of swaps would be essentially zero because the supply of slots persistently exceeds demand, making it very easy for Purchasers with Must-Move needs to acquire slots. Thus, all Purchasers with Must-Move spent fuel by 2002 would be able to have all their Must-Move spent fuel removed by 2002 at the latest. They could do this by acquiring slots at zero price in year 2002. All of Plaintiff's spent fuel is Must-Move by 2002, because Plaintiff's plant has shut down permanently. The year 2002 establishes the latest date for Plaintiff's spent fuel removal in the Non-Breach World because by then, the price of slots falls dramatically (to essentially zero), and Plaintiff could acquire all the slots it needed at no additional cost. The date of removal could be earlier than 2002 to the extent Plaintiff is willing to pay for earlier acceptance slots.

[8] My conclusions regarding when spent fuel would be removed are based on the Economic Sequence Model described in the next section. The Must-Move analysis provides only aggregate results, whereas more detail is necessary to determine the impact on Plaintiff. As can be seen in the next section, the Economic Sequence Model results are entirely consistent with the Must-Move analysis

Unfortunately, while this backstop date offers a useful bound, the aggregate Must-Move analysis does not establish when *before* this backstop date the Plaintiff's site would be free of spent fuel—it might be economically better for Plaintiff to pay a non-zero price before 2002 and have its spent fuel removed sooner. In order to establish this, the results of the Must-Move analysis (the Must-Move quantities at individual sites) are used in a more detailed model, the Economic Sequence Model, described in the following section.

### B. The Need to Depart from the OFF Allocation of Acceptance Slots

To determine the Non-Breach removal schedule for individual Purchasers, I first demonstrate that the initial allocation of acceptance slots, according to Oldest Fuel First, is not an efficient basis for accepting spent fuel. Rather, Purchasers would swap their acceptance slots to achieve an economically efficient allocation, and DOE would accept spent fuel according to the resulting, efficient allocation. A look at the consequences of adhering to an OFF-based acceptance sequence shows why such a sequence would be inefficient. OFF priority, by design, has no underlying cost foundations. In particular, it does not relate a Purchaser's priority to the costs that would be incurred or could be avoided at the Purchaser's facility. OFF takes no account of a facility's shutdown status, nor of the need to accept spent fuel to prevent operating plants from reaching pool capacity limits. Therefore, accepting the spent fuel based on OFF priority would force some facilities to continue operating a spent fuel pool long after shutdown, and others to incur the cost of dry storage as their pool reaches capacity. At the same time, it would involve repeatedly removing spent fuel from operating plants with slack pool capacity and no pressing need for such removal.

In addition, the OFF sequence would impose major inefficiencies on DOE's transportation system without offsetting private cost savings. OFF would involve picking up a small amount of spent fuel from many facilities each year. While there can be good reasons for small pickups in some circumstances (*e.g.*, to relieve facilities that are on the verge of facing full-pool constraints), the OFF sequence would require small acceptances as a matter of course. This would be inefficient in terms of logistics (coordinating pickups and shipment with transportation systems) and operational staffing (requiring more staff to handle more shipments). In contrast, a system of campaigned spent fuel

removal is economically superior, to the extent that it would not interfere accommodation of with Must-Move needs.[9]

### C. The Role of Swaps of Acceptance Slots

The primary vehicle for achieving a sequence that is more cost-effective than OFF is "swaps" of acceptance slots relative to the initial allocation based on OFF. Slots would be bought and sold among Purchasers, who have the effect of reallocating acceptance slots from Purchasers who have less immediate need for spent fuel removal to those with greater immediate need.[10] The aggregate supply of "swap-able" slots in a given year would be determined by DOE's aggregate annual acceptance.

For example, as indicated in Table 1, in the Non-Breach World, DOE would accept 2,000 MTU in the year 2001. Accordingly, 2,000 MTU of acceptance slots would be allocated to Purchasers according to their chronological discharge date. Since the 2,000 MTU accepted in year 2001 are the industry's 4,401st through 6,400th metric tons to be accepted by DOE, the Purchasers who are initially allocated these slots under OFF are just those who discharged the industry's 4,401st through 6,400th metric tons. (These tons were discharged in 1979 and 1980.) Only by happenstance would these OFF slots be allocated to the Purchasers with greatest need for spent fuel acceptance in 2001. Through swaps of acceptance slots, all parties could reduce their costs.[11]

---

9 The economic superiority of campaigns has been widely recognized by DOE and others. See, for example, *Spent Fuel Acceptance Scenarios Devoted to Shutdown Reactors: A Preliminary Analysis*, Pacific Northwest Laboratories, October 1989.

10 To remind the reader, the term "Purchaser" does *not* refer in this context to a purchaser of acceptance slots, or swaps. It is the designation given to commercial nuclear power producers who are counterparties to DOE in a contract for disposal of spent nuclear fuel. To avoid confusion in this report, I use "buyer" and "seller" to refer to parties who exchange acceptance slots.

11 In addition to the obvious benefit to the buyer of slots, the seller may also enjoy a benefit beyond the revenue generated. An operating reactor with slack pool capacity may *prefer* to delay acceptance so as to avoid frequent mobilization for small fuel acceptances, which would be implied by the initial OFF allocation of slots. This benefit to sellers was not explicitly modeled.

