**Economic Sequence Model for Plaintiff, including when spent fuel is accepted, and when and at what cost acceptance slots are bought and sold.**

**Table 2**
**Economic Sequence Model Results**
**Yankee Atomic Electric Company**

| | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 |
|---|---|---|---|---|---|---|
| Spent Fuel Acceptance (MTU) (Economic Sequence Model Result) | 122.4 | 5.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Initial Allocation of Slots (MTU) (According to OFF) | 19.7 | 9.8 | 18.0 | 0.0 | 17.8 | 8.4 |
| Market Price of Slots ($000/MTU) | 122 | 59 | 35 | 15 | 0* | 0 |
| Cost of Required Slots ($ Millions) (PV = $15.4 M) | 14.9 | 0.3 | 0.0 | 0.0 | 0.0 | 0.0 |
| Revenue from OFF Slots Sold ($ Millions) (PV = $3.6 M) | 2.4 | 0.6 | 0.6 | 0.0 | 0.0 | 0.0 |

* All costs and revenues from slots are zero from year 2002 forward, as market price of slots goes to zero in 2002 and remains at zero.

The model results show that overall, facilities with smaller amounts of Must-Move spent fuel (typically small shutdown pools and operating reactors with full pools) tend to acquire earlier acceptance slots. The larger shutdown facilities have their spent fuel removed relatively later, closer to the time when cumulative acceptance slots catch up with cumulative Must-Move spent fuel.

## V. SPENT FUEL ACCEPTANCE ANALYSIS—BREACH WORLD

In principle, the same kind of economic sequencing analysis performed above could be applied to the Breach World, albeit with a different set of inputs regarding the program start date and acceptance rate, and with appropriate adjustments to spent fuel inventories and discharges to reflect the later time period. However, the data on which such a Breach World analysis would have to be

based is extremely speculative. Most obviously, the program's acceptance rate is highly uncertain (particularly the start date). The existence of a viable swap market for acceptance slots—critical to achieving an economically efficient reallocation of slots—is doubtful. The results of such a Breach World analysis would have to be deemed highly uncertain, so much so that it would be difficult to have reasonable confidence in them.

One of the most critical and also most uncertain factors in the Breach World is the date at which DOE will begin accepting spent fuel. Obviously, a later start date implies correspondingly later acceptance, all else equal. However, a later start also allows more Must-Move spent fuel to accumulate by the time the program begins. The resulting increased competition for available slots would likely push any particular Purchaser's acceptance back still further. DOE has recently projected a program start date of 2010, though even this late date is by no means assured.[16]

In my analysis of the Non-Breach World, with program operation beginning in 1998, the backlog of Must-Move spent fuel could be eliminated within a few years. However, by 2010, the volume of Must-Move spent fuel is considerably larger. To illustrate the situation in the Breach World, Figure 4 plots cumulative Must-Move spent fuel. This cumulative demand for spent fuel removal reaches 18,000 MTU by 2010, and continues to grow at an average rate of approximately 3,000 MTU/year for the next 20 years. A 2010 program start with the same annual acceptance as in the Non-Breach World, also illustrated in Figure 4, cannot catch up with this need. The cumulative amount of Must-Move spent fuel is significantly in excess of the cumulative acceptance through the year 2030 and beyond. A later start date would only make the situation worse, and even a start date several years earlier would not solve the problem. Absent a *much* higher acceptance rate in the Breach World, it is not possible for the supply of spent fuel acceptance slots to keep pace with demand.



[16] *Civilian Radioactive Waste Management System Requirements Document, Revision 05*, Office of Civilian Radioactive Waste Management, U.S. Department of Energy, January 1999.

**Figure 4**
**Supply and Demand for Acceptance Slots**
**Breach World**




In addition to this, DOE's failure to accept spent fuel on any schedule approaching its initially announced plans threatens overall confidence in the program. This is likely to make significant numbers of Purchasers unwilling to swap away their allocated OFF acceptance slots at any price, or at least demand a premium well in excess of their actual avoidable cost. This reluctance would interfere strongly with the development of an efficient, effective exchange market for acceptance slots. At the very least, the fact that the quantity of Must-Move spent fuel constantly and significantly exceeds the cumulative supply of acceptances dictates that the price of any available swaps could be quite high indefinitely. Further, some Purchasers with no immediate need for spent fuel removal (no true Must-Move situation) might choose to use rather than swap their OFF slots, or even try to "swap up" for earlier removal, as insurance against further DOE performance failure. Thus, the trading dynamics would be considerably more complex in the Breach World—so much

so that the Economic Sequence Model is not an appropriate tool for evaluating swaps in the Breach World.

