**PUBLICLY AVAILABLE**
**REDACTED VERSION**

# APPENDIX A:
# DOCUMENTS CONSIDERED

**PUBLICLY AVAILABLE**
**REDACTED VERSION**

**EXPERT REPORTS AND DISCUSSIONS**

Expert Report of Kenneth T. Wise (1999).

Expert Report of Christopher C. Barry of PricewaterhouseCoopers (1999).

Expert Report of Frank C. Graves titled "Frank C. Graves Expert Witness Report" (1999).

Discussions with Yankee Atomic personnel.

**DOCUMENTS PROVIDED THROUGH DISCOVERY**

Yankee Atomic Budget Estimates (2003).

Yankee Atomic Evaluation of Costs for Wet Fuel Storage, ISFSI Construction, and ISFSI Operations as related to budget estimates (2003).

Yankee Atomic Decommissioning Trust Fee Analysis (2003).

Yankee Atomic supporting budget information for rents and leases, vehicles and tax audits (2003).

Yankee Atomic Budget Estimate (1999).

**PUBLICLY AVAILABLE DOCUMENTS**

The Wall Street Journal (3/25/03)

U.S. Treasury Bond Yield Curve (3/25/03)

Blue Chip Economic Indicators CONSENSUS Forecast (10/10/2002, 3/10/2003).

PUBLICLY AVAILABLE
REDACTED VERSION

**APPENDIX B:**
**RESUME OF KENNETH T. WISE**

Dr. Kenneth Wise has specialized in the application of economics and statistical techniques to analyze complex issues in connection with business and environmental litigation. He has developed expert analyses of damages in connection with toxic tort, breach of contract, and product liability matters. Much of his work has addressed damages or the allocation of liabilities associated with environmental problems. He has presented economic, statistical, and financial testimony in state and federal court, and before administrative law judges, regulatory commissions, arbitrators, and mediators.

Dr. Wise holds a B.S. in Physics (with honors) from Harvey Mudd College and a Ph.D. in Economics from the Massachusetts Institute of Technology.

**TESTIMONY**

Testimony on behalf of defendant in *United States of America v. Illinois Power Company and Dynegy Midwest Generation, Inc.*, United States District Court; Southern District of Illinois; No. 99-CV-833-MJR. (Deposition taken.)

Testimony on behalf of defendant in *Union Station Associates, LLC vs. Puget Sound Energy, Inc.*, United States District Court; Western District of Washington; C01-0298P. (Deposition taken.)

Testimony on behalf of defendant in *Advanced Micro Devices, Inc., vs. Olin Corporation and Arch Chemicals, Inc.*, Civil Action No. A-01-CA-734-SS, United States District Court for the Western District of Texas, Austin Division (Deposition taken.)

Testimony on behalf of defendant in *State of New Mexico, et al. vs. General Electric Company, et al.*, Case No.: CV 99-1118 BSJ/KBM, Case No.: CV 99-1254 BSJ/LFG in the District Court of New Mexico. (Deposition taken.)

Testimony on behalf of plaintiffs concerning damages in *Yankee Atomic Electric Company, Maine Yankee Atomic Power Co., and Connecticut Yankee Atomic Power Co., v. The United States*, Case No. 98-126C, 98-474C, and 98-154C in the United States Court of Federal Claims. (Deposition taken.)

Testimony on behalf of New England Electric System as a 30(b)(6) witness in *New England Electric System, et al. v. Allianz Insurance Company, et al.*, Commonwealth of Massachusetts Superior Court, Civil Action No. 99-00467B. (Deposition taken.)

Testimony on behalf of Union Pacific concerning alleged diminution of property values. *Gwendolyn Guillory, et al. v Union Pacific Corporation, et al.*, State of Louisiana, Parish of Calcasieu, 14th District Court, No. 98-5405. (Deposition taken.)

