of spent fuel are delivered at a time.[18] This efficiency stems largely from the fact that the movement of spent fuel from a spent fuel pool is a detailed, labor-intensive process. The workers performing the necessary tasks can perform them more efficiently if they do them regularly rather than episodically.

A schedule that permits and encourages the use of campaigns is particularly advantageous for operating plants. The movement of spent fuel from a spent fuel pool at an operating plant can be disruptive of the normal electricity generation activities at the plant.[19] This disruption occurs because the personnel that are required by government regulation to be involved in the movement of the spent fuel from the pool are the same personnel that are required for the normal operations of the plant. For these reasons, the schedule for spent fuel acceptance should permit and encourage utilities to organize their deliveries of spent fuel to DOE in a limited number of campaigns.

1. <u>Role of Spent Fuel Discharge Listing</u>

Plaintiff's contract requires the government to list utilities' spent fuel discharges from their respective reactors in the order in time in which such discharges occurred as "an annual acceptance priority ranking" for receipt of spent fuel at the DOE repository.[20] The spent fuel discharged earliest is listed first and is frequently referred to as the oldest fuel. I understand that the government has taken the position that the appropriate schedule for its acceptance of spent

---

[18] In addition to my own knowledge of this fact, I have considered the expert witness report of Ivan Stuart as further support for this opinion.

[19] In addition to my own knowledge of this fact, I have considered the expert witness report of Ivan Stuart as further support for this opinion.

[20] *See* Plaintiff's Contract, Art. IV.B.5.(a).

fuel from utilities would be the order shown in this listing. This sort of schedule is frequently referred to as "oldest-fuel-first" or "OFF."

OFF would not be a reasonable schedule for the actual acceptance of spent fuel. Part of the problem with OFF is apparent from a review of the government's most recent combined Annual Capacity Report and Annual Priority Report.[21] This report includes a scheduling queue that applies the government's stated annual receiving capacity for spent fuel from utilities to the list of spent fuel discharges arranged according to OFF. The scheduling queue consists of a listing by a utility of the amount of spent fuel to be picked up from that utility in each of the first ten years of the government's acceptance of spent fuel from utilities.[22] The OFF-based scheduling queue would require that relatively small amounts of spent fuel be accepted from a large number of different plants each year. The scheduling queue does not take into account whether a utility has Must-Move fuel. The scheduling queue would not permit the use of transportation campaigns. In fact, many of the annual allocations to individual utilities in the OFF queue are so small that they do not even call for full containers of spent fuel to be used. For these reasons, among others, the OFF queue does not represent a reasonable schedule for spent fuel acceptance. In my opinion, DOE would and could not have followed an OFF schedule even if it had commenced spent fuel acceptance by January 31, 1998.

---

[21] *See* 1995 Annual Capacity Report/Annual Priority Report, DOE/RW-0457 (March 1995).

[22] *Id.* at 6.

2. Exchanges of Scheduling Slots

The OFF listing can be useful, however. The scheduling queue can be used as an allocation of scheduling slots rather than as a rigid schedule for actual acceptance. If used as an allocation of scheduling slots, the OFF listing can serve as a useful starting point from which utilities can exchange or swap such scheduling slots in a manner that would increase efficiency for each utility and reduce total utility costs.

DOE has long expected that the exchange provisions in the Standard Contracts would "allow industry to optimize the allocation of waste acceptance capacity to meet individual utility needs, without the overt involvement of [DOE]."[23] I had that expectation myself when I was Director of OCRWM. Using such exchanges, utilities with Must-Move fuel would have incentive to trade for early acceptance slots so as to reduce their spent fuel storage costs.

3. DOE's Consideration of Proposed Exchanges

As noted above, plaintiff's contract provides a mechanism through which utilities can exchange acceptance slots. The contract provides DOE with a role in approving or disapproving of such exchanges of slots for spent fuel acceptance. In order to have achieved an efficient schedule for spent fuel acceptance, and thereby to have minimized utilities' total costs, DOE would have approved such exchanges liberally. I expected that DOE would do so when I was Director of OCRWM.

