IN THE U.S. COURT OF FEDERAL CLAIMS

\- - - - - - - - - - - - - - - - - - x

YANKEE ATOMIC ELECTRIC CO., :
MAINE YANKEE ATOMIC POWER CO., :
CONNECTICUT YANKEE ATOMIC POWER :
CO., :
Plaintiffs: : No. 98-126C
vs. : 98-474C
UNITED STATES OF AMERICA : 98-154C
Defendant. :

\- - - - - - - - - - - - - - - - - - x

CERTIFIED COPY

Washington, D.C.
Tuesday, August 26, 2003

Deposition of:

DR. JOHN BARTLETT

called for examination by counsel for the defendant, pursuant to notice and agreement, commencing at 9:30 a.m., at Department of Justice, 1100 L Street N.W., before Virlana Kardash, RPR, CSR, a Notary Public in and for the District of Columbia, when were present on behalf of the respective parties:

A. No.

Q. Do you know, sir, if -- if DOE were to accept one MTU -- let me clarify. You know what I mean when I say MTU? Yes. My definition of that is metric tons uranium. Is that yours as well?

A. Uh-huh.

Q. I need yeses and noes from you, by the way. A friendly reminder.

A. Sorry. Yes.

Q. If DOE were to accept one MTU of spent nuclear fuel in 1998 by January 31st, 1998, would it have been in compliance with the contract?

A. I don't know whether it would be considered in compliance or not.

Q. Do you know why the standard contract doesn't give a date by which all the spent fuel must be accepted?

A. No.

Q. You also indicate in this sentence that we're talking about in your report that the contract doesn't specify a sequence in which spent fuel should be accepted. Do I have that right?



1825 I Street, N.W.
Washington, D.C. 20006

JABS REPORTING, INC.
www.jabsreporting.com

(202) 296-6102
(888) 805-5227

A. That's right.

**Q. Can you explain that opinion?**

A. Which opinion?

**Q. Your opinion that the contract does not specify a sequence in which spent fuel should be picked up.**

A. Oh. Well, it describes the OFF approach, as it is called.

**Q. Explain for us what you mean by the OFF approach.**

A. Oldest Fuel First is a protocol that it describes as a basis for receipt of spent fuel.

**Q. And is the OFF method not -- do you not consider that a sequence by which spent fuel should be accepted?**

A. It is a sequence. It is a sequence, yes.

**Q. Then what do you mean when you say that the contract does not specify a sequence?**

A. It specifies the OFF concept, which it could interpreted as a sequence if it was followed rigorously.

**Q. Can it be interpreted in another way? Do**



1825 I Street, N.W.
Washington, D.C. 20006
JABS REPORTING, INC.
www.jabsreporting.com
(202) 296-6102
(888) 805-5227

CERTIFICATE OF NOTARY PUBLIC

I, Michelle Bulkley, the reporter before whom the foregoing deposition was taken, do hereby certify that the witness whose testimony appears in the foregoing deposition was duly sworn by me; that said deposition is a true record of the testimony given by said witness, that I am neither counsel for, related to, nor employed by any of the parties to the action in which this deposition was taken; and, further, that I am not a relative or employee of any attorney or counsel employed by the parties hereto, nor financially or otherwise interested in the outcome of the action.

Notary Public in and for the
District of Columbia

My Commission Expires:
April 14, 2007

JMB
cc: Rudy, Tom B, Bud
SPS, JPP. Russ M.

**Department of Energy**
Washington, DC 20585
September 28, 1995

Dr. Andrew C. Kadak
President and Chief Executive Officer
Yankee Atomic Electric Company
580 Main Street
Bolton, Massachusetts 01740-1398

Dear Dr. Kadak:

Thank you for your letter of September 7, 1995, expressing your thoughts on the viability of the exchange process for Delivery Commitment Schedules and restating your position on the Department's obligation to afford priority waste acceptance to the spent fuel from Yankee Atomic Electric Company's Rowe power station.

