THE WITNESS: It would shift the order a little bit amongst the others because Yankee Atomic in particular, who buys some of the early rights, would no longer buy them for that period. They would wait a while to buy. They would probably sell rights for that period and buy more in 2001.

Connecticut and Maine would sell all of their rights in the early years. So other parties could get out a little bit sooner if those three were unable to get out as soon as they could.

BY MS. POWELL:

**Q. Changing the hypothetical slightly, and now the assumption would be that all of the plants, not just the -- all of the participants, not just the three Yankee plants, would need a ten-year cooling period. How would that affect the results of your analysis?**

MR. SKALABAN: Objection. Vague. Foundation.

THE WITNESS: I haven't done that analysis formally, obviously, so I can only talk about the qualitative effects. But generally that would make any shutdown facility wait longer to become a Must-Move facility, five years longer.

So it would push back their demand for acceptance slots. They would still have the OFF acceptance slots that they would have otherwise partially used for their own purposes. So they would release those sooner. So basically full pools would gain priority -- more priority in the economic re-ordering than they now have.

So a lot more full pools would be served than since most -- I think there is only -- since no one builds an ISFSI, it probably wouldn't change the full-pool Must-Move situation. It probably won't change the rate at which any full pools get out. I would have to analyze that more carefully, but it would delay the shutdown

pools and might not accelerate the full pools.

BY MS. POWELL:

**Q. What would happen to the price of slots in this hypothetical with the cooling time for all utilities being ten years, not five?**

MR. SKALABAN: Objection. Vague.

THE WITNESS: It's pretty hard to be precise about this, again having not run that analysis, but I would guess the price would fall in the early years and rise in the later years.

It depends on whether there was still Must-Move slack later on when the deferred shutdown pools started to become eligible for Must-Move.

BY MS. POWELL:

**Q. And staying with the same hypothetical of ten years cooling time for all the utilities, what would happen to the**

**utilities' at-reactor storage costs?**

MR. SKALABAN: Objection.

THE WITNESS: For all utilities?

BY MS. POWELL:

**Q. Yes.**

MR. SKALABAN: Objection. Vague.

THE WITNESS: Some would change and some wouldn't. I guess it's too broad to -- I don't know what you're getting at.

BY MS. POWELL:

**Q. If all utilities had a cooling time of ten years, not five, wouldn't it be logical that their at-reactor storage costs would increase because they had to hold onto the fuel longer?**

MR. SKALABAN: Objection. Vague. Foundation.

THE WITNESS: Anyone who was in shutdown mode would continue to bear unavoidable O&M costs for five years longer than they would have -- with a five-year

cooling period. So their but-for costs would have been higher.

BY MS. POWELL:

**Q. And if the utilities had to hold onto their fuel for five more years, five more years than what your model assumes, would their damages then fall?**

MR. SKALABAN: Objection. Vague.

THE WITNESS: Yes. The approach we're taking of damages compares the damages incurred in the breach to the avoidable costs in the -- it is based on the avoidable costs in the but-for world relative to the breach world. If the avoidable costs go up in the non-breach world, the difference goes down.

BY MS. POWELL:

**Q. So in this hypothetical of a ten-year cooling time, the damages would fall because both the swap prices would fall at least in the early years and the at-reactor storage costs would increase?**

MR. SKALABAN: Objection. Vague. Form. Can you read that back?

(Reporter read record as requested.)

THE WITNESS: I don't know what the net effect of the swap prices would be, because some of the utilities do buy swaps in the current analysis, and they might be able to buy them for a lower price in the hypothetical analysis. They would buy them later conceivably at a lower price.

So that would actually raise damages, because the but-for world would be cheaper. On the other hand, they would have had to bear five years of wet O&M in the meantime, so I suspect the net effect would be that the damages would be lower.

BY MS. POWELL:

**Q. Mr. Graves, do you know what type -- and by "type" I mean model and manufacture of casks or canisters Maine Yankee is going to use at ISFSI?**

MR. SKALABAN: Objection.

