in this model. That may be more than you wanted to know.

Q No, I think I followed it. I don't think I could give it back to you as eloquently as you did, but I think I followed it.

Do you know whether all of the utilities have the same costs for the wet storage?

A I'm sure they don't.

Q Did you see any documentation of the cost for wet storage in creating your model?

MR. SHAPIRO: Objection, vague.

THE WITNESS: As a rule, I would believe that is proprietary data to utilities who are operating those plants, but we did have some awareness of the cost that Connecticut, Maine, and Yankee Atomic were bearing. And we know they weren't identical, but they were on the same order of magnitude as our $8 million. I don't recall those numbers precisely, but I know they vary.

BY MS. POWELL:

**Q Mr. Graves, did you test the -- I think one of your previous answers, you mentioned the factor of ten would impact the model. Would you test the factor of ten sensitivity to the wet O&M cost assumption?**

MR. SHAPIRO: Objection, vague.

THE WITNESS: No, we never ran any sensitivities with that extreme of variation in numbers. In fact, I wasn't offering that opinion because of the empirical experience with the model, but just because I can tell from the structure of the model that that's true.

BY MS. POWELL:

**Q I think you answered this, but let me make sure. Then you also didn't test your model for like the $10 million instead of the $8 million as listed here on line 5?**

MR. SHAPIRO: Objection, vague.

THE WITNESS: Correct. Again, I can tell that from the structural features of the model, but I didn't run a simulation of the model to allocate that.

BY MS. POWELL:

**Q Let me go on to the next line, dry O&M costs per year. Again, if you can just tell me for the record what that represents?**

A This is the maintenance costs for an ISFSI which is assumed to be the avoidable cost of a full -- that are part of the avoidable cost faced by a fuel pool.

**Q And where did you get this $3.5 million?**

A Again, Nuclear Assurance Corporation or NAC, N-A-C.

**Q And is your answer for number 6 -- or if we were to change that value, the same answer as you gave me for number 5, the $8 million, how it would impact the results of your model?**

A Yes. It would have -- still denominator effects matter the most. It's predominantly full pools that won out in the early years. So they are the ones facing this number. But they have very small denominators of "must-move fuel". So it would take a huge change

in this number to change that position of the queue.

**Q Let me ask a more general question, Mr. Graves. You said your last few answers have been based on the structure of the model. Did you run any sensitivities, sensitivity analysis on your model?**

MR. SHAPIRO: Objection, vague.

THE WITNESS: Well, I don't think we ran any in the sense of saying, well, now the model is done, now let's push it and tweak it in different directions to see what happens.

Instead, what happened is, over the course of building the model, we didn't start off with very good or specific estimates as some of these numbers. So we put in a place holder so that the model would have the ability to solve the problem and later get a better number.

So, for instance -- and I'll make this up. Let's imagine for sake of argument that we thought the wet O&M costs per year were going to be $6 million as a representative number and we

BY MS. POWELL:

**Q Well, again, staying in the non-breach world, would one possible source of uncertainty be the acceptance rate?**

MR. SHAPIRO: Objection, vague.

THE WITNESS: Well, it matters what time you're talking about in the non-breach world. Once things are underway, uncertainty is resolved.

People have more and more confidence in the performance of the system, and they begin to believe it's working. It doesn't all go away, but it changes over time. So there is -- the uncertainty has a personality of sorts.

BY MS. POWELL:

**Q Well, again, in the non-breach world, did you analyze the impact of alternative acceptance rates?**

MR. SHAPIRO: Objection, vague.

THE WITNESS: Well, in order to put a price tag and a schedule into the damage calculations, we need to have a scenario that's

representative of what we think would happen in the uncertain world.

So I could have run lots of scenarios. I would still have to choose one or choose the average of a bunch of them to describe, in order for Dr. Wise to calculate the damages that would ensue from not being in that world.

So, we have to get specific at some point just so that as a matter of practice to be able to do calculations of what damages are.

And so what I've done is take a value that I think is illustrative of reasonable performance and lacking any reason to believe that there's noise around that that would bias it, I would use that as my representative value.

