IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| YANKEE ATOMIC ELECTRIC COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | No. 98-126 C<br>(Senior Judge Merow) |

YANKEE ATOMIC'S OPPOSITION TO
MOTION *IN LIMINE* TO EXCLUDE THE EXPERT REPORT AND TESTIMONY
OF DR. JOHN BARTLETT

JERRY STOUCK
Spriggs & Hollingsworth
1350 I Street, NW, Ninth Floor
Washington, DC 20005

Counsel for Plaintiff
YANKEE ATOMIC ELECTRIC
COMPANY

Of Counsel:

Robert Shapiro
Peter J. Skalaban, Jr.
SPRIGGS & HOLLINGSWORTH

April 16, 2004

# TABLE OF CONTENTS

**PAGE**


Index to Appendix ........ ii

Table of Authorities ........ iv

I. Introduction. ........ 1

II. Argument. ........ 2

A. Dr. Bartlett's testimony is admissible under FRE 702. ........ 5

B. The government's attack on Dr. Bartlett's qualifications erroneously depends upon the government's already-rejected interpretation of the contract. ........ 7

C. Dr. Bartlett's opinions are reliable under FRE 702. ........ 15

D. Dr. Bartlett's testimony will assist the trier of fact. ........ 24

III. Conclusion. ........ 25

INDEX TO APPENDIX


**Description** **Page**

John W. Bartlett Expert Witness Report....................0001

Frank C. Graves Expert Witness Report....................0023

Ivan F. Stuart Expert Witness Report....................0070

Dr. John W. Bartlett Deposition Transcript (8/26/03, 8/27/03) [Excerpts]....................1000

Victor Trebules Deposition Transcript (4/19/02) [Excerpts]....................1050

Lake H. Barrett Deposition Transcript (4/22/02) [Excerpts]....................1053

Susan Klein Deposition Transcript (4/24/02, 4/25/02) [Excerpts]....................1056

Alan Brownstein Deposition Transcript (4/11/02) [Excerpts]....................1071

Billy M. Cole Deposition Transcript (3/13/02) [Excerpts]....................1078

Dr. John W. Bartlett Deposition Transcript (8/26/03, 8/27/03) [Excerpts]....................1082

Lake H. Barrett Deposition Transcript (5/14/02) [Excerpts]....................1091

Letter from Goodman (TRW) to Milner (DOE) with attached "ACR Issues Status Report – December 31, 1991," of 1/6/92....................2000

Memorandum from Morgan to Hodel, of 4/8/83....................2003

Letter from Dreyfus (DOE) to Kadak (Yankee Atomic), of 9/28/95....................2013

Nuclear Waste Fund Fee Adequacy: An Assessment, of 7/84 [Excerpts]....................2014

Mission Plan for the Civilian Radioactive Waste Management Program, Volume 1, of 6/85 [Excerpts]....................2019

"Report on Financing the Disposal of Commercial Spent Nuclear Fuel and Processed High-Level Radioactive Waste," of 6/83 [Excerpts]....................2024

Fiscal Implications of a 1-mil/kwh Waste Management Fee, of 12/82 [Excerpts]....................2027

Projected Costs for Mined Geologic Repositories for Disposal of Commercial Nuclear Waste, of 12/82 [Excerpts]....................2029

Throughput Rate Study ........................................................................................................2035

Letter from Kearney (EEI) to Morgan (DOE) – March 7, 1983 ...........................................2041

# TABLE OF AUTHORITIES

## Cases

*Commonwealth Edison Co. v. United States*, 56 Fed. Cl. 652 (2003) ............................ 11, 12, 17

*Cortés-Irizarry v. Corporación Insular de Seguros*, 111 F.3d 184 (1st Cir. 1997)....................... 5

*Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579 (1993) ........................................................ 5

*Dickie v. Shockman*, No. CIV A3-98-137, 2000 WL 33339623 (D.N.D. July 17, 2000) ............. 5

*Gonzalez-Perez v. Gomez-Aguila*, 296 F. Supp. 2d 110 (D.P.R. 2003) ...................................... 19

*Hawthorne Partners v. AT&T Techs., Inc.*, 831 F. Supp. 1398 (N.D. Ill. 1993)........................... 6

*Indiana Michigan Power Co. v. United States*, 57 Fed. Cl. 88 (2003) .................................... 3, 11

*Koch v. Koch Indus., Inc.,* 2 F. Supp. 2d 1385 (D. Kan. 1998) ..................................................... 6

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999) ............................................................ 5, 15

*Macke Co. v. United States*, 467 F.2d 1323 (Ct. Cl. 1972)......................................................... 23

*Maiz v. Virani,* 253 F.3d 641 (11th Cir. 2001) ............................................................................ 15

*Micro Chem., Inc. v. Lextron, Inc.,* 317 F.3d 1387 (Fed. Cir. 2003) ....................................... 6, 17

*Noble v. Sheahan*, 116 F. Supp. 2d 966 (N.D. Ill. 2000) ............................................................. 6

*Seaboard Lumber Co. v. United States*, 308 F.3d 1283 (Fed. Cir. 2002) ...................................... 6

*United States v. Alatorre*, 222 F.3d 1098 (9th Cir. 2000)......................................................... 6, 7

*United States v. Hankey*, 203 F.3d 1160 (9th Cir. 2000) ..................................................... passim

*United States v. Vesey*, 338 F.3d 913 (8th Cir. 2003).................................................................... 7

## Statutes and Rules

Fed. R. Evid. 401 ........................................................................................................................ 24

Fed. R. Evid. 702 ........................................................................................................... 10, 17, 24

Fed. R. Evid. 702 advisory committee’s note (2000 Amendments).......................................... 5, 6

**Other Authorities**

RESTATEMENT (SECOND) OF CONTRACTS § 204 (1981)................................................................ 12

WEINSTEIN'S FEDERAL EVIDENCE § 702.02[1] (2002) .................................................................. 5

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| YANKEE ATOMIC ELECTRIC COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | No. 98-126 C<br>(Senior Judge Merow) |

YANKEE ATOMIC'S OPPOSITION TO
MOTION *IN LIMINE* TO EXCLUDE THE EXPERT REPORT AND TESTIMONY
OF DR. JOHN BARTLETT

Yankee Atomic respectfully submits this opposition to the government's motion *in limine* to exclude the expert report and testimony of Dr. John Bartlett ("Mot.").[1]

## I. Introduction.

It is clear that the government really, really does not want this Court to hear Dr. Bartlett's testimony.

