IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| YANKEE ATOMIC ELECTRIC COMPANY,<br>Plaintiff,<br>v.<br>UNITED STATES OF AMERICA,<br>Defendant. | No. 98-126 C<br>(Senior Judge Merow) |

APPENDIX TO
YANKEE ATOMIC'S OPPOSITION TO MOTION *IN LIMINE*
TO EXCLUDE EXPERT TESTIMONY OF DR. JOHN BARTLETT

JERRY STOUCK
Spriggs & Hollingsworth
1350 I Street, N.W., Ninth Floor
Washington, D.C. 20005
(202) 898-5800
(202) 682-1639 - Fax

Counsel for Plaintiff,
YANKEE ATOMIC ELECTRIC COMPANY

Of Counsel:

Robert L. Shapiro
Peter J. Skalaban, Jr.
SPRIGGS & HOLLINGSWORTH

April 16, 2004

# INDEX TO APPENDIX


| **Description** | **Page** |
|---|---|
| John W. Bartlett Expert Witness Report | 0001 |
| Frank C. Graves Expert Witness Report | 0023 |
| Ivan F. Stuart Expert Witness Report | 0070 |
| Dr. John Bartlett Deposition Transcript (8/26/03, 8/27/03) [Excerpts] | 1000 |
| Victor Trebules Deposition Transcript (4/19/02) [Excerpts] | 1050 |
| Lake H. Barrett Deposition Transcript (4/22/02) [Excerpts] | 1053 |
| Susan Klein Deposition Transcript (4/24/02, 4/25/02) [Excerpts] | 1056 |
| Alan Brownstein Deposition Transcript (4/11/02) [Excerpts] | 1071 |
| Billy M. Cole Deposition Transcript (3/13/02) [Excerpts] | 1078 |
| Dr. John W. Bartlett Deposition Transcript (8/26/03, 8/27/03) | 1082 |
| Lake H. Barrett Deposition Transcript (5/14/02) [Excerpts] | 1091 |
| Letter from Goodman (TRW) to Milner (DOE) with attached "ACR Issues Status Report – December 31, 1991," of 1/6/92 | 2000 |
| Memorandum from Morgan to Hodel, of 4/8/83 | 2003 |
| Letter from Dreyfus (DOE) to Kadak (Yankee Atomic), of 9/28/95 | 2013 |
| Nuclear Waste Fund Fee Adequacy: An Assessment, of 7/84 [Excerpts] | 2014 |
| Mission Plan for the Civilian Radioactive Waste Management Program, Volume 1, of 6/85 [Excerpts] | 2019 |
| "Report on Financing the Disposal of Commercial Spent Nuclear Fuel and Processed High-Level Radioactive Waste," of 6/83 [Excerpts] | 2024 |
| Fiscal Implications of a 1-mil/kwh Waste Management Fee, of 12/82 [Excerpts] | 2027 |
| Projected Costs for Mined Geologic Repositories for Disposal of Commercial Nuclear Waste, of 12/82 [Excerpts] | 2029 |

Throughput Rate Study ........................................................................................................2035

Letter from Kearney (EEI) to Morgan (DOE) – March 7, 1983 ..........................................2041

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| YANKEE ATOMIC ELECTRIC COMPANY,<br>Plaintiff,<br>v.<br>UNITED STATES OF AMERICA,<br>Defendant. | : | No. 98-126 C<br>(Senior Judge Merow) |

JOHN W. BARTLETT EXPERT WITNESS REPORT

This report addresses plaintiff's contract with the Department of Energy ("DOE") for the disposal of spent nuclear fuel and high-level radioactive waste (together "spent fuel"). The parties' contract is one of approximately 50 such contracts with essentially the same terms between the government and commercial nuclear utilities. The basic contract form is frequently referred to as a Standard Contract.

I am aware that the Court has held that the government breached plaintiff's contract by not beginning to dispose of plaintiff's spent fuel by January 31, 1998. The contract does not specify either the pace at which DOE would accept spent fuel from commercial nuclear reactors or the sequence in which DOE was supposed to be accepting plaintiff's spent fuel after DOE commenced its acceptance of spent fuel not later than January 31, 1998. I have been asked to present my opinions on what the proper pace and schedule should have and would have been had the government not breached its obligation to start accepting spent fuel by January 31, 1998. This report presents those opinions and my basis therefor together with the other information called for in Fed. R. Civ. P. 26(a)(2)(B).

