2. Exchanges of Scheduling Slots

The OFF listing can be useful, however. The scheduling queue can be used as an allocation of scheduling slots rather than as a rigid schedule for actual acceptance. If used as an allocation of scheduling slots, the OFF listing can serve as a useful starting point from which utilities can exchange or swap such scheduling slots in a manner that would increase efficiency for each utility and reduce total utility costs.

DOE has long expected that the exchange provisions in the Standard Contracts would "allow industry to optimize the allocation of waste acceptance capacity to meet individual utility needs, without the overt involvement of [DOE]."[23] I had that expectation myself when I was Director of OCRWM. Using such exchanges, utilities with Must-Move fuel would have incentive to trade for early acceptance slots so as to reduce their spent fuel storage costs.

3. DOE's Consideration of Proposed Exchanges

As noted above, plaintiff's contract provides a mechanism through which utilities can exchange acceptance slots. The contract provides DOE with a role in approving or disapproving of such exchanges of slots for spent fuel acceptance. In order to have achieved an efficient schedule for spent fuel acceptance, and thereby to have minimized utilities' total costs, DOE would have approved such exchanges liberally. I expected that DOE would do so when I was Director of OCRWM.

With reasonable planning, DOE would have been able to have accommodated most exchanges that would have been likely to have added to the efficiency of the spent fuel

[23] *See, e.g.*, Letter from Dreyfus (OCRWM director) to Andrew Kadak (Yankee Atomic chief executive officer) dated September 28, 1995.

acceptance schedule. As explained above, plants with Must-Move fuel would have been those that would most likely have had an economic incentive to exchange for the opportunity to have had their spent fuel accepted earlier by the government. Similarly, as explained above, plants without Must-Move fuel, particularly plants with ample spent fuel pool capacity, would have had an economic incentive to exchange away early slots for spent fuel acceptance in favor of groups of later slots in order to avoid the disruptions inherent in moving spent fuel from an operating plant. Also as noted above, the government tracks and possesses data showing the locations and timing of Must-Move fuel. The government could have and should have used this data to have planned its spent fuel acceptance capabilities in order to have been able to have accepted Must-Move fuel from the places it would be. Indeed, the government has performed a variety of analyses in which it has identified efficiency enhancing spent fuel acceptance schedules.[24] Thus, DOE should and would have been able to have accommodated efficiency-enhancing exchanges.[25]

## II. Data or Information Considered in forming Opinions

Data and other information I considered in forming my opinions is listed in exhibit 1 to this report.

## III. Qualifications

My qualifications to offer the opinions included in this report, including a list of all publications I have authored within the preceding ten years, are set out in exhibit 2 to this report.

---

[24] *See, e.g.,* Operation Options Report; *Spent Fuel Acceptance Scenarios Devoted to Shutdown Reactors,* Prepared by Pacific Northwest Laboratory for the U.S. Department of Energy (October 1989); *MRS Systems Study Task G Report,* Prepared by Pacific Northwest Laboratory for the U.S. Department of Energy (April 1989)

[25] In addition to my own knowledge and expertise, I have considered the expert witness report of Ivan Stuart as further support for this opinion.

IV. Compensation

I am being paid $150 per hour for my time working on this matter.

V. Other Expert Testimony

I have not testified as an expert at trial or by deposition in any other cases within the preceding four years.

Respectfully submitted,

Dated: June 30, 1999

John W. Bartlett

**Exhibit 1**

**DATA AND OTHER INFORMATION CONSIDERED IN FORMING OPINIONS**

1. Civilian Radioactive Waste Management System Modular Design/Construction and Operation Options Report, Revision 02 (December 18, 1998).

2. U.S. Department of Energy Contract No. DE-CR01-83NE44428, Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste (June 22, 1983).

