**Exhibit 4**
**FRANK C. GRAVES**

**Rule 26(a)(2)(B)—Disclosure of Publications During the Last Ten Years**

1. "How Competitive Market Dynamics Affect Coal, Nuclear and Gas Generation and Fuel Use—A 10 Year Look Ahead" (with L.S. Borucki, R.P. Broehm, S.L. Thumb, and M. Schaal), Final Report May 1999, TR-111506 (Palo Alto, CA: Electric Power Research Institute, 1999).

2. "Price Caps for Standard Offer Service: A Hidden Stranded Cost" (with Paul Liu), *The Electricity Journal*, Volume 11, Number 10, December 1998.

3. *Mechanisms for Evaluating the Role of Hydroelectric Generation in Ancillary Service Markets* (with R.P. Broehm, R.L. Earle, T.J. Jenkin, and D.M. Murphy), Final Report, November 1998, TR-111707 (Palo Alto, CA: Electric Power Research Institute, 1998).

4. *Energy Market Impacts of Electric Industry Restructuring: Understanding Wholesale Power Transmission and Trading* (with S.L. Thumb, A.M. Schaal, L.S. Borucki, and R. Broehm), Final Report, March 1998, EPRI TR-108999, GRI-97/0289 (Palo Alto, CA: Electric Power Research Institute, 1998).

5. "One-Part Markets for Electric Power: Ensuring the Benefits of Competition" (with E. Grant Read, Philip Q Hanser, and Robert L. Earle), *Power Systems Restructuring: Engineering and Economics*, M. Ilić, F. Galiana, and L. Fink, eds. (Boston: Kluwer Academic Publishers, 1998), pp. 243-280.

6. "Railroad and Telecommunications Provide Prior Experience in 'Negotiated Rates'" (with Carlos Lapuerta), Marketing and Rates, *Natural Gas*, July 1997.

7. "Regional Impacts of Electric Utility Restructuring on Fuel Markets" (with S.L. Thumb, L.S. Borucki, and A.M. Schall), Final Report, April 1997, Vol 1 (EPRI TR-107900-V1/GRI-97/0108.1) and Vol 2 (EPRI TR-107900-V2/GRI-97/0108.2) (Palo Alto, CA: Electric Power Research Institute, 1997).

8. "The Economics of Negative Barriers to Entry: How to Recover Stranded Costs and Achieve Competition on Equal Terms in the Electric Utility Industry" (with William B. Tye), Electric Industry Restructuring, *Natural Resources Journal*, Volume 37, No. 1, Winter 1997.

9. "Capacity Prices in a Competitive Power Market" (with James A. Read), *The Virtual Utility: Accounting, Technology & Competitive Aspects of the Emerging Industry*, S. Awerbuch and A. Preston, eds. (Boston: Kluwer Academic Publishers, 1997), pages 175-192.

**Exhibit 4**
**FRANK C. GRAVES**

**Rule 26(a)(2)(B)—Disclosure of Publications During the Last Ten Years**

10. "Stranded Cost Recovery and Competition on Equal Terms" (with William B. Tye), *Electricity Journal*, Volume 9, Number 10, December 1996.

11. "A Framework for Operations in the Competitive Open Access Environment" (with Marija D. Ilić, Lester H. Fink, Albert M. DiCaprio), *Electricity Journal*, Volume 9, Number 3, April 1996.

12. "Potential Impacts of Electric Restructuring on Fuel Use," EPRI *Fuel Insights*, Issue 2, September 1995.

13. "Optimal Use of Ancillary Generation Under Open Access and its Possible Implementation" (with Maria Ilić), *M.I.T. Laboratory for Electromagnetic and Electronic Systems Technical Report*, LEES TR-95-006, August 1995.

14. *A Primer on Electric Power Flow for Economists and Utility Planners*, TR-104604, Electric Power Research Institute, EPRI Project RP2123-19, January 1995.

15. "Hierarchical Control and Pricing of Frequency Quality and Network Security Under Open Transmission Access" (with M. Ilic, A. Zobian, and P.R. Carpenter), *Proceedings of NSF Workshop on Infrastrutures in Power Systems*, Washington, DC, October 1994.

16. "Estimating the Cost of Switching Rights on Natural Gas Pipelines" (with James A. Read, Jr. and Paul R. Carpenter), *The Energy Journal*, Volume 10, Number 4, October 1989.

