A. I don't know or remember.

Q. Okay. No. 9 is a document authored by J.W. Doman, D-o-m-a-n, and T.E. Tehan, T-e-h-a-n. Had you ever seen this document before this litigation?

A. Again, no.

Q. What is it?

A. It talks about the option and characteristics of a campaigned approach to taking spent fuel from the reactors, and it's a "think piece" on how you would do that most effectively.

Q. We're going to talk a little bit more about campaigns a little later in your deposition, but I just want to ask you while we're talking about this document, are shipment campaigns or transportation campaigns anything that you worked on while you were director of OCRWM?

A. It's something we recognized as an ideal option of running the system.

Q. Did you actually do any work toward --

A. No.

Q. -- transportation campaigns?

actually the mission plan, and so these things would be there available as a basis for some action, but they were not -- I wouldn't call them working documents.

Q. So going back then to this document on campaign shipments, when did there come about more information about shipment campaigns so that it was more than just a good idea and it could actually be analyzed?

A. After our watch.

Q. Do you have any idea when?

A. No.

Q. Were you involved in that at all in your --

A. No.

Q. -- consulting work?

Have you ever done any work in your career on shipment campaigns, transportation campaigns?

A. No.

Q. Okay. No. 10 is the 1987 annual capacity report.

A. Uh-huh.

01030

A. In a sense, yes. Yes. They are not meant to commit anybody. They were not a basis for program action or anything. It was just widely recognized that this would be a very inefficient way of doing things, and it would be far better to have a system where you, well, frankly, campaigned and made effective use of the resources of the system; but at the time it was all very qualitative, you know, how should this system run, because it was very premature to even think about those details because we didn't have an MRS. We didn't know what it was going to look like or what the reactor fleet was going to do.

**Q. So really while you were director, you didn't know one way or the other whether the OFF method was going to happen?**

A. That's right.

**Q. Did you do any studies or anything while you were director, or were you responsible for any studies as to whether the OFF system would work?**

A. Specific studies, no.

**Q. General studies?**



1825 I Street, N.W.
Washington, D.C. 20006

JABS REPORTING, INC.
www.jabsreporting.com

(202) 296-6102
(888) 805-5227

**for your opinion as to the proper pace?**

A. The proper pace is a dependent factor depending on what the situation is, and as a matter of fact, from the late, middle '80s when they started doing these studies like Wood's, on through to this day, the circumstance that existed at any point in time has changed. It's been a constant evolution of rate of production of spent fuel, the ability of the reactors to accommodate storage on site. So all you can do at any given time is make assumptions and use the existing data at that point in time as a basis for saying what would be appropriate or proper to achieve your goal.

**Q. So the proper pace changes with time?**

A. The definition of proper depends on the system -- or the circumstance of the system at any given time. That's right.

**Q. So when you offer your opinion as to the proper pace in this report, what is that based upon? What are the circumstances that you base that opinion on?**

MR. SHAPIRO: Objection. Vague.

THE WITNESS: The definition -- or explicitness of proper would depend on when you were looking at the system, what the circumstances were.

BY MS. HERRMANN:

**Q. And I'm trying to find out what the circumstances were when you, Dr. Bartlett, looked at the system and decided that this was the proper pace.**

A. Proper pace would have gone with the circumstances of the system while I was director, but we did not investigate that to any detail because, again, as I said, we could not implement. These kinds of issues were backburner all the way.

**Q. Sure.**

A. We had a shelf full of these theoretical studies, if you will. We had a changing dynamic in the reactor system, and we had no place and no way to accept spent fuel, no place to take it and no way -- so there's no specific proper as much as there is an appropriate strategy to meet the goal of servicing shutdown reactors and not forcing shutdown of operating reactors.



1825 I Street, N.W.
Washington, D.C. 20006

JABS REPORTING, INC.
www.jabsreporting.com

(202) 296-6102
(888) 805-5227

they're discharging fuel at a rate of 2,000 tons per year for the fleet. Some reactors, for one reason or another, are being forced into having dry storage capability because their pools are full.

