FY92 TCSS Deliverables

TRW

TRW Environmental Safety Systems Inc.

One Federal Systems Park Drive
Fairfax, VA 22033
703.934.7600

TSO.920103.0084
January 6, 1992

Department of Energy
1000 Independence Avenue, S.W.
OCRWM RW-40
Washington, DC 20585

Attention: Mr. Ronald A. Milner

Dear Mr. Milner:

Subject: DE-AC01-91RW00134; ACR Issues Resolution Process Status Report - December 1991

Attached is the subject report responding to the requirement defined in the FY 1992 Work Authorization for Waste Acceptance support. If you have any questions or require further information, please contact Mr. Billy Cole of my staff at (703) 934-2449.

Very truly yours,

Raymond W. Godman
Assistant General Manager, Operations

RWG:BMC:cej

Attachment

cc: J. R. Clark, TEST/300
E. R. Johnson, JAI
D. Marcelli, TES2/695
J. J. Miller, TEST/300
M. L. Payton, RW-432
R. L. Robertson, TEST/300
A. Segrest, Duke, Charlotte
B. R. Teer, TEST/300
R. G. Vawter, TEST/300
L. K. Wildman, (ORF), TEST/300

HQ0004489

# ACR ISSUES STATUS REPORT
## DECEMBER 31, 1991

The Standard Disposal Contract (10CFR961), which defines the spent nuclear fuel (SNF) and high-level radioactive waste acceptance process, was unfortunately developed in such a way that the terms and conditions contained numerous omissions, inconsistencies, ambiguities, and contradictions. An OCRWM review of the Standard Disposal Contract identified 34 issues requiring resolution before waste acceptance could begin.

Since 1987, OCRWM has been working cooperatively with waste owner representatives on many of the issues, a process referred to as the Annual Capacity Report (ACR) Issues Resolution Process. The waste owners have formally submitted consensus positions on 18 of the ACR Issues.

The M&O has been assigned the responsibility of drafting OCRWM Positions for each of the 34 ACR Issues. To date, 19 draft OCRWM Positions have been prepared and submitted for OCRWM review. Comment and preparation of eight additional draft Positions is in progress. The following table summarizes the current status of the Issues Resolution Process and, in addition, identifies the ACR Issues for which the waste owners have submitted consensus positions:

| ISSUE NO. | SUBJECT | STATUS |
|---|---|---|
| 001 | Exceptions to Oldest Fuel First (OFF) acceptance priority criteria | (2) |
| 002 | OFF acceptance ranking vs. delivery of SNF | (1)(2) |
| 003 | Adding new Purchasers to acceptance ranking queue | (3) |
| 004 | Disposition of SNF owned by DOE and other Federal Agencies not covered by the Standard Contract | (3) |
| 005 | Acceptance capacity for commercial high-level waste | (3) |
| 006 | Clarification of "all SNF" as applied to Delivery Commitment Schedule (DCS) instructions | (1)(2) |
| 007 | Verification of SNF descriptions | (1)(2) |
| 008 | Two month/20% DCS adjustment | (1)(2) |
| 009 | Fungibility of Final Delivery Schedules (FDS) | (3) |
| 010 | DCS exchange procedures | (3) |
| 011 | Implementation of DCS submittal and approval process | (2) |
| 012 | FDS adjustments to accommodate "full cask load" operational considerations | (1)(2) |
| 013 | Approval of FDS subject to negotiations | (3) |
| 014 | Priority for emergency deliveries | (1)(2) |
| 015 | Acceptance priority for shutdown reactors | (1)(2) |
| 016 | Appendix F clarifications | (4) |
| 017 | Conflict of delivery and procedure confirmation requests with timing of submittal of Appendix F | (4) |
| 018 | Approval of Appendices E and F | (2) |

HQ000

| | | |
|---|---|---|
| 019 | Basis for the Acceptance Priority Ranking (and acceptance criteria) for non-fuel components not in an assembly at the time of proposed delivery | (1)(2) |
| 020 | SNF classification procedures | (1)(2) |
| 021 | Acceptance of assembly hardware resulting from consolidation | (1)(2) |
| 022 | Acceptance of Transportable Storage Casks as a Standard Fuel classification | (1)(3) |
| 023 | Acceptance and handling of multiple-element sealed canisters | (1)(4) |
| 024 | Acceptance of non-fuel components that are not in an assembly | (1)(2) |
| 025 | Consolidated fuel canisters | (1)(2) |
| 026 | Purchaser-furnished Failed Fuel canisters | (1)(2) |
| 027 | Classification of Nonstandard Fuel | (1)(2) |
| 028 | Definition of Failed Fuel | (1)(2) |
| 029 | Definition of a "year" as used in the Annual Priority Ranking report | (4) |
| 030 | Intent of indemnity coverage as it applies to operations at Purchaser's delivery sites | (3) |
| 031 | Charges/credits for Purchaser actions related to SNF acceptance | (4) |
| 032 | Use of Nuclear Waste Fund monies for capital improvements to Purchasers' facilities | (1)(2) |
| 033 | Legal status of contracts not in compliance with 10CFR961 | (4) |
| 034 | Improving the efficiency of the acceptance process | (2) |

