JOHN J. KEARNEY, Senior Vice President

EDISON ELECTRIC INSTITUTE The association of electric companies

1111 19th Street, N.W.
Washington, D.C. 20036
Tel (202) 828-7400

March 7, 1983

Mr. Robert Morgan
Project Director
Nuclear Waste Policy Act Project Office
Department of Energy
1000 Independence Avenue, S.W.
Room 7B-084
Washington, D.C. 20585

Re: Standard Contract for Disposal of Spent Nuclear Fuel and/or High Level Radioactive Waste (10 CFR Part 961)

Dear Mr. Morgan:

On February 4, 1983, the Department of Energy (DOE) published in the Federal Register a notice of proposed rulemaking concerning the standard contract for disposal of spent nuclear fuel and/or high level radioactive waste. 48 Fed. Reg. 5458. The proposed contract would implement the authority granted to DOE by Section 302 of the Nuclear Waste Policy Act (Public Law 97-425), signed into law by the President on January 7, 1983. Under Section 302, DOE is authorized to enter into contracts for the disposal of spent nuclear fuel (SNF) and high-level radioactive waste (HLW) of domestic origin.

On behalf of the Edison Electric Institute and the Utility Nuclear Waste Management Group, we are pleased to comment on the proposed contract. The Edison Electric Institute (EEI) is the association of the nation's investor-owned utilities. The member utilities of EEI provide about 78 percent of the nation's electricity and serve over 67 million customers. The Utility Nuclear Waste Management Group (UNWMG) is comprised of 43 utilities with specific interests relating to nuclear waste management. EEI and UNWMG were pleased to testify at the March 3, 1983 public hearing held by DOE on the proposed contract. Both EEI and UNWMG, and their member utilities, have a vital interest in the proposed contract. Most of the SNF/HLW which will be disposed of pursuant to the standard contract will be generated in reactors owned and operated by these utilities. And most of the fees to be paid to DOE under the contract will come from these utilities and ultimately from

their customers. For these reasons, we have carefully reviewed the proposed contract and have prepared the comments which follow. We believe that our comments are widely shared throughout the industry, although individual utilities may favor other viewpoints on one or more of the issues covered.

EEI and UNWMG have several major comment areas. These are discussed below. In addition, specific comments and suggested revisions to the provisions of the draft contract and to the appendices of the contract are set forth in the enclosed Attachment A, Detailed Comments on DOE Draft Disposal Contract, and Attachment B, Detailed Commentson Appendices to DOE Draft Disposal Contract. We respectfully request that the comments in this letter and its Attachments be incorporated into the standard contract when it is published in final form.

Our six major comment areas are as follows:

1. Fee for SNF discharged prior to April 7, 1983;

2. Fee for in-core fuel on April 7, 1983;

3. Payment options;

4. Audit and review rights;

5. Priorities; and

6. Appendices.

1. <u>Fee For SNF Discharged Prior To April 7, 1983</u>.

The fee provisions for SNF/HLW are set forth in Sections 302(a)(2) and 302(a)(3) of the Nuclear Waste Policy Act. Section 302(a)(3) establishes the fee for electricity generated and sold from civilian nuclear power reactors on or after April 7, 1983. The statute describes the fee simply and in unambiguous terms, stating that it "shall be equal to 1.0 mill per kilowatt-hour". On the other hand, the fee for SNF/HLW used to generate electricity prior to April 7, 1983 is described in different terms. Under section 302(a)(3), that fee is to be "a 1 time fee per kilogram of heavy metal ... in an amount equivalent to an average charge of 1.0 mill per kilowatt-hour for electricity generated by such spent nuclear fuel, or such solidified high-level waste derived therefrom".

Mr. Robert Morgan
March 7, 1983
Page Three

The legislative history for section 302(a)(3) is very sparse and provides no guidance in interpreting this language. Perhaps the most that can be said is that Congress used somewhat different language to describe the two types of fees. DOE has thus been given the flexibility to determine a fee that is "per kilogram", is an "average charge", and is "equivalent" (not "equal" as in section 302(a)(2)) to 1 mill per kWh. There are many ways in which these terms can be accommodated. For example, "average charge" may mean the average for the industry, for the utility, for the reactor, for the core, or for a particular group of fuel assemblies.

One way, and perhaps the best way, to apply the flexibility afforded by section 302(a)(3) is to use a principle found throughout the Act -- that different categories of SNF/HLW should bear their fair share of disposal costs. While this principle of reasonable equity may not strictly apply to the prospective 1 mill/kWh fee, the inequities arguably inherent in the prospective fee (transportation differences, fuel burnup, etc.) are Congressionally imposed. Since section 302(a)(3) does not adopt the same fee approach for existing SNF as does section 302(a)(2) for prospective SNF, DOE can look to this principle in applying section 302(a)(3). The principle appears in several places. For example, if defense wastes are sent to a repository for commercially generated SNF/HLW, there must be an appropriate "allocation of costs". Nuclear Waste Policy Act, §8. Similarly, government owned or generated SNF/HLW must pay fees equivalent to those for commercial SNF/HLW. §302(a)(4). Where Congress has given DOE some flexibility in setting a fee structure (unlike the prospective 1 mill/kWh fee), the concept of reasonable equity should apply.

