IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| YANKEE ATOMIC ELECTRIC CO., Plaintiff, | |
| v. | No. 98-126C (Senior Judge Merow) |
| UNITED STATES OF AMERICA, Defendant. | Filed electronically: April 23, 2004 |

# YANKEES' OPPOSITION TO GOVERNMENT MOTION *IN LIMINE* TO EXCLUDE EVIDENCE OF, AND TO STRIKE, PRE-BREACH DAMAGES AND RESTITUTION CLAIMS

JERRY STOUCK
Spriggs & Hollingsworth
1350 I Street, N.W., Ninth Floor
Washington, D.C. 20005
(202) 898-5800

Counsel of Record for Plaintiff,
YANKEE ATOMIC ELECTRIC COMPANY

Of Counsel:

Robert L. Shapiro
SPRIGGS & HOLLINGSWORTH

# TABLE OF CONTENTS

**Page**

ARGUMENT .......... 2

I. WITH RESPECT TO "PRE-BREACH" DAMAGES, THE GOVERNMENT'S DISCOURSE ON CONTRACT REMEDIES IS WRONG, WRONG-HEADED, AND CONTRARY TO WELL-ESTABLISHED LAW .......... 2

A. There Is No Authority For The Government's Elaborate Syllogism .......... 2

B. Yankee's Pre-Breach Damages Are Recoverable Under Established Law. .......... 3

C. The Anticipatory Repudiation Doctrine Is Irrelevant Here. .......... 7

II. WITH RESPECT TO RESTITUTION, THE GOVERNMENT'S DISCOURSE ON ELECTION OF REMEDIES IS ALSO WRONG, AND ALSO CONTRARY TO WELL-ESTABLISHED LAW. .......... 10

A. Yankee Can Plead and Pursue Inconsistent Remedies .......... 10

B. Under Applicable Law, No Contract Election Has Been Made By Yankee .......... 12

# Table of Authorities

## Cases

*Apex Pool Equip. Corp. v. Lee*, 419 F.2d 556 (2d Cir. 1969) ........ 16

*Chain Belt Co. v. United States*, 115 F. Supp. 701 (Ct. Cl. 1953). ........ 4, 5

*Cities Services Helex, Inc. v. United States,* 543 F.2d 1306 (Ct. Cl. 1976) ........ 14

*City of Fairfax, Va. v. Washington Metro. Area Transit Auth.*, 582 F.2d 1321 (4th Cir. 1978) ........ 8

*Dow Chem. Co. v. United States*, 226 F.3d 1334 (Fed. Cir. 2000) ........ 12

*Franconia Assocs. v. United States*, 536 U.S. 129 (2002) ........ 8

*Harden v. TRW, Inc.*, 959 F.2d 201 (11th Cir. 1992) ........ 11

*Hughes Communications Galaxy, Inc. v. United States*, 271 F.3d 1060 (Fed. Cir. 2002) ........ 3

*Lake v. New York Life Ins. Co.*, 218 F.2d 394 (4th Cir. 1955) ........ 13

*Maine Yankee Atomic Power Co. v. United States*, 225 F.3d 1336 (Fed. Cir. 2000) ........ 6

*McDonnell Douglas Corp. v. United States*, 182 F.3d 1319, 1327 (Fed. Cir. 1999) ........ 12

*Medallic Art Co., Inc. v. Novus Mktg., Inc.*, No. 99 Civ. 502 (NRB), 2004 WL 396046, at *1 (S.D.N.Y. Mar. 2, 2004) ........ 2

*Medcom Holding Co. v. Baxter Travenol Labs.*, 984 F.2d 223 (7th Cir. 1993) ........ 16

*Middleton v. United States*, 175 Ct. Cl. 786 (1966) ........ 8, 9, 10

*Mobil Oil Prod. & Explor. S.E., Inc. v. United States*, 530 U.S. 604 (2000) ........ 12

*N. Am. Graphite Corp. v. Allan*, 184 F.2d 387 (D.C. Cir. 1950) ........ 13

*Neil v. Kennedy*, 149 N.E. 775 (Ill. 1925) ........ 16

*Petrofsky v. United States*, 488 F.2d 1394 (Ct. Cl. 1973) ........ 10, 16

*Prudential Ins. Co. v. BMC Indus.,* 662 F. Supp. 436 (S.D.N.Y. 1987) ........ 11

*Roehm v. Horst*, 178 U.S. 1 (1900) ........ 8

*Rule v. Brine, Inc.*, 85 F.3d 1002 (2d Cir. 1996) ........ 11

*S.N.A. Nut Co. v. The Haagen-Daas Co.*, 247 B.R. 7 (Bankr. N. D. Ill. 2002) ........ 4

