**No. 98- 126C**
**(Senior Judge Merow)**

---

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

**YANKEE ATOMIC ELECTRIC COMPANY,**

**Plaintiff,**

**v.**

**THE UNITED STATES,**

**Defendant.**

---

# DEFENDANT'S REPLY TO YANKEE ATOMIC'S OPPOSITION TO DEFENDANT'S MOTION *IN LIMINE* REGARDING TAKINGS DAMAGES

---

**PETER D. KEISLER**
**Assistant Attorney General**

**DAVID M. COHEN**

**HAROLD D. LESTER, JR.**
**Assistant Director**
**Commercial Litigation Branch**
**Civil Division**
**Department of Justice**
**Attn: Classification Unit**
**8th Floor**
**1100 L Street, N.W.**
**Washington, D.C. 20530**
**Tele: (202) 305-7562**
**Fax: (202) 307-2503**

**OF COUNSEL:**

**ELIZABETH THOMAS**
**Commercial Litigation Branch**
**Civil Division**
**Department of Justice**
**Washington, D.C. 20530**

**JANE K. TAYLOR**
**Office of General Counsel**
**Department of Energy**
**1000 Independence Avenue, S.W.**
**Washington, D.C. 20582**

**Dated: May 12, 2004**

**Attorneys for Defendant**

TABLE OF CONTENTS

PAGE(S)

DISCUSSION . . . . . . . . . . 1

I. DEFENDANT'S MOTION *IN LIMINE* REGARDING TAKINGS DAMAGES IS NOT AN IMPERMISSIBLE ATTEMPT AT DISMISSING YANKEE ATOMIC'S TAKINGS CLAIM . . . . . . . . . . 1

II. BECAUSE YANKEE ATOMIC ADMITS THAT IT HAS WITHDRAWN ITS FAIR RENTAL VALUE CLAIM, THE COURT SHOULD EXCLUDE ANY SUCH EVIDENCE . . . . . . . . . . 2

III. YA IS ACTUALLY MAKING A TEMPORARY TAKING, RATHER THAN A PERMANENT TAKING, ARGUMENT BECAUSE IT IS ONLY SEEKING LIABILITY FOR A PARTIAL BREACH OF CONTRACT . . . . . . . . . . 3

IV. BECAUSE IT WAS NOT THE GOVERNMENT'S DECISION TO STORE YA'S NUCLEAR WASTE IN DRY STORAGE, BUT INSTEAD IT WAS YA'S DECISION, THE GOVERNMENT DID NOT PHYSICALLY OCCUPY YA'S REAL PROPERTY . . . . . . . . . . 7

V. BECAUSE THE GOVERNMENT DOES NOT EXERCISE COMPLETE PHYSICAL CONTROL OVER YA'S REAL PROPERTY, YA CANNOT ESTABLISH A PERMANENT TAKING . . . . . . . . . . 9

VI. THOMAS W. BENNET MAY NOT BASE HIS TESTIMONY REGARDING FMV UPON UNTRUSTWORTHY TAX ASSESSMENT DOCUMENTS . . . . . . . . . . 14

VII. YA'S TAX ASSESSMENT EVIDENCE IS INADMISSIBLE AS A PUBLIC RECORD BECAUSE IT IS UNTRUSTWORTHY . . . . . . . . . . 16

VIII. YA'S TAX ASSESSMENT EVIDENCE IS INADMISSIBLE AS A BUSINESS RECORD BECAUSE IT IS UNTRUSTWORTHY . . . . . . . . . . 17

CONCLUSION . . . . . . . . . . 18

# TABLE OF AUTHORITIES

CASES PAGE(S)

Air Land Forwarders, Inc. v. United States,
172 F.3d 1338 (Fed Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

American Capital Corp. v. United States,
58 Fed. Cl. 398 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Armijo v. United States,
229 Ct. Cl. 34, 663 F.2d 90 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Barron Bancshares, Inc. v. United States,
53 Fed. Cl. 310 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Baskett v. United States,
2 Cl. Ct. 356 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Beech Aircraft v. Rainey,
488 U.S. 153 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Boise Cascade Corporation v. United States,
296 F.3d 1339 (Fed. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Cities Service Helix, Inc. v. United States,
211 Ct. Cl. 222, 543 F.2d 1306 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Commonwealth Edison Co. v. United States,
56 Fed. Cl. 652 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Florida Rock Industries, Inc. v. United States,
18 F.3d 1560 (Fed. Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Goodwyn v. United States,
32 Fed. Cl. 409 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Graef v. Chemical Leaman Corporation,
106 F.3d 112 (5th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Hanson Bancorp, Inc. v. United States,
53 Fed. Cl. 92 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

TABLE OF AUTHORITIES (cont'd)

CASES PAGE(S)

Hendler v. United States,
952 F.2d 1364 (Fed. Cir. 1991) . . . . . . . . . . 11

Home Federal Bank of Tenn., F.S.B. v. United States,
57 Fed. Cl. 676 (2003) . . . . . . . . . . 3

