IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| YANKEE ATOMIC ELECTRIC COMPANY,<br>Plaintiff,<br>v.<br>UNITED STATES OF AMERICA,<br>Defendant. | No. 98-126 C<br>(Senior Judge Merow)<br><br>Filed Electronically May 28, 2004 |

APPENDIX TO
YANKEE ATOMIC'S MOTION *IN LIMINE* TO PRECLUDE EVIDENCE
CONCERNING FOUR GOVERNMENT DAMAGES "SCENARIOS" THAT
(1) HAVE NO RELEVANCE TO YANKEE ATOMIC'S DAMAGES CLAIM, AND
(2) HAVE NO BASIS IN THE GOVERNMENT'S PROPOSED FINDINGS
IN ITS PRETRIAL SUBMISSIONS

JERRY STOUCK
Spriggs & Hollingsworth
1350 I Street, N.W., Ninth Floor
Washington, D.C. 20005
(202) 898-5800
(202) 682-1639 - Fax

Counsel for Plaintiff,
YANKEE ATOMIC ELECTRIC COMPANY

Of Counsel:

Robert Shapiro
SPRIGGS & HOLLINGSWORTH

May 28, 2004

## INDEX TO APPENDIX

**Description** **Page**

Transcript of Hearing on May 4, 1999 [Excerpts] ........ 1

Deposition of Edward Abbott (May 10, 2004) [Excerpts] ........ 5

Analysis of the Total System Life Cycle Cost of the Civilian Radioactive Waste Management Program, December 1998 [Excerpts] ........ 15

# EXHIBIT 1

# UNITED STATES
# COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| YANKEE ATOMIC ELECTRIC COMPANY,<br>CONNECTICUT YANKEE ATOMIC POWER COMPANY,<br>MAINE ATOMIC POWER COMPANY, | ) | |
| Plaintiffs, | ) | |
| v. | ) | No.: 98-126C<br>98-154C<br>98-474C |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

Pages: 1 through 124

Place: Washington, D.C.

Date: May 4, 1999

**HERITAGE REPORTING CORPORATION**
*Official Reporters*
1220 L Street, N.W., Suite 600
Washington, D.C. 20005
(202) 628-4888

kind of a concept. It is a little bit difficult though, as I say, in our present circumstance of having this open options about how we're going to proceed.

The current submission date -- let just, as I say, try to -- I will try to wrap up here. The current submission date is May 17.

THE COURT: You probably have to index that, some index too if you go that route.

MR. STOUCK: Yes, yes. Well, what we -- where we currently are -- and again, we're pretty close, frankly, to being done, at least with the analysis -- or with the analysis is that for all three cases, which has been a substantial task, is not a per diem for the reason that I mentioned. But I think it should not be. We've talked about the per diem concept. It should not be difficult once the future -- the immediate future, the imminent future, becomes a little more definite. It seems to me not a difficult task to translate that into an annual number.

Submissions are currently due May 17.

THE COURT: As you see, I'm trying to avoid having a trial on when they are going to actually pick it up.

MR. STOUCK: Well, we have informally broached the subject with the government of a stipulation on that, Your Honor. I don't think that the Plaintiffs are the only ones, the Plaintiffs in Court, are the only ones who perceive that

REPORTER'S CERTIFICATE

DOCKET NO.: 98-126C, 98-154C and 98-474C

CASE TITLE: Yankee Atomic Electric Company

HEARING DATE: May 4, 1999

LOCATION: Washington, DC

I hereby certify that the proceedings and evidence are contained fully and accurately on the tapes and notes reported by me at the hearing in the above case before the United States Court of Federal Claims.

Date: May 4, 1999

Sharon Bellamy

Official Reporter

Heritage Reporting Corporation

Suite 600

1220 L Street, N. W.

Washington, D. C. 20005

# EXHIBIT 2

In the United States Court of Federal Claims

---------------------------------x

Yankee Atomic Electric :
Company :
: NO. 98-126C
v. :
:
United States of America :
---------------------------------x

May 10, 2004

DEPOSITION OF:

Edward C. Abbott

a witness, called by counsel pursuant to notice, commencing at 9:30 a.m., which was taken at Spriggs and Hollingsworth, 1350 Eye St., NW, Washington, DC

A. I don't believe so.

Q. Now, you told me earlier that the Department of Justice developed the five scenarios, is that right?

A. That's correct. That's what we were asked to evaluate.

Q. Scenario four is the actual damages claim of each of my three clients, right?

A. Yes.

Q. Presumably the Department of Justice didn't develop that -- I mean, they identified it as a scenario but the information in the scenario came from my client's claims, right?

