Connecticut Yankee Atomic Power Company v. United States of America
Maine Yankee Atomic Power Company v. United States of America
Yankee Atomic Power Company v. United States of America

# Summary of Opinion

Prepared by
Kenneth W. Blair, P.E.

February 18, 2004

Navigant Consulting, Inc.
10,000 Midlantic Drive
Mt. Laurel, New Jersey 08054

# TABLE OF CONTENTS


I. Statement of Purpose

II. Qualifications

III. Documents

IV. Our Understanding

  A. Connecticut Yankee

  B. Maine Yankee

  C. Yankee Atomic

V. Summary of Opinions

  A. Connecticut Yankee

  B. Maine Yankee

  C. Yankee Atomic

Appendices

  1. Curriculum Vitae

  2. Documents Considered

  3. Documents Not Yet Provided by the Plaintiffs

## I. Statement of Purpose

Navigant Consulting, Inc. ("NCI") was engaged by the Department of Justice to provide an independent assessment of schedule delays experienced by each of the Plaintiffs (Connecticut Yankee Atomic Power Company("CY"), Maine Yankee Atomic Power Company ("MY") and Yankee Atomic Power Company ("YA")) during the design and construction of the Independent Spent Fuel Storage Installation ("ISFSI"). In preparing its analysis, NCI utilized Critical Path Methodology to establish the as-built critical path, to quantify progress achieved and delay incurred, and to determine the causes of critical delays. This analysis addresses the time period and delays associated with the completion of fuel transfer as identified by the Plaintiffs' Stipulations of Facts dated June 30, 1999, July 13, 1999 and March 28, 2003.

## II. Qualifications

NCI is a specialized independent consulting firm providing litigation, financial, restructuring, strategic and operational consulting services to government agencies, legal counsel and large companies facing the challenges of uncertainty, risk, distress and significant change. I, Kenneth W. Blair, P.E., am a Principal with NCI and have developed and reviewed numerous claims for schedule delay and disruption on construction-related contracts. The opinions expressed in this report are based upon my education, training, knowledge, experience and expertise in assessing delay, as well as

an analysis of the relevant information that has been made available to me and the professional staff working at my direction as of the date of this report. A copy of my curriculum vitae is included in Appendix 1.

## III. Documents

In forming my opinion, I examined contemporaneous project records and publicly available information as well as reports, pre-trial submissions and transcripts generated during the course of the discovery process. The documents relied upon in developing the conclusions herein are contained in the Exhibit List submitted by the Department of Justice. Additional information considered in developing the conclusions is included in Appendix 2. I have also identified and requested information that I understand exists, but has not yet been provided by the Plaintiffs. Such information is included in Appendix 3. If this or other additional information becomes available to me, I reserve the right to revise this report and the opinions stated herein, as necessary.

## IV. Our Understanding

### A. Connecticut Yankee

1. CY's Proposed Stipulation of Fact No. 136 dated July 13, 1999 indicates that fuel transfer to the ISFSI would be completed in February 2003.

2. CY's Proposed Stipulation of Fact No. 206 dated March 28, 2003 indicates that fuel transfer to the ISFSI would be completed in December 2003.
3. Bechtel Power Corporation ("Bechtel") entered into a firm fixed price contract with CY on April 3, 1999 to provide decommissioning services, including the design and construction of the ISFSI. Work commenced shortly thereafter.
4. In accordance with the contract, Bechtel issued a planned schedule on June 19, 1999 with a data date (or status date) of April 30, 1999. This planned schedule indicates that fuel transfer to the ISFSI would be completed on February 5, 2003, consistent with CY's Stipulation of Facts dated July 13, 1999. Bechtel issued subsequent weekly and/or monthly updates to this schedule periodically throughout its tenure on the project.
5. The last project schedule update provided during the time period of the schedule analysis has a data date of May 6, 2002. This schedule indicates that fuel transfer to the ISFSI would be completed on December 28, 2003, consistent with CY's Stipulation of Facts dated March 28, 2003.
6. The planned submittal date of the Safety Analysis Report ("SAR") Storage Amendment to the Nuclear Regulatory Commission ("NRC") was November 1, 1999.
7. The actual submittal date of the SAR Storage Amendment to the NRC was May 19, 2000.

