In the United States Court of Federal Claims

--------------------------------x

Yankee Atomic Electric :
Company :
: NO. 98-126C
v. :
:
United States of America :
--------------------------------x

May 3, 2004

DEPOSITION OF:

Kenneth W. Blair,

a witness, called by counsel pursuant to notice, commencing at 9:30 a.m., which was taken at Spriggs and Hollingsworth, 1350 Eye St., NW, Washington, DC

from Judge Merow to have a report done by the middle of February. We complied with that requirement.

Those are the kinds of communication I would get from staff relative to what it is the Department of Justice was interested in.

MR. SHAPIRO: Mark this as exhibit one.

(Whereupon the proffered item was marked as exhibit number 1.)

Q. Mr. Blair, you've been handed what we've marked as exhibit one to your deposition.

Do you recognize this document?

A. Yes, I do.

Q. What is it?

A. It's the summary of my opinion that was prepared, signed on February 18, 2004 relative to delay issues on the three atomic power plants.

Q. Did you prepare this summary of opinion yourself?

A. The staff and I drafted this document.

Q. What was your role in drafting this

document, exhibit one?

A. The process took place, the actual drafting of the document took place during the month of January.

I was involved with Frank Caputo, Kelly Heuer and we would look at the results of our work papers, the analysis, and we put together the document that's before you.

Q. Who was responsible for actually drafting the prose in exhibit one?

A. I have overall responsibility for the report.

Q. My question is who wrote it?

A. Who wrote it? Kelly Heuer and I.

Q. Did Kelly Heuer have the major role in actually writing the words that we see in exhibit one?

MR. SHULTIS: Objection, characterization of major role.

A. She typed it because she can type but she and I went back and forth on the draft of this

document and she and I -- we co-authored it as far as I'm concerned.

Q. You are saying Ms. Heuer typed it. Did you provide her with a longhand handwritten document that she typed?

A. It evolved over time. It evolved over a period of a couple of weeks.

Q. That's not my question. My question is did you provide Ms. Heuer a handwritten document that she simply typed up that became exhibit one?

A. No.

Q. Was there any part of exhibit one that you actually wrote the words of yourself?

A. The wording in here was in many cases my language. What percentage of it I originally authored so that she typed it, I can't say, but we passed the draft several times and I would write things down, she would type them, she would offer some statements and so forth and we would do it together.

MR. SHULTIS: I'd like it noted for

the record that we provided you with the draft of the report.

MR. SHAPIRO: We'll get to that. Thank you.

Q. Maybe it would help, Mr. Blair, if you could describe the process for me a little bit more. When it came time to actually draft the report, what did you do?

A. At that point in time we had the work papers, we had the number of months of delay, causation and so forth and we put into writing within the time constraint that we had the results of that analysis that was set forth in our work papers, and Ms. Heuer and I drafted the report.

Q. You and Ms. Heuer discussed the findings and then Ms. Heuer went off and typed up the first draft?

A. I don't recall. She may very well have done that. She did the typing so she obviously typed it, yes.

Q. Did you provide her with a written outline

that she used to type up the report?

A. I drafted parts of it. I don't recall what percentage I provided to her. I don't recall giving her an outline.

The format of the report she and I discussed at length. That outline format was discussed, as I understand, with counsel and we finished the report.

Q. You said that you drafted portions of exhibit one. What portions did you yourself draft?

A. I don't recall.

MR. SHULTIS: Objection, asked and answered.

Q. Do you recall what percentage of exhibit one that you yourself drafted?

MR. SHULTIS: Objection, asked and answered.

A. I don't recall what percentage I drafted, no.

Q. If you don't type, in what format did you provide Ms. Heuer, who was doing the typing, with the parts of exhibit one that you did draft?

A. One, I do type. A marked up copy of the draft and faxed it to her, perhaps. I just don't recall how she got it.

She came to Mount Laurel occasionally. I went to New York occasionally.

Q. How many times did you mark up drafts of the report and communicates comments to Ms. Heuer?

A. I don't recall.

Q. Was it more than five?

MR. SHULTIS: Objection, asked and answered.

A. Probably.

Q. More than ten?

MR. SHULTIS: Same objection.

A. I don't know. Somewhere between five and -- I don't know. I just don't recall. We worked on it together and sometimes you wouldn't even call it a draft. I would talk to her about it. Do you consider that a draft?

Q. How many different times do you recall communicating written comments on the drafts of

exhibit one to Ms. Heuer?

A. I don't recall. I just don't recall.

There may be one paragraph she didn't like or I didn't like or we wanted to refine and I would re-do that paragraph or add a word in that paragraph.

There are just numerous scenarios. It wasn't always page one through whatever page it is, page 20, that we went from beginning to end. It was done by nuclear power plant.

Q. Do you know what happened to the drafts of what's now exhibit one that you looked at prior to signing a version of this on February 18?

MR. SHULTIS: Objection, vague and asked and answered.

A. She kept the electronic copy on the server or on her laptop. It superseded the earlier version. The hard copies I would discard in the normal course of reviewing them.

Q. What about your written comments on the prior drafts? What happened to those?

A. Those would be discarded.

Q. Why were the electronic drafts written over instead of preserved?

A. I don't think I've ever preserved a copy of a report.

Q. Are you aware in this case that the court has ordered the parties to produce from their experts drafts of their expert witness reports?

A. Other than the draft that we submitted to the Department of Justice, no.

Q. No one ever communicated to you that you needed to preserve your drafts of your expert witness report?

A. No.

Q. Did anyone ever communicate to you a need to preserve your work product in preparing your expert witness report?

A. I'm aware of no special requirements other than what I've done over the years and that work product is preserved.

Q. Did you preserve all of your work product

in preparing your expert witness report or did you end up discarding some of it?

