MR. SHULTIS: Objection, mischaracterizes his prior testimony.

A. If there are outstanding documents I have not reviewed there is always the potential that it would change my opinion in some fashion, and the same is true with your hypotheses that these documents have not been seen.

There may be some minor or major reevaluation of my opinion. I don't know until I see the documents. I wouldn't anticipate it but it's possible.

Q. You say you wouldn't anticipate it. What do you think the likelihood is that more documents would cause you to change the opinions that you're offering in exhibit one?

MR. SHULTIS: Objection, asked and answered, calls for speculation.

A. I don't know if I can assign a probability to that.

Q. Can you give us any ballpark?

MR. SHULTIS: Same objections.

A. I don't think additional documents would change the opinion significantly.

Q. What do you mean by significantly?

A. As I indicated, I can't put a numerical probability on that.

Q. As I understood the way you were using "significantly" in that sentence, you were using that to indicate the extent of the change, not the probability of the change.

What do you mean by "significant"?

A. Significantly is significant. I'm not able to sit here and tell you that the eleven months may become 11.5 or 10.5. Significant is significant.

Q. What about the part of your opinions that attribute the causes of the delays you've identified in each of the three Yankee ISFSI projects?

MR. SHULTIS: Objection, vague. I'm not sure what you're asking about.

MR. SHAPIRO: I haven't finished my question yet.

MR. SHULTIS: Sorry.

Q. What about -- let me start over again.

In each of your opinions about a delay in each of the three Yankee ISFSI projects you attribute a cause to that delay, don't you?

A. I do.

Q. Is there a chance that your opinion as to the cause of those delays would change if you review more documents?

A. It's possible, or at least a portion of the delay. Perhaps it would be a portion definitely.

The eleven months might be ten months of one and 1.0 of something else if there was some additional documentation that would yield information on that.

Q. Do you believe as you sit here today that you had sufficient documentation to make the opinions that you made in exhibit one about the causes of the delays you've identified reliable?

MR. SHULTIS: Objection, asked and

answered.

A. I believe they are reliable based on the information that I have reviewed.

Q. Also in each of the opinions about delay of the ISFSI project that you offered an opinion that those delays were not related to any action or inaction by the Department of Justice, is that correct?

A. Department of Energy.

Q. Department of Energy, is that correct?

A. Yes.

Q. Is that part of your opinions that those delays are not attributable to actions or inactions of the Department of Energy, is that opinion subject to change upon review of more documents?

A. It's possible.

Q. Can you give me an example of a document you might look at that would change that opinion?

MR. SHULTIS: Objection, calls for speculation.

A. We're in the process of looking at Yankee

A. And the resulting inability to get a building permit, yes.

Q. You ascribe the eleven month delay in the completion of fuel transfer to CY's direction to postpone construction work at the ISFSI, is that correct?

A. Yes.

Q. Do you have any opinion as to whether Connecticut Yankee acted unreasonably in postponing construction work of the ISFSI at that time?

A. I didn't offer an opinion, no.

Q. In fact, would you conclude that it was reasonable for Connecticut Yankee to postpone construction work in light of the inability to obtain a building permit because of the zoning dispute?

MR. SHULTIS: Objection, asked and answered. He said he didn't offer an opinion yet.

A. If they don't have a building permit and they are not permitted to do so by state law it may be a reasonable decision, yes.

Q. You're not saying it's Connecticut Yankee's fault that completion of fuel transfer was delayed eleven months?

A. I don't go to that level. I stop at Connecticut Yankee essentially.

I'm not trying to assign delay to a contractor or subcontractor. I'm saying that Connecticut Yankee suspended work and that's not the Department of Energy's fault.

So I ascribe it to Connecticut Yankee. If you're asking me to take another step down, I haven't done that.

Q. Why did you choose to phrase the cause of the delay as Connecticut Yankee's direction to postpone construction work as opposed to the town of Haddam's refusal to issue a building permit?

