A. Paragraph four?
Q. Four. As I understand it, you are attributing all of the delay to fuel transfer preparation activities, contractor delays to the fuel transfer preparation activities.
A. Yes.
Q. So there are no other reasons that make up your opinion, are there?
A. The three reasons that I mentioned are contractor delays, yes.
Q. If I could just ask you to delineate those again so I understand the three separate parts.
A. One is that the delays are referenced generically in amendment number one to the fuel transfer contract.
Q. When you say that the delays are referenced --
A. There are --
Q. -- generically, how did an amendment to the contract reflect the delays?
A. It actually states that the contractor is

at fault and there are certain new deadlines that are set and my recollection is there's some compensation due if he beats certain dates and so forth.

But if you -- if we had amendment number one we could look it up and it would say.

Secondly, if you look at the chart that's on 0033, there's again this problem with the canisters and the modifications required that are taking a long period of time.

That plus the schedules that we've recently looked at, the electronic versions and the NAC schedules, illustrate that the procedures that were to have been developed early in this process in fact dragged out during this whole phase.

Although we don't have a precise breakdown by each of those categories, the general categories that I just mentioned caused the eleven months of delay here.

Q. You refer to procedures. Are these procedures for the loading of spent fuel?

A. Yes.

Q. Are you saying the delays referenced in amendment number one are separate in addition to delays attributable to modifications to canisters, the canisters not to be on site and delays attributable to not having procedures ready in a timely manner?

A. The amendment is not clear on that.

Q. It may ultimately be the same delay that you talked about?

A. Yes.

Q. If I understand your opinion noted in exhibit one, page ten, paragraph four correctly, you're not attributing any of this eleven month delay to Yankee Atomic, are you?

A. Only to the extent that Yankee Atomic is responsible for its contractors which you alluded to as a legal opinion.

Q. Do you have any opinion as to whether Yankee Atomic acted unreasonably in selecting NAC as the contractor here?

A. I have no specific knowledge of any unreasonable decision, no.

Q. Do you have any opinion as to whether or not Yankee Atomic administered that contract in an unreasonable manner in any way?

A. Not at the present time. We're still looking at the electronic schedules that we just got.

Q. You say that this eleven month delay is not related to actions or inactions of the DOE. If you would explain for me how you reached that conclusion.

A. Primarily the same answer as the other project, that in reviewing the chronology of which there is another chronology in this package, that I saw no evidence of the Department of Energy or NRC causing those problems.

Q. Once again, if Yankee Atomic is correct that the Department of Energy's breach of its contract to remove its spent fuel caused it to have to build the ISFSI at all, isn't in some manner then

delays in that project attributable in some manner to Department of Energy's breach of that contract?
A. Not if the causation for this is imprudent construction management or negligent construction management, although I have not found that specifically.
Q. You haven't found that generally either, have you?
A. No.
Q. .
(Whereupon the proffered item was marked as exhibit number 8.)
Q. Mr. Blair, you've been handed what's been marked as exhibit eight. Do you recognize this document?
A. Yes.
Q. Would you explain for us, please, what this is?
A. Documentation for each of the delays that we looked at as we went through the project -- when I say we, in this case primarily Frank Caputo and

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| YANKEE ATOMIC POWER COMPANY | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No. 98-126C |
| UNITED STATES OF AMERICA | ) | |
| Defendant. | ) | |

**EXPERT WITNESS REPORT**
**OF**
**EDWARD C. ABBOTT**

**PURPOSE**

The purpose of my report is to provide an evaluation of technical issues related to the claim for damages brought by owners of Yankee Nuclear Power Station (also known as Yankee Rowe or YR) against the Department of Energy (DOE) for not beginning acceptance of spent fuel assemblies in 1998. This report supplements my previous report of February 2002. This report contains all of my opinions regarding the YR claim. This report does not, however, duplicate the background information contained in my previous report.

The owners of YR have shut down the plant and are decommissioning it. YR has made arrangements to store its spent fuel assemblies in a dry independent spent fuel storage installation (ISFSI) and is claiming damages related to that storage.

My evaluation of the YR claim focused on technical issues associated with the handling, storing and transporting of spent nuclear fuel assemblies and other radioactive waste. I evaluated those technical issues based on my experience as a nuclear power plant manager, federal regulator and consultant to the nuclear industry.

My report presents a general overview of the conclusions followed by write-ups which explain those conclusions in some detail.

**EXPERIENCE**

My qualifications as an expert in the handling and storage of spent nuclear fuel are based on working in the nuclear industry for over thirty years. I have been responsible for numerous activities related to the handling, storage and management of spent fuel assemblies. I have had experience as a regulator in developing policies and rules related to the safety of nuclear

Scenario 4 is the YR damage claim scenario which is based on the assumptions set forth by YR. The YR assumptions about the methods of fuel storage and the timing of DOE actions in the non-breach and breach worlds have been used. Relative to this scenario, I have evaluated the basis, appropriateness and methodology behind the YR stated costs.

