PROTECTED MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE WITH
UNITED STATES COURT OF FEDERAL CLAIMS PROTECTIVE ORDER

# REPORT OF DANIEL R. FISCHEL RE: YANKEE ATOMIC ELECTRIC COMPANY V. UNITED STATES

## I. QUALIFICATIONS.

1. I am Director, Chairman and President of Lexecon Inc., a consulting firm that specializes in the application of economics to a variety of legal and regulatory issues. I am also the Lee and Brena Freeman Professor of Law and Business at The University of Chicago Law School. I have served previously as Dean of The University of Chicago Law School, Director of the Law and Economics Program at The University of Chicago Law School and as Professor of Law and Business at The University of Chicago Graduate School of Business.

2. Both my research and my teaching have concerned the economics of corporate law. I also have lectured widely in this area. I have published approximately forty articles in leading legal and economics journals and am coauthor, with Judge Frank Easterbrook of the Seventh Circuit Court of Appeals, of the book The Economic Structure of Corporate Law (Harvard University Press). Courts of all levels, including the Supreme Court of the United States, have cited my articles as authoritative. See, e.g., Central Bank v. First Interstate Bank, 114 S. Ct. 1439 (1994); Basic Inc. v. Levinson, 485 U.S. 224, 246 n. 24 (1988); and Edgar v. MITE Corp., 457 U.S. 624, 643 (1982). My curriculum vitae, which contains a list of my publications, is attached hereto as Exhibit A.

3. I have served as a consultant or adviser on economic issues to, among others, the United States Securities and Exchange Commission, the National Association of Securities Dealers, the New York Stock Exchange, the Chicago Board of Trade, the United States Department of Labor, the United States Department of Justice, the Federal Deposit Insurance Corporation, the Resolution Trust Corporation, and the Federal Trade Commission.

4. I am a member of the American Economics Association and the American Finance Association. I am also a member of the Board of Directors of the Center for the Study of the Economy and the State at The University of Chicago, and former Chairman of the American Association of Law Schools' Section on Law and Economics. I have testified as an expert witness in multiple proceedings in federal and state courts across the country, as detailed in Exhibit A. My billing rate is $1,000 per hour.

## II. INTRODUCTION AND SUMMARY OF CONCLUSIONS.

5. In 1982, Congress enacted the Nuclear Waste Policy Act ("NWPA") which created a program for the permanent disposal of spent nuclear fuel ("SNF") and high-level radioactive waste ("HLW") generated by domestic commercial nuclear power plants. Complaint, ¶ 9. Pursuant to the NWPA, the Department of Energy ("DOE") entered into a contract in 1983 with plaintiff Yankee Atomic Electric Company ("Yankee Atomic") which provided that the Government would accept and dispose permanently of Yankee Atomic's SNF and HLW in return for the payment of fees by Yankee Atomic. Id., ¶¶ 1 & 10. DOE entered into contracts with the owners of other commercial nuclear power plants (referred to in the standard-form contracts as "Purchasers") at about the same time. Among other things, these contracts provided that DOE would begin acceptance of nuclear waste by January 31, 1998. Id., ¶ 10. I understand that the Court has found that DOE partially breached Yankee Atomic's contract by failing to commence acceptance by the January 31, 1998 deadline.

6. Yankee Atomic claims that as a result of the partial breach, it has been forced to incur and will incur substantial additional costs to continue to store its nuclear waste on site. Complaint, ¶¶ 23 & 25. One of plaintiff's experts, Mr. Frank C. Graves, claims that "had DOE commenced acceptance of spent fuel by January 31, 1998 with a reasonable aggregate acceptance rate, it should and would have completed removal of spent fuel from Plaintiff's facility by January 1999." Frank C. Graves Expert Witness Report ("Graves Report"), at 3. Mr. Graves admits that "[i]n order to achieve removal by this date, Plaintiff would need to swap removal slots with other Purchasers" but concludes that sufficient exchanges would have

occurred, at a net cost of $11.8 million to Yankee Atomic. Id., at 3-4. Based on these conclusions, another one of plaintiff's experts, Dr. Kenneth T. Wise, has opined that Yankee Atomic's "minimum damages" are $70.6. Expert Report on Damages Incurred by Yankee Atomic Due to The Department of Energy's Partial Contract Breach Prepared by Kenneth T. Wise, Ph.D ("Wise Report"), at 7. This figure represents the sum of the estimated incremental costs of on-site storage through 2010 that Yankee Atomic will incur in the "Breach World" but does not include the $11.8 million net cost for the slots that Mr. Graves claims Yankee Atomic would have incurred in the "Non-Breach World". Id., at 7-8.

