84. Article entitled "Free-Agency and the Concentration of Player Talent in Major League Baseball" by Craig A. Depken, II, the University of Texas at Arlington, Department of Economics

85. Article entitled "The Sports Business as a Labor Market Laboratory" by Lawrence M. Kahn, Journal of Economic Perspectives, Vol. 14, No. 3, Summer 2000

86. Article entitled "Labour Markets in Professional Sports" by Sherwin Rosen and Allen Sanderson, The Economic Journal, 111 (February 2001)

87. Article entitled "The Salary Cap and the Luxury Tax: Affirmative Action Programs for Weak-Drawing Franchises" by James Quirk, Stee-Rike Four! What's Wrong with the Business of Baseball?, edited by Daniel R. Marburger, Praeger 1997

88. Article entitled "The Impact of Free Agency on the Distribution of Playing Talent in Major League Baseball" by Christopher R. Drahozal, Journal of Economics and Business, 1986: 38

89. Article entitled "Free-Agency and the Competitiveness of Major League Baseball" by Craig A. Depken II, Review of Industrial Organization 14, 1999

90. Article entitled "The Coase Theorem, Free Agency, and Major League Baseball: A Panel Study of Pitcher Mobility from 1961 to 1992" by Timothy R. Hylan, Maureen J. Lage and Michael Treglia, Southern Economic Journal, vol. 62, no. 4, April 1996

91. Article entitled "Hospitality versus Exchange: the Limits of Monetary Economies" by Stephanie Bell and John F. Henry, Review of Social Economy, June 1, 2001

92. Article entitled "A beginner's guide to corporate barter" by Nigel M. Healey, Illinois Business Review, March 22, 1991

93. Article entitled "Trading Places" by Mary Kwak, Inc. Vol. 22, No. 14, October 2000

94. Article entitled "Is Why We Use Money Important" by Victor E. Li, Federal Reserve Bank of Atlanta, Economic Review, First Quarter 2001

95. Article entitled "A Search-Theoretic Approach to Monetary Economics" by Nobuhiro Kiyotaki and Randall Wright, The American Economic Review, March 1993, Vol. 83, No. 1

96. Article entitled "Social and Economic Behaviour in Organizations: Restricting the Means of Exchange Within Organizations" by Canice Prendergast and Lars Stole, European Economic Review 43 (1999)

97. Article entitled "Bargains, Barter and Money" by Merwan Engineer, Review of Economic Dynamics 4 (2001)

98. Article entitled "A Theory of Monetary Exchange" by Alfred Lorn Norman, Review of Economic Studies (1987) LIV

99. Article entitled "Money and Barter in General Equilibrium with Transactions Costs" by Jürg Niehans, American Economics Review, vol. 61, no. 5, December 1971

100. Article entitled "Asymmetry, Imperfectly Transferable Utility, and The Role of Fiat Money In Improving Terms of Trade" by Merwan Engineer and Shouyong Shi, Journal of Monetary Economics 41 (1998).

101. Article entitled "Simulating a Multiproduct Barter Exchange Economy" by Daniel Levy and Mark Bergen, Economic Inquiry, Vol. XXXI, April 1993

102. Article entitled "Institutional Guidelines for Designing Successful Transferable Rights Programs" by James T.B. Tripp and Daniel J. Dudek, Yale Journal on Regulation 1989

103. Article entitled "Economics Prescriptions for Environmental Problems: How the Patient Followed the Doctor's Orders" by Robert W. Hahn, Journal of Economic Perspectives, Vol. 3, No. 2, Spring 1989

104. Article entitled "Marketable Permits: Lessons for Theory and Practice" by Robert W. Hahn and Gordon L. Hester, Ecology Law Quarterly, Vol. 16, 1989

105. Article entitled "The Market for Sulfur Dioxide Emissions" by Paul L. Joskow, Richard Schmalensee and Elizabeth M. Bailey, The American Economic Review, Vol. 88, No. 4, September 1998

106. Article entitled "Environmental Commodities Markets: 'Messy' Versus 'Ideal' Worlds" by Richard J. McCann, Contemporary Economic Policy, Vol. XIV, July 1996

