A. Assumptions about Future Events

10. A portion of the claimed damages consists of "other continuing costs" that plaintiff's experts claim plaintiff will incur until its nuclear waste is accepted and removed; plaintiff's experts assume that this will not occur until at least 2010. Wise Report, at 5-6. This portion of plaintiff's claimed damages is speculative because it depends on future events.[3]

B. Assumptions about the "Non-Breach" Aggregate Acceptance Schedule

11. Plaintiff's damage claim assumes not only that DOE should have started disposing of fuel by January 31, 1998, but also that DOE should and would have continued to dispose specified amounts of nuclear fuel at specified dates thereafter. The assumed amounts are set forth in Table 1 of the Graves Report, which shows an assumed acceptance rate of 1,200 MTU in 1998 and 1999, 2,000 MTU in 2000 and 2001, 2,700 MTU in 2002 and 3000 MTU in each subsequent year.

Economic Efficiency

12. Plaintiff's experts claim that this assumed "non-breach world" aggregate acceptance schedule is economically efficient, arguing that a slower acceptance rate would "impose additional unnecessary storage requirements and costs on Purchasers." Graves Report, at 8; John W. Bartlett Expert Witness Report ("Bartlett Report"), at 9. However, their analysis does not establish that the assumed "non-breach world" aggregate acceptance schedule would be economically efficient because it does not take into account how the assumed acceptance schedule would affect other relevant costs. As Dr. Bartlett notes:

> The total cost to utilities of storing and disposing of spent fuel . . . can be divided into three parts. One is the program costs -- the sum of the fees each contracting utility has or will pay to the government for the services specified in the Standard Contracts. A second is at-reactor spent fuel storage costs -- the sum of the costs each contracting utility has or will incur storing spent fuel prior to it being accepted by the government. A third is loading costs -- the sum of the costs each contracting utility will incur loading spent fuel into casks provided by

3. Moreover, if plaintiff were to recover the claimed damages and did not incur these costs, the difference between plaintiff's projected costs and plaintiff's actual costs would be a windfall to the plaintiff.

the government pursuant to the Standard Contracts for transport to a government facility. (Bartlett Report, at 2-3)

Plaintiff's experts have not shown that the assumed acceptance schedule minimizes the sum of program costs, at-reactor storage costs and loading costs.[4] In fact, plaintiff's experts' reports do not provide any analysis of how the assumed acceptance schedule would affect program costs and loading costs.

Alternative Acceptance Rates

13. Article IV.B.5.b of the contract provides that "beginning not later than July 1, 1987, DOE shall issue an annual capacity report for planning purposes . . . [setting] forth the projected annual receiving capacity for the DOE facility(ies) . . . ." Article IV.B.5.a of the contract provides that "beginning on April 1, 1991, DOE shall issue an annual acceptance priority ranking for receipt of SNF and/or HLW at the DOE repository." Pursuant to these requirements the DOE published both an acceptance priority ranking ("APR") and an annual capacity report ("ACR") in 1991. The 1991 ACR projected waste acceptance rates for SNF of 400 MTU in 1998, 600 MTU in 1999 and 900 MTU in each year from 2000 though 2007, for a 10-year total of 8,200 MTU. 1991 Annual Capacity Report, Table 2.1 (Bates No. HQ0002365). This acceptance schedule also is consistent with DOE accepting no more than 10,000 MTU prior to 2010. Id., at 4 (Bates No. HQ0002364).[5]

14. The 1991 ACR applied the waste acceptance rates to the 1991 APR, resulting in individual Purchaser allocations based on an oldest fuel first ("OFF") priority. See 1991 Annual Capacity Report, Table 3.1 (Bates No. HQ0002369). Even with the acceptance

4. In order to show that a proposed acceptance schedule was socially efficient, one would also have to take into account external, societal costs, such as the costs associated with potential accidental discharges of radioactive material.
5. I understand that the 1987 amendments to the NWPA authorized DOE to site, construct and operate a single Monitored Retrievable Storage ("MRS") facility, and provided that no more than 10,000 MTU of nuclear waste could be stored at the MRS facility until a permanent repository began to operate. I also understand that DOE had announced prior to issuance of the 1991 ACR that it did not anticipate that the permanent repository would begin operating until at least 2010.

