C

## Exhibit C

### OFF Acceptance Schedule For Maine Yankee's SNF Under Plaintiff's Aggregrate Acceptance Schedule

| Year | Beginning Inventory | Acceptance of SNF | Ending Inventory |
|---|---|---|---|
| 1998 | 541.83 | 71.75 | 470.08 |
| 1999 | 470.08 | 12.42 | 457.66 |
| 2000 | 457.66 | 77.88 | 379.78 |
| 2001 | 379.78 | 26.25 | 353.53 |
| 2002 | 353.53 | 56.28 | 297.25 |
| 2003 | 297.25 | 27.44 | 269.82 |
| 2004 | 269.82 | 52.23 | 217.59 |
| 2005 | 217.59 | 23.79 | 193.80 |
| 2006 | 193.80 | 27.36 | 166.44 |
| 2007 | 166.44 | 23.20 | 143.24 |
| 2008 | 143.24 | 29.46 | 113.77 |
| 2009 | 113.77 | 30.69 | 83.08 |
| 2010 | 83.08 | 0.00 | 83.08 |

Source: Backup materials to Frank Graves' Expert Witness Report.

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

\- - - - - - - - - - - - - - - - - - - - x
YANKEE ATOMIC ELECTRIC :
COMPANY, et al.,
Plaintiffs, :
v. : Case Nos.
THE UNITED STATES, : 98-126C, 98-154C,
Defendant. : 98-474C
\- - - - - - - - - - - - - - - - - - - - x

CERTIFIED COPY

Washington, D.C.
Wednesday, September 4, 2002

Deposition of DANIEL FISCHEL, a witness herein, called for examination by counsel for Plaintiffs Yankee Atomic, Maine Yankee and Connecticut Yankee, in the above-entitled matter, pursuant to notice, the witness being duly sworn by CYNTHIA R. SIMMONS, a Notary Public in and for the District of Columbia, taken at the offices of Spriggs & Hollingsworth, 1350 I Street, N.W., Washington, D.C., at 10:11 a.m., Wednesday, September 4, 2002, and the proceedings being taken down by Stenotype by CYNTHIA R. SIMMONS, RMR, CRR, and transcribed under her direction.

the plaintiffs' case and their damage model that it just comes up over and over and over again in a variety of different forms throughout the report.

Q. In paragraph 8, let's turn to paragraph 8, you're saying that if the Department of Energy had started removing plaintiffs' spent fuel in 1998 but did not remove all of the waste by 2010, then plaintiff would have incurred most of the costs it is claiming in its damages in that instance. Is that a fair representation as to what you're saying?

MS. POWELL: The document speaks for itself.

THE WITNESS: I don't think there's a need to paraphrase the language in the report but what I think the report does say, based on the damage analysis that the plaintiffs and their experts have put forward and the assumptions underlying that damage analysis, the report makes the point which, again, is clear from the language of the report itself that the damage claim is not based on the failure to start but rather it's based on removal of all of plaintiffs' nuclear waste prior to 2010.

BY MR. SHAPIRO:

Q. I appreciate your view that you don't find it necessary to rephrase but I find it helpful and

calls for a legal conclusion.

THE WITNESS: Again, I don't want to debate what the court held because I'm not offering any opinions on that issue. My understanding is contained in the report.

BY MR. SHAPIRO:

Q. So your statement, the last sentence in paragraph 8 referring to the partial breach of contract that you're referring to in paragraph 8 is limited to what you've set out in the last sentence of paragraph 5?

A. That's what it refers to, correct.

Q. So if in actuality the Department of Energy is in partial breach of obligations beyond commencing acceptance by January 31, 1998, you don't have an opinion as to whether or not the claimed damages result from that further partial breach?

MS. POWELL: Objection to the extent it calls for a legal conclusion and vague.

THE WITNESS: Yeah, I'm not sure I fully understand the question, but I don't think that my opinions would change so long as the partial breach found by the court involved to a significant extent the failure to commence disposing of spent nuclear fuel and high-level radioactive waste by

in your -- I'm not sure of whether you're asking hypothetical or whether you're characterizing the contract or the court's finding of what the breach was but whatever you're doing, I don't want to acquiesce in it and certainly don't want to offer an opinion about what the contract provides, as I've stated numerous times.

But that said, the reasons why I don't think that the plaintiffs, even if that were the contract would have established damages are those reasons that I described before that are described in the report.

BY MR. SHAPIRO:

Q. I just want to make sure I understand what your criticisms are and make sure that I ask you about all those criticisms and I just want to make sure that I'm complete about it. I know the government has other experts that might have different criticisms, in fact do have different criticisms of plaintiffs' damage claims.

