from utilities?

A. I don't have any opinion one way or another other than if you're going to talk about economic efficiency from a social point of view, you have to take this factor into account.

Q. If this factor is not sensitive to changes in the aggregate acceptance rate, how do you take this factor into account?

A. Well, I certainly didn't say that there's no relationship between the assumptions about acceptance rates and potential social costs.

As I said, I don't really myself have sufficient independent expertise to form a judgment about that one way or another. But I do have sufficient expertise to say that if you're going to reach an opinion about what is an economically efficient outcome, you can't do so without taking social costs into account and that wasn't done in connection with Mr. Graves' opinion about economic efficiency, in addition to whatever other problems may exist with his conclusions about the assumed acceptance schedule in the nonbreach world.

Q. You say an acceptance rate that purports to be socially efficient should consider external societal costs such as costs associated with

potential accidental discharge.
Can you think of any other external societal costs other than that particular example, potential accidental discharge?
A. I was referring generally to the possibility of accident costs borne by third parties that are not borne by the utilities. Accidents or other harm suffered by third parties that are not internalized to the utilities which accidental discharge is an example.
Q. Can you think of any other example?
A. I don't really know enough about the dangers that exist from nuclear fuel to be able to provide specific examples. But that's the one that comes to mind.
Q. What's your understanding of the term economic efficiency, what does that term mean to you?
A. Minimizing the sum of private and social costs and internalizing those costs to ensure that actions that are taken are those in which the benefits, private and social, exceed the costs.
Q. And to determine whether or not private and social costs have been minimized, would Mr. Graves have to look at all potential factors that might affect those costs or could he limit his study

page.

A. Okay, I have that.

Q. The second page of documents considered, starting with the third one down, civilian radioactivity active waste management system throughput rate analysis.

Next document, throughput study for the radioactive waste management system.

Next study, determination of cost effective waste management system receipt rates.

Did you consider any studies like that in determining whether or not Mr. Graves appropriately used an economically efficient acceptance rate?

A. I don't recall whether we ever looked at any of those particular studies but the sentence in question refers to the plaintiffs' expert reports as opposed to documents such as these.

Q. Well, you understand, don't you, that it's appropriate for an expert to rely on studies done by others?

A. Certainly not inappropriate to do that depending on the facts and circumstances.

Q. So if the studies upon which Mr. Graves relied show that the acceptance rate that he's using in fact is consistent with lower costs for utilities

and lower costs for the program, wouldn't that tend to show that the acceptance rate that Mr. Graves is using is efficient?

A. I certainly couldn't conclude that because there's other relevant costs and other possible studies.

Q. Are you aware of any other studies that have different conclusions?

A. I guess I'm not aware, as I sit here, subject to checking, that the plaintiffs' expert reports consider all of the relevant costs that I identified in my report as I stated in the report.

Q. You would agree, wouldn't you, that at-reactor storage costs are very sensitive to changes in the acceptance rate?

A. That sounds logical but, again, I don't have any particular technical expertise in this area.

Q. And when I say very sensitive, I mean that at best their acceptance rates at reactor storage costs are lower, you would agree with that?

A. Again, I don't have any particular expertise in this area but that sounds logical.

Q. You don't have any reason to dispute that conclusion?

A. I don't have any reason to dispute it but

I don't have the expertise to form an opinion one way or the other.

Q. If DOE studies show that program costs are insensitive to acceptance rate, isn't the economically efficient acceptance rate one that's going to tend to be faster then in order to minimize at-reactor storage costs?

A. Not necessarily.

Q. Why not?

A. Because even taking Dr. Bartlett's analysis at face value, there's loading costs which have to be taken into account and social costs as well. Even accepting your assumptions about storage costs and program costs.

Q. Let's go back to this about, you say that social costs have to be included as well.

Why is it appropriate to take into account social costs if we're looking at economic efficiency between two parties, the government and Connecticut Yankee in this particular expert witness report or just utilities generally?

A. Because there's a very well recognized distinction between private efficiency and social efficiency and you would think that the government would be sensitive to social efficiency as well as

you're going to use the criteria of economic efficiency, you have to take into account the factors which determine economic efficiency.

