for the various components, series of names for the various components of the analysis that I performed on which my conclusions are based.

Q. I just want to make sure that there's no caveat here, you said there's no name that you're aware of for putting it all together, using my phrase in this particular case, is there also no name for putting it all together in terms of in general determining whether or not a plaintiff's damage claim in the litigation is speculative more generally, not necessarily linked just to this case?

MS. POWELL: Objection, vague.

THE WITNESS: I'm not sure what that means but I think in different cases the damages analyses can vary, obviously, so I would say it's, to the extent I understand the question, I would say that you would need to understand the context and the facts and circumstances of a particular case and then you could determine the extent to which conclusions that are reached in that particular case depending on whatever the relevant facts and circumstances are, what the bases is for those conclusions and what methodology is used and what the name is or names for the particular methodologies that are used and whether it's one or several. I'm not even sure at

this level of generality it's possible to discuss this in a meaningful way.

BY MR. SHAPIRO:

Q. All right. I think we've covered that subject adequately for the time being. Before we got the call from the judge we were focused on "must move" fuel and footnote six in your expert witness report, and you had said that the footnote was intended to imply that the operating plants would have "must move" fuel that would have to be taken care of. As I was looking at the phrase first, what did you mean to refer to when you said that discharge from operating reactors would have to be removed -- would have to be moved first, what would be moved second then?

A. Again, this is attempting to capture the concept of "must move" fuel as used in Mr. Graves' report. Any one of the number of things could be second or third or fourth or fifth.

Q. You didn't necessarily mean to say that the "must move" fuel from operating reactors has to be moved first before plaintiffs' shutdown reactor "must move" fuel. That's not what you were referring to?

A. I'm not sure that is necessarily what was

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - x CERTIFIED COPY

YANKEE ATOMIC ELECTRIC :
COMPANY, MAINE YANKEE ATOMIC:
POWER CO., and CONNECTICUT : Case Nos. 98-126C,
YANKEE ATOMIC POWER CO., : 98-474C, 98-154C
Plaintiffs, :
v. : (Senior Judge Morrow)
UNITED STATES OF AMERICA, : (VOLUME III)
Defendant. :
- - - - - - - - - - - - - - - - x

Washington, D.C.

Tuesday, October 8, 2002

Deposition of DANIEL FISCHEL, a witness herein, called for examination by counsel for Plaintiff in the above-entitled matter, pursuant to notice, the witness being duly sworn by LORI G. MACKENZIE, a Notary Public in and for the District of Columbia, taken at the offices of Spriggs & Hollingsworth, 1350 I Street, N.W., 9th Floor, Washington, D.C., at 9:37 a.m. on Tuesday, October 8, 2002, and the proceedings being taken down by Stenotype by LORI G. MACKENZIE, RPR, and transcribed under her direction.

Q. You said there was 70-some order contracts initially and then, through consolidation there are now an effectively smaller number of players.

Do you know what that smaller number is?

A. I have some understanding that maybe some number in the 40s. But, I am not 100 percent sure of that.

Q. Let's turn back to your expert witness report, I believe it is Exhibit 4 to your deposition. I believe it is in the compilation in front of you.

MS. POWELL: Exhibit 1?

MR. SHAPIRO: It must be, Exhibit 1, I am sorry.

BY MR. SHAPIRO:

Q. I want to ask you some questions starting with Paragraph 17.

A. Okay. I have it.

Q. We are discussing greater than Class C Waste. What sort of greater than Class C Waste does Yankee Atomic have?

MS. POWELL: Objection, vague.

THE WITNESS: I don't have an opinion on that one, one way or the other.

BY MS. POWELL:

Q. Do you know how Yankee Atomic has come to have greater than Class C waste?

A. No, I don't know.

Q. What about Connecticut Yankee, do you know what sort of greater than Class C Connecticut Yankee has?

MS. POWELL: Objection, vague.

THE WITNESS: Not as I sit here.

BY MR. SHAPIRO:

Q. What about Maine Yankee, do you know what sort of greater than Class C waste the Maine Yankee might have?

MS. POWELL: Same objection.

THE WITNESS: No, I don't.

BY MR. SHAPIRO:

Q. Do you how Maine Yankee has come to have a greater than Class C waste?

A. No.

Q. Do you know that Yankee Atomic has greater than Class C Waste?

A. My understanding is that at least some of the plaintiffs have greater than Class C waste.

Q. Do you know which ones?

A. Not from memory, no, I would have to

check.

Q. Is greater than Class C waste something that every utility has?

A. I would have to check.

Q. Do you know what percentage of nuclear utilities have greater than Class C waste?

A. Not without checking, no.

Q. Do you know how any utility would develop greater than Class C waste?

MS. POWELL: Objection.

THE WITNESS: Not without checking, no.

