# In the United States Court of Federal Claims

No. 98-486C
(Filed: May 21, 2004)

| | | |
|---|---|---|
| * * * * * * * | | |
| INDIANA MICHIGAN POWER CO., | * | Spent Nuclear Fuel Case; Nuclear Waste Policy Act of 1982; Standard Contract; Partial Breach of Contract; Past Damages; Mitigation; Repudiation; Expert Testimony; Daubert; Fed. R. Evid. 702; Future Damages; Speculation; Full Core Reserve; Reracking Costs; Dry Storage Facility; Decommissioning Costs. |
| Plaintiff, | * | |
| v. | * | |
| UNITED STATES OF AMERICA, | * | |
| Defendant. | * | |
| * * * * * * * | | |

Alex D. Tomaszczuk, Shaw Pittman LLP, Washington, D.C., for plaintiff. Jay E. Silberg, Devon E. Hewitt, Daniel S. Herzfeld, and Jack Y. Chu, of counsel.

Harold D. Lester, Jr., United States Department of Justice, Commercial Litigation Branch, Civil Division, Washington, D.C., for defendant. John C. Ekman, Marian E. Sullivan, Heide L. Herrmann, Scott Damelin, Jane K. Taylor, and Martha S. Crosland, of counsel.

## OPINION

**HODGES,** Judge.

The Donald C. Cook Nuclear Plant in Bridgman, Michigan contains two pressurized-water nuclear reactors operated by plaintiff Indiana Michigan Power Company. Cook Unit 1 and Cook Unit 2 began operation in 1975 and 1978, respectively. The plant is licensed to operate until December 2017.

Nuclear plants use the heat of uranium fission to produce steam, which powers turbines that generate electricity. Fuel suppliers stack enriched and processed uranium pellets in metal

tubes called fuel rods and combine them into squares known as fuel assemblies. A typical reactor core holds 193 twelve-foot fuel assemblies.

The fuel assemblies weaken over time; utilities normally refuel every eighteen months or so. Used fuel assemblies are stored in pools of treated water known as spent nuclear fuel pools. Indiana Michigan's spent nuclear fuel pool is approximately one hundred feet long, sixty feet wide, and forty feet deep. The walls of the pool are made of heavy concrete and lined with stainless steel. The storage process is subject to government regulation and to detailed written procedures approved by the Nuclear Regulatory Commission. See generally 10 C.F.R. pts. 72-73 (2004).

It was thought in the 1970's and early 1980's that nuclear residue could be reprocessed or recycled. The idea was abandoned by 1983 when the Government decided that such an approach would not be safe or efficient. Congress directed the Department of Energy to collect the utilities' spent fuel instead. See Roedler v. Dep't of Energy, 255 F.3d 1347, 1350 (Fed. Cir. 2001) (noting that Congress enacted the NWPA to "establish the Federal responsibility, and a definite Federal policy, for the disposal of . . . waste and spent fuel.") (quoting 42 U.S.C. § 10131(b)(2)). The Government signed a contract with Indiana Michigan and other utilities in 1983, calling for DOE to begin collecting the nuclear fuel residue in 1998 and to dispose of it safely in a repository. In 1994, DOE issued a Notice in the Federal Register stating that it would not comply with the Contract until 2010 at the earliest.[1]

Indiana Michigan sued the Government for partial breach of contract in 1998, claiming

[1] The nuclear waste produced by utilities is known for the purposes of this case as Spent Nuclear Fuel, or SNF. More than sixty Spent Nuclear Fuel cases are pending in this court.

past costs of $23.9 million and future costs of $83.8 million. Plaintiff's experts applied an inflation rate to past damages and a discount rate to future damages to state Indiana Michigan's $107.7 million claim in current dollars. A claim for partial breach calls for reimbursement of plaintiff's costs incurred between the date of the breach and the date of trial. Plaintiff incurred costs between January 1998 and the March 2004 trial, but it did not show that these costs were related to the breach.

Costs incurred before the breach are not permitted in a partial breach case. Plaintiff's claim for wet pool reracking costs accounts for the bulk of its alleged past damages. Other claims include the costs of entering an Advanced Purchase Agreement for dry storage casks and investing in a Private Fuel Storage Consortium. Plaintiff did not show that its past costs resulted from defendant's 1998 breach or that it incurred such costs in anticipation of the breach.

Plaintiff cannot claim future damages in a partial breach case either. Future costs in this case depend entirely on the occurrence of speculative events. Such events include the year that DOE will begin complying with the Standard Contract and the likelihood that plaintiff will continue to operate the Cook reactors after 2017. A major element of plaintiff's estimated future costs is the cost of building and maintaining a dry storage facility. The parties' arguments whether plaintiff would build a dry storage facility in the future and how much such a facility would cost, were exemplary of testimony during trial concerning the speculative events at the foundation of plaintiff's claim for future costs.

Part One of this Opinion includes a discussion of plaintiff's claimed past and future costs, though its claim of partial breach of contract does not permit recovery of damages incurred before January 1998 and after March 2004. We make findings on the speculative events as well.

Part Two provides more detail on plaintiff's claimed costs, its expert report, and a key factual dispute in this case: Indiana Michigan's need for a "full core offload reserve."

## PART ONE

### I. BACKGROUND

The Government informed nuclear-powered utilities in 1983 that the Department of Energy would begin collecting their spent fuel beginning in 1998.[2] DOE signed contracts with the utilities setting forth procedures for collecting, transporting, and storing spent nuclear fuel in a permanent repository. The Department of Energy's Standard Contract required it to remove all nuclear residue beginning in 1998. See Standard Contract, 10 C.F.R. § 961.11, Art. II. The utilities pay for DOE's collection service in the form of fees based on production. See Nuclear Waste Policy Act, 42 U.S.C. § 10222(a)(5)(B). Utilities paid a one-time fee based on electricity generated before 1983, and they have paid fees of 1.0 mil per kilowatt-hour of electricity produced since.[3] 42 U.S.C. § 10222(a)(2).

---

[2] The Department drafted a Standard Contract for the program and published it for comment. See Standard Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste, 48 Fed. Reg. 5,458 (Feb. 4, 1983) (codified at 10 C.F.R. § 961.11).

[3] The Government asserted last year that plaintiff had not paid its one-time fee, which defendant argued was a condition precedent to DOE's obligation to pick up SNF. The Government raised the fee issue for the first time in a May 2003 motion for reconsideration of the court's 2003 ruling on liability. See Indiana Michigan Power Co. v. United States, No. 98-486 (Fed. Cl. Jan. 17, 2003) (order ruling on defendant's liability). This new argument would have been dispositive of plaintiff's six-year-old lawsuit. Plaintiff responded that DOE had told Indiana Michigan that it was not necessary or appropriate for Indiana Michigan to pay the fee. Plaintiff produced a letter dated May 6, 1988 to DOE from Indiana Michigan's parent company, AEP: "This will confirm our understanding that the Department of Energy agrees that it is not appropriate or necessary for Indiana Michigan Power Company to initiate the forty quarter

(continued...)

Defendant announced in 1994 that it would not meet the contract requirement that DOE begin collecting spent nuclear fuel in 1998. See Office of Civilian Radioactive Waste Management: Waste Acceptance Issues, 59 Fed. Reg. 27,007-27,008 (May 25, 1994). Defendant's failure to begin removing nuclear waste from the utilities in 1998 was a breach of the Standard Contract. See Maine Yankee Atomic Power Co. v. United States, 225 F.3d 1336, 1343 (Fed. Cir. 2000) ("The government does not, and could not, deny that it failed to meet the contractual requirement to begin accepting nuclear waste no later than January 31, 1998.").[4]

DOE should have begun collecting nuclear fuel from Indiana Michigan's Cook reactors in 2001, according to plaintiff's place in a priority queue established by the Standard Contract.[5] It would have picked up all of plaintiff's spent fuel by 2026. Plaintiff sued the Government in

---

[3](...continued)
payment schedule for spent nuclear fuel in April 1988. Your advance notice and assistance on such matters is greatly appreciated . . ." The Public Service Commissions of Indiana and Michigan are holding the one-time fee in escrow. We denied defendant's motion for reconsideration in August 2003. Indiana Michigan Power Co. v. United States, No. 98-486 (Fed. Cl. Aug. 27, 2003).

[4] The Standard Contract did not include a rate of acceptance. We ruled that the Department of Energy was responsible for collecting a total of 3,000 MTU of waste per year after the first four years. Indiana Michigan Power Co. v. United States, 57 Fed. Cl. 88, 99 (2003). MTU or "tons" as used in this Opinion means Metric Tons of Uranium.

[5] We refer to the years 2010 and 2015 hereafter for convenience. Plaintiff's place in a delivery queue established by the Standard Contract creates a three-year lag in performance for Indiana Michigan. The Contract required that the Department of Energy issue Acceptance Priority Rankings annually based on the age of fuel discharged from reactors. The oldest waste had the highest priority. Standard Contract, Art. IV.B.5(a). Other high priorities were materials from abandoned plants, Art. V.B.1(b); and "emergency deliveries," Art. V.D. The utilities could exchange approved Delivery Commitment Schedules with other utilities, subject to DOE approval. Art. V.E. For example, a utility with older Spent Nuclear Fuel and a higher priority ranking could trade or sell its Schedule to a lower-ranked utility. Id.

1998 for alleged past and future costs resulting from the breach. Damages claimed by Indiana Michigan for partial breach of contract total $107.7 million in current dollars.

Plaintiff argued that Indiana Michigan was entitled to mitigate its damages, and in fact had an obligation to do so. See generally 24 RICHARD A. LORD, WILLISTON ON CONTRACTS § 64:27 at 191-200 (4th ed. 2002) (injured party is required to take reasonable steps to mitigate its loss upon a breach of a contract). Mitigation efforts are measured by a standard of reasonableness. Reasonableness is determined from the facts and circumstances of each case. See, e.g., Home Sav. of Am., F.S.B. v. United States, 57 Fed. Cl. 694, 729 (2003).

The amount of damages need not be proved with mathematical precision once breach of contract is established. See, e.g., Energy Capital Corp. v. United States, 47 Fed. Cl. 382 (2000), aff'd in part, rev'd in part, 302 F.3d 1314 (Fed. Cir. 2002). Plaintiff claims only partial breach of contract, however. Such a claim precludes damages incurred before breach and after trial. See, e.g., Coughlin v. Blair, 41 Cal. 2d 587, 598, 262 P.2d 305, 311 (1953) ("If the breach is partial only, the injured party may recover damages for nonperformance only to the time of trial and may not recover damages for anticipated future nonperformance.") (citing Rischard v. Miller, 182 Cal. 351, 353; RESTATEMENT (SECOND) OF CONTRACTS § 313). Moreover, plaintiff did not prove that its past costs were related to defendant's breach.

Award of plaintiff's future costs in this case depends on speculative events. Among the speculative events supporting plaintiff's future costs are the year that DOE will comply with the Standard Contract, whether NRC will renew plaintiff's operating licenses for additional twenty-year terms, and how long plaintiff will remain in business irrespective of whether its licenses are renewed.

## II. DISCUSSION

Plaintiff's claim for past costs depends mainly on whether defendant's breach required it to expand the utility's fuel storage capacity in 1993. According to plaintiff's witnesses, Indiana Michigan's management realized as early as 1987 that the Government would not meet the Standard Contract's requirement that DOE start collecting fuel in 1998. Plaintiff believed that it had no choice but to expand the reactors' spent fuel pool before 1995 because the pool would be full by then. Indiana Michigan explored various options for spent fuel storage and decided in 1989 that reracking was the most effective method for storing additional fuel.

