# APPENDIX

# INDEX TO THE APPENDIX

Document | Pages

Excerpts from the Deposition of Mr. Daniel Fischel, conducted September 4, and 6, and October 8, and 9, 2002 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1-37

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

\- - - - - - - - - - - - - - - - x

YANKEE ATOMIC ELECTRIC :
COMPANY, et al., :
Plaintiffs, :
v. : Case Nos.
THE UNITED STATES, : 98-126C, 98-154C,
Defendant. : 98-474C

\- - - - - - - - - - - - - - - - x

Washington, D.C.
Wednesday, September 4, 2002

Deposition of DANIEL FISCHEL, a witness herein, called for examination by counsel for Plaintiffs Yankee Atomic, Maine Yankee and Connecticut Yankee, in the above-entitled matter, pursuant to notice, the witness being duly sworn by CYNTHIA R. SIMMONS, a Notary Public in and for the District of Columbia, taken at the offices of Spriggs & Hollingsworth, 1350 I Street, N.W., Washington, D.C., at 10:11 a.m., Wednesday, September 4, 2002, and the proceedings being taken down by Stenotype by CYNTHIA R. SIMMONS, RMR, CRR, and transcribed under her direction.

Page 10

time, whether periods of time which have already occurred or periods of time that will extend into the future are both encompassed within my reports, that's correct.
Q. Well, let me ask, for instance, to make sure we're on the same page about a particular kind of past damage that's claimed, call it reracking, are you familiar with the reracking damages?
A. Yes, I believe I am.
Q. What's your understanding of what the nature of those, what those damage claims are?
A. You know, I would want to check to make sure that my answer that I'm about to give is consistent with the particular damage claim that plaintiffs are making but my general understanding is damages having to, claim damages having to do with the creation of additional capacity.
Q. What sort of additional capacity are you referring to?
A. Additional capacity for storage of spent nuclear fuel.
Q. Why would a utility rerack?
A. I don't have an opinion on that other than what's obvious in terms of the need for additional capacity.

Page 11

Q. Are you saying that plaintiffs' claimed reracking damages are included in your, in your expert witness reports referenced to plaintiff damage claim?
A. I'm saying that all plaintiffs' damages that I'm aware of are included in my reports.
Q. In paragraph 7 of your report you say the, you have two principal conclusions, do you have any conclusions that are not your principal conclusions that are not subsidiary to those two conclusions?
MS. POWELL: Objection, vague.
THE WITNESS: I don't want to get into a semantic discussion of what's a conclusion. I would say all of the conclusions that I presently have are contained in the report.
BY MR. SHAPIRO:
Q. And are all the bases for your opinions also contained in the report?
A. Yes.
Q. Let me make sure I understand the structure of your report correctly. The first bullet point in paragraph 7, the one that says, The claimed damages do not result from DOE's failure to commence disposing SNF and HLW by January 31, 1998. The basis for that conclusion is set out in paragraph 8 of your

Page 12

report?
A. Correct, and elsewhere in the report. There's references to the same point.
Q. What other references, what are the other references to that claim?
A. Would you like me to go through?
Q. Yes, please.
A. Difficult to pick one paragraph in a report and ask what else in the report is related to the point being made in that particular paragraph but since you've asked me to do it, I will do my best to at least point out some illustrative other parts of the report that refer to the point made in paragraph 8, recognizing the somewhat artificial nature of the exercise that you're asking me to perform.
Paragraph 10 is related to the point in paragraph 8. Actually paragraph 9 is as well. I'm not going to refer to the footnotes that are referred to in particular paragraphs but the link between the footnotes and the text is obvious by their numbers. Paragraphs 13 and 14, really 11 and 12 I guess also.
When I look at it, I would say every paragraph in the report is related to the point made in paragraph 8.

Page 13

Q. I thought my question was a little different which is what is, where in your report is set out the basis for the first bullet point in paragraph 7, but rather than sort of getting into a semantics basis in related to, maybe it will become clear as we get into a little bit more into the substance of that first opinion as to how the rest of the report may relate to that opinion.
With respect to the second bullet point, am I reading the report correctly that the basis for that opinion, when I say second bullet point I mean the second bullet point in paragraph 7, is the basis for that opinion set out in the section of your report under Roman numeral IV?
A. Yes.
Q. Let's go back for a moment to the first bullet point. You say that there are paragraphs beyond paragraph 8 that relate to that first bullet point, would it be fair to say that the primary basis for that opinion is set out in paragraph 8 under Roman numeral III?
A. Again, I just don't want to quibble over semantics. Certainly the point is stated in paragraph 8, but then I would say that it's just such a fundamental point and such a fundamental flaw in

Page 14

the plaintiffs' case and their damage model that it just comes up over and over and over again in a variety of different forms throughout the report.

