Page 74

to the actual background that I was going to leave more to the end. But why did you focus on the January 31, 1998 date when you say that the damages do not result from the failure to commence by January 31, 1998; why did you focus on January 31, 1998?
A. Based on my understanding of what the partial breach was that was found by the court.
Q. If your understanding about the partial breach found by the court was -- was that the government has failed to perform and will not perform at least through 2010, you would have looked at the question differently?
A. Not necessarily, it depends what you mean by looked at the question differently.
Q. You wouldn't have said necessarily that the claimed damages do not result from DOE's failure to perform services under the contract through 2010?
A. Well, again, that depends. I might very well have if there was no showing that the costs that were incurred would have been avoided had there been no breach, whatever the breach is in this assumed hypothetical.
Q. But you haven't studied then the question of whether or not the claimed damages result from

Page 75

DOE's failure to perform services under the contract through 2010?
A. No, I wouldn't say that either.
Q. Do you have an opinion as to whether or not the claimed damages result from DOE's failure to perform services through 2010?
MS. POWELL: Objection to the extent it calls for a legal conclusion.
THE WITNESS: Again, without giving an opinion on what the contract provides or what the breach was, which is a legal opinion which I'm not offering any opinion of, any opinion about, there is no showing in my opinion that the costs that were incurred would have been avoided even under the formulation of the contract and what the breach was in your question.
BY MR. SHAPIRO:
Q. Why is there no showing of that?
A. Because based on my analysis of the plaintiffs' claims and the damage models on which the plaintiffs' damage claims are based, I don't believe that the conclusion that all of the nuclear waste would have been removed by 2010. Actually the date's far earlier than 2010 according to the plaintiffs' expert. I don't believe that conclusion is credible

Page 76

because of the series of speculative and implausible assumptions upon which it was based.
Q. Other than the problem that you just articulated that you find with plaintiffs' expert's conclusion that all of plaintiffs' spent fuel would have been removed well prior to 2010, is there any other problem that you have with plaintiffs' showing of damages due to DOE's failure to perform through 2010?
A. Well, I think within that general conclusion there was a series of points about the aggregate acceptance schedule, about the assumptions relating to swaps, about the conclusions relating to failed fuel and GTCC, so those are all part of my opinions that are described in the report.
Q. And if we include those, what I would call subsidiary opinions to the main opinion, are there any other reasons that you can think of why the plaintiffs' showing would not have established its damages out through, because of DOE's failure to perform through 2010?
MS. POWELL: Objection, vague and to the extent it calls for a legal conclusion.
THE WITNESS: Again, I don't want to -- as I've said numerous times, I don't want to acquiesce

Page 77

in your -- I'm not sure of whether you're asking hypothetical or whether you're characterizing the contract or the court's finding of what the breach was but whatever you're doing, I don't want to acquiesce in it and certainly don't want to offer an opinion about what the contract provides, as I've stated numerous times.
But that said, the reasons why I don't think that the plaintiffs, even if that were the contract would have established damages are those reasons that I described before that are described in the report.
BY MR. SHAPIRO:
Q. I just want to make sure I understand what your criticisms are and make sure that I ask you about all those criticisms and I just want to make sure that I'm complete about it. I know the government has other experts that might have different criticisms, in fact do have different criticisms of plaintiffs' damage claims.
I think we can move on to the next paragraph, paragraph 9. In this paragraph, you state that Mr. Grace's conclusion is speculative.
What's your definition of speculative as you're using it in this paragraph, and I know you use

the word speculative in a number of places in the report and tell me if you're using it differently in this paragraph as opposed to any place else in the report?

A. You know, again, I think the word has a certain ordinary meaning. I wasn't intending to place a special meaning on the word other than its ordinary meaning. But in this context, you know, the ordinary meaning is that there are a series of assumptions that there are either, there's either no basis for or to the extent that it's possible to analyze whether there's a basis for the assumptions. The reality is inconsistent with the assumptions. It's not only speculative but also implausible.

Q. I guess, I certainly agree that speculative has an ordinary meaning. Just to try to help make sure we're on the same page, could you define speculative in that ordinary meaning for us?

A. I think I just did in my previous answer.

Q. Well, you tried to define it in terms of the specifics of what you're doing in paragraph 9 and in the report, but I'm asking, you know, not to define a Webster's definition of speculative. What would be Dan Fischel's definition of speculative?

A. It might be the Webster's definition.



Again I don't mean to put any special gloss on the term. And as I said in my previous answer, I was just using the term to mean assumptions for which there is not a -- an adequate basis in reality or relevant economic evidence.

Q. You're aware that in, that there's a legal definition of speculative as well, aren't you?

MS. POWELL: Objection to the extent it calls for a legal conclusion.

THE WITNESS: I guess I'm generally aware that the term speculative is used in the legal context.

BY MR. SHAPIRO:

Q. And that one of the contexts that it's used is that speculative damages are not recoverable?

MS. POWELL: Objection, again, to the extent it calls for a legal conclusion.

THE WITNESS: I really haven't systemically studied that. I don't have a formal opinion about it but I think it's fair to say that once damages are characterized as speculative, that's usually a reason why they should not be recoverable.

BY MR. SHAPIRO:

Q. Have you attempted to determine whether or



not plaintiffs' damage claims meet that legal definition of speculative?

MS. POWELL: Objection to the extent it calls for legal conclusion.

THE WITNESS: No, I haven't done any legal research or asked to be provided with any legal research on what the legal test for recovery of damages is in a case such as this one.

