particular name, it just needs to be described at great length?
A. No, I didn't say that either. I just said I've covered this so extensively that I don't know if there's anything that I can add to what I've already said, particularly on Wednesday.
Q. I didn't see it --
A. And this morning.
Q. I didn't see it. What's the name of the analysis that you did perform to determine the plaintiffs' damage claim was speculative?
MS. POWELL: Asked and answered.
THE WITNESS: As I said, I don't really have anything to add to what I've said.
BY MR. SHAPIRO:
Q. I need you to provide an answer to my question. Is there a name for the kind of analysis that you used to determine the plaintiffs' damage claim is speculative?
MS. POWELL: Argumentative and asked and answered.
THE WITNESS: I think I have answered that question so many different times in my description of the relevant economic literature, the relevant empirical data, my analysis of the plaintiffs' cost



function, everything else that's described in the report and in my previous testimony, I just don't have anything else to add.
BY MR. SHAPIRO:
Q. If the analysis has a name, you can provide it simply. If it doesn't have a name, you can tell me that. You've done neither. Does the analysis that you performed to determine the plaintiffs' damage claim is speculative have a name?
MS. POWELL: Asked and answered and argumentative.
THE WITNESS: I don't have anything to add to what I've said.
BY MR. SHAPIRO:
Q. I want to stop the deposition here and call Judge Merow because the witness is not answering the questions. See if he's available.
MS. POWELL: Okay.
(Recess.)
BY MR. SHAPIRO:
Q. Mr. Fischel, as you heard, but I'm going to state for the record, we attempted to contact the court to see if we can resolve our little dispute with respect to the last couple questions. We'll see if we get back from the court. We weren't able to



get an immediate hearing from Judge Merow, let me move on to something else with you where we'll have more success.
Earlier today I asked how you would try to establish that the method you used to reach your first opinion, the first bullet point in paragraph seven of your report is reliable, I'd like to ask the same question with respect to your second opinion, the one noted in the second bullet point in paragraph seven. How would you try to establish that your opinion is reliable?
A. That is a variant of the exact same question or questions that you have been asking me, I've given these answers before but I will give them again. I analyzed the plaintiffs' cost function to determine whether or not there is a relationship between the claimed costs of storing nuclear fuel and analyzed whether or not there's a relationship between that cost function and the breach, that's the causation analysis that I have described.
I looked at the discussion of economic efficiency which is a well-recognized concept which there is an extensive economic literature and analyzed whether the plaintiffs' claim concerning economic efficiency was consistent with the general



body of economic literature. I looked at how sensitive the plaintiffs' damage claim was to particular assumptions about acceptance rates.
I looked at the extent to which the plaintiffs' assumptions about exchanges was consistent with another body of extensive economic literature on the extent to which licenses and permits are traded, particularly when such trades involve gaining government approval. I looked at the empirical data on exchanges in this particular market. I looked at the extent to which plaintiffs' damage claims take into account other relevant costs that would have to be incurred in connection with GTCC waste and failed fuel, that's as I said earlier another variant of the cost function analysis that I've described. And I reached the various conclusions that are set out in this particular section.
Q. I think, Mr. Fischel, you just described what you did. What I'm trying to find out is how would you establish that what you did is in fact reliable?
MS. POWELL: Asked and answered and argumentative.
THE WITNESS: You could look at what I

Page 187

did, the conclusions that I reached, the economic literature that I referred to, and make your own conclusions as I assume the court in this case ultimately will as to the extent to which my conclusions are consistent with the economic data that I referred to and the economic literature that I referred to.
BY MR. SHAPIRO:
Q. One of the points that you just mentioned was that dealt with efficiency, and you again might recall from our discussion of Wednesday, we had a discussion of social efficiency, how could an expert trying to find an efficient acceptance rate determine the social efficiency of that acceptance rate?
MS. POWELL: Objection, vague.
THE WITNESS: I don't have an opinion on that other than if one is going to make conclusions about economic efficiency, one would have to, at a minimum, include a discussion of social costs in their analysis and make a determination of what those social costs would be under the particular facts and circumstances.
BY MR. SHAPIRO:
Q. How would an expert make a determination of the social costs for a particular acceptance rate?

Page 188

MS. POWELL: Objection, vague.
THE WITNESS: Well, again, I don't myself have an independent opinion as I've said on what acceptance rate was legally required, technically feasible, or the like. But somebody performing that investigation, if they were going to use the criteria of efficiency as opposed to some other criteria would have to take all relevant costs into account, accident costs and other social costs as well as private costs. Exactly how to take accident costs into account would require particular industry and possibly technical expertise that I don't claim to have.
BY MR. SHAPIRO:
Q. Let's go back now hopefully to where we left off on Wednesday, you may recall we were talking about paragraphs 13 and 14 of Exhibit 1, your expert witness report -- one of your expert witness reports -- and your consideration of an alternative acceptance scenario as noted in 1991 annual capacity report. Do you know how the acceptance rate scenario in that 1991 annual capacity report is developed?
MS. POWELL: Asked and answered several times.
THE WITNESS: I don't have an opinion on

