# APPENDIX A

# Appendix A

## "Yankee Atomic's 2003 Statement of Relevant Facts in the Form of a Proposed Stipulation of Facts" that the Government has: (A) Deemed Relevant And Stipulated Or (B) Agreed To But Deemed Not Relevant.

(A) The government deemed the following numbered facts or portions thereof as relevant and stipulated. Accordingly, the Court should order that the following findings of fact are deemed stipulated:

6. Yankee Atomic is an electric utility company incorporated under the laws of the Commonwealth of Massachusetts.

7. Yankee Atomic's only electricity generating facility was a nuclear power plant located in Rowe, Massachusetts, which plant is now permanently shut down.

10. Spent fuel remains highly radioactive for many years, and is potentially toxic to humans if not properly handled.

12. The Yankee Atomic fuel pool is filled with water, which provides a radiation shield and protects both the spent fuel in the pool and the environment.

15. When it was operating, Yankee Atomic's nuclear reactor held and used 76 fuel assemblies in the reactor "core" where fission occurred and generated heat to power steam turbines, which in turn generated electricity.

16. Yankee Atomic last operated its nuclear power plant in late 1991.

30. After the NWPA became law, DOE and nuclear utility representatives, including representatives of Yankee Atomic, participated in developing a "Standard Contract" for acceptance and disposal of spent fuel and HLW.

33. On June 22, 1983, Yankee Atomic and the DOE entered into such a contract (the "Contract").

35. In or about June 1983, DOE entered into contracts similar to Yankee Atomic's Contract with other utility companies (together with Yankee Atomic, the "Contracting Utilities").

38. Neither the Standard Contract nor the Yankee Atomic Contract terms set out the specific schedule on which DOE must accept and dispose of spent fuel and HLW from Yankee Atomic.

137a. GTCC waste includes material known as "reactor internals," which is material near the core of a nuclear reactor that became highly irradiated during the operation of the reactor.

137c. No site is licensed for disposal of Yankee Atomic's GTCC waste.

171. Yankee Atomic has completed development, licensing and construction of its ISFSI, including licensing and purchase of all necessary dry storage containers.

(B) The government agreed to the following facts or portions thereof, but deemed them to be not relevant. The question of relevance, however, is an evidentiary issue that has no bearing on whether the government agrees to a proposed fact or not. The government agreed to the following facts and thus, the Court should order that these findings of fact are deemed stipulated:

8. Yankee Atomic commenced commercial operation of its nuclear power plant in 1960.

11. The Yankee Atomic fuel pool is approximately 16 feet wide by 34 feet long by 35½ feet deep.

17. As of February 1992, all fuel assemblies from Yankee Atomic's reactor had been moved into the fuel pool.

18. In February 1992, Yankee Atomic announced it would permanently cease operation of its plant.

152. Yankee Atomic incurred costs to study alternative options (*e.g.*, wet storage versus dry storage) for extended on-site storage of spent fuel.

# APPENDIX B

## Appendix B

**"Connecticut Yankee's 2003 Statement of Relevant Facts in the Form of a Proposed Stipulation of Facts" that the Government has: (A) Deemed Relevant And Stipulated Or (B) Agreed To But Deemed Not Relevant.**

(A) The government deemed the following numbered facts or portions thereof as relevant and stipulated. Accordingly, the Court should order that the following findings of fact are deemed stipulated:

6. Connecticut Yankee is an electric utility company incorporated under the laws of the State of Connecticut.

7. Connecticut Yankee's only electricity generating facility was a nuclear power plant located in Haddam, Connecticut, which plant is now permanently shut down.

10. Spent fuel remains highly radioactive for many years, and is potentially toxic to humans if not properly handled.

12. The Connecticut Yankee fuel pool is filled with water, which provides a radiation shield and protects both the spent fuel in the pool and the environment.

15. When it was operating, Connecticut Yankee's nuclear reactor held and used 157 fuel assemblies in the reactor "core" where fission occurred and generated heat to power steam turbines, which in turn generated electricity.

16. Connecticut Yankee last operated its nuclear power plant in July 1996.

24. Connecticut Yankee is also presently storing 82 spent fuel assemblies at a site in Morris, Illinois, under a contractual arrangement with General Electric, the owner of the Morris facility.

25. Connecticut Yankee arranged for shipping of the 82 assemblies to the General Electric/Morris facility in the late 1970s for reprocessing.

33. After the NWPA became law, DOE and nuclear utility representatives, including representatives of Connecticut Yankee, participated in developing a "Standard Contract" for acceptance and disposal of spent fuel and HLW.

36. On June 30, 1983, Connecticut Yankee and the DOE entered into such a contract (the "Contract").

38. In or about June 1983, DOE entered into contracts similar to Connecticut Yankee's Contract with other utility companies (together with Connecticut Yankee, the "Contracting Utilities").

