# EXHIBIT 2

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---------------------------------------------X

YANKEE ATOMIC ELECTRIC COMPANY :
(98-126C)(Merow, S.J.) :
CONNECTICUT YANKEE ATOMIC POWER COMPANY :
(98-154C)(Merow, S.J.) :
MAINE YANKEE ATOMIC POWER COMPANY :
(98-474C)(Merow, S.J.) :
FLORIDA POWER & LIGHT COMPANY :
(98-483C)(Wilson, J.) :
NORTHERN STATES POWER COMPANY :
(98-484C)(Wiese, J.) :
DUKE POWER, a Division of DUKE ENERGY CORP.:
(98-485C)(Sypolt, J.) :
INDIANA MICHIGAN POWER COMPANY :
(98-486C)(Hodges, J.) :
SACRAMENTO MUNICIPAL UTILITY DISTRICT :
(98-488C)(Yock, S.J.) :
SOUTHERN NUCLEAR OPERATING COMPANY, et al. :
(98-614C)(Merow, S.J.) :
COMMONWEALTH EDISON COMPANY :
(98-621C)(Hewitt, J.) :
BOSTON EDISON COMPANY :
(99-447C) (Allegra, J.) :
GPU NUCLEAR, INCORPORATED :
(00-440C)(Bush, J.) :
WISCONSIN ELECTRIC POWER COMPANY : VOLUME
(00-697C)(Merow, S.J.) : I
POWER AUTHORITY OF THE STATE OF NEW YORK :
(00-703C)(Damich, J.) :
OMAHA PUBLIC POWER DISTRICT :
(01-115C)(Bush, J.) :
NEBRASKA PUBLIC POWER DISTRICT :Discovery
(01-116C)(Sypolt, J.) :Judge:
TENNESSEE VALLEY AUTHORITY :(Judge
(01-249C)(Bruggink, J.) :Sypolt)
Plaintiffs, :PAGES
v. :1 - 274

THE UNITED STATES, :

Defendant. :

---------------------------------------------X

Deposition of Susan Klein

Washington, DC

Wednesday, April 24, 2002

Reported by: Denise Dobner Vickery, RMR, CRR

JOB NO. 144539

Ms. Klein, are you aware that there's a protective order in the spent nuclear fuel cases?

A. I think there is, yes.

Q. All right. What I'm going to do is I'm going to hand you a copy of the protective order and I'd like you to take a minute to look at it.

A. Okay.

MR. HIRSCH: Mark that as Exhibit 1.

(Thereupon, the reporter marked for identification Deposition Exhibit No. 1.)

THE WITNESS: (Pause). Okay. I don't fully understand it at this point, but I've read through it.

BY MR. HIRSCH:

Q. Okay. Would you generally agree to abide by the terms in the protective order, Ms. Klein?

A. If something is labeled confidential, yes, I will keep it confidential.

Q. Okay. All right. That's fine.

Ms. Klein, I've handed you what's been marked as Klein Deposition Exhibit 1 or I'm handing you that document, which is the notice of deposition that was

issued on April 18th for today's Rule 30(b)(6) deposition. And if you look on the exhibit page, you'll see four topics. That's page 5. You see those topics?
A. Yes, I see those topics.
Q. And you understand you're supposed to be the Rule 30(b)(6) designated Department of Energy witness for these four topics?
A. Yes.
Q. What's your current position, Ms. Klein?
A. I'm a senior policy adviser to the Director and Deputy Director of the Office of Civilian Radioactive Waste Management at the Department of Energy.
Q. And how long have you been the senior policy adviser?
A. For about three years.
Q. So, since about 1999?
A. Yes. I was transferred there but detailed back to general counsel for a couple years.
Q. When was your detail back to General Counsel's Office?

A. I think it was '97 that I was transferred to RW, but I was detailed back to general counsel to work with the general counsel at the time on any legal issues and then later on it was limited to issues involving this litigation.

