IN THE UNITED STATES COURT OF FEDERAL CLAIMS

-------------------------------------------X
YANKEE ATOMIC ELECTRIC COMPANY :
(98-126C)(Merow, S.J.) :
CONNECTICUT YANKEE ATOMIC POWER COMPANY :
(98-154C)(Merow, S.J.) :
MAINE YANKEE ATOMIC POWER COMPANY :
(98-474C)(Merow, S.J.) :
FLORIDA POWER & LIGHT COMPANY :
(98-483C)(Wilson, J.) :
NORTHERN STATES POWER COMPANY :
(98-484C)(Wiese, J.) :
DUKE POWER, a Division of DUKE ENERGY CORP.:
(98-485C)(Sypolt, J.) :
INDIANA MICHIGAN POWER COMPANY :
(98-486C)(Hodges, J.) :
SACRAMENTO MUNICIPAL UTILITY DISTRICT :
(98-488C)(Yock, S.J.) :
SOUTHERN NUCLEAR OPERATING COMPANY, et al. :
(98-614C)(Merow, S.J.) :
COMMONWEALTH EDISON COMPANY :
(98-621C)(Hewitt, J.) :
BOSTON EDISON COMPANY :
(99-447C) (Allegra, J.) :
GPU NUCLEAR, INCORPORATED :
(00-440C)(Bush, J.) :
WISCONSIN ELECTRIC POWER COMPANY : VOLUME
(00-697C)(Merow, S.J.) : II
POWER AUTHORITY OF THE STATE OF NEW YORK :
(00-703C)(Damich, J.) :
OMAHA PUBLIC POWER DISTRICT :
(01-115C)(Bush, J.) :
NEBRASKA PUBLIC POWER DISTRICT :Discovery
(01-116C)(Sypolt, J.) :Judge:
TENNESSEE VALLEY AUTHORITY :(Judge
(01-249C)(Bruggink, J.) :Sypolt)
Plaintiffs, :PAGES
v. :275 - 533

THE UNITED STATES, :

Defendant. :

-----------------------------------------X

Deposition of Susan Klein

Washington, DC

Thursday, April 25, 2002

Reported by: Denise Dobner Vickery, RMR, CRR

JOB NO. 144540

(Thereupon, the reporter marked for identification Deposition Exhibit No. 26.)

Thereupon,

SUSAN KLEIN

was called for examination, and, after having been previously sworn or affirmed, was examined and testified as follows:

EXAMINATION BY COUNSEL FOR THE PLAINTIFF,
COMMONWEALTH EDISON

BY MR. HIRSCH:

Q. Good morning, Ms. Klein.
A. Good morning.
Q. Do you understand you're still under oath?
A. Yes.
Q. All right.

MS. SULLIVAN: Excuse me. Mr. Hirsch, before we start today, Ms. Klein would like to clarify something that she testified about yesterday if she might.

MR. HIRSCH: Okay.

THE WITNESS: I went back to my office and checked the record and as to the rates that we would

pick up for, they are the same as in the VA that you showed me. You probably want to know what exhibit number that is. And that is in our current requirements document that the 3,000 continues throughout the years as stated in the VA. The viability assessment.

BY MR. HIRSCH:

Q. All right.

A. I think it's now -- that looks like it could be it.

MS. SULLIVAN: 22.

BY MR. HIRSCH:

Q. Volume 2 of the viability assessment.

MS. SULLIVAN: 22.

THE WITNESS: Let's see. It was a page you showed me. Page 3. Yes, that's correct.

BY MR. HIRSCH:

Q. Well, let's hopefully clarify that a little bit. Why don't you look at Klein Deposition Exhibit 22, which is --

A. A new one?

Q. No.

A. No.
Q. The one we were just looking at. The volume 2 of the DOE viability assessment from December of '98.
A. Okay. Uh-huh.
Q. And in particular, I think we were looking yesterday at the table on page 3-2.
A. Yes.
Q. And --
A. Those are approximately. I think there was a 1900 not an 1800 in our requirements document.
Q. Okay.
A. But they're based on -- they're based on these receipt rates, annual repository receipt rates in Table 3-1.
Q. And this table shows a receipt rate of 3,000 starting in 2014 and I guess running until 2032 on this --
A. Yes.
Q. -- table?
A. That's correct.
Q. And I'm sorry. Your clarification after checking with your office this morning with respect to

the rate was what?

A. Was that the rate here in this Volume 2 of the VA, Exhibit 22, in Table 3-1 is the correct rate for our planning purposes. What we plan, how we plan, the rate at which we plan to accept spent fuel at the repository.

Q. And that is a rate that would ramp up to 3,000 by 2014 and continue on at 3,000 until 2032; is that correct?

A. Yes, that's correct. 2033. Through 2032.

Q. I think you mentioned in your previous answer a system requirements document put out by the DOE?

A. Yes.

MR. HIRSCH: We've previously marked an exhibit which we'll get back to. Let's go ahead and look at that. 27.

