you're referring to at the time.

Q Well, various points in time your office issued ACRs, correct?

A I believe so. I didn't follow, quote, the ACR, DCSs and those sort of things. I didn't follow those very closely. They should have been consistent.

Q So you didn't follow them very closely, correct?

A No. That's correct.

Q When you were acting director and deputy director of your office, did you not have ultimate responsibility for those documents?

A I did.

Q And did you delegate that responsibility to someone else?

A You can delegate authority; you retain responsibility.

Q And although you retained your responsibility for them, you did not familiarize yourself with them?

MR. CRAWFORD: Objection, argumentative.

A Oh, I think I was familiar with them, but I

debate in the formulation of the '82 act was there was discussions between what was known at the time as away-from-reactor storage concept versus a geologic repository concept, and the after the debate was over the decision was not to authorize an away-from-reactor storage facility, which the new name became a monitored retrievable storage facility, because the opponents of that felt it would detract from the geologic repository and the DOE was to submit a proposal for an MRS, but it was not approved. It took an act of Congress to approve it and authorize it. That was the forces that were at play from a policy perspective on this.

Q In 1982?

A In 1982. And those existed right through '87. Some people vehemently opposed the MRS; some people wished -- were proponents of the MRS.

Q So then am I correct that in 1985 it was important to your office that the MRS as then proposed not be perceived as a replacement for the permanent repository?

A That's correct.

MR. CRAWFORD: Objection. Lack of foundation.
Q You see B, the waste receipt rate?
A Uh-huh.
Q Are you familiar with the basis for the 3,000 MTU per year receipt rate in 1985?
MR. CRAWFORD: Objection, asked and answered. Objection, foundation.
A I'm familiar with it. It was established before my arrival or personal participation in establishing that number. It seemed like a reasonable number to me then as it does today.
Q Has there ever been a time since you've been at the Department of Energy that a 3,000 MTU per year rate did not seem reasonable?
MR. CRAWFORD: Objection, vague. Objection, asked and answered. Objection, lack of foundation.
A As this is used in this case, as an assumption for an operating facility rate and capacity, it was a reasonable number.
Q In C, do I understand this correctly that

foundation.
A The failure of 19 -- as we were delayed there's more storage costs that are going to have to be paid for in society.
Q So in proposing this plan, this improved plan your office was attempting to reduce those costs, correct?
MR. CRAWFORD: Objection to the extent it calls for speculation and objection to the foundation and objection, vague.
A Yes. Let me add, it's much more than just cost. It's also the intent. The government should be trying to take the material and discharge its responsibilities under the act. So it's more than just cost.
Q And is it your understanding that the standard contract was entered into between the government and the utilities with nuclear reactors in order to carry out the underlying intent of the Nuclear Waste Policy Act?
MR. CRAWFORD: Objection. Mischaracterizes prior testimony. Objection, asked and answered.

Objection, foundation. Objection to the extent it calls for speculation.

A To me the contract was administrivia for aspects of the program.

Q What?

A Administrivia.

Q Can you explain that novel term to me?

A Paperwork. Legal stuff. I didn't pay much attention to the contract. We were -- our sights were set on trying to perform, to take the waste into the government system as quickly as possible.

Q Consistent with the intent of the act?

A Act. Not -- the contract is a small subpiece of the act. The act is primary; the contract is tertiary.

Q Your sights were focused on the requirements of the Nuclear Waste Policy Act of 1982, correct?

A Correct.

Q Continuing on page 28, subparagraph one towards the bottom of the page, would you take a moment to look at that, sir.

A Positions by decision group, current status?
Q Yes. You see under Decisions Group it has aggregate acceptance, the first entry, system study on technical basis under review confirms 3,000 MTU per year?
A I see it.
Q That's consistent with your testimony today, correct, that --
MR. CRAWFORD: Objection.
MR. CAYNE: Could I finish, counsel.
MR. CRAWFORD: Sorry.
Q That's consistent with your testimony today that in 1986 your office was projecting a 3,000 MTU per year acceptance rate, correct?
MR. CRAWFORD: Objection, vague.
A Seems consistent.
Q Do you know what the, or are you familiar with the system study that is being referred to in this entry?
A Not the specific one.
Q Do you have a general understanding of the

system study being referred to here?

MR. CRAWFORD: Objection. Asked and answered.

