consternation about what constitutes an emergency. So neither of those in my recollection did I consider practical. And we didn't pursue them.

Q What did you mean by the last statement, "The MRS review commission recommendations are viewed as an interim solution to a problem that requires long-range planning and thought"?

A That their recommendations didn't make any sense but we were being nice about it.

(Deposition Exhibit Barrett 17 was marked for identification and was retained by counsel.)

Q The court reporter has handed you, Mr. Barrett, a document marked for identification as Exhibit 17, which is encaptioned Nuclear Waste. Is there a need for federal interim storage by the U.S. monitored retrievable storage review commission? November '89, bearing Bates numbers PA-172230 through PA-172270. Do you have that document before you?

A Yes.

Q And let me tell you that this document is an excerpt from the entire -- of the entire report issued by the U.S. monitored retrievable storage

review commission.
Did you ever have an opportunity to review this document in the course of the performance of your duties as an official at the Department of Energy?
A I believe so.
Q Let me turn your attention to page bearing Bates number PA-172244.
A Okay.
Q I'd like to ask you to read the passage, the paragraph that begins at the very bottom of the left-hand column of that page starting, "However, the schedule linkage." Do you see that?
A Yes.
Q Could you read that paragraph up to including number five.
A I've read that.
Q Okay. Let me ask you to focus your attention to the first statement of that section, specifically, "However, the schedule linkage presently in the NWPAA (MRS construction may not begin until the Nuclear Regulatory Commission issues a license with a construction of a repository) would make it impossible

for an MRS to be operational more than three years before the repository." Do you see that statement?
A Yes.
Q Do you agree with that statement?
MR. CRAWFORD: Objection. Asked and answered.
A In general, yes.
Q Do you agree with it as stated here to be accurate and correct?
A It's a judgment call.
MR. CRAWFORD: Same objection.
A I don't disagree with it -- I don't disagree with that statement.
(Deposition Exhibit Barrett 18 was marked for identification and was retained by counsel.)
Q Mr. Barrett, the court reporter has handed you a document marked for identification as Exhibit 18. Do you have that before you?
A Yes.
Q This document is the report to Congress on reassessment of the civilian radioactive waste management program dated November 1989 issued by the

Exhibit 22. The second full paragraph contains the statement that, "This schedule, based on a realistic assessment of activity durations and past experience, shows a significant slip for the start of repository operations from the year 2003 to approximately 2010. The current restrictions in the amendments act linking the repository and MRS make it impossible for DOE to accept waste at an MRS facility on a schedule independent from that of the repository." Do you see that statement?

A Yes.

Q Based on your testimony earlier this afternoon concerning linkage, can I assume correctly that you would agree with that statement?

A Yes. I would also -- the very next sentence says that DOE indicates a preference that it be done through the negotiator. So in a selective reading, yes, I agree with you.

Q You agree that as the law stood in 1990 and, in fact, as the law stands today it would be impossible for the DOE to accept waste at an MRS facility on a schedule that is independent from that

of the repository, correct?
MR. CRAWFORD: Objection, compound. Objection, asked and answered.
Q Correct?
A Correct.
MR. CRAWFORD: Objection, compound. Objection, asked and answered.
Q And proceeding on to page five, the last sentence of the carryover paragraph, do you agree with the statement that if the current linkages to the repository are maintained --
A Regular -- Arabic five?
Q Arabic five, yes.
A Oh, up top.
Q Do you agree with the statement "If the current linkages to the repository are maintained, it is estimated that the commencement of facility operations and initial acceptance of SNF/HLW by DOE would not start until 2007."
MR. CRAWFORD: Objection. Asked and answered.
A Yes.

colleagues, that we begin at 8 on Friday? Off the record.

(Signature having not been waived, the deposition of Lake H. Barrett was concluded at 5:32 p.m.)

ACKNOWLEDGMENT OF DEPONENT

I, Lake H. Barrett, do hereby acknowledge that I have read and examined the foregoing testimony, and the same is a true, correct and complete transcription of the testimony given by me and any corrections appear on the attached Errata sheet signed by me.

