generated within the Office of Civilian Radioactive Waste Management Control, if I got the name right, and I apologize if I got it wrong. I take it there would have been documentation generated within the office relating to the proposed report setting out the reason the report was proposed, arguing why or why not the report should be conducted, and that documentation would be circulated through the appropriate individuals in the office, correct?

MS. HERRMANN: Objection. Compound.

A Correct.

Q And would there be some type of typically sign-off sheet accompanying that analysis of the need of the report where the various authorizing officials within your office would individually sign off on the proposed report and then send it to the next person up the chain of command?

A Yes. The chain might be short. May only have been one person did it but, nonetheless, there should be those documents similar to what you described.

Q Is it possible that you personally may have

fine.

Q Do you disagree with any other aspect of the statement?

A No.

Q Again I'm starting with the beginning receipt rates ranging from 1500 to 6,000, that entire statement, do you disagree with any other aspect of it?

A No.

Q But you do disagree with the statement that there is not a clearly documented rationale for 3,000 MTU per year receipt rate, correct?

A Correct.

Q Because you believe that there is, in fact, a clearly documented rationale for a 3,000 MTU per year receipt rate, correct?

A Yes.

Q And could you explain to me that rationale that you believe has been clearly documented by the department?

A There was one in the old mission plans. It basically was that the rate of 3,000 tons per year

exceeded a generation rate of a nominal 2,000 tons per year and allowed a catchup of a thousand tons per year delta. And for where the program was at that time that was sufficient, and I felt that was sufficient at that time.

Q Sufficient to do what?

A Sufficient as a design basis for the facility. I didn't want to basically put resources, inasmuch as I was involved in this, into further refinements and expenditures of money on fine-tuning when we needed to focus on do we have a site and can we ever do this.

Q And fine-tuning, for example, whether it should be higher than 3,000?

A Correct.

Q And when you just stated "allowed a catchup of a thousand tons per year delta," what did that statement refer to?

A The receipt rate of a nominal 3,000 tons per year steady state when the generation rate was approximately 2,000 tons per year. The system capacity and take-rate was exceeding the generation

rate in the nation.

Q Why was that important?

A Because we would like to catch up and, you know, remove the waste that had been accumulating at whatever the start date of the facility would be.

Q Did you consider that to be your mission under this statute, the 1982 Nuclear Waste Policy Act?

MS. HERRMANN: Objection. Vague, calls for a legal conclusion.

A Repeat the question again.

Q You stated "We would like to catch up and, you know, remove the waste that had been accumulating at whatever the start date of the facility would be." Do you recall that statement?

A Yes.

Q Why would you have liked to have caught up, as you stated in that answer?

A Because waste existed in the United States, both commercial waste and defense waste, and we were to start, either be it '98 or some other date, there would be an inventory existing, and you wanted to work off that inventory as soon as practicable.

Q Why did you want to work off that inventory of spent nuclear fuel as soon as practicable?

A Because I believe that's the intent of the act.

Q By "the act" you're referring to the Nuclear Waste Policy Act of 1982?

A Correct.

MR. CAYNE: It's 9:18. Let's take a short break.

MS. HERRMANN: Okay.

(There is a recess from the record.)

(Deposition Exhibit Barrett 58 was marked for identification and was attached to the transcript.)

Q Mr. Barrett, the court reporter has handed you a document marked for identification as Exhibit 58. It's a parametrics analysis for future program costs scenarios bearing Bates number HQR-022-0001 through 0030. On the front page it says November 5th, 1999, Stephen Goldberg with the DOE CBO staff, draft. Do you have that document before you?

A Yes.

Q What was the purpose of this statement or report?

A This was an aid used to brief various people or organizations on what the draft environmental impact statement was. I used it from time to time.

Q Can I turn your attention to page 12 under Additional Analyses.

A Yes.

Q Is it reasonably foreseeable that commercial greater than Class C waste will be delivered to and accepted for disposal in the permanent repository?

MS. HERRMANN: Objection. Foundation. Objection, calls for a legal conclusion. Objection, speculation.

A It is my understanding under CEQ guidelines for environmental impact statements these were appropriately classified as reasonably foreseeable future scenarios, and analysis would be appropriate.

Q Why do you conclude that the acceptance of greater than Class C waste would be a reasonably

foreseeable scenario?

MS. HERRMANN: Same objection.

Q Acceptance by the repository of the greater than Class C waste.

MS. HERRMANN: Same objections.

