with the MRS concept at the time. You know, I just don't know.

Q. So your testimony is DOE did not have the capability during the 15-year period between 1983 and 1998 of developing whatever special handling procedures for failed fuel may have been necessary to commence operations and acceptance of failed fuel commencing in January 1998; is that what you're telling me?

MS. HERRMANN: Objection. That's a mischaracterization of his prior testimony.

A. I don't know what the plans were. I don't know what the intentions were because that wasn't the -- failed fuel was not standard fuel, and I don't know what the plans were.

Q. Okay. I'm not asking about plans. I'm just asking about -- plans are included in my question. Plans could have been developed to address the problem, study the problem, or if it was a problem study the issue of failed fuel and how to accept it. And whatever special handling procedures may have been or may be necessary in order to accept spent fuel, the DOE had the capability, the technical expertise of developing those special handling procedures and implementing

them by January 1998 when the acceptance of spent fuel was supposed to begin, correct?

MS. HERRMANN: Objection. Vague. Speculation.

A. In a 15-year time period, if there is a will and finances, et cetera, from the technological point of view you can develop a system to accept failed fuel in a 15-year period.

Q. I'm going to hand you what the reporter is about to mark as Exhibit 81.

(Barrett Deposition Exhibit No. 81 was marked for identification.)

BY MR. STOUCK:

Q. Let me identify this for the record. It is entitled, Transportation Business Plan, January 1986, Bates number HQR-037-0258 through 0311.

Is that the document that you have?

A. It is.

Q. Have you seen this before?

A. Yes.

Q. What is it?

A. It is Transportation Business Plan from long ago, January '86.

A. Yes.
Q. Do you consider yourself to be knowledgeable about "the schedule DOE would have followed had it begun to take SNF from purchasers by January 31, 1998 pursuant to the contract."
MS. HERRMANN: Objection. Vague.
A. I suppose I have as much knowledge as many.
Q. As many? Your last word was M-A-N-Y; is that what you said?
A. Yes.
Q. What schedule --
A. I never said I know as much as one might know. I know it from a policy point of view.
Q. Could you give testimony under oath about the schedule that DOE would have followed had it taken SNF from purchasers by January 1998?
MS. HERRMANN: Objection. Vague.
A. I will answer questions under oath, if I can.
Q. What schedule would DOE have followed had it begun to take SNF from purchasers by January 31, 1998 pursuant to this contract?
MS. HERRMANN: Objection. Foundation.

Mr. Barrett is not here as a 30(b)(6) witness.

A. We would have operated our system at our plant which was, you know, whatever the operation rate which transiented and leveled out at 3,000 metric tons per year after five years. That's what we were planning to do.

Q. That's what you would have done?

A. That's what we would have done if we could have gotten the, you know, the sites approved, et cetera.

Q. And in what sequence -- do you happen to know, can you just generally tell me a ramp-up rate up to that 3,000 ton rate that might have been realistic?

MS. HERRMANN: Objection. Foundation.

A. I don't know what system we are referring to or what time because those are changes as a function of time. So if you give us the time frame --

Q. The government has told us that you are one of the most knowledgeable people about how the schedule would have been referenced. I'm not asking about any documents. I'm asking what the schedule would have been.

You already told me it would have

leveled out at a steady state of about 3,000 tons, and I'm trying to find out your best testimony about what the ramp-up rate would have been had DOE gotten to take spent fuel by January 31, 1998.

MS. HERRMANN: Objection.

Q. If you want to answer by reference to the current program plan or some other program plan, that's fine, or if you want to answer with numbers, that's fine, or if you want to tell me you don't know, that's fine. But it says here that you are knowledgeable about this and I want to know what your answer is.

MS. HERRMANN: Objection. Foundation, speculation, and now it is vague.

A. It would have been whatever the rate was for the MRS that we could have potentially put in place in 1993 with whatever was in the reference documents then which was something like 4-6-9-12, 2,000, 3,000.

Q. And in what sequence would DOE have accepted spent fuel from the various utility contract holders had DOE begun to take SNF from purchasers by January 31, 1998?

MS. HERRMANN: Objection. Foundation. Speculation.

A. We would have -- first of all it was nonstandard fuel, and then use the oldest fuel first table we looked at earlier by the contract holders and worked out the details, or waste acceptance issues, I think, was the name we used to actually go down to shipping campaigns.

Q. When you say worked out -- so the actual sequence would not have been oldest fuel first, it would have been some adjustment or rearrangement of oldest fuel first; is that what you are telling me?

MS. HERRMANN: Objection to the extent it mischaracterizes his testimony.

