IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - x

YANKEE ATOMIC ELECTRIC :
COMPANY, MAINE YANKEE ATOMIC :
POWER CO., and CONNECTICUT :
YANKEE ATOMIC POWER CO., : Case No. 98-126C,
Plaintiffs, : 98-474C, 98-154C
vs. : (Senior Judge Merrow)
UNITED STATES OF AMERICA, :
Defendant. : VOLUME II

- - - - - - - - - - - - - - - - -x

Certified Copy

Washington, D.C.
Wednesday, May 15, 2002

Deposition of LAKE H. BARRETT, a witness herein, called for examination by counsel for Defendant in the above-entitled matter, pursuant to notice, the witness being previously duly sworn, taken at the offices of Spriggs & Hollingsworth, 1350 Eye Street, N.W., Washington, D.C., commencing at 9:05 a.m., Wednesday, May 15, 2002, and the proceedings being taken down by Stenotype by CAPPY HALLOCK, RPR-CRR, and transcribed under her direction.

CONTAINS CONFIDENTIAL INFORMATION
PURSUANT TO THE PROTECTIVE ORDER

Is that a fair characterization?
A. Yes.
Q. Okay. Number 1, "Granting priority can be shown to be lest costly to DOE's waste management system."
Do you believe that a shutdown utility could make that showing?
MS. HERRMANN: Objection. Speculation.
A. Possibly.
Q. Okay. Well, I mean the question is not whether this would always be true, but whether -- the question included possibly. Is it possible that a shutdown utility could make that showing? I'm not sure that "possibly" is a fair answer to that.
MS. HERRMANN: Objection. Speculation. Asked and answered.
A. What was the question?
Q. The question is could a shutdown reactor, is it possible that a shutdown reactor could show that granting priority acceptance to it would be less costly to DOE's -- would reduce the cost of the waste management system?
A. Yes.
Q. And is it possible that granting

priority acceptance -- this is Number 2 -- to a shutdown utility -- I'm paraphrasing -- could be shown to involve small enough quantities of fuel compared to the overall DOE acceptance rate so as not to jeopardize the timely removal of spent fuel from other sites. Is it possible that they could make that showing?

MS. HERRMANN: Objection. Speculation.

A. You use the word timely in an absolute sense. The answer is no.

Q. Okay. So it is your opinion that granting priority acceptance to a shutdown reactor would necessarily involve a schedule impact to some other utility or utilities? In other words, there is no play in the system. If you got priority for one, somebody else would necessarily have to move; is that your understanding?

A. Yes.

Q. And I take it you would agree that granting priority -- this is a different question -- not whether the showing could be made, but I take it you would agree that granting priority to a shutdown reactor can be shown, at least in some circumstances, to avoid the establishment of

otherwise unneeded reactor site storage facilities?

A. Yes.

MS. HERRMANN: Objection. Speculation.

Q. And Number 4, "Granting priority can be shown to be clearly cost-effective for consumers from the standpoint of timely decommissioning."

I take it you agree with that? We talked about that earlier.

MS. HERRMANN: Objection. Speculation.

A. Yes.

Q. All right. And Number 5 is an overall policy issue which I think we have also talked about. Okay.

I think we have exhausted that one, and I just have a couple more questions for you about your prior testimony and I hope we can wrap this up. So all my remaining questions, I believe, are going to concern either Exhibit Number 100 or Exhibit Number 97, which are the first two days of your testimony in this deposition, so you might want to have those handy.

Before we turn to those I do have one other question. Yesterday we talked about something, and I believe, Mr. Barrett, it concerned

schedule and would not have picked up Yankee Atomic's GTCC on the same schedule?

Do you know that the government has taken that position in this case?

MS. HERRMANN: Objection. Foundation.

A. No.

Q. But you understand the position that I just explained to you, that I just stated to you?

A. Yes.

MS. HERRMANN: Objection. Foundation.

Q. Is it your expectation that when the Department begins to accept and remove from the site Yankee Atomic's standard spent fuel, is it your expectation that the Department will not accept on the same schedule Yankee Atomic's failed fuel?

MS. HERRMANN: Objection. Foundation. Speculation.

A. Repeat the question, please.

Q. Yes.

Is it --

MR. STOUCK: Let's read it back.

(The record was read as requested.)

MS. HERRMANN: Same objections.

A. It was spent fuel and --

Q. First is standard and second is failed?

MS. HERRMANN: You can have it read again.

MR. STOUCK: Yes, read it again.

(The record was read as requested.)

A. Can you define expectation a little bit or not?

BY MR. STOUCK:

Q. Well, I will accept a definition from you if you are uncertain about the word. I mean, do you think it's going to happen that way?

MS. HERRMANN: Same objections.

A. When all is said and done, my expectation, what I really think will happen is when it moves along it will move together -- contemporary, it will all move contemporary, that's the failed fuel and the standard fuel.

Q. Now, a different question: Is it your expectation that when the Department of Energy commences the acceptance of Yankee Atomic's spent fuel, it will accept at the same time contemporaneously Yankee Atomic's GTCC and remove it away from the site?

MS. HERRMANN: Objection. Foundation. Speculation.

