# EXHIBIT 4

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - - - - - - -x
YANKEE ATOMIC ELECTRIC COMPANY :
(98-126C)(Merow, S.J.) :
CONNECTICUT YANKEE ATOMIC POWER COMPANY :
(98-154C)(Merow, S.J.) :
FLORIDA POWER & LIGHT COMPANY :
(98-483C)(Wilson, J.) :
NORTHERN STATES POWER COMPANY :
(98-484C)(Wiese,J.) :
DUKE POWER, A Division of :
DUKE ENERGY CORP. :
(98-485C)(Sypolt,J.) :
INDIANA MICHIGAN POWER COMPANY :
(98-486C)(Hodges, J.) :
SACRAMENTO MUNICIPAL UTILITY DISTRICT :
(98-488C)(Yock, S.J.) :
SOUTHERN NUCLEAR OPERATING COMPANY, :
et al. :
(98-488C)(Yock, S.J.) :
COMMONWEALTH EDISON COMPANY :
(98-621C)(Hewitt, J.) :
BOSTON EDISON COMPANY :
(99-447C)(Allegra, J.) :
GPU NUCLEAR, INCORPORATED :

CERTIFIED COPY

(00-440C)(Bush, J.) :
WISCONSIN ELECTRIC POWER COMPANY :
(00-697C)(Merow, S.J.) :
POWER AUTHORITY OF THE STATE OF NEW YORK :
(00-703C)(Damich, J.) :
OMAHA PUBLIC POWER DISTRICT :
(01-115C)(Bush, J.) :
NEBRASKA PUBLIC POWER DISTRICT :
(01-116C)(Sypolt, J.) :
TENNESSEE VALLEY AUTHORITY :
(01-249C)(Bruggink, J.) :
Plaintiffs, :
v. :Discovery
THE UNITED STATES, :Judge:
Defendant. :(Judge
- - - - - - - - - - - - - - - - - - - - -xSypolt)

McLean, Virginia
Wednesday, May 1, 2002

Deposition of RONALD A. MILNER, a witness, called for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to notice, the witness being duly sworn by CATHERINE S. BOYD, a Notary Public in and for the Commonwealth of Virginia, taken at the offices of Shaw Pittman, LLP, 1650 Tysons

Officer for the Civilian Radioactive Waste
Program.
Q. And how long have you held that
position?
A. About two and a half years.
Q. And to whom do you report?
A. Lake Barrett, who is the deputy
director.
Q. And how many people report to you as
the Chief Operating Officer?
A. I guess approximately 150 federal
staff.
Q. Are there contractors that report to
you also?
A. Not directly, but there are
contractors in the organization.
Q. Can you describe for me your duties as
the, what I'll refer to as the COO for OCRWM?
A. Okay. Basically it's to manage the
operational aspect of the program.
Q. What do you mean by operational
aspect?
Can you tell me what you mean by that
term?
A. Day-to-day operations of the program,

administrative principally.
Q. All right. When you say administrative, do you mean you're primarily involved in personnel matters, or am I misunderstanding what you mean by that term?
A. Personnel matters, contractual matters.
Q. When you say contractual matters, what do you mean by that?
A. Matters relating to our support service contracts, our contract with our M&O.
Q. What is your educational background?
A. I'm a mechanical engineer by education.
Q. Okay. From what institution did you obtain a degree?
A. University of Mississippi.
Q. And that was a Bachelor of Science Degree?
A. A Bachelors and a Masters.
Q. What year did you obtain your Bachelors Degree?
A. 1966.
Q. And in what year did you obtain your Masters Degree?

Amendment was issued?

A. I can't recall.

Q. Can I direct your attention to the last page of this exhibit, Mr. Milner?

This has printed on it the date of 8/10/99 in the lower right-hand corner.

As of that date, what was your position on this organization chart?

(The witness reviewed the document.)

THE WITNESS: I believe it was acting deputy director.

I can't recall exactly when I became Chief Operating Officer.

