IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - - - - - -)
YANKEE ATOMIC ELECTRIC COMPANY )
(98-126C)(Merow, S.J.)
CONNECTICUT YANKEE ATOMIC POWER )
COMPANY )
(98-154C)(Merow, S.J.) ) Volume I
MAINE YANKEE ATOMIC POWER COMPANY) Washington, D.C.
(98-474C)(Merow, S.J.) ) Tuesday
Plaintiffs, ) May 7, 2002
v. )
THE UNITED STATES, )
Defendant. )
- - - - - - - - - - - - - - - - - - - - -)

CERTIFIED COPY

Deposition of RONALD A. MILNER, a witness herein, called for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to agreement, the witness being duly sworn by CHERYL A. LORD, a Notary Public in and for the District of Columbia, taken at the offices of SPRIGGS & HOLLINGSWORTH, 1350 I Street, N.W., Washington, D.C., at 3:48 p.m., Tuesday, May 7, 2002, and the proceedings being taken down by Stenotype by CHERYL A. LORD, RPR, CRR, and transcribed under her direction.

Q. That were not rail-accessible?
A. That were not rail-capable, and I may be wrong.
Q. So an approximation is ten?
A. It's not 50-50.
Q. Right. So about ten, 15 percent are not rail, approximate?
A. That's my very general recollection, yeah.
Q. Okay. I recognize it's kind of a -- a rough approximation.
Is the department of energy planning to or intending to leave failed fuel at the utility reactor sites there indefinitely?
MR. SHULTIS: Objection, calls for a legal conclusion. Also Mr. Milner is not a 30(b)(6) witness.
A. In my opinion, the department does not plan to leave it there definitely.
BY MR. SKALABAN:
Q. Is there any -- well, actually, in your opinion, that wouldn't be a good policy, would it?
A. Not in my opinion.
MR. SHULTIS: Same objection.
BY MR. SKALABAN:
Q. In actuality, failed fuel is moved in this

speculation.
A. I'm certainly not an expert in that area, but I don't know of any.
BY MR. SKALABAN:
Q. And having worked in the office of storage and transportation in OCRWM and now as its chief operating officer, have you ever heard anyone express the opinion that within OCRWM that failed fuel couldn't be moved or would be technically infeasible to move?
A. No.
Q. Are you aware of any current OCRWM plans to defer the acceptance of failed fuel?
MR. SHULTIS: Objection, calls for a legal conclusion.
A. I guess my understanding of the current situation -- and I think that's provided for under the standard contract -- that the failed fuel is back further in the queue.
BY MR. SKALABAN:
Q. Okay. Maybe we can take a look at that. If you could please take out Milner Exhibit 3. And in particular, article six on Milner Exhibit 3, criteria for disposal, page 16602, if you could take a look at article 6 A, 2 B.

Page 42

fuel for purposes of the schedule.

BY MR. SKALABAN:

Q. Whether it would be technically feasible to accept that spent fuel?

A. On the currently agreed-to schedule.

Q. Do you have an understanding of what would happen if the department thought it wasn't technically feasible to do it at that point in time on the currently agreed-to schedule?

MR. SHULTIS: Objection, vague, calls for a legal conclusion. Mr. Milner is not a 30(b)(6) witness.

A. I guess in my opinion if the department determined that it wasn't technically feasible on the schedule and since we've already stated that we would accept it, it would move back in the queue.

BY MR. SKALABAN:

Q. Well, does this read to you more like just a basic operational provision, whereas the department is going to look at the individual case, if it can't accommodate it at that time, it's going to move it back a little bit?

A. That's the way I would read it.

MR. SHULTIS: Asked and answered.

Page 43

BY MR. SKALABAN:

Q. This doesn't suggest to you that failed fuel is going to be put back years later in the queue, does it?

MR. SHULTIS: Objection, asked and answered, calls for a legal conclusion.

A. I couldn't say on that. It would depend on the nature of the fuel.

BY MR. SKALABAN:

Q. Well, assuming that there was an NRC-licensed container for that failed fuel, would the department then accept it upon the currently agreed schedule?

MR. SHULTIS: Objection, calls for speculation, asks for a legal conclusion.

A. I guess in my opinion, if for that specific failed fuel, if there were an NRC-certified container, the NRC said, yep, that particular fuel is okay to move in that container, then, yes.

