activated metal question.

If we have not solved it by then, then utilities are then storing the activated metal and they're not storing spent fuel any longer.

I think that would be an unreasonable or an untenable situation, that we should have been able to solve the problem by then, such that -- particularly a decommissioned utility could then finally close out as opposed to having to -- to store this Greater-Than-Class C activated metal.

Q So it's important for the Department to have a solution in place by the time the nuclear -- by the time the spent fuel is being removed from the site -- a solution for the GTCC waste?

MS. HERRMANN: Objection, foundation, vague. Go ahead.

THE WITNESS: I think it's -- I think it's important, yes.

BY MR. SKALABAN:

Q And it's important -- tell me the reasons why you think that's important.

MS. HERRMANN: Asked and answered.

THE WITNESS: Well, first of all, the amount of Greater-Than-Class C activated metals compared to spent nuclear fuel is small. So

although you could disagree with this, the impact of the utility storing that while they have to store their spent fuel is smaller than the impact of having to store the spent fuel.

So given that situation, storing the activated metal while they store the spent fuel, is not an unreasonable situation in -- from my point of view.

Once the spent fuel is gone, though, then you've -- I think that creates a problem. The Public Law 99-0240 was amended in 1985, an estimate of the opening of the repository is approximately 2015. If we've not come up with some kind of answer for that by 2015, I just think that leaves the Department in an untenable situation.

I don't know how you explain to anybody why they still have to store their waste at that point.

BY MR. SKALABAN:

Q So the urgency to have an off-site -- when I say off-site, I mean off-utility site, so the urgency to have an off-site -- I'm sorry. Let me start again.

So the urgency to have an off-site option available becomes much greater once the spent fuel

is being removed from the utility reactor sites?

MS. HERRMANN: Objection, mischaracterizes the prior testimony.

THE WITNESS: Yes, once the fuel is left, the urgency would increase.

BY MR. SKALABAN:

Q And is it important to have an off-site option available once the spent fuel has left the utility site in order to allow for timely decommissioning of the facility?

MS. HERRMANN: Objection, foundation, vague.

THE WITNESS: Yes. It's certainly important to the utilities, but I think in terms of DOE providing a solution to this problem, it's also important.

BY MR. SKALABAN:

Q So from a policy perspective, in your view, it's important to have an off-site option available once the spent fuel is removed so reactors can complete their decommissioning?

MS. HERRMANN: Objection, foundation, vague.

THE WITNESS: I don't know from a policy point of view. I mean, to have a policy that -- to

which says in the absence of specific requirements, in this part.

A Yes.

Q Is it your understanding that GTCC waste must be disposed of in a geologic repository unless proposals -- unless a proposal for disposal of such waste in a disposal site licensed by the NRC is approved by the NRC?

MS. HERRMANN: Objection, calls for a legal conclusion.

THE WITNESS: Yes.

BY MR. SKALABAN:

Q What's your understanding of the timing of that? When is -- when must the GTCC go into a geologic repository?

MS. HERRMANN: Objection, calls for a legal conclusion, foundation, speculation.

THE WITNESS: I don't know.

BY MR. SKALABAN:

Q Take a look at Bates page HQR092-0052, the very last page, attachment 3.

In the very last sentence, it says DOE did not meet its commitment to begin accepting GTCC waste for storage by February 1989.

Do you agree with that statement?

A Yes.
Q What was the purpose of offering, putting together this issue paper?
MS. HERRMANN: Objection, asked and answered.
BY MR. SKALABAN:
Q What was it used for?
MS. HERRMANN: Same objections, speculation.
THE WITNESS: I would -- I wrote this issue paper to give my management information on what the Greater-Than-Class C waste was and what the issues surrounding it were. I do not know what they used it for.
BY MR. SKALABAN:
Q Now, was there a specific question or -- a specific question or event that was on the table that caused you to draft this issue paper, this Exhibit 1?
A I don't recall. Typically, if there's a specific question or issue, I would have included that in the first couple of paragraphs because that would have been the genesis of the issue paper. I didn't. It's more of a general information paper.
So I don't know -- I don't recall the

from that point of view.

