this document would be consistent with that is a mischaracterization.

BY MR. STOUCK:

Q. Let me just ask this, is that true, that DOE had made the decision to reject Yankee's position before the meeting was held?

A. I don't think that's a fair statement. I mean the purpose of the meeting was to hear what they had to say and we were going to listen to it. And perhaps there was something that we hadn't considered or known before. We were trying to do what the contract said. We were trying to implement the contract.

To the extent that they could not bring to our attention any information that was new or different, we objected to the position outright to the extent that we were implementing the contract as we understood it. So I think that's a little different characterization.

Q. That's fair enough. The next paragraph, first sentence, says, DOE urged us to swap delivery schedules with other contract holders as the most equitable way for achieving accelerated deliveries. Do you see that?

A. Yes.

Q. And is that an accurate report of one of the things DOE said?

MR. CRAWFORD: Same objection as I had before.

THE WITNESS: Urge is a little subjective. We certainly made it clear that the contract which they were party to gave them the right to exchange approved DCSs of which they can achieve their objectives.

We wanted to make sure that they were aware of that and, you know, we saw that as a way that all parties could benefit. So, you know, we made them aware, I think we encouraged -- I don't know if there's a difference between encouraged and urged. But we certainly discussed that at the meeting.

BY MR. STOUCK:

Q. Encouraged swaps as a way -- as a possible way of helping Yankee achieve its objective?

A. Yes, that's true.

MR. CRAWFORD: Let me just state for the record, okay, if it is your intent to proceed in this same fashion through this document, I'm going to object to best evidence because we have before us Exhibits 96 and 97, two different memos reflecting

have been correct had that said ACR instead of contract.

MR. STOUCK: Mr. Brownstein, you are done for today subject to what I just told you.

THE WITNESS: Thank you.

MR. CRAWFORD: We'll reserve any further questioning of the witness until the time of trial.

(Discussion off the record.)

MR. CRAWFORD: I will reserve the right to ask questions should Mr. Stouck succeed as he states that he intends to do in getting Mr. Brownstein before him again. But I will say that we will oppose that.

MR. STOUCK: Okay. Good. Thanks a lot.

(Whereupon, at 3:30 p.m., the taking of the instant deposition ceased.)

[signature]

Signature of the Witness

SUBSCRIBED AND SWORN to before me this 26th day of June, 2002.

NOTARY PUBLIC

My Commission expires: 5/14/06

ERRATA SHEET FOR THE TRANSCRIPT OF:

Notice Date: June 17, 2002
Case Name: Yankee Atomic vs. United States
Case Number: 98-126C-987 4C
Dep. Date: June 14, 2002
Deponent: Alan Brownstein
Place: Washington DC
Ref. No.: 4269-45

| Page | Line | Now Reads | CORRECTIONS: Should Read | Reasons Therefore |
|---|---|---|---|---|
| 263 | 11 | signed as the | signed the | |
| 263 | 24 | I reported to Billy | I worked with Billy | |
| 267 | 18 | active | acting | |
| 335 | 12 | not a attorney | not a program attorney | |
| 389 | 14 | dissolving | devolving | |
| 393 | 7 | Alyssa | Elissa | |
| 401 | 19 | directed | direct | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

[signature]

Signature of Deponent

# EXHIBIT 5

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - x

YANKEE ATOMIC ELECTRIC :
COMPANY, :
Plaintiff, : Case No. 98-126C
v. : Senior Judge
: Merow
THE UNITED STATES, :
Defendant. :

- - - - - - - - - - - - - - - x

Washington, D.C.
Wednesday, April 21, 1999

Deposition of NANCY H. SLATER, a witness herein, called for examination by counsel for Plaintiff in the above-entitled matter, pursuant to agreement, the witness being duly sworn by JAN A. WILLIAMS, a Notary Public in and for the District of Columbia, taken at the offices of Spriggs & Hollingsworth, 1350 I Street, N.W., Washington, D.C., at 10:10 a.m., Wednesday, April 21, 1999, and the proceedings being taken down by Stenotype by JAN A. WILLIAMS, RPR, and transcribed under her direction.

P R O C E E D I N G S

Whereupon,

NANCY H. SLATER,

was called as a witness by counsel for Plaintiff, and having been duly sworn by the Notary Public, was examined and testified as follows:

EXAMINATION BY COUNSEL
FOR PLAINTIFF

BY MR. SHAPIRO:

Q. Would you state your name for the record, please.

A. Nancy H. Slater.

Q. Ms. Slater, my name is Robert Shapiro, we're here for your deposition. Have you ever had your deposition taken before?

