facilities would be able to accept waste at the same time the department might be able to shorten or speed up the MRS somewhat?

A. Correct.

Q. I'd like to call your attention while we're on this document just to page 18 for a moment. In the bottom paragraph it says: The DOE recognizes that under current conditions waste acceptance as a waste management facility cannot begin in 1998. Furthermore the delay in repository schedule and the linkages between the schedule and key milestones in the siting and construction of an MRS facility make it unlikely that the DOE will be able to start accepting waste significantly before 2003.

Do you agree that this accurately describes DOE's beliefs at the time of June 1988?

MR. SHULTIS: Objection. The document speaks for itself.

A. I believe it does, at least the department's opinions given the linkages.

BY MR. SKALABAN:

Q. And would it be fair that for a purchaser -- and what I mean by that, someone who has -- utility has executed a standard contract -- would it be fair for a purchaser to read that to

assume that the department is not going it make the 1998 date and is unlikely to start accepting waste significantly before 2003?

MR. SHULTIS: Objection, calls for speculation, asking for a legal conclusion.

A. Well, I think to me this would indicate that the department was being candid in terms of its views of a schedule at that point in time.

How the purchasers would interpret that, I can't say.

BY MR. SKALABAN:

Q. And in "candid," you mean you're giving them a frank opinion that it's unlikely -- or that they cannot begin in 1988 and it's unlikely to begin much before 2003?

MR. SHULTIS: Objection, asked and answered.

A. Yeah, I believe so.

(Discussion off the record.)

MR. SKALABAN: Put on the record that I intended to say 1998.

BY MR. SKALABAN:

Q. And that doesn't change any of your answers, I assume?

A. I assumed that myself.

Q. Now, Mr. Milner, actually to perhaps speed things up a little bit, there are three exhibits I'd like to ask you about, and they're 20, 33, and 42.

BY MR. SKALABAN:

Q. Now, on No. -- Exhibit 20, which is, report to Congress on reassessment of the Civilian Radioactive Waste Management program, dated November 1989 -- 20 -- if you could turn for a moment to page 7 -- or roman numeral seven, the executive summary section.

The fourth paragraph down refers to the secretary's comprehensive review of the schedule for repository-related activities, and it states, quotes: This schedule shows a significant slip for the expected start of repository operations from the year 2003 to approximately 2010.

And this I assume accurately reflects the department's position at this time, November 1989, when it reported to Congress that it anticipated that a repository would not be available until 2010?

A. Yes.

MR. SHULTIS: Objection. The document speaks for itself.

BY MR. SKALABAN:

Q. And your answer to that question was, yes?

A. In November of 1989 that certainly reflected the department's opinion -- position.

Q. Now, on page 12, in the first full paragraph, it again refers to the statutory linkages between the MRS and the repository. And it states in the second sentence, quotes: If the current statutory linkages to the repository are maintained, an additional delay of five years would result, with startup estimated at 2007 for the basic MRS facility.

Does this suggest that at this time DOE's best estimate of the earliest time that it could begin an MRS operation in view of the scheduled linkages was 2007?

A. I think it reflects the department's view at the time, yes. If the linkages remained in place, that would be the startup date.

Q. At that time the department was estimating a gap between -- in view of the statutory linkages a gap of three years between when the repository would be operational and when the MRS would be operational?

A. Yes, that appears to be the case, yeah.

Q. Okay. Do you have any reason to believe that the department could have accelerated that three-year -- the ability of the MRS to be online three years before the repository any further under

the scheduled linkages?
MR. SHULTIS: Objection, calls for speculation.
A. I don't know.
BY MR. SKALABAN:
Q. Was there any talk that you were aware of that instead of three years, maybe you could have the MRS online in four years?
MR. SHULTIS: Same objection.
A. Take a year longer?
BY MR. SKALABAN:
Q. Well, a year earlier.
A. Extend the time delta to four years. I don't recall.
Q. I mean, this was at this time the department's best estimate --
A. Yes.
Q. -- of how quickly it could get an MRS up and running under the current statutory linkages?
A. Correct, correct.
Q. And, sir, if you could, please, turn to Milner 33, which for the record is the annual capacity report of December 1990, beginning with a Bates number of HQ 0002486.
A. I'm sorry. What was the page number

again?

