facility began operations in '98, then the contract lays out a process -- ACR, APR, DCSs, final DCSs.

And that's, that's, they would have, that's how we would implement terms and conditions of the contract.

If a facility did not begin commencement of operations in '98, whether it was in '99 or whether it was in 2009, I'm hard pressed to believe a DCS submitted and approved by the department, in whatever year that's specified, 1992, that given that the changes to the system and changes to the utilities, the utilities in fact would not have a desire ten years later or that we would not have a desire ten years later to modify that.

That's what I'm trying to explain.

Q. Okay. That's helpful. You referred to, in your earlier answer, if I wrote it down right, as to final DCSs.

Is that a term that is used in the contract somewhere?

A. Yes, it is.

Q. Can you point me out or point me to where in the contract that term is used?

CERTIFICATE OF NOTARY PUBLIC

I, Catherine S. Boyd, the Notary Public before whom the proceeding occurred, pages 1 through 241, do hereby certify that the witness was duly sworn, that the testimony of said witness was taken by me and thereafter reduced to this typewritten transcript under my supervision, that said transcript is a true record of the testimony given by said witness, that I am neither counsel for, related to, nor employed by any of the parties to this proceeding, and further, that I am not a relative or an employee of any attorney or counsel employed by the parties thereto, or financially or otherwise interested in the outcome of the proceeding, or any action involved therewith.

Witness my signature and seal:

CATHERINE S. BOYD
Notary Public in and for
The Commonwealth of Virginia

My commission expires:
February 28, 2006

CERTIFICATE OF NOTARY PUBLIC

I, Catherine S. Boyd, the Notary Public before whom the proceeding occurred, pages through , do hereby certify that the witness was duly sworn, that the testimony of said witness was taken by me and thereafter reduced to this typewritten transcript under my supervision, that said transcript is a true record of the testimony given by said witness, that I am neither counsel for, related to, nor employed by any of the parties to this proceeding, and further, that I am not a relative or an employee of any attorney or counsel employed by the parties thereto, or financially or otherwise interested in the outcome of the proceeding, or any action involved therewith.

Witness my signature and seal:

Catherine S. Boyd

CATHERINE S. BOYD

Notary Public in and for

The Commonwealth of Virginia

My commission expires:

February 28, 2006

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

\- - - - - - - - - - - - - - - - - - - - -x

YANKEE ATOMIC ELECTRIC COMPANY :
(98-126C)(Merow, S.J.) :
CONNECTICUT YANKEE ATOMIC POWER COMPANY :
(98-154C)(Merow, S.J.) :
FLORIDA POWER & LIGHT COMPANY :
(98-483C)(Wilson, J.) :
NORTHERN STATES POWER COMPANY :
(98-484C)(Wiese,J.) :
DUKE POWER, A Division of :
DUKE ENERGY CORP. :
(98-485C)(Sypolt,J.) :
INDIANA MICHIGAN POWER COMPANY :
(98-486C)(Hodges, J.) :
SACRAMENTO MUNICIPAL UTILITY DISTRICT :
(98-488C)(Yock, S.J.) :
SOUTHERN NUCLEAR OPERATING COMPANY, :
et al. :
(98-488C)(Yock, S.J.) :
COMMONWEALTH EDISON COMPANY :
(98-621C)(Hewitt, J.) :
BOSTON EDISON COMPANY :
(99-447C)(Allegra, J.) :
GPU NUCLEAR, INCORPORATED :

Certified Copy

(00-440C)(Bush, J.) :
WISCONSIN ELECTRIC POWER COMPANY :
(00-697C)(Merow, S.J.) :
POWER AUTHORITY OF THE STATE OF NEW YORK :
(00-703C)(Damich, J.) :
OMAHA PUBLIC POWER DISTRICT :
(01-115C)(Bush, J.) :
NEBRASKA PUBLIC POWER DISTRICT :
(01-116C)(Sypolt, J.) :
TENNESSEE VALLEY AUTHORITY :
(01-249C)(Bruggink, J.) :
Plaintiffs, :
v. :Discovery
THE UNITED STATES, :Judge:
Defendant. :(Judge
- - - - - - - - - - - - - - - - - - - - -xSypolt)

McLean, Virginia
Wednesday, April 10, 2002

Continued deposition of ALAN BROWNSTEIN, a witness, recalled for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to notice, the witness being previously duly sworn by CATHERINE S. BOYD, a Notary Public in and for the Commonwealth of Virginia, taken at the offices of Shaw Pittman,

MR. BANES: Objection. Mischaracterizes the instructions, and calls for a legal conclusion.

