Thank you.

(Whereupon, at 4:25 p.m., the deposition adjourned.)

Alan Brownstein

Signature of the Witness

SUBSCRIBED AND SWORN to before me this 10th day of June, 2002.

Pat L. Austin

NOTARY PUBLIC

My Commission expires: 5/14/2006

# ERRATA SHEET FOR THE TRANSCRIPT OF:

Notice Date: May 28, 2002
Case Name: Yankee Atomic vs. United States
Case Number: 98-126C-987 4C
Dep. Date: May 23, 2002
Deponent: Alan Brownstein (continued)
Place: Washington DC
Ref. No.: 4269-18

CORRECTIONS:

| Page | Line | Now Reads | Should Read | Reasons Therefore |
|---|---|---|---|---|
| 97 | 23 | approve DCSs | approved DCSs | |
| 116 | 7 | answers | issues | |
| 120 | 16 | in the act | with the act | |
| 220 | 12 | use | used | |
| 235 | 1 | I meant meant | ? | As written, makes no sense, not sure what I actually said |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

[signature]
Signature of Deponent

6/11/02
Date of Signature

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

\- - - - - - - - - - - - - - - - - - - - x

YANKEE ATOMIC ELECTRIC COMPANY :

(98-126C)(Merow, S.J.) :

CONNECTICUT YANKEE ATOMIC POWER COMPANY :

(98-154C)(Merow, S.J.) :

MAINE YANKEE ATOMIC POWER COMPANY :

(98-474C)(Merow, S.J.) CERTIFIED COPY

Plaintiffs, :

v. :

THE UNITED STATES, :

Defendant. :

\- - - - - - - - - - - - - - - - - - - - x

Washington, D.C.

Friday, June 14, 2002

Continued deposition of ALAN BROWNSTEIN, a witness herein, called for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to agreement, the witness being previously duly sworn, taken at the offices of Spriggs & Hollingsworth, 1350 I Street, N.W., Washington, D.C., 20005-3305, at 8:40 a.m., Friday, June 14, 2002, the proceedings being taken down by Stenotype by JAN A. WILLIAMS, RPR, and transcribed under her direction.

legal significance of an approved DCS?
MR. CRAWFORD: Objection to the extent it calls for a legal conclusion.
THE WITNESS: I'm not a lawyer.
BY MR. STOUCK:
Q. Well, you're not a lawyer. But at this time you were working on the program and you were working on these matters. And sometimes nonlawyers have understandings of legal things that relate to their jobs. Maybe you did and maybe you didn't, but I don't know that that's responsive to my question. At this time did you have an understanding of the legal significance of an approved DCS?
MR. CRAWFORD: Objection to the extent it calls for a legal conclusion.
THE WITNESS: Probably not, because I don't recall having a discussion with anybody about that.
BY MR. STOUCK:
Q. Okay. What about at some subsequent time prior to the time that you ceased working on these matters? I'm looking for my notes here. I think it was March 1995. Did you have any discussions with anyone that would have given you, Alan Brownstein, an understanding of the legal significance of approved

DCSs?

MR. CRAWFORD: Same objection.

THE WITNESS: Not that I recall.

BY MR. STOUCK:

Q. And subsequent to that, in '95, you have had no such discussions; is that right or is that not right?

MR. CRAWFORD: Same objection.

THE WITNESS: I think I testified earlier that I may have reviewed a DOJ, you know, document, a reply.

BY MR. STOUCK:

Q. In this litigation?

A. In this litigation.

Q. Was that subsequent to the last time we were here in this deposition room?

A. No.

Q. It was prior to that?

A. Yes.

Q. Was it prior to your first deposition?

A. Yes.

Q. Do you know whether it was prior to or after the DOJ document was filed in court or was it a DOJ document that was filed in court?

MR. CRAWFORD: Objection to the extent it

calls for speculation.

THE WITNESS: I reviewed it -- a draft DOJ document. And I testified to that before too.

BY MR. STOUCK:

Q. Okay. Again I really apologize.

A. Yeah.

Q. It's been a long deposition, I just did not recall that. I'm not trying to ask you the same questions over.

A. And I believe, you know, that addressed some of that issue. So that's what jogged my memory.

Q. So based on that you have an understanding or at least at the time you read this you had an understanding of what DOJ's current position about the legal significance of this is?

MR. CRAWFORD: Well, objection, asked and answered and to the extent that that may have mischaracterized anything he previously testified to.

THE WITNESS: There was discussion about --

MR. CRAWFORD: And I'm going to instruct the witness not to reveal anything about any discussions with any DOJ lawyers about any kind of matter discussed with respect to this litigation at all.

