ask you --
A. Conceptually.
Q. Approved. Let's focus on approved.
Do you believe that a delivery commitment schedule that's been proposed and approved is binding on any party?
MS. SULLIVAN: Objection to the extent it calls for a legal conclusion.
You may answer.
A. In my personal opinion, I do not believe that it is binding because I do not believe -- I am at a loss as to how you could bind yourself to anything in a range of discharge dates. I am at a loss as to how you could bind yourself when it's not final.
Q. So a utility wouldn't even be binding itself as to the total amount of MTU of spent fuel that it would be delivering to DOE in a particular year?
MS. SULLIVAN: Objection to the extent it calls for a legal conclusion. Objection, vague.
A. I think it is possible that a utility in fact could deliver less than it indicated on its DCS for whatever reason.

Q. Did you view an approved delivery commitment schedule as binding a utility to not delivering more spent fuel than is set out on that delivery commitment schedule?

MS. SULLIVAN: Objection to the extent it calls for a legal conclusion. Objection, vague.

A. It's not the DCS that establishes the allocation. It's simply a reflection.

Q. What sets out the allocation?

A. The ACR; and that's for planning purposes only because that allocation could change.

Q. And is it fair to say then that the allocations reflected on the delivery commitment schedules are not binding because they are based in turn on the allocations set out in the Annual Capacity Reports which say explicitly that they are not binding?

MS. SULLIVAN: Objection. Calls for a legal conclusion.

A. I really think that's a legal issue. We are really stepping beyond what I feel skilled enough to answer.

MR. SHAPIRO: Do you want to take a

with a better understanding of how to complete the form. This was a cooperative effort, mutually agreed to by both sides. That's why we took the time once we had drafted instructions to go back over and discuss the instructions with them and get comments.

Q. Did you view the DCS instructions as guidance to utilities as to how to fill out their delivery commitment schedule forms or did you view the instructions more directly as requirements for how the forms must be filled out by utilities?

MS. SULLIVAN: Objection to the extent it calls for a legal conclusion.

You may answer.

A. I view the DCS instructions as my expectations for what it would take in completing these forms in order for me to approve a DCS. For example, if I told them, which I did on page 2, section 7, section E, that if they exceeded their allocation I would disapprove the DCS, I view that as an instruction.

Actually, that point is also made clear on page 5, item number 2.5, that says: The total quantity of SNF designated for delivery must not exceed the allocation in the ACR.

Exceeding the allocation will result in disapproval of the DCS (S).

This is Exhibit 10.

Q. Do you recall whether you ever disapproved a proposed delivery commitment schedule for any reason other than the proposed schedule exceeding a utility's allocation of spent fuel acceptance?

A. No, I don't.

Q. I am not sure that -- maybe I didn't ask the question quite clearly enough.

You don't recall whether you did or you recall that you didn't disapprove any for any other reason?

A. I do not recall whether I disapproved additional DCSs for reasons other than having exceeded the acceptance allocation.

Q. We have been talking about you approving or disapproving delivery commitment schedule forms submitted by utilities. Technically, wasn't it the contracting officer who was doing the approval or disapproval?

A. Yes, but as the contracting officer's technical representative, it was my responsibility by virtue of my signature to make a

recommendation.
Q. And as a practical matter, you were in fact the person who was approving or disapproving; wouldn't that be a fair statement?
A. Well, I can't make that statement. That's to imply that the contracting officer had no role whatsoever and did no review.
Q. Did the contracting officer ever disagree with one of your recommendations concerning the approval or disapproval of a proposed delivery commitment schedule?
A. Not that I recall.
Q. Did the contracting officer ever question one of your recommendations to approve or disapprove a proposed delivery commitment schedule?
A. Not that I recall.
Q. Did the contracting officer ever question any of your recommendations that you made in your role as COTR?
MS. SULLIVAN: Objection. Vague.
A. That's a lot of history and a lot of time. Unless you can be more specific, I am not sure I can answer that question.
Q. I am just asking for your

THE REPORTER: Reading and signing?

