fuel for purposes of the schedule.
BY MR. SKALABAN:
Q. Whether it would be technically feasible to accept that spent fuel?
A. On the currently agreed-to schedule.
Q. Do you have an understanding of what would happen if the department thought it wasn't technically feasible to do it at that point in time on the currently agreed-to schedule?
MR. SHULTIS: Objection, vague, calls for a legal conclusion. Mr. Milner is not a 30(b)(6) witness.
A. I guess in my opinion if the department determined that it wasn't technically feasible on the schedule and since we've already stated that we would accept it, it would move back in the queue.
BY MR. SKALABAN:
Q. Well, does this read to you more like just a basic operational provision, whereas the department is going to look at the individual case, if it can't accommodate it at that time, it's going to move it back a little bit?
A. That's the way I would read it.
MR. SHULTIS: Asked and answered.



BY MR. SKALABAN:
Q. This doesn't suggest to you that failed fuel is going to be put back years later in the queue, does it?
MR. SHULTIS: Objection, asked and answered, calls for a legal conclusion.
A. I couldn't say on that. It would depend on the nature of the fuel.
BY MR. SKALABAN:
Q. Well, assuming that there was an NRC-licensed container for that failed fuel, would the department then accept it upon the currently agreed schedule?
MR. SHULTIS: Objection, calls for speculation, asks for a legal conclusion.
A. I guess in my opinion, if for that specific failed fuel, if there were an NRC-certified container, the NRC said, yep, that particular fuel is okay to move in that container, then, yes.
There's all kinds of failed fuel. You can have a fuel rod that goes -- the cladding is slightly unzipped, or it can have it totally failed and a bunch of pellets laying at the bottom of the pool. That's the extreme case, of



course.
BY MR. SKALABAN:
Q. And in the extreme case, do you know whether or not the technology has been developed to put that into a safe, licensed container?
MR. SHULTIS: Objection, calls for a legal conclusion.
A. I don't know. That would be a utility operation responsibility in any event.
BY MR. SKALABAN:
Q. But it's possible that that kind of situation would be dealt with?
A. As an engineer, I like to think that most things are technically feasible.
Q. And you have no reason to believe that it wouldn't be technically feasible to develop a safe, NRC-licensed container to handle that extreme situation you posited?
MR. SHULTIS: Objection, calls for a legal conclusion.
A. I can't think of any.
MR. SKALABAN: Can we go off the record a



second?
(Whereupon, at 5:08 p.m., the taking of the instant deposition adjourned.)

Ronald A. Milner
Signature of the Witness
SUBSCRIBED AND SWORN to before me this 24th day of May, 20 02.

Notary Public
My Commission Expires: 5/14/06

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

```
- - - - - - - - - - - - - - - - - - -)
YANKEE ATOMIC ELECTRIC COMPANY     )
(98-126C)(Merow, S.J.)             )
CONNECTICUT YANKEE ATOMIC POWER    )
COMPANY                            ) Volume II
(98-154C)(Merow, S.J.)             ) Washington, D.C.
MAINE YANKEE ATOMIC POWER COMPANY) Wednesday
(98-474C)(Merow, S.J.)             ) May 8, 2002
               Plaintiffs,         )
           v.                      )
THE UNITED STATES,                 )
               Defendant.          )
- - - - - - - - - - - - - - - - - - -)
```

CERTIFIED COPY

Continued Deposition of RONALD A. MILNER, a witness herein, called for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to agreement, the witness being duly sworn by CHERYL A. LORD, a Notary Public in and for the District of Columbia, taken at the offices of SPRIGGS & HOLLINGSWORTH, 1350 I Street, N.W., Washington, D.C., at 9:20 a.m., Wednesday, May 8, 2002, and the proceedings being taken down by Stenotype by CHERYL A. LORD, RPR, CRR, and transcribed under her direction.

schedule at that point. It did not disapprove it. It just did not act on it, did not approve it.

