# EXHIBIT 4

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

\- - - - - - - - - - - - - - - - - - - - - - -x

YANKEE ATOMIC ELECTRIC COMPANY :
(98-126C)(Merow, S.J.) :
CONNECTICUT YANKEE ATOMIC POWER COMPANY :
(98-154C)(Merow, S.J.) :
FLORIDA POWER & LIGHT COMPANY :
(98-483C)(Wilson, J.) :
NORTHERN STATES POWER COMPANY :
(98-484C)(Wiese,J.) :
DUKE POWER, A Division of :
DUKE ENERGY CORP. :
(98-485C)(Sypolt,J.) :
INDIANA MICHIGAN POWER COMPANY :
(98-486C)(Hodges, J.) :
SACRAMENTO MUNICIPAL UTILITY DISTRICT :
(98-488C)(Yock, S.J.) :
SOUTHERN NUCLEAR OPERATING COMPANY, :
et al. :
(98-488C)(Yock, S.J.) :
COMMONWEALTH EDISON COMPANY :
(98-621C)(Hewitt, J.) :
BOSTON EDISON COMPANY :
(99-447C)(Allegra, J.) :
GPU NUCLEAR, INCORPORATED :

Certified Copy

(00-440C)(Bush, J.) :
WISCONSIN ELECTRIC POWER COMPANY :
(00-697C)(Merow, S.J.) :
POWER AUTHORITY OF THE STATE OF NEW YORK :
(00-703C)(Damich, J.) :
OMAHA PUBLIC POWER DISTRICT :
(01-115C)(Bush, J.) :
NEBRASKA PUBLIC POWER DISTRICT :
(01-116C)(Sypolt, J.) :
TENNESSEE VALLEY AUTHORITY :
(01-249C)(Bruggink, J.) :
Plaintiffs, :
v. :Discovery
THE UNITED STATES, :Judge:
Defendant. :(Judge
- - - - - - - - - - - - - - - - - - - - - -xSypolt)

McLean, Virginia
Tuesday, April 9, 2002

Deposition of ALAN BROWNSTEIN, a witness, called for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to notice, the witness being duly sworn by CATHERINE S. BOYD, a Notary Public in and for the Commonwealth of Virginia, taken at the offices of Shaw Pittman, LLP, 1650 Tysons

P R O C E E D I N G S

Whereupon,

ALAN BROWNSTEIN,

was called as a witness by counsel for Plaintiffs, and having been duly sworn by the Notary Public, was examined and testified as follows:

EXAMINATION BY COUNSEL FOR PLAINTIFFS FLORIDA POWER AND LIGHT COMPANY, NORTHERN STATES POWER COMPANY, DUKE POWER, INDIANA MICHIGAN POWER COMPANY, BOSTON EDISON COMPANY, GPU NUCLEAR, INCORPORATED, POWER AUTHORITY OF THE STATE OF NEW YORK, OMAHA PUBLIC POWER DISTRICT, NEBRASKA PUBLIC POWER DISTRICT:

BY MR. TOMASZCZUK:

Q. Mr. Brownstein, would you state your name for the record, please?
A. Alan Brownstein.
Q. And by whom are you employed, sir?
A. Department of Energy.
Q. And what is your title?
A. I'm a director of the Regulatory Coordination Division, and I'm on detail right

now as a special advisor to the, special, senior policy advisor to the director.

Q. You said director of regulatory enforcement division?

A. Regulatory Coordination.

Q. And I'm sorry -- senior policy advisor?

A. Right, to the director; that's a detail right now.

Q. To the director of OCRWM?

A. Of OCRWM.

Q. And that is all within the Department of Energy, correct?

A. Right. Um-hm.

Q. My name is Alex Tomaszczuk. We met prior to going on the record.

I'm counsel for various of the utility plaintiffs in this case.

I'm going to ask some questions about your knowledge with respect to the management of spent nuclear fuel.

If you don't understand my question, please tell me, and I'll try and rephrase it so that --

A. Okay.

economics from the Pennsylvania State University.

