testimony?

A. In the mission plan or the mission plan amendments.

Q. Okay. And how did you go about doing that?

Explain to me what you mean by that.

A. My responsibilities did not include developing a waste acceptance rate that was done by other parts of the program, and in order to complete the things that I was responsible for, we needed a waste acceptance rate, and I used documents available elsewhere in the program.

Q. Who was responsible for developing the waste acceptance rates reflected on page 26 of Exhibit 2?

A. I don't recall. As I testified, this document came out before I was an employee, so I don't know who, who was responsible for that.

I don't recall who was responsible for that.

Q. What office within DOE was responsible for preparing this data, do you know?

A. OCRWM.

Q. Was there a division or branch within OCRWM that was responsible for preparing the

it not?

A. It does.

MR. BANES: Objection. Calls for a legal conclusion.

THE WITNESS: Okay. I'm sorry. It does. It says that in the contract.

BY MR. TOMASZCZUK:

Q. Do you have an understanding of what that term means, planning purposes only?

MR. BANES: Objection. Calls for a legal conclusion.

You can answer.

THE WITNESS: Okay. I believe I do. I believe I did, and I believe I do, and I tried to take my beliefs, the department's beliefs, and write them into this document, which is under, under the entire Chapter One of the document, so we tried to explain what it meant, what its purpose was, what it did, and what it didn't do.

BY MR. TOMASZCZUK:

Q. When you say Chapter One of the document, what were you referring to?

A. The beginning on page 1.

Q. Is there a particular language that

explicates what the term planning purposes means?

MR. BANES: Objection. Calls for a legal conclusion.

You can answer.

THE WITNESS: I believe the key sentence in my mind is under Section 1.1.

The last, the next to last sentence in that first paragraph says as specified in the contract, the ACR is for planning purposes only and thus is not contractually binding on either the DOE or the purchasers.

So it was a planning document.

BY MR. TOMASZCZUK:

Q. Just -- so it's a planning document required by the contract?

A. Yes.

Q. As I understand your testimony; were you under time pressure to get this document out?

A. The contract, if I recall correctly, specified I believe both a, a month and a day and a year for the document I believe.

Q. If I told you the contract in part said beginning not later than July 1, 1987, DOE

Q. Were those rates consistent with the letter and spirit of the NWPA and the contract?

MR. BANES: Objection. Calls for a legal conclusion, and vague.

THE WITNESS: The letter and spirit you're referring to in that paragraph was responding to Mr. Kraft's concern of his letter.

His concern was that the department would fulfill whatever its obligations were through accepting a single assembly.

We tried to address that concern in this paragraph in those words, so --

BY MR. TOMASZCZUK:

Q. And as I understand it, acceptance of one spent fuel rod would not be consistent with the letter and spirit of the NWPA in the contract in your mind?

A. I would agree with that statement.

Q. All right. A little further down on this same page, in paragraph, page 2, there is a reference and a sentence that reads as required by the contract, these schedules will serve as the basis for developing contractually binding Delivery Commitment Schedules in 1991?

A. Yes.

CERTIFICATE OF NOTARY PUBLIC

I, Catherine S. Boyd, the Notary Public before whom the proceeding occurred, pages 1 through 241, do hereby certify that the witness was duly sworn, that the testimony of said witness was taken by me and thereafter reduced to this typewritten transcript under my supervision, that said transcript is a true record of the testimony given by said witness, that I am neither counsel for, related to, nor employed by any of the parties to this proceeding, and further, that I am not a relative or an employee of any attorney or counsel employed by the parties thereto, or financially or otherwise interested in the outcome of the proceeding, or any action involved therewith.

Witness my signature and seal:

CATHERINE S. BOYD
Notary Public in and for
The Commonwealth of Virginia

My commission expires:
February 28, 2006

CERTIFICATE OF NOTARY PUBLIC

I, Catherine S. Boyd, the Notary Public before whom the proceeding occurred, pages through , do hereby certify that the witness was duly sworn, that the testimony of said witness was taken by me and thereafter reduced to this typewritten transcript under my supervision, that said transcript is a true record of the testimony given by said witness, that I am neither counsel for, related to, nor employed by any of the parties to this proceeding, and further, that I am not a relative or an employee of any attorney or counsel employed by the parties thereto, or financially or otherwise interested in the outcome of the proceeding, or any action involved therewith.

