have the understanding that the approved DCSs could have different value to different utilities?

MR. CRAWFORD: Objection, compound; and objection, vague; objection, foundation.

THE WITNESS: If you take two utilities that had, you know, different places in the queue, their situations on, for instance, their cost of storage could have been different. I'll give you a couple of examples.

Maybe one utility had an early allocation that would have been easy for them to rerack or, you know, they had already made the capital costs for a storage facility or had excess storage capacity within their pool.

The value -- we believed the value of that place in the queue to that utility was less than a utility that, if they did not receive the services in that particular year, they would have had to make a major capital expense. So you can see a natural imbalance to the utilities themselves and the value of receiving fuel at any particular time.

And, if there was that imbalance, we assumed, certainly the contract allowed for, you know, a market to develop. And we were going to then be a part of that because the contract required us to

approve it, when the government has to approve it.

We wanted to be careful how we, quote, interfered with the marketplace. And there were these issues, these technical issues that, if we resolved together, would have -- again, since these were primarily equity issues, not issues of key importance to us, we wanted to do as little as possible in interfering with the market. That was my rationale in how these -- how this subject developed.

BY MR. STOUCK:

Q. And that was a subject that you, that being a subject of exchanges of DCSs, approved DCSs, that was something you certainly had responsibility for?

A. Yes.

Q. And you wanted to be careful in not interfering too much with this marketing DCS exchanges because, as a general proposition, you know markets are good, you wanted to allow the utilities to pursue presumably their self interest in making economic exchanges; is that what was behind it or was there something else behind it?

MR. CRAWFORD: Objection, compound.

THE WITNESS: Markets are efficient. And the efficiency of that market increases with the

amount of information that's available. Whether it be the -- who has got what place in the queue or how the rules are going to be interpreted and applied.

It's one of the reasons we did some -- we went out of our way. When we decided to move forward with the APR process, we did something very strange I think. We went out and published a draft APR and sort of alerted to the utilities as best as we could, hey, we're going to do this, please take a serious look at this.

We tried to do everything we could that the department would minimize its interference in the markets. I hope that's responsive to your question.

BY MR. STOUCK:

Q. That's very responsive. But I guess we're still left with the fact on this same subject that there were these -- it's my understanding that this ACR issue resolution process, and my recollection is 34 or maybe 36, but some number like that, those issues were never resolved, at least many of those issues were never resolved?

MR. CRAWFORD: Objection, overbroad.

THE WITNESS: First of all of those, whether it was 34 or 36, did not -- were not associated with this particular issue. Let me see.

There's another part of the question.

BY MR. STOUCK:

Q. There was some number, yeah. You did what you could with the APR in terms of getting information out to as I understand your testimony sort of lay the groundwork, if you will, to the extent possible for an efficient market mechanism?

A. That was certainly our motive.

Q. Okay. That was your motive in getting this APR out, at least getting the APR out for comment and making sure people took it took seriously, took their obligations to give you the best data you could getting the RW-859s?

A. Right.

Q. But nonetheless, notwithstanding that motive and those actions with respect to the APR, there were, were there not, some number of issues in the issue resolution process that did have a bearing on exchanges or at least could that were not resolved, right?

MR. CRAWFORD: Objection, vague, overbroad.

BY MR. STOUCK:

Q. Is that right?

A. Yes, the subset of those 34 issues that

Thank you.

(Whereupon, at 4:25 p.m., the deposition adjourned.)

[signature]

Signature of the Witness

SUBSCRIBED AND SWORN to before me this 10th day of June, 2002.

[signature]

NOTARY PUBLIC

My Commission expires: 5/14/2006

ER ATA SHEET FOR THE TRANSCR OF:

Notice Date: May 28, 2002
Case Name: Yankee Atomic vs. United States
Case Number: 98-126C-987 4C
Dep. Date: May 23, 2002
Deponent: Alan Brownstein (continued)
Place: Washington DC
Ref. No.: 4269-18

CORRECTIONS:

| Page | Line | Now Reads | Should Read | Reasons Therefore |
|---|---|---|---|---|
| 97 | 23 | approve DCSs | approved DCSs | |
| 116 | 7 | answers | issues | |
| 120 | 16 | in the act | with the act | |
| 220 | 12 | use | used | |
| 235 | 1 | I meant meant | ? | As written, Makes no sense, not sure what I actually said |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

