not involve a time frame of when they are obligated to accept it, just whether they are obligated to accept it?

MR. CRAWFORD: Objection to the foundation; objection to the extent it calls for a legal conclusion.

THE WITNESS: I'm going to try to ask a clarification.

BY MR. STOUCK:

Q. Sure.

A. Are you saying -- let me try this again. Are you saying, if there is an approved DCS, irrespective of anything else, do we have an obligation, does the department have an obligation to accept that fuel? Is that what you're asking me?

Q. Actually the question I just asked was about all of the fuel that's not described and approved.

A. Okay.

Q. The fuel that's not described in an approved DCS, do you have an obligation under the contract as DOE to accept that spent fuel for disposal?

MR. CRAWFORD: Same objections.

THE WITNESS: I really don't know because

that's a situation that we never looked at. You know, the expectation is that both sides would complete the contractual requirements for both the delivery commitment schedules and then final delivery schedules, you know, as we did the dance to the waste acceptance -- you know, to actual waste acceptance. I don't recall ever addressing the question of what happens if, you know, a utility did not do that. So the answer is I don't know.

BY MR. STOUCK:

Q. So would it be fair based on that answer to say that, during your tenure at RW, when you had responsibility for these waste acceptance matters which as we've said or I have said many times I think is from 1985 to March of '95, during that time you did not have any understanding one way or the other about whether or not DOE was obligated under the standard contract to accept spent fuel that was not described in an approved delivery commitment schedule; is that right? I thought you said you never thought about it.

A. Yeah. As I recall my assumption was that both sides would do it. What happens if somebody did not do it? I don't -- I don't believe we ever really had that discussion.

And then I'm going to follow that up with a question about what you knew at the time.

A. Well, today, I mean to me that's a legal call, you know, in light of the court decision which, you know, occurred after my responsibilities. So that's a legal question. At the time --

Q. Let me ask the question just so we have a clear record. At the time you were working on waste acceptance matters at RW from '85 to '95, did you have an understanding with respect to the spent fuel that is described in an approved delivery commitment schedule whether or not DOE had a binding obligation to accept that spent fuel pursuant to the standard contracts?

MR. CRAWFORD: Objection to the extent it calls for a legal conclusion.

THE WITNESS: First of all at the time I and I believe the department viewed the obligation as a conditional obligation. Now, putting that aside, the contract required other steps. The final delivery commitment schedule, because the specific fuel was often not described, you know, in the approved delivery commitment schedules which was fine under the instructions.

So, with those two caveats, no, if we

didn't have a facility, with respect to the first caveat; with respect to the second, what would happen if they had an approved DCS but took no action to submit an FDS, we never really addressed that, I never really addressed that.

You know, every stage -- you know, whether it was the APR or the DCSs, I know in correspondence we urged -- we told the utilities this was consistent with the contract, but we never said -- well, we never did the what-if questions.

BY MR. STOUCK:

Q. So you didn't have any understanding one way or the other about my question which is you have the DCS, but you don't have anything subsequent, you just never thought about it, never focused on it; is that fair?

MR. CRAWFORD: Same objections.

THE WITNESS: I did not think we had a binding obligation with respect to my first caveat which is because the commencement of facility operations. We never really addressed the second caveat situation, where we had that and it stopped.

BY MR. STOUCK:

Q. You never formed that understanding?

A. No.

Q. You agree with my statement, never formed an understanding?
A. Yes.
Q. And you expected that utilities, you expected them in the course of the processes discussed in the standard contract, that at some point in time utilities would submit final delivery schedules, that's the way you thought about it?
A. I had every reason to expect that utilities, you know, participated, if you will, in both the ACR, in the development of the APR, and in responding to our instructions on the DCS.
Q. Okay. So you did expect that there would be FDSs for all spent fuel described in a DCS?
A. I did.
Q. And do you know whether it would be possible for DOE to accept spent fuel from a utility if that utility had submitted a DCS to DOE, proper DCS, completely filled out, but had not submitted an FDS? And, just to amplify my question, is there enough information specified in the DCS to allow DOE to accept spent fuel for disposal even if DOE does not subsequently get the additional information specified in the FDS?
MR. CRAWFORD: Objection, compound, vague,

Q. Okay. Were there ever similar or comparable instructions given to the purchasers regarding completion of final delivery schedules?

A. There were not.

Q. Why is that?

A. At least through March of '95, we were just in the DCS process, in the very -- I mean in the very early stages of addressing FDS issues.

Q. Do you know whether subsequent to your leaving FDS instructions were finalized and given to the purchasers?

MR. CRAWFORD: Objection, calls for speculation.

THE WITNESS: To the best of my knowledge, they were not.

