# EXHIBIT 11

CERTIFIED COPY



IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - - - x
YANKEE ATOMIC ELECTRIC :
COMPANY, :
Plaintiff, : Case No. 98-126C
v. : Senior Judge
: Merow
THE UNITED STATES, :
Defendant. :
- - - - - - - - - - - - - - - - - - x

Washington, D.C.
Thursday, April 22, 1999

Continued deposition of NANCY H. SLATER, a witness herein, called for examination by counsel for Plaintiff in the above-entitled matter, pursuant to agreement, the witness being previously duly sworn, taken at the offices of Spriggs & Hollingsworth, 1350 I Street, N.W., Washington, D.C., at 2:10 p.m., Thursday, April 22, 1999, and the proceedings being taken down by Stenotype by JAN A. WILLIAMS, RPR, and transcribed under her direction.

aware that the utility industry did not support priority for shutdown reactors. In fact, their stated consensus position was that priority should not be afforded to shutdown reactors.

Q. So it was not intended that the delivery commitment schedule process be a gotcha process?

A. A static process.

Q. Right, that, gee, you only requested five and now, even though we can accommodate 20, you've wanted all along to do 20, we're not going to let you because you only asked for five, that was not the intention?

A. That's correct, it was not our intention to do that.

Q. And we might have covered this yesterday, but let me just make sure it's clear, that the delivery commitment schedule was intended to indicate how much spent fuel the utility wanted to deliver up to the limit of their allocation?

A. In part, because recall that the discharge date of the fuel earned you a slot in the acceptance priority ranking, but the fuel you could actually deliver did not have to be the

out its scope. I don't precisely recall which section in the contract discusses the annual capacity report.

Q. If you want to turn to page 10, the paragraph above Article V. Is that what you were referring to?

A. Yes, because it establishes it as a document for planning purposes only because there is a recognition that system capacity could change up or down.

Q. So the annual capacity report was not intended to be binding on the parties?

A. It was not intended to be absolute in the sense that again it's a planning document. And DOE, and I distinctly remember saying this and I distinctly remember it being said to me when I was on the utility side, DOE had always stated that, if we were able to improve the system capacity, then the ACR would reflect those improvements in system capacity.

And the APR would be used to readjust which utilities, when, and how much fuel. So, as a planning document, planning documents are subject to change.

And the ACR as I understood it was to

communicate to the utilities what DOE believed was the likely receipt rate at a repository, the likely acceptance rate, and to accept who was likely to deliver during the first ten years of system operation based on the APR.

Q. What was the first ACR that you were involved in?

A. Let's see. I joined DOE in August of '91, and I don't recall which ACR that was. But I would probably have been involved in the ACR starting on the ACR that was issued in '92.

Q. What would your role have been in determining that amount that DOE was going to tell utilities DOE was expecting to -- what they expected the annual receiving rate for the facilities to be, what would your role have been in that?

A. None, nothing.

Q. Who would have made that determination?

A. I don't recall who precisely made the determination because I believe those receipt rates were established in ACR's prior to my advent with the program. And there were no changes in those receipt rates for this document that I'm aware of. So the document -- the

MR. SHAPIRO: Why don't we stop for the day here and discuss where to go next.

(Whereupon, at 4:50 p.m., the deposition adjourned, to be resumed on Thursday, April 22, 1999, at 2:00 p.m.)

W. Hale Thompson

Signature of the Witness

SUBSCRIBED AND SWORN to before me this 2nd day of August, 2002.

