# EXHIBIT 12

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - - - - - x
YANKEE ATOMIC ELECTRIC COMPANY, :
(98-126C) :
CONNECTICUT YANKEE ATOMIC POWER COMPANY :
(98-154C) :
MAINE YANKEE ATOMIC POWER COMPANY :
(98-474C) :
FLORIDA POWER & LIGHT COMPANY :
(98-483C) :
NORTHERN STATES POWER COMPANY :
(98-484C) :
DUKE POWER, A Division of DUKE :
ENERGY CORP. (98-485C) :
INDIANA MICHIGAN POWER COMPANY :
(98-486C) :
SACRAMENTO MUNICIPAL UTILITY DISTRICT :
(98-488C) :
SOUTHERN NUCLEAR OPERATING COMPANY, :
et al., (98-614C) :
COMMONWEALTH EDISON COMPANY :
(98-621C) :
BOSTON EDISON COMPANY :
(99-447C) :
GPU NUCLEAR, INCORPORATED :
(00-440C) :
WISCONSIN ELECTRIC POWER COMPANY, :
(00-697C) :
POWER AUTHORITY OF THE STATE OF :
NEW YORK (00-703C) :
OMAHA PUBLIC POWER DISTRICT :
(01-115C) :
NEBRASKA PUBLIC POWER DISTRICT :
(01-116C) :
TENNESSEE VALLEY AUTHORITY :
(01-249C) :
Plaintiffs, :
v. :
UNITED STATES OF AMERICA, :
Defendant. :
- - - - - - - - - - - - - - - - - - - - x

Washington, D.C.
Friday, May 3, 2002

Continued Deposition of RONALD MILNER, a witness herein, called for examination by counsel for

Department goes and prepares an APR, all the allocations for the fifth year will be different than they were originally in the '90s?

A. Yes, okay.

Q. Okay. So a utility that submitted a DCS for an allocation based on the rates in the early '90s may have a different allocation under current forecasts?

MR. SHULTIS: Calls for speculation.

THE WITNESS: I would assume, yes.

BY MR. TOMPKINS:

Q. Okay. Do you know what the Department is, or the program OCWRM is currently planning on doing about the fact that the allocations may be different with the DCS forms? Are they going to go back and have utilities prepare a new DCS form based on these rates?

A. Actually we've not addressed that yet.

MR. SHULTIS: Objection.

BY MR. TOMPKINS:

Q. Haven't addressed it. Would it be reasonable to assume that utilities will have that option?

MR. SHULTIS: Objection, calls for speculation. Mr. Milner's not a 30(b)(6) witness.

THE WITNESS: The Department simply has not addressed that yet. We decided we should probably focus our efforts on getting a site first and then work out the details.

BY MR. TOMPKINS:

Q. I'd like to turn your attention back to Milner Exhibit 43 which are the DCS instructions.

Under the general instructions which start on page one and go on page two, item 7C, we had discussed this yesterday but I just want to now apply this to the situation we've just been talking about. It states that in the event that such circumstances change, all DCS's previously approved by DOE may need to be reevaluated by DOE and the purchaser.

Would this type of change of allocation be the type of event that may implicate this instruction?

MR. SHULTIS: Objection, calls for a legal conclusion and also speculation.

THE WITNESS: In my opinion it would.

BY MR. TOMPKINS:

Q. One final question on this DCS form and I believe you testified about this earlier too. Instruction 7B states that once a purchaser has an allocation, any SNF owned by the purchaser can be designated for delivery against the allocation. Is

## *CERTIFICATE OF REPORTER*

***UNITED STATES OF AMERICA ) ss.:***

***COMMONWEALTH OF VIRGINIA )***

I, **CYNTHIA R. SIMMONS, RPR, CRR,** the officer before whom the foregoing deposition was taken, do hereby certify that the witness whose testimony appears in the foregoing deposition was duly sworn by me; that the testimony of said witness was taken by me to the best of my ability and thereafter reduced to typewriting under my direction; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this deposition was taken, and further that I am not a relative or employee of any attorney or counsel employed by the parties thereto, nor financially or otherwise interested in the outcome of the action.

