IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| YANKEE ATOMIC ELECTRIC COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 98-126C |
| | ) | (Senior Judge Merow) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

DEFENDANT'S RESPONSE TO PLAINTIFF'S BENCH MEMORANDUM ADDRESSING THE ADMISSIBILITY OF CERTAIN EXHIBITS PREPARED BY CONTRACTORS[1]

Defendant, the United States, respectfully responds to "Yankee Atomic's Bench Memorandum Addressing The Admissibility Of Certain Exhibits Prepared By Contractors," which the plaintiffs, Yankee Atomic Electric Company, Connecticut Yankee Atomic Power Company, and Maine Yankee Atomic Power Company (collectively, "the Yankees"), provided to the Court on July 12, 2004.[2]

## DISCUSSION

### I. PLAINTIFFS HAVE MISREPRESENTED THE STATUS OF DOCUMENTS FROM THE PACIFIC NORTHWEST NATIONAL LABORATORY

In their bench memorandum, the Yankees assert that the Pacific Northwest National Laboratory ("PNNL") in Richland, Washington, "like other national laboratories, is a part of DOE [the Department of Energy]." Bench Memo, at 4. On this basis, the Yankees contend that all documents generated at PNNL are documents actually created by DOE.

---

1/ The Government requests that this submission be deemed applicable in Connecticut Yankee Atomic Power Co. v. United States, No. 98-154C (Fed. Cl.), and Maine Yankee Atomic Power Co. v. United States, No. 98-474C (Fed. Cl.).

2/ In their bench memorandum, the Yankees discuss the relevance of contractor documents. Bench Memorandum, at 2-3. We have thoroughly discussed this issue with the Court on the record at the trial of this case and refer the Court to that discussion as our response to that portion of the Yankees' argument.

The Yankees' claim regarding PNNL is entirely without foundation. In support of their allegation, they refer only to a page from the PNNL website. Bench Memo Exh. 5. Far from establishing that PNNL is part of DOE, that page indicates that PNNL performs work for other Government agencies as well as private industry. Id. Further, the website page included in the Yankees' appendix makes clear that PNNL is operated by Battelle, a contractor to DOE: "Battelle has operated PNNL for DOE and its predecessors since 1965. A unique feature of Battelle's contract with DOE allows our staff to work for private industry." Id. Thus, the Yankees have shown no more reason to believe that PNNL is part of DOE than the Department of Defense or a private company. Id.

In fact, trial testimony and designated deposition testimony specifically establishes that DOE's contractors do not operate as part of DOE and that their documents do not constitute public documents. For instance, one of the Yankees' expert witnesses, Charles Pennington, openly acknowledged at trial that NAC, as a DOE contractor, does not make policy for DOE. Tr. July 16, 2004, 1204:3-11. Likewise, Alan Brownstein, a Senior Policy Advisor to the Director of the Office of Civilian Radioactive Waste, specifically stated that PNNL documents do not represent DOE positions during questioning regarding a PNNL document in his deposition:

> Q. You're saying that for something to be adopted as department policy, additional people would have to review it and approve it?
>
> A. What I'm saying is that a contractor product is not departmental policy.
>
> Q. How would a contractor product become departmental policy?
>
> A. One way it would become that would be for it to be issued under DOE letterhead.
>
> Q. By issue, what do you mean?

> A. Number of ways -- issued could be instructions or it could be a report. It could be a letter by a program official or, or contracting officer. Those are three ways.
>
> Q. So if it were incorporated into a DOE document or a DOE letter, then it could become departmental position, departmental position?
>
> A. Sure.

Deposition of Alan Brownstein, April 11, 2002, 574:7-576:2.[3] Similarly, Mr. Lake Barrett, Deputy Director of the Office of Civilian Radioactive Waste Management, testified that PNNL was a contractor and that DOE used PNNL to provide nothing more than advice, not to make policy decisions:

> Q What is Pacific Northwest Laboratory?
>
> A It's a contractor in Richland, Washington.
>
> Q Were those contractors relied on often by the Department of Energy in connection with the development, design, and construction of the waste management system?
>
> MS. HERRMANN: Objection. Vague.
>
> A We use them as advisors and analysts for the waste management system.
>
> * * *
>
> Q Did you ever rely on the work of Pacific Northwest Laboratory?
>
> MS. HERRMANN: Objection. Vague.
>
> A I used it as input.

