IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - - - x

| | |
|---|---|
| YANKEE ATOMIC ELECTRIC COMPANY; | : Case Nos. 98-126C, |
| CONNECTICUT YANKEE ATOMIC POWER | : 98-154C, 98-474C, |
| COMPANY; MAINE YANKEE ATOMIC | : 98-483C, 98-484C, |
| POWER COMPANY; FLORIDA POWER & | : 98-485C, 98-486C, |
| LIGHT COMPANY; NORTHERN STATES | : 98-488C, 98-614C, |
| POWER COMPANY; DUKE POWER, a | : 98-621C, 99-447C, |
| Division of DUKE ENERGY CORP.; | : 00-440C, 00-695C, |
| INDIANA MICHIGAN POWER COMPANY; | : 00-703C, 01-115C, |
| SACRAMENTO MUNICIPAL UTILITY | : 01-116C, 01-249C |

- - - - - - - - - - - - - - - - - - x

(Caption continued on the next page)

Deposition of LAKE H. BARRETT

Washington, D. C.

Monday, April 22, 2002

9:31 a.m.

CERTIFIED COPY

Job No.: 11792-4

Pages 1 through 272, Volume 1

Reported by: Diane Gomez, RPR

1998, at a ramp-up level that would -- in a reasonable amount of time and at a 3,000 per year MTU acceptance rate, correct?

MR. CRAWFORD: Objection to the form. Objection to the mischaracterization of prior testimony. Objection to the extent it assumes facts not in evidence.

A It was a systems goal to receive the material at a reasonable rate, okay, of which the 3,000, ramp up to 3,000 tons was a reasonable rate. It was never a -- in my opinion it was never a legal requirement to do 3,000 tons per year.

Q You base the goal on the statute, correct? That's what you've testified to, correct?

A Yes.

Q Back to paragraph three --

A Excuse me. Let me go back to that. When you say the statute does not say 3,000, okay, that was a judgment part. It is the receipt in January 31, 1998, is in the statute. The rate to my knowledge is not in the statute.

Q So why did you set the 3,000 MTU goal?

A Did they for what? Were they consistent with which?
Q The system requirement documents that you just described.
A Consistent with -- what would they not be consistent with?
Q That's what I'm asking you, sir.
A I don't know of anything they would not be consistent with. I mean, there's -- I won't speculate.
Q Were the acceptance rates that the department was planning to use consistent with the ACRs?
MR. CRAWFORD: Objection to the form of the question. Objection, vague. Objection, assumes facts not in evidence. Objection, mischaracterizes prior testimony. Objection, foundation.
A I don't know.
Q You have no idea?
A I just don't know in the sequence of what you're referring to were they consistent, what they are. I would have to look and see what documents

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

\- - - - - - - - - - - - - - - - - - x

YANKEE ATOMIC ELECTRIC COMPANY; : Case Nos. 98-126C,
CONNECTICUT YANKEE ATOMIC POWER : 98-154C, 98-474C,
COMPANY; MAINE YANKEE ATOMIC : 98-483C, 98-484C,
POWER COMPANY; FLORIDA POWER & : 98-485C, 98-486C,
LIGHT COMPANY; NORTHERN STATES : 98-488C, 98-614C,
POWER COMPANY; DUKE POWER, a : 98-621C, 99-447C,
Division of DUKE ENERGY CORP.; : 00-440C, 00-695C,
INDIANA MICHIGAN POWER COMPANY; : 00-703C, 01-115C,
SACRAMENTO MUNICIPAL UTILITY : 01-116C, 01-249C

\- - - - - - - - - - - - - - - - - - X

(Caption continued on the next page)

Deposition of LAKE H. BARRETT, VOLUME 4

Washington, D.C.

Wednesday, May 8, 2002

9:31 a.m.

Job No.: 11792-10

Pages: 826 through 1103

Reported by: Diane Gomez, RPR

A A support role.

Q And please describe that support role.

A We've done technological issues with the Nuclear Regulatory Commission to facilitate and support vendors getting certifications. An example of would be burn-up credit. We've submitted topical reports to the NRC which all vendors can use. So we play a support role to certifications.

Q The actual approval or certification comes from the NRC alone, correct?

A For health and safety purposes, yes.

