Q But it was not pursued, if I understand your testimony, because of the difficulty in determining the amount of the cash payments as opposed to a determination by the department that it didn't have an obligation to rectify the harm suffered by the utilities as a result of the acceptance delays, correct?

MS. HERRMANN: Objection. Foundation, calls for a legal conclusion.

Q Correct?

MS. HERRMANN: Same objections.

A I don't know how to answer that question, because you had so many things mixed in it. I don't know how to answer that question.

Q If I understand your testimony, the department basically threw up its hands and said, It's too complicated for to us figure out how much we should pay each utility, so we're not going to pursue this proposal. Would that be a correct statement?

MS. HERRMANN: Objection. Mischaracterizes prior testimony.

A No, it would not be, because the amount

that one would pay is probably one of the more easy things to do, and that is very complicated in itself. So there are many issues involving direct payments, of which determining what amounts to whom and when is a very complicated one, but that is probably less complicated than the source of funds and the other things discussed in this statement.

So I did say that, but that's a lesser item. Although that is a major item. I have nothing to do -- in my statement on that, my remark had nothing to do regarding obligations or anything else that revolved through contractual matters.

Q Do you see under Policy Consideration it says "mitigates the perceived problems of utilities 'having to pay twice for storage'"? Do you see that?

A I see that.

Q What is that?

MS. HERRMANN: Objection. Foundation, speculation.

A I believe what the authors were trying to do here was find a way to provide resources back to the utilities that were having to spend resources due

to the fact that we didn't pick the fuel up, through storage or whatever, while they were -- operating utilities, not shut down ones -- were still paying money into the waste fund. The ones who were operating claimed they were paying twice; once to pay the waste fund and once to do with storage. So we were trying to figure a way to cover some of the storage costs that would alleviate the utilities to have to, quote, pay twice.

Q Under the statute the utilities were supposed to pay into the waste fund, and at that point it became the obligation of the Department of Energy to store and dispose of the spent fuel, correct?

MS. HERRMANN: Objection. Calls for a legal conclusion.

Q Correct?

MS. HERRMANN: Same objection.

A Repeat the question again.

Q The problem of the utilities having to pay twice for storage arose because under the Nuclear Waste Policy Act it was the intention of Congress that the utilities pay once into the nuclear waste fund,

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - - - - - - x COPY

| | |
|---|---|
| YANKEE ATOMIC ELECTRIC COMPANY; | : Case Nos. 98-126C, |
| CONNECTICUT YANKEE ATOMIC POWER | : 98-154C, 98-474C, |
| COMPANY; MAINE YANKEE ATOMIC | : 98-483C, 98-484C, |
| POWER COMPANY; FLORIDA POWER & | : 98-485C, 98-486C, |
| LIGHT COMPANY; NORTHERN STATES | : 98-488C, 98-614C, |
| POWER COMPANY; DUKE POWER, a | : 98-621C, 99-447C, |
| Division of DUKE ENERGY CORP.; | : 00-440C, 00-695C, |
| INDIANA MICHIGAN POWER COMPANY; | : 00-703C, 01-115C, |
| SACRAMENTO MUNICIPAL UTILITY | : 01-116C, 01-249C |

- - - - - - - - - - - - - - - - - - - - - X

(Caption continued on the next page)

Continued Deposition of LAKE H. BARRETT

Washington, D. C.

Friday, May 10, 2002

8:06 a.m.

Job No.: 11792-11

Pages 1104 to 1437, Volume 5

Reported by: Diane Gomez, RPR

Q Are you familiar with the HLRWM conference?
A It's one of many conferences that were held regarding high-level waste management. Exactly this one, I don't know what it is.
Q So does HLRWM stand for high-level radioactive waste management?
A I think so.
Q Do you know why there's a statement on this buck slip, "high priority"?
MS. HERRMANN: Objection. Speculation.
A Not at all.
Q With respect to the statement "papers volume two," did your office maintain a library of papers such as the paper represented by Exhibit 57?
A No.
Q So you don't know what the volume two is referring to here on the buck slip?
MS. HERRMANN: Objection. Speculation.
A No.
Q Why was Pacific Northwest Laboratories assigned the task of conducting a determination of cost-effective waste management system receipt rates?

