IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - - - - - -x

YANKEE ATOMIC ELECTRIC COMPANY :
(98-126C)(Merow, S.J.) :
CONNECTICUT YANKEE ATOMIC POWER COMPANY :
(98-154C)(Merow, S.J.) :
FLORIDA POWER & LIGHT COMPANY :
(98-483C)(Wilson, J.) :
NORTHERN STATES POWER COMPANY :
(98-484C)(Wiese,J.) :
DUKE POWER, A Division of :
DUKE ENERGY CORP. :
(98-485C)(Sypolt,J.) Certified Copy :
INDIANA MICHIGAN POWER COMPANY :
(98-486C)(Hodges, J.) :
SACRAMENTO MUNICIPAL UTILITY DISTRICT :
(98-488C)(Yock, S.J.) :
SOUTHERN NUCLEAR OPERATING COMPANY, :
et al. :
(98-488C)(Yock, S.J.) :
COMMONWEALTH EDISON COMPANY :
(98-621C)(Hewitt, J.) :
BOSTON EDISON COMPANY :
(99-447C)(Allegra, J.) :
GPU NUCLEAR, INCORPORATED :

(00-440C)(Bush, J.) :
WISCONSIN ELECTRIC POWER COMPANY :
(00-697C)(Merow, S.J.) :
POWER AUTHORITY OF THE STATE OF NEW YORK :
(00-703C)(Damich, J.) :
OMAHA PUBLIC POWER DISTRICT :
(01-115C)(Bush, J.) :
NEBRASKA PUBLIC POWER DISTRICT :
(01-116C)(Sypolt, J.) :
TENNESSEE VALLEY AUTHORITY :
(01-249C)(Bruggink, J.) :
Plaintiffs, :
v. :Discovery
THE UNITED STATES, :Judge:
Defendant. :(Judge
- - - - - - - - - - - - - - - - - - - - -xSypolt)

McLean, Virginia
Tuesday, April 9, 2002

Deposition of ALAN BROWNSTEIN, a witness, called for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to notice, the witness being duly sworn by CATHERINE S. BOYD, a Notary Public in and for the Commonwealth of Virginia, taken at the offices of Shaw Pittman, LLP, 1650 Tysons

Boulevard, McLean, Virginia 22102-4859, at 9:30 a.m., Tuesday, April 9, 2002, and the proceedings being taken down by Stenotype by CATHERINE S. BOYD and transcribed under her direction.

Q. What were the responsibilities of the department with respect to the disposal of spent nuclear fuel?

A. We were responsible --

MR. BANES: Objection -- I'm sorry. Objection. Calls for a legal conclusion.

Go ahead.

THE WITNESS: Okay. Ultimately we were responsible for accepting that fuel for permanent disposal.

BY MR. TOMASZCZUK:

Q. Was there a date by which the department was to undertake that effort?

MR. BANES: Objection. Calls for a legal conclusion.

Go ahead.

THE WITNESS: I believe and the department believed that we had to begin accepting that fuel upon commencement of the facility operations.

BY MR. TOMASZCZUK:

Q. Not by a particular date?

A. There was a date, but that date was conditional.

We believed that the January 31st,

1998 date was clear as we responded to written questions from the Hill and others, that that date was conditional based on the commencement of facility operations.

Q. Did the department have the responsibility to take title to the spent nuclear fuel or high-level waste involved as expeditiously as practicable?

MR. BANES: Objection. Calls for a legal conclusion.

THE WITNESS: Yes, but, and the but is based upon commencement of facility operations.

BY MR. TOMASZCZUK:

Q. Is it your understanding, Mr. Brownstein, that if the facility never opens, then DOE never has an obligation under the contract?

MR. BANES: Objection. Calls for a legal conclusion, and vague.

THE WITNESS: Yes.

BY MR. TOMASZCZUK:

Q. Did you have any understanding at or about the time you became a DOE employee with respect to the spent nuclear fuel acceptance rate that DOE was using with respect to the

Q. Let me hand you, Mr. Brownstein, I'm going to have this marked as Brownstein Exhibit 3, what appears to be Volume 1 of a draft mission plan dated December 20, 1983.

(Brownstein Exhibit No. 3 was marked for identification.)

BY MR. TOMASZCZUK:

Q. Have you ever seen that document before?

A. I cannot recall ever seeing this document.

Q. Can I direct your attention to page 2-1 under the heading II, program strategy?

I would direct your attention to the first paragraph under that heading, program strategy.

(The witness reviewed the document.)

THE WITNESS: Okay.

BY MR. TOMASZCZUK:

Q. Do you see the last two sentences of that paragraph?

A. Yes.

Q. It states, "The waste materials will be accepted in accordance with a Waste

Acceptance Schedule designed to provide an acceptance rate in the first five years such that no utility will have to provide additional storage capacity after January 31, 1998. Subsequently, the acceptance rate will be equal to or greater than the actual discharge rate of spent fuel each year."

That's what is stated there, correct?

A. Correct.

Q. Was that DOE's policy at the time you became an employee?

A. I've never seen this document.

MR. BANES: Objection -- vague.

THE WITNESS: And I do not believe it reflects the policy.

BY MR. TOMASZCZUK:

Q. It does not reflect the policy?

A. I do not believe it does.

Q. It was not DOE's policy under the contract to provide an acceptance rate in the first five years such that no utility will have to provide additional storage capacity after January 31, 1998?

MR. BANES: Objection -- asked and answered.

THE WITNESS: It may have been a goal. I mean I was not with the program and had not seen this document.

May have been a goal, but in terms of the policy with respect to the contract, I don't believe that reflects that.

