in the mission plan amendment in the first ACR, or was it someone else's within DOE?

A. I believe it was my recommendation that others concurred on.

Q. And why did you use the data in Table F-1 to prepare the first ACR?

A. I have not looked at the ACR in a long time, so I'm assuming based on your statement that, that I did.

I mean I need to review it to make sure.

Q. That's fair. And I base my statement on what I understood your testimony to be.

A. Okay.

MR. BANES: Objection -- lack of foundation.

THE WITNESS: In implementing the terms of the contract, the, I didn't view -- there are many factors that go into the waste acceptance rate that are not contractual.

There are logistical. There are engineering. There are other concerns that, responsibilities of other parts of the office, not mine.

I needed a waste acceptance rate in

order to carry out my responsibilities in the contract.

It was not my responsibility to, to do, to put that together, so I took information that the department was publishing at the time and used that.

It was, it was more simple as opposed to more complicated in terms of the decision.

BY MR. TOMASZCZUK:

Q. In or about June of 1987, Mr. Brandt was your immediate supervisor?

A. Yes.

Q. Okay. And where was Mr. Milner in the supervisory chain?

A. To the best of my recollection, in June of '87, he was not in my supervisory chain.

He was, he was I believe a division director in another division within one of the offices within RW, so he was someone that I regularly consulted with on a number of issues associated with the contract.

Q. Okay, but you, just so I understand your testimony, you didn't report to him directly at that time?

A. At that time, I did not.

Q. When you got this letter and saw the reference to performance standards, did you understand that to be milestones in meeting the January 31, 1998 date, or did you have a different understanding of that term?

MR. BANES: Objection -- vague and lack of foundation.

I think the words are additional performance standards.

MR. TOMASZCZUK: I appreciate that. That's fair.

THE WITNESS: Okay. Could you restate the question?

BY MR. TOMASZCZUK:

Q. When you got this copy of this letter from Mr. Kraft, what did you understand the term additional performance standards to mean in your mind?

A. In my mind, they, they wanted us to be clearer in terms of what we were going to do and when we were going to do it than was included in either the NWPA or the contract itself.

We felt both documents were sufficiently clear.

Q. And did you understand the term

additional performance standards to mean milestones for meeting the January 31, 1998 date, or did you understand it to mean something other than that?

MR. BANES: Objection -- compound, vague.

THE WITNESS: In my mind, the January 31st, 1998 date, as I have stated previously, was always a conditional requirement, and it was conditioned clearly both on the law and the contract, on the commencement of the facility operations, and so while we, as I indicated to you earlier today, we had, I think you used the word goals or objectives of accepting fuel as early as possible, that is separate and apart from the contractual, conditional contractual commitment which predicated the acceptance on commencement of facility operations.

That's how I used it.

BY MR. TOMASZCZUK:

Q. Did you understand when you saw the term additional performance standards that the utilities were asking DOE to adopt a minimum acceptance rate for the facility?

A. One of the things that was implied in

the letter that Mr. Kraft was concerned about was in his mind, the department could potentially meet its obligation again in my mind, following commencement of facility operations by accepting a single fuel assembly from a utility, and, and they were concerned about that.

Q. Did you have a view about that issue?

A. We viewed the contract and the law, you know, contain sufficient performance standards.

It was clear that in return for payment, ultimately and conditionally, we would be required to take their waste, and that's the ultimate performance standard.

Everything else were intermediate milestones or goals as opposed to contractual commitments.

Q. Do you know whether the federal Courts of Appeal have adopted your view as to the conditional nature of DOE's performance that you just articulated?

A. They have not, but that is how we, that is what we believed, and that's how we acted really at all times prior to that decision

(The witness reviewed the document.)
THE WITNESS: Not solely, but, but had a large hand in the others, yes.
BY MR. TOMASZCZUK:
Q. Okay. And the first paragraph, the last sentence states, "The Department shares your desire to ensure that the Contract is fair and equitable and that it accurately reflects the intent of the contracting parties."
Do you see that on page 1, first paragraph.
A. Oh, yes.
Q. Last sentence?
A. Yes. I'm sorry. Yes.
Q. And does that accurately reflect a desire of the department at that time?
A. Yes.
Q. What was the intent of the parties at that time concerning the spent nuclear fuel acceptance rate?
MR. BANES: Objection. Calls for a legal conclusion.
THE WITNESS: Well, in, I believe as I testified behalf before, in the broadest of terms, the utilities were responsible for

funding the system, and that we were responsible ultimately to accept their fuel.

BY MR. TOMASZCZUK:

Q. Directing your attention to page 2 of the document --

A. Um-hm.

Q. Under the heading No. 1, additional performance standards?

A. Yes.

Q. Do you see that? Would you look at the second paragraph under this heading?

(The witness reviewed the document.)

THE WITNESS: Yes.

BY MR. TOMASZCZUK:

Q. Do you recall sitting here today whether you drafted this language in this paragraph?

A. I am sure I played a major role in it.

Q. And Mr. Jedrey is telling Mr. Kraft here in the first sentence of the second paragraph under subheading or under heading one, additional performance standards, quote, "...I can assure you that the Department intends to honor both the letter and spirit of the NWPA and the contract, rather than seek opportunities to

documents that you have shown me, they were part of the, the issue resolution process as we called it.

I'm going to refer back to Exhibit 11, since the beginning, so you know, they were, they were involved to help me think about changes in the contract from the Day One. It was nothing new.

Q. So at this point in time, we're two years beyond that initial December 1987 meeting as I recall?

A. Right.

Q. Was there a concern at this time about the contractual definition of high-level waste in the standard contract?

A. By?

MR. BANES: Objection -- vague.

BY MR. TOMASZCZUK:

Q. Was there a concern at DOE about the definition of high-level waste used in the standard contract?

A. Not by me, but --

MR. BANES: Objection -- vague.

THE WITNESS: But maybe by others.

BY MR. TOMASZCZUK:

Q. Do you see at the bottom of this page, following the phrase general comment on the format?

A. Yes.

Q. And the first sentence states, "Since the recent NRC ruling on the disposal requirements for GTCC, and the broad definition of HLW used in the Contract, many questions arise concerning the inclusion of decommissioned reactor GTCC wastes as a waste form covered in the current Contract," correct?

A. Right.

Q. Is it fair to say that there were many questions at this time about whether GTCC was a waste form covered in the contract?

MR. BANES: Objection. Calls for a legal conclusion.

Go ahead.

THE WITNESS: Not by me. As I indicated to you before, since the beginning of the relationship with PNL, one of their jobs was to think, think things through, but I never had an issue about GTCC.

So when he says in here many questions arise, not by me.

I can't speak for others.

BY MR. TOMASZCZUK:

Q. Do you agree with his reference here that the definition of high-level waste used in the contract was quote, unquote, broad?

MR. BANES: Objection -- vague; lack of foundation.

THE WITNESS: I mean it is a relative term.

I did not have a concern about this issue.

BY MR. TOMASZCZUK:

Q. And did you not have a concern because no one had raised it with you, or for some other reason?

A. No. To me, the contract was, was clear that we had responsibilities for spent nuclear fuel, and we had responsibilities for non-fuel bearing components, and the NRC did not make a determination that greater than Class C waste required deep geologic disposal.

Therefore, in my view, it was clear that it was not covered by the contract.

Q. Your view then was that GTCC was not covered by the contract?

A. Correct.
Q. Is that your view today?
A. It is.
Q. And can you identify for me on what language in the contract you rely for that position?
A. Okay. Okay. I found it quicker than I thought -- Article one, 12, Article one -- No -- 12 B, and you've really got to have, to read A, A and B, and B says other highly radioactive material that the commission, the Commission, referring to the Nuclear Regulatory Commission, consistent with existing law determines by rule requires permanent isolation.
The Commission never made that ruling, so that's the basis for my previous statement to you.
MR. TOMASZCZUK: I would like to take a break.
MR. BANES: Okay.
(A recess was taken.)
BY MR. TOMASZCZUK:
Q. Mr. Brownstein, I meant to ask you earlier did your office have a alphabetical and numerical designation within OCRWM?

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
- - - - - - - - - - - - - - - - - - - - - -x
YANKEE ATOMIC ELECTRIC COMPANY :
(98-126C)(Merow, S.J.) :
CONNECTICUT YANKEE ATOMIC POWER COMPANY :
(98-154C)(Merow, S.J.) :
FLORIDA POWER & LIGHT COMPANY :
(98-483C)(Wilson, J.) :
NORTHERN STATES POWER COMPANY :
(98-484C)(Wiese,J.) :
DUKE POWER, A Division of :
DUKE ENERGY CORP. ORIGINAL :
(98-485C)(Sypolt,J.) :
INDIANA MICHIGAN POWER COMPANY :
(98-486C)(Hodges, J.) :
SACRAMENTO MUNICIPAL UTILITY DISTRICT :
(98-488C)(Yock, S.J.) :
SOUTHERN NUCLEAR OPERATING COMPANY, :
et al. :
(98-488C)(Yock, S.J.) :
COMMONWEALTH EDISON COMPANY :
(98-621C)(Hewitt, J.) :
BOSTON EDISON COMPANY :
(99-447C)(Allegra, J.) :
GPU NUCLEAR, INCORPORATED :

```
(00-440C)(Bush, J.)                              :
WISCONSIN ELECTRIC POWER COMPANY                 :
(00-697C)(Merow, S.J.)                           :
POWER AUTHORITY OF THE STATE OF NEW YORK         :
(00-703C)(Damich, J.)                            :
OMAHA PUBLIC POWER DISTRICT                      :
(01-115C)(Bush, J.)                              :
NEBRASKA PUBLIC POWER DISTRICT                   :
(01-116C)(Sypolt, J.)                            :
TENNESSEE VALLEY AUTHORITY                       :
(01-249C)(Bruggink, J.)                          :
          Plaintiffs,                            :
v.                                               :Discovery
THE UNITED STATES,                               :Judge:
          Defendant.                             :(Judge
- - - - - - - - - - - - - - - - - - - - -xSypolt)
```

McLean, Virginia

Wednesday, April 10, 2002

Continued deposition of ALAN BROWNSTEIN, a witness, recalled for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to notice, the witness being previously duly sworn by CATHERINE S. BOYD, a Notary Public in and for the Commonwealth of Virginia, taken at the offices of Shaw Pittman,

LLP, 1650 Tysons Boulevard, McLean, Virginia 22102-4859, at 9:26 a.m., Wednesday, April 10, 2002, and the proceedings being taken down by Stenotype by CATHERINE S. BOYD and transcribed under her direction.

in part because of, you know, legal concerns, not to do that, again, to the best of my recollection.

Q. Okay.

(There was a pause in the proceedings.)

BY MR. TOMASZCZUK:

Q. There is a reference here at the bottom of page 1 to an option for dealing with the waste acceptance rate issue as I understand it?

A. Correct.

Q. And it refers to the need or desire to allow the purchasers to cooperatively avoid out-of-pool storage requirements based on RW-859 data?

A. Correct.

Q. Do you see that?

A. Yes, I do.

Q. Was it DOE's intention at the time to structure the program such that purchasers would avoid out-of-pool storage requirements based on RW-859 data?

MR. BANES: Objection -- vague.

THE WITNESS: In my mind, there's a

fundamental difference between goals and objectives and policy and contractual commitments.

There was no contractual commitment to do any such thing.

Was there a goal to try to avoid additional storage? Sure, but that's separate and apart from contractual commitment.

BY MR. TOMASZCZUK:

Q. So at least in that context, you understood a distinction between contractual commitments and other things?

MR. BANES: Objection. Mischaracterizes prior testimony.

THE WITNESS: Every time I use, whether today or yesterday, every time I use the word goal or objectives, to me, that's separate, distinct and apart from a contractual commitment.

MR. TOMASZCZUK: All right. Ms. Reporter, would you mark as Brownstein Exhibit 26 a memorandum dated April 15th, 1991?

And the subject is approval for issuance of a comment draft of the annual Acceptance Priority Ranking.

going to be here a long time if you continue to make objections which I consider to be ill-advised and not consistent with the rules of the court.

I would encourage you to make your objection. Fine, go ahead make it.

MR. BANES: Are you just telling me that I just did something inconsistent with the rules of the court?

All I did was ask you to set a foundation for this document.

He doesn't remember it. He didn't write it, and he has testified that he doesn't know what it means other than just reading what it says.

That's a valid objection. If you want to ask him what something means, you need to lay a foundation for it first.

BY MR. TOMASZCZUK:

Q. At or about the time you received this document in August 14th, 1991, did you understand this to be a draft document?

A. This was a, this was, clearly was a contractor document.

Contractors prepare studies all the

time at DOE's direction.

That automatically means to me that it was, it was a, it was something that DOE had not signed off on.

Now whether this was the first draft or the last draft, who knows? But it was a contractor document.

The contractor documents are regularly prepared. They regularly go through extensive review and modification before they're, if they're ever accepted as a DOE document.

Q. After you received the document, did you do anything other than read it?

A. I cannot specifically recall. My normal operation would be to, to read it.

If I had comments, I would make those comments either verbally or in writing. I use both.

Q. And do you recall sitting here today whether you made any comments on this particular document?

A. I honestly cannot recall.

Q. All right.

(There was a pause in the proceedings.)

Q. Okay. Now with respect to when a purchaser would submit a Delivery Commitment Schedule, let's say a purchaser wanted to, pursuant to this paragraph B on the contract, Article V.B., if a purchaser wanted to deliver SNF beginning in say 1998, when would they have to submit a Delivery Commitment Schedule?

A. It's clear in our mind you would have to subtract 63 months from that date.

Q. Okay. Now if they didn't want to, if a purchaser did not want to deliver any SNF in 1998, would they have to submit a DCS 63 months prior to that?

A. No. It states that purchaser shall identify all SNF and/or HLW the purchaser wishes, emphasize wishes, to deliver to DOE beginning 63 months thereafter.

Q. So but was this, was the submission of a DCS a prerequisite, pursuant to the contract in your opinion, was submission of a DCS a prerequisite to acceptance of a purchaser's spent nuclear fuel?

A. In my mind, it was.

Q. And was that pursuant to this, was it a prerequisite 63 months prior to the date they

wished delivery to occur?

MR. TOMASZCZUK: Objection to the form.

I don't know what "this" is.

BY MR. BANES:

Q. Was it, was such a, was such acceptance of spent nuclear fuel a prerequisite, or was submission of a DCS 63 months prior, in your opinion, a prerequisite to DOE's acceptance pursuant to the contract to such spent nuclear fuel?

A. Yes.

Q. All right. Now if a, if a utility decided not to submit a DCS -- well, strike that.

If a utility -- let's see. Prior to, I think you testified earlier prior to acceptance of spent nuclear fuel, who in your opinion was responsible for this, for storage of the spent nuclear fuel?

A. I think it is in my mind, and based on several documents, it is clear that the utilities remained responsible until DOE accepted it.

Q. In the documents you prepared, did you

convey that to the purchasers?
A. I did.
Q. All right. Now let's take a look at --
(There was a pause in the proceedings.)
BY MR. BANES:
Q. Okay. With respect to, with respect to the rates, acceptance rates contained in each of these documents we have looked at, I think that you testified earlier that they were subject to a whole host of assumptions, is that correct?
A. Yes.
Q. Now so let's take a look at Exhibit 6 and go to Table 2 dash 1 or 2.1 on page 7.
(There was a pause in the proceedings.)
THE WITNESS: Okay.
BY MR. BANES:
Q. Now on page 7 of this document, there is a, there is what purports to be called illustrative waste acceptance schedule.
And then at the top there, it says the waste acceptance schedule, or excuse me -- this

the document.

Q. And is that because in other portions of the document, the assumptions upon which the rates on page 7 are based are described?

MR. TOMASZCZUK: Objection -- leading.

THE WITNESS: In each of the ACRs, and we reviewed several of them here, there were a number of caveats concerning the waste acceptance schedule.

They were in different places in different, different documents as the document evolved, but they were there.

We didn't put them in the same place in the same time.

They were always there somewhere.

BY MR. BANES:

Q. Let's see. Mr. Tomaszczuk showed you Exhibit 2, which was the 1985 mission plan.

Before we get to that, let me ask you a couple of questions.

Did the, in your opinion, did the Nuclear Waste Policy Act require the Department of Energy to accept spent nuclear fuel at any particular rate from the purchasers?

MR. TOMASZCZUK: Objection -- lack of

foundation.

THE WITNESS: There was no rate in the Nuclear Waste Policy Act.

BY MR. BANES:

Q. Okay. And with respect to the standard contract, which is located at Exhibit 1 --

A. Yes, I have that.

Q. Did the standard contract require the Department of Energy to accept spent nuclear fuel from the purchasers at any particular rate of acceptance?

A. There was no rate in the standard disposal contract.

Q. Now going back to the mission plan, which is Exhibit 2, to your knowledge, was the mission plan or any portion thereof ever incorporated into the contract?

A. No.

Q. All right. Now Mr. Brownstein, Mr. Tomaszczuk was asking you about the 1991 APR, which is Exhibit 30. He was referring to page --

A. Wait a second.

Q. I'm sorry. Did you find it?

A. No -- Number 30?
Q. Exhibit 30.
MR. HANDWERTER: The ACR.
BY MR. BANES:
Q. Was that the ACR? Excuse me. The ACR is the one I want to talk to you about.
A. I'm sorry. I don't have these things in order.
Okay.
Q. Page 4 for a second of the document under 2.0, waste acceptance projections?
A. Yes.
Q. Mr. Tomaszczuk was asking you whether the rates reflected in Table 2 dash one or 2.1 -- excuse me -- assumed the existence of an MRS facility or a DOE facility.
Do you recall that question?
MR. TOMASZCZUK: Object to the form.
THE WITNESS: Yes.
BY MR. BANES:
Q. All right. And do you recall that you responded to that yes, it did assume the existence of a DOE facility for acceptance of spent nuclear fuel?
A. Yes, an MRS facility, yes.

Q. Now with respect to every, in every
document that you, that contained a rate that
you worked on, did, did all of those projected
rates assume the existence of some type of
repository, either repository or MRS, prior to
the acceptance of spent nuclear fuel?
MR. TOMASZCZUK: I'm going to object
to the form of the question.
I don't understand it.
THE WITNESS: I can still answer?
BY MR. BANES:
Q. Sure, if you understand it, you can.
A. I made the statement in all the
documents, as I have testified -- I'm looking at
page 4 -- that assumed the commencement of
facility operations.
Q. Okay.
A. And I defined facility as either an
MRS or a geologic repository.
Q. So in any document in which you would
have incorporated a rate, is it fair to say that
you would have assumed the, an operational
facility being either an MRS or a repository?
A. Yes.
(There was a pause in the

that the D.C. Circuit has now held that the DOE was required to begin SNF acceptance in 1998?

A. I have never read the decision, but that's my understanding of it.

Q. And I believe we also had some testimony from you that it was DOE's objective or goal to eliminate the need for utilities to provide on-site storage after the DOE began acceptance, is that correct?

MR. BANES: Objection -- vague.

THE WITNESS: It's correct, and I used the term and testified to such to distinguish between intent and goal and objectives as opposed to a contractual commitment.

BY MR. HIRSCH:

Q. All right, but the DOE goal or objective was to eliminate the need for utilities to provide on-site storage after the DOE began acceptance of spent nuclear fuel, is that correct?

A. That was a goal.

Q. Now Mr. Banes also asked you a question about whether the mission plans were incorporated in the contract.

Do you recall that?

dollar investment in dry storage capability.

BY MR. HIRSCH:

Q. But if the DOE was going to miss the acceptance date by a long period, say 12 years, then the utilities might be forced to engage in those high-cost, high-capital alternatives, correct?

MR. BANES: Objection. Calls for speculation.

THE WITNESS: It, it is, it is possible.

Again, we made no secret of this program, where we were and the difficulties of commencing facility operations, and we also made it clear in all the documents that we reviewed that until that time, we believed it was the utilities' responsibility, so you know, that burden exists on the, existed on the utilities.

I should say that responsibility.

BY MR. HIRSCH:

Q. And so in DOE's view, if the government was going to miss the 1998 acceptance date by 20 years say, that entire burden of storing waste was the utilities'?

A. The, the statements, and if necessary,

we can go back in the ACRs as that I recall them, you know, made it clear until we accepted waste, we used that type of statement, or until the facility operations commenced, responsibility for the spent fuel rested with the utilities.

That was our interpretation of the law.

Q. Without going over this too many times, that particular interpretation was rejected, correct?

MR. BANES: Objection -- misleading; calls for legal conclusion.

THE WITNESS: Yes.

BY MR. HIRSCH:

Q. Now Mr. Brownstein, will you look at page 2394 or 2395 of Exhibit 38?

Do you see there is a reference on here to NOI response summary?

A. Yes.

Q. And do you know what the NOI response summary was?

A. I do.

Q. What was it?

A. That refers to a Notice of Inquiry.

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - - - - - - -x

YANKEE ATOMIC ELECTRIC COMPANY :
(98-126C)(Merow, S.J.) :
CONNECTICUT YANKEE ATOMIC POWER COMPANY :
(98-154C)(Merow, S.J.) :
FLORIDA POWER & LIGHT COMPANY :
(98-483C)(Wilson, J.) :
NORTHERN STATES POWER COMPANY :
(98-484C)(Wiese,J.) :
DUKE POWER, A Division of :
DUKE ENERGY CORP. :
(98-485C)(Sypolt,J.) :
INDIANA MICHIGAN POWER COMPANY :
(98-486C)(Hodges, J.) :
SACRAMENTO MUNICIPAL UTILITY DISTRICT :
(98-488C)(Yock, S.J.) :
SOUTHERN NUCLEAR OPERATING COMPANY, :
et al. :
(98-488C)(Yock, S.J.) :
COMMONWEALTH EDISON COMPANY :
(98-621C)(Hewitt, J.) :
BOSTON EDISON COMPANY :
(99-447C)(Allegra, J.) :
GPU NUCLEAR, INCORPORATED :

(00-440C)(Bush, J.) :
WISCONSIN ELECTRIC POWER COMPANY :
(00-697C)(Merow, S.J.) :
POWER AUTHORITY OF THE STATE OF NEW YORK :
(00-703C)(Damich, J.) :
OMAHA PUBLIC POWER DISTRICT :
(01-115C)(Bush, J.) :
NEBRASKA PUBLIC POWER DISTRICT :
(01-116C)(Sypolt, J.) :
TENNESSEE VALLEY AUTHORITY :
(01-249C)(Bruggink, J.) :
Plaintiffs, :
v. :Discovery
THE UNITED STATES, :Judge:
Defendant. :(Judge
- - - - - - - - - - - - - - - - - - - - -xSypolt)

McLean, Virginia
Thursday, April 11, 2002

Continued deposition of ALAN BROWNSTEIN, a witness, recalled for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to notice, the witness being previously duly sworn by CATHERINE S. BOYD, a Notary Public in and for the Commonwealth of Virginia, taken at the offices of Shaw Pittman,

LLP, 1650 Tysons Boulevard, McLean, Virginia 22102-4859, at 9:38 a.m., Thursday, April 11, 2002, and the proceedings being taken down by Stenotype by CATHERINE S. BOYD and transcribed under her direction.

for these documents for planning purposes.

MR. BANES: Okay.

(There was a pause in the proceedings.)

BY MR. BANES:

Q. Mr. Brownstein, does, does DOE have, assuming an operational repository, does DOE have an obligation under the contract to accept fuel that's other than spent nuclear, pursuant to the contract that's other than spent fuel, spent nuclear fuel or high-level waste?

MR. HIRSCH: Objection. Calls for a legal conclusion; vague.

THE WITNESS: No.

BY MR. BANES:

Q. Does DOE, in your opinion, have an obligation under the contract to accept fuel that's not packaged in accordance with the Appendix E of the contract?

MR. HIRSCH: Same objection.

(The witness reviewed the document.)

THE WITNESS: Utilities had to provide fuel consistent with the specifications under Appendix E.

(There was a pause in the