Q. And I think you testified that the, that the point of the process that we're in is in the, in the DCS?

We're still in the DCS process, is that correct.

A. Yes.

Q. Now the utilities and the utilities and the -- to, to your recollection, have you, the utilities and DOE ever agreed upon a mutually acceptable schedule?

MR. HIRSCH: Objection -- vague. Calls for a legal conclusion.

THE WITNESS: Some utilities have submitted the DCSs, and we have approved them.

BY MR. BANES:

Q. Okay. And for those that you haven't approved, what's the process for after disapproval occurs?

MR. HIRSCH: Objection -- vague, no foundation.

Calls for a legal conclusion.

THE WITNESS: I don't know how to identify these boxes.

This exhibit shows the path. If -- once we have completed our review, which is

indicated in the box.

BY MR. BANES:

Q. The number in the upper left-hand corner?

A. 005; if we disapprove it and it goes to box 025, then it lays out a series of steps.

We, we disapprove it. We notice the utility of that disapproval, and then the utility is supposed to revise their DCS and submit it to us.

We then go through another review process, and again, we then have two options.

We can approve the DCS, or we can disapprove it.

If we disapprove it again, there is, appears to be two links.

We notify purchaser, and the purchaser -- or we can then propose a DCS to the purchaser. That's a little different than the first one, and I believe that's consistent with the contract.

Do you want me to continue on with the steps?

Q. Sure.

MR. HIRSCH: I'm going to make the

same objection I made to the previous question.

THE WITNESS: There is another review process.

Once again, you can end up with an, with approved DCS or, or we could then disapprove what the purchaser proposed, which leads into negotiations between DOE and the purchasers.

BY MR. BANES:

Q. Okay. Now let's go to, let's go to the contract for a minute, Exhibit 1.

A. Okay.

Q. All right. And turn to page 660 of the Exhibit 1.

A. Okay.

Q. And is the process you have just described located, contained somewhere in the contract here?

MR. HIRSCH: Objection -- vague. Calls for a legal conclusion.

THE WITNESS: Yes.

BY MR. BANES:

Q. And where is that?

MR. HIRSCH: Same objection.

THE WITNESS: Under Article V.B.1 and

2 is the process that I just tried to describe off that.

BY MR. BANES:

Q. At the end of that process, you describe the process where parties would seek or there would be some type of scheduling negotiation, is that correct?

MR. HIRSCH: Objection -- vague. Misstates the testimony.

Calls for a legal conclusion.

THE WITNESS: Under Article V.B.2, it says, quote, if these are not acceptable to the purchaser, the parties shall promptly seek to negotiate mutually acceptable schedules.

BY MR. BANES:

Q. Would it be accurate to say that that's the point in the process that the parties are now?

MR. HIRSCH: Objection -- leading. Misstates the testimony.

Calls for a legal conclusion.

THE WITNESS: For those utilities that have not, not gotten approved DCSs, yes.

BY MR. BANES:

Q. Okay. So have the parties, for those

MR. BANES: All right. Okay.
THE WITNESS: I have not, I have not been involved in those.
To the best of my recollection, I was only involved in one set of negotiations between the utilities and the contracting officer over this, and it's just -- since '95, I have not been party to that.
MR. BANES: Okay.
(There was a pause in the proceedings.)
BY MR. BANES:
Q. All right. Now with respect to, with respect to the process as laid out on the chart here, I'm referring to Exhibit 36, in your opinion, does DOE have any, have any requirement to provide casks or transportation until the schedule is established?
MR. HIRSCH: Objection -- no foundation.
Calls for a legal conclusion.
THE WITNESS: Well, the casks, we're responsible for providing the casks when, when we pick up the fuel.
BY MR. BANES:

Q. Okay. Now are the -- you talked about the TSLCCs with Mr. Hirsch.
Do you recall that testimony, sir?
A. Yes.
Q. Are the TSLCCs, were the TSLCCs referenced in the contract at all?
A. No.
Q. Were they in any way incorporated into the contract, what you believe?
A. No.
MR. HIRSCH: Objection. Calls for a legal conclusion.
BY MR. BANES:
Q. And in your opinion, is anything contained in them contractually binding?
MR. HIRSCH: Objection. Calls for a legal conclusion; no foundation.
THE WITNESS: In the TSLCCs?
BY MR. BANES:
Q. Yes.
A. No.
Q. With respect to the issue of whether the -- I think you testified earlier the contract did not contain a particular rate of spent nuclear fuel and acceptance beyond January

31st, 1998?
MR. HIRSCH: Objection. I think that misstates --
MR. BANES: Yeah, that does.
BY MR. BANES:
Q. I think you testified earlier that the contract did not contain a particular rate of spent nuclear fuel acceptance, is that right?
A. I testified about both the contract and the statute.
Q. All right. Was the contract, did you -- in your opinion, was the contract ambiguous on that point?
MR. HIRSCH: Objection. Calls for a legal conclusion; no foundation.
THE WITNESS: No.
BY MR. BANES:
Q. Okay. Was the statute ambiguous on that point?
A. No.
MR. HIRSCH: Same objection.
(There was a pause in the proceedings.)
MR. BANES: Okay. Thank you, sir. That's all I have.

(Brownstein Exhibit No. 50
was marked for
identification.) ^

BY MR. NESLIN:

Q. Mr. Brownstein, you're being handed what's been marked as Exhibit 50 to your deposition.

It's an August 30, 1988 letter from Mr. B.M. Cole to Joseph Sutey with an attachment titled, "Delivery Commitment Schedule Processing, Approval, and Management Control System" stamped as Bates Numbers PNL-098-1106 through 1126.

Are you familiar with these documents?

(The witness reviewed the document.)

THE WITNESS: I vaguely recall seeing this.

BY MR. NESLIN:

Q. Was this work undertaken at your direction?

A. As I testified previously, PNL did, did a number of pieces of work, some at my direction, and some that they pursued on their own consistent with work tasks that we gave them.

This was probably done at my direction.

Q. The upper right of the attached document, there is a date August 30, 1988, and then Rev 4.

Would that to your mind refer to Revision 4?

A. Yes.

Q. Did you typically comment on different drafts and revisions?

A. It could have gone one of two ways. It could have been because I commented on it and went through it, or because they went through their internal reviews before it was presented to DOE and went through revs.

It could have been either way.

Q. What was your practice as they were preparing work that you requested them to do, going through different drafts?

Was it your practice to provide input to them to review drafts?

A. It depended on time associated with a particular product.

If there was some time urgency, I would review an early draft.

If there wasn't, it would go through the normal course of internal reviews.

That's how I recollect it.

Q. Would others at DOE have reviewed drafts PNL prepared as well?

A. As I testified yesterday, you know, my office evolved from sort of a one-man place to, to a branch and then a division.

I have to go back and think about whether in 1988, I was still a one man, or I had staff.

If I had staff at that time, they would review it, yes.

Q. Do you recall reviewing this attached document?

A. I don't have a specific recollection of that.

Q. If I could ask you to turn to page 6 of the attachment, and would you review lines 24 through 31?

(The witness reviewed the document.)

THE WITNESS: Okay.

BY MR. NESLIN:

Q. Mr. Brownstein, 24 through 32 state exchange requests should be approved if, and

If there wasn't, it would go through the normal course of internal reviews.
That's how I recollect it.
Q. Would others at DOE have reviewed drafts PNL prepared as well?
A. As I testified yesterday, you know, my office evolved from sort of a one-man place to, to a branch and then a division.
I have to go back and think about whether in 1988, I was still a one man, or I had staff.
If I had staff at that time, they would review it, yes.
Q. Do you recall reviewing this attached document?
A. I don't have a specific recollection of that.
Q. If I could ask you to turn to page 6 of the attachment, and would you review lines 24 through 31?
(The witness reviewed the document.)
THE WITNESS: Okay.
BY MR. NESLIN:
Q. Mr. Brownstein, 24 through 32 state exchange requests should be approved if, and

then they set forth in bullets five criteria.

Would you agree that an exchange should be approved if it meets these criteria?

MR. BANES: Objection. Calls for a legal conclusion.

THE WITNESS: Those were important criteria.

There may be other things that we would want to have considered, and I don't recall those now, but, but these, these criteria were appropriate.

I agree with them.

BY MR. NESLIN:

Q. Let me ask again if an exchange request meets these four criteria, should it be approved?

MR. BANES: Objection -- asked and answered.

THE WITNESS: I think I did answer that, and the reason for the hesitation is upon review of this, and upon discussion with others in the department ranging from the contracting officer, my peers, my superiors, we may have -- it's conceivable that this, these contractor-proposed criteria may have evolved,

been modified, added to, deleted.

BY MR. NESLIN:

Q. Do you recall discussing these criteria with anyone else at the department, these criteria set forth on page 6?

A. I don't have a specific recollection of that.

Q. Do you recall discussing them with the contractor PNL?

A. The only way I can answer you is I don't specifically recall, but that's not saying that I did not.

Q. Do you recall discussing these criteria with anyone at the utility, at the utility?

A. I can't recall whether in the ACR initial resolution process, which was subsequent to this date, whether we discussed, you know, that issue or not.

I don't specifically recall, but again, I don't want to testify that I absolutely never did.

Q. Let me direct you to lines 28 through 29.

That sets forth as one of the criteria

that the transcportation system and receiving facilities have the capacity to meet the revised commitments?

A. Yes.

Q. What does that mean to you?

A. Okay.

MR. BANES: Objection. Calls for speculation, and lack of foundation.

Go ahead.

THE WITNESS: Okay. When the DCSs were approved, I believe we -- we can go back to it, but I believe one of the pieces of information that we requested from the utilities was that the type of transportation cask that would be required.

One of the concerns we had in this criteria, as I recall, is -- let's take an example.

If we had approved, you know, let's say we had approved 90 percent of our DCSs for a, they would accommodate PWR rail casks.

If somebody wanted to do, you know, exchanges at the last minute, we may have gone through the procurement process to procure the type of casks to be available for who we thought

we were going to serve, and we, and that could
have affected our ability.
If somebody wanted a BWR truck cask, and we had ordered, you know, too many of the other kind based on the information provided in the DCS, because the utilities were acting on the DCS, so were we, so that was the intent.
BY MR. NESLIN:
Q. So if, if sufficient casks were available to accommodate the exchange, would this criteria be met, to your mind?
A. No. I used that as an example. To says receiving facilities, there may have been other characteristics that, that could have influenced that.
Q. Okay. What, can you think of what those characteristics would be?
A. Well, beyond just the casks, you had to have the, the infrastructure to serve that.
Some utilities may only be able to accommodate a truck operation as opposed to a rail, and so, you know, that's an example.
Q. Let me ask this then. If you had sufficient casks and if the utilities involved in the exchange and the facility had sufficient

infrastructure to accommodate the exchange, would this criteria be satisfied?

A. Could I extend your analysis one step in answering?

Q. Certainly.

A. If the information on a DCS of the two DCSs between two utilities that were approved by us came to us and they were identical, then it would be met. Then that criteria would be met.

Q. By information, what information are you referring to?

A. Can we go back to the DCS, please?

Q. Yes.

MR. HANDWERKER: The instructions.

MR. NESLIN: The instructions.

THE WITNESS: Yes. That's the form I'm thinking of.

MR. HANDWERKER: Thirty-four.

THE WITNESS: You can see on the form under 2.0 -- I'm looking at the actual form itself -- it asks things like number of assemblies and type, PWR, BWR, proposed shipping mode, type cask required, including maximum loading lifting weight.

Those, those are the types of things

that I'm referring to.

There are others? There are two. The date of discharge potentially could be important.

BY MR. NESLIN:

Q. Mr. Brownstein, would they have to be identical, or would the transportation system and receiving facilities simply have to have the capacity to accommodate the exchanged spent nuclear fuel?

A. We were talking about this one.

MR. BANES: Go ahead.

THE WITNESS: This one criteria; no, I used identical as an example, as an extreme.

No, they would not have to be identical.

BY MR. NESLIN:

Q. So they could involve different number of fuel assemblies?

MR. BANES: Objection. Calls for speculation.

THE WITNESS: I really, it really does call for speculation because we had never gotten that, that far, that detailed, to my recollection.

We were never faced with a DCS exchange process, and I would be speculating about the answer, you know, specific intricacies.

BY MR. NESLIN:

Q. Mr. Brownstein, would it be your testimony that you don't recall DOE considering the specific details of how these criteria might apply to a given exchange?

A. No. What I'm saying is you're asking if, if, if there was a one-assembly difference, would that affect it?

That's getting down to a gradation that we never got to.

We did consider a number of things, but that's a fine gradation.

Q. Let me ask it a different way. Would the fact that there is a different --

A. Okay.

Q. Number of fuel assemblies automatically lead an exchange request not to be approved?

A. If that was the only difference, that would not be an automatic disapproval in my mind.

Q. The fact that a, if requested, exchange might involve a different size or type of fuel assembly wouldn't automatically lead it to be disapproved to your mind?

A. Well, that could because that could affect the cask, the availability of the cask.

Other certain, certain facilities have, you know, for example, very long fuel, and that could affect it.

Q. Would the fact that a proposed exchange might involve DCSs which involve different modes of shipment, would that necessarily lead to, a requested exchange to be denied?

A. It could, but not necessarily.

Q. I would like to direct you to lines 30 and 31.

A. I just want to clarify all these questions you're asking me were all hypotheticals?

Q. I'm asking you a series of hypothetical questions, sir.

I'm asking for your opinion on how they would apply.

A. Right.

Q. Lines 30 and 31 state that the exchange, another criteria in the exchange will not impact WMS performance in a way that would delay acceptance of waste from other purchasers.
What does that mean to you?
MR. BANES: Objection -- lack of foundation.
Calls for speculation. Go ahead.
THE WITNESS: The best way I can try to explain it is by example, if that's okay with you.
If a utility were to give us failed fuel, that might influence the decision.
BY MR. NESLIN:
Q. And why would that influence the decision?
A. Again, hypothetically, there would probably be a preference in the early stages of system operation to, to try to use standard fuel to minimize the opportunity for, for us having to employ some contingencies.
In other words, failed fuel, we might have to do some repackaging that we would have rather not have done on the opening day.
Q. Would, would that necessarily delay

the acceptance of waste from other purchasers?
A. It could, but not necessarily. It was a concern.
There may have been other concerns associated with that criteria that at this moment, I can't recall.
Q. Do you recall the basis of these criteria?
A. Well, the basis of the criteria was that PNL was, was tasked to think about this and develop suggestions to the department.
It was a normal course of business, and so I viewed this as contractor input to the department that, you know, certainly the department did not take a position.
One, as I said, hadn't gone through to my knowledge, you know, the necessary concurrence and evaluation by a range of people within RW that would need to have, you know, evaluated it.
Q. Evaluated it for what purpose?
A. Of whether that was appropriate or acceptable to the department; in other words, this is not departmental policy.
Q. You're saying that for something to be

adopted as department policy, additional people would have to review it and approve it?

A. What I'm saying is that a contractor product is not departmental policy.

Q. How would a contractor product become departmental policy?

A. One way it would become that would be for it to be issued under DOE letterhead.

Q. By issue, what do you mean?

A. Number of ways -- issued could be instructions or it could be a report.

It could be a letter by a program official or, or contracting officer.

Those are three ways.

Q. So if it were incorporated into a DOE document or a DOE letter, then it could become departmental position, departmental position?

A. Sure.

Q. How was this information, this report used, do you recall, by the department, used by the department?

A. I don't recall.

Q. Do you recall whether you did anything in response to this report?

A. That's a good question. There are 14

years between the report and now, and I just don't recall.

(There was a pause in the proceedings.)

MR. NESLIN: Can we go off the record for a second?

(A discussion was held off the record.)

MR. NESLIN: Mark that as 51.

(Brownstein Exhibit No. 51 was marked for identification.) ^

BY MR. NESLIN:

Q. You've been handed what's been marked as Exhibit 51 to your exhibit -- to your deposition.

This is a document entitled, "Guidebook for Standard Contract for Disposal," stamped preliminary draft.

MR. BANES: Do you have several copies of that?

MR. NESLIN: Yeah. Sorry, counsel.

MR. BANES: No problem. Is this 51?

MR. NESLIN: Fifty-one.

BY MR. NESLIN:

contract.

That's how the parties, that was a, a key criterion that the parties negotiated in '83 to allocate acceptance capacity.

As a result of that mutual negotiation, did that result in a difference between those that were, had the allocations and those that had storage problems, recognizing that, you know, until DOE accepted storage problems with responsibility of the utility, in my mind, that's an equity issue, you know, among utilities.

BY MR. NESLIN:

Q. Well, Mr. Brownstein, didn't you testify previously that one of the OSM or one of DOE's objectives with this system was to avoid the need for utilities to have to add additional on-site storage after 1998?

MR. BANES: Objection -- vague.

THE WITNESS: I did, and I put the caveat on that their goals and objectives, apart from contractual commitments, I viewed the oldest fuel forecasts as a contractual commitment.

I viewed the, I viewed as a goal as

opposed to contractual commitment to avoid additional on-site storage.

BY MR. NESLIN:

Q. As a goal, wouldn't the mismatch between those utilities which had allocations and those utilities that needed additional storage, running into storage problems, would not that mismatch frustrate that goal?

Do you understand my question?

A. I do.

MR. BANES: Objection. Calls for speculation.

THE WITNESS: A contractual commitment in my mind is a higher priority than a goal.

BY MR. NESLIN:

Q. My question was simply would the goal that you had identified, and understanding that it is a goal and that's the form in which you're speaking to it, wouldn't that be frustrated by the mismatch between those utilities which have allocations, annual allocations and those utilities which need additional storage?

A. It certainly could.

Q. Okay. And wouldn't that problem be addressed by exchanges?

was simply would the goal that you had identified, and understanding that it is a goal and that's the form in which you're speaking to it, wouldn't that be frustrated by the mismatch between those utilities which have allocations, annual allocations and those utilities which need additional storage?"

MR. BANES: Objection -- lack of foundation.

THE WITNESS: My opinion is yes, and the only caveat I have to that is that when those terms of the contract -- you know, I wasn't with the department, you know, originally, but in my mind, that was -- that's right.

BY MR. NESLIN:

Q. Could exchanges, would exchanges be beneficial to the operation of the waste management system?

MR. BANES: Object. Calls for speculation.

THE WITNESS: It could be.

BY MR. NESLIN:

Q. Insofar as exchanges addressed this mismatch between those utilities which had

allocations and those utilities which faced storage problems, exchange which addressed that mismatch would be beneficial to the operation of the waste management system, wouldn't it?

MR. BANES: Same objection.

THE WITNESS: It could be, and I can think of cases where it wouldn't for other reasons that we have talked about before, but in terms of that, that narrow issue that you're raising, yes.

BY MR. NESLIN:

Q. The other reasons you're referring to being infrastructural problems?

A. As an example, like I testified before about mismatch in terms of cask availability, as an example.

Q. Well, I'll accept that as an additional clarification of my hypothetical.

A. Okay.

Q. That the exchange would not create such a mismatch would create infrastructural capacity problems for the system?

A. Okay.

Q. Assuming that, would an exchange of the sort that I previously described be

beneficial to the operation of the waste management system?

MR. BANES: Objection. Calls for speculation.

THE WITNESS: Are you saying -- waste management system, you're talking about the federal site?

BY MR. NESLIN:

Q. Yes.

A. And I have answered you it could.

Q. Why wouldn't it be?

MR. BANES: Objection. Calls for speculation.

BY MR. NESLIN:

Q. If it does not, if it fits within the capacity of the system, and if it addresses this mismatch between allocations and storage needs, why wouldn't that be beneficial?

A. Well, I'm answering when you talk to me about beneficial to the federal waste management system, I'm viewing it from a technical perspective.

For instance, if the exchange were between, you know, exactly alike, everything was alike between the utilities, would this be a

benefit to, to the federal waste management system?

A. Well, you know, we might have to travel a few miles less or a few miles more, that that's not really much of a benefit to me. It's a wash. The benefit falls to the utilities.

If you're meaning beyond the technical, and that's how I was answering you, that's a different question.

Q. And let me clarify. I was meaning beyond the technical.

I was meaning in terms of, I was talking in terms of the addressing your objectives for the system, which included, as I understand it, avoiding the need for additional at-reactor storage after 1998?

A. Right. That's a policy objective, and I agree with the policy objective.

I was trying to answer you in the technical, how I was interpreting the question.

Q. You would agree that an exchange would help to meet that policy objective?

A. Yes.

(Brownstein Exhibit No. 52

recall her telling me as I was looking through this that she had received it and was, you know, had some concerns with it, but this was a, an early contractor deliverable to a request that my staff had made.

Q. Did you have any input in its development?

Did you provide any direction to TRW regarding this project?

MR. BANES: Objection -- compound.

THE WITNESS: The answer is both yes and no.

As division director, I was responsible for, I did discuss it with my staff before the, before the task was made, and I know I discussed with her her views and comments on this paper when it was turned in, so I hope that's responsive.

BY MR. NESLIN:

Q. Will you turn to page 2 of the attachment, page 2 of the attached report?

A. Oh, okay.

Q. Under heading 2, second paragraph, the first -- excuse me -- the first paragraph, under heading 2, if you can review that?

A. Okay.

(The witness reviewed the document.)

BY MR. NESLIN:

Q. This states that DOE has determined that a DCS exchange PAS capable of analyzing, tracking DCS exchanges needs to be put in place, and I'll represent to you that on the preceding page, PAS is defined as a processing approval system.

Is this statement accurate that DOE had determined that such a system capable of analyzing and tracking DCS exchanges needed to be put in place?

A. As I recall, our contractor support suggested that such a system was necessary, and we said, you know, why don't you flush it out?

The words DOE has determined, again, as I testified before, the contractor often made a lot of statements.

This isn't, the department never determined that, that this system was necessary.

We made the request to, you know, explore it, flush it out.

They write words, but because the contractor writes words does not mean it's

departmental policy.

Q. Was such a system in fact developed?

A. I don't recall how far they went in it and how much it was used, frankly.

If you have got some documents, that might jog my memory, but I don't recall how far we went with that.

MR. NESLIN: Let's take a break for about five minutes here.

MR. BANES: Okay.

MR. NESLIN: I'll come back with such a document I hope.

(A recess was taken.)

BY MR. NESLIN:

Q. Mr. Brownstein, before the break, we were discussing Exhibit 53 and the proposal to develop an exchange processing approval system, and I think your testimony was that you do not know sitting here today whether such a system was in fact ever developed?

A. I did not recall how far the contractor or we took that.

Q. Do you recall any additional steps towards such a system that were taken?

MR. BANES: Objection -- vague.

BY MR. NESLIN:

Q. Mr. Brownstein, Exhibit 54 is a document captioned preliminary draft that appears to be a preliminary draft of a Federal Register notice. Bears Bates Number CTR-024-0043 through 4.

(The witness reviewed the document.)

THE WITNESS: Okay.

BY MR. NESLIN:

Q. Do you recall this document?

A. Yeah. I think I have seen it before.

Q. Did you ask that it be prepared?

A. To the best of my recollection, I testified that there were -- contractors did work for us primarily one of two ways.

We would give them a work task to do, something specific, and there would also be a general task order and where they would, you know, develop ideas and present them to us, you know, on related but, but matters specifically asked for.

I think, my recollection is this fell in the latter category.

I don't recall specifically asking for it.

I believe they had an idea, and they did it.
That's my recollection.
Q. Do you recall reviewing it at some point in the past?
A. Well, I testified that I think I have seen this before, so if I saw it before, then I would have read it.
Q. By contractor, are you referring to PNL?
A. Yes, by the distinguishing marks on the left-hand side.
I also don't know what year this is.
Q. Do you recall doing anything in response to this document?
A. The department never, to my recollection, never moved forward with the Federal Register notice.
I think it was an idea, but I don't believe we moved forward.
Q. Do you recall who decided not to move on that?
Would that have been your decision?
A. Well, one of things that would help is for me to understand the year of the document.

Q. It does not bear a date.
A. So I would speculate it probably was me, but it could have been, you know, who knows? Timing reasons, whatever; I don't specifically recall.
(There was a pause in the proceedings.)
BY MR. NESLIN:
Q. Do you recall the idea of developing an information clearinghouse to facilitate exchanges?
A. No. The way I recall it is that I testified I believed this was an idea that the contractor thought up and, and proposed it, and for whatever specific reason, I don't recall.
I did not move further on it.
Q. Do you recall the department taking any action to develop an information clearinghouse for this purpose?
MR. BANES: Objection -- asked and answered.
THE WITNESS: I believe I did answer that question.
No.
(Brownstein Exhibit No. 55

differences between the Phase 1 and Phase 2, I can probably give you a more complete and accurate recollection.

Q. Let's turn to page 5.

A. Okay.

Q. Lines 1 through 17.

(The witness reviewed the document.)

THE WITNESS: That's a pretty good example.

BY MR. NESLIN:

Q. This is discussing priority, the issue of priority for shutdown reactors?

A. Yes.

Q. And under -- and it distinguishes between Phase 1 and Phase 2, correct?

A. Yes.

Q. Phase 1 being the ramp-up period for the facility, and Phase 2 being steady-state operations?

A. Right.

Q. Phase 1 says that during Phase 1, this indicates that the issue is primarily an equity issue among the purchasers.

What does that mean to you?

A. To me, that means an issue that