irregardless how it would be resolved would not affect the technical operations of the federal waste management system, but would impact the individual utilities more or exclusively, not the federal system.

Q. And was that your opinion?

A. Yes, it was.

Q. And it goes on to state DOE concurs with the purchasers' consensus view that no priority shall be afforded to shutdown reactors during the start-up phase of the waste management system?

A. Correct.

Q. At least during Phase 1; what does consensus mean in this context?

A. As part of the ACR issue resolution process, that group, we would discuss issues, and they would attempt to reach consensus if you will on individual issues.

In some way, shape or fashion that I really don't recall, in other words, whether it was orally or in writing or in a particular meeting, the utilities came to that view, as I stated, that no priority should be given to shutdown reactors during that phase.

Q. Do you recall discussing that issue with the utility representatives?
A. Yes, I do.
Q. And were all the utility representatives in agreement on that issue?
A. I believe consensus, consensus implies to me not in unanimity.
Q. Do you have any recollection of what portion of the utilities agreed with that view?
A. No. When they would discuss the issues, they would have their own private meetings and present to us things like a consensus view.
What their internal conversations were, you know, I have no idea.
Q. This states DOE concurred with that view.
Was that accurate?
A. No. As I have testified before, this is a, this is a contractor document, and they are proposing that DOE concur with that, but because, as I testified because, it says so in a contractor document doesn't make it so.
It makes it so what DOE, a DOE official puts in a letterhead, you know,

official correspondence or an official report or in testimony, something like that, not, a DOE policy is not made through a contractor document.

Q. And to your knowledge, DOE did not formally adopt a policy on this issue?

A. To the best of my recollection, the sentence that you pointed out in the Manion letter, the previous one, was the department's policy.

Q. Just for purposes of clarity, that was the sentence that read the department has not determined whether or not priority will be accorded shutdown reactors or if priority is granted, under what specific circumstances?

A. Yeah. That was the, that was the official line.

Again, we were trying to reach closure on these issues, but I have answered your question.

Q. With respect to Phase 2, the document states that when the waste management system receipt rate exceeds the aggregate purchasers' annual discharge rates, and all purchasers can be assured that they will not need additional

(The witness reviewed the document.)

THE WITNESS: Okay.

BY MR. NESLIN:

Q. Mr. Brownstein, this document purports to discuss a meeting that the author had with you, Mr. Dreyfus, Mr. Barrett, Ms. Slater, on or about July 21 of 1994 discussing priority legislative agenda and greater than Class C waste.

Do you recall participating in such a meeting?

A. I do not.

Q. In the second paragraph, there is language addressing the issue of whether greater than Class C waste is considered part of the DOE waste fund?

A. Um-hm.

Q. It states that you believed that it's not.

Does that statement accurately reflect your views?

A. I would like to make a correction. That's not what the memo says.

Q. Did I misstate the memo?

A. I believe you did.

Q. Let me be clear. It says, "In addition, we need a careful review of the legislative history and our contracts that provide a clarification on whether the greater than Class C waste is considered part of the DOE waste fund. Alan Brownstein believes that it is"?

A. That's what it says.

Q. Yes.

A. And you said -- okay.

Q. I'm sorry if I misspoke. Okay. Is that accurate?

A. It is not.

Q. It goes on to says that Ms. Slater thinks it is not quite that clear.

Do you recall whether Ms. Slater has expressed her views on this issue to you?

A. Nancy and I probably have talked about that.

You know, I can't tell you the timeframe, but sure.

Q. To your knowledge, what is her view on that issue?

A. Irrespective of what this, whoever prepared this, what this says, I believe both of

us agree that Class C waste is not covered by the contract.

Q. Have you discussed this issue with others at the department?

A. I believe that I have.

Q. And have you discussed it with Mr. Barrett, for example?

A. I believe that I have.

Q. Do you have any understanding of Mr. Barrett's views on this issue?

MR. BANES: Objection as to form.

THE WITNESS: I have no reason to believe that Lake believes something other than I believe.

BY MR. NESLIN:

Q. To your knowledge, has the department taken a formal position on this issue?

A. To the best of my recollection, we have addressed this issue in response to Congressional cues or Congressional questions.

That's what I specifically recall, and that would be a matter of public record.

Q. And do you recall the position that the department enumerated in response to those Congressional questions?

A. I don't recall the specific language, but it would be consistent with, with, with what I just testified to, that, that it was -- well, that's speculation.

I believe I helped prepare those, those responses. They are, they're a matter of record.

I believe they indicated that it was not covered by the contract if that in fact was the exact question.

I know the subject came up in Congressional questions.

I don't recall the specific question. It's hard for me to speculate.

MR. NESLIN: I have no further questions at this time.

I reserve my right to reopen the deposition for the reasons previously set forth by other counsel for the plaintiffs.

MR. BANES: Okay. And we reserve the right to object.

I would just note for the record that Exhibit 64 is a Yankee Atomic document that purports to be, had been prepared by Dr. Andrew Kadak.

MR. BANES: Objection. Mischaracterized prior testimony.

Go ahead; asked and answered.

THE WITNESS: The design of the federal waste management system, you know, is an engineering feat, has many elements. Has financial. Has contractual. Has engineering. Has regulatory and many -- a policy decision affecting, you know, technical aspects of the program in a real world should be influenced by the technical feasibility of implementing that, and I think that was I recall in the documents that we reviewed, several of them like the mission plan talked about the complexity of the system and the early stage that we're in and the challenges that we faced, many of those from, from engineering, and that was an important way and important component to develop acceptance rate.

It is not a question of somebody sitting back and saying I would like to have 20,000 MTU a year accepted.

I think it's more than that.

BY MR. HANDWERKER:

Q. So to summarize your testimony, would

it be fair then that one element of determining what the appropriate annual aggregate acceptance rate should be would be engineering considerations?

MR. BANES: Objection. Calls for a legal conclusion.

THE WITNESS: Engineering is a part.

BY MR. HANDWERKER:

Q. And financial issues as well?

MR. BANES: Same objection.

THE WITNESS: If you build a system, the extreme response to your answer to make my point is it is highly unlikely in my view, probably others', that Congress would fund, provide enough funding for you to develop an entire system to take all the utilities' fuel in one day.

BY MR. HANDWERKER:

Q. So to answer my question then, financial considerations were also an element in determining what the appropriate annual aggregate acceptance rate should be?

MR. BANES: Same objection.

THE WITNESS: To the extent I used it in the example, as an example; there are many

aspects.

BY MR. HANDWERKER:

Q. And the utilities also fund the waste acceptance program, don't they?

MR. BANES: Objection -- misleading.

THE WITNESS: The utilities contribute to the nuclear waste fund consistent with the statutory and contractual requirements.

BY MR. HANDWERKER:

Q. Turn if you would to PNL-102-1183, which is entitled at the top "Alternative Approaches or Concepts for ACR."

And Mr. Brownstein, this page has three columns on it.

The first column on the left is entitled concept, and then the middle column is entitled philosophy, and then the third column is entitled content.

And underneath, going back to concept, the first concept listed is minimum contractual, and the philosophy from minimum contractual is include only absolutely necessary information, avoid taking preliminary positions, and the content is aggregate acceptance rate from mission plan -- fuel age rankings for existing

do you agree with the statement that I read to you from the top of page 3 of Brownstein Exhibit 68?

MR. BANES: Same objection.

THE WITNESS: We need to do this almost sentence by sentence.

Some I agree with and some I don't agree with.

BY MR. HANDWERKER:

Q. Okay.

A. Where would you --

Q. Let's start with the first sentence -- the ACR sets forth a projected acceptance schedule which indicates that neither Alabama Power Company nor Georgia Power Company will receive any disposal services in the first several years after the Department of Energy begins performing its obligations under the standard under the disposal contract.

A. Okay. And, you know, I'm taking your words.

Q. You're taking our assumption.

A. I'm taking that assumption without looking at the document.

Q. That's fine. Now let's talk about the

second sentence then. "The projected acceptance schedule in the ACR would result in the Department of Energy not meeting its 1998 contract obligations to APC and GPU..."

A. I do not agree with that.

Q. And why not?

MR. BANES: Objection -- asked and answered.

THE WITNESS: I really have, through a series of testimonies, I have tried to lay out what the waste acceptance process is and the steps to get there and the, and how the annual allocations were, were put together consistent with the contract, and I have testified that there was never any expectation I think by the statute, by the contract, by the department, that for us to build a system that would take all the fuel on the first day of operation that, that we, that what we did was consistent with the terms and conditions of the contract, and those terms through the allocation process, clearly showed to all, signed by the utilities, that not every company would receive services in the first year.

BY MR. HANDWERKER:

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

\- - - - - - - - - - - - - - - - - - - - x

YANKEE ATOMIC ELECTRIC COMPANY :

(98-126C)(Merow, S.J.) :

CONNECTICUT YANKEE ATOMIC POWER COMPANY :

(98-154C)(Merow, S.J.) :

MAINE YANKEE ATOMIC POWER COMPANY :

(98-474C)(Merow, S.J.) :

Plaintiffs, :

v. :

THE UNITED STATES, :

Defendant. :

\- - - - - - - - - - - - - - - - - - - - x

Washington, D.C.

Thursday, May 23, 2002

Deposition of ALAN BROWNSTEIN, a witness herein, called for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to agreement, the witness being duly sworn by JAN A. WILLIAMS, a Notary Public in and for the District of Columbia, taken at the offices of Spriggs & Hollingsworth, 1350 I Street, N.W., Washington, D.C., 20005-3305, at 8:40 a.m., Thursday, May 23, 2002, the proceedings being taken down by Stenotype by JAN A. WILLIAMS, RPR, and transcribed under her direction.

CERTIFIED COPY

terms of whether that's an obligation, that's a question the lawyers have to answer.

BY MR. STOUCK:

Q. You have no understanding one way or the other about whether or not DOE had an obligation under the contracts to have a facility such as you have described operating by '98; is that your testimony?

A. We had responsibility which we carried out consistent with the law and consistent with the contract to find a site; in other words, we collected money from utilities, we did not sit and bank the money, we spent it for the purposes of trying to develop a facility.

And we did that under the constraints that we faced. And we tried to do that as expeditiously as possible. I believe that it was a goal and we tried to work as hard as we could to achieve that goal.

Q. Okay. But I don't think you've answered the question. I'm just asking about your understanding. There's a long history to this program and I'm familiar with some of it and, you know, maybe a lot of it. That's not what I'm asking about.

Q. I'm just asking whether or not you had this other understanding about whether the contracts obligated DOE to have that facility by 1998?

MR. CRAWFORD: Same objection.

THE WITNESS: The same answer. I really don't know how to expand on it. I don't believe its's -- if it's a yes or no, that's a legal conclusion.

BY MR. STOUCK:

Q. Your understanding is not a legal conclusion because you already told me you can't give me legal conclusions?

A. Right.

Q. Your understanding, Alan Brownstein, ten years in the program, was it your understanding that the contracts obligated DOE to have or did you not -- if you didn't have that understanding, just tell me that.

A. I'll try it this way --

MR. CRAWFORD: Wait a minute. Same objections.

Go ahead.

THE WITNESS: Why don't you help me out with your definition of obligated.

BY MR. STOUCK:

Q. It's the same obligated by the contracts. I mean you answered a question about obligations on line 20 of page 55.

A. To me the obligation of the department was ultimately to accept all the waste. And we had a goal to do that as quickly as we could. It was a goal set by Congress of 1998. And we worked to try with all the things we faced, budgetary and other matters, to meet that. So, from a policy perspective, it was a goal.

Q. Right. Did the contracts obligate DOE to have a facility in place by 1998, do you know?

MR. CRAWFORD: Same objections as before.

THE WITNESS: I really can't go beyond that answer. I think I've given you an answer, my understanding of the contract.

BY MR. STOUCK:

Q. You haven't given me an answer to my question and I'd like to get one. I'm going to get one, that's a promise.

A. Okay.

Q. Okay. It stands. It hasn't been answered. If you didn't have any understanding about that subject, just tell me that.

A. Well, I had an understanding of the

subject. I think I tried to answer that.

MR. CRAWFORD: Same objections.

BY MR. STOUCK:

Q. Was it your understanding that the contracts obligated DOE or not to have a facility operational in 1998?

MR. CRAWFORD: Same objections.

THE WITNESS: I guess I've never thought about it that way. You know --

MR. CRAWFORD: Jerry.

MR. STOUCK: He is not done with his answer.

MR. CRAWFORD: I know. I have a suggestion.

MR. STOUCK: Let's wait and see if he's got anything else to say.

MR. CRAWFORD: Okay. Fair enough.

THE WITNESS: My understanding was that the law set a goal. It set a lot of goals in the Nuclear Waste Policy Act. And it established a goal of January 31st, 1998.

And we proceeded to try to meet that goal. And we had an obligation to try to meet the date that was in the law. And I think we did everything we could to try to meet that. Is that responsive to

your question?

BY MR. STOUCK:

Q. That is responsive if you would agree with me that -- I would take that as a no answer, because there's a difference between try to meet and meet. You testified that your understanding was there was an obligation to try to meet. And my question was whether it was your understanding that there was an obligation to have a facility operating, not try, to have it operating by '98.

So I understand the substance of your answer to be no, it was not your understanding that the contracts obligated DOE to have a facility operational by '98. But I don't want to mischaracterize your testimony. I'm just asking if that is accurate?

MR. CRAWFORD: Well, objection, asked and answered; objection to the extent it calls for a legal conclusion; let me object to the foundation of it. Those are my objections.

BY MR. STOUCK:

Q. Do you understand the pending question?

A. It's the same question.

Q. I take it as a no answer. But you have testified that your understanding was the obligation

was to try to meet the date. My question was whether you had an understanding that there was an obligation, in some sense absolute obligation to have the facility operating by '98.

And I think what you told me is you did not have an understanding that the contracts obligated DOE to actually have it, a facility, your understanding is the contracts only obligated DOE to try to have it. Is that a fair characterization? I'm just trying to get your understanding of these matters which are important to this dispute.

MR. CRAWFORD: Objection, asked and answered; to the extent it calls for a legal conclusion; objection to the foundation; and objection to the extent it may have mischaracterized prior testimony.

You may answer.

THE WITNESS: I think your restatement of it is probably close. There are a lot of things that have to happen in order for that date to be met that are independent of us. There are NRC licensing actions, there are budgetary considerations that are determined by Congress.

So there are a number of things that are outside of our control. So I viewed it at the time

as a goal. I never thought about it as, you know, anything other than, you know, the conditional obligation I talked about, in terms of fulfilling my responsibilities in the waste acceptance process as conditional.

I guess I never thought about that question, you know, in its absolute sense. So I think your characterization is probably closer to my views.

BY MR. STOUCK:

Q. At the time you were working on this?

A. Yes.

Q. Now, I want to ask about your understanding now about what obligations DOE had under the contracts, if any, prior to the commencement of facility operations.

A. Okay.

Q. Did you understand that there were any obligations prior to the commencement of facility operations? I guess you have already told me that one obligation was to try to get the facility operating.

A. No, no.

MR. CRAWFORD: No.

BY MR. STOUCK:

operations; is that your understanding?

MR. CRAWFORD: Same objection.

THE WITNESS: That is my understanding.

BY MR. STOUCK:

Q. Okay. Now, in light of those court rulings, as we sit here today, I take it your understanding is that DOE was obligated to commence spent fuel acceptance in 1998; is that right?

MR. CRAWFORD: Objection, asked and answered; objection to the extent it mischaracterizes prior testimony; objection to the extent it calls for a legal conclusion.

THE WITNESS: I understand that the -- my interpretation and I believe the department's interpretation of that was not considered accurate by the courts.

BY MR. STOUCK:

Q. Okay. And I do realize that a lot of similar questions were asked previously and I'm trying to avoid duplication, but to some extent I've just got to get you back to the same subjects and I apologize.

And one of those questions is coming. You were asked something similar, but I just want to get back to the subject about whether or not it was the

intent of the Nuclear Waste Policy Act that no power reactor would require additional spent fuel storage capacity on-site after January 31, 1998.

I believe you testified previously that it was not your understanding that it was the intent of the act that no utility would have a need for additional storage capacity after the '98 date; is that right?

MR. CRAWFORD: Objection to the extent it calls for a legal conclusion; objection, asked and answered; objection, vague.

THE WITNESS: As I testified before, we clearly had a goal. But, in terms of was that required by the contract, no, that's not what the parties agreed to in the contract, that's my understanding.

BY MR. STOUCK:

Q. The current question is about the intent of the act. Your understanding was that it was the intent of the act that no utility would have a need for additional on-site storage, spent fuel storage capacity after the '98 date?

MR. CRAWFORD: Objection, foundation, and to the extent it calls for a legal conclusion.

THE WITNESS: I don't recall that from the

act.

BY MR. STOUCK:

Q. Okay. So when you say recall, it was not your understanding during the time you were working on these matters, from the mid-eighties to mid-nineties, that the act intended that?

MR. CRAWFORD: Objection, same objection as before.

THE WITNESS: That's correct, nor did the contract.

BY MR. STOUCK:

Q. Okay. And that's an understanding that you would have gotten after you started working at DOE, that understanding about the intent of the act that we just talked about, it was not the intent of the act about the additional storage capacity and whatnot, that was an understanding that you would have gotten after you started working at DOE during these first few years you testified, when you were working on Congressional testimony and questions from utilities, and you were performing other functions; is that right?

A. I had no understanding of the Nuclear Waste Policy Act before I learned about this job. So that's true.

Q. Okay. Well, do you know whether DOE officials, DOE officials had an understanding different from yours prior to your arrival about whether it was the intent of the act that no power reactor would require additional storage after the '98 date?

MR. CRAWFORD: Objection to the extent it calls for speculation.

THE WITNESS: Not that I'm aware of.

BY MR. STOUCK:

Q. Okay. Does that mean that you believe that the understanding that DOE officials had about the intent of the act prior to your arrival was consistent with your understanding that you have testified about?

MR. CRAWFORD: Same objection.

THE WITNESS: Yes, there is nothing that happened subsequently to change that view. I never recall a conversation where someone indicated that, you know, the views that we had were ever different.

BY MR. STOUCK:

Q. Were ever different prior to your arrival?

A. Prior to my arrival.

Q. You don't recall any discussion that there were any views different prior to your arrival?

MR. CRAWFORD: Same objection.

THE WITNESS: Not that I recall.

BY MR. STOUCK:

Q. But I think the original question, and let me rephrase it or restate it, was do you know whether there was a different understanding prior to your arrival?

MR. CRAWFORD: Objection to the extent it calls for speculation.

THE WITNESS: No.

BY MR. STOUCK:

Q. You don't know?

A. I do not know.

Q. But you don't recall any conversations during the time you were there that there was a different understanding?

A. That's --

MR. CRAWFORD: Same objection.

THE WITNESS: That's correct.

MR. STOUCK: Why don't we go ahead and mark this as Exhibit 78.

(Brownstein Exhibit No. 78 was marked for identification.)

BY MR. STOUCK:

Q. Mr. Brownstein, you have been handed a

both were possible, you know, reach a consensus, it's not that the department could not act. The department could act. It would have made its decisions.

BY MR. STOUCK:

Q. Here's the thing, I'm not trying to be critical, I'm jut trying to find out what did happen. And the approval criteria, exchange approval criteria were never finalized, right? I mean I think that's what you testified to. Tell me. I see you pausing.

A. You're talking about the ACR issue resolution process. Issues were never finalized? That would be a correct statement.

Q. Now I'm talking about criteria for approval of exchanges of DCSs. There was an effort underway at some point in all these documents to develop specific -- and I could show it to you, if it becomes important, to develop criteria to guide DOE in determining whether or not to approve exchanges?

A. Right.

Q. And it's my understanding, my recollection from the testimony that I have heard that those criteria were never finalized?

A. I think that's correct.

Q. Okay. And I thought you agreed with me

that that was an example of the kind of thing that, despite your efforts and your motives to as I understood the testimony remove impediments from the marketplace, to promote the smooth functioning with this market, this failure to, you know, failure, again I'm not being critical, but the fact that those exchange criteria were never finalized is an example of something I thought you agreed, that, you know, I used word impediment, that if those criteria had been finalized or those exchange approval criteria, that would have furthered the smooth functioning of this marketplace in DCSs that we're talking about.

You do you agree with that and the fact that it, therefore, was something that could have been done to make it even better than the things that you were able to accomplish?

MR. CRAWFORD: Objection, compound.

THE WITNESS: That's a long question. As I recall we evaluated different alternatives, different criteria. There was no -- let me make it clear for the record. No one ever gave us a DCS -- an approved DCS for an exchange.

So we had in our desk drawer something that we were prepared to use. Now, whether it was finalized, well, no one ever had to sign off it

because it never became --

BY MR. STOUCK:

Q. I see. Now I understand. That's fine. Do you know why there were never any exchanges of DCSs submitted for approval?

MR. CRAWFORD: Objection to the extent it calls for speculation.

THE WITNESS: No. I mean because that was something that the utilities had the right to do on their own to submit to us. And why they never did I don't know.

BY MR. STOUCK:

Q. Do you have an opinion about it?

A. No.

Q. No understanding of why it has happened, but there have not apparently been any exchanges submitted for approval?

MR. CRAWFORD: Objection, asked and answered.

THE WITNESS: I don't know. All I know is they had the right. And we needed -- it was my responsibility to be prepared for that should it occur.

BY MR. STOUCK:

Q. And you could not testify about the

reasons why utilities had not submitted exchanges for approval; is that right?

MR. CRAWFORD: Objection, argumentative; objection, asked and answered.

THE WITNESS: No, I testified why I think a market could develop just a few minutes ago. Why it didn't I have no idea. I don't know, I just flat out don't know.

BY MR. STOUCK:

Q. Okay. Now, in this same testimony I have directed your attention to from the prior deposition, I think we moved on to 293 now, you said you thought there were advantages to delaying, but the utilities didn't want to delay; is that right? I mean is that a brief summary of for whatever this is on page 293, line 21, my only recollection is for whatever reason they came back and said -- well --

A. Let me just review that for a second.

Q. Okay. It's actually on 292 I guess, line 5.

A. Yes.

Q. You thought there were advantages to delay, but the purchasers for whatever reason did not want a delay according to this question and answer, it says they were concerned that they not take any

Q. You don't recall that?
A. No, no, wait a second.
Q. What am I not understanding?
A. This is a contractor document. Contractors make suggestions and recommendations to the department all the time. Because a contractor says something doesn't mean, you know, the department either wanted it or agrees with it. This was a contractor input.
Q. I understand that. That's fair enough. And this contractor input apparently is suggesting or at least describing a change to the definition of high-level radioactive waste?
A. That's correct.
Q. Do you know -- maybe I don't have to preface it by saying independent of this document. Even not independent of this document, do you know whether that kind of change was ever discussed, making that change was ever discussed within RW; that is, a change to the standard contract to the meaning of the term high-level radioactive waste that would affect coverage of GTCC?
A. We talked about this subject before and there was testimony before. And I think you asked a similar question. I told you --

Q. You don't recall that?
A. No, no, wait a second.
Q. What am I not understanding?
A. This is a contractor document. Contractors make suggestions and recommendations to the department all the time. Because a contractor says something doesn't mean, you know, the department either wanted it or agrees with it. This was a contractor input.
Q. I understand that. That's fair enough. And this contractor input apparently is suggesting or at least describing a change to the definition of high-level radioactive waste?
A. That's correct.
Q. Do you know -- maybe I don't have to preface it by saying independent of this document. Even not independent of this document, do you know whether that kind of change was ever discussed, making that change was ever discussed within RW; that is, a change to the standard contract to the meaning of the term high-level radioactive waste that would affect coverage of GTCC?
A. We talked about this subject before and there was testimony before. And I think you asked a similar question. I told you --

A. I think so.
MR. CRAWFORD: I'll pose an objection, asked and answered.
BY MR. STOUCK:
Q. And you said actually I don't believe utilities are submitting DCSs any longer. Does that mean -- I'm just trying to find out if you know, does that mean the DCS process is ongoing or do you know?
MR. CRAWFORD: Objection, asked and answered.
THE WITNESS: Well, I don't know because I don't follow it whether it is or not. That's not what I answered yes to. I answered yes to when he was pointing to these boxes.
BY MR. STOUCK:
Q. The where?
A. Where on that chart we were.
MR. STOUCK: Fine. Let's take a break, if you like.
(Recess.)
BY MR. STOUCK:
Q. I'm handing you what's been previously marked as Exhibit 50. It's a transmittal letter from Mr. Cole and an attachment called Delivery Commitment Schedule Processing Approval and Management Control

System. If you would take a look at that. You were asked about this on page 562 and following, you were asked a bunch of questions about this. I'm not going to ask you any of those questions, I'm just directing your attention to that because you said on page 563 this was probably done at my direction.

A. Okay.

Q. It's at the top of page 563.

A. Yes, I see that.

Q. And I appreciate that this is a contractor document and you have caveated about contractor documents. But do you have any reason to change your recollection that this was probably done at your direction?

A. No reason to change that.

Q. What was Mr. Cole's role? In other words, was he someone -- what was his role, why would he send you these kinds of documents?

A. At the time PNL was my major contractor support. I basically had two. And he was my principal -- he was the principal link, the guy I worked with at PNL.

Q. And who was the other one?

A. The other contractor support was the Energy Information Administration.

Q. Now, I'd like to turn now to almost the end, pages 714 and 715 and 716. There's a question about the -- and I'll get the document also as we have been doing here. I believe this is -- oh, gosh, exhibit -- I think it's Exhibit 12. Let's see. I'm interested in this question that starts on page 24 of 714 and I'll show you the document in a second. Here. This has been previously marked as Exhibit No. 12 to your deposition, it's the 1988 annual capacity report. And the exchange ends on line 13 of 716, at least the one I'm interested in.

A. Okay.

Q. On this question there's the sentence in the report, and you can certainly look at that on page 10, if you want to. I mean I think it's accurately quoted in the transcript, about resolution of the issues, analysis and resolution so that the waste management system can achieve maximum efficiency while attempting to assure equity among the parties. And you testified you had in mind in that sentence the federal waste management system, the federal side, right?

A. Yes.

Q. Okay. And then you were asked were you concerned whether the utilities could operate in an

efficient manner, and you said that was not my responsibility. But then the follow-up was do you believe -- you see it here on line 7 of 716, did you believe that one of the purposes of the waste acceptance schedule that is incorporated into the ACRs was to enable the utilities to obtain maximum efficiency in terms of their storage needs.

MR. CRAWFORD: Objection, vague.

BY MR. STOUCK:

Q. And the answer that you gave there is not entirely responsive. You said you believed that it was to help them in their planning efforts. But let me ask you this question again and see if we can -- because I don't think that -- did you, this is the question, did you believe that one of the purposes of the waste acceptance schedule that was incorporated into the ACRs was to enable the utilities to obtain maximum efficiency in terms of their storage needs?

MR. CRAWFORD: Objection, vague; objection to the extent it calls for speculation; objection to the foundation.

THE WITNESS: As I testified previously, not today, but in the previous deposition, and as we indicated in documents and we can find them, you know, until we accepted the waste, it was the