Slots would be exchanged based on private costs and benefits, as swaps occur at each Purchaser's discretion. However, because such swaps will inevitably drive the acceptance schedule toward Must-Move campaigns, the resulting trades would also foster reductions in transportation and other system costs, and would be viewed with favor by DOE, which retains some discretion to disapprove swaps.

### D. Calculating Spent Fuel Removal Schedule with the Economic Sequence Model

The Economic Sequence Model, described in this section, uses the results of the Must-Move analysis as input. The results of the Economic Sequence Model for the Non-Breach World include estimates of when spent fuel would be removed from individual Purchaser's facilities, which Purchasers would have bought and sold the necessary swaps of acceptance slots, and the prices that would have been paid for those swaps in order to achieve this outcome.

I have demonstrated above that economic forces provide compelling reasons for private exchanges of acceptance slots. Because the buyers would be motivated by their avoidable costs, it is reasonable to assume that such swaps would approach the efficient economic allocation of slots. I use an avoided-cost maximization model to determine the efficient economic allocation of acceptance slots. The key assumption of my model, consistent with market structure and price formation throughout the economy, is that swap prices and the corresponding rescheduling of removals will reflect participants' willingness to pay (WTP) up to their avoidable storage costs for improving their position in the acceptance sequence. Those Purchasers with the greatest impending, hence avoidable, costs will have the greatest willingness to pay and will buy slots to achieve earlier removal. Those with less pressing needs will wait and/or sell their slots.

For purposes of this analysis, I assume an OFF-based initial allocation. Acceptance slots are allocated on a per metric ton basis, and all trading of slots would also occur on that basis.[12] This is

---

[12] This exchange provision is consistent with DOE's view on approving exchanges on a tonnage basis as stated by Nancy Slater at her deposition. "You may substitute PWR for BWR. You may substitute older fuel for younger fuel. You may not substitute more MTU for less MTU." *Deposition of Nancy Slater*, April 21, 1999,
(continued...)

consistent with the fact that the total DOE acceptance for each year is a specified number of metric tons, and the initial OFF allocation of acceptance slots is for a given number of metric tons.

The storage costs that a Purchaser can avoid by having spent fuel removed from a site in a particular year influence the Purchaser's willingness to pay. Avoidable storage costs may consist of ongoing pool O&M at a shutdown reactor, or the setup and operating costs of dry storage for a facility with a full pool. A Purchaser's WTP for acceptance slots is expressed on a per metric ton basis, and it is equal to the avoidable cost divided by the tonnage of spent fuel that must be removed to avoid those costs.[13] Exhibit 2 presents the input data on costs, cask size, and handling constraints incorporated in my Economic Sequence Model.[14]

The economic model assumes that all Purchasers will pursue their economic self-interest and be willing to buy slots if price is below their WTP, or sell if it is above. Purchasers "bid" for slots based on their WTP for removal of spent fuel in the current year relative to one year later. These bids are ranked in decreasing order, and acceptance slots are allocated to the highest bidders. The clearing price for all acceptance slots in a given year is equal to the marginal bid (the lowest winning bid) and is paid by all buyers to all sellers. A market that performs in this manner could be implemented by a last-bid auction procedure, or it could be the result of active, visible bilateral trading.

Figure 3 displays the annual market price of acceptance slots produced by the Economic Sequence Model. The higher initial price of acceptance slots reflects significant demand in excess of aggregate acceptance capacity. However, the price drops over time as the Purchasers with the highest WTP have their spent fuel removed, and the remaining Purchasers have lower WTP. In year 2002 and beyond, the price goes to essentially zero, reflecting the fact that there is excess supply. That is, total demand (from Purchasers with positive WTP) is less than total supply, so slots will trade freely at essentially zero price. A Purchaser's net cost of exchanging acceptance slots is the difference

---

12 (...continued) p. 109.



13 A constraint requiring removal of full casks when possible is incorporated into the Economic Sequence Model.

14 I rely upon James P. Malone for data on costs, cask size, and handling constraints.

between the total cost of the acceptance slots it needs according to the Economic Sequence Model and the total value of its initial allocation of OFF slots, both evaluated at the market clearing price.[15]

**Figure 3**
**Yearly Prices for Acceptance Slots**
**Results from the Economic Sequence Model**




Note: Price of removal rights is zero for all years after 2002.

The Economic Sequence Model operates on an annual basis. To estimate to the nearest month when the Plaintiff would have all its spent fuel accepted, I assumed that a bidder's acceptance position within a year would be proportional to the rank of its WTP among the winning bidders within that year (*i.e.*, the highest winning bidder has spent fuel accepted first, and the lowest last within a year). Based on this, Yankee Atomic would buy sufficient acceptance slots in 1998 and 1999 to remove all 127 metric tons from its pool by January 1999, at a cost of $15.4 million. Offsetting this, it would sell its OFF slots for revenue of $3.6 million, for a net swap cost of approximately $11.8 million to buy these slots (all costs in 1999 present value). Table 2 displays the detailed results of the

[15] Purchasers' initial allocations of acceptance slots based on OFF are calculated from data on discharges from U.S. commercial reactors, obtained through James P. Malone.

0015