## VI. CONCLUSION

I have described an economic analysis and projection of the government's (and the swap market's) performance in the Non-Breach World, using economic efficiency principles that prioritize acceptance to minimize avoidable costs. This analysis allows me to specify with reasonable certainty the date at which Plaintiff's site would have been free of spent fuel, and to identify the costs of obtaining the acceptance slots necessary to achieve this. That analysis shows that Yankee Atomic would have its spent fuel removed in 1999.

In contrast, such analysis is speculative and more difficult in the Breach World, because of the substantial unresolvable uncertainties about overall program performance and the existence and performance of a market for exchanges of acceptance slots. Thus, in the Breach World it is not possible to develop a reasonably accurate estimate of when or at what cost the Plaintiffs' sites will be free of spent fuel. Any given set of assumptions could of course be mechanically analyzed, but there is so much uncertainty surrounding these assumptions that one could not rely on the results.

## VII. QUALIFICATIONS

I have 19 years experience in assisting utilities in the design and implementation of long-range planning, investment, and operating policies, and I assist their counsel with regulatory compliance and policy review. This work has involved market design and performance evaluation, capacity expansion and network modeling, investment and contract prudence reviews, estimation of marginal costs, design and pricing of new services, and financial simulation and valuation techniques. I have testified on the economics of electric and gas industry restructuring before the FERC and State regulatory commissions on numerous topics, including market entry, antitrust, retail and wholesale transmission access, power contract interpretations, service unbundling, new services, and cost of capital. I am the author of several papers on approaches to and impacts of restructuring of the

electric and gas industries in the U.S., and am a member of professional societies for mathematics, electrical engineering, energy economics, and finance. I received an M.S. with a concentration in finance from the M.I.T. Sloan School of Management in 1980, and a B.A. in Mathematics from Indiana University in 1975. My experience and qualifications to offer the opinions included in this report are set out in greater detail in Exhibit 3 of this report.

## VIII. Compensation

*The Brattle Group* is being paid $325 per hour for my time working on this matter.

## IX. Other Expert Testimony

Exhibit 4 lists the cases in which I have testified as an expert at trial or by deposition within the preceding four years and my publications for the last ten years.

Respectfully submitted,

Frank C. Graves

Frank Graves

June 30, 1999

**Exhibit 1**

**List of Data and Documents Considered in Forming Opinions**

U.S. Department of Energy Contract No. DE-CR-01-83NE44428, Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste (June 22, 1983).

*Mission Plan for the Civilian Radioactive Waste Management Program*, U.S. DOE, June 1985, DOE/RW-0005.

*OCRWM Mission Plan Amendment*, June 1987, US DOE, DOE/RW-0128.

*Draft 1988 Mission Plan Amendment*, June 1988, US DOE, DOE/RW-0187.

*Nuclear Waste Policy Act of 1982*, as presented in 42 USC Chapter 108 - Nuclear Waste Policy, 1/6/97.

*Nuclear Waste Policy Amendments Act of 1987*, as presented in 42 USC Chapter 108 - Nuclear Waste Policy, 1/6/97.

*Report to Congress on Reassessment of the Civilian Radioactive Waste Management Program*, November 1989, US DOE, DOE/RW-0247.

*Annual Capacity Reports*, U.S. DOE, Annual series of reports, 1987 - 1994.

*1992 Acceptance Priority Ranking*, May 1993, Revision 1, U.S. DOE, DOE/RW-0419.

*Acceptance Priority Ranking & Annual Capacity Report*, U.S. DOE, March 1995.

*Spent Fuel Storage Requirements 1994-2042*, U.S. DOE, June 1995, DOE/RW-0431-Rev. 1.

*Civilian Radioactive Waste Management System Requirements Document*, Revision 05, U.S. DOE, January 1999.

*Viability Assessment of a Repository at Yucca Mountain*, US DOE, December 1998, DOE/RW-0508.

*Analysis of the Total System Life Cycle Cost of the Civilian Radioactive Waste Management Program*, U.S. DOE, December 1998, DOE/RW-0510.

*The DOE Position on the MRS Facility*, U.S. DOE, June 1989, DOE/RW-0239. 0022

*MRS Systems Study Task G Report - The Role and Functions of Surface Storage of Radioactive Material in the Federal Waste Management System*, Pacific Northwest Laboratory, Apr. 1989.

*MRS System Study Summary Report*, U.S. DOE, June 1989, DOE/RW-0235.

*Spent Fuel Acceptance Scenarios Devoted to Shutdown Reactors: A Preliminary Analysis,* Pacific Northwest Laboratory, October 1989.

J.W. Doman (WESTON/Rogers & Associates) and T.E. Tehan (Pacific Nuclear), "Significance of Campaigned Spent Fuel Shipments."

*Civilian Radioactive Waste Management System Throughput Rate Analysis,* August 17, 1993, Prepared for U.S. Department of Energy, Prepared by System Analysis, Civilian Radioactive Waste Management System Management and Operating Contractor.

Gottlieb, Peter and W. Bailey III, F. Emami, L. M. Ford, and J. F. King, "Throughput Study for the Civilian Radioactive Waste Management System," from the Proceedings of the High Level Radioactive Waste Management Conference, Las Vegas, NV, April 12 - 16, 1992.

McKee, R. W. and H. D. Huber, "Determination of Cost Effective Waste Management System Receipt Rates," Pacific Northwest Laboratory, from the Proceedings of the High Level Radioactive Waste Management Conference, Las Vegas, NV, April 28 - May 3, 1991

Letter from Daniel Dreyfus, OCRWM Director, to Dr. Andrew Kadak, President and CEO of Yankee Atomic, dated September 28,1995.

U.S. Commercial Spent Fuel Inventory; data on historic and projected spent fuel inventory and discharges, provided by NAC International (spreadsheet U.S. Commercial Spent Fuel Inventory.xls)

Memorandum provided by NAC International on ISFSI inventories as of 1/31/98 (ISFSI.doc).

*Deposition of Nancy Slater*, April 21, 1999.

*John W. Bartlett Expert Witness Report*

*James P. Malone Expert Witness Report*

*Ivan F. Stuart Expert Witness Report*

*Expert Witness Report of Kenneth T. Wise*

**Exhibit 2**
**Inputs for Economic Sequence Model**

| | Assumption | Data | Units |
|---|---|---|---|
| [1] | Cask Size: | 10.56 | MTU |
| [2] | GE Morris Wet O&M Costs per year: | 14,800,000 | ($) |
| [3] | Wet O&M Costs per year: | 8,000,000 | ($) |
| [4] | Dry O&M Costs per year: | 3,500,000 | ($) |
| [5] | Dry Fixed Setup: | 6,461,000 | ($) |
| [6] | Dry Decommissioning Cost: | 240,000 | ($)/cask |
| [7] | Variable Cask Costs: | 887,000 | ($)/cask |
| [8] | Crane Upgrade Threshold: | 30 | Metric Tons |
| [9] | Small Crane Upgrade Cost: | 4,500,000 | ($) |
| [10] | Large Crane Upgrade Cost: | 5,500,000 | ($) |
| [11] | Real Discount Rate: | 1.3% | (%) |

Notes:
[1]: Expert Report of James P. Malone.
[2]: Connecticut Yankee Atomic Power Company.
[3] - [10]: Expert Report of James P. Malone.
[11]: Expert Report of Kenneth T. Wise.

**Exhibit 3**
**Qualifications of Frank C. Graves**

**FRANK C. GRAVES** **Principal**

Mr. Graves assists utilities in the design and implementation of long-range planning, investment, and operating policies, and he assists their counsel with regulatory compliance and policy review. He has extensive experience with capacity expansion and network modeling, investment and contract prudence reviews, estimation of marginal costs, design and pricing of new services, and financial simulation and valuation techniques. He has testified on the economics of restructuring for retail and wholesale transmission access, power contract interpretations, service unbundling, market entry, and new services before the FERC and State regulatory commissions. He received an M.S. with a concentration in finance from the M.I.T. Sloan School of Management in 1980, and a B.A. in Mathematics from Indiana University in 1975.

## REPRESENTATIVE CONSULTING EXPERIENCE

- Mr. Graves has assisted several utilities in forecasting market prices, revenues, and risks for generation assets being shifted from regulated cost recovery to competitive, deregulated wholesale power markets. Such studies have facilitated planning decisions, such as whether to divest generation or retain it, and have been used as the basis for quantifying stranded costs associated with restructuring in regulatory hearings. Mr. Graves work in this area has helped several utilities develop long term planning models for managing their generation assets in a competitive market.

- A major concern associated with electric utility industry restructuring is whether or not generation markets will prove adequately competitive to allow complete deregulation of generation prices. Because of the state-dependent nature of transmission transfer capability between regions, itself a function of generation use, the extent of viable competition in the generation market can vary significantly and may be susceptible to market power abuse by dominant suppliers. Mr. Graves is leading an engagement to develop market monitoring procedures on behalf of one of the largest ISOs in the U.S., to detect and discourage any market manipulations that would impair competition.

- Many utilities find the prospects for participation in overseas power markets appealing, because of the similarities to regulatory contracting and pricing that they

have experienced in the U.S., prior to restructuring. However, it is clear that there are many new risks associated with operations in a foreign country, related to the stability of its currency, its macroeconomy, its foreign investment policies, and even its political system. Mr. Graves has assisted firms facing these new dimensions to assess the risks, identify strategic advantages, and choose an appropriate, risk-adjusted hurdle rate for the market conditions and contracting terms they will face.

- The value of hydroelectric generation assets in a competitive power market is heavily dependent on operating practices that astutely shift between real power and ancillary services markets, while still observing a host of non-electric hydrological constraints. Mr. Graves has lead studies for several major hydro generation owners in regard to forecasting of market conditions and corresponding hydro schedule optimization. He has also designed transfer pricing procedures that create an internal market for diverting hydro assets from real power to system support services firms that do not yet have explicit, observable market prices.

- The natural gas pipeline industry is wedged between competitive gas production and competitive resale of gas delivered to end users. In principle, the resulting basis differentials between locations around the pipeline ought to provide efficient usage and expansion signals, but traditional pricing rules prevent the pipeline companies from participating in the marginal value of their own services. Mr. Graves has worked to develop alternative pricing mechanisms and service mixes for pipelines that would provide more dynamically efficient signals and incentives.

- The glut of generation capacity that helped usher in electric industry restructuring in the US lead to asset devaluations in many places, even where no retail access was allowed. In some cases, this has lead to bankruptcy, especially of a few large rural electric cooperatives. Mr. Graves assisted one such coop with its long term financial modeling and rate design under its plan of reorganization, which was approved. Testimony on cost of service was provided.

- Power plants often provide a significant contribution to the property tax revenues of the townships where they are located. A common valuation policy for such assets has been that they are worth at least their book value, because that is the foundation for their cost recovery under cost-of-service utility ratemaking. However,

restructuring throws away that guarantee, requiring reassessment of these assets.. Traditional assessment tests, e.g., based on the replacement costs of comparable assets, can be extremely misleading, because they do not consider market conditions. Utility property tax assessments must be based on sound concepts of how value is captured in competitive power markets, requiring careful education and presentation to tax assessment boards. Mr. Graves has testified on such matters on behalf of the owners of a small, out-of-market coal unit in Massachusetts.

- Much attention has been payed to horizontal market power in the electric generation industry, but less so to the possibility of vertical market power, whereby sufficient control of an upstream market creates competitive advantage in a downstream market. It is possible for this problem to arise in fuels, in settings where the likely marginal generation are dependent on one or a very few fuel suppliers who also have economic interests in the local generation market. Mr. Graves has analyzed this problem in the context of the California gas and electric markets and filed testimony to explain the magnitude and manifestations of the problem.

- Overseas markets for energy services provide intriguing investment prospects for U.S. electric and gas utilities, but the type and degree of risk involved is generally unfamiliar. Mr. Graves has assisted several developers of power plants and energy infrastructure with adjusting their investment criteria for different international environments. Generally, political risk indexes and relative bond yields are not sufficient indicators of when, why, or how much of a higher discount rate for project valuations may be necessary.

- The impacts of transmission open access and generation competition on utility financial health are well documented. In contrast, the effects on fuel use have been largely ignored, though there are many reasons to believe that relative fuel use will change, due to revised dispatch, repowerings and retirements, changes in expansion mix, and altered load shapes and load growth under more competitive pricing. For EPRI, Mr. Graves has contributed to a study that projects changes in fuel use within and between ten large power market regions spanning the country under different scenarios for the pace and success of restructuring.

- Several states are moving rapidly on implementing retail access for electric utilities. Mr. Graves has worked with the executive committees of several utilities in designing a regulatory strategy for influencing this transition and developing comprehensive business strategies and integrated planning tools for service unbundling and pricing, incentive ratemaking corporate reorganization, market forecasting, asset valuation and risk management.

- Stranded costs and out-of-market contracts from restructuring can affect municipalities and cooperatives as well as investor-owned utilities. Mr. Graves has assisted one debt-financed utility in an evaluation of its possibilities for reorganization, refinancing, and re-engineering to improve financial health and to lower rates. Sale and leaseback of generation, fuel contract renegotiation, targeted downsizing, spinoff of transmission, and new marketing programs were among the many components of the proposed new business plan.

- Regulatory and legal approvals of utility mergers require evidence that the combined entity will not have undue market power and that it will create operating synergies that produce benefits for electric customers. Mr. Graves has assisted several utilities in evaluating potential mergers and acquisitions. He has identified ways in which transmission constraints reduce the number and type of suppliers, creating a risk of anticompetitive impacts unless structural, ownership, and pricing adjustments are put in place. He has also determined which benefits can be attributed to a merger and which can be accomplished without forming the combined organization.

- Mr. Graves has lead a gas distribution company in the development of an incentive ratemaking system to replace all aspects of traditional cost of service regulation. The base rates (for non-fuel operating and capital costs) were indexed on a price-cap basis (RPI-X), while the gas and upstream transportation costs allowances were tied to optimal average annual usage of a reference portfolio of supply and transportation contracts. The gas company will also make numerous adjustments to its rate design, e.g. designing new standby rates so that customer choice will not be distorted by pricing inefficiencies.

- As a means of reducing supply commitment risk, several utilities have solicited offers for power contracts that grant the right but not the obligation to take power at some

future date at a predetermined price, in exchange for an initial option premium payment. Mr. Graves has assisted several of these utilities in the development of valuation models for comparing the asking prices to fair market values for option contracts. In addition, he has helped these clients develop estimates of the critical option valuation parameters, such as trend, volatility, and correlations of the future prices of electric power and the various fuel indexes proposed for pricing the optional power. Training seminars on options valuation methods were also presented.

- The ability to recover sunk costs of generation assets under open transmission access is of great concern to utilities. Mr. Graves has assisted one electric utility in the design and implementation of a method for forecasting probable capital recovery levels in the regional power market over the coming decade. The approach involves calculating a fixed cost contribution per kWh based on the marginal customer's value of lost load and the hourly loss of load probability, coupled with iterative adjustments to the quantity and mix of generation reserves in the regional pool based on the implied financial viability of each generating unit at the forecasted market prices.

- Mr. Graves has participated as a facilitator and advisor to one electric utility's task force on transmission strategy formulation and service pricing. Of particular concern were how much to unbundle and where to draw the line between generation and transmission functions. The efficiency and cost recovery merits of "nonconforming" rates (not based on embedded cost of service) were weighed against the potential regulatory controversy. Straw-man alternatives reflecting time- or location-of-use in rate design were mocked up for assessment of competitive position and customer impact. The need to revise existing interconnection contracts to achieve comparability of service was also evaluated.

- An electric utility with several out-of-market independent power contracts wanted to determine the value of making those plants dispatchable and to devise a negotiating strategy for restructuring the IPP agreements. Mr. Graves developed a range of forecasts for the delivered price of natural gas to this area of the country through the year 2000. Alternative ways of sharing the potential dispatch savings were proposed as incentives for the IPPs to renegotiate their utility contracts.

- For an electric utility considering the conversion of some large oil-fired units to natural gas, Mr. Graves conducted a study of the advantages of alternative means of obtaining gas supplies and gas transportation services. A combination of monthly and daily spot gas supplies, interruptible pipeline transportation over several routes, gas storage services, and "swing" (contingent) supply contracts with gas marketers was shown to be attractive. Testimony was presented on why the additional services of a local distribution company would be unneeded and uneconomic.

- A power engineering firm entered into a contract to provide operations and maintenance services for a cogenerator, with incentives fees tied to the unit's availability and operating cost. When the fees increased due to changes in the electric utility tariff to which they were tied, a dispute arose. Mr. Graves provided analysis and testimony on the avoided costs associated with improved cogeneration performance under a variety of economic scenarios and under several alternative utility tariffs.

- For a division of a large telecommunications firm, Mr. Graves assisted in a cost benchmarking study, in which the costs and management processes for billing, service order and inventory, and software development were compared to the practices of other affiliates and competitors. Unit costs were developed at a level far more detailed than the company normally tracked, and numerical measures of drivers that explained the structural and efficiency causes of variation in cost performance were identified. Potential costs savings of 10-50 percent were estimated, and procedures for better identification of inefficiencies were suggested.

- Mr. Graves has helped several pipelines design incentive pricing mechanisms for recovering their expected costs and reducing their regulatory burdens. Among these have been Automatic Rate Adjustment Mechanisms (ARAMs) for indexation of operations and maintenance expenses, construction-cost variance-sharing for routine capital expenditures that included a procedure for eliciting unbiased estimates of future costs, and market-based prices capped at replacement costs when near-term future expansion was an uncertain but probable need.

- On behalf of the Electric Power Research Institute (EPRI), Mr. Graves has written a primer on how to define and measure the cost of electric utility transmission