Testimony on behalf of Amoco Oil Company, Texaco Refining and Marketing, Inc., Chevron, USA Inc., Chevron USA Products Company, BP Exploration & Oil, Inc., Star Enterprise, and Shell Oil Products Company in *Lynn, et al. v. Amoco Oil Company, et al.*, Civil Action No. 96-T-940-N. (Deposition taken.)

Testimony on behalf of Clark Refining & Marketing concerning the economic benefit associated with alleged non-compliance with Clean Air Act regulations. *United States v. Clark Refining & Marketing, Inc.* (USDC SD Ill.) (Deposition taken.)

Testimony on behalf of Motorola, Inc. concerning alleged diminution of property values. *Melody Baker, et al., v. Motorola, Inc.*, Superior Court of the State of Arizona in and for the County of Maricopa, No. CV 92-02603. (Deposition taken.)

Testimony on behalf of Bay Metal, Inc. concerning allocation of remedial costs at the Metcoa radiation site. *United States of America v. Marvin Pesses, et al.*, United States District Court for the Western District of Pennsylvania, Civil Action No. 90-0654. (Deposition taken.)

Testimony on behalf of Koch Industries, Inc. concerning the economic benefit associated with alleged non-compliance with Clean Water Act regulations. *United States of America and The State of Texas v. Koch Industries, Inc., Koch Pipeline Co., L.P., and Koch Gathering Systems, Inc.*, United States District Court for the Northern District of Oklahoma, Civil Action No. 97CV687B(E). (Deposition taken.)

Testimony on behalf of Koch Industries, Inc. concerning the economic benefit associated with alleged non-compliance with Clean Water Act regulations. *United States of America and The State of Texas v. Koch Industries, Inc., et al.*, United States District Court for the Southern District of Texas Houston Division, Civil Action No. H 95-1118. (Deposition taken.)

Testimony on behalf of WCI Steel, Inc. concerning the economic benefit associated with alleged non-compliance with RCRA regulations. *United States of America v. WCI Steel, Inc.*, United States District Court for the Northern District of Ohio, No. C.A. 4:98CV1082. (Deposition taken.)

Testimony on behalf of NL Industries and Crown Cork & Seal concerning allocation issues at the Lipari Landfill site. *United States of America and New Jersey Department of Environmental Protection v. Rohm and Haas Company, et al., v. John Cachinnate, et al.*, United States District Court for the District of New Jersey, Camden Vicinage, Civil Action No. 85-4386 (JHR). (Deposition taken.)

Testimony on behalf of the City of Newburgh concerning damage issues. *City of Newburgh, New York, v. Central Hudson Gas & Electric Corporation*, United States District Court, Southern District of New York, Index No. 95 CIV. 3863 (CLB). (Deposition taken.)

Testimony on behalf of Borden Chemicals concerning the economic benefit associated with delayed compliance. *Borden Chemicals & Plastics Operating Limited Partnership v. Carol Browner as Administrator of, and the United States Environmental Protection Agency*, United States District

Court, District of Louisiana, Docket No. 94-440-A-3, consolidated with Civil Action No. 94-2592-A-3. (Deposition taken.)

Testimony on behalf of WCI Steel, Inc. concerning the economic benefit of delayed compliance. *United States of America vs. WCI Steel, Inc.*, Case No. 4:95 CV 1442. (Deposition taken.)

## SELECTED PUBLICATIONS AND PRESENTATIONS

"Generating Interest: The Misapplication of the BEN Model to Regulated Utilities," Kenneth T. Wise, M. Alexis Maniatis, and Marc Chupka. *Environment Reporter*, March,1, 2002.

"Measuring Mountains and Molehills: Property Impact Claims," Kenneth T. Wise, Matthew A. Barmack, and Paul Liu. American Bar Association, Section of Environment, Energy, and Resources, 8th Section Fall Meeting, September 21, 2000.

"Decision in *U.S. v. WCI Steel Inc.* Departs From U.S. EPA's 'BEN' Methodology." Kenneth T. Wise and Robert H. Fuhrman. *Environmental Compliance & Litigation Strategy*, February 2000.

"An Approach to Environmental Civil Penalty Cases." Robert H. Fuhrman, Kenneth T. Wise, and M. Alexis Maniatis. *Environmental Compliance & Litigation Strategy*, January 1999.

"Consideration of 'Wrongful Profits' in Environmental Civil Penalty Cases." Robert H. Fuhrman, Kenneth T. Wise, and M. Alexis Maniatis. *Environment Reporter*, September 18, 1998.

"Allocation of Orphan Shares in the Face of Economically Divisible Harm" Kenneth T. Wise, M. Alexis Maniatis, and Gayle S. Koch. *Chemical Waste Litigation Reporter*, May 1998

"Economists, Orphans, and Superfund Allocation: Clearing Up the Controversy" Kenneth T. Wise, Alexis Maniatis, and Gayle S. Koch. *Chemical Waste Litigation Reporter*, October 1997.

"The Economic Benefit of Noncompliance: A Response" Robert H. Fuhrman, M. Alexis Maniatis, and Kenneth T. Wise. *Toxics Law Reporter*, September 1997.

"Insurance Recovery for Manufactured Plant Liabilities: Valuation, Optimization, and Settlement Strategies" Gayle S. Koch, Kenneth T. Wise, and Philip Hanser. *Public Utilities Fortnightly*, April 1997.

"Government Expands Economic Benefit Concept Using Flawed Theory in 'U.S. *v.* Dean Dairy'" Kenneth T. Wise and M. Alexis Maniatis. *The Toxics Law Reporter*, February 1997.

"Allocating CERCLA Liabilities: The Applications and Limitations of Economics" Kenneth T. Wise, M. Alexis Maniatis, and Gayle S. Koch. *The Toxics Law Reporter*, January 1997.

"Breaking the Impasse: Structured Analysis to Mediate Insurance Disputes" Kenneth T. Wise and Gayle S. Koch. Chapter in "Insurance Coverage for Environmental Claims" published by the Defense Research Institute in October 1995.

"Correct Estimation of Stigma Damages: Avoiding the Pitfalls" Kenneth T. Wise and Susan J. Guthrie. Mealey's Litigation Reports Toxic Property Damage, September 1995.

"Time to Remodel: Challenging the Use of BEN and ABEL in Environmental Litigation" Kenneth T. Wise, Gayle S. Koch, and M. Alexis Maniatis. Hazardous Waste Strategies Update, Fall 1995.

"Estimating Natural Resource Damages with and without Contingent Valuation" Kenneth T. Wise, Susan Guthrie, and Daniel L. McFadden. Presented at the 88th Annual Meeting of the Air and Waste Management Association in June 1995.

"The Best Approach to Environmental Compliance" Paul R. Ammann, Gayle S. Koch, M. Alexis Maniatis, and Kenneth T. Wise. *Chemical Engineering*, February 1995.

"Filling the GAAP: An Approach to Improve SEC Disclosure of Environmental Liabilities" Kenneth T. Wise, M. Alexis Maniatis, Paul R. Ammann, and Gayle S. Koch. *Journal of Environmental Law & Practice*, September/October 1994

"Controlling Costs and Improving Performance: Strategic Analysis of Litigation" Carlos Lapuerta, Gayle S. Koch, Kenneth T. Wise, and Vincent Gallogly. *ACCA Docket*, Summer 1994.

"The Enigma of Stigma: The Case of the Industrial Excess Landfill" Kenneth T. Wise and Johannes P. Pfeifenberger. Analysis and Perspective, *The Toxics Law Reporter*, May 1994.

"Evaluating Environmental Costs: Accounting for Uncertainties" Gayle S. Koch, Paul R. Ammann, and Kenneth T. Wise. *Chemical Waste Litigation Reporter*, Volume 27, Number 3, February 1994.

"Estimating Contingent Environmental Liabilities: An Approach to Achieve SEC Compliance" Kenneth T. Wise, M. Alexis Maniatis, Paul R. Ammann, and Gayle S. Koch. Analysis and Perspective, *The Toxics Law Reporter*, December 1993.

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| YANKEE ATOMIC ELECTRIC COMPANY, Plaintiff, | |
| v. | No. 98-126 C (Senior Judge Merow) |
| UNITED STATES OF AMERICA, Defendant. | |

JOHN W. BARTLETT EXPERT WITNESS REPORT

This report addresses plaintiff's contract with the Department of Energy ("DOE") for the disposal of spent nuclear fuel and high-level radioactive waste (together "spent fuel"). The parties' contract is one of approximately 50 such contracts with essentially the same terms between the government and commercial nuclear utilities. The basic contract form is frequently referred to as a Standard Contract.

I am aware that the Court has held that the government breached plaintiff's contract by not beginning to dispose of plaintiff's spent fuel by January 31, 1998. The contract does not specify either the pace at which DOE would accept spent fuel from commercial nuclear reactors or the sequence in which DOE was supposed to be accepting plaintiff's spent fuel after DOE commenced its acceptance of spent fuel not later than January 31, 1998. I have been asked to present my opinions on what the proper pace and schedule should have and would have been had the government not breached its obligation to start accepting spent fuel by January 31, 1998. This report presents those opinions and my basis therefor together with the other information called for in Fed. R. Civ. P. 26(a)(2)(B).

## I. Opinions to be Expressed and the Basis Therefor

I offer the following points as the opinions to which I expect to testify at the trial of this matter. I am outlining my reasoning for reaching my conclusions along with the conclusions themselves. In addition, my opinions are based on my many years of experience in the field of spent fuel management (including three years as director of the Office of Civilian Radioactive Waste Management ("OCRWM") in DOE) and my review of relevant documents.

My principle opinions are as follows:

(1) Had the government not breached its contract, it would have reasonably ramped up to the acceptance of 3,000 Metric Tonnes of Uranium ("MTU") per year of spent fuel from contracting utilities.

(2) Had the government not breached its contract, it would have followed a spent fuel acceptance schedule that would have taken advantage of swaps of acceptance slots and acceptance campaigns.

### A. Pace of Spent Fuel Acceptance

The pace of spent fuel acceptance should be efficient.[1] In particular, the pace should generally minimize the total cost to utilities of storing and disposing of spent fuel.[2] This total

---

[1] The parties' activities under the Standard Contracts must be conducted in a safe manner. My opinions fully take this requirement into account.

[2] The government has recently analyzed alternative approaches to performing its obligations under the Standard Contracts that focus on certain aspects of cost minimization that are similar to those presented in my report here. *See Civilian Radioactive Waste Management System Modular Design/Construction and Operation Options Report*, Revision 02 (December 18, 1998) ("Operation Options Report"). The government's report refers to the total cost to utilities as the "total societal costs." *Id.* at xii and 9-14. As noted below, a complete list of documents I have considered is attached to this report.

cost can be divided into three parts. One is the program cost – the sum of the fees each contracting utility has or will pay to the government for the services specified in the Standard Contracts. A second is at-reactor spent fuel storage costs – the sum of the costs each contracting utility has or will incur storing spent fuel prior to it being accepted by the government. A third is loading costs – the sum of the costs each contracting utility will incur loading spent fuel into casks provided by the government pursuant to the Standard Contracts for transport to a government facility.

The government should minimize these total costs to utilities because the Standard Contracts are "full cost recovery" contracts.[3] The full cost recovery structure of the Standard Contracts ensures that the cost of providing the services specified in the standard contract is not a burden for the government because the government may and has passed all of these costs on to contracting utilities. The full cost recovery structure of the Standard Contracts has, thus, provided the government with the flexibility to do whatever has been necessary in order to perform its contract obligations in an efficient, cost-effective manner so as to minimize the total costs to utilities. DOE has long recognized the desirability of performing its contractual

[3] *See* Plaintiff's contract fourth whereas paragraph and Art. VIII.A.4; *see also* 1985 Mission Plan, defining "full cost recovery" at 423.

obligations in a cost-effective manner.[4] DOE has also recognized the desirability of reducing utilities' at-reactor spent fuel storage costs.[5]

1. <u>Sufficient to Accept "Must-Move Fuel"</u>

Commercial nuclear reactors in the United States were designed to temporarily store spent fuel, "wet," in pools pending its removal from the plant site. In this arrangement, spent fuel is stored under water that provides shielding so that the radiation from the spent fuel does not impact people or the environment. Spent fuel pools are equipped with racks that hold the spent fuel. Given a particular rack arrangement, any particular pool can hold only a specified amount of spent fuel. The operation of a spent fuel pool requires utilities to bear the labor, maintenance, security, management and other costs of running the pool. This cost does not vary significantly with the amount of spent fuel in the pool. The storage capacity of a spent fuel pool can be increased to a limited extent by "re-racking" the pool. In that process, additional racks are added to the spent fuel pool or the existing racks are replaced with ones having a more compact

---

[4] *See, e.g., Mission Plan for the Civilian Radioactive Waste Management Program,* DOE/RW-0005 (DOE June 1985) ("1985 Mission Plan") at 6 ("The program must be conducted in a cost-effective manner, with full cost recovery.") and 15 ("The program must be conducted in a financially responsible, cost-effective manner and on the basis of full cost recovery."); Operations Options Report at 9 (explaining that the effectiveness of various operations options were being studied by eight criteria: (1) the total amount of waste accepted, (2) the amount of waste stored in repository surface facilities, (3) the number of shutdown reactor sites with empty pools, (4) the number of reactor sites where construction of new dry storage facilities could be avoided, (5) the number of reactor site-years that spent fuel would remain at shutdown reactor pools, (6) utility costs for post-shutdown storage and pool maintenance, (7) total system life cycle cost and (8) societal costs.

[5] *See,* <u>*e.g.,*</u> 1985 Mission Plan at 18; T.W. Wood (Pacific Northwest Laboratory), Spent Fuel Storage Requirements for Nuclear Utilities and OCRWM, 2 *High Level Waste Management: Proceedings of the International Meeting at Las Vegas, Nevada, April Topical 8-12, 1990.*

design. Re-racking requires not only the purchase of the new racks but also significant labor involved in the installation of the new racks. In addition, an operating nuclear reactor should have a spent fuel pool with sufficient unused capacity to accommodate all of the spent fuel currently in the reactor itself. This storage capacity is frequently referred to as a "full core reserve" capacity.

Commercial nuclear reactors can also store spent nuclear fuel in "dry" form. In this arrangement, spent fuel is moved from the spent fuel pool to containers which are designed to keep radiation from the spent fuel from reaching the atmosphere. These containers are costly to purchase. In addition, the movement of spent fuel from wet to dry storage is expensive, as it entails substantial labor costs. Once spent fuel is in dry storage, however, the ongoing costs of a dry storage facility for operations, maintenance, labor, security and other costs are significantly less than those of a spent fuel pool containing a similar amount of spent fuel.

A utility's cost of storing spent fuel can rise precipitously in two events: (1) if it is forced to add to its at-reactor storage capacity because its spent fuel pool fills up, and (2) if it is forced to extend at-reactor storage of spent fuel after its reactor permanently shuts down and all of the spent fuel has "cooled" for a period of time. Thus, utilities have an economic incentive to avoid costs arising from either of these types of events. Additions to at-reactor storage capacities can be made through re-racking, the creation of a dry storage facility or additions to an existing dry storage facility – all of which entail significant cost.[6] The amount of spent fuel that would trigger one of these events can be thought of as "Must-Move" fuel in the sense that the spent fuel

[6] A utility could theoretically also add to its at-reactor storage capacity by building another spent fuel pool. The large cost for the construction of such a facility, however, prevent this from being an economically viable option.

must be moved in order to avoid these significant additional costs. In the case of an operating reactor, Must-Move fuel would be the amount of spent fuel that would have to be moved from the reactor site in order to avoid the need to either re-rack or create a dry storage facility – generally the amount discharged from the reactor core when the spent fuel pool is full.

Spent fuel must "cool" in a spent fuel pool for a period of time after it is discharged from the reactor and before it can be moved into a container and stored "dry," out of the spent fuel pool. Therefore, the spent fuel pool must be operated after the date of the last discharge of spent fuel from the reactor into the spent fuel pool and until that period of time has elapsed. In the case of a shut down reactor, until that period has elapsed none of the spent fuel in the spent fuel pool constitutes Must-Move fuel. After the requisite period of time has elapsed from the date of the last discharge into the spent fuel pool, all of the reactor's spent fuel constitutes Must-Move fuel, since it would all have to be accepted by DOE in order to avoid all of the additional costs of storing the spent fuel at the reactor site. Since the Standard Contracts call for spent fuel to ordinarily cool in a spent fuel pool for at least five years before being accepted by DOE,[7] all of the spent fuel in a shut down reactor's spent fuel pool becomes Must-Move fuel five years after the date when the last of that spent fuel is discharged from the reactor.

DOE's spent fuel acceptance rate should accommodate as much of the utilities' Must-Move fuel as practicable given the full-performance capacity of the system. After a ramp-up to a full-performance level, an efficient spent fuel acceptance rate should be relatively constant so as to make the fullest possible use of the spent fuel transportation and handling facilities developed to receive spent fuel. An acceptance rate that does not accommodate as much of the utilities'

---

[7] *See, e.g.*, Plaintiff's contract, Appendix E, ¶ B.3.

Must-Move fuel as practicable would be inefficient in that it would impose avoidable costs for the at-reactor storage of spent fuel on the utilities that could be avoided. In addition, the spent fuel acceptance rate should provide for the acceptance of more than the minimum amount of spent fuel necessary to accept all Must-Move fuel anticipated in current projections. This buffer amount of spent fuel acceptance is necessary to accommodate at least some unanticipated increases in the need for spent fuel acceptance without increasing utilities' spent fuel storage costs. Indeed, DOE itself has long recognized the desirability of relieving utilities of at-reactor spent fuel storage pressures, particularly around the time of the 1998 date for the commencement of government acceptance.[8]

The amounts and locations of Must-Move fuel can be projected with reasonable certainty. Nuclear power plants discharge spent fuel at a fairly predictable rate. Since 1990, nuclear power plants have in the aggregate been discharging approximately 2,000 MTU per year. This aggregate annual discharge rate is expected to continue for at least the next fifteen years and then decline as currently operating plants reach the end of their licensed lives.[9] In addition, the current

---

[8] *See* 1985 Mission Plan at 28.

[9] *See, e.g., Spent Fuel Storage Requirements 1994 - 2042*, DOE/RW-0431 Rev. 1(June 1995) ("1995 Spent Fuel Storage Report") at 4.3. The government has published a similar report on roughly an annual basis from 1978 through 1995.

capacity of each reactor's fuel pool is known. Also, the licensed life of each plant is known.[10] DOE has long made projections of this sort itself.[11]

2. Ramp Up

The acceptance rate should not and would not include a long "ramp up" for spent fuel acceptance between the commencement of spent fuel acceptance and the time when the acceptance rate reaches a reasonably efficient, full-performance level. Prior to the required January 31, 1998 commencement date, DOE had more than fifteen years in which to plan the necessary transportation and storage facilities so that DOE could work efficiently once performance commenced. Moreover, the tasks at issue – moving spent fuel from reactor sites, transporting spent fuel and placing it in a storage facility are very familiar to DOE and to the nuclear energy industry both in the United States and abroad.[12] Furthermore, DOE could and would have done all the necessary planning and construction work (of both storage facilities and casks) to have been able to have started accepting spent fuel in 1998. Given this experience, the government should not and would not need more than three years to attain an efficient full performance acceptance rate.

---

[10] Although a plant may apply to the government to extend its licensed life, only two utilities have initiated that process to date. Moreover, nuclear power plants have limited lives due to their physical structures and components. Therefore, it is reasonable for purposes of projecting Must-Move fuel at permanently shut down reactors to assume that, on average, currently operating reactors will be permanently shut down at the end of their currently licensed lives.

[11] *See, e.g.*, 1995 Spent Fuel Storage Report and preceding reports.

[12] In addition to my own knowledge of this fact, I have considered the expert witness report of Ivan Stuart as further support for this opinion.

DOE itself has recently specified a conservative ramp up for the spent fuel acceptance rate in its listing of requirements for a possible Centralized Interim Storage Facility ("CISF").[13] This type of facility is indicative of the system DOE should have and could have developed to have met its obligation to begin accepting spent fuel by January 31, 1998.

3. Acceptance Rate Conclusion

An analysis of Must-Move fuel consistent with my opinions noted above has been set out in the expert witness report of Frank C. Graves. This report shows that if DOE had started accepting spent fuel in 1998 with a reasonable ramp up to a 3,000 MTU per year spent fuel acceptance rate, DOE would have been able to have eliminated the Must-Move fuel backlog within approximately four years after 1998.[14] Mr. Graves' also shows that DOE would subsequently have been able to have accepted all additional spent fuel as it attained Must-Move status.[15] Hence, a reasonable ramp-up to a 3,000 MTU/year acceptance rate, as reflected in Mr. Graves' report, would have been efficient. This efficient rate would have been the rate at which DOE would have accepted spent fuel. Therefore, the 3,000 MTU per year acceptance rate with a

---

[13] *See Civilian Radioactive Waste Management System Requirements Document, Revision 05*, DOE/RW-0406 (January 1999) at 13, Table 3, specifying a ramp up (in MTHM per year) of 1200, 1200, 2000, 2000, 2700, 3000.

[14] *See* Expert Witness Report of Frank C. Graves.

[15] A 3,000 MTU per year annual spent fuel acceptance rate is also consistent with the fact that nuclear reactors have been in the aggregate discharging approximately 2,000 MTU per year of spent fuel. The annual spent fuel acceptance rate must be greater than this aggregate annual spent fuel discharge rate for DOE to have an ability to eliminate the backlog of at-reactor spent fuel waiting for acceptance by DOE.

ramp of 1200, 1200, 2000, 2000, 2700 is reasonable and appropriate for the purposes of Mr. Graves' analysis.[16]

B. Schedule for Spent Fuel Acceptance

The schedule for DOE's acceptance of spent fuel should be efficient. The schedule should permit and encourage minimization of utilities' total costs of at-reactor storage and payments for DOE's spent fuel program. With respect to utilities' storage costs, the schedule should take into account the fact that not all plants have costs which could be avoided if their spent fuel were accepted by DOE. As explained above, a utility's costs of storing spent fuel rise precipitously if the utility is forced either to add at-reactor storage capacity or to extend at-reactor storage more than five years after its plant permanently shuts down. In other words, a utility's costs of storing spent fuel rise if it possesses Must-Move fuel. The schedule should permit and encourage plants facing these costs to avoid the costs, if possible, by have their spent fuel accepted as soon as possible after the January 31, 1998 commencement date for DOE's acceptance of spent fuel from utilities.

In addition, the schedule should be efficient in that it should permit and encourage utilities to reduce their costs of delivering spent fuel to the government. Plaintiff's contract requires plaintiff to load its spent fuel on to the transportation vehicles supplied by DOE.[17] The movement of spent fuel from a spent fuel pool to the transportation vehicles can be accomplished more efficiently and less expensively if it is done in campaigns in which relatively large volumes

---

[16] I recognize that these acceptance rate numbers are approximations and do not contend that DOE would have accepted precisely these amounts of spent fuel each year.

[17] *See* Plaintiff's, Art. IV.A.2.(a).