With reasonable planning, DOE would have been able to have accommodated most exchanges that would have been likely to have added to the efficiency of the spent fuel

---

[23] *See, e.g.*, Letter from Dreyfus (OCRWM director) to Andrew Kadak (Yankee Atomic chief executive officer) dated September 28, 1995.

acceptance schedule. As explained above, plants with Must-Move fuel would have been those that would most likely have had an economic incentive to exchange for the opportunity to have had their spent fuel accepted earlier by the government. Similarly, as explained above, plants without Must-Move fuel, particularly plants with ample spent fuel pool capacity, would have had an economic incentive to exchange away early slots for spent fuel acceptance in favor of groups of later slots in order to avoid the disruptions inherent in moving spent fuel from an operating plant. Also as noted above, the government tracks and possesses data showing the locations and timing of Must-Move fuel. The government could have and should have used this data to have planned its spent fuel acceptance capabilities in order to have been able to have accepted Must-Move fuel from the places it would be. Indeed, the government has performed a variety of analyses in which it has identified efficiency enhancing spent fuel acceptance schedules.[24] Thus, DOE should and would have been able to have accommodated efficiency-enhancing exchanges.[25]

II. Data or Information Considered in forming Opinions

Data and other information I considered in forming my opinions is listed in exhibit 1 to this report.

III. Qualifications

My qualifications to offer the opinions included in this report, including a list of all publications I have authored within the preceding ten years, are set out in exhibit 2 to this report.

---

[24] *See, e.g.*, Operation Options Report; *Spent Fuel Acceptance Scenarios Devoted to Shutdown Reactors*, Prepared by Pacific Northwest Laboratory for the U.S. Department of Energy (October 1989); *MRS Systems Study Task G Report*, Prepared by Pacific Northwest Laboratory for the U.S. Department of Energy (April 1989)

[25] In addition to my own knowledge and expertise, I have considered the expert witness report of Ivan Stuart as further support for this opinion.

IV. Compensation

I am being paid $150 per hour for my time working on this matter.

V. Other Expert Testimony

I have not testified as an expert at trial or by deposition in any other cases within the preceding four years.

Respectfully submitted,

Dated: June 30, 1999

John W. Bartlett

## Exhibit 1

## DATA AND OTHER INFORMATION CONSIDERED IN FORMING OPINIONS

1. Civilian Radioactive Waste Management System Modular Design/Construction and Operation Options Report, Revision 02 (December 18, 1998).

2. U.S. Department of Energy Contract No. DE-CR01-83NE44428, Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste (June 22, 1983).

3. Mission Plan for the Civilian Radioactive Waste Management Program, DOE/RW-0005 (June 1985).

4. T.W. Wood (Pacific Northwest Laboratory), Spent Fuel Storage Requirements for Nuclear Utilities and OCRWM, in 2 *High Level Radioactive Waste Management: Proceedings of the International Topical Meeting at Las Vegas, Nevada, April 8-12, 1990.*

5. Spent Fuel Storage Requirements 1994-2042, DOE/RW-0431, Rev. 1 (June 1995).

6. Civilian Radioactive Waste Management System Requirements Document, Revision 05, DOE/RW-0406 (January 1999).

7. Expert Witness Report of Frank C. Graves.

8. Expert Witness Report of Ivan F. Stuart.

9. J.W. Doman (WESTON/Rogers & Associates) and T.E. Tehan (Pacific Nuclear), Significance of Campaigned Spent Fuel Shipments.

10. 1987 Annual Capacity Report, DOE/RW-0146 (June 1987).

11. 1988 Annual Capacity Report, DOE/RW-0191 (June 1988).

12. 1995 Annual Capacity Report/Annual Priority Report, DOE/RW-0457 (March 1995).

13. Letter from Daniel Dreyfus (OCRWM Director) to Andrew Kadak (Yankee Atomic, Chief Executive Officer), dated September 28, 1995.

14. Spent Fuel Acceptance Scenarios Devoted to Shutdown Reactors, Prepared by Pacific Northwest Laboratory for the U.S. Department of Energy (October 1989).

15. MRS System Study Task G Report, Prepared by Pacific Northwest Laboratory for the U.S. Department of Energy (April 1989).

16. **Alternative Allocation Strategies for Delivery Rights to Purchasers of Disposal Services for Spent Nuclear Fuel and High-Level Radioactive Waste: A White Paper on Issue I.1, Prepared by The Transportation Operations Project Office for the U.S. Department of Energy (January 1991).**

**Exhibit 2**

**JOHN W. BARTLETT**

## WORK EXPERIENCE

**Senior Project Manager, S. Cohen & Associates, McLean,VA (1996-present)**

Directs projects concerned with radioactive and hazardous waste management and disposal, decommissioning of nuclear facilities, risk assessment, regulatory impact assessment, and fissile materials management and disposition.

**President, The Bartlett Company, Vienna, VA. (1993-1996)**

Provided technical and management support consulting services to government agencies and the private sector. Services to clients included: technical support to development of regulations for management and disposal of radioactive wastes; analyses of alternative technologies for treatment of hazardous and radioactive wastes in the Department of Energy complex; analysis of options for management and disposition of fissile materials from dismantled nuclear weapons; analyses of alternative technologies for packaging and transport of hazardous materials; development of a conceptual design and implementation plan for an international repository for disposal of radioactive wastes; and development of a methodology for selecting methods for Sustainable Development of energy resources.

**Senior Consultant, Golder Associates, Inc., Rockville, MD. (January-August 1993)**

Participated in business development activities for programs concerning energy supply, environmental restoration, and radioactive waste management for private sector clients in other nations.

**Director, Office of Civilian Radioactive Waste Management (OCRWM), U.S. Department of Energy. (1990-1993)**
Executive Schedule Level IV

Nominated by President Bush and confirmed by the U.S. Senate. The OCRWM has responsibility for the U.S. program for management and disposal of commercial spent nuclear fuel and defense high-level radioactive wastes. Program activities under the Director's cognizance include technical

characterization of the candidate Yucca Mountain site and determination of its suitability as a location for disposal; siting, design, licensing, and operation of a central facility for storage of commercial spent nuclear fuel; design of waste packages and the engineered repository; and selection and design of the technology and operational system for transport of waste materials.

Work activities in this service included agency and national policy development; budget development; program strategy development; interagency, international, intergovernmental, and Congressional interactions; representation to constituencies; staff and contractor direction; and technical leadership of program activities. Responsibilities involved substantive participation in energy, environmental, regulatory, economic, and national defense issues of concern to administration agencies and the U.S. Congress. The OCRWM has an annual budget of about $400 million, and involves the services of over 3000 personnel. The technical functions in the program span approximately 25 engineering and scientific disciplines.

**Director of Energy and Environment Programs, The Analytic Sciences Corporation, Reading, MA.** (1978-1990)

Responsible for management, technical direction, and business development for projects within cognizance. Clients included Federal Government agencies such as the U.S. Nuclear Regulatory Commission, the Department of Energy, and the Department of Defense; state agencies; and private sector organizations such as the Edison Electric Institute and the Electric Power Research Institute. Topics of work included waste management program development, regulatory compliance, risk assessment, and technical systems integration. Accomplishments included significant business expansion, high proposal win rates, and client retention.

**Program Manager, Pacific Northwest Laboratories, Richland, WA. (1968-1978)**

Management positions and business development activities in chemical technology and radioactive waste management. Led development of the first computer code for prediction of nuclide transport from a geological waste repository, and directed preparation of ERDA-76-43, a five-volume document which was the first comprehensive compilation of alternative technologies for radioactive waste management. Authored or co-authored numerous papers and presentations concerning waste management program strategies and technical activities. Served as consultant to the International Atomic Energy Agency, presented testimony to Congress, and participated in founding of the Pacific Basin Conference for the nuclear fuel cycle. While at PNL served as Adjunct Professor of the University of Washington, teaching engineering curriculum courses such as transport phenomena at the Joint Center for Graduate Study.

**Presidential Exchange Executive, National Bureau of Standards, Gaithersburg, MD.** (1973-1974)

On leave from Battelle, served as senior staff officer to the Director of the Center for Radiation Research in the National Bureau of Standards (now the National Institute for Science and Technology). Developed the plan for what became the NBS program in nuclear safeguards. Had significant participation in budget and program development for NBS.

**Fulbright Professor of Nuclear Engineering, Istanbul Technical University, Istanbul, Turkey.** (1968-1969)

Taught courses in nuclear engineering and atomic physics, directed student research projects, and developed the chapter on thermal-hydraulics for a Turkish text on nuclear engineering. Assisted the Director of the Nuclear Institute in development of Turkey's national nuclear power program. Participated in a NASA technology transfer program which involved travel throughout the nation describing the U.S. space program and its technical applications. Stimulated and evaluated research proposals.

**Assistant Professor, Chemical Engineering Department, The University of Rochester, Rochester, NY.** (1962-1968)

Taught courses in the chemical engineering curriculum, directed and taught the nuclear engineering program, directed M.S. and Ph.D. theses, and served as consultant to various clients. Selected for participation in the Summer Visiting Professor Program of the U.S. Atomic Energy Commission at the Hanford Site in Richland, WA. Initiated collaborative research with the School of Medicine which introduced concepts of chemical system function and modeling to research on diabetes. This work began use of innovative strategies for diabetes research and was at the forefront of bioengineering research at the time.

**Staff Engineer, Knolls Atomic Power Laboratory, Schenectady, NY.** (1957-1962)

Project engineer with the D1G Project, which designed and built the prototype for the first nuclear-powered surface ship. Developed mathematical models for activation and transport of radioactive corrosion products in nuclear reactor coolant systems, and participated in design and test engineering for the USS Bainbridge prototype. The work on corrosion product transport became the basis for subsequent research and development programs in the United States and Canada.

## EDUCATION

University of Rochester, Rochester, NY
B. S. in Chemical Engineering, 1957

Resselaer Polytechnic Institute, Troy, NY
Master of Chemical Engineering, 1959

Rensselaer Polytechnic Institute, Troy, NY
PhD, Chemical Engineering, 1962

Burlington High School, Burlington, NJ. Diploma 1953.
Valedictorian.

## HONORS, AWARDS, AND PROFESSIONAL ACTIVITIES

Bausch and Lomb Scholar. Elected to Sigma Xi and Phi Lambda Upsilon. Recipient of several research grants while at the University of Rochester. Numerous technical publications.

Member of the American Institute of Chemical Engineers, the American Nuclear Society, and the American Association for the Advancement of Science. In the American Nuclear Society was elected to two terms of service on the Executive Committee of the Fuel Cycle and Waste Management Division, served as Chairman of the Niagara-Finger Lakes Section, and Director for the Niagara-Finger Lakes and Northeast Sections. Participates extensively in technical paper reviews and service as session chairman in ANS conferences.

Received, from the Nuclear Division of the AIChE, the Robert E. Wilson Award for leadership in nuclear chemical engineering.

Listed in Who's Who in America.

## CIVIC SERVICE

Twice elected to the City Council of Richland, Washington, and served one term as Mayor Pro-Tem. Also was elected to two terms on the Richland School Board and served on the Richland Community Concert Board. Served three terms on the Conservation Commission of Lynnfield, Massachusetts, which has community responsibility for implementation of wetland protection statutes. Also served as member and Director of Rotary International clubs in Richland and Lynnfield

## PERSONAL INFORMATION

Born October 18, 1935, Camden, NJ. US Citizen
No Veterans' Preference
Highest Federal Employment: Executive Schedule IV
Security Clearances: SCI, DOD Top Secret, DOE "Q"

CONF-831217

# Proceedings of the 1983 Civilian Radioactive Waste Management Information Meeting

December 12-15, 1983
Washington, D.C.

February 1984

Sponsored by:
U.S. Department of Energy
Office of Civilian Radioactive Waste Management
Washington, D.C. 20585

PROGRAM OVERVIEW

Robert Morgan, Acting Director of Civilian
Radioactive Waste Management
U.S. Department of Energy
Washington, D.C.

Since the Nuclear Waste Policy Act was signed January 7, 1983, we've made considerable progress in implementing the Act. Within this first year, there has been a demanding set of timetables in process requirements. We have signed contracts with all nuclear utilities. We've started accepting the one mill per kilowatt hour of nuclear generated electricity. We've identified States with one or more potentially acceptable repository sites for the first repository. We have established the fee collection and payment procedures for the one or more potentially acceptable repository sites for the first repository. We have established the fee collection and payment procedures for the one mill per kilowatt hour I mentioned a moment ago. We have also fulfilled most of the other requirements in the time frame that the Act has specified except for just a couple.

We are late in one area and that is in issuing final siting guidelines. We have not done so because we felt we needed to extend the process of consultation with the States beyond the process specified in the Act. Proposed final guidelines were transmitted to the Nuclear Regulatory Commission (NRC) on November 22, which was about four months late. We believe that the process of extending the consultation with the States, was worthwhile and necessary for our credibility. We are not racing to judgement; we intend to go through the process requirements and the technical requirements, and if we have to slip schedules, we will slip schedules. Our intent is to fully comply with the Act in process and in technical mandates. However, if we must slip a date in the schedule to accomplish the requirements and intent of consultation, we will do so.

In going through the guidelines process, we learned one lesson early in the process. That lesson that we learned is important early consultation. For that reason, we will be adding an extra early step in the development of the mission plan. The Act requires that the draft mission plan be published in the Federal Register and distributed 15 months after enactment of the Act and that a final mission plan be issued 17 months after the enactment. We are going to add an extra step in that process; we are going to issue a preliminary draft to get comments before we get into a formal stage of issuing the draft for comments.

We have just received a preliminary draft of Volume I of the mission plan and we hope to have this available to interested parties, the States and others by Christmas.

In the mission plan, what we are trying to do is outline the strategy, discuss the schedule in the interrelationship of all the aspects of the program, including Monitored Retrievable Storage (MRS), Federal Interim Storage and a Repository Program. In addition, we will cover the management of the waste fund.

Volume II of the mission plan will address those 11 specific areas required by the Act. Volume II is not yet ready; however, we will get Volume II out as soon as possible for early review and comment. The formal process for issuing the draft mission plan will begin in March or April.

I would like to talk a little bit about the strategy as laid out in the mission plan and what we intend do. I think most of you know that the Act requires that we receive waste from the utilities by January 1, 1998. Technically, the Act does not specify how much waste or spent fuel we must begin receiving at that time. In fact, if we accepted one spent fuel element in 1998 we would technically be in accordance with the Act. However, we did not believe that that meets the intent of the Act. The basic strategy which we've outlined in the mission plan, is that beginning in 1998, utilities will not have to provide any additional storage facilities on site. During the first year of operation of the repository in 1998, we should be receiving fuel at a rate so that no utility would have to add any further storage facilities either on site or at another location.

After the initial operation of the repository through the first few years, we would anticipate that the weight of acceptance of fuel should be the rate of discharge from the reactors that are in operation at the time. So, by the year 2000 or 2001, we should be accepting in the repository the amount of fuel as being discharged from the

reactors. It is anticipated that at that point, it would look at bringing home the second repository. According to the Act, the second repository follows the first repository by four or five years. We are looking at the sensitivity of that sequence, and we may use the second repository to start working on the backlog of fuel. In addition, by that time, there may be some reactors which have reached the end of their design lifetime and that will be shutting down. If so, we would have the second repository to receive the fuel from the basins of those reactors so that they could go through the appropriate decommissioning aspects.

That is our basic strategy which we are outlining in the draft mission plan.

We are concerned with the schedule on the repository is extremely optimistic for getting to 1998. We believe that there are challenges in that some will say risks to obtaining that date. Therefore, we must have an alternative plan or a parallel plan to begin receiving waste by January 31, 1998. Monitored Retrievable Storage could serve as that alternative. The mission plan will also cover Federal Interim Storage, waste packaging and other interrelated issues.

We have learned a lot in the consultation process. There are some very difficult issues that have been identified and we are attempting to work with the States in the resolution of those issues. It is our intent to continue and in many cases expand the consultation process. The time-tables set out in the Act and those discussed in the mission plan are clearly optimistic. While we are making a number of assumptions in laying out the schedules contained in the mission plan, we are trying to identify those areas where we know there is inadequate time available to meet a mandated milestone, such as the time allowed in the Act for site characterization. For example, the Act specifies that in January 1985 we recommend to the President three sites for site characterization. Then in March 1987, the President must recommend a site for the first repository. Clearly two years, from 1985 to 1987, is insufficient for conducting site characterization.

As we develop better schedules, we will present those schedules to the states and to the public. We are now anticipating possibly a two or three year delay in recommending the first site. We are looking at ways of bringing that date closer as best we can, but I think it is questionable that we could complete site characterization on those three sites in less than four or five years.

To summarize, the basic strategy is to have a repository in operation in 1998. We will, however, keep a parallel program going on an MRS, so that if a repository is not available by 1998 or if Congress decides to authorize the construction of an MRS prior to that time, we will be able to comply with the law -- to begin accepting waste in 1998.