While your letter describes circumstances that you believe will impede the exchange of delivery commitment schedules, we continue to believe that once the Federal waste management system is operational, the exchange provision will be exercised by Purchasers as originally anticipated. Article V.E of the Standard Contract for the Disposal of Spent Nuclear Fuel and/or High Level Radioactive Waste (Standard Contract) grants Purchasers the right to exchange, with DOE concurrence, approved delivery commitment schedules. This provision was included in the Standard Contract in response to comments received during the Standard Contract rulemaking, in order to allow Purchasers greater flexibility in managing their inventories of spent fuel. We believe the exchange provision will allow industry to optimize the allocation of waste acceptance capacity to meet individual utility needs, without the overt involvement of the Department.

With respect to the Department's ability to grant priority acceptance of the spent fuel from your Rowe power station, as I noted in my letter of July 13, 1995, to State Representative Herren, there are statutory limits on the amount of spent fuel that the Department can accept prior to the opening of a permanent repository. Consequently, the Department does not have the ability to grant priority acceptance to shutdown reactors without adversely affecting other utilities. The Congress is debating the issue of centralized interim storage of spent nuclear fuel. The outcome of this debate may involve new policy direction for this program, and may include policy guidance on the priority acceptance of spent fuel from shutdown reactors.

Sincerely,

Daniel A. Dreyfus, Director,
Office of Civilian Radioactive
Waste Management

Printed with soy ink on recycled paper

VERIS Consulting, LLC

# Expert Report of R. Larry Johnson

**Yankee Atomic Electric Company**

**v.**

**United States of America**

**In the U.S. Court of Federal Claims**

**No. 98-126C (Senior Judge Merow)**

**Prepared By:**

**R. Larry Johnson, CPA**

[signature]

**February 19, 2004**



11710 Plaza America Drive, Suite 300 • Reston, VA 20190-4745
Phone (703) 654-1400 • Fax (703) 796-1200

www.verisconsulting.com

20801 Biscayne Blvd., Suite 301 • Aventura, FL 33180-1422
Phone (305) 705-9960 • Fax (305) 705-9961

7500 Old Georgetown Rd., Suite 700 • Bethesda, MD 20814-6133
Phone (301) 656-0040 • Fax (301) 656-0518

# TABLE OF CONTENTS

Introduction .......... 1-4

Summary Conclusions .......... 5-7

Detailed Findings:
- Scenario 1 .......... 8
- Scenario 2 .......... 9-10
- Scenario 3 .......... 11-12
- Scenario 4 .......... 13-22
- Scenario 5 .......... 23
- Alternative Acceptance Models for GTCC and Failed Fuel .......... 24-27
- Discounting .......... 28

Summary Calculations .......... 29

Exhibits .......... 30-102

Documents Considered .......... 103

Curriculum Vitae of R. Larry Johnson .......... 104-110

Compensation .......... 111

## DETAILED FINDINGS

***Scenario 1***

- It is assumed that in the non-breach world the DOE would have picked up Maine Yankee's spent fuel in accordance with the 1995 ACR rates as contrasted to the breach world in which the DOE's acceptance is based on the 1998 DOE TSLCC.

Mr. Abbott has reported that under these assumptions, and further assuming the wet storage of the spent fuel, there would be no incremental costs of storage of spent fuel in the breach world over that experience in the non-breach world, and consequently, no damages as a result of the DOE partial breach.

Mr. Abbott has further reported that under these assumptions, and further assuming the dry storage of the spent fuel, there might be greater costs in the breach world than that experienced in the non-breach world. However, in recognition of the results of Mr. Abbott's analysis that no incremental costs (and therefore no damages) occur in the wet storage assumption, as reported above, any such costs in the dry storage assumption are as a result of the decision to dry store and not as a result of the DOE partial breach.

***Scenario 2***

Yankee Atomic could have stored the Spent Fuel in the Wet Pool for the duration of the period prior to DOE acceptance. Dr. Wise's calculations of damages are founded upon the assertion that the partial breach by DOE required that Yankee Atomic construct an ISFSI. Dr. Wise's 2003 Report reflects the following:

> "But for the failure of DOE to accept and remove Yankee Atomic's spent fuel in accordance with the contract, Yankee Atomic would not have incurred costs related to the design and construction of the ISFSI."[6]

Dr. Wise then measured damages as the difference between what Yankee Atomic asserted it would cost to construct and operate its ISFSI, as well as to re-rack and operate its Wet Pool prior to transfer of the spent fuel from the Wet Pool to the ISFSI, as contrasted with what it is asserted it would have cost Yankee Atomic to operate the Wet Pool, prior to a non-breach fuel-out date of January 1999.

However, Mr. Abbott has opined that Yankee Atomic could have simply continued to store the spent fuel in its Wet Pool from the non-breach fuel out schedule through the date the DOE removes the spent fuel. Mr. Abbott's conclusions in that regard are detailed in his 2004 report.

Accordingly, under this scenario, the damages that Yankee Atomic incurred as a consequence of the DOE partial breach are limited to the duration of additional years for which the spent fuel would have continued to be stored in the Wet Pool at the annual operating cost of the Wet Pool.

[6] Page 4 of Dr. Wise Expert Report dated March 28, 2003

## SUMMARY CALCULATIONS

I have prepared the following table to summarize the damage scenarios I have described in this report in both constant dollars and 2003 present value dollars. I have prepared this table by applying the same risk-adjusted discount rates and inflation assumptions as Dr. Wise; with the exception that I have applied these rates on a pre-tax basis.

| Scenario | Mid-2002 Constant Dollars | Present Value in 2003 Dollars |
|---|---|---|
| Scenario 1 | | |
| Wet Storage | -zero- | -zero- |
| Dry Storage | -zero- | -zero- |
| Scenario 2 | $ 74,160,242 | $ 56,243,938 |
| with Non-Acceptance of GTCC | -zero- | -zero- |
| with Non-Acceptance of GTCC and Failed Fuel | -zero- | -zero- |
| Scenario 3 | 64,942,154 | 54,333,368 |
| with Non-Acceptance of GTCC | 20,161,908 | 19,256,631 |
| with Non-Acceptance of GTCC and Failed Fuel | 20,161,908 | 19,360,780 |
| Scenario 4 | 91,220,955 | 89,565,195 |
| with Non-Acceptance of GTCC | 43,204,088 | 42,831,107 |
| with Non-Acceptance of GTCC and Failed Fuel | 37,443,543 | 37,120,293 |
| Scenario 5 | 77,693,669 | 67,813,528 |
| with Non-Acceptance of GTCC | 3,533,427 | 11,569,590 |
| with Non-Acceptance of GTCC and Failed Fuel | (2,227,118) | 5,948,668 |

These calculations have been made using only the risk-adjusted discount rate. It is my opinion that the risk-adjusted rate is appropriate to the measurement of damages; this opinion is shared by Dr. Wise, as reflected in the following testimony:

> "These cash flows are not 100 percent devoid of market risk. So, from a strictly theoretical finance perspective, you should apply a risk adjusted rate to these cash flows."[32]

In the event that it is determined that the risk-free rate should be applied to determine the present value measurements of damages, Exhibit 39 presents the alternative measurement of damages on that basis.

[32] Wise Deposition, 8/26/02 p. 212

UNITED STATES COURT OF FEDERAL CLAIMS

COPY

| | | |
|---|---|---|
| YANKEE ATOMIC ELECTRIC COMPANY, Plaintiff, vs. UNITED STATES OF AMERICA, Defendant. | : | No. 98-126 C (Senior Judge Merow) |
| CONNECTICUT YANKEE ATOMIC POWER COMPANY, Plaintiff, vs. UNITED STATES OF AMERICA, Defendant. | : | No. 98-154 C (Senior Judge Merow) |
| MAINE YANKEE ATOMIC POWER COMPANY, Plaintiff, vs. UNITED STATES OF AMERICA, Defendant. | : | No. 98-474 C (Senior Judge Merow) |

VOLUME I

PAGES 1 - 235

Deposition of Frank C. Graves

Washington, D.C.

Monday, November 12, 2001

Reported by: Deborah Larson Hommer, RPR

**disapprove a swap because of the location of the fuel, the spent fuel?**

MR. SHAPIRO: Objection. Vague.

THE WITNESS: I don't know what constitutes a sufficient criterion for them to withhold. I assume it would have to be a material inconvenience to the program creating costs greater than the savings that would have been achieved by the private parties for their preferred order, otherwise they're making total system costs go up for the sake of minimizing their portion of the costs. I don't think that be would be a legitimate execution of the program.

BY MS. POWELL:

**Q. You don't know the criterion under which DOE would approve or disapprove exchanges?**

MR. SHAPIRO: Objection. Vague.

THE WITNESS: I don't know of any formal description of the decision criteria that DOE would apply. I do know

that Daniel Dreyfus wrote that letter to Dr. Kadak explaining that he expected it to be a bias toward approval of utility swaps, not a bias against them. So I interpret that meaning they won't be unreasonably disallowed.

BY MS. POWELL:

Q. And, again, I'm not sure the record is clear on your response when I asked you about whether access to railways or ports or highways, whether that would have any impact on DOE's decision to approve or disapprove an exchange. Again, you gave me a long answer, but I guess I'm looking for the simpler "yes" or "no." Would access, again, to highways, ports, railways, would that impact DOE's decision whether to approve or disapprove an exchange?

MR. SHAPIRO: Objection. Vague.

THE WITNESS: It's hard for me to make a distinction between fuel location and access to highways, et cetera. So I

CERTIFICATE OF NOTARY PUBLIC

I, Deborah Larson Hommer, RPR, the officer before whom the foregoing deposition was taken, do hereby certify that the witness whose testimony appears in the foregoing deposition was duly sworn by me; that the testimony of said witness was taken by me in stenotype and thereafter reduced to typewriting under my direction; that said deposition is a true record of the testimony given by said witness; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this deposition was taken; and, further, that I am not a relative or employee of any attorney or counsel employed by the parties hereto, nor financially or otherwise interested in the outcome of the action.

____________________________
Notary Public in and for
the District of Columbia

My Commission Expires:
August 31, 2003

UNITED STATES COURT OF FEDERAL CLAIMS

COPY

\- - - - - - - - - - - - - - - - X
YANKEE ATOMIC ELECTRIC COMPANY, :
Plaintiff, :
vs. : No. 98-126 C
UNITED STATES OF AMERICA, : (Senior
Defendant. : Judge Merow)
\- - - - - - - - - - - - - - - - X
CONNECTICUT YANKEE ATOMIC POWER :
COMPANY, :
Plaintiff, :
vs. : No. 98-154 C
UNITED STATES OF AMERICA, : (Senior
Defendant. : Judge Merow)
\- - - - - - - - - - - - - - - - X
MAINE YANKEE ATOMIC POWER :
COMPANY, :
Plaintiff, : No. 98-474 C
vs. : (Senior
UNITED STATES OF AMERICA, : Judge Merow)
Defendant. :
\- - - - - - - - - - - - - - - - X

VOLUME II

PAGES 236 - 444

Deposition of Frank C. Graves

Washington, D.C.

Tuesday, November 13, 2001

Reported by: Deborah Larson Hommer, RPR

Connecticut Yankee and Maine Yankee, and they get out around 2001 and 2002.

So if they had to wait ten years, they would get out 2006 and 2007. And I guess Yankee Atomic gets out in 1980 to 1999, and that's a couple of years beyond their two-year cooling period, they would have probably gotten out about 2001 with a ten-year cooling period. And I believe they shut down in 1991.

**Q. How would specifically the results of your analysis change in this hypothetical?**

MR. SKALABAN: Objection. Vague. Asked and answered.

THE WITNESS: The result that I produce is the out-dates for those units, which are all before 2002, on or before 2002 under the five-year cooling assumption. Under the ten-year cooling assumption, only Yankee Atomic would get out before 2002.

BY MS. POWELL:

**Q. Would the change in the cooling**

**period from five to ten years in this current hypothetical, would that also affect the other utilities -- the other participants and, therefore, your economic sequence model?**

MR. SKALABAN: Objection. Vague.

THE WITNESS: Your predicate was that Yankee Atomic had this problem. In fact, I actually extended it to Maine and Connecticut in my answer. So perhaps I overanswered.

BY MS. POWELL:

**Q. No. Actually my hypo was each of the Yankee plants, so --**

A. But if they're the only ones, then it wouldn't affect the other's willingness to get out.

**Q. So they're -- it would have no impact whatsoever, the cooling period, for the Yankees --**

MR. SKALABAN: Objection. Vague.