# CERTIFICATE OF NOTARY PUBLIC

I, Deborah Larson Hommer, RPR, the officer before whom the foregoing deposition was taken, do hereby certify that the witness whose testimony appears in the foregoing deposition was duly sworn by me; that the testimony of said witness was taken by me in stenotype and thereafter reduced to typewriting under my direction; that said deposition is a true record of the testimony given by said witness; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this deposition was taken; and, further, that I am not a relative or employee of any attorney or counsel employed by the parties hereto, nor financially or otherwise interested in the outcome of the action.

____________________________

Notary Public in and for
the District of Columbia

My Commission Expires:
August 31, 2003

UNITED STATES COURT OF FEDERAL CLAIMS

COPY

| | | |
|---|---|---|
| YANKEE ATOMIC ELECTRIC COMPANY, Plaintiff, vs. UNITED STATES OF AMERICA, Defendant. | : | No. 98-126 C (Senior Judge Merow) |
| CONNECTICUT YANKEE ATOMIC POWER COMPANY, Plaintiff, vs. UNITED STATES OF AMERICA, Defendant. | : | No. 98-154 C (Senior Judge Merow) |
| MAINE YANKEE ATOMIC POWER COMPANY, Plaintiff, vs. UNITED STATES OF AMERICA, Defendant. | : | No. 98-474 C (Senior Judge Merow) |

VOLUME III

PAGES 445 - 605

Deposition of Frank C. Graves

Washington, D.C.

Wednesday, November 14, 2001

Reported by: Deborah Larson Hommer, RPR

**Q. On page 14 of your report, the second full paragraph, the last sentence in there says, "A market that performs in this manner could be implemented by a last bid auction procedure or could be the result of active, visible bilateral trading." What do you mean by "active, visible bilateral trading"?**

A. That could be trading that is facilitated by something like a web-based bulletin board to let parties interested in trading post bids and asks for swaps. It could include information about past trades. It could actually perform an auction itself. So some sort of informational mediation of what's happening in the market is all that is required to get a pretty efficient solution.

MS. POWELL: Could you read back his answer?

(Reporter read record as requested.)

BY MS. POWELL:

**Q. Are you saying that an auction could**

**occur within a bilateral trade? I'm sorry?**

MR. SHAPIRO: Objection. Vague.

THE WITNESS: No. What I'm saying is that sort of an exchange mechanism could be created whereby sellers and buyers would submit willingness-to-buy and willingness-to-sell bids, and a piece of software could be run which, in effect, imitates an auction, and rank-orders their willingness -- their relative willingness to pay to create marriages between them.

And then afterwards it notifies them of who married whom. And people who participate in that mechanism could agree to all pay the price of the last couple that got married or they could agree to some other pricing mechanism. But they would end up with bilateral rights exchanges, but they would enjoy centralized information and competition for the rights.

That sort of thing happens, for instance, in electric transmission rights or

did for a while before there was -- in the early days of open access. It's not an uncommon mechanism.

BY MS. POWELL:

**Q. Does your model assume that every bilateral trade occurs at what you define as the market-clearing price?**

MR. SHAPIRO: Objection. Vague.

THE WITNESS: I have quantified swap prices to my clients as though they acquired their rights at the market-clearing price. And because they weren't always the marginal bidder, although they were actually often quite close, I've assumed that that would be a feature available to other bidders as well.

For purposes of setting the dates at which my clients would get out of managing their pools, it wouldn't matter whether they paid their own bid or paid the market-clearing price.

So in terms of dates, the

CERTIFICATE OF NOTARY PUBLIC

I, Deborah Larson Hommer, RPR, the officer before whom the foregoing deposition was taken, do hereby certify that the witness whose testimony appears in the foregoing deposition was duly sworn by me; that the testimony of said witness was taken by me in stenotype and thereafter reduced to typewriting under my direction; that said deposition is a true record of the testimony given by said witness; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this deposition was taken; and, further, that I am not a relative or employee of any attorney or counsel employed by the parties hereto, nor financially or otherwise interested in the outcome of the action.

____________________________
Notary Public in and for
the District of Columbia

My Commission Expires:
August 31, 2003

603

IN THE U.S. COURT OF FEDERAL CLAIMS

CERTIFIED COPY

- - - - - - - - - - - - - - - - - - - - - - X
YANKEE ATOMIC ELECTRIC CO. :
MAINE YANKEE ATOMIC POWER CO.
CONNECTICUT YANKEE ATOMIC POWER CO., :

Plaintiff, : 98-126C
vs. 98-474C
: 98-154C
UNITED STATES,
:
Defendant
- - - - - - - - - - - - - - - - - - - - - -X

Washington, D.C.
Thursday, January 3, 2002

Deposition of:

FRANK C. GRAVES,

the witness, called for examination by counsel for the defendant, pursuant to notice and agreement, commencing at 9:30 a.m., at 1100 L Street, N.W., Washington, D.C., before Linda C. Marshall, RPR, a Notary Public in and for the District of Columbia, when were present on behalf of the respective parties:

down. That is, if you've had your fuel removed and taken over by the -- so not permanently shut down, shut down by the power plant.

**Q And how did you derive this $8,000,000? Where did you get the $8,000,000 from?**

A Well, we interacted extensively with NAC experts on this to get a sense of what is an appropriate number to use for wet O&M costs. And we may have related it to internal budgets as well. There's a footnote saying that that is the source.

I would be a little loathe to rely on that as a fact because the -- that footnote may have been prepared early in the process of developing the spreadsheets and not ultimately consistent with what our best sources for the data were.

I believe the 8 million is more of a generic number than an attempt to represent the costs for those three specific facilities.

**Q Is it the annual O&M costs to run a spent fuel facility for one year?**

here, item 5, wet O&M cost refers to item 3 in my input table. And there, the footnote refers to the expert report of James Malone.

**Q If the -- again, if this number were to change, the $8 million, would that impact the overall result of your model?**

A Well, we have to be careful about terms as to what we mean by overall results. If you generalize a little bit from your questions, it may help formulate other questions for you.

The big driver of the order in which pools are accepted from "must-move" removal is the volume of waste that is "must-move" at each site. That can range from a very small number.

If, for instance, it's a full pool and it only needs to have one core picked up to stay in operation. So in that case, the pool might only have 10 to 50 metric tons of waste that has to be removed.

Conversely, if it's a shut down pool, it could have 500 to a thousand tons of waste. So, potentially, 10 to a hundred times as much

waste as other kinds of "must-move" facilities.

So, you recall plants are ranked in terms of the ratio of their avoidable cost to -- the ratio of that number to the amount of volume that is "must-move".

So that it's both the numerator and denominator matter to the ordering.

The dominator varies by -- as I just mentioned by about two or more orders of magnitude across the plants in the sample.

Unless the costs were to vary by a couple orders of magnitude as well and the uncertainties surrounding those, it could not have very much effect on the outcome.

So, for instance, if we changed this number to, let's say, $10 million of wet O&M cost per year, it would have very, very little effect on the results in terms of rank order of who gets out when.

It would have no effect on how soon everybody gets out, because the program has the capacity to remove all of the -- to get ahead of

the "must-move" requirements by 2002.

So that would still be true. And the rank order of who got out first would probably be unchanged by changing this number. Unless you thought you -- that you were going to change it from 8 million to say 80 million. If you change it by a factor of 10 or 15 to get more because you think there's that much noise in it, then costs start to matter a lot.

But in fact that's implausible. We're told by Mr. Pennington that in all likelihood these costs vary by only a few percent, maybe 15 percent plus or minus these numbers across almost all the pools in the United States.

So if you're within shouting distance of $8 million, changing that inside of the plausible range will have almost no effect on my model.

Mathematically, if you were to change it by a factor of ten, that would make a huge difference, but that is implausible. So as the rule, the dominator effects dominate the results