BY MS. POWELL:

**Q Okay. I do understand your answer, but recognizing that to prepare your report, you had to become somewhat specific in choosing acceptance rate. My question was really whether you analyzed the impact of alternative acceptance rates in arriving at this -- your report?**

handling and what fuel handling are you
talking about?

BY MS. POWELL:

**Q. In order to -- let's start then with the utility's ability to load the fuel into either casks or canisters. Would the fueling-handling requirements that would be needed for loading the fuel into casks or canisters, would they have any impact on DOE's decision to approve or disapprove an exchange?**

MR. SHAPIRO: Objection. Vague.

THE WITNESS: I don't see anything about swaps that makes fuel handling any harder than it is under OFF, so I don't think it changes the fundamental character of the problem. There has to be fuel-handling capability, but that has to be there in either case.

BY MS. POWELL:

**Q. Is it possible that the fuel -- that there would be a utility that would be**

**capable of loading their fuel in a cask and another one that was not for whatever reason capable of loading their fuel in a cask? Wouldn't that affect DOE's decision as to whether to approve or disapprove an exchange?**

MR. SHAPIRO: Objection. Vague.

THE WITNESS: I would think it would also affect the utility's interest in having a swap for the time frame when they weren't yet ready to handle their own fuel. They would swap in a fashion that mapped into their ability to handle the fuel on site.

BY MS. POWELL:

**Q. Would different casks used or in use at different sites change the desirability of campaigns?**

MR. SHAPIRO: Objection. Vague.

THE WITNESS: I guess my belief is none of the results of an exchange that produced campaign-like schedules would be surprises not known to the government in advance long enough for them to accommodate

them with logistical planning. So I don't think they aggravate those problems.

BY MS. POWELL:

**Q. I understand that you said that you don't think it would be anything that the government couldn't solve, but I guess my question was more basic as to whether it would be impacted at all.**

MR. SHAPIRO: Objection. Vague.

THE WITNESS: I am not offering an opinion that some swaps somewhere couldn't raise minor complications for the logistical problems of the government and that all swaps would have to be approved. Some could be disallowed. Sure, that's possible.

If they created intractable short-run problems, I don't think they would have to be disallowed for very long, because I don't think those problems persist for very long. And if -- in many cases if they had to be disallowed, it would be because the government could save even more money by an

alternative to the order that saved the most costs for the utilities, in which case they would have savings, if needed, to buy the utilities out of their swaps and still have net social savings from the program.

MR. SHAPIRO: Is this a good time for a break?

BY MS. POWELL:

**Q. One or two more questions. You're okay?**

A. I'm fine.

**Q. How are the disallowances that you just referenced reflected in your model?**

A. I don't model any disallowances because I don't model specific bilateral swaps. That is, I don't know who swaps with whom in my model. I know that there are net buyers, and the sellers are all the people in those time frames who had OFF rights that they didn't need because it wouldn't save them any money -- those purchasers who had OFF rights in a given year that they did not

CERTIFICATE OF NOTARY PUBLIC

I, Linda C. Marshall, a Notary Public in and for the District of Columbia, before whom the foregoing deposition was taken, do hereby certify that the witness whose testimony appears in the foregoing pages was duly sworn by me; that the testimony of said witness was taken by me in shorthand at the time and place mentioned in the caption hereof and thereafter reduced to typewriting under my supervision; that said deposition is a true record of the testimony given by said witness; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this deposition is taken; and, further, that I am not a relative or employee of any attorney or counsel employed by the parties thereto, nor financially or otherwise interested in the outcome of the action.

Linda C. Marshall
Linda C. Marshall, RPR
Notary Public in and for
The District of Columbia

commission expires:
November 30, 2005

6

# UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| ANKEE ATOMIC ELECTRIC COMPANY, ONNECTICUT YANKEE ATOMIC POWER OMPANY, MAINE YANKEE ATOMIC OWER COMPANY, | ) | Docket Nos.: 98-126C 98-154C 98-474C |
| Plaintiffs. | ) | |
| . | ) | |
| HE UNITED STATES OF AMERICA, | ) | |
| Defendant. | ) | |

**ORAL ARGUMENT**

ages: 1 through 50

lace: Washington, D.C.

ate: August 6, 2001

**HERITAGE REPORTING CORPORATION**

*Official Reporters*

1220 L Street, N.W., Suite 600

Washington, D.C. 20005-4018

(202) 628-4888

hrc@concentric.net

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| YANKEE ATOMIC ELECTRIC COMPANY, CONNECTICUT YANKEE ATOMIC POWER COMPANY, MAINE YANKEE ATOMIC POWER COMPANY, Plaintiffs. | Docket Nos.: 98-126C<br>98-154C<br>98-474C |
| v. | |
| THE UNITED STATES OF AMERICA, Defendant. | |

Courtroom 6, Room 507
National Courts Building
717 Madison Place, N.W.
Washington, D.C.

Monday,
August 6, 2001

The parties met, pursuant to the notice of The Court, at 2:31 p.m.

BEFORE: HONORABLE JAMES F. MEROW
Senior Judge

APPEARANCES:

<u>For the Plaintiffs</u>:

JERRY STOUCK, Esquire
ROBERT L. SHAPIRO, Esquire
Spriggs & Hollingsworth
1351 I Street, N.W., Ninth Floor
Washington, D.C. 20005-3305
(202) 898-5839

APPEARANCES: (Continued)

For the Defendant:

HAROLD D. LESTER, Jr., Esquire
MARIAN E. SULLIVAN, Esquire
U.S. Department of Justice
Civil Division
1100 L Street, N.W.
Washington, D.C. 20530
(202) 307-6288

possible.

However, with regard to --

THE COURT: Are you contemplating non-party discovery?

MR. LESTER: Yes, Your Honor, and that is built into the suggested -- the joint motion and order that the parties all stipulated to. It provides dates for service of those subpoenas upon third parties. It's likely that most of that will be at least initially document requests, and subpoenas, and then we will determine whether it's worthwhile to pursue any particular third party utilities for any further depositions or proceedings.

Let me go into the second part of the schedule issues, Your Honor; one where we think the discovery from the utilities is essential to our case. And that is, with regard to rebutting the Yankees' claims with regard to priority for shutdown reactors and these exchanges which the Yankees claims are heavily dependent upon, you know, those exchanges are based upon and depend upon, although the Yankees dispute this, the existence of other utilities that would have traded with them or had entered into agreements with them. We have not identified any yet that have done so, but we think it's important for mounting a full defense to the Yankees' claims that we fully exhaust those avenues so that when we -- we understand that under the Court's pre-

trial order what we are supposed to submit to the Court is our complete case for trial, for a trial or further proceedings, and that we think to do that we need to exhaust or complete the discovery in the coordinated proceedings.

THE COURT: Okay. Mr. Stouck?

MR. STOUCK: Yes, Your Honor.

Let me start at the beginning of our position because I have got a number of things to say and a number of things in response to Mr. Lester, and I would like to start at the beginning. But to frame what I am about to say, you may recall we were back here two or two and a half years ago asking for lots of wide-ranging discovery before we submitted our pre-trial submissions.

And the Court at that time, I would say, rather narrowly confined our discovery rights on what I understood to be your understanding and interpretation of your pre-trial orders as being intended to streamline discovery and not to contemplate necessarily things like third party.

You know, the government, what they are really saying here is they need to ask someone else before they find out what their position is, and I think it's a little strange.

But to take it from the top, as Mr. Lester said, as soon as we got your order I sent them a letter suggesting that 75 days would an appropriate time, October 15th, to

REPORTER'S CERTIFICATE

DOCKET NO.: 98-126C

CASE TITLE: Yankee Atomic Electric v. United States

HEARING DATE: August 6, 2001

LOCATION: Washington, DC

I hereby certify that the proceedings and evidence are contained fully and accurately on the tapes and notes reported by me at the hearing in the above case before the United States Court of Federal Claims.

Date: August 6, 2001

Theodore Fambro

Theodore Fambro

Official Reporter

Heritage Reporting Corporation

Suite 600

1220 L Street, N. W.

Washington, D. C. 20005-4018