Initially, the government accused Dr. Bartlett of being a felon because he had so much inside knowledge and experience concerning the DOE spent nuclear fuel ("SNF") program and its contracts with utilities that he should be precluded from now testifying for Yankee Atomic.[2] Now, having failed in that attempt, the government has filed a new motion asserting that Dr.

---

[1] This Opposition should also be deemed applicable to *Connecticut Yankee v. United States*, No. 98-154C, and *Maine Yankee v. United States*, No. 98-474C.

[2] *See* Defendant's Motion To Strike The Expert Report Of Dr. John W. Bartlett and Exclude Dr. Bartlett From Testifying As An Expert Or Lay Opinion Witness In This Proceeding (filed 10/12/01) ("First Motion to Exclude"); *see also* Defendant's Supplemental Motion To Strike The Fact And Expert Testimony of Dr. John Bartlett ("Supp. Mot. to Exclude").

Bartlett has so *little* knowledge of the program and the contracts that he is not an expert at all, and his testimony should be excluded on that basis.

The government is wrong again. Dr. Bartlett is not a felon, but he is an expert. The Court should hear his testimony despite the government's hyperaggressive attempts to prevent the Court from doing so. Indeed, the real reason the government is trying to keep the Court from hearing Dr. Bartlett is obvious: Dr. Bartlett's testimony, informed by experience with the DOE spent fuel program and knowledge obtained throughout his 47-year career, squarely supports Yankee Atomic's damages claim. The government's motion should be denied, just like the government's prior attempts to silence Dr. Bartlett.

**II. Argument.**

Several facets of the government's motion are striking, and fundamentally wrong. First, the government in its prior motion to exclude Dr. Bartlett's testimony took the contrary position before this Court: "It cannot be seriously argued that Dr. Bartlett does not rely upon scientific, technical, or other specialized knowledge . . . in which the DOE would have disposed of the contract holders' SNF." First Motion To Exclude, *supra* n.2, at 31. That representation alone is dispositive of the government's present motion.

Second, the government does not even argue that Dr. Bartlett's opinions or the principles he applied are unaccepted in the field of spent fuel management and program planning or unsupported by the historical DOE program documents or studies. Nor does the government advance any competing theories or models by which the Court could test the reliability of Dr. Bartlett's opinions. These failures are not surprising because Dr. Bartlett's opinions are well-reasoned and supported by a vast evidentiary record. And Dr. Bartlett's knowledge and experience in the relevant field of spent fuel management and program planning are so well-recognized that the first President Bush appointed him, and the Senate confirmed him, to be the

Director of DOE's SNF disposal program. Indeed, Dr. Bartlett's fundamental acceptance rate opinion – that the non-breach world acceptance rate would have been 3000 metric tons of uranium per year ("MTU") – is so well-supported that a Judge of this Court held that it is appropriate for determining damages as a *matter of law*. *See Indiana Michigan Power Co. v. United States*, 57 Fed. Cl. 88, 99 (2003). Similarly, Dr. Bartlett's opinions concerning the desirability of shipping campaigns and the importance and role of exchanges have long been accepted by DOE itself and are supported by overwhelming evidence. The government's various attacks amount to picking lint off Dr. Bartlett's experience and amply-supported opinions.

Third, time and time again, the government's assertions regarding the contents of Dr. Bartlett's deposition testimony are exaggerated or false. As but one example, the government asserts that Dr. Bartlett "does not even have an opinion regarding the proper pace and schedule at which [DOE] should have, or would have, accepted the Yankee's SNF" (Mot. at 1) and that he has "abandoned" his rate opinion (Mot. at 3). These outlandish representations are untrue and the cited transcript pages, DA 31-33, DA 38-39, do not support them.[3] The government never even *asked* Dr. Bartlett if he was abandoning or now disagreed with the opinion set forth in his report that 3000 MTU is a reasonable and appropriate steady-state rate for DOE's performance in the non-breach world, beginning in 1998. Far from abandoning his opinion, Dr. Bartlett testified that DOE has generally "stuck with 3,000 [MTU] as the ultimate fully implemented system," A1036, tr. 175:10-11. Moreover, the various snippets of deposition testimony that the government relies upon – when read in context with Dr. Bartlett's other deposition testimony – at most indicate that the reasonableness of an acceptance rate could potentially vary under different

---

[3] Citations to "A__" refer to the pages of the appendix attached to this Opposition; citations to "DA__" refer to the appendix attached to the government's motion to exclude Dr.

circumstances and at different times, *see, e.g.*, A1032, tr. 170:2-3 ("the proper pace is a dependent factor depending on what the situation is. . . ."); A1033, tr. 171:2-3 (it "depend[s] on when you were looking at the system, what the circumstances were"). This is hardly surprising: for instance, if the nation's fleet of nuclear reactors were only discharging 1000 MTU, it stands to reason that what is a reasonable acceptance rate might be different than if the reactors are discharging 2000 MTU annually. That what is reasonable can vary under different circumstances is simply a truism that *bolsters* – rather than undermines – Dr. Bartlett's credibility and the reliability of his opinions. The government's motion is teeming with such citation mischaracterizations and exaggerations.

Fourth, the government's motion continues to press the ill-founded theme that the schedule issues in the case are unduly complex and unprovable. To the contrary, the ultimate "schedule" issue before the Court is straightforward – namely, in the non-breach world, what is the approximate date by which (more likely than not) DOE would have completed removal of Yankee Atomic's SNF. Yankee Atomic can and will provide competent evidence, including the testimony of Dr. Bartlett, so that the Court can make a reasonable and supported finding on this question. The various underlying "schedule" issues – rate of spent fuel acceptance, the role of the explicit and important contract provision allowing exchanges, the shutdown priority clause and the attendant public policy it safeguards, and the efficiencies resulting from spent fuel transportation campaigning – are simply *factors* that will inform and guide the Court in making a reasonable estimate of when, in the non-breach world, Yankee Atomic's SNF likely would have been removed. Dr. Bartlett's testimony will help the Court to appropriately evaluate these

---

Footnote continued from previous page
Bartlett's expert testimony and report.

factors and to give appropriate value to the contract's explicit terms (such as the exchanges provision) as well as the fundamental purpose of the contract and the underlying statute, which was to help utilities avoid additional on-site spent fuel storage costs after 1998.

Fifth, the government's motion is largely beside the point. Dr. Bartlett can testify, as a fact witness, regarding his understandings and expectations – while Director of the program – regarding how the DOE spent fuel program should and would operate. The government cannot silence the truth. The fact that Dr. Bartlett will testify in any event underscores that the government's present motion should be denied so that the parties can focus on preparing for trial. Indeed, the government's motion, which is supported by nothing more than flimsy excerpts from a deposition transcript, cannot possibly be granted now. *E.g.*, *Cortés-Irizarry v. Corporación Insular de Seguros*, 111 F.3d 184, 188 (1st Cir. 1997) ("given the complex factual inquiry required by *Daubert*, courts will be hard-pressed in all but the most clearcut cases to gauge the reliability of expert proof on a truncated record"); *Dickie v. Shockman*, No. CIV A3-98-137, 2000 WL 33339623, at *2 (D.N.D. July 17, 2000) (same).

**A. Dr. Bartlett's testimony is admissible under FRE 702.**

Despite important changes in recent years regarding the admission of expert testimony, it remains true that "[e]xpert testimony is liberally admissible under the Federal Rules of Evidence," and the "presumption under the Rules is that expert testimony is admissible." WEINSTEIN'S FEDERAL EVIDENCE § 702.02[1], p.702-6 (2002); *see United States v. Hankey*, 203 F.3d 1160, 1168 (9th Cir. 2000) ("Rule 702 generally is construed liberally"); Fed. R. Evid. ("FRE") 702 advisory committee's note (2000 Amendments) ( "A review of the caselaw after *Daubert* shows that the rejection of expert testimony is the exception rather than the rule"). Moreover, while *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993) and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), provide that the Court has a "gatekeeping"

role to confirm that the testimony is relevant and reliable, "these concerns are of lesser import in a bench trial, where no screening of the factfinder can take place . . . ." *Seaboard Lumber Co. v. United States*, 308 F.3d 1283, 1302 (Fed. Cir. 2002).

The Rule 702 analysis is highly flexible, and depends "on the nature of the issues, the witness's expertise, and the subject of the testimony." *Micro Chem., Inc. v. Lextron, Inc.,* 317 F.3d 1387, 1391 (Fed. Cir. 2003). *See also United States v. Alatorre*, 222 F.3d 1098, 1102 (9th Cir. 2000) (the precedent does not "mandate the form that the inquiry into relevance and reliability must take . . ."). Moreover, "the trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system." FRE 702 advisory committee's note (2000 Amendments) (quotation omitted); *Micro Chem.*, 317 F.3d at 1392 (quoting same). And the 2000 Amendments to Rule 702, which essentially codified *Daubert* and *Kumho Tire*, are "not intended to provide an excuse for an automatic challenge to the testimony of every expert." FRE 702, advisory committee note (2000 Amendments). Prior to trial – on a motion *in limine* to exclude evidence – the government bears the burden of proving that the evidence is inadmissible for any purpose. *See Hawthorne Partners v. AT&T Techs., Inc.*, 831 F. Supp. 1398, 1398 (N.D. Ill. 1993) ("This court has the power to exclude evidence *in limine* only when [the] evidence is clearly inadmissible on all potential grounds."); *Koch v. Koch Indus., Inc.,* 2 F. Supp. 2d 1385, 1388 (D. Kan. 1998) ("The movant has the burden of demonstrating that the evidence is inadmissible on any relevant ground."); *see also Noble v. Sheahan*, 116 F. Supp. 2d 966, 969 (N.D. Ill. 2000) (the movant "bears the burden").

Dr. Bartlett has exceptional qualifications in spent fuel disposal program planning, including service as Director of DOE's program. His testimony, which flows reliably from his experience and knowledge, easily satisfies the applicable evidentiary standards and is plainly

admissible. *See, e.g.*, *United States v. Vesey*, 338 F.3d 913, 917-18 (8th Cir. 2003) (admitting experience-based expert testimony); *Hankey,* 203 F.3d at 1169 ("F.R.E. 702 works well for this type of data gathered from years of experience and special knowledge"); *Alatorre*, 222 F.3d at 1104 (finding customs special agent qualified to testify where his testimony was largely based on personal experience).

**B. The government's attack on Dr. Bartlett's qualifications erroneously depends upon the government's already-rejected interpretation of the contract.**

Dr. Bartlett is eminently qualified to opine on an appropriate and reasonable rate of acceptance, the role and importance of exchanges, and the use of transportation campaigns if DOE had performed in 1998, as the parties intended and the contract required. If Dr. Bartlett is not qualified to opine on reasonable performance in the non-breach scenario, it is doubtful that anyone is.

1. As the former Director of DOE's SNF disposal program, from 1990 to 1993, Dr. Bartlett has experience and personal knowledge regarding how DOE should have performed. Dr. Bartlett also has extensive experience in the nuclear industry generally and with spent fuel and radioactive waste program planning specifically. Beginning in 1957, he worked at Knolls Atomic Power Laboratory, A20, where he helped design the Navy's first nuclear-powered surface ship, A1001, tr. 8:11-19. He obtained a Ph.D from Rensselaer Polytechnic Institute, where he both studied and taught courses in nuclear engineering and sciences. A1002, tr. 14:4-5; A1003, tr. 15:11-16. Beginning in 1962, he served on the faculty at the University of Rochester where he taught a course in nuclear engineering and the nuclear fuel cycle. A1004-1006, tr. 16:7-18 & 17:3-8. In 1968, Dr. Bartlett was a Fulbright professor of Nuclear Engineering in Istanbul, Turkey, where he taught atomic physics, reactor engineering, and reactor design. A1007, tr. 24:14-15; A1008, tr. 27:9-10.

In 1968, he joined the Battelle Memorial Institute (what is now Pacific Northwest National Laboratory), where he was the manager of systems studies for their Nuclear Waste Program Office. A1009-1010, tr. 29:17-30:4; A19. At that time, the Atomic Energy Commission had just formed a Division of Waste Management and Transportation to address the emerging issue of spent nuclear fuel disposal, and Battelle served as the contractor to that division. A1011, tr. 31:10-16. At the Nuclear Waste Program Office, Dr. Bartlett's job was "to determine what kind of a program made sense because everything was just starting with respect to [nuclear] waste management . . . ." A1010, tr. 30:8-16. He developed the program plan for putting together a complete system for nuclear waste management. A1011-1012, tr. 31:17-32:4. His responsibility was "to bring the system together." A1012-1013, tr. 32:20-33:1. In other words, he was on the ground floor of designing and planning the Nation's spent nuclear fuel and high-level waste disposal plans.

In 1974, Dr. Bartlett led the Nuclear Waste Management Planning Office's preparation of the five-volume "Technical Alternatives Document," which "was a compilation of every technology for every action that could be taken in nuclear waste management." A1014, tr. 39:2-11. Beginning in 1978, Dr. Bartlett worked for a consulting firm, where his work included waste management program development, regulatory compliance, risk assessment, and technical system integration. A19. His work included providing technical support to the NRC for the NRC's promulgation of regulations, pursuant to the Nuclear Waste Policy Act ("NWPA") relating to the repository. A1015-1016, tr. 48:12-49:16. He also provided peer review of DOE's 1985 Mission Plan, a document required by the NWPA that set forth DOE's plans for the spent fuel program (and, notably, uses the 3000 MTU acceptance rate). A1028, tr. 136:1-15; A2021-3.

In October of 1989, President Bush nominated Dr. Bartlett to be the director of DOE's spent fuel disposal program, and the Senate confirmed him in 1990. A1017, tr. 52:1-7. As Director of the program, his work included "agency and national policy development" and "program strategy development." A19. In this role, he worked closely with Congress. A19. He had dealings with the CEOs of leading utilities, including discussions regarding their interest in exchanges, *see* A1040, tr. 345:10-19; A1090, tr. 509:7-10. His work included selection and design of the technology and operational systems for transportation of nuclear waste. A19.

Beginning in 1993, after leaving DOE, Dr. Bartlett again worked as a consultant, including work in the field of radioactive waste disposal program planning. A18. For example, he worked on the "PANGEA" project, which attempted to establish an international spent fuel repository in Australia. A1022, tr. 83:11-17. Here, Dr. Bartlett provided "studies and evaluations of alternative systems to make it work. . . . I worked on developing an integrated system concept, helped support development of that, and the logistics of the operation because you would be getting spent fuel from all over the world." A1022-1023, tr. 83:19-84:6.
Dr. Bartlett worked on the transportation logistics: "I would do, essentially, the system studies, the logistics, what you had to have in the way of a fleet, ports, and where the spent fuel or the waste would come from, what would be involved in getting it to the ports . . . [the] same kinds of details as our national program." A1024-1025, tr. 86:18-87:7. Right up to today, Dr. Bartlett has continued to monitor developments in this Nation's spent fuel program. A1085, tr. 111:9-113:4.

Dr. Bartlett's professional achievements include membership in the American Nuclear Society ("ANS"). A21. Dr. Bartlett was elected to two terms of service on the ANS's Executive Committee of the Fuel Cycle and Waste Management Division. *Id.*

2. The government entirely ignores Dr. Bartlett's substantial, relevant experience in radioactive waste disposal program planning, and in DOE's own program. Instead, the government asserts that Dr. Bartlett only claims expertise in hydrology, radiation, and repository performance (Mot. at 2, 10) – an argument that has no substance and is founded on the government's own failure to ask follow-up questions at Dr. Bartlett's deposition. First, the government never asked Dr. Bartlett questions that implicated the actual standards set forth in Rule 702 – whether he had "knowledge" "skill" or "experience," within the meaning of Rule 702, in radioactive waste disposal program planning, or with respect to DOE's program, nor did the government ask him if his opinions were based on any "specialized knowledge," *see* FRE 702. The government did not even ask Dr. Bartlett to explain whether he thought he was qualified to advance the opinions at issue – and why. Of course, Dr. Bartlett's resume, A18-22, and his deposition testimony, A1000-1027, make abundantly clear that he does indeed have knowledge, skill and experience in the areas of radioactive waste program planning and the DOE program (as the government acknowledged in its prior motion to exclude him), and that he is qualified to offer the opinions at issue.

Second, the government's fundamental assertion on page 10, which is unaccompanied by any citation, that Dr. Bartlett's expertise in system performance assessment is not "in any way related to the matters about which he intends to offer expert testimony in this case" is purely and simply wrong. The government never asked Dr. Bartlett whether performance assessment "is in any way related" to the matters on which he is planning to testify, even though Dr. Bartlett told the government that this is a broad discipline that "subsumes a lot of things." *See* A1026, tr. 114:9-20. Performance assessment includes assessment and system study of the repository, and the discipline also necessarily includes assessment of all components of the disposal system,

from initial waste acceptance, to transportation, to ultimate disposal in the repository. Almost all of Dr. Bartlett's career has been dedicated to those relevant matters, and he is more than amply qualified.

3. The government's assertion that "Dr. Bartlett claims to have virtually no knowledge of the Standard Contract" (Mot. at 10) – is likewise without substance and a red herring. The government is also not accurately representing the testimony (again): Dr. Bartlett testified that he had minimal *involvement* with the contract when he was Director, A1083-1084, tr. 79:22-80:15, not no *knowledge* of the contract. More fundamentally, Dr. Bartlett is not purporting to offer legal opinions on the meaning of contract provisions, but rather to provide evidence that will assist the Court in providing content to the contract's various missing or incomplete terms and in *assigning value and giving effect* to the various contract terms that bear on when Yankee Atomic's spent fuel likely would have been removed. These contract clauses were intended to operate in the context of a functional disposal program, and Dr. Bartlett's testimony will help provide that missing context. Indeed, the government is essentially recycling its already-rejected arguments that the contract specifies the removal schedule. Instead, as explained in the "well reasoned ruling in *Commonwealth Edison*," which this Court "adopted here," *see* Order of June 26, 2003, the "Standard Contract, including specifically the ACR and DCS process, does not contain or create a SNF acceptance rate," 56 Fed. at 663. *See also Indiana Michigan Power Co. v. United States*, 57 Fed. Cl. 88 (2003). Moreover, here, the well-established rule that "[c]ourts should read contract provisions to 'effectuate the spirit and purpose'" of the contract is of paramount importance. *Commonwealth Edison Co. v. United States*, 56 Fed. Cl. 652, 662 (2003) (emphasis added) (citations omitted).

Overwhelming evidence shows that a significant purpose of the contract here, and of the Nuclear Waste Policy Act, was to help utilities avoid additional on-site storage costs after 1998. *See* DOE documents and deposition testimony cited in and appended to Yankee Atomic's opposition to the government's motion for partial summary judgment on the rate of acceptance ("Rate Motion Opposition Brief"), at pp. 12-14 and at A2-5, 217-18, 215-82, 285-88, 354-59, 421-22, 1631, 3246, 3329 of the appendix to that brief (filed October 28, 2002). Indeed, the Court must engage in a "fact-specific inquiry necessary to determine the intent of Congress and the parties," and supply a reasonable, "missing acceptance rate term." *Commonwealth Edison*, 56 Fed. Cl. at 667; *see* RESTATEMENT (SECOND) OF CONTRACTS § 204 (1981) (The court must supply "a term which is reasonable under the circumstances") (quoted with approval in *Commonwealth Edison*, 56 Fed. Cl. at 662).

It is equally true that the contract provisions dealing with the sequence of spent fuel acceptance are incomplete and provide at best a rough starting point. The contract "was unfortunately developed in such a way that the terms and conditions contained numerous omissions, inconsistencies, ambiguities and contradictions." A2001-2002; *see* A1073-1076, tr. 516:20-519:9 (Deposition of DOE's Alan Brownstein). The contract did not set forth the sequence for spent fuel removal – had DOE begun performance in 1998 and continued thereafter – but rather provided a rough framework in which numerous clauses would have operated to adjust and establish the sequence of spent fuel removal in the non-breach world. As discussed in greater detail in Yankee Atomic's Rate Motion Opposition Brief, at 30-31, in 1987 DOE and the utilities began a dialogue to address 34 open and unresolved issues, most of which related to schedule matters, such as "DCS exchange procedures;" "[i]mproving the efficiency of the acceptance process;" "[a]cceptance priority of shutdown reactors;" and "[f]ungibility of final

delivery schedules." *See* A2001-2002. Ultimately, these issues were never resolved because of the program's failure, but the incomplete and open nature of the contract's provisions dealing with the removal schedule and sequence underscore the importance of Dr. Bartlett's testimony, which will assist the Court in making a reasonable estimate of when, more likely than not, Yankee Atomic's spent fuel would have been removed in the non-breach world.

4. The government's remaining complaints regarding Dr. Bartlett's qualifications are, at most, cross-examination material and many are completely unsupported by the citations provided. One common complaint, that runs throughout the government's motion, is that Dr. Bartlett does not purport to know all of the exchanges that would have occurred between utilities, and when, had DOE performed in 1998 (*see, e.g.,* Mot. 4, 12). The government then concludes that Dr. Bartletts lacks "superior knowledge regarding exchanges that would qualify him to testify as an expert on the issue." (Mot. at 12). Such attacks are again wrong on multiple levels. First, Dr. Bartlett is not offering an opinion on what each and every utility would have done or providing an itemized list of exchanges that would have taken place – rather, he is offering the well-accepted and supported opinion that exchanges were valuable, important, and would have been utilized if DOE had performed as intended in 1998. Second, the government is artificially narrowing the scope of the relevant field – Dr. Bartlett is not being offered as an expert on exchange details; instead, his vast experience in spent fuel management and program planning, experience and knowledge as Director, and such experience as discussions with leading utilities on exchanges, all qualify him to offer the opinion he plans to sponsor, which is simply that exchanges would have been used by the contracting parties to make DOE's removal schedule more efficient and to carry out the contract's purpose. Finally, the main testimony cited – which the government quotes selectively but prominently on pages 4-5 – does not even deal with the

issue at hand: what is a reasonable estimate of the effect or value of the contract's exchange provision for the purpose of determining damages. The issue is *not* what each and every utility would have done, and when, in the non-breach world (as the government wrongly presumes).

Similarly, the government's assertion that Dr. Bartlett has never done any work "involving" shipping campaigns (Mot. at 11) is another example of the government exaggerating the record. The actual questions were vague and the testimony indicates only that Dr. Bartlett has not directly worked *on* an actual shipping or transportation campaign of spent fuel. A1030, tr. 143:17-19 ("Have you ever done any work . . . *on* shipment campaigns, transportation campaigns?) (emphasis added). The government never followed up on its question to determine whether Dr. Bartlett's *program planning* experience involved the consideration of or plans to use campaigning for transportation of radioactive waste. Dr. Bartlett's opinion here, what DOE would have and should have done if it had performed in 1998, is from a program planning perspective. The government, moreover, ignores Dr. Bartlett's relevant testimony that he planned logistics and transportation for the international repository project in Australia, A1022-1023, tr. 83:10-84:6, which involved shipments and transportation of spent fuel byproduct from *across the world*, A1023, tr. 84:2-6. Second, from his experience as Director, Dr. Bartlett has first-hand knowledge that campaigning would be important to the program. "It's something we recognized as an ideal option of running the system." A1029, tr. 141:12-19.[4] As Dr. Bartlett further explained "it would be far better to have a system where you well, frankly, campaigned and made effective use of the resources of the system . . . ." A1031, tr. 161:3-7. In short,

---

[4] Generally, a transportation campaign is the acceptance and transportation of a substantial amount of spent fuel or radioactive waste from a site during each visit. This approach must be contrasted to an episodic approach where DOE (or the transporter) would make all necessary preparations and come to a particular reactor, but then would only take a small amount

Dr. Bartlett, who has dozens of years of experience in spent fuel management and program planning, and specific experience with DOE's program, is amply qualified to opine on the role of transportation campaigns had DOE performed as intended in 1998.

**C. Dr. Bartlett's opinions are reliable under FRE 702.**

The government's assertions that Dr. Bartlett's testimony is "highly unreliable" and that "it is unclear whether he applied *any* methodology" (Mot. at 13) are unsupported and they are also wrong. As elaborated further below, *see* pp. 22-23, Dr. Bartlett's opinions are admissible as experience-based testimony. As the Ninth Circuit explained:

> [I]n considering the admissibility of testimony based on some "other specialized knowledge," Rule 702 generally is construed liberally ....The *Daubert* factors (peer review, publication, potential error rate, etc.) simply are not applicable to this kind of testimony, whose reliability depends heavily on the knowledge and experience of the expert, rather than the methodology or theory behind it.

*Hankey,* 203 F.3d at 1168-1169 (citations omitted); *see Kumho Tire*, 526 U.S. at 150 (in such cases "the relevant reliability concerns may focus upon personal knowledge and experience"); *Maiz v. Virani,* 253 F.3d 641, 669 (11th Cir. 2001) ("[T]here is no question that an expert may still properly base his testimony on 'professional study or personal experience.'") (quoting *Kumho Tire*, 526 U.S. at 152).

1. In addition, Dr. Bartlett did apply reliable principles in reaching each of his three principal opinions. Dr. Bartlett first explains that his opinions "are based on my many years of experience in the field of spent fuel management (including three years as director of the Office of Civilian Radioactive Waste Management ("OCRWM") in DOE," as well as his review of relevant documents. A2. Second, from that experience, Dr. Bartlett knows that spent fuel and

---

Footnote continued from previous page
of spent fuel, which would then necessitate many more similar trips to the site over time.

radioactive waste management programs should be *efficient*, and here that the program "should generally minimize the total cost to utilities of storing and disposing of spent fuel." A2. Dr. Bartlett knows that "DOE has long recognized the desirability of performing its contractual obligations in a cost-effective manner," A3-4, and of reducing "utilities' at-reactor spent fuel storage costs," A4. These principles of efficiency and reduction to utility costs are supported by the full cost recovery nature of the contracts. A3.

Conducting operations efficiently and the elimination of utilities' at-reactor storage costs are reliable principles for determining reasonable performance and/or how DOE would have or should have performed if it had performed beginning in 1998 as intended. Dr. Bartlett's report cites numerous DOE documents or DOE-commissioned studies confirming the importance of efficiency to the program. *See* A2 at n.2; A4 at nn.4 & 5. DOE's own statutorily-required report to Congress, the 1985 Mission Plan, explains: "the program must be conducted in a cost-effective manner, with full cost recovery," A4, A2020, and similarly – "The program must be conducted in a financially responsible, cost-effective manner and on the basis of full cost recovery." A2020a, A2016. Deposition testimony further confirms the reliability of Dr. Bartlett's approach. Victor Trebules, the DOE employee responsible for preparing the 1985 Mission Plan, explained, "I think we used phrases like fiduciary responsibility. People working in the program felt that they had an obligation to try to execute the program efficiently and effectively." A1051, tr. 5:10-14.

The government submits no evidence that suggests that efficiency is a rejected principle in radioactive waste disposal program planning, or that DOE's program would have been conducted inefficiently or inconsistently with the contract's purpose of eliminating at-reactor storage costs after 1998. Rather, the government argues that efficiency and minimizing costs to

utilities are not required by the Standard Contract. (*See* Mot. at 16). While no provision of the contract *expressly* so requires, it is equally true that no provision of the contract authorizes DOE to waste money, waste system resources, and inflict unnecessary expenses on the utilities and their ratepayers. To the contrary, the overwhelming evidence shows that a significant purpose of the contract here, and of the NWPA, was to help utilities avoid additional at-reactor storage costs after 1998. *See* Rate Opposition Brief, at pp. 12-14 and at A2-5, 217-18, 275-82, 285-88, 354-59, 421-22, 1631, 3246, 3329 of the appendix to that brief; *see also Commonwealth Edison*, 56 Fed. Cl. at 667 ("The deposition testimony of several DOE officials involved with the SNF program supports plaintiff's assertion that the intent of the NWPA and the parties was to avoid the construction by utilities of additional at-reactor storage."). To the extent that the government still disputes the parties' intent and the contract's purpose, that dispute must be resolved in the context of trial, not on a motion *in limine*. *See Micro Chem.*, 317 F.3d at 1392 (regarding admissibility, "[w]hen, as here, the parties' experts rely on conflicting sets of facts, it is not the role of the trial court to evaluate the correctness of facts underlying one expert's testimony").

2. Dr. Bartlett's report, his testimony, and abundant record evidence further demonstrate that each of Dr. Bartlett's three principal opinions has a sufficient basis, is based on reliable principles, and follows from the reliable application of these principles to the facts. *See* FRE 702. First, with respect to his acceptance rate opinion, Dr. Bartlett drew not only from his own experience and knowledge, but also from the analysis of Yankee Atomic's expert Frank Graves, whose report confirms that a 3000 MTU acceptance rate would have been efficient. *See* A9; A29-30 (Graves' report). Further, Dr. Bartlett considered historical documents, such as the 1985 Mission Plan, which utilized the 3000 MTU rate. A2022. Moreover, numerous other documents and studies also validate the reliability of Dr. Bartlett's acceptance rate opinion. One

of the DOE-commissioned acceptance studies, for example, analyzed various acceptance scenarios and concluded that the preferred acceptance rate for DOE's program is between 3000 MTU and 5000 MTU (Dr. Bartlett opines that a 3000 MTU rate is appropriate). A2035. Indeed, the 3000 MTU acceptance rate finds validation in pre-NWPA documents, in an almost uninterrupted line of DOE reports and planning documents following the contract's execution, and in current DOE program plans. *See, e.g.,* A2021-2022, A2026-2027, A2029, A2032, A1054, tr. 59:4-11 (testimony of government's Rule 30(b)(6) witness on acceptance rate).

Second, Dr. Bartlett's opinion that exchanges would have been an important part of DOE's spent fuel removal program similarly follows from his own experience and personal knowledge, and from principles of efficiency and cost-minimization. As another former Director of the program, Daniel Dreyfus, explained in a letter to Yankee Atomic, the purpose of the contract's exchanges provision is to "allow [the] industry to *optimize* the allocation of waste acceptance capacity to meet individual utility needs, without the overt involvement of [DOE]." A2013 (emphasis added). Dr. Bartlett held the same expectation when he served as Director. *See, e.g.*, A13. Dr. Bartlett's opinion on the role of exchanges is also supported by his discussions with leaders of the utility industry, while he served as Director. A1090, tr. 509:7-20. Of course, this well-understood purpose of the exchanges clause dates back to the formation of the contract, when the utility industry vigorously advocated for its inclusion, *see* A2047, and the then-head of DOE's program, Mr. Morgan, explained to the Secretary of Energy – prior to publication of the contract – that DOE "intend[s] to be reasonable" in its approval of exchanges. A2009.

In formulating his opinion on exchanges, Dr. Bartlett also considered that a schedule based on oldest fuel first, and without exchanges, would be inefficient, would frustrate the use of

transportation campaigns, and periodically would result in removal of quantities of spent fuel from a particular site so small that the quantity involved would not even fill a single container. A12. Dr. Bartlett further considered that many utilities with old fuel (and, thus, early allocations) but with no pressing storage needs, would have a strong economic incentive to trade with utilities with later slots "to avoid the disruptions inherent in moving spent fuel from an operating plant," and that exchanges would reduce total utility costs. A14.

Not surprisingly, the government attack on the reliability of Dr. Bartlett's opinion on exchanges, like the government challenges to his other opinions, does not actually dispute that any of the principles Dr. Bartlett applied are incorrect or unsupported by the evidence. As such, the government's attacks go, at most, to the weight of the evidence, not admissibility. *Gonzalez-Perez v. Gomez-Aguila*, 296 F. Supp. 2d 110, 116 (D.P.R. 2003) ("Any flaws in [the expert's] otherwise reliable methodology go to the weight and credibility of the evidence and not to its admissibility."). For example, the government makes the beside-the-point assertion that Dr. Bartlett did not know whether "pursuant to the Standard Contract, contract holders could make 'partial exchanges' or would be required to make only 'pair-wise, or bilateral, exchanges.'" (Mot. at 4). The contract does not dictate such details, so it is hardly surprising that Dr. Bartlett "didn't know." What is pertinent is that Dr. Bartlett testified that exchanges of partial allocations or multiple-party exchanges *should* be part of the system, A1045, tr. 531:1-4, 14-21, and that such testimony is consistent with the other evidence.

Similarly, the government's assertion that Dr. Bartlett is "not even sure whether the contract holders had anything at all to exchange" again misrepresents the transcript – the question and answer dealt with whether contract holders, *in the breach world*, had anything to exchange, A1043-43a, tr. 514:8 – 515:13, which has no bearing on his opinions. Of course, in

the actual, breach world no one knows when DOE will begin to perform (if ever), and as Mr. Graves' economic analysis also shows, an exchange market is unlikely to develop in the actual, breach world. A39-41. As Dr. Bartlett credibly explained, "[t]here was too much uncertainty," A1043, tr. 514:11-19. Likewise, as another example, there is nothing inconsistent with Dr. Bartlett's testimony that exchanges could have occurred based on approved delivery schedules and also based on an initial rights allocation (*i.e.* prior to approved delivery schedules) (*see* Mot. 14) – the government simply does not like Dr. Bartlett's answer.

Third, Dr. Bartlett's opinion that the schedule of spent fuel acceptance would have permitted and encouraged utilities to organize their deliveries of spent fuel to DOE in a limited number of transportation campaigns, *see* A10-11, is reliable and correct. Dr. Bartlett again considered a number of foundational principles: (1) the movement of spent fuel from the spent fuel pool is a detailed, labor intensive process, which can be done more efficiently and less expensively if done in campaigns, where a substantial volume of spent fuel is taken at each site visit, A10-11; and (2) campaigning is advantageous for operating plants, because spent fuel removal can be disruptive of normal electricity generation operations, A11. The government does not claim that these foundational principles are erroneous or that such reasoning is otherwise unaccepted in the field of spent fuel management and disposal program planning. Moreover, in reaching his opinions on whether a reasonable, non-breach world program would have taken advantage of campaigns, Dr. Bartlett also considered the opinions of Ivan Stuart, an expert in this case and a leading authority on spent fuel transportation. *See* A11 nn.18 & 19; *see* A70-80 (Stuart report). In addition, as noted above, Dr. Bartlett's own experience in spent fuel management, including his service as Director, informs his understanding that it is far preferable to plan for acceptance and transportation in focused shipping campaigns. A10-11.

Dr. Bartlett's reasoning, and his conclusion, regarding shipping campaigns are also validated by the government's own witnesses. As but two examples, another former program leader, Acting Director Lake Barrett, testified:

> Q. Now, would you agree that there are advantages to shipping campaigns versus moving over only a small number of assemblies at a time?
>
> A. Yes.
>
> Q. Would you agree that one of the important advantages of shipping campaigns is that efficiencies in transportation operations tend to be realized?
>
> A. Yes.
>
> Q. Okay, and would you agree that repetitive operations such as cask handling, loading, decontamination, receipt and turnaround are all more efficiently accomplished per cycle in a campaign versus individual cask transport?
>
> A. Yes.

A1092-1093, Barrett tr. 174:13-175:5 (Objections omitted). Similarly, Billy Cole, a long-time contractor for DOE on waste acceptance and transportation issues, explained:

> Q. What would be the benefit of campaigning?
>
> A. Permitting is one. Size of the train you can move into a facility, move a train in and pick up three car loads of three casks, load 30 tons instead of one cask of ten tons, its going to cost less, cost you almost the same to haul one of those cars down the railroad as it does three of them.
>
> You're going to save a lot of money. Campaigning can save money.
>
> Q. Campaigning can save money for DOE?
>
> A. Um-hm. It can also save money for the utilities possibly because you only, you're only interrupting your site one time every maybe three years instead of every year . . .
>
> There's benefits to everybody by doing campaigning.

A1080, Cole tr. 439:1-22.

Having no evidence showing that the principles Dr. Bartlett applied or his reasoning on campaigning are unsound or unaccepted in the field, the government again advances only

limited, micro-level attacks, such as its assertion that Dr. Bartlett purportedly "has never determined the quantity of spent nuclear fuel that would be accepted in each campaign, the method of acceptance, or the logistics of acceptance from any plant." (Mot. 14). Aside from no citation to the record, the government's argument is beside-the-point because Dr. Bartlett is not purporting to offer an opinion on how each and every acceptance, at each and every plant, across the industry would have happened in the non-breach world. Rather, Dr. Bartlett's opinion is on the system-wide level: from a *programmatic perspective*, campaigning would have been sensible, efficient, important, and *vital* if DOE had performed as intended.

3. The government's remaining complaints about the reliability of Dr. Bartlett's three principal opinions also go to the weight the Court should provide the evidence, not admissibility. For example, the government makes various document-related assertions, that essentially amount to a complaint that Dr. Bartlett "only" considered 16 documents in reaching his opinions, and that many of these documents are putatively "outdated." Mot. 3, 13. Dr. Bartlett's opinions, however, are not dependent on particular documents. Moreover, the government is confusing documents that an expert specifically consults or considers in preparing the expert's report and documents that have, through the course of the expert's career, informed and contributed to the expert's knowledge. Dr. Bartlett has reviewed hundreds of radioactive waste program documents, system studies, and NRC documents, over the years, and he has prepared multiple systems studies and analyses relating to spent fuel management, all of which assuredly contributed to his substantial experience and his knowledge regarding this program and spent fuel management and program planning generally. To the extent the government thinks Dr. Bartlett should have specifically consulted more or different documents than the sixteen he consulted in preparing his report, that is a matter for cross-examination.

Similarly, the government's strident complaints that Dr. Bartlett did not know whether documents he consulted were "outdated" underscores how far the government is stretching. (Motion at 3). Dr. Bartlett's opinions again do not depend upon whether he has consulted the latest version of every DOE report: indeed, Dr. Bartlett largely consulted documents that *pre-dated* this controversy, such as the 1985 Mission plan, and such documents are particularly probative of how DOE would have performed if it had performed consistent with the contract's purpose. *Macke Co. v. United States*, 467 F.2d 1323, 1325 (Ct. Cl. 1972) ("how the parties act under the arrangement, before the advent of controversy, is often more revealing than the dry language of the written agreement by itself"). Further, Dr. Bartlett stays current on program developments on an ongoing basis. A1085-87, tr. 111:9-133:4; A1088-1089, tr. 309:19-310:16.

The government's assertion that Dr. Bartlett conducted no "independent research" (Mot. at 13) is unclear, and also beside-the-point. Dr. Bartlett's opinions are derived from his considerable experience and personal knowledge, considerations of efficiency, consideration of the contract's and statute's purpose, consideration of other relevant expert testimony, and review of relevant documents, studies, and reports here and over the course of his career, *see, e.g.*, A1028, tr. 136:12-15 (hired by the industry to conduct peer review of DOE's Mission Plan to see if it "made sense"). An expert does not have to reinvent the wheel in order to testify, or otherwise spend exorbitant amounts of money to conduct studies when such work has already been done or is otherwise unnecessary for the opinions being offered.

4. While Dr. Bartlett's opinions are admissible because he reliably applied principles of spent fuel management and program planning to reach his conclusions, Dr. Bartlett's opinions are also admissible on the ground that the opinions constitute reliable, experience-based expert testimony. The Ninth Circuit's decision in *Hankey* is instructive. 203 F.3d 1160. There, a

police officer was permitted, based on his experience, to testify regarding gang practices. The witness had devoted years working with gangs, knew their "colors," signs, and activities, heard the admissions of the specific gang members involved, and had communicated and worked undercover with numerous gang members. *Id.* at 1169. The court stated, "[t]his type of street intelligence might be misunderstood as either remote (some dating back to the late 1980's) or hearsay (based upon current communications about "retaliation" and "code of silence"), but FRE 702 works well for this type of data gathered from years of experience and special knowledge." *Id.*

Rule 702 works equally well here. Dr. Bartlett has years of experience in spent fuel management and program planning, system study, and his service as the Director of the program. Like the officer in *Hankey*, he also has first-hand knowledge and experience with the very organization here (DOE) whose conduct is at issue. Dr. Bartlett's expert testimony – well-grounded in "years of experience" and personal knowledge as in *Hankey* – is admissible.

**D. Dr. Bartlett's testimony will assist the trier of fact.**

Dr. Bartlett's testimony will "assist the trier of fact to understand the evidence or to determine a fact in issue," FRE 702. This requirement "goes primarily to relevance," *Daubert*, 509 U.S. at 591, and the standard for relevancy is "a liberal one," *id* at 587; *see* FRE 401 (relevant evidence is that which has "*any* tendency to make the existence of *any* fact that is of consequence to the determination of the action more probable or less probable than it would be without evidence") (emphasis added). Dr. Bartlett's testimony will be helpful to determining, among other issues, when Yankee Atomic's fuel likely would have been removed had DOE fully performed as intended. *See, infra*, pp. 11-12. The government's assertions to the contrary (Mot. at 15-16) essentially recycle the government's arguments on reliability, which, as demonstrated above, are wrong. Indeed, these complaints depend again upon the premise that the contract specifies the rate of acceptance and the

schedule in the non-breach world. The contract does neither, as the Court has already held. *See* Order of June 26, 2003 (adopting *Commonwealth Edison*, 56 Fed. Cl. 652). Dr. Bartlett's expert testimony will be helpful to the Court, and should be heard and considered.

**III. Conclusion.**

It is difficult to conceive of a witness better qualified or suited to provide the Court with information that will assist the Court in determining what is reasonable performance by DOE, or that will give context and content to the contract's various incomplete terms that bear on when, more likely than not, DOE would have removed Yankee Atomic's spent fuel. Dr. Bartlett is not a felon but he is most assuredly an expert – as the government acknowledged in its prior effort to have his opinion excluded. *See* First Motion to Exclude, *supra* n.2, at 31 ("It cannot be seriously argued that Dr. Bartlett does not rely upon scientific, technical, or other specialized knowledge in which the DOE would have disposed of the contract holders' SNF"). Dr. Bartlett should not be barred from providing expert testimony in addition to the fact testimony that he will provide at trial.

Dated: April 16, 2004

Respectfully submitted,

s/Jerry Stouck
JERRY STOUCK
Spriggs & Hollingsworth
1350 I Street, N.W., Ninth Floor
Washington, D.C. 20005
(202) 898-5800
(202) 682-1639 (facsimile)

Counsel for Plaintiff,
YANKEE ATOMIC ELECTRIC COMPANY

Of Counsel:

Robert L. Shapiro
Peter J. Skalaban, Jr.
SPRIGGS & HOLLINGSWORTH