## I. Opinions to be Expressed and the Basis Therefor

I offer the following points as the opinions to which I expect to testify at the trial of this matter. I am outlining my reasoning for reaching my conclusions along with the conclusions themselves. In addition, my opinions are based on my many years of experience in the field of spent fuel management (including three years as director of the Office of Civilian Radioactive Waste Management ("OCRWM") in DOE) and my review of relevant documents.

My principle opinions are as follows:

(1) Had the government not breached its contract, it would have reasonably ramped up to the acceptance of 3,000 Metric Tonnes of Uranium ("MTU") per year of spent fuel from contracting utilities.

(2) Had the government not breached its contract, it would have followed a spent fuel acceptance schedule that would have taken advantage of swaps of acceptance slots and acceptance campaigns.

### A. Pace of Spent Fuel Acceptance

The pace of spent fuel acceptance should be efficient.[1] In particular, the pace should generally minimize the total cost to utilities of storing and disposing of spent fuel.[2] This total

---

[1] The parties' activities under the Standard Contracts must be conducted in a safe manner. My opinions fully take this requirement into account.

[2] The government has recently analyzed alternative approaches to performing its obligations under the Standard Contracts that focus on certain aspects of cost minimization that are similar to those presented in my report here. *See Civilian Radioactive Waste Management System Modular Design/Construction and Operation Options Report*, Revision 02 (December 18, 1998) ("Operation Options Report"). The government's report refers to the total cost to utilities as the "total societal costs." *Id.* at xii and 9-14. As noted below, a complete list of documents I have considered is attached to this report.

cost can be divided into three parts. One is the program cost – the sum of the fees each contracting utility has or will pay to the government for the services specified in the Standard Contracts. A second is at-reactor spent fuel storage costs – the sum of the costs each contracting utility has or will incur storing spent fuel prior to it being accepted by the government. A third is loading costs – the sum of the costs each contracting utility will incur loading spent fuel into casks provided by the government pursuant to the Standard Contracts for transport to a government facility.

The government should minimize these total costs to utilities because the Standard Contracts are "full cost recovery" contracts.[3] The full cost recovery structure of the Standard Contracts ensures that the cost of providing the services specified in the standard contract is not a burden for the government because the government may and has passed all of these costs on to contracting utilities. The full cost recovery structure of the Standard Contracts has, thus, provided the government with the flexibility to do whatever has been necessary in order to perform its contract obligations in an efficient, cost-effective manner so as to minimize the total costs to utilities. DOE has long recognized the desirability of performing its contractual

[3] *See* Plaintiff's contract fourth whereas paragraph and Art. VIII.A.4; *see also* 1985 Mission Plan, defining "full cost recovery" at 423.

obligations in a cost-effective manner.[4] DOE has also recognized the desirability of reducing utilities' at-reactor spent fuel storage costs.[5]

1. Sufficient to Accept "Must-Move Fuel"

Commercial nuclear reactors in the United States were designed to temporarily store spent fuel, "wet," in pools pending its removal from the plant site. In this arrangement, spent fuel is stored under water that provides shielding so that the radiation from the spent fuel does not impact people or the environment. Spent fuel pools are equipped with racks that hold the spent fuel. Given a particular rack arrangement, any particular pool can hold only a specified amount of spent fuel. The operation of a spent fuel pool requires utilities to bear the labor, maintenance, security, management and other costs of running the pool. This cost does not vary significantly with the amount of spent fuel in the pool. The storage capacity of a spent fuel pool can be increased to a limited extent by "re-racking" the pool. In that process, additional racks are added to the spent fuel pool or the existing racks are replaced with ones having a more compact

---

[4] *See, e.g., Mission Plan for the Civilian Radioactive Waste Management Program*, DOE/RW-0005 (DOE June 1985) ("1985 Mission Plan") at 6 ("The program must be conducted in a cost-effective manner, with full cost recovery.") and 15 ("The program must be conducted in a financially responsible, cost-effective manner and on the basis of full cost recovery."); Operations Options Report at 9 (explaining that the effectiveness of various operations options were being studied by eight criteria: (1) the total amount of waste accepted, (2) the amount of waste stored in repository surface facilities, (3) the number of shutdown reactor sites with empty pools, (4) the number of reactor sites where construction of new dry storage facilities could be avoided, (5) the number of reactor site-years that spent fuel would remain at shutdown reactor pools, (6) utility costs for post-shutdown storage and pool maintenance, (7) total system life cycle cost and (8) societal costs.

[5] *See, e.g.,* 1985 Mission Plan at 18; T.W. Wood (Pacific Northwest Laboratory), Spent Fuel Storage Requirements for Nuclear Utilities and OCRWM, 2 *High Level Waste Management: Proceedings of the International Meeting at Las Vegas, Nevada, April Topical 8-12, 1990.*

design. Re-racking requires not only the purchase of the new racks but also significant labor involved in the installation of the new racks. In addition, an operating nuclear reactor should have a spent fuel pool with sufficient unused capacity to accommodate all of the spent fuel currently in the reactor itself. This storage capacity is frequently referred to as a "full core reserve" capacity.

Commercial nuclear reactors can also store spent nuclear fuel in "dry" form. In this arrangement, spent fuel is moved from the spent fuel pool to containers which are designed to keep radiation from the spent fuel from reaching the atmosphere. These containers are costly to purchase. In addition, the movement of spent fuel from wet to dry storage is expensive, as it entails substantial labor costs. Once spent fuel is in dry storage, however, the ongoing costs of a dry storage facility for operations, maintenance, labor, security and other costs are significantly less than those of a spent fuel pool containing a similar amount of spent fuel.

A utility's cost of storing spent fuel can rise precipitously in two events: (1) if it is forced to add to its at-reactor storage capacity because its spent fuel pool fills up, and (2) if it is forced to extend at-reactor storage of spent fuel after its reactor permanently shuts down and all of the spent fuel has "cooled" for a period of time. Thus, utilities have an economic incentive to avoid costs arising from either of these types of events. Additions to at-reactor storage capacities can be made through re-racking, the creation of a dry storage facility or additions to an existing dry storage facility – all of which entail significant cost.[6] The amount of spent fuel that would trigger one of these events can be thought of as "Must-Move" fuel in the sense that the spent fuel

[6] A utility could theoretically also add to its at-reactor storage capacity by building another spent fuel pool. The large cost for the construction of such a facility, however, prevent this from being an economically viable option.

must be moved in order to avoid these significant additional costs. In the case of an operating reactor, Must-Move fuel would be the amount of spent fuel that would have to be moved from the reactor site in order to avoid the need to either re-rack or create a dry storage facility – generally the amount discharged from the reactor core when the spent fuel pool is full.

Spent fuel must "cool" in a spent fuel pool for a period of time after it is discharged from the reactor and before it can be moved into a container and stored "dry," out of the spent fuel pool. Therefore, the spent fuel pool must be operated after the date of the last discharge of spent fuel from the reactor into the spent fuel pool and until that period of time has elapsed. In the case of a shut down reactor, until that period has elapsed none of the spent fuel in the spent fuel pool constitutes Must-Move fuel. After the requisite period of time has elapsed from the date of the last discharge into the spent fuel pool, all of the reactor's spent fuel constitutes Must-Move fuel, since it would all have to be accepted by DOE in order to avoid all of the additional costs of storing the spent fuel at the reactor site. Since the Standard Contracts call for spent fuel to ordinarily cool in a spent fuel pool for at least five years before being accepted by DOE,[7] all of the spent fuel in a shut down reactor's spent fuel pool becomes Must-Move fuel five years after the date when the last of that spent fuel is discharged from the reactor.

DOE's spent fuel acceptance rate should accommodate as much of the utilities' Must-Move fuel as practicable given the full-performance capacity of the system. After a ramp-up to a full-performance level, an efficient spent fuel acceptance rate should be relatively constant so as to make the fullest possible use of the spent fuel transportation and handling facilities developed to receive spent fuel. An acceptance rate that does not accommodate as much of the utilities'

[7] *See, e.g.,* Plaintiff's contract, Appendix E, ¶ B.3.

Must-Move fuel as practicable would be inefficient in that it would impose avoidable costs for the at-reactor storage of spent fuel on the utilities that could be avoided. In addition, the spent fuel acceptance rate should provide for the acceptance of more than the minimum amount of spent fuel necessary to accept all Must-Move fuel anticipated in current projections. This buffer amount of spent fuel acceptance is necessary to accommodate at least some unanticipated increases in the need for spent fuel acceptance without increasing utilities' spent fuel storage costs. Indeed, DOE itself has long recognized the desirability of relieving utilities of at-reactor spent fuel storage pressures, particularly around the time of the 1998 date for the commencement of government acceptance.[8]

The amounts and locations of Must-Move fuel can be projected with reasonable certainty. Nuclear power plants discharge spent fuel at a fairly predictable rate. Since 1990, nuclear power plants have in the aggregate been discharging approximately 2,000 MTU per year. This aggregate annual discharge rate is expected to continue for at least the next fifteen years and then decline as currently operating plants reach the end of their licensed lives.[9] In addition, the current

---

[8] *See* 1985 Mission Plan at 28.

[9] *See, e.g., Spent Fuel Storage Requirements 1994 - 2042*, DOE/RW-0431 Rev. 1(June 1995) ("1995 Spent Fuel Storage Report") at 4.3. The government has published a similar report on roughly an annual basis from 1978 through 1995.

capacity of each reactor's fuel pool is known. Also, the licensed life of each plant is known.[10] DOE has long made projections of this sort itself.[11]

2. Ramp Up

The acceptance rate should not and would not include a long "ramp up" for spent fuel acceptance between the commencement of spent fuel acceptance and the time when the acceptance rate reaches a reasonably efficient, full-performance level. Prior to the required January 31, 1998 commencement date, DOE had more than fifteen years in which to plan the necessary transportation and storage facilities so that DOE could work efficiently once performance commenced. Moreover, the tasks at issue – moving spent fuel from reactor sites, transporting spent fuel and placing it in a storage facility are very familiar to DOE and to the nuclear energy industry both in the United States and abroad.[12] Furthermore, DOE could and would have done all the necessary planning and construction work (of both storage facilities and casks) to have been able to have started accepting spent fuel in 1998. Given this experience, the government should not and would not need more than three years to attain an efficient full performance acceptance rate.

---

[10] Although a plant may apply to the government to extend its licensed life, only two utilities have initiated that process to date. Moreover, nuclear power plants have limited lives due to their physical structures and components. Therefore, it is reasonable for purposes of projecting Must-Move fuel at permanently shut down reactors to assume that, on average, currently operating reactors will be permanently shut down at the end of their currently licensed lives.

[11] *See, e.g.*, 1995 Spent Fuel Storage Report and preceding reports.

[12] In addition to my own knowledge of this fact, I have considered the expert witness report of Ivan Stuart as further support for this opinion.

DOE itself has recently specified a conservative ramp up for the spent fuel acceptance rate in its listing of requirements for a possible Centralized Interim Storage Facility ("CISF").[13] This type of facility is indicative of the system DOE should have and could have developed to have met its obligation to begin accepting spent fuel by January 31, 1998.

3. <u>Acceptance Rate Conclusion</u>

An analysis of Must-Move fuel consistent with my opinions noted above has been set out in the expert witness report of Frank C. Graves. This report shows that if DOE had started accepting spent fuel in 1998 with a reasonable ramp up to a 3,000 MTU per year spent fuel acceptance rate, DOE would have been able to have eliminated the Must-Move fuel backlog within approximately four years after 1998.[14] Mr. Graves' also shows that DOE would subsequently have been able to have accepted all additional spent fuel as it attained Must-Move status.[15] Hence, a reasonable ramp-up to a 3,000 MTU/year acceptance rate, as reflected in Mr. Graves' report, would have been efficient. This efficient rate would have been the rate at which DOE would have accepted spent fuel. Therefore, the 3,000 MTU per year acceptance rate with a

[13] *See Civilian Radioactive Waste Management System Requirements Document, Revision 05*, DOE/RW-0406 (January 1999) at 13, Table 3, specifying a ramp up (in MTHM per year) of 1200, 1200, 2000, 2000, 2700, 3000.

[14] *See* Expert Witness Report of Frank C. Graves.

[15] A 3,000 MTU per year annual spent fuel acceptance rate is also consistent with the fact that nuclear reactors have been in the aggregate discharging approximately 2,000 MTU per year of spent fuel. The annual spent fuel acceptance rate must be greater than this aggregate annual spent fuel discharge rate for DOE to have an ability to eliminate the backlog of at-reactor spent fuel waiting for acceptance by DOE.

ramp of 1200, 1200, 2000, 2000, 2700 is reasonable and appropriate for the purposes of Mr. Graves' analysis.[16]

B. Schedule for Spent Fuel Acceptance

The schedule for DOE's acceptance of spent fuel should be efficient. The schedule should permit and encourage minimization of utilities' total costs of at-reactor storage and payments for DOE's spent fuel program. With respect to utilities' storage costs, the schedule should take into account the fact that not all plants have costs which could be avoided if their spent fuel were accepted by DOE. As explained above, a utility's costs of storing spent fuel rise precipitously if the utility is forced either to add at-reactor storage capacity or to extend at-reactor storage more than five years after its plant permanently shuts down. In other words, a utility's costs of storing spent fuel rise if it possesses Must-Move fuel. The schedule should permit and encourage plants facing these costs to avoid the costs, if possible, by have their spent fuel accepted as soon as possible after the January 31, 1998 commencement date for DOE's acceptance of spent fuel from utilities.

In addition, the schedule should be efficient in that it should permit and encourage utilities to reduce their costs of delivering spent fuel to the government. Plaintiff's contract requires plaintiff to load its spent fuel on to the transportation vehicles supplied by DOE.[17] The movement of spent fuel from a spent fuel pool to the transportation vehicles can be accomplished more efficiently and less expensively if it is done in campaigns in which relatively large volumes

[16] I recognize that these acceptance rate numbers are approximations and do not contend that DOE would have accepted precisely these amounts of spent fuel each year.

[17] *See* Plaintiff's, Art. IV.A.2.(a).

of spent fuel are delivered at a time.[18] This efficiency stems largely from the fact that the movement of spent fuel from a spent fuel pool is a detailed, labor-intensive process. The workers performing the necessary tasks can perform them more efficiently if they do them regularly rather than episodically.

A schedule that permits and encourages the use of campaigns is particularly advantageous for operating plants. The movement of spent fuel from a spent fuel pool at an operating plant can be disruptive of the normal electricity generation activities at the plant.[19] This disruption occurs because the personnel that are required by government regulation to be involved in the movement of the spent fuel from the pool are the same personnel that are required for the normal operations of the plant. For these reasons, the schedule for spent fuel acceptance should permit and encourage utilities to organize their deliveries of spent fuel to DOE in a limited number of campaigns.

1. <u>Role of Spent Fuel Discharge Listing</u>

Plaintiff's contract requires the government to list utilities' spent fuel discharges from their respective reactors in the order in time in which such discharges occurred as "an annual acceptance priority ranking" for receipt of spent fuel at the DOE repository.[20] The spent fuel discharged earliest is listed first and is frequently referred to as the oldest fuel. I understand that the government has taken the position that the appropriate schedule for its acceptance of spent

---

[18] In addition to my own knowledge of this fact, I have considered the expert witness report of Ivan Stuart as further support for this opinion.

[19] In addition to my own knowledge of this fact, I have considered the expert witness report of Ivan Stuart as further support for this opinion.

[20] *See* Plaintiff's Contract, Art. IV.B.5.(a).

fuel from utilities would be the order shown in this listing. This sort of schedule is frequently referred to as "oldest-fuel-first" or "OFF."

OFF would not be a reasonable schedule for the actual acceptance of spent fuel. Part of the problem with OFF is apparent from a review of the government's most recent combined Annual Capacity Report and Annual Priority Report.[21] This report includes a scheduling queue that applies the government's stated annual receiving capacity for spent fuel from utilities to the list of spent fuel discharges arranged according to OFF. The scheduling queue consists of a listing by a utility of the amount of spent fuel to be picked up from that utility in each of the first ten years of the government's acceptance of spent fuel from utilities.[22] The OFF-based scheduling queue would require that relatively small amounts of spent fuel be accepted from a large number of different plants each year. The scheduling queue does not take into account whether a utility has Must-Move fuel. The scheduling queue would not permit the use of transportation campaigns. In fact, many of the annual allocations to individual utilities in the OFF queue are so small that they do not even call for full containers of spent fuel to be used. For these reasons, among others, the OFF queue does not represent a reasonable schedule for spent fuel acceptance. In my opinion, DOE would and could not have followed an OFF schedule even if it had commenced spent fuel acceptance by January 31, 1998.

---

[21] *See* 1995 Annual Capacity Report/Annual Priority Report, DOE/RW-0457 (March 1995).

[22] *Id.* at 6.