3. Mission Plan for the Civilian Radioactive Waste Management Program, DOE/RW-0005 (June 1985).

4. T.W. Wood (Pacific Northwest Laboratory), Spent Fuel Storage Requirements for Nuclear Utilities and OCRWM, in 2 *High Level Radioactive Waste Management: Proceedings of the International Topical Meeting at Las Vegas, Nevada, April 8-12, 1990.*

5. Spent Fuel Storage Requirements 1994-2042, DOE/RW-0431, Rev. 1 (June 1995).

6. Civilian Radioactive Waste Management System Requirements Document, Revision 05, DOE/RW-0406 (January 1999).

7. Expert Witness Report of Frank C. Graves.

8. Expert Witness Report of Ivan F. Stuart.

9. J.W. Doman (WESTON/Rogers & Associates) and T.E. Tehan (Pacific Nuclear), Significance of Campaigned Spent Fuel Shipments.

10. 1987 Annual Capacity Report, DOE/RW-0146 (June 1987).

11. 1988 Annual Capacity Report, DOE/RW-0191 (June 1988).

12. 1995 Annual Capacity Report/Annual Priority Report, DOE/RW-0457 (March 1995).

13. Letter from Daniel Dreyfus (OCRWM Director) to Andrew Kadak (Yankee Atomic, Chief Executive Officer), dated September 28, 1995.

14. Spent Fuel Acceptance Scenarios Devoted to Shutdown Reactors, Prepared by Pacific Northwest Laboratory for the U.S. Department of Energy (October 1989).

15. MRS System Study Task G Report, Prepared by Pacific Northwest Laboratory for the U.S. Department of Energy (April 1989).

16. **Alternative Allocation Strategies for Delivery Rights to Purchasers of Disposal Services for Spent Nuclear Fuel and High-Level Radioactive Waste: A White Paper on Issue I.1, Prepared by The Transportation Operations Project Office for the U.S. Department of Energy (January 1991).**

**Exhibit 2**

**JOHN W. BARTLETT**

## WORK EXPERIENCE

**Senior Project Manager, S. Cohen & Associates, McLean,VA** (1996-present)

Directs projects concerned with radioactive and hazardous waste management and disposal, decommissioning of nuclear facilities, risk assessment, regulatory impact assessment, and fissile materials management and disposition.

**President, The Bartlett Company, Vienna, VA.** (1993-1996)

Provided technical and management support consulting services to government agencies and the private sector. Services to clients included: technical support to development of regulations for management and disposal of radioactive wastes; analyses of alternative technologies for treatment of hazardous and radioactive wastes in the Department of Energy complex; analysis of options for management and disposition of fissile materials from dismantled nuclear weapons; analyses of alternative technologies for packaging and transport of hazardous materials; development of a conceptual design and implementation plan for an international repository for disposal of radioactive wastes; and development of a methodology for selecting methods for Sustainable Development of energy resources.

**Senior Consultant, Golder Associates, Inc., Rockville, MD.** (January-August 1993)

Participated in business development activities for programs concerning energy supply, environmental restoration, and radioactive waste management for private sector clients in other nations.

**Director, Office of Civilian Radioactive Waste Management (OCRWM), U.S. Department of Energy.** (1990-1993)
Executive Schedule Level IV

Nominated by President Bush and confirmed by the U.S. Senate. The OCRWM has responsibility for the U.S. program for management and disposal of commercial spent nuclear fuel and defense high-level radioactive wastes. Program activities under the Director's cognizance include technical

characterization of the candidate Yucca Mountain site and determination of its suitability as a location for disposal; siting, design, licensing, and operation of a central facility for storage of commercial spent nuclear fuel; design of waste packages and the engineered repository; and selection and design of the technology and operational system for transport of waste materials.

Work activities in this service included agency and national policy development; budget development; program strategy development; interagency, international, intergovernmental, and Congressional interactions; representation to constituencies; staff and contractor direction; and technical leadership of program activities. Responsibilities involved substantive participation in energy, environmental, regulatory, economic, and national defense issues of concern to administration agencies and the U.S. Congress. The OCRWM has an annual budget of about $400 million, and involves the services of over 3000 personnel. The technical functions in the program span approximately 25 engineering and scientific disciplines.

**Director of Energy and Environment Programs, The Analytic Sciences Corporation, Reading, MA.** (1978-1990)

Responsible for management, technical direction, and business development for projects within cognizance. Clients included Federal Government agencies such as the U.S. Nuclear Regulatory Commission, the Department of Energy, and the Department of Defense; state agencies; and private sector organizations such as the Edison Electric Institute and the Electric Power Research Institute. Topics of work included waste management program development, regulatory compliance, risk assessment, and technical systems integration. Accomplishments included significant business expansion, high proposal win rates, and client retention.

**Program Manager, Pacific Northwest Laboratories, Richland, WA. (1968-1978)**

Management positions and business development activities in chemical technology and radioactive waste management. Led development of the first computer code for prediction of nuclide transport from a geological waste repository, and directed preparation of ERDA-76-43, a five-volume document which was the first comprehensive compilation of alternative technologies for radioactive waste management. Authored or co-authored numerous papers and presentations concerning waste management program strategies and technical activities. Served as consultant to the International Atomic Energy Agency, presented testimony to Congress, and participated in founding of the Pacific Basin Conference for the nuclear fuel cycle. While at PNL served as Adjunct Professor of the University of Washington, teaching engineering curriculum courses such as transport phenomena at the Joint Center for Graduate Study.

**Presidential Exchange Executive, National Bureau of Standards, Gaithersburg, MD.** (1973-1974)

On leave from Battelle, served as senior staff officer to the Director of the Center for Radiation Research in the National Bureau of Standards (now the National Institute for Science and Technology). Developed the plan for what became the NBS program in nuclear safeguards. Had significant participation in budget and program development for NBS.

**Fulbright Professor of Nuclear Engineering, Istanbul Technical University, Istanbul, Turkey.** (1968-1969)

Taught courses in nuclear engineering and atomic physics, directed student research projects, and developed the chapter on thermal-hydraulics for a Turkish text on nuclear engineering. Assisted the Director of the Nuclear Institute in development of Turkey's national nuclear power program. Participated in a NASA technology transfer program which involved travel throughout the nation describing the U.S. space program and its technical applications. Stimulated and evaluated research proposals.

**Assistant Professor, Chemical Engineering Department, The University of Rochester, Rochester, NY.** (1962-1968)

Taught courses in the chemical engineering curriculum, directed and taught the nuclear engineering program, directed M.S. and Ph.D. theses, and served as consultant to various clients. Selected for participation in the Summer Visiting Professor Program of the U.S. Atomic Energy Commission at the Hanford Site in Richland, WA. Initiated collaborative research with the School of Medicine which introduced concepts of chemical system function and modeling to research on diabetes. This work began use of innovative strategies for diabetes research and was at the forefront of bioengineering research at the time.

**Staff Engineer, Knolls Atomic Power Laboratory, Schenectady, NY.** (1957-1962)

Project engineer with the D1G Project, which designed and built the prototype for the first nuclear-powered surface ship. Developed mathematical models for activation and transport of radioactive corrosion products in nuclear reactor coolant systems, and participated in design and test engineering for the USS Bainbridge prototype. The work on corrosion product transport became the basis for subsequent research and development programs in the United States and Canada.

## EDUCATION

University of Rochester, Rochester, NY
B. S. in Chemical Engineering, 1957

Resselaer Polytechnic Institute, Troy, NY
Master of Chemical Engineering, 1959

Rensselaer Polytechnic Institute, Troy, NY
PhD, Chemical Engineering, 1962

Burlington High School, Burlington, NJ. Diploma 1953.
Valedictorian.

## HONORS, AWARDS, AND PROFESSIONAL ACTIVITIES

Bausch and Lomb Scholar. Elected to Sigma Xi and Phi Lambda Upsilon. Recipient of several research grants while at the University of Rochester. Numerous technical publications.

Member of the American Institute of Chemical Engineers, the American Nuclear Society, and the American Association for the Advancement of Science. In the American Nuclear Society was elected to two terms of service on the Executive Committee of the Fuel Cycle and Waste Management Division, served as Chairman of the Niagara-Finger Lakes Section, and Director for the Niagara-Finger Lakes and Northeast Sections. Participates extensively in technical paper reviews and service as session chairman in ANS conferences.

Received, from the Nuclear Division of the AIChE, the Robert E. Wilson Award for leadership in nuclear chemical engineering.

Listed in Who's Who in America.

## CIVIC SERVICE

Twice elected to the City Council of Richland, Washington, and served one term as Mayor Pro-Tem. Also was elected to two terms on the Richland School Board and served on the Richland Community Concert Board. Served three terms on the Conservation Commission of Lynnfield, Massachusetts, which has community responsibility for implementation of wetland protection statutes. Also served as member and Director of Rotary International clubs in Richland and Lynnfield

## PERSONAL INFORMATION

Born October 18, 1935, Camden, NJ. US Citizen
No Veterans' Preference
Highest Federal Employment: Executive Schedule IV
Security Clearances: SCI, DOD Top Secret, DOE "Q"

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| YANKEE ATOMIC ELECTRIC COMPANY<br>Plaintiff,<br>v.<br>UNITED STATES OF AMERICA<br>Defendant. | No. 98-126 C<br>(Senior Judge Merow) |

# FRANK C. GRAVES EXPERT WITNESS REPORT

## I. INTRODUCTION

I have been asked to prepare this report to address the performance of the United States Department of Energy (DOE) in accepting spent nuclear fuel and high-level waste (together, "spent fuel") under the terms of its contract with the Plaintiff, Yankee Atomic Electric Company. This contract is one of approximately 50 similar contracts (each sometimes referred to as a Standard Contract) between the government and commercial nuclear power producers ("Purchasers").

Due to the government's failure to commence acceptance of spent fuel by January 31, 1998, the Plaintiff is incurring and will continue to incur economic damages. The damages are equal to the costs the Plaintiff actually incurs, in excess of the costs that would have been incurred had the government commenced and continued acceptance in accordance with its contract obligations. To quantify this difference, cost models must be constructed that describe the Plaintiff's economic operations in a Non-Breach World (a calculated world in which the government honors its contract obligations) and in the Breach World (the actual world, in which the government's contract obligations are not fulfilled).

The Plaintiff's costs are heavily influenced by the timing of the completion of spent fuel removal from its site. The contract does not specify the date by which the government was required to complete removal of spent fuel from Plaintiff's site. The purpose of my report is to determine the date of completion of spent fuel removal from the Plaintiff's site, had the government commenced spent fuel acceptance by January 31, 1998. In order to do this, I applied economic principles and cost evaluation tools to characterize what the government's performance in this Non-Breach World would have looked like and how it would and should have operated. Based on this, I determined the date on which the government would and should have completed removing the spent fuel from the Plaintiff's site pursuant to the parties' contract. I also endeavored, to the extent possible, to understand the spent fuel removal schedule in the Breach World.

The key results of my analysis are the timing of spent fuel removal at Plaintiff's facility and the net cost of swaps, *i.e.*, the cost to buy acceptance allocations (or "slots") to alter a Purchaser's position in the acceptance queue (as discussed later). These results, in turn, affect the timing and in some cases the magnitude of spent fuel storage and other costs at Plaintiff's facility. Accordingly, my results are incorporated into the cost models that provide the basis for the damages calculation in the expert report of Dr. Kenneth T. Wise.

## II. Summary of Approach and Results

My analysis of DOE's spent fuel acceptance program consists of two parts: 1) an assessment of a reasonable aggregate acceptance rate for DOE's acceptance of spent fuel from all Purchasers; and 2) given this aggregate acceptance rate, determination of the sequence in which spent fuel would be removed from individual plants. This basic structure applies in principle to analysis of both the Non-Breach and Breach Worlds.

Under the contract, the government has provided for an initial allocation of spent fuel acceptance rights, or "slots," depending on the date of the discharge of spent fuel from each Purchaser's reactor. This initial allocation is frequently referred to as "Oldest Fuel First," or "OFF." The contract states

that swaps of acceptance slots within the OFF queue are allowed. By this mechanism, plant owners may voluntarily exchange removal slots among themselves (subject to DOE approval), for a mutually-agreed price.

Because of the possibility of swaps of acceptance slots among Purchasers, it is essential to draw a distinction between the initial allocation of acceptance slots and the actual sequence of spent fuel acceptance that would occur. Since Purchasers are able to exchange acceptance slots, a Purchaser's initial acceptance allocation need not determine the schedule of removal at its facility. By buying and/or selling acceptance slots, a different position in the sequence could be arranged. Swaps of acceptance slots would allow Purchasers (and not insignificantly, DOE also) to realize substantial savings in cost and efficiency as compared with the initial allocation of acceptance slots under OFF. The costs associated with buying and/or selling acceptance slots are determined and accounted for in my analysis.

I model the performance of a market for acceptance slots, in which each participant pursues its own economic interest in swapping slots. The market would include payments for swaps, and earlier acceptance slots would in general be more valuable than later slots. For example, a Purchaser who swaps away later acceptance slots in exchange for earlier slots would have to pay for the exchange. The Purchaser would be willing to pay for this swap because the cost of the swap payment is less than the storage costs it would incur by waiting until a later date for the government to remove spent fuel. Similarly, a different Purchaser with less urgent need for spent fuel removal would be willing to relinquish its earlier slots in exchange for later slots, because the payment received is at least as great as the storage cost incurred by waiting until the later date.

My analysis shows that in the Non-Breach World, had DOE commenced acceptance of spent fuel by January 31, 1998 with a reasonable aggregate acceptance rate, it should and would have completed removal of spent fuel from Plaintiff's facility by January 1999. In order to achieve removal by this date, Plaintiff would need to swap removal slots with other Purchasers, and these swaps would occur at a price. The estimated net cost of the swaps required for the Plaintiff to achieve this removal date is $11.8 million, in 1999 present value. That is, Yankee Atomic would

pay a net cost of $11.8 million to exchange its initial OFF allocation of slots for the slots needed to remove all of its spent fuel by January 1999. The economic foundations for swaps are discussed in detail in Section IV.

Even though it did not occur, efficient government performance in the Non-Breach World is easier to describe and evaluate than is DOE's future performance in the Breach World. In the Breach World, it is not possible to estimate with confidence the date by which DOE will complete spent fuel removal from Plaintiff's facility. This is primarily because of significant, currently unresolvable uncertainty in DOE's future actual performance. The most obvious missing fact in the Breach World is the rate at which spent fuel will be accepted, particularly the start date of acceptance. In addition to this uncertainty (and partly because of it), it is much harder to characterize with confidence how acceptance slots may be traded, if at all, and thus what the cost and availability might be for swaps. These difficulties are explored further after the discussion of the more straightforward Non-Breach World.

In forming my opinions, I rely on data input and facts from available documentary evidence and expert opinion from other witnesses. I have considered the expert witness report of John W. Bartlett, former Director of the Office of Civilian Radioactive Waste Management, for how the government should and would have structured its spent fuel acceptance program. In particular, I rely on Dr. Bartlett's expertise and experience to determine the overall acceptance rate for efficient performance. Documentary evidence in the form of DOE publications also supports this acceptance rate. The amount and timing of spent fuel generated and stored by each Purchaser also affects the demand for spent fuel acceptance and the removal date of any particular Purchaser. James P. Malone of NAC International has provided information on spent nuclear fuel inventory and projected discharges. I rely for Purchasers' spent fuel storage capacity on parameters taken from DOE's most recent published study on this topic.[1] As discussed later, the cost of spent fuel storage at the Purchasers' facilities also affects removal. Data on storage cost has been supplied by Mr. Malone. I also rely on the expert witness report of Ivan F. Stuart of NAC International to establish parameters describing

---

[1] *Spent Fuel Storage Requirements 1994-2042*, U.S. DOE, June 1995, Appendix A.

00026