17. "Demand-Charge GICs Differ from Deficiency-Charge GICs" (with Paul R. Carpenter), *Natural Gas*, August 1989.

18. "What Price Unbundling?" (with P.R. Carpenter), *Natural Gas*, June 1989.

19. "Planning for Electric Utilities: The Value of Service" (with James A. Read, Jr.), in *Moving Toward Integrated Value-Based Planning*, Electric Power Research Institute, 1988.

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| YANKEE ATOMIC ELECTRIC COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | No. 98-126C<br>(Senior Judge Merow) |

IVAN F. STUART EXPERT WITNESS REPORT

This report addresses matters relevant to the contract entered into by Yankee Atomic Electric Company ("Yankee Atomic") with the government for the acceptance of spent nuclear fuel and high-level radioactive waste (together "spent fuel"). This contract is one of approximately 50 such contracts with essentially the same terms between the government and commercial nuclear utilities. The form of each such contract is sometimes referred to as a Standard Contract. I am aware that the Court has held that the government breached Yankee Atomic's contract by not beginning to accept spent fuel from Yankee Atomic by January 31, 1998.

Neither the terms of Yankee Atomic's contract nor those of the Standard Contracts specify either the pace at which the Department of Energy ("DOE") should accept spent fuel from the contracting parties or the schedule on which DOE was required to accept spent fuel from Yankee Atomic after the government commenced acceptance. John W. Bartlett has submitted an expert report in this matter addressing the pace and schedule on which the government should have been accepting spent fuel from Yankee Atomic and other contracting

utilities after January 31, 1998 pursuant to the parties' contract. In his report, Dr. Bartlett concludes that if the government had fulfilled its contractual obligations, it would have accepted spent fuel from contract holders at the rate of 3000 MTU per year, and would have facilitated swaps of acceptance allocations amongst contracting utilities. I have been asked to present my opinions on the ability of DOE to implement a spent fuel acceptance schedule with a reasonable ramp up to 3000 MTU and that would accommodate swaps of acceptance allocations amongst contracting utilities. This report presents those opinions and the bases therefor, together with the other information called for in Fed. R. Civ. P. 26(a)(2)(B).

I. <u>Opinions to be Expressed and the Bases Therefor</u>

I offer the following points as the opinions to which I expect to testify at the trial of this matter. I present my reasoning for reaching my conclusions along with the conclusions themselves. My opinions are based on my over 35 years of experience in the field of spent fuel management, particularly in the area of spent fuel transportation and storage. My opinions are also based on my review of relevant documents.

My principal opinions are as follows:

The acceptance of 3,000 MTU per year by DOE with a reasonable ramp up beginning in 1998 would have been readily achievable if appropriate planning and preparations had started sufficiently in advance of the January 31, 1998 deadline set by the Yankee Atomic contract and the Standard Contract. Sufficient advance work was clearly possible in view of the large body of experience in the transportation of spent fuel gathered by and/or available to DOE prior and subsequent to 1983. Adequate planning and preparations would have ensured the availability of

a sufficient number of casks to transport the spent fuel, as well as the availability of an efficient transportation network. This network could have been used for the acceptance of spent fuel in "campaigns" (defined below), and would have been flexible enough to accommodate exchanges of acceptance allocations amongst contracting utilities. There are no site specific conditions that would have prevented DOE from utilizing acceptance campaigns to transport spent fuel from Yankee Atomic. In sum, the spent fuel acceptance schedule contemplated by Dr. Bartlett in his report is technically and logistically reasonable.

A. DOE's experience in transporting spent fuel

Over the course of many years, starting long before the Standard Contracts were formulated, a great deal of experience in the transportation of spent fuel was developed. This experience was developed by and/or available to DOE, and could have easily been drawn upon and expanded upon to enable the development of a national program that by January 31, 1998 would have begun the systematic transport of spent fuel from reactor sites to one or more storage/disposal locations in the United States.

Commercial nuclear power has been used for many years in the United States, and throughout this long history of use significant quantities of spent fuel have been shipped from reactor sites to commercial and government facilities. These shipments have been for various purposes, including: testing storage technologies; post-irradiation fuel examination; and reprocessing. Exhibit 1 to this report lists some of the spent fuel shipments that have been conducted for the government and for nuclear utilities. Altogether, since the early 1960's, enough commercial spent fuel has been shipped by road and rail in the United States to fill (or

empty) the cores of twenty commercial nuclear reactors.

There is also a substantial body of experience in transporting spent fuel in foreign countries. Outside the United States, spent fuel shipments are more commonplace than they are domestically. Most of these shipments are made from reactor sites to spent fuel reprocessing centers in Britain, France, Japan and Russia. Through 1998, more than 100,000 MTU of spent fuel has been shipped by road, rail and sea outside the United States. This is greater than the total amount of spent fuel projected to be discharged from all domestic commercial reactors over the course of their licensed lives.

Thus, had the government started to commence acceptance of spent fuel by January 31, 1998, there was a wealth of experience that DOE could have drawn and expanded upon prior to 1998 in order to have a suitable spent fuel transportation plan ready for implementation by January 31, 1998.

B. The availability of casks to transport spent fuel

There were spent fuel transportation casks available well before 1998 to support the acceptance of 3000 MTU per year with a reasonable ramp up beginning by January 31, 1998. In fact, as early as the 1970s, at least two types of casks were available for, and used in, the transportation of spent fuel by rail. One of those casks, the General Electric IF-300, is still in use today. In 1995, the Nuclear Regulatory Commission ("NRC") licensed a cask for the dual purposes of storage and transportation of spent fuel. That cask, the NAC-STC, can accommodate 26 pressurized water reactor assemblies, including the assemblies used at Yankee Atomic.

If existing casks were determined to be insufficient, DOE could have readily developed a transportation cask in time to commence the performance of its contractual obligations in 1998. For example, Nuclear Assurance Corporation ("NAC") was able to obtain an NRC license for the NAC-STC within five years of the time NAC started work on that cask. This amount of time reflected extra licensing time required because the NAC-STC was the first dual-purpose cask to be licensed by the NRC.

DOE would not have needed to obtain a large fleet of casks to establish a receipt rate of 3000 MTU per year. The following example illustrates this point:

> Using the mass of a standard fuel assembly as a reference, the NAC-STC's capacity is equivalent to about 10 MTU.[1] Therefore, 300 cask trips per year would be required to establish an acceptance rate of 3,000 MTU. To make a complete cycle with a cask between utilities on the East Coast and an acceptance facility in Nevada, for example, would require about a one-month turnaround time. Given a one-month turnaround time, and allowing for two months per year of down time for maintenance, one cask could transport 100 MTU per year. Thus, in this scenario, as few as 30 casks would have been required to meet the 3000 MTU acceptance rate.

00074

[1]The Westinghouse 17 x 17 fuel assembly is considered to be a standard fuel assembly.

Of course, the government could have procured a greater number of casks than called for in the example above, which would have made it even easier to meet the 3000 MTU acceptance rate.

Regardless of the particular cask model selected, DOE could easily have designed, built, and licensed the requisite number of casks if it had started this process in the early 1990's. In the example given above, it would have taken approximately 24 months to fabricate the necessary number of NAC-STC casks. Each cask would have cost between $2 and $2.5 million dollars; thus, thirty or more NAC-STC casks could have been purchased with a small portion of the Nuclear Waste Fund. Had DOE initiated this process early enough, DOE could have procured a large enough fleet of suitable casks to be available on January 31, 1998, to accept 3000 MTU with a reasonable ramp up and in an efficient sequence.

Moreover, the "non-standard" fuel, failed fuel, and Greater Than Class C ("GTCC") waste generated by the contracting nuclear utilities would not have been a barrier to DOE's acceptance of spent fuel in a timely manner. With sufficient advanced planning, DOE could also have developed a cask or casks for non-standard fuel, failed fuel, and GTCC waste, obtained the necessary license from the NRC, and procured enough such casks in time to accept these materials from Yankee Atomic in a timely manner.

C. The use of shipping campaigns

DOE's transportation performance in fulfillment of its obligations under the Yankee Atomic contract and the Standard Contracts should have included acceptance campaigns. Acceptance campaigns are the movement of a relatively large amount of spent fuel from one location to another using personnel and equipment in a repetitive manner. Shipments of spent

fuel should be conducted in campaigns in order to achieve efficient operations, and the government should have done so in this case.

There are several advantages to shipping campaigns versus moving only a small number of assemblies at a time. Perhaps the biggest advantage is that efficiencies in transportation operations can be realized. Repetitive operations such as cask handling, loading, decontamination, receipt and turnaround all see reduced time per cycle in a campaign.

The value of shipping campaigns is evidenced by the fact that DOE has encouraged the use of campaigns in the spent fuel transportation services for which it has contracted. In the 1980's, DOE contracted with NAC to move spent fuel from Taiwan to the United States. This project included shipping campaign sizes of up to 11 casks. Additionally, a campaign size of 8 casks has been used in the past -- and continues to be used -- by NAC in the government's ongoing program to return spent nuclear fuel from research reactors in foreign countries. NAC is transporting the research reactor fuel pursuant to a contract with the government. In both of these cases, NAC was encouraged by the government to use shipping campaigns to provide for the efficient transportation of the spent fuel at issue.

Sufficient transportation resources were available to, or could have been obtained by, DOE prior to 1998 to implement the type of acceptance campaigns called for to efficiently accept 3000 MTU per year. Returning again to the example cited earlier:

> 30 NAC-STC casks making 300 cask trips would have been required to transport 3,000 MTU per year. If each shipment consisted of 5 casks, and shipments to the acceptance facility were

to be conducted by rail, 60 rail shipments would have been involved, or about 1 shipment per week.

Based on my experience supervising the transport of spent fuel from reactor sites and my knowledge of the transport and receipt of other heavy equipment, I believe that adequate heavy-haul vehicles and mobile cranes were available, or could readily have been made available, to DOE prior to 1998 to support this level of spent fuel transport from reactor sites.

This level of spent fuel transport would represent a very small fraction of the current rail system capacity. Union Pacific Railroad alone owns more than 6,900 locomotives in the United States. I estimate that a spent fuel shipment of 5 casks carrying approximately 50 MTU of spent fuel as defined above would require two locomotives. Therefore, 1 spent fuel shipment on rail each week would constitute a fraction of one percent of Union Pacific Railroad's locomotives.[2]

It should be noted that although the example I have provided features rail transportation of spent fuel, my conclusions regarding the technical feasibility of shipping 3000 MTU per year would not change if truck transportation was included in the DOE transportation system. Based on the experience I have cited above, I believe that a sufficient number of truck casks and transporters could readily have been made available to DOE prior to 1998 to support a 3000 MTU acceptance schedule if a mix of rail and truck transport was used for the DOE transportation system.

---

[2]There are, of course, numerous rail lines in the United States that could be used for spent fuel shipments alone or in combination with other rail lines. The example of Union Pacific is provided simply for illustrative purposes.

**D. The ability to accommodate swaps of acceptance allocations**

**There would be no technical barriers to swaps of acceptance allocations amongst contracting utilities under the transportation program described above. The level of transportation resources necessary to establish the 3000 MTU per year acceptance schedule is largely independent of the sequence in which spent fuel is to be accepted from the contract holders. Moreover, there could be enough flexibility in the program – in terms of the number of casks, the availability of heavy-haul equipment to handle casks, and rail system capacity – to accommodate changes in the sequence of spent fuel removal.**

E. Site Specific Conditions for Yankee Atomic

Based upon my experience in various aspects of the transportation of spent fuel, it is my opinion that DOE would have faced no significant logistical impediments to accepting all of the spent fuel contained in Yankee Atomic's spent fuel pool within one year from the commencement of acceptance. After the requisite license was obtained from the NRC, shipment would likely begin with heavy-haul vehicle shipment from the reactor site to the nearest rail access point at the Hoosac tunnel about 7 miles from the site. At this point the casks would be transferred to rail cars. The list of rail routes that could be used to move the train to Nevada, for example, is provided in Exhibit 2. Other potential destinations can be reached by a similar array of rail routes.

## II. Data or Information Considered in Forming Opinions

Data and other information I considered in forming my opinions is listed in Exhibit 3 to this report.

## III. Qualifications

My qualifications to offer the opinions included in this report, including a list of all publications I have authored within the preceding ten years, are set out in herein and in Exhibit 4 to this report.

## IV. Compensation

NAC is being paid $250 per hour for my time working on this matter.

## VI. Other Expert Testimony

I have not testified as an expert at trial or by deposition in any other cases within the preceding four years.

Respectfully submitted,

Ivan F. Stuart

Dated: June 30, 1999