**Q. What do you mean by fleet?**

A. All reactors in the United States.

**Q. I see.**

A. Our inventory of reactors -- operating reactors.

**Q. So if the circumstances have changed since you wrote this report, then is the pace that you advocated in this report no longer the proper pace?**

MR. SHAPIRO: Objection. Vague.

BY MS. HERRMANN:

**Q. Do you understand what I'm asking?**

A. I understand what you're asking. You can set a goal of a rate, a pace of receipt and implement it for the circumstance that you face.

**Q. I understand that you can set a goal, but can you determine that one particular pace is the right pace?**

MR. SHAPIRO: Objection. Vague.

**01034**

BY MS. HERRMANN:

**Q. I'm sorry. The proper pace. I want to use your terminology.**

A. Uh-huh.

**Q. Do you understand my question?**

A. You can determine for a circumstance what a proper pace would be.

**Q. But it wouldn't be the only proper pace?**

A. That's right.

**Q. I see. Okay. So then how did you go about choosing this particular pace as the proper one that you would write about in this report?**

A. That was the case or system of record at that time that would be appropriate.

**Q. At what time?**

A. Early '90s.

**Q. When you were director?**

A. Uh-huh. And it was also consistent with what appeared to be the feasibility of getting the system running. So it's an event.

**Q. Okay. But from what you're telling me that there could be more than one proper pace, there**

**could have been other paces at that time when you were director?**

A. Could be. That's right.

**Q. And they would have been correct also?**

A. Uh-huh.

**Q. Okay.**

A. As you go through some of the documentation for the past decade or so, you'll find in different documents DOE has set different targets for a ramp-up rate and a pace. They generally stuck with 3,000 as the ultimate fully implemented system, and the reason for that is that's as fast as you can put it in a repository. And so that's a constraint on the system. How fast you go from when you start to 3,000 is adjustable depending on system need, depending on your ability to produce the casks of the system, et cetera.

**Q. You mentioned that DOE has had different goals, set different targets --**

A. At different times in different documents they've assumed different ramp-up rates and different start rates.

CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC

I, Virlana Kardash, Registered Professional Reporter and a Notary Public in and for the District of Columbia, before whom the foregoing proceedings were taken, do hereby certify that the witness whose testimony appears in the foregoing pages was duly sworn by me; that the testimony of said witness was taken by me stenographically at the time and place noted in the caption hereof and thereafter reduced to computer-aided transcription by me; that the foregoing transcript is a true and correct record of the proceedings; and that I am neither counsel for, related to, nor employed by any of the parties to this case and have no interest, financial or otherwise, in the outcome of the action.

Virlana Kardash, RPR, CSR
Notary Public in and for
The District of Columbia

My commission expires:
June 30, 2006

IN THE U.S. COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - - x

YANKEE ATOMIC ELECTRIC CO., :
MAINE YANKEE ATOMIC POWER CO., :
CONNECTICUT YANKEE ATOMIC POWER :
CO., :
Plaintiffs: : No. 98-126C
vs. : 98-474C
UNITED STATES OF AMERICA : 98-154C
Defendant. :

- - - - - - - - - - - - - - - - - x

CERTIFIED COPY

Washington, D.C.
Wednesday, August 27, 2003

Continued Deposition of:

DR. JOHN BARTLETT

called for examination by counsel for the defendant, pursuant to notice and agreement, commencing at 9:30 a.m., at Department of Justice, 1100 L Street N.W., before Virlana Kardash, RPR, CSR, a Notary Public in and for the District of Columbia, when were present on behalf of the respective parties:

01038

Q Okay.
A And I've looked at all of them.
Q I have a couple questions for you, then. So let me take them one at a time. No. 1, are you saying that the number 3,000 MTU can be accepted as the repository; does that number change over time?
A No, no. That number doesn't change significantly. That's the baseline parameter.
Q Okay. You mentioned the '98 viability assessment. Is that now outdated, then?
A Very much so.
Q Okay.
A Totally.
Q Is the spent fuel storage document that's listed here at No. 5 outdated?
A Probably.
Q Is there any document that you relied upon for your 3,000 MTU number that is not outdated?
MR. SHAPIRO: Objection. Vague.
THE WITNESS: I don't know.

A They come in and see me.

**Q Did you ever send a letter?**

A No.

**Q Did you ever have any written communication with the utilities to that effect?**

A On this issue?

**Q Yes.**

A No.

**Q Okay.**

A The utilities were typically represented by the Nuclear Energy Institute. They would come visit periodically, check on the status of the program. The utilities had an organization called American Committee on RAD Waste Disposal, composed of CEOs of major nuclear utilities.

I would meet with them periodically, tell them the status of the program; so there was understanding on their part constantly of where the program stood and where the effort stood.

**Q Okay. I'm back on page 8 now. The very last sentence on that page is, "Given this experience, the government should not and would**

A Uh-huh.

Q That looks, to, me like a five-year ramp-up.

A That's what it counts to, yes.

Q So here is my question. On this page you seem to be talking about a three-year ramp-up, and on that page, you seem to be talking about a five-year ramp-up.

Which ramp-up period are you expressing your expert opinion that DOE should actually use?

MR. SHAPIRO: Objection. Vague.

THE WITNESS: They're both possible. Mr. Graves chose that analysis; that's feasible, I think.

BY MS. HERRMANN:

Q So you're not giving us an expert opinion that one is more proper than the other?

A No. I'm just saying that it's feasible to do it in three years with market response, but you could choose something different, like Mr. Graves did.

Q Would it also be feasible to do it in

**seven years?**

A Certainly.

Q **Or ten years or any other number?**

A Yes.

Q **Did you expert opinion go any further than that --**

A No.

Q **-- as to choosing one?**

A No.

MR. SHAPIRO: Objection. Vague.

BY MS. HERRMANN:

Q **Okay. You're not advocating one ramp-up --**

A No.

Q **You understand my question; right?**

A Yes. And the answer is no.

Q **Is it your opinion that DOE is obligated to any given ramp-up?**

MR. SHAPIRO: Objection. Vague.

THE WITNESS: No.

BY MS. HERRMANN:

Q **The standard contract doesn't require a**



1825 I Street, N.W.
Washington, D.C. 20006

JABS REPORTING, INC.
www.jabsreporting.com

(202) 296-6102
(888) 805-5227

**acceptance slots?**

A No. We addressed it as a strategy for the operation of the system.

**Q Have you ever talked to any CEO of any utility who was interested in exchanging so that they could get a later acceptance slot?**

A Not specifically on that subject, no.

**Q Do you know whether any utilities have ever attempted to exchange acceptance slots?**

A No.

**Q When you were director of OCRWM, were you confident that DOE performance was predictable enough that an exchange market could be viable?**

MR. SHAPIRO: Objection. Vague.

BY MS. HERRMANN:

**Q Do you understand my question?**

A I can't answer that. Confidence? There was too much uncertainty. The short answer is no, but there are many factors in that.

**Q Okay. Let me explore those factors a little bit. So there was uncertainty in when DOE would be performing?**



1825 I Street, N.W.
Washington, D.C. 20006

JABS REPORTING, INC.
www.jabsreporting.com

(202) 296-6102
(888) 805-5227

A There still is.

**Q Okay. I guess that's kind of why we're all here. Was there also uncertainty as to when the acceptance slots would happen?**

MR. SHAPIRO: Objection. Vague.

THE WITNESS: I don't know. That's at a level I did not address.

BY MS. HERRMANN:

**Q So do you know, one way or the other, whether the utilities had something concrete they could count on to exchange?**

MR. SHAPIRO: Objection. Vague.

THE WITNESS: I do not know.

BY MS. HERRMANN:

**Q Okay. But you understand my question?**

A Yes, I understand the question. I do not know.

**Q Okay. Did you analyze that as part of your report?**

A No.

**Q Okay. Do you know of any issues that would make exchanges inefficient?**

Q Okay. In the exchange system, as you understand it, the exchange system that is provided in the contract -- is that clear to you, first of all? When I talk about exchanges as it is provided in the contract, I'm talking about the contracts provision on exchanges that we've talked about.

A Yes. Yes. On page 11 or whatever it is.

Q Okay. I don't want to go further if nobody is following me. As you understand that provision, would partial exchanges be allowed?

MR. SHAPIRO: Objection. Vague.

BY MS. HERRMANN:

Q Let me explain myself. In other words, say, would a utility be allowed to trade 10 MTUs of its 20 MTU allocation?

MR. SHAPIRO: Objection. Vague.

BY MS. HERRMANN:

Q Do you understand my question?

A I don't know. I understand the question. I don't know.

Q Under your system of exchanges as you advocate it should happen, would a utility be allowed to have such a partial exchange?

A Yes.

Q Okay. Under the exchange provision in the contract as it's written, do you know whether exchanges would be pair-wise; in other words, bilateral? One utility with one utility, and that's all?

MR. SHAPIRO: Objection. Vague.

THE WITNESS: I don't know, and that's hard -- I couldn't even guess.

BY MS. HERRMANN:

Q And under your system of exchanges that you present in your expert report, would all utilities -- would all exchanges be pair-wise, just one utility and one utility?

A Not necessarily.

Q So they could be between several utilities?

A Yes.

Q Do you know whether the contract allows



1825 I Street, N.W.
Washington, D.C. 20006
JABS REPORTING, INC.
www.jabsreporting.com
(202) 296-6102
(888) 805-5227

know.

Q Okay. Would the time that it took to approve or disapprove exchanges affect the incentive to trade?

MR. SHAPIRO: Objection. Vague.

THE WITNESS: I don't know.

BY MS. HERRMANN:

Q If a utility had an approved delivery commitment schedule, would you agree that it wouldn't want to exchange away its early slot in order -- if that would cause it to incur avoidable storage costs?

MR. SHAPIRO: Objection. Vague.

THE WITNESS: Again, I don't know. You cannot -- my experience is that the utilities are so different in the driving forces for their economic and business decisions that there's just no way of knowing except when you get into a specific case and they bring to the table at the time whatever their situation is.

It might be driven by their PUC, for example. Many, many factors that they will have

01046

to make the decision on a case-by-case basis as to whether or not they want to exchange, what would be involved as far as they're concerned.

All these factors are just -- you can identify factors, but you certainly cannot project them or make any assumptions about how they would be implemented by any given utility at any time.

BY MS. HERRMANN:

**Q You just can't know how things would ultimately happen?**

A You cannot know. You cannot know.

**Q Is there any relationship between your opinion about exchanges and your opinion about the efficient acceptance schedule?**

MR. SHAPIRO: Objection. Vague.

BY MS. HERRMANN:

**Q Do you understand my question?**

A It is my expectation that having the opportunity for a free market exchange situation will make the system as operationally cost effective as possible.

**Q Okay. Giving you a hypothetical. If**

no exchanges were allowed, if it just was not allowed by DOE, how would that change your opinion about what an efficient acceptance schedule is, if at all?

A No, it doesn't.

MR. SHAPIRO: Objection. Vague.

BY MS. HERRMANN:

Q It doesn't change your opinion?

A No.

MS. HERRMANN: All right. Let's take a break.

(Recess.)

BY MS. HERRMANN:

Q Dr. Bartlett, I tell you what. It's five minutes to 4:00 right now. I think that it would make for a much shorter and more efficient day tomorrow if we were to break right now for me to go through and clean up my notes and see what has been missed and what we still have to go on to rather than continue.

I think we'd have to continue on to tomorrow anyway. If we break now, assuming it's all the

CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC

I, Virlana Kardash, Registered Professional Reporter and a Notary Public in and for the District of Columbia, before whom the foregoing proceedings were taken, do hereby certify that the witness whose testimony appears in the foregoing pages was duly sworn by me; that the testimony of said witness was taken by me stenographically at the time and place noted in the caption hereof and thereafter reduced to computer-aided transcription by me; that the foregoing transcript is a true and correct record of the proceedings; and that I am neither counsel for, related to, nor employed by any of the parties to this case and have no interest, financial or otherwise, in the outcome of the action.

Virlana Kardash, RPR, CSR
Notary Public in and for
The District of Columbia

My commission expires:
June 30, 2006