Key to Status:

(1) Purchaser consensus on the ACR Issue submitted to OCRWM.
(2) OCRWM Position on the ACR Issue drafted by M&O and submitted to OCRWM for review and comment.
(3) OCRWM Position on the ACR Issue being drafted by M&O.
(4) OCRWM Position on the ACR Issue not started.

HQ0004491

U.S. DEPARTMENT OF ENERGY

# memorandum

DATE April 8, 1983

REPLY TO ATTN OF: S-10

SUBJECT: **ACTION MEMORANDUM:** Final Rulemaking on Standard Contract for Nuclear Waste Disposal

TO: The Secretary

**BACKGROUND:**

A critical item in implementing the Nuclear Waste Policy Act is the waste disposal contract that will be signed between DOE and the industry. These contracts must be signed and in place by June 30, 1983. Key assumptions and responsibilities are listed under Tab A. Section-by-section analyses of the contract are lised under Tab B. Key dates for implementation are listed under Tab C.

**DISCUSSION:**

We followed the requirements of the Administrative Procedures Act in implementing and executing the contract. This involved publishing the contract in the Federal Register, having a 30-day comment period, holding a public hearing, incorporating comments, and publishing a final contract in the Federal Register. There were 85 sets of comments received during the comment period. Comments were received from nuclear power utilities, nuclear power vendors, environmentalists, consumer protection associations, State and Federal agencies, and individual members of the public. Comments have been reviewed throughout the Department, and subsequently, we have incorporated within the contract recommendations as we deemed appropriate. Eight general policy issues arose from the comments and we appropriately resolved these issues (Tab D).

**CONCLUSION:**

The attached Rulemaking is ready for publication in the Federal Register.

**RECOMMENDATION:**

That the Secretary approve below.

RLMorgan
Robert L. Morgan
Project Director
Nuclear Waste Policy Act
Project Office

APPROVED: Donald Paul Hodel

DISAPPROVED: ____________________

DATE: April 11, 1983

Attachments

Tab A - Key Assumptions and Responsibilities
Tab B - Section-by-Section Analysis of Contract
Tab C - Key Dates
Tab D - Policy Issues

TAB A

## Disposal Fund Contract

### Key Assumptions

- o The disposal contract must be signed by 6-30-83, or owners and generators of spent fuel lose the opportunity to dispose of their nuclear waste with DOE.
- o Contract covers:
  - disposal of existing waste ($/KG) and future waste (1 mill/KWHR).
- o Contracts will be "standard" and little "negotiation" is expected.

### DOE Responsibilities

- o Establish acceptance priority ranking based on age of fuel.
- o Review and approve delivery schedules.
- o Transport:
  - assume title at facility.
  - arrange for shipping cask.
- o Handle and dispose:
  - per NRC approved standards and procedures.
- o Establish fees and collection/financial procedures:
  - 180 days from enactment to establish fee collection procedures.
  - payment for existing fuel either collected over 10 years or one lump sum payment at time of fuel delivery.
  - fee reviewed annually and Congress notified of changes.

### Utility Responsibilities

- o Remit fee: revenues expected to begin between July and September 1983.
- o Forecast shipments.
  - quantity from specific powerplant.
  - fiscal year of delivery.
- o Prepare for transportation.
  - per applicable regulatory requirements.
  - describe material.

### NRC Requirements

- o NRC shall not issue or renew a license for a nuclear power reactor unless:
  - the utility has signed a contract with DOE for disposal services, or
  - DOE affirms that a utility is actively and in good faith negotiating with DOE for a contract.

TAB B (1)

## Section by Section Contract Analysis

Introduction and Recitals - Sets forth the authorities and the basic parameters for the contract.

Definitions - Sets forth the terms used throughout the contract and provides the meanings for them. Wherever possible the terms defined and used in the contract are those contained in Section 2 of the Nuclear Waste Policy Act (P.L. 97-425).

Scope of Contract - For the transportation and subsequent disposal by DOE of spent nuclear fuel and/or high-level radioactive waste of domestic origin from civilian nuclear power reactors. The contract services shall commence not later than January 31, 1998, and continue until disposal of all SNF and/or HLW accepted by DOE hereunder.

Delivery/Acceptance of SNF and/or HLW - Sets forth the procedures for advance notification to DOE by the Purchaser of all discharge rates and proposed deliveries of SNF and/or HLW under this contract, and sets forth the procedures by which DOE will accept the SNF/HLW. Appendices A, B, and C set forth the form and content of the notification.

Responsibilities of Parties - Sets forth the required actions and areas of responsibility of the Purchaser and DOE.

Criteria for Disposal - Sets forth the requirement for accurate and detailed technical information to be provided to DOE by the Purchaser, and establishes DOE's method and procedures for accepting SNF/HLW. Appendices D and E provide the necessary technical information and guidance. DOE shall verify the Purchaser's information prior to acceptance. Coverage is given to the circumstances where it is determined by DOE, both prior to and subsequent to acceptance, of improperly described fuel and waste.

Title - Title to all SNF and/or HLW shall pass to DOE as soon as possible after commencement of operation of a disposal repository developed under the Act and upon acceptance by DOE at the Purchaser's site (Section 302(a)(1) and 302(a)(5)(A)).

Fees and Terms of Payment - Sets forth the procedures for payment of fees; differentiates between fuel generating electricity prior to 90 days after enactment and that of after 90 days from the date of enactment; states that annually fees will be reassessed and changes published in Federal Register and sent to Congress as the Act requires. Also discusses the late payment procedures and that interest will be charged on late fees. Also sets forth DOE right to audit whether the Purchaser is paying the correct amount of fee.

TAB B1



Delays - In the event of unavoidable delays by DOE or the Purchaser, the parties will reschedule deliveries as necessary, to accommodate the delay. In the event of avoidable delays, charges and schedules will be equitably adjusted to cover any additional costs incurred by the Party not responsible for the delay.

TAB C

## Contract Development and Execution

### Key Actions and Dates

| | | |
|---|---|---|
| February 4 | - | Draft was published in Federal Register/APA process began |
| March 3 | - | Held Public Hearing |
| March 7 - April 6 | - | Incorporated comments |
| April 13 | - | Publish contract in Federal Register and mail to utilities - contract effective upon publication |
| April 13 - June 6 | - | Execution interactions with utilities |
| June 3 | - | Brief Secretary on contract execution progress |
| June 7 - 17 | - | Contract signature period for utilities |
| June 20 - 30 | - | DOE signature period |

TAB D

# POLICY ISSUES ADDRESSED DURING NUCLEAR WASTE CONTRACT COMMENT PERIOD

1. Spent Nuclear Fuel "Exchange" Rights

The majority of utilities commented that they should have "exchange" or "swapping" rights to ship their SNF and/or HLW to our repository. After consideration, aside from some complex record keeping, this poses no great problem to us, and consequently, we have accepted this suggestion. It will require our approval, and we intend to be reasonable.

2. "Credits" to the Waste Fund/or Utilities

The vast majority of utilities suggested that "credits" be given to the Fund for the value of reprocessed material and for cost savings measures that they have personally taken--potentially resulting in cost savings to the waste program. Such measures may include rod consolidation, or utilities providing their own shipping casks.

We have considered this issue, and reached a decision to "defer" establishing a position at this time until reprocessing becomes a reality and the types of efficiency credits and their values are better calculable vis-à-vis our program and its costs. For example, recognizing that there is not a private sector reprocessing enterprise at this time, calculating such reprocessing cost savings and potential "credits" is not realistic. Also, savings from rod consolidation would be difficult to predict now at this time.

3. Fee Structure for Existing SNF (Fuel Value $1.5-2.0 Billion)

Our method for calculating the fee for existing SNF (that is retroactive fuel in basins) is essentially based on fuel

burn-up levels that equal an industry wide average charge of 1 mill per KWH, as required by the Act. It is equitable to the majority of the affected owners and generators of SNF or HLW. The vast majority of the utilities endorse our approach. However, there are a few groups who did take exception and may challenge our approach. They are: General Electric, TVA, and possibly Commonwealth Edison. These groups, overall, have low burn-up fuel, and will be charged a disproportionately higher rate than other groups on their overall fuel inventory. We have gone to a four tier approach to partially alleviate the problem.

4. Fee Structure For In-Core Fuel as of Midnight April 6,1983. (Fuel Value $200-300 Million)

There are several possibilities for calculating this fee. The initial option in our February 4, 1983 rule had a method based on a three tier cost approach. This approach was unacceptable to the majority of the utilities. We have recognized the substance of their comments, and have altered the fee calculation methodology to a formula based approach which is more acceptable to most utilities/vendors.

5. Fee Adjustment for Retrospective Fuel (in Basins) Not Retroactive

The law, as many commenters have pointed out, stipulates that only the 1 mill fee for prospectively generated electricity should be adjusted. Our February 4 rule stipulated that the one time fee for existing spent fuel or HLW would also be adjusted according to the kilogram equivalency rate in effect at the time a utility would make a lump sum payment to DOE for disposing of their fuel. For example, if the 1983 dollars/ kilogram equivalent to the 1 mill is $176, it could conceivably be $350 in 1993, as adjusted.

Recognizing the comments and in reading the Act closely, we will not adjust the fee for existing spent fuel but will charge utilities/vendors interest on the outstanding balance from April 7, 1983, until payment is made. This type of adjustment will be agreeable to the majority of the utilities, however, one vendor (Westinghouse) may challenge the concept.

6. Kilowatt Hours Generated - "Net Vs Gross"

The majority of utilities favor kilowatt hours generated, to be measured "net at the busbar." This would allow utilities to essentially discount station uses for power generation, although such cost would ultimately be passed onto the customers anyway through PUC rulings. Conversely, others have suggested that kilowatt hours generated be measured at the plant's turbine output meter, in effect providing a gross generation measurement. This would immediately capture all station uses, and in effect would levy fees upon a utility for 100 percent of nuclear power generation versus an average of 96.5 percent of generation as would be measured under the net method.

Recognizing these factors, and the intent of the Act that DOE provide disposal services for all nuclear waste resulting from commercial generating capabilities, we have decided to use the gross measurement for the kilowatt hours generated that will be subject to the 1 mill fee.

7. Utilities "Rights" to "Audit" the Waste Disposal Fund

The utilities expressed a firm desire to have "audit rights" for them written into the contract. In essence,

they would like management, economy/efficiency, program objectives, and financial audit rights over the waste management fund.

Out of sheer history, there is clearly no precedents for the private sector to audit the Federal Government. Additionally, the utilities will be able to get programmatic access from several other sources:

DOE IG,
GAO,
OMB,
Legislatively mandated waste fund report on an annual basis to the Congress, and
a private sector "big 8" accounting firm.

Therefore, this suggestion was denied.

8. Late Payment Penalty (Quarterly Treasury Rate Plus 6 Percent)

The majority of the utilities commented that this rate was too excessive a penalty. We cannot accept these comments because we want to encourage utilities to make timely payments, and, therefore, the penalty should be stiff. We, therefore, have decided to remain with this rate.

JMB
cc: [handwritten names] SPS, JPP. Russ M.

**Department of Energy**
Washington, DC 20585
September 28, 1995

Dr. Andrew C. Kadak
President and Chief Executive Officer
Yankee Atomic Electric Company
580 Main Street
Bolton, Massachusetts 01740-1398

Dear Dr. Kadak:

Thank you for your letter of September 7, 1995, expressing your thoughts on the viability of the exchange process for Delivery Commitment Schedules and restating your position on the Department's obligation to afford priority waste acceptance to the spent fuel from Yankee Atomic Electric Company's Rowe power station.

While your letter describes circumstances that you believe will impede the exchange of delivery commitment schedules, we continue to believe that once the Federal waste management system is operational, the exchange provision will be exercised by Purchasers as originally anticipated. Article V.E of the Standard Contract for the Disposal of Spent Nuclear Fuel and/or High Level Radioactive Waste (Standard Contract) grants Purchasers the right to exchange, with DOE concurrence, approved delivery commitment schedules. This provision was included in the Standard Contract in response to comments received during the Standard Contract rulemaking, in order to allow Purchasers greater flexibility in managing their inventories of spent fuel. We believe the exchange provision will allow industry to optimize the allocation of waste acceptance capacity to meet individual utility needs, without the overt involvement of the Department.

With respect to the Department's ability to grant priority acceptance of the spent fuel from your Rowe power station, as I noted in my letter of July 13, 1995, to State Representative Herren, there are statutory limits on the amount of spent fuel that the Department can accept prior to the opening of a permanent repository. Consequently, the Department does not have the ability to grant priority acceptance to shutdown reactors without adversely affecting other utilities. The Congress is debating the issue of centralized interim storage of spent nuclear fuel. The outcome of this debate may involve new policy direction for this program, and may include policy guidance on the priority acceptance of spent fuel from shutdown reactors.

Sincerely,

Daniel A. Dreyfus, Director,
Office of Civilian Radioactive
Waste Management

Printed with soy ink on recycled paper