The February 4 Notice of Proposed Rulemaking provides a method for calculating the fee for existing spent fuel as well as three alternative methods. All four methods can be viewed as compatible with the statutory language. Although certain of our members favor alternate methods, the method set forth in the draft contract appears to be the most equitable of the four.

a. Alternate 1 computes the total fee for all spent fuel by multiplying the total kilowatt hours generated by all spent fuel and 1 mill/kWh. Each reactor's share of the total fee is the ratio of that reactor's kilograms of heavy metal to the kilograms of heavy metal in all spent fuel. This approach favors higher burnup fuel, typically from pressurized water reactors.

Mr. Robert Morgan
March 7, 1983
Page Four

b. Alternate 2 utilizes a formula to determine the fee directly from burnup, on an assembly-by-assembly basis. This approach obviously favors lower burnup fuel, typically from boiling water reactors. This alternate does not appear to use an "average charge" approach since it contemplates a separate fee calculation for each fuel assembly.

c. Alternate 3 establishes two categories of spent fuel, based on burnup of less than -- and greater than -- 10,000 MWD/MTU. The fee for the first category could be determined on an assembly-by-assembly basis, as in Alternate 2. Or it might be based on some averaging approach for all fuel in that category. The notice of proposed rule-making is ambiguous in this respect. The remainder of the total fee would be distributed among fuel with more than 10,000 MWD/MTU burnup, based on an average dollar/kilogram basis. Under this approach, all assemblies with greater than 10,000 MWD/MTU burnup would pay a fee based solely on the amount of heavy metal, with no consideration of burnup. This approach does not penalize high burnup fuel as much as Alternate 2, although it still greatly benefits low burnup fuel.

The draft contract itself proposes a three tier fee approach, based on differing dollars per kilogram for three ranges of burnup. Appropriate burnup ranges may be less than 10,000, 10-20,000, and greater than 20,000 MWD/MTU. The fee in dollars per kilogram of heavy metal for each range should relate to one another on the same basis as the estimated average cost for disposing of the spent fuel in each range. On this basis, the tiered approach would appear to result in the most equitable allocation of costs. Of particular importance is avoiding both unreasonably small fees for low burnup assemblies and unreasonably large fees for high burnup assemblies. For example, Alternate 2 would result in a fee of $36/kg for an assembly with a 4500 MWD/MTU burnup, while charging $288 for an assembly with a burnup of 36,000 MWD/MTU. The $36 fee would not even cover the costs of transportation, let alone any disposal costs, while the $288 fee would greatly exceed the cost of transportation and disposal. The draft contract's approach would better match the fees to the costs and should therefore be supported.

For these reasons, we favor the three-tiered approach described in the contract and urge that it be retained.

2. Fee For In-Core Fuel On April 7, 1983.

EEI and UNWMG support the contract's coverage of the "burned" portion of fuel in-core as of April 7, 1983. Article VIII.A.4. Although an argument can be made that such in-core fuel is not subject to a fee since it is not "spent nuclear fuel" (i.e., withdrawn from the reactor) as of April 7, 1983, the Act is equally open to the opposite interpretation since the partially utilized fuel will at some point be withdrawn from the reactor. We believe that it is more equitable to assess a fee for the "burned" portion of such fuel. Excluding it would unfairly burden those utilities whose reactors have not yet begun to operate. Excluding it would also unfairly burden future utility customers by having them pay for the disposal of fuel which benefited earlier customers.

The proposed contract suggests that the method for calculating the fee for the "burned" portion of in-core fuel is the same as that for previously discharged SNF, i.e. the three-tier approach. Practical difficulties may exist in pointing to particular in-core kilograms which have been "burned" as of April 7. We believe that for this in-core fuel, an approach based upon 1 mill per kilowatt hour of electricity generated by this fuel is more appropriate. The bias in Alternate 2 favoring previously discharged low burnup fuel will not exist to the same extent for in-core fuel since the prospective 1 mill/kWh fee will recover future burnup. The 1 mill/kWh approach for in-core fuel would also avoid an inequity in the three tier fee by avoiding the situation where relatively high burnup fuel would pay both the highest tier fee for its burnup prior to April 7 and the 1 mill/kWh fee for further burnup after April 7. Specific language to implement this change is set forth in Attachment A, p. 34.

3. Payment Options.

Article VIII.B.2 of the proposed contract sets forth two payment options for the fee for previously-discharged SNF -- lump sum payment and payment in 40 quarterly installments. We support these two options, and also urge that the same options apply to the fee for in-core fuel. These payments may be made at any time provided that payment is complete by the time of the first scheduled delivery date.

The proposed contract should, however, be more explicit on adjustments to this fee. The Act and its legislative intent, we believe, call for fee adjustments to be prospective. Article VIII.A.3 of the contract implies that the fee for previously discharged SNF

will not be retroactively adjusted when it states that "the adjustment to the fee will not be retroactive to previously generated electricity". We suggest that the contract be more explicit and specifically state that the one-time fee for previously-discharged SNF and in-core fuel will not be readjusted. However, to recognize that the Nuclear Waste Fund should not lose money from a utility's decision to defer payment, the one-time fee should escalate at the government's cost of money until payment is made. Specific changes to the proposed contract to implement this concept are set forth in Attachment A, p. 33.

4. Audits And Review Rights.

In the typical commercial contracting situation, the buyer is purchasing a product or service from the seller. In any substantial commercial agreement, the buyer will insist on having the right to audit and inspect the seller's performance, in order to assure that the contractual obligations are being carried out. This is certainly the case for the utility members of EEI and UNWMG. The proposed disposal contract provides audit rights, but these only protect DOE -- the seller. Article VIII.E. The utilities, who are contributing billions of dollars to the Nuclear Waste Fund, do not have the type of protection in the proposed contract routinely provided in contracts involving a tiny fraction of the amounts involved here.

We are not suggesting that each utility have the right to duplicate the work of the General Accounting Office. What we are suggesting is that utilities or their representatives have access to the civilian waste management program and how their money is being spent. This access will help utilities answer their customers and rate-makers. It will also provide utilities with the kind of detailed information that will enable them to support the DOE program in Congress and elsewhere.

Specific implementing language is suggested in Attachment A, pp. 22, 41-42.

5. Priorities.

The proposed contract recognizes the possibility that generators and owners of SNF/HLW may request DOE to take delivery of more SNF/HLW than DOE can handle in any given period. To deal with this, Article VI.B.3 of the proposed contract creates a priority system.

Two priorities are established -- one based on the age of the SNF/HLW (oldest first) and the second for SNF/HLW from permanently shutdown reactors. While the proposed contract is not entirely clear, it appears that the latter classification may take priority over the former. No priority is given to utilities who may need to ship SNF to DOE in order to keep their facilities operating (although DOE can, in its discretion, take "emergency deliveries"). Nor is any consideration given to the size of a Purchaser's SNF inventory. Finally, the contract does not appear to allow contract holders to exchange their allocations and delivery schedules among themselves.

To remedy these shortcomings, EEI and UNWMG urge that an allocation system be established with half of the receiving capacity to be allocated based on SNF/HLW age and the remaining half allocated based on purchaser's share of the industry-wide inventory. We also urge that purchasers be allowed to exchange delivery commitments. This will allow the market place to deal with particular utility needs. See Attachment A, pp. 15-16, 28-30.

6. Appendices.

Appendices B, C, E and F of the proposed contract request the owners and generators of SNF/HLW to supply significant quantities of highly detailed information on the material to be delivered to DOE. Based on an extensive technical review of these appendices, EEI and UNWMG have concluded that much of this information is unnecessary for the transportation or disposal of SNF/HLW. Furthermore, we believe that the technical details that ultimately will be needed cannot be established at this early date. Rather than attempting to prescribe this level of detail so far in advance, we would suggest that the contract include only sample appendices and that the parties develop the actual appendices when it is more clear precisely what information is needed.

In addition to these comments on the contract itself, we would also incorporate the view expressed by EEI and UNWMG at the March 3 public hearing that the contract not be a part of the regulation. The reasons supporting this comment are those which we discussed in our testimony.

Although the contract is generally comprehensive and complete, there are two significant issues on which the proposed contract is silent -- DOE performance standards and purchaser remedies. Article II states that the disposal services shall commence not later than January 31, 1998, a provision consistent with the Nuclear Waste Policy Act. However, no other milestones are included. Nor does the contract commit DOE to accept any given quantity of SNF/HLW. And, of most significance to utilities, the contract provides no specific remedies in the event that DOE fails to meet the 1998 deadline. (A related difficulty is the absence in the contract of any guidelines for DOE's approval or disapproval of delivery commitment schedules and final delivery schedules.) We recognize that these issues are complicated ones and not easily resolved. On the other hand, they deserve serious study, even if their resolution comes after the draft contract has been promulgated. We would therefore strongly urge that DOE meet with purchasers to negotiate a mutually acceptable solution to these open items.

EEI and UNWMG commend you and your staff for the substantial effort which has gone into developing the proposed contract. We appreciate the opportunity to submit these comments and would be pleased to discuss them with you and your staff. Please consider these comments to be active and good faith negotiation on the part of the member utilities of EEI and UNWMG.

Very truly yours,

JOHN J. KEARNEY
Senior Vice President

Attachments

cc: Mr. Jeff Hill
Office of Information and
Regulatory Affairs
Office of Management and Budget