*San Carlos Irrigation & Drainage Dist. v. United States*, 111 F.3d 1557 (Fed. Cir. 1997) .......... 3

*Schism v. United States*, 316 F.3d 1259 (Fed. Cir. 2003) .......... 8

*Siderpali, S.P.A. v. Judal Indus.*, 833 F. Supp. 1023 (S.D.N.Y. 1993) .......... 11

*United States v. Dekonty Corp.*, 922 F.2d 826 (Fed. Cir. 1991) .......... 8

*W. Transmission Corp. v. Colo. Mainline, Inc.*, 376 F.2d 470 (10th Cir. 1967) .......... 13

*Wynfield Inns v. Edward Leroux Group*, 896 F.2d 483 (11th Cir. 1990) .......... 11

*Yankee Atomic Elec. Co. v. United States,* 42 Fed. Cl. 223 (1998) .......... 6

**Statutes**

42 U.S.C. § 10222 (b) .......... 16

U.C.C. § 2-712 (2) (2002) .......... 4

**Other Authorities**

Dan B. Dobbs, *The Law of Remedies* § 12.2(2) (1973). .......... 4, 13

Restatement (Second) Contracts §378 cmt .......... 13

Restatement (Second) of Contracts ("Restatement 2d") § 350 .......... 4

Restatement 2d § 350 cmt. b, c, e, f & h .......... 4

Samuel Williston & Walter H.E. Jaeger, *A Treatise on the Law of Contracts*, §688 at 305 (3d ed. 1963) .......... 20

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

YANKEE ATOMIC ELECTRIC CO.,

Plaintiff,

v.

UNITED STATES OF AMERICA,

Defendant.

No. 98-126C
(Senior Judge Merow)

Filed electronically: April 23, 2004

YANKEES' OPPOSITION TO GOVERNMENT MOTION *IN LIMINE*
TO EXCLUDE EVIDENCE OF, AND TO STRIKE,
PRE-BREACH DAMAGES AND RESTITUTION CLAIMS

Yankee Atomic, Connecticut Yankee and Maine Yankee respectfully submit this opposition to the government's motions to exclude evidence regarding pre-breach damages and restitution, and to strike ("Remedy Motion"). The three Yankees are filing a common opposition to this motion for the Court's convenience, as they typically do, even though the government presents its restitution arguments only in the Connecticut Yankee and Maine Yankee cases, and only those two cases involve one type of pre-breach damages – for "re-racking" of the plaintiff's spent fuel pool. These immaterial differences among the Yankee cases are noted further below, but otherwise references in this brief to "Yankee" are applicable to all three Yankee plaintiffs. [1] References in this brief to the government's Remedy Motion are to the version filed in *Maine Yankee*, which sets out the government's restitution arguments and also addresses the re-racking facts.

[1] Yankee Atomic does not claim damages for a re-racking of its spent fuel pool. Yankee Atomic also did not explicitly reference the remedy of restitution in its pretrial submissions, but did set forth all material facts supporting that remedy which, as explained in the text, *see* pp. 10-18, is legally available to Yankee Atomic at its election.

## ARGUMENT

The government's Remedy Motion asks the Court to hold, as a matter of law, that Yankee is not entitled (1) to recover as damages costs it incurred prior to the government's breach based on its reasonable belief that the government would not perform its contract obligations, or (2) to restitution as an alternative remedy for the government's breach. Although the propriety of raising these issues on a motion *in limine* is suspect – the government effectively seeks summary judgment, not an evidentiary ruling – the government's arguments are so clearly wrong that the form of its motion is ultimately beside the point.[2]

### I. WITH RESPECT TO "PRE-BREACH" DAMAGES, THE GOVERNMENT'S DISCOURSE ON CONTRACT REMEDIES IS WRONG, WRONG-HEADED, AND CONTRARY TO WELL-ESTABLISHED LAW

#### A. There Is No Authority For The Government's Elaborate Syllogism.

The government does not cite any authority – and cannot – that announces or applies the harsh contract remedy limitations it seeks to impose in Yankee. Instead, the government constructs an elaborate syllogism to support its position, which essentially reduces to the proposition that Yankee Atomic should be penalized because it "made a careful decision" to proceed on a "partial" breach theory, "[w]e presume . . . because Yankee wants DOE to continue perform the Standard Contract." Remedy Motion at 4-5. But there is no reason in law or logic why Yankee should be penalized for that decision, particularly considering that it simply reflects the government's own insistence that the Department of Energy ("DOE") will eventually perform the contract sometime in the future, albeit not until 2010 at the earliest.

---

[2] The government tacitly acknowledges that it is raising summary judgment issues through its longwinded justification for presenting these issues through a motion *in limine*. Remedy Motion at 6-7. But none of the precedents the government cites allowed fundamental legal issues to be resolved on evidentiary motions, without trial. *See, e.g., Medallic Art Co., Inc. v. Novus Mktg., Inc.*, No. 99 Civ. 502 (NRB), 2004 WL 396046, at *1 (S.D.N.Y. Mar. 2, 2004) ("A bare-bones *in*

Putting restitution aside for later discussion, *see* pp. 10-18 below, and focusing now on pre-breach damages, despite the complexity of the government's arguments, the heart of the government's position is buried on page five of its motion: "[b]ecause there is no such legal doctrine as an anticipatory *partial* breach of contract, Yankee has no basis for seeking damages that precede the actual partial breach. . . ." (emphasis in original). The short answer to this is that Yankee has not sued for anticipatory repudiation, but rather for an actual breach, and costs it incurred in preparing to accommodate the breach are fully recoverable under well-established law.

B. Yankee's Pre-Breach Damages Are Recoverable Under Established Law.

The cardinal principle of damages in contract cases is that sufficient damages should be awarded "to place the injured party in as good a position as he or she would have been had the breaching party fully performed." *Hughes Communications Galaxy, Inc. v. United States*, 271 F.3d 1060, 1066 (Fed. Cir. 2002); *San Carlos Irrigation & Drainage Dist. v. United States*, 111 F.3d 1557, 1562-63 (Fed. Cir. 1997). The government's attack on Yankee's "pre-breach" damages is contrary to this cardinal principle, and is unsupported by any policy rationale that might justify *not* making Yankee whole.

Moreover, it is basic that, when faced with a breach, the non-breaching party is entitled and indeed *required* to try to avoid further losses through mitigation efforts or by engaging in substitute transactions designed to obtain the goals of the contract. *See* Restatement (Second) of Contracts ("Restatement 2d") § 350 and cmts. b, c, e, f, & h (1981); U.C.C. § 2-712 (2) (2002).[3]

---

*limine* motion on this complex issue cannot act as a substitute for a motion for summary judgment supported by affidavits and exhibits, or a *Daubert* motion and hearing.").

[3] Although Article 2 of the U.C.C., which governs the sale of goods, is not directly applicable, the Federal Circuit has recognized that the principles expressed therein are useful in evaluating service contracts like that at issue here. *See Hughes Communications Galaxy, Inc.*, 271 F.3d at 1066.

Neither logic nor law requires the non-breaching party to wait until *after* the breach actually occurs to *begin* mitigating or arranging a substitute transaction. Rather, the right, and in the case of mitigation the obligation, to engage in substitute transactions to avoid losses and obtain the purposes of the contract arises "[o]nce a party has reason to know that performance by the other party would not be forthcoming." Restatement 2d § 350 cmt. b. *See, e.g. S.N.A. Nut Co. v. The Haagen-Daas Co.*, 247 B.R. 7, 17-18 (Bankr. N. D. Ill. 2002) (where nut supplier indicated that nuts would be unavailable temporarily in the future, buyer was entitled to cover prospectively for the partial breach and recover resulting damages.). And of course, the costs incurred in mitigation or in a substitute transaction are properly regarded as a part of the non-breaching party's expectancy damages. *See* Dan B. Dobbs, *The Law of Remedies* § 12.2(2), at 30-31 (1973).

In fact, and also contrary to the heart of the government's complex syllogism, the Court of Claims held fifty years ago that "pre-breach" damages *are* available for a contract breach that is less than "total" or a "repudiation." *Chain Belt Co. v. United States*, 115 F. Supp. 701 (Ct. Cl. 1953). In that case, plaintiff had purchased a building from the government for $1,422,000. Because the government had a substantial amount of equipment installed in the building, the sale contract gave the government sixty days after closing to remove its equipment. The government did not begin to remove the equipment in a timely manner, and when it became apparent that the government would be unable to remove the equipment in the time allotted, the plaintiff retained a contractor to move some of the equipment in order that it might begin to use a portion of the building for its own purposes. The government ultimately completed removal of the equipment, but not until two months after the 60-day period specified in the contract. Plaintiff then brought suit to recover the costs it incurred to have its contractor remove the government's equipment (along with lost profits resulting from the government's delay in clearing the building and the

cost of repairing the building's floor, which was damaged by the government's tardy removal operations).

The Court awarded plaintiff the amounts it paid the contractor, even though those costs were incurred *before* the contractual deadline for the government to remove the equipment; in other words, before the breach. *Chain Belt*, 115 F. Supp. at 714 ("[P]laintiff is entitled to recover the amount proved to have been spent as expenses incurred in a reasonable effort to avoid the harm which both parties had reason to foresee would be the probable result of defendant's breach of the contract."). In so holding, the Court explained, in language equally applicable here, that:

> [P]laintiff was under an obligation to avoid by a reasonable effort any damages which it should have foreseen, and having done so, it may recover as damages the expense incurred in such a reasonable effort to avoid harm . . . . *It makes no difference whether the breach has already occurred, or where . . . it is merely impending* under circumstances such that it was not reasonable for plaintiff to expect defendant to prevent the harm.

*Id.* at 714 (emphasis added).

The distinction between "total" and "partial" breaches is irrelevant to the "pre-breach" damages issue before the Court, a point confirmed by *Chain Belt*'s failure to address or even mention the distinction. Nonetheless, it is obvious that the breach giving rise to damages in *Chain Belt* was less than "total" or a "repudiation." The contract was for the sale of real property. The building was, in fact, transferred to plaintiff and the government received $1,422,000 in return. The dispute involved the government's breach of a separate, relatively minor provision that certainly was not the essence of the contract. And despite the government's breach of that provision, the contract did not "terminate." To the contrary, the government went on to fulfill its obligation to remove the equipment, albeit not by the contractual deadline. *Id.* at 707. The government cannot credibly characterize *Chain Belt* as a "total," breach case, and that precedent alone is therefore fatal to the government's attack on Yankee's "pre-breach" damages.

The facts of the present case are strikingly similar to those in *Chain Belt*. The Department of Energy ("DOE") was contractually obligated to remove Yankee Atomic's spent fuel beginning in 1998, and failed to do so.[4] Beginning in the late 1980's and continuing through the 1990's, it became increasingly clear from statements and conduct of DOE that DOE could not and would not meet the 1998 start-date. For example, in its 1987 "Mission Plan Amendment," DOE stated that removal of spent fuel was not likely to commence before 2003 because of repository delays, although DOE suggested spent fuel removal could begin earlier if an MRS were constructed. *See* Defendant's Amended Proposed Stipulation of Facts ("Gov't Fact Stip.") ¶ 61. In 1989, DOE's "Report to Congress on Reassessment of the Civilian Radioactive Waste Management Program" announced (at p. vii) "a significant slip for the expected start of repository operations – from the year 2003 to approximately 2010." In its 1991 Annual Capacity Report, DOE estimated it would not begin spent fuel removal before "at least 2007." Gov't Fact Stip. at p. 78. In its 1995 "Final Interpretation," DOE flatly disclaimed any obligation to commence spent fuel removal by January 1998, in the absence of a repository. *See Yankee Atomic Elec. Co. v. United States,* 42 Fed. Cl. 223, 228 (1998), *aff'd*, *Maine Yankee Atomic Power Co. v. United States*, 225 F.3d 1336 (Fed. Cir. 2000).

Thus, by the early to mid-1990's it was reasonable for Yankee Atomic to conclude – as did the *Chain Belt* plaintiff, also prospectively – that the government would not timely perform its contract obligations, including in this case the fundamental obligation to begin removing spent fuel by 1998. As a result, Yankee – like the *Chain Belt* plaintiff – began to take steps and incur costs to ensure that it could pursue its business objectives in the face of the impending

[4] Yankee Atomic has explained elsewhere its position that (1) DOE was also contractually obligated to remove Yankee Atomic's GTCC waste, and (2) regardless of the contract, DOE would have removed the GTCC waste in conjunction with spent fuel removal. For convenience in this brief, the term "spent fuel" is used to refer to both spent nuclear fuel and GTCC waste.

breach, in this case by evaluating the many factors bearing on whether it would be preferable for Yankee's overall decommissioning project to store spent fuel for an extended period in the existing fuel pool or in a newly-constructed dry storage facility. Costs Yankee incurred in making that evaluation, and in beginning to implement what Yankee determined was the preferred dry-storage solution, are fully recoverable as damages here even if incurred prior to the breach – just as comparable "pre-breach" costs were recoverable in *Chain Belt*. In addition, before shutting down their plants Connecticut Yankee and Maine Yankee reasonably determined, based on DOE's announced and actual inability to meet the 1998 start-date, that it was necessary and appropriate to re-rack their spent fuel pools to provide adequate storage space for their spent fuel. The costs of those re-rackings are also fully recoverable here, just like the "pre-breach" damages in *Chain Belt*. And these "pre-breach" damages are recoverable whether or not the contract terminates, and even if the government eventually does perform – as occurred in *Chain Belt*.

C. The Anticipatory Repudiation Doctrine Is Irrelevant Here.

Despite the government's elaborate arguments, the doctrine of anticipatory repudiation has no bearing on these facts. That doctrine has nothing to do with contract remedies, but simply outlines the circumstances in which one party may sue his contracting partner before an actual breach occurs. In this case, as in *Chain Belt*, the actual breach occurred *before* suit was filed, and indeed in this case the breach has continued for more than six additional years, and may continue *forever*. There is nothing "anticipatory" about DOE's breach. Nonetheless, it is notable that the government, in seeking to convert the anticipatory repudiation doctrine into a limitation on contract remedies, blatantly misrepresents the Restatement 2d commentary upon which it relies. Positing that "pre-breach" damages are only available for a "total" breach, and are not available to Yankee because it sued for "partial" breach, the government argues as

follows, quoting from Restatement 2d commentary: "Unfortunately for Yankee, 'a breach by repudiation alone can only give rise to a claim for total breach . . . .'" Remedy Motion at 13 (quoting Restatement 2d § 253 cmt. b). The government's crocodile tears notwithstanding, the continuation of the very same sentence directly contradicts the government's argument as applied to this case: ". . . although a breach by non-performance, even if coupled with a repudiation, can generally give rise to *either* a claim for partial breach or to one for a total breach" (emphasis added).

Nor do the anticipatory repudiation decisions cited by the government, *see* Remedy Motion at 12, contain any hint that this doctrine restricts, or even affects, available remedies. *Franconia Assocs. v. United States*, 536 U.S. 129 (2002) and *Roehm v. Horst*, 178 U.S. 1 (1900), both simply articulated the contours of the doctrine; neither decision addressed any issue of available remedies. The Federal Circuit's decision in *United States v. Dekonty Corp.*, 922 F.2d 826 (Fed. Cir. 1991), is to the same effect; it does not address the remedies available for anticipatory repudiation, including any issue of "pre-breach" damages. The same is true of *City of Fairfax, Va. v. Washington Metro. Area Transit Auth.*, 582 F.2d 1321, 1331 (4th Cir. 1978), which simply applied the basic rule that a contract party does not obtain an immediate right to sue before the time performance is due based on the other party's repudiation of only an immaterial part of the performance it owes. *Id*. at 1331.

The one decision the government cites that does contain language purporting to disapprove "pre-breach" mitigation, *Middleton v. United States*, 175 Ct. Cl. 786 (1966), is not even a contract case. It involved the appropriate setoff to a claim for back pay by an improperly discharged seaman – a dispute of the type the Federal Circuit has held is not founded in contract, but instead is a creature of administrative law. *See Schism v. United States*, 316 F.3d 1259, 1271-1275 (Fed. Cir. 2003) (en banc). Moreover, the complex facts in *Middleton* differed

materially from those here. In *Middleton*, the parties agreed that the award of back pay for the period prior to the improper discharge should be setoff by the sailor's civilian earnings during that period, which reduced (or "mitigated") his actual loss. But the sailor claimed that the offsetting earnings should be reduced, and thus his back pay award increased, by the amount of attorneys' fees he incurred (1) in fighting, and eventually overturning, the civilian conviction that led to his "undesirable discharge," and (2) in upgrading his discharge to a "general discharge." Middleton claimed these costs were additional mitigation, "necessarily incurred . . . to rectify the injury sustained by his illegal discharge." *Middleton*, 175 Ct. Cl. at 791.

The court disallowed Middleton's civilian conviction defense and appeal costs, noting in broad language that these costs were incurred before his improper discharge. Despite that language, however, *Middleton* was decided on causation grounds, not on the timing of the attorneys' fees. The sailor did not (and could not plausibly) contend that the possibility of a future improper discharge is what caused him to incur the attorneys' fees to fight the civilian charges. The sailor incurred the attorneys' fees *to stay out of jail*. Indeed, it is not clear from the opinion that he even knew the subsequent military discharge was a possibility at the time he incurred these legal fees. Nor were these attorneys' fees related in any way to his civilian earnings, which were the real "mitigation" involved in the case, a point that alone appears to have been dispositive:

> [T]he sums spent for attorneys fees in connection with the [civilian offense] may not be allowed, since it is clear that these expenses were not paid out of interim earnings. It follows, therefore, that all expenses which arose prior to plaintiff's discharge that he seeks to include, may not be considered within the framework of the setoff question.

*Id.* at 792. That the timing of the mitigation costs was not the real issue in *Middleton* is confirmed by the fact that the court also disallowed the sailor's attorneys' fees to upgrade his

discharge – fees incurred *after* the discharge – and also did so on causation-related grounds, namely, there was "no showing" that such fees "were necessary expenditures essential to his obtaining either the *right to*, or the *benefit of*, profitable civilian employment." *Id*. at 794 (emphasis in original). Accordingly, and notwithstanding the broad language employed by the court in *Middleton*, its non-contract holding (on facts quite unlike those here) cannot possibly be read to overrule *Chain Belt*.[5]

## II. WITH RESPECT TO RESTITUTION, THE GOVERNMENT'S DISCOURSE ON ELECTION OF REMEDIES IS ALSO WRONG, AND ALSO CONTRARY TO WELL-ESTABLISHED LAW.

The government's high-pitched discussion of the election-of-remedies doctrine is simply wrong. That doctrine does not prevent Yankee from *pursuing* alternate remedies like restitution. The correct rule of law is that Yankee may not *obtain judgment* on alternative remedies that may be inconsistent. In other words, Yankee must make an election of remedies at some point prior to final judgment – not now.

### A. Yankee Can Plead and Pursue Inconsistent Remedies

Contrary to the government's elaborate arguments, it is black letter procedural law (at least in the federal system) that plaintiffs may pursue alternate but inconsistent remedies. *See, e.g., Petrofsky v. United States*, 488 F.2d 1394, 1405 (Ct. Cl. 1973) (regarding "claim for a refund" and "claim for damages for breach," "plaintiff could have pleaded both claims simultaneously but alternatively"). Indeed, Rule of the Court of Federal Claims 8(a) explicitly allows claims for "[r]elief in the alternative." Equally clear is that plaintiffs are entitled to present evidence supporting multiple inconsistent remedies to a trier of fact. *See, e.g., Harden v.*

[5] The cases the government cites involving the exchange of goods, real property, and marketable securities, which hold that damages for the seller's default are measured by the property's market value on the contractual transfer date, *see* Remedy Motion at 8 and 11, are irrelevant because neither that damages measure, nor that type of breach, are involved here.

*TRW, Inc.*, 959 F.2d 201, 204 (11th Cir. 1992) ("a plaintiff is entitled to submit both theories to the jury if there is sufficient evidence to support them both"); *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996) ("Where the complaint asserts claims on theories of both contract and quantum meruit and there is a genuine dispute as to the existence of a contract, the plaintiff need not make a pretrial election between these theories; he is entitled to have the case submitted to the jury on both theories."); Dobbs, *The Law of Remedies* §12.7(6) ("Although it may be a nuisance to structure proper instructions or interrogatories to the jury if both claims are submitted, there is no reason to require a pre-verdict election.").

Consistent with the law allowing pleading and pursuit of inconsistent remedies, plaintiffs may amend their pleadings to assert inconsistent theories, even late in proceedings. *See, e.g., Prudential Ins. Co. v. BMC Indus.,* 662 F. Supp. 436, 440-442 (S.D.N.Y. 1987) (amendment two years after action seeking rescission of contract to assert breach claim was not barred by election of remedies doctrine); *accord* Restatement (Second) Contracts §378 cmt. a ("a change in remedy may often be made by amendment of the complaint, even at an advanced stage of the action"). In fact, courts have recognized that a plaintiff may continue to pursue a remedy even after the entry of judgment in favor of the plaintiff on an inconsistent remedy, as long as no execution is made on the judgment. *See Wynfield Inns v. Edward Leroux Group*, 896 F.2d 483, 488-90 (11th Cir. 1990) (trial court directed verdict on one of two alternative remedies, but that interlocutory judgment did not bar continued pursuit of the alternative remedy); *Siderpali, S.P.A. v. Judal Indus.*, 833 F. Supp. 1023, 1028-1029 (S.D.N.Y. 1993). As discussed below, so long as the defendant is not prejudiced by the lack of an election, the election of remedies doctrine simply will not bar the pursuit of inconsistent remedies.

B. Under Applicable Law, No Contract Election Has Been Made By Yankee

The Federal Circuit recently considered the contract-election doctrine in *Dow Chem. Co. v. United States*, 226 F.3d 1334 (Fed. Cir. 2000), a decision the government neglects, which held that a non-breaching contract party does not waive its right to terminate the contract and elect total breach remedies unless a delay in making the election has prejudiced the party in breach. *Id*. at 1346 (no waiver of termination right "by continuing to urge government to perform and by failing to terminate . . . in a reasonable time," because "there is no evidence the government was prejudiced by Dow's delay in terminating the license."). As explained below, in this case Yankee's use of the "partial" breach label and failure to terminate the contract has caused the government no prejudice at all.

The *Dow* holding is unremarkable. In *McDonnell Douglas Corp. v. United States*, 182 F.3d 1319, 1327 (Fed. Cir. 1999), the Federal Circuit enforced the same rule: "a party that chooses to proceed with the contract – even if it is the government – does not thereby waive its right to terminate for default." And with specific reference to restitution, the Supreme Court likewise explained in *Mobil Oil Prod. & Explor. S.E., Inc. v. United States*, 530 U.S. 604, 621-622 (2000), that the government "cannot claim that the companies waived their rights simply by urging performance." These decisions are also consistent with Restatement 2d § 378, which provides that "[i]f a party has more than one remedy under the rules stated in this chapter, his manifestation of a choice of one of them by bringing suit or otherwise is not a bar to another remedy unless the remedies are inconsistent *and* the other party materially changes his position in reliance on the manifestation." (emphasis added). *See Mobil Oil,* 530 U.S. at 622-23 (non-

breaching party does not waive its right to restitution unless it "received at least partial performance" from the breaching party post-repudiation).[6]

Applying these principles, it is clear that Yankee has not waived its right to claim a total breach, and thus has made no "binding" election that would preclude a remedy for total breach – like restitution. The government cannot seriously maintain, and certainly has presented no evidence showing, that it has prejudicially relied on Yankee's use of the "partial" breach label, or on Yankee's failure to "terminate" the contract − assuming such termination were sensible or even possible in view of Yankee's need to dispose of its spent fuel, DOE's ongoing insistence that it will eventually perform, and the statutory requirement that Yankee be party to a spent fuel contract. *See* 42 U.S.C. § 10222 (b). The government cannot legitimately contend that it has incurred, or will in the future incur, any cost or other detriment *in reliance* on Yankee's use of the "partial" breach label or failure to terminate the contract.

In fact, the only statement in the government's brief that can even be construed as suggesting that it has been prejudiced by Yankee's pursuit of an action for "partial" breach or failure to terminate the contract is that "[s]ince that time [January 31, 1998], DOE has continued to expend considerable resources in its efforts to complete the processing of licensing and opening a repository that would allow DOE to accept Yankee's SNF." Remedy Motion at 23. But this purported "detriment" − which in fact is the central purpose of a large and important

[6] *See also W. Transmission Corp. v. Colo. Mainline, Inc.*, 376 F.2d 470, 472 (10th Cir. 1967) ("even after an innocent party has elected to proceed under the contract . . . he may thereafter change his position and assert the breach if the other party has not relied upon the election and changed his position because of such reliance"); *N. Am. Graphite Corp. v. Allan*, 184 F.2d 387, 389 (D.C. Cir. 1950) ("since it is rooted in estoppel, the doctrine [of contract election] is not available as a defense unless the defendant has materially changed his position as a consequence of plaintiffs previous conduct"); *Lake v. New York Life Ins. Co.*, 218 F.2d 394, 400 (4th Cir. 1955) ("whether a choice of remedies has been followed by a material change of position detrimental to a party subsequently sued is an element which may be considered in the application of the doctrine.").

government program, for which DOE is receiving hundreds of millions of dollars annually in contract fees from other utilities on an on-going basis – bears absolutely no relation to Yankee's litigation strategy in this case. Even if Yankee had sued for "total" breach (and thus, says the government, terminated the contract), or if the government had fully removed all of Yankee's spent fuel and stored it someplace other than Yucca Mountain, the government would *still* be incurring the *very same* costs it seeks to attribute to Yankee's litigation strategy. The government is not only statutorily-committed to construct, license and operate a repository for the storage of SNF, it also has entered into contracts with dozens of other nuclear utilities operating in the United States and must continue constructing a repository to store the vast quantity of spent fuel it is obligated to pick up from those utilities, even if Yankee were to declare its own contract at an end. Both legally and factually, then, Yankee's "urging," and DOE's purported "performance," do not involve the kind of prejudicial reliance by the government on Yankee's actions that could result in a waiver of Yankee's right to elect a total breach remedy like restitution in the future.

It must be remembered that DOE will miss the fundamental and "unconditional" 1998 start-date by at least twelve years by its own admission, leading Yankee to incur enormous costs for on-site spent fuel storage during that period. Thus here, as in *Mobil Oil*, "[t]he breach was 'substantial,' depriving the companies of the benefit of their bargain." 530 U.S. at 621. If anything, given the severity of the breach, Yankee not only has caused no prejudice by its actions, Yankee has done the government an enormous favor by suing only for a partial breach.

The government's reliance upon, and long block quotations from, an older Court of Claims case, *Cities Services Helex, Inc. v. United States,* 543 F.2d 1306 (Ct. Cl. 1976), *see* Remedy Motion at 19-22, are fully consistent with *Dow* and the other more recent contract-election decisions (and Restatement 2d sections) discussed above. In *Cities Service Helix*, the

government *was* prejudiced by plaintiff's failure to terminate the contract, as the government begrudgingly acknowledges in its brief here. *See* Remedy Motion at 21 ("The Court determined that . . . the contractor had elected to continue performance . . . to the prejudice of the Government . . . ."). The prejudice in that case could hardly be denied. The plaintiff had continued to perform by delivering helium to the government for more than two years, and in response the government had paid for much of the helium (and become obligated for the remainder). In the present case, by contrast, the government has never provided any contract performance – a default that the government cannot possibly attribute to anything Yankee has done. Since DOE's breach, none of the Yankees has paid the government a dime under their contracts, or "accepted" any DOE performance. Yankee's actions here, consisting merely of litigation strategy decisions, have caused no prejudice to the government.

The contract election decisions the government cites from other jurisdictions are legally consistent with *Dow*, *Cities Service Helex* and other precedent binding on this Court, or entirely different than this case factually, or both. For example, in *Lucente v. International Business Machines, Corp.*, 310 F.3d 243 (2d Cir. 2002), which the government discusses prominently, *see* Remedy Motion at 13-15, plaintiff claimed that a single letter from IBM cancelling his stock rights at once constituted both an actual material breach of contract as to his "restricted stock," but only an "anticipatory repudiation" at to his "stock options." *Id.* at 258-59. It was that "bizarre" assertion, *id.* at 251, and nothing remotely like the situation here (and in *Dow* and *Cities Service Helex*) – where the question is whether a plaintiff waives the right to later terminate by urging, or accepting, continued performance by the breaching party – that led the Second Circuit to declare that the non-breaching party "must make an affirmative election. He 'cannot *at the same time* treat the contract as broken and subsisting.'" *Id.* at 259 (emphasis added). Other factors in that case, also not present here, also contributed to the conclusion that

the plaintiff was bound to it claim of material breach. *See id.* at 259-260.[7] The government's reliance on *Medcom Holding Co. v. Baxter Travenol Labs.*, 984 F.2d 223 (7th Cir. 1993), *see* Remedy Motion at 19*,* is equally misplaced; there the Court concluded that "the election of remedies doctrine does not apply to this case." *Id.* at 220.

That DOE's breach is a continuing one also bears on the question of waiver, because as DOE's breach continues, so too do Yankee's corresponding remedial rights. *See, e.g., Apex Pool Equip. Corp.*, 419 F.2d at 562 ("deciding to continue a contract despite a breach does not necessarily foreclose future terminations if there are succeeding breaches"). Commentators have also recognized, and other courts have agreed, that . . . "[a] continuing breach of condition . . . is not necessarily excused permanently because the injured party elects to go on with the contract." Samuel Williston & Walter H.E. Jaeger, *A Treatise on the Law of Contracts*, §688 at 305 (3d ed. 1963). *See Neil v. Kennedy*, 149 N.E. 775, 777 (Ill. 1925) ("When there is a continuing cause of forfeiture, the acceptance of payment after a breach incurring the forfeiture was originally committed will not preclude an insistence upon the forfeiture if the breach continue after the acceptance or a new breach occur.").

The government's breach began in January 1998 and continues uninterrupted to this day; DOE has never tendered *any* performance, it will not do so for at least twelve years after the 1998 contractual start date, and DOE may *never* perform. It simply cannot be the case – and the government has offered no reason why it should be the case – that Yankee has waived any right to sue for total breach. Accordingly, all remedies remain available to Yankee.

---

[7] Although the Second Circuit did elsewhere state (contrary to the law of this Circuit) that "detrimental reliance" by the breaching party is unnecessary to a binding election of contract remedies, *Apex Pool Equip. Corp. v. Lee*, 419 F.2d 556, 563 (2d Cir. 1969), that statement may reflect a mere semantic difference. A waiver was found in that case only because after the breach the non- breaching seller "continue[d] the business relationship, and accept[ed] future performance'" *id.* at 561, by urging the breaching buyer to continuing purchasing, which it did.

* * *

Because the government's attempt to preclude Yankee's pre-breach damages and restitution claim is not consistent with the law generally, and binding precedent specifically, the Court should deny the government's motion and permit the introduction of Yankee's pre-breach damages and restitution evidence at trial. Indeed, because the issues the government raises are – like damages issues generally – inherently factual in nature, the Court cannot even properly address the issues prior to hearing the underlying evidence. The government's motion "*in limine*" should be denied for this reason alone.

Dated: April 23, 2004

Respectfully submitted,

s/ Jerry Stouck

JERRY STOUCK
Spriggs & Hollingsworth
1350 I Street, N.W., Ninth Floor
Washington, D.C. 20005
(202) 898-5800
(202) 682-1639 (facsimile)

Counsel for Plaintiff,
YANKEE ATOMIC ELECTRIC COMPANY

Of Counsel:

Robert L. Shapiro
SPRIGGS & HOLLINGSWORTH