Hughes v. United States,
953 F.2d 531 (9th Cir. 1991) . . . . . . . . . . 17

In re Korean Air Lines Disaster of September 1, 1983,
932 F.2d 1475 (D.C. Cir. 1991) . . . . . . . . . . 16

Loretto v. Teleprompter Manhattan CATV Corp.,
458 U.S. 419 (1982) . . . . . . . . . . 12

Loveladies Harbor, Inc. v. United States,
21 Cl. Ct. 153 (1990), aff'd, 28 F.3d 1171 (Fed. Cir. 1994) . . . . . . . . . . 14, 18

Lovink v. Guilford Mills, Inc.,
878 F.2d 584 (2d Cir. 1989) . . . . . . . . . . 4

McKay v. United States,
199 F.3d 1376 (Fed. Cir. 1999) . . . . . . . . . . 12

Miller v. United States,
223 Ct. Cl. 352, 620 F.2d 812 (1980) . . . . . . . . . . 15

PVI, Inc. v. Ratiopharm,
253 F.3d 320 (8th Cir. 2001) . . . . . . . . . . 4

Pinewood Realty Ltd. P'ship v. United States,
223 Ct. Cl. 98, 617 F.2d 211 (1980) . . . . . . . . . . 5

Porter v. Resor,
415 F.2d 764 (10th Cir. 1969) . . . . . . . . . . 10

Rich v. Eastman Kodak Company,
583 F.2d 435 (8th Cir. 1978) . . . . . . . . . . 14

TABLE OF AUTHORITIES (cont'd)

CASES PAGE(S)

S&R Corp. v. Jiffy Lube International, Inc.,
968 F.2d 371 (3d Cir. 1992) . . . . . . . . . . 4

San Carlos Irrigation & Drainage District v. United States,
23 Cl. Ct. 276 (1991), aff'd, 111 F.3d 1557 (Fed. Cir. 1997) . . . . . . . . . . 4

Skip Kirchdorfer, Inc. v. United States,
6 F.3d 1573 (Fed. Cir. 1993) . . . . . . . . . . 10

Southern Nuclear Operating Co. v. United States,
No. 98-614C, slip op. (Fed. Cl. Apr. 7, 2004) (unpublished opinion) . . . . . . . . . . 4

Tal'Wi-Wi Ranches v. United States,
156 Ct. Cl. 700 (1962) . . . . . . . . . . 9

United States v. 10,031.98 Acres of Land, More or Less, Situate in Las Animas County, Colorado,
850 F.2d 634 (10th Cir. 1988) . . . . . . . . . . 13

United States v. Mateo-Mendez,
215 F.3d 1039 (9th Cir. 2000) . . . . . . . . . . 16

United States v. Ventura-Melendez,
275 F.3d 9 (1st Cir. 2001) . . . . . . . . . . 16

Yankee Atomic Electric Co. v. United States,
42 Fed. Cl. 223 (1998), aff'd sub nom. Maine Yankee Atomic Power Co. v. United States, 225 F.3d 1336 (Fed. Cir. 2000) . . . . . . . . . . 5

REGULATIONS

10 C.F.R. § 961.11 . . . . . . . . . . 3

# INDEX TO APPENDIX


| DOCUMENT | PAGE |
| --- | --- |
| Yankee Atomic Written Discovery Responses | 1 |
| Yankee Atomic 2003 Proposed Statement Of Relevant Facts | 3 |
| Methods Of Decommissioning | 10 |
| Yankee Rowe Community Advisory Board Meeting Minutes | 14 |
| Letter From Rowe Board Of Assessors | 27 |

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| YANKEE ATOMIC ELECTRIC COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 98-126C |
| | ) | (Senior Judge Merow) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

DEFENDANT'S REPLY TO YANKEE ATOMIC'S OPPOSITION TO DEFENDANT'S MOTION *IN LIMINE* REGARDING TAKINGS DAMAGES

Pursuant to Rule 7.1(b) of the Rules of the United States Court of Federal Claims ("RCFC"), defendant, the United States, respectfully submits this reply in support of our motion *in limine* regarding takings damages. In support of this motion, we rely upon Defendant's Motion *In Limine* Regarding Takings Damages, the appendix to defendant's motion, the following reply and corresponding appendix.[1]

## DISCUSSION

### I. DEFENDANT'S MOTION *IN LIMINE* REGARDING TAKINGS DAMAGES IS NOT AN IMPERMISSIBLE ATTEMPT AT DISMISSING YANKEE ATOMIC'S TAKINGS CLAIM

The plaintiff, Yankee Atomic Electric Company ("Yankee Atomic" or "YA"), suggests in its opposition to our motion *in limine* that the Government has improperly or in bad faith filed Defendant's Motion *In Limine* Regarding Takings Damages. Yankee Atomic's Opposition To Defendant's Motion *In Limine* Regarding Takings Damages ("YA Opp.") p. 1 ("[I]t is simply another attempt at getting rid of Yankee Atomic's taking claim without a trial."). However, YA does not cite any authority that states it is impermissible to file several motions based upon

[1] The appendix to this reply brief will not be filed electronically because it contains protected material. It will be filed under seal with the Clerk's Office.

different legal theories that request the same relief. YA admits that defendant's motion *in limine* is based upon "new grounds." YA Opp. p. 2. It is obviously proper to file a motion *in limine* to narrow the factual issues at trial. See Baskett v. United States, 2 Cl. Ct. 356, 359 (1983) ("There is no question . . . that this court, as a trial court, has the power to issue pretrial orders simplifying issues for trial. Not only does this court have such power, it has a duty to exercise it in appropriate cases.") (citation omitted). It is in the interests of both justice and judicial economy for the Court to limit trial to those claims that are not obviously legally defective. If YA cannot prove liability and damages, its claim is legally defective. There is no point in expending either the scarce resources of the Court or the scarce resources of the parties trying YA's unsupportable claims. The result of such judicial management would be an unfocused trial and a disjointed record.

II. BECAUSE YANKEE ATOMIC ADMITS THAT IT HAS WITHDRAWN ITS FAIR RENTAL VALUE CLAIM, THE COURT SHOULD EXCLUDE ANY SUCH EVIDENCE

Yankee Atomic has affirmatively abandoned its fair rental value ("FRV") damages claim. YA Opp. p. 1, 8; Appendix To Defendant's Motion *In Limine* Regarding Takings Damages ("App.") p. 25-27, 31-32. Specifically, in response to the Government's discovery requests about the amount, scope, and basis of Yankee Atomic's FRV claim, as well as the support for that claim, Yankee informed us that, in lieu of providing that support, it was withdrawing its FRV claim. App. p. 26-27, 31-32. Further, YA states in its opposition that it "has withdrawn its FRV theory." YA Opp. p. 8. To ensure that Yankee Atomic does not attempt to resurrect this claim at trial after asserting that "this issue is a moot point," YA Opp. p. 8, we respectfully request that the Court affirmatively dismiss Yankee Atomic's FRV claim from this litigation. See, e.g.,

American Capital Corp. v. United States, 58 Fed. Cl. 398, 409 (2003) (dismissing claim that plaintiff had withdrawn as moot); Home Fed. Bank of Tenn., F.S.B. v. United States, 57 Fed. Cl. 676, 678 (2003) (dismissing takings claim after plaintiff withdrew claim). If the Court does not dismiss this claim, the Government could be unfairly prejudiced at trial. Based upon Yankee Atomic's 2003 submissions withdrawing the FRV claim, we elected not to continue incurring expenses to have a real estate appraiser conduct an independent analysis of the FRV of Yankee Atomic's property. Therefore, the Court should preclude Yankee Atomic from introducing any evidence at trial in support of the FRV of its real property.

## III. YA IS ACTUALLY MAKING A TEMPORARY TAKING, RATHER THAN A PERMANENT TAKING, ARGUMENT BECAUSE IT IS ONLY SEEKING LIABILITY FOR A PARTIAL BREACH OF CONTRACT

Although YA asserts that "[t]he Court, in its June 26, 2003 Order, already rejected the same, contract-based arguments the government makes here," YA Opp. p. 3, defendant did not raise the issue, in it's motion for summary judgment upon Count III of plaintiff's complaint, that YA was actually claiming a temporary taking, rather than permanent taking, because YA is pursuing a partial breach of contract claim and assumes DOE's future disposal of the its spent nuclear fuel ("SNF") and high-level radioactive waste ("HLW"). Further, the Court did not address such an issue. See Order filed June 26, 2003. We argued in our summary judgment motion that, because YA was pursuing a contract remedy based upon the "Standard Contract For The Disposal Of Spent Nuclear Fuel And/Or High-Level Radioactive Waste" ("Standard Contract"), 10 C.F.R. § 961.11, into which it entered with DOE, the utility therefore did not have a legal basis also to seek takings damages. These are obviously two distinct and separate arguments.

In YA's complaint and throughout this litigation, YA has made it clear that it is seeking damages allegedly "arising from the government's delay in performance, which constitutes a partial breach of contract." YA Complaint ("Compl.") ¶¶ 3, 29-33 (emphasis added); App. p. 2 ¶ 5, 11-12 ¶¶ 128, 135. Nowhere in its complaint has YA asserted a claim for total breach of contract. Further, the Court in Southern Nuclear Operating Company, No. 98-614C, found that "liability for a partial breach of SNF contracts by the United States has been found." Southern Nuclear Operating Company, No. 98-614C, filed April 7, 2004, p. 5 (citing Commonwealth Edison Co. v. United States, 56 Fed. Cl. 652 (2003)). If "one party to a contract materially breaches his duties under the contract, the other party may either consider the contract terminated and sue for total breach, or he can continue his performance and sue for partial breach." S&R Corp. v. Jiffy Lube Int'l, Inc., 968 F.2d 371, 376 (3d Cir. 1992). That is, a claim for partial breach is one for damages based upon "only part of the injured party's remaining rights to performance," while a claim for damages for total breach is "one for damages based on all of the injured party's remaining rights to performance." San Carlos Irrigation & Drainage Dist. v. United States, 23 Cl. Ct. 276, 279 (1991) (citations omitted), aff'd, 111 F.3d 1557 (Fed. Cir. 1997). These claims are distinguishable by the remedies provided to an injured party.

A plaintiff's decision to continue a contract after a material breach and initiate an action for damages for partial breach is not "without consequences." PVI, Inc. v. Ratiopharm, 253 F.3d 320, 325 (8th Cir. 2001). This is because a "total breach justifies termination of the contract and damages for complete failure of performance," whereas a "partial breach does not." Lovink, 878 F.2d at 587; see Pinewood Realty Ltd. P'ship v. United States, 223 Ct. Cl. 98, 104, 617 F.2d 211, 215 (1980) ("[i]f the injured party ignores the breach, and continues to perform, it has waived its

right to terminate the contract, and has only retained its claim for damages for partial breach"); Hanson Bancorp, Inc. v. United States, 53 Fed. Cl. 92, 100 (2002) ("[a] breach by non-performance gives rise to a claim for damages for total breach only if it discharges the injured party's remaining duties to render such performance"). As the Court held in Cities Service Helix, Inc. v. United States, 211 Ct. Cl. 222, 543 F.2d 1306 (1976):

> A material breach does not automatically and *ipso facto* end a contract. It merely gives the injured party the right to end the agreement; the injured party can choose between canceling the contract and continuing it. If he decides to close the contract and so conducts himself, both parties are relieved of their further obligations and the injured party is entitled to damages to the end of the contract term (to put him in the position he would have occupied if the contract had been completed). If he elects instead to continue the contract, the obligations of both parties remain in force and the injured party may retain only a claim for damages for partial breach.

Id. at 234, 543 F.2d at 1313; accord Barron Bancshares, Inc. v. United States, 53 Fed. Cl. 310, 323 (2002) (emphasis added).

YA chose to make a partial breach of contract claim, as opposed to a total breach of contract claim. Further, this Court has already found a partial breach of contract in this case. Yankee Atomic Elec. Co. v. United States, 42 Fed. Cl. 223, 229, 236 (1998) (granting plaintiff's motion for summary judgment on Count I of plaintiff's complaint that DOE had committed "a partial breach of Article II of the Standard Contract"), aff'd sub nom. Maine Yankee Atomic Power Co. v. United States, 225 F.3d 1336 (Fed. Cir. 2000). When a partial breach of contract occurs, the non-breaching party is not only entitled to recover damages resulting from that partial breach from the breaching party, but is also entitled to continued performance of the partially breached contract. When a total breach of contract occurs, however, the contract is deemed to be

at an end, and, although the non-breaching party may recover damages for the total breach from the breaching party, neither party has any further obligations to continue performance under the totally breached contract. That distinction is extremely important here. If YA had wanted to pursue a claim for a total breach of contract, it certainly could have attempted to do so. However, had it pursued and prevailed upon such a theory, DOE would have had no further obligation to perform the Standard Contract or to accept YA's SNF and HLW, although DOE would potentially have been liable to YA in damages for its total breach. We presume that, because YA wants DOE to continue to perform the Standard Contract and wants to ensure that DOE will accept its nuclear waste, to preclude it from having to find an alternative means of long-term storage for that waste, YA consciously elected not to pursue a claim for total breach and limited its claim before this Court to one for a partial breach of contract.

Regardless of the rationale behind YA's election, YA may not now attempt to recover upon a claim for a partial breach, through which it can require DOE's continued performance under the Standard Contract, while at the same time asserting a permanent taking, which is based upon the theory that DOE will not accept YA's nuclear waste at any time in the future. The two legal theories are incongruous. YA's partial breach claim and damage model which, rely upon, and assume, DOE's future disposal of nuclear waste, App. p. 2, 11-12, 14-15, can reasonably only be joined with a temporary taking claim, which also relies upon, and assumes, DOE's future disposal of SNF and HLW. Therefore, YA's asserted "permanent" taking claim is actually a temporary taking claim.

## IV. BECAUSE IT WAS NOT THE GOVERNMENT'S DECISION TO STORE YA'S NUCLEAR WASTE IN DRY STORAGE, BUT INSTEAD IT WAS YA'S DECISION, THE GOVERNMENT DID NOT PHYSICALLY OCCUPY YA'S REAL PROPERTY

Yankee Atomic asserts that the Government "has decided to store, indefinitely and perhaps permanently, Yankee Atomic's spent nuclear fuel ("SNF") and Greater-Than-Class-C ("GTCC")[2] waste on about 12 acres of land owned by Yankee Atomic, in a permanent, fixed, dry storage structure, . . . [called] an Independent Spent Fuel Storage Installation ("ISFSI")." YA Opp. p. 3. In Yankee Atomic's 2003 discovery responses, the utility also identified HLW as being stored in its ISFSIs. App. p. 19. Essentially, YA argues that the Government has imposed a taking because YA has been forced to build "permanent, physical structure[s]" in the form of its ISFSIs. YA Opp. p. 7. However, the physical structure, as well as its alleged permanence in nature, was YA's choice and is not something that the partial breach of the Standard Contract required. Exhibit ("Ex.") A. p. 8 ¶¶ 170-172.

Yankee Atomic's decision to transfer its nuclear waste to a dry storage facility was a business decision made by YA. Ex. A p. 4-7 ¶¶ 135, 151, 152, 160-163. Yankee Atomic is in the process of decommissioning its facility. App. p. 3 ¶ 20. The manner in which YA has chosen to dismantle its nuclear power plant - electing the prompt decommissioning option also known as "DECON" - has prompted the utility to demolish its spent fuel pools. Ex. A p. 6 ¶¶ 158-159 and Ex. A p. 10-13. Once that election was made, other constraints, such as the availability of another facility for the disposal of the YA's low-level waste, had an effect upon the

[2] As the Court is aware from prior briefing regarding the Government's obligations to accept Greater-Than-Class-C ("GTCC") low-level radioactive waste, the Standard Contract does not provide for the acceptance of GTCC waste as part of DOE's nuclear waste disposal responsibilities.

desire to remove SNF from the spent fuel pool as well. Ex. A p. 15. Thus, even under YA's theory of the case, YA's business decision to dismantle/decommission the facility as rapidly after reactor shutdown as possible to achieve termination of the nuclear license, the DECON option, had as much to do with YA's decision to build ISFSIs as did DOE's plans to accept YA's nuclear waste. Other business considerations, such as YA's desire to place its waste in a transportable container, the public's interests in YA having a fuel storage contingency plan, and the public's safety concerns, also had, at the very least, an effect upon YA's desire to build ISFSIs. Ex. A p. 15, 18, 21-23, 26. Yankee Atomic's decision to build and store nuclear waste in the ISFSIs was, at the very least, based upon a myriad of business factors and considerations, and DOE's partial breach of the standard contract did not require that YA convert to dry storage.

Additionally, Yankee Atomic's contention that its ISFSIs are permanent structures seems disingenuous when YA is seeking as damages the costs of decommissioning its ISFSI after DOE accepts all of its SNF and HLW. Ex. A p. 9 ¶ 181. We are aware of no requirement that YA is required to maintain its ISFSIs after the nuclear waste has been removed. To the degree that YA has undertaken a permanent responsibility by building its ISFSIs, it was, as discussed above, a responsibility that the utility company chose. Further, regardless of the "permanence" of any ISFSI, YA owns the SNF that is on its property. It must continue to store it until DOE removes it pursuant to its Standard Contract obligations. Given that DOE does not own the SNF at issue and did not require construction of ISFSIs, YA's arguments about "permanence" are irrelevant

V. BECAUSE THE GOVERNMENT DOES NOT EXERCISE COMPLETE PHYSICAL CONTROL OVER YA'S REAL PROPERTY, YA CANNOT ESTABLISH A PERMANENT TAKING

To support its position, YA cites case law that YA asserts simply stands for the legal principle that a permanent taking does not mean Government intrusion must last forever, but actually means an indefinite period of occupation. YA Opp. p. 4-7. However, YA's analysis is cursory, and the cases that it cites are easily distinguishable from the facts here. The following are the cases that YA cites to support its argument.

In Tal'Wi-Wi Ranches v. United States, 156 Ct. Cl. 700 (1962), the Government's jet aircraft interfered with the plaintiff's use and enjoyment of its land, which constituted a permanent taking of an avigation easement over that area. The taking was permanent in nature because the Air Force base, from where the flights took off, was a permanent military airport expected to continue operating for the indefinite future. Tal'Wi-Wi Ranches, 156 Ct. Cl. at 706 ¶ 25. In that case, the Government physically invaded the plaintiff's airspace, pieces of the Government's aircraft physically fell onto the plaintiff's property, and the Government's actions (that is, continued use of the military airport) evidenced an intent permanently to occupy the plaintiff's land. Id. at 705-706. In those circumstances, the Court found a permanent taking and vested the Government "with a perpetual easement of flight for aircraft . . .." Id. at 707.

The Court of Claims' decision in Armijo v. United States, 229 Ct. Cl. 34, 663 F.2d 90 (1981), involved the Government's taking of property through a series of one-year leases of land within a missile range. The missile range was a permanent facility which, by its very nature, precluded use of the land for grazing by the plaintiff. Armijo, 663 F.2d at 92. The parties stipulated that there was no prospect that the range would not be used in the foreseeable future.

Id. at 93. Again, the Government physically precluded the plaintiff's property rights, and the Government's actions showed no intent/plan of closing the missile range. Id. The Court stated that a different case would exist "[w]here a leasehold interest is taken to serve a purpose that is or may be temporary." Id.

In Porter v. Resor, 415 F.2d 764 (10th Cir. 1969), the Army took a grazing permit provided to the decedent while he was alive. The decedent, however, decided to continue to use the land and the Army did not prevent him from doing so. Porter, 415 F.2d at 765. It was the decedent's intent indefinitely to use the land for grazing and the arrangement continued until his death. Id. The court held that "[t]his indefinite period was permanent in the sense that it was his alternative to asking for compensation for the 'permanent' taking or cancellation of a portion of his permit." Id. In that case, the fact that Government had the right to physical control over the land and completely cancelled a portion of decedent's grazing permit made the taking permanent in nature. Id.

In Skip Kirchdorfer, Inc. v. United States, 6 F.3d 1573 (Fed. Cir. 1993), the Navy seized a subcontractor's warehouse. The Court held that the taking was permanent because the Navy gained entry to the warehouse without permission, directed its contractor to control access to the warehouse, and, when the Navy no longer needed the facility, directed its contractor to dismantle and dispose of the warehouse. Skip Kirchdorfer, Inc., 6 F.3d at 1583. The Court concluded that the Government's actions constituted a permanent taking because of the Government's substantial physical interference with plaintiff's property rights. Id. at 1582. The Government's actions in this case permanently took away the subcontractor's property rights to the warehouse. Id. at 1582-83.

In Hendler v. United States, 952 F.2d 1364 (Fed. Cir. 1991), the Environmental Protection Agency ("EPA") trespassed upon plaintiffs' property and began the installation of a series of wells. The Court concluded that the taking was not temporary because "[n]othing in the Government's activities suggests that the wells were a momentary excursion shortly to be withdrawn, and thus little more than a trespass. Nor does . . . the Government's subsequent actions disclose any indication of a timetable for withdrawal." Hendler, 952 F.2d at 1376. Again, the Court concluded that the taking was permanent because the Government physically occupied the plaintiff's property and the Government's actions showed no indicia of being temporary.

In Boise Cascade Corporation v. United States, 296 F.3d 1339 (Fed. Cir. 2002), the U.S. Fish and Wildlife Service ("Service") briefly intruded upon the plaintiff's land to conduct owl surveys. The Court held that "[t]ransient, nonexclusive entries by the Service to conduct owl surveys . . . [did] not permanently usurp Boise's exclusive right to possess, use, and dispose of its property." Boise Cascade Corporation, 296 F.3d at 1355. The Court clarified the "permanent does not mean forever" language in Hendler cited by Yankee Atomic, YA Opp. p. 4. The Court stated that "it is clear that the court merely meant to focus attention on the *character* of the government intrusion necessary to find a permanent occupation, rather than solely focusing on temporal duration." Boise Cascade Corporation, 296 F.3d at 1356. Because the Government's intrusion did not involve the total occupation or control of plaintiff's property rights, the Court did not find a permanent taking. Id. at 1356-57.

The Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419 (1982), case involved cable installation, authorized by Government, upon appellant's building. The Court

held that the cable installation constituted a permanent taking because the installation included the direct physical attachment of plates, boxes, wires, bolts, and screws to the building. Loretto, 458 U.S. 438. The Court "affirm[ed] the traditional rule that a permanent physical occupation of property is a taking." Id. at 441.

In McKay v. United States, 199 F.3d 1376 (Fed. Cir. 1999), the plaintiffs claimed a taking resulting from the installation of multiple groundwater monitoring wells, by the Government, that extended into their mineral estate and remained there for several years. The Court agreed and held that the wells were not temporary in nature because the evidence submitted supported a lengthy physical occupation. McKay, 199 F.3d at 1381-82. Thus, this was another case where there was an actual physical occupation by the Government.

Finally, YA cites Goodwyn v. United States, 32 Fed. Cl. 409 (1994), in support of its permanent takings claim. In Goodwyn, the action of the U.S. Army Corps of Engineers ("Corps") in building a dike and the Government's determination not to permit any further development by the plaintiffs had the effect of taking plaintiffs' remaining property rights. Goodwyn, 32 Fed. Cl. at 417. "Under these circumstances, the Corps exercised complete, physical dominion over plaintiffs' property." Id. Thus, the Court held that the taking was permanent. Id. at 18.

In the cases above that YA cites in support of its permanent takings claim, the Government physically occupied or intruded upon the landowner's real property, the Government's actions indicated no intent of returning the property, and/or the Government exercised complete control over the plaintiff's property rights. The facts of this case are distinguishable because DOE has never physically occupied the plaintiff's property or usurped the

plaintiff's property rights, and, as evidenced by the Court's finding of a partial breach of contract, DOE is still obligated to accept YA's SNF and HLW and Yankee Atomic assumes, and relies upon the fact, that DOE will accept its nuclear waste at some point in the future. The Government has not "taken" or seized Yankee Atomic's land or facilities. Moreover, the Government has not intruded upon Yankee Atomic's real property by placing ISFSIs upon YA's land. Yankee Atomic is complaining that it is being required to store YA's nuclear waste. YA admitted in its response to our request for admission number 19 that the "spent fuel and high-level radioactive waste are by products of the generation of electricity at its nuclear power plant and that Yankee Atomic owns the spent fuel and high-level radioactive waste." Ex. A p. 2.

For the sake of argument, even if DOE had physically taken YA's property, it would not constitute a permanent taking because DOE does not totally control YA's property rights. As established at the beginning of this section, it was Yankee Atomic's decision to build the ISFSIs and store its waste in dry storage. It was not a decision that the defendant made or approved. DOE's delay in accepting YA's SNF and HLW has not been a "substantial physical interference" with YA's exercise of its real property rights. Moreover, the Government has not permanently occupied YA's property, in a temporal sense, because DOE plans to pick-up YA's nuclear waste and YA's partial contract breach claim is based upon YA's assumption, and reliance, that DOE will begin acceptance of the utility's SNF and HLW at some time in the future. App. 2, 11-15. Therefore, Yankee Atomic's claim of a permanent taking by the Government is without support.

## VI. THOMAS W. BENNET MAY NOT BASE HIS TESTIMONY REGARDING FMV UPON UNTRUSTWORTHY TAX ASSESSMENT DOCUMENTS

Yankee Atomic is correct that a property owner may, generally, offer testimony regarding the value of his property and is entitled to the privileges of a testifying expert. United States v. 10,031.98 Acres of Land, More or Less, Situate in Las Animas County, Colorado, 850 F.2d 634, 636 (10th Cir. 1988). However, Mr. Bennet, the individual who YA proposes to have testify, has never been identified as an expert witness, precluding expert testimony from him. Further, "[t]here must be a basis for the landowner's valuation, and when the landowner's own testimony shows that his valuation has no probative value," the Court may determine that the landowner's testimony is insufficient. Id. at 637. In 10,031.98 Acres of Land, the property owner used the offering price of replacement property as the basis for figuring the value of his own property. Id. "It has long been held in condemnation suits that the offering price of replacement properties cannot be used to show the fair market value of condemned land." Id. Therefore, it was proper for the court to conclude that the jury could not base its award on the property owner's testimony "because his own testimony indicated that he had calculated the value of his property in an unacceptable manner." Id. The court in Rich v. Eastman Kodak Company, 583 F.2d 435, 437 (8th Cir. 1978), also stated that "there must be a basis for the valuation." The court held that, because lost profits "could not have been established under Missouri law in this case, it is clear that a valuation based on them would not establish an issue for trial." Rich, 583 F.2d at 437.

Valuation for purposes of state taxation and valuation for purposes of determining a taking under the Fifth Amendment are not identical issues, and this Court is not bound by findings in a state tax assessment case. Florida Rock Industries, Inc. v. United States, 18 F.3d

1560, 1563 n.6 (Fed. Cir. 1994); Loveladies Harbor, Inc. v. United States, 21 Cl. Ct. 153, 157 n.6 (1990) ("The court would note that valuation for determining the scope of protection afforded by the fifth amendment is different from valuation for state taxation purposes. Each state expresses unique concerns by the way in which it chooses to value property for taxation; the inviolable mandate of the fifth amendment, however, does not permit such variety"), aff'd, 28 F.3d 1171 (Fed. Cir. 1994). The "value placed on the property in . . . [a] tax case should not be determinative of the fair market value for takings purposes." Id. Tax assessment documents are simply not a trustworthy measure of FMV. The Court stated in Loveladies Harbor, Inc. that "although defendant's expert witness testified that tax assessments are indicative of fair market value, he also testified that the assessments are only as good as the individual appraisers, not all of whom visit the property or reexamine the relevant data on a yearly basis." Loveladies Harbor, Inc., 21 Cl. Ct. at 157 n.6. Because the Court is unable to assess the efficacy of tax assessment documents, such evidence is "without any persuasiveness." See id. Therefore, assessed valuations for property taxes "are not admissible as evidence of fair market value in condemnation proceedings as they merely represent the opinion of the tax assessor who was not called as a witness." Miller v. United States, 223 Ct. Cl. 352, 620 F.2d 812, 817 (1980) (citation omitted).

Mr. Thomas W. Bennet may not base his testimony regarding FMV on the untrustworthy, unpersuasive, and inadmissible grounds of tax assessment documents, i.e. YA's proposed trial Exhibit 1729 and Exhibit 1745. App. p. 33-56. Moreover, it seems clear that a previous assessment of YA's property makes the point that such evidence is not reliable because the assessment was subject to negotiation and, therefore, was not the product of an impartial analysis

by the town. Ex. A p. 27 ("The Town of Rowe, through its Board of Assessors, has agreed to lower the assessed value of Yankee Atomic Electric Company's real and personal property for Fiscal Year 1993 . . . In accepting this new assessment, Yankee agrees to file no abatement of taxes for Fiscal 1993.") This Court simply can not trust YA's tax assessment documents, therefore, the Court should exclude YA's proposed trial exhibits related to its takings claim and any testimony based upon such documents.

## VII. YA'S TAX ASSESSMENT EVIDENCE IS INADMISSIBLE AS A PUBLIC RECORD BECAUSE IT IS UNTRUSTWORTHY

Yankee Atomic asserts that "YA's tax records evidence is admissible pursuant to the public records exception to the hearsay rule, F.R.E. 803(8)." YA Opp. p. 11. Such documents are generally admissible in state taxation cases. However, as argued above, tax assessment records are not a reliable source of evidence for determining FMV under a takings claim. The source of information for the public record must be trustworthy. Graef v. Chemical Leaman Corporation, 106 F.3d 112, 118 (5th Cir. 1997). It is the duty of this Court "to make a threshold trustworthiness finding." In re Korean Air Lines Disaster of September 1, 1983, 932 F.2d 1475, 1483 (D.C. Cir. 1991). Furthermore, it is the trial judge's obligation to exclude an entire report that he determines is unreliable. Beech Aircraft v. Rainey, 488 U.S. 153, 167 (1988). Therefore, because tax assessment documents are an untrustworthy measure of FMV, this Court should not admit YA's proposed trial Exhibits 1729 and 1745.

Yankee Atomic also argues that YA's tax evidence is self-authenticating pursuant to F.R.E. 902(1) and (2). YA Opp. p. 13. However, as stated in our initial motion, a document must be under seal and properly certified to be self-authenticating under 902(1). United States v.

Ventura-Melendez, 275 F.3d 9, 14 (1st Cir. 2001) (pursuant to 902(1) the seal of any executing officer or custodian will generally suffice along with a signature purporting to be an attestation); United States v. Mateo-Mendez, 215 F.3d 1039, 1043 (9th Cir. 2000) (under the plain meaning of 902(1) a document may not be excluded for lack of authentication if it is under seal and bears a certified signature); Hughes v. United States, 953 F.2d 531, 540 (9th Cir. 1991) ("The [IRS] Forms are admissible as self-authenticating domestic public documents under F.R.E. 902(1) because they were certified under seal."). F.R.E. 902(2) addresses the admissibility of a public document not under seal and requires that "a public officer having a seal and having official duties in the political subdivision in question must certify under seal the official capacity and genuineness of the signature of the signer of the document." Leifheit v. Leifheit, 53 B.R. 271, 274 (Bankr. S.D. Ohio 1985). YA's proposed trial exhibits do not bear a seal, or a certified signature, and neither document is accompanied by another document under seal certifying the official capacity and genuineness of the signature of the signer of the exhibits. App. p. 33-56. Although proposed trial Exhibit 1729 bears the initials of some unidentified individual, neither exhibit even bears an un-certified signature. Id. Because proposed trial Exhibits 1729 and 1745 do not meet the requirements of Rule 902(1) and 902(2), the Court should exclude both exhibits from trial.

## VIII. YA'S TAX ASSESSMENT EVIDENCE IS INADMISSIBLE AS A BUSINESS RECORD BECAUSE IT IS UNTRUSTWORTHY

Finally, YA argues that the tax assessment documents are admissible pursuant to the business records exception, F.R.E. 803(6). YA Opp. p. 14. YA is correct that a document prepared by a third party may be admitted as part of the business entity's records if the test

announced in Air Land Forwarders, Inc. v. United States, 172 F.3d 1338 (Fed Cir. 1999), for the business records exception is satisfied. One of the factors is an "indicia of trustworthiness." Air Land Forwarders, 172 F.3d at 1342. YA cannot establish that factor. As established above, tax assessment records are not a reliable source of evidence for determining FMV under a takings claim. Valuation for determining the scope of protection afforded by the Fifth Amendment is different from valuation for state taxation purposes because "[e]ach state expresses unique concerns by the way in which it chooses to value property for taxation; the inviolable mandate of the fifth amendment, however, does not permit such variety." Loveladies Harbor, 21 Cl. Ct. at 157 n.6. Furthermore, assessments are only as good as the individual appraisers, who may not visit the property or reexamine the relevant data on an annual basis and who are not testifying at trial. Id. Moreover, it seems evident that a previous assessment of YA's property was subject to negotiation and was not the product of an impartial analysis. Ex. A p. 27. Therefore, because tax assessment documents are an untrustworthy measure of FMV, this Court should exclude YA's proposed trial Exhibits 1729 and 1745.

## CONCLUSION

For the foregoing reasons, we respectfully request that the Court grant our motion *in limine* and exclude all evidence related to Yankee Atomic's takings claims.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

s/ David M. Cohen
DAVID M. COHEN
Director

s/ Harold D. Lester, Jr.
HAROLD D. LESTER, JR.
Assistant Director
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street, N.W.
Attn: Classification Unit,
8th Floor
Washington, D.C. 20530
Tel: (202) 305-7562
Fax: (202) 307-2503

OF COUNSEL:

ELIZABETH THOMAS
Commercial Litigation Branch
Civil Division
Department of Justice
Washington, D.C. 20530

JANE K. TAYLOR
Office of General Counsel
Department of Energy
1000 Independence Avenue, S.W.
Washington, D.C. 20582

May 12, 2004

Attorneys for Defendant

CERTIFICATE OF FILING

I hereby certify that on this 12th day of May 2004, a copy of foregoing ""DEFENDANT'S REPLY TO YANKEE ATOMIC'S OPPOSITION TO DEFENDANT'S MOTION *IN LIMINE* REGARDING TAKINGS DAMAGES" was filed electronically. The appendix to this reply brief, which contains protected material, is being filed with the Court under seal. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/Harold D. Lester, Jr.