A. Yes.

Q. The other four scenarios the Department of Justice developed and said to you evaluate these?

MR. CRAWFORD: Objection.

A. We were asked to look at scenarios that involved different storage methods, wet or dry, different acceptance rates and then, given that, we developed the tables that are in the report.

Q. The assumptions for each of the four scenarios other than scenario four, who developed those assumptions?

MR. CRAWFORD: Objection, overbroad and vague.

A. Well, if you're talking about the assumptions on the pickup dates and rates, that data was given to us by -- we were told to look at those scenarios -- those -- using the 1998, 2010 pickup dates --

MR. STOUCK: Excuse me.

(Pause)

Q. Can you answer that question now?

MR. CRAWFORD: Objection, vague.

A. Since that's a little garbled, let's start over.

The Department of Justice -- again, aside from scenario four which is the Yankees' claim, we were asked there to evaluate that claim, scenarios 1, 2, 3, 5 are scenarios that we were asked to develop given the assumptions of a pickup date and a

rate.
Q. And --
A. For each of the -- that's what we developed.
Q. You were given the pickup dates and the rates -- you were given the start dates and the rates by the Department of Justice?
A. The start dates, yes. The pickup information, the allocations as it were for each plant were given to us by the Department of Justice.
Q. Do you know where those allocations came from?
A. I don't, no.
Q. Were they given to you in spreadsheet form?
A. Yes, they were.
Q. Have we been provided those?
A. Yes, you have.
Q. I take it -- let's start with scenario by scenario.
Scenario one then, just so I understand

this, you don't have any opinion on whether in the non-breach world DOE would have or should have been picking up fuel at the rates that are assumed for scenario one here, is that right?

A. That's correct.

Q. You're not going to be offering an opinion about that?

A. I will not be offering an opinion about rates.

Q. At all in any scenario?

A. That's correct.

Q. Or about the date that DOE is going to start picking up in the breach world?

A. That is also correct.

Q. Do you know who is going to be giving opinions about that?

A. I have no idea.

Q. Do you know whether the assumptions in scenario one about rates in the non-breach world are reasonable?

MR. CRAWFORD: Objection to the lack

of foundation.

A. I don't know if they are reasonable or unreasonable.

Q. The same for the breach world assumptions in scenario one?

A. That's correct.

Q. Would you say that you don't know whether any of the assumptions about rates in any of the scenarios are reasonable or not?

A. That's correct.

Q. I take it then you would not have any opinion about which scenario among the five is the most reasonable, relatively speaking?

MR. CRAWFORD: Objection to the vagueness of that.

A. That's sort of an odd question in a way.

Q. Do you have an opinion about which of these five scenarios is the most reasonable among the five, relatively speaking?

MR. CRAWFORD: Objection.

A. Of course, the 1998 scenario didn't happen

so obviously they aren't part -- they won't happen, those scenarios. They didn't start picking up in 1998. 2010, I'm not offering an opinion on the 2010.

Q. I'm talking about the scenarios overall. I'm not talking about -- maybe we're not communicating here.

There are five scenarios.

A. There are five scenarios and each scenario is a breach and non-breach case.

Q. Can you say which of these scenarios -- and maybe this is the missing link -- can you say which of these scenarios is the most reasonable scenario to evaluate for purposes of determining damages in the Connecticut Yankee case?

MR. CRAWFORD: Objection to the vagueness.

A. No.

Q. You don't have an opinion about that?

A. No.

Q. Do you have an opinion whether any of

these five scenarios are reasonable scenarios to use in evaluating Connecticut Yankee's damages?

MR. CRAWFORD: Objection to the vagueness.

A. No.

Q. Would you give the same answers for Yankee Atomic and Maine Yankee?

MR. CRAWFORD: Same objection.

A. I would give a no answer to Connecticut Yankee and Maine Yankee.

Q. What about Yankee Atomic? Do you have an opinion whether any of these five scenarios are reasonable for purposes of determining Yankee Atomic's damages?

MR. CRAWFORD: Objection, same objection.

A. No.

Q. Do you have any opinion about whether any of these five scenarios are reasonable for purposes of determining Maine Yankee's damages?

MR. CRAWFORD: Same objection.

A. No.

Q. Let's stick with Connecticut Yankee. We will be looking at the other reports, but for convenience initially, let's look at this.

(Pause)

Q. I take it you agree with everything that's stated in exhibit two.

A. Yes.

Q. You agree with everything that's stated in exhibit one?

A. Yes.

Q. You agree with everything that's stated in exhibit three?

A. Yes.

Q. Do you know why -- you refer in here to the Zion plant. Is that right?

A. Yes.

Q. Do you know why the Zion plant is storing fuel in -- well, do you know whether the Zion plant is storing spent fuel in its pool for an indefinite period?

# EXHIBIT 3

DOE/RW-0510



# Analysis of the Total System Life Cycle Cost of the Civilian Radioactive Waste Management Program

December 1998

U.S. Department of Energy
Office of Civilian Radioactive Waste Management
Washington, D.C. 20585

**This publication was produced by the U.S. Department of Energy's Office of Civilian Radioactive Waste Management**

**For further information, contact:**

**Office of Civilian Radioactive Waste Management National Information Center**
**600 Maryland Ave., S.W., Suite 695**
**Washington, DC 20024**

**or call:**

**1-800-225-NWPA (6972)**
**Washington, DC: 202-488-6720**

**or visit:**

**http:\\www.rw.doe.gov**

of emplacement. All structures will be designed so as not to preclude a future decision to extend retrievability beyond a 100-year period should future decision-makers choose to obtain additional repository performance data. Additional cost would be incurred to keep it open longer.

It is assumed that a repository draft environmental impact statement is completed for the Yucca Mountain site during 1999, the final environmental impact statement is completed in 2000, and a technical site suitability evaluation is completed in 2001. The current repository design uses an areal mass loading of waste, which is an average amount of uranium in a given area to maintain temperatures within established limits, of approximately 85 MTHM/acre. For purposes of this estimate, it is assumed that the repository will be granted a high thermal-loading license prior to emplacement operations. Variation from these milestone events and assumptions would impact the costs. Emplacement rates at the repository were assumed to be the same as the rate at which the repository receives waste. These rates are shown in Tables 3, 4, and 5.

The VA cost estimate is a subset of the TSLCC. There are three key differences between the TSLCC assumptions and the VA cost assumptions. The first difference is that the TSLCC addresses the costs for management and disposal of more wastes than the VA. The VA, Volume 5, provides an estimate of disposal costs for only 70,000 MTHM of waste, including 63,000 MTHM of commercial SNF, 2,333 MTHM of DOE SNF, and 8,326 canisters of HLW. The TSLCC includes an additional 23,317 MTHM of commercial SNF, an additional 237 MTHM of DOE SNF, and 11,678 additional canisters of HLW. The second difference is the inclusion of all waste acceptance and transportation costs for bringing the waste to the repository, program integration costs, and Institutional costs. The last difference is the inclusion of all costs from program inception in 1983 to License Application (LA) in 2002. Figure C-1 in Appendix C illustrates the relationship of total system costs to the LA plan and VA repository costs, on an annual basis.

## 1.6 WASTE ACCEPTANCE AND TRANSPORTATION ASSUMPTIONS

As a basis for planning, OCRWM uses the no-new-orders, end of reactor life case, referenced in the *WAST Cost Estimate Assumptions Document* (CRWMS M&O 1998d). For commercial SNF, this case does not assume additional early reactor shutdowns or service life extensions that would reduce or increase projected quantities of SNF, respectively. Commercial SNF, DOE SNF, and HLW pickup is assumed to begin in 2010. Initial acceptance rates for DOE SNF and HLW are assumed to be low until 2015. Commercial fuel pickup allocation assumes fuel is picked up from the sites with the oldest fuel first, in accordance with the Annual Capacity Report (ACR) (DOE 1995a) and agreements with the utilities. Table 3 shows the acceptance rate for commercial SNF by MTHM per year.

All commercial SNF is stored at utility sites prior to being transported to the Monitored Geologic Repository (MGR). Storage costs at utility sites are not included in this TSLCC analysis. The cost of mixed oxide SNF transportation casks and transportation from utility sites to the MGR is included in this TSLCC analysis as part of the commercial allocation. MOX SNF is assumed to be transported in a commercial 21-PWR uncanistered fuel cask containing only 9 assemblies.

**The following number is for**
**Office of Civilian Radioactive Waste Management**
**Records Management purposes only and should not be**
**used when ordering this publication.**

**Accession No. HQO•19980901.0001**