8. The planned approval date of the SAR Storage Amendment was December 21, 2000.

9. The actual approval date of the SAR Storage Amendment was November 28, 2001.

10. The planned date for obtaining a Certificate of Compliance was September 5, 2001.

11. The actual date for obtaining a Certificate of Compliance was May 29, 2002.

12. CY issued a written directive to Bechtel on December 14, 2000 postponing construction work for the ISFSI facility and haul road until further notice.

13. CY withdrew its postponement to Bechtel's mobilization for ISFSI civil work on February 19, 2002.

14. Bechtel commenced construction efforts at the ISFSI on March 18, 2002.

15. On March 27, 2002, Bechtel submitted a "Proposal for Time Extensions and Impact Costs – ISFSI" related to CY's direction to postpone work at the ISFSI from December 14, 2000 through February 19, 2002. Bechtel requested reimbursement from CY in the amount of $11,654,884 as well as time extensions of 383 days to Contract Milestones 21.24, 21.26 and 21.27, and a time extension of 461 days to Contract Milestone 21.23.

16. CY and Bechtel agreed to an "ISFSI Claim Settlement" in the amount of $2,510,000 for damages claimed by Bechtel and its subcontractors resulting from

the delayed start of Bechtel's work at the ISFSI. This settlement is set forth in Agreed Change Order 02-15, effective date September 3, 2002.

17. Shortly after Bechtel's commencement of construction on March 18, 2002, the ISFSI civil work was again postponed due to archeological and wetlands issues.

18. A Letter to Proceed was issued on July 9, 2002 that allowed Bechtel's work at the ISFSI haul road, pad and monitoring station to proceed.

**B. Maine Yankee**

1. Stone & Webster Engineering Corporation ("SWEC") entered into a firm fixed price contract with MY effective August 31, 1998 to provide decommissioning services, including the design and construction of the ISFSI. Work commenced shortly thereafter.

2. The contract provided for a schedule to complete fuel transfer and all other items necessary to eliminate the operation of the spent fuel pool by August 20, 2002.

3. NAC International ("NAC") entered into a firm fixed price subcontract with SWEC effective November 30, 1998 to provide the engineering, licensing, fabrication and supply of casks, canisters and ancillary equipment for the spent fuel storage and transfer system.

4. In accordance with its contract with MY, SWEC issued a planned schedule on April 6, 1999 that indicated a completion of fuel transfer by August 13, 2002.

5. MY's Proposed Stipulation of Fact No. 186 dated June 30, 1999 indicates that fuel transfer to the ISFSI would be completed in August 2002.
6. On November 18, 1999, MY issued a formal notice of default to SWEC and demanded that SWEC take immediate action to remedy the deficiencies in its performance.
7. On May 4, 2000, MY issued a notice to SWEC stating that it was terminating the decommissioning contract based upon SWEC's insolvency and because SWEC had not adequately performed under the contract.
8. Following SWEC's termination, MY re-negotiated SWEC's subcontract with NAC and subsequently issued a change order to NAC on January 11, 2001 which added the fuel transfer to its scope of work.
9. The planned delivery of the first canister was December 15, 2000.
10. The actual delivery of the first canister occurred on April 3, 2001.
11. The planned start of fuel transfer was April 13, 2001.
12. The actual start of fuel transfer was August 12, 2002.
13. MY terminated NAC's contract effective January 15, 2003.
14. MY's Proposed Stipulation of Fact No. 186 dated March 28, 2003 indicates that fuel transfer to the ISFSI would be completed in December 2003.

## C. Yankee Atomic

1. NAC entered into a Hardware Contract with YA effective May 29, 1996.
2. NAC entered into a Fuel Transfer Contract with YA effective November 27, 2000.
3. The planned delivery of the first canister was April 14, 1998.
4. The actual delivery of the first canister occurred in the last week of December 2000.
5. The planned start of fuel transfer was June 21, 2001.
6. The actual start of fuel transfer was May 30, 2002.
7. The planned completion of fuel transfer was March 9, 2002.
8. The actual completion of fuel transfer was June 25, 2003.

# V. Summary of Opinions

## A. Connecticut Yankee

1. Bechtel's planned schedule with a data date of April 30, 1999 has been represented as the as-planned schedule. The schedule indicates that Bechtel's plan for the ISFSI was consistent with the milestones outlined in its contract with CY.
2. Bechtel's schedule update with a data date of May 6, 2002 includes the as-built and projected schedule information for the ISFSI for the time period consistent

with CY's Stipulation of Facts dated March 28, 2003. The schedule indicates that the projected completion of fuel transfer is December 28, 2003.

3. The as-built critical path has been established based, in part, on the information contained in the May 6, 2002 schedule. The amount of critical delay incurred between Bechtel's contract award on April 3, 1999 and May 6, 2002 has been determined.

4. Overall delay is measured by comparing the actual completion of critical path activities with the corresponding planned dates for such activities. There is an 11-month delay to the planned completion of fuel transfer as of May 6, 2002 as identified in Bechtel's project schedule. This delay is the result of CY's direction to postpone construction work at the ISFSI, and is not related to the actions or inactions of the Department of Energy ("DOE").

5. Agreed Change Order 02-15 represents settlement of damages claimed by Bechtel related to CY's direction to postpone work at the ISFSI from December 14, 2000 through February 19, 2002, and is not related to the actions or inactions of the DOE.

**B. Maine Yankee**

1. SWEC's schedule of April 6, 1999 has been represented as the as-planned schedule. The schedule indicates that SWEC's plan was consistent with the completion milestone outlined in its contract with MY.
2. MY provided a schedule with a data date of July 17, 2003 that reflected the as-built activities completed up until that time and projected the remaining fuel transfer activities would complete on March 6, 2004, three (3) months later than the December 2003 projection in MY's Stipulation of Facts dated March 28, 2003.
3. The as-built critical path has been established based, in part, on the information contained in the July 17, 2003 schedule. The amount of critical delay incurred between SWEC's contract award on August 31, 1998 and July 17, 2003 has been determined.
4. Overall delay is measured by comparing the actual completion of critical path activities with the corresponding planned dates for such activities. There is a 16-month delay to the planned completion of fuel transfer as identified in MY's Stipulation of Facts dated March 28, 2003. This delay is the result of SWEC's performance and ultimate termination as well as NAC's performance and ultimate termination, and is not related to the actions or inactions of the DOE.

## C. Yankee Atomic

1. Unlike CY and MY, there was no overall decommissioning contractor that was responsible for coordinating all of the decommissioning activities including activities related to the transfer of fuel to the ISFSI. Instead, two separate contracts were issued to NAC related to the equipment needed for fuel transfer and the actual transfer of fuel to the ISFSI. The first is known as the Hardware Contract and the second is the Fuel Transfer Operations Contract, or FTOC. The contract milestones outlined in these contracts were utilized as the baseline in the review of activities leading to and actually transferring fuel to the ISFSI.
2. As there was no comprehensive project schedule, a detailed as-built schedule was generated utilizing contemporaneous documents including, but not limited to, correspondence, weekly fabrication logs, monthly project reports, transmittals, submittals, invoices, amendments to the Contracts, and Certificates of Compliance.
3. The critical path of the as-built schedule has been determined as well as the amount of critical delay incurred between May 29, 1996, the award date of NAC's Hardware Contract, and June 25, 2003, the completion of fuel transfer.
4. Eleven months of critical path delay to the completion of fuel transfer is the result of contractor delays to the fuel transfer preparation activities, and is not related to the actions or inactions of the DOE.

1

## Appendix 1 – Curriculum Vitae

Kenneth W. Blair, P.E.

My qualifications as an expert in scheduling are based upon my work experience in the engineering, construction, and government contract industries for over thirty years. I am currently a Principal at Navigant Consulting, Inc. ("NCI") where I consult on a wide variety of matters.

I have Bachelor of Science and Master of Science degrees in civil engineering from Rutgers University. The degrees were awarded in 1969 and 1971, respectively. I am a licensed Professional Engineer in the states of New Jersey, Pennsylvania, and Maryland. I served as a commissioned officer in the United States Army Reserve Corps of Engineers from 1969 through 1977.

My career began in 1969 as a Structural Engineer Associate with a structural engineering consulting firm in New Jersey. In this capacity, I was responsible for the structural design, specification preparation and field inspection of many types of concrete, steel, and timber structures. I also evaluated existing structures for safety, alternate uses, and code compliance. My work involved coordination with clients and governmental/ regulatory agencies, as well as architects, engineers, contractors and owners.

After leaving the structural engineering consulting firm, I joined the Technical Services Division of the New Jersey Housing Finance Agency. The Housing Finance Agency was responsible for design, construction, financing, and management of low-rise, mid-rise, and high-rise housing throughout the State of New Jersey. I served as Senior Structural Engineer and, subsequently, as Manager of Engineering and Construction. In the latter position, I had responsibility for the engineering department, coordination with architectural teams and other consultants, geotechnical investigations of sites,