A. Some of it was discarded.

Q. What work product did you discard?

A. I sketched diagrams and so forth and they were transferred to work product that you probably have in front of you and in the normal course of the analysis that was not unusual and I've done that for many, many years.

Q. You're saying the sketched diagrams would have been discarded?

MR. SHULTIS: Objection, mischaracterizes his statement.

A. I did not save every piece of paper that I sketched on, no.

Q. What's your recollection of what work product was discarded?

A. Depends on how you define work product. I define work product as that which I turned over to you. The evolution of that work product is an earlier version of it and I discarded paper that I

wrote on.

Q. So you made preliminary sketches of the diagrams that had been turned over to us as part of your work product in this case and those preliminary sketches would have been discarded?

A. Yes.

Q. Other than those preliminary sketches, would you have discarded anything else that you would have created in your work in the three Yankee cases?

A. I took notes of conversations and once I finished doing what I was supposed to do I would discard the notes.

There are computer databases that result in chronological databases. We didn't save every version that existed because we would be continuing to add documents to that chronology.

So in a strict definition, we did not save at the end of every day every version of the chronology that we had.

Q. You say you took notes of conversations.

What notes did you take conversations of?
A. Conversations that I would have with Kelly or Frank or George Zacharki.
If we wanted to do something or have something done, it's a normal thing that I've done for years but once I finished it, that task or followup or whatever the note said, I would discard those notes.
Q. Did you take notes in your initial conversations with individuals at Navigant as to what your tasks were to be in the three Yankee cases?
A. Yes.
Q. You discarded those notes as well?
A. That's correct.
Q. Did you take notes during your conversations with Mr. Abbott and Mr. Brewer?
A. Yes.
Q. You discarded those notes?
A. Yes.
Q. Did you take notes of your conversations

with Mr. Shultis?

MR. SHULTIS: Objection, seeking attorney work product. Don't answer that.

Q. Mr. Shultis mentioned a while ago, and we may well get to it in the course of the day, a draft of your summary of opinion that was turned over to us.

What's your understanding as to why that particular draft was turned over to us?

A. That was a draft that we turned over to the Department of Justice for review the end of January, if I recall correctly.

Q. What about the other drafts that you referred to that were not turned over to the Department of Justice?

A. Those were discarded. Obviously, I didn't believe there was any need to keep them or direction to keep them.

Q. Were any of those drafts that were discarded turned over to the Department of Justice?

A. No, not that I'm aware of.

Q. Did you receive comments on the draft that was turned over to the Department of Justice?

A. I don't recall receiving any comments from the Department of Justice.

Q. Do you know if Ms. Heuer received any comments?

MR. SHULTIS: Objection, calls for speculation.

A. I don't recall her sharing with me any comments from anyone at the Department of Justice.

Q. Ultimately you made changes from that draft that was turned over to the Department of Justice and your February 18 summary of opinion that's exhibit one. Why did you make changes?

A. We continued to read documents. We continued with the analysis during that timeframe. Some of the changes were English form, if you will.

So a combination for all those reasons that we worked up to -- I don't know the exact date, but up until the time we turned in the final report of revising it and trying to formalize it and make sure

in forming your opinions.

Did you review the complete pretrial submissions of each party in this case?

A. I don't know if it was complete or not.

Q. What parts did you review?

A. Stipulations, 1999 and 2003, the Wise reports, Mr. Abbott's earlier reports. I don't recall anything else.

Q. Mr. Blair, I want to draw your attention now to the last two sentences in section Roman numeral three on page two of exhibit one, maybe last three sentences. You say: "I have identified and requested information that I understand exists but has not yet been provided by the plaintiffs. Such information is included in appendix three. If this or other additional information becomes available to me, I reserve the right to revise this report and the opinions stated herein as necessary."

Do you anticipate revising your opinions?

A. It's possible, depending on if we get any of this information and if, in fact, it's relevant

to the analysis or other information becomes available.

Q. Are the opinions that you've offered in exhibit one reliable if you don't receive any additional information?

A. They are reasonable based on the information I reviewed, yes.

Q. Are you drawing a distinction between reasonable and reliable?

A. I would say reliable.

Q. You are saying even if you don't receive any other documents in this case that the opinions that you've offered in exhibit one are reliable?

A. Depends on what the other information out there is. If there's something I just didn't anticipate, I can't speculate on what might be out there.

We're looking at additional information during the month of May. We haven't totally done that yet. We just got Framatone documents, for example.

Q. I'm the one right now who is speculating but I'm hoping you can help me out. You say if this or other additional information becomes available I reserve the right to revise my opinions and report.

What possible revisions are you anticipating?

MR. SHULTIS: Objection, mischaracterizes the prior testimony.

A. I really don't know specifically but it hasn't been unusual in my career to find that documents show up to cause me to change my opinion in some cases.

It may be minor. Rarely is it major, but it is possible.

Q. For example, concerning Yankee Atomic, you have opined there is an eleven month delay to the planned completion of fuel transfer.

A. Yes.

Q. Do you think that additional documents might cause you to alter that opinion?

A. It's possible.

Q. What documents might cause you to alter that opinion?

A. Any one of a number of different types of documents, schedules, correspondence, letters.

Q. At what point would you feel that you have enough documents -- let me ask it this way.

What further documents do you feel you need such that you could say that your opinion about an eleven month delay at Connecticut Yankee would not be subject to possible change if you received yet further documents?

A. I think if we got the documents that we requested in the back, that would be the documents I would like to see in order to draw that conclusion, appendix three.

Q. So without the documents listed in appendix three you don't feel confident that you can say that the opinions you're offering in exhibit one about the length of the delays that you've identified would not change if you received further documents?