A. As I indicated, I tried to keep it at the level of the utility. I think I did that on all of them.

Q. Paragraph four on page eight of exhibit one, you refer to an eleven month delay to the

but the exhibit five, that addresses specific CPM activities that were identified on which the delay was experienced.

Q. Back to exhibit one, page nine, paragraph four, are you attributing any of the 16 month delay to actions or inactions of Maine Yankee?

A. To the extent that Maine Yankee is responsible for SWEC and NAC, the answer is yes. They hired SWEC and they hired NAC and they did some of the work themselves on Maine Yankee, and so if there was a delay on the project, the owner is responsible.

Q. Do you have an opinion as to whether or not Maine Yankee's selection of SWEC was imprudent in any way?

A. I do not have such an opinion, no.

Q. Do you have an opinion as to whether Maine Yankee's subsequent decision to contract with NAC was imprudent in any way?

A. I have no opinion, no.

Q. Do you have an opinion that Maine Yankee

acted in an unreasonable manner in its administration of its contracts with either SWEC or NAC in any way?

A. I have not been that specific, no.

Q. Is there any fault that you have found with Maine Yankee contributing to the 16 month delay that you note in paragraph four, page nine of exhibit one?

MR. SHULTIS: Objection, asked and answered, assumes facts not in evidence.

A. Exhibit five are the reasons in my opinion that the 16 month delay was -- the basis for the cause of those delays. Those are also shown as activities on 0074.

The responsibility for execution of those activities, for example in period two, GTCC TSC repairs, procedures and the GTCC loading was Maine Yankee's responsibility. Precisely when NAC picks up that responsibility, I did not offer an opinion on that.

Q. Do you have any opinion as to why time was

lost on GTCC procedure development and training and GTCC TSC repairs?

A. It's inconclusive at this time. We know that it was prolonged, that it took a long time to repair.

Canister number 63, it was loaded last, the procedures were not done. The precise cause of that we did not yet determine.

Q. You say it took a long time to load a particular canister. Long in comparison to what?

A. I don't have those figures with me. We were in the process of looking at those over the last couple of weeks.

I don't have any hard dates for you in that regard.

Q. Do you have an opinion as to an appropriate length of time it should take to load a canister of GTCC waste?

A. I do not have a personal opinion on how long it takes to load a GTCC canister of waste, no.

Q. So you're not in a position to say it took

an excessive amount of time to load?

A. I can measure it against the plan and that's what I'm doing.

Q. Do you have an opinion as to whether or not the plan was ambitious or conservative or right on the money as to how long the timeframe should be?

A. First of all, it was done out of sequence so there really isn't a plan to do it in this process.

The four month delay is borne out of the late delivery of canister number 63 on April -- in April and then what should have happened is the dry run, testing and final procedures should have started immediately, and all of that twelve months is associated with events on the GTCC that was not planned to occur during that timeframe.

So the twelve month delay is borne out of that delay.

Q. Moving on in your opinions noted in paragraph four, page nine of exhibit one with regard to the 16 month delay in planned completion of the

planned transfer you say this delay is not related to actions or inactions of the Department of Energy, is that correct?

A. Yes.

Q. What's the basis of that conclusion?

A. In reviewing the chronology in the timeframe we just discussed here, early 2001 through early 2002, I saw no evidence that the Department of Energy was responsible for any of that.

Q. Did you analyze any actions or inactions of the Department of Energy on this issue, the 16 month delay in Maine Yankee?

A. The level of detail -- I have not seen anything at this point in time.

As I indicated earlier, this is being studied in more detail and the details, the manner in which this procedure, development, training, TSC repairs and so forth, it's being investigated.

Q. As far as you understand the situation, the Department of Energy simply wasn't involved in those issues?

A. It's Maine Yankee or one of its contractors that caused the gap.

Q. Suppose Maine Yankee is correct that absent DOE's breach of its spent fuel removal contract, that it would not have built the ISFSI at all but for the breach.

In that instance would the delay be related to inactions of DOE?

A. If the delay is caused by nonperformance have a contractor, I'm not sure what the breach or non-breach has to do with it. It's pure performance of the work.

Q. My question is suppose the work didn't have to be done at all but for the breach?

MR. SHULTIS: Objection, asked and answered.

Q. Isn't the party that caused the need for the work to be done at all responsible?

A. There's always an obligation for the party that is pursuing work to do it by mitigating problems and doing it reasonably, pursuing that work

consistent with industry standards.

Q. Do you have an opinion that Maine Yankee failed to act reasonably in any way with respect to the 16 month delay that you are referring to in exhibit one, page nine?

A. The gap between the delivery of the first canister and the start of dry run is a year and the plan shows no gap.

If you'll see the one in the right hand column, that is a credit of one month because the fuel load was, in fact, accomplished during this time and it comes off the ultimate load and fuel transfer activity at the bottom of the page, but that should not have happened, that whole timeframe.

Q. I don't think you quite answered my question which is do you have an opinion that Maine Yankee failed to act reasonably in any way with respect to the 16 month delay that you opine about on page nine of exhibit one?

MR. SHULTIS: Objection, asked and answered.

A. Yes.

Q. How did Maine Yankee act unreasonably?

A. In the fashion that I've just indicated.

In period number one, it dealt with inability to pursue the state permitting and construction for phase two, construction for phase two of the ISFSI was substantially behind schedule and the procedures, development, training, GTCC TSC repairs, GTCC loading and transfer all exceeded the original plan by twelve months.

Q. I understand that the work took longer than the original plan but focusing again back on paragraph four, page nine of exhibit one, where in that paragraph or elsewhere in exhibit one do you say that the 16 month delay is due to unreasonable conduct by Maine Yankee?

MR. SHULTIS: Objection, asked and answered.

A. It doesn't say but implicit in the responsibility that Maine Yankee has for SWEC and NAC, there was no one else doing the work.

Q. What are you saying that Maine Yankee should have done with respect to SWEC and NAC?

A. There were substantial problems. They should have either -- I can't speculate on what they should have done but the problem should have been resolved in some fashion or they have to accept the repercussions, if you will, and the fuel loading was late.

Q. You say that Maine Yankee has acted unreasonably.

What should they have done instead that would have been reasonable?

MR. SHULTIS: Objection, mischaracterizes his testimony.

A. I'm not sure I could answer the question because Maine Yankee retained SWEC and NAC to do their work.

If there's a delay in the work then the responsibility lies with Maine Yankee because they hired the contractor.

Q. Is that a legal opinion you're offering?

Why is that Maine Yankee's responsibility? When you say they are responsible, I don't understand the basis for that statement.

A. If you hire a contractor to do work and delay a bridge opening or whatever it may be, it's the owner's responsibility.

If he seeks to recover those damages from in this case SWEC or NAC, that's fine, but the ISFSI was not finished 16 months earlier and whatever costs are different between wet and dry, it seems like the Department of Energy should not pay those costs.

Q. But isn't that a legal opinion that you're offering?

A. Might have some legal overtones. I don't know. That's my opinion, though.

Q. How is that opinion informed by expertise?

A. How is the opinion?

Q. Informed by expertise.

A. Based on experience.

Q. Anything else?

A. No.

Q. Back to part of exhibit four, the page that ends in 0074.

A. Yes.

Q. The ISFSI as-built diagram. Right about in the middle of that page, maybe a little bit above the middle, there's written there if I read this correctly MY phase two construction is critical path. No confidence in I believe it's BME's forecasts, delays have had an impact. ISFSI ready for GTCC.

What's being discussed in that text?

A. In the timeframe April, May, June, the performance of the ISFSI subcontractor or contractor is poor. They were behind schedule. They were not making progress whatsoever.

So that is a representation that the June 5, 2001 comment, if you look at the chronology, probably get a little bit more information about that document.

The ISFSI ready for GTCC dated July 25, 2001