Scenario 5 utilizes the YR assumptions about the methods of spent fuel storage in the breach and non-breach worlds, but utilizes different assumptions about the rate of spent fuel pick up in the breach and non-breach worlds. The different assumed rates and effect on the date for pickup of the last fuel assembly in the non-breach and breach worlds were provided to me by DOE. I have not been asked to opine on the assumed rates or on the non-breach and breach dates resulting from the assumed rates.

Finally, for each of the five scenarios described above, I have evaluated what the effect on calculated possible damages would be if in the breach and non-breach worlds prolonged storage of Greater Than Class C Waste (GTCC) and/or other than standard fuel assemblies was required, independent of the pickup of standard fuel assemblies.

## COMPARISON TO MY PREVIOUS EXPERT REPORT

The opinions I present in this report are consistent with the opinions I offered in my previous report. However, the details of the opinions and results from those opinions are often very different because the revised damages claimed by YR are significantly different from the claimed damages I evaluated in my previous report.

## GENERAL CONCLUSIONS

My general conclusions about the YR claim are provided below. Those conclusions are provided with enough detail to explain the conclusion. I have provided the supporting detail for each conclusion in the sections that follow.

### Scenario 1

DOE did not begin to move spent fuel from storage locations at nuclear power plants to the repository in 1998. Currently, DOE is scheduled to begin spent fuel pickups in 2010. If it is assumed that in the non-breach world DOE would have picked up spent fuel at the 1995 ACR rates and that in the breach world DOE will accept spent fuel at the 1998 DOE TSLCC rates, the date of acceptance of the last CY fuel assembly by DOE would be earlier in the breach world than in the non-breach world.

If it is further assumed that in both the breach and non-breach worlds that the fuel is stored wet in the spent fuel pool until accepted by DOE, there would be no damages due to construction or operating costs. There would be a difference in the timing of the costs for spent fuel pool decommissioning and dismantlement (D&D) in the breach and non-breach worlds. Although the total costs for this activity in both worlds would be the same in constant year dollars, the difference in timing would result in the net present value of this cost in the breach world being larger than in the non-breach world. However, operating costs would be incurred for more

years in the non-breach world than in the breach world and the additional operating costs would more than offset the difference in the net present value of the D&D of the spent fuel pool. Therefore, there would be no damages as a result of DOE's breach.

If, instead, it is assumed that in both the breach and non-breach worlds that a dry storage ISFSI is constructed, the spent fuel remaining on site at the time the construction is complete is moved to the ISFSI and that fuel is stored there until accepted by DOE, there would be differences in both construction and operating costs between the breach and non-breach worlds. Because in the non-breach world, DOE would have accepted some fuel from CY before the ISFSI could be completed, there would be a difference in the size of the ISFSI constructed in the breach and non-breach worlds. This difference in size would cause the ISFSI construction and D&D costs in the breach world to be larger than in the non-breach world. However, since the ISFSI operating costs would be incurred for more years in the non-breach world, there would be greater operating costs in the non-breach world that would partially or completely offset the larger breach world construction and D&D costs.

**Scenario 2**

DOE did not begin to move spent fuel from storage locations at nuclear power plants to the repository in 1998. Currently, DOE is scheduled to begin spent fuel pickups in 2010. Regardless of the rate of fuel acceptance by DOE, if it is assumed that the rate of pickup in the breach and non-breach worlds is the same, this will result in YR storing spent fuel assemblies for 12 years longer in the breach world compared to the non-breach world. There is no technical reason that the fuel assemblies could not continue to be stored in the spent fuel pool until taken by DOE. The specific rate of fuel acceptance assumed is important only in determining when the extra 12 years of storage occurs. Thus, in terms of constant year dollars, the calculated damages would be 12 multiplied by the annual cost of operating and maintaining the spent fuel pool.[3] The specific assumed rate of acceptance by DOE would only change the net present value of these calculated damages. Since maintaining the spent fuel assemblies in the spent fuel pool until accepted by DOE is a technically acceptable method for storing the assemblies, the damages calculated for this scenario would constitute one measure of the maximum damages that YR would incur due to the DOE breach.

If different rates of spent fuel acceptance are assumed for the non-breach and breach worlds, the non-breach and breach rates would be used to determine the date of acceptance by DOE of the last fuel assembly from YR in the non-breach and breach worlds. Based on this calculation, the number of years of extra storage required in the breach world would be established. The calculated maximum damages for these rates would be the number of years of additional storage multiplied by the annual cost of operating and maintaining the spent fuel pool.

---

[3] There are circumstances where the damages could be less than 12 multiplied by the annual wet operating costs. If the acceptance rates are very high such that the 12 years of extra storage were to begin before the decommissioning of the rest of the plant were complete, then the corporate overhead and general and administrative costs would not be part of calculated damages until such time as the decommissioning of the rest of the plant was complete. That is, during the years when other site activities such as decommissioning are ongoing, the wet storage operating costs would be reduced by the amount of the corporate costs.

**Scenario 3**

A different measure of the maximum damages would be obtained if it is assumed that the YR spent fuel would have been transferred to a dry storage ISFSI in both the breach and non-breach worlds. Again, if the rate of spent fuel acceptance in the non-breach and breach worlds is assumed to be the same, YR would have to store the spent fuel assemblies for 12 additional years. Regardless of the assumed rate of fuel pickup, the calculated damages in constant year dollars would be 12 multiplied by the annual cost of operating and maintaining the dry storage ISFSI. The specific rate of acceptance would change the point in time at which these 12 additional years would occur and therefore, the net present value of the calculated damages would change depending on the assumed pickup rate. The ISFSI constructed in the non-breach world would be smaller than the one constructed in the breach world, making the construction and demolition costs in the two worlds different. The calculated damages would be the net present value of the added years of operations cost plus the difference in ISFSI construction and demolition costs.

If different rates of spent fuel acceptance are assumed for the non-breach and breach worlds, the non-breach and breach rates would be used to determine the date of acceptance by DOE of the last fuel assembly from YR in the non-breach and breach worlds. Those 2 "fuel out" end-dates would then be compared. Damages would only result if the breach world end-date were later than the non-breach world end-date (i.e., if, as a result of the different rates, fuel were required to be stored for a longer period of time in the breach world). The operations cost would then be the number of years of additional storage multiplied by the annual cost of operating and maintaining the dry storage ISFSI. Again, the ISFSI size for the breach and non-breach worlds would be different. The calculated damages would be the net present value of the added years of operations cost plus the difference in ISFSI construction and demolition costs.

**Scenario 4**

YR has provided numerous spreadsheets and supporting documentation for its claimed damages. I have evaluated this documentation and have concluded that many corrections to the YR calculated damages are necessary. The necessary corrections can be characterized by one or more of the following general problems.

1. YR has included costs in the calculated damages that are not the result of the DOE failure to begin spent fuel acceptance in 1998. Including these costs inappropriately inflates the damage claim.

2. YR has incorrectly assumed what would have happened in the non-breach world. Costs that would have been incurred in the non-breach world have not been properly included in the calculation and as a result the claimed damages are inflated.

3. YR overestimated the costs of some items related to the storage of spent fuel. Some costs have been overestimated because of application of faulty assumptions. Others have been estimated when there is actual cost experience that would be more accurate. Again, these problems inappropriately inflate the damage claim.

4. YR has made incorrect assumptions about the breach world. These assumptions include maintaining more extensive programs than would be necessary for the dry storage of spent fuel, as well as including services and costs that would not be required for the storage of spent fuel. These incorrect assumptions inappropriately inflate the damage claim.

5. YR has improperly included costs for activities or services after the assumed date of the removal of all fuel that would not be needed after that date. Including these costs inappropriately inflates the damage claim.

6. YR has provided no basis or inadequate basis for some costs. For some costs, no basis beyond a statement of who estimated the cost has been provided. In other cases, there is a basis provided, but upon review, the basis is technically or logically inadequate.

7. YR did not account for the schedule delays which would have lessened its claim.

**Scenario 5**

YR makes an assumption in the non-breach case that the last spent fuel assembly will be removed from the YR site by the beginning of 1999.[4] This assumption is based on the willingness of other utilities to exchange fuel acceptance allocations, effectively moving YR to the head of the queue and significantly accelerating the non-breach acceptance of spent fuel from YR. If exchanges of allocations are not assumed to occur in the non-breach world, the date for removal of the last fuel, the non-breach fuel out date, for YR would be much later than assumed by YR. Incorporating a non-breach fuel out date that does not depend on exchanges of acceptance allocation in the YR damage claim calculation significantly reduces the damages in two ways.

First, YR assumes that the fuel would all be removed in the non-breach world by the beginning of 1999 and therefore, most of the costs of site operation are damages after this date. YR uses the term "offset" for costs that are common to both the breach and non-breach world. By subtracting the offsets from the YR cost estimates in the breach world, YR eliminates costs that they would have incurred even if DOE had performed. However, if the alternate non-breach fuel out date is used in the claim, costs that do not currently have offsets in the breach case would have offsets because the non-breach fuel storage would not end at the beginning of 1999. These additional offsets would eliminate the corresponding breach world costs as damages.

Second, the alternate fuel out date pushes costs unique to the breach world farther into the future. This reduces the net present value of these costs.

---

[4] Yankee Atomic's 2003 Statement of Relevant Facts In The Form Of A Proposed Stipulation Of Facts," March 28, 2003, item 120.

if by virtue of the cask license, the fuel assemblies could not be moved until after the date of the plant's original acceptance slot.

**Compensation**

ABZ, Incorporated is being paid $210 per hour for my time on this matter.

Edward C. Abbott