7. I have been asked by the Department of Justice to analyze plaintiff's damage claim from an economic perspective. In connection with my analysis, I have been assisted by members of Lexecon's professional staff. Exhibit B lists the materials we have reviewed. Based on this review and analysis, and my knowledge and experience, I have reached two principal conclusions:

- The claimed damages do not result from DOE's failure to commence disposing SNF and HLW by January 31, 1998.
- Plaintiff's damage claim is speculative because it depends on assumptions about future events, assumes that the DOE should have implemented a particular schedule for the disposal of Purchasers' SNF and HLW, assumes that DOE would accept Greater Than Class C ("GTCC") waste and "failed fuel" under this acceptance schedule, and assumes that exchanges of allocation slots between program participants would minimize aggregate at-reactor storage costs.

I elaborate upon and explain the bases for these conclusions in the remainder of this report.

## III. THE CLAIMED DAMAGES DO NOT RESULT FROM DOE'S FAILURE TO COMMENCE DISPOSING SNF AND HLW BY JANUARY 31, 1998.

8. Yankee Atomic's only generating plant was a nuclear facility in Rowe, Massachusetts which was permanently shut down in 1991. Complaint, ¶¶ 7 & 22. Yankee Atomic's claimed damages consist of the costs associated with storing its nuclear waste on site until at least 2010. Yankee Atomic's Pre-Trial Brief of Legal Points and Authorities Relied Upon

("Pre-Trial Brief"), at 7-8. The claimed damages do not result from DOE's failure to commence disposing SNF and HLW by January 31, 1998, because if DOE had started disposing SNF and HLW by January 31, 1998, but did not dispose of all of plaintiff's nuclear waste prior to 2010, then plaintiff still would have to store nuclear waste on site through 2010 and still would have to incur most of the costs that it claims as damages.[1] In other words, the claimed damages do not result from the partial breach of contract found by the Court.

## IV. PLAINTIFF'S DAMAGE CLAIM IS SPECULATIVE.

9. As described above, plaintiff's damage claim consists of the estimated incremental costs of on-site storage through 2010 that plaintiff would have avoided if it had been able to dispose of all of its nuclear waste by 1999, as Mr. Graves concludes it would have. Therefore, plaintiff's damage claim depends critically on Mr. Graves' conclusion. However, Mr. Graves' conclusion is speculative because it depends on a series of interrelated assumptions about future events, the "non-breach world" aggregate acceptance schedule, exchanges, GTCC and failed fuel. Each of these critical assumptions is discussed below.

### A. Assumptions about Future Events

10. A portion of the claimed damages consists of "other continuing costs" that plaintiff's experts claim plaintiff will incur until its nuclear waste is accepted and removed; and plaintiff's experts assume that this will not occur until at least 2010. Wise Report, at 5-6. This portion of plaintiff's claimed damages is speculative because it depends on future events.[2]

---

1. Plaintiff's damage claim depends on the assumption that all of plaintiff's nuclear waste would have been removed because plaintiff's experts assume that the costs of storing nuclear waste do not vary with the amount of inventory at the site. See Graves Report, note 5 and Charles W. Pennington Expert Witness Report, at 2-3 & 6-7. When a dry storage system (known as an independent spent fuel storage installation or "ISFSI") is used to store nuclear waste, the number of dry storage canisters will vary with the amount of inventory. Id. However, the initial and decommissioning costs of dry storage canisters are relatively low. Id.
2. Moreover, if plaintiff were to recover the claimed damages and did not incur these costs, the difference between plaintiff's projected costs and plaintiff's actual costs would be a windfall to the plaintiff.

B. Assumptions about the "Non-Breach" Aggregate Acceptance Schedule

11. Plaintiff's damage claim assumes not only that DOE should have started disposing of fuel by January 31, 1998, but also that DOE should and would have continued to dispose specified amounts of nuclear fuel at specified dates thereafter. The assumed amounts are set forth in Table 1 of the Graves Report, which shows an assumed acceptance rate of 1,200 MTU in 1998 and 1999, 2,000 MTU in 2000 and 2001, 2,700 MTU in 2002 and 3000 MTU in each subsequent year.

Economic Efficiency

12. Plaintiff's experts claim that this assumed "non-breach world" aggregate acceptance schedule is economically efficient, arguing that a slower acceptance rate would "impose additional unnecessary storage requirements and costs on Purchasers." Graves Report, at 8; John W. Bartlett Expert Witness Report ("Bartlett Report"), at 9. However, their analysis does not establish that the assumed "non-breach world" aggregate acceptance schedule would be economically efficient because it does not take into account how the assumed acceptance schedule would affect other relevant costs. As Dr. Bartlett notes:

> The total cost to utilities of storing and disposing of spent fuel . . . can be divided into three parts. One is the program costs -- the sum of the fees each contracting utility has or will pay to the government for the services specified in the Standard Contracts. A second is at-reactor spent fuel storage costs -- the sum of the costs each contracting utility has or will incur storing spent fuel prior to it being accepted by the government. A third is loading costs -- the sum of the costs each contracting utility will incur loading spent fuel into casks provided by the government pursuant to the Standard Contracts for transport to a government facility. (Bartlett Report, at 2-3)

Plaintiff's experts have not shown that the assumed acceptance schedule minimizes the sum of program costs, at-reactor storage costs and loading costs.[3] In fact, plaintiff's experts' reports do not provide any analysis of how the assumed acceptance schedule would affect program costs and loading costs.

---

3. In order to show that a proposed acceptance schedule was socially efficient, one would also have to take into account external, societal costs, such as the costs associated with

Alternative Acceptance Rates

13. Article IV.B.5.b of the contract provides that "beginning not later than July 1, 1987, DOE shall issue an annual capacity report for planning purposes . . . [setting] forth the projected annual receiving capacity for the DOE facility(ies) . . . ." Article IV.B.5.a of the contract provides that "beginning on April 1, 1991, DOE shall issue an annual acceptance priority ranking for receipt of SNF and/or HLW at the DOE repository." Pursuant to these requirements DOE published both an acceptance priority ranking ("APR") and an annual capacity report ("ACR") in 1991. The 1991 ACR projected waste acceptance rates for SNF of 400 MTU in 1998, 600 MTU in 1999 and 900 MTU in each year from 2000 though 2007, for a 10-year total of 8,200 MTU. 1991 Annual Capacity Report, Table 2.1 (Bates No. HQ0002365). This acceptance schedule also is consistent with DOE accepting no more than 10,000 MTU prior to 2010. Id., at 4 (Bates No. HQ0002364).[4]

14. The 1991 ACR applied the waste acceptance rates to the 1991 APR, resulting in individual Purchaser allocations based on an oldest fuel first ("OFF") priority. See 1991 Annual Capacity Report, Table 3.1 (Bates No. HQ0002369). Even with the acceptance schedule plaintiff's experts assume, an OFF priority allocation would not allow Yankee Atomic to dispose of all of its nuclear waste before 2007. See Exhibit C. Under plaintiff's proposed acceptance rate, the aggregate amount of fuel accepted by 2007 would total 24,100 MTU. Because only 10,000 MTU would be accepted by 2010 at the acceptance rate projected in the 1991 ACR, an OFF priority allocation using this acceptance rate would not allow Yankee Atomic

(...continued)
potential accidental discharges of radioactive material.

4. I understand that the 1987 amendments to the NWPA authorized DOE to site, construct and operate a single Monitored Retrievable Storage ("MRS") facility, and provided that no more than 10,000 MTU of nuclear waste could be stored at the MRS facility until a permanent repository began to operate. I also understand that DOE had announced prior to issuance of the 1991 ACR that it did not anticipate that the permanent repository would began operating until at least 2010.

to dispose of its nuclear waste before 2010.[5] Moreover, even if the exchange market functioned to minimize aggregate storage costs as Mr. Graves has assumed, plaintiff would continue to store fuel through 2010 under the acceptance rates projected in the 1991 ACR because, according to Mr. Graves' calculations, the amount of "Must-Move" fuel generated by discharges from operating reactors (i.e., discharges in excess of spent fuel pool capacity) exceeds 10,000 MTU by 2010.[6] See Graves Report, Figure 1. Therefore, if the 1991 ACR acceptance rate had been achieved, plaintiff would not avoid the additional storage costs on which its damage claim is predicated.

B. Assumptions about Exchanges

15. Article V.E of the contract provides Purchasers with the "right to exchange approved delivery commitment schedules with parties to other contracts with DOE for disposal of SNF and/or HLW; provided, however, that DOE shall, in advance, have the right to approve or disapprove, in its sole discretion, any such exchanges." Plaintiff's damage claim "assume[s] that such swaps would approach the efficient economic allocation of slots" [i.e., the allocation of slots which minimized the aggregate on-site storage costs of all purchasers]. Graves Report, at 13. Mr. Graves' conclusion that all of Yankee Atomic's SNF and HLW would have been removed by 1999 in the "Non-Breach World" depends on this assumption. However, this assumption is both speculative (because there is no way to know with certainty how the market would function) and implausible for several reasons.

16. First, only approved delivery commitment schedules ("DCSs") can be exchanged under the contract. See Article V.E. Moreover, under the contract, DOE is only required to project receiving capacity for 10 years following the projected commencement of

5. With an OFF priority, Yankee Atomic's allocation would total 56.1 MTU through 2007. Mr. Graves' data show that Yankee Atomic has an SNF inventory of 127.41 MTU.
6. To minimize aggregate storage costs under plaintiff's model, "Must-Move" fuel generated by discharges from operating reactors in excess of spent fuel pool capacity would have to be moved first, because if this fuel is not moved, an additional storage facility would have to be built.

operation of the initial DOE facility, and utilities are not required to submit DCS's for the full 10 years. See Article IV.B.5.b and Article V.B.1. Purchasers could not exchange allocations that had not been projected, requested, and approved.

17. Second, if GTCC can not be included in DCSs and failed fuel might not be accepted in the year stated on a DCS, then Purchasers would have little incentive to engage in exchanges (because exchanges would not eliminate the need for on-site storage).

18. Third, Article V.E. provides for bilateral exchanges of like amounts of SNF and/or HLW (i.e., exchanges of DCS's for equal MTUs between Purchasers), not the "last-bid auction procedure" that Mr. Graves refers to in his report (at page 14). One cannot assume that a market with bilateral exchanges in-kind will produce the same results as a market with a last-bid auction procedure. A large number of bilateral exchanges would be required to achieve the same result and, in each exchange, there would be bargaining and the attendant possibility of expropriation by Purchasers with desirable allocations. Moreover, a market with bilateral exchanges in-kind does not produce as much information as a market with a last-bid auction procedure. Economists have recognized that sequential, bilateral trading is not the most efficient way to organize a market.[7]

19. Fourth, Article V.E. of the contract also provides that Purchasers must submit exchange requests to DOE for approval and gives DOE the discretion to disapprove proposed exchanges. Economists also have recognized that a requirement for government approval discourages trading. See, e.g., Stavins, "Transaction Costs and Tradeable Permits,"

7. See, e.g., Hahn & Noll, "Barriers to Implementing Tradable Air Pollution Permits: Problems of Regulatory Interactions," 1 Yale J. on Regulation (1983) 63, 74;, Stavins, "Transaction Costs and Tradeable Permits," 29 J. Envir. Econ. & Management, (1995) 133, 135, note 5 ("the sequential and bilateral nature of the trading process [leads] to some initial trades that preclude better trades from being carried out subsequently"), and Atkinson & Tietenberg, "Market Failure in Incentive-Based Regulation: The Case of Emissions Trading," 21 J. Environmental Econ. & Management (1991) 17, 28 ("the type of bilateral, sequential trading that occurs under the bubble policy results in substantially smaller cost savings than would be expected from the more sophisticated, but uncommon, cost-effective trading process that analysts have historically presumed to exist.")

29 J. Envir. Econ. & Management, (1995) 133, 145.[8] I understand that DOE might disapprove exchanges for many reasons, including differences in storage cask requirements and transportation requirements that potential exchanges would generate.[9]

20. The actual behavior of Purchasers to date does not support Mr. Graves' allocation assumption. Even though many Purchasers currently have tradable DCSs and some utilities (such as Yankee Atomic) have actively solicited exchange proposals, no exchanges have occurred. In his report, Mr. Graves argues that the incentive to exchange would be greater in the "Non-Breach World." Graves Report at 11-13 & 17-19. However, even if this were true, it would not establish that the exchanges that would occur in the Non-Breach World would minimize aggregate on-site storage costs and allow Yankee Atomic to dispose of all of its nuclear waste by 1999.

21. Mr. Graves' conclusion regarding the net cost to plaintiff of exchanging DCSs is also questionable because, for the reasons stated above, one cannot know with certainty whether exchanges would occur and what the terms of exchanges which did occur would be.[10] It is possible that the exchanges which did occur would occur at terms unfavorable

8. In 1981, the State of Wisconsin implemented a program designed to allow for the limited trading of marketable discharge permits to control biological oxygen demand on a part of the Fox River. Hahn, "Economic Prescriptions for Environment Problems: How the Patient Followed the Doctor's Orders," J. Econ. Perspectives, 3 (1989) 95, 97. The actual trading and cost savings of this program were minimal. Id., at 98. The program's disappointing results have been attributed to certain features of the market structure that also exist here: limited permit trading between small numbers of market participants, subject to regulatory approval. Id. Also, see, Tripp & Dudek, "Institutional Guidelines for Desigining Successful Transferable Rights Programs," 6 Yale J. on Regulation (1989), 369, 387 ("the rights to pollute are not freely tradeable under the Fox River program, which impairs the value of the rights").

9. Mr. Graves asserts that "swaps of acceptance slots would allow Purchasers (and not insignificantly, DOE also) to realize substantial savings in cost and efficiency as compared with the initial allocation of acceptance slots under OFF." Graves Report, at 3. However, even if this were true, it would not be sufficient to establish that Purchasers would propose the necessary sequence of exchanges or that DOE would approve the exchanges as they were proposed. Both Purchasers and DOE would have to evaluate each exchange on its own merits. DOE would not be able to rely on Mr. Graves' assumption that a series of bilateral exchanges would ultimately result in an allocation that allowed them to obtain "substantial savings in cost and efficiency" because it would have no way of knowing whether all of the necessary exchanges would be proposed.

10. The price of exchanges could also be affected by other factors not taken into account by Mr.

to plaintiff, and that the exchanges would cost plaintiff more than Mr. Graves assumes. Of course, any such additional costs would offset plaintiff's storage costs savings.

C. <u>Assumptions about GTCC Waste and Failed Fuel</u>

22. I understand that plaintiff has both failed fuel and GTCC waste on its site.[11] Under these circumstances, plaintiff will incur the costs of on-site storage until its failed fuel and GTCC waste are removed from its site. Therefore, plaintiff's damage calculations necessarily assume that its failed fuel and GTCC waste would also be accepted by DOE under the assumed schedule discussed above. This assumption is speculative because the contract does not require DOE to do this.

D. <u>The Interrelationship between Assumptions</u>

23. Plaintiff's assumptions are interrelated in several respects. First, plaintiff's experts' conclusion that the proposed acceptance schedule would minimize at-reactor storage costs depends on their assumptions about exchanges, GTCC waste and failed fuel: if the exchange market did not function as plaintiff's experts assume, or DOE did not accept GTCC waste and failed fuel as plaintiff's experts assume, then there would be no way to know whether the assumed acceptance schedule would minimize at-reactor storage costs. Second, Mr. Graves analysis of the demand for allocation slots (which determines the allocation schedule in his economic sequence model) depends on the assumed "non-breach world" acceptance schedule and the assumption that DOE would accept GTCC waste and failed fuel under the "non-breach world" acceptance schedule. The interrelationship between these assumptions

(...continued)
Graves' "economic sequence model" such as Purchasers' ability to shut-down plants prior to the end of their currently licensed lives, and Purchasers' ability to obtain extensions of the licensed lives of their nuclear plants.

11. I understand that GTCC waste is a form of low-level radioactive waste that contains concentrations of certain radioactive nuclides that exceed the concentration limits established by the Nuclear Regulatory Commission for Class C waste. Failed fuel is SNF and/or HLW that does not meet the General Specifications for such fuel as set forth in Appendix E of the contract.

makes plaintiff's damage claim a house of cards: if any one of the assumptions is incorrect, the entire model would fall apart.

Daniel R. Fischel

March 1, 2002