107. Article entitled "Transaction Costs and Tradeable Permits" by Robert N. Stavins, Journal of Environmental Economics and Management 29 (1995)

108. Article entitled "What Can We Learn from the Grand Policy Experiment? Lessons from $SO_2$ Allowance Trading" by Robert N. Stavins, Journal of Economic Perspectives, Vol. 12, No. 3, Summer 1998

109. Article entitled "Market Failure in Incentive-Based Regulation: The Case of Emissions Trading" by Scott Atkinson and Tom Tietenberg, Journal of Environmental Economics and Management 21 (1991)

110. Article entitled "Why Are There So Few Transactions Among Water Users?" by Robert A. Young, American Journal of Agricultural Economics, Vol. 68, No. 5, 1986

111. Article entitled "Bargaining Rules for a Thin Spot Water Market" by R. Maria Saleth, John B. Braden and J. Wayland Eheart, Land Economics, August 1991, 67(3)

112. Article entitled "Do Water Markets 'Work'? Market Transfers and Trade-Offs in the Southwestern States" by Bonnie Colby Saliba, Water Resources Research, Vol. 23, No. 7, July 1987

113. Article entitled "EPA's Bubble Policy: the Theory of Marketable Pollution Permits Confronts Reality" by Richard A. Liroff from Marketable Pollution Permits

114. Article entitled "Where Did All the Markets Go? An Analysis of EPA's Emissions Trading Program" by Robert W. Hahn and Gordon L. Hester, Yale Journal on Regulation, 1989, Vol. 6, No. 109

115. Article entitled "Emissions Trading: Why Is This Thoroughbred Bobbled?" by Daniel J. Dudek and John Palmisano, Columbia Journal of Environmental Law, Vol. 13:217

116. Article entitled "Emissions Trading and Transaction Costs: Analyzing the Flaws in the Discussion" by Edwin Woerdman, Ecological Economics 38 (2001) 293

117. Article entitled "$SO_2$ Allowance Trading: How Do Expectations and Experience Measure Up? By Douglas R. Bohi and Dallas Burtraw, The Electricity Journal, August/September 1997

118. Article entitled "The Behavior of the Allowance Market: Theory and Evidence" by Robert W. Hahn and Carol A. May, The Electricity Journal, March 1994

119. Article entitled "Barriers to Implementing Tradable Air Pollution Permits: Problems of Regulatory Interactions" by Robert W. Hahn and Roger G. Noll, Yale Journal on Regulation, Vol. 1: 63, 1983

120. Article entitled "Transaction Costs in Pollution Markets: An Empirical Study" by Lata Gangadharan, Land Economics, November 2000, 76 (4)

121. Article entitled "The US Market for $SO_2$ Permits" by Klaus Conrad and Robert E. Kohn, Energy Policy, Vol. 24, No. 12, 1996

122. Article entitled "The U.S. Allowance Trading System for Sulfur Dioxide: An Update on Market Experience" by Renee Rico, Environmental and Resource Economics, March 1995

123. Article entitled "An Interim Evaluation of Sulfur Dioxide Emissions Trading" by Richard Schmalensee, Paul L. Joskow, A. Denny Ellerman, Juan Pablo Montero and Elizabeth M. Bailey, Journal of Economic Perspectives, Volume 12, Number 3, Summer 1998

124. Article entitled "Carbon Taxes and Carbon Emissions Trading" by Paul Ekins and Terry Baker, Journal of Economic Surveys, Vol. 15, No. 3 (2001)

125. Article entitled "Sellers' Hedging Incentives at EPA's Emission Trading Auction" by Bouwe R. Dijkstra and Marco Hahn, Journal of Environmental Economics and Management 41 (2001)

126. Article entitled "Pollution Permit Markets with Intertemporal Trading and Asymmetric Information" by Andrew J. Yates and Mark B. Cronshaw, Journal of Environmental Economics and Management 42 (2001)

127. Article entitled "Seller Incentive Properties of EPA's Emission Trading Auction" by Timothy N. Cason, Journal of Environmental Economics and Management 25 (1993)

128. Article entitled "Using Markets to Allocate Pollution Permits and Other Scarce Resource Rights Under Limited Information" by Tracy R. Lewis, David E. M. Sappington, Journal of Public Economics 57 (1995)

129. Article entitled "Exclusionary Manipulation of Markets for Pollution Rights" by Walter S. Misiolek and Harold W. Elder, Journal of Environmental Economics and Management 16 (1989)

130. Article entitled "Market Power and Transferable Property Rights" by Robert W. Hahn, Quarterly Journal of Economics, November 1984

131. Article entitled "Theoretical and Practical Possibilities and Limitations of a Market Mechanism Approach to Air Pollution Control" by William S. Vickery, Land Economics, February 1992, 68(1)

132. Article entitled "Marketable Emission Permits: Efficiency, Profitability and Substitutability" by Rose Anne Devlin and R. Quentin Grafton, Canadian Journal of Economics, XXIX, April 1996

133. Article entitled "Economic Assessment of the Regional Clean Air Incentives Market: A New Emissions Trading Program for Los Angeles" by Scott Lee Johnson and David M. Pekelney, Land Economics, August 1996, 72 (3)

134. Article entitled "Attitudes Toward Risk and Compliance in Emission Permit Markets" by Shaul Ben-David, David Brookshire, Stuart Burness, Michael McKee and Christian Schmidt, Land Economics, November 2000, 76 (4)

135. Article entitled "Why Sulfur Trading Failed in the UK" by Steve Sorrell, Pollution for Sale

136. Article entitled "Efficiency and Distributional Aspects of Market Mechanisms in the Control of Pollution: an Empirical Analysis" by Nick Hanley and Ian Moffatt, Scottish Journal of Political Economy, Vol. 40, No. 1, February 1993

137. Article entitled "Emission Trading in theory and Practice: An Analysis of RECLAIM in Southern California" by O. Fromm and B. Hansjürgens, Environment and Planning C: Government and Policy, 1996, Volume 14

138. Article entitled "Too Much Market? Conflict Between Tradable Pollution Allowances and The "Polluter Pays" Principle" by Jonathan Remy Nash, Harvard Environmental Law Review, Vol. 24, 2000

139. Article entitled "Political Obstacles to the Implementation of Emissions Markets: Lessons from RECLAIM" by Dale B. Thompson, Natural Resources Journal, Vol. 40, Summer 2000

140. Article entitled "An Experimental Investigation of the Seller Incentives in the EPA's Emission Trading Auction" by Timothy N. Cason, The American Economic Review, September 1995, Vol. 85, No. 4

141. Article entitled "The Political Economy of Market-Based Environmental Policy: The U.S. Acid Rain Program" by Paul L. Joskow and Richard Schmalensee, Journal of Law and Economics, Vol. XLI, April 1998

142. Article entitled "The Political Economy of International Emissions Trading Scheme Choice: A Theoretical Analysis" by Ian-Tjeerd Boom and Gert Tinggaard Svendsen, Journal of Institutional and Theoretical Economics, Vol. 156 (2000)

143. Article from Nuclear Energy Institute entitled "Utilities Seek Court Order Requiring Energy Department To Dispose of Used Nuclear Fuel 'Immediately,'" February 19, 1998

144. Article from <u>www.sciencefriday.com</u> entitled "Hour Two: Nuclear Waste Storage/Science Budget, February 6, 1998

145. Article from Citizens Against Government Waste entitled" Nuclear Waste Storage"

**<u>Books</u>**

146. Excerpts from Chapter 26, "Money and Commercial Banking" from <u>Economics</u>, Fifteenth Edition by Paul A. Samuelson, William D. Nordhaus and Michael J. Mandel, 1995, MacGraw Hill

147. Excerpts from Chapter 13, "Exchange, Transaction Costs, and Money" from <u>Price Theory and Applications</u>, Sixth Edition by Jack Hirshleifer and David Hirshleifer, 1998, Prentice Hall

148. Excerpts from <u>Emissions Trading Under the U.S. Acid Rain Program: Evaluation of Compliance Costs and Allowance Market Performance</u> by A. Denny Ellerman, Richard Schmalensee, Paul J. Joskow, Juan Pablo Montero and Elizabeth M. Bailey, October 1997, Massachusetts Institute of Technology

**<u>Working Papers, Discussion Papers and White Papers</u>**

149. Working Paper entitled "Non-Monetary Exchange within Firms and Industry" by Canice Prendergast and Lars Stole, NBER Working Paper Series, September 1996

150. Discussion Paper entitled "Cost Savings San Allowance Trades? Evaluating the $SO_2$ Emission Trading Program to Date" by Dallas Burtraw, Resources for the Future, February 1996

151. Discussion Paper entitled "Transaction Costs and the Performance of Markets for Pollution Control" by Robert N. Stavins, Resources for the Future, June 1993

152. White Paper entitled "Responsible Nuclear Waste Disposal an Unmet Obligation" sponsored by The New England Council, Inc., Yankee Atomic Electric company, Connecticut Yankee Atomic Power Company, February 2001

**Miscellaneous Documents**

153. Cases arising under the Standard Contract At 10 C.F.R. Part 961 Pending Before The Court of Federal Claims

154. Delivery Commitment Schedules

155. Final Delivery Schedules

156. Binder entitled "Spent Nuclear Fuel Litigation Fee Adequacy Reviews"

157. Binder entitled "Spent Nuclear Fuel Litigation Total System Life Cycle Costs"

158. Binder entitled "Spent Nuclear Fuel Litigation - MRS, Volume 1"

159. Binder entitled "Spent Nuclear Fuel Litigation - MRS, Volume 2"

C

## Exhibit C

### OFF Acceptance Schedule For Yankee Atomic's SNF Under Plaintiff's Aggregrate Acceptance Schedule

| Year | Beginning Inventory | Acceptance of SNF | Ending Inventory |
|---|---|---|---|
| 1998 | 127.41 | 19.70 | 107.71 |
| 1999 | 107.71 | 9.84 | 97.87 |
| 2000 | 97.87 | 17.99 | 79.88 |
| 2001 | 79.88 | 0.00 | 79.88 |
| 2002 | 79.88 | 17.76 | 62.11 |
| 2003 | 62.11 | 8.41 | 53.70 |
| 2004 | 53.70 | 17.78 | 35.91 |
| 2005 | 35.91 | 9.12 | 26.79 |
| 2006 | 26.79 | 9.24 | 17.55 |
| 2007 | 17.55 | 17.56 | 0.00 |

Source: Backup materials to Frank Graves' Expert Witness Report.

PROTECTED MATERIAL
TO BE DISCLOSED ONLY IN ACCORDANCE WITH
UNITED STATES COURT OF FEDERAL CLAIMS PROTECTIVE ORDER

# REPORT OF DANIEL R. FISCHEL RE: CONNECTICUT YANKEE ATOMIC POWER COMPANY V. UNITED STATES

## I. QUALIFICATIONS.

1. I am Director, co-Chairman and co-President of Lexecon Inc., a consulting firm that specializes in the application of economics to a variety of legal and regulatory issues. I am also the Lee and Brena Freeman Professor of Law and Business at The University of Chicago Law School. I have served previously as Dean of The University of Chicago Law School, Director of the Law and Economics Program at The University of Chicago Law School and as Professor of Law and Business at The University of Chicago Graduate School of Business.

2. Both my research and my teaching have concerned the economics of corporate law. I also have lectured widely in this area. I have published approximately forty articles in leading legal and economics journals and am coauthor, with Judge Frank Easterbrook of the Seventh Circuit Court of Appeals, of the book The Economic Structure of Corporate Law (Harvard University Press). Courts of all levels, including the Supreme Court of the United States, have cited my articles as authoritative. See, e.g., Central Bank v. First Interstate Bank, 114 S. Ct. 1439 (1994); Basic Inc. v. Levinson, 485 U.S. 224, 246 n. 24 (1988); and Edgar v. MITE Corp., 457 U.S. 624, 643 (1982). My curriculum vitae, which contains a list of my publications, is attached hereto as Exhibit A.

3. I have served as a consultant or adviser on economic issues to, among others, the United States Securities and Exchange Commission, The National Association of Securities Dealers, the New York Stock Exchange, the Chicago Board of Trade, the United States Department of Labor, the United States Department of Justice, the Federal Deposit Insurance Corporation, the Resolution Trust Corporation, and the Federal Trade Commission.

4. I am a member of the American Economics Association and the American Finance Association. I am also a member of the Board of Directors of the Center for the Study of the Economy and the State at The University of Chicago, and former Chairman of the American Association of Law Schools' Section on Law and Economics. I have testified as an expert witness in multiple proceedings in federal and state courts across the country, as detailed in Exhibit A. My billing rate is $1,000 per hour.

## II. INTRODUCTION AND SUMMARY OF CONCLUSIONS.

5. In 1982, Congress enacted the Nuclear Waste Policy Act ("NWPA") which created a program for the permanent disposal of spent nuclear fuel ("SNF") and high-level radioactive waste ("HLW") generated by domestic commercial nuclear power plants. Complaint, ¶ 7. Pursuant to the NWPA, the Department of Energy ("DOE") entered into a contract in 1983 with plaintiff Connecticut Yankee Atomic Power Company ("Connecticut Yankee") which provided that the government would accept and dispose permanently of Connecticut Yankee's SNF and HLW in return for the payment of fees by Connecticut Yankee. Id., ¶¶ 1 & 8. DOE entered into similar contracts with the owners of other commercial nuclear power plants (referred to in the contracts as "Purchasers") at about the same time. Among other things, these contracts provided that DOE would begin acceptance of nuclear waste by January 31, 1998. Id., ¶ 10. I understand that the Court has found that DOE partially breached Connecticut Yankee's contract by failing to commence acceptance by the January 31, 1998 deadline.

6. Connecticut Yankee claims that as a result of the partial breach, it has been forced to incur and will incur substantial additional costs to continue to store its nuclear waste on site. Complaint, ¶ 23. One of plaintiff's experts, Mr. Frank C. Graves, claims that "had DOE commenced acceptance of spent fuel by January 31, 1998 with a reasonable aggregate acceptance rate, it should and would have completed removal of spent fuel from Plaintiff's facility by August 2001." Frank C. Graves Expert Witness Report ("Graves Report"), at 3. Mr. Graves admits that "[i]n order to achieve removal by this date, Plaintiff would need to swap removal slots with other Purchasers" but concludes not only that sufficient exchanges would

have occurred, but also that "Connecticut Yankee would receive net revenues of $7.8 million" by exchanging slots. Id., at 3-4. Based on these conclusions, another one of plaintiff's experts, Dr. Kenneth T. Wise, has opined that Connecticut Yankee's "total minimum damages" are $119.7 million. Expert Report on Damages Incurred by Connecticut Yankee Due to The Department of Energy's Partial Contract Breach Prepared by Kenneth T. Wise, Ph.D ("Wise Report"), at 7-8. This figure represents the sum of the estimated incremental costs of on-site storage through 2010 that Connecticut Yankee will incur in the "Breach World" as well as the foregone exchange receipts that Mr. Graves claims it would have received in the "Non-Breach World". Id.

7. I have been asked by the Department of Justice to analyze plaintiff's damage claim from an economic perspective. In connection with my analysis, I have been assisted by members of Lexecon's professional staff. Exhibit B lists the materials we have reviewed. Based on this review and analysis, and my knowledge and experience, I have reached two principal conclusions:

- The claimed damages do not result from DOE's failure to commence disposing SNF and HLW by January 31, 1998.
- Plaintiff's damage claim is speculative because it depends on future events, assumes that the DOE should have implemented a particular schedule for the disposal of Purchasers' SNF and HLW, assumes that DOE would accept Greater Than Class C ("GTCC") waste and "failed fuel" under this acceptance schedule, and assumes that exchanges of allocation slots between program participants would minimize aggregate at-reactor storage costs.

I elaborate upon and explain the bases for these conclusions in the remainder of this report.

## III. THE CLAIMED DAMAGES DO NOT RESULT FROM DOE'S FAILURE TO COMMENCE DISPOSING SNF AND HLW BY JANUARY 31, 1998.

8. Connecticut Yankee's only generating plant was a nuclear facility in Haddam Neck, Connecticut which was permanently shut down in 1996. Complaint, ¶¶ 5 & 22. Connecticut Yankee's claimed damages consist of the costs associated with storing its nuclear waste on site until at least 2010. Connecticut Yankee's Pre-Trial Brief of Legal Points and

Authorities Relied Upon ("Pre-Trial Brief"), at 8. The claimed damages do not result from DOE's failure to commence disposing SNF and HLW by January 31, 1998, because if DOE had started disposing SNF and HLW by January 31, 1998, but did not dispose of all of plaintiff's nuclear waste prior to 2010, then plaintiff still would have to store nuclear waste on site through 2010 and still would have to incur the costs that it claims as damages.[1] In other words, the claimed damages do not result from the partial breach of contract found by the Court.

## IV. PLAINTIFF'S DAMAGE CLAIM IS SPECULATIVE.

9. As described above, plaintiff's damage claim consists of the estimated incremental costs of on-site storage through 2010 that plaintiff would have avoided if it had been able to dispose of all of its nuclear waste by 2001, as Mr. Graves concludes it would have. Therefore, plaintiff's damage claim depends critically on Mr. Graves' conclusion. However, Mr. Graves' conclusion is speculative because it depends on a series of interrelated assumptions about future events, the "non-breach world" aggregate acceptance schedule, exchanges, GTCC and failed fuel. Each of these critical assumptions is discussed below.

### A. Assumptions about Future Events

10. A portion of the claimed damages consists of "other continuing costs" that plaintiff's experts claim plaintiff will incur until its nuclear waste is accepted and removed; plaintiff's experts assume that this will not occur until at least 2010. Wise Report, at 5-6. This portion of plaintiff's claimed damages is speculative because it depends on future events.[2]

### B. Assumptions about the "Non-Breach" Aggregate Acceptance Schedule

---

1. Plaintiff's damage claim depends on the assumption that all of plaintiff's nuclear waste would have been removed because plaintiff's experts assume that the costs of storing nuclear waste do not vary with the amount of inventory at the site. See Graves Report, note 5 and Charles W. Pennington Expert Witness Report, at 2-3 & 6-7. When a dry storage system (known as an independent spent fuel storage installation or "ISFSI") is used to store nuclear waste, the number of dry storage canisters will vary with the amount of inventory. Id. However, the initial and decommissioning costs of dry storage canisters are relatively low. Id.
2. Moreover, if plaintiff were to recover the claimed damages and did not incur these costs, the difference between plaintiff's projected costs and plaintiff's actual costs would be a windfall

11. Plaintiff's damage claim assumes not only that DOE should have started disposing of fuel by January 31, 1998, but also that DOE should and would have continued to dispose specified amounts of nuclear fuel at specified dates thereafter. The assumed amounts are set forth in Table 1 of the Graves Report, which shows an assumed acceptance rate of 1,200 MTU in 1998 and 1999, 2,000 MTU in 2000 and 2001, 2,700 MTU in 2002 and 3000 MTU in each subsequent year.

Economic Efficiency

12. Plaintiff's experts claim that this assumed "non-breach world" aggregate acceptance schedule is economically efficient, arguing that a slower acceptance rate would "impose additional unnecessary storage requirements and costs on Purchasers." Graves Report, at 8; John W. Bartlett Expert Witness Report ("Bartlett Report"), at 9. However, their analysis does not establish that the assumed "non-breach world" aggregate acceptance schedule would be economically efficient because it does not take into account how the assumed acceptance schedule would affect other relevant costs. As Dr. Bartlett notes:

> The total cost to utilities of storing and disposing of spent fuel . . . can be divided into three parts. One is the program costs -- the sum of the fees each contracting utility has or will pay to the government for the services specified in the Standard Contracts. A second is at-reactor spent fuel storage costs -- the sum of the costs each contracting utility has or will incur storing spent fuel prior to it being accepted by the government. A third is loading costs -- the sum of the costs each contracting utility will incur loading spent fuel into casks provided by the government pursuant to the Standard Contracts for transport to a government facility. (Bartlett Report, at 2-3)

Plaintiff's experts have not shown that the assumed acceptance schedule minimizes the sum of program costs, at-reactor storage costs and loading costs.[3] In fact, plaintiff's experts' reports do not provide any analysis of how the assumed acceptance schedule would affect program costs and loading costs.

---

(...continued)
to the plaintiff.

3. In order to show that a proposed acceptance schedule was socially efficient, one would also have to take into account external, societal costs, such as the costs associated with