schedule plaintiff's experts assume, an OFF priority allocation would not allow Maine Yankee to dispose of all of its nuclear waste before 2010. See Exhibit C. Because the acceptance rate projected in the 1991 ACR is lower, an OFF priority allocation using this acceptance rate also would not allow Maine Yankee to dispose of its nuclear waste before 2010.[6] Moreover, even if the exchange market functioned to minimize aggregate storage costs as Mr. Graves has assumed, plaintiff would continue to store fuel through 2010 under the acceptance rates projected in the 1991 ACR because, according to Mr. Graves' calculations, the amount of "Must-Move" fuel generated by discharges from operating reactors (i.e., discharges in excess of spent fuel pool capacity) exceeds 10,000 MTU by 2010.[7] See Graves Report, Figure 1. Therefore, if the 1991 ACR acceptance rate had been achieved, plaintiff would not avoid the additional storage costs on which its damage claim is predicated.

B. Assumptions about Exchanges

15. Article V.E of the contract provides Purchasers with the "right to exchange approved delivery commitment schedules with parties to other contracts with DOE for disposal of SNF and/or HLW; provided, however, that DOE shall, in advance, have the right to approve or disapprove, in its sole discretion, any such exchanges." Plaintiff's damage claim "assume[s] that such swaps would approach the efficient economic allocation of slots" [i.e., the allocation of slots which minimized the aggregate on-site storage costs of all purchasers]. Graves Report, at 13. Mr. Graves' conclusion that all of Maine Yankee's SNF and HLW would have been removed by 2002 in the "Non-Breach World" depends on this assumption. However, this assumption is both speculative (because there is no way to know with certainty how the market would function) and implausible for several reasons.

6. With an OFF priority, Maine Yankee's allocation would total 216.5 MTU through 2007. Mr. Graves' data show that Maine Yankee has an SNF inventory of 541.83 MTU.
7. To minimize aggregate storage costs under plaintiff's model, "Must-Move" fuel generated by discharges from operating reactors in excess of spent fuel pool capacity would have to be moved first, because if this fuel is not moved, an additional storage facility would have to be built.

16. First, only approved delivery commitment schedules ("DCSs") can be exchanged under the contract. See Article V.E. Moreover, under the contract, DOE is only required to project receiving capacity for 10 years following the projected commencement of operation of the initial DOE facility, and utilities are not required to submit DCSs for the full 10 years. See Article IV.B.5.b and Article V.B.1. Purchasers could not exchange allocations that had not been projected, requested, and approved.

17. Second, if GTCC can not be included in DCSs and failed fuel might not be accepted in the year stated on a DCS, then Purchasers would have little incentive to engage in exchanges (because exchanges would not eliminate the need for on-site storage).

18. Third, Article V.E of the contract provides for bilateral exchanges of like amounts of SNF and/or HLW (i.e., exchanges of DCSs for equal MTUs between Purchasers), not the "last-bid auction procedure" that Mr. Graves refers to in his report (at page 14). One cannot assume that a market with bilateral exchanges in-kind will produce the same results as a market with a last-bid auction procedure. A large number of bilateral exchanges would be required to achieve the same result and, in each exchange, there would be bargaining and the attendant possibility of expropriation by Purchasers with desirable allocations. Moreover, a market with bilateral exchanges in-kind does not produce as much information as a market with a last-bid auction procedure. Economists have recognized that sequential, bilateral trading is not the most efficient way to organize a market.[8]

---

8. See, e.g., Hahn & Noll, "Barriers to Implementing Tradable Air Pollution Permits: Problems of Regulatory Interactions," 1 Yale J. on Regulation (1983) 63, 74; Stavins, "Transaction Costs and Tradeable Permits," 29 J. Envir. Econ. & Management, (1995) 133, 135, note 5 ("the sequential and bilateral nature of the trading process [leads] to some initial trades that preclude better trades from being carried out subsequently"), and Atkinson & Tietenberg, "Market Failure in Incentive-Based Regulation: The Case of Emissions Trading," 21 J. Environmental Econ. & Management (1991) 17, 28 ("the type of bilateral, sequential trading that occurs under the bubble policy results in substantially smaller cost savings than would be expected from the more sophisticated, but uncommon, cost-effective trading process that analysts have historically presumed to exist.")

19. Fourth, Article V.E of the contract also provides that Purchasers must submit exchange requests to DOE for approval and gives DOE the discretion to disapprove proposed exchanges. Economists also have recognized that a requirement for government approval discourages trading. See, e.g., Stavins, "Transaction Costs and Tradeable Permits," 29 J. Envir. Econ. & Management, (1995) 133, 145.[9] I understand that DOE might disapprove exchanges for many reasons, including differences in storage cask requirements and transportation requirements that potential exchanges would generate.[10]

20. The actual behavior of Purchasers to date does not support Mr. Graves' allocation assumption. Even though many Purchasers currently have tradable DCSs and some utilities (such as Yankee Atomic) have actively solicited exchange proposals, no exchanges have occurred. In his report, Mr. Graves argues that the incentive to exchange would be greater in the "Non-Breach World." Graves Report, at 11-13 & 17-19. However, even if this were true, it would not establish that the exchanges that would occur in the Non-Breach World would minimize aggregate on-site storage costs and allow Maine Yankee to dispose of all of its nuclear waste by 2002.

---

9. In 1981, the State of Wisconsin implemented a program designed to allow for the limited trading of marketable discharge permits to control biological oxygen demand on a part of the Fox River. Hahn, "Economic Prescriptions for Environment Problems: How the Patient Followed the Doctor's Orders," J. Econ. Perspectives, 3 (1989) 95, 97. The actual trading and cost savings of this program were minimal. Id., at 98. The program's disappointing results have been attributed to certain features of the market structure that also exist here: limited permit trading between small numbers of market participants, subject to regulatory approval. Id. Also, see, Tripp & Dudek, "Institutional Guidelines for Desigining Successful Transferable Rights Programs," 6 Yale J. on Regulation (1989), 369, 387 ("the rights to pollute are not freely tradeable under the Fox River program, which impairs the value of the rights").

10. Mr. Graves asserts that "swaps of acceptance slots would allow Purchasers (and not insignificantly, DOE also) to realize substantial savings in cost and efficiency as compared with the initial allocation of acceptance slots under OFF." Graves Report, at 3. However, even if this were true, it would not be sufficient to establish that Purchasers would propose the necessary sequence of exchanges or that the DOE would approve the exchanges as they were proposed. Both Purchasers and the DOE would have to evaluate each exchange on its own merits. The DOE would not be able to rely on Mr. Graves' assumption that a series of bilateral exchanges would ultimately result in an allocation that allowed them to obtain "substantial savings in cost and efficiency" because it would have no way of knowing whether all of the necessary exchanges would be proposed.

21. Mr. Graves' conclusion regarding the net proceeds that plaintiff would obtain from exchanging DCSs is also questionable because, for the reasons stated above, one cannot know with certainty whether exchanges would occur and what the terms of exchanges which did occur would be.[11] It is possible that the exchanges which did occur would occur at terms unfavorable to plaintiff, and that instead of obtaining net revenues from exchanges, plaintiff would incur net costs. Of course, any such costs would offset plaintiff's claimed storage costs savings.

C. Assumptions about GTCC Waste and Failed Fuel

22. I understand that plaintiff has both failed fuel and GTCC waste on its site.[12] Under these circumstances, plaintiff will incur the costs of on-site storage until its failed fuel and GTCC waste are removed from its site. Therefore, plaintiff's damage calculations necessarily assume that its failed fuel and GTCC waste would also be accepted by DOE under the assumed schedule discussed above. This assumption is speculative because the contract does not require DOE to do this.

D. The Interrelationship between Assumptions

23. Plaintiff's assumptions are interrelated in several respects. First, plaintiff's experts' conclusion that the proposed acceptance schedule would minimize at-reactor storage costs depends on their assumptions about exchanges, GTCC waste and failed fuel: if the exchange market did not function as plaintiff's experts assume, or DOE did not accept GTCC waste and failed fuel as plaintiff's experts assume, then there would be no way to know whether the assumed acceptance schedule would minimize at-reactor storage costs. Second, Mr.

11. The price of exchanges could also be affected by other factors not taken into account by Mr. Graves' "economic sequence model" such as Purchasers' ability to shut-down plants prior to the end of their currently licensed lives, and Purchasers' ability to obtain extensions of the licensed lives of their nuclear plants.

12. I understand that GTCC waste is a form of low-level radioactive waste that contains concentrations of certain radioactive nuclides that exceed the concentration limits established by the Nuclear Regulatory Commission for Class C waste. Failed fuel is SNF and/or HLW that does not meet the General Specifications for such fuel as set forth in

Graves' analysis of the demand for allocation slots (which determines the allocation schedule in his economic sequence model) depends on the assumed "non-breach world" acceptance schedule and the assumption that DOE would accept GTCC waste and failed fuel under the "non-breach world" acceptance schedule. The interrelationship between these assumptions makes plaintiff's damage claim a house of cards: if any one of the assumptions is incorrect, the entire model would fall apart.

Daniel R. Fischel

March 1, 2002

(...continued)
Appendix E of the contract.

A

**DANIEL R. FISCHEL**

February 2002

Business Addresses:

Lexecon Inc.
332 South Michigan Avenue
Chicago, Illinois 60604
(312) 322-0209

University of Chicago
Law School
1111 East 60th Street
Chicago, Illinois 60637
(773) 834-4167

## PROFESSIONAL EXPERIENCE

Dean of Law School (1/4/99 – 2/01); Lee and Brena Freeman Professor of Law and Business, University of Chicago Law School (7/1/89 - present); Professor of Law, University of Chicago Law School (1/1/84 - present); Visiting Professor of Law, University of Chicago Law School (7/1/82 - 6/30/83).

Professor of Law and Business, University of Chicago Graduate School of Business (7/1/87 - 6/30/90).

Director, Law and Economics Program, University of Chicago (1/1/84 - 6/30/91).

Assistant Professor of Law, Northwestern University School of Law (6/80 - 6/81); Associate Professor of Law, Northwestern University School of Law (6/81 - 6/82); promoted to full professor in 6/82.

Attorney with Levy and Erens, Chicago, Illinois (7/79 - 6/80).

Law Clerk for Associate Justice Potter Stewart of the United States Supreme Court (1978 - 1979).

Law Clerk for Judge Thomas E. Fairchild, Chief Judge of the Seventh Circuit Court of Appeals (1977 - 1978).

## CONSULTING EXPERIENCE

Chairman and President, Lexecon Inc.

## AREAS OF SPECIALIZATION

Corporate Finance, Corporate Control Transactions, Corporations, Financial Institutions, Regulation of Financial Markets, Regulation of Investments, Economic Analysis of Law.

## PUBLICATIONS

Payback: The Conspiracy to Destroy Michael Milken and His Financial Revolution, Harper Business (1995).

The Economic Structure of Corporate Law, Harvard University Press (1991) (with Frank H. Easterbrook).

## ARTICLES

Multidisciplinary Practice, The Business Lawyer, Vol. 55, (May 2000).

Government Liability for Breach of Contract, American L. & Econ. Rev. V1 N1/2 313 (1999) (with Alan Sykes).

Lawyers and Confidentiality, 65 U. Chi. L. Rev. 1 (1998).

The Law and Economics of Vanishing Premium Life Insurance, 22 Del. J. Corp. Law 1 (1997) (with Robert S. Stillman).

Clustering and Competition in Asset Markets, 20 J. Law & Econ. 23 (1997) (with Sanford J. Grossman, Merton H. Miller, Kenneth R. Cone and David J. Ross).

Corporate Crime, 25 J. Legal Studies 319 (1996) (with Alan O. Sykes).

The Use of Trading Models to Estimate Aggregate Damages in Securities Fraud Litigation: A Proposal for Change, in Securities Class Actions: Abuses and Remedies (The National Legal Center for the Public Interest, 1994) (with David J. Ross).

Civil Rico After Reves: An Economic Commentary, 1993 Sup. Ct. Rev. 157 (with Alan O. Sykes).

Contract and Fiduciary Duty, 36 J. Law & Econ. 425 (1993) (with Frank H. Easterbrook).

Should the Law Prohibit "Manipulation" in Financial Markets?, 105 Harv. L. Rev. 503 (1991) (with David J. Ross).

Efficient Capital Markets, the Crash, and the Fraud on the Market Theory, 74 Cornell L. Rev. 907 (1989).

The Corporate Contract, 89 Colum. L. Rev. 1416 (1989) (with Frank H. Easterbrook); also published in Corporate Law and Economic Analysis (Cambridge University Press 1990) (Lucian Bebchuk ed.).

The Economics of Lender Liability, 99 Yale L. J. 131 (1989).

Should One Agency Regulate Financial Markets, in Black Monday and the Future of Financial Markets (R. Kormendi, R. Kamphuis & J. W. H. Watson, ed.) (Dow Jones-Irwin Inc., 1988).

ERISA's Fundamental Contradiction: The Exclusive Benefit Rule, 55 U. Chi. L. Rev. 1105 (1988) (with John H. Langbein).

From MITE to CTS: Takeovers, the Williams Act and the Commerce Clause, 1987 Sup. Ct. Rev. 47.

The Regulation of Banks and Bank Holding Companies, 73 Va. L. Rev. 301 (1987) (with Andrew M. Rosenfield and Robert S. Stillman).

The Regulation of Accounting: Some Economic Issues, 52 Brooklyn L. Rev. 1051 (1987).

Organized Exchanges and the Regulation of Dual Class Common Stock, 54 U. Chi. L. Rev. 119 (1987).

Comparable Worth and Discrimination in Labor Markets, 53 U. Chi. L. Rev. 891 (1986) (with Edward P. Lazear).

Comparable Worth: A Rejoinder, 53 U. Chi. L. Rev. 950 (1986) (with Edward P. Lazear).

Close Corporations and Agency Costs, 38 Stan. L. Rev. 271 (1986) (with Frank H. Easterbrook).

The Role of Liability Rules and the Derivative Suit in Corporate Law: A Theoretical and Empirical Analysis, 71 Corn. L. Rev. 261 (1986) (with Michael Bradley).

Regulatory Conflict and Entry Regulation of New Futures Contracts, 59 J. Bus. S85 (1985).

Optimal Damages in Securities Cases, 52 U. Chi. L. Rev. 611 (1985) (with Frank H. Easterbrook).

The Business Judgment Rule and the Trans Union Case, 40 Bus. Law. 1437 (1985).

Insider Trading and Investment Analysts: An Economic Analysis of Dirks v. SEC, 13 Hofstra L. Rev. 127 (1984).

Limited Liability and the Corporation, 52 U. Chi. L. Rev. 89 (1985) (with Frank H. Easterbrook).

Labor Markets and Labor Law Compared with Capital Markets and Corporate Law, 51 U. Chi. L. Rev. 1061 (1984).

Customer Protection in Futures and Securities Markets, 4 J. Futures Markets 273 (1984) (with Sanford J. Grossman).

Mandatory Disclosure and the Protection of Investors, 70 Va. L. Rev. 669 (1984) (with Frank H. Easterbrook).

The Appraisal Remedy In Corporate Law, 1983 Am. Bar Found. Res. J. 875.

The Regulation of Insider Trading, 35 Stan. L. Rev. 857 (1983) (with Dennis W. Carlton).

Voting in Corporate Law, 26 J. Law & Econ. 395 (1983) (with Frank H. Easterbrook).

Auctions and Sunk Costs in Tender Offers, 35 Stan. L. Rev. 1 (1982) (with Frank H. Easterbrook).

The Corporate Governance Movement, 35 Vand. L. Rev. 1259 (1982).

Use of Modern Finance Theory in Securities Fraud Cases Involving Actively Traded Securities, 38 Bus. Law 1 (1982).

Antitrust Suits By Targets of Tender Offers, 80 Mich. L. Rev. 1155 (May 1982) (with Frank H. Easterbrook).

Corporate Control Transactions, 91 Yale L. J. 698 (1982) (with Frank H. Easterbrook).

The "Race to the Bottom" Revisited: Reflections on Recent Developments in Delaware Corporation Law, 76 Nw. Univ. L. Rev. 913 (1982).

Takeover Bids, Defensive Tactics and Shareholders' Welfare, 36 Bus. Law 1733 (1981) (with Frank H. Easterbrook).

The Law and Economics of Dividend Policy, 67 Va. L. Rev. 699 (1981).

The Proper Role of a Target's Management in Responding to a Tender Offer, 94 Harv. L. Rev. 1161 (1981) (with Frank H. Easterbrook) (awarded prize by Emory University for best paper written in law and economics for the year 1981).

Secondary Liability Under Section 10(b) of the Securities Act of 1934, 69 California L. Rev. 80 (1981).

Efficient Capital Market Theory, the Market for Corporation Control, and the Regulation of Cash Tender Offers, 57 Tex. L. Rev. 1 (1978); reprinted in K. Scott and R. Posner ed., Economic Perspectives on Corporation Law and Securities Regulation (Little Brown 1980).

Antitrust Liability for Attempts to Influence Government Action: The Basis and Limits of the Noerr-Pennington Doctrine, 45 U. Chi. L. Rev. 80 (1977).

Comment, The Demand and Standing Requirements in Stockholder Derivation Actions, 44 U. Chi. L. Rev. 168 (1977).

Comment, The Use of Government Judgments in Private Antitrust Litigation: Clayton Act Section 5(a), Collateral Estoppel, and Jury Trial, 43 U. Chi. L. Rev. 338 (1976).

## EDUCATION

University of Chicago Law School, Chicago, Illinois; J.D. 1977, cum laude; Order of the Coif; Comment Editor, Vol. 44, University of Chicago Law Review; Approximately top 1% of the Class. Awarded Casper Platt Award for best paper written by a student of the University of Chicago Law School; awarded Jerome N. Frank Prize for excellence in legal writing while a member of the University of Chicago Law Review, 1974 - 1977. Studied law and economics with Richard Posner and other members of the faculty.

Brown University, Providence, Rhode Island; M.A. 1974 in American History.

Cornell University, Ithaca, New York; major-American History; minor-Economics; B.A. 1972.

## TESTIMONY

Testimony of Daniel R. Fischel Re: In the Matter of Coram Healthcare Corp. and Coram, Inc., Debtors, In the United States Bankruptcy Court for the District of Delaware, Case No. 00-3299 Through 00-3300 (MFW) (December 14, 2001).

Affidavit of Daniel R. Fischel in Re: Jack M. Webb, Special Deputy Receiver For American Eagle Insurance Company v. Elvis Mason, Mason Best Company, L.P., Don D. Hutson, American Eagle Group, Inc., Marion Phillip Guthrie, Frederick G. Anderson, George F. Cass, Richard M. Kurz, Patricia S. Pickard, Arthur Andersen & Co., L.L.P., and Towers, Perrin Forester & Crosby, Inc., D/B/A Tillinghast, In the District Court of Travis County, Texas, 201st Judicial District, Cause No. 99-08253 (September 7, 2001).

Declaration of Daniel R. Fischel Re: In the Matter of Inquiry Concerning High-Speed Access to the Internet Over Cable and Other Facilities: Before the Federal Communications Commission, Washington DC, GN Docket No. 00-185, (Declaration with K. Arrow, G. Becker, D. Carlton, R. Gertner, J. Kalt, H. Sider, and Gustavo Bamberger) (July 24, 2001).

Declaration of Daniel R. Fischel in Re: Walter Green, on behalf of himself and all others similarly situated v. Merck-Medco Managed Care, L.L.C., United States District Court, Southern District of New York, Civil Action No. 99 CIV 0847 (CLB) (June 18, 2001).

Testimony of Daniel R. Fischel in Re:Tyson Foods, Inc. and Lasso Acquisition Corporation v. IBP, Inc., In the Chancery Court of Washington County, Arkansas, Case No. E 2001-749-4, (May 25, 2001).

Deposition of Daniel R. Fischel in Re:Tyson Foods, Inc. and Lasso Acquisition Corporation v. IBP, Inc., In the Chancery Court of Washington County, Arkansas, Case No. E 2001-749-4, (May 10, 2001).

Rebuttal Report of Daniel R. Fischel in Re: Myron Weiner, Nicholas Sitnycky, Ronald Anderson and Robert Furman on behalf of themselves and all others similarly situated v. The Quaker Oats Company and William D. Smithburg, United States District Court, Northern District of Illinois, Case No. 98 C 3123, (February 19, 2001).

Deposition of Daniel R. Fischel in Re: Myron Weiner, Nicholas Sitnycky, Ronald Anderson and Robert Furman on behalf of themselves and all others similarly situated v. The Quaker Oats Company and William D. Smithburg, United States District Court, Northern District of Illinois, Case No. 98 C 3123, (January 24, 2001).

Report of Daniel R. Fischel in Re: Myron Weiner, Nicholas Sitnycky, Ronald Anderson and Robert Furman on behalf of themselves and all others similarly situated v. The Quaker Oats Company and William D. Smithburg, United States District Court, Northern District of Illinois, Case No. 98 C 3123, (December 5, 2000).

Deposition of Daniel R. Fischel in Re: Retsky Family Limited Partnership v. Price Waterhouse, LLP, United States District Court, Northern District of Illinois, Eastern Division, No. 97 C 7694, (October 31, 2000).

Joint Affidavit of Daniel R. Fischel and David J. Ross in Re: Floyd D. Wilson, for himself and all others similarly situated v. Massachusetts Mutual Life Insurance Company, in the First Judicial District Court, County of Santa Fe, State of New Mexico, No. D0101 CV-98-02814 (August 4, 2000).

Affidavit of Daniel R. Fischel in Re: T. Rowe Price Recovery Fund, L.P., and Carl Marks Management Co., L.P., individually and derivatively on behalf of Seaman Furniture Co., Inc. v. James Rubin, M.D. Sass Associates, Inc., Resurgence Asset Management, L.L.C., M.D. Sass Corporation Resurgence Partners, L.P. , M.D. Sass Corporate Resurgence International, Ltd., Robert Symington, Byron Haney, Alan Rosenberg, Steven H. Halper, and Peter McGeough and Seaman Furniture Co., Inc., In the Court of Chancery of the State of Delaware in and for New Castle County, C.A. No. 18013, (June 7, 2000).

Testimony of Daniel R. Fischel in Re: Bank United of Texas, FSB, et al., v. United States of America, United States Court of Federal Claims, Case Number 95-437C, (October 12 and 14, 1999).

Report of Daniel R. Fischel in Re: Bell Atlantic Corp., Cellco Partnership, and GTE Corp. v. AirTouch Communications, Inc. and WMC Partners, L.P., United States District Court, Northern District of California, San Francisco Division, Case No. C99-0141-MHP, (August, 1999).

Deposition of Daniel R. Fischel in Re: Bank United of Texas, FSB, et al., v. United States of America, United States Court of Federal Claims, Case Number 95-437C, (September, 26, 1999; July 10, 1999; and June 16, 17, 1999),

Testimony of Daniel R. Fischel in Re: C. Robert Suess, et al., v. The United States, United States Court of Federal Claims, No. 90- 981C (May 15, 1999).

Testimony of Daniel R. Fischel in Re: California Federal Bank v. United States, in the United States Court of Federal Claims, Case Number 92-138C, (February 4 and 11, 1999).

Deposition of Daniel R. Fischel in Re: California Federal Bank v. United States, in the United States Court of Federal Claims, Case Number 92-138C, (February 6, 1999; January 27 and 30, 1999).

Deposition of Daniel R. Fischel in Re: C. Robert Suess, et al., v. The United States, United States Court of Federal Claims, No. 90- 981C (October 27 and 28, 1998).

Deposition of Daniel R. Fischel in Re: Connector Service Corporation v. Jeffrey Briggs, United States District Court, Northern District of Illinois, Eastern Division, No. 97-C-7088 (August 28, 1998).

Deposition of Daniel R. Fischel in Re: Statesman Savings Holding Corp., et al. v. United States of America, United States Court of Federal Claims, Case No. 90-773C, (May 4, 1998 and February 12, 1998).

Testimony of Daniel R. Fischel in Re: Glendale Federal Bank FSB v. United States of America, United States Court of Federal Claims, No. 90-772C, (March 24, 25 and 26, 1998; September 2, 3, 4, 5, 8, 9, 10, 11, 12, 24, 25, 26 and 27, 1997; October 7, 9, 16, 17, 30 and 31, 1997; December 8, 9 and 10, 1997).