I think we can move on to the next paragraph, paragraph 9. In this paragraph, you state that Mr. Grace's conclusion is speculative.

What's your definition of speculative as you're using it in this paragraph, and I know you use

the word speculative in a number of places in the report and tell me if you're using it differently in this paragraph as opposed to any place else in the report?

A. You know, again, I think the word has a certain ordinary meaning. I wasn't intending to place a special meaning on the word other than its ordinary meaning. But in this context, you know, the ordinary meaning is that there are a series of assumptions that there are either, there's either no basis for or to the extent that it's possible to analyze whether there's a basis for the assumptions. The reality is inconsistent with the assumptions. It's not only speculative but also implausible.

Q. I guess, I certainly agree that speculative has an ordinary meaning. Just to try to help make sure we're on the same page, could you define speculative in that ordinary meaning for us?

A. I think I just did in my previous answer.

Q. Well, you tried to define it in terms of the specifics of what you're doing in paragraph 9 and in the report, but I'm asking, you know, not to define a Webster's definition of speculative. What would be Dan Fischel's definition of speculative?

A. It might be the Webster's definition.

Again I don't mean to put any special gloss on the term. And as I said in my previous answer, I was just using the term to mean assumptions for which there is not a -- an adequate basis in reality or relevant economic evidence.

Q. You're aware that in, that there's a legal definition of speculative as well, aren't you?

MS. POWELL: Objection to the extent it calls for a legal conclusion.

THE WITNESS: I guess I'm generally aware that the term speculative is used in the legal context.

BY MR. SHAPIRO:

Q. And that one of the contexts that it's used is that speculative damages are not recoverable?

MS. POWELL: Objection, again, to the extent it calls for a legal conclusion.

THE WITNESS: I really haven't systemically studied that. I don't have a formal opinion about it but I think it's fair to say that once damages are characterized as speculative, that's usually a reason why they should not be recoverable.

BY MR. SHAPIRO:

Q. Have you attempted to determine whether or

basis in reality?

A. I think that depends on the facts and circumstances.

Q. If an event is shown within a likelihood of 99 percent to be true, would it have a sufficient basis in reality?

A. It sounds like it generally speaking but again, it depends on the facts and circumstances as to what the assumption is.

Q. So it's whether or not -- let's pick one of the assumptions you complain about generally is future events is whether or not assumptions on future events, whether or not those assumptions are speculative, does it depend on the likelihood that the future event is going to happen such that if it can be shown that the future event is 99 percent likely that it's not speculative or is there more to it than that?

A. Well, I think precisely because it is a future event it's hard to say with a specific probability how likely it is to happen at least for this type of event. Again, that's why context is so important if you said there's for all practical purposes 100 percent chance that from now until 2010, the sun is going to come up every day, that would be

Q. What future events is Mr. Graves assuming that you're criticizing him for making those assumptions, which particular future event assumptions do you have in mind in paragraph 9?

A. I don't really have anything specific in mind. I can imagine lots of different possible developments in the future, legal and regulatory change, technological change, change in behavior of the utilities. Those are the things that come to mind.

Q. Going out to 2010, to take one of the examples you gave, technological change, what technological change do you think was sufficiently likely that Mr. Graves should have taken it into account in his damage model?

A. I'm certainly not saying that anything's sufficiently likely because, as I said, I don't have a particular opinion about any change that is going to occur or will not occur, but that's really the point, it's very hard to predict the future.

There may be technological changes that significantly affect the cost of storing nuclear fuel, as an example. Whether that's likely to occur, I obviously have no opinion about one way or the other.

But there's so many factors like that that can affect costs in the future that any prediction which tries to predict what's going to happen between now and 2010 is going to be somewhat speculative, particularly in context such as this one because as I keep saying, predicting the future is very difficult.

Q. You say any prediction of the future is going to be somewhat speculative, and I suppose that's also tautologically true.

Have you made any effort to quantify how speculative Mr. Graves' model is because he's making predictions based upon future events?

A. I haven't made any attempt to quantify the extent to which his costs going to 2010 are likely to vary based on future events precisely because, well, first of all, I don't have the expertise to do it, and secondly, in some respects, I don't think anybody has the expertise to do it because it's very hard to predict future events.

Q. I thought you said before, but let me make sure that I'm not wrong on this, that simply because a damage model depends upon assumptions about future events that doesn't make the damage model inherently speculative, does it?

A. I'm not sure what answer that I gave that

dramatically affect what's going to happen between now and 2010.

Q. What variables are those?

A. The kinds of things that I mentioned, possible changes in legal and regulatory environment, possible technological changes, possible changes of behavior of the utilities, any one of a number of other factors that might occur.

Q. Well, you said that, you list three specific items and then perhaps others. We talked about one of those technological changes but I thought previously you said you can't identify any expected technological change that's sufficiently likely that Mr. Graves should have taken it into account?

A. I think the point is note what, on this particular issue what he should have taken into account, the question is how reliable are predictions about the future when these kinds of things that I mentioned which can have a significant effect on the future haven't yet occurred.

Q. Let me take the part of the question about Mr. Graves should have taken into account. Can you name one technological change, potential technological change that you have in mind?

A. Not a specific technological change, no, because I don't have expertise in technology. But any technological change which affects the cost of storing nuclear fuel would qualify as a possible future event which could have a significant impact on predictions about the future which, again, is a reason for waiting till the future occurs to avoid this problem.

Q. I understand your preference to wait, but --

A. Not always. It's a trade-off.

Q. What's the point of waiting to see if there's a technological change if you don't have any expectation that there's going to be a material technological change?

A. I covered this at length already. I don't know what's going to happen in the future. In this particular area, I don't believe anybody knows what's going to happen in the future. For that reason, a damage claim which is premised on assumptions about what's going to happen in the future, particularly in a context such as this, has a certain speculative component to it. And the report points that out.

Therefore an alternative way to proceed would be to analyze the additional costs that have

already been incurred and again while there may be many other problems with those costs, at least this problem wouldn't exist. And I'd have some mechanism for dealing with costs that are incurred, if any, in the future to the extent I don't have all the other potential problems.

But whether this particular problem is one that, you know, by itself makes the, or at least this part of the plaintiffs' damage claim unreliable as a matter of law is really for somebody else to, really for a court to determine. I'm simply pointing out this component of the damage claim which is speculative for the reasons that I've stated.

Q. Let me go back. You listed three types of things that might change in the future that give you pause about Mr. Graves' assumptions. We talked about possible technological changes. I believe the first item you mentioned was possible legal and regulatory changes.

Do you have any expectation of any particular legal and regulatory changes that might take place in the future?

A. No, I don't, but, again, my opinion wasn't based on an expectation of anything specific happening in the future.

Q. And then likewise you also mention behavior of utilities, but you don't have any expectation that utilities' behavior might change in the future?

A. I don't have any expectations to that effect but I don't have any expectation to any other effect either. I don't know what's going to happen in the future. And that's true with all the different areas, that's really the point.

(Recess.)

BY MR. SHAPIRO:

Q. Again, going back, Mr. Fischel, to paragraph 9 and 10. Your opinion that Mr. Graves' assumptions about future events make his conclusions speculative, what area of expertise did you apply in order to reach your conclusion?

A. I think I have general expertise on analyzing damages in cases of this type, that aspect of that expertise.

Q. Is that a matter of economics?

A. It's a relationship between understanding the components of a damage claim which frequently does require economic expertise and understanding the extent to which a particular damage analysis is sensitive to particular assumptions.

11, you simply note that Mr. Graves has reached an opinion as to a certain acceptance rate schedule that would have been applied in the nonbreach world.

Are you saying that his opinion that this acceptance rate would have been followed in the nonbreach world is faulty?

A. I'm saying exactly what is stated in the report.

Q. Do you have an opinion as to whether Mr. Graves' conclusion that the acceptance schedule shown in paragraph 11 of your report that Mr. Graves' conclusion is faulty?

A. I wouldn't say I would use the term faulty because I don't have an independent expertise of what the acceptance rate would have been had there been no breach. But I do have the opinion that the reasons that the plaintiffs' experts have given for this particular assumed acceptance rate in light of all the relevant facts and circumstances makes this particular conclusion speculative.

Q. So you don't have the requisite expertise to determine what acceptance rate would have been followed absent the breach?

A. In terms of forming an independent opinion, that's correct, I don't.

outcome would be one that would minimize the sum of those costs.

Do you agree with that conclusion in Dr. Bartlett's report?

A. I'm not sure I'd have an opinion on that one way or the other. I don't have any obvious disagreement that comes to mind, but I'm not sure I have sufficient expertise to form a definitive opinion as to whether Dr. Bartlett has accurately summarized the total cost to utilities of storing and disposing of spent fuel.

Q. And you have a footnote there that notes one additional criteria that you say ought to be considered in order to have a socially efficient program which is societal cost and one societal cost you mention in particular is the potential for accidental discharge of radioactive material, do you have any opinion as to how sensitive potential accidental discharge of radioactive material is to differences in acceptance rates?

A. No, I don't.

Q. Do you have any reason to believe that potential for accidental discharge is at all sensitive to differences in acceptance rates of how fast Department of Energy would accept spent fuel