Q. But you, yourself, can't think of any factors that would determine social efficiency beyond the one example that you gave of potential accidental discharges?

A. That's the one that comes to mind, accidents generally are harm to third parties.

Q. Turn to the next section of your report, alternative acceptance rates. That's the subheading between paragraph 12 and 13.

Are you examining more than one alternative acceptance rate?

A. Skimming this section, it looks like there's one alternative acceptance rate that is described. Whether or not there are others, I don't have any opinion about one way or the other. The point is really illustrative about alternative assumptions which could be made about acceptance rates.

Q. How did you come to, the one particular illustration that you use in paragraphs 13 and 14 of your expert witness report is an acceptance projection, at least one that goes out 10 years and

then annual capacity report published in 1991, that's correct?

A. Correct.

Q. How did you come to focus on using that particular projection for your illustration?

A. I don't recall.

Q. You're aware that Department of Energy has published a number of annual capacity reports?

A. Again, I don't have any particular expertise in this area but I think I've seen discussion about it in some of the background materials concerning this case that I reviewed.

Q. Do you have any reason to believe that the 1991 annual capacity report is any more pertinent than projections in any other capacity report?

A. I don't have any opinion on that one way or the other.

Q. Do you have an opinion as to whether the projections in annual capacity reports as opposed to projections in other Department of Energy documents like system requirements documents or total system life cycle cost studies are more important than those other projections?

A. I don't have any opinion on that one way or the other.

Q. What's the significance of the annual priority ranking to your analysis?

A. It's an input into the rest of the paragraph which describes the implications of this particular schedule.

What the implications are with respect to the 10,000 MTU limitation prior to 2010 and then the subsequent paragraph discusses the further implications of the OFF priority system.

Q. What area of expertise are you applying in paragraph 13 to your report?

A. Again, I am analyzing in this particular context the implications of using alternative assumptions regarding acceptance rates in light of the methodological problems that I have identified in connection with Mr. Graves choice of assumptions in light of his criteria of economic efficiency.

Q. Do you have an opinion as to whether the acceptance projection in the 1991 ACR is more economically efficient than the acceptance rate used by Mr. Graves in his conclusions set out in paragraph 11 of your report?

A. I don't have any opinion on that one way or the other.

Q. Do you have an opinion as to whether the

acceptance rate set out in that 1991 annual capacity report is more appropriate for use in determining the date upon which the Department of Energy would complete removal of spent fuel as Mr. Graves does in his report, and the acceptance rate that Mr. Graves uses that's set out in paragraph 11 of your expert witness report?

MS. POWELL: Objection to the extent it calls for a legal conclusion.

THE WITNESS: I don't have any opinion of that one way or the other.

BY MR. SHAPIRO:

Q. Are you saying that the -- you have an opinion as to whether the acceptance rate in the 1991 annual capacity report is just as plausible for use in projecting when the Department of Energy would complete removal of plaintiffs' spent fuel as the acceptance rate used by Mr. Graves in his analysis?

A. I wouldn't say I have an opinion on that either because that requires interaction between legal conclusions and other conclusions relating possible alternative acceptance rates. I only wanted to point out that particularly in light of the analysis, incomplete analysis of economic efficiency in Mr. Graves' report as well as the uncertainty

about whether economic efficiency is even the correct criteria, that there are other possible acceptance rates and if you use those other possible acceptance rates, all of Mr. Graves' conclusions would not hold up.

Q. You say there are other possible acceptance rates. I believe you said earlier that you haven't attempted to determine whether or not the acceptance rate in the 1991 annual capacity report is more plausible than the one Mr. Graves uses. You're concluding though that the acceptance rate in the 1991 annual capacity report is a plausible acceptance rate that the Department of Energy could have used absent the breach?

A. Again, I'm not really concluding that because to do so would require both a legal conclusion as well as other relevant conclusions about acceptance rates and schedules.

I'm suggesting that Mr. Graves' analysis is extremely sensitive to the particular acceptance schedule which he has chosen and in light of the insufficient justification for the choice of that particular acceptance schedule because of the incomplete analysis of economic efficiency as well as the uncertainty as to whether economic efficiency is

still would not have established that of all the different possible acceptance schedules that might exist. The one that he selected would be the one that would be, would be the one that would have been used.

Q. Going back to paragraph 13 for a moment, let's focus on paragraph 13. Isn't this a legal analysis that concludes at the bottom that the acceptance schedule is consistent with the Department of Energy accepting no more than 10,000 MTU prior to 2010 consistent with a statute of 1987 amendments to the Nuclear Waste Policy Act?

A. I'm sorry, is what a legal analysis?

Q. The conclusions you reach in paragraph 13. Is there something other than legal analysis in paragraph 13?

A. Yes, because I am not offering a legal opinion on what the acceptance schedule would have been, what the ultimate implications are of the 10,000 MTU limitation. All of those are legal questions as well as other kinds of related legal questions.

I'm simply pointing out that there are other acceptance schedules which exist which unlike the one that Mr. Graves has selected seem to have at

least some basis in the contract to have very different implications. But I'm not offering any legal conclusions or legal opinions on what the required acceptance schedule was or for that matter if there was any.

Q. I thought you just said that you're of the view that this schedule that you are discussing in paragraph 13, the one in the 1991 annual capacity report seems to be more based in the contract than the one used by Mr. Graves?

A. Seems to but again I'm not offering any opinions as to whether or not there's any contractual obligation to have this particular acceptance schedule or any other one that's quoting a particular provision of the contract. But as I said, the point is really illustrative.

I'm not offering any opinion as to what the acceptance schedule would have been. I'm simply pointing out that there are others, other than the one that Mr. Graves selected that have radically different implications for his analysis.

Q. And the last sentence of paragraph 13, why did you bother to note that the acceptance schedule in the 1991 annual capacity report is consistent with DOE accepting no more than 10,000 MTU prior to 2010?

A. For the reasons that are stated in the report in footnote 4.

Q. I guess I don't understand. If the point of this section of your brief is simply to show an illustration of another acceptance rate, why is it material to point out that this alternative acceptance rate is less than 10,000 MTU?

A. First of all, I wouldn't characterize the document as a brief just for clarification. Apart from that, I think the sentence just makes a point that if the 10,000 MTU limitation is a binding restriction, then Mr. Graves' acceptance schedule violates it and the particular acceptance schedule discussed in paragraph 13 does not violate it. But whether or not it's a binding restriction is a legal question and I don't have any opinion about it one way or the other.

Q. Then why do you bother to put it in your report?

MS. POWELL: Asked and answered.

THE WITNESS: For the reasons that I just stated.

BY MR. SHAPIRO:

Q. Aren't you trying to imply in this section of your report that the 1991, that the acceptance

rate in the 1991 annual capacity report is somehow
more plausible than the rate used by Mr. Graves?
MS. POWELL: Asked and answered.
THE WITNESS: No, I'm not, at least as a
matter of any independent conclusion that I have
reached.
BY MR. SHAPIRO:
Q. You refer to the acceptance rate in the
1991 annual capacity report as an alternative to the
acceptance rate Mr. Graves posits.
Mr. Graves is -- the rate he uses is the
same in paragraph 11 of your report has a ramp-up of
3000 MTU per year and then says that 3000 MTU per
year will be used in each subsequent year. The 1991
annual capacity report simply goes out 10 years, for
a total of 8200 MTU per year.
Do you have any understanding as to
whether or not 8200, acceptance of 8200 MTU per year
would constitute acceptance of all of the spent fuel
for 8200 total per year is acceptance of all the
spent fuel that the Department of Energy is obligated
to accept under its contract with utilities?
MS. POWELL: Again, objection to the
extent it calls for a legal conclusion.
THE WITNESS: I don't have an opinion one


Alderson Reporting Company, Inc.
1111 14th Street, N.W. Suite 400 1-800-FOR-DEPO Washington, DC 20005

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

\- - - - - - - - - - - - - - - x

YANKEE ATOMIC ELECTRIC

COMPANY, et al., :

Plaintiffs, :

v. : Case Nos.

THE UNITED STATES, : 98-126C, 98-154C,

Defendant. : 98-474C

\- - - - - - - - - - - - - - - x

CERTIFIED COPY

Washington, D.C.

Friday, September 6, 2002

Continued deposition of DANIEL FISCHEL, a witness herein, called for examination by counsel for Plaintiffs Yankee Atomic, Maine Yankee and Connecticut Yankee, in the above-entitled matter, pursuant to notice, the witness being duly sworn by CYNTHIA R. SIMMONS, a Notary Public in and for the District of Columbia, taken at the offices of Spriggs & Hollingsworth, 1350 I Street, N.W., Washington, D.C., at 10:03 a.m., Friday, September 6, 2002, and the proceedings being taken down by Stenotype by CYNTHIA R. SIMMONS, RMR, CRR, and transcribed under her direction.

plaintiffs' spent fuel in the absence of a breach would be relevant to your conclusions. And I believe I'm a little bit unclear and that's what I wanted to get back to.

Is it your opinion that that date, the date when the government would complete removal of plaintiffs' spent fuel in the absence of a breach, that that date is irrelevant to the opinion that you reached, your first opinion noted in paragraph seven?

MS. POWELL: Asked and answered.

THE WITNESS: I think we covered that so many different times but I just want to make sure. Can I have the question read back, please.

THE REPORTER: "Question: And let me move on to another question I wanted to verify, you may recall that one issue, another issue we covered with respect to that first opinion was whether or not the date upon which the government would remove, would complete removing plaintiffs' spent fuel in the absence of a breach would be relevant to your conclusions. And I believe I'm a little bit unclear and that's what I wanted to get back to.

Is it your opinion that that date, the date when the government would complete removal of plaintiffs' spent fuel in the absence of a breach,

that that date is irrelevant to the opinion that you reached, your first opinion noted in paragraph seven?"

THE WITNESS: I'm not sure I fully understand that question. Again, this is covered extensively in the report. Covered very extensively on Wednesday, the first day of the deposition. I'm not sure what I can add. The report I think makes clear, and certainly my testimony about it, my opinion that the fundamental conceptual flaw of the plaintiffs' damage claim which was highlighted in my first opinion is that the claim is not based on when the government was obligated to begin removing spent nuclear fuel which is the breach, but rather focuses on removal of spent nuclear fuel by a certain date which is not the breach. And because the costs of storing the nuclear fuel will exist in both the breach and the nonbreach world to use the plaintiffs' terminology, for that reason the plaintiffs' damage claim is fundamentally flawed from its inception.

It's measuring the wrong thing. There are many other flaws as well but that's certainly a fundamental flaw.

BY MR. SHAPIRO:

Q. One of the things you just said was that

THE WITNESS: Again, I think this is context specific so you need to refer me to a particular context that you have in mind. If it's different from what we covered at length on Wednesday, I'll do my best to respond. If it's exactly the same as what we covered on Wednesday and I don't have anything to add, I'll say that.

Q. Let me change it around a little bit. Is there a difference in your mind in the way you're defining speculativeness as opposed to the word likelihood, is the speculativeness of an event different than its likelihood?

MS. POWELL: Vague.

THE WITNESS: I'm not sure what that question means.

BY MR. SHAPIRO:

Q. Let me give you a specific example. In my common understanding of the word speculative, if an event is 90 percent likely to happen, I would say it's not speculative, is that consistent with your understanding of speculative?

A. It depends on the facts and circumstances.

Q. What do you have to know about the facts and circumstances?

A. The specific context, the way the event is

of trading permits or licenses the report itself refers to a vast body of economic literature on that subject. So that would be a description of the various methodologies that I used in reaching the conclusions that I reached.

Q. Is there a literature that you're relying upon on the subject as to whether or not damage claims are speculative?

MS. POWELL: Objection, vague.

THE WITNESS: I think in the context of this case, everything that I've just referred to is a literature and other aspects of my methodology, everything that I refer to is an input into my conclusion that plaintiffs' damage analysis in this case is speculative.

BY MR. SHAPIRO:

Q. I understand they're all inputs but what I'm looking for is how you put it all together, and it's that put it all together analysis -- is that simply the Dan Fischel analysis that you're applying or is there some other, is there a particular name that it has that it's known in the field?

A. There's no name that I'm aware of for putting it all together, if that's your phrase in this particular case. I would say there is a name