BY MR. SHAPIRO:

Q. You say in paragraph 17 that if greater than Class C waste, and I see you used the acronym GTCC, I assume you mean greater than Class C waste?

A. Yes.

Q. Greater than Class C waste cannot be included in delivery commitment schedules, and I know you also talk about fuel and spent fuel, but I'll treat them one at a time.

If greater than Class C waste cannot be included in delivery commitment schedules, then purchaser would have little incentive to engage in exchanges, because the exchanges would not

Q. What facts and circumstances do you need to know?

A. The extent to which the costs that would be incurred in trying to engage in exchanges would be a worthwhile investment and expenditure if the need for on-site storage would not be eliminated in any event because of the exclusion of greater than Class C waste from the program.

Q. Do you know if greater than Class C waste has to be stored on the site of a nuclear utility as opposed to being stored at other locations?

MS. POWELL: Objection, vague.

THE WITNESS: Not without checking, no.

Q. Do you have any knowledge of just what the requirements are for a nuclear utility to store greater than Class C waste?

MS. POWELL: Same objection.

THE WITNESS: Not without checking, no.

BY MR. SHAPIRO:

Q. Do you know physically how a nuclear utility goes about storing greater than Class C waste?

MS. POWELL: Same objection.

THE WITNESS: Not without checking.

BY MR. SHAPIRO:

A. It is your hypothetical.

Q. Well, it is my hypothetical, but I represent to you that it is also the real world, and a lot of the utilities don't have greater than Class C waste.

So I am trying to figure out why it matters whether or not greater than Class C waste could be included in the schedules, of a utility that doesn't have greater than Class C waste.

A. It matters for the reasons that I have said, namely the existence of a type of nuclear waste that requires storage, and, therefore, cost of storage, but is excluded from a governmental program for removing nuclear waste.

It affects the incentives of all possible trading partners, whether or not they themselves have greater than Class C nuclear waste, because it affects the terms on which transactions can occur.

And, for that reason, it affects the incentives of everyone.

Q. Have you made any attempt to quantify the impact on effective use of utilities to exchange delivered commitment schedules, if greater than Class C waste cannot be stored, cannot be taken by

the Department of Energy under the utilities contracts?

MS. POWELL: Objection, vague.

THE WITNESS: Not beyond what is stated in the report and what I have stated in my answers.

BY MR. SHAPIRO:

Q. Well, I haven't seen any. Am I wrong? I haven't seen any attempt in the report to quantify the affect on incentives that you have been talking about, about the potential inability to include greater than Class C waste on delivery commitment schedules.

Am I missing something? Have you attempted to quantify that impact?

A. What I would say is the report concludes that the quantification, advanced by Mr. Graves in his extreme and implausible assumptions about exchanges, is incorrect and fundamentally flawed for a number of reasons, including the exclusions expressed in Paragraph 17.

Q. But, you haven't attempted to quantify the impact on incentives that you are talking about in Paragraph 17, have you?

MS. POWELL: Asked and answered.

THE WITNESS: No. Other than concluding, as I have just stated, that the purported quantification by Mr. Graves concerning this hypothetical exchange market is speculative and implausible for a number of different reasons, including this particular reason expressed in Paragraph 17.

BY MR. SHAPIRO:

Q. You haven't attempted to identify particular utilities that would be less likely to engage in exchanges at approved delivery commitment schedules if greater than Class C waste cannot be taken by the Department of Energy under its spent fuel program, have you?

A. Well, I think I have just stated that it would affect the incentives of all utilities to varying extents.

Q. But, you haven't attempted to identify which utilities would be affected more or less, have you?

A. Not as of this time, no.

Q. Suppose the Department of Energy has an obligation, entirely independent of utilities, contracts with the Department of Energy that are the particular subject of this dispute, to remove

to include that information in your hypothetical, as well as lots of other relevant facts and circumstances, in order to be able to address it in a meaningful way.

Q. Let me ask again about Paragraph 17, now about failed fuel. You have discussed both greater than Class C waste and failed fuel in that paragraph.

Do you know if Yankee Atomic has failed fuel?

A. Not without checking, no.

Q. Do you know if Connecticut Yankee has failed fuel?

A. Same answer.

Q. Do you know if Maine Yankee has failed fuel?

A. Same answer. Again, my understanding is that at least some of the utilities in the program that have signed contracts have failed fuel.

Q. Do you have any sense of what percentage of nuclear utilities have failed fuel?

A. Not without checking, no.

Q. Do you have any idea what the volume of failed fuel is amongst all utilities?

A. Not without checking, no.

Q. Reviewing Appendix E doesn't help you
figure that out?
A. No, it doesn't.
Q. Do you see that the first page of
Appendix E refers to standard fuel, nonstandard
fuel, failed fuel, Paragraph A(1)?
A. I see that.
Q. Do you have any understanding of what the
difference is between nonstandard fuel and failed
fuel?
MS. POWELL: Objection, relevance.
THE WITNESS: Not other than what is
stated in the definitions, no.
BY MR. SHAPIRO:
Q. As you look at Appendix E to the
contract, and compare that to the second sentence
in Footnote 11 of your expert witness report, do
you think it is possible that that sentence in the
expert witness report is not fully correct?
MS. POWELL: Objection, vague.
THE WITNESS: Since it refers to Appendix
E of the contract, which contains the provision of
the contract defining what failed fuel is, seems
pretty clear to me that that is what is being
referred to.

BY MR. SHAPIRO:

Q. Footnote 11, the second sentence of Footnote 11 of your expert witness report says that failed fuel is spent fuel or high level waste that does not meet the general specifications for such fuel as set forth in Appendix E.

Now that you have taken a look at Appendix E, do you still agree that all spent fuel that does not meet the general specifications in Appendix E should be deemed failed fuel?

A. If what you are suggesting is there is no reference in the sentence to nonstandard fuel, if that is what you mean, I don't think that makes the sentence inaccurate, because of the reference to Appendix E, which has a fuller description.

Q. Do you have any idea how fuel becomes failed?

MS. POWELL: Objection, relevance.

THE WITNESS: No, I don't. Not as I sit here without checking.

Q. What is your understanding of what the contract requires in terms of the Department of Energy's obligation to accept failed fuel?

MS. POWELL: Objection to the extent it calls for a legal conclusion.

BY MR. SHAPIRO:

Q. Do you have any knowledge of the technical feasibility of transporting failed fuel?

MS. POWELL: Same objection.

THE WITNESS: No, I don't.

BY MR. SHAPIRO:

Q. Does technical feasibility come into play in determining whether or not Department of Energy would accept utilities' failed fuel, with the same schedule as the rest of its spent fuel?

MS. POWELL: Same objection and also object to the extent it calls for a legal conclusion.

THE WITNESS: I don't have an opinion on that one way or the other.

BY MR. SHAPIRO: Do you have any knowledge of how failed fuel is stored.

MS. POWELL: Objection, vague.

THE WITNESS: Not as I sit here, no.

BY MR. SHAPIRO:

Q. Do you have any understanding of how the storage of failed fuel compares to the storage of spent fuel that is not failed?

MS. POWELL: Same objection.

THE WITNESS: Not as I sit here, no.

experiment.

Or whether there has ever been a real world situation where you could have a sufficiently controlled experiment, so you could begin to answer a question like that, at least in a particular context.

Q. For purposes of your opinion in these cases, you haven't attempted to quantify the difference between how efficient market would be if it is bilateral trading as opposed to the auction procedure that Mr. Graves uses in his report?

A. Well, I would say that is correct, except to the extent that all of these points are a response to the quantification contained in Mr. Graves's report in an attempt to show how extreme and implausible the assumptions are that underlie that quantification.

Q. Is bilateral trading an unusual part of the economy, generally?

A. It is not an unusual part of the economy generally for certain purposes. But, it would be very unusual for other purposes, such as the one contemplated in, or the assumptions that are made in Mr. Graves's report.

Q. Well, taking into account those rules that might lead to a suboptimal result, do you have an opinion, though, as to whether or not, at the end of that process, with whatever the rules are, the market for delivery commitment schedules would be efficient on an allocative basis, if the Department of Energy was otherwise accepting spent fuel from utilities?

MS. POWELL: Same objection.

THE WITNESS: Again, I would say there is no way to know, based on the experience in other regulatory contacts where the rules for exchanges have been similar to the ones that exist here.

I would say that it is not likely that this particular exchange market, in the hypothetical that you have described, would work all that well in the sense that the rules would interfere with the ability of participants in the market to reallocate themselves in an optimal way.

If you want to say that that is an inefficiency, then if that is the way you want to use the term inefficiency, then that is what I would say.

BY MR. SHAPIRO:

Q. If the Department of Energy was otherwise

of making the second exchange.

Q. Do you have any opinion as to how short of completely optimal the allocation of acceptance rights would likely be if the Department of Energy was otherwise accepting spent fuel from utilities?

A. No. I don't think it is possible to know that.

Q. Are you saying it is not possible to know with certainty, or it is not possible to make any reasonable estimate of how efficient, allocatively efficient the market would end up being?

MS. POWELL: Objection, vague.

THE WITNESS: It is certainly possible to know with certainty. I think there are some things that you could say, which I have said, based on the experience of other participants in different regulatory schemes, based on the rules that existed in those regulatory schemes that are referred to in the report and in the footnotes to the report.

But, any kind of precise prediction as to what would occur in this market, I think would be very difficult, if not impossible, to make.

Q. What features of a market determine whether it would perform efficiently?