Reracking essentially is removing existing fuel racks and replacing them in a tighter formation so the same pool can accommodate more fuel rods. The newer "higher density" racks provide additional capacity for fuel assemblies. In this case, plaintiff removed all existing racks and replaced them with new racks.[6] This expansion of plaintiff's fuel storage capacity represents the bulk of its alleged damages in the category Past Costs. Other claimed past costs relate to Indiana Michigan's participation in an Advanced Purchase Agreement and its investment in a Private Fuel Storage Consortium.

The parties argued during trial that the threshold issue for considering plaintiff's future cost claim is when the Department of Energy will begin collecting spent nuclear fuel according to the Standard Contract. Their emphasis on the year of contract compliance related to a major

---

[6] This was plaintiff's second reracking, the first having been completed in 1979. The costs of that process are not included in this lawsuit. Indiana Michigan's original spent fuel pool capacity was 550 assemblies. The pool was expanded to hold 2,050 assemblies in 1979. The 1993 rerack discussed here created a capacity of 3,613 assemblies.

element of plaintiff's projected damages – the cost of building and maintaining a Dry Storage System. Such a system would store the fuel that remains uncollected after 2010. If DOE begins complying with the Standard Contract in 2010, plaintiff will not need a Dry Storage System; its current wet pool storage system will have sufficient capacity at least until then.[7] The appropriate full core offload reserve also is an important element in considering the adequacy of plaintiff's wet pool.

Other key issues as the parties presented the case during trial were whether the Nuclear Regulatory Commission will grant Indiana Michigan's license renewal applications and whether plaintiff will continue operation of the Cook reactors regardless of NRC's action.[8] Plaintiff calculated its future damages on the assumption that it will cease operations in 2017. It argued that the Nuclear Regulatory Commission may not approve Indiana Michigan's applications to continue operation of the Cook reactors when their licenses expire in 2014 and 2017. Plaintiff cannot guarantee that it will operate the reactors after their expiration dates even if NRC does approve the licenses. Defendant responded that NRC likely will approve plaintiff's application because it has not yet rejected a license extension. Plaintiff will continue to operate the Cook reactors after license renewal because it makes economic sense to do so.

A. Year of Compliance

Competent evidence during trial permitted a finding that 2010 is the most likely year of

---

[7] Plaintiff's fuel pool is about two-thirds full. Of the 3,613 spaces available in the pool, 2,400 were occupied in March 2004.

[8] We do not necessarily agree that the year of DOE's compliance and other speculative events are important to the court's rulings in this case, or even relevant. Much of the testimony during trial addressed these issues, however. We make findings of fact throughout the Opinion.

DOE's compliance with the Standard Contract. Another date would require speculation amounting to a guess. Plaintiff's expert predicted that DOE's date of contract compliance will be 2015 at the earliest. The key witnesses on this issue were Eileen Supko, who is a nuclear industry expert, and Christopher Kouts, who is the Director of DOE's Office of Systems Analysis and Strategy.

Ms. Supko operates a consulting business known as Energy Resources International. ERI is unique in the industry for the nature of its expertise and its mission. The expert report that Ms. Supko prepared for this litigation assumes that DOE will begin accepting spent nuclear fuel at Yucca Mountain in 2015. Ms. Supko offered alternative dates of acceptance in her testimony, extending to 2020. Her expert opinion is that 2015 is the earliest that the Government will perform. She testified that Indiana Michigan's spent fuel pool capacity would have been sufficient until well after 2010 if the Government had started collecting spent fuel beginning in 1998 as promised. In that event, plaintiff would not be facing the need to build a Dry Storage System.[9]

Mr. Kouts testified that DOE has a strategic plan for completing the Yucca Mountain Repository and taking initial deliveries by 2010. The President approved the Yucca site formally in late July 2002. See Approval of Yucca Mountain Site, Pub. L. No. 107-200 (2002). The next milestone in the process is submitting DOE's application to begin construction. The Department will submit its license application to NRC by December 2004. See 10 C.F.R. Part 2, Appendix

[9] Plaintiff projects that it will begin removing fuel from its spent fuel pool and placing it into a dry storage facility in 2009-2010. It may begin construction of the Facility in 2005 or 2006. Ms. Supko's 2002 analysis showed that plaintiff's fuel pool will not be full until 2013, however.

D; see also 10 C.F.R. § 2.1023(b). Hearings are expected to take 90 days. 10 C.F.R. § 2.307; see also 10 C.F.R. Part 2, Appendix G. DOE expects to receive authority from NRC to begin construction at Yucca Mountain no later than March 2008.

DOE has 1,500 employees assigned to the Yucca Project. The Nuclear Regulatory Commission is providing additional employees to work with DOE on Yucca issues. Kouts noted that some work can be done ahead of time, such as roads, utilities, and other surface operations. See 10 C.F.R. Part 63 (2004). DOE issued disposal schedules in January of this year. See Disposal Decision Plan, Jan. 2004 (updated quarterly); Repository Design Update: Panel on the Engineered System, United States Technical Review Board, Jan. 20, 2004; see also Yucca Mountain Review Plan, United States Dep't of Energy, July 2003. Mr. Kouts is satisfied that defendant will comply with its obligations in 2010.

Mr. Kouts testified that DOE plans to used a "phased construction" process, which is relatively efficient and "budget-friendly." The Government hopes to avoid further breaches of the Standard Contract in part by building a Fuel Demonstration Handling Facility near the Repository to receive the first shipments in 2010. Mr. Kouts described the Fuel Demonstration Handling Facility as "a hot cell with [a] handling capability that can accomplish an expected throughput of 400 metric tons." DOE expects to pick up 400 tons of spent nuclear fuel the first year. The Facility's capacity would be sufficient in 2010, but it was not clear how much the Facility could receive in the second year if the Repository is not available then.

DOE decided to construct the Fuel Demonstration Handling Facility in late December

2003 or early January of this year, according to Mr. Kouts.[10] The construction will take twenty-four months to complete.

Plaintiff showed on cross-examination that the Department's licensing strategy already has slipped from its April 2003 projection. See Yucca Mountain Project Licensing Strategy, Apr. 2003. Mr. Kouts testified that DOE has "evolved beyond this document." DOE is "marshaling its resources" and has a "dynamic program" in place. Such earlier documents concerning strategies may not "contain current thinking of the Department." Mr. Kouts stated that the 2010 plan is "still on track." DOE plans to hire outside counsel specializing in license applications but it has not done so yet.

Mr. Kouts spoke of "aggressive management" and believes that 2010 is a "viable goal." He was "confident" that DOE will meet the 2010 deadline.[11] Mr. Kouts made a point during trial of separating his personal views from those of the Department, but their positions were not dramatically different, if at all. In fact, his views seemed consistent with those of DOE. Mr. Kouts was a credible witness. We saw no room for error or delay in the schedule that he described, however.[12]

---

[10] Mr. Kouts referred to testimony of Deputy Secretary of Energy McSlarrow before a Congressional Committee in February 2004. He said that the Deputy Secretary represented to Congress that the Department would perform as promised in 2010. The statement was not offered into evidence.

[11] Plaintiff noted on cross-examination that Mr. Kouts did not use the word "confident" in his deposition. He did not make any statements to the contrary, however, in the deposition or during trial.

[12] Mr. Kouts testified that NRC will grant DOE's license to begin construction at Yucca Mountain by the end of 2007. Upon questioning he acknowledged that it could be 2008. Then he stated that it would be no later than March 2008.

Asked about the status of negotiations with the NRC so far, Mr. Kouts testified DOE and NRC have a total of 293 technical issues to cover. They have discussed 213 to some extent, though without full agreement to date. DOE has submitted no information on eighty of the issues but will do so during this year. Of forty "critical" issues, DOE has addressed twenty. NRC has resolved ninety issues; the rest are pending. The statute requires NRC to review DOE's application within three years, but permits a one-year extension. See 42 U.S.C. §10134(d). If DOE takes the extra year, the site will not be ready by 2010.

Mr. Kouts acknowledged that DOE cannot control certain entities that are important to the project. Examples of such entities include the Nuclear Regulatory Commission, the State of Nevada, and Congress. We concluded during trial that meeting the 2010 deadline is possible if everything goes smoothly, according to plan. Mr. Kouts conceded that DOE's plan does not contain much flexibility.[13]

B. License Renewal

We have little doubt that the Nuclear Regulatory Commission will renew Indiana Michigan's licenses in 2014 and 2017. Few of the witnesses who addressed the issue seriously questioned timely license approval. One of plaintiff's witnesses placed the likelihood of NRC approval at ninety percent. Indiana Michigan used this projection in its financial planning.

Mr. Hoffman is the senior project manager for licensing and renewal at the Nuclear Regulatory Commission. He testified that the NRC has approved applications for twenty-three

---

[13] See, e.g., Statement of Dr. Margaret Chu, Director for Office of Civilian Radioactive Waste Management, U.S. Department of Treasury, FY 2004 House Energy and Water Development Appropriations Hearing, Mar. 20, 2003 ("The Program's key objective remains to begin receiving and emplacing waste at a NRC licensed Yucca Mountain repository in 2010. . . . That is an extremely tight schedule.") (emphasis added).

reactors to date. None has been rejected. Mr. Powers is a vice president of Indiana Michigan and a top manager of the utility's parent company, AEP. He testified that he is "optimistic" that the licenses will be granted. DOE assumes that Indiana Michigan's applications for renewal will be approved by the NRC, according to Mr. Kouts.

No utility has yet entered its renewal phase. That is, no reactor is operating on a renewed license.[14] Moreover, some utilities with renewed licenses have declined to continue operation.

C. Continued Operation

Plaintiff likely will continue operations beyond 2017 and indefinitely into the future. It is also true that Indiana Michigan's management could decide any day to cease operations, however. Mr. Powers was the highest-ranking member of plaintiff's corporate structure who testified. He is responsible for plaintiff's day-to-day operations, long-term planning and investment, environmental performance, and all aspects of its operation and financial performance. Mr. Powers testified that he would like for Indiana Michigan to operate beyond 2014 and 2017, but he could not predict what will happen. He pointed out that Indiana Michigan could cease operations tomorrow, next week, or next month. Such comments from management highlights the speculative nature of plaintiff's claims for future costs.

Indiana Michigan has applied for a twenty-year extension of its operating license. The cost of applying for a new operating license is more than $22 million. Asked why plaintiff applied for license renewal if it may not operate beyond 2014 and 2017, Mr. Powers explained that Indiana Michigan does not "have a lot of confidence that there will be any national solution

[14] Applications for renewal of operating licenses must be filed no less than five years, nor more than twenty years before expiration. 10 C.F.R. § 54.17(c) (2003).

to spent fuel storage. . . . [W]e're looking toward as much optionality as possible to recover costs of the facility."

Mr. Kobyra is a former chief nuclear engineer for Indiana Michigan. He is now a director and a member of senior management. He offered a financial analysis of the company's proposed license renewal to AEP's Board of Directors in August 2001. The two options that he presented to the Board were to renew the Cook licenses, with a net present value of $1.026 billion; or to shut down the facility and obtain replacement energy. Shutting down the facility had a value of $818 million. The difference between these two numbers was the net present benefit of renewal: $208 million.[15]

Dr. Macatangay was defendant's expert in energy economics. He testified that plaintiff's operation beyond 2017 is supported by long-term energy forecasts. Dr. Macatangay also has expertise in the use of empirical methods to analyze energy markets. The Government attempted to show through this witness that plaintiff's operation after license renewal is likely. He testified that shutdown is not supported economically or by plaintiff's own financial analysis, and that Indiana Michigan's reactors will be useful well beyond 2017. He termed the possibility that plaintiff will discontinue operations as "speculative."

Indiana Michigan closed its plant in 1997 for repairs and improvements. The Cook reactors were down for more than two years. Plaintiff replaced one of its steam generators during that time and spent $750 million on general improvements. Mr. Kobyra testified that plaintiff

[15] Obtaining replacement energy from the market typically is more expensive than increasing output from an existing facility. Both sources are cheaper than "building power plants from scratch," according to Dr. Macatangay. He also testified that the cost of obtaining replacement energy would be an "economic penalty of having Cook shut down."

considered replacing the steam generator to be an important factor in applying for license renewal. Plaintiff spent more than $900 million to upgrade its facilities less than two years ago.

## III. LEGAL ISSUES

Plaintiff produced expert testimony that DOE will not meet its contract requirement to begin collecting nuclear waste by 2010. We allowed the testimony, but expressed concern whether expert testimony was necessary or appropriate to inform the court's judgment on the date of contract performance. Related concerns were whether the likely date of DOE's contract performance was relevant to the damages issues in this case; and if so, whether the court had a reasonable basis for choosing a date *other* than 2010 for contract compliance. Another issue was whether the court should attempt to make a "jury-verdict award" in absence of proven damages, given the fact of breach and the leeway accorded a non-breaching party in such circumstances. Defendant argued that Indiana Michigan's past damages case was dependent on plaintiff's showing that DOE was in anticipatory breach of the Standard Contract. This presented the issue of whether plaintiff could claim "anticipatory partial breach of contract."

### A. Expert Testimony

Plaintiff offered Ms. Supko as an expert who could predict when DOE will open the repository and accept spent nuclear fuel. Defendant stipulated Ms. Supko's expertise during trial but objected to her testifying as "an expert to opine as to when DOE will open the repository." We accepted Ms. Supko's expertise in the fields stipulated by the parties: spent nuclear fuel storage and licensing, rate of acceptance, and "DOE's Yucca Mountain schedule."

Ms. Supko predicted that the United States will begin collecting spent nuclear fuel pursuant to its contract with the utilities in 2015 "at the earliest." The first legal issue regarding

this testimony is whether it is an appropriate subject of expert opinion. The Supreme Court has stated that we must consider the relevance and helpfulness of an expert's testimony, its reliability, and whether the basis of her opinion is one reasonably relied upon by experts in her field. See Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 589 (1993). The Federal Circuit ruled that "Daubert standards of relevance and reliability" must be met in a bench trial as well as a jury trial. Seaboard Lumber Co. v. United States, 308 F.3d 1283, 1302 (Fed. Cir. 2002).

Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." FED. R. EVID. 401. Ms. Supko's testimony was relevant according to that definition.[16] The expert testimony in Daubert involved "scientific . . . knowledge." Daubert, 509 U.S. at 590 (citing FED. R. EVID. 702). The Court noted, "the word 'knowledge' connotes more than subjective belief or unsupported speculation." Id. The Court later extended the Daubert tests to non-scientific issues and emphasized the flexibility of Rule 702. Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137 (1999).[17]

---

[16] The evidence also must be helpful to the finder of fact. Helpfulness and relevance are closely related. See BioCore, Inc. v. Khosrowshahi, 183 F.R.D. 695, 699 (D. Kan. 1998). "Expert testimony which does not relate to any issue in the case is not relevant, and ergo, non-helpful." 3 J. Weinstein & M. Berger, Weinstein's Evidence ¶ 702[02], p.702-18, cited in BioCore, 183 F.R.D. at 699.

[17] Rule 702 "sets forth the overarching requirement of reliability" of expert testimony in requiring that: "(1) the expert be qualified; (2) the testimony address a subject matter on which the fact-finder can be assisted by an expert; (3) the testimony be reliable; and (4) the testimony 'fit' the facts of the case." FED. R. EVID. 702, 2000 Amendments Commentary.
Rule 702 states: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the
(continued...)

Ms. Supko tracks the progress of pending license applications for her clients. She testified that problems with budgetary shortfalls and politically sensitive issues such as environmental concerns will cause substantial delays in constructing the repository. She used congressional budget figures to suggest that DOE may not have sufficient funds to meet its 2010 goal. A non-expert could obtain and comment upon such figures. The same is true of her speculation that political or environmental obstacles or contentious hearings will cause substantial delays.

No one doubted that Ms. Supko's expertise involves scientific knowledge, but the purpose of her testimony was to predict a date. Her duty was to guess when a government agency might act. She did not present a "methodology" that could be used by experts in such a field. "The more subjective . . . the expert's inquiry, the more likely the testimony should be excluded as unreliable." FED. R. EVID. 702, 2000 Amendments Commentary (citing O'Connor v. Commonwealth Edison Co., 13 F.3d 1090 (7th Cir. 1994) (expert testimony based on a subjective analysis should be excluded)).[18] Ms. Supko has only a "subjective belief" that DOE will not meet the current 2010 deadline. See Daubert, 509 U.S. at 590.

Mr. Kouts testified that the Department of Energy has a firm strategy to begin the collection process in 2010. Defendant has asserted repeatedly that the Government has the

---

[17](...continued)
product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." FED. R. EVID. 702.

[18] See also United States v. Dorsch, 34 M.J. 1042, 1044 (N.M.C.M.R. Mar. 20, 1992) (stating that a psychiatrist may testify about a mental disorder, but should not predict future events).

means and the resources to meet the 2010 deadline. Testimony and other evidence that we considered at trial did not establish a credible basis for choosing a year other than 2010. Another date would require speculation and guesswork.

B. Partial Breach of Contract

Defendant announced in 1994 that it would not meet the contract requirement that DOE begin collecting spent nuclear fuel in 1998. Indiana Michigan did not terminate the Standard Contract, but elected to require defendant's performance despite the breach. See RESTATEMENT (SECOND) OF CONTRACTS § 236 cmt. b (1981) (distinguishing total breach from partial breach). Plaintiff expects defendant to comply with the Contract by collecting the spent nuclear fuel as promised. Defendant argued that

> Indiana, having elected not to seek damages for a total breach of contract and to continue to seek performance under the Standard Contract, cannot seek damages at this time for partial breaches of the Standard Contract that may occur in the future. Here, Indiana Michigan has elected to treat DOE's failure to meet the January 31, 1998 date for beginning spent nuclear fuel acceptance as a partial, rather than total, breach. Accordingly, its damages are limited to those for the partial breach, or partial breaches, that occurred by the time that it filed its complaint in this case or, at the outside, that have occurred to date.

Thus, defendant's position is that plaintiff cannot recover pre-breach and post-trial damages on a claim for partial breach of contract.[19] Damages for partial breach of contract are measured by costs incurred between the breach and the date of trial. See Coughlin, 41 Cal. 2d at 598 ("If the breach is partial only, the injured party may recover damages for nonperformance only to the

---

[19] The law governing partial breach of contract seems correct as defendant presents it. This could have been a harsh result, however, depending on the timing of plaintiff's damages. The year 2010 is irrelevant because the parties have not agreed to a new contract. No one knows when or if DOE will comply in the future. Utilities should have means of protecting their causes of action in these unique circumstances, despite the limitations of partial breach principles.

time of trial and may not recover damages for anticipated future nonperformance.") (citations omitted). See also Middleton v. United States, 175 Ct. Cl. 786, 792 (1966) (denying expenses "relate[d] to a period *antedating* defendant's breach.").

Plaintiff responded that it had no choice but to declare a partial breach. Plaintiff's counsel observed, when it comes to disposing of nuclear fuel "there is only one game in town." That is, the Department of Energy.[20] The Nuclear Waste Policy Act grants to the Secretary of Energy discretion to choose an appropriate site for the disposal of high level radioactive waste, and recommend it to the President. See 42 U.S.C. § 10132. The Secretary has chosen a site–Yucca Mountain–and the President approved it in 2002. See Pub. L. No. 107-200. Congress enacted the NWPA to "establish the Federal responsibility, and a definite Federal policy, for the disposal of . . . waste and spent fuel." Roedler, 255 F.3d at 1350 (quoting 42 U.S.C. § 10131(b)(2)). "The Act requires the producers of nuclear-generated power to enter into contractual arrangements with the Department of Energy in accordance with the terms of a Standard Contract . . . ." Id.

Plaintiff stated that had it declared a total breach, the Contract would have ended and Indiana Michigan would have lost its license. See 42 U.S.C. § 10222(b)(1)(A)(I) (NRC will not issue or renew a license to any utility that has not entered into a Standard Contract with the Government). Defendant responded that no one can foresee what the result would have been. This would be a matter for DOE or NRC or Congress to address. Meanwhile, defendant stated that remedies for "partial breach are well-defined by the courts, and those remedies are

[20] Plaintiff's counsel stated, "it's DOE's responsibility and only DOE's responsibility to dispose of spent fuel, whether it's from the Cook plant or any other plant."

limited . . . ."

The Government contended that plaintiff's past damages claim is dependent on the doctrine of anticipatory breach because Indiana Michigan incurred most of its costs well before DOE announced that it would not comply with the 1998 deadline. Anticipatory repudiation does not apply in a partial breach situation. Indiana Michigan did not argue anticipatory repudiation, however.[21] Its damage theory is based on mitigation.

C. Plaintiff's Mitigation Claim

The Government filed a pretrial motion *in limine* seeking to exclude evidence of plaintiff's costs before the breach and costs that may be incurred after trial. Plaintiff contended that it was entitled to past and future costs because of its obligation to mitigate damages. See RESTATEMENT (SECOND) OF CONTRACTS §350 cmt. b ("Once a party has reason to know that performance by the other party will not be forthcoming . . . he is expected to take such affirmative steps as are appropriate in the circumstances to avoid loss by making substitute arrangements or otherwise.").

The victim of a breach must take reasonable steps to mitigate its damages. Otherwise he is "charged with" such damages that he could have prevented by reasonable mitigation. See RESTATEMENT (SECOND) OF CONTRACTS § 350 (1981). That is, damages to which the non-breaching party otherwise would be entitled are reduced by the amount that he could have saved through mitigation. Id.

[21] Plaintiff did not claim anticipatory breach, despite frequent discussions on the issue during trial. Plaintiff's counsel stated, "[i]t has never been Indiana Michigan's position . . . that they [DOE] are never coming." He added, "I don't think it's an anticipatory breach. I think the understanding of Indiana Michigan both then and now . . . [is] that the utilities . . . understood that DOE was coming; they just weren't coming on the scheduled specified in the contract."

According to Indiana Michigan, the utility began incurring expenses in 1989 because its management believed that DOE would not meet its contractual obligations in January 1998.[22] For example, plaintiff claimed that it mitigated damages by expanding the capacity of its spent fuel pool through a process know as reracking. It completed the rerack in 1993 and 1994, but began incurring the costs of the additional on-site storage several years before DOE announced that it would not perform. Its purpose as stated at trial was to mitigate the consequences of the impending breach. "Indiana Michigan did not have the luxury of sitting on its hands until DOE breached the Contract, but rather had to take immediate measures and had to incur expenses long before DOE breached."

Plaintiff asserted that its damages would have been much higher had Indiana Michigan waited until after DOE's non-performance to act. Such costs could include business interruption and emergency preparedness, for example. Plaintiff did not describe claims for business interruption or emergency preparedness during trial, much less attribute amounts to such costs or attempt to prove them. We assumed that plaintiff used such potential damages only as examples.

Indiana Michigan is entitled to costs of mitigation that were reasonable at the time and in the circumstances, according to plaintiff, and whether the breach was partial or total, or precipitated by repudiation or by non-performance. Plaintiff argued that the sole question before the court was whether it acted reasonably at the time and in the circumstances; it should not matter whether the actions were taken before January 31, 1998. These are reasonable arguments,

[22] Defendant made statements in 1987 and 1989 suggesting that DOE might not meet the 1998 deadline. See Office of Civilian Radioactive Waste Management Plan Amendment, June 1987. See also Report to Congress on Reassessment of the Civilian Radioactive Waste Management Program, Nov. 1989.

but the cases that plaintiff offered do not support them. All of plaintiff's cases on mitigation are summarized below.

Plaintiff argued that Ketchikan Pulp Co. v. United States, 20 Cl. Ct. 164 (1990), supports its mitigation argument. This was a timber contract in which the Government was the non-breaching party. The issue was defendant's obligation to mitigate its damages after the breach occurred. The case involved Forest Service regulations requiring prompt sale of timber in such circumstances. Plaintiff claimed that defendant did not wait for the best time to sell the timber to a third party to mitigate damages. The Government argued that its duty to mitigate did not require the Forest Service to wait an indefinite period of time to resell at the highest possible price. The case held that the defaulting contractor bears the risk of a changing market after breach. Id. at 167.

Plaintiff cited Chain Belt Co. v. United States, 127 Ct. Cl. 38 (1953) as authority for awarding pre-breach mitigation costs. Chain Belt was a total breach claim, however, in a lost profits case that may have involved repudiation. The Government agreed in September 1946 that it would remove certain heavy machinery from plaintiff's premises by December. It was clear in November 1946 defendant could not move out all its machinery by December 10 as the contract required. Plaintiff hired a contractor to move the machinery before December and charged the cost to the Government. Defendant argued that such costs were not proper mitigation of damages, apparently because plaintiff moved the machines solely for its own benefit, without defendant's permission. It is not clear how much work was done before December 10 but the court stated that most was done after the date of breach. The court noted that defendant knew the work was being done and did not object. It did not matter whether "the breach has already

occurred, or where (as was the case of the work done prior to December 10) it is merely impending . . . ." Id. at 57. The court here was considering mitigation occurring a matter of days before breach, as compared with years in this case.

Another of plaintiff's cases is Santa Fe Trail Transp. Co. v. Peoples, 281 F. Supp. 692 (W.D. Mo. 1967). The breach at issue here resulted from a dispute between labor and management. Peoples was a commercial truck driver who was hospitalized with heart disease. Santa Fe did not allow him to return to driving after his release. Peoples' union threatened a strike unless Santa Fe reinstated him. Such a threat was contrary to the parties' binding arbitration arrangement. The court found that the union had breached its agreement to abide by a doctor's recommendation concerning Peoples' fitness for work. A strike could have cost Santa Fe as much as $2,000 per day. Plaintiff continued to pay Peoples to avoid a strike but it did not allow him to drive a truck. This was a post-breach case. The court found that plaintiff's cost of keeping Peoples on the payroll to avoid a strike was a reasonable mitigation of damages. "[T]he sum of $8,087.24 paid out by plaintiff to mitigate damages was a reasonable sum necessarily expended to mitigate damages certain to result from the wrongful breach of the contract." Id. at 697. The court did not discuss the principles of mitigation as the term has been used here. The $8,000 award reimbursed plaintiff for the union's breach of contract. See id. This was the amount that Santa Fe spent to avoid a strike that the union threatened but had no legal right to call.

Plaintiff cited an anticipatory breach case in Record Club of America, Inc. v. United Artists Records, Inc., 643 F. Supp. 925 (S.D.N.Y. 1986). Plaintiff RCOA had a licensing contract with United Artists, whose performance was subpar. UAR's inefficiencies caused

plaintiff to experience delays under the agreement. RCOA tried to mitigate its potential damages by reducing its own contract obligations to advertise United Artist products.

> By ceasing its advertising of UAR products, [plaintiff] was mitigating its damages. Based on UAR's shoddy performance under the contract from the beginning, and UAR's repeated unequivocal repudiations of the contract . . . RCOA had reason to doubt that it would receive UAR product under the license agreement.

Id. at 941 (emphasis added). The court held that the Record Club's mitigation efforts were proper because of its expectation of breach. The court stated, "[e]ven when an aggrieved promisee chooses to hold a repudiating promisor to the contract and urges retraction, he must still take steps to mitigate his damages." Id. (citations omitted). Anticipatory repudiation apparently was not disputed in that case. See id. (referring to "UAR's repeated unequivocal repudiations of the contract.").

Plaintiff contended that mitigation efforts are recoverable if they are reasonable in the circumstances, citing Naekel v. Dep't of Transp., 850 F.2d 682 (Fed. Cir. 1988). This also is a post-breach mitigation case. Naekel was an air traffic controller who lost his job with the FAA. He brought suit seeking reinstatement. Naekel worked for the Army Reserves for twenty months while he was separated. This was the only job he could get after over two years of unemployment, due in part to the Government's criminal allegations against him. He sent out over two hundred resumes and relocated for the job. He argues that the expenses of locating an interim job were reimbursable as mitigation of his damages from the Government's breach. The Court agreed and held that Naekel should be reimbursed for the expenses he incurred securing the job. "[T]he law does not require an employee to relocate in order to mitigate damages for wrongful discharge . . . or to make extraordinary efforts to find interim employment . . . Mr.

Naekel . . . did both . . . [t]he board erred in refusing to recognize Mr. Naekel's costs of obtaining interim employment." Id. at 685 (citations omitted). The court noted that the extensive job search efforts did not of themselves make the cost of such efforts unreasonable. "Consideration must be given to the extremity of Mr. Naekel's situation due to the circumstances of his wrongful discharge and the damaging personnel record." Id.

Defendant cited Middleton v. United States, 175 Ct. Cl. 786 (1966), which holds that expenses "antedating defendant's breach" are not recoverable. Middleton was an enlisted man in the Navy when he was arrested and convicted of immoral conduct in September 1955 and later discharged. Ten years after his conviction, a court held that his discharge was void and granted Middleton pay and allowances for the unexpired portion of his enlistment. The issue was the amount of government offset allowed for Middleton's civilian earnings during the ten-year period. Plaintiff contends that the court's holdings disqualifying expenses antedating breach are dicta. A review of Middleton suggests that the court's rulings disallowing the costs of pre-breach mitigation may not be dicta, but the court did not necessarily establish "an inflexible rule" based on the unusual facts of that case.[23]

---

[23] The plaintiff in Middleton attempted to deduct from his earnings various pre-breach costs, including attorney fees and other expenses incurred in challenging the discharge. The Court of Claims recognized the Government's right to limit "its liability by alleging an offset measured in terms of plaintiff's interim earnings." Middleton, 175 Ct. Cl. at 791. The court also agreed that Middleton had a duty to mitigate his damages with civilian pay. Id. However, it did not allow plaintiff to deduct the expenses from his interim earnings, and thereby reduce defendant's offset, because the expenses "relate[d] to a period *antedating* defendant's breach." Id. at 792. The court explained that

> the defendant's right to a setoff and the plaintiff's duty to mitigate are defined in terms of the same fixed time period . . . [t]hus, plaintiff could no more seek to reduce defendant's setoff by alleging expenses incurred prior to his discharge,

(continued...)

D. Proof of Damages

One who files a claim against the Government must prove every element of damages with specificity. A person dealing with the federal government must turn square corners. See, e.g., Lamb Eng'g & Constr. Co. v. United States, 58 Fed. Cl. 106, 111 (2003) (quoting United States v. Rivera, 55 F.3d 703, 709 (1st Cir. 1995)). See also Myerle v. United States, 33 Ct. Cl. 1, 27 (1897) (regarding lost profits, plaintiff must prove that defendant's breach caused its loss "inevitably and naturally, not possibly nor even probably."). Once breach is established, however, the amount of damages need not be proved with mathematical precision. See, e.g., Energy Capital Corp. v. United States, 47 Fed. Cl. 382 (2000), aff'd in part, rev'd in part, 302 F.3d 1314 (Fed. Cir. 2002). A plaintiff is permitted some leeway in proving the amount of damages. "If a reasonable probability of damage can be clearly established, uncertainty as to the amount will not preclude recovery. . . ." Ace-Federal Reporters, Inc. v. Barram, 226 F.3d 1329, 1333 (Fed. Cir. 2000) (quoting Locke v. United States, 151 Ct. Cl. 262, 283 F.2d 521, 524 (1960)); Elec. and Missile Facilities, Inc. v. United States, 189 Ct. Cl. 237, 257 (1969) (noting that the amount of damages need not be "ascertainable with absolute exactness or mathematical precision.").[24] This latitude often applies where the fact of damages is established, as in cases involving profits likely to have been made in a no-breach world. This is not a case of deciding whether to require mathematical precision in assessing damages, however. The issue here is the

---

[23](...continued)
than defendant could enlarge its setoff by seeking the inclusion of income which plaintiff earned prior to his erroneous dismissal. Id.

[24] When damages resulting from a breach are foreseeable, a "jury verdict" approach to calculating them may be appropriate. See, e.g., Bluebonnet Sav. Bank, F.S.B v. United States, 47 Fed. Cl. 156 (2000), rev'd on other grounds, 266 F.3d 1348 (Fed. Cir. 2001).

*basis* for assessing damages.

The bases for assessing damages as the parties presented them were speculative issues such as the date of DOE's contract compliance, whether NRC will grant plaintiff a license to operate for additional terms, and how long plaintiff will remain in business assuming the licenses are renewed.[25] We make findings on these issues in this Opinion, though plaintiff's partial breach claim precludes its recovery of damages incurred before January 1998 and after March 2004.

The Government did not argue that DOE could not have foreseen that plaintiff would run out of space in its fuel pool and incur the expenses of building and operating a dry storage facility. Defendant did not disagree with plaintiff's assertion that the applicable standard for damages is "reasonable certainty." The Government argued that the only period of time during which it is responsible for costs related to DOE's breach of contract is January 1998 through March 2004.[26] Plaintiff claimed partial breach of contract and insisted on continued performance

---

[25] Plaintiff evidently recognized the problems inherent in its effort to establish future damages at this stage of the proceedings. Its Complaint includes the following allegation: "The rate at which Indiana Michigan's damages will continue to accrue is dependent upon when and on what schedule DOE performs its contractual obligation, and <u>Indiana Michigan reserves its rights to recover presently unascertainable damages that may be caused by DOE's future partial breaches</u> of the Standard Contract." Pl.'s Compl., Count I (emphasis added).

[26] Indiana Michigan did not present a breakdown of its alleged costs between the January 1998 breach and the March 2004 trial. Plaintiff used the end of 2002 to divide its claim into past costs and future costs. The past and future costs that fall into the "qualified" time period are itemized below. The total is $6,316,000. As noted elsewhere in this Opinion, Indiana Michigan did not show that these costs were caused by the Government's breach.

Engineering Staff Costs:

| Year | Amount | Year | Amount |
|---|---|---|---|
| 1998 | $36,000 | 2002 | $49,000 |

(continued...)

by the Government. In such circumstances, DOE is not responsible for past or future costs. Plaintiff has not established that defendant's breach caused it to incur past or future costs in any event. Indiana Michigan is not entitled to damages.

This is the first of more than sixty Spent Nuclear Fuel cases pending in this court. Plaintiffs in some pending cases no longer are operating, and some already have built dry storage facilities because of the breach. Those cases are different from this one in some respects, but many have similar issues. We address Indiana Michigan's theories of past and future damages in some detail for that reason, in Part Two.

## PART TWO

### I. BACKGROUND

This Part provides additional information about the nature of plaintiff's claimed past and future costs. It includes plaintiff's arguments concerning the need for a full core offload reserve of 554 assemblies, and a summary of its expert report on damages. Plaintiff's concept of full

---

[26](...continued)

| | | | |
|---|---|---|---|
| 1999 | $38,000 | 2003 | $6,000 |
| 2000 | $46,000 | 2004 | $5,000 |
| 2001 | $61,000 | | |

Private Fuel Storage:

| | | | |
|---|---|---|---|
| 1998 | $801,000 | 2001 | $1,567,000 |
| 1999 | $1,455,000 | 2002 | $ 812,000 |
| 2000 | $1,343,000 | | |

Engineering Analyses:

| | | |
|---|---|---|
| 2001 | Gamma Heat Study | $82,000 |
| 2002 | Heat Load Study | $16,000 |

core reserve or full core offload reserve is central to the argument that DOE's breach of contract will cause Indiana Michigan to run out of space in its spent nuclear pool by 2009-2010. Defendant referred to the full core reserve as the "trigger" for plaintiff's dry storage facility. That is, the capacity of the reserve may establish the need for a dry storage facility and its associated future costs. If the reserve that plaintiff now claims is excessive, Indiana Michigan may not need a dry storage facility.

A consulting company called Tucker Alan was plaintiff's damages expert. Mr. Tucker and Mr. Sieracki wrote the expert report that details the assumptions underlying plaintiff's claim for total damages of $107.7 million.

A. The Tucker Alan Report

Mr. Tucker is a member of the consulting firm Tucker Alan, which developed the damages model and otherwise assisted plaintiff in developing its theory of this case. His firm consults in the areas of government regulation, prudence investigations, general business operations, and commercial litigation. Mr. Tucker explained the methodology he used as a six-step process: (1) Identify all events or activities related to spent fuel storage. (2) Determine the extent to which DOE's failure to perform affected each event or activity. (3) Compile costs related to past events and activities from records and other available information. (4) Make offsets for the would-have-been world. (5) Calculate damages as the difference between actual costs and would-have-been costs. (6) Report results in 2004 dollars.

Mr. Tucker was a credible witness for the most part, but his information often was derived without verification from other witnesses for Indiana Michigan. For example, he relied on Mr. Malin and Mr. MacRae for information concerning spent fuel capacity, Mr. Powers and

Mr. Kobyra for decommissioning cost data, and Mr. MacRae for management costs. Tucker Alan constructed a model and "plugged in" numbers provided by these witnesses and others.

Mr. Tucker's damages model focuses on discharges of spent fuel from plaintiff's site and the timing of DOE's acceptances of the fuel. He compares plaintiff's costs incurred after 2010 and 2015, then translates these costs into economic damages as of the date of trial. Mr. Sieracki was an expert for plaintiff in construction costs, estimating, and damage calculations. He provided the increased costs to Tucker Alan. Mr. Tucker said, "my role was to make sure that the way the model worked and the inputs were handled theoretically correctly and also that they were proper inputs to a damage model." He explained that economic impact in most damages cases can be either increased costs or lost profits. Tucker Alan used increased costs from delayed performance by the Department of Energy.

An important feature of the damages model in this case is that all costs are stated both in nominal terms, as of the day the costs were or will be incurred, and in present value. Present value adds an escalation factor for past costs, and discounts future nominal costs to current dollars. Mr. Tucker acknowledged that cost of capital "is similar to, but not synonymous with, interest." He chose the Consumer Price Index to estimate future inflation because he thought that it was "the best proxy." He stated that it was a conservative surrogate for cost escalation in the nuclear industry.

Mr. Tucker used a fifty-year historical inflation average to project inflation into the future, but he looked at only one year for the discount rate. Tucker relied on plaintiff's 2002 weighted average cost of capital to calculate the discount rate. That was plaintiff's second lowest cost of capital in the past fifteen years. The lower the cost of capital, the higher the present value

of future damages. See, e.g., Energy Capital, 302 F.3d at 1331 n.7 ("The lower the discount rate used, the higher the present value of the damages award."). Mr. Tucker explained that the single year was sufficient because it "considers imbedded debt." This means that the current year's rate includes both past and future information. Indiana Michigan issues its average cost of capital each year.

Dr. Neuberger testified as an expert witness for the Government. He is employed at a consulting firm called Economists Incorporated. He criticized the inflation rate that plaintiff used to estimate future costs. The Consumer Price Index measures inflation at the consumer level. Housing and housing-related expenses are more than forty percent of the Consumer Price Index, according to Dr. Neuberger. Food is another fifteen percent. Tucker Alan used the Consumer Price Index from 2004 through 2013 at 2.5%. In 2014, the assumed inflation rate becomes 3.93% and remains at that rate through the end of the future damages period.

Dr. Neuberger suspects that plaintiff used a fifty-year average to project the inflation rate because inflation over the last twenty years has been significantly different from that of the previous thirty years. Since 1982, inflation rates have been less variable and generally lower. He stated that he has "studied inflation models quite a bit during my career as an economist [and] I've never seen any inflation forecasting models that look at a fifty year average of past inflation to project future inflation."

The Tucker Alan Expert Report was issued in August 2003 and revised on November 25, 2003. As Mr. Tucker put it, his role was not to perform technical analysis but to "incorporat[e] the technical inputs into the model to make sure that they were appropriately considered for damages purposes." He accepted the numbers used for his model as correct, and he assumed the

need for a full core reserve of 554 spaces.

B. Full Core Reserve

Commercial nuclear power plants reserve space in their spent fuel pools in case they must offload fuel from a reactor unexpectedly. This may occur in an emergency to effect repairs or to prevent core damage. The extra capacity in a pool maintained for this purpose is known as full core offload capability or full core reserve. A nuclear reactor at Indiana Michigan holds 193 assemblies. If a utility wanted to maintain enough space to unload an entire reactor in such circumstances, it would have a full core reserve capacity of 193 assemblies.

Most of plaintiff's future damages depend on its claimed need to maintain a full core offload reserve of 554 assemblies.[27] This number is based on a reserve of 193 assemblies for each of the two reactors plus space for eighty-four new fuel assemblies to refuel each reactor.[28] The full core reserve is important because it affects the amount of plaintiff's claimed damages. Plaintiff projects that it will begin removing fuel from its storage pool and placing it in dry storage in 2009-2010.[29] Plaintiff claims $27 million for the cost of building a Dry Storage

---

[27] Dr. Neuberger pointed out that plaintiff's "unrealistically" high full core reserve results in higher damages. "In general terms the greater the pool reserve the lower the effective capacity of the pool and the sooner spent fuel pool capacity constraints are reached. Inasmuch as that pulls costs closer in time it will . . . raise damages."

[28] Indiana Michigan has a fuel locker to store new fuel temporarily. The fuel locker is a dry facility that can hold about one and a half deliveries of new fuel, or 144 new fuel assemblies. The assemblies are moved into the spent fuel pool from the fuel locker, where they are processed and moved into the core.

[29] Defendant's Exhibit 1095 is a chart issued by Energy Resources International, summarizing the times Ms. Supko projects that nuclear plants in the United States will lose full (continued...)

Facility. More importantly, the size of the reserve controls whether future damages occur at all.

Defendant's experts testified that plaintiff's claimed need for an offload reserve of 554 is excessive. If plaintiff does not require a reserve of that size, Indiana Michigan's argument that it will have to begin constructing a Dry Storage Facility in 2005 or 2006 because of the breach is incorrect. Plaintiff would have sufficient room in its current wet pool for normal operations without a dry storage capability. Using a reserve of 193 rather than 554, for example, plaintiff would not need to build a dry storage facility until later, if at all.[30] Asked about plaintiff's reserve policy now, Mr. Malin stated, "[w]e don't have one at the current time. Our spent fuel pool is approximately two-thirds full." Later construction would result in a need for fewer canisters, as DOE may be collecting plaintiff's fuel by then.

Mr. Abbott testified for the Government that plaintiff operates with a reserve smaller than 554 now, and no evidence supports the need for a policy of 554 spaces in reserve. The Nuclear Regulatory Commission does not require a specific full core offload reserve. Plaintiff has not claimed the need for a reserve of 554 spaces before this litigation.[31]

Plaintiff's engineer, Mr. MacRae, made a point of emphasizing the difference between full core reserve and full core offload. "A full core offload is a physical dimension of the plant.

---

[29](...continued)
core discharge capability. It shows that Indiana Michigan will not lose full core reserve until 2013.

[30] Depending on the full core reserve, the need for a dry storage capacity could be extended at least three years. The record contains no evidence of the relationship between amount of reserve and years of delay.

[31] Defendant testified that the likelihood of two reactors going out of service at once is remote. For that reason, most utilities have reserve policies setting aside fewer than 554 spaces. It is safe to leave fuel in the reactor during periods of shutdown, according to Mr. Abbott.

We have 193 assemblies in each core. . . . A reserve is a policy, so they're not interchangeable . . . they seem to be used interchangeably [during trial]." Mr. MacRae admitted on cross-examination that he used the terms full core reserve and full core offload interchangeably during his deposition in November 2003. He said at trial that his testimony on this point during the deposition was "a mistake."[32]

Plaintiff's counsel asked Mr. MacRae to "articulate how that number was arrived at, 554." Mr. MacRae responded that he and Mr. Malin "haven't written down the policy and formalized it by taking it to our senior executives. [W]e don't have a need to. We have quite a few more than 554 at this point." Mr. Malin testified, "at the current time we don't need to define one. However, as DOE continues its non-performance and as the spent fuel pool fills up with discharged spent fuel . . . we will need to define one and at that time my recommendation of a prudent level would be full core reserve [of] . . . 554 spaces." Thus, Mr. Malin testified that he would recommend setting a 554 full core reserve at some point in the future. Mr. Malin testified at his November 2003 deposition that the appropriate reserve was 470 assemblies.[33] Asked why

---

[32] Plaintiff's witnesses were not entirely consistent regarding the meaning of full core reserve or offload. Mr. Malin stated that "the terms are used interchangeably in the industry to describe how many open or empty spaces you leave in the spent fuel pool for contingency or for offloading the core or for the receipt of new fuel." Mr. Tucker tended to use the terms "synonymously" before his deposition but it occurred to him then that there was a "slight" difference between the two. "Offload means actually taking it out of the core; and the reserve is the available space in the pool," he stated. Mr. Tucker testified at trial that he sees a "slight distinction." Mr. Sieracki, another expert witness for plaintiff, did not have any understanding of the term full core reserve prior to this litigation.

[33] Plaintiff's witnesses discussed several times during trial the fact that Indiana Michigan had to shut down for repairs for two years or more starting in 1997. During that period, plaintiff offloaded both reactors and may have stored one load of new fuel in the pool. If so, this called for a total of 470 spaces. Plaintiff never has taken delivery of two loads of fuel at one time. In

(continued...)

he intends to recommend 554 now, Mr. Malin explained,

> I have subsequently changed my opinion. We have some new management at our power plant and they are stressing for our success in the industry that we move into a realm where we are preventing errors or mistakes. We're not correcting errors or mistakes. So we want to prevent, we don't want to correct.

Mr. Powers was the highest-ranking management officer to testify on behalf of Indiana Michigan. He was not aware of any formal company position on the amount of reserve needed, though he found from experience that a reserve improved the plant's safety margin and provided business flexibility. Mr. Powers' comments on direct examination concerning the need for full core reserve were hardly definitive:

> I believe going forward, as the spent fuel pool is further filled, that will be a topic of discussion that management will be very interested in and which from my personal perspective I would certainly be very interested in preserving as much capacity as possible to give the operating crews at the station as much flexibility as possible with station management. Again getting back to that question you asked me earlier about what philosophy within which we operate the facility, there is a provision in the capacity that the spent fuel pool has and then there's operating philosophy of making sure that we can operate that facility as safely and wisely as possible and I think it would be in that context that we'd have to look at what the minimum discharge capacity of the pool would be.

Mr. MacRae and Mr. Malin acknowledged that Indiana Michigan "currently" has no official policy on reserve, yet Mr. MacRae provided the only testimony that a full core reserve policy actually exists at Indiana Michigan. He testified that he and Mr. Malin established a full core reserve of 554 in January *2004*. Their testimony generally on this important issue was not credible. Plaintiff's claimed need for a dry storage facility and most of its other future costs

---

[33](...continued) fact, plaintiff staggers fuel loads to minimize the outage during refueling.

depend on a number that seems artificial to us, and in any event one that has not been "formalized."

## II. PAST COSTS

Plaintiff argued that it is entitled to reimbursement of its past costs because of its obligation to mitigate damages. Past costs for these purposes are those incurred before 2003. Plaintiff claimed past costs for: (1) wet pool reracking, (2) an Advanced Purchase Agreement, (3) a Private Fuel Storage Facility, and (4) engineering and staff.[34] Defendant asserted that costs incurred by plaintiff up to nine years before the breach cannot be a consequence of the breach. Past costs in plaintiff's claim total about $16 million, which increases to $23 million by application of an escalation factor.[35] Defendant's experts questioned a number of the costs that plaintiff included in its claim. Indiana Michigan did not incur the costs because of the breach in any event.

### A. 1993 Rerack

Indiana Michigan's witnesses stated that they knew by 1987 that DOE would not comply with 1998 deadline. They cited reports that defendant would not perform according to the Contract as planned. For example, a 1989 report stated that DOE would begin accepting fuel in 2010 at the earliest. See, e.g., Report to Congress on Reassessment of the Civilian Radioactive Waste Management Program, Nov. 1989. A representative of DOE, Mr. Kouts, testified that the

---

[34] Indiana Michigan claims $15.684 million for Reracking; $2.515 million for Cask Development; $9.993 million for Private Fuel Storage; and $593,000 for Engineering Analyses and Staffing.

[35] Plaintiff applied an escalation rate to damages incurred in a given year to report costs in current dollars.

"2010 milestone [for the Department] predated the 1998 date by several years. I believe it was set in stone initially by Secretary Watkins in 1989."

Plaintiff asserted that it mitigated damages of the impending breach in part by expanding the capacity of its spent fuel pool in 1993 and 1994. This expansion of capacity is known as reracking. While plaintiff completed the reracking in 1993 and 1994, it authorized capital for the project in 1989. This was nine years before defendant's breach and several years before DOE announced that it would not perform. The total cost was approximately $6.6 million in nominal dollars.[36]

Plaintiff needed at least a partial rerack by 1995, but it claims that the Government is responsible for the racks that it installed beyond what it needed. That is, the need for the rest of the racks was an impact of defendant's impending breach. Defendant pointed out that the new system provided a number of advantages to plaintiff's operation, compared to the original racks that were over twenty years old.[37] Indiana Michigan would have had to replace its entire rack anyway.

---

[36] The term "nominal dollars" as used here means then-current dollars. The claim for this cost is $15.684 million.

[37] Defendant also questioned the basis for deciding to rerack nine years before the breach because DOE had not repudiated the Contract then. The mere fact that plaintiff "distrusted" DOE, or doubted that it would abide by the Contract, was not a basis for reracking or for assuming breach, according to defendant. Anticipatory repudiation occurs "when one party to [a] . . . contract absolutely refuses to perform . . . and before the time arrives for performance distinctly and unqualifiedly communicates that refusal to the other party . . . ." Tretchick v. Dep't of Transp., 109 F.3d 749, 752 (Fed. Cir. 1997) (quoting United States v. Dekonty Corp., 922 F.2d 826, 828 (Fed. Cir. 1991)). The Dekonty case shows that repudiation is not easily found: "[A] mere assertion that the party will be unable, or will refuse to perform his contract, is not sufficient; it must be a distinct and unequivocal absolute refusal to perform the promise, and must be treated and acted upon as such by the party to whom the promise was made . . . ." Dekonty, 922 F.2d at 828 (quoting Dingley v. Oler, 117 U.S. 490, 503 (1886)) (emphasis added).

Mr. Malin has been an engineer at Indiana Michigan since 1983. His testimony offered some support for defendant's argument that a full rerack was appropriate at the time irrespective of the breach. For example, he testified that Indiana Michigan chose a complete rerack over a partial rerack because "it becomes a matter of safety and operations and cost. . . . [I]t's safer and cheaper and more appropriate to do the rerack evolution all at once." He noted that the assemblies are "heavy, they're radioactive, they're hot, they're underwater. We only had to disrupt plant operations one time. We only had to use all the cranes one time. It's more appropriate to do the job right, do the job correctly and in hindsight that was the right choice."

Mr. Abbott is a reactor physicist who testified as an expert for DOE. His opinion was that plaintiff needed the 1993 rerack irrespective of the Government's failure to pick up spent fuel in 1998. Leaving a mix of the old Boraflex racks and the new racks would have caused problems with thermal analysis. The removal of all of the old racks was a fixed cost of the reracking.[38] He also testified that plaintiff's claimed damages are too high for a number of reasons. These included the price of the design that plaintiff ultimately chose; the costs of the project were not apportioned properly between the partial rerack that plaintiff admits was necessary and the full rerack that it performed; the bid for an alternate design used in the costs was obtained over the telephone and not reliable; and a different design would have provided the

[38] One of the reasons the witness gave for this opinion was that "the Boraflex that it used caused problems over the long term." Boraflex is a substance used on the racks to control reactivity. Plaintiff criticized Abbott's "lack of knowledge with respect to the specifics of the pool at Cook" because the substance used was not Boraflex but Boral. Plaintiff described Boral as a "firm, aluminum-type substance and Boraflex is the rubbery, soft substance." Moreover, Dr. Singh, one of plaintiff's expert witnesses, testified that degradation in the case of Boral occurs only in the early years after installation. Mr. Abbott acknowledged that his expert report was incorrect in that respect, "[b]ut that change doesn't affect my analysis." Plaintiff would have replaced the entire rack regardless because "Boral also exhibits degradation over time . . . ."

space that plaintiff claims would not have been necessary if DOE had begun accepting spent fuel in 1998.

Abbott testified that plaintiff should not have charged the Government with "fixed costs" of the project, such as design and engineering. He defined fixed costs to include those associated with design, mobilization and demobilization, special equipment purchase or fabrication, and removal and disposal of the old racks. Such costs would have been incurred regardless of how many racks were installed. Specific examples included a new lighting system for the pool and fabrication or maintenance of tools used for installing the racks. Such items are costs that are unrelated to how many racks plaintiff installed. Mr. Abbott's opinion was that only the "variable costs" of fabrication and installation should be attributed to the Government's breach. Variable costs depend on the number of racks being fabricated and installed. The costs of construction materials are costs directly proportional to the number of racks and may be allocated on a per rack basis. His review of the Tucker Alan report concluded that only 21.7% of the damages claimed by plaintiff for reracking could have been avoided had DOE begun picking up fuel in 1998.

B. Advanced Purchase Agreement

Plaintiff claims $1.25 million for its investment in Holtec HI-STAR containers for the storage of Spent Nuclear Fuel. Holtec International agreed to provide Indiana Michigan a substantial discount on the purchase of HI-STAR containers as part consideration for the investment.[39] Plaintiff claims its costs of participating in the Advanced Purchase Agreement as

[39] There was a dispute at trial about the introduction of an investment agreement between Holtec and AEP, which is Indiana Michigan's parent corporation. Plaintiff objected that "the (continued...)

damages because Indiana Michigan would not have needed the canisters had DOE performed according to the Standard Contract.

Indiana Michigan entered into the Advanced Purchase Agreement with Holtec in 1994. Plaintiff's purpose was to insure access to sufficient dry storage containers for its spent fuel in the event of DOE's breach. Indiana Michigan provided financial support to Holtec for development of the HI-STAR system, which was multi-purpose. That is, it could be used both to store nuclear fuel and to transport it. Holtec agreed that Indiana Michigan would have a first priority right to purchase HI-STAR multipurpose canister systems in the future.

Mr. Malin was the management official at Indiana Michigan who was responsible for negotiating the Advanced Purchase Agreement. Mr. Lewis was one of the negotiators. Malin reviewed Mr. Lewis' work. Mr. Malin testified, "[w]e were faced once again with the Department of Energy['s] inability to take the spent fuel off our site." He stated that other utilities were reracking their pools and "it looked like all the utilities were starting to go to storage casks for their own private on-site fuel storage." Plaintiff's management was concerned

---

[39](...continued)
AEP investment agreement is not part of our claim in this case. We're not seeking any damages resulting from that agreement in this case. . . . [I]t is actually a separate AEP entity." Defendant responded that the investment agreement was negotiated by Indiana Michigan personnel simultaneously with the Advanced Purchase Agreement, and "the Advance Purchase Agreement . . . provides monies to Indiana Michigan if DOE ultimately purchases the HI-STAR capsule system." Both agreements were with Holtec. We asked the parties to,

> [m]ake a note of this issue and other similar issues . . . that we should discuss when we have a chance. . . . The mere fact that it's in the record now doesn't mean it has to stay there. [I]f you can show when it's all over that they never connected it up or that it's not competent evidence of anything, I can strike it.

Neither party brought up the matter again.

that dry storage casks would be unavailable when the time came that plaintiff needed them, or too expensive. Plaintiff had a purchase priority on their production as a result of its agreement with Holtec. Also, it could purchase the casks at a discount. The product line by Holtec was called HI-STAR. Mr. Malin did not know whether Indiana Michigan still is interested in the Holtec HI-STAR system.

Mr. Lewis confirmed that he negotiated the contract on behalf of Indiana Michigan, and that it "gave us a financial incentive to use the system. We got a discounted price." He explained the difference between a HI-STAR system, which he negotiated, and the HI-STORM which did not exist at the time.[40] Mr. Malin testified that the HI-STAR system was no longer practical and that plaintiff is no longer contributing to its development. The company felt that the monies being spent on the investment could be used elsewhere "for greater benefit of the business." Tucker Alan summarized this information in its expert report:

> In 1994, in order to assure it could obtain dry storage containers for its spent fuel, Indiana Michigan entered into an Advance Purchase Agreement for HI-STAR containers with Holtec International. We understand that, according to the agreement, Indiana Michigan provided financial support to Holtec to support the development, licensing and commercial availability of the HI-STAR multipurpose canister system used for the dry storage of spent fuel. In exchange, Holtec agreed that Indiana Michigan will have a first priority right to purchase HI-STAR multipurpose canister system in the future. Had DOE performed according to its contractual obligations, Indiana Michigan would not have been required to purchase canisters for an on-site dry storage facility.

Tucker Alan Expert Report, Nov. 25, 2003, page 20.

Plaintiff did not show a connection between the breach and its investment in the HI-STAR System. It had an equity interest in the System, and it may have made the investment

---

[40] HI-STAR is an all-metal multi-purpose storage and transportation system. HI-STORM has inner and outer steel shells with concrete between the shells. It is used for storage only.

anyway. The HI-STAR System involved both storage and transportation; it was more expensive than the other system. DOE was responsible for transportation, so the cost of a combination system was not necessary. Plaintiff needed only a storage system. See Standard Contract, Art. IV(A)(2)(a)-(c).

C. Private Fuel Storage Facility

Indiana Michigan joined a consortium called Private Fuel Storage, LLC. Several utilities sought to license, construct, and operate their own storage facility for spent nuclear fuel until DOE began collecting the waste. Plaintiff argued at trial that this investment would not have been necessary but for defendant's breach. Mr. Malin was Indiana Michigan's representative to the Facility, the PFS. He testified that plaintiff had "put a lot of work into it" but that it was no longer an option. He cited delays in licensing by the NRC and other factors. It would not be ready in time for plaintiff in any event because of the lead time needed on the dry storage facility. Plaintiff could have recouped some of its investment in the Consortium given a certain level of participation and capacity, but "we would not make any profit," Malin asserted.[41] He stated that the reason for participating in the PFS was "to mitigate the failure of the Department of Energy to take the fuel off of our site." He agreed that plaintiff's investment in PFS was a "speculative" venture. Indiana Michigan no longer is contributing to the Consortium.

The Private Fuel Storage Consortium was "too speculative" according to plaintiff's own

---

[41] Defendant read the following disclosure to the witness on cross-examination: "AEP [Indiana Michigan's parent company] is an equity member of Private Fuel Storage. As such, there are two financial benefits for the company. The first is a discounted price. The cost models above reflect the discounted price. Non-members will be required to pay . . . more than members. The second benefit is the potential to make a profit. . . ." (emphasis added). Mr. Malin explained that profit as used in the context of a public utility does not have the normal meaning.

witnesses when it was proposed. The cost of plaintiff's investment was $7.2 million. It was an expensive system that defendant could not have foreseen even if it were otherwise liable for such costs. Members of the Consortium had problems with NRC licensing and funding for construction, and they still do.

D. Engineering, Staffing Costs

Plaintiff claims over $400,000 for engineering and management costs of reracking and related mitigation efforts. Staff costs allegedly were incurred by Indiana Michigan to investigate methods for storing spent nuclear fuel. Defendant argues that neither management costs nor the engineering analyses included in plaintiff's claim are appropriately claimed as damages. They were analyses and evaluations that would have been required in connection with either a full or partial reracking, or because of general industry concerns relating to spent fuel pools. Engineering costs were questionable because plaintiff charged labor time to management officers. Mr. MacRae, for example, was a salaried employee. His billing in any event was not clear and not itemized. Plaintiff did not meet its burden of proving how its labor costs of labor related to defendant's breach. See, e.g., Chain Belt, 127 Ct. Cl. at 57 (denying plaintiff's claim for its employees' mitigation work because the record did not establish the amount of plaintiff's costs). Defendant showed that some costs of this litigation were "imbedded" in the charges engineering costs.

Mr. MacRae testified that the total amount spent on engineering staffing costs related to SNF was $346,000. Some of these costs fall into the period between breach and trial, as follows:

| | | |
|---|---|---|
| Year 1998 - $36,000 | Year 2001 - $61,000 | Year 2004 - $ 5,000 |
| Year 1999 - $38,000 | Year 2002 - $49,000 | |
| Year 2000 - $46,000 | Year 2003 - $ 6,000 | |

E. Gamma Heat Analysis

Plaintiff conducted an engineering analysis known as a Gamma Heat Study. Holtec conducted the Gamma Study in 2001 because plaintiff was concerned about gamma radiation against the concrete walls of the spent fuel pool. According to Mr. Malin,

> we had a lot of fuel in our pool and the racks that shelved the fuel were very close to the concrete walls. And so, we made sure we took a look at it and did the right thing and made sure that there wasn't any adverse impact on the system structure.

The racks were close to the wall because "we have to store all the fuel that the Department of Energy didn't pick up," the witness commented. Mr. Sieracki testified that the Gamma Study was performed "because of the tightened configuration of the rerack actually performed in 1993." He noted that the study is attributable to the Government because "the 1993 rerack is attributable to the [G]overnment."

Mr. Abbott testified that the Government is not responsible for the Gamma Heat Analysis. The test is related to the structural integrity of the pool and plaintiff would have conducted such a test regardless of whether DOE had started picking up fuel in 1998. This was an internal analysis by Indiana Michigan's Nuclear Safety Section. Plaintiff did not show what additional charges were occasioned by the breach, or that its employees would not have conducted this study as a part of their normal duties anyway.

F. Decay Heat Load Study

Mr. Malin testified that Indiana Michigan conducted an engineering analysis of the Decay Heat Load in its spent fuel pool.

> The pool gets hot, gives off heat. We watch how much heat is going into the pool.

> The way that heat is controlled and directed is through the cooling of the water that surrounds the racks in the pool. [W]e had to re-rack because DOE wasn't picking up fuel. So, to support operations from the discharge of fuel from the reactor, we had to do a thermal analysis of the spent fuel pool and the racks and the capability to dissipate that heat, and that was done, because we had racks with those designs with that much fuel that close together. It was due to a Holtec re-rack and, of course, of DOE inaction.

In other words, this analysis was necessary because of the 1993 reracking. It was accomplished "so we [could] continue to utilize and run the plant with the Holtec racks that we had. And the reason we had those racks in there was because of DOE's non-performance and their expected continuing their non-performance."

Plaintiff claims $16,375 in nominal dollars for the Heat Load Study, completed by Indiana Michigan personnel in 2002. Mr. MacRae testified about the costs, but he could not explain their source sufficiently for the court to use as evidence. His only source for the numbers was Mr. Kohrt, who did not testify. Asked if he could "vouch for the accuracy of these estimates," Mr. MacRae replied: "No. I can't."

G. Interest

The Tucker Alan report applied plaintiff's average after-tax cost of capital to damages incurred each year. This is prejudgment interest, which is not allowable against the United States absent a specific waiver of sovereign immunity.[42] See, e.g., Library of Congress v. Shaw, 478 U.S. 310, 321 (1986). Plaintiff referred to the unique nature of this case and the "unfairness" of

---

[42] Defendant's economist Dr. Neuberger stated that plaintiff's effort to apply a cost of capital amounts to "imputing interest against past costs. . . . [F]rom an economics perspective, this reflects what's known as pre-judgment interest . . . ." He agrees that it makes sense to provide some award for the time value of money "[f]rom an economics perspective." See, e.g., Blake v. Califano, 626 F.2d 891, 894-95 (D.C. Cir. 1980) (noting economic distinction between interest and delay factor but both are nonetheless prohibited by the no-interest rule).

permitting defendant to benefit from delaying trials of these cases. "Indiana Michigan . . . should not be bound by existing precedent with respect to the recovery of reasonable costs of capital. Indiana Michigan has financed the capital costs of its mitigation expenses . . . for more than ten years. It is only fair that these costs be shifted to the breaching party in this case – DOE." Plaintiff states that this case "justifies an award of cost of capital expenses and departure from the court's bright line prohibition against prejudgment interest." In plaintiff's opinion, its case is distinguished by the fact that "prejudgment expenses incurred by Indiana Michigan and other utilities are likely to be significantly larger than those incurred by a typical government contractor."

Indiana Michigan suspects that the Government is purposely delaying resolution of the sixty or more Spent Nuclear Fuel cases pending in this court. Plaintiff stated,

> [if] Indiana Michigan or any other party to the standard contract delays fees required under the standard contract . . . [it] is liable for interest on that delayed payment to DOE. . . . DOE has delayed performance of the standard contract by more than a decade, [yet] it has no comparable duty . . . to pay interest to utilities resulting from its delay in performance. As a result, DOE has every incentive to continue this pattern of delay, and has no incentive to seek prompt resolution of this litigation.

Plaintiff's equitable arguments that "Indiana Michigan . . . should not be bound by existing precedent with respect to the recovery of reasonable costs of capital" may be reasonable for the reasons stated above. However, policy arguments are for Congress to address, not the courts. Plaintiff did not cite a case in support of its position.

## III. FUTURE COSTS

Plaintiff's future damages are those incurred after 2002. Such damages depend on factual findings that we have rejected in this Opinion. These include DOE's failure to comply with the

Standard Contract until 2015 and plaintiff's need for a full core reserve of 554. Plaintiff's claim for future costs assumes that it will cease all operations after 2017. The claim also depends on the court's awarding plaintiff future costs in a lawsuit for partial breach of contract. This is a legal determination that we have not made. We discuss these costs nonetheless, for the reasons stated earlier. See Introduction to Part Two.

Plaintiff's claims for future costs may be summarized in the following categories: Construction of a dry storage facility; purchase and handling of casks; dry storage facility operation and maintenance; and decommissioning of the dry storage facility and the Cook Plant. Plaintiff's expert adjusted the projected costs in these categories to current dollars.[43] Future damages represented by these costs total over a billion dollars. Their present value is $83.8 million.

A. Dry Storage Facility Construction

Mr. MacRae used the experience of another utility to estimate plaintiff's costs of building a Dry Storage Facility. The other utility, PSEG, is a larger facility than Indiana Michigan, so Mr. MacRae scaled down the PSEG estimate by forty-eight percent to account for plaintiff's smaller size. Holtec International, which also handled Indiana Michigan's reracking in 1993, supplied the materials for the PSEG facility. Holtec's Chief Executive Officer is Dr. Singh, who testified for plaintiff as an expert in this case.

PSEG was Mr. MacRae's only source for dry storage construction costs. He has no independent expertise or experience in design or construction of dry storage facilities. His

[43] Mr. Sieracki testified that for future costs, "you take the constant 2003 dollars that I testified to and they are then escalated to the year at which they will be expended."

testimony on this issue may have been hearsay. Mr. MacRae could have testified about past costs if he had the invoices and contracts and he were the project manager, for example. Here he was testifying about future costs based on information that he obtained from others. See FED. R. EVID. 701 (lay witness' testimony may not be based on technical knowledge appropriate for an expert); FED. R. EVID. 702 (governing qualification and testimony of expert witnesses).

Plaintiff assumes that it will need 648 square-foot pads for the dry storage casks. This is too big, according to Mr. Abbott, who pointed out that plaintiff's own expert, Dr. Singh, assumes a 244 square-foot pad. Two other utilities who use Holtec equipment project 225 square feet. The Private Fuel Storage Facility designed by plaintiff's Consortium assumes 244 square feet; and Mr. Abbott recommends 244 square feet.

Dry storage facility construction costs should be adjusted based on the actual number of casks needed and the proper amount of space needed in the dry storage facility for each cask. The pad does not need to be 648 square feet, but 244 square feet per cask. This per cask pad size is consistent with information on dry storage facilities utilizing Holtec casks and with Dr. Singh's report.

The revised Tucker Alan damages report notes that the cost to build the Dry Storage Facility is about $27 million. This is an estimate, however. It is unknown at this point how much the actual Dry Storage Facility will cost. The estimate that Mr. Sieracki relied on was created by Mr. MacRae, who based his cost estimate on a dry storage facility to be built at a larger power plant, PSEG. Mr. Abbott's estimates for licensing, design, and construction of the Dry Storage Facility were more credible. This total is $12,329,928. The variable costs, or costs per cask, are approximately $11,389 each. Mr. Abbott estimates variable costs totaling

$2,873,405, for a total of $15,203,333.[44]

Mr. Sieracki and Mr. MacRae added a "contingency factor" of fifteen percent to the cost estimate of building a dry storage facility to account for unknown items that have not been included in the estimate, such as additional personnel and equipment. Mr. Sieracki testified that adding contingencies to estimates is routine in the estimating business. Such unknown costs must be excluded from assessment of damages against the Government.

B. Dry Cask Purchase Costs

Mr. Abbott believes that the cost for the procurement of canisters and casks should be corrected consistent with his opinions described earlier in this Opinion, concerning the necessary full core offload reserve and the extensions of Indiana Michigan's operating licenses. He was not asked to review the estimate for the cost of each canister. Dr. Singh thought the per cask estimate that plaintiff used was reasonable, but we heard little evidence on this issue.[45] Ninety-five casks may be needed, depending on the year of DOE's compliance. Differences in cask procurement costs affect the total substantially. Defendant claims that the only estimate in evidence based on other than Dr. Singh's experience is less than plaintiff projects.

C. Dry Cask Loading Costs

---

[44] It takes five years for spent fuel to cool down before it can be placed in a dry storage facility. Mr. Abbott testified that the fixed costs therefore should be distributed over a five-year period, as follows:

Year 1 - $2,397,086
Year 2 - $619,779
Year 3 - $2,879,813
Year 4 - $5,921,826
Year 5 - $511,420

[45] Some evidence of these costs was presented under seal. We do not include the applicable numbers here for that reason.

Plaintiff's cask loading costs associated with transfer of fuel from the spent fuel pool to the dry storage facility are too high, according to Mr. Abbott. However, defendant stipulated that it would not challenge plaintiff's estimates of cask loading costs. The "stipulation renders the Court's consideration of the methodology used to reach those cost estimates unnecessary," according to the parties. This stipulation relates to cask loading costs and spent fuel discharge. Defendant did "not stipulat[e] that Indiana Michigan will necessarily need to load any or all of the casks, including casks for storing spent nuclear fuel assemblies at a dry storage facility . . . ."

Plaintiff charged time for work performed by salaried employees. Such costs should not be included because plaintiff did not show that it would hire additional salaried staff because of cask transfer. Mr. Abbott testified that no "true incremental costs" apply to the utility for salaried staff due to the fuel transfer.

D. Dry Storage Facility Operation and Maintenance

Plaintiff's damage claim includes costs of operations and maintenance of the Dry Storage Facility. Mr. Sieracki relied almost exclusively on Scientech's 2000 decommissioning study for these costs. Mr. Sieracki explained that another study in 2003 showed increased costs for procuring additional security personnel, due to revised protocol in light of the September 11th attacks. Mr. Abbott said these costs would be about $5.5 million per year.[46]

Mr. Abbott explained that certain costs of staff and routine activities are related to the everyday functions of a nuclear power plant. Such costs accumulate regardless of when DOE

---

[46] The cost of a specific facility would depend on salary and wage levels, state regulatory requirements, and property taxes. Regulations issued since September 11, 2001 have increased security costs by $1.5 million per year.

begins collecting the fuel. He referred to these as "non-incremental staff costs," or sunk costs. Examples include dry run simulations, procedure development, project engineering, and project management.

Mr. Sieracki placed the maintenance costs at $96 million, but plaintiff applied an offset of $44.8 million to that figure. The reason for the offset is that the wet pool would be in operation for a longer period of time in the would-have-been world than in the actual world. The offset accounts for this assumption.

E. Decommissioning Costs

Mr. Knight was a witness for Indiana Michigan who is employed by Scientech, a company that performs decommissioning cost estimates. Decommissioning is the process of dismantling a nuclear facility after shutdown or license expiration. Mr. Knight has calculated as many as fifty decommissioning cost estimates since he has been with Scientech. He has conducted four studies for Indiana Michigan. These were in 1994, 1997, 2000, and 2003.

Mr. Knight testified that utilities perform decommissioning studies for internal planning purposes, to support rate hearings, and to provide reasonable assurance to the NRC that decommissioning funds will be available at the expiration of the plant's licenses. Indiana Michigan's most recent decommissioning study was performed for evidence in a rate case. Decommissioning studies also help project how and when certain situations at a nuclear facility will be handled based on shutdown dates for the plant, whether the fuel will be stored in a fuel pool or in dry storage, and when DOE will begin collecting the fuel. Mr. Knight determines costs and other scenarios based on such assumptions and other information. The 2000 and 2003 decommissioning cost studies for Indiana Michigan include scenarios based on spent fuel being

picked up in 2015. Other scenarios estimate costs based on a 2025 start date.

Decommissioning applies both to the dry storage facility and to the plant itself. According to Mr. Knight, the 2000 Study concluded that it would cost $3.6 million to decommission Indiana Michigan's dry storage facility in 2043, the year that plaintiff expects DOE to remove the last container.[47] Mr. Sieracki estimated the cost of decommissioning the dry storage facility is $2,827,000 in constant 2003 dollars. Mr. Tucker testified that decommissioning the dry storage facility will cost $11,368,000 in nominal dollars.

Once DOE has collected all of the spent fuel on Indiana Michigan's property, plaintiff must decommission the plant itself. This involves dismantling the reactors, the auxiliary buildings, and the wet pool. The cost of decommissioning the rest of the power plant is the same in the would-have-been world and the actual world, according to Mr. Sieracki. Mr. Sieracki bases his damages figures on the fact that Indiana Michigan will not operate beyond 2017. Decommissioning would last from that period until sometime in the 2020's.

The cost of decommissioning the balance of the plant is $389,835,000 in constant 2003 dollars. Mr. Sieracki noted that the purpose of including this figure in the would-have-been and actual scenarios is for cash flow purposes. He explained that he included this category because "there are cash flow differences in the . . . timing of the decommissioning of the balance of the plant in the actual and would-have-been world."

Tucker testified that decommissioning the balance of the plant would be a credit of $7,709,000 but a present value cost of $1,466,000 to the Government. Mr. Tucker explained that

---

[47] Dry storage facility decommissioning costs include all costs to restore the facility site for unrestricted use. These include general contractor and Indiana Michigan labor costs for dismantling the facility and disposing of the storage overpacks.

the reason it goes from a credit to a charge against the Government "has to do with discounting and timing." In the actual world, Indiana Michigan may decommission its reactors earlier than it would have in the would-have-been world. The wet pool and the auxiliary building would be decommissioned much later than the rest of the plant in the would-have-been world.

F. Other Costs

The items in this category are costs to be incurred as the result of a lawsuit initiated by the Michigan Environmental Council; and time spent by plaintiff's engineers for breach-related issues during 2003 and 2004. Plaintiff could not show reliably what portion of its engineers' time was spent on projects related to the breach. Some of the engineers were management personnel and most were on salary.

The litigation claim is $15,245 for plaintiff to defend itself against a suit filed in March 2003 by the Michigan Environmental Council and other consumer groups. The Council brought suit to contest Indiana Michigan's practices regarding rates charged to consumers for Nuclear Waste Fund fees and SNF storage and disposal. Plaintiffs asked that the Michigan Public Service Commission investigate costs that the utilities charged to store and dispose of SNF. The consumers' complaint alleges that Indiana Michigan "has collected $405.4 million (including interest credits) in rates for the federal SNF fee, of which approximately $223.7 million (plus interest) relates to utility SNF debt for the federal SNF fee for pre-April 7, 1983 nuclear generation . . . ." Expenses incurred in litigation, whether legal, accounting, or secretarial, are not awarded against the United States in the absence of specific statutory authority. See, e.g., Kania v. United States, 227 Ct. Cl. 458 (1981). Indiana Michigan is unable to segregate

litigation time from the damages as a result of its failure to maintain sufficiently descriptive records. Such litigation expenses infect the entire claim.[48] Plaintiff could not show foreseeability, or that litigation costs are attributable to the Government in any event.

Indiana Michigan did not establish that its engineering costs were attributable to DOE's partial breach of contract. Mr. MacRae acknowledged on cross-examination that he billed all time spent dealing with spent nuclear fuel issues to the billing number from which Indiana Michigan's past damages are derived. He conceded that he would have billed time to spent fuel-related issues without the breach. Indiana Michigan alleged but did not show that Mr. MacRae or his predecessor spent fifty percent of their time after 1995 on breach-related spent nuclear fuel issues.

## CONCLUSION

Defendant breached the Standard Contract in 1998. Plaintiff has not shown that it incurred damages related to the breach to date, however. Defendant's delay has not impaired DOE's ultimate performance of the Standard Contract so far as this plaintiff is concerned. Indiana Michigan continues to expect compliance from the Department of Energy.

We did not discuss repudiation or anticipatory breach in detail because plaintiff did not argue those theories of recovery. Plaintiff seeks its costs of mitigation. Repudiation was implicit in plaintiff's evidence and testimony supporting some of its past costs, however. Its decision to

[48] In an earlier lawsuit, the Michigan Public Service Commission required Indiana Michigan to put disputed funds in a decommissioning trust fund. This may be one reason why plaintiff did not pay the one-time fee required by the Standard Contract. See Opinion, page 4, n. 4, above. Consumers in this suit are urging that an escrow be set up for the same purpose.

rerack is an example. Plaintiff decided to rerack years before defendant's breach and well before DOE stated that it would not meet the contract deadline. Government statements in the late 1980's expressing doubt that DOE would meet the 1998 deadline did not rise to the level of repudiation. Indiana Michigan made its decision in 1989 to rerack for sound business reasons.

Plaintiff is entitled to recover its costs related to the breach during the period 1998 through 2004. The utility accumulated tons of nuclear waste that DOE should have collected during those years, but plaintiff's case included little testimony or other evidence of costs associated with that period of time. Plaintiff emphasized instead costs that it incurred well before the breach, in 1993 and 1994, and possible costs extending forty years or more into the future.

Future costs are not allowable for the reasons stated in the Opinion. Defendant testified that it will comply with the Standard Contract by beginning to collect spent nuclear fuel from the utilities in 2010. One of plaintiff's experts attempted to show that defendant may not meet that deadline. Statements made by a government witness and by counsel that DOE will start accepting fuel in 2010 do not create a new promise, however. When Indiana Michigan can show that it has incurred costs related to defendant's breach, plaintiff may have damages that are not speculative. A non-breaching party "may elect to regard the breach as partial, proceed with his own performance, sue for the partial injury, and maintain a second suit in case a further breach occurs." 9 ARTHUR L. CORBIN, CORBIN ON CONTRACTS § 946, at 720 (interim ed.). Defendant represented before trial that such causes of action would be appropriate if applicable. If DOE begins compliance with the Standard Contract soon enough, Indiana Michigan may not need to build a dry storage facility. This would reduce plaintiff's potential damages substantially.

Count I of the Complaint states, "Indiana Michigan reserves its rights to recover presently unascertainable damages that may be caused by DOE's future partial breaches of the Standard Contract." Plaintiff asks that we retain jurisdiction to hear partial breaches of contract that may occur in the future. The Clerk of Court may treat such claims as related cases pursuant to the rules of this court.

The Clerk will dismiss Count I of plaintiff's Complaint.[49] No costs.

Defendant breached the Standard Contract in 1998. Plaintiff has not shown that it incurred damages related to the breach to date, however. Defendant's delay has not impaired DOE's ultimate performance of the Standard Contract so far as this plaintiff is concerned. Indiana Michigan continues to expect compliance from the Department of Energy.

We did not discuss repudiation or anticipatory breach in detail because plaintiff did not argue those theories of recovery. Plaintiff seeks its costs of mitigation. Repudiation was implicit in plaintiff's evidence and testimony supporting some of its past costs, however. Its decision to rerack is an example. Plaintiff decided to rerack years before defendant's breach and well before DOE stated that it would not meet the contract deadline. Government statements in the late 1980's expressing doubt that DOE would meet the 1998 deadline did not rise to the level of repudiation. Indiana Michigan's decision in 1989 to rerack was made for sound business reasons.

The claim for partial breach of contract focuses on the years 1998 through 2004, the period between the breach and the trial. The utility accumulated tons of nuclear waste that DOE

---

[49] Plaintiff abandoned Count II of the Complaint, alleging breach of defendant's implied covenant of good faith and fair dealing. This is a final judgment.

should have collected during those years, but plaintiff's case included little testimony or other evidence of costs associated with that period of time. Plaintiff emphasized instead costs that it incurred well before the breach, in 1993 and 1994; and possible costs in 2005 or 2006, extending forty years or more into the future.

Future costs are not allowable for the reasons stated in the Opinion. Defendant testified that it will comply with the Standard Contract by beginning to collect spent nuclear fuel from the utilities in 2010. One of plaintiff's experts attempted to show that defendant may not meet that deadline. Defendant has not promised to comply in 2010, however. When Indiana Michigan can show that it has incurred costs related to defendant's breach, plaintiff may have causes of action that are not speculative. A non-breaching party "may elect to regard the breach as partial, proceed with his own performance, sue for the partial injury, and maintain a second suit in case a further breach occurs." 9 ARTHUR L. CORBIN, CORBIN ON CONTRACTS § 946, at 720 (interim ed.). Defendant represented before trial that such causes of action would be appropriate if applicable. If DOE begins compliance with the Standard Contract soon enough, Indiana Michigan may not need to build a dry storage facility. This would reduce plaintiff's potential damages substantially.

Count I of the Complaint states, "Indiana Michigan reserves its rights to recover presently unascertainable damages that may be caused by DOE's future partial breaches of the Standard Contract." Plaintiff asks that we retain jurisdiction to hear partial breaches of contract that may occur in the future. The Clerk of Court may treat such claims as related cases pursuant to the rules of this court.

The Clerk will dismiss Count I of plaintiff's Complaint.[50] No costs.

s/ Robert H. Hodges, Jr.
Robert H. Hodges, Jr.
Judge

[50] Plaintiff abandoned Count II of the Complaint, alleging breach of defendant's implied covenant of good faith and fair dealing. This is a final judgment.