Q. In paragraph 8, let's turn to paragraph 8, you're saying that if the Department of Energy had started removing plaintiffs' spent fuel in 1998 but did not remove all of the waste by 2010, then plaintiff would have incurred most of the costs it is claiming in its damages in that instance. Is that a fair representation as to what you're saying?

MS. POWELL: The document speaks for itself.

THE WITNESS: I don't think there's a need to paraphrase the language in the report but what I think the report does say, based on the damage analysis that the plaintiffs and their experts have put forward and the assumptions underlying that damage analysis, the report makes the point which, again, is clear from the language of the report itself that the damage claim is not based on the failure to start but rather it's based on removal of all of plaintiffs' nuclear waste prior to 2010.

BY MR. SHAPIRO:

Q. I appreciate your view that you don't find it necessary to rephrase but I find it helpful and

Page 15

that was my question.

Are you saying that if DOE had started removing plaintiffs' spent fuel in 1998 and did not remove all of the spent fuel by 2010 then plaintiff would have incurred most of the costs it is otherwise claiming as damages?

MS. POWELL: Same objection.

THE WITNESS: Again, I think the report speaks for itself but that said, I would just, to incorporate my previous answer to what I understood to be the identical question.

BY MR. SHAPIRO:

Q. Are you not saying that if DOE had started removing plaintiffs' spent fuel in 1998 and would not have removed all the spent fuel by 2010 that plaintiff would have incurred most of the costs it's claiming as damages?

A. Again I think I've answered that numerous times now but I would say based on the particular damage claim that the plaintiffs have made and the particular assumptions underlying that claim made by plaintiffs and their experts, the principal determinant of the cause of damages is not a failure to start by 1998 but rather the failure to remove all of plaintiffs' nuclear waste prior to 2010.

Page 16

Q. Are you assuming if DOE had started removing Plaintiffs' spent fuel in 1998 that DOE would not have completed removing all of Plaintiffs' spent fuel by 2010?

A. I'm not assuming anything. I'm simply pointing out what I've said in my previous answers which I think is also clear in the report itself.

Q. So you're not assuming that DOE even if it had starting removing plaintiffs spent fuel in 1998, that it would not have completed removing that spent fuel by 2010?

A. I'm not making any assumptions one way or the other. Other parts of the report talk about how the conclusions of plaintiffs and their experts that all of the spent nuclear fuel and high-level radioactive waste would have been removed far earlier than 2010 are based on a series of speculative and implausible assumptions, but I independently am not assuming anything one way or the other.

Q. Are you making a judgment as to whether or not the Department of Energy has an obligation to remove plaintiffs' spent fuel before 2010?

MS. POWELL: Objection to the extent it calls for a legal conclusion.

THE WITNESS: Other than what I've said in

Page 17

the report concerning my analysis of plaintiffs' damage claims and the analysis of plaintiffs' experts in support of those alleged damages, I don't have any opinion, independent opinion of what DOE's obligations are.

BY MR. SHAPIRO:

Q. Well, if it were 100 percent clear in your report, I might not be asking the question. But I'm asking you the question, are you making a judgment as to whether or not the Department of Energy has an obligation to complete removing plaintiffs' spent fuel prior to 2010?

MS. POWELL: Same objection and also argumentative.

THE WITNESS: I think I've just answered that identical question so I would just incorporate my prior answer to what I understood to be the identical question.

BY MR. SHAPIRO:

Q. I need you to answer the question, Mr. Fischel.

MS. POWELL: Mr. Fischel has answered it several times, Mr. Shapiro.

BY MR. SHAPIRO:

Q. Are you assuming --

Page 18

A. Excuse me, I'm sorry.
Q. Are you assuming that the Department of Energy had no obligation to complete removal of plaintiffs' spent fuel by 2010?
MS. POWELL: Same objections.
THE WITNESS: Can I have my answer to, I guess, two questions ago read back, please.
THE REPORTER: "Answer: I'm not making any assumptions one way or the other. Other parts of the report talk about how the conclusions of plaintiffs and their experts that all of the spent nuclear fuel and high-level radioactive waste would have been removed far earlier than 2010 are based on a series of speculative and implausible assumptions, but I independently am not assuming anything one way or the other."
BY MR. SHAPIRO:
Q. Can you answer the question?
A. I can't answer it any more clearly than that answer that was just read back. That's my answer.
Q. Do you have an opinion as to whether or not the Department of Energy has an obligation to remove plaintiffs' spent fuel by 2010?
MS. POWELL: Same objections.

Page 19

THE WITNESS: Well, again, I think that's just the identical question again and I think I've answered that question. I can't add to what I've already said.
BY MR. SHAPIRO:
Q. Are you not making such a judgment?
MS. POWELL: Mr. Shapiro, Mr. Fischel has answered that question several times.
THE WITNESS: I think for the reasons that I explained in my previous answer, I am not making any independent assessment of any obligation that the DOE either had or didn't have. I am focused on the claims that the plaintiffs have made in connection with their damage claim and the opinions and the analyses of plaintiffs' damage experts.
BY MR. SHAPIRO:
Q. Mr. Fischel, your opinion, again, in paragraph 8, let me read the particular sentence that I'm focusing on, it's on the top of page four, it says that the claimed damages do not result from DOE's failure to commence disposing SNF and HLW by January 31, 1998 because if, and I'll emphasize that word if, if DOE had started disposing SNF and HLW by January 31, 1998, but did not dispose of all of plaintiffs' nuclear waste prior to 2010, then

Page 20

plaintiff still would have to store nuclear waste on site through 2010 and still would have to incur the cost that it claims is damages.
Suppose DOE, if it had started disposing of plaintiffs' spent fuel and high level waste by January 31, 1998, suppose it had started to do that, that it would have disposed of or removed all of plaintiffs' nuclear waste prior to 2010, would that change your opinion?
A. I guess I would need to see the particular claim or the, and/or the damage analysis that supported the claim in connection with what sounds like a hypothetical question. What I have done is analyze the particular claims made by the plaintiffs and their experts and have reached the conclusions that I've reached. If there were a different damage claim based on a different damage analysis, you know, then perhaps I could respond to that. But I've focused on the claims and the damage analyses made in connection with the particular three cases that I've submitted reports in connection with.
Q. Well, you may choose to characterize my question as a hypothetical or not but I would still like you to answer it.
MS. POWELL: Mr. Fischel has answered the

Page 21

question.
THE WITNESS: I think I answered the question.
BY MR. SHAPIRO:
Q. Now, you didn't -- the question, are you making an assumption in the sentence that I just read that DOE would not dispose of plaintiffs' spent fuel prior to 2010? Isn't that what that sentence is doing?
A. No.
Q. What is the sentence doing there?
A. It's doing what, again, I think it speaks for itself. I don't know what you mean what the sentence is doing. The sentence doesn't do anything. It communicates information.
Q. What are you trying to communicate in that sentence?
A. Again, I think the sentence as well as the rest of the report and the similar reports submitted in connection with the other cases speak for themselves. If there's something that is not clear to you, I'd be happy to clarify it but to me the sentence is clear in terms of what it means.
Q. Are you saying that even if DOE had started disposing of plaintiffs' nuclear waste in

Page 34

opposed to the failure to start by a certain date is your understanding that there is at least the possibility if you start by a certain date that you will not have completed removal by the date set out in plaintiffs' damage claim?

MS. POWELL: Objection, vague.

THE WITNESS: I don't think that's a fair characterization of the opinions that are reflected in my report.

BY MR. SHAPIRO:

Q. What's unfair about that characterization?

A. Because it ignores the discussion in the report and the reasons given for why the plaintiffs' damage claim is based on a series of speculative and implausible assumptions concerning the timing of when the spent nuclear fuel and high-level radioactive waste are going to be removed in addition to the other problems with the plaintiffs' damage claim and analysis of their experts that are described in the report.

Q. Well, I'm trying to focus and to simplify this to focus on the first bullet point, your first opinion, is that opinion, is it a fair characterization of that opinion that plaintiffs' damages stem from the failure to remove by a certain

Page 35

date rather than the failure to start by a certain date because there's a possibility that even if you start by a certain date that you will not have completed removal by the date otherwise required in plaintiffs' damage claim?

MS. POWELL: Asked and answered, vague.

THE WITNESS: Again, I just don't think that's a fair characterization of the point or the discussion of the point in the report for the reasons that I've stated.

BY MR. SHAPIRO:

Q. The conclusion that you're reaching in paragraph 8, what economic principles are you applying in reaching that conclusion?

A. My analysis of the claimed damages and the damage analysis of plaintiffs' experts in this case.

Q. I'm asking more specifically, what economic principle tells you that, that the claimed damages do not result from DOE's failure to commence disposal of spent fuel by January 31, 1998, isn't that a legal conclusion?

A. I wasn't making any legal conclusions in reaching my opinion as set out in the report.

Q. What economic principle then are you applying or is it just a common sense principle that

Page 36

you're applying?

MS. POWELL: Objection, vague.

THE WITNESS: I think certainly it has a common sense appeal because I think most principles of economics if they're stated clearly have a common sense appeal. In this particular case, I guess you could call economic principles of causation for lack of a better description having looked at the plaintiffs' damage analysis and analyze the bases of, for the damage analysis, I concluded that there's a fundamental disconnect, a lack of causal connection between the alleged breach and the claimed damages.

BY MR. SHAPIRO:

Q. You referred to the economic principles of causation, what are the economic principles of causation?

A. In this case, whether the claimed damages of the plaintiff and the plaintiffs' damage expert is causally related to the alleged wrong doing or breach of contract.

Q. Well, I certainly understand that to be the legal definition of causation, is there a difference then between the legal principles of causation and the economic principles of causation?

A. In what the legal definition of causation

Page 37

is, is obviously a subject matter for the court and not one in which I am offering an opinion on, I've confined my analysis to trying to understand and then describe and criticize the opinion of plaintiffs' experts and their damage experts based on my own analysis of what they've done in light of the facts and circumstances of this case, including the claimed breach and the causal relationship or lack thereof between the breach and the damage claim.

Q. A moment ago I asked you what economic principles you're applying in reaching the conclusions you've reached in paragraph 8 of your report and you replied, the economic principles of causation, and I said what are the economic principles of causation and you referred specifically to this case and that whether or not the damages result from the alleged breach. How about more generally, what are generally the economic principles of causation? I'm not familiar with that field.

MS. POWELL: Asked and answered.

THE WITNESS: I don't know if there are general principles beyond analyzing the relationship or the nexus between a particular event and the economic consequences of that event, which is something which is routinely a part of any damage

Page 42

in paragraph 7 are not really independent opinions, that they're inextricably intertwined?
A. Well, first of all, there was so much preamble in your question of characterizing what I've said, which I just don't want to by silence accept the extended characterization and will stick with my own words, what I said. But as far as the relationship between the points, I think they are related by the opinions described in the reports. I don't agree with your characterization of the bases for my opinions that you included in your long preamble to your question.
Q. What's the relationship between your two opinions that you've set out in two bullet points in paragraph 7?
A. The relationship is that they are two opinions that relate to the criticisms that I have of plaintiffs' damage claims and damage models in this particular case as described in the reports themselves.
Q. Is there any other relationship between the two bullet points other than that they're both criticisms of the same damage claims and damage models?
A. I guess I'm not sure what you mean by any

Page 43

other, other than what's described in the reports themselves.
Q. You keep referring to the report, I don't see any relationship between the two of them in the report but I'm asking you to describe what the relationship is and you just testified that the relationship is that they're both criticisms of plaintiffs' damage claims, I'm asking is there relationship between the two opinions, not what they both relate to. But are the two opinions themselves related?
MS. POWELL: Objection, vague.
THE WITNESS: I think they're related for the reasons that are described in the reports.
BY MR. SHAPIRO:
Q. What are those reasons that you're referring to?
A. I think I've covered this many times, I think it's described in the reports but there's a fundamental conceptual flaw that underlies the plaintiffs' damage claim and the claims of their experts in this case that there's a lack of relationship, causal relationship, a fundamental disconnect between the alleged wrongdoing, the government's breach and the damage claim. And

Page 44

moreover, the damage claim on its own terms is speculative and implausible for the reasons that are described in the report. And those speculative and implausible assumptions that are described in connection with the second bullet point make the first bullet point not only a conceptual error but also emphasize even more strongly that the damage claim is not persuasive or credible because the claims about removal are based on these speculative and implausible assumptions that are described in the report.
Q. Go back to that first bullet point again, suppose the court tells us that, the court makes a finding that if the Department of Energy had commenced disposing of plaintiffs' spent fuel and high-level waste by January 31, 1998, it would have completed removal of plaintiffs' spent fuel and high-level waste by 2001. Would that change your opinion as to whether or not plaintiffs' claimed damages result from the failure to commence?
MS. POWELL: Objection, vague to the extent it calls for a legal conclusion and I believe asked and answered.
THE WITNESS: It's difficult for me to answer that question without knowing what the basis

Page 45

for the finding would be and how it relates to the claims of plaintiffs or their damage experts, whether it's the existing claims, different claims, what the nature is of the findings, but I think regardless wouldn't change the fact that the claimed damages, at least based on the structure of the case as it currently exists would result from the failure to remove as opposed to the failure to start putting aside other problems that my reports discuss in connection with failed fuel, GTCC, acceptance schedule, and other things that are included in the report.
BY MR. SHAPIRO:
Q. In your answer you said even if the court makes a finding that if DOE had started removing spent fuel by January 31, 1998 that they would have completed the removal by 2001, you said even in that instance the claimed damages stem from the failure to remove as opposed to the failure to start. The failure to start what?
A. Again, I was speaking in my previous answer about some assumed hypothetical finding that I don't know what else you're assuming in connection with this hypothetical finding, as I've stated in my answer, so I can't really respond more specifically



6

Page 46

because we're talking about something that doesn't exist.
Q. I'm just, I want to make sure I understand your words. You said that the damages would still result from the failure to remove as opposed to the failure to start. The failure to start what?
A. Removing the spent nuclear fuel and the high-level radioactive waste.
Q. So you're drawing a distinction between removal of the waste and starting the removal of the waste?
A. You know, again, I don't want to confuse the actual facts and circumstances of the case and the analysis of the plaintiffs' experts in the particular case with doing my best to respond to some very vague and open-ended hypothetical in connection with some assumed state of events which hasn't occurred in the real world, so therefore it's very difficult to respond to.
What distinctions I would draw, if any, if confronted with anything like the hypothetical that you are referring to, I think would just depend on exactly what happened, what I was asked to do, how it relates to what I've already done in connection with this case and other uncertainties that I can't really

Page 47

anticipate in connection with your question.
Q. Well, even in your actual opinion, not a hypothetical, but your actual opinion in paragraph 7 in the first bullet point and paragraph 8, you're drawing a distinction between removal and the start of removal, is that correct?
A. I'm drawing that distinction in the context of the facts and circumstances of this case and the plaintiffs' damage analysis in this case which is not linked to the failure to start but rather is linked on a series of speculative and implausible assumptions relating to time of removal independent of time of commencement.
Q. I asked you a while back what would be an appropriate way to measure damages resulting from the failure to commence removal of spent fuel by January 31, 1998, would you say that generally it is not the correct way to go about that by trying to estimate when the spent fuel, when the completion of the removal of spent fuel would have happened?
MS. POWELL: Objection, vague.
THE WITNESS: As I said when you asked me that question, I really haven't given that any thought but if I were trying to analyze damages flowing from the failure to commence by a certain

Page 48

date, that's what I would try and analyze.
BY MR. SHAPIRO:
Q. You would try to analyze when the removal would be completed?
A. No.
Q. Okay.
A. I would try and analyze what the damages were if any that resulted from the failure to start by a certain date, if that's the exercise that I was trying to perform.
Q. Is trying to estimate the date of removal fundamentally the wrong way to go about it then?
MS. POWELL: Objection, vague.
THE WITNESS: Again, I haven't really given this any thought. I focused on the damage claims in this case and the opinions of plaintiffs' damage experts in this case. I haven't tried to perform the exercise that you are referring to in your question as I've stated several times. So I don't really have anything to add.
BY MR. SHAPIRO:
Q. I don't think you've answered the question. I asked, if you were trying to estimate damages resulting from the failure to commence, would you try to go about that by estimating when removal

Page 49

would be completed and I thought at one point that you had indicated that that's how you would go about it, am I mistaken?
A. Yes, I think you're mistaken. I don't have an opinion as to how I would go about it. It would depend on all kinds of different facts and circumstances that I haven't thought about or considered as of this time.
Q. Is trying to estimate the damages resulting from the failure to commence by estimating when spent fuel removal would have been completed, is that an inappropriate way to go about estimating the damages in your opinion?
MS. POWELL: Objection, vague.
THE WITNESS: As I've said, if you're asking that question in the abstract apart from anything that's been done in this case or anything that I've done in this case, I don't have an opinion on that without thinking about it and knowing a lot more facts and circumstances and having a chance to reflect on those facts and circumstances.
What I've done in this case is focus on rather than this abstract hypothetical exercise that you're asking about is focus specifically on the plaintiffs' damage claims and the claims of their

Page 50

experts in these three cases.
BY MR. SHAPIRO:
Q. Well, that's really what I'm trying to do, again, focusing I guess perhaps on Mr. Graves' report, are you saying that from the outset, you know, let's say Mr. Graves had otherwise perfectly done his analysis, didn't have any implausible assumptions, any errors in his analysis, are you saying that he was fundamentally trying to ask the wrong question when the spent fuel would have been removed?
A. I think what I'm saying, to keep repeating your phrase, is what is contained in the reports. I'm not sure what else I can add to what's in the reports and what I've said in response to that identical question which you've asked, many, many times.
Q. Again, I'm not asking about the report, I'm asking what your opinion is. Is it your opinion that Mr. Graves in trying to estimate when plaintiffs' spent fuel would have been removed that he was fundamentally looking at the wrong question if he was trying to estimate, if the purpose was to estimate plaintiffs' damages resulting from the failure to commence removal by January 31, 1998?

Page 51

MS. POWELL: Vague.
THE WITNESS: I think in the context of the particular claims that are being made in this case and in particular damage analyses by plaintiffs' experts in this case, there is no attempt to identify the damages or the costs that would have been avoided had the government commenced removal as of January 31st, 1998. In that sense, there is a fundamental conceptual problem with the damage claim and the analyses of plaintiffs' experts for the reasons that I've described and have stated in the reports.
BY MR. SHAPIRO:
Q. Is it your opinion that the date upon which the government would complete removal of plaintiffs' spent fuel is irrelevant to the question of its damages resulting from the failure to commence disposing of plaintiffs' spent fuel and high-level waste by January 31, 1998?
MS. POWELL: Objection to the extent it calls for a legal conclusion.
THE WITNESS: I wouldn't say I think it's irrelevant. But I think the question of what costs were incurred in the real world that would have been avoided had the government commenced removal as of

Page 52

January 31st, 1998 is the right question and I don't believe that that question is analyzed in plaintiffs' damage claims or the analyses of plaintiffs' damage experts for the reasons that are described in detail in the report, my report.
BY MR. SHAPIRO:
Q. You said you wouldn't say that the date when the government would complete removal of spent fuel is irrelevant to a determination of damages resulting from a failure to commence removal by January 31, 1998. What's the relevance then of that date when the government would complete removal?
A. Well, again, relevance depends on the facts and circumstances. There are many, many different possible relevant facts and circumstances. And what the relevance is, is itself dependent on all kinds of issues regarding the legal and regulatory environment and other issues. So I wouldn't say it's irrelevant. How relevant it is just depends on the relevant facts and circumstances.
Q. Well, I'm referring to the facts and circumstances of this case, how relevant it is, how was it relevant?
A. The facts and circumstances of this case I would say for reasons that are described at length in

Page 53

the reports, my reports in the three cases, the plaintiffs' damage claims and damage analysis are not based on the failure of the government to commence removal by January 31st, 1998 but rather are based on the alleged failure of the government to remove all of the spent nuclear fuel and high-level radioactive waste as well as failed fuel and GTCC by 2010 or really dates significantly before that date, so the analysis is conceptually flawed for that reason and apart from that conceptual problem the conclusions are that everything would be removed by the dates that Mr. Graves concludes that analysis is itself based on a series of speculative and implausible assumptions as described in my reports.
Q. I don't think there was any connection between your answer and my question. My question went back to one of your prior statements which was that the date upon which the government would complete removal of plaintiffs' spent fuel is not irrelevant to the question of whether the claimed damages result from DOE's failure to commence removal of the spent fuel on January 31, 1998. And I asked you, well, if it's not irrelevant, how is it relevant. And you said it depends on the facts and circumstances, and I referred you to apply the facts

AFTERNOON SESSION
(1:13 p.m.)
Whereupon,
DANIEL FISCHEL,
the witness testifying at the time of recess, having been previously duly sworn, was further examined and testified further as follows:
EXAMINATION BY COUNSEL
FOR PLAINTIFFS (RESUMED)
BY MR. SHAPIRO:
Q. Mr. Fischel, before we took our lunch break, I think we were looking at the last sentence in paragraph 8 of your report, the one that says the claimed damages do not result from the partial breach of contract found by the court. What's your understanding of what the partial breach of contract found by the court is?
A. My understanding is contained in the last sentence of paragraph 5.
Q. Your understanding is that the court found DOE partially breached Connecticut Yankee's contract by failing to commence acceptance by January 31, 1998?
A. Correct.
Q. Is it your understanding that that's the



extent of the partial breach found by the court?
A. Again I'm not offering legal opinions and anyway I haven't looked at the opinion in a while, so I wouldn't want to offer any definitive opinions about it but my understanding is what's stated in that sentence.
Q. Well, you understand that Department of Energy has obligations to perform services under the party's contract beyond commencing acceptance by January 31, 1998, don't you?
MS. POWELL: Objection to the extent it calls for a legal conclusion.
THE WITNESS: I don't really have any opinions about what the contract provides other than what I'm assuming or basing the opinions that are contained in the report on.
BY MR. SHAPIRO:
Q. I asked the question because my understanding, Mr. Fischel, is that the court's summary, partial summary judgment decision was broader than focusing simply on the failure to commence, it simply was a finding of partial summary judgment on breach of contract liability, do you have a different understanding?
MS. POWELL: Objection to the extent it



calls for a legal conclusion.
THE WITNESS: Again, I don't want to debate what the court held because I'm not offering any opinions on that issue. My understanding is contained in the report.
BY MR. SHAPIRO:
Q. So your statement, the last sentence in paragraph 8 referring to the partial breach of contract that you're referring to in paragraph 8 is limited to what you've set out in the last sentence of paragraph 5?
A. That's what it refers to, correct.
Q. So if in actuality the Department of Energy is in partial breach of obligations beyond commencing acceptance by January 31, 1998, you don't have an opinion as to whether or not the claimed damages result from that further partial breach?
MS. POWELL: Objection to the extent it calls for a legal conclusion and vague.
THE WITNESS: Yeah, I'm not sure I fully understand the question, but I don't think that my opinions would change so long as the partial breach found by the court involved to a significant extent the failure to commence disposing of spent nuclear fuel and high-level radioactive waste by



January 31st, 1998.
BY MR. SHAPIRO:
Q. And you say that because it's your view that the damages claimed by plaintiff result from the failure to continue acceptance of spent fuel after January 31, 1998 rather than the failure to commence on January 31, 1998?
A. I wouldn't phrase it that way, no.
Q. How would you phrase it?
A. I would phrase it the way it's phrased in the report that the claimed damages are a function of the alleged failure of the government to remove all or substantially all of the spent nuclear fuel and high-level radioactive waste along with everything else by dates significantly before 2010 according to the analyses of the plaintiffs' experts.
Q. Do you have an opinion as to whether the claimed damages result from the Department's failure to meet its obligation to continue removing plaintiffs' spent fuel after January 31, 1998?
MS. POWELL: Objection to the extent it calls for a legal conclusion.
THE WITNESS: My opinion is what I stated at least in connection with the claimed damages and it's not -- the claimed damages are not based on an

obligation to continue in the abstract but rather the alleged failure of the government to remove all spent nuclear fuel and high-level radioactive waste as well as failed fuel and GTCC by dates much earlier than 2010.

BY MR. SHAPIRO:

Q. I know that you have certain opinions and I'm asking you, you know, can we extrapolate or interpolate from those and let me go back to this one about continuing, do you have an opinion as to whether plaintiffs' claimed damages result from DOE's failure to continue accepting spent fuel after January 31, 1998?

MS. POWELL: Same objection and asked and answered.

THE WITNESS: I think I've just answered that several times. The claimed damages are not based on some abstract obligation to continue after January 31st, 1998, but rather on an alleged failure to remove everything by dates significantly before 2010.

BY MR. SHAPIRO:

Q. Wasn't that because plaintiffs' damage expert has estimated and concluded that if the Department of Energy had continued to accept spent



fuel after January 31, 1998, that it would have completed removal of the spent fuel at some point in time prior to 2010?

A. Well, not when you say isn't that because I think plaintiffs' experts have reached the conclusions that I stated, I have the criticisms that are described in the report.

Q. Let me try hopefully what will be considered to be a simple hypothetical to see if we're on the same page, hypothetical for a partial breach of contract. Suppose the parties have a contract where the defendant was supposed to supply the plaintiff with widgets with which the plaintiff was going to make a product, and under the contract, the defendant was supposed to start supplying the widgets not later than January 31, 1998 and was supposed to supply the widgets for the next 50 years after that date.

And suppose on January 31, 1998, the defendant says, I'm not going to have any widgets for you and I know I'm not going to have any widgets for you at least through 2010. Starting with 2010 I may have widgets for you. And the plaintiff goes into court -- first, back up, the plaintiff finds an alternative supply of widgets through 2010. The



defendant was going to charge the plaintiff X dollars for that number of widgets and instead the plaintiff had to pay X plus $100 for that, those widgets through 2010. And then the plaintiff goes into court and says, you know, I want a finding of partial summary judgment for breach of contract and I want damages from that and my damages are $100. Would that, in your opinion would that $100 result from that partial breach of contract in that instance?

A. Sounds like it in your simple hypothetical.

Q. What's the distinction between that hypothetical and our case here in terms of what plaintiffs' damage experts were setting out to determine?

A. Well, I think your hypothetical assumes away all of the problems that exist with the plaintiffs' damage claims and the claims of plaintiffs' damage experts in this case. If I understood the hypothetical correctly, the damages, the assumed damages of $100 were causally related to the breach, the same $100 wouldn't have been incurred had there been no breach and in addition, there weren't the same problems in the hypothetical as there are in the actual case of speculative and



implausible assumptions permeating the calculations to get to the particular damage number that's claimed in each of the cases.

Q. I'm going to focus in on, again, on the hypothetical as compared to the opinion in your first bullet point in paragraph 7 and in paragraph 8, in the hypothetical you're not saying that the plaintiff should be limited to its damages from the defendant's failure to supply widgets commencing only on January 31, 1998, it was entitled to damages stemming out through 2010 because the defendant said it wasn't going to perform at least through 2010.

If I understand your opinion in the present case correctly, you're saying that the claim, at least the claim of damages the plaintiff is making do not result from the partial breach because the partial breach is only the failure to commence performance of services by January 31, 1998. Why is there, just focusing on that aspect, why is there a difference between the two cases?

A. In a different, in addition to the different nature of the promises or the contracts, in one case there's no question that the claimed damages are under the circumstances of your hypothetical as I understood it, were costs that would have been

Page 66

avoided had the contract been performed and in this case there's no such showing.

Q. You said there's no such showing in this case because you find the damages model which attempts to show that is based upon what, implausible assumptions?

A. Yes, as well as there's no attempt to measure what the damages are as a result of failing to begin removal as of January 31st, 1998.

Q. Well, that's sort of the nub of what I'm getting at, the distinction of the two cases. In the hypothetical, the widget case, the plaintiff is not attempting to measure damages only from the failure to commence on January 31, 1998. The plaintiff is immediately going out through 2010 saying these are my damages, why is it inappropriate in the present case for the plaintiff to similarly attempt to estimate its damages out through 2010, regardless as to whether or not the plaintiff has done it with the accuracy that you feel may be appropriate?

MS. POWELL: Asked and answered. And objection to the extent it calls for a legal conclusion.

THE WITNESS: We covered this several times now but in your hypothetical you have a, as I

Page 67

understand the hypothetical, a clear, contractual undertaking to take or to perform certain acts throughout the entire period from 1998 through 2010. And I am not aware of any similar analogous set of contractual requirements in this case but moreover, there's no showing in this case of any attempt to measure what the consequences were, if any, of failing to start, the government's failing to start removal as of January 31st, 1998, or whether any of the plaintiffs' claimed damages would have been avoided had the government met its contractual obligation to begin removal as of January 31st, 1998 for the reasons that are stated in the report.

BY MR. SHAPIRO:

Q. At the beginning of your answer you noted a distinction between the hypothetical where there is a clear obligation on the part of the defendant to supply widgets through 2010 versus the present case where, at least within the four corners of the contract the contours of the Department of Energy's obligation after January 31, 1998 are not as clear, is that why you're focusing then on January 31, 1998 because that's the only obligation that's clear within the four corners of the contract?

MS. POWELL: Objection to the extent that

Page 68

it calls for a legal conclusion.

THE WITNESS: I'm not interpreting the contract, I'm certainly not offering any legal conclusions about the contract, I was simply stating that in your hypothetical you had very clear, a very simple contract with very clear and well specified obligations over an extended period of time. And I was simply pointing out that my understanding is among many differences between these cases and your hypothetical that I described, one of the differences is that there is no analogous set of simple, clear, and well-defined obligations to perform over time in these cases as opposed to your hypothetical. But again, I'm not offering any opinions on what the contract in fact provides as a legal matter, that's just my understanding.

BY MR. SHAPIRO:

Q. You say you were simply pointing out your understanding that that's one of the differences between the hypothetical and the present case. Why is that difference important?

A. For the reasons that I've stated.

Q. If you could restate it for me, because I don't see it in your answer.

A. In your hypothetical the promise that's

Page 69

breached is the obligation to do something in 1998, 1999, 2000, all the way up through 2010, and beyond, the breach covers till 2010. What the breach is and what the consequences of the breach are, are clear based on assumed explicit contractual provisions that you referred to in your hypothetical.

My understanding with the significant caveat that I'm not offering any legal opinions about what the contract provides but my understanding is that there are no analogous, well-specified performance obligations that deal with the question of the rate at which the government must perform after January 31st, 1998 and other issues that are referred to in the report regarding what needs to be picked up, how quickly, what different possible contracting parties are entitled to do in terms of exchanging their allocations, all those are very significant -- all those issues and others referred to in the report are very significant differences between these cases in fact and your simple hypothetical.

Q. And it's because in the present case the timing of the government's performance is uncertain in terms of the government's obligation under the contract why in the present case you're saying that