BY MR. SHAPIRO:

Q. Do you have any idea what the legal definition of speculative is that's applicable to cases in a Court of Federal Claims?

MS. POWELL: Same objection and vague.

THE WITNESS: Not as to the specific legal standard, no, I've testified quite extensively about the issue of what damages are speculative in the court of claims. I've testified about that issue in other contexts as well, so I wouldn't say I have no understanding just based on background and experience. But I don't have an understanding of what the precise legal definition is and in any event, I don't have any legal opinions on this or any other issue that I'm offering in this case.

BY MR. SHAPIRO:

Q. Given your general understanding of the



legal definition of speculative, is there any difference between how you're using the term in your expert witness report and that legal definition of speculative?

MS. POWELL: Same objection.

THE WITNESS: I would assume that, again, because of the ordinary meaning of language that, you know, there's a relationship. But whether there's any difference or not, I don't know anything about that one way or the other.

BY MR. SHAPIRO:

Q. In paragraph 9 you say that Mr. Graves' conclusion, I'm reading specifically the third sentence, Mr. Graves' conclusion is speculative because it depends on a series of interrelated assumptions about future events in the nonbreach world, aggregate acceptance schedule, exchanges, GTCC, and failed fuel.

And what I'm trying to get at here in the question is just what is it that's making Mr. Graves' conclusions speculative? Is it your opinion that Mr. Graves' conclusion is speculative because he needs to rely on interrelated assumptions or is it the particular assumptions that he's named?

A. I'm not sure I can separate those

Page 90

Q. Are there other parts of the report that talk about Mr. Graves' assumptions about future events?
A. Well, there's a lot that talk about his assumptions about future events but in this particular context, I was simply referring to not what he talks about but what he doesn't talk about of what might happen between now and 2010, which is very hard to predict.
Q. So your particular criticism about Mr. Graves' assumptions about future events is that he doesn't make enough predictions of future events?
A. No.
Q. Or he doesn't give adequate , he doesn't give adequate consideration to potential future events that you think might otherwise change his results?
A. No. Just that I think it's very hard to predict the future which is why one alternative to predicting the future is to wait until the future occurs and eliminate this problem and then determine what additional costs have been incurred, if any, and whether they're related to the breach.
In other words, in your simple example about the widgets earlier, there wasn't a problem

Page 91

with future events because, as I understood the example, somebody covered and secured a supply of widgets through 2010 for an additional cost of $100.
So there wasn't any future information that wasn't yet known. But here, there's all kinds of factors that can influence what costs are going to be incurred, if any, between now and 2010. As I say, one alternative is simply to wait until 2010, see what additional costs have been incurred, whether Mr. Graves' predictions are right or wrong I think it's very hard to know.
Q. Well, it's now September 2002, it's more than three years after Mr. Graves authored his expert report and after plaintiff submitted their pretrial submission setting forth their damages, and I don't have an exact number but suppose, let's say as of today, plaintiffs are already out of pocket 70 percent of the costs that they claim in their damages back in 1999, would those damages still be speculative since we've waited at least that much?
A. Not for this reason. I mean there may be other problems with damage claims of those amounts, but I certainly wouldn't say that they're speculative because they're based on future events if they've already been incurred.

Page 92

Q. What future events is Mr. Graves assuming that you're criticizing him for making those assumptions, which particular future event assumptions do you have in mind in paragraph 9?
A. I don't really have anything specific in mind. I can imagine lots of different possible developments in the future, legal and regulatory change, technological change, change in behavior of the utilities. Those are the things that come to mind.
Q. Going out to 2010, to take one of the examples you gave, technological change, what technological change do you think was sufficiently likely that Mr. Graves should have taken it into account in his damage model?
A. I'm certainly not saying that anything's sufficiently likely because, as I said, I don't have a particular opinion about any change that is going to occur or will not occur, but that's really the point, it's very hard to predict the future.
There may be technological changes that significantly affect the cost of storing nuclear fuel, as an example. Whether that's likely to occur, I obviously have no opinion about one way or the other.

Page 93

But there's so many factors like that that can affect costs in the future that any prediction which tries to predict what's going to happen between now and 2010 is going to be somewhat speculative, particularly in context such as this one because as I keep saying, predicting the future is very difficult.
Q. You say any prediction of the future is going to be somewhat speculative, and I suppose that's also tautologically true.
Have you made any effort to quantify how speculative Mr. Graves' model is because he's making predictions based upon future events?
A. I haven't made any attempt to quantify the extent to which his costs going to 2010 are likely to vary based on future events precisely because, well, first of all, I don't have the expertise to do it, and secondly, in some respects, I don't think anybody has the expertise to do it because it's very hard to predict future events.
Q. I thought you said before, but let me make sure that I'm not wrong on this, that simply because a damage model depends upon assumptions about future events that doesn't make the damage model inherently speculative, does it?
A. I'm not sure what answer that I gave that

Page 94

you're referring to.
Q. I thought you said that, I thought you said, you answered that question in the affirmative that the fact that there are future events being assumed in a damage model, that in and of itself doesn't make the model speculative or am I misremembering that or is that, let me just ask, is that your opinion one way or the other?
A. Again, I think it depends on context. Again I'm not giving a legal opinion on what the test for speculativeness is in analyzing damage claims. I'm simply pointing out that in circumstances such as this one, predicting the future is difficult, and therefore a damage claim which is premised on predictions about the future is speculative for that reason.
And I contrasted this situation with your widget example with a prediction about the sun coming up every day where even if some, there's some future component to what your prediction is, there's a basis for being very confident that your prediction is right or in the widget example, as I understood the example certain, that your claim is correct. But this situation is very different.
Q. Is there a particular threshold of

Page 95

difficulties in predicting the future that an event would have after which point the judgment becomes speculative?
A. Again, I'm not offering a legal opinion. I think that the harder it is to predict the future, the more variables there are, the more moving parts there are, the more possible intervening causes, the more the prediction that you have is sensitive to certain assumptions about the present that could change in the future, the less reliable your prediction is going to be.
And the stronger the argument is for rather than predicting the future waiting until the future occurs in exactly the way that you described about the three-year period between 1999 and to date where even if there are other problems with the damage claim, this particular problem is eliminated.
Q. In reaching your conclusion that plaintiffs' damage claim is speculative, that Mr. Graves' conclusions are speculative, did you do a particular analysis of his assumptions about future events or did you reach just more of a gestalt view that gee, there's an awful lot going on here, it's too much?
A. Again, I don't want to accept your

Page 96

characterization of what I did. I did do a particular analysis of the type that I described.
Q. I didn't see that description. What particular analysis did you do to determine whether or not Mr. Graves' model is speculative?
A. The analysis that I described in my answers of thinking about the extent to which any assumptions about future costs are sensitive to future developments which are not yet known and the extent to which that situation differs from other situations where one can be more confident about the accuracy of their predictions concerning the future.
Q. But you didn't do any actual sensitivity studies of Mr. Graves' model, did you?
A. I think I already said I didn't perform any specific quantifications, that's right.
Q. Not only that, but you didn't attempt to identify all of the various variables upon which one could do sensitivity analysis?
A. Again, I'm not sure about the last part of your question relating to sensitivity analysis. And I certainly didn't attempt to identify all variables, but I think I did identify a number of very important potential variables where what's going to happen in the future is simply not known today which could

Page 97

dramatically affect what's going to happen between now and 2010.
Q. What variables are those?
A. The kinds of things that I mentioned, possible changes in legal and regulatory environment, possible technological changes, possible changes of behavior of the utilities, any one of a number of other factors that might occur.
Q. Well, you said that, you list three specific items and then perhaps others. We talked about one of those technological changes but I thought previously you said you can't identify any expected technological change that's sufficiently likely that Mr. Graves should have taken it into account?
A. I think the point is note what, on this particular issue what he should have taken into account, the question is how reliable are predictions about the future when these kinds of things that I mentioned which can have a significant effect on the future haven't yet occurred.
Q. Let me take the part of the question about Mr. Graves should have taken into account. Can you name one technological change, potential technological change that you have in mind?

Page 98

A. Not a specific technological change, no, because I don't have expertise in technology. But any technological change which affects the cost of storing nuclear fuel would qualify as a possible future event which could have a significant impact on predictions about the future which, again, is a reason for waiting till the future occurs to avoid this problem.
Q. I understand your preference to wait, but --
A. Not always. It's a trade-off.
Q. What's the point of waiting to see if there's a technological change if you don't have any expectation that there's going to be a material technological change?
A. I covered this at length already. I don't know what's going to happen in the future. In this particular area, I don't believe anybody knows what's going to happen in the future. For that reason, a damage claim which is premised on assumptions about what's going to happen in the future, particularly in a context such as this, has a certain speculative component to it. And the report points that out.
Therefore an alternative way to proceed would be to analyze the additional costs that have

Page 99

already been incurred and again while there may be many other problems with those costs, at least this problem wouldn't exist. And I'd have some mechanism for dealing with costs that are incurred, if any, in the future to the extent I don't have all the other potential problems.
But whether this particular problem is one that, you know, by itself makes the, or at least this part of the plaintiffs' damage claim unreliable as a matter of law is really for somebody else to, really for a court to determine. I'm simply pointing out this component of the damage claim which is speculative for the reasons that I've stated.
Q. Let me go back. You listed three types of things that might change in the future that give you pause about Mr. Graves' assumptions. We talked about possible technological changes. I believe the first item you mentioned was possible legal and regulatory changes.
Do you have any expectation of any particular legal and regulatory changes that might take place in the future?
A. No, I don't, but, again, my opinion wasn't based on an expectation of anything specific happening in the future.

Page 100

Q. And then likewise you also mention behavior of utilities, but you don't have any expectation that utilities' behavior might change in the future?
A. I don't have any expectations to that effect but I don't have any expectation to any other effect either. I don't know what's going to happen in the future. And that's true with all the different areas, that's really the point.
(Recess.)
BY MR. SHAPIRO:
Q. Again, going back, Mr. Fischel, to paragraph 9 and 10. Your opinion that Mr. Graves' assumptions about future events make his conclusions speculative, what area of expertise did you apply in order to reach your conclusion?
A. I think I have general expertise on analyzing damages in cases of this type, that aspect of that expertise.
Q. Is that a matter of economics?
A. It's a relationship between understanding the components of a damage claim which frequently does require economic expertise and understanding the extent to which a particular damage analysis is sensitive to particular assumptions.

Page 101

Q. I believe, as you said before the break, you certainly have the understanding that ultimately it's the court's role to determine whether or not a particular damage claim is speculative, what particular expertise are you bringing to this issue that would assist the court beyond the court's own experience in assessing damage claims?
A. Well, of course that's also a question for the court whether to allow expert testimony on this or any other issue and whatever the court rules obviously will be binding. But in terms of my own expertise, I think I have a lot of expertise as well as experience in analyzing damage claims. And this is part of that expertise.
Q. Is there a general field of damage experts that you feel you're a, that you would have colleagues who are your fellow colleagues as damages experts?
A. I'm not sure how to answer that question. I think there is a very well-developed field of expert testimony in developing damages analyses and models as well as criticizing them and I can think of a number of individuals who have, significant number of individuals who have given expert testimony in those subjects.

Page 102

Q. Is there a particular literature that, beyond legal literature that covers this issue from a technical standpoint of determining whether or not claim damages are speculative?

MS. POWELL: Objection, vague.

THE WITNESS: I think there actually is a literature in law and economics on the question of what the optimal time is to measure damages or loss, whether, and in what circumstances it's appropriate to measure damages or loss going forward as opposed to the time after which the alleged damages or losses have been incurred. I think that is a well-defined and widely written about problem in damages analyses.

BY MR. SHAPIRO:

Q. Are you purporting to be applying those principles here?

A. Yes, in general terms, yes, I am.

Q. Is there a particular methodology that you apply to reach your conclusion that Mr. Graves' damage model is speculative?

A. Well, I think this is only one of the assumptions that I'm referring to as is obvious from the report itself, but, again, in general there's a trade-off between an adjudication where everything occurs at one time, closer in time to the events in

Page 103

question which create liability in the first place between the benefits of that and the benefits of waiting until there is more concreteness in terms of what the injury suffered was, if any.

And it depends on a variety of different factors, including the extent to which future events have the possibility of making current estimates of what the claimed losses are likely to be in the future unreliable, and that general framework which as I said is well recognized in the academic literature is what, is the approach that I'm using in this particular paragraph.

Q. Can you identify a particular academic article or something that's in accord with the analysis that you've made here?

A. Not from memory, no. It's not really an analysis. It's just pointing out that the claims of plaintiffs, and particularly Mr. Graves, have a, are based on a series of speculative assumptions, in some cases implausible assumptions and this is one of them.

Q. The one of them that you're referring to is the assumptions about future events, that's correct?

A. Correct.

Page 104

Q. Given that before our last break, you weren't able to identify -- you identified three potential categories of changes, I believe regulatory, technological, behavior of utilities, but you weren't able to identify anything that you expected to change, why is it speculative then for Mr. Graves to assume that there wouldn't be material changes in those three areas?

A. I think I've covered that already. I haven't attempted to identify anything that I believe would change both because I don't have the expertise but also because as I've said, I don't believe anyone has the expertise to know what's going to happen in the future on so many different variables and moving parts as are involved in this particular issue and that's really the point of the paragraph.

Q. So your conclusion is that when there are enough moving parts to a future prediction, the future prediction inherently becomes speculative?

A. Again, I just don't want to accept your characterizations of what I've said which I think are clear but I've said them so many different times that I'm not sure I can make them any more clear than what I've already said in terms of the rationale of this particular paragraph.

Page 105

Q. If Mr. Graves' model only looked out to 2002 to predict when plaintiffs' spent fuel would have removed as opposed to looking out to 2010, would that make his model less speculative?

A. That's a different question. I would say if he only counted costs that he claims were incurred because of the breach up and to the present, then his analysis would not have this particular problem of making predictions about what's going to happen in the future. It may be flawed for many other different reasons. In fact, I think it would be, but it wouldn't have this particular defect.

Q. What's your -- I think there's another disconnect we have going on. What's your understanding as to what Mr. Graves does in his expert witness report?

A. I'm not sure I can answer that question in a way that I could faithfully speak of for him nor would I attempt to. But I think he makes certain assumptions about what the aggregate acceptance schedule should have been in what he refers to as the nonbreach world and then I think he makes a further series of assumptions about what utilities would have done to change the allocations that they originally received and makes another set of assumptions about

Page 106

what the government would have done had the utilities behaved in the way that he says that it should have behaved.
And then I'm not 100 percent sure frankly what assumptions he's making about certain other issues such as failed fuel and GTCC fuel and he gets some kind of benchmark about what would have happened in his opinion based on all these different assumptions and I'm sure others since he's relying on all kinds of other assumptions made by technical experts of various kinds. So it's something of a pyramid of speculative assumptions and then he compares that world to what he claims is the real world, the breach world and he and Mr. Wise come up with their damage calculations.
Q. What is Mr. Wise doing as opposed to -- Dr. Wise doing as opposed to what Mr. Graves is doing?
A. Well, again, I think that is described in the report, the relationship between them that Dr. Wise, excuse me, I didn't mean to.
Q. That's all right.
A. To be disrespectful, attempts to quantify in some ways what Mr. Graves has done which in turn depends on what other experts have done. So it's

Page 107

something of a series of not just interrelated assumptions but interrelated experts who are making interrelated assumptions which are speculative and in some cases implausible and obviously I'm not expressing any opinions on many of the experts in terms of their technical opinions and other things that I don't have any particular expertise about.
Q. All right. I asked the question because a question or two ago you referred to Mr. Graves and you referred to costs that he claims were incurred because of the breach, do you understand that Mr. Graves is not plaintiff -- the expert of plaintiffs that estimates the costs that plaintiffs claims that it has incurred due to the breach?
A. I do, but because he is analyzing what would have occurred in his opinion in a no-breach world, this is the benchmark by which these costs are being compared with, and so-called costs in the breach world and the real world.
Q. Let me turn to again the same issue. Paragraph 9 you refer to Mr. Graves making -- Mr. Graves' conclusion being speculative because it depends upon future events. Then in paragraph 10 you talk more specifically about those assumptions about future events, but isn't

Page 108

paragraph 10 actually discussing Dr. Wise's report, not Mr. Graves' report?
A. Well, yes, that is what is stated but I think they're interrelated for the reasons that I've cited.
Q. Well, Mr. Graves' conclusion doesn't depend upon assumption about plaintiffs' claimed damages consisting of other contingent costs, does it?
A. Tell the reference to other continuing costs in paragraph 10 refers to expert plaintiffs generically and then there's a citation to Dr. Wise's report.
Q. Is there some part of Mr. Graves' report that refers to other continuing costs that you feel makes his report speculative?
A. Again, I think the reference here is to the plaintiffs' claims, plaintiffs' experts' claims with respect to any specific question about Mr. Graves' report, that's that specific, I'd have to look through it to see if there's any reference to other continuing cost.
Q. I don't want to just take up time but I have copies of his report. Would it be helpful for you to refresh your recollection about what his

Page 109

report does so we don't have a misunderstanding?
A. I don't think we do have a misunderstanding because I think paragraph 10 is very clear about what it's referring to and whose report is being cited. But if you want to ask me the specific question that I can't answer from memory and I have to look and I'll look.
Q. Well, are the assumptions about future events of Mr. Graves that you refer to in paragraph 9, those are different than the assumptions about future events that you're talking about in paragraph 10, are they or aren't they?
A. I don't think they're different. I think paragraph 10 is meant to refer to the reference concerning future events that is referred to in paragraph 9.
Q. So it's your recollection of Mr. Graves' report that he does make assumptions about plaintiffs' other continuing costs?
MS. POWELL: Mischaracterizes his testimony.
THE WITNESS: I don't think that's a fair characterization of what I've said. I think paragraph 10 is clear as to what is referenced in connection with the phrase other continuing costs.

from utilities?
A. I don't have any opinion one way or another other than if you're going to talk about economic efficiency from a social point of view, you have to take this factor into account.
Q. If this factor is not sensitive to changes in the aggregate acceptance rate, how do you take this factor into account?
A. Well, I certainly didn't say that there's no relationship between the assumptions about acceptance rates and potential social costs.
As I said, I don't really myself have sufficient independent expertise to form a judgment about that one way or another. But I do have sufficient expertise to say that if you're going to reach an opinion about what is an economically efficient outcome, you can't do so without taking social costs into account and that wasn't done in connection with Mr. Graves' opinion about economic efficiency, in addition to whatever other problems may exist with his conclusions about the assumed acceptance schedule in the nonbreach world.
Q. You say an acceptance rate that purports to be socially efficient should consider external societal costs such as costs associated with



potential accidental discharge.
Can you think of any other external societal costs other than that particular example, potential accidental discharge?
A. I was referring generally to the possibility of accident costs borne by third parties that are not borne by the utilities. Accidents or other harm suffered by third parties that are not internalized to the utilities which accidental discharge is an example.
Q. Can you think of any other example?
A. I don't really know enough about the dangers that exist from nuclear fuel to be able to provide specific examples. But that's the one that comes to mind.
Q. What's your understanding of the term economic efficiency, what does that term mean to you?
A. Minimizing the sum of private and social costs and internalizing those costs to ensure that actions that are taken are those in which the benefits, private and social, exceed the costs.
Q. And to determine whether or not private and social costs have been minimized, would Mr. Graves have to look at all potential factors that might affect those costs or could he limit his study



to only the larger costs in order to assure that he's minimized, is there some threshold or do you have to look at every detail?
A. I think it depends on the facts and circumstances.
(Recess.)
BY MR. SHAPIRO:
Q. Mr. Fischel, before the break, I was asking about, to what extent a model, if the model is attempting to determine an efficient, an economically efficient outcome, to what extent does the model have to look at every conceivable criteria as opposed to simply looking at the major criteria in order to reasonably reach an economically efficient outcome.
You said it depends on the facts and circumstances. What about in the present case, what criteria beyond those Mr. Graves looked at should he have looked at?
A. Well, I think at a minimum you would want to analyze the other factors, even taking Dr. Bartlett's report at face value as well as the issue of social costs and conclude as, I take it as the premise of your question as all the other factors are insignificant but you can't ignore.
Q. You have to determine that they're



insignificant first?
A. Correct.
Q. When Mr. Graves reached his opinion that the aggregate acceptance rate that you list in paragraph 11 of your report is efficient, he relied in part on certain studies showing that the acceptance rates consistent with those rates in fact lead to lower utility costs and to lower program costs, are you familiar with those studies?
A. You'd have to show me what you were referring to.
(Fischel Exhibit No. 2 was marked for identification.)
BY MR. SHAPIRO:
Q. Mr. Fischel, you've been handed what's been marked as Exhibit 2 which is a copy of Mr. Graves' expert witness report. This particular one from the Maine Yankee v. United States case.
I'll represent to you that the report in the other two cases is not materially different in this respect. I was asking about some of the documents Mr. Graves particularly relied upon to see if you considered these same studies.
If you'd turn to Exhibit 1 to Mr. Graves' report, starts at the page after page 21, signature

Page 130

page.
A. Okay, I have that.
Q. The second page of documents considered, starting with the third one down, civilian radioactivity active waste management system throughput rate analysis.
Next document, throughput study for the radioactive waste management system.
Next study, determination of cost effective waste management system receipt rates.
Did you consider any studies like that in determining whether or not Mr. Graves appropriately used an economically efficient acceptance rate?
A. I don't recall whether we ever looked at any of those particular studies but the sentence in question refers to the plaintiffs' expert reports as opposed to documents such as these.
Q. Well, you understand, don't you, that it's appropriate for an expert to rely on studies done by others?
A. Certainly not inappropriate to do that depending on the facts and circumstances.
Q. So if the studies upon which Mr. Graves relied show that the acceptance rate that he's using in fact is consistent with lower costs for utilities

Page 131

and lower costs for the program, wouldn't that tend to show that the acceptance rate that Mr. Graves is using is efficient?
A. I certainly couldn't conclude that because there's other relevant costs and other possible studies.
Q. Are you aware of any other studies that have different conclusions?
A. I guess I'm not aware, as I sit here, subject to checking, that the plaintiffs' expert reports consider all of the relevant costs that I identified in my report as I stated in the report.
Q. You would agree, wouldn't you, that at-reactor storage costs are very sensitive to changes in the acceptance rate?
A. That sounds logical but, again, I don't have any particular technical expertise in this area.
Q. And when I say very sensitive, I mean that at best their acceptance rates at reactor storage costs are lower, you would agree with that?
A. Again, I don't have any particular expertise in this area but that sounds logical.
Q. You don't have any reason to dispute that conclusion?
A. I don't have any reason to dispute it but

Page 132

I don't have the expertise to form an opinion one way or the other.
Q. If DOE studies show that program costs are insensitive to acceptance rate, isn't the economically efficient acceptance rate one that's going to tend to be faster then in order to minimize at-reactor storage costs?
A. Not necessarily.
Q. Why not?
A. Because even taking Dr. Bartlett's analysis at face value, there's loading costs which have to be taken into account and social costs as well. Even accepting your assumptions about storage costs and program costs.
Q. Let's go back to this about, you say that social costs have to be included as well.
Why is it appropriate to take into account social costs if we're looking at economic efficiency between two parties, the government and Connecticut Yankee in this particular expert witness report or just utilities generally?
A. Because there's a very well recognized distinction between private efficiency and social efficiency and you would think that the government would be sensitive to social efficiency as well as

Page 133

private efficiency. At least you would have to discuss that if you were going to conclude that social efficiency was irrelevant and you'd have to have a basis for doing that.
Q. In your opinion, is it an insufficient basis for not attempting to quantify social efficiency as part of the equation on the basis of not being able to conjure up any ways in which social efficiency would be sensitive to changes in the aggregate acceptance rate?
A. If I understand that question correctly, if you're saying -- this is what I said before, if you have a basis for concluding that this particular factor is irrelevant in this particular analysis, then obviously it wouldn't be very important, but you'd have to demonstrate that.
Q. Why do you have to demonstrate that the factor is irrelevant as opposed to simply not finding any reason why it would be relevant? Why is there an obligation to demonstrate irrelevant?
A. I'm not speaking in terms of what there's an obligation to do but if you're going to use a term like economic efficiency, that has a well-recognized meaning which includes social costs and benefits as well as private costs and benefits. As long as

Page 134

you're going to use the criteria of economic efficiency, you have to take into account the factors which determine economic efficiency.
Q. But you, yourself, can't think of any factors that would determine social efficiency beyond the one example that you gave of potential accidental discharges?
A. That's the one that comes to mind, accidents generally are harm to third parties.
Q. Turn to the next section of your report, alternative acceptance rates. That's the subheading between paragraph 12 and 13.
Are you examining more than one alternative acceptance rate?
A. Skimming this section, it looks like there's one alternative acceptance rate that is described. Whether or not there are others, I don't have any opinion about one way or the other. The point is really illustrative about alternative assumptions which could be made about acceptance rates.
Q. How did you come to, the one particular illustration that you use in paragraphs 13 and 14 of your expert witness report is an acceptance projection, at least one that goes out 10 years and

Page 135

then annual capacity report published in 1991, that's correct?
A. Correct.
Q. How did you come to focus on using that particular projection for your illustration?
A. I don't recall.
Q. You're aware that Department of Energy has published a number of annual capacity reports?
A. Again, I don't have any particular expertise in this area but I think I've seen discussion about it in some of the background materials concerning this case that I reviewed.
Q. Do you have any reason to believe that the 1991 annual capacity report is any more pertinent than projections in any other capacity report?
A. I don't have any opinion on that one way or the other.
Q. Do you have an opinion as to whether the projections in annual capacity reports as opposed to projections in other Department of Energy documents like system requirements documents or total system life cycle cost studies are more important than those other projections?
A. I don't have any opinion on that one way or the other.

Page 136

Q. In the beginning of paragraph 13 of your report, you quote part of the contract between Connecticut Yankee and the United States as providing responsibility for the Department of Energy to publish annual capacity reports.
Why did you quote that section of the contract?
A. I don't recall whether we saw it in a brief or whether it was brought to our attention by one of the government lawyers or we saw it in some other document, I just don't recall. It's really an illustrative point, as I said.
Q. And in the next sentence of paragraph 13, you refer to a prior provision action in that same article of the parties' contract that calls for DOE to publish something called an acceptance priority ranking.
Why did you pick that provision of the contract?
A. Because it's illustrative of the point that there is an alternative or more than one alternative acceptance schedule as well as implications of the priority ranking given that acceptance schedule for how quickly particular utilities can get rid of their nuclear fuel.

Page 137

Q. What's the significance of the annual priority ranking to your analysis?
A. It's an input into the rest of the paragraph which describes the implications of this particular schedule.
What the implications are with respect to the 10,000 MTU limitation prior to 2010 and then the subsequent paragraph discusses the further implications of the OFF priority system.
Q. What area of expertise are you applying in paragraph 13 to your report?
A. Again, I am analyzing in this particular context the implications of using alternative assumptions regarding acceptance rates in light of the methodological problems that I have identified in connection with Mr. Graves choice of assumptions in light of his criteria of economic efficiency.
Q. Do you have an opinion as to whether the acceptance projection in the 1991 ACR is more economically efficient than the acceptance rate used by Mr. Graves in his conclusions set out in paragraph 11 of your report?
A. I don't have any opinion on that one way or the other.
Q. Do you have an opinion as to whether the

Page 138

acceptance rate set out in that 1991 annual capacity report is more appropriate for use in determining the date upon which the Department of Energy would complete removal of spent fuel as Mr. Graves does in his report, and the acceptance rate that Mr. Graves uses that's set out in paragraph 11 of your expert witness report?
MS. POWELL: Objection to the extent it calls for a legal conclusion.
THE WITNESS: I don't have any opinion of that one way or the other.
BY MR. SHAPIRO:
Q. Are you saying that the -- you have an opinion as to whether the acceptance rate in the 1991 annual capacity report is just as plausible for use in projecting when the Department of Energy would complete removal of plaintiffs' spent fuel as the acceptance rate used by Mr. Graves in his analysis?
A. I wouldn't say I have an opinion on that either because that requires interaction between legal conclusions and other conclusions relating possible alternative acceptance rates. I only wanted to point out that particularly in light of the analysis, incomplete analysis of economic efficiency in Mr. Graves' report as well as the uncertainty

Page 139

about whether economic efficiency is even the correct criteria, that there are other possible acceptance rates and if you use those other possible acceptance rates, all of Mr. Graves' conclusions would not hold up.
Q. You say there are other possible acceptance rates. I believe you said earlier that you haven't attempted to determine whether or not the acceptance rate in the 1991 annual capacity report is more plausible than the one Mr. Graves uses. You're concluding though that the acceptance rate in the 1991 annual capacity report is a plausible acceptance rate that the Department of Energy could have used absent the breach?
A. Again, I'm not really concluding that because to do so would require both a legal conclusion as well as other relevant conclusions about acceptance rates and schedules.
I'm suggesting that Mr. Graves' analysis is extremely sensitive to the particular acceptance schedule which he has chosen and in light of the insufficient justification for the choice of that particular acceptance schedule because of the incomplete analysis of economic efficiency as well as the uncertainty as to whether economic efficiency is

Page 140

the correct criterion, those factors taken together make his ultimate conclusion very sensitive and speculative but also this particular assumption about choice of this particular acceptance schedule also speculative.
Q. Could you have made the point then that you're trying to make in paragraphs 13 and 14 of your expert witness report by simply making up any random acceptance rate different than the one that Mr. Graves uses? Is there some need to use one that was actually published?
A. Well, I think using one that was actually published illustrates the point more effectively than making one up.
Q. To illustrate the point that you want to illustrate about the sensitivity of Mr. Graves' use of an aggregate acceptance rate schedule that he uses, however you have to use an alternative acceptance rate schedule that calls for significantly less acceptance than Mr. Graves' analysis?
A. I don't really have to do anything. I think that is in fact true with respect to this alternative acceptance rate. But I wouldn't say that it's necessary to do that. It just happens to be the case.

Page 141

Q. Well, looking at paragraph 14 where you reach certain conclusions that with the acceptance schedule, plaintiffs' experts asserts an oldest fuel first priority allocation that that would not allow Connecticut Yankee to dispose of all of its spent fuel before 2010.
Then you go on to say that because of the acceptance rate projected in the 1991 annual capacity report is lower, an oldest fuel first priority ranking, priority allocation using this acceptance rate also would not allow Connecticut Yankee to dispose of its nuclear waste before 2010. If you were looking at an alternative with a higher acceptance rate, you might reach a different conclusion.
A. When you say you might, obviously you need to know what you're referring to in order to answer. And the previous sentence makes clear that even with the acceptance schedule that the plaintiffs' experts assume, using the OFF priority allocation method wouldn't allow Connecticut Yankee to dispose of all of its nuclear waste before 2010.
Q. In the next sentence you say that, even if the exchange market function did minimize aggregate storage costs, Mr. Graves assumes plaintiff would

Page 167

of plaintiffs' claimed cost function and the alleged breach and then, you know, obviously it would be up to the court to decide, assuming that there were an objection and I guess even if there weren't as to whether or not that was appropriate expert testimony.
Q. So as you sit here today, you can't think of any further basis for establishing that your technique in reaching the first opinion that you note in paragraph seven of your report is reliable and what you've already described in your testimony?
A. That's a question that's phrased in argumentative way, analyzing economic data in this case, the cost function and determining whether or not that cost function is related or produced or caused by a particular event in this case a partial breach of contract is so standard and part of really every economic analysis of damages, certainly the ones that I'm familiar with that I just don't know how to provide any further information to what I've already provided.
Q. And let me move on to another question I wanted to verify, you may recall that one issue, another issue we covered with respect to that first opinion was whether or not the date upon which the government would remove, would complete removing

Page 168

plaintiffs' spent fuel in the absence of a breach would be relevant to your conclusions. And I believe I'm a little bit unclear and that's what I wanted to get back to.
Is it your opinion that that date, the date when the government would complete removal of plaintiffs' spent fuel in the absence of a breach, that that date is irrelevant to the opinion that you reached, your first opinion noted in paragraph seven?
MS. POWELL: Asked and answered.
THE WITNESS: I think we covered that so many different times but I just want to make sure. Can I have the question read back, please.
THE REPORTER: "Question: And let me move on to another question I wanted to verify, you may recall that one issue, another issue we covered with respect to that first opinion was whether or not the date upon which the government would remove, would complete removing plaintiffs' spent fuel in the absence of a breach would be relevant to your conclusions. And I believe I'm a little bit unclear and that's what I wanted to get back to.
Is it your opinion that that date, the date when the government would complete removal of plaintiffs' spent fuel in the absence of a breach,

Page 169

that that date is irrelevant to the opinion that you reached, your first opinion noted in paragraph seven?"
THE WITNESS: I'm not sure I fully understand that question. Again, this is covered extensively in the report. Covered very extensively on Wednesday, the first day of the deposition. I'm not sure what I can add. The report I think makes clear, and certainly my testimony about it, my opinion that the fundamental conceptual flaw of the plaintiffs' damage claim which was highlighted in my first opinion is that the claim is not based on when the government was obligated to begin removing spent nuclear fuel which is the breach, but rather focuses on removal of spent nuclear fuel by a certain date which is not the breach. And because the costs of storing the nuclear fuel will exist in both the breach and the nonbreach world to use the plaintiffs' terminology, for that reason the plaintiffs' damage claim is fundamentally flawed from its inception.
It's measuring the wrong thing. There are many other flaws as well but that's certainly a fundamental flaw.
BY MR. SHAPIRO:
Q. One of the things you just said was that

Page 170

the plaintiffs' damages would exist or plaintiffs' costs would exist in both the breach and the nonbreach world. What's your understanding of the nonbreach world in making that statement?
A. I was referring to what's referred to in the report and what I testified to on Wednesday where there is a change from the actual world in the sense that the government begins removing nuclear fuel as of the end of January, 1998.
Q. In reaching that conclusion, are you assuming or making a determination in any way about government, the government's performance beyond January 31, 1998 and simply beginning to remove spent fuel?.
A. This is, again, covered extensively in the report and in testimony on Wednesday. There are a number of alternative scenarios discussed in the report and in my testimony on Wednesday as to performance after the end of January 1998. But I'm obviously not offering any legal opinions on what legal obligations the government would have had, if any, after commencing removal in the end of January 1998.
Q. I understand you're not making legal, you're not reaching a legal opinion. Are you making

any assumption about what the government would have done after January 31, 1998?
MS. POWELL: Objection, vague.
THE WITNESS: I don't think I'm making any assumptions but I do discuss in my report as well as in, discussed in the first day of the deposition on Wednesday the various alternative scenarios after 1998, after the end of January 1998 in connection with acceptance schedules, change in allocations by swapping, discussion of failed fuel and GTCC waste, so there are a lot of different scenarios that are referred to in connection with the time period after the end of January 1998.
BY MR. SHAPIRO:
Q. And do I understand correctly that it's because there are a number of potential different scenarios that you would not conclude that plaintiffs' costs are caused by the breach because you don't know what scenario would happen?
A. I don't think that's a fair characterization of all the different points in the report as well as all the testimony that I gave on Wednesday.
Q. What's wrong with that characterization?
A. It doesn't capture all of the various



points that are in the report and points that I made in my testimony on Wednesday.
Q. Does it matter to your opinion, the first opinion that you note in paragraph seven of your report how much spent fuel the government would have removed after it commenced spent fuel removal?
MS. POWELL: Objection, vague.
THE WITNESS: Well, you never want to say that something doesn't matter without knowing what it is and what assumptions you are making and what all the different permutations that you might be referring to. But that said, in the context of the plaintiffs' analysis and their damage claims that I have reviewed, given their assumptions, plaintiffs' assumptions and the assumptions of plaintiffs' damage experts it doesn't matter.
BY MR. SHAPIRO:
Q. Let's switch subjects again, another clarification. You might recall I asked you about your definition of speculative and what you said is it's something that lacks a sufficient basis in reality. How do you determine by your definition whether something has that sufficient basis, how do you determine that sufficiency?
MS. POWELL: Asked and answered.



THE WITNESS: I just don't think I have anything to add to what I said in connection with this issue and its application in specific context to what was covered before.
BY MR. SHAPIRO:
Q. I need you to answer the question today. Because I don't see an answer. How do you determine whether or not that's sufficiency, whether or not there's a sufficient basis in reality?
MS. POWELL: Again, asked and answered.
THE WITNESS: I think it depends on the context and the specific issue that's being involved, in the specific context of this case, I performed the analysis that's described in the report and that I testified extensively about on Wednesday. As I said, I don't have anything to add to what I said unless you have a different question than the questions that you asked me on Wednesday.
BY MR. SHAPIRO:
Q. Is there a particular technique that you applied to determine whether or not the basis in reality would have been -- is sufficient in order to determine whether that potential event is speculative?
MS. POWELL: Same objection.



THE WITNESS: Again, I think this is context specific so you need to refer me to a particular context that you have in mind. If it's different from what we covered at length on Wednesday, I'll do my best to respond. If it's exactly the same as what we covered on Wednesday and I don't have anything to add, I'll say that.
Q. Let me change it around a little bit. Is there a difference in your mind in the way you're defining speculativeness as opposed to the word likelihood, is the speculativeness of an event different than its likelihood?
MS. POWELL: Vague.
THE WITNESS: I'm not sure what that question means.
BY MR. SHAPIRO:
Q. Let me give you a specific example. In my common understanding of the word speculative, if an event is 90 percent likely to happen, I would say it's not speculative, is that consistent with your understanding of speculative?
A. It depends on the facts and circumstances.
Q. What do you have to know about the facts and circumstances?
A. The specific context, the way the event is