Page 189

that.
BY MR. SHAPIRO:
Q. I'm not asking about an opinion. I'm asking do you know how it was developed. It was developed somehow, do you know how it was developed?
MS. POWELL: Asked and answered.
THE WITNESS: Obviously, I've seen discussions of it in various documents, legal documents that I've reviewed in this case but I don't have any opinion one way or another on how that schedule was developed.
BY MR. SHAPIRO:
Q. Did you actually review the 1991 annual capacity report in formulating your opinions in this case?
A. I don't recall.
Q. Do you recall if you've reviewed any annual capacity reports issued by the Department of Energy in your work in this case?
A. As I said, I've certainly seen a lot of discussions of them in various, either filings or briefs. It's a little bit hard for me to separate the discussions of them and the underlying documents themselves, so I don't recall.
Q. But did you personally prepare your

Page 190

report?
A. Prepare?
Q. Your expert witness report, Exhibit 1.
A. I would say it was prepared under my supervision working with in particular one other individual.
Q. Who was that individual?
A. An individual by the name of David Ross.
Q. Would it be your expectation that Mr. Ross would have reviewed the 1991 annual capacity report in preparing your report?
A. Not necessarily, no.
Q. I was going to put this off to the end but maybe it makes sense to get into what's typically some of the earlier questions now. How did you go about forming your opinions in this case?
A. I familiarized myself with the issues, with the claims in the case, the claims by plaintiffs' experts. I interacted primarily again with one other individual at Lexecon by the name of David Ross and as a result of that interactive process, excuse me, formed the opinions that are summarized in my report.
Q. When were you first contacted by the Department of Justice about working in these cases,

Page 195

countless other cases so I think it was, again, fairly clear that we were going to look at the claims, look at the plaintiffs' damage claims, their reports, and analyze those claims and the reports of plaintiffs' damage experts in the context of this case.
Q. Did you have any understanding that you were being asked to focus on the expert witness report of Mr. Graves as opposed to the expert witness reports of plaintiffs' other experts?
A. Not initially, no.
Q. Did you ultimately develop that understanding?
A. Either I developed an understanding or it became obvious, but at some point it was clear that that's what we were going to do.
Q. Is that because you couldn't find any criticisms to make of the other expert witness reports?
A. No. I think it is more that there was an understanding that there were various different types of expertise that were going to be involved in this case and many of the other experts dealt with subject matters that were different, required a different type of expertise than what we were bringing to bear

Page 196

on this particular case.
Q. But you don't know how that decision got made?
MS. POWELL: Objection, vague.
THE WITNESS: I'm not sure by whom you're referring to but to me it was just obvious.
BY MR. SHAPIRO:
Q. One of plaintiffs' other experts is Dr. Kenneth Wise. Did you review any of his expert witness reports in conjunction with your work here?
A. I read it.
Q. And you concluded that you would need different expertise than what you and Lexecon have in order to analyze that report?
A. I would say in the way that's described in the report and I testified about on Wednesday, there's an interaction between the Wise report and the Graves' report so by responding in the way that I have, it's really a response in that sense to both.
Q. What about the expert witness report prepared by John Bartlett, did you review that report?
A. I read that as well.
Q. Did you conclude that neither you nor Lexecon have the requisite expertise to criticize

Page 197

Dr. Bartlett's conclusions in his expert witness report?
A. I can't speak for everybody at Lexecon, and I'd have to look at the report to look at all the different conclusions that were reached to give a definitive answer. And I understood also there was some question as to whether Dr. Bartlett would be in the case or whether because of some ground for disqualification he wouldn't be in the case, but beyond that I also understood from reading Mr. Graves' report that Mr. Graves used what Dr. Bartlett did as an input into his analysis so therefore by responding in the way that I did to Mr. Graves it also by implication addressed at least the extent to which Mr. Graves relied on Dr. Bartlett.
Q. Let me go back to I guess the steps that you took in your work on this case, you gave some perhaps minimal direction to Mr. Ross because he didn't need more than minimal direction, but what was the next thing that you did in your work on this case?
A. I can't really answer a question that suggests a process that is as regimented and, from my perspective, artificial as your question suggests. I

Page 198

interact with Mr. Ross on a regular basis in connection with all the cases that we are working on and discuss everything continuously. That's what happened.
Q. Well, between the time that you were first contacted and when you first presented a draft of your expert witness report to the Department of Justice, how many hours would you estimate that, you, yourself spent working on these cases?
A. Not that many, but I don't remember exactly how many until I was involved in the report itself.
Q. Are we talking less than 100 hours that, you, yourself would have spent prior to the draft report being prepared?
A. Yes, I'm sure. Again I don't know the exact number but I'm sure it's less than 100 hours.
Q. Would it be less than 50 hours?
A. Probably, I would say.
Q. Less than 20 hours?
A. Possibly, but, again, at a certain point I would have to check.
Q. More than 10 hours?
A. Again, at that level of specificity, I would have to look.

Page 227

understand your question correctly.
Q. And is it your opinion that such an acceptance rate projection would not necessarily be speculative?
A. I'm not sure how you're using the term speculative. As I said, in my answers to extensive questioning on this issue earlier, to me the term speculative generally refers to a conclusion, not an event.
Q. I'm referring to projections, call it a conclusion that this is how fast we will accept spent fuel. Would you refer to that conclusion as speculative if it depends upon change in the law?
A. Depends on if there's a recognition when stating the conclusion as to the extent to which the conclusion is premised on a possible change in the law, if I understand the question correctly.
Q. You say in paragraph 14 of your expert witness report that if the acceptance rate used by Mr. Graves would have been used but there were no exchanges of approved delivery commitment schedules, then plaintiffs' spent fuel would not have been removed until 2007.
A. Where are you reading from?
Q. I'm sorry, I think I misspoke. That if --

Page 228

you said in paragraph 14 of your report that if Mr. Graves' acceptance rate was used but there was, there were no exchanges of approved delivery commitment schedules that plaintiffs' spent fuel would still not be removed before 2010.
Do you believe that Mr. Graves has argued otherwise?
A. I'm not trying to characterize in that particular sentence what Mr. Graves has argued, to use your phrase. More generally, I don't know what he's arguing.
Q. Why did you bother to state in your report that even with the acceptance schedule Mr. Graves assumes that, to put it in your report, an oldest fuel first priority allocation would not allow plaintiff to dispose of all of its waste before 2010? Why is that significant?
A. Because it just shows, it's one of the different ways that, as the end of my report states, that the analysis of the plaintiffs and their damage experts is a house of cards, because you have to assume so many different things in order to get to their ultimate conclusion. And if you change anything, the whole analysis falls apart like a house of cards.

Page 229

So this particular sentence refers to the fact that even if you accept plaintiffs' acceptance schedule, you accept that assumption but you don't accept their alteration and set of what I refer to as speculative and implausible assumptions on how they've changed the real world OFF priority allocation to their alternative that they've created for the purpose of litigation, that the analysis wouldn't work. And that's without taking into account other problems that are referred to elsewhere in the report.
Q. Further down in paragraph 14 of your report, you also say that even if the exchange market for approved delivery commitment schedules had functioned as Mr. Graves opines to minimize storage costs, more generally Mr. Graves opines that the market operated efficiently, you say the plaintiffs still would have stored spent fuel at least through 2010 if the acceptance rate projections set out in the 1991 annual capacity report were used. How did you reach that conclusion?
A. I reached it by considering the rest of the sentence or the information contained in the rest of the sentence.
Q. Could you walk me through that? I've read

Page 230

the sentence, I don't understand how you reached the conclusion.
A. Again I think the sentence is fairly self-explanatory but the point is that if you, this is really the flip side of the sentence you asked me about before, that if you accept Mr. Graves' assumptions about swaps, contrary to what I believe is appropriate but for the sake of discussion, if you accepted those assumptions but didn't accept his assumption about the aggregate acceptance rate, there would still be an inability to remove the spent nuclear fuel by 2010 as is stated in the sentence.
Q. What I want to get to is, did you do any calculations to reach the conclusion that even with efficient swaps but with the 1991 acceptance rate projections that plaintiffs' spent fuel would still have not been removed prior to 2010? Did you do a calculation to reach that conclusion?
A. I asserted the calculation that's referred to in the sentence.
Q. When you say in the sentence that "must move" fuel generated by discharges from operating reactors exceeds 10,000 MTU, exceeds the amount of spent fuel in the 1991 annual capacity rate projections, is that the significance of the 10,000

Page 235

moved first as stated in footnote 6 of your report?
A. Again, I think footnote 6 just refers to the fact that based on Mr. Graves' definition of "must move" fuel, that discharges from operating reactors in excess of spent fuel capacity qualifies as "must move" fuel and therefore in plaintiffs' model, as is stated, that there would be according to Mr. Graves a demand from a contracting party in this situation to swap to alter the OFF priority schedule.
(Recess.)
(Conference with Judge Merow.)
BY MR. SHAPIRO:
Q. Mr. Fischel, we had a little break and as you're aware, you were in the room with us, we had a brief hearing with Judge Merow about the small dispute we had earlier about a question I was trying to get the answer to. And I want to try it again.
I think we've gotten sufficient guidance from the court and hopefully we can go through that very quickly and get back to our prior, what we were talking about before we got the telephone call. I had asked you this morning about the section of your report, what I called the second opinion that deals with the second bullet point in paragraph seven that plaintiffs' damage claim is speculative and I've

Page 236

asked you whether or not the sort of analysis that you've applied to reach that conclusion, whether or not there's a particular name for that sort of analysis. Is there a particular name for that sort of analysis?
A. Well, I think as I've testified to at length, there are a series of interrelated types of analyses which are contained in this Roman numeral IV, which is the opinion that you're referring to, my second opinion that plaintiffs' damage claim is speculative. And, again, I think I've covered all this in my previous answers but as I indicated to the court, I'm happy to do it again to create a clear record on this issue.
Q. Well --
A. Can I just finish my answer?
Q. Sure.
A. I analyzed plaintiffs' cost function and the relationship between that cost function and their damage claims in this case. I looked at plaintiffs' analysis of economic efficiency and analyzed the extent to which that criteria of economic efficiency as used by the plaintiff was consistent with the generally accepted use of the term economic efficiency in economics.

Page 237

I looked at the assumptions that plaintiffs and their experts have made about exchanges and analyzed whether those assumptions are consistent with an extensive economic literature about trading permits and licenses, particularly in circumstances where there is a requirement for government approval.
I looked at the extent to which plaintiffs' damage claim depends on future events and analyzed the extent to which that particular component of plaintiffs' damage claim is consistent with a body of economic literature on the choice between either anticipatory or after the fact adjudication and the trade-offs between those two alternatives when assessing the damages.
In connection with my various analyses that I've described, I've either referred to in my answers, or cited in the report a vast body of relevant economic literature, in some cases I do both. And taking all of that into account, as well as my review of the plaintiffs' damage analysis and models used in this case, reached my second opinion that the particular damage model used by the plaintiffs and their experts in this case is speculative and in certain respects not only

Page 238

speculative but implausible as well.
Actually let me just add one thing because of the discussion with the judge, although I don't think any of the articles cited that I remember were written by Nobel Prize winners. Since that subject did come up with the court, there's actually an extensive body of literature by Nobel Prize winners actually at the University of Chicago, I'm sure elsewhere, on a number of the subjects. The whole issue of the relevance of transactions' cost and exchange, which is one of the key points that I make in my discussion criticism of the plaintiffs' assumption regarding exchanges, that subject was pioneered by Ronald Coase at the University of Chicago, a subject for which he won a Nobel Prize.
The definition of economic efficiency and the criteria for economic efficiency, that's been analyzed extensively by economists such as George Stiegler and Gary Becker at the University of Chicago and I'm sure elsewhere, Richard Posner as well, although he has not yet won a Nobel Prize although I wouldn't be surprised if he does.
The other subjects, particularly the subject about trading licenses with government, with or without government approval and different methods

Page 239

of trading permits or licenses the report itself refers to a vast body of economic literature on that subject. So that would be a description of the various methodologies that I used in reaching the conclusions that I reached.

Q. Is there a literature that you're relying upon on the subject as to whether or not damage claims are speculative?

MS. POWELL: Objection, vague.

THE WITNESS: I think in the context of this case, everything that I've just referred to is a literature and other aspects of my methodology, everything that I refer to is an input into my conclusion that plaintiffs' damage analysis in this case is speculative.

BY MR. SHAPIRO:

Q. I understand they're all inputs but what I'm looking for is how you put it all together, and it's that put it all together analysis -- is that simply the Dan Fischel analysis that you're applying or is there some other, is there a particular name that it has that it's known in the field?

A. There's no name that I'm aware of for putting it all together, if that's your phrase in this particular case. I would say there is a name

Page 240

for the various components, series of names for the various components of the analysis that I performed on which my conclusions are based.

Q. I just want to make sure that there's no caveat here, you said there's no name that you're aware of for putting it all together, using my phrase in this particular case, is there also no name for putting it all together in terms of in general determining whether or not a plaintiff's damage claim in the litigation is speculative more generally, not necessarily linked just to this case?

MS. POWELL: Objection, vague.

THE WITNESS: I'm not sure what that means but I think in different cases the damages analyses can vary, obviously, so I would say it's, to the extent I understand the question, I would say that you would need to understand the context and the facts and circumstances of a particular case and then you could determine the extent to which conclusions that are reached in that particular case depending on whatever the relevant facts and circumstances are, what the bases is for those conclusions and what methodology is used and what the name is or names for the particular methodologies that are used and whether it's one or several. I'm not even sure at

Page 241

this level of generality it's possible to discuss this in a meaningful way.

BY MR. SHAPIRO:

Q. All right. I think we've covered that subject adequately for the time being. Before we got the call from the judge we were focused on "must move" fuel and footnote six in your expert witness report, and you had said that the footnote was intended to imply that the operating plants would have "must move" fuel that would have to be taken care of. As I was looking at the phrase first, what did you mean to refer to when you said that discharge from operating reactors would have to be removed -- would have to be moved first, what would be moved second then?

A. Again, this is attempting to capture the concept of "must move" fuel as used in Mr. Graves' report. Any one of the number of things could be second or third or fourth or fifth.

Q. You didn't necessarily mean to say that the "must move" fuel from operating reactors has to be moved first before plaintiffs' shutdown reactor "must move" fuel. That's not what you were referring to?

A. I'm not sure that is necessarily what was

Page 242

meant in connection with this footnote. I'm not sure if that thought entered into this footnote. I can't remember. That may very well be right, I think that's logically right. But whether or not that's what the term first in this footnote was meant to convey, I just don't recall.

Q. Well, you may recall how we got into this discussion was my trying to figure out how you reached your conclusion that even if the exchange market functioned efficiently but if the 1991 annual capacity report acceptance rate projections were used, then plaintiff would continue to store its spent fuel through 2010.

And how do you reach that conclusion without making some judgment as to whether operating reactor "must move" fuel would be moved before plaintiffs' "must move" fuel?

A. I think the logic is with respect to discharges from operating reactors that you would have to create additional storage facilities unless that fuel is moved where that would not be the case in other circumstances where there was either additional capacity or where there wasn't any additional spent fuel being generated.

Q. Well, if a reactor, such as plaintiff, is

Page 247

direct answer. Do you have an opinion as to whether there would have been exchanges of approved delivery commitment schedules if the Department of Energy had started acceptance of spent fuel in 1998 at the rates about which -- of which Mr. Graves opines and are listed in your expert witness report in paragraph 11?
A. Now I understand the question that you're referring to. No, I don't have a definitive opinion. I think it's very hard to know.
Q. Turn to paragraph 15 of your expert witness report. The last sentence of this paragraph you conclude that Mr. Graves' assumption that in this particular report, Connecticut Yankee would have had all the spent fuel removed by 2001 is speculative because there is no way to know with certainty how the market for exchange of approved delivery commitment schedules would function and implausible.
Do you need to know how a market will function with certainty in order for an assumption that the market will work for that assumption to not be speculative?
MS. POWELL: Objection, vague.
THE WITNESS: I think the word certainty is there just to be used illustratively. I don't think that's the only word that could have been used

Page 248

or it could have just as easily have said with any high level of confidence or anything like that and made the same point.
BY MR. SHAPIRO:
Q. Let's turn to paragraph 16 of your report. You say in this paragraph that the Department of Energy's only required to project receiving capacity of spent fuel for 10 years and that purchasers cannot exchange allocations that have not been projected.
How did you reach this conclusion that purchasers cannot exchange allocations that have not been projected?
A. Well, it says projected, requested and approved.
Q. It needs to do three things, one of them being projected?
A. Correct. That's part of the sentence.
Q. How did you reach that conclusion?
A. That's my understanding of how the procedure works based on the various contractual provisions that are cited as well as the overall background that I have in connection with the case.
Q. Is this anything more than a legal analysis, a legal interpretation of the contractual provisions?

Page 249

A. I don't know if I would call it a legal analysis. I would say this is, the contract itself is a background document. In Mr. Graves' analysis he assumes that certain actions could take place under the contract. So this is simply responding to the same type of, in this particular paragraph as opposed to other paragraphs, this is simply responding to what is permissible or not permissible under the contract in the exact same way that Mr. Graves does in his report.
Q. Did you analyze the parties' contract in order to reach this conclusion in paragraph 16?
MS. POWELL: Objection, vague.
THE WITNESS: Yes, I looked at these particular provisions in connection with these points.
BY MR. SHAPIRO:
Q. If I show you a copy of the contract, would you be able to show me what, how you reached that conclusion looking at these provisions?
A. Possibly.
(Fischel Exhibit No. 4 was marked for identification.)
BY MR. SHAPIRO:
Q. Mr. Fischel, you've been handed what's

Page 250

been marked as Exhibit 4 to your deposition which is a copy of the contract between Yankee Atomic and the United States. I suppose there's a small disconnect because the actual version of the report that's Exhibit 1 to your deposition is the one from Connecticut Yankee but I don't think there's a material difference. Can you take a look at the contract and can you explain to us how you looked at the provisions there and reached the conclusion that purchasers could not exchange allocations that had not been projected?
A. As I think the report makes clear, there is a reference in article IV B5(b), which refers to the 10-year period that's referred to in the report and then there's another reference to an article V, (b)1 which refers to the shorter than 10-year period that utilities are required to submit delivery commitment schedules for according to the contract.
Q. Well, let me point your attention to article V, B(1) that you just referred to. In the middle of that paragraph, fifth line down, it says the purchaser shall submit to DOE the delivery commitment schedules which shall identify all SNF and/or HLW the purchaser wishes to deliver to DOE beginning 63 months thereafter.

Page 293

THE WITNESS: No, I don't, without checking.
BY MR. SHAPIRO:
Q. Do you know what the security requirements or the costs are for storing greater than Class C waste on the site of a nuclear utility?
MS. POWELL: Same objection.
THE WITNESS: No, I don't, without checking.
BY MR. SHAPIRO:
Q. Going back to Paragraph 17 of your expert witness report, if greater than Class C waste is stored differently than spent nuclear fuel -- or actually let me rephrase it.
If you don't know how the storage of greater than Class C waste compares with the storage of spent nuclear fuel, why do you conclude that failure to include greater than Class C waste on delivery commitment schedules would remove the incentive for utilities to engage in exchanges of acceptance allocations for spent nuclear fuel?
A. Well, first of all, the paragraph doesn't exactly say that.
But, apart from the extent to which your

Page 294

paraphrase doesn't accurately reflect what is stated in the paragraph, this is just another implication of the basic point, which was discussed at some length in the first session of my deposition, a point that is reflected in Footnote 1 in this report.
Q. So, you understand Mr. Graves to be saying that the cost of storing, the cost of storage at a nuclear utility does not vary if that utility is storing greater than Class C waste as opposed to spent nuclear fuel?
MS. POWELL: Objection, vague.
THE WITNESS: I am not sure I would say that exactly, no.
BY MR. SHAPIRO:
Q. Well, how would you phrase it?
A. I would say that the plaintiff's damage analysis, from what I have seen, again without having a chance to review it as I sit here, ignores the problem of failed fuel, and greater than Class C waste.
But, that is an implication of Mr. Graves's assumption that all of the fuel, nuclear waste, has to be removed by 2010, in order for the Plaintiffs to avoid storage costs.

Page 295

An implication of that is if greater than Class C nuclear waste and failed fuel are outside the parameters of the program, that would suggest, under Mr. Graves's own assumptions, that storage costs under the assumptions of his model, would not be avoided, because they wouldn't be removed by 2010.
Q. Let me go back to the general subject again of greater than Class C waste.
Do you know what volume of greater than Class C waste we are talking about?
How much greater than Class C waste do utilities have to deal with?
MS. POWELL: Objection, vague.
THE WITNESS: I don't have an opinion on that without checking.
BY MR. SHAPIRO:
Q. Do you have any idea how the volume of greater than Class C waste the utilities have, nuclear utilities have, compares with volume of spent nuclear fuel?
MS. POWELL: Same objection.
THE WITNESS: I would have to check.
BY MR. SHAPIRO:
Q. If a nuclear utility has no greater than

Page 296

Class C waste, would the ability or inability to include greater than Class C waste on delivery schedules affect the incentives of that utility to engage in exchanges of the commitment schedules?
MS. POWELL: Objection, vague.
THE WITNESS: It might.
BY MR. SHAPIRO:
Q. Why would it affect that utilities' incentives, if it had no greater than Class C waste?
A. Because you would have to swap with somebody else, and you have to take that party's incentives into account and decide whether it is worth incurring the costs yourself of trying to engage in any kind of swap or exchange.
Q. Why does a utility that itself might have some incentive to exchange, why does it have to take into account its trading partners incentives in order to decide whether or not to exchange?
A. Because exchange is not costless, I might add, in contrast with Mr. Graves's extreme and implausible assumption.
And, therefore, deciding whether or not it is worthwhile to incur costs is a function of what your expected return is on those

Page 297

expenditures.
And your expected return is a function of the willingness of contra parties to engage in exchanges with you.
Q. You are saying it will affect the price that a utility, even without greater than Class C waste, might have to pay for an exchange?
A. It might. It might affect the existence or lack of existence of an exchange in the first place in this hypothetical world that we are dealing with.
Q. Let me try a bit more specific example, still a hypothetical. Suppose an operating utility has no greater than Class C waste, but a spent fuel pool is filling up.
And if it doesn't get rid of some of its spent nuclear fuel it would have to add storage on site. And it has figured out that the least costly way of adding storage would cost $10 million.
Wouldn't that utility still have an incentive to engage in exchanges to save that $10 million expense?
A. By phrasing the hypothetical in that manner, you are assuming a problem. The problem

Page 298

is whether it is worth incurring the cost to try and determine if that $10 million assumed cost in your hypothetical can be avoided.
And that depends on all kinds of different assumptions, including the willingness of other parties to engage in exchanges and have the government approve those exchanges, where the initial utility in your hypothetical would be able to save all or a part of the $10 million.
Q. Sticking with the hypothetical, if the utility can save $10 million and it finds that it can find trading partners to exchange to accomplish the same thing to avoid having to expend that $10 million additional storage cost, execute the trades for $5 million, the utility would do it, wouldn't it?
A. Again, if you assume the problem away by just saying you can pay $5 million to avoid $10 million, and if those are all of the relevant costs, there are no other relevant facts and circumstances, yes, again, it becomes somewhat tautological.
Q. Where does the greater than Class C waste, how should that issue get inserted into the hypothetical?

Page 299

A. It is your hypothetical.
Q. Well, it is my hypothetical, but I represent to you that it is also the real world, and a lot of the utilities don't have greater than Class C waste.
So I am trying to figure out why it matters whether or not greater than Class C waste could be included in the schedules, of a utility that doesn't have greater than Class C waste.
A. It matters for the reasons that I have said, namely the existence of a type of nuclear waste that requires storage, and, therefore, cost of storage, but is excluded from a governmental program for removing nuclear waste.
It affects the incentives of all possible trading partners, whether or not they themselves have greater than Class C nuclear waste, because it affects the terms on which transactions can occur.
And, for that reason, it affects the incentives of everyone.
Q. Have you made any attempt to quantify the impact on effective use of utilities to exchange delivered commitment schedules, if greater than Class C waste cannot be stored, cannot be taken by

Page 300

the Department of Energy under the utilities contracts?
MS. POWELL: Objection, vague.
THE WITNESS: Not beyond what is stated in the report and what I have stated in my answers.
BY MR. SHAPIRO:
Q. Well, I haven't seen any. Am I wrong? I haven't seen any attempt in the report to quantify the affect on incentives that you have been talking about, about the potential inability to include greater than Class C waste on delivery commitment schedules.
Am I missing something? Have you attempted to quantify that impact?
A. What I would say is the report concludes that the quantification, advanced by Mr. Graves in his extreme and implausible assumptions about exchanges, is incorrect and fundamentally flawed for a number of reasons, including the exclusions expressed in Paragraph 17.
Q. But, you haven't attempted to quantify the impact on incentives that you are talking about in Paragraph 17, have you?
MS. POWELL: Asked and answered.

Page 301

THE WITNESS: No. Other than concluding, as I have just stated, that the purported quantification by Mr. Graves concerning this hypothetical exchange market is speculative and implausible for a number of different reasons, including this particular reason expressed in Paragraph 17.
BY MR. SHAPIRO:
Q. You haven't attempted to identify particular utilities that would be less likely to engage in exchanges at approved delivery commitment schedules if greater than Class C waste cannot be taken by the Department of Energy under its spent fuel program, have you?
A. Well, I think I have just stated that it would affect the incentives of all utilities to varying extents.
Q. But, you haven't attempted to identify which utilities would be affected more or less, have you?
A. Not as of this time, no.
Q. Suppose the Department of Energy has an obligation, entirely independent of utilities, contracts with the Department of Energy that are the particular subject of this dispute, to remove

Page 302

utilities greater than Class C waste.
Would that affect your conclusion of Paragraph 17?
MS. POWELL: Objection, vague.
THE WITNESS: I think I would need to know more about the purported obligation that you are referring to.
BY MR. SHAPIRO:
Q. What more would you need to know?
A. What the nature of the obligation was, whether there was a cost to the utilities, what the timing of the obligation was, the relevant facts and circumstances as well.
Q. Suppose the plan by the Department of Energy, pursuant to that other obligation, is to take utilities greater than Class C waste to the repository that the Department of Energy is building, or planning to build, at this point, in Yucca Mountain, Nevada, and to take that greater than Class C waste roughly contemporaneously with the utilities spent nuclear fuel, would that affect your opinion?
A. Roughly contemporaneously is pretty vague. It doesn't really answer the question of at what cost, and the interaction between this

Page 303

assumed plan and the plans for, particularly in hypothetical world of Mr. Graves, for removing other types of nuclear waste.
Q. Why would the cost that, let's say utilities have to pay a cost to the Department of Energy for this disposal of their greater than Class C waste.
Why would that disposal cost affect utility incentives to exchange delivery commitment schedules that affect the timing of removal of the spent nuclear fuel?
A. Well, it is obviously hard to know without knowing exactly how the assumed program would work.
But, anything that affects the cost function of a particular economic actor might conceivably be relevant to other decisions that they make, particularly in connection with other types of nuclear waste.
Q. But you are not sure how such a charge for a disposal of greater than Class C waste would affect a utility's willingness to exchange delivery commitment schedules for the timing of spent nuclear fuel.
A. Certainly, I don't think the phrase

Page 304

whether I am sure or not sure is the right terminology for a hypothetical never never land that we are in.
I am just trying to make the point that this alternative obligation that you are positing, without providing any information on what it is, how much would it cost, who would pay, what the relationship is between that obligation and the alleged exchange market, assumed exchange market that Mr. Graves is positing in his damage analysis.
Without knowing any of those things, it is impossible to address the hypothetical that you are asking about.
Q. Suppose the Department of Energy imposed a flat fee on every nuclear utility. By January 1st of 2003 every utility has to pay $10 million, and that will take care of the cost of disposing of utilities greater than Class C waste, if they have it, or whenever they have it.
How would that charge affect the utility incentives to exchange delivery commitment schedules for the removal of spent nuclear fuel?
A. I don't know without knowing all of the relevant facts and circumstances. I don't think

Page 325

criticism.
Let me focus now on the last sentence of Paragraph 18 where you say economists have recognized that sequential bilateral trading is not the most efficient way to organize a market.
And I assume that you are saying that not simply to note that some economists have recognized that, but you agree with that statement, that sequential bilateral trading is not the most effective way?
A. In this context, I do.
Q. How less efficient is sequential bilateral trading than the most efficient way to organize a market?
A. I am not sure how to answer that question.
Q. Are we talking about a 5 percent difference between bilateral trading and the most efficient way to organize a market?
Is that 10 percent more efficient than bilateral trading? How inefficient is bilateral trading?
A. I would have to actually look at the relevant economic literature again to see if there has ever been an attempt to have a controlled

Page 326

experiment.
Or whether there has ever been a real world situation where you could have a sufficiently controlled experiment, so you could begin to answer a question like that, at least in a particular context.
Q. For purposes of your opinion in these cases, you haven't attempted to quantify the difference between how efficient market would be if it is bilateral trading as opposed to the auction procedure that Mr. Graves uses in his report?
A. Well, I would say that is correct, except to the extent that all of these points are a response to the quantification contained in Mr. Graves's report in an attempt to show how extreme and implausible the assumptions are that underlie that quantification.
Q. Is bilateral trading an unusual part of the economy, generally?
A. It is not an unusual part of the economy generally for certain purposes. But, it would be very unusual for other purposes, such as the one contemplated in, or the assumptions that are made in Mr. Graves's report.

Page 327

Q. Okay. Isn't most of the U.S. economy, any country's economy, based upon bilateral exchanges?
A. I would probably say yes, without really thinking about all of the different possible ways that you could classify an economic transaction. But --
Q. I want to make sure I understand the concept. Am I understanding correctly --
A. But -- let me just finish.
But, for reallocating a possibly infinite number of property rights, in the way that Mr. Graves assumes would occur, without being able to specify how those trades would occur, who would trade with whom, and the assumption that it would all incur costlessly, would be approved by the government in that context, I am not aware of any example where that could occur costlessly with bilateral exchanges, sequential bilateral exchanges of unknown amounts.
Q. What is the sequential for, what do you mean by sequential -- what is a sequential bilateral trading, as opposed to simply a bilateral trade?
A. Well, in Mr. Graves's model, you don't

Page 328

need one bilateral trade, you need a lot of bilateral trades.
And that is why they are sequential as opposed to individual.
Q. And, to take that step back -- I am sorry I didn't mean to interrupt, to make sure I understand how bilateral trading generally works in the economy.
We are talking about any time I go to the store and buy something, that is a bilateral trade, isn't it?
If I go to the grocery store, I give Giant Food $100 and in exchange I get groceries.
A. Yes and no. It is a type of bilateral trade.
But, for example, if you changed your example and said how many bilateral trades are in kind, where you can't trade for dollars, but you have to trade for a similar commodity, it is more like some kind of barter system, which is not typical of most transactions in the economy.
So, in other words, while I would say that it is fair to say that there were many bilateral exchanges that occur all of the time in the economies around the world, it is not accurate

Page 333

ability to trade, whose ability to trade are you referring to?
A. All of the relevant potential actors' ability to trade, willingness to trade.
Q. And, in this sort of market, what determines whether or not an actor has an ability to trade?
It is whether or not they have approved delivery commitment schedules, isn't it?
A. In part.
Q. What else would affect utilities's ability to trade?
A. Well, in the sense that I was using the term, there was ability to trade with, have an exchange, and that requires some other party that has the ability to trade.
Q. Well, you mentioned another item. You mentioned willingness of others to trade.
What would effect a utility's willingness to trade?
A. All kinds of factors regarding their cost function, whether they have something in kind to trade.
And then there are all kinds of bargaining issues that are completely assumed away

Page 334

by Mr. Graves that are real costs of bargaining, particularly bilateral bargaining, in this context as opposed to an open auction.
Q. It is your opinion that in this context, open auction would have lower transaction costs than bilateral trading?
A. In this context, yes. An open auction would have much lower transactions costs than a series of bilateral in kind exchanges.
Q. What is your opinion as to what the cost would be of putting together a series of bilateral exchanges?
A. The costs are described in the report, and those are all of the costs that are ignored by Mr. Graves. It assumes that all of these costs, in effect, don't exist.
And that is a radical and implausible assumption that all of these rights are going to be reallocated, costlessly and instantaneously.
Q. You haven't attempted to quantify the costs of this market of sequential bilateral exchanges, have you?
A. Well, again, since there is no specification of what bilateral exchanges would occur, how many, who would trade with whom, that

Page 335

is again one of the problems with the model.
All of these real world considerations are simply assumed away by Mr. Graves. So, there is nothing really to quantify other than to say that the conclusion that he has reached, which you describe as a quantification, that all nuclear waste for these particular Plaintiffs would be removed by certain dates, based on these radical, implausible assumptions.
There is simply no basis for reaching any conclusion that he reaches.
Q. Where would the costs of -- let me start a new question.
What would the form of the costs that utilities would incur in putting together a series of bilateral exchanges in kind take?
MS. POWELL: Objection, vague.
THE WITNESS: I am sorry, I don't understand the question.
BY MR. SHAPIRO:
Q. Are we talking about -- you are referring to the costs of putting together the series of bilateral exchanges in kind.
Are you referring to brokerage costs, commission costs? Where are these costs coming

Page 336

from?
A. Well, there certainly might be brokerage or commission costs depending on how the market would operate. There would be bargaining costs.
There would be the potential for strategic or opportunistic behavior, which I guess could be described as a type of bargaining cost. That is what comes to mind.
Q. You refer to bargaining costs. What do you mean by a bargaining costs?
A. That there is no way to force people in this market to exchange on prearranged terms. It is not any kind of condemnation proceeding.
Preset valuation parties have to transact voluntarily, which means that they have to agree to transact. They have to agree on some kind of settling up.
They might have different valuations, different assessments. Even if they have the same valuations, some parties may bargain more aggressively than other parties.
As I said, there is the possibility of strategic or opportunistic behavior of one party to think another party has a very strong demand, and therefore maybe hold out for an extremely high

Page 409

Q. Your report certainly implies that Yankee Atomic is not the only utility, though, doesn't it?
A. Yes. I think you could say that is a fair inference from the use of the words "some" and "such as."
Q. How would you check to find out what utilities have submitted proposals for exchanges?
A. I guess I would start by asking that question.
Q. Of who?
A. I guess you. I could ask the government lawyers, I could ask people at Lexicon. I could ask a lot of different people, if I am really interested in researching that question.
Q. Well, I am asking the question because I am not aware of any utility that has solicited exchange proposals, other than Yankee Atomic.
So, I would like to know why you made this statement in your expert witness report, that implies that there had been others besides Yankee Atomic.
MS. POWELL: It has been asked and answered.
THE WITNESS: Because that was my

Page 410

understanding.
BY MR. SHAPIRO:
Q. Why do you feel that the fact that Yankee Atomic solicited exchange proposals that did not result in any exchanges, why do you feel that that is good evidence as to what exchanges would look like if the government was otherwise accepting spent fuel for utilities?
A. I don't think the paragraph uses that language.
Q. What point are you trying to make from the fact that Yankee Atomic solicited exchanges, yet no exchanges have occurred?
A. That it is a piece of data which is inconsistent with Mr. Graves's radical and implausible assumptions about how the countless exchanges, which he can't identify, would instantaneously and costlessly occur and get government approval.
Q. How does the fact that no exchanges have occurred -- why is that evidence inconsistent with Mr. Graves's conclusion?
A. Because Mr. Graves assumes countless exchanges that he can't identify would occur costlessly and instantaneously and get government

Page 411

approval.
And, in the real world, in this particular instance that is referred to in the sentence, no exchanges have occurred.
Even though the circumstances are different from what Mr. Graves is assuming in Mr. Graves's terminology, because his discussion in a so-called "nonbreach world," which is discussed in the rest of the paragraph, it is still the case that the data from the real world is at least a data point that is inconsistent with the radical and implausible assumptions that he makes about exchanges.
Q. Isn't the reason that no exchanges have occurred that utilities have no real acceptance allocations to trade?
A. I don't know if that is true or not.
Q. Well, do you have any knowledge of what sort of acceptance allocations utilities have?
A. Not detailed knowledge. But, my understanding is that the DOE has approved certain delivery commitment schedules pursuant to, I think, the 1991 Aggregate Acceptance Schedule. I would want to check that.
Q. I will represent to you that the

Page 412

Department of Energy has approved delivery commitment schedules, but they haven't approved any for a time period past 2010.
At the same time, the Department of Energy has made it very clear that they are not accepting any spent fuel until at least 2010.
So, in that circumstance, do the utilities really have anything to trade?
A. Again, I am not sure what to make of your representations, but, yes, the utilities might have something to trade.
Q. What would they be trading as a practical matter?
A. They would be again, potentially, trading -- excuse me, let me start that over again.
They would be trading in anticipation of different possible future outcomes which are hard to know with certainty in advance. And, therefore, don't eliminate completely the incentive to trade.
Q. So, utilities would be trading based upon the hope that somehow trading for an acceptance allocation that they know is not going to be acted upon when the acceptance allocation says, might