41. Neither the Standard Contract nor the Connecticut Yankee Contract terms set out the specific schedule on which DOE must accept and dispose of spent fuel and HLW from Connecticut Yankee.

141a. GTCC waste includes material known as "reactor internals," which is material near the core of a nuclear reactor that became highly irradiated during the operation of the reactor.

141c. No site is licensed for disposal of Connecticut Yankee's GTCC waste.

153. When its reactor was operating, Connecticut Yankee always maintained sufficient excess capacity in its fuel pool (known as "full core reserve") to allow discharge into the fuel pool of all fuel assemblies in the reactor core.

154. Maintaining full core reserve in the fuel pool is a safety-enhancing and common practice in the commercial nuclear power industry.

155. By 1992, Connecticut Yankee knew that its reactor would, within the next few years, discharge a quantity of spent fuel which if placed into the Connecticut Yankee fuel pool with its then-existing racks would eliminate full core reserve capacity in the fuel pool.

186. Connecticut Yankee has completed development, licensing and construction of its ISFSI, including licensing and purchase of all necessary dry storage containers.

221. Under the Connecticut Yankee Contract, the ACR/APR was for planning purposes only.

(B) The government agreed to the following facts or portions thereof, but deemed them to be not relevant. The question of relevance, however, is an evidentiary issue that has no bearing on whether the government agrees to a proposed fact or not. The government agreed to the following facts and thus, the Court should order that these findings of fact are deemed stipulated:

8. Connecticut Yankee commenced commercial operation of its nuclear power plant in January 1968.

11. The Connecticut Yankee fuel pool is approximately 37 feet wide by 36 feet long by 35 feet deep.

17. As of November 1996, all fuel assemblies from Connecticut Yankee's reactor had been moved into the fuel pool.

18. In December 1996, Connecticut Yankee permanently ceased operation of its plant.

165. Connecticut Yankee incurred costs to study alternative options (*e.g.*, wet storage versus dry storage) for extended on-site storage of spent fuel.

# APPENDIX C

## Appendix C

### "Maine Yankee's 2003 Statement of Relevant Facts in the Form of a Proposed Stipulation of Facts" that the Government has: (A) Deemed Relevant And Stipulated Or (B) Agreed To But Deemed Not Relevant.

(A) The government deemed the following numbered facts or portions thereof as relevant and stipulated. Accordingly, the Court should order that the following findings of fact are deemed stipulated:

6. Maine Yankee is an electric utility company incorporated under the laws of the State of Maine.

7. Maine Yankee's only electricity generating facility was a nuclear power plant located near Wiscasset, Maine, which plant is now permanently shut down.

10. Spent fuel remains highly radioactive for many years, and is potentially toxic to humans if not properly handled.

12. The Maine Yankee fuel pool is filled with water, which provides a radiation shield and protects both the spent fuel in the pool and the environment.

15. When it was operating, Maine Yankee's nuclear reactor held and used 217 fuel assemblies in the reactor "core" where fission occurred and generated heat to power steam turbines, which in turn generated electricity.

16. Maine Yankee last operated its nuclear power plant in December 1996.

30. After the NWPA became law, DOE and nuclear utility representatives, including representatives of Maine Yankee, participated in developing a "Standard Contract" for acceptance and disposal of spent fuel and HLW.

33. On June 6, 1983, Maine Yankee and the DOE entered into such a contract (the "Contract").

35. In or about June 1983, DOE entered into contracts similar to Maine Yankee's Contract with other utility companies (together with Maine Yankee, the "Contracting Utilities").

38. Neither the Standard Contract nor the Maine Yankee Contract terms set out the specific schedule on which DOE must accept and dispose of spent fuel and HLW from Maine Yankee.

137a. GTCC waste includes material known as "reactor internals," which is material near the core of a nuclear reactor that became highly irradiated during the operation of the reactor.

137c. No site is licensed for disposal of Maine Yankee's GTCC waste.

149. By 1992, Maine Yankee knew that its reactor would, within the next few years, discharge a quantity of spent fuel which if placed into the Maine Yankee fuel pool with its then-existing racks would eliminate the ability to rerack the fuel pool and to refuel the reactor.

153. The reracking project stopped in 1997 when Maine Yankee permanently ceased operation of its plant.

154. At the time the reracking project stopped, 26 of the 29 new racks were installed and the 3 others had been purchased.

185. Maine Yankee has completed development, licensing and construction of its ISFSI, including licensing and purchase of all necessary dry storage containers.

(B) The government agreed to the following facts or portions thereof, but deemed them to be not relevant. The question of relevance, however, is an evidentiary issue that has no bearing on whether the government agrees to a proposed fact or not. The government agreed to the following facts and thus, the Court should order that these findings of fact are deemed stipulated:

8. Maine Yankee commenced commercial operation of its nuclear power plant in December 1972.

11. The Maine Yankee fuel pool is approximately 37 feet wide by 41 feet long by 38 feet deep.

17. As of June 1997, all fuel assemblies from Maine Yankee's reactor had been moved into the fuel pool.

18. In August 1997, Maine Yankee permanently ceased operation of its plant.

162. Maine Yankee incurred costs to study alternative options (*e.g.*, wet storage versus dry storage) for extended on-site storage of spent fuel.

# APPENDIX D

Spriggs & Hollingsworth

1350 I Street, NW
Washington, DC 20005

tel. 202.898.5800
fax 202.682.1639
www.spriggs.com

**Jerry Stouck**
202.898.5839
jstouck@spriggs.com

June 21, 2004

VIA FACSIMILE, ORIGINAL TO FOLLOW BY U.S. MAIL

Harold D. Lester, Jr., Esq.
Associate Director
Commercial Litigation Branch
Civil Division
United States Department of Justice
Eighth Floor Mailroom
1100 L Street, NW
Washington, DC 20530

Re: Yankee Spent Fuel Cases

Dear Harv:

This letter is in regards to several pre-trial matters. As you know, plaintiffs have previously sought from the government, but have not yet received: (1) a copy of the government's "will call" trial witness list; (2) an agreed-upon deadline for the parties to exchange designations of deposition testimony that each party seeks to offer into evidence; and (3) an agreed-upon deadline for the exchange of demonstrative exhibits. I will address each of these items in turn.

1. Prior to the May 13, 2004 Pretrial Conference, plaintiffs furnished the government a good faith list of witnesses that plaintiffs then expected to call in our affirmative cases at trial. The government, however, still has not served a similar, good faith list to plaintiffs. This is unacceptable. The witness lists in the government's pretrial submissions are inordinately large – the government's Maine Yankee witness list alone contains 39 witnesses – and plainly name many more witnesses than the government actually plans to call at trial. These excessive lists – and the government's failure to serve a good faith, will call list – are a transparent attempt to hide the ball and impede plaintiffs' ability to effectively prepare for cross-examination of government witnesses. Likewise, the government cannot legitimately complain that it needs to hear from plaintiffs' witnesses at trial before it can furnish this list because the government knows plaintiffs' positions and has extensively deposed all of the witnesses. The government should furnish its will call witness list now, without further delay.

2. Plaintiffs are preparing designations of deposition transcripts to use as substantive evidence at trial. Based on the government's positions set forth in Mr. Ekman's June 14 letter, we assume that the government will not be offering any deposition designations. Nevertheless,

we propose that the parties mutually exchange any deposition designations on or before June 28, 2004, so that potential disputes over designations can be addressed at the pretrial conference.

3. The government has not agreed to a deadline for the exchange of demonstrative exhibits. Plaintiffs propose that both parties should disclose their demonstrative exhibits by July 9, 2004. This should allow both parties to raise any objections to demonstrative exhibits in an orderly fashion.

In the interest of time, plaintiffs plan to file a motion seeking assistance from the Court on these matters within the next few days. Therefore, plaintiffs would appreciate a prompt response from the government.

Very truly yours,

Jerry Stouck

# APPENDIX E

U.S. Department of Justice

Civil Division

PDK:DMC:HDL:JEkman
154-98-126

Telephone:
(202) 353-0897

*Washington, D.C. 20530*

June 14, 2004

VIA FACSIMILE

Peter J. Skalaban, Jr.
Spriggs & Hollingsworth
1350 I Street, N.W.
Ninth Floor
Washington, D.C. 20005-3305

Re: Yankee Atomic Electric Co. v. United States, No. 98-126C (Fed. Cl.); Connecticut Yankee Atomic Power Co. v. United States, No. 98-154C (Fed. Cl.); Maine Yankee Atomic Power Co. v. United States, No. 98-474C (Fed. Cl.)

Dear Mr. Skalaban:

This letter is intended to follow-up upon a few issues raised during our June 4, 2004 meeting.

As I informed you during our meeting, we generally will oppose the introduction of deposition excerpts in lieu of live testimony at trial. Where necessary, however, we will allow deposition designations for the limited purpose of authentication of documents. Additionally, to the extent that you seek to admit a limited amount of testimony concerning a discrete issue from a witness who otherwise would not be called to testify, we may agree to allow such testimony to be admitted through deposition designations, depending upon the circumstances. Please contact me to discuss use of deposition designations consistent with these limitations.

We also discussed the issue of the introduction of expert witness reports as exhibits at trial. We would prefer to have each party's expert reports provided to the Court as exhibits.

We are continuing to work through the Yankees' updated "will use" exhibit list. We will contact you later this week to discuss a second meeting concerning both parties' "will use" exhibit lists. However, we propose that all changes to the "will use" lists be finalized by the June 29, 2004 pretrial conference.

Please contact me if you have any questions.

Sincerely,

JOHN C. EKMAN
Trial Attorney
Commercial Litigation Branch