Q. Okay. We'll get back to that in a second. But who do you report to as the senior policy adviser?

A. Lake Barrett. Ron Milner and Lake Barrett.

Q. And Mr. Barrett's current title is?

A. Deputy Director of the Office of Civilian Radioactive Waste Management.

Q. And Mr. Milner's title is?

A. He's the COO, the Chief Operating Officer of the Office of Civilian Radioactive Waste Management at DOE.

Q. And is the Office of Civilian Radioactive Waste Management otherwise known by its acronym as OCRWM?

A. OCRWM, yes, and actually with regard to Ron, I think now I just report to Lake. I was reporting to Ron when he was also Acting Deputy, but now that Margaret is here, to just correct the record. I don't

you can answer to your personal knowledge.

BY MR. HIRSCH:

Q. And what was the acceptance rate in the 1995 ACR report from the DOE?

MS. POWELL: Same objection. You can answer.

THE WITNESS: Okay. 400 the first year, 600 the second year, 900 the third year, and then steady state 900, and that was just through the first 10 years of operation.

BY MR. HIRSCH:

Q. So when the utilities started submitting DCS forms, they were relying on whether they had an allocation in what was then I guess the 1991 ACR; is that correct?

MS. POWELL: Objection, beyond the scope. You can answer.

THE WITNESS: Yes, I think. Yeah.

BY MR. HIRSCH:

Q. And I take it from your -- strike that?

Referring to the 1995 ACR rates that you just recited, I take it from your earlier testimony that the

D OE is not planning on using those rates in terms of when it starts accepting spent nuclear fuel?

A. No. Well, once there's an operational repository, we are planning to use the larger rates that were -- that I have mentioned. I don't know if we'll be accepting it outside of a repository. That's yet to be. It depends upon your definition of accept I guess.

Q. Do you know when the last time the DOE used the acceptance rates in the 1995 ACR for planning purposes?

MS. POWELL: Object to beyond the scope. You can answer to your personal knowledge.

THE WITNESS: No, I don't.

BY MR. HIRSCH:

Q. I --

A. I don't know.

Q. Let me say, I don't think this one is beyond the scope because I think it relate to the acceptance rate question.

Well, I take it from your answer that the DOE is not currently planning on using the acceptance rates

Q. There's a statement there that: "The NWPA by its terms contemplated that the entire process of siting, licensing, and constructing a repository would have been completed more than four years ago, by January 31, 1998." You see that statement?
A. I do.
Q. Do you agree that the Nuclear Waste Policy Act contemplated that process of siting, licensing, and constructing a repository would have been completed by January 1998?
MS. POWELL: I object, beyond the scope and to the extent it calls for a legal conclusion. You can answer.
THE WITNESS: I'm thinking. Yes.
BY MR. HIRSCH:
Q. Ms. Klein, will you look at page 40 -- excuse me -- 19 in the back.
A. 19?
Q. Right. Last paragraph, first sentence says: "This is not an insignificant point" --
A. Wait a minute. Where are you?
Q. I'm sorry. Last --

Q. All right. Now, let me just ask you in general. Is one of the purposes of the total system life cycle cost reports to determine the total cost of the Nuclear Waste Disposal Program?

MS. POWELL: Objection.

THE WITNESS: Yeah.

MS. POWELL: Beyond the scope, but --

THE WITNESS: Yes.

MS. POWELL: -- you can answer.

BY MR. HIRSCH:

Q. And is one of the reasons that that's done to make a determination whether the fees that are being charged to the utilities are sufficient?

A. I think that's --

MS. POWELL: Same objection. Go ahead.

THE WITNESS: I think that's required by the statute that we do that, yes.

BY MR. HIRSCH:

Q. All right. Now, going back to the bullet points on page 3-8 of Exhibit 16.

A. Uh-huh.

Q. Does this show a construction phase for the

BY MR. HIRSCH:

Q. Will you look at page 10 of the report or the testimony, Klein Deposition Exhibit 20. Do you see at the very top of that page there's a statement in there: "In its August 2001 report on alternative means for financing and managing the program, DOE stated that unless the program's funding is increased, the budget might become the 'determining factor' whether DOE will be able to accept wastes in 2010."

Were you aware or are you aware, Ms. Klein, that the DOE has taken that position?

MS. POWELL: Object to beyond the scope, but you can answer.

THE WITNESS: I worked on that report and I remember emphasizing how important the budget is. I don't remember if we said it was the determining factor or not, but yes, the budget is a big issue.

BY MR. HIRSCH:

Q. And is it correct that it's a big issue because if the DOE doesn't get enough money, it can't open the repository in 2010?

A. That's true.

A. Yeah, I would -- well, it hasn't been discussed that I know of that, I've known about in a long time. The 2007 has not been discussed, no.

Q. And does the fact that it's not been discussed reflect that it's not under consideration?

A. No. The new director is looking at all possibilities, and she's talking to people about accelerating.

Q. Are you aware of any current proposal of the DOE to begin accepting spent nuclear fuel before 2010?

A. Repeat that. Do you have objection in? Repeat the beginning of it. I'm sorry.

Q. Let me restate it. Are you aware of any current proposal by the DOE to begin accepting fuel earlier than 2010?

A. No.

Q. Going back to the question I guess I asked you a little earlier. Is there a DOE document that you've seen that reflects a range of acceptance dates starting in 2010 and including -- or strike that?

Have you reviewed a document at DOE which reflects this range to start removing spent nuclear

MS. POWELL: I'm just going to note for the record that we offered Mr. Pollog on I think -- I think that you're talking about this topic, but you can answer.

THE WITNESS: I don't remember. I wasn't told about the backlog. I was informed that it was based on 3,000 was at the time the average utility discharge rate. So...

BY MR. HIRSCH:

Q. It was your understanding that the --

A. I don't know about the backlog issue at all.

Q. All right.

A. About that that accounted for a backlog.

Q. Is it your understanding that the 3,000 rate would keep up with the utility discharge rate?

A. Yes.

Q. Is that correct?

A. Uh-huh.

Q. And then I guess you mentioned the other reason or rationale. I'm sorry. What was the second rationale?

A. 70,000 metric tons, which is how much we're

authorized to put in the first repository, divided by the life of the repository, which is 25 years.

Q. Gives you about 3,000 metric tons a year?

A. Uh-huh.

Q. Given both of those reasons, are you aware of any reason why the DOE would run the repository at Yucca Mountain at a rate less than 3,000 metric tons?

MS. POWELL: Object to beyond the scope, but you can answer.

THE WITNESS: I understand there are lots of ramp-up issues. There's transportation issues. There's utility interface issues. Casks. I mean, that could affect it, but that was our planning and what we'd like to do is be able to do that at 3,000. But I know there's lots of things that need to be worked out.

BY MR. HIRSCH:

Q. Well, assuming that all the ramp-up issues are resolved including transportation?

A. Uh-huh.

Q. Are you aware of any reason why the DOE wouldn't operate the facility at a 3,000 metric ton

rate --
A. No, I'm not.
Q. -- over the life of the facility?
A. No, I'm not aware of any reason we would not do that.
Q. All right. You got or we saw this maybe a little earlier. In order to open by 2010, does the DOE need to essentially build a rail line from the existing rail line in Nevada to the repository?
MS. POWELL: Objection, beyond the scope, but you can answer.
THE WITNESS: That's one of the possibilities is building a rail line. The other is to have -- I know one of the counties wanted to have some sort of system through there. I think it's Lincoln County, Nevada. To have a transportation truck centrally located site. So we haven't made the decision yet. Mostly rail is our preferred alternative, but we haven't decided the routes and the methods.
BY MR. HIRSCH:
Q. So, well, is there -- is it correct that