(Thereupon, the reporter marked for identification Deposition Exhibit No. 27.)

THE WITNESS: Yes.

BY MR. HIRSCH:

Q. Ms. Klein?

A. Yes.

says.

Q. All right. But at least until the utility discharge rate goes down, it's the DOE's expectation, is it not, that they're going to continue to pick up 3,000 metric tons?

A. That is the expectation for planning purposes, yes.

Q. Does the DOE consider a 3,000 metric ton acceptance rate to be a reasonable rate to run the spent nuclear fuel program at?

A. I would -- yes.

Q. All right. Will you look at Klein Deposition Exhibit -- the one we just marked and then went on past -- 26.

A. Okay.

Q. In particular, what I'd like to refer you to is page 6 of Exhibit 26.

A. Yes.

Q. You have that there. This page 6 is what I think is labeled as a Time-Phased Cost Summary in Constant 1998 Dollars for the DOE spent nuclear fuel program. You see that?

Q. Ms. Klein, my name is Alex Tomaszczuk. I'm counsel for various utility plaintiffs which have pending cases at Court of Federal Claims.

I have a few follow-up questions to ask you based on the testimony that I've heard so far. I'll compliment Mr. Hirsch. He was very thorough. I wouldn't say this in his presence, but since he stepped out, he was very thorough and I think I have only a relatively few number of questions for you.

The same ground rules apply that Mr. Hirsch expressed to you at the outset of your deposition. If for some reason you don't understand my question, please let me know that I'll try and rephrase it so that there's common ground and so that we understand your testimony, okay?

A. Yes.

Q. I would like you if you can to identify for me all the assumptions on which your testify that DOE will begin performance in 2010.

A. The assumptions?

Q. Yes.

A. The assumption is that we would have a

designation by Congress of the site. That we will have a construction authorization from the Commission, and that we will have a license to receive by -- to receive nuclear material by 2010. All those things have to be accomplished.

Q. If I understood your answer, there were three basic assumptions on which DOE's ability to meet 2010 is based. The first was the designation of the site; is that correct?

A. Uh-huh. Yes.

Q. And the second assumption was the obtaining of an authorization for construction?

A. Yes.

Q. And the third was receiving a license to operate?

A. Yes.

Q. Okay.

A. Those are the three major assumptions.

Q. Are there any other assumptions on which DOE's ability to meet the 2010 date is based?

A. Well, we do need to get funding. We need to -- there can be no injunctions against us by a court.

I mean, I could go on about, you know, how the assumptions one has, how they got to work. I think by court, right.

Q. What I'm asking you to do is identify them to the best of your ability.

A. Every one of them? I don't think I'm capable of identifying every one of them. There are big differences between what we plan and hope to happen and what we assume, but I mean we would like to have an alternative means of financing and managing the program, but I don't know that that's a required amended order for us to meet the 2010 date. But that would certainly ease our burden if we could get government cooperation and have our funding mechanism changed. That is a high priority for the program in order to succeed. I think those are the assumptions that I can think of, I mean. Those are the assumptions.

Q. All right. The two that you identified in your -- in the continuation of your answer was first funding and second no injunctions as I understood your testimony?

is the Nuclear Waste Disposal Fund and the other is the Defense Waste Disposal Fund. Some of it is appropriated for the purpose of disposing of defense waste. But we use all that money for the program.

BY MR. TOMASZCZUK:

Q. You testified in response to some of the questions posed by Mr. Hirsch that DOE expected for planning purposes when it begins performance to ramp up to 3,000 MTU rate and stay at that steady state rate for a number of years. Do you recall that testimony?

A. Yes, I do.

Q. And that's reflected in various documents that Mr. Hirsch showed you yesterday and today as well?

A. Yes.

Q. And you used that term planning purposes in your answer?

A. Yes.

Q. That intention of DOE to ramp up to the 3,000 MTU rate, is that being used by DOE for purposes other than planning purposes?

A. No, not that I know of.

Q. Is that 3,000 MTU rate the rate that DOE was

to use to determine if the fees are sufficient?

MS. SULLIVAN: Objection, beyond the scope. Answer if you know.

THE WITNESS: I don't know. I'd have to look at the TSLCC to know.

BY MR. TOMASZCZUK:

Q. Would you do so. If you need to refer to a document to answer the question, that's fine. TSLCC, Number 16.

A. That's the most recent one. I have a few of them here. And would you repeat the question?

MR. TOMASZCZUK: Ms. Reporter, could you read it back.

(Requested material was read.)

THE WITNESS: (Pause). I haven't found it. I'm working on it.

BY MR. TOMASZCZUK:

Q. That's all right. Take your time.

A. It appears from this document that those are the rates that we assumed in determining the cost of the program.

Q. And did you have a page of the document that

Q. All right. So, DOE is using the 3,000 MTU rate for the purposes of determining adequacy of the fee, correct?

MS. SULLIVAN: Objection, beyond the scope and also the document speaks for itself. You can answer the question.

THE WITNESS: Yes.

BY MR. TOMASZCZUK:

Q. They're using that rate basically to design the facility that they're planning to build at Yucca Mountain; is that right?

A. Yes.

Q. They're using it in any number of documents that we've seen here over the last couple of days, correct?

A. Yes.

Q. Wouldn't it be fair to say, Ms. Klein, that the lower rate that DOE is using, that is, the rate that goes up to 900 MTU and stops there, is being used for one purpose and that is for this litigation?

MS. SULLIVAN: Objection, beyond the scope. You can answer as to your personal opinion.

has no obligation, but I don't know that we have ever said that we have that obligation as a department beyond the 10-year period.

BY MR. TOMASZCZUK:

Q. Well, I commend you for dancing on that high wire, but maybe you can just tell me what this answer is communicating to me because, frankly, I don't understand it.

MS. SULLIVAN: Objection.

BY MR. TOMASZCZUK:

Q. What is DOE's position with respect to its obligation to accept spent nuclear fuel from purchasers beyond the 10 years of allocations addressed in the ACR? Can you explain that to me what is DOE's position because I don't understand it in this answer.

MS. SULLIVAN: Objection, the document speaks for itself. Objection to the extent it calls for a legal conclusion. Objection, it's beyond the scope. You can answer the question.

And I would note for the record that to the extent the utility plaintiffs have questions about these Interrogatories, a proper vehicle would be a

letter, perhaps a motion with the court, but Ms. Klein is here to testify as to her personal knowledge. If she can.

THE WITNESS: I don't know that the DOE has at this time a position on that.

BY MR. TOMASZCZUK:

Q. Do you have a position?

A. I do.

Q. Can you tell me what it is?

A. My own personal position? Yes.

Q. Yes?

A. Yes, we have an obligation.

MR. TOMASZCZUK: Ms. Klein, I don't have any further questions at this time.

I am going to adjourn your deposition because there are some pending issues with respect to the government's privilege log and documents contained thereon. There were also some instructions not to answer both from questions posed by Mr. Hirsch as well as some questions posed by me, and we're going to reserve the right to look at that and potentially call you back.

contract?

A. I believe in this process, which we call the ACR resolution process, utilities raised issues and the department addressed them. I don't know what all the issues were. That could have been one of them, and in that case we would have looked at it, but other than that I don't know. Maybe we did look at it in that context. As a request from a utility company.

Q. Sitting here today, do you recall DOE considering changing the definition of high-level waste?

A. No, I do not recall.

Q. Is the Federal government responsible for disposing of greater than Class C waste?

A. Yes, it is.

Q. Would you look at the definition of high-level waste in the standard contract, Exhibit 38, specifically I'd ask you to turn to page 589.

A. Yes.

Q. Number 12. The term high-level waste means?

A. Uh-huh.

Q. You see there under B it states: "Other

Q. Do you know if DOE has ever formulated a position as to whether there's a formal definition for the term other highly radioactive material?

A. I don't believe we have.

Q. What does the phrase requires permanent isolation mean?

MS. SULLIVAN: Objection to the extent it calls for legal conclusion. Objection, document speaks for itself.

THE WITNESS: That's a good question. It's a very good question. I think it's pretty vague. I don't know. It would be for NRC to determine in our rulemaking.

BY MR. MACDONALD:

Q. Would disposal in a permanent repository constitute -- strike that.

Would disposal in a deep geologic repository constitute permanent isolation?

MS. SULLIVAN: Objection, vague. Objection to the extent it calls for legal conclusion.

THE WITNESS: Even if it would, it doesn't say that NRC has determined that it requires it. But I

would say if you put it in a repository and we're going to leave -- one of our plans is to leave ours open for 300 years, I guess after 300 years hopefully it's permanent isolation. But the requirement is they have to determine by rule that it requires permanent isolation. So that to me is different than saying if you put it in the repository. That doesn't mean that NRC has determined that it's required. But it is -- that's all.

BY MR. MACDONALD:

Q. I'm not sure that that exactly answered my question.

A. Okay. Ask it again, please.

Q. Would disposal constitute -- strike that.

Would disposal in a deep geologic repository constitute permanent isolation, in your view?

MS. SULLIVAN: Objection, vague.

THE WITNESS: I guess so, yeah. I would hope it would be isolated and it wouldn't leak out.

MR. MACDONALD: I'd like to mark as Exhibit 40.

(Thereupon, the reporter marked for