A There were various studies done in the eighties and also in the very early nineties on system performance rate, you know, what the costs were, schedules were, plausibility of them.

Q And these system studies looked at system issues, correct?

A Yes.

Q And am I correct that each one of these studies to which you've just referred confirmed an acceptance rate, an aggregate acceptance rate of 3,000 MTU per year?

MR. CRAWFORD: Well, objection, vague.

A I think it's overstated to say it confirmed it. It showed that, you know, at 2,000 it does this, at 3,000 it does that, 4,000 it does something different. I don't know if they actually reached an absolute confirmation that 3,000 was the exact number, but generally they supported the system rate of 3,000 was a reasonable rate.

Q So it's your understanding or your knowledge that each of the various system studies to which you just referred that were undertaken in the -- from the mid-1980s to I think you said the mid-1990s, supported an acceptance rate of 3,000 MTU per year, correct?
MR. CRAWFORD: Objection, vague. Objection, assumes facts not in evidence. Objection, mischaracterizes prior testimony.
A Yes.
Q I'll ask you to turn to page HQ 0002909 of this same exhibit.
A Okay.
Q Do you see under the second entry, allocation of acceptance under consequences of decisions, it says "allocation required to plan maximum storage at some sites." Do you see that statement?
A I see it.
Q Do you understand that statement?
A No.
Q Do you understand that statement to refer

but certainly site designation was a key matter.
Q Look at page two of this document, two in Arabic at the bottom.
A Okay.
Q You see the statement, "As specified in the contracts, the ACR is for planning purposes only"?
MR. CRAWFORD: Where are you?
MR. CAYNE: I'm at the last sentence of the carryover paragraph -- next to the last sentence of the carryover paragraph on the top of page two.
A I've read it.
Q You see that?
A Yes.
Q To your knowledge does the contract actually make that statement, the standard contract?
A Don't know.
Q Have you ever been advised by anyone of the statement on this page two that the ACR is for planning purposes only?
A I've heard that statement.
Q Have you ever made that statement?
A Don't recall. Might have.

Q Is that your position?
A Yes.
MR. CRAWFORD: Objection, foundation.
A Yes.
Q And what is the basis for that position?
MR. CRAWFORD: Objection to the extent it calls for a legal conclusion.
A My staff has advised me that's the proper thing to say when asked.
Q What members of your staff?
A Mr. Brownstein, Mr. Zabransky and the people who are responsible in that area.
Q When did they give you that advice?
A Numerous times over many years.
Q Starting when?
A Probably when I came back, '93 on I would guess.
Q Did they give you that advice in the context of discussions relating to the issue of whether operations would start at the repository by January 31st, 1998?
MR. CRAWFORD: Objection, vague.

Q Did you ever read part of a DCS?
A Might have. Don't know.
Q What is a DCS?
A Well --
MR. CRAWFORD: Objection. Asked and answered.
Q I understand the title.
A Delivery commitment schedule.
Q Do you understand what role it played in the overall SNF process?
MR. CRAWFORD: Objection, foundation.
A These were all part of the administrative details of the contract that I did not pay much management policy attention to.
Q So in your view was a DCS what you referred to, Mr. Barrett, I think the term was administrivia?
A That's correct.
Q A delivery commitment schedule was administrivia?
A Uh-huh.
Q Didn't really matter much to you, correct?
A That's correct, relative to running the

program and getting the site.

Q So you really did not have a particular understanding of what role or what function the overall administrative process that a DCS played; it was just another kind of bureaucratic piece of paper, correct?

MR. CRAWFORD: Objection, vague. Objection, mischaracterizes the witness's prior testimony. And objection to the foundation.

Q Correct?

A Yes.

Q My statement is correct?

A Correct.

Q Would you turn to page seven of Exhibit 6. Are you there, sir?

A Yes.

Q You see the section captioned Projected Waste Acceptance Capacity? That's the caption of the section?

A Yes. Yes.

Q And about seven lines down there's a sentence that begins, "The schedule will serve as a

the Department of Energy, correct?

MR. CRAWFORD: Objection to the foundation.

A That's my understanding.

Q How in your knowledge or in your view could the amendments act of '87 have affected the purchasers?

MR. CRAWFORD: Objection to the foundation. Objection, calls for speculation.

A By making it more difficult for the department to achieve a 1998 date.

Q And how would that have affected the purchasers.

A If we could not select a place by law we couldn't move the fuel, therefore the fuel would remain there longer.

Q And that would have what impact on the purchasers?

MR. CRAWFORD: Objection as to speculation. Objection to the foundation.

A Primarily one of cost, that they would have to store the fuel.

Q Additional cost?

A Additional cost.
Q Costs in addition to those that would have been incurred had the repository been up and running by January 31st, 1998, correct?
MR. CRAWFORD: Objection to foundation. Objection to the extent it calls for speculation.
A The system running by 1998, being the repository and MRS.
Q So you're referring to costs, additional costs that would have been sustained by the utilities -- you're referring to additional costs that would have been sustained by the utilities that would not have been incurred had the waste management system been up and running by January 31st, 1998, correct?
A Correct.
Q Please turn to page seven. First full paragraph. Actually, would you take a moment, please, to read that, the two paragraphs on page seven.
A Okay.
Q Did your office attempt to quantify the projected increase in the purchasers' need for at-reactor storage as a result of the delay in the

269

ACKNOWLEDGMENT OF DEPONENT

I, Lake H. Barrett, do hereby acknowledge that I have read and examined the foregoing testimony, and the same is a true, correct and complete transcription of the testimony given by me and any corrections appear on the attached Errata sheet signed by me.

6/27/02 ______________________

(DATE) (SIGNATURE)

270

CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC

I, Diane Gomez, Registered Professional Reporter, the officer before whom the foregoing proceedings were taken, do hereby certify that the foregoing transcript is a true and correct record of the proceedings; that said proceedings were taken by me stenographically and thereafter reduced to typewriting under my supervision; and that I am neither counsel for, related to, nor employed by any of the parties to this case and have no interest, financial or otherwise, in its outcome.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal this 25th day of April, 2002.

My commission expires:
June 14, 2005

______________________
NOTARY PUBLIC IN AND FOR
THE DISTRICT OF COLUMBIA

271

ERRATA SHEET

IN RE: YANKEE ATOMIC v. UNITED STATES

RETURN BY: ______________________

PAGE LINE CORRECTION AND REASON

______________________ ______________________

(DATE) (SIGNATURE)

272

ERRATA SHEET CONTINUED

IN RE: YANKEE ATOMIC v. UNITED STATES

RETURN BY: ______________________

PAGE LINE CORRECTION AND REASON

______________________ ______________________

(DATE) (SIGNATURE)

# ERRATA SHEET

IN RE: YANKEE ATOMIC v. UNITED STATES

RETURN BY: MAY 27 2002

| PAGE | LINE | CORRECTION AND REASON |
|---|---|---|
| 161 | 14 | they → there |

6/20/02 (DATE)

(SIGNATURE)

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

\- - - - - - - - - - - - - - - - - - - - - x

YANKEE ATOMIC ELECTRIC COMPANY; : Case Nos. 98-126C,
CONNECTICUT YANKEE ATOMIC POWER : 98-154C, 98-474C,
COMPANY; MAINE YANKEE ATOMIC : 98-483C, 98-484C,
POWER COMPANY; FLORIDA POWER & : 98-485C, 98-486C,
LIGHT COMPANY; NORTHERN STATES : 98-488C, 98-614C,
POWER COMPANY; DUKE POWER, a : 98-621C, 99-447C,
Division of DUKE ENERGY CORP.; : 00-440C, 00-695C,
INDIANA MICHIGAN POWER COMPANY; : 00-703C, 01-115C,
SACRAMENTO MUNICIPAL UTILITY : 01-116C, 01-249C

\- - - - - - - - - - - - - - - - - - - - - X

(Caption continued on next page)

Continued Deposition of LAKE H. BARRETT

Washington, D. C.

Tuesday, April 23, 2002

9:36 a.m.

Job No.: 11792-5

Pages 273 through 526, Volume 2

Reported by: Diane Gomez, RPR

DISTRICT; SOUTHERN NUCLEAR :
OPERATING COMPANY, et al.; :
COMMONWEALTH EDISON COMPANY; :
BOSTON EDISON COMPANY; GPU :
NUCLEAR, INCORPORATED; WISCONSIN :
ELECTRIC POWER COMPANY; POWER :
AUTHORITY OF THE STATE OF NEW :
YORK; OMAHA PUBLIC POWER DISTRICT; :
NEBRASKA PUBLIC POWER DISTRICT; :
and TENNESSEE VALLEY AUTHORITY, :
Plaintiffs :
v. :
THE UNITED STATES, :
Defendant :
- - - - - - - - - - - - - - - - - X

Q Is it your testimony then that it would have been less costly for the Department of Energy to operate a repository for a period of 80, 90 or more years than it would have been for the department to operate a repository in the ballpark of 30 years?

MR. CRAWFORD: Objection to the foundation. Objection, vague.

A No.

Q In fact, it would have been much more expensive to the department to operate the repository for a period of 80, 90 or more years as contrasted with operations in the ballpark of 30 years, correct?

A Yes.

Q Are you aware of any TSLCC or fee adequacy study undertaken at any time that assumed a repository design receipt rate of 900 MTUs per year on a steady state basis?

A No.

Q Are you aware of any TSLCC or fee adequacy study that assumed a 900 MTU per year acceptance rate on a steady state basis?

A No.

Q In fact, Mr. Barrett, to your knowledge have not all of the TSLCC and fee adequacy studies assumed 3,000 MTU per year acceptance rates or repository design receipt rates?

MR. CRAWFORD: Objection to the foundation.

Q To your knowledge, sir.

A Repeat the question again.

Q To your knowledge, Mr. Barrett, have all TSLCC or fee adequacy studies issued on or after 1982 assumed a 3,000 per annum MTU acceptance rate or a repository design receipt rate?

MR. CRAWFORD: Objection to the foundation.

A Some had more.

Q Some had more? Which ones had more?

A Ones that had two repositories in it had rates higher than 3,000.

Q What was the highest annual aggregate rate of any of the TSLCC or fee adequacy studies that you're referring to?

MR. CRAWFORD: Objection. Best evidence.

A Some of the earlier ones, pre-'87, had two repositories at steady state which would run higher at

nominal 6,000 tons.
Q Per year?
A Per year. All recent ones, since '87 or so to my knowledge are basically steady state at 3,000.
Q And by recent ones -- I'm sorry.
A In the 1990s the TSLCCs had a state steady receipt rate at 3,000 tons per year.
Q And what about the most recent study?
A I believe the most recent ones --
MR. CRAWFORD: Objection, best evidence.
A -- is 3,000 tons per year steady state.
(Deposition Exhibit Barrett 15 was marked for identification and was retained by counsel.)
Q Mr. Barrett, the court reporter has handed you a document marked for identification as Exhibit 15, which is a multipage document, the first page of which is a routing and transmittal slip directed to L. Barrett, J. Hale, S. Brocoum, B-r-o-c-o-u-m, A. Brownstein, B-r-o-w-n-s-t-e-i-n, W. Danker, D-a-n-k-e-r, MRS team and D. Shelor, S-h-e-l-o-r. And attached to that is a multipage memorandum that the subject line reads "Document Change Proposal to

repository, you understand that?
A Yes.
Q But did the '87 legislation authorize the construction and operation of an MRS facility that was not compliant with each of the links established by the 1987 amendments to the Nuclear Waste Policy Act of 1982?
MR. CRAWFORD: Objection, best evidence.
A I think the way you phrased that the answer is no.
Q Did you not understand the question?
A Your phraseology had a double negative in it, so I think the answer was no.
Q Let me try to ask the question again, because we want the record clear. Did the 1987 legislation authorize the construction and operation of an MRS facility that was not compliant with each of the links established by the 1987 amendment to the NWPA?
A No.
MR. CRAWFORD: Objection. Best evidence.
Q So you agree with me that such an MRS was

not lawful in 1989, correct?
MR. CRAWFORD: Objection. Asked and answered.
A The answer is yes.
Q And in fact --
A I do.
Q And, in fact, such an MRS never became lawful under the laws of the United States, correct?
A Yes.
Q Turn your attention to page four of Exhibit 16, please. The second full paragraph, Mr. Barrett. Are you there?
A Yes.
MR. CRAWFORD: What page?
MR. CAYNE: Page four of the attachment to Exhibit 16.
MR. CRAWFORD: Which paragraph are we on?
MR. CAYNE: The second full paragraph.
Q It starts, in conclusion number four, "The commission found that an MRS link as provided in the current law would not be justified, especially in light of uncertainties in completion time for the