6/27/02 (DATE)

[signature] (SIGNATURE)

# ERRATA SHEET

IN RE: YANKEE ATOMIC v. UNITED STATES

RETURN BY: MAY 30 2002

| PAGE | LINE | CORRECTION AND REASON |
| --- | --- | --- |
| | | |

6/26/02
(DATE)

(SIGNATURE)

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - - - - - x

YANKEE ATOMIC ELECTRIC COMPANY; : Case Nos. 98-126C,
CONNECTICUT YANKEE ATOMIC POWER : 98-154C, 98-474C,
COMPANY; MAINE YANKEE ATOMIC : 98-483C, 98-484C,
POWER COMPANY; FLORIDA POWER & : 98-485C, 98-486C,
LIGHT COMPANY; NORTHERN STATES : 98-488C, 98-614C,
POWER COMPANY; DUKE POWER, a : 98-621C, 99-447C,
Division of DUKE ENERGY CORP.; : 00-440C, 00-695C,
INDIANA MICHIGAN POWER COMPANY; : 00-703C, 01-115C,
SACRAMENTO MUNICIPAL UTILITY : 01-116C, 01-249C

- - - - - - - - - - - - - - - - - - - - x

(Caption continued on the next page)

Continued Deposition of LAKE H. BARRETT

Washington, D. C.

Friday, April 26, 2002

8:10 a.m.

Job No.: 11792-8

Pages 527 through 825, Volume 3

Reported by: Diane Gomez, RPR

DISTRICT; SOUTHERN NUCLEAR :
OPERATING COMPANY, et al.; :
COMMONWEALTH EDISON COMPANY; :
BOSTON EDISON COMPANY; GPU :
NUCLEAR, INCORPORATED; WISCONSIN :
ELECTRIC POWER COMPANY; POWER :
AUTHORITY OF THE STATE OF NEW :
YORK; OMAHA PUBLIC POWER DISTRICT; :
NEBRASKA PUBLIC POWER DISTRICT; :
and TENNESSEE VALLEY AUTHORITY, :
Plaintiffs :
v. :
THE UNITED STATES, :
Defendant :
- - - - - - - - - - - - - - - - - X

abeyance and just don't change it.
A Because before, the last time one of these was done there was an MRS in the system and there was numerical numbers put in. Then the MRS -- due to events beyond our control we couldn't do the MRS, and it became pretty obvious you could not do 1998. It was unlikely to do 1998. To go and rewhip your numbers around, what value was that going to be? Because it was moot at that point.
Q What was moot? What was moot at that point?
A From my perspective -- I wasn't really much involved in all these -- the whole thing is moot as to what the numbers are because we focused on trying to perform and bring capacity on line, not what the administrative aspect of this was. From my perspective. That's why I don't consider this one way or the other.
Q You said "from my perspective I wasn't really much involved in all these." When you said "all these," what are you referring to?
A ACRs, DCSs, contract language, etc.

Q Because they were moot because of what was happening on the bigger picture?

A Because we were focused on trying to address the 1998 date through the -- at this time through the multipurpose canisters. We had negotiations, and we were focused on trying to get the repository done under extremely difficult budget conditions. So I as the deputy director, which I guess that's what I was then, did not focus on this. And trying to go and change around contracts to me was not a proper utilization of resources.

Q Because the whole issue of annual capacity reports and acceptance priority rankings and other such administrivia was moot until such time as you had a repository plan in place?

MR. CRAWFORD: Objection to the extent it mischaracterizes prior testimony.

A Until we had a facility in a place to move the material. That was our primary focus, was to create a facility so we could start to move the material. That was my main focus.

Q So is my statement correct that all this

administrivia such as acceptance priority rankings and annual capacity reports were, in your opinion, moot until that time?

MR. CRAWFORD: Objection, vague. Objection to the extent it mischaracterizes prior testimony.

A They weren't high on my priority.

Q They weren't on your priority at all?

A They were not on my priority, that's fair. They were not on my priority.

Q Because until you had a repository plan in place, in your words it was moot, correct?

A Okay. Yeah, I'll accept that. Yes.

MR. CAYNE: Let's take a five-minute break. It's 3:48.

(There is a recess from the record.)

(Deposition Exhibit Barrett 39 was marked for identification and was retained by counsel.)

Q Mr. Barrett, the court reporter has handed you a document marked for identification as Exhibit 39, which is the acceptance priority ranking and annual capacity report issued March 1995, and it bears Bates numbers -- looks like the last four digits on

the first page are 0676 through 0748. Do you have that document before you?
A I do.
Q Now, March 1995, this date is subsequent to the 1994 plan you were referring to a moment ago, correct?
A Correct.
Q What was that 1994 plan?
A Program plan.
Q And that program plan did not reflect in the table the -- the acceptance schedule did not reflect an MRS facility, correct?
A That's my recollection.
Q You can look at it again, sir, if you need to refresh your recollection.
A Did this have a table in it? You probably know what the table is.
Q 1-2.
A The program plan.
Q Mr. Barrett --
A You're asking about this one?
Q No. Strike that. I asked you I think

ACKNOWLEDGMENT OF DEPONENT

I, Lake H. Barrett, do hereby acknowledge that I have read and examined the foregoing testimony, and the same is a true, correct and complete transcription of the testimony given by me and any corrections appear on the attached Errata sheet signed by me.

6/27/02
(DATE)

[signature]
(SIGNATURE)

# ERRATA SHEET

IN RE: YANKEE ATOMIC V UNITED STATES

RETURN BY: MAY 30 2002

| PAGE | LINE | CORRECTION AND REASON |
|---|---|---|
| 640 | 16 | Sing => s.t |
| 641 | 17 | poke => joke |
| 641 | 17 | insert "anti" before "nuclear" |
| 650 | 11 | after within insert "the Administration meeting" that . . . |
| 662 | 2 | N => "M" in MPC |
| 667 | 15 | add at end "too strong" |

6/20/02
(DATE)

[illegible]
(SIGNATURE)

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - - - - - x

| | |
|---|---|
| YANKEE ATOMIC ELECTRIC COMPANY; | : Case Nos. 98-126C, |
| CONNECTICUT YANKEE ATOMIC POWER | : 98-154C, 98-474C, |
| COMPANY; MAINE YANKEE ATOMIC | : 98-483C, 98-484C, |
| POWER COMPANY; FLORIDA POWER & | : 98-485C, 98-486C, |
| LIGHT COMPANY; NORTHERN STATES | : 98-488C, 98-614C, |
| POWER COMPANY; DUKE POWER, a | : 98-621C, 99-447C, |
| Division of DUKE ENERGY CORP.; | : 00-440C, 00-695C, |
| INDIANA MICHIGAN POWER COMPANY; | : 00-703C, 01-115C, |
| SACRAMENTO MUNICIPAL UTILITY | : 01-116C, 01-249C |

- - - - - - - - - - - - - - - - - - - - x

(Caption continued on the next page) COPY

Continued Deposition of LAKE H. BARRETT

Washington, D. C.

Friday, May 10, 2002

8:06 a.m.

Job No.: 11792-11

Pages 1104 to 1437, Volume 5

Reported by: Diane Gomez, RPR

DISTRICT; SOUTHERN NUCLEAR :
OPERATING COMPANY, et al.; :
COMMONWEALTH EDISON COMPANY; :
BOSTON EDISON COMPANY; GPU :
NUCLEAR, INCORPORATED; WISCONSIN :
ELECTRIC POWER COMPANY; POWER :
AUTHORITY OF THE STATE OF NEW :
YORK; OMAHA PUBLIC POWER DISTRICT; :
NEBRASKA PUBLIC POWER DISTRICT; :
and TENNESSEE VALLEY AUTHORITY, :
Plaintiffs :
v. :
THE UNITED STATES, :
Defendant :
- - - - - - - - - - - - - - - - - X

for identification and was attached to the transcript.)

Q Mr. Barrett, the court reporter has handed you a document marked for identification as Exhibit 57. It is captioned Determination of Cost-effective Waste Management Receipt Rates. It is by R.W. McKee, M-c-K-e-e. It starts at Bates PA-221971. And it continues through PA-221980. Do you have that document before you?

A I believe so. I can't read the Bates number at the bottom, but go ahead. Yes.

Q And you'll see that the first two pages of this consecutively-Bates-numbered document appear to be the same other than the fact that the first page looks as if a buck slip covered over a portion of the left-hand column, correct?

A Correct.

Q Do you know a person named R.W. McKee?

A No.

Q Have you ever heard of that person?

A I've heard the name.

Q Are you familiar with Pacific Northwest

Laboratory?

A Yes.

Q What is Pacific Northwest Laboratory?

A It's a contractor in Richland, Washington.

Q Were those contractors relied on often by the Department of Energy in connection with the development, design, and construction of the waste management system?

MS. HERRMANN: Objection. Vague.

A We use them as advisors and analysts for the waste management system.

Q Do you continue to so use them through today?

A No.

Q Through when did you use them?

A Through the late eighties.

Q There's also another name at the top of the first page, H.D. Huber, H-u-b-e-r. Do you know that individual?

A No.

Q Did you ever rely on the work of Pacific Northwest Laboratory?

MS. HERRMANN: Objection. Vague.
A I used it as input.
Q For what purposes?
A For advice on systems analysis.
Q Did you ever personally assign work out to be performed by Pacific Northwest Laboratory?
A I don't remember me personally, but my staff did.
Q Did you authorize your staff to assign work out to Pacific Northwest Laboratory?
A Yes.
Q I take it then you considered the work of Pacific Northwest Laboratory to be competent?
A Yes.
Q I turn your attention to page Bates number PA-221972. It's the second page of the document. Actually, returning to the first page, do you see the buck slip on the first page? It says, '91 HLRWM conference papers, volume two, "high priority."
A I see it.
Q Is that your writing?
A No.

MS. HERRMANN: Objection. Speculation.

A I'm not sure they were.

Q Do you believe that this paper was unauthorized by your department?

MS. HERRMANN: Same objection.

A I don't know.

Q Do you believe it likely someone in your department, an employee of yours, would have requested that Pacific Northwest Laboratory prepare the paper reflected by Exhibit 57?

MS. HERRMANN: Same objection.

A I don't know.

Q How would this paper have been used by your office?

MS. HERRMANN: Objection. Speculation.

A Paper, not at all.

Q Excuse me?

A The paper, not at all.

Q How would the analysis set forth in Exhibit 57 have been used by your office?

A The paper is a summary of a report. The report was submitted to the department, I would

assume. The report is what we would use. The paper given at the conference is just a paper given at a conference.

Q Fine. Let's go back to that series of questions now that I understand what you're doing.

Would your office have authorized the report summarized in the paper, specifically Exhibit 57?

MS. HERRMANN: Objection. Speculation.

A I don't know for sure, but probably so.

Q For what purpose would your office have authorized that report?

MS. HERRMANN: Same objection.

A For input to the Department of Energy regarding the overall design of the system.

Q And you see that according to the abstract, the abstract states, does it not, that a comprehensive logistics and cost analysis has been carried out to determine if there are potential benefits to the high-level waste management system for receipt rates other than the current 3,000 MTU per year design basis receipt rate. You see that?

A I see it, yes. I'm trying to figure out what the question was.
Q Simply whether you see it.
A I see it.
Q Not a hard question.
How would your office have gone about authorizing payment for this report? What would the process have been?
A Generally we request -- first we decide what we wanted done. In the case of a report like this one we would have asked them to analyze logistics and cost analyses for the system for a range of scenarios. To find that scope of work agreed to on a contractual basis, either person hours or dollar value, the contractor would execute the report, submit the report. The report would be reviewed by the Department of Energy, and then payment would be made if it was a satisfactory report.
Q Would a number of individuals have to, in the chain of command, authorize such a report?
A Generally.
Q And I take it there would be documentation