A It's my understanding that the Low-Level Waste Policy Act of 1980 requires waste to be disposed of in an NRC-licensed deep geologic. It is not appropriate for a near-surface disposal facility. The only other one I know of for ultimate disposition would be a deep one. Which Yucca Mountain, if there were appropriate authorizations made, could dispose of greater than Class C. So we did evaluate, and also there were requests from the EIS scoping that we evaluate the disposition of both what's called module one and module two.

Q What is the EIS scoping?

A EIS scoping is a necessary part of preparing an environmental impact statement, which was done before the draft environmental impact statement was prepared.

Q Could you please turn to the page, a number

reference to a variety of DOE documents. My question is do you have an understanding of the term "steady-state rate"?

A I believe so.

Q What's your understanding of that term?

A Basically constant over time.

Q I believe you testified that there is a relationship between the 3,000 MTU annual steady-state rate and either the discharge rate or generation rate. Is that correct?

A There's a difference.

Q Is there a relationship between the two?

A Discharge rate is what it is. Utilities control that. The receipt rate, which is what you call 3,000, is something that is variable, but depending upon the system we design to build, we can vary that. So there's no direct relationship between the two.

Q My understanding from your testimony -- and please correct me if I'm wrong -- was that the 3,000 MTU steady-state rate or receipt rate as you just used that term, was chosen in part because it exceeded the

discharge rate or the generation rate by utilities. Is that right?

A Correct.

Q What other factors went into choosing a 3,000 MTU receipt rate?

A The 3,000 rate that we have was established before I was ever involved in the program. It's my understanding that it was looked at then as a proper balance for total life-cycle costs as well as near-term cash flow requirements and performance. If you make the number too high, then you have -- you would quickly work off the backlog, and then you would have a lot of idle capacity. If it was too low, you would have reactors needing to put in dry storage, and 3,000, based on an early 1980s, seemed like a reasonable number to use.

Q Do you know if there were any studies that talked about the 3,000 rate being a reasonable number to use?

A I don't know of any that were done back then, but I'm told there were some done. I never had reason to ever look. There were some -- we went

through some of them here that were done in the middle eighties and some done in the early nineties that would say that you can run them at a higher rate. And you can run them at a higher rate and there are puts and takes on costs and performance.

Q And am I right in understanding that the 3,000 steady-state rate has been used as the steady-state rate in the majority of design documents for the facility that DOE will eventually use to take and emplacement spent nuclear fuel?

A Yes, it's around 3,000.

Q And am I also right in understanding that the 3,000 steady-state rate has been the rate that is used in the majority of documents issued by DOE with regard to total system life-cycle costs?

A Correct.

Q With regard to those documents, the documents issued in connection with estimating total system life-cycle costs, what is that document supposed to reflect, the TSLCC document?

A Our best estimates of what the costs would be, you know, year by year for the program. And to

determine those you would have some assumption as to what the receipt rate would be, and we used 3,000.

Q And is the receipt rate of 3,000 used because that's what your intention at the time you issued that TSLCC report, is that the intention at that time, to use that rate for whatever facility you would have running when you begin to accept spent nuclear fuel?

MS. HERRMANN: Objection. Foundation.

A At steady state, yes.

Q Do you have an understanding of what the term "waste management system" is?

A Yes.

Q What's your understanding of that term?

A That would be the transportation system to remove it from the reactors. It would be an MRS if there were to be an MRS, and it would be the repository, or repositories if we have more than one.

Q With regard to the transportation system, other than the RFP that we've discussed just a couple of hours ago, were there any other documents that talked about the acceptance rate or the physical

A The higher the rate of performance the better.

Q That doesn't answer the question of whether or not the rate --

A I couldn't understand the question. Repeat the question.

Q At least you told me that.

A All right. I thought that was your question, but try again.

Q My understanding is that one of the goals of the Civilian Radioactive Waste Management Program was to design a system that could take spent nuclear fuel at a rate that would eliminate the need for utilities to provide for additional on-site storage after January 31st, 1998. Is that correct?

A No.

Q What is not correct about that statement?

A I never considered the design of the system to solely try to avoid spent-fuel pool overflows. I tried to design the system to be as large as you could reasonably make it to avoid not only spent-fuel overflows but pool rerackings to allow shut-down

reactors to empty their sites. For all those other reasons in addition to. So the way you phrased it I don't think is correct.

Q Thank you for clarifying. It actually did clarify a misimpression I had, so I'm glad I asked the question.

And is it your testimony that prior to you actually coming to the Office of Civilian Radioactive Waste Management DOE had established that a steady-state rate of 3,000 MTUs on an annual basis would achieve all those objectives that you just specified in your prior answer?

MS. HERRMANN: Objection. Foundation.

A In a general sense, yes.

Q At any point during your tenure at OCRWM did you have a reason to disagree with that rate that was selected, the 3,000 MTU steady-state rate on an annual basis?

A Never paid much attention to it. Because all my energies were focused on trying to get a system that could run as soon as practicable.

Q But in your tenure at the program did you

ever see any evidence that would indicate that that 3,000 MTU rate was not sufficient to address all of those needs as you specified a couple of answers ago?

A I saw no reason nor saw no reports that said 3,000 was a bad choice. There were some studies done in the late eighties, also in the early nineties that, you know, it didn't say there was an obvious better number. That 2,000 was better or 4,000 was better. And 3,000 appeared to be okay. So I didn't pay much attention. So I was satisfied. It wasn't conscious per se. I saw no reason why I should change it. Let's phrase it that way.

Q And I'll take it a step further. Do you believe that the 3,000 annual steady-state rate is a reasonable rate for DOE to plan to use in terms of taking spent nuclear fuel from utilities?

A I think it's a reasonable rate. There may be better rates that if we -- if the nation gets a little clearer that we're going to really perform I think we will refine that number and we may, based on events of September 11th, maybe it will be raised.

Q And would you agree that the 3,000 annual

steady-state rate is a rate that is consistent with achieving the objectives that you enumerated earlier?

A Generally so, yes.

Q In your opinion would a steady-state rate of 2,000 MTUs on an annual basis be consistent with achieving those same objectives?

A I would think that's low.

Q Why?

A Because that's about what the generation rate is, and if we start with that, matching the generation rate at 2010 -- if we steady state at 2010, all the fuel that's in dry storage and a lot of the shut-down reactors, it will be difficult to avoid new storages or prolong decommissionings.

Q And what would your opinion be if an annual steady-state rate was chosen that was around 1,000 MTUs per year?

MS. HERRMANN: Objection. Speculation.

A For performance aspect it would be better, you know, better than none, but not as good as 2,000 and not as good as 3,000.

Q Would you believe that a steady-state

funds or is being paid on a regular basis?

A Yes.

Q Okay.

MR. TOMPKINS: I believe that's all I have. We reserve our right to reopen the deposition pending resolution of the outstanding document production issues.

MS. HERRMANN: And of course we object to that.

MR. TOMPKINS: Other than that, we're done.

(Signature having not been waived, the deposition of Lake H. Barrett was concluded at 5:21 p.m.)

ACKNOWLEDGMENT OF DEPONENT

I, Lake H. Barrett, do hereby acknowledge that I have read and examined the foregoing testimony, and the same is a true, correct and complete transcription of the testimony given by me and any corrections appear on the attached Errata sheet signed by me.

6/27/02 ____________________ [signature] ____________________

(DATE) (SIGNATURE)

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - - - x

YANKEE ATOMIC ELECTRIC : ...TIFIED COPY
COMPANY, CONNECTICUT YANKEE :
ATOMIC POWER COMPANY, MAINE :
YANKEE ATOMIC POWER COMPANY, : Case No. 98-126C,
Plaintiff, : 98-154C, 98-474C
vs. : (Senior Judge Merrow)
UNITED STATES OF AMERICA, :
Defendant. : Volume I

- - - - - - - - - - - - - - - - - - x

Washington, D.C.
Tuesday, May 14, 2002

Deposition of LAKE H. BARRETT, a witness herein, called for examination by counsel for the Plaintiffs in the above-entitled matter, pursuant to notice, the witness being duly sworn, taken at the offices of Spriggs & Hollingsworth, 1350 Eye Street, N.W., Washington, D.C., commencing at 9:30 a.m., Tuesday, May 14, 2002, and the proceedings being taken down by Stenotype by CAPPY HALLOCK, RPR-CRR, and transcribed under her direction.

CONTAINS CONFIDENTIAL INFORMATION
PURSUANT TO THE PROTECTIVE ORDER

most of the sequencing would remain the same?
A. They should be minor.
Q. So they would be substantially the same today, there might be some minor variations?
A. Correct.
Q. Putting aside those minor variations, is it your understanding that when the program starts to operate in 2010, or some other time, that this listing of allocations of oldest fuel first is going to be the actual sequence in which the Department picks up spent fuel from the various contract holders?
MS. HERRMANN: Objection.
THE WITNESS: Could I have that again?
(The record was read as requested.)
A. I doubt it.
BY MR. STOUCK:
Q. And why do you doubt it?
A. Because from a practical matter, the numbers on some of the contract holders are not an efficient size or, for example, Consolidated Edison has 2.9 tons, Dairyland 0.7 tons, and it would not be very efficient to pick up such small amounts for either the Department of Energy's contractor nor the utility itself to

prepare for shipping such small amounts, so most likely there will be some arrangement such as more efficient sizes as determined through a process yet to be worked out.

Q. When you say more efficient sizes, are you referring to fuel casks, filling up casks?

A. Correct, cask campaigns.

Q. So you are referring to filling up casks, but that's not all you are referring to?

A. Correct.

Q. So in addition to filling up casks you are referring to cask campaigns?

A. Correct.

Q. And what do you mean by cask campaigns?

A. From a practical point of view primarily for the utility, but also somewhat for the Department of Energy that you would establish, a term that's sometimes used, bite size, the campaign size of how much tonnage you would take in a campaign that would be scheduled to be consistent with the reactor's operating cycle or the situation at the contract holder which would be mutually beneficial for both parties.

Q. Okay. Could you just clarify or

for an acceptable arrangement for both the contract holders and the Department of Energy, to present that for mutual approvals.

Q. Well, for mutual approvals. What are the contractual matters that you are referring to?

MS. HERRMANN: Objection. Calls for a legal conclusion.

A. Given that the contract -- contracts exist under the statute and that there are implementing documents under the contract, I would -- it is our goal that there is an acceptable arrangement for all the parties how to work the allocations into actual shipping campaigns.

Q. And when you referred a moment or two ago to working out the most efficient system for scheduling that could be arranged -- do you recall that reference?

A. Yes.

Q. Okay. What are your expectations in the context of working out the most efficient system or an efficient system for scheduling? What are your expectations about the extent to which exchanges of allocations between or among utilities will occur?

MS. HERRMANN: Objection. Foundation. Speculation. Calls for a legal conclusion.
A. I don't -- I'm hopeful, but I don't know what the actual utility contract holders will do.
Q. Why are you hopeful?
A. From a macroscopic perspective it has always been my hope that utilities that have a lesser need earlier would exchange the appropriate remuneration or compensation with others that might have a greater need to work out the most effective national utilization of whatever capacity you were able to bring on line.
Q. And that's your hope because that would promote the most effective national utilization of the capacity? Is that why it is your hope, because it would be the most effective utilization of the capacity of a system?
A. It would be more effective than a layout like this on this table. You say the most -- it would be better.
Q. Okay, but that's a goal that the program has, is to promote effective utilization of the capacity of the system?
MS. HERRMANN: Objection. Foundation.

A. Yes.

BY MR. STOUCK:

Q. Okay.

Do you think there is any possibility that when the spent fuel acceptance program commences operations in 2010, or at some other time, that the actual sequence of pickup of spent nuclear fuel will be the sequence -- putting aside the minor variations that we referred to previously -- do you think there is any possibility that the actual sequence will be the sequence that is shown on this OFF array on Page 40?

MS. HERRMANN: Objection. Speculation.

A. Yes.

Q. You do?

A. Yes.

Q. Okay. Can you quantify the possibility?

MS. HERRMANN: Objection. Speculation.

A. No.

Q. If that sequence were to be followed in actuality, do you believe that the costs would

be greater or less than the costs of a system that includes some -- included some amount of campaign pickups?

MS. HERRMANN: Objection. Speculation.

A. Greater.

Q. Okay.

So it would be in the utility's interests to avoid that greater cost through some kind of rearrangement of the sequence; would you agree with that?

MS. HERRMANN: Objection. Foundation.

A. From a cost perspective, yes.

Q. Okay, and it would be in DOE's interest from a cost perspective to promote some rearrangement of the sequencing to be more cost-effective, right?

A. Within the extent of the law, yes.

Q. And is the reason that you believe it is possible that the actual sequence for pickup would be the sequence that is shown on Page 8 of Exhibit 40 is -- the reason that you believe that is a possibility, that contractual matters and issues and disputes on the utility side would require that that schedule be maintained if those