A. It is my understanding that utilities did not have to automatically ship the oldest fuel first. They had allocations based on oldest fuel first. What fuel was shipped was an issue that needed to be worked out between the contract holders and the Department.

Q. And as of today -- well, would what fuel have been shipped, have been worked out in the manner you just described by January 31, 1998 if DOE had begun to take SNF by that date from the purchasers?

MS. HERRMANN: Objection. Foundation.

Speculation.
A. Yes.
Q. Do you know what the outcome of that working out of the ultimate schedule for acceptance would have been?
MS. HERRMANN: Same objections.
A. No.
Q. Thank you.
Now, if you turn to Page 65 you are again -- now see how this document works. You are again listed as one of the individuals under Interrogatory Number 65, one of the individuals "within DOE with the most knowledge of whether DOE would have given priority to purchasers with shutdown facilities" -- I'm sorry, would have given -- strike all that. The diction of this is not very good, but let me start over.
What this interrogatory says, at least according to this page is, "Identify the three individuals within DOE with the most knowledge of whether DOE would have given priority to purchasers with shutdown facilities priority in the utility queue pursuant to the Standard Contract Article VI.B.1.b."
Do you see that?

inside at Hanford?
A. Yes.
Q. Paid the fee to the government?
A. No. They paid a fee.
Q. Who did they pay the fee to?
A. The operator of the facility, which I think is U.S. Ecology
Q. Okay. Thank you.
Now, tell me what effect this litigation has had on RW's consideration of whether or not to accept GTCC wastes for disposal in the repository.
MS. HERRMANN: Objection. Vague, foundation.
And let me caution you, if this requires disclosure of communication between you and counsel you should not answer.
A. All the litigation issues have just made it very complex to make decisions that are in shades of gray such as our authority to dispose of the greater than Class C waste, as well as the financial equities between the government and the individual contract holders, so that has made it more difficult to reach closure on this matter.
Q. When you say has made it more difficult,

has this litigation caused the consideration by RW of whether or not to accept GTCC wastes for disposal in the repository to cease? Has the litigation caused consideration to essentially stop or is consideration of that matter ongoing?

A. As I said, it just makes it much more complex.

Q. Well, is consideration of disposing of GTCC waste in the repository currently ongoing within RW or has that consideration essentially stopped because of the litigation?

A. It is being addressed. It is in the FDIS, but there is very little progress I think toward resolution of the issue due to the complexities that we talked about.

Q. Which is the litigation?

A. And current litigation, possible future litigation and the whole legalities of the situation.

Q. Primarily the litigation and the legal issue of whether GTCC waste is covered or not by the contract?

MS. HERRMANN: Objection to the extent that it mischaracterizes his testimony.

Q. Is that what you are referring to?

A. And also covered by the Act.
Q. And also covered by the Act, but that's what you are referring to when you talk about complexities?
A. Those are the complexities, yes.
Q. Those are the complexities?
A. Those are the major complexities.
Q. Are there any others that have led it to be very difficult to address the matter at this time?
A. I haven't thought about it. I'm sure there are others. The state of Nevada comes to mind.
Q. But the major ones are this litigation and the legal question about whether GTCC waste is covered or not by the contract?
A. And also if we are -- if we are authorized to dispose of -- authorized under law, clearly, to dispose of highly radioactive waste.
I can argue that greater than Class C is low-level waste and not high-level waste and therefore we are not authorized to dispose of it. That's a complicated matter that is currently being litigated, and if it wasn't being litigated there would be debate amongst lawyers and

politicians if we are authorized to dispose of it or not.

Q. I understand your testimony to be that absent litigation over the question of whether GTCC should or should not be disposed of in the repository, absent that litigation, RW would be more actively and with less difficulty considering that matter; is that right?

MS. HERRMANN: Objection to the extent it mischaracterizes his testimony. Speculation.

A. We might have.

Q. Okay, then there must be some other factor other than the litigation that is inhibiting the act of consideration, and I would like to know what that factor is.

A. The authorization question, are we authorized under the law to dispose of what is essentially low-level waste in a high-level waste repository. That will be a question that will be very likely litigated independent of the current litigation.

Q. Okay. That's your view.

A. Yes.

Q. Why do you think that? Why do you think that there is some question about whether or

not GTCC is covered by the contract that is not going to be resolved in this -- I mean your distinction is between the statute and the contract; is that what you're saying?

A. Yes. It's not just a contract issue that is at issue here, it is also are we authorized to dispose of low-level waste in the high-level waste repository.

Q. Assume that that question is exactly the same question that is being litigated in this case. Just assume that. You don't have to agree with it, just assume it. Okay?

A. Go ahead.

Q. Then is litigation over that question, combined question, I'm to assume they are -- I'm telling you to assume they are the same thing. Is that the factor that is inhibiting and making more difficult RW's consideration of whether or not to put GTCC waste into the repository?

MS. HERRMANN: Speculation in all capital letters, calls for a legal conclusion, and assumes facts not in evidence.

A. I don't know. It's confusing to me.

Q. Okay. But in any event, this litigation is having some depressive effect on

RW's consideration of the matter?
MS. HERRMANN: Asked and answered about eighteen times.
A. Yes.
MR. STOUCK: Can you mark this for me, please.
(Barrett Deposition Exhibit No. 82 was marked for identification.)
(Discussion off the record.)
BY MR. STOUCK:
Q. You have been handed a document that is marked Exhibit Number 82, Mr. Barrett. This is a printout from an electronic database of a publication, at least a portion of the publication entitled Nuclear Waste News. The date is Thursday March 14, 2002.
Do you see that?
A. I see it.
Q. Do you know what that publication is?
A. I don't know.
Q. Okay. You don't know? If you read it, is that because -- is that because if you read it you don't read it in this electronic format? You don't recognize it?

beginning January 31, 1998, DOE could have readily developed a transportation cask fleet in time to commence that level of acceptance at that time?

MS. HERRMANN: Objection. Speculation.

Q. We talked about this to some extent earlier today.

A. And this is starting at what time? You said the early 1990s.

Q. There is no time frame to this question. DOE could have developed, could have deployed a transportation cask suitable to the task to the extent that task -- that casks were not already available.

A. That you had at least eight years or so, yes.

Q. And would you also agree that -- well, there was adequate time prior to -- there is adequate time from the enactment of the statute in 1983 to the planned January 1998 acceptance commencement date for DOE to have developed a transportation cask or casks for nonstandard fuel, failed fuel and GTCC wastes, obtained the necessary licenses from the NRC and procured enough such casks in time to accept these materials commencing in January of 1998?

MS. HERRMANN: Objection. Vague. Speculation.

Q. That that could have been done?

A. It could have been done.

Q. Okay.

A. It technically could have been done.

Q. Now, you again -- some of these things I know we touched on earlier, I'm just attacking it from a different angle here.

You mentioned earlier today shipping campaigns. Do you recall that?

A. Yes.

Q. Now, would you agree that there are advantages to shipping campaigns versus moving over only a small number of assemblies at a time?

A. Yes.

Q. Would you agree that one of the important advantages of shipping campaigns is that efficiencies in transportation operations tend to be realized?

MS. HERRMANN: Objection. Vague.

A. Yes.

Q. Okay, and would you agree that repetitive operations such as cask handling, loading, decontamination, receipt and turnaround

are all more efficiently accomplished per cycle in a campaign versus individual cask transport?

MS. HERRMANN: Objection. Vague, compound.

A. Yes.

Q. Okay. Good.

Now, also earlier today I believe you testified that you thought it was possible -- we looked at I think it was Page 8 from one of the ACRs which had the oldest fuel first queue, if you will. Do you recall that?

A. Yes.

Q. And the question was, do you think it's possible that when DOE commences fuel acceptance in 2010 or some other time that that queue, with minor variations that we put to one side for purposes of the earlier question and I will put aside here, did you think it was possible that that queue would be the actual sequence of pickup of spent fuel. Do you recall that?

A. Yes.

Q. And you said you thought that was possible?

A. It was possible. Unlikely.

Q. Unlikely. That would be my next

question. We are back to that now.
Now, would you agree that an acceptance sequence that strictly followed the OFF queue, if you will -- do you understand that reference?
A. Yes.
Q. -- would be economically inefficient?
MS. HERRMANN: Objection. Vague.
A. Not as economical nor efficient as other alignments might be.
Q. Okay. It would be relatively economical and efficient, relative to some other alignments.
A. Yes.
Q. Can you think of any -- do you know of any -- would there be some alignments that might be even less economically efficient than the OFF queue?
A. Well, I suppose you could make them less efficient. You could spread them out. Everybody has a right to go smaller amounts or something like that, but it's just speculative.
Q. Do you think it would make any economic sense to follow that queue for the actual sequence of pickup?
MS. HERRMANN: Objection. Vague.

A. The one that is in that table?
Q. Yes.
A. Do I think it would -- what is the question?
Q. Would it be economically sensible.
A. Yes, it could be sensible. I mean, it is not desirable, but, all things considered, if there is a strict adherence to certain interpretations of the contract, you could do it.
Q. Okay. Your answer is it would be sensible, because it might be required by the contract?
A. Yes.
Q. But that's not -- that's different from economical sense. It would be economically relatively inefficient you already testified?
A. It could be inefficient.
Q. It would be inefficient?
A. It would be inefficient.
Q. I think much earlier today we looked at the mission plan and there was an objective in the mission plan to conduct the program in a cost-effective manner; do you recall that?
A. Yes.
Q. And that is still one of the objectives

of the program?
A. Yes.
Q. What is your understanding of the relationship between the objective of economic efficiency and the fuel cost recovery nature of the contract?
MS. HERRMANN: Objection. Calls for a legal conclusion.
A. I believe it is the federal government's responsibility to prepare a cost-effective system to minimize the costs on the waste generators for societal good.
Q. Is that related to the -- do you understand the term fuel cost recovery?
MS. HERRMANN: Objection. Calls for a legal conclusion.
A. I believe I do.
Q. What is your understanding?
A. That the cost for -- the costs incurred by this program are fully paid for by the waste generators, in this case the utility contract holders and the defense activities of the Department of Energy.
Q. And is that related to what you just testified was -- I think you just testified was

Page 238

A. Right. It's moved now.
Q. All right.
MR. STOUCK: Can you mark this one, please, Number 92.
(Barrett Deposition Exhibit No. 92 was marked for identification.)
BY MR. STOUCK:
Q. Okay. This is a one-pager, Mr. Barrett. It has been marked Exhibit 92. It looks like a Memorandum of Agreement. It says, Subject: Multipurpose Canister Program, date April 30, 1996, Bates number HQR-045-2612. It has got your signature on it, and a Ms. Jill Lyte?
A. Correct.
Q. Do you recall this document?
A. Vaguely.
Q. Okay, what is it? And please review it before you answer.
A. This was when we -- we had a very bad budget year in FY96, and we were in the midst of finishing the Westinghouse design for the multipurpose canister. And we wanted to finish the design and complete the design before the design team disbanded to allow it to continue to

Page 239

be of some use in the industry.
We asked the Office of Environmental Management to try to support us with that and they agreed to do so, and this was the agreement that they provided a million dollars to us to help us finish that design.
Q. Why would they do that?
MS. HERRMANN: Objection. Speculation.
A. So they could use the technology and storage that they have. They have storage needs, and that technology would be helpful to them as well.
Q. What are their storage needs?
A. They store commercial fuel at Idaho as well as West Valley, New York and also DOE fuel in the end reactor.
Q. And the technology being developed in the MPC program could be useful to EM in connection with its responsibility for the storage of that fuel you just mentioned?
A. Correct.
Q. Okay.
MR. STOUCK: Let's quit for the day.
(Discussion off the record.)
(Thereupon, at 5:40 p.m., the taking of

Page 240

the instant deposition ceased.)

[signature]
Signature of the Witness

SUBSCRIBED AND SWORN to before me this 27 day of June, 2002

[signature]
NOTARY PUBLIC
My Commission Expires: ______________

Pat L. Austin
Notary Public, District of Columbia
My Commission Expires 05-14-2006

Page 241

UNITED STATES OF AMERICA )
STATE OF MARYLAND )

I, CAPPY HALLOCK, the reporter before whom the foregoing deposition was taken, do hereby certify that the witness whose testimony appears in the foregoing deposition was sworn by me; that said deposition is a true record of the testimony given by said witness.

I further certify that I am neither counsel for, related to, nor employed by any of the parties to the action in which this deposition was taken; and further that I am not a relative or employee of any attorney or counsel employed by the parties hereto, or financially or otherwise interested in the outcome of this action.

Cappy Hallock, RPR, CRR

My Commission expires January 1, 2005

# ERRATA SHEET FOR THE TRANSCRIPT OF:

Notice Date: May 16, 2002
Case Name: Yankee Atomic vs. United States
Case Number: 98-126C-987 4C
Dep. Date: ~~May 15, 2002~~ 5/14/02
Deponent: Lake Barrett (cont)
Place: Washington DC
Ref. No.: 4269-4

CORRECTIONS:

| Page | Line | Now Reads | Should Read | Reasons Therefore |
|---|---|---|---|---|
| 68 | 9 | the appropriate | for appropriate | ? |
| 132 | 11 | reactive | reactor | ? |
| 136 | 10 | that | what | ? |
| 141 | 13 | FDIS | FEIS | This happens several times so please fix later |
| 224 | 24 | management | package | ? |
| 225 | 17 | 97 | 07 | ? |

[signature]
Signature of Deponent

6/20/02