A. When all extraneous legal matters are finally resolved my expectation is the greater than Class C waste will go at the same time, contemporaneously, at the same time.

Q. And why is it -- let's start, take them one at a time. Why do you expect that the failed fuel, putting aside what you refer to as the extraneous matters, at the end of the day the failed fuel will go contemporaneously with the standard fuel? Why do you think that's likely to happen?

MS. HERRMANN: Foundation. Speculation.

A. Because it is my understanding that the physical configuration of the spent fuel at Yankees are somewhat similar to normal spent fuel handling, so there is none that I know of -- there are no sneak technical reasons why it could not be accepted into the system. And that, from a common sense point of view, we should resolve these, you know, other legality matters, and if you have a campaign you want to move all the fuel at once.

Q. And would you give the same answer if I asked you the same question about the basis for your expectation that GTCC would move

contemporaneously with the spent fuel?
MS. HERRMANN: Objection. Foundation. Speculation.
A. It is similar, but more complex, because there is a lot of administrative matters that have to happen regarding the authorization of greater than Class C, so it is not as simple -- you are dealing with another class of materials, but when all is said and done, at the end of the day, I believe that should go at the same time.
Q. With respect to GTCC, if I limited the question to removal from the site at the same time, then would you agree that these additional complexities that you referred to would not come into play because those complexities relate to disposal and placement?
Do you understand my question?
MS. HERRMANN: Objection.
Q. If I were to ask a different question about whether you expect the GTCC to be removed from the Yankee site --
A. By whom?
Q. By the Department of Energy, contemporaneous with the spent fuel without regard to where the GTCC goes, would you give

substantially the same answer that you gave with failed fuel? In other words, these complexities, the complexities that you referred to with respect to the GTCC, you said the bottom line was essentially the same, but there was more complexities, because it is a different class of materials.

A. Correct.

Q. My question is do those complexities concern only destination for the GTCC and emplacement in the repository or disposal in the repository, or do those complexities also bear on the question of what happens at the Yankee site and the removal of GTCC from the Yankee site?

MS. HERRMANN: Objection. Calls for a legal conclusion.

A. Those additional complexities primarily have to do with the government's authority or nonauthority and where the government is going to put it under what, legislation, et cetera. It has little to do with anything at the Yankee site.

Q. And also, just for completeness, I limited my questions at the outset to failed fuel and GTCC and the timing of their removal from the Yankee Atomic site, but if I were to ask you the

same questions about those matters with respect to Connecticut Yankee and Maine Yankee, would you give me the same answers?

MS. HERRMANN: Same objections.

A. I don't -- I knew -- I think I know more about the configurations at the Yankee Rowe site. I don't know what is being considered or I don't know enough to be as conclusive as I was about Maine Yankee or Connecticut Yankee.

Q. Okay. As you can be about Yankee Atomic?

A. Right.

Q. What is it about the configurations that you would need to know to compare? Are we talking about cask configurations, crane configurations, transportational issues or what are we talking about -- or what are you talking about?

A. The ability to handle failed fuel, does it handle like a normal fuel assembly or is it unique in 10-ton canisters which are much more complex to handle. If we have to go in and vacuum out fuel pieces from a 10-ton canister, that's a significant consideration. That's not the case at Yankee Rowe is my understanding. That may or may

not be the case at other sites.

Q. Anything else that you can think of -- if I wanted to find out if the answer you gave for Yankee Atomic also applied to Maine Yankee and Connecticut Yankee for failed fuel, what other things would I look out for to see if your answer applies there?

A. That's the only one I can think of.

Q. With respect to GTCC, likewise if I wanted to find out if your answer for Yankee Atomic applied to the other two sites, what factors would bear on whether or not the answer did apply?

A. If they have packaged it such that it is relatively standard handling, meaning like a spent fuel assembly, the same should apply at the other sites.

MR. STOUCK: Okay. Mr. Barrett, thank you for your testimony over these many days. I have no further questions. I will tell you that it has been our practice, meaning the plaintiffs in these cases -- there are some disputes between the parties that are ongoing about the production of documents, some of them are privileged, et cetera. There are some things we want from the

lookout for that.

(Thereupon, at 1:30 p.m., the taking of the instant deposition ceased.)

Signature of the Witness

SUBSCRIBED AND SWORN to before me this ______ day of 6/27, 2002.

NOTARY PUBLIC

My Commission Expires: Pat L. Austin Notary Public, District of Columbia My Commission Expires 05-14-2006

ERRATA SHEET FOR THE TRANSCRIPT OF:

Notice Date: May 16, 2002
Case Name: Yankee Atomic vs. United States
Case Number: 98-126C-987 4C
Dep. Date: May 15, 2002
Deponent: Lake Barrett (cont)
Place: Washington DC
Ref. No.: 4269-4

CORRECTIONS:

| Page | Line | Now Reads | Should Read | Reasons Therefore |
|---|---|---|---|---|
| 333 | 22 | he. | he was (add) | |
| 333 | 23 | signed | assigned him | |
| 337 | 18 | fuel | full | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

[signature]
Signature of Deponent

6/20/02
Date of Signature