MR. TOMASZCZUK: Ms. Reporter, I would like marked as Milner Exhibit No. 2 a one-page document which we have downloaded from the DOE Web site, and it is entitled Appendix C, organization chart, Office of Civilian Radioactive Waste Management.

(Milner Exhibit No. 2 was marked for identification.)

BY MR. TOMASZCZUK:

Q. Are you familiar with this document, Mr. Milner?

A. Yes.
Q. All right. And does it accurately depict OCRWM's current organization?
A. Yes, it does.
Q. And you're serving as Chief Operating Officer, correct?
A. Correct.
Q. This organization chart shows that everybody reports up to you, is that fair?
A. Correct.
Q. And in that capacity, you're responsible for all of OCRWM's publications?
A. Yes.
Q. Including but not limited to the TSLCC reports and the fee adequacy reports, right?
A. Correct.
(There was a pause in the proceedings.)
BY MR. TOMASZCZUK:
Q. I understand that Mr. Barrett is going to retire.
Is that your understanding?
A. That's correct.
Q. Do you know who is going to replace him?

Page 194

Annual Capacity Report.
I can represent that I believe it's a draft document.
(Milner Exhibit No. 19 was marked for identification.)
BY MR. TOMASZCZUK:
Q. Have you seen this document before today, Mr. Milner?
A. I don't recall.
Q. My characterization of the document as a draft is, seems fair to you?
A. It appears to be, yes.
Q. Do you know whether a, an ACR was issued in final form for 1989?
A. I don't know.
Q. In June of '89, were you or personnel in your office responsible for ACRs?
A. I believe it was.
Q. Do you know who prepared this draft?
A. No, I don't.
Q. Who in your office at this time would have been working on ACRs?
A. I don't recall.
Q. Was Mr. Brownstein reporting to you at

Page 195

this time?
A. I don't recall offhand. He may have been.
Q. Sitting here today, do you recall whether there was anything about this draft that caused an ACR not to be issued in 1989 in final form?
MS. HERRMANN: Objection -- vague, foundation.
THE WITNESS: I don't recall, no.
MR. TOMASZCZUK: Let's mark as Milner 20 a November 1989 report to Congress on reassessment of the Civilian Radioactive Waste Management Program.
(Milner Exhibit No. 20 was marked for identification.)
MR. TOMASZCZUK: Actually it's six o'clock.
I propose we adjourn.
(The transcript continues on the following page.)

MS. HERRMANN: We have no problem with

Page 196

that.
MR. SHULTIS: Okay.
(Whereupon, at 6:00 p.m., the deposition was recessed, to reconvene Thursday, May 2, 2002, at 9:15 p.m.)

Ronald A. Milner

RONALD A. MILNER

SUBSCRIBED AND SWORN to before me this 24th

day of May, 2002

[signature]
NOTARY PUBLIC

My commission expires: 5/19/06

Page 197

CERTIFICATE OF NOTARY PUBLIC

I, Catherine S. Boyd, the Notary Public before whom the proceeding occurred, pages 1 through 196, do hereby certify that the witness was duly sworn, that the testimony of said witness was taken by me and thereafter reduced to this typewritten transcript under my supervision, that said transcript is a true record of the testimony given by said witness, that I am neither counsel for, related to, nor employed by any of the parties to the proceeding, and further, that I am not a relative or an employee of any attorney or counsel employed by the parties thereto, or financially or otherwise interested in the outcome of the proceeding, or any action involved therewith.

Witness my signature and seal:

CATHERINE S. BOYD
Notary Public in and for
The Commonwealth of Virginia
My commission expires:
February 28, 2006

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
- - - - - - - - - - - - - - - - - - - - - - - -x
YANKEE ATOMIC ELECTRIC COMPANY :
(98-126C)(Merow, S.J.) :
CONNECTICUT YANKEE ATOMIC POWER COMPANY :
(98-154C)(Merow, S.J.) :
FLORIDA POWER & LIGHT COMPANY :
(98-483C)(Wilson, J.) :
NORTHERN STATES POWER COMPANY :
(98-484C)(Wiese,J.) :
DUKE POWER, A Division of :
DUKE ENERGY CORP. Certified Copy :
(98-485C)(Sypolt,J.) :
INDIANA MICHIGAN POWER COMPANY :
(98-486C)(Hodges, J.) :
SACRAMENTO MUNICIPAL UTILITY DISTRICT :
(98-488C)(Yock, S.J.) :
SOUTHERN NUCLEAR OPERATING COMPANY, :
et al. :
(98-488C)(Yock, S.J.) :
COMMONWEALTH EDISON COMPANY :
(98-621C)(Hewitt, J.) :
BOSTON EDISON COMPANY :
(99-447C)(Allegra, J.) :
GPU NUCLEAR, INCORPORATED :

(00-440C) (Bush, J.) :
WISCONSIN ELECTRIC POWER COMPANY :
(00-697C) (Merow, S.J.) :
POWER AUTHORITY OF THE STATE OF NEW YORK :
(00-703C) (Damich, J.) :
OMAHA PUBLIC POWER DISTRICT :
(01-115C) (Bush, J.) :
NEBRASKA PUBLIC POWER DISTRICT :
(01-116C) (Sypolt, J.) :
TENNESSEE VALLEY AUTHORITY :
(01-249C) (Bruggink, J.) :
Plaintiffs, :
v. :Discovery
THE UNITED STATES, :Judge:
Defendant. :(Judge
- - - - - - - - - - - - - - - - - - - - -xSypolt)

McLean, Virginia
Thursday, May 2, 2002

Continued deposition of RONALD A. MILNER, a witness, recalled for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to notice, the witness being duly sworn by CATHERINE S. BOYD, a Notary Public in and for the Commonwealth of Virginia, taken at the offices of Shaw Pittman, LLP, 1650 Tysons

MR. SHULTIS: Objection. Calls for a legal conclusion.

Mr. Milner is not a 30(b)(6) witness.

THE WITNESS: At this point in time, I don't recall any I was aware of at that point in time.

BY MR. TOMASZCZUK:

Q. Isn't it true, Mr. Milner, that the DOE's intentions with respect to repository design receipt rates have stayed constant over the years at 3,000 metric tons?

MR. SHULTIS: Objection. Calls for a legal conclusion.

Mr. Milner is not a 30(b)(6) witness.

THE WITNESS: It indicates that the steady-state rate stayed at 3,000, yes.

BY MR. TOMASZCZUK:

Q. And that hasn't changed really in 16 years, has it?

MR. SHULTIS: The same objection.

THE WITNESS: Would appear not to have.

MR. TOMASZCZUK: Give me just one second.

THE WITNESS: Sure.

Mr. Milner is not a 30(b)(6) witness.
THE WITNESS: Well, again, given that they are assumptions for different cases, depending on which case was assumed, yes, it would have reflected DOE's goal.
BY MR. TOMASZCZUK:
Q. At or about this point in time, May 1989, are you aware of any documents published by DOE which would have indicated a design rate other than 3,000 metric tons for the steady-state operation?
A. No, not that I can recall.
Q. And would I be fair in assuming that if there were such documents, you would be aware of them?
A. I certainly would have hoped so.
MR. TOMASZCZUK: This could be off the record.
(A discussion was held off the record.)
BY MR. TOMASZCZUK:
Q. Mr. Milner, I would now like you to get in front of you Exhibit 20, which was the last exhibit that we marked yesterday, but we adjourned and I didn't ask you any questions

Page 402

does.
Q. It appears that these rates are based on the existence of an MRS?
A. Apparently so.
MR. TOMASZCZUK: It's 6:20.
(Whereupon, at 6:20 p.m., the deposition was recessed, to reconvene at 9:00 a.m. May 3, 2002.)

Ronald A. Milner

RONALD A. MILNER

SUBSCRIBED AND SWORN to before me this 24th

day of May, 2002.

NOTARY PUBLIC

My commission expires: 5/14/06

Page 403

CERTIFICATE OF NOTARY PUBLIC

I, Catherine S. Boyd, the Notary Public before whom the proceeding occurred, pages through , do hereby certify that the witness was duly sworn, that the testimony of said witness was taken by me and thereafter reduced to this typewritten transcript under my supervision, that said transcript is a true record of the testimony given by said witness, that I am neither counsel for, related to, nor employed by any of the parties to this proceeding, and further, that I am not a relative or an employee of any attorney or counsel employed by the parties thereto, or financially or otherwise interested in the outcome of the proceeding, or any action involved therewith.

Witness my signature and seal:

CATHERINE S. BOYD
Notary Public in and for
The Commonwealth of Virginia
My commission expires:
February 28, 2006

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - - - - - X
YANKEE ATOMIC ELECTRIC COMPANY, (98-126C) :
CONNECTICUT YANKEE ATOMIC POWER COMPANY (98-154C) :
MAINE YANKEE ATOMIC POWER COMPANY (98-474C) :
FLORIDA POWER & LIGHT COMPANY (98-483C) :
NORTHERN STATES POWER COMPANY (98-484C) :
DUKE POWER, A Division of DUKE ENERGY CORP. (98-485C) :
INDIANA MICHIGAN POWER COMPANY (98-486C) :
SACRAMENTO MUNICIPAL UTILITY DISTRICT (98-488C) :
SOUTHERN NUCLEAR OPERATING COMPANY, et al., (98-614C) :
COMMONWEALTH EDISON COMPANY (98-621C) :
BOSTON EDISON COMPANY (99-447C) :
GPU NUCLEAR, INCORPORATED (00-440C) :
WISCONSIN ELECTRIC POWER COMPANY, (00-697C) :
POWER AUTHORITY OF THE STATE OF NEW YORK (00-703C) :
OMAHA PUBLIC POWER DISTRICT (01-115C) :
NEBRASKA PUBLIC POWER DISTRICT (01-116C) :
TENNESSEE VALLEY AUTHORITY (01-249C) :
Plaintiffs, :
v. :
UNITED STATES OF AMERICA, :
Defendant. :
- - - - - - - - - - - - - - - - - - - - X

Washington, D.C.
Friday, May 3, 2002

Continued Deposition of RONALD MILNER, a witness herein, called for examination by counsel for

for such priority be deleted, that the Department had not accepted that recommendation because again it states that this type of priority is necessary to prevent reactors from waiting 20 or 30 years to be decommissioned after they finish generating electricity.

And, again, my question is, was avoiding that kind of delay a goal or objective of the Department?

MR. SHULTIS: Objection, same objection.

THE WITNESS: No, and again, my recollection of the situation is that the Department preferred not to preclude the ability to give some priority to shutdown reactors. But of course we are reading from the preamble to the rule and discussing how comments were addressed.

BY MR. NESLIN:

Q. That's correct. Did the Department have any interest in the timely decommissioning of shutdown reactors?

A. It did.

MR. SHULTIS: Same objection.

BY MR. NESLIN:

Q. That was an interest of the Department's?

A. It was an interest, yes.

Q. The Department, would it be fair to say that the Department had an objective of allowing shutdown reactors to decommission in a timely manner?

MR. SHULTIS: Same objection.

THE WITNESS: Well, again, I think it was more a case that the Department preferred not to preclude that ability.

BY MR. NESLIN:

Q. What do you mean by not preclude that ability?

A. The Department did not as I recall have an objective to give priority to shutdown reactors, it simply preferred not to preclude that ability in the future.

Q. My question isn't about asking granting priority, my question is simply did the Department have an objective of allowing shutdown reactors to decommission in a timely manner?

MR. SHULTIS: Same objection.

THE WITNESS: It did, yes.

BY MR. NESLIN:

Q. And would that remain an objective of the Department's today?

A. I believe so.

Q. If we could turn to page 16606, do you see

A. No.

Q. I thought that you testified that you also considered the potential for brokering exchanges between utilities?

A. Yeah, as a concept, yes.

Q. What do you mean, what do you mean by as a concept?

A. We were -- well, looking at the concept of was it appropriate for the Department to do that sort of thing.

Q. What was your opinion?

A. My personal opinion was that it potentially could serve a useful purpose if the utilities desired such an activity.

Q. And what do you mean by useful purpose, what would that purpose be?

A. Well, certainly one purpose could have been if one utility that was needing to build a dry storage that was farther down in the queue, and another utility that had a higher priority that either didn't at that particular time or perhaps even life of plant storage, which I don't recall anybody was that high in the queue that they had life of plant, but you could preclude the need for constructing dry storage if such an exchange were

made.

Q. And that would be beneficial to the utilities?

A. Certainly to the utility that would have had to build the dry storage.

Q. Would it also be beneficial to the program?

A. Not necessarily, no.

Q. When you refer to brokering, what do you mean by that?

A. If we had done comparisons and saw a situation where, as I just described, that occurred, I guess one concept might have been that we would contacted both utilities and inquired as to their interest in exchange and trying to bring it about.

Q. Was this concept memorialized or documented in any way?

A. Not that I recall, no.

Q. Do you recall any documents discussing how this brokering might work?

MR. SHULTIS: Objection, asked and answered.

THE WITNESS: Not that I recall other than what we just looked at.

BY MR. NESLIN:

reactor in the queue?

A. Correct. And certainly there were discussions at that point in time and at various points in time with industry representatives as to whether there was any desire on the part of the industry in general to give priority to shutdown reactors.

Q. Other than --

A. The Department raised that issue a number of times with the industry and the industry consensus always was no.

Q. By consensus, do you mean it was uniform, everyone in the industry took that position or something else?

A. Well, certainly the majority.

Q. Other than the effect on other utilities, were there other reasons that the Department would be unwilling to grant priority to a shutdown reactor?

MR. SHULTIS: Objection, Mr. Milner is not a 30(b)(6) witness.

THE WITNESS: Well, my opinion, yeah, there would be several. Well, if approval somehow adversely -- I can't necessarily think of a situation where that would occur, but if somehow approval or doing that would have adversely affected the system,

it would have been.

BY MR. NESLIN:

Q. Sitting here today can you think of a way of which approving authority to shut down a reactor would have adversely affected a system?

A. The federal system, I can not, no.

Q. Any other reasons why the Department would be unwilling to grant priority to a shutdown reactor?

MR. SHULTIS: Objection, Mr. Milner is not a 30(b)(6) witness. Calls for speculation.

THE WITNESS: I can't think of any. In my opinion, the chief one would be equity. I can't think of any others.

(Milner Exhibit No. 59 was marked for identification.)

BY MR. NESLIN:

Q. Mr. Milner, Exhibit 59 is a report by S.R. Rod, Pacific Northwest Laboratory, entitled, Cost Estimates of Operating Onsite Spent Fuel Pools After Final Reactor Shutdown.

A. Uh-huh.

Q. Now I note on page HQR-025-0904, under the distribution list, you're listed as a recipient of this report. Do you recall this report?

A. No, I don't specifically recall this

# *CERTIFICATE OF REPORTER*

*UNITED STATES OF AMERICA ) ss.:*

*COMMONWEALTH OF VIRGINIA )*

**I, CYNTHIA R. SIMMONS, RPR, CRR,** the officer before whom the foregoing deposition was taken, do hereby certify that the witness whose testimony appears in the foregoing deposition was duly sworn by me; that the testimony of said witness was taken by me to the best of my ability and thereafter reduced to typewriting under my direction; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this deposition was taken, and further that I am not a relative or employee of any attorney or counsel employed by the parties thereto, nor financially or otherwise interested in the outcome of the action.

*Notary Public in and for*

*the Commonwealth of Virginia*

*My Commission expires: 11/30/2004*