There's all kinds of failed fuel. You can have a fuel rod that goes -- the cladding is slightly unzipped, or it can have it totally failed and a bunch of pellets laying at the bottom of the pool. That's the extreme case, of

Page 44

course.

BY MR. SKALABAN:

Q. And in the extreme case, do you know whether or not the technology has been developed to put that into a safe, licensed container?

MR. SHULTIS: Objection, calls for a legal conclusion.

A. I don't know. That would be a utility operation responsibility in any event.

BY MR. SKALABAN:

Q. But it's possible that that kind of situation would be dealt with?

A. As an engineer, I like to think that most things are technically feasible.

Q. And you have no reason to believe that it wouldn't be technically feasible to develop a safe, NRC-licensed container to handle that extreme situation you posited?

MR. SHULTIS: Objection, calls for a legal conclusion.

A. I can't think of any.

MR. SKALABAN: Can we go off the record a

Page 45

second?

(Whereupon, at 5:08 p.m., the taking of the instant deposition adjourned.)

Ronald A. Milner

Signature of the Witness

SUBSCRIBED AND SWORN to before me this 24th day of May, 20 02.

Pat L. Austin

Notary Public

My Commission Expires: 5/14/06

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - - - - - - -)
YANKEE ATOMIC ELECTRIC COMPANY )
(98-126C)(Merow, S.J.) )
CONNECTICUT YANKEE ATOMIC POWER )
COMPANY ) Volume II
(98-154C)(Merow, S.J.) ) Washington, D.C.
MAINE YANKEE ATOMIC POWER COMPANY) Wednesday
(98-474C)(Merow, S.J.) ) May 8, 2002
Plaintiffs, )
v. CERTIFIED COPY
THE UNITED STATES, )
Defendant. )
- - - - - - - - - - - - - - - - - - - - - -)

Continued Deposition of RONALD A. MILNER, a witness herein, called for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to agreement, the witness being duly sworn by CHERYL A. LORD, a Notary Public in and for the District of Columbia, taken at the offices of SPRIGGS & HOLLINGSWORTH, 1350 I Street, N.W., Washington, D.C., at 9:20 a.m., Wednesday, May 8, 2002, and the proceedings being taken down by Stenotype by CHERYL A. LORD, RPR, CRR, and transcribed under her direction.

Q. And I believe you testified earlier that that was -- even though the MPC program had been canceled, that that was a positive that came out of it, is that industry did look and develop this technology?

A. In my opinion, that was a positive, yeah.

Q. And I mean, if it's not going to be compatible with the waste management system that RW is developing, then that wouldn't be a positive, would it?

A. That would be a negative. That's right.

Q. And so I mean as you sit here today, are you aware of any DOE plans to cut off that kind of technology from the system and not integrate it into the system?

MR. SHULTIS: Objection, asked and answered.

A. I think the department is certainly considering that it may have to open those canisters.

BY MR. SKALABAN:

Q. So at this point in time, there's a possibility in your mind that the DOE is not going to integrate multipurpose canisters into its system?

A. I think that's a mischaracterization. We're certainly going to be able to integrate and

handle multipurpose canisters. The decision as to whether or not that canister gets disposed of in the repository is not the department's decision. That's the Nuclear Regulatory Commission's decision.

Q. I see. Again, I'm not trying to mischaracterize. I'm trying to understand.

A. Yeah.

Q. And again -- so if I understand correctly, I mean, it's your understanding, I mean, as COO of OCRWM, that the system is going to accept those kind of canisters.

It's just a matter of whether or not for disposal the NRC will let you dispose of them as is or in an overpack, I guess?

A. Correct.

Q. You're not planning to go just cut that technology off and kind of leave the utilities hanging so to speak?

A. No.

MR. SKALABAN: I'd like to mark as Milner Exhibit 96 the 1992 annual capacity report.

BY MR. SKALABAN:

Q. And Mr. Milner, if you can look at this, and also Milner 51, which is the 1995 annual capacity report, and Milner 42. So the numbers are 42, 51,

and 96.

(Milner Exhibit No.96
was marked for
identification.)

BY MR. SKALABAN:

Q. And Mr. Milner, before we start on these documents, I want to ask you a followup about what we just talked about. And I understand your testimony to be it's not the department's intent to not accept this kind of multipurpose canister technology that's being implemented by utilities.

It plans to accept those kind of waste packages?

A. That's correct.

MR. SHULTIS: Objection, calls for a legal conclusion.

BY MR. SKALABAN:

Q. And if you weren't going to do that, that would potentially create some very serious problems for the industry, wouldn't it?

MR. SHULTIS: Objection, calls for speculation.

A. If we were not going to accept multipurpose canisters, I think it would certainly cause some problems for the utilities. They would

Q. So if -- when the department starts performing presumably in 2010, if there's no alternative disposal site proposed and approved by the commission, it's going to consider taking GTCC waste in your opinion?

MR. SHULTIS: Objection, calls for a legal conclusion, asked and answered.

A. Well, let me go to the matter of timing again.

To me, you seem to be inferring that when we begin accepting waste in the year 2010 that you can infer from the NRC regulation that at that time we'd begin accepting GTCC, and I'm saying in my opinion I don't think you can infer that.

By the same token, there's certainly not been any discussion or intent that GTCC would sit at a reactor site for a hundred years either. The department has simply not addressed that. This program has certainly not addressed that at this point.

BY MR. SKALABAN:

Q. As a matter of policy, wouldn't it be desirable to see that the GTCC waste goes somewhere when the department begins performing, that it goes either to the repository, or alternatively, if an

alternative disposal site is developed, that it would go there?

MR. SHULTIS: Objection, vague, calls for speculation.

A. In my personal opinion, I think there should be an agreed-upon path forward for the disposal of GTCC. Again, my personal opinion, I think it would not be good to leave it sitting at the reactor site or any site for any length of time, any significant length of time.

BY MR. SKALABAN:

Q. I mean, that would be a bad policy, wouldn't it, to leave GTCC waste at reactor sites for an extended period of time even when all the -- even when the rest of this -- well, let me rephrase.

It would be bad policy to leave GTCC waste at reactor sites for an extended period of time if the department has otherwise picked up all the spent fuel from the site?

MR. SHULTIS: Objection, mischaracterizes prior testimony.

BY MR. SKALABAN:

Q. Do you agree with that?

A. My personal opinion, in this mechanical engineer's opinion, I think it would be bad policy to

leave GTCC sit at a reactor site long after all of the spent fuel has been removed from that reactor site.

MR. SKALABAN: Off the record.

(Recess.)

MR. SKALABAN: Back on the record.

BY MR. SKALABAN:

Q. We were just looking at the definition of -- standard contract of high-level waste, and in particular the provision about other highly radioactive material that the commission consistent with existing law determines by rule requires permanent isolation.

Would you agree that there's some ambiguity in the application of that definition of high-level waste when it's applied to the NRC regulation that we've just been looking at, which requires disposal in a geologic repository in the absence of an alternative?

MR. SHULTIS: Objection, calls for a legal conclusion, asks for speculation.

A. I guess it's my understanding that the NRC has not determined that GTCC requires disposal in the Yucca Mountain repository.

BY MR. SKALABAN:

for disposal, you've created a fairly large secondary waste stream to deal with canisters.

Q. Any other disadvantages that you can think of?

A. Not offhand, no.

Q. And at this point, if I understand -- again I don't want to -- I want to make sure I'm correctly testifying -- or correctly representing your prior testimony -- at least currently the department's plans are to accept canister systems and to dispose of them if possible?

A. Certainly the department plans to accept canister systems. The department certainly hopes to be able to dispose of those. Obviously, we would prefer not to have to open them and create another waste stream.

MR. SKALABAN: Let me go ahead and mark this. I believe we're on Exhibit 102; is that correct?

MR. SHULTIS: 103.

MR. SKALABAN: Thanks.

(Milner Exhibit No. 103 was marked for identification.)

BY MR. SKALABAN:

Q. 103 is a memo from Mr. Ronald Milner dated March 8, 1994, to a series of people listed on a distribution list, and it contains an attachment. And the subject of the memo is, modification of the CRWMS program baseline to a multipurpose canister-based system.

Are you familiar with this document, Mr. Milner?

A. I am, yes.

Q. What was the purpose of this document?

A. Essentially, as it's stated here, that this was advising staff within the program that the director of the program had approved a change to the baseline to incorporate multipurpose canisters into the baseline.

Q. And what does that mean, to be incorporated into the baseline?

A. That means that essentially that we expect and would accept canisters into the system. That was part of the operation that we envisioned.

Q. Was the intent of this at this time to actually furnish multipurpose canisters to all of the utilities?

A. To the best of my recollection, time frames are unclear. Certainly at one point, which

would be this approximate time frame, the department gave consideration to furnishing multipurpose canisters to utilities as a potential means to mitigate any delays. Whether it was actually this exact time frame, I can't recall.

Certainly what this baseline change is dealing with is not the provision of canisters to anyone. It's simply a change in the baseline so that as part of the design process, designers will begin to take into account multipurpose canisters in the design of the system.

Q. And is that baseline still in effect?

A. I believe it is.

MR. SKALABAN: If I could mark now as Exhibit 104.

(Milner Exhibit No. 104 was marked for identification.)

BY MR. SKALABAN:

Q. Can you tell me what this -- and just for the record, 104 is a memo, although I will indicate there's no approval signature on the memo, but it appears to be a memo from Mr. Milner to Daniel Dreyfus, the director of OCRWM.

Do you recall this memo?

A. I do vaguely, yes.
Q. Did you send it Mr. Dreyfus?
A. My recollection is that I did.
Q. And what was the purpose of the memo?
A. Essentially to get the formal approval of the director to terminate funding for the MPC development program.
Q. And was this in response to Congressional appropriations?
A. It was.
Q. So the effect of this memorandum is that the department was no longer going to directly fund the development of MPCs?
A. Correct.
Q. Now, the second page, it says that the -- at the top: The technical and operational objectives and advantages of standard canistered SNF defined in the attached MPC approval memo are still applicable.
Recognizing that I don't have the attached memo, but at that time, do you agree with that statement that the general -- or do you agree with that generally that technical and operational objectives and advantages of standard canister SNF would still be applicable?
A. Yeah, I do.

Q. And it says at the very bottom: The program will continue actions that are necessary to encourage private industry development and utilization of casks, slash, canister technologies that provide the technical and operational objectives and advantages that were anticipated with the MPC.

Do you see that?

A. Yes.

Q. And that was your understanding of the program -- of a program goal at that time?

A. Yes.

Q. And to this day, does the program -- is -- are -- excuse me. Scratch that.

To this date, is the department still encouraging the development and utilization of cask/canister technologies?

MR. SHULTIS: Objection. Mr. Milner is not a 30(b)(6) witness.

A. I believe it is. I guess I would add that at least in my opinion the work that DOE had done on MPC technology development I think provided the seed and the impetus which ultimately resulted in at least a couple of canister systems being so far certified for storage and transportation.

BY MR. SKALABAN:

Q. Such as some of the NAC systems?
A. Yeah.
Q. And that's a positive development?
A. It is.
MR. SKALABAN: I'd like to mark defendant's proposed stipulation of fact as Exhibit 105.
(Milner Exhibit No. 105 was marked for identification.)
BY MR. SKALABAN:
Q. I'm going to represent to you, Mr. Milner, that this is the government's proposed statements of fact in the Yankee Atomic litigation.
Do you -- have you ever reviewed or seen this document?
A. I don't recall that I did, no.
Q. Do you recall or have you reviewed any pleadings in this litigation or filings in this litigation other than interrogatories that we talked about yesterday?
A. I have not.
Q. And I'm sorry. Let me clarify my question also a little bit: What I'm saying, in this litigation, I'm not limiting it just to Yankee

your understanding, are those canister systems that are an outgrowth of what we've just been talking about, the multipurpose canister program that DOE was looking at?

A. Actually, I'm not familiar with the designation UMS. Certainly the NAC MPC is -- my understanding suggests a canister system.

Q. Okay. So you're -- just with respect to the NAC UMS, you're just not sure if that is a multipurpose canister-type system?

A. Yes.

Q. Now, here the assertion is made that it is a multipurpose element sealed canister.

Does that suggest to you that it's a canister-type system?

I'm talking about the Maine Yankee part.

A. Yeah. It suggests that certainly. I've simply indicated I had not heard the term UMS before.

Q. Now, part 114, can you take a look at that paragraph.

(Pause.)

BY MR. SKALABAN:

Q. Do you agree with that?

MR. SHULTIS: Objection, calls for a legal conclusion.

A. To the best of my recollection, there is no provision in the contract that requires disposal of a canister.

BY MR. SKALABAN:

Q. Is there anything in the contract to your recollection that excludes acceptance of a canister?

MR. SHULTIS: Same objection.

A. In my recollection, nothing excludes it. That's my opinion.

BY MR. SKALABAN:

Q. So is the contract kind of open on the issue of whether or not a canister has to be accepted?

MR. SHULTIS: Objection, calls for a legal conclusion, asked and answered.

A. You know, in my opinion -- well, in fact, when the contract was written and executed, there were no such things as multipurpose canisters, so I would have been surprised if they'd been referenced in the contract in one way or another.

BY MR. SKALABAN:

Q. Can you take a look at proposed finding of fact 145, which is on page 70 of this document.

Mr. Milner, what I'd like to ask you first is, as a general matter, do you think it's an

Q. If I could call to your attention Milner 18.

For the record this is the draft 1988 mission plan amendment.

If you could take a look at page 16. In the section 2.24, transportation, in the second paragraph under that heading in the second sentence it says: The casks to be developed for shipments from reactors will differ from the casks currently used for spent fuel shipments in that they will have considerably greater capacities.

Do you see that?

A. I do.

Q. Does that reflect the department's intent at the time to either directly develop or encourage the development of larger-capacity casks?

MR. SHULTIS: Objection. The document speaks for itself.

A. I believe at that point in time, the department was involved in development effort to develop higher-capacity casks.

BY MR. SKALABAN:

Q. So that was -- the department was intending to use greater-capacity casks in its program?

A. The department certainly had an objective to utilize higher-capacity casks.

Q. And it still has that objective today?

A. Certainly.

Q. What are the reasons for that?

A. Utilization of higher-capacity casks, you make less shipments.

Q. And so it's more cost-effective?

A. Yes.

Q. And there's less repetitive visits to individual utility sites?

A. Correct.

Q. What's the estimated average turnaround time for one rail cask trip to a reactor to a repository?

A. I don't recall.

Q. Would a month sound right, or is it longer than that?

A. I guess to me a month would be to the best of my recollection. It may be a little on the high side, but I really don't recall.

Q. You're thinking it could be a quicker turnaround time from a trip from the repository to a site and like a complete round-trip?

A. My recollection is, the estimate is a

little bit less than that, but again I really don't recall.
Q. If I wanted to find out the answer to that question, who would I ask in the department?
A. Well, I believe that the estimates of turnaround times and so forth are embodied somewhere in the TSLCC analysis. Whether it's specifically stated in the published report, I don't recall. The person responsible for the TSLCC analysis is currently the acting director of the -- I forget what we call it now -- acceptance transportation and integration office.
Q. And who is that?
A. That's Jeff Williams.
Q. Does the department anticipate any problems handling higher burnup fuel?
What I mean by that is fuel --
A. I understand the term higher burnup, yeah.
MR. SHULTIS: Objection, vague.
A. I guess I'm vaguely aware that somebody has raised the question as to whether or not there would be any difficulty in handling higher burnup fuel. I don't recall any specifics or any specific concern.
BY MR. SKALABAN:

capacity report.

I'd like to call your attention to the -- inside the first page, there's a letter from Ben Rusche, or a statement signed by Mr. Rusche.

Do you see that there's a statement there where Mr. Rusche says: Even more importantly, comma, it activates a mechanism through which contract holders can express their views on how the waste management system can achieve maximum efficiency while assuring equity among the parties?

What did Mr. Rusche mean to your knowledge about achieving maximum efficiency?

MR. SHULTIS: Objection, calls for a legal conclusion, calls for speculation.

A. I don't know what specifically what Mr. Rusche was referring to. I can form an opinion in my own mind at this point in time reading that that the start of issuing this document indicated to the utilities at that time what the capacity in the rankings plans were, and that could be the basis for comment on how efficiencies might be improved

BY MR. SKALABAN:

Q. Has it been the objective of OCRWM to operate the waste management system in a way that can achieve maximum efficiency?