Q So the -- in other words, the waste form is the same as material that -- I'm sorry. Let me ask a more precise question, and let me start over.

The activated metal, the nuclear utility activated metal GTCC is the same material that has already been analyzed in the repository performance models?

A Yes.

Q So assuming that material gets licensed to be put into the repository, it would be, presumably, easy to get the same material, the GTCC waste, also licensed for the repository?

MS. HERRMANN: Objection, speculation.

THE WITNESS: I was not addressing licensing issues. What I was saying is if you can dispose of spent nuclear fuel in the repository from a technical performance basis, then you can also dispose of activated metal because spent nuclear fuel is activated metal plus fuel.

So one is a component of the other. Therefore, if it can perform for one, it will perform for both because they're the same thing.

BY MR. SKALABAN:

Q Did you give consideration to licensing?

I understand what you were saying -- the answer you just gave me, but did you also give consideration to licensing -- getting licenses for activated metals and spent fuel, presumably it would be easier to -- or easy to get licensing for activated metal as GTCC?

A I wasn't discussing that in this particular paragraph, but I -- I agree with that basic statement, that I don't foresee a licensing issue. If the NRC was going to issue a license for the one, I don't know.

From a performance standpoint in terms of how the metal's going to perform in the repository, I would be surprised if they would have an objection to it on that basis.

Q Because they're one and the same?

A Yes.

Q You go on to say the additional volume is small to insignificant when compared to the volume of SNF and HLW planned for the repository.

Why did you include that -- first of all, let me ask you this: The additional volume you're referring to, the additional volume of material that is nuclear utility activated metal, that would be included into the repository?

A Yes.

Q And why did you include this statement that the volume is small to insignificant when compared to the volume of SNF and HLW planned for the repository?

A I included that to point out that it would not be a major undertaking and that it would not significantly affect the planning for the repository.

Q And was it your understanding that the additional volume required to add the nuclear utility activated metal GTCC in the repository would not create a capacity problem at the repository?

MS. HERRMANN: Objection, speculation.

THE WITNESS: That's correct.

BY MR. SKALABAN:

Q Now, Option Number 4, this is an evaluation of other existing disposal facilities that are currently in existence that are used to disposal of waste forms that are greater than low-level waste; is that right? Or if I'm wrong, can you correct what I just said?

A Well, I list them out, I said evaluation of other existing disposal facilities. It would

estimates. It also gave estimates over time periods.

And this, as far as I can tell by glancing at this document, I can't tell over what time period or over what part of the report they took that number from. And I also don't recall what ACA stands for. So I really don't know why they picked that number.

MS. HERRMANN: Off the record.

(Whereupon, at 5:15 p.m., the taking of the instant deposition adjourned.)

Signature of the Witness

SUBSCRIBED AND SWORN TO before me this 9 day of July, 2002.

NOTARY PUBIC

My commission expires: 02/11/05

ER. TA SHEET FOR THE TRANSCRII OF:

Notice Date: June 17, 2002
Case Name: Yankee Atomic vs. United States
Case Number: 98-126C-987 4C
Dep. Date: June 13, 2002
Deponent: Robert Campbell
Place: Washington DC
Ref. No.: 4269-46

CORRECTIONS:

| Page | Line | Now Reads | Should Read | Reasons Therefore |
|---|---|---|---|---|
| 18 | 8 | Bernario | Bernero | typo |
| 18 | 11 | Bernario | Bernero | typo |
| 32 | 16 | Hyzinga | Huizenga | typo |
| 32 | 20 | Hyzinga | Huizenga | typo |
| 35 | 3 | land | landlord | unknown |
| 39 | 10 | Belecan | Belencan | typo |
| 54 | 5 | Hansson | Hanson | typo |
| 54 | 6 | Arenaze | Arenaz | typo |
| 54 | 8 | Lenard | Leonard | typo |
| 54 | 10 | Orbin | Orban | typo |
| 54 | 12 | Orbin | Orban | typo |
| 54 | 16 | Orbin | Orban | typo |
| 54 | 25 | Arenaze | Arenaz | typo |
| 55 | 1 | Orbin | Orban | typo |

Robert A. Campbell
Signature of Deponent

July 9, 2002

ER. .TA SHEET FOR THE TRANSCRI. OF:

Notice Date: June 17, 2002
Case Name: Yankee Atomic vs. United States
Case Number: 98-126C-987 4C
Dep. Date: June 13, 2002
Deponent: Robert Campbell
Place: Washington DC
Ref. No.: 4269-46

CORRECTIONS:

| Page | Line | Now Reads | Should Read | Reasons Therefore |
|---|---|---|---|---|
| 55 | 4 | Hensson | Henson | typo |
| 55 | 9 | Acenaze | Arenaz | typo |
| 55 | 21 | Hensson | Henson | typo |
| 59 | 13 | exposure | closure | unknown |
| 49 | 23 | 1995 | 1985 | typo |
| 131 | 12 | f | if | typo |
| 165 | 6 | is not | is | unknown |
| 207 | 2 | not a test site | at Nevada Test Site | unknown |
| 212 | 21 | without | with | unknown. |
| 48 | 9-10 | and the stain | in the steel, | makes no sense as written |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

Robert A. Campbell
Signature of Deponent

July 9, 2002
Date of Signature

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

------------------------------------------X

YANKEE ATOMIC ELECTRIC COMPANY, CONNECTICUT YANKEE ATOMIC POWER COMPANY, MAINE YANKEE ATOMIC POWER COMPANY,

Plaintiffs,

vs.

UNITED STATES OF AMERICA,

Defendant.

CASE NO. 98-126C 98-154C 98-474C

------------------------------------------X

CERTIFIED COPY

Washington, D.C.

Friday, June 14, 2002

Continued Deposition of ROBERT ALLEN CAMPBELL, a witness herein, called for examination by counsel for the Plaintiffs in the above-entitled matter, pursuant to recess, the witness having been previously duly sworn, taken at the offices of Spriggs & Hollingsworth, 1350 I Street, N.W., Suite 1010, Washington, D.C, at 9:33 a.m, on Friday, June 14, 2002, and the proceedings being taken down by Stenotype by CINDY L. SEBO, and transcribed under her direction.

regulatory mission then is hampered if it -- if there's no ability to dispose of GTCC waste?

MS. HERRMANN: Objection, foundation, speculation, calls for a legal conclusion.

THE WITNESS: The particular things I had stated are hampered. Their overall -- anywhere where disposal doesn't affect their regulatory framework, no, it doesn't hamper them. It is only in the areas where disposal plays a role.

BY MR. SKALABAN:

Q Now, in addition to public safety and health and properly maintaining their regulatory framework, would you also agree it's undesirable, just from a sound nuclear management perspective, if waste that needs a home doesn't have a home, that is unsound nuclear management practice?

MS. HERRMANN: Objection, vague, foundation, speculation.

THE WITNESS: I believe the regulatory framework is the nuclear management foundation, so I don't think my answer changes.

BY MR. SKALABAN:

Q Well, how about promoting timely decommissioning, is that also a factor why the existing status quo is not an acceptable state of

affairs?

MS. HERRMANN: Objection, vague, foundation, speculation.

THE WITNESS: The Congress of the United States determined that there should be disposal for Greater-Than-Class C waste, and they directed the Department of Energy to make it happen. Therefore, it's undesirable if it's not happening, because it's the policy of the Government of the United States to dispose of Greater-Than-Class C waste.

BY MR. SKALABAN:

Q Are you familiar at all, in any of your conversations or discussions within EM or with the NRC, of the concept that's reflected here, that NRC staff considers DOE derelict in not having taken action on the GTCC issue already?

MS. HERRMANN: Objection, assumes facts not in evidence, foundation, speculation.

THE WITNESS: I'm sorry. Could you repeat that?

MR. SKALABAN: Can you read the question back, please?

THE REPORTER: "Question: Are you familiar at all, in any of your conversations or discussions within EM or with the NRC, of the

concept that's reflected here, that NRC staff considers DOE derelict in not having taken action on the GTCC issue already?"

THE WITNESS: Yes.

BY MR. SKALABAN:

Q And can you tell me about those conversations? How has that -- how has that issue come up that NRC staff considers DOE derelict in not having taken action?

MS. HERRMANN: Objection, vague, foundation, speculation.

THE WITNESS: In a meeting discussing this issue with the NRC, they expressed -- my management was explaining why we were unable to do certain things. And they expressed -- what's the word I'm looking for -- a certain amount of amazement that 15 to 17 years had gone by and we weren't well on our way to developing disposal.

BY MR. SKALABAN:

Q And this meeting you're referring to between DOE and NRC staff, when did this meeting occur that you just referred to?

A It would have been the 2001 time frame.

Q And who from the NRC was at that meeting?

A I was tied in on a conference call, so I

BY MR. SKALABAN:
Q Okay. Let's assume that the Yucca Mountain repository was available in 1998, and in 1998 nuclear utility spent fuel had begun to be removed to that site.
In that scenario, is it your opinion that the Department should then have had a disposal path identified and available for GTCC waste?
MS. HERRMANN: Objection, speculation, relevance.
THE WITNESS: Yes, I think there was ample time between 1985 and 1998 for DOE to determine what disposal path they wanted, had -- if the repository was available, then -- you know, based on the suitability of that repository to dispose of Greater-Than-Class C waste, yes, a path should have been in place.
BY MR. SKALABAN:
Q Do you think -- putting aside politics and funding, from a technical and engineering point of view, is a 13-year period from 1985 to 1998, is that ample time to identify and develop and have available a storage or disposal path for nuclear utility activated metal Greater-Than-Class C waste?
MS. HERRMANN: Objection, speculation,

activity or if Congress didn't appropriate the funding for that activity.

Q Can you think of any other policy justification other than funding, licensing incapabilities and legislation?

MS. HERRMANN: Objection, speculation, relevance.

THE WITNESS: No, I can't think of any.

BY MR. SKALABAN:

Q In your various conversations and dealings with the NRC, has the NRC ever given you any indication that it would be an acceptable or a desirable policy to leave Greater-Than-Class C waste at the site of decommissioned reactors once the spent fuel has been removed?

MS. HERRMANN: Objection, vague.

THE WITNESS: No.

BY MR. SKALABAN:

Q Has anyone in any of the conversations you've ever been involved in with the Department of Energy -- and we've talked about many of them, but I'm not limiting it to the ones we've talked about -- have any of the conversations that you've been involved with with members of the Department of Energy, has anyone ever expressed to you that it

would be sound policy or desirable to leave Greater-Than-Class C waste at the site of decommissioned reactors after the spent fuel has been removed?

MS. HERRMANN: Objection, vague as to sound policy and desirable.

THE WITNESS: I do not remember any such conversation.

BY MR. SKALABAN:

Q From a transportation perspective, prior to 1998, did the technology exist to transport nuclear utility activated metal for storage or disposal?

A That's not my area of expertise, but I believe it did.

Q Has the Government ever moved either Greater-Than-Class C waste or material comparable under a DOE or Defense classification system of Greater-Than-Class C waste, has it ever moved it prior to 1998?

MS. HERRMANN: Objection, foundation, speculation, vague.

THE WITNESS: Yes.

BY MR. SKALABAN:

Q What do you think the effect of the

Policy Act, and I've not -- I don't believe I've read enough of the Nuclear Waste Policy Act to be able to imply something from the context of the Act. I'm not -- I've not looked at that before, so I do not know.

BY MR. SKALABAN:

Q Is that a concept that you're familiar with at all, any awareness of the permanent isolation is the equivalent of deep geologic disposal?

MS. HERRMANN: Objection. It assumes facts not in evidence. It calls for a legal conclusion.

THE WITNESS: I don't believe I've ever tried to juxtapose those two in this manner before, but I assume I've -- they mean the same thing. That would be my assumption all along is that those two would have been synonomous.

BY MR. SKALABAN:

Q Just as a general understanding as someone working in the nuclear material field and as someone that works in the industry and works at DOE, your general understanding of that permanent isolation would be the equivalent to deep geologic disposal?

MS. HERRMANN: Objection, calls for a legal conclusion.
THE WITNESS: Yes.
BY MR. SKALABAN:
Q In the second bullet point, it says numerous provisions in the NWPA show that the term high-level radioactive waste is not limited to DOE-generated weapons-related waste.
Do you see that?
A Yes.
Q Do you agree with that statement?
MS. HERRMANN: Objection, calls for a legal conclusion.
THE WITNESS: Again, I've not read the Nuclear Waste Policy Act in its entire, especially the sections on high-level radioactive waste. But my assumption is is that it was not limited to DOE-generated weapons-related waste. It was broader than that.
BY MR. SKALABAN:
Q Is that assumption just based on kind of a working knowledge of the law from having worked at DOE and in the area of the industry?
A Yes.
Q What about the next statement, it was

(Whereupon, at 5:05 p.m., the taking of the instant deposition adjourned.)

Robert A Campbell

Signature of the Witness

SUBSCRIBED AND SWORN TO before me this 9 day of July, 2002.

NOTARY PUBIC

My Commission Expires: 02/11/05

ERRATA SHEET FOR THE TRANSCRIPT OF:

Notice Date: June 17, 2002
Case Name: Yankee Atomic vs. United States
Case Number: 98-126C-987 4C
Dep. Date: June 14, 2002
Deponent: Robert Campbell (continued)
Place: Washington DC
Ref. No.: 4269-47

CORRECTIONS:

| Page | Line | Now Reads | Should Read | Reasons Therefore |
|---|---|---|---|---|
| 264 | 3 | nothing on | ~~nothing~~ nothing other than | sentence makes no sense as typed ~~[illegible]~~ |
| 289 | 14 | hadn't done | hadn't not done | typo |
| 295 | 25 | Head and EM | Head in EM, | typo |
| 295 | 25 | David Zabransky, again RW | David Zabransky in RW | typo |
| 315 | 25 | Arenaze | Arenaz | typo |
| 316 | 17 | Arenaze | Arenaz | typo |
| 319 | 1 | Arenaze | Arenaz | typo |
| 399 | 24 | now currently | not now currently | typo |
| 428 | 13 | a GMC30 | in GC30 | typo |
| 430 | 7 | Bupar | Bubar | typo |
| 430 | 13 | Gowen | Cohen | typo |
| 438 | 11 | Weese | Wiess | typo |
| 438 | 12 | Weese | Wiess | typo |

Robert A. Campbell
Signature of Deponent

July 9, 2002

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

\- - - - - - - - - - - - - - - - - - X

YANKEE ATOMIC ELECTRIC :
COMPANY, et al., :
Plaintiffs, :
v. : Case Nos.
THE UNITED STATES, : 98-126C, 98-154C,
Defendant. : 98-474C

\- - - - - - - - - - - - - - - - - - X

Washington, D.C.
Wednesday, January 29, 2003

Continued deposition of ROBERT ALLEN CAMPBELL, a witness herein, called for examination by counsel for Plaintiffs Yankee Atomic, Maine Yankee and Connecticut Yankee, in the above-entitled matter, pursuant to notice, the witness being duly sworn by MARY GRACE CASTLEBERRY, a Notary Public in and for the District of Columbia, taken at the offices of Spriggs & Hollingsworth, 1350 I Street, N.W., Washington, D.C., at 9:30 a.m., Wednesday, January 29, 2003, and the proceedings being taken down by Stenotype by MARY GRACE CASTLEBERRY, RPR, and transcribed under her direction.

Q. Are you still spending about 50 percent of your time on GTCC matters?
A. Yes.
Q. Who else is currently working with you on GTCC-related issues?
A. Working with me? No one.
Q. Is anyone supporting your work on GTCC? Personnel. I'm looking for names.
A. Are you asking for something different than when we went through this before?
Q. The current status, what the current status is, who is working on GTCC issues in addition to yourself at the Department of Energy at this time?
A. For sealed sources and the recovery effort in the Department of Energy, it is Joel Grimm at the Albuquerque office. Other than that, other than our management in terms of how we work on anything, there isn't anyone else who works for DOE.
Q. Are there any contractors who are doing work on GTCC waste for DOE at the present time?
A. Yes.
Q. And who are they, sir?
A. The sealed source recovery at Los Alamos. There are a number of employees in that program.
Q. Who are the contractors? What are the