A. No.

Q. Do you have some understanding of what's going to happen today?

A. Yes.

Q. What do you understand is going to happen today?

A. I understand that I'm going to be a factual deponent and that you're interested in asking me questions about my knowledge of the waste acceptance area during the time I was in

waste acceptance.

Q. And let me tell you just briefly procedurally how it will work. I'll be asking you a series of questions and you will be expected to answer the questions. As we discussed even before we went on the record, the court reporter is taking everything down and we'll get a written transcript of everything that's said today. Do you understand that?

A. Yes.

Q. And it will also be helpful for the court reporter's purposes so we get a clean transcript if you will respond as you just did.

A. Verbally.

Q. A nice verbal answer, yes or no or whatever the appropriate response might be.

A. I understand.

Q. Also I would ask, if you don't understand one of my questions, you're not sure what I'm asking in one of my questions, if you would please ask me to rephrase it rather than trying to answer a question you're not sure what the question is.

A. Will do.

Q. I appreciate that. Where do you work?

A. At the U.S. Department of Energy in the Office of Civilian Radioactive Waste Management in the Regulatory Coordination Division.

Q. What's your job title there?

A. Team leader.

Q. And what are you a team leader of?

A. The entire division basically. I serve in lieu of a deputy division director. And we deal with the regulatory concerns between the program and the Nuclear Regulatory Commission, the EPA, National Academy of Science, and dealings with the Nuclear Waste Technical Review Board.

Q. When you say you deal with regulatory concerns of EPA, NRC, and the other agencies, what do you do on a day-to-day basis vis-a-vis the NRC?

A. Let's see, a typical example would be the fact that we are involved in developing safeguards and security policy guidelines for the eventual acceptance and disposal of a variety of waste forms. And those policy guidelines will be translated into actual waste acceptance criteria by another group.

And the waste owners will then have to

A. An office, right.
Q. What office would it have been part of?
A. I don't know, I think they may have called it the waste acceptance storage and transportation office. But again I don't commit things like that to memory. I feel there are organization charts that I can go pull to look it up.
Q. And, between 1991 and 1993, Mr. Brownstein was the branch chief?
A. Yes.
Q. And after 1993 Mr. Brownstein became division director?
A. Director.
Q. And, between '91 and '93, do you recall who was the division director?
A. Jim Carlson.
Q. And then who was the office director above Mr. Carlson?
A. Ron Milner.
Q. What were your duties in this 1991 to 1993 period when you were an industrial specialist?
A. I was involved in the preparation of the annual capacity report, the acceptance

priority ranking, answering questions both internal and external about the terms and conditions of the contract. Let's see. And whatever else may have arisen at the time.

I know, when we came in, we were on the tail end of a rulemaking, net versus gross, as sold was that clarification. So I wrapped part of that up. I believe I terminated a couple of nonutility contracts at the contract holder's request because they either no longer had the material or had, in fact, in one case I believe sold it to the government.

Q. Do you remember any other issues you worked on during that period?

A. '91 to '93, I think we began to discuss delivery commitment schedules at that point. Would that be about right? That would be about right.

Q. That would also have included exchange of approved delivery commitment schedules?

A. Actually my recollection is that we discussed exchanges not concurrently, because there was the opportunity to do that a little later. And it was more important given the timing requirement in the contract to have that

guidance issue.

Q. And guidance as to what to do with the delivery commitment schedules themselves?

A. How to fill them out, instructions. I believe, if I'm not incorrect, that that's an OMB reviewed form. And you know that process, that takes time and there must be instructions on how to complete the form.

Q. What was the time concern?

A. I believe the contract requires delivery commitment schedules to be submitted by the purchaser 63 months in advance of the year in which they have an allocation. So back it out from 1998, and they would have been submitting in '92, late '92.

Q. Are there any other issues that you recall working on in the '91 to '93 period?

A. Let's see. I know we addressed priority for shutdown reactors. And nothing else comes to mind right now.

Q. What about the period '93 to '95, what issues did you work on?

A. During that time period, I believe I worked on delivery commitment schedule exchanges, many of the same things from '91 and '93, the

acceptance, priority ranking, the annual capacity report, DCS review and approval.

We began conversations about final delivery schedules and what would be included in those, safeguards and security, and that was policy development. I know that I worked on numerous reviews of system baseline documents, system requirements documents primarily from a waste acceptance standpoint. And I know we kept working on priority for shutdown reactors.

Q. Let me ask you to clarify what you mean by just a couple of these categories. Safeguards and security, what was involved with safeguards and security?

A. NRC regulations require that a licensee have in place a safeguards and security system. And that means physical security as in physical protection. And that physical protection is based on the attractiveness of the material, would someone want to steal it to make a bomb.

They also require as another subelement material control and accounting. That is that, if you as a utility tell me that you're giving me ten MTU, you have to provide me with some documentation to give me confidence that you are;

reorganization.

Q. But otherwise it's basically the same group?

A. Yes. I do believe there was a separate transportation program at the time that UNWMG existed. And I do not recall the name of the law firm that managed that, but I believe that was consolidated with UWASTE.

Q. If you could turn to page 761 in the compilation. Do you see the first issue listed as being of a priority to DOE was whether or not there should be any exceptions to the oldest fuel first priority ranking; do you recall that issue?

A. Yes. The issue there was do I have to give you my oldest fuel. And, from the utility perspective, I have fuel in my pool, I have fuel in the lower forty. I would prefer to give you the newer fuel which is in my pool and free up space there, I'm not interested in giving you the stuff I've already canned.

So, if my oldest fuel is what earns me a place in the ranking based on its discharge dates, must I give that you fuel that earned the ranking. And the answer was no. That fuel earns you a space in the ranking. But on your DCS you

tell us that you want to give us a range of fuels; and, as long as it meets those minimum conditions, five-year-old being the biggest one.

So that's what OFF was about, because it could have been interpreted -- this was the utility perspective. It could have been interpreted to mean that I had to give you the precise fuel that earned me the slot in the ranking.

Q. I think I understand. Let me point your attention to particular language in the middle of that column. Right about in the middle, it says the resolution of this issue will focus on clarifying that the application of the OFF principle is used only in establishing the acceptance priority ranking, and as such, there should be no exceptions.

Then the next sentence says, any basis other than OFF would result in inequitable assignment of acceptance capacity among the purchasers. Why would that be if you just said that utilities, they've already earned their spot in the queue?

A. No, I think you're not reading that in the proper context. What they're saying is that

MR. SHAPIRO: Why don't we stop for the day here and discuss where to go next.

(Whereupon, at 4:50 p.m., the deposition adjourned, to be resumed on Thursday, April 22, 1999, at 2:00 p.m.)

W Hale Thompson

Signature of the Witness

SUBSCRIBED AND SWORN to before me this 23d day of August, 2002.

Sharon Fay Veltman

NOTARY PUBLIC

My Commission expires: February 28, 2003

Page _____ of ______

ERRATA SHEET FOR THE TRANSCRIPT OF:

Notice Date: 04/29/99
Case Name: Yankee Atomic Electric Company v. The United States
Case Number: 98-126C
Dep. Date: 04/21/99 / / / / / /
Deponent: Nancy H. Slater
Place: Washington, DC
TS#: 78077

CORRECTIONS:

| Page | Line | Now Reads | Should Read | Reasons Therefore |
|---|---|---|---|---|

No comments

[signature]
Signature of Deponent

8-2-02
Date of Signature

CERTIFIED COPY



IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - x
YANKEE ATOMIC ELECTRIC :
COMPANY, :
Plaintiff, : Case No. 98-126C
v. : Senior Judge
: Merow
THE UNITED STATES, :
Defendant. :
- - - - - - - - - - - - - - - - x

Washington, D.C.

Thursday, April 22, 1999

Continued deposition of NANCY H. SLATER, a witness herein, called for examination by counsel for Plaintiff in the above-entitled matter, pursuant to agreement, the witness being previously duly sworn, taken at the offices of Spriggs & Hollingsworth, 1350 I Street, N.W., Washington, D.C., at 2:10 p.m., Thursday, April 22, 1999, and the proceedings being taken down by Stenotype by JAN A. WILLIAMS, RPR, and transcribed under her direction.

Let's focus on Yankee Atomic perhaps as an example. Was it really expected that DOE would pick up from Yankee Atomic 9.9 MTU in the first year or at least as you get closest to a full cask that's 9.9 MTU and then it would stop in the first year and come back in year two, come back for another 10.1, year three come back for 9.7, year four come back for 8.7, and then do nothing in year five and then have to come back yet again in year six for 9.4 strictly as it's indicated on this chart?

A. Yes, that would be my strict understanding of this table, yes.

Q. But was that also how DOE expected the program to work?

A. My understanding of how the program would work again, if you accept the premise of the round up or round down for full cask loads, might mean that in any given year, again the following year is debited for the additional amount, that you might actually complete pickup ahead of schedule if you made the optimistic assumption that you were always rounding up.

There was some discussion about campaigning. Do you understand what I mean by

campaigning?

Q. I think I do. But if you could explain it for the record.

A. Campaigning would be that we might like to select rather than the first year as the basis for delivery the first three years and in large chunks work off three years of fuel for one utility, work off three years of fuel for the next.

And this was subject to negotiation with the utilities obviously because this is not the unilateral right as I understand it of DOE to do this. And in the second year accept the first year and the second year and the third year from another utility.

This was discussed with the utilities and it was discussed as a matter of fact when I was part of the utility industry. And the utilities were not averse to considering that because again it's an operational consideration for them.

Do I want you to come to my facility every year and disrupt my operations because I won't be doing anything while we're loading fuel or would I rather say don't come the first year,

show up the second year and take my first year, my second year, and maybe my third year.

So that was discussed when I was in the industry. And I don't know where that went after that. So I have a recollection that the precise schedule laid out in here, alterations to that schedule were discussed by the utilities.

Q. And the campaign was premised in part I think as you said on the notion that it would be more efficient for utilities to have pickups done in larger amounts than in a series of smaller amounts?

A. In fewer years actually, in fewer years, so that you weren't showing up every year with the consequent interruption of operation.

Q. And it was --

A. I think it was DOE's understanding that it would result in -- might result in efficiencies for the DOE transportation system as well. So my recollection is that there were discussions on both sides about efficiencies for both sides by campaign. But I'm not the expert on campaigning and you would have to talk to the transportation folks about that.

Q. Let me ask a couple questions on that

just so I make sure I understood what you were saying. The efficiency from DOE's perspective to campaigning would be, once you got the transportation campaign going, it was more efficient to keep it going at one time than to stop it and start it five different times or a number of different times, it doesn't have to be five?

A. I don't recall the details. I do recall that some of the efficiencies included not having to retrain personnel on the specifics of that site three years in a row because you might not have the same personnel at the same site again.

So there were efficiencies to be obtained from that. And that's the one that really sticks in my mind. I'm sure there were others, but again I'm not the transportation expert.

Q. Do you recall discussions of this notion of campaigning after you got to DOE?

A. I am aware that the issue was evaluated, but I was not part of those evaluations. So I have no knowledge of what was involved in the evaluation inputs, outputs,

such consideration of campaigning?

A. I don't recall who specifically was in the transportation group at that time. In fact, I'm having a tough time recalling who the transportation division director was. I really don't know.

Q. Going back to this table 2 in Slater Exhibit 23, other than the notion of campaigning, do you recall any other ways in which DOE or utilities for that matter might have expected that actual acceptances of spent fuel might occur in an order different than what is depicted on this table?

A. Plus or minus 20 percent rounding, campaigning, DCS exchanges, because, if exchanges occurred, although the amount wouldn't change, the individual utility that would be serviced in that year would. So that would have represented a departure from what's published in here.

Q. And it was generally anticipated that there would be some amount of DCS exchanges?

A. Yes, I did anticipate that there would be some amount of DCS exchanges.

Q. You said that was your expectation. To what extent did you understand that that

don't know. I know that the receipt rates were established, I have a vague knowledge of the basis for their establishment, and I know why I changed from 1998, 1999, to year one and year two. But I don't think that I can speak to the question you've just asked me.

BY MR. SHAPIRO:

Q. And the reason you changed again from specific years, calendar years, to year one, year two, was that you weren't sure when acceptance would start?

A. Yes.

MR. SHAPIRO: That's all we have.

MS. SULLIVAN: We consider Ms. Slater's deposition to be closed.

(Whereupon, at 5:10 p.m., the taking of the instant deposition ceased.)

W. Slater Thompson

Signature of the Witness

SUBSCRIBED AND SWORN to before me this 2sd

day of August, ~~19~~ 2002. SFJ

Sharon Fay Jeffers

NOTARY PUBLIC

My Commission expires: February 28, 2003

Page _____of______

ERRATA SHEET FOR THE TRANSCRIPT OF:

Notice Date: 04/29/99
Case Name: Yankee Atomic Electric Company v. The United States
Case Number: 98-126C
Dep. Date: 04/22/99 / / / / / /
Deponent: Nancy H. Slater
Place: Washington, DC
TS#: 78180

CORRECTIONS:

| Page | Line | Now Reads | Should Read | Reasons Therefore |
|---|---|---|---|---|

No corrections

[signature]
Signature of Deponent

8-2-02
Date of Signature