MR. SHULTIS: That was just the cover. Right?

MR. SKALABAN: Yep.

A. Okay.

BY MR. SKALABAN:

Q. And here again, sir, on page 5, you see that the beginning paragraph, the last sentence of the beginning paragraph appears to estimate the possibility that the MRS could be ready three years prior to the repository operations.

Is that fair?

A. Correct.

Q. And that would again be the department's best estimate of when it could feasibly get an MRS up and running before a repository?

A. Yes.

MR. SHULTIS: The document speaks for itself.

BY MR. SKALABAN:

Q. And we did look at this document before, and there was the upper and lower bounding case?

A. I believe that's true, yeah.

Q. I just want to call your attention in the first full paragraph on page 4 -- almost in the

middle of the paragraph, it refers to the lower bounding case, and it says: The lower bounding case represents a receipt rate that would be in compliance with the amendments act restriction on storage limits at an MRS before a repository starts operations.

Do you see that?

A. Yes.

Q. And then it goes on to say that: However, this case assumes removal of the schedule linkages with the repository imposed by the amendments act.

In view of that passage, it's fair to say that the lower bounding rate in the lower capacity report, which for your reference can be found on page 7, is based on a change -- is based on a change in the law?

MR. SHULTIS: Objection, calls for a legal conclusion.

A. Yes, because it removed one of the linkages.

BY MR. SKALABAN:

Q. It would require the removal -- a Congressional -- a law, a change in the law to remove some of the -- the scheduling?

A. That's correct.

Q. If we could turn to Milner 42, which is

the December 1991 annual capacity report, on page 4, it has what appears to me a similar estimate on when an MRS facility could be available to start spent fuel acceptance in view of the schedule linkages between an MRS and the operation of a repository.

Do you see that in the middle paragraph?

A. I do.

Q. And here again like in the 1990 annual capacity report the department is estimating that the time -- that it could not start MRS facility operations until at least 2007 in view of the statutory schedule linkage?

A. Correct.

Q. And again, at this point in time, the repository was anticipated to be in operation in 2010, so the department here is figuring that at the earliest -- and I'm focusing on the language, until at least 2007, the earliest that an MRS could be available to accept spent fuel before a repository could be available to accept spent fuel would be three years?

MR. SHULTIS: Objection. The document speaks for itself.

BY MR. SKALABAN:

Q. Is that fair?

A. Correct.
Q. Now, sir, on page 5, there are the waste acceptance rates for the 1991 ACR.
Do you see that, sir?
A. Yes.
Q. And this is a waste acceptance schedule that is based on the assumption of again like the 1990 ACR a change in the law?
A. Correct. I think at that point in time, it was envisioned that if the nuclear waste negotiator were successful in finding a volunteer site for an MRS that that volunteer host would certainly support a change in the schedule linkage.
Q. And it would still, however, would still require Congress to change the law, presumably the president to sign the law or --
A. Correct.
Q. -- or an override veto, but it would require a change in law to make the schedule linkages go away?
A. Correct.
Q. Now, this waste acceptance schedule on page 5, which is based on the absence of the schedule linkages in the statute, these were the basis for the DCS submittals; is that correct?

Page 42

fuel for purposes of the schedule.
BY MR. SKALABAN:
Q. Whether it would be technically feasible to accept that spent fuel?
A. On the currently agreed-to schedule.
Q. Do you have an understanding of what would happen if the department thought it wasn't technically feasible to do it at that point in time on the currently agreed-to schedule?
MR. SHULTIS: Objection, vague, calls for a legal conclusion. Mr. Milner is not a 30(b)(6) witness.
A. I guess in my opinion if the department determined that it wasn't technically feasible on the schedule and since we've already stated that we would accept it, it would move back in the queue.
BY MR. SKALABAN:
Q. Well, does this read to you more like just a basic operational provision, whereas the department is going to look at the individual case, if it can't accommodate it at that time, it's going to move it back a little bit?
A. That's the way I would read it.
MR. SHULTIS: Asked and answered.

Page 43

BY MR. SKALABAN:
Q. This doesn't suggest to you that failed fuel is going to be put back years later in the queue, does it?
MR. SHULTIS: Objection, asked and answered, calls for a legal conclusion.
A. I couldn't say on that. It would depend on the nature of the fuel.
BY MR. SKALABAN:
Q. Well, assuming that there was an NRC-licensed container for that failed fuel, would the department then accept it upon the currently agreed schedule?
MR. SHULTIS: Objection, calls for speculation, asks for a legal conclusion.
A. I guess in my opinion, if for that specific failed fuel, if there were an NRC-certified container, the NRC said, yep, that particular fuel is okay to move in that container, then, yes.
There's all kinds of failed fuel. You can have a fuel rod that goes -- the cladding is slightly unzipped, or it can have it totally failed and a bunch of pellets laying at the bottom of the pool. That's the extreme case, of

Page 44

course.
BY MR. SKALABAN:
Q. And in the extreme case, do you know whether or not the technology has been developed to put that into a safe, licensed container?
MR. SHULTIS: Objection, calls for a legal conclusion.
A. I don't know. That would be a utility operation responsibility in any event.
BY MR. SKALABAN:
Q. But it's possible that that kind of situation would be dealt with?
A. As an engineer, I like to think that most things are technically feasible.
Q. And you have no reason to believe that it wouldn't be technically feasible to develop a safe, NRC-licensed container to handle that extreme situation you posited?
MR. SHULTIS: Objection, calls for a legal conclusion.
A. I can't think of any.
MR. SKALABAN: Can we go off the record a

Page 45

second?
(Whereupon, at 5:08 p.m., the taking of the instant deposition adjourned.)

Ronald A. Milner
Signature of the Witness

SUBSCRIBED AND SWORN to before me this 24th day of May, 20 02.

Notary Public

My Commission Expires: 5/14/06

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

\- - - - - - - - - - - - - - - - - )
YANKEE ATOMIC ELECTRIC COMPANY )
(98-126C)(Merow, S.J.) )
CONNECTICUT YANKEE ATOMIC POWER )
COMPANY ) Volume II
(98-154C)(Merow, S.J.) ) Washington, D.C.
MAINE YANKEE ATOMIC POWER COMPANY) Wednesday
(98-474C)(Merow, S.J.) ) May 8, 2002
Plaintiffs, )
v. CERTIFIED COPY
THE UNITED STATES, )
Defendant. )
\- - - - - - - - - - - - - - - - - )

Continued Deposition of RONALD A. MILNER, a witness herein, called for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to agreement, the witness being duly sworn by CHERYL A. LORD, a Notary Public in and for the District of Columbia, taken at the offices of SPRIGGS & HOLLINGSWORTH, 1350 I Street, N.W., Washington, D.C., at 9:20 a.m., Wednesday, May 8, 2002, and the proceedings being taken down by Stenotype by CHERYL A. LORD, RPR, CRR, and transcribed under her direction.

(Milner Exhibit No. 108
was marked for
identification.)

(Discussion off the record.)

BY MR. SKALABAN:

Q. Do you recognize this TRW letter?
It's dated July 30, 1993, and it's addressed to you.

A. I don't offhand recall it, no.

Q. It says: The attached report provides the current status of all domestic utility dry storage facilities.
Do you know why you or your office might have requested TRW do a report on this subject?

A. Just to stay abreast of the current status of storage at the utilities.

Q. And it was important to you to do so?

A. Yeah. In my mind it was.

Q. And is that for purposes of -- why was it important to you?

A. Well, for acceptance, I think it was important to know whether we would be picking up spent fuel from a spent fuel pool, from a dry storage facility, what the nature of the dry storage facility was. In my opinion, it would potentially affect

which fuel the utility shipped to us.

Q. How so?

A. Utilities verbally -- I don't recall anything in writing -- but I think utilities verbally indicated to us that if they placed fuel in dry storage, they would more likely give us fuel out of spent fuel pool than pull it out of dry storage.

Q. I see. If I can call your attention to Bates No. HQ 0013570, and it's a page entitled, dry storage requirements, 1998 to 2002.

A. Yes.

Q. In the I guess the third paragraph, it says: There are eight shutdown reactors prior to 1998. No additional reactors shut down during the period 1998 to 2002. The annual maintenance cost at each of these reactors is assumed to be 4.5 million.

Do you know where the 4.5 million figure came from?

A. No, specifically I don't. I vaguely recall at some point in time that utilities were basically asked what their costs were. Whether that is the basis of this figure, I don't know.

Q. Okay. Do you have any reason to believe it's -- or it's an accurate estimate?

I mean, do you believe it's an accurate

Page 284

which fuel the utility shipped to us.

Q. How so?

A. Utilities verbally -- I don't recall anything in writing -- but I think utilities verbally indicated to us that if they placed fuel in dry storage, they would more likely give us fuel out of spent fuel pool than pull it out of dry storage.

Q. I see. If I can call your attention to Bates No. HQ 0013570, and it's a page entitled, dry storage requirements, 1998 to 2002.

A. Yes.

Q. In the I guess the third paragraph, it says: There are eight shutdown reactors prior to 1998. No additional reactors shut down during the period 1998 to 2002. The annual maintenance cost at each of these reactors is assumed to be 4.5 million.

Do you know where the 4.5 million figure came from?

A. No, specifically I don't. I vaguely recall at some point in time that utilities were basically asked what their costs were. Whether that is the basis of this figure, I don't know.

Q. Okay. Do you have any reason to believe it's -- or it's an accurate estimate?

I mean, do you believe it's an accurate

Page 285

estimate at the time?

A. I don't know.

Q. Just don't know.

Why was the department looking for this information about the number of shutdown reactors and the annual maintenance cost of those reactors?

MR. SHULTIS: Objection, asked and answered.

A. The department was interested in the status of reactors and storage, and certainly we had been interested in utility cost.

BY MR. SKALABAN:

Q. And part of your interest in utility cost was to help promote efficiency in the overall system and at the individual reactor sites?

A. Yeah.

MR. SHULTIS: Asked and answered.

A. It had been a goal of the department to minimize those costs to the extent possible, looking at the industry as a whole.

MR. SKALABAN: Mr. Milner, I have no further questions.

THE WITNESS: Okay.

MR. SHULTIS: I don't have any redirect.

MR. SKALABAN: Great.

Page 286

MR. SHULTIS: Off the record.

MR. SKALABAN: We are concluded.

(Whereupon, at 6:02 p.m., the taking of the instant deposition ceased.)

Ronald A. Milner

Signature of the Witness

SUBSCRIBED AND SWORN to before me this 29th day of May, 2002.

[signature]

Notary Public

My Commission Expires: 5/14/06

Page 287

CERTIFICATE OF COURT REPORTER

UNITED STATES OF AMERICA )

DISTRICT OF COLUMBIA )

I, CHERYL A. LORD, the reporter before whom the foregoing deposition was taken, do hereby certify that the witness whose testimony appears in the foregoing deposition was sworn by me; that the testimony of said witness was taken by me in machine shorthand and thereafter transcribed by computer-aided transcription; that said deposition is a true record of the testimony given by said witness; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this deposition was taken; and, further, that I am not a relative or employee of any attorney or counsel employed by the parties hereto, or financially or otherwise interested in the outcome of this action.

CHERYL A. LORD
Notary Public in and for the
District of Columbia
My Commission expires April 30, 2006