THE WITNESS: A lot has occurred in the last seven years.

I would think the person responsible now would want to review what we did, why we did it, and how we did it, and to see, you know, the applicability in sum or in part as to how they're going to proceed.

I wouldn't purport to say that they should take these and throw them out or take them and adopt them in total.

I don't think a responsible manager would use this as input in helping make a decision.

BY MR. TOMASZCZUK:

Q. Changed circumstances might warrant reviewing and revising these to reflect those circumstances, is that fair?

A. I think that is.

Q. If the, as I understand these instructions, if the ACR on which the DCSs are based is a planning document, which I understand it to be, are the DCSs also planning documents?

MR. BANES: Objection. Calls for a legal conclusion.

THE WITNESS: In my mind, they are. In order to get, if we can just set aside a specific date for a second, in order to get the government with the right equipment to be able to get through the gate of the utility at the right time, there has to be planning that takes place.

For example, we need to know years in advance how many BWR and PWR casks we should make sure are available through whatever means.

We ought to know how many truck casks and how many rail casks we ought to have available.

In order to do that, we need to understand whose fuel we're going to accept, so there has to be communication between the utilities and us years in advance in order to, to allow that marriage to occur at the end, irrespective of the date.

I believe -- as you know, I did not negotiate this contract in '83, but I believe that was the intent of the process that was laid which we have talked about the ACR, the APR, the

DCSs and the FDSs.

I think that, in that sense, that's a planning arrangement. That's a way to respond to your question, but I think that is responsive.

BY MR. TOMASZCZUK:

Q. Okay. Mr. Brownstein, did you have a role to play in the preparation of what I'll refer to as the TSLCC reports -- total system life cycle cost reports?

A. No. Again, I may have, consistent with, I may have reviewed drafts, you know, as my responsibilities as a division director or as a branch chief, but in terms of its preparation, no.

Q. Okay. Same question with respect to fee adequacy reports -- did you have a role to play in the preparation of those?

A. At one time in the organization, for one short period of time, I did, but under the time that I had that responsibility, I don't recall that we actually issued it during that time period.

Q. Can you put a year on that activity for me?

CERTIFICATE OF NOTARY PUBLIC

I, Catherine S. Boyd, the Notary Public before whom the proceeding occurred, pages 242 through 466, do hereby certify that the witness was duly sworn, that the testimony of said witness was taken by me and thereafter reduced to this typewritten transcript under my supervision, that said transcript is a true record of the testimony given by said witness, that I am neither counsel for, related to, nor employed by any of the parties to this proceeding, and further, that I am not a relative or an employee of any attorney or counsel employed by the parties thereto, or financially or otherwise interested in the outcome of the proceeding, or any action involved therewith.

Witness my signature and seal:

CATHERINE S. BOYD
Notary Public in and for
The Commonwealth of Virginia

My commission expires:
February 28, 2006

CERTIFICATE OF NOTARY PUBLIC

I, Catherine S. Boyd, the Notary Public before whom the proceeding occurred, pages _____ through _____, do hereby certify that the witness was duly sworn, that the testimony of said witness was taken by me and thereafter reduced to this typewritten transcript under my supervision, that said transcript is a true record of the testimony given by said witness, that I am neither counsel for, related to, nor employed by any of the parties to the proceeding, and further, that I am not a relative or an employee of any attorney or counsel employed by the parties thereto, or financially or otherwise interested in the outcome of the proceeding, or any action involved therewith.

Witness my signature and seal:

Catherine S. Boyd

CATHERINE S. BOYD
Notary Public in and for
The District of Columbia

My commission expires:
August 31, 2002

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

\- - - - - - - - - - - - - - - - - - - - x

YANKEE ATOMIC ELECTRIC COMPANY :

(98-126C)(Merow, S.J.) :

CONNECTICUT YANKEE ATOMIC POWER COMPANY :

(98-154C)(Merow, S.J.) :

MAINE YANKEE ATOMIC POWER COMPANY :

(98-474C)(Merow, S.J.) :

Plaintiffs, :

v.

CERTIFIED COPY

THE UNITED STATES, :

Defendant. :

\- - - - - - - - - - - - - - - - - - - - x

Washington, D.C.

Thursday, May 23, 2002

Deposition of ALAN BROWNSTEIN, a witness herein, called for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to agreement, the witness being duly sworn by JAN A. WILLIAMS, a Notary Public in and for the District of Columbia, taken at the offices of Spriggs & Hollingsworth, 1350 I Street, N.W., Washington, D.C., 20005-3305, at 8:40 a.m., Thursday, May 23, 2002, the proceedings being taken down by Stenotype by JAN A. WILLIAMS, RPR, and transcribed under her direction.

overbroad.

THE WITNESS: I really don't know.

BY MR. STOUCK:

Q. You don't know one way or the other?

A. No.

Q. Okay. Well, do you believe that the Department of Energy -- or do you know whether the Department of -- let me ask it this way, without regard to whatever position the Department of Justice has taken, do you know whether the Department of Energy has an obligation under the standard contracts to accept spent fuel that is not described in an approved delivery commitment schedule?

MR. CRAWFORD: Objection to the extent it calls for a legal conclusion and foundation since he's not a 30(b)(6) witness.

THE WITNESS: That's an issue in question. I always viewed that both parties had to do the steps required in the contract. The DCSs are -- there's another step in the process which is the final delivery commitment schedules.

So you're asking about DCSs. Where I'm going to ask you for clarification is you're asking me about what happens if there's an approved DCS but there never is an approved FDS.

BY MR. STOUCK:

Q. I believe you testified that is the situation we're in, correct?

A. Yes.

Q. There are no approved final delivery commitment schedules that I'm aware of. Are you aware of any?

A. There are not to my knowledge.

Q. Okay. So do you know whether -- well, I don't know if that clarifies the question. But my question is, with respect to spent fuel, commercial spent fuel, utility spent fuel that's out in the world somewhere in the United States that is not described in a delivery commitment schedule that has been submitted by a utility and approved by the Department of Energy, okay, you agree there is such spent fuel out there?

A. Yes.

Q. Okay. With respect to that spent fuel that's not described in a delivery commitment schedule that has been submitted to the Department of Energy and approved by the Department of Energy, do you know whether or not DOE is obligated under the standard contract to accept that spent fuel for disposal at some point in time? The question does

not involve a time frame of when they are obligated to accept it, just whether they are obligated to accept it?

MR. CRAWFORD: Objection to the foundation; objection to the extent it calls for a legal conclusion.

THE WITNESS: I'm going to try to ask a clarification.

BY MR. STOUCK:

Q. Sure.

A. Are you saying -- let me try this again. Are you saying, if there is an approved DCS, irrespective of anything else, do we have an obligation, does the department have an obligation to accept that fuel? Is that what you're asking me?

Q. Actually the question I just asked was about all of the fuel that's not described and approved.

A. Okay.

Q. The fuel that's not described in an approved DCS, do you have an obligation under the contract as DOE to accept that spent fuel for disposal?

MR. CRAWFORD: Same objections.

THE WITNESS: I really don't know because

that's a situation that we never looked at. You know, the expectation is that both sides would complete the contractual requirements for both the delivery commitment schedules and then final delivery schedules, you know, as we did the dance to the waste acceptance -- you know, to actual waste acceptance. I don't recall ever addressing the question of what happens if, you know, a utility did not do that. So the answer is I don't know.

BY MR. STOUCK:

Q. So would it be fair based on that answer to say that, during your tenure at RW, when you had responsibility for these waste acceptance matters which as we've said or I have said many times I think is from 1985 to March of '95, during that time you did not have any understanding one way or the other about whether or not DOE was obligated under the standard contract to accept spent fuel that was not described in an approved delivery commitment schedule; is that right? I thought you said you never thought about it.

A. Yeah. As I recall my assumption was that both sides would do it. What happens if somebody did not do it? I don't -- I don't believe we ever really had that discussion.

And then I'm going to follow that up with a question about what you knew at the time.

A. Well, today, I mean to me that's a legal call, you know, in light of the court decision which, you know, occurred after my responsibilities. So that's a legal question. At the time --

Q. Let me ask the question just so we have a clear record. At the time you were working on waste acceptance matters at RW from '85 to '95, did you have an understanding with respect to the spent fuel that is described in an approved delivery commitment schedule whether or not DOE had a binding obligation to accept that spent fuel pursuant to the standard contracts?

MR. CRAWFORD: Objection to the extent it calls for a legal conclusion.

THE WITNESS: First of all at the time I and I believe the department viewed the obligation as a conditional obligation. Now, putting that aside, the contract required other steps. The final delivery commitment schedule, because the specific fuel was often not described, you know, in the approved delivery commitment schedules which was fine under the instructions.

So, with those two caveats, no, if we

didn't have a facility, with respect to the first caveat; with respect to the second, what would happen if they had an approved DCS but took no action to submit an FDS, we never really addressed that, I never really addressed that.

You know, every stage -- you know, whether it was the APR or the DCSs, I know in correspondence we urged -- we told the utilities this was consistent with the contract, but we never said -- well, we never did the what-if questions.

BY MR. STOUCK:

Q. So you didn't have any understanding one way or the other about my question which is you have the DCS, but you don't have anything subsequent, you just never thought about it, never focused on it; is that fair?

MR. CRAWFORD: Same objections.

THE WITNESS: I did not think we had a binding obligation with respect to my first caveat which is because the commencement of facility operations. We never really addressed the second caveat situation, where we had that and it stopped.

BY MR. STOUCK:

Q. You never formed that understanding?

A. No.

Q. You agree with my statement, never formed an understanding?

A. Yes.

Q. And you expected that utilities, you expected them in the course of the processes discussed in the standard contract, that at some point in time utilities would submit final delivery schedules, that's the way you thought about it?

A. I had every reason to expect that utilities, you know, participated, if you will, in both the ACR, in the development of the APR, and in responding to our instructions on the DCS.

Q. Okay. So you did expect that there would be FDSs for all spent fuel described in a DCS?

A. I did.

Q. And do you know whether it would be possible for DOE to accept spent fuel from a utility if that utility had submitted a DCS to DOE, proper DCS, completely filled out, but had not submitted an FDS? And, just to amplify my question, is there enough information specified in the DCS to allow DOE to accept spent fuel for disposal even if DOE does not subsequently get the additional information specified in the FDS?

MR. CRAWFORD: Objection, compound, vague,

Q. Okay. Were there ever similar or comparable instructions given to the purchasers regarding completion of final delivery schedules?

A. There were not.

Q. Why is that?

A. At least through March of '95, we were just in the DCS process, in the very -- I mean in the very early stages of addressing FDS issues.

Q. Do you know whether subsequent to your leaving FDS instructions were finalized and given to the purchasers?

MR. CRAWFORD: Objection, calls for speculation.

THE WITNESS: To the best of my knowledge, they were not.

BY MR. STOUCK:

Q. Okay. Now, on page 27 C of these instructions please, Exhibit 34, take a look at that for a moment.

A. Yes. Okay.

Q. It says in the second sentence the process described herein assumes -- well, strike that.

Let's go actually up to 7A and take a look at 7A for a minute. I've got a question about the last sentence.

A. Okay.

Q. In this last sentence, quote, due to the limited annual acceptance capacity of the FWMS, federal waste management system that stands for?

A. Yes.

Q. Continuing on, reading, only DCSs submitted by purchasers with an allocation in the delivery year will be considered for approval, parentheses, e.g., in order for a purchaser to have a DCS considered for approval for delivery in 1998, the purchaser must have an allocation in 1998, correct?

A. Yes.

Q. Okay. Must have an allocation as shown in the ACR, APR, current at the time of submittal of a delivery commitment schedule, is that what this means?

A. In the APR, yes. Well, in one of those documents, yes.

Q. Right. Okay. Whichever one was current at the time?

A. Yes.

Q. Okay. And so here, in C now, it says, in the second sentence, the process described herein assumes that the FWMS will be able to accept the purchasers' SNF beginning in 1998 according to the

acceptance rate reflected in the 1991 ACR, right?
A. Yes.
Q. Okay. Next sentence, in the event that such circumstances change, all DCSs previously approved by DOE may need to be reevaluated by DOE and the purchasers. Do you see that?
A. I do.
Q. Those circumstances have changed, right?
A. Yes.
Q. Okay. In other words, DOE did not -- was not able to or in any event did not begin accepting purchasers' SNF beginning in 1998, right?
A. Yes.
Q. And it follows that then that DOE did not begin accepting fuel in 1998 according to the acceptance rate reflected in the '91 ACR, right?
A. Yes.
Q. Okay. So, in light of those changed circumstances, do you have an opinion whether DCSs previously approved by DOE need to be reevaluated by DOE and the purchasers? This sentence says may. I'm asking you whether in your view they need to be?
MR. CRAWFORD: Objection to the extent it calls for a legal conclusion; objection, asked and answered.

THE WITNESS: I would think that we would, I would think both sides would want to do that.

BY MR. STOUCK:

Q. Okay. Why would you think that?

A. We're going to jump from the time period we're talking about to today, for example? Let's not do this year by year. Let's talk about the utilities.

If the utilities had submitted and gotten approved DCSs, and let's say they were very specific about the fuel that they wanted to deliver. Their situation and views on what they want to deliver to us could have substantially changed. And it seems to me that that should give you -- we should in my opinion give the utilities another opportunity to review and see if that's same fuel.

And I especially feel that way because the department has not, you know, procured casks. I may feel differently if casks had been purchased based on that information as an example.

Q. Okay. As an example would you agree with the categorization that that would be a kind of updating of the DCS information to deal with current circumstances?

MR. CRAWFORD: Objection, vague.

THE WITNESS: I think both sides --

MR. CRAWFORD: And to the extent it calls for a legal conclusion.

THE WITNESS: I think both sides should have the opportunity to update that information.

BY MR. STOUCK:

Q. And you gave me an example of a reason why utilities should be given the opportunity?

A. Right.

Q. Can you give an example of reasons why DOE should be given the opportunity to update that information to deal with current circumstances?

A. The department may have better information on the rate or the timing, both of which I would think would influence utilities' decisions.

Q. Right. Well, you recall that the '91 -- excuse me, the '91 ACR -- do you recall the rate in the '91 ACR?

A. No.

Q. This has been previously marked as Exhibit 30. It's the '91 annual capacity report. I have a copy for you and your counsel. You know where to look for the rate, right?

A. Yes.

Q. Page 5. This was the so-called or I'll

call it 400, 600, 900, and then 900 steady state rate, right?

A. Right.

Q. And so that is not the acceptance rate that is specified in DOE's current planning documents; is that correct?

MR. CRAWFORD: Objection, vague.

THE WITNESS: I believe you're accurate.

BY MR. STOUCK:

Q. Okay. The current planning documents for the program indicate an acceptance rate that ramps up to a steady state of 3,000 tons per MTU per year?

MR. CRAWFORD: Objection.

THE WITNESS: I don't recall what the rampup rate is, but the steady state I believe is 3,000.

BY MR. STOUCK:

Q. Okay. And so presumably, according to your testimony earlier today, those current planning documents are DOE's current best estimate of what the acceptance rate will be when the program actually starts, correct?

MR. CRAWFORD: Objection, vague; and objection to the extent it mischaracterizes prior testimony.

THE WITNESS: I believe that's accurate.

BY MR. STOUCK:

Q. Okay. And so that change in projected acceptance rates, is that another reason why in the language -- why in your view, in the language of paragraph 7C of the instructions, Exhibit 34, all DCSs previously approved by DOE need to be reevaluated?

MR. CRAWFORD: Objection to the foundation; objection, asked and answered; objection, vague.

THE WITNESS: I use that as an example. So I agree.

BY MR. STOUCK:

Q. Okay. You used the acceptance rate change as an example?

A. Yes.

Q. We have now got it in more detailed form on the record.

A. That's fine.

Q. Do you expect that others in RW would share your views about this need to reevaluate previously approved DCSs in light of changed circumstances as the instructions contemplate?

MR. CRAWFORD: Objection to the extent it