THE WITNESS: Okay. Well, that's fine. I think somewhere in that draft there was, you know, some views expressed about what the government's -- Department of Justice's views were with respect to the legal effect of the DCSs. I read those words.

BY MR. STOUCK:

Q. Approximately when was that, do you recall, within the last year?

MR. CRAWFORD: Objection to the extent it calls for speculation.

THE WITNESS: Yeah, within a year, within the last year.

BY MR. STOUCK:

Q. Okay. Can you place it any more specifically than that in time?

MR. CRAWFORD: Objection, asked and answered.

THE WITNESS: No.

BY MR. STOUCK:

Q. But, prior to reading that draft and prior to whatever discussions grew out of that draft, you had no understanding of the legal significance, you had no discussions with anyone who would have given you any other basis for having any understanding of the legal significance of the DCSs; is that right?

A. That's right. And why I brought that up is because, you know, my reaction was, well, that's interesting, when I read that it was interesting. I never discussed it or thought about that before.

Q. Directing your attention to the very last sentence of Exhibit No. 109, I'll read it, it says what liabilities and obligations on the part of both parties are locked in by the DCS submittal and approval process.

A. Okay.

Q. Now, that's a question that -- you know, the words are different. But it's very similar to this question about the legal significance, is that right, do you agree with that?

A. I agree with your statement.

Q. So, therefore, you had no understanding of what liabilities and obligations on the part of both parties are locked in by the DCS submittal and approval process contemporaneous with this document in August of '91; is that right?

A. That's right.

Q. And you had no understanding about those matters as of the time you stopped working on waste acceptance matters in March 1995?

A. That's accurate.

Q. And you had no understanding about those matters at least prior to the time that whatever understanding you gained by reading this draft that you just referred to?

A. That's correct.

(Recess.)

BY MR. STOUCK:

Q. Do you know whether the standard contract or any of these -- not these standard contracts but any of these individual waste acceptance contracts with the utilities were ever amended?

MR. CRAWFORD: Well, object to the extent of lack of foundation and to the extent it would call for speculation.

But go ahead.

MR. STOUCK: I'm not asking for speculation, I'm just asking if he knows if any of them were ever amended.

MR. CRAWFORD: Then maybe my objection is more appropriately objection, vague.

THE WITNESS: Yeah, I believe there were some modifications made. It would be hard for me to tell you what they were. But I remember there were some modifications made.

BY MR. STOUCK:

have been correct had that said ACR instead of contract.

MR. STOUCK: Mr. Brownstein, you are done for today subject to what I just told you.

THE WITNESS: Thank you.

MR. CRAWFORD: We'll reserve any further questioning of the witness until the time of trial.

(Discussion off the record.)

MR. CRAWFORD: I will reserve the right to ask questions should Mr. Stouck succeed as he states that he intends to do in getting Mr. Brownstein before him again. But I will say that we will oppose that.

MR. STOUCK: Okay. Good. Thanks a lot.

(Whereupon, at 3:30 p.m., the taking of the instant deposition ceased.)

Signature of the Witness

SUBSCRIBED AND SWORN to before me this 30th day of June, 2002.

NOTARY PUBLIC

My Commission expires: 5/14/06

ERRATA SHEET FOR THE TRANSCRIPT OF:

Notice Date: June 17, 2002
Case Name: Yankee Atomic vs. United States
Case Number: 98-126C-987 4C
Dep. Date: June 14, 2002
Deponent: Alan Brownstein
Place: Washington DC
Ref. No.: 4269-45

CORRECTIONS:

| Page | Line | Now Reads | Should Read | Reasons Therefore |
|---|---|---|---|---|
| 263 | 11 | signed as the | signed the | |
| 263 | 24 | I reported to Billy | I worked with Billy | |
| 267 | 18 | active | acting | |
| 335 | 12 | not a attorney | not a program attorney | |
| 389 | 14 | dissolving | devolving | |
| 393 | 7 | Alyssa | Elissa | |
| 401 | 19 | directed | direct | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

Signature of Deponent

# EXHIBIT 11

CERTIFIED COPY



IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - - - X

YANKEE ATOMIC ELECTRIC :
COMPANY, :
Plaintiff, : Case No. 98-126C
v. : Senior Judge
: Merow
THE UNITED STATES, :
Defendant. :

- - - - - - - - - - - - - - - - - - X

Washington, D.C.
Thursday, April 22, 1999

Continued deposition of NANCY H. SLATER, a witness herein, called for examination by counsel for Plaintiff in the above-entitled matter, pursuant to agreement, the witness being previously duly sworn, taken at the offices of Spriggs & Hollingsworth, 1350 I Street, N.W., Washington, D.C., at 2:10 p.m., Thursday, April 22, 1999, and the proceedings being taken down by Stenotype by JAN A. WILLIAMS, RPR, and transcribed under her direction.

aware that the utility industry did not support priority for shutdown reactors. In fact, their stated consensus position was that priority should not be afforded to shutdown reactors.

Q. So it was not intended that the delivery commitment schedule process be a gotcha process?

A. A static process.

Q. Right, that, gee, you only requested five and now, even though we can accommodate 20, you've wanted all along to do 20, we're not going to let you because you only asked for five, that was not the intention?

A. That's correct, it was not our intention to do that.

Q. And we might have covered this yesterday, but let me just make sure it's clear, that the delivery commitment schedule was intended to indicate how much spent fuel the utility wanted to deliver up to the limit of their allocation?

A. In part, because recall that the discharge date of the fuel earned you a slot in the acceptance priority ranking, but the fuel you could actually deliver did not have to be the

out its scope. I don't precisely recall which section in the contract discusses the annual capacity report.

Q. If you want to turn to page 10, the paragraph above Article V. Is that what you were referring to?

A. Yes, because it establishes it as a document for planning purposes only because there is a recognition that system capacity could change up or down.

Q. So the annual capacity report was not intended to be binding on the parties?

A. It was not intended to be absolute in the sense that again it's a planning document. And DOE, and I distinctly remember saying this and I distinctly remember it being said to me when I was on the utility side, DOE had always stated that, if we were able to improve the system capacity, then the ACR would reflect those improvements in system capacity.

And the APR would be used to readjust which utilities, when, and how much fuel. So, as a planning document, planning documents are subject to change.

And the ACR as I understood it was to

communicate to the utilities what DOE believed was the likely receipt rate at a repository, the likely acceptance rate, and to accept who was likely to deliver during the first ten years of system operation based on the APR.

Q. What was the first ACR that you were involved in?

A. Let's see. I joined DOE in August of '91, and I don't recall which ACR that was. But I would probably have been involved in the ACR starting on the ACR that was issued in '92.

Q. What would your role have been in determining that amount that DOE was going to tell utilities DOE was expecting to -- what they expected the annual receiving rate for the facilities to be, what would your role have been in that?

A. None, nothing.

Q. Who would have made that determination?

A. I don't recall who precisely made the determination because I believe those receipt rates were established in ACR's prior to my advent with the program. And there were no changes in those receipt rates for this document that I'm aware of. So the document -- the

MR. SHAPIRO: Why don't we stop for the day here and discuss where to go next.

(Whereupon, at 4:50 p.m., the deposition adjourned, to be resumed on Thursday, April 22, 1999, at 2:00 p.m.)

W. Slater Thompson
Signature of the Witness

SUBSCRIBED AND SWORN to before me this 2nd day of August, 2002.

Sharon Fay Vellas
NOTARY PUBLIC

My Commission expires: February 28, 2003

ERRATA SHEET FOR THE TRANSCRIPT OF:

Notice Date: 04/29/99
Case Name: Yankee Atomic Electric Company v. The United States
Case Number: 98-126C
Dep. Date: 04/21/99 / / / / / /
Deponent: Nancy H. Slater
Place: Washington, DC
TS#: 78077

CORRECTIONS:

| Page | Line | Now Reads | Should Read | Reasons Therefore |
| --- | --- | --- | --- | --- |
| | | No comments | | |

N H Slater Thompson
Signature of Deponent

8-2-02
Date of Signature

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - - - - - x

YANKEE ATOMIC ELECTRIC :

COMPANY, MAINE YANKEE ATOMIC : Certified Copy

POWER CO., and CONNECTICUT :

YANKEE ATOMIC POWER CO., : Case No. 98-126C

Plaintiffs : 98-474C, 98-154C

-v- : (Senior Judge

: Merrow)

UNITED STATES OF AMERICA, :

Defendant :

- - - - - - - - - - - - - - - - - - - - x

Washington, D.C.

Thursday, June 13, 2002

Deposition of NANCY SLATER THOMPSON, a witness herein, called for examination by counsel for the Plaintiff in the above-entitled matter, pursuant to notice, the witness being duly sworn, taken at the offices of Spriggs & Hollingsworth, 1350 I Street, N.W., Washington, D.C., at 9:40 a.m., Thursday, June 13, 2002, and the proceedings being taken down in Stenotype by DEBORAH K. WILKINS, RPR, and transcribed under her direction.

it calls for a legal conclusion. Objection, foundation.

A. I do not recall.

Q. Isn't such a limitation inconsistent with the language that we just focused on, all spent fuel or all SNF and/or HLW the purchaser wishes to deliver?

MS. SULLIVAN: Objection, argumentative. Objection to the extent it calls for a legal conclusion.

You may answer.

A. No, I don't believe it is inconsistent. It's all fuel that you wish to deliver within the bounds of what you are entitled to deliver.

Q. A little while ago you referred to the ACR as a planning document. What did you mean by that?

MS. SULLIVAN: Objection. The documents speak for themselves.

You may answer.

A. As we have discussed in my prior deposition and previously in this deposition, the ACR represents a planning basis. The acceptance rates are subject to influences by future budget

constraints, lack of a facility, unavailability of transportation casks.
For example, no one would have contemplated at the time that I did these that we would have an RSA, Regional Services Agreement, that would in fact contract out with someone else to provide the transportation which would have financial effects and could have scheduling and capacity effects. It's a planning document. And in fact when I sat on the utilities side of the table the industry recognized that not only was the ACR for planning purposes only, but that in fact their DCSs were for planning purposes, and they filled DCSs out consistent with that planning presumption because providing a range of discharge dates which might be over a 10-year period certainly doesn't permit a system to do more than plan.
Q. A couple sentences before the end of your answer, you said it was understood by the industry that both the ACRs and the delivery commitment schedules were for planning purposes only. By using the word "only," did you mean to exclude -- what did you mean to exclude?
A. That we viewed the DCSs as fungible,

and we have been through that in prior deposition as well; that the industry recognized that in fact they wouldn't be providing us with specifics about what they wanted us to accept until they submitted a final delivery schedule; and the final delivery schedule actually does represent the commitment on their part to this reactor, this time, this amount of fuel, this age fuel, so greater specificity with the FDS, ball park with the DCS.

It was important for the utilities to give us DCSs because of their very fungibility. If you didn't submit a DCS, you couldn't exchange your slot in the cue, and given that those exchanges were possible, I don't know how one would perceive a DCS as anything other than for planning purposes.

Q. Let's go back first just to the ACRs and the statement that they are for planning purposes only.

When you say that ACRs were for planning purposes only, does that mean that the ACRs were not meant to be binding on the Department of Energy?

MS. SULLIVAN: Objection, vague. Objection to the extent it calls for a legal

conclusion.

A. I can't speak to that legal issue or speak for a contracting officer. In my estimation, that's a question you would have to ask someone else.

Q. When you published the 1995 ACR, did you understand that you were committing the Department of Energy to accept the amount of spent fuel noted in the waste acceptance projections in that document?

MS. SULLIVAN: Objection to the extent it calls for a legal conclusion. Objection, the document speaks for itself. Objection, vague.

A. My understanding is entirely consistent with the sentence at the bottom of page 1 in the -- I guess this would be Exhibit 3, which is the 1995 ACR. As specified in the Standard Contract, the ACR is for planning purposes only, and this is not contractually binding on either DOE or the purchasers. And so were I to reason this out and not make a legal decision, I would have to say as a simple engineer my clear reading of that language would say if it's in the contract, everyone, including the utility, would be well aware of that.

Q. What about the delivery commitment schedules? Was it your understanding that those similarly were for planning purposes only and not contractually binding on either the utilities or the department?

MS. SULLIVAN: Objection to the extent it calls for a legal conclusion. Objection, vague.

A. In my personal opinion, they were for planning purposes only and in fact were completed in such a way that not much but planning could be done based on the information contained in them. In addition, given the fungibility of the DCSs, that's why there is a final delivery schedule which is somewhat more than a planning document. And I do recall siting across the table from numerous utility representatives, clearly recognizing that the DCSs were planning purposes, and they in fact did not view themselves as binding themselves to deliver specifically what was described on the DCS.

Q. During the time that you worked in the waste acceptance division at the Department of Energy, do you recall anyone either within DOE or in industry who thought that the delivery

commitment schedules were binding on either industry or the department?

MS. SULLIVAN: Objection, vague. Objection to the extent it calls for a legal conclusion.

A. No, I don't.

Q. You said something a minute ago that I guess has me a little confused. You said that the delivery commitment schedules are definitely for planning purposes but they provided relatively little information so you couldn't do much planning with them. I may be getting your language a little wrong, but what did you mean by that?

A. The DCSs -- and you need to put this in the context of their fungibility -- the DCSs, were they to remain as is, would provide you with the location of the reactor to which you would arrive to pick fuel up, so you know the type of fuel, you can plan appropriately for the type of cask to send. Given that they have submitted one DCS for, let's assume, 10 MTU, you know how many casks to send. The date on which you would show up and schedule a pickup was not resolved until the FDS because that was actually done in