MS. SULLIVAN: Yes, reading and signing.

Off the record.

(Thereupon, at 4:35 p.m., the taking of the instant deposition was ceased.)

\- - - - - -

Signature of the Witness

N Slater Thompson

SUBSCRIBED AND SWORN to before me this 2nd day of August, 2002.

Sharon Fay Sellers

NOTARY PUBLIC

My Commission Expires: February 28, 2003

ERRATA SHEET FOR THE TRANSCRIPT OF:

Notice Date: June 17, 2002
Case Name: Yankee Atomic vs. United States
Case Number: 98-126C-987 4C
Dep. Date: June 13, 2002
Deponent: Nancy Slater Thompson
Place: Washington DC
Ref. No.: 4269-37

CORRECTIONS:

| Page | Line | Now Reads | Should Read | Reasons Therefore |
|---|---|---|---|---|
| 24 | 15 | "build" half a | "fill" half a | misunderstood word |
| 27 | 3 | had one "assembled" | had one "assembly" | misunderstood word |
| 52 | 7 | older | younger | probably confused by older v colder |
| 82 | 9 | recall | called | misunderstood word |
| 93 | 20 | NCR | ACR | typo |
| 101 | 15 | hour | our | misunderstood word |
| 106 | 16 | here | year | misunderstood word |
| 122 | 16 | your | year | misunderstood word |
| 132 | 2 | There's | That's | misunderstood word |
| 146 | 8 | part two | Part 2 | (reference is to 10CFR Part 2) |
| 150 | 4 | delivered | delivery | misunderstood word |
| 157 | 5 | commute | go to | misunderstood word |
| | | end of errata | | |

Kimberly A. Smith

KIMBERLY A. SMITH
Notary Public - Nevada
No. 99-51976-1
My appt. exp. Jan. 29, 2003

July 18, 2002

N Slater Thompson
Signature of Deponent

# EXHIBIT 12

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

\- - - - - - - - - - - - - - - - - - - - x
YANKEE ATOMIC ELECTRIC COMPANY, :
(98-126C) :
CONNECTICUT YANKEE ATOMIC POWER COMPANY :
(98-154C) :
MAINE YANKEE ATOMIC POWER COMPANY :
(98-474C) :
FLORIDA POWER & LIGHT COMPANY :
(98-483C) :
NORTHERN STATES POWER COMPANY :
(98-484C) :
DUKE POWER, A Division of DUKE :
ENERGY CORP. (98-485C) :
INDIANA MICHIGAN POWER COMPANY :
(98-486C) :
SACRAMENTO MUNICIPAL UTILITY DISTRICT :
(98-488C) :
SOUTHERN NUCLEAR OPERATING COMPANY, :
et al., (98-614C) :
COMMONWEALTH EDISON COMPANY :
(98-621C) :
BOSTON EDISON COMPANY :
(99-447C) :
GPU NUCLEAR, INCORPORATED :
(00-440C) :
WISCONSIN ELECTRIC POWER COMPANY, :
(00-697C) :
POWER AUTHORITY OF THE STATE OF :
NEW YORK (00-703C) :
OMAHA PUBLIC POWER DISTRICT :
(01-115C) :
NEBRASKA PUBLIC POWER DISTRICT :
(01-116C) :
TENNESSEE VALLEY AUTHORITY :
(01-249C) :
Plaintiffs, :
v. :
UNITED STATES OF AMERICA, :
Defendant. :
\- - - - - - - - - - - - - - - - - - - - x

Washington, D.C.
Friday, May 3, 2002

Continued Deposition of RONALD MILNER, a witness herein, called for examination by counsel for

Department goes and prepares an APR, all the allocations for the fifth year will be different than they were originally in the '90s?

A. Yes, okay.

Q. Okay. So a utility that submitted a DCS for an allocation based on the rates in the early '90s may have a different allocation under current forecasts?

MR. SHULTIS: Calls for speculation.

THE WITNESS: I would assume, yes.

BY MR. TOMPKINS:

Q. Okay. Do you know what the Department is, or the program OCWRM is currently planning on doing about the fact that the allocations may be different with the DCS forms? Are they going to go back and have utilities prepare a new DCS form based on these rates?

A. Actually we've not addressed that yet.

MR. SHULTIS: Objection.

BY MR. TOMPKINS:

Q. Haven't addressed it. Would it be reasonable to assume that utilities will have that option?

MR. SHULTIS: Objection, calls for speculation. Mr. Milner's not a 30(b)(6) witness.

THE WITNESS: The Department simply has not addressed that yet. We decided we should probably focus our efforts on getting a site first and then work out the details.

BY MR. TOMPKINS:

Q. I'd like to turn your attention back to Milner Exhibit 43 which are the DCS instructions.

Under the general instructions which start on page one and go on page two, item 7C, we had discussed this yesterday but I just want to now apply this to the situation we've just been talking about. It states that in the event that such circumstances change, all DCS's previously approved by DOE may need to be reevaluated by DOE and the purchaser.

Would this type of change of allocation be the type of event that may implicate this instruction?

MR. SHULTIS: Objection, calls for a legal conclusion and also speculation.

THE WITNESS: In my opinion it would.

BY MR. TOMPKINS:

Q. One final question on this DCS form and I believe you testified about this earlier too. Instruction 7B states that once a purchaser has an allocation, any SNF owned by the purchaser can be designated for delivery against the allocation. Is

# *CERTIFICATE OF REPORTER*

***UNITED STATES OF AMERICA ) ss.:***

***COMMONWEALTH OF VIRGINIA )***

I, **CYNTHIA R. SIMMONS, RPR, CRR,** the officer before whom the foregoing deposition was taken, do hereby certify that the witness whose testimony appears in the foregoing deposition was duly sworn by me; that the testimony of said witness was taken by me to the best of my ability and thereafter reduced to typewriting under my direction; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this deposition was taken, and further that I am not a relative or employee of any attorney or counsel employed by the parties thereto, nor financially or otherwise interested in the outcome of the action.

*Notary Public in and for*

*the Commonwealth of Virginia*

*My Commission expires: 11/30/2004*

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - - - - - -)
YANKEE ATOMIC ELECTRIC COMPANY )
(98-126C)(Merow, S.J.) )
CONNECTICUT YANKEE ATOMIC POWER )
COMPANY )
(98-154C)(Merow, S.J.) ) Volume I
MAINE YANKEE ATOMIC POWER COMPANY) Washington, D.C.
(98-474C)(Merow, S.J.) ) Tuesday
Plaintiffs, ) May 7, 2002
v. )
THE UNITED STATES, )
Defendant. )
- - - - - - - - - - - - - - - - - - - - -)

CERTIFIED COPY

Deposition of RONALD A. MILNER, a witness herein, called for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to agreement, the witness being duly sworn by CHERYL A. LORD, a Notary Public in and for the District of Columbia, taken at the offices of SPRIGGS & HOLLINGSWORTH, 1350 I Street, N.W., Washington, D.C., at 3:48 p.m., Tuesday, May 7, 2002, and the proceedings being taken down by Stenotype by CHERYL A. LORD, RPR, CRR, and transcribed under her direction.

department's position at the time that the delivery commitment schedule submitted by purchasers had to be based upon the waste acceptance schedule reflected here on page 5?

MR. SHULTIS: Objection. The document speaks for itself, Mr. Milner is not a 30(b)(6) witness, and calling for a legal conclusion.

A. In my opinion, that's what this states, yes.

BY MR. SKALABAN:

Q. And then also, sir, if you could please take out Exhibit 43. And on page -- for the record, Exhibit 43 is the DCS instructions. It's entitled, United States Department of Energy instructions for completing the appendix C delivery commitment schedule general instructions.

And item two, it says, who should submit. And it states there, the DCS should be submitted by all purchasers with allocations in the 1991 annual capacity report.

And that further suggests, does it not, that the department was requiring the purchasers to use this waste acceptance schedule here on page 5 of the -- of Milner 42 as well as the individual breakdown of allocations which appear on page 9 of

the 1991 ACR?

MR. SHULTIS: Objection. The document speaks for itself, calls for a legal conclusion.

A. In my opinion, that's what it states.

BY MR. SKALABAN:

Q. And if I could turn your attention to the specific instruction portion of this document, Milner 43 of the DCS instructions, there's a paragraph entitled, 2.7, on page 6. And if you could just take a moment to read paragraph 2.7.

A. Okay.

Q. This paragraph says -- or -- I'm sorry. In the second sentence of this paragraph after a comma, it states, quote: The total quantity of SNF designated for delivery must not exceed the allocation in the ACR, semicolon, exceeding the allocation will result in the approval of the DCS.

MR. SHULTIS: Objection, mischaracterizes the document.

MR. SKALABAN: Oh, I'm sorry. Okay. Thank you, counsel.

BY MR. SKALABAN:

Q. Exceeding the allocation will result in the disapproval of the DCS.

And doesn't this part 2.7 further confirm

that the department will require the purchasers to follow the waste acceptance schedule in page 5 and page 9 of the 1991 ACR?

MR. SHULTIS: Objection. The document speaks for itself, Mr. Milner is not a 30(b)(6) witness, calls for a legal conclusion.

A. In my opinion, that's what it says -- indicating here.

BY MR. SKALABAN:

Q. And is therefore, assuming that purchasers followed the instructions and submitted DCSs on the basis of the 1991 ACR -- the delivery commitment schedules would then be based upon a waste acceptance schedule that was not consistent with the Nuclear Waste Policy Act?

MR. SHULTIS: Objection, calls for a legal conclusion and -- objection, calls for a legal conclusion, and also Mr. Milner is not a 30(b)(6) witness.

MR. SKALABAN:

Q. Specifically to give you further clarification, I mean the Nuclear Waste Policy Act schedule linkages between the MRS and the repository.

MR. SHULTIS: Same objections.

BY MR. SKALABAN:

Q. The DCSs were -- do you understand my question?

A. No, I don't.

Q. I mean, assuming then, that the purchasers followed the instructions and submitted DCSs based on the schedules in the 1991 annual capacity report, then the DCSs would be based upon a waste acceptance schedule that was inconsistent with the statutory linkages in the Nuclear Waste Policy Act?

MR. SHULTIS: Objection. It calls for a legal conclusion.

A. You're talking schedule linkage?

BY MR. SKALABAN:

Q. Yes, sir.

A. Well, I just don't view it as inconsistent in the sense that certainly in my opinion at the time there was a possibility of that schedule linkage being removed.

Q. But it was -- but the schedule linkage was there?

A. Yes.

Q. And so as the law then existed and as it exists now, because I don't believe -- scratch that.

As the law then existed, the DCSs were based on a waste acceptance schedule that was

inconsistent with the Nuclear Waste Policy Act's
schedule linkages as they existed at this time?
A. Sitting here today looking at that, that would be my opinion.
Q. And to your knowledge, the schedule linkages have never been changed. There's -- I'm sorry.
Let me ask a more artful question.
There hasn't been a change in the law removing those schedule linkages?
A. No, there has not.
Q. Mr. Milner, if you could just give me a general overview of how -- as the chief operating officer of OCRWM, how you envision the actual overall process of waste acceptance, transportation, disposal unfolding when it begins in approximately -- as you anticipate in 2010, an overview, just kind of a general overview of the process.
How do you envision that working?
MR. SHULTIS: I'm sorry. Which process?
MR. SKALABAN: The process of the -- well, let's say the real logistical process of sort of waste acceptance, transportation, disposal.
BY MR. SKALABAN:
Q. How do you envision that happening in