BY MR. SKALABAN:

Q. Was the department intending to convey to purchasers at this time that the DCS and final delivery commitment schedule process had been in effect suspended?

MR. SHULTIS: Objection. The document speaks for itself, calls for a legal conclusion, and Mr. Milner is not a 30(b)(6) witness.

A. Well, I guess in my opinion, the -- when you got to the point of final delivery schedules, you then specified specific dates. Since the department didn't have a facility in operation, it felt that it couldn't approve or disapprove final schedules since we didn't know when a facility would be in operation.

BY MR. SKALABAN:

Q. Well, would DCSs in your view be binding if no final delivery schedule had been finalized?

MR. SHULTIS: Objection, calls for a legal conclusion.

A. I guess my understanding of the process of the contract is that, no, if a final delivery schedule had not been approved, then nothing in the DCS binds either party to accept or deliver waste on

a specified date.

BY MR. SKALABAN:

Q. So if no final delivery commitment schedules had been approved for Yankee Atomic, Maine Yankee, or Connecticut Yankee, there would be no binding commitments on either party?

MR. SHULTIS: Objection, calls for a legal conclusion.

BY MR. SKALABAN:

Q. Either DOE or Maine Yankee, Connecticut Yankee, on Yankee Atomic?

MR. SHULTIS: Objection, calls for a legal conclusion.

A. I don't understand the question.

BY MR. SKALABAN:

Q. Well, if I -- following up on your last answer and if I understood it, what you just testified to was that if an FDS had never been approved, there wouldn't be a binding commitment between Yankee Atomic and the department, and I'm asking, would that hold true for Connecticut Yankee and Maine Yankee if they never had a final commitment delivery schedule approved for the department?

MR. SHULTIS: Objection, calls for a legal conclusion, asks for speculation.

Page 284

which fuel the utility shipped to us.
Q. How so?
A. Utilities verbally -- I don't recall anything in writing -- but I think utilities verbally indicated to us that if they placed fuel in dry storage, they would more likely give us fuel out of spent fuel pool than pull it out of dry storage.
Q. I see. If I can call your attention to Bates No. HQ 0013570, and it's a page entitled, dry storage requirements, 1998 to 2002.
A. Yes.
Q. In the I guess the third paragraph, it says: There are eight shutdown reactors prior to 1998. No additional reactors shut down during the period 1998 to 2002. The annual maintenance cost at each of these reactors is assumed to be 4.5 million.
Do you know where the 4.5 million figure came from?
A. No, specifically I don't. I vaguely recall at some point in time that utilities were basically asked what their costs were. Whether that is the basis of this figure, I don't know.
Q. Okay. Do you have any reason to believe it's -- or it's an accurate estimate?
I mean, do you believe it's an accurate

Page 285

estimate at the time?
A. I don't know.
Q. Just don't know.
Why was the department looking for this information about the number of shutdown reactors and the annual maintenance cost of those reactors?
MR. SHULTIS: Objection, asked and answered.
A. The department was interested in the status of reactors and storage, and certainly we had been interested in utility cost.
BY MR. SKALABAN:
Q. And part of your interest in utility cost was to help promote efficiency in the overall system and at the individual reactor sites?
A. Yeah.
MR. SHULTIS: Asked and answered.
A. It had been a goal of the department to minimize those costs to the extent possible, looking at the industry as a whole.
MR. SKALABAN: Mr. Milner, I have no further questions.
THE WITNESS: Okay.
MR. SHULTIS: I don't have any redirect.
MR. SKALABAN: Great.

Page 286

MR. SHULTIS: Off the record.
MR. SKALABAN: We are concluded.
(Whereupon, at 6:02 p.m., the taking of the instant deposition ceased.)

Ronald A. Milner
Signature of the Witness

SUBSCRIBED AND SWORN to before me this 29th day of May, 20 02.

[signature]
Notary Public

My Commission Expires: 5/14/06

Page 287

CERTIFICATE OF COURT REPORTER

UNITED STATES OF AMERICA )
DISTRICT OF COLUMBIA )

I, CHERYL A. LORD, the reporter before whom the foregoing deposition was taken, do hereby certify that the witness whose testimony appears in the foregoing deposition was sworn by me; that the testimony of said witness was taken by me in machine shorthand and thereafter transcribed by computer-aided transcription; that said deposition is a true record of the testimony given by said witness; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this deposition was taken; and, further, that I am not a relative or employee of any attorney or counsel employed by the parties hereto, or financially or otherwise interested in the outcome of this action.

CHERYL A. LORD
Notary Public in and for the
District of Columbia
My Commission expires April 30, 2006

# EXHIBIT 13

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| CONNECTICUT YANKEE ATOMIC POWER COMPANY<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | No. 98-154C<br>(Senior Judge Merow) |

**DEFENDANT'S WITNESS LIST**

Pursuant to the Court's pretrial order issued November 4, 1998, as amended by subsequent orders, defendant submits the following list of witnesses. This list does not contain witnesses that the defendant may choose to use for impeachment. Defendant reserves the right to amend this list as described in the Court's rules. Defendant also reserves the right to call all witnesses listed on plaintiff's witness list.

**Fact Witnesses**

Government, Contractor or former Government employees

1. Christopher S. Bajwa
   Thermal Engineer
   Nuclear Regulatory Commission
   One White Flint North
   11555 Rockville Pike
   Rockville, Maryland 20852-2738

Mr. Bajwa will testify concerning the licensing process and requirements for fuel storage and transportation.

2. Lake Barrett
7805 Potters Mill Court
Derwood, Maryland 20855

Mr. Barrett, former Director of the Office of Civilian Radioactive Waste Management, will provide testimony concerning the Government's implementation of the Standard Contract, including acceptance rates, priority for shutdown reactors, the Annual Capacity Report ("ACR") issue resolution process conducted with industry representatives, the issuance and content of the ACRs, the issuance and content of the Acceptance Priority Rankings ("APR"), delivery commitment schedules, schedule negotiations, exchanges, and other relevant matters.

3. Edward Benz
JAI Corp.
955 L'Enfant Plaza
Suite 8000
Washington D.C.

Mr. Benz, based upon his position as a contractor for DOE, will testify about the technical aspects of the Standard Contract, including the ACR issue resolution process conducted with industry representatives and the technical and legal basis for acceptance rates contained in the ACRs/APRs.

4. Alan Brownstein
Senior Policy Advisor
Office of Civilian Radioactive Waste Management
United States Department of Energy
RW-2
1000 Independence Ave., SW
Washington, DC 20585

Mr. Brownstein will provide testimony concerning the Government's implementation of the Standard Contract, including acceptance rates, priority for shutdown reactors, the ACR issue resolution process conducted with industry representatives, the issuance and content of the

ACRs, the issuance and content of the APRs, delivery commitment schedules, schedule negotiations, the exchange approval process, and other relevant matters.

5. Patrice Bubar
Deputy Assistant Secretary Integrated Safety Management & Operation Oversight
Office of Environmental Management
United States Department of Energy
1000 Independence Ave., S.W.
Washington D.C. 20585

Ms. Bubar will testify regarding the development of DOE's plans to accept "greater-than-class-C" low-level radioactive waste from commercial utilities pursuant to the Low Level Radioactive Waste Policy Act Amendments of 1985 and other relevant matters.

6. James Carlson
4008 Glenrose St.
Kensington, MD 20895

Mr. Carlson, former Director of the DOE Waste Acceptance and Transportation Division, will testify about the implementation of the Standard Contract, including transportation issues, as well as other relevant matters.

7. Billy Cole
Senior Consultant
JAI Corp.
11350 Random Hills Road
Suite 440
Fairfax, VA 22030

Mr. Cole, based upon his position as a contractor for DOE, will testify about the Government's implementation of the Standard Contract, including the ACR issue resolution process conducted with industry representatives and the technical and legal basis for acceptance rates contained in the ACRs/APRs, the exchange approval process, and other relevant matters.