Q. And what year did you obtain your Bachelors Degree?

A. 1973.

Q. And in what year did you obtain your Masters?

A. 1975.

Q. Did you undertake course work for a Ph.D?

A. I did not.

Q. So you stopped your formal educational training after obtaining your Masters Degree?

A. That's correct.

Q. Can you summarize for me your employment history after graduating from college?

A. I worked at Penn State in a research unit, was a consultant to the Pennsylvania governor's energy council from '75 to '78.

In 1978, I went to, moved to General Public Utilities, and worked there until 1980; 1980 to 1985, I worked for the General Accounting Office, and from 1985 to the present, I have worked for the Department of Energy.

Q. And that was a promotion for you at the time?
A. Yes.
Q. And what GS position or SES position are you in now?
A. Fifteen.
Q. And at what point in time did you get promoted from a GS-14 to a 15?
A. In the early '90s; I don't remember the exact date.
It's a GM.
Q. I'm sorry. Say that again.
A. It's a GM-15. It's not an SES position.
Q. It's a GM-15?
A. Yes.
Q. Now you're here today as a Department of Energy employee, correct?
A. Correct.
Q. And you're represented by counsel for the Department of Justice?
A. I am.
Q. Do you hold any professional licenses?
A. I do not.
Q. Subsequent to the receipt of your

since moved on to other positions.
Q. Okay. And are there individuals that are employees of contractors that provide support to DOE with whom you work closely?
A. We're talking about the Regulatory Coordination Division.
Q. Yes.
A. Is that correct?
Q. Correct.
A. I have contractors both at Booz Allen and at the M&O, BSC.
What periods are you talking about?
Q. Why don't we take today? And I'm going to work backwards a little bit.
A. At Booz Allen, my main contracting support is Richard Goffi and his team of people, but mainly Richard, and the current M&O contractor, BSC, would be David Siefkin, but understand I have been on detail for the past eight or nine months, so I have not worked very closely with Siefkin.
Q. Okay. You have been on detail for the last eight or nine months as a senior policy advisor?
A. Right, since July I believe, of last

year.

Q. So since July of 2001?

A. That's correct. It has been longer than eight months, yes.

Q. And since that period, you have been on detail as a senior policy advisor to the director of OCRWM?

A. Correct.

Q. And who has been that person?

A. Lake Barrett.

Q. And is Mr. Barrett still serving as the director of OCRWM?

A. No. He is deputy director.

Q. So are you now reporting to someone else in that, in your capacity as senior policy advisor?

A. The new director was confirmed two or three weeks ago.

Her name is Margaret Chu, C-h-u.

Q. And my question, sir, is are you now reporting to Ms. Chu?

A. Well, my direct, my first level supervisor is Ron Milner.

Q. In your capacity as a senior policy advisor to the director of OCRWM, your first

level supervisor is Mr. Milner?
A. That's correct.
Q. All right.
A. He is the chief operating officer.
Q. And then above him, you report to Mr. Barrett?
A. That's correct. The reporting chain is Milner, Barrett, and now Chu.
Q. And so would it be fair to say that you're also reporting to Ms. Chu at this time?
A. It would be.
Q. What have been your duties as a senior policy advisor to the director of OCRWM?
A. Principally I have been responsible for site recommendation activities.
Q. What do you mean by site recommendation activities?
A. All the work leading up to the Secretary's recommendation to the President and the President's decision to recommend a site for development of deep geologic disposal, which he did in February.
Q. And when you say the site, you're referring to Yucca Mountain, correct?
A. I am.

Q. Is Mr. Barrett retiring?
A. He is.
Q. Are you considering leaving DOE?
A. I am not.
Q. Have you discussed the possibility of leaving DOE with Mr. Barrett?
A. Of my leaving DOE?
Q. Yes.
A. No.
Q. Mr. Brownstein, I would like to go back to 1985 when you first became a DOE employee. Okay?
What position did you assume at that time?
A. Position title in '85 was a nuclear industry specialist.
Q. Do you recall in what month in 1985 you began service at DOE?
A. September.
Q. What were your duties as nuclear industry specialist?
A. I was responsible for implementing the terms of the standard disposal contract.
I ran the, was responsible for the data inputs that we received from the utilities

called the RW-859 information.
I also ran the graduate fellowship program.
Those were my primary responsibilities.
Q. What were your duties with respect to the graduate fellowship program?
A. Running it; I mean I had responsibility for selecting candidates to serve, you know, in the fellowship program, so you know, I was the man responsible for implementing it and running it.
Q. And that's a program under which DOE brings in talented people to work in fellowship positions?
A. We support --
MR. BANES: Objection -- vague.
BY MR. TOMASZCZUK:
Q. Do you understand my question? I'm just trying to get a feel for what the program is.
A. We, we supported 20 fellows a year in their graduate work in fields of importance to our program.
Q. So these would be graduate fellows

working on nuclear engineering projects?

A. It could be. We supported people in, I believe in health physics.

I believe we supported people in policy-related positions, so it was not limited to just engineering.

Q. What were your duties with respect to implementing the terms of the standard disposal contract?

MR. BANES: Objection -- overbroad.

BY MR. TOMASZCZUK:

Q. I believe that's the term that you used.

You said one of your duties was to implement the terms of the standard disposal contract, is that correct?

A. Sure.

Q. And what --

A. Well, let me give examples. The contract required issuance of something called the Annual Capacity Report. That had never been done before, and so as an example, I was responsible for developing that.

I was responsible for interacting with the utilities and answering their questions.

I was responsible for implementing various items as a refund program as we had lost a lawsuit, actually we lost two lawsuits, and I was responsible for refunding money to the utilities, responsible for collecting data on spent fuel from the utilities, the RW-859.

Those are examples.

Q. Did there come a point in time in your career at DOE when you, when your duties changed from your duties that you just described as a nuclear industry specialist?

A. The, the position itself evolved over time.

Let me give a broad outline, see if that's responsive to your question.

Q. Please.

A. In 1985 when I started that position, I was basically a one-person show doing these type of activities with contractor support.

Over time, that position evolved into a branch of which I was the branch chief, and eventually that position evolved into a division, and each time, the responsibilities got a little bit broader.

Q. Okay. Thank you for that. That's

helpful.

When did the duties that you were performing as a specialist evolve into a branch chief position.

A. I do not recall the exact dates. I believe in the late '80s, it went to a branch, and I believe in the early '90s, it went to a division.

I just don't recall the exact times.

Q. And when it became a division, what was the name of the division?

A. Well, let's see. They do this internally.

The branch was called I believe Utility Interface and Logistics Branch.

I'm hesitating because I believe the division underwent several names, and I actually just don't recall it. I have to review my resume.

I didn't do that before I came here.

Q. Does the division, whatever its name, still exist today?

A. It does. I mean it's continued to evolve.

Q. And is it the Regulatory Coordination

Division?

A. It is not.

Q. It is not. Okay. What is its current name, if you know?

A. I don't know. I left, I left that area in early '95.

Q. When you say you left that area, what area are you referring to?

A. I'm sorry. I left the, my, my responsibilities, talk about it broadly, interacting with the utilities, and responsibility for the contract, I left that I believe in March of '95 to go into the division director for the Regulatory Coordination Division.

Over this long span of time, names of divisions have changed and evolved and responsibilities, and I have not kept very closely associated or attached to that.

Q. Okay. You assumed the position of the director of the Regulatory Coordination Division in March of '95?

A. To the best of my recollection.

Q. Okay. That's fair. It has been a little while I understand. All I can ask you is

your best recollection, and I thank you for it.
A. Okay.
Q. So it's fair to say then for roughly a ten-year period, you were responsible for implementing the terms of the standard contract?
A. That's fair.
Q. And in that regard, you were dealing with the utility industry?
A. That's fair.
Q. And in or about March of 1985, your duties changed?
A. '95.
Q. '95 -- I'm sorry.
A. That's correct.
Q. In March of 1995 when you assumed the position of director of regulatory coordination, was that a promotion for you?
A. No.
Q. Was it a lateral move?
A. That's correct.
Q. And why did you make that move?
A. The director asked me to take on those responsibilities, Lake Barrett.
There was, there was other, as I'm thinking back on it, there was other periods.

Q. That would it be fair to say that in dealing with regulatory matters, you have less contact with the utilities and more contact with the regulatory agencies?

A. In a relative sense, not absolute sense, yes.

Q. You testified, Mr. Brownstein, that you were responsible I believe for preparing the ACRs, is that right?

A. Correct.

Q. Okay. Were there documents other than the ACRs for which you had responsibility to prepare?

A. Over time, responsibility for the Annual Priority Ranking, those were two separate independent -- the Delivery Commitment Schedules, it was a separate document, so those were the two, in the '80s, those were the two documents I was responsible for.

Q. You said the Delivery Commitment Schedule you view as part of that process?

A. Yes, but not as a separate independent report like the ACR and APR.

Q. But you had responsibility for the DCS process?

A. Yes.

Q. Other than the ACRs, the APRs, and the DCS, were there other documents for which you had responsibility to prepare?

A. When you say responsibility to prepare, those never, those two documents didn't exist, so when I say had responsibility to prepare, I mean starting from conceptually to how we're going to do it. Those were unique documents.

I had responsibilities, for instance, on the RW-859 form and worked with utilities in trying to modify that and trying to implement those terms.

The Energy Information Administration was responsible for implementing that, but that in essence worked as a contractor for my office, so we worked closely with the utilities to try to streamline the information that we felt we needed and minimize the burdens on the utilities.

I view that as a different category of document.

Q. You had no role, if I understand your testimony, when you came on the scene, you had

MR. TOMASZCZUK: Ms. Reporter, I'm going to hand you and ask you to mark as Brownstein Exhibit 2 an excerpt of a June 1985 document entitled, "Mission Plan for the Civilian Radioactive Waste Management Program," and I think I can represent it reflects the Table of Contents and the, I believe the first 28 pages of that mission plan.

(Brownstein Exhibit No. 2 was marked for identification.)

BY MR. TOMASZCZUK:

Q. Do you recall that document, Brownstein Exhibit 2?

A. Yes.

Q. And it is an excerpt of the June 1985 mission plan, is that correct?

A. To the best of my recollection, it is.

Q. All right. And you're familiar with this document, are you not?

A. I'm aware of it. I have read pieces of it.

Q. You didn't prepare it, did you?

A. That's correct.

Q. Do you know who did?

A. I do not recall. This is, the date is June '85. It was before my time.

Q. I appreciate that. Do you recall whether you read this document at or about the time you became a DOE employee or shortly thereafter?

A. I believe I read excerpts from it.

Q. Did you use the document to implement the terms of the standard contract?

A. I used -- yes, in part.

Q. And what parts did you use?

A. I used the waste acceptance rates. Hesitation in the response is whether I used the '85 or the subsequent mission plan.

I don't recall which, but I certainly used the mission plan or its predecessor documents for the waste acceptance rates.

Q. Do you know whether there was an earlier version of this mission plan?

A. I don't believe there was.

Q. The reason I ask, sir, is because I believe you used the term this document or its predecessor. I was trying to --

A. Subsequent documents; it's amended documents after. I'm sorry.

THE WITNESS: It may have been a goal. I mean I was not with the program and had not seen this document.

May have been a goal, but in terms of the policy with respect to the contract, I don't believe that reflects that.

BY MR. TOMASZCZUK:

Q. And it's your testimony that you haven't seen this document before today as best you can recall?

A. As best I recall, I have not seen this document.

(There was a pause in the proceedings.)

BY MR. TOMASZCZUK:

Q. Let's go back to Brownstein Exhibit 2, which was the June 1985 mission plan.

And I believe you testified if I understood it, Mr. Brownstein, that you used the waste acceptance schedules in the mission plan to implement the terms of the contract?

A. And --

MR. BANES: Objection. Go ahead.

BY MR. TOMASZCZUK:

Q. I understood that to be your