Witness my signature and seal:

Catherine S. Boyd

CATHERINE S. BOYD

Notary Public in and for

The Commonwealth of Virginia

My commission expires:

February 28, 2006

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - - - - - - - - x

YANKEE ATOMIC ELECTRIC COMPANY :
(98-126C)(Merow, S.J.) :
CONNECTICUT YANKEE ATOMIC POWER COMPANY :
(98-154C)(Merow, S.J.) :
FLORIDA POWER & LIGHT COMPANY :
(98-483C)(Wilson, J.) :
NORTHERN STATES POWER COMPANY :
(98-484C)(Wiese,J.) :
DUKE POWER, A Division of :
DUKE ENERGY CORP. :
(98-485C)(Sypolt,J.) :
INDIANA MICHIGAN POWER COMPANY :
(98-486C)(Hodges, J.) :
SACRAMENTO MUNICIPAL UTILITY DISTRICT :
(98-488C)(Yock, S.J.) :
SOUTHERN NUCLEAR OPERATING COMPANY, :
et al. :
(98-488C)(Yock, S.J.) :
COMMONWEALTH EDISON COMPANY :
(98-621C)(Hewitt, J.) :
BOSTON EDISON COMPANY :
(99-447C)(Allegra, J.) :
GPU NUCLEAR, INCORPORATED :

Certified Copy

(00-440C)(Bush, J.) :
WISCONSIN ELECTRIC POWER COMPANY :
(00-697C)(Merow, S.J.) :
POWER AUTHORITY OF THE STATE OF NEW YORK :
(00-703C)(Damich, J.) :
OMAHA PUBLIC POWER DISTRICT :
(01-115C)(Bush, J.) :
NEBRASKA PUBLIC POWER DISTRICT :
(01-116C)(Sypolt, J.) :
TENNESSEE VALLEY AUTHORITY :
(01-249C)(Bruggink, J.) :
Plaintiffs, :
v. :Discovery
THE UNITED STATES, :Judge:
Defendant. :(Judge
- - - - - - - - - - - - - - - - - - - - -xSypolt)
McLean, Virginia
Wednesday, April 10, 2002

Continued deposition of ALAN BROWNSTEIN, a witness, recalled for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to notice, the witness being previously duly sworn by CATHERINE S. BOYD, a Notary Public in and for the Commonwealth of Virginia, taken at the offices of Shaw Pittman,

goal of trying to get a repository approved and built at Yucca Mountain?

A. Completing the mission of the program.

Q. Right. In your view, how likely is it that the repository will be designed and constructed to accept 900 metric tons a year?

MR. BANES: Objection. Calls for speculation; lack of foundation.

THE WITNESS: The question is confusing to me.

Whatever the acceptance, whatever the long term if you will acceptance rate is, whatever that number would be, you would expect a several year ramp-up period.

MR. TOMASZCZUK: Can you read my question back?

THE REPORTER: Question: "In your view, how likely is it that the repository will be designed and constructed to accept 900 metric tons a year?"

MR. BANES: Objection. Calls for speculation; lack of foundation.

THE WITNESS: As a steady state? Is that what your question implies?

BY MR. TOMASZCZUK:

Q. As a steady state, I'll take that answer. That's fine if you want to put that clarification on it to help you answer.

A. I believe we would, I believe that would be a low figure.

I mean every document that you have shown me shows a higher figure than that for steady-state operation.

(There was a pause in the proceedings.)

BY MR. TOMASZCZUK:

Q. Mr. Brownstein, going back to the ACR, this 1991 ACR, still on page 4, third paragraph on this page, and there is a reference in the first sentence to Table 2.1. ?

I think I have asked you some questions about that.

A. Yes.

Q. And then the sentence appears this table, that is, the Table 2.1, provides only an approximation of the system throughput rates and is subject to change depending on the system design and configuration and Congressional action regarding the conditions for the siting of an MRS facility?

utilities assumed.

I mean the statement as I wrote it and as I meant it, the utilities started looking from a planning perspective, assuming that DOE would begin acceptance in '98.

It doesn't mean anymore than that.

BY MR. HIRSCH:

Q. Now you said, went on to say by the end of 1998, it is projected that approximately 38,200 metric tons of spent nuclear fuel will be in storage at reactor sites across the country?

A. Um-hm.

Q. Do you know where you got that information?

A. I probably got that from one of two sources.

Probably I either got it from an EIA document, or -- the DOE Energy Information Administration analysis or report, or a PNL document.

Q. Now --

A. To the best of my recollection.

Q. Okay. Thanks. It goes on to say until the federal government begins to accept the spent nuclear fuel from utilities, available

storage capacity at each reactor site will continue to decrease, and other alternatives such as dry storage will be needed.

Do you know what your basis for making that statement was?

A. As each day goes on, spent fuel is produced, and the utilities, as they undergo, have to replace that spent fuel on, on a regular basis.

That spent fuel has to go somewhere on their site, and the first line defense of the utilities if you will is their storage pool, and space was running out in their storage pools, and they were going to have to look at, at alternatives.

Once they looked at alternatives like reracking, they would then have to look at alternatives beyond the storage pool.

Q. So as of the time you wrote this document, you recognized that, that nuclear utilities were running out of, out of space in their storage pools, is that correct?

A. That was no secret. Everyone understood that.

Q. Okay. And then you go on to say, "As

MR. HIRSCH: Sure. That's fine.
(A recess was taken.)
BY MR. HIRSCH:
Q. Mr. Brownstein, will you look back at Brownstein Deposition Exhibit 38?
A. Okay.
Q. Will you look at page 2390? There also appears to be a drawing shown here, and then beneath that, there's some text with four bullet points.
Do you see that?
A. Yes, I do.
Q. Somebody drew through the last bullet point.
Is that something that you did, Mr. Brownstein?
A. I probably would have done that.
Q. And why did you strike determine fees in terms of payment?
A. It is, in my mind, the waste acceptance process, the fees in terms of payment while they're part of the contract, is, is a separate, separate subject from the waste acceptance process.
Q. Look at page 2391. At the top of

group of utilities, that they were going to have to, to make those decisions with respect to, you know, additional storage at their sites.

BY MR. HIRSCH:

Q. And what kind of spent fuel decisions or commitments did you understand the utilities were going to have to make?

A. Oh, as an example, commitments to dry storage.

Q. And then the last bullet point on this page is "The hardships resulting from the uncertainties in the start of acceptance."

What did you understand were the hardships to the utilities resulting from the uncertainties in the start-up?

MR. BANES: Objection -- vague. Calls for speculation.

THE WITNESS: To the extent that we could not identify a particular point in time when a facility would commence operations, that would put a burden on the utilities of what, of internal decisions that they needed to make in order to continue to keep their plants running to accommodate the spent fuel, and so this statement recognized -- again, I'm not sure that

hardships is a word that I would have used, but purports to indicate in this draft that the department at least has a recognition if in fact not a clear, in fact a clear understanding of that the utilities have been affected by that.

BY MR. HIRSCH:

Q. The DOE recognized that the uncertainties about when the DOE would start acceptance would cause burdens on the utilities, is that correct?

A. Sure. Yes.

Q. There's a -- strike that. And one of the burdens would be, would it not, having to determine or provide alternative storage, is that correct?

MR. BANES: Objection -- vague.

THE WITNESS: Maybe I can use an example, and the way best way to respond to you, if we were going to be 30 days or 180 days or 360 days beyond a certain date, and then begin the waste acceptance process, the utilities would find a, a low capital cost alternative to accommodate their spent fuel, whether it be reracking or transferring to another facility.

It would not invest in multi-million

dollar investment in dry storage capability.

BY MR. HIRSCH:

Q. But if the DOE was going to miss the acceptance date by a long period, say 12 years, then the utilities might be forced to engage in those high-cost, high-capital alternatives, correct?

MR. BANES: Objection. Calls for speculation.

THE WITNESS: It, it is, it is possible.

Again, we made no secret of this program, where we were and the difficulties of commencing facility operations, and we also made it clear in all the documents that we reviewed that until that time, we believed it was the utilities' responsibility, so you know, that burden exists on the, existed on the utilities.

I should say that responsibility.

BY MR. HIRSCH:

Q. And so in DOE's view, if the government was going to miss the 1998 acceptance date by 20 years say, that entire burden of storing waste was the utilities'?

A. The, the statements, and if necessary,

reporter mark something.

This is an accompanying document to this, so let's go ahead and mark this as 42.

(Brownstein Exhibits Nos. 41 and 42 were marked for identification.)

THE WITNESS: Okay.

BY MR. HIRSCH:

Q. Mr. Brownstein, I have handed you what has been marked as Brownstein Deposition Exhibit 41 and Brownstein Deposition Exhibit 42.

Brownstein Deposition Exhibit 41 is a memorandum for the Secretary from Dan Dreyfus.

It has Bates labels HQR-001-0339 and HQR-001-311 through 312.

Can you identify these documents?

A. Can I?

Q. What they are.

A. Yes.

Q. Can you tell me what you understand they are?

A. Sure. They're, as I said, they're recommendations to the Secretary to approve the department's issuance of a Notice of Inquiry regarding waste acceptance issues.

Q. And did you prepare Exhibit 41 and 42, the text, that is?

A. Yes.

Q. And I guess Exhibit 42 shows that it was approved by the Secretary, is that correct, the Secretary of Energy?

A. Yes.

Q. That would have been Hazel O'Leary, is that right?

A. Yes. That doesn't look like -- yes. Yes.

Q. And on the right-hand column of Exhibit 41, on the second page, everybody signed off on this memo before I guess it went to the Secretary, is that correct?

A. That's correct, um-hm.

Q. You see in the discussion section --

A. Looking at 41 or 42?

Q. I'm sorry. Let's look at 41, the first page.

A. Okay.

Q. On the discussion section, first paragraph, second sentence, it says, "While it is the Department's preliminary view that the Act does not impose a statutory obligation to

the mission plans and the ACRs, the DOE had created an expectation it would begin accepting spent fuel in 1998, is that correct?

A. I would not --

MR. BANES: Calls for legal conclusion.

THE WITNESS: No, I would not include the mission plan in that because the mission plan was part of the statute, not part of the contract, but the rest of that statement was accurate.

BY MR. HIRSCH:

Q. All right. So for example, by issuing the ACRs, the department could have created an expectation it would begin accepting spent fuel in 1998, is that correct?

MR. BANES: Objection. Calls for a legal conclusion.

THE WITNESS: May have created an expectation.

(There was a pause in the proceedings.)

BY MR. HIRSCH:

Q. At the, under the issue heading at the, on the first page of Exhibit 41 --

A. Okay.
Q. Do you see a reference to eliciting the views of interested parties on several issues, one, they're listed as one, two and three?
A. Yes.
Q. And the third option is options through the nuclear waste fund to offset a portion of the financial burden which may be incurred by utilities in continuing to store spent nuclear fuel at reactor sites beyond 1998, is that right?
A. Yes.
Q. What was your understanding at that time of what the financial burden was to the utilities for storing spent nuclear fuel beyond 1998?
MR. BANES: Objection -- asked and answered, and calls for speculation.
THE WITNESS: Things like adding dry storage to accommodate the spent fuel.
BY MR. HIRSCH:
Q. Mr. Brownstein, did you have any discussions at the DOE that the DOE's inability to start accepting waste could delay reactor

decommissioning?

A. I was aware of that, and you know, over ten years dealing with the subject, I considered I would certainly have had a discussion about that, but I don't recall a specific discussion, but I may have.

Q. Well, let me put it this way. You were aware I take it of the possibility that the DOE's failure to pick up spent nuclear fuel could cause utilities to delay reactor decommissioning, is that correct?

MR. BANES: Objection -- misleading. Calls for speculation.

THE WITNESS: Yes.

BY MR. HIRSCH:

Q. Were you informed of that by utilities?

A. I don't have a specific recollection of that.

Q. Did your contractors study those issues?

A. They may have.

Q. Do you recall any particular studies done by PNL or your other contractors on that issue?

CERTIFICATE OF NOTARY PUBLIC

I, Catherine S. Boyd, the Notary Public before whom the proceeding occurred, pages 242 through 466, do hereby certify that the witness was duly sworn, that the testimony of said witness was taken by me and thereafter reduced to this typewritten transcript under my supervision, that said transcript is a true record of the testimony given by said witness, that I am neither counsel for, related to, nor employed by any of the parties to this proceeding, and further, that I am not a relative or an employee of any attorney or counsel employed by the parties thereto, or financially or otherwise interested in the outcome of the proceeding, or any action involved therewith.

Witness my signature and seal:

CATHERINE S. BOYD
Notary Public in and for
The Commonwealth of Virginia

My commission expires:
February 28, 2006

CERTIFICATE OF NOTARY PUBLIC

I, Catherine S. Boyd, the Notary Public before whom the proceeding occurred, pages ____ through ____, do hereby certify that the witness was duly sworn, that the testimony of said witness was taken by me and thereafter reduced to this typewritten transcript under my supervision, that said transcript is a true record of the testimony given by said witness, that I am neither counsel for, related to, nor employed by any of the parties to the proceeding, and further, that I am not a relative or an employee of any attorney or counsel employed by the parties thereto, or financially or otherwise interested in the outcome of the proceeding, or any action involved therewith.

Witness my signature and seal:

Catherine S. Boyd

CATHERINE S. BOYD
Notary Public in and for
The District of Columbia

My commission expires:
August 31, 2002

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

\- - - - - - - - - - - - - - - - - - - - X

YANKEE ATOMIC ELECTRIC COMPANY :

(98-126C)(Merow, S.J.) :

CONNECTICUT YANKEE ATOMIC POWER COMPANY :

(98-154C)(Merow, S.J.) :

MAINE YANKEE ATOMIC POWER COMPANY :

(98-474C)(Merow, S.J.) :

Plaintiffs, :

v.

CERTIFIED COPY

THE UNITED STATES, :

Defendant. :

\- - - - - - - - - - - - - - - - - - - - X

Washington, D.C.

Thursday, May 23, 2002

Deposition of ALAN BROWNSTEIN, a witness herein, called for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to agreement, the witness being duly sworn by JAN A. WILLIAMS, a Notary Public in and for the District of Columbia, taken at the offices of Spriggs & Hollingsworth, 1350 I Street, N.W., Washington, D.C., 20005-3305, at 8:40 a.m., Thursday, May 23, 2002, the proceedings being taken down by Stenotype by JAN A. WILLIAMS, RPR, and transcribed under her direction.

the contract, the DOE would make adjustments from time to time in the queue, if you will, the APR ranking, based on reinserted fuel; is that right?

A. Yes. And that was -- as I recall that was one of the issues. To get in the queue, it had to be based on the date of final discharge. Utilities could have, you know, subsequent to its, you know, final discharge date decided for other reasons to reinsert that fuel. And then that fuel which created the place in the queue was no longer -- no longer there. So what do we do. That was an issue.

Q. Was that issue ever resolved?

A. To the best of my recollection somewhere, whether it was in the APR or some instructions, I think we addressed it. I don't recall offhand, but I think we addressed the subject. I don't remember the details. It was published, whatever we did.

Q. Now, you said earlier, when we were talking -- when we were discussing exchanges, that you were aware or the department was aware that these approved DCSs had different value to different utilities?

A. Well, what I said was could have.

Q. Okay. What do you mean by that, why did you have an understanding, why did the department