[signature]
Signature of Deponent

6/11/02
Date of Signature

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - - - - - x
YANKEE ATOMIC ELECTRIC COMPANY :
(98-126C)(Merow, S.J.) :
CONNECTICUT YANKEE ATOMIC POWER COMPANY :
(98-154C)(Merow, S.J.) :
MAINE YANKEE ATOMIC POWER COMPANY :
(98-474C)(Merow, S.J.)
Plaintiffs, :
v. :
THE UNITED STATES, :
Defendant. :
- - - - - - - - - - - - - - - - - - - - x

CERTIFIED COPY

Washington, D.C.
Friday, June 14, 2002

Continued deposition of ALAN BROWNSTEIN, a witness herein, called for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to agreement, the witness being previously duly sworn, taken at the offices of Spriggs & Hollingsworth, 1350 I Street, N.W., Washington, D.C., 20005-3305, at 8:40 a.m., Friday, June 14, 2002, the proceedings being taken down by Stenotype by JAN A. WILLIAMS, RPR, and transcribed under her direction.

this document would be consistent with that is a mischaracterization.

BY MR. STOUCK:

Q. Let me just ask this, is that true, that DOE had made the decision to reject Yankee's position before the meeting was held?

A. I don't think that's a fair statement. I mean the purpose of the meeting was to hear what they had to say and we were going to listen to it. And perhaps there was something that we hadn't considered or known before. We were trying to do what the contract said. We were trying to implement the contract.

To the extent that they could not bring to our attention any information that was new or different, we objected to the position outright to the extent that we were implementing the contract as we understood it. So I think that's a little different characterization.

Q. That's fair enough. The next paragraph, first sentence, says, DOE urged us to swap delivery schedules with other contract holders as the most equitable way for achieving accelerated deliveries. Do you see that?

A. Yes.

Q. And is that an accurate report of one of the things DOE said?

MR. CRAWFORD: Same objection as I had before.

THE WITNESS: Urge is a little subjective. We certainly made it clear that the contract which they were party to gave them the right to exchange approved DCSs of which they can achieve their objectives.

We wanted to make sure that they were aware of that and, you know, we saw that as a way that all parties could benefit. So, you know, we made them aware, I think we encouraged -- I don't know if there's a difference between encouraged and urged. But we certainly discussed that at the meeting.

BY MR. STOUCK:

Q. Encouraged swaps as a way -- as a possible way of helping Yankee achieve its objective?

A. Yes, that's true.

MR. CRAWFORD: Let me just state for the record, okay, if it is your intent to proceed in this same fashion through this document, I'm going to object to best evidence because we have before us Exhibits 96 and 97, two different memos reflecting

have been correct had that said ACR instead of contract.

MR. STOUCK: Mr. Brownstein, you are done for today subject to what I just told you.

THE WITNESS: Thank you.

MR. CRAWFORD: We'll reserve any further questioning of the witness until the time of trial.

(Discussion off the record.)

MR. CRAWFORD: I will reserve the right to ask questions should Mr. Stouck succeed as he states that he intends to do in getting Mr. Brownstein before him again. But I will say that we will oppose that.

MR. STOUCK: Okay. Good. Thanks a lot.

(Whereupon, at 3:30 p.m., the taking of the instant deposition ceased.)

[signature]

Signature of the Witness

SUBSCRIBED AND SWORN to before me this 26th day of June, 2002.

Pat L. Austin

NOTARY PUBLIC

My Commission expires: 5/14/06

# ERRATA SHEET FOR THE TRANSCRIPT OF:

Notice Date: June 17, 2002
Case Name: Yankee Atomic vs. United States
Case Number: 98-126C-987 4C
Dep. Date: June 14, 2002
Deponent: Alan Brownstein
Place: Washington DC
Ref. No.: 4269-45

CORRECTIONS:

| Page | Line | Now Reads | Should Read | Reasons Therefore |
| --- | --- | --- | --- | --- |
| 263 | 11 | signed as the | signed the | |
| 263 | 24 | I reported to Billy | I worked with Billy | |
| 267 | 18 | active | acting | |
| 335 | 12 | not a attorney | not a program attorney | |
| 389 | 14 | dissolving | devolving | |
| 393 | 7 | Alyssa | Elissa | |
| 401 | 19 | directed | direct | |

[signature]
Signature of Deponent