BY MR. STOUCK:

Q. Okay. Now, on page 27 C of these instructions please, Exhibit 34, take a look at that for a moment.

A. Yes. Okay.

Q. It says in the second sentence the process described herein assumes -- well, strike that.

Let's go actually up to 7A and take a look at 7A for a minute. I've got a question about the last sentence.

A. Okay.
Q. In this last sentence, quote, due to the limited annual acceptance capacity of the FWMS, federal waste management system that stands for?
A. Yes.
Q. Continuing on, reading, only DCSs submitted by purchasers with an allocation in the delivery year will be considered for approval, parentheses, e.g., in order for a purchaser to have a DCS considered for approval for delivery in 1998, the purchaser must have an allocation in 1998, correct?
A. Yes.
Q. Okay. Must have an allocation as shown in the ACR, APR, current at the time of submittal of a delivery commitment schedule, is that what this means?
A. In the APR, yes. Well, in one of those documents, yes.
Q. Right. Okay. Whichever one was current at the time?
A. Yes.
Q. Okay. And so here, in C now, it says, in the second sentence, the process described herein assumes that the FWMS will be able to accept the purchasers' SNF beginning in 1998 according to the

acceptance rate reflected in the 1991 ACR, right?
A. Yes.
Q. Okay. Next sentence, in the event that such circumstances change, all DCSs previously approved by DOE may need to be reevaluated by DOE and the purchasers. Do you see that?
A. I do.
Q. Those circumstances have changed, right?
A. Yes.
Q. Okay. In other words, DOE did not -- was not able to or in any event did not begin accepting purchasers' SNF beginning in 1998, right?
A. Yes.
Q. And it follows that then that DOE did not begin accepting fuel in 1998 according to the acceptance rate reflected in the '91 ACR, right?
A. Yes.
Q. Okay. So, in light of those changed circumstances, do you have an opinion whether DCSs previously approved by DOE need to be reevaluated by DOE and the purchasers? This sentence says may. I'm asking you whether in your view they need to be?
MR. CRAWFORD: Objection to the extent it calls for a legal conclusion; objection, asked and answered.

THE WITNESS: I would think that we would, I would think both sides would want to do that.

BY MR. STOUCK:

Q. Okay. Why would you think that?

A. We're going to jump from the time period we're talking about to today, for example? Let's not do this year by year. Let's talk about the utilities.

If the utilities had submitted and gotten approved DCSs, and let's say they were very specific about the fuel that they wanted to deliver. Their situation and views on what they want to deliver to us could have substantially changed. And it seems to me that that should give you -- we should in my opinion give the utilities another opportunity to review and see if that's same fuel.

And I especially feel that way because the department has not, you know, procured casks. I may feel differently if casks had been purchased based on that information as an example.

Q. Okay. As an example would you agree with the categorization that that would be a kind of updating of the DCS information to deal with current circumstances?

MR. CRAWFORD: Objection, vague.

THE WITNESS: I think both sides --
MR. CRAWFORD: And to the extent it calls for a legal conclusion.
THE WITNESS: I think both sides should have the opportunity to update that information.
BY MR. STOUCK:
Q. And you gave me an example of a reason why utilities should be given the opportunity?
A. Right.
Q. Can you give an example of reasons why DOE should be given the opportunity to update that information to deal with current circumstances?
A. The department may have better information on the rate or the timing, both of which I would think would influence utilities' decisions.
Q. Right. Well, you recall that the '91 -- excuse me, the '91 ACR -- do you recall the rate in the '91 ACR?
A. No.
Q. This has been previously marked as Exhibit 30. It's the '91 annual capacity report. I have a copy for you and your counsel. You know where to look for the rate, right?
A. Yes.
Q. Page 5. This was the so-called or I'll

call it 400, 600, 900, and then 900 steady state rate, right?

A. Right.

Q. And so that is not the acceptance rate that is specified in DOE's current planning documents; is that correct?

MR. CRAWFORD: Objection, vague.

THE WITNESS: I believe you're accurate.

BY MR. STOUCK:

Q. Okay. The current planning documents for the program indicate an acceptance rate that ramps up to a steady state of 3,000 tons per MTU per year?

MR. CRAWFORD: Objection.

THE WITNESS: I don't recall what the rampup rate is, but the steady state I believe is 3,000.

BY MR. STOUCK:

Q. Okay. And so presumably, according to your testimony earlier today, those current planning documents are DOE's current best estimate of what the acceptance rate will be when the program actually starts, correct?

MR. CRAWFORD: Objection, vague; and objection to the extent it mischaracterizes prior testimony.

THE WITNESS: I believe that's accurate.

BY MR. STOUCK:

Q. Okay. And so that change in projected acceptance rates, is that another reason why in the language -- why in your view, in the language of paragraph 7C of the instructions, Exhibit 34, all DCSs previously approved by DOE need to be reevaluated?

MR. CRAWFORD: Objection to the foundation; objection, asked and answered; objection, vague.

THE WITNESS: I use that as an example. So I agree.

BY MR. STOUCK:

Q. Okay. You used the acceptance rate change as an example?

A. Yes.

Q. We have now got it in more detailed form on the record.

A. That's fine.

Q. Do you expect that others in RW would share your views about this need to reevaluate previously approved DCSs in light of changed circumstances as the instructions contemplate?

MR. CRAWFORD: Objection to the extent it

Thank you.

(Whereupon, at 4:25 p.m., the deposition adjourned.)

Signature of the Witness

SUBSCRIBED AND SWORN to before me this 10th day of June, 2002.

NOTARY PUBLIC

My Commission expires: 5/14/2006

ERRATA SHEET FOR THE TRANSCRIPT OF:

Notice Date: May 28, 2002
Case Name: Yankee Atomic vs. United States
Case Number: 98-126C-987 4C
Dep. Date: May 23, 2002
Deponent: Alan Brownstein (continued)
Place: Washington DC
Ref. No.: 4269-18

CORRECTIONS:

| Page | Line | Now Reads | Should Read | Reasons Therefore |
|---|---|---|---|---|
| 97 | 23 | approve DCSs | approved DCSs | |
| 116 | 7 | answers | issues | |
| 120 | 16 | in the act | with the act | |
| 220 | 12 | use | used | |
| 235 | 1 | I meant meant | ? | As written, Makes no sense, not sure what I actually said |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

Signature of Deponent

6/11/02
Date of Signature

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

\- - - - - - - - - - - - - - - - - - - - x

YANKEE ATOMIC ELECTRIC COMPANY :
(98-126C)(Merow, S.J.) :
CONNECTICUT YANKEE ATOMIC POWER COMPANY :
(98-154C)(Merow, S.J.) :
MAINE YANKEE ATOMIC POWER COMPANY :
(98-474C)(Merow, S.J.)
Plaintiffs, :
v. :
THE UNITED STATES, :
Defendant. :

\- - - - - - - - - - - - - - - - - - - - x

CERTIFIED COPY

Washington, D.C.
Friday, June 14, 2002

Continued deposition of ALAN BROWNSTEIN, a witness herein, called for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to agreement, the witness being previously duly sworn, taken at the offices of Spriggs & Hollingsworth, 1350 I Street, N.W., Washington, D.C., 20005-3305, at 8:40 a.m., Friday, June 14, 2002, the proceedings being taken down by Stenotype by JAN A. WILLIAMS, RPR, and transcribed under her direction.

legal significance of an approved DCS?

MR. CRAWFORD: Objection to the extent it calls for a legal conclusion.

THE WITNESS: I'm not a lawyer.

BY MR. STOUCK:

Q. Well, you're not a lawyer. But at this time you were working on the program and you were working on these matters. And sometimes nonlawyers have understandings of legal things that relate to their jobs. Maybe you did and maybe you didn't, but I don't know that that's responsive to my question. At this time did you have an understanding of the legal significance of an approved DCS?

MR. CRAWFORD: Objection to the extent it calls for a legal conclusion.

THE WITNESS: Probably not, because I don't recall having a discussion with anybody about that.

BY MR. STOUCK:

Q. Okay. What about at some subsequent time prior to the time that you ceased working on these matters? I'm looking for my notes here. I think it was March 1995. Did you have any discussions with anyone that would have given you, Alan Brownstein, an understanding of the legal significance of approved

DCSs?

MR. CRAWFORD: Same objection.

THE WITNESS: Not that I recall.

BY MR. STOUCK:

Q. And subsequent to that, in '95, you have had no such discussions; is that right or is that not right?

MR. CRAWFORD: Same objection.

THE WITNESS: I think I testified earlier that I may have reviewed a DOJ, you know, document, a reply.

BY MR. STOUCK:

Q. In this litigation?

A. In this litigation.

Q. Was that subsequent to the last time we were here in this deposition room?

A. No.

Q. It was prior to that?

A. Yes.

Q. Was it prior to your first deposition?

A. Yes.

Q. Do you know whether it was prior to or after the DOJ document was filed in court or was it a DOJ document that was filed in court?

MR. CRAWFORD: Objection to the extent it

calls for speculation.

THE WITNESS: I reviewed it -- a draft DOJ document. And I testified to that before too.

BY MR. STOUCK:

Q. Okay. Again I really apologize.

A. Yeah.

Q. It's been a long deposition, I just did not recall that. I'm not trying to ask you the same questions over.

A. And I believe, you know, that addressed some of that issue. So that's what jogged my memory.

Q. So based on that you have an understanding or at least at the time you read this you had an understanding of what DOJ's current position about the legal significance of this is?

MR. CRAWFORD: Well, objection, asked and answered and to the extent that that may have mischaracterized anything he previously testified to.

THE WITNESS: There was discussion about --

MR. CRAWFORD: And I'm going to instruct the witness not to reveal anything about any discussions with any DOJ lawyers about any kind of matter discussed with respect to this litigation at all.

THE WITNESS: Okay. Well, that's fine. I think somewhere in that draft there was, you know, some views expressed about what the government's -- Department of Justice's views were with respect to the legal effect of the DCSs. I read those words.

BY MR. STOUCK:

Q. Approximately when was that, do you recall, within the last year?

MR. CRAWFORD: Objection to the extent it calls for speculation.

THE WITNESS: Yeah, within a year, within the last year.

BY MR. STOUCK:

Q. Okay. Can you place it any more specifically than that in time?

MR. CRAWFORD: Objection, asked and answered.

THE WITNESS: No.

BY MR. STOUCK:

Q. But, prior to reading that draft and prior to whatever discussions grew out of that draft, you had no understanding of the legal significance, you had no discussions with anyone who would have given you any other basis for having any understanding of the legal significance of the DCSs; is that right?

A. That's right. And why I brought that up is because, you know, my reaction was, well, that's interesting, when I read that it was interesting. I never discussed it or thought about that before.

Q. Directing your attention to the very last sentence of Exhibit No. 109, I'll read it, it says what liabilities and obligations on the part of both parties are locked in by the DCS submittal and approval process.

A. Okay.

Q. Now, that's a question that -- you know, the words are different. But it's very similar to this question about the legal significance, is that right, do you agree with that?

A. I agree with your statement.

Q. So, therefore, you had no understanding of what liabilities and obligations on the part of both parties are locked in by the DCS submittal and approval process contemporaneous with this document in August of '91; is that right?

A. That's right.

Q. And you had no understanding about those matters as of the time you stopped working on waste acceptance matters in March 1995?

A. That's accurate.

Q. And you had no understanding about those matters at least prior to the time that whatever understanding you gained by reading this draft that you just referred to?

A. That's correct.

(Recess.)

BY MR. STOUCK:

Q. Do you know whether the standard contract or any of these -- not these standard contracts but any of these individual waste acceptance contracts with the utilities were ever amended?

MR. CRAWFORD: Well, object to the extent of lack of foundation and to the extent it would call for speculation.

But go ahead.

MR. STOUCK: I'm not asking for speculation, I'm just asking if he knows if any of them were ever amended.

MR. CRAWFORD: Then maybe my objection is more appropriately objection, vague.

THE WITNESS: Yeah, I believe there were some modifications made. It would be hard for me to tell you what they were. But I remember there were some modifications made.

BY MR. STOUCK:

have been correct had that said ACR instead of contract.

MR. STOUCK: Mr. Brownstein, you are done for today subject to what I just told you.

THE WITNESS: Thank you.

MR. CRAWFORD: We'll reserve any further questioning of the witness until the time of trial.

(Discussion off the record.)

MR. CRAWFORD: I will reserve the right to ask questions should Mr. Stouck succeed as he states that he intends to do in getting Mr. Brownstein before him again. But I will say that we will oppose that.

MR. STOUCK: Okay. Good. Thanks a lot.

(Whereupon, at 3:30 p.m., the taking of the instant deposition ceased.)

[signature]

Signature of the Witness

SUBSCRIBED AND SWORN to before me this 26th day of June, 2002.

[signature]

NOTARY PUBLIC

My Commission expires: 5/14/06

ERRATA SHEET FOR THE TRANSCRIPT OF:

Notice Date: June 17, 2002
Case Name: Yankee Atomic vs. United States
Case Number: 98-126C-987 4C
Dep. Date: June 14, 2002
Deponent: Alan Brownstein
Place: Washington DC
Ref. No.: 4269-45

CORRECTIONS:

| Page | Line | Now Reads | Should Read | Reasons Therefore |
|---|---|---|---|---|
| 263 | 11 | signed as the | signed the | |
| 263 | 24 | I reported to Billy | I worked with Billy | |
| 267 | 18 | active | acting | |
| 335 | 12 | not a attorney | not a program attorney | |
| 389 | 14 | dissolving | devolving | |
| 393 | 7 | Alyssa | Elissa | |
| 401 | 19 | directed | direct | |

[signature]
Signature of Deponent