Sharon Fay Veller

NOTARY PUBLIC

My Commission expires: February 28, 2003

Page _____of______

ERRATA SHEET FOR THE TRANSCRIPT OF:

Notice Date: 04/29/99
Case Name: Yankee Atomic Electric Company v. The United States
Case Number: 98-126C
Dep. Date: 04/21/99 / / / / / /
Deponent: Nancy H. Slater
Place: Washington, DC
TS#: 78077

CORRECTIONS:

| Page | Line | Now Reads | Should Read | Reasons Therefore |
|---|---|---|---|---|

No comments

N Slater Thompson
Signature of Deponent

8-2-02
Date of Signature

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - x
YANKEE ATOMIC ELECTRIC :
COMPANY, MAINE YANKEE ATOMIC :
POWER CO., and CONNECTICUT :
YANKEE ATOMIC POWER CO., : Case No. 98-126C
Plaintiffs : 98-474C, 98-154C
-v- : (Senior Judge
: Merrow)
UNITED STATES OF AMERICA, :
Defendant :
- - - - - - - - - - - - - - - - x

Certified Copy

Washington, D.C.
Thursday, June 13, 2002

Deposition of NANCY SLATER THOMPSON, a witness herein, called for examination by counsel for the Plaintiff in the above-entitled matter, pursuant to notice, the witness being duly sworn, taken at the offices of Spriggs & Hollingsworth, 1350 I Street, N.W., Washington, D.C., at 9:40 a.m., Thursday, June 13, 2002, and the proceedings being taken down in Stenotype by DEBORAH K. WILKINS, RPR, and transcribed under her direction.

it calls for a legal conclusion. Objection, foundation.

A. I do not recall.

Q. Isn't such a limitation inconsistent with the language that we just focused on, all spent fuel or all SNF and/or HLW the purchaser wishes to deliver?

MS. SULLIVAN: Objection, argumentative. Objection to the extent it calls for a legal conclusion.

You may answer.

A. No, I don't believe it is inconsistent. It's all fuel that you wish to deliver within the bounds of what you are entitled to deliver.

Q. A little while ago you referred to the ACR as a planning document. What did you mean by that?

MS. SULLIVAN: Objection. The documents speak for themselves.

You may answer.

A. As we have discussed in my prior deposition and previously in this deposition, the ACR represents a planning basis. The acceptance rates are subject to influences by future budget

constraints, lack of a facility, unavailability of transportation casks.

For example, no one would have contemplated at the time that I did these that we would have an RSA, Regional Services Agreement, that would in fact contract out with someone else to provide the transportation which would have financial effects and could have scheduling and capacity effects. It's a planning document. And in fact when I sat on the utilities side of the table the industry recognized that not only was the ACR for planning purposes only, but that in fact their DCSs were for planning purposes, and they filled DCSs out consistent with that planning presumption because providing a range of discharge dates which might be over a 10-year period certainly doesn't permit a system to do more than plan.

Q. A couple sentences before the end of your answer, you said it was understood by the industry that both the ACRs and the delivery commitment schedules were for planning purposes only. By using the word "only," did you mean to exclude -- what did you mean to exclude?

A. That we viewed the DCSs as fungible,

and we have been through that in prior deposition as well; that the industry recognized that in fact they wouldn't be providing us with specifics about what they wanted us to accept until they submitted a final delivery schedule; and the final delivery schedule actually does represent the commitment on their part to this reactor, this time, this amount of fuel, this age fuel, so greater specificity with the FDS, ball park with the DCS.

It was important for the utilities to give us DCSs because of their very fungibility. If you didn't submit a DCS, you couldn't exchange your slot in the cue, and given that those exchanges were possible, I don't know how one would perceive a DCS as anything other than for planning purposes.

Q. Let's go back first just to the ACRs and the statement that they are for planning purposes only.

When you say that ACRs were for planning purposes only, does that mean that the ACRs were not meant to be binding on the Department of Energy?

MS. SULLIVAN: Objection, vague. Objection to the extent it calls for a legal

conclusion.

A. I can't speak to that legal issue or speak for a contracting officer. In my estimation, that's a question you would have to ask someone else.

Q. When you published the 1995 ACR, did you understand that you were committing the Department of Energy to accept the amount of spent fuel noted in the waste acceptance projections in that document?

MS. SULLIVAN: Objection to the extent it calls for a legal conclusion. Objection, the document speaks for itself. Objection, vague.

A. My understanding is entirely consistent with the sentence at the bottom of page 1 in the -- I guess this would be Exhibit 3, which is the 1995 ACR. As specified in the Standard Contract, the ACR is for planning purposes only, and this is not contractually binding on either DOE or the purchasers. And so were I to reason this out and not make a legal decision, I would have to say as a simple engineer my clear reading of that language would say if it's in the contract, everyone, including the utility, would be well aware of that.

Q. What about the delivery commitment schedules? Was it your understanding that those similarly were for planning purposes only and not contractually binding on either the utilities or the department?

MS. SULLIVAN: Objection to the extent it calls for a legal conclusion. Objection, vague.

A. In my personal opinion, they were for planning purposes only and in fact were completed in such a way that not much but planning could be done based on the information contained in them. In addition, given the fungibility of the DCSs, that's why there is a final delivery schedule which is somewhat more than a planning document. And I do recall siting across the table from numerous utility representatives, clearly recognizing that the DCSs were planning purposes, and they in fact did not view themselves as binding themselves to deliver specifically what was described on the DCS.

Q. During the time that you worked in the waste acceptance division at the Department of Energy, do you recall anyone either within DOE or in industry who thought that the delivery

commitment schedules were binding on either industry or the department?

MS. SULLIVAN: Objection, vague. Objection to the extent it calls for a legal conclusion.

A. No, I don't.

Q. You said something a minute ago that I guess has me a little confused. You said that the delivery commitment schedules are definitely for planning purposes but they provided relatively little information so you couldn't do much planning with them. I may be getting your language a little wrong, but what did you mean by that?

A. The DCSs -- and you need to put this in the context of their fungibility -- the DCSs, were they to remain as is, would provide you with the location of the reactor to which you would arrive to pick fuel up, so you know the type of fuel, you can plan appropriately for the type of cask to send. Given that they have submitted one DCS for, let's assume, 10 MTU, you know how many casks to send. The date on which you would show up and schedule a pickup was not resolved until the FDS because that was actually done in

ask you --

A. Conceptually.

Q. Approved. Let's focus on approved.

Do you believe that a delivery commitment schedule that's been proposed and approved is binding on any party?

MS. SULLIVAN: Objection to the extent it calls for a legal conclusion.

You may answer.

A. In my personal opinion, I do not believe that it is binding because I do not believe -- I am at a loss as to how you could bind yourself to anything in a range of discharge dates. I am at a loss as to how you could bind yourself when it's not final.

Q. So a utility wouldn't even be binding itself as to the total amount of MTU of spent fuel that it would be delivering to DOE in a particular year?

MS. SULLIVAN: Objection to the extent it calls for a legal conclusion. Objection, vague.

A. I think it is possible that a utility in fact could deliver less than it indicated on its DCS for whatever reason.

Q. Did you view an approved delivery commitment schedule as binding a utility to not delivering more spent fuel than is set out on that delivery commitment schedule?

MS. SULLIVAN: Objection to the extent it calls for a legal conclusion. Objection, vague.

A. It's not the DCS that establishes the allocation. It's simply a reflection.

Q. What sets out the allocation?

A. The ACR; and that's for planning purposes only because that allocation could change.

Q. And is it fair to say then that the allocations reflected on the delivery commitment schedules are not binding because they are based in turn on the allocations set out in the Annual Capacity Reports which say explicitly that they are not binding?

MS. SULLIVAN: Objection. Calls for a legal conclusion.

A. I really think that's a legal issue. We are really stepping beyond what I feel skilled enough to answer.

MR. SHAPIRO: Do you want to take a

with a better understanding of how to complete the form. This was a cooperative effort, mutually agreed to by both sides. That's why we took the time once we had drafted instructions to go back over and discuss the instructions with them and get comments.

Q. Did you view the DCS instructions as guidance to utilities as to how to fill out their delivery commitment schedule forms or did you view the instructions more directly as requirements for how the forms must be filled out by utilities?

MS. SULLIVAN: Objection to the extent it calls for a legal conclusion.

You may answer.

A. I view the DCS instructions as my expectations for what it would take in completing these forms in order for me to approve a DCS. For example, if I told them, which I did on page 2, section 7, section E, that if they exceeded their allocation I would disapprove the DCS, I view that as an instruction.

Actually, that point is also made clear on page 5, item number 2.5, that says: The total quantity of SNF designated for delivery must not exceed the allocation in the ACR.

Exceeding the allocation will result in disapproval of the DCS (S).

This is Exhibit 10.

Q. Do you recall whether you ever disapproved a proposed delivery commitment schedule for any reason other than the proposed schedule exceeding a utility's allocation of spent fuel acceptance?

A. No, I don't.

Q. I am not sure that -- maybe I didn't ask the question quite clearly enough.

You don't recall whether you did or you recall that you didn't disapprove any for any other reason?

A. I do not recall whether I disapproved additional DCSs for reasons other than having exceeded the acceptance allocation.

Q. We have been talking about you approving or disapproving delivery commitment schedule forms submitted by utilities. Technically, wasn't it the contracting officer who was doing the approval or disapproval?

A. Yes, but as the contracting officer's technical representative, it was my responsibility by virtue of my signature to make a

recommendation.
Q. And as a practical matter, you were in fact the person who was approving or disapproving; wouldn't that be a fair statement?
A. Well, I can't make that statement. That's to imply that the contracting officer had no role whatsoever and did no review.
Q. Did the contracting officer ever disagree with one of your recommendations concerning the approval or disapproval of a proposed delivery commitment schedule?
A. Not that I recall.
Q. Did the contracting officer ever question one of your recommendations to approve or disapprove a proposed delivery commitment schedule?
A. Not that I recall.
Q. Did the contracting officer ever question any of your recommendations that you made in your role as COTR?
MS. SULLIVAN: Objection. Vague.
A. That's a lot of history and a lot of time. Unless you can be more specific, I am not sure I can answer that question.
Q. I am just asking for your

THE REPORTER: Reading and signing?

MS. SULLIVAN: Yes, reading and signing.

Off the record.

(Thereupon, at 4:35 p.m., the taking of the instant deposition was ceased.)

\- - - - - -

Signature of the Witness

N. Slater Thompson

SUBSCRIBED AND SWORN to before me this 2nd day of August, 2002.

Sharon Fay Sellers

NOTARY PUBLIC

My Commission Expires: February 28, 2003

ERRATA SHEET FOR THE TRANSCRIPT OF:

Notice Date: June 17, 2002
Case Name: Yankee Atomic vs. United States
Case Number: 98-126C-987 4C
Dep. Date: June 13, 2002
Deponent: Nancy Slater Thompson
Place: Washington DC
Ref. No.: 4269-37

CORRECTIONS:

| Page | Line | Now Reads | Should Read | Reasons Therefore |
|---|---|---|---|---|
| 24 | 15 | "build" half a | "fill" half a | misunderstood word |
| 27 | 3 | had one "assembled" | had one "assembly" | misunderstood word |
| 52 | 7 | older | younger | probably confused by older v colder |
| 82 | 9 | recall | called | misunderstood word |
| 93 | 20 | NCR | ACR | typo |
| 101 | 15 | hour | our | misunderstood word |
| 106 | 16 | here | year | misunderstood word |
| 122 | 16 | your | year | misunderstood word |
| 132 | 2 | There's | That's | misunderstood word |
| 146 | 8 | part two | Part 2 | (reference is to 10CFR Part 2) |
| 150 | 4 | delivered | delivery | misunderstood word |
| 157 | 5 | commute | go to | misunderstood word |
| | | end of errata | | |

Kimberly A. Smith

KIMBERLY A. SMITH
Notary Public - Nevada
No. 99-51976-1
My appt. exp. Jan. 29, 2003

July 18, 2002.

N. Slater Thompson
Signature of Deponent