Cynthia R Simmons

*Notary Public in and for*

*the Commonwealth of Virginia*

*My Commission expires: 11/30/2004*

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - - - - - -)
YANKEE ATOMIC ELECTRIC COMPANY )
(98-126C)(Merow, S.J.) )
CONNECTICUT YANKEE ATOMIC POWER )
COMPANY )
(98-154C)(Merow, S.J.) ) Volume I
MAINE YANKEE ATOMIC POWER COMPANY) Washington, D.C.
(98-474C)(Merow, S.J.) ) Tuesday
Plaintiffs, ) May 7, 2002
v. )
THE UNITED STATES, )
Defendant. )
- - - - - - - - - - - - - - - - - - - - -)

CERTIFIED COPY

Deposition of RONALD A. MILNER, a witness herein, called for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to agreement, the witness being duly sworn by CHERYL A. LORD, a Notary Public in and for the District of Columbia, taken at the offices of SPRIGGS & HOLLINGSWORTH, 1350 I Street, N.W., Washington, D.C., at 3:48 p.m., Tuesday, May 7, 2002, and the proceedings being taken down by Stenotype by CHERYL A. LORD, RPR, CRR, and transcribed under her direction.

department's position at the time that the delivery commitment schedule submitted by purchasers had to be based upon the waste acceptance schedule reflected here on page 5?

MR. SHULTIS: Objection. The document speaks for itself, Mr. Milner is not a 30(b)(6) witness, and calling for a legal conclusion.

A. In my opinion, that's what this states, yes.

BY MR. SKALABAN:

Q. And then also, sir, if you could please take out Exhibit 43. And on page -- for the record, Exhibit 43 is the DCS instructions. It's entitled, United States Department of Energy instructions for completing the appendix C delivery commitment schedule general instructions.

And item two, it says, who should submit. And it states there, the DCS should be submitted by all purchasers with allocations in the 1991 annual capacity report.

And that further suggests, does it not, that the department was requiring the purchasers to use this waste acceptance schedule here on page 5 of the -- of Milner 42 as well as the individual breakdown of allocations which appear on page 9 of

the 1991 ACR?

MR. SHULTIS: Objection. The document speaks for itself, calls for a legal conclusion.

A. In my opinion, that's what it states.

BY MR. SKALABAN:

Q. And if I could turn your attention to the specific instruction portion of this document, Milner 43 of the DCS instructions, there's a paragraph entitled, 2.7, on page 6. And if you could just take a moment to read paragraph 2.7.

A. Okay.

Q. This paragraph says -- or -- I'm sorry. In the second sentence of this paragraph after a comma, it states, quote: The total quantity of SNF designated for delivery must not exceed the allocation in the ACR, semicolon, exceeding the allocation will result in the approval of the DCS.

MR. SHULTIS: Objection, mischaracterizes the document.

MR. SKALABAN: Oh, I'm sorry. Okay. Thank you, counsel.

BY MR. SKALABAN:

Q. Exceeding the allocation will result in the disapproval of the DCS.

And doesn't this part 2.7 further confirm

that the department will require the purchasers to follow the waste acceptance schedule in page 5 and page 9 of the 1991 ACR?

MR. SHULTIS: Objection. The document speaks for itself, Mr. Milner is not a 30(b)(6) witness, calls for a legal conclusion.

A. In my opinion, that's what it says -- indicating here.

BY MR. SKALABAN:

Q. And is therefore, assuming that purchasers followed the instructions and submitted DCSs on the basis of the 1991 ACR -- the delivery commitment schedules would then be based upon a waste acceptance schedule that was not consistent with the Nuclear Waste Policy Act?

MR. SHULTIS: Objection, calls for a legal conclusion and -- objection, calls for a legal conclusion, and also Mr. Milner is not a 30(b)(6) witness.

MR. SKALABAN:

Q. Specifically to give you further clarification, I mean the Nuclear Waste Policy Act schedule linkages between the MRS and the repository.

MR. SHULTIS: Same objections.

BY MR. SKALABAN:

Q. The DCSs were -- do you understand my question?

A. No, I don't.

Q. I mean, assuming then, that the purchasers followed the instructions and submitted DCSs based on the schedules in the 1991 annual capacity report, then the DCSs would be based upon a waste acceptance schedule that was inconsistent with the statutory linkages in the Nuclear Waste Policy Act?

MR. SHULTIS: Objection. It calls for a legal conclusion.

A. You're talking schedule linkage?

BY MR. SKALABAN:

Q. Yes, sir.

A. Well, I just don't view it as inconsistent in the sense that certainly in my opinion at the time there was a possibility of that schedule linkage being removed.

Q. But it was -- but the schedule linkage was there?

A. Yes.

Q. And so as the law then existed and as it exists now, because I don't believe -- scratch that.

As the law then existed, the DCSs were based on a waste acceptance schedule that was

inconsistent with the Nuclear Waste Policy Act's schedule linkages as they existed at this time?

A. Sitting here today looking at that, that would be my opinion.

Q. And to your knowledge, the schedule linkages have never been changed. There's -- I'm sorry.

Let me ask a more artful question.

There hasn't been a change in the law removing those schedule linkages?

A. No, there has not.

Q. Mr. Milner, if you could just give me a general overview of how -- as the chief operating officer of OCRWM, how you envision the actual overall process of waste acceptance, transportation, disposal unfolding when it begins in approximately -- as you anticipate in 2010, an overview, just kind of a general overview of the process.

How do you envision that working?

MR. SHULTIS: I'm sorry. Which process?

MR. SKALABAN: The process of the -- well, let's say the real logistical process of sort of waste acceptance, transportation, disposal.

BY MR. SKALABAN:

Q. How do you envision that happening in

Page 42

fuel for purposes of the schedule.
BY MR. SKALABAN:
Q. Whether it would be technically feasible to accept that spent fuel?
A. On the currently agreed-to schedule.
Q. Do you have an understanding of what would happen if the department thought it wasn't technically feasible to do it at that point in time on the currently agreed-to schedule?
MR. SHULTIS: Objection, vague, calls for a legal conclusion. Mr. Milner is not a 30(b)(6) witness.
A. I guess in my opinion if the department determined that it wasn't technically feasible on the schedule and since we've already stated that we would accept it, it would move back in the queue.
BY MR. SKALABAN:
Q. Well, does this read to you more like just a basic operational provision, whereas the department is going to look at the individual case, if it can't accommodate it at that time, it's going to move it back a little bit?
A. That's the way I would read it.
MR. SHULTIS: Asked and answered.

Page 43

BY MR. SKALABAN:
Q. This doesn't suggest to you that failed fuel is going to be put back years later in the queue, does it?
MR. SHULTIS: Objection, asked and answered, calls for a legal conclusion.
A. I couldn't say on that. It would depend on the nature of the fuel.
BY MR. SKALABAN:
Q. Well, assuming that there was an NRC-licensed container for that failed fuel, would the department then accept it upon the currently agreed schedule?
MR. SHULTIS: Objection, calls for speculation, asks for a legal conclusion.
A. I guess in my opinion, if for that specific failed fuel, if there were an NRC-certified container, the NRC said, yep, that particular fuel is okay to move in that container, then, yes.
There's all kinds of failed fuel. You can have a fuel rod that goes -- the cladding is slightly unzipped, or it can have it totally failed and a bunch of pellets laying at the bottom of the pool. That's the extreme case, of

Page 44

course.
BY MR. SKALABAN:
Q. And in the extreme case, do you know whether or not the technology has been developed to put that into a safe, licensed container?
MR. SHULTIS: Objection, calls for a legal conclusion.
A. I don't know. That would be a utility operation responsibility in any event.
BY MR. SKALABAN:
Q. But it's possible that that kind of situation would be dealt with?
A. As an engineer, I like to think that most things are technically feasible.
Q. And you have no reason to believe that it wouldn't be technically feasible to develop a safe, NRC-licensed container to handle that extreme situation you posited?
MR. SHULTIS: Objection, calls for a legal conclusion.
A. I can't think of any.
MR. SKALABAN: Can we go off the record a

Page 45

second?
(Whereupon, at 5:08 p.m., the taking of the instant deposition adjourned.)

Ronald A. Milner
Signature of the Witness
SUBSCRIBED AND SWORN to before me this 24th day of May, 20 02.
Pat L. Austin
Notary Public
My Commission Expires: 5/14/06

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

```
- - - - - - - - - - - - - - - - - - - -)
YANKEE ATOMIC ELECTRIC COMPANY         )
(98-126C)(Merow, S.J.)                 )
CONNECTICUT YANKEE ATOMIC POWER        )
COMPANY                                ) Volume II
(98-154C)(Merow, S.J.)                 ) Washington, D.C.
MAINE YANKEE ATOMIC POWER COMPANY)     ) Wednesday
(98-474C)(Merow, S.J.)                 ) May 8, 2002
               Plaintiffs,             )
           v.                          )
THE UNITED STATES,                     )
               Defendant.              )
- - - - - - - - - - - - - - - - - - - -)
```

CERTIFIED COPY

Continued Deposition of RONALD A. MILNER, a witness herein, called for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to agreement, the witness being duly sworn by CHERYL A. LORD, a Notary Public in and for the District of Columbia, taken at the offices of SPRIGGS & HOLLINGSWORTH, 1350 I Street, N.W., Washington, D.C., at 9:20 a.m., Wednesday, May 8, 2002, and the proceedings being taken down by Stenotype by CHERYL A. LORD, RPR, CRR, and transcribed under her direction.

schedule at that point. It did not disapprove it. It just did not act on it, did not approve it.

BY MR. SKALABAN:

Q. Was the department intending to convey to purchasers at this time that the DCS and final delivery commitment schedule process had been in effect suspended?

MR. SHULTIS: Objection. The document speaks for itself, calls for a legal conclusion, and Mr. Milner is not a 30(b)(6) witness.

A. Well, I guess in my opinion, the -- when you got to the point of final delivery schedules, you then specified specific dates. Since the department didn't have a facility in operation, it felt that it couldn't approve or disapprove final schedules since we didn't know when a facility would be in operation.

BY MR. SKALABAN:

Q. Well, would DCSs in your view be binding if no final delivery schedule had been finalized?

MR. SHULTIS: Objection, calls for a legal conclusion.

A. I guess my understanding of the process of the contract is that, no, if a final delivery schedule had not been approved, then nothing in the DCS binds either party to accept or deliver waste on

a specified date.

BY MR. SKALABAN:

Q. So if no final delivery commitment schedules had been approved for Yankee Atomic, Maine Yankee, or Connecticut Yankee, there would be no binding commitments on either party?

MR. SHULTIS: Objection, calls for a legal conclusion.

BY MR. SKALABAN:

Q. Either DOE or Maine Yankee, Connecticut Yankee, on Yankee Atomic?

MR. SHULTIS: Objection, calls for a legal conclusion.

A. I don't understand the question.

BY MR. SKALABAN:

Q. Well, if I -- following up on your last answer and if I understood it, what you just testified to was that if an FDS had never been approved, there wouldn't be a binding commitment between Yankee Atomic and the department, and I'm asking, would that hold true for Connecticut Yankee and Maine Yankee if they never had a final commitment delivery schedule approved for the department?

MR. SHULTIS: Objection, calls for a legal conclusion, asks for speculation.

Page 284

which fuel the utility shipped to us.
Q. How so?
A. Utilities verbally -- I don't recall anything in writing -- but I think utilities verbally indicated to us that if they placed fuel in dry storage, they would more likely give us fuel out of spent fuel pool than pull it out of dry storage.
Q. I see. If I can call your attention to Bates No. HQ 0013570, and it's a page entitled, dry storage requirements, 1998 to 2002.
A. Yes.
Q. In the I guess the third paragraph, it says: There are eight shutdown reactors prior to 1998. No additional reactors shut down during the period 1998 to 2002. The annual maintenance cost at each of these reactors is assumed to be 4.5 million.
Do you know where the 4.5 million figure came from?
A. No, specifically I don't. I vaguely recall at some point in time that utilities were basically asked what their costs were. Whether that is the basis of this figure, I don't know.
Q. Okay. Do you have any reason to believe it's -- or it's an accurate estimate?
I mean, do you believe it's an accurate

Page 285

estimate at the time?
A. I don't know.
Q. Just don't know.
Why was the department looking for this information about the number of shutdown reactors and the annual maintenance cost of those reactors?
MR. SHULTIS: Objection, asked and answered.
A. The department was interested in the status of reactors and storage, and certainly we had been interested in utility cost.
BY MR. SKALABAN:
Q. And part of your interest in utility cost was to help promote efficiency in the overall system and at the individual reactor sites?
A. Yeah.
MR. SHULTIS: Asked and answered.
A. It had been a goal of the department to minimize those costs to the extent possible, looking at the industry as a whole.
MR. SKALABAN: Mr. Milner, I have no further questions.
THE WITNESS: Okay.
MR. SHULTIS: I don't have any redirect.
MR. SKALABAN: Great.

Page 286

MR. SHULTIS: Off the record.
MR. SKALABAN: We are concluded.
(Whereupon, at 6:02 p.m., the taking of the instant deposition ceased.)

Ronald A. Milner
Signature of the Witness

SUBSCRIBED AND SWORN to before me this 24th day of May, 20 02.

[signature]
Notary Public

My Commission Expires: 5/14/06

Page 287

CERTIFICATE OF COURT REPORTER
UNITED STATES OF AMERICA )
DISTRICT OF COLUMBIA )

I, CHERYL A. LORD, the reporter before whom the foregoing deposition was taken, do hereby certify that the witness whose testimony appears in the foregoing deposition was sworn by me; that the testimony of said witness was taken by me in machine shorthand and thereafter transcribed by computer-aided transcription; that said deposition is a true record of the testimony given by said witness; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this deposition was taken; and, further, that I am not a relative or employee of any attorney or counsel employed by the parties hereto, or financially or otherwise interested in the outcome of this action.

CHERYL A. LORD
Notary Public in and for the
District of Columbia
My Commission expires April 30, 2006

# EXHIBIT 13

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

CONNECTICUT YANKEE ATOMIC POWER COMPANY

Plaintiff,

v.

UNITED STATES OF AMERICA,

Defendant.

No. 98-154C
(Senior Judge Merow)

**DEFENDANT'S WITNESS LIST**

Pursuant to the Court's pretrial order issued November 4, 1998, as amended by subsequent orders, defendant submits the following list of witnesses. This list does not contain witnesses that the defendant may choose to use for impeachment. Defendant reserves the right to amend this list as described in the Court's rules. Defendant also reserves the right to call all witnesses listed on plaintiff's witness list.

**Fact Witnesses**

Government, Contractor or former Government employees

1. Christopher S. Bajwa
Thermal Engineer
Nuclear Regulatory Commission
One White Flint North
11555 Rockville Pike
Rockville, Maryland 20852-2738

Mr. Bajwa will testify concerning the licensing process and requirements for fuel storage and transportation.

2. Lake Barrett
7805 Potters Mill Court
Derwood, Maryland 20855

Mr. Barrett, former Director of the Office of Civilian Radioactive Waste Management, will provide testimony concerning the Government's implementation of the Standard Contract, including acceptance rates, priority for shutdown reactors, the Annual Capacity Report ("ACR") issue resolution process conducted with industry representatives, the issuance and content of the ACRs, the issuance and content of the Acceptance Priority Rankings ("APR"), delivery commitment schedules, schedule negotiations, exchanges, and other relevant matters.

3. Edward Benz
JAI Corp.
955 L'Enfant Plaza
Suite 8000
Washington D.C.

Mr. Benz, based upon his position as a contractor for DOE, will testify about the technical aspects of the Standard Contract, including the ACR issue resolution process conducted with industry representatives and the technical and legal basis for acceptance rates contained in the ACRs/APRs.

4. Alan Brownstein
Senior Policy Advisor
Office of Civilian Radioactive Waste Management
United States Department of Energy
RW-2
1000 Independence Ave., SW
Washington, DC 20585

Mr. Brownstein will provide testimony concerning the Government's implementation of the Standard Contract, including acceptance rates, priority for shutdown reactors, the ACR issue resolution process conducted with industry representatives, the issuance and content of the

ACRs, the issuance and content of the APRs, delivery commitment schedules, schedule negotiations, the exchange approval process, and other relevant matters.

5. Patrice Bubar
Deputy Assistant Secretary Integrated Safety Management & Operation Oversight
Office of Environmental Management
United States Department of Energy
1000 Independence Ave., S.W.
Washington D.C. 20585

Ms. Bubar will testify regarding the development of DOE's plans to accept "greater-than-class-C" low-level radioactive waste from commercial utilities pursuant to the Low Level Radioactive Waste Policy Act Amendments of 1985 and other relevant matters.

6. James Carlson
4008 Glenrose St.
Kensington, MD 20895

Mr. Carlson, former Director of the DOE Waste Acceptance and Transportation Division, will testify about the implementation of the Standard Contract, including transportation issues, as well as other relevant matters.

7. Billy Cole
Senior Consultant
JAI Corp.
11350 Random Hills Road
Suite 440
Fairfax, VA 22030

Mr. Cole, based upon his position as a contractor for DOE, will testify about the Government's implementation of the Standard Contract, including the ACR issue resolution process conducted with industry representatives and the technical and legal basis for acceptance rates contained in the ACRs/APRs, the exchange approval process, and other relevant matters.