3/ With one exception, all of the deposition testimony that has been cited here has either been designated by the Yankees for inclusion in the trial record of this case or will be included in the Government's counterdesignations. With regard to the one exception, the deposition testimony of Mr. Tom Pollog, Mr. Pollog is expected to be a witness at the trial of this case.

Q For what purposes?

A For advice on systems analysis.

Deposition of Lake Barrett, May 10, 2002, 1150:3-1151:4.

In fact, Mr. Brownstein reiterated this point on several occasions with regard to contractor documents generally. With regard to another contractor document, he stated that "[t]his was a, this was, clearly was a contractor document. . . . That automatically means to me that it was, it was a, it was something that DOE had not signed off on. . . . The contractor documents . . . regularly go through extensive review and modification before they're, if they're ever accepted as a DOE document." Deposition of Alan Brownstein, April 10, 2002, 319:23-320:11. When questioned about a third contractor document, he clarified that "[t]his is a contractor document. Contractors make suggestions and recommendations to the department all the time. Because a contractor says something doesn't mean, you know, the department either wanted it or agrees with it." Deposition of Alan Brownstein, May 23, 2002, 140:3-9. Further, with regard to a fourth document, Mr. Brownstein stated that "the contractor often made a lot of statements. . . . They write words, but because the contractor writes words does not mean it's departmental policy." Deposition of Alan Brownstein, April 11, 2002, 569:18-571:1. Indeed, these statements were so prevalent that they did not go unnoticed by counsel. Mr. Stouck began a line of questioning by saying "I appreciate that this is a contractor document and you have caveated about contractor documents."[4] Deposition of Alan Brownstein, May 23, 2004, 196:10-13.

---

[4/] Further, on cross examination during the trial of this case, the Yankees' witness, Mr. Bartlett, testified that, as Director of the Office of Civilian Radioactive Waste Management, he often did not see documents such as Plaintiff's Exhibit No. 175, a contractor study of throughput, 714:22-23, and that M&O contractors do not make policy or program decisions. 715:3-5.

Mr. Ronald Milner, Chief Operating Officer of OCRWM, similarly testified that contractor documents do not speak for DOE:

> A. . . . In any event this is a contractor report which would never relate to a position the Department took, simply input data to it.
>
> Q. You say it would never relate to a position?
>
> A. It would never reflect, I'm sorry; not relate, it would never reflect the Department's position, it would simply input data to it.
>
> Q. The Department would have to subsequently take a separate position which might or might not approve or reflect what the contractor recommended?
>
> A. The Department would take a position based on information from a number of sources including its contractor's input.

Deposition of Ronald Milner, May 3, 2002, 443:19-444:8.

Given the significant evidence that PNNL documents do not constitute DOE documents and the lack of any evidence to the contrary, this underlying premise of the Yankees' evidentiary argument should be rejected by the Court.[5]

## II. THE YANKEES' ASSERTION THAT FEDERAL RULE OF EVIDENCE 803(8)(A) PROVIDES FOR THE ADMISSION OF DOCUMENTS GENERATED BY CONTRACTORS FOR THE DEPARTMENT OF ENERGY IS UNSUPPORTABLE

### A. A Contractor For DOE Is Not An "Agency" Of The United States Government

The Yankees seek to introduce as substantive evidence numerous documents created not only by the contractor at PNNL, but also from other contractors to DOE. The first hearsay

[5] In their bench memorandum, the Yankees appear to attempt to assert, without any support, that PNNL is an M&O contractor for the Department of Energy. See Bench Memo, at 4-5 & 7. As will be discussed below, it makes no difference whether the contractor that operates PNNL is an M&O contractor for DOE. Nevertheless, the record is clear that the contractor at PNNL was never an M&O contractor. See Deposition of Thomas Pollog, February 19, 2002, 229:10-23:5.

exception upon which the Yankees rely in seeking wholesale admission of all "contractor" documents for the truth of the matters asserted in those "contractor" documents is Federal Rule of Evidence 803(8)(A). That rule provides an exception to the hearsay rule for "[r]ecords, reports, statements, or data compilations, in any form, of public offices and agencies, setting forth (A) the activities of the office or agency . . . ." The public records exception to the hearsay rule is justified by "the assumption that a public official will perform his duty properly and the unlikelihood that he will remember details independently of the record." Zeus Enterprises, Inc. v. Alphin Aircraft, Inc., 190 F.3d 238, 241 (4th Cir. 1999) (quoting Fed. R. Evid. 803(8), Advisory Committee's Note to Paragraph (8)) (emphasis added); see Reynolds v. Green, 184 F.3d 589, 596 (6th Cir. 1999) (quoting same).

To the extent that the Yankees are claiming that activities performed by a contractor to an agency are the same as those performed by the agency itself, and that all contractor activities should be attributed to the agency, the Yankees are simply wrong. The Yankees assert that management and operations ("M&O") contractors "for all intents and purposes function as DOE," Bench Memo, at 5, but they lack any support for that assertion. Although the United States Court of Appeals for the Federal Circuit has found that "an agency relationship can be created by contract," it has determined that "not all contracts create agency relationships and not all conduct creates agency relationships." Rotec Indus. v. Mitsubishi Corp., 215 F.3d 1246, 1256 (Fed. Cir. 2000) (quoting Chemtool, Inc. v. Lubrication Techs., Inc., 148 F.3d 742, 745 (7th Cir. 1998)). The focus in determining whether the relationship between contracting parties creates an agency relationship "focuse[s] on contract provisions [and] not day-to-day Government involvement in the performance of the subcontract." Lockheed Martin Corp. v. United States, 50

Fed. Cl. 550, 558-59 (2001) (involving M&O contractor) (citing United States v. Johnson Controls, Inc., 713 F.3d 1541, 1551 (Fed. Cir. 1983)), aff'd, 48 Fed. Appx. 752 (Fed. Cir. 2002). Specifically, the test for determining agency "requires an interpretation of the contract" and findings that "(1) the prime [M&O] contractor was acting as a purchasing agent for the Government; (2) the agency relationship between the Government and the prime contractor was established by clear contractual consent; and (3) the contract stated that the Government would be directly liable to the vendors for the purchase price." Lockheed, 50 Fed. Cl. at 562.

In Blue Water Environmental v. United States, 60 Fed. Cl. 48 (2004), this Court held that (1) a private contractor which operated a laboratory under an M&O contract with the Department of Energy could not be deemed a Federal "agency" for purposes of Tucker Act bid protest jurisdiction even if, as alleged, DOE exercised day-to-day supervision of the contractor's activities. Id. at 52. The Court further determined that, even if such supervision was sufficient to establish "agency," evidence was required to establish that DOE supervised or directed the subcontracting process about which the plaintiff was complaining. Id. In sum, the plaintiff was required to prove that an agency relationship was established by the contract, and that it created an agency relationship with regard to the specific work about which agency was being claimed, before the contractor could be deemed an "agent" for purposes of that work.

The difficulty with the Yankees' assertion that the contractor statements at issue represent the views of DOE is highlighted by the United States Supreme Court's decision in United States v. Orleans, 425 U.S. 807 (1976). The Supreme Court explained that the critical element in distinguishing an "agency" of the Federal Government from a "contractor" for purposes of the Federal Tort Claims Act is the power of the Federal Government to control the detailed physical

performance of the contractor. Therefore, the issue is not whether the entity receives Federal money and must comply with Federal regulations, but whether its daily operations are supervised by the Federal Government. Id. at 814. The Supreme Court explained that any contrary finding would be inconsistent with general contracting principles:

> Billions of dollars of federal money are spent each year on projects performed by people and institutions which contract with the Government. These contractors act for and are paid by the United States. They are responsible to the United States for compliance with the specifications of a contract or grant, but they are largely free to select the means of its implementation . . . . Similarly, by contract, the Government may fix specific and precise conditions to implement federal objectives. Although such regulations are aimed at assuring compliance with goals, the regulations do not convert the acts of entrepreneurs or state governmental bodies into federal government acts.

Id. at 815-16.

The Yankees' only cited support is this Court's decision in Westinghouse Electric Corp. v. United States, Nos. 93-445C & 93-446C, 1997 WL 1068204, at *2 (Fed. Cl. June 4, 1997). See Bench Memo, at 4-5, 7. Yet, that decision only describes the general character of an M&O contractor. It does not purport to identify an M&O contractor as an "agent" of the Federal Government. As previously discussed, both this Court and its appellate court have rejected the concept that M&O contracts constitutes "agents" of the Government. As explained in Orleans, the simple fact that the documents at issue were generated by DOE M&O contractors does not establish that PNNL, or any other DOE contractor, is an "agent" of DOE or that the contractor's documents are those reflecting the activities of the "agency." In fact, many documents evidence on their face that they are not expressing the views of an agency, as indicated by the disclaimer on the first page of Plaintiff's Exhibit No. 152: "The views and opinions of authors expressed

herein do not necessarily state or reflect those of the United States Government or any agency thereof." The Yankees' otherwise unsupported assertions of agency cannot provide a basis for admitting documents under FRE 803(8)(A).

B. Because The "Contractor" Documents To Which The Yankees Refer Were Not Prepared Or Adopted By The "Agency," They Are Not Admissible Under Federal Rule Of Evidence 803(8)(A) As Public Records Or Reports Of The Agency's Activities

As previously discussed, the public records exception to the hearsay rule is justified by "the assumption that a public official will perform his duty properly and the unlikelihood that he will remember details independently of the record." Zeus Enterprises, Inc. v. Alphin Aircraft, Inc., 190 F.3d 238, 241 (4th Cir. 1999) (quoting Fed. R. Evid. 803(8), Advisory Committee's Note to Paragraph (8)) (emphasis added); see Reynolds v. Green, 184 F.3d 589, 596 (6th Cir. 1999) (quoting same). The Yankees would expand this exception to the hearsay rule to include not only public records issued by "public officials" and Federal agencies, but also internal contractor documents prepared by Government contractor employees working under a contract with the Government, and the Yankees assert that the "fact that these documents may have been prepared by a contracting party (albeit working for DOE) is irrelevant to their admissibility as public records." Bench Memo, at 4. Yet, the Yankees' interpretation of the rule would create a ridiculous result. Under the Yankees' theory, all documents generated by a construction contractor with a contract to construct a Federal courthouse become "public records" that are admissible in court proceedings without regard to their hearsay nature. A contractor could potentially generate documents that could be used against the Government in any litigation arising from that contract. With regard to PNNL specifically, the Yankees' own exhibit demonstrates that the contractor also works for other agencies and private industry. See Bench

Memo at 4, Ex.4. Thus, documents created in the course of those working relationships with private industry would also constitute the "public records" of DOE in the Yankees' view. In fact, the Yankees themselves have contracts with the Government, creating the possibility under the Yankees' theory that even their own internal memoranda could constitute "public records" under FRE 803(8)(A), regardless whether the Government even saw those documents during the ordinary course of business.

The Yankees' assertions that Government contractor documents, even those of M&O contractors, somehow constitute government documents for the purposes of FRE 803(8)(a) are unsupported by relevant case law. As an initial matter, the documents that courts have found appropriate to admit under the first clause of FRE 803(8) are typically classic public records – the type of documents that would spring to mind when thinking of a "public" record. See, e.g., Hawthorne Partners v. AT&T Technologies, Inc., No. 91-C-7167, 1994 WL 63054, at *5 (N.D. Ill. Feb. 17, 1994) ("the fact that the preliminary report is preliminary and that certain sections were not released until Hawthorne Partners subpoenaed them suggest that the preliminary report would not be easily construed as a public record under Rule 803(8)"). For instance, courts have admitted copies of a conviction, see United States v. Vidaure, 861 F.2d 1337, 1340-41 (5th Cir. 1988); an automobile's title history, see United States v. Ramirez, 45 F.3d 1096, 1101 (7th Cir. 1995); a county's registry of applicants for firefighter position, Alexander v. Estepp, 95 F.3d 312, 314 (4th Cir. 1996); a certified copy of docket entries in another court, United States v. Loera, 923 F.2d 725, 730 (9th Cir. 1991); and certifications specifically authorized by statute to made by a cabinet official or his designee, United States v. Guerrero, 114 F.3d 332, 340 (1st Cir. 1997); United States v. Rojas, 53 F.3d 1212, 1214 (11th Cir. 1995). Such documents are a far cry from

the obscure reports and memoranda that the Yankees would have this Court admit as substantive evidence of DOE policy or decisions.

More importantly, the "contractor" documents to which the Yankees refer should not be admitted under FRE 803(8) simply because, as previously explained, they are not agency documents in any sense. See Marsee v. United States, 866 F.2d 319 (10th Cir.) (neither an International Agency for Research on Cancer nor a National Institute of Health report qualified as a Government record under FRE 803(8)(B) because their contents were drawn from "a conference attended by scientists from various countries" and "a panel of scientists and non-scientists after a conference at which invited speakers presented papers," rather than the agencies themselves). As such, they do not fit the rationale for the FRE 803(8) hearsay exception. See Zeus Enterprises, Inc., 190 F.3d at 241. There is simply no reason to believe that the reliability attributed to documents created by public officials should be attributed to documents created by their contractors, especially where the relevant public officials have generally disavowed those documents as not representing the Government's position. Although the Yankees assert that it is the Government's burden to establish that "public records" should not be admitted into evidence, Bench Memo, at 5, the Yankees have failed to establish that the documents at issue are, in fact, public records in the first place. Only after the Yankees make that showing would the burden shift to require the Government to establish reasons that the public records in question should not be admitted.

Even where the admission of contractor documents as public records has been contemplated, in situations in which the Government has essentially adopted reports as its own, an analysis has been conducted to demonstrate reliability that simply cannot be assumed for these

documents. See, e.g. Hawthorne Partners, 1994 WL 63054, at *5 (discussing trustworthiness in the context of FRE 803(8)(C)). Courts have carefully considered whether the "work was performed at the direction and under the guidance of" the agency; whether "proposed work plans were reviewed for conformity with [agency] methodology and standards;" whether the agency "remained in charge of and closely involved with," "remained in close contact with," and "closely managed" the contractor; whether the agency "required its contractors to submit regular reports concerning the project;" and whether the agency "reviewed prior drafts . . . requiring all necessary changes and additions to ensure the report's accuracy." Id. at *5 (citing United States v. Davis, 826 F. Supp. 617 (D.R.I. 1993)).

The Yankees have made no showing that the contractor documents have these indicia of "trustworthiness." In fact, the record establishes that there was great variability in the degree of involvement and control that DOE exercised over contractor work. For instance, Alan Brownstein testified that "PNL did, did a number of pieces of work, some at my direction, and some that they pursued on their own consistent with work tasks that we gave them" and that DOE may, or may not, comment on PNNL documents. Deposition of Alan Brownstein, April 11, 2002, 562:18-564:2. Without specific showings of DOE involvement as well as adoption of contractor documents, such documents should be found to lack sufficient trustworthiness to be admitted as "public records" under FRE 803(8). See Hawthorne Partners, 1994 WL 63054, at *5 (finding "no indicia of reliability" where agency's working relationship and supervision of contractor was unknown).

C. Even If They Were Somehow Considered Evidence Of The Activities Of The Agency, The Preliminary Nature Of The Documents At Issue Precludes Use Of Federal Rule Of Evidence 803(8)(A)

Even if the Yankees somehow could view "contractor" documents as the equivalent of records or reports of public officers or agencies, those documents still would not fall within the hearsay exception of FRE 803(8)(A) because of their preliminary or interim nature. In Smith v. Isuzu Motors Ltd., 137 F.3d 859 (5th Cir. 1998), cert. denied, 525 U.S. 1142 (1999), the plaintiffs attempted to introduce three memoranda prepared by staff members of the National Highway Traffic Safety Administration relating to a petition filed with the agency by Congressman Wirth, which asked the agency to establish stability standards for certain types of passenger vehicles. Although the agency ultimately rejected the Wirth petition, plaintiffs sought to introduce the three memoranda in which the staff members expressed opinions supporting the petition and the plaintiffs' theory of their case. The Fifth Circuit rejected the plaintiffs' argument that the preliminary memoranda fell within FRE 803(8)(A), finding that FRE 803(8)(A) does not apply to allow the admission of preliminary or interim evaluation opinions of agency staff members:

> Smith first argues that the memoranda qualify as public records within the meaning of Rule 803(8)(A). We disagree. Although NHTSA staff members prepared the memoranda in the course of evaluating the Wirth petition, the memoranda do not "set forth" the "activities of the agency" within the meaning of Rule 803(8)(A).
>
> Smith cites no case law in which Rule 803(8)(A) has been applied to allow the admission of the preliminary or interim evaluation opinions of agency staff members. Indeed, to apply Rule 803(8)(A) in the fashion Smith suggests would swallow whole Rule 803(8)(C) and its limitations. Rule 803(8)(C) provides a hearsay exception for "factual findings resulting from an investigation made pursuant to authority granted by law" unless those findings lack trustworthiness. If memoranda reflecting the

> preliminary opinions of agency staff members were admissible under Rule 803(8)(A), then Rule 803(8)(C)'s limitations would be meaningless.

Id. at 862 (emphasis added; citations omitted).

If the contractor documents were adopted by DOE and issued as the agency's public positions, the Yankees would have much better grounds for attempting to introduce "contractor" documents as public records. However, the contractor documents to which the Yankees cite are not the agency's adopted positions, but instead, at best, are nothing more than preliminary or interim evaluations of various issues that may, or may not, have ever been communicated to DOE. Even if these evaluations had been conducted by DOE employees, they would not necessarily fall within the requirements of FRE 803(8)(A), given their preliminary or interim nature.

"Prior to the adoption of the Federal Rules of Evidence in 1975, hearsay contained in agency memoranda or records could be admitted into evidence either under 28 U.S.C. § 1732 (1970) (hereinafter § 1732), as writings made in the ordinary course of business, or under 28 U.S.C. § 1733 (1970) (hereinafter § 1733) as official records of an agency . . . ." Brown v. ASD Computing Cntr., 519 F. Supp. 1096, 1103 n.2 (S.D. Ohio 1981). "When the Federal Rules of Evidence were enacted, Rule 803(8) was considered to have been derived from § 1733 . . . ." Id. (citing H.R. Rep. No. 93-650, 93rd Cong., 2d Sess. reprinted in 1974 USCCAN 7051, 7075, 7091). "The assumption must be made that Congress was aware of the current status of court interpretations of [section] . . . 1733 when it enacted Rule[] . . . 803(8)." Id. (citing United States v. Smith, 521 F.2d 957, 968 n.24 (D.C. Cir. 1975)). "Despite this awareness, Congress failed to manifest an intention to alter the traditional interpretation of [section] . . . 1733 . . . ." Id.

"Although Rule 803(8)(A)," on its face, "appears to be broad enough to include hearsay which is contained in agency documents not required or authorized by law, that provision cannot be read in so expansive a manner," and "interpreting subsection (A) to include matters such as internal agency memoranda would establish an undesirable precedent." Id. "[T]he House debate on the Proposed Rules of Evidence indicates that Congress intended to restrict, rather than broaden, the application of Rule 803(8)" from the admissibility standards contained in section 1733, as evidenced by Congressional debate regarding the need to narrow the exception contained in FRE 803(8)(B). Id. (citing various Congressional Record provisions). Given "the express concern of Congress over restricting subsection (B)" of FRE 803(8), "it would be incongruous to conclude that legislative intent could be circumvented by interpreting subsection (A) so expansively . . ." to render the limitations imposed upon FRE 803(8)(B), and (C), irrelevant. Id.

## III. THE YANKEES' ASSERTION THAT FEDERAL RULE OF EVIDENCE 803(6) PROVIDES FOR THE ADMISSION OF DOCUMENTS GENERATED BY CONTRACTORS IS UNSUPPORTABLE

In their bench memorandum, the Yankees assert that the Court can admit the "contractor" documents as "business records" pursuant to FRE 803(6). Bench Memo, at 3 n.4. However, the Federal Circuit's decision in Air Land Forwarders v. United States, 172 F.3d 1338 (1999), makes plain that the contractor documents cannot be admitted on that basis.[6] The Air Land Forwarders case involved claims by service members for damage to property by common carriers and freight forwarders. Id. at 1340. The service members submitted their claims to the United States with estimates done by third parties. Id. The United States adjudicated the claims and, where

[6] Although the Yankees are aware of the Air Land Forwarders case and cite it for another proposition, see Bench Memo, at 4, they tellingly do not rely on it with regard to their FRE 803(6) argument. Rather, they direct the Court to a Tenth Circuit decision. Bench Memo, at 3 n.4 (citing United States v. Frazier, 53 F.3d 1105, 1109 (10th Cir. 1995)).

appropriate, compensated the service member and sought reimbursement from the carriers or offset against payments due to the carriers. Id. The trial court admitted the third party estimates, which were in the files of the military, as "business records" of the military, and the carrier appealed. Id. at 1341-42.

In reaching its decision, the Federal Circuit reviewed authorities regarding the circumstances in which documents produced by third parties have been considered the business records of another entity in whose files they appear. Id. at 1342-43. It concluded that a third party document may be admitted as another entity's business record where "the incorporating business rel[ies] upon the accuracy of the document incorporated and . . . there are other circumstances indicating the trustworthiness of the document." Id. at 1343. The circumstances upon which the Court relied included the fact that military personnel could be fined or imprisoned for submitting a false claim and that "Military Claims Office personnel were responsible for becoming familiar with the competency of estimators." Id. at 1343-44. The Court also held that admission of such documents would require "foundation testimony of a witness with first-hand knowledge of the record keeping procedures of the incorporating business." Id. at 1343; see Coast Federal Bank v. United States, 48 Fed. Cl. 402, 447 (2000) (testimony of individual could not secure the admission as business records of the records of various institutions because it did not establish requisite foundation).

This Court adopted the Air Land Forwarders approach in Columbia First Bank, FSB v. United States, 58 Fed. Cl. 333 (2003), finding that, "when a document produced by a third party is incorporated into the business records of another entity this circuit applies a two-factor standard of reliability in order to admit a record that has an otherwise appropriate foundation."

Id. at 339. With regard to the requirement that the entity must have "rel[ied] upon" the accuracy the document, the Court found that "[r]eliance can be shown if the entity used the document in its dealings." Id. With regard to the requirement that there be "other circumstances indicating the trustworthiness of the document," the Court determined that "indicia of trustworthiness can be shown, to cite one example, by demonstrating the existence of legal consequences for falsity or inaccuracy in the document." Id. It further found that "[t]hird party documents," such as documents created by DOE's contractors, "kept in the records of a party in this case must be shown to have been received and incorporated, to have been relied upon, and to have indicia of trustworthiness to meet the Air Land Forwarders test for the business records exception in Fed. R. Evid. 803(6)" and that "[t]he proponent of such evidence at trial must show that this test has been met to overcome a hearsay objection." Id.

Under the applicable case precedent, there is no basis for admitting the "contractor" documents. As an initial matter, the underlying factual predicate does not exist with regard to many of the documents because they were never in DOE's files, but, rather, were produced to the Yankees directly from the files of the DOE contractors, and the Yankees have not called any witnesses from these contractors to testify in this case. Moreover, even with regard to contractor materials that made their way to DOE files or into individual files of employees at DOE, the Yankees cannot establish the foundation necessary to admit the documents. The Yankees are not calling as a witness anyone who is familiar with DOE's record-keeping procedures, will not establish whether particular documents came from individual employee files or official DOE files, will not call any witness to establish the reliability of the record-keeping practices of individual employees regarding documents that might have come from their own personal files or

that they kept these documents "in the regular course of business," will not be able to establish that DOE has relied on the accuracy of the documents, and will not be able to identify other circumstances that support the trustworthiness of the documents. Indeed, it is difficult to imagine how they could do so, even with a knowledgable witness, considering the significant previously discussed testimony to the contrary at trial and in the depositions.

## IV. THE YANKEES' ASSERTION THAT "CONTRACTOR" DOCUMENTS CONSTITUTE ADMISSIONS BY DOE PURSUANT TO FEDERAL RULE OF EVIDENCE 801(d)(2) CONFLICTS WITH THE ROLE OF CONTRACTORS

The Yankees also assert that the documents generated by contractors to DOE are admissible pursuant to FRE 801(d)(2)(C) or 801(d)(2)(D). FRE 801(d)(2) provides that a statement is not hearsay if

> [t]he statement is offered against a party and is (A) the party's own statement, in either an individual or a representative capacity or (B) a statement of which the party has manifested an adoption or belief in its truth, or (C) a statement by a person authorized by the party to make a statement concerning the subject, or (D) a statement by the party's agent or servant concerning a matter within the scope of the agency or employment . . . . The contents of the statement shall be considered but are not alone sufficient to establish the declarant's authority under subdivision (C), [or] the agency or employment relationship and scope thereof under subdivision (D) . . . .

FRE 801(d)(2). The Yankees are not relying upon subdivisions (A) and (B) of this rule as bases for the admission of contractor documents, but instead rely exclusively on subdivisions (C) and (D).

With regard to subdivision (C), the Yankees have failed to establish that the DOE contractors were “authorized” to speak for the Government under FRE 801(d)(2)(C). In fact, the Yankees have not cited to a single case in which a Government contractor was found to be

"authorized" to make admissions upon behalf of the Government. To the contrary, for the same reasons previously explained, a contractor serves as just that: a contractor. It does not make policy for DOE, and it does not speak for DOE, unless that authority is expressly identified in a contract. The Yankees have not identified any basis for finding DOE's contractors – potentially including Yankee itself, who has a contract with DOE – "authorized" to make admissions upon DOE's behalf.

In Kirk v. Raymark Indus., Inc., 61 F.3d 147 (3rd Cir. 1995), the Court held that the testimony of an expert witness on behalf of a party could not later be used against that party in unrelated litigation unless there was a finding that the expert witness was "authorized to speak" on behalf of that party under FRE 801(d)(2)(C). The Court stated that "Rule 801(d)(2)(C) requires that the declarant be an agent of the party-opponent against whom the admission is offered." Id. at 164. The Third Circuit continued that, "since an expert witness is not subject to the control of the party opponent with respect to consultation and testimony he or she is hired to give, the expert witness can not be deemed an agent." Id. Further, "one can call an expert witness even if one disagrees with the testimony of the expert," so that proof must exist that an agency relationship was established. Id. In addition, even if the Court finds factual evidence of authorization to speak for a party, the statements must be in the scope of that authorization. See, e.g., Reid Brothers Logging Co. v. Ketchikan Pulp Co., 699 F.2d 1292, 1306 (9th Cir. 1983) (holding that an employee was "authorized" under FRE 801(d)(2)(C) to make statements regarding the entire scope of a company's woods operations, the subject of the report prepared by the employee).

Barring evidence that the DOE contractors were subject to the control of the Government, or "authorized to speak" on behalf of DOE under FRE 801(d)(2)(C), the contractor documents at issue are inadmissible. Similar to an expert witness that can be called "even if one disagrees with the testimony of the expert," and is therefore not "authorized to speak" for that party, a DOE contractor could produce a report for the Government with which the Government disagrees. Kirk, 61 F.3d at 163. Analogous to the problem discussed by the Supreme Court in Orleans, under the Yankees' broad interpretation of the hearsay exception, all reports or statements by an M&O contractor, or any contractor, would become statements of the Government, regardless of whether the Government adopted, agreed with, or even was aware of these statements.

Further, the Yankees assert that the language on the inside cover of Plaintiff's Exhibit No. 169 establishes the M&O contractor's authorization to speak because it states that it is a cost estimate report "Prepared for the U.S. Department of Energy." Again, the Yankees fail to support a finding that this language establishes authorization to speak for the Government under FRE 801(d)(2)(C). This Court's decision in Glendale Fed. Bank, FSB v. U.S., 39 Fed. Cl. 422, 425 (1997), to which the Yankees cite, does not assist their argument. In Glendale, the Court held that Government experts who were listed as such at the beginning of trial had been authorized to speak for the Government because they were retained specifically for that purpose, and it was evident that their opinions were consistent with the sponsoring party. Id. at 423. However, in the case at hand, the Yankees have failed to show that the DOE contractor's views are the views of the Government or that they were adopted by the Government. The Government receives numerous reports and statements from contractors and could not possibly adopt or agree

with all recommendations or scenarios promoted in these documents. The Court should find the challenged documents are not admissible under FRE 801(d)(2)(C).

With regard to subdivision (D), it is clear that contractors – even an M&O contractor – is not an "agent" of DOE. As previously discussed, the Yankees have failed to present any evidence that any of the particular contractors that authored documents which the Yankees now seek to admit as admissions by DOE are agents of DOE, as evidenced by specific contractual provisions granting them that authority. Absent such evidence, the Yankees have failed to satisfy their burden of proof regarding admissibility under FRE 801(d)(2)(D).

CONCLUSION

For the foregoing reasons, the Court should reject the Yankees' attempts to introduce the contractor documents at issue in their bench memorandum.[7]

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

s/ David M. Cohen
DAVID M. COHEN
Director

7/ In their bench memorandum, the Yankees separately address Plaintiff's Exhibit Nos. 641 and 968. Bench Memorandum, at 8. Because those exhibits have been discussed and addressed at trial, we will not further address them here, but instead rely upon our discussion of them at trial.

s/ Harold D. Lester, Jr.
HAROLD D. LESTER, JR.
Assistant Director
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
Washington, D.C. 20530
Tele: (202) 305-7562
Fax: (202) 307-2503

July 27, 2004

Attorneys for Defendant

CERTIFICATE OF FILING

I hereby certify that on this 27th day of July, 2004, a copy of foregoing "DEFENDANT'S RESPONSE TO PLAINTIFFS' BENCH MEMORANDUM ADDRESSING THE ADMISSIBILITY OF CERTAIN EXHIBITS PREPARED BY CONTRACTORS" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/Harold D. Lester, Jr.