Q What do you mean by "for health and safety purposes"?

A The NRC evaluates and approves based upon public health and safety. They do not on economics or interchange issues or other things like that. An example would be under the contract on the DOE accepting this as an acceptable waste form, there are issues such as size, loads, and things like that need to be worked out, which we have not done. So we have approval, DOE has approval for receipt as well as the NRC for health and safety.

(Deposition Exhibit Barrett 50 was marked for identification and retained by Counsel.)

Q Mr. Barrett, the court reporter has handed you Exhibit 50, which bears Bates CTR-040-0568 through 0583. It's dated April 26, 1995, and it's from T.J. Glauthier, G-l-a-u-t-h-i-e-r, Associate Director, Natural Resources, Energy, and Science; and Charles Curtis, Undersecretary, Department of Energy. Do you have that document before you?

A I do.

Q And do you see on the second page the distribution includes a copy going to Daniel Dreyfus?

A Yes.

Q Now, on April 26, 1995, you reported to Mr. Dreyfus, did you not?

A Correct.

Q Do you recall earlier today you I believe indicated that on, I don't know if you used the term "frequent," but perhaps regularly you deal, in your capacity as deputy director, with the Office of Management and Budget?

A Yes.
Q And --
A Well, excuse me. Primarily as the acting director.
Q Primarily as the acting director?
A Yeah. Sometimes I do.
Q And would you have dealt with the Office of Management and Budget in 1995 in connection with the issues addressed in Exhibit 50?
A In a nonpolicy sense.
Q So you would have dealt with the Office of Management and Budget in connection with these issues, correct?
A In a nonpolicy sense.
Q Now, the memorandum, it's on the letterhead of the Executive Office of the President, Office of Management and Budget. Do you see that?
A I see that.
Q Who is T.J. Glauthier, if that's how you state it?
A Yeah, T.J. Glauthier.
Q Who was he?

A At that time he was the associate director of natural resources and energy and science within the OMB.

Q And Mr. Charles Curtis, who the memorandum is also from, was an official with the Department of Energy, correct?

A He was the Undersecretary at that time.

Q Do you know why Mr. Curtis issued a memorandum on April 26th, 1995, on letterhead of the Office of Management and Budget?

MS. HERRMANN: Objection. Speculation.

A No.

Q Would that have been unusual based on your experience in the office?

A Not unusual. I'm not sure this is a final. I don't see any initials on it. I'm not sure this is issued.

Q Have you ever seen another memorandum in which Undersecretary of the Department of Energy issued a memorandum on letterhead of the Office of Management and Budget?

A What?

Q Are you familiar with any other situation in which an official of the Department of Energy issued a memorandum on letterhead of the Office of Management and Budget?

A You used the word "issued." I'm not sure this is issued. Usually I'm used to seeing a little curlicue, a signature, something with it. This may be issued.

Q But assuming it was issued, are you aware of any other instance in which an official of the Department of Energy issued a memorandum on letterhead of the Office of Management and Budget?

A I don't know of any, but it's -- I would think it's not uncommon.

Q Well, assuming this memorandum was, in fact, issued, why do you believe that Mr. Curtis would have issued a memorandum on the letterhead of the Office of Management and Budget?

MS. HERRMANN: Objection. Speculation.

A The first name on there is T.J.'s, not Charlie's. So this was a joint activity. So whose letterhead it is, it's going to be one or the other.

T.J. is first. That's probably why it's on his letterhead, but I'm speculating because I don't know.

Q Can you turn to page two, Bates number 0571.

A I'm sorry, 05 -- mine's cut off. So it's the second page?

Q Second page, yes.

A Okay. I'm there.

MR. MACDONALD: Fourth page of the document.

THE WITNESS: Says page two on the bottom?

MR. MACDONALD: Yes.

Q Under Issues in the first paragraph, will you take a moment to read that.

A Yes.

Q Have you read the first paragraph?

A Yes.

Q Is the first paragraph consistent with your understanding?

A When you said the first -- I haven't read -- you says issues. The first paragraph, not down to "expectation for waste"?

Q No. My question is with respect to this statement: When the nuclear waste policy was enacted, policy act was enacted, it was envisioned that the department would have a repository available for permanent waste disposal in 1998, and the department entered into contracts with the utility to begin accepting waste in 1998 on that basis. Is that statement consistent with your understanding?

A Yes.

MS. HERRMANN: Objection. Foundation, calls for a legal conclusion.

A Yes.

Q On page three could you please turn to the first paragraph on the top of the page. Do you see that?

A Yes.

Q Why would continued on-site storage of spent fuel threaten the orderly operation of the nation's civilian nuclear reactors?

MS. HERRMANN: Objection. Foundation.

You can take time to read it if you need to.

THE WITNESS: Yeah.
A You're referring to a phrase in this paragraph?
Q I'm looking at the last sentence of the first full paragraph on page three. Do you see that?
A The last sentence. I see the last sentence.
Q And my question is how or why would the continued on-site storage of spent fuel threaten the orderly operation of the nation's civilian nuclear reactors?
MS. HERRMANN: Objection. Foundation.
A The example of this would be the Prairie Island situation.
Q And please explain to me that example.
A Where due to local state -- state law they had difficulty getting storage and may have to shut the reactor down.
Q Are there any other situations that you're familiar with which at-reactor storage could threaten the orderly operation of nuclear reactors?
A No specific ones.

Q Do you believe that to be generally a concern?

A Yes.

Q Do you recall I asked you about an Upton Bill, U-p-t-o-n, the last session of this deposition?

A Vaguely.

Q Could you please turn to what's marked as page one, Bates number 0579 of this exhibit.

MS. HERRMANN: The next page in our copy, right, counsel?

A Policy options, option one?

Q Yes, that's the page.

A I see it.

Q It's Option 4. I'm sorry.

A Option 4?

Q Yes. The bottom of the page is Bates number 0579.

MS. HERRMANN: Our Bates numbers are cut off so we're going to need a better reference.

MR. CAYNE: It's Option 4.

A Yes, I see the page.

MS. HERRMANN: For the record, a good

number of these pages are numbered page number one and page number two, so that's not going to help.

A Just so you know, ten minutes from now I need to go.

Q It's 3:45.

A Oh, I'm a whole hour off. Sorry about that.

MS. HERRMANN: Wishful thinking.

Q I'd like to turn your attention to towards the bottom of the page there's a paragraph that begins "start of waste acceptance." Do you see that?

A Yeah, I see the paragraph.

Q Would you please read that.

A Okay.

Q Have you read that passage?

A Yes.

Q Now, the reference to the storage facility here is to an interim storage facility, correct?

MS. HERRMANN: Objection. Foundation.

A That's my understanding.

Q And just for the record, let me just read the statement so it's clear what we're talking about.

The paragraph reads "Start of waste acceptance: The Upton/Towns Bill mandates a storage facility in 1998, but this appears infeasible. More realistic estimates are that a storage facility could be available in five to seven years after legislation is passed, depending on the degree of procedural streamlining included in the law. Assuming passage of legislation 1995, therefore acceptance could begin from 1999 to 2003." Do you see that? That's the statement you're referring to, correct?

A Yes.

Q Earlier on your office believed that an interim storage facility could be up and running within three-and-a-half years of the start of construction, correct?

MS. HERRMANN: Objection. Speculation.

A I don't recall three-and-a-half years.

Q You do not recall testifying in this deposition that at an earlier point in time you believed that it would take less than five to seven years to get an interim storage facility up and running?

A All depends on the infrastructure and degree of streamlining, etc. The shortest I think I've ever said was four under some -- some circumstances which I don't remember the details. But generally -- I've never said less than four. You can do it in three and a half. That's the licensing phase or something, to put it in context. But go ahead. I mean, what's the -- what's the question? If you're saying three and a half, I don't think you can do it in three and a half.

Q My question is do you agree with the statement at page Bates 0579 that a realistic estimate of the amount of time that it would take to get an interim storage facility up and running would be from five to seven years after the enactment of authorizing legislation?

MS. HERRMANN: Objection. Speculation.

A Could be four, could be five, could be seven. All depends on a lot of things.

Q Would an MRS facility be an interim storage facility within the meaning of this paragraph on 0579?

MS. HERRMANN: Objection. Foundation.

A It would be very similar.
Q Is that what was in mind?
MS. HERRMANN: Objection. Foundation. Speculation.
A The Upton/Towns Bill was straight storage. An MRS was more than straight storage. It was an integral part of the system.
Q Turn to page -- it's a section that on the top of the page it states "supporting initiatives for policy options."
A We're going back in the document or forward?
Q It's --
MR. MACDONALD: Third-to-the-last page.
Q -- third-to-the-last page.
A I see that page.
Q And can you take a moment to read this portion of the memorandum. And to put it into context for you, I'm going to specifically ask you about, on the following page, the section on policy considerations. Why don't you read this memorandum, this portion of the memorandum so that you can respond

to the questions I have on that section.
A Am I supposed to read B or A?
Q I'm focusing on Subsection B.
A Oh, I'm sorry, I'm doing A.
I've read B.
Q Okay. Now, under page 0581.
A Tell me which one.
Q That's the first page with "supporting initiatives for policy actions." Do you see that?
A Yes.
Q In 1995, in April 1995 was the multipurpose canister program still in force, or had you terminated it already?
A It's my recollection it was still there in early '95.
Q And as you discussed earlier, the multipurpose canister program would have been intended to mitigate at least some of the harm suffered by utilities as a result of the delay in acceptance of spent nuclear fuel, correct?
A Correct.
Q Well, why, as reflected in this Exhibit 50,

was it also believed that -- by the department and the Office of Management and Budget that additional payments would be required to be made to the utilities to supplement the provision of multipurpose canisters?

MS. HERRMANN: Objection. Foundation.

A It doesn't say that. It says it could be. You know, if this option were adopted you could do that to additionally compensate them for the delays.

Q Because I thought when you explained the multipurpose canister program, that would have been a stand-alone proposal, to compensate the utilities?

A That was a -- that was a stand-alone proposal, but what this is referring to, I believe, is this would be in addition to the multipurpose canisters. It says right there, These payments would supplement the multipurpose canisters.

Q You indicated that the multipurpose canister program was intended to mitigate the harm suffered by the utilities, correct, as a result of the acceptance delays?

A Yes.

Q Why was the department in 1995 considering

the possibility of supplementing the provision of multipurpose canisters to utilities with additional payments reflected in the proposal on page 0581 and 0582 of Exhibit 50?

MS. HERRMANN: Objection. Foundation. Speculation.

A It would be my understanding that many utilities were not particularly satisfied that the multipurpose canisters being supplied were sufficient to cover the delays and wanted more. And this was our -- an option that we were looking at that we could provide more. An example is one you said earlier, we talked about earlier was that the multipurpose canisters did not cover the construction costs that on-site reactors would have to do.

Q And would the payments reflected in the proposal set forth at page 581 have covered such construction costs?

A Could have been used for that.

Q That would have been one of the purposes, correct?

A Could have been, yes.

Q For what other purposes would the payments reflected at page 051 have been used?
MS. HERRMANN: Objection. Foundation.
A I don't know.
Q Well, rather than giving me all the purposes, what other purposes can you think of? Can you think of any other purposes?
MS. HERRMANN: Same objection.
Q Other than construction?
A Well, if it was a payment in terms of cash, utilities could do with it what they wished to do in conjunction with the PUCs.
Q In conjunction with the?
A Public utility commissions.
Q How would the amount of the payments have been determined?
MS. HERRMANN: Objection. Foundation, speculation.
A That's a complexity that's there and one of the reasons why we never did it.
Q On the next page, page 0582.
MS. HERRMANN: Can we get a title on the

top, please?

MR. CAYNE: The first entry is Legislative Implications.

MR. MACDONALD: The second-to-the-last page.

A The next-to-the-last page?

Q Yes. You said a moment ago the payments weren't made because of the complexity of determining the amount. Do you recall that statement?

A Yeah, I recall the statement. I shouldn't have made it.

Q You didn't mean to indicate that the department didn't make the payments because it didn't believe that it had an obligation to mitigate or rectify the harm sustained by the utilities as the result of the delay in acceptance, did you?

MS. HERRMANN: Objection. Foundation, calls for a legal conclusion. Objection to the extent it mischaracterizes prior testimony.

A Cash payments are extremely complicated, and this was not pursued beyond the preconceptual discussion that you see here.