MS. HERRMANN: Objection. Speculation.
A I'm not sure they were.
Q Do you believe that this paper was unauthorized by your department?
MS. HERRMANN: Same objection.
A I don't know.
Q Do you believe it likely someone in your department, an employee of yours, would have requested that Pacific Northwest Laboratory prepare the paper reflected by Exhibit 57?
MS. HERRMANN: Same objection.
A I don't know.
Q How would this paper have been used by your office?
MS. HERRMANN: Objection. Speculation.
A Paper, not at all.
Q Excuse me?
A The paper, not at all.
Q How would the analysis set forth in Exhibit 57 have been used by your office?
A The paper is a summary of a report. The report was submitted to the department, I would

assume. The report is what we would use. The paper given at the conference is just a paper given at a conference.

Q Fine. Let's go back to that series of questions now that I understand what you're doing.

Would your office have authorized the report summarized in the paper, specifically Exhibit 57?

MS. HERRMANN: Objection. Speculation.

A I don't know for sure, but probably so.

Q For what purpose would your office have authorized that report?

MS. HERRMANN: Same objection.

A For input to the Department of Energy regarding the overall design of the system.

Q And you see that according to the abstract, the abstract states, does it not, that a comprehensive logistics and cost analysis has been carried out to determine if there are potential benefits to the high-level waste management system for receipt rates other than the current 3,000 MTU per year design basis receipt rate. You see that?

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

\- - - - - - - - - - - - - - - - x

YANKEE ATOMIC ELECTRIC

COMPANY, CONNECTICUT YANKEE :

ATOMIC POWER COMPANY, MAINE :

YANKEE ATOMIC POWER COMPANY, : Case No. 98-126C,

Plaintiff, : 98-154C, 98-474C

vs. : (Senior Judge Merrow)

UNITED STATES OF AMERICA, :

Defendant. : Volume I

\- - - - - - - - - - - - - - - - x

Washington, D.C.

Tuesday, May 14, 2002

Deposition of LAKE H. BARRETT, a witness herein, called for examination by counsel for the Plaintiffs in the above-entitled matter, pursuant to notice, the witness being duly sworn, taken at the offices of Spriggs & Hollingsworth, 1350 Eye Street, N.W., Washington, D.C., commencing at 9:30 a.m., Tuesday, May 14, 2002, and the proceedings being taken down by Stenotype by CAPPY HALLOCK, RPR-CRR, and transcribed under her direction.

CONTAINS CONFIDENTIAL INFORMATION

PURSUANT TO THE PROTECTIVE ORDER

amplify a little bit by what you mean by bite size campaigns?

A. Bite size meaning how much tonnage of fuel are you going to take in a campaign over a certain period of time.

Q. Okay. Is that determination something that is going to be substantially left to the regional contractors under the RFP that we were discussing earlier?

MS. HERRMANN: Objection. Speculation.

A. It is my opinion regarding the efficiency of the system that the RSC would work with the contract holders in their region or nationally to work out the best mutual arrangement for the contract holders and the government for the most efficient system that could be devised.

Q. As to schedule; is that what you are talking about? It may be other things, but including scheduling matters?

A. Including scheduling, recognizing the fact that there are contractual legal matters that will also have to be addressed, and that I would hope that the RSC, the regional services contractor or agent could facilitate and arrange

for an acceptable arrangement for both the contract holders and the Department of Energy, to present that for mutual approvals.

Q. Well, for mutual approvals. What are the contractual matters that you are referring to?

MS. HERRMANN: Objection. Calls for a legal conclusion.

A. Given that the contract -- contracts exist under the statute and that there are implementing documents under the contract, I would -- it is our goal that there is an acceptable arrangement for all the parties how to work the allocations into actual shipping campaigns.

Q. And when you referred a moment or two ago to working out the most efficient system for scheduling that could be arranged -- do you recall that reference?

A. Yes.

Q. Okay. What are your expectations in the context of working out the most efficient system or an efficient system for scheduling? What are your expectations about the extent to which exchanges of allocations between or among utilities will occur?

A. I'm not sure the program has taken a programmatic position or programmatic document on that when it is my opinion.

Q. Wouldn't it be more economically efficient? Isn't that what we are talking about, the economic efficiency -- the economic efficiency of effective system utilization?

Or let me ask that question. Do you believe that a schedule that more effectively utilizes system capacity would be more economically efficient?

A. Most of the time, but there may be some particular situations where it may not be effective for somebody.

Q. Well, as a general matter would be more economically efficient?

MS. HERRMANN: Objection. Vague.

A. It should be, but there may be many cases it is not.

Q. Give an example of a case or a situation in which more effective utilization of system capacity will not be more economically efficient for a particular utility.

A. It would depend upon the details, you know, such as interface issues, transportation

issues possibly. Possibly one utility has got pool overflow issues, another has a decommissioning issue. Another has maybe a policy or political issue about moving fuel. So those, all those issues would have to be dealt with, and they may -- it may not be to everyone's advantage to do something like that. We just don't know that.

Q. And what is the "something like that"?

A. To have exchanges or allocations recommended by the RSC.

Q. Okay. Well, let's see if you agree with this: Those matters that you just referred to might pose impediments to an optimal, in other words most efficient utilization of capacity, but that's not inconsistent with utilization of a system capacity being made as a goal more efficient than what would result if the schedule were to follow the sequence that is shown on Page 8 of Exhibit 40, right?

THE WITNESS: Can I have that question again?

MR. STOUCK: Would you read it back, please?

(The record was read as requested.)

be greater or less than the costs of a system that includes some -- included some amount of campaign pickups?

MS. HERRMANN: Objection. Speculation.

A. Greater.

Q. Okay.

So it would be in the utility's interests to avoid that greater cost through some kind of rearrangement of the sequence; would you agree with that?

MS. HERRMANN: Objection. Foundation.

A. From a cost perspective, yes.

Q. Okay, and it would be in DOE's interest from a cost perspective to promote some rearrangement of the sequencing to be more cost-effective, right?

A. Within the extent of the law, yes.

Q. And is the reason that you believe it is possible that the actual sequence for pickup would be the sequence that is shown on Page 8 of Exhibit 40 is -- the reason that you believe that is a possibility, that contractual matters and issues and disputes on the utility side would require that that schedule be maintained if those

issues and disputes could not be worked out; do
you think that's a possibility?
MS. HERRMANN: Objection.
Can I have that question back?
(The record was read as requested.)
MS. HERRMANN: Objection. Foundation.
Vague. Calls for a legal conclusion.
Speculation.
A. Yes.
BY MR. STOUCK:
Q. Any other reason other than the
inability of the utilities with or without the
Department's help to work out those issues, is
there any other reason that you think it's
possible that the schedule that is shown on Page 8
of Exhibit 40 would be the actual sequence for
pickup?
MS. HERRMANN: Objection.
Speculation.
A. That's the main reason.
Q. Okay. That's the only reason you can
think of right now?
A. That's the only one I can think of
right now.
Q. Okay.

AFTERNOON SESSION

(1:30 p.m.)

Whereupon,

LAKE H. BARRETT,

the witness on the stand at the time of recess, having been previously duly sworn, was further examined and testified as follows:

EXAMINATION BY COUNSEL FOR PLAINTIFFS (RESUMED)

BY MR. STOUCK:

Q. Good afternoon, Mr. Barrett.

A. Good afternoon.

Q. Welcome back. You are still under oath; you understand that?

A. Yes, I do.

Q. We spoke a little earlier this morning about -- I think I referred you to a couple passages in the mission plan about DOE's ability to develop a transportation system suitable to support the Spent Fuel Acceptance Program.

Do you recall that?

A. Yes.

Q. And it is true, is it not, and I think you told me this morning, but whether or not you did, it is true that, in the period from 1983 to 1988, DOE had the ability to develop a

You are familiar -- I know you have given some testimony about this already, so I will try not to be duplicative. You are familiar with greater than Class C waste, sometimes called GTCC?

A. Yes.

Q. Do you know whether there currently exists, Mr. Barrett, alternatives for the disposition of -- for the disposal of GTCC wastes, alternatives to disposal at Yucca Mountain currently?

MS. HERRMANN: Objection. Foundation. Speculation.

A. Yes.

Q. Okay. You know are there?

A. Yes.

Q. What are the alternatives that are currently available for disposal of GTCC wastes?

A. You can get an exemption from the NRC, I believe. Special approval from the NRC.

Q. To do what?

A. Dispose of it in a near-surface facility.

Q. Okay.

A. Also you could request from the NRC special approval for a facility other than Yucca

Mountain.
Q. Like, you mean close-to-surface facility or --
A. Intermediate depth, bore hole emplacement.
Q. Okay. Anything else?
A. Those are the ones that come to mind.
Q. Those are two alternatives to disposal at Yucca Mountain for GTCC wastes --
A. Yes.
Q. -- that are currently available?
A. Yes.
Q. Do you know whether any utility has obtained a special exemption from the NRC to dispose of GTCC wastes at a near-surface facility?
MS. HERRMANN: Objection. Speculation.
A. I don't know if it is phrased exactly that way, but the Trojan reactor vessel was disposed of at Hanford on a NRC approval process.
Q. And that contained GTCC wastes?
A. Greater than Class C like wastes.
Q. And was it in some respect in which it was not like greater than Class C wastes?
A. It gets very complicated with the rules and radioactive concentration per gram or per

volume over what volume or weight material you use, so there is some discretion and latitude in the definitions on how it is applied.

Q. Okay, but in your mind that reactor vessel from Trojan was comparable to GTCC wastes?

MS. HERRMANN: Objection. Vague. Calls for a legal conclusion.

A. Some pieces of metal inside that vessel might have been called greater than Class C wastes under different circumstances than that.

Q. Okay. How do you know about this Trojan episode? Were you involved personally?

A. No.

Q. How do you know about it?

A. Trade, industry trade information.

Q. Do you know of any other examples of a utility obtaining a special exception from the NRC for disposal of GTCC wastes in a near-surface facility?

A. Not off -- no.

Q. Well, do you know -- do you know for sure one way or the other whether there are any other examples?

A. There have been concepts of -- a term DOE would use is special case wastes, which is

greater than Class C wastes being disposed of in hundred meter deep bore holes, Nevada test site and other such special arrangements, but those are not NRC certified though one could -- there was plans by some companies to dispose of greater than Class C sources in a similar facility in a NRC licensed facility in Texas or New Mexico.

Q. Do you know which company that was?

A. No, I don't recall.

Q. Now these one hundred foot poles that you mentioned, or bores -- I forget the exact phrase you used -- was that defense waste?

A. I believe it was. It may have been R&D waste, but there are one hundred meter bore holes.

Q. So you think there are other examples other than the Trojan example of approval, whether by the NRC or otherwise, for the disposal of GTCC wastes in other than a geologic depository, but aside from the example in Texas where you don't know the name of the utility, you can't think of any others but you think there are others?

A. It's possible. You asked if there are any. There are some possible concepts.

Q. My question was, as you sit there you don't know for a fact that Trojan is the only

example?
A. Right.
Q. There may be others, you just can't think of any?
A. Right.
Q. Now, you also mentioned, going back to the first answer about alternatives to geologic disposal for GTCC wastes, you also mentioned some intermediate depth disposal option. Can you tell me a little more about that option?
A. That would be the one hundred meter deep bore holes type arrangement.
Q. And again, that was not defense waste -- has that actually been used by any utility for GTCC wastes?
A. I don't know about a utility. It has been used for disposal of GTCC like wastes over the past 30 years, none recently, but it used to be reasonably common.
Q. Okay. If it wasn't utilities, was it defense wastes?
A. I believe it was R&D wastes.
Q. R&D wastes. Forgive me, I think you said that before. I'm trying to write and think and ask questions, and I apologize.