BY MR. TOMASZCZUK:

Q. And it's your testimony that you haven't seen this document before today as best you can recall?

A. As best I recall, I have not seen this document.

(There was a pause in the proceedings.)

BY MR. TOMASZCZUK:

Q. Let's go back to Brownstein Exhibit 2, which was the June 1985 mission plan.

And I believe you testified if I understood it, Mr. Brownstein, that you used the waste acceptance schedules in the mission plan to implement the terms of the contract?

A. And --

MR. BANES: Objection. Go ahead.

BY MR. TOMASZCZUK:

Q. I understood that to be your

testimony?
A. In the mission plan or the mission plan amendments.
Q. Okay. And how did you go about doing that?
Explain to me what you mean by that.
A. My responsibilities did not include developing a waste acceptance rate that was done by other parts of the program, and in order to complete the things that I was responsible for, we needed a waste acceptance rate, and I used documents available elsewhere in the program.
Q. Who was responsible for developing the waste acceptance rates reflected on page 26 of Exhibit 2?
A. I don't recall. As I testified, this document came out before I was an employee, so I don't know who, who was responsible for that.
I don't recall who was responsible for that.
Q. What office within DOE was responsible for preparing this data, do you know?
A. OCRWM.
Q. Was there a division or branch within OCRWM that was responsible for preparing the

waste acceptance schedule at page 26 of Brownstein 2?

A. There probably was, but I just don't recall.

Q. Do you see the first sentence of this section under the heading 2.7, waste-acceptance schedules, on page 25?

(The witness reviewed the document.)

THE WITNESS: Yes.

BY MR. TOMASZCZUK:

Q. It says, "The DOE is committed to accept waste from the signatories of the standard disposal contracts on a firm schedule that begins no later than January 31, 1998"?

A. Yes.

Q. Is that an accurate statement?

MR. BANES: Objection. Calls for a legal conclusion.

It's vague.

BY MR. TOMASZCZUK:

Q. I'm not asking for your understanding as a, as an attorney.

A. The statement is what it is. You read it correctly.

Q. Is it an accurate statement? Do you

understand my question?

A. I don't.

MR. BANES: Same objection.

BY MR. TOMASZCZK:

Q. Well, is it true that DOE under the contract is committed to accept waste from the signatories of standard disposal contracts on a firm schedule that begins no later than January 31, 1998?

MR. BANES: Objection. Calls for a legal conclusion.

Go ahead.

THE WITNESS: I don't believe that. I believe that this is a, a goal.

I don't believe that it accurately represents what the contract calls for.

BY MR. TOMASZCZUK:

Q. Did you ever discuss that view with anyone?

A. I'm sure that I must have, but I don't recall specifically who or circumstances.

Q. You would at least agree the first sentence doesn't talk about goals, does it?

MR. BANES: Objection -- vague, argumentative.

A. I don't believe I have seen it before today.

Q. You don't know who prepared it?

A. I can read the bottom of the page and know the organization that purportedly prepared it, but it says PNL.

Q. Do you recall any discussions with PNL personnel concerning the document?

A. I don't recall seeing the document before, so I do not.

Q. Could you read the first paragraph of the document?

A. Sure.

Q. You don't have to read it out loud. You can just read it to yourself.

A. Thank you.

(The witness reviewed the document.)

THE WITNESS: Okay.

BY MR. TOMASZCZUK:

Q. Do you agree with the first sentence as stated in the first paragraph of this document?

MR. BANES: Objection. Calls for a legal conclusion.

You can answer.

THE WITNESS: I do agree with it.
BY MR. TOMASZCZUK:
Q. You would agree the current contracts do not commit the department to accept spent fuel on any specific schedule?
A. I am agreeing to that, yes.
Q. And therefore do not provide a basis for utilities to plan for meeting their storage needs?
You agree with that part of the schedule?
A. Yes.
MR. BANES: Objection. Calls for a legal conclusion.
MR. TOMASZCZUK: I'm sorry. What about that calls for a legal conclusion?
MR. BANES: You're asking him about, to interpret the contract.
Every time you ask him to interpret the contract, we file a motion for summary judgment on the contract because it's a question of law and interpreting the contract, so every time you ask him to interpret the contract, I'm going to say calls for a legal conclusion.
BY MR. TOMASZCZUK:

Q. Well, I'm not sure I have asked you, at least in this most recent question, to interpret the contract, and it's not my intention to ask you for legal conclusions, but you were here for ten years, as I understand it, responsible for administering the contract, and I think it's fair that, that I should be entitled to ask you some questions about that, and that's what I'm going to purport to do.

Okay?

MR. BANES: I'm not going to prevent you from asking those questions.

I'm just going to preserve my objection for the record because it doesn't, we don't need testimony to interpret the contract.

MR. TOMASZCZUK: Well, we don't agree with that statement of the law, but we don't need to debate it here.

MR. BANES: Okay.

BY MR. TOMASZCZUK:

Q. Do you see the second sentence in this first paragraph, Mr. Brownstein?

A. Yes.

Q. Would you agree or disagree with that sentence as written?

That's the subject we're talking about?

A. Yes.

Q. And my question to you is do you agree that that was DOE's intention at or about the time that this document was prepared in July of 1986?

MR. BANES: Objection -- vague.

THE WITNESS: I must tell you that contractor, contractors prepare a number of documents for many different parts of the organization to do many things.

I can agree with what this is. This is separate from the department policy.

Contractors do contractor work, provide input to the department. The department considers that.

So this is a contractor document, not a DOE document, and that's why I'm hesitating in your answers.

BY MR. TOMASZCZUK:

Q. Okay. Was it a goal of DOE at this time, July of 1986, that utilities would not need to expand their storage capacities after 1998?