utilities' responsibility, it was their responsibility.

So the answer that I gave here, you know, I think was accurate. I mean I think the information was helpful or, you know, hopefully was helpful to them in their planning efforts. But to obtain maximum efficiency in terms of their storage needs, to obtain maximum efficiency in terms of their storage needs, that was the question, that was the utilities' responsibility, not ours.

BY MR. STOUCK:

Q. So you do not agree that that was one of the purposes of the waste acceptance schedules incorporated into the ACRs?

A. Not those words, no.

Q. Was one of the purposes of the waste acceptance schedule that is incorporated into the ACRs to enable the utilities to obtain greater efficiencies in terms of their storage needs? Strike the word maximum, just to be able to more efficiently store fuel on-site when the program started operating?

MR. CRAWFORD: Objection, asked and answered; objection, argumentative.

THE WITNESS: Let me try a different way.

That was their responsibility, it was not our responsibility to assist them in the -- to maximize or help in their efficiencies. I think we did have a responsibility and I think it was enumerated in the contract, you know, to provide them information for planning purposes.

How they used that planning -- how they used that information for planning purposes, could it have contributed to that goal, sure. But I would rather answer it in terms of it was planning information.

BY MR. STOUCK:

Q. That's fair enough. Does that mean that it was your understanding when you had responsibility for waste acceptance matters, from about '85 to '95, that RW was not concerned in issuing these planning documents meaning ACRs, APRs, DCSs, et cetera, was not concerned in issuing those documents about the cost implications for utilities' on-site storage of spent fuel, is that what you're saying?

MR. CRAWFORD: Objection, vague; objection, compound; objection to the extent it calls for speculation, to the foundation, and asked and answered.

THE WITNESS: No, that's not what I'm

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - - - - - - - X

YANKEE ATOMIC ELECTRIC COMPANY :

(98-126C)(Merow, S.J.) :

CONNECTICUT YANKEE ATOMIC POWER COMPANY :

(98-154C)(Merow, S.J.) :

MAINE YANKEE ATOMIC POWER COMPANY :

(98-474C)(Merow, S.J.)

ORIGINAL

Plaintiffs, :

v. :

THE UNITED STATES, :

Defendant. :

- - - - - - - - - - - - - - - - - - - - - - X

Washington, D.C.

Friday, June 14, 2002

Continued deposition of ALAN BROWNSTEIN, a witness herein, called for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to agreement, the witness being previously duly sworn, taken at the offices of Spriggs & Hollingsworth, 1350 I Street, N.W., Washington, D.C., 20005-3305, at 8:40 a.m., Friday, June 14, 2002, the proceedings being taken down by Stenotype by JAN A. WILLIAMS, RPR, and transcribed under her direction.

personal knowledge about any of these subjects, implementation of standard contract, priority for shutdown reactors, how the Department of Justice was handling that?

A. That's correct.

Q. And when did you stop working on waste acceptance matters?

A. March of 1995.

Q. Subsequent to that time, you would have had no personal knowledge of these topics; is that right?

A. Hallway conversations with people, but I didn't stay very much connected with it.

Q. You would not be able to testify about what the Department of Energy was doing in these areas subsequent to the time you stopped working on them; is that right?

A. I think that's fair.

Q. The exchange approval process which is the last mentioned subtopic, if you will, here, I thought you told me previously that -- I showed you some documents or I asked you some questions about exchange approval criteria.

And I thought the testimony from you was that those kinds of documents and that thinking about

exchange approval, this is delivery commitment exchanges, thinking about criteria under which those would be approved, it was clearly done by the contractor and their documents reflecting that.

But, when it got to your desk, you never really acted on the pursuit of the development of these exchange approval criteria; is that a fair recollection of what you told me?

MR. CRAWFORD: Objection, asked and answered.

THE WITNESS: I'm not sure what you mean by acted on.

BY MR. STOUCK:

Q. They were never implemented, they were never finalized?

A. That's true.

Q. Was there ever an exchange approval process at the Department of Energy while you were working on waste acceptance matters that was anything other than proposals for how the process would work?

MR. CRAWFORD: Objection.

BY MR. STOUCK:

Q. In other words, was the process of exchange approvals ever implemented?

MR. CRAWFORD: Objection, vague.

THE WITNESS: We never received an exchange request.

BY MR. STOUCK:

Q. Was there a process in place at the Department of Energy during your tenure in working on waste acceptance matters for approval of exchange requests that might be submitted?

MR. CRAWFORD: Objection, vague.

THE WITNESS: There was not one approved by my management.

BY MR. STOUCK:

Q. And lastly, just the only other question I have about this description of what you might testify about, there's a reference there to schedule negotiations. And the context is it says Mr. Brownstein will provide testimony concerning the government's implementation of the standard contract including acceptance rates, priority for shutdown reactors, and a number of other things and also including according to this statement schedule negotiations. Do you see that?

A. I see it.

Q. Do you know what that means?

MR. CRAWFORD: Objection to the extent it calls for speculation.

THE WITNESS: Well, here they're telling us their site is -- the lifting capacity, they could only handle a -- let's go back.

The DCS indicates that Haddam Neck can accommodate a cask with a maximum lifting weight of less than 100 tons, while the FICA and the RW-859 data indicate the site capability is five tons.

They could -- it was not a basis for disapproval because we just had to know what equipment -- again this was part of the planning process, the DCS preceding the, you know, 12 months before expected delivery of the FDS. We're trying to understand what equipment we ought to have there.

They're not required, the utilities weren't required to be able to accommodate a certain cask. I mean we had responsibility under the contract to have the right cask there. So there would be no basis for us to disapprove it, it's just trying to understand what they could and couldn't handle.

BY MR. STOUCK:

Q. So the things that would be a basis for disapproval were -- I mean I know some examples. One example would be if they asked for acceptance of more than their allocation, right?

A. Correct.
Q. Here is another example, the wrong signature, right, in this letter?
A. There were, you know, technical reasons and administrative reasons.
Q. Can you just characterize for me why some things would lead to disapproval. I'll tell you, what Mr. Williamson told me was that he went through this checklist. And, if everything on the checklist was there, then he recommended approval.
I mean is there some dividing line that you had in your office between issues that would lead to disapproval and would not lead to disapproval, I mean how did you make that determination?
MR. CRAWFORD: Objection, vague and overbroad.
THE WITNESS: Well, I thought I provided you that answer. If the contract requires specific things for procurement reasons or for, you know, language in the contract, if a certain person had to be authorized to sign it and -- you know, that was a basis for disapproval. I mean that was -- again I have testified, whether the requirement came from the contract or procurement rules, you know, I'm not sure.

utilities put me on the cc, sometimes I would get it from the contracting officer.

Q. Could I see that. So a copy came directly to you of RW-432?

A. Right, in this case.

Q. Do you recall whether prior to -- and the substance of this is that they're submitting delivery commitment schedules. It says, quote, please note that because the Yankee Nuclear Power Station is permanently shutdown and to facilitate decommissioning, we are requesting that DOE accept all of the spent nuclear fuel in storage at the station over a three year period starting in 1998 as indicated on the DCSs, close quote. Have I read that correctly?

A. Yes.

Q. Okay. Do you recall whether prior to receipt of this correspondence there were discussions between Yankee and DOE about priority acceptance for its spent fuel?

A. I don't recall.

Q. One way or the other?

A. Right. I mean there were discussions. But, in terms of whether it was before this date or after this date, I don't recall that.

Q. Okay. What did you do when you got a copy of this correspondence? And I'm trying to find out, there were discussions, there's a lot of correspondence, we're going to look at that. But I'll trying get a very detailed understanding of exactly how you, Alan Brownstein, responded to or reacted to this letter. What did you do?

A. Are you asking how I reacted or how I responded?

Q. Well, if there's a difference, tell me both.

A. Well, how I responded, I have to go back to whether there are notes that I took. I mean I kept and turned in -- you know, when I had discussions with utilities, I generally wrote them down. And that's part of the record somewhere. And how I specifically responded I don't recall.

How I reacted, I mean I recall that which is clearly they were requesting approval of a DCS that went beyond their allocation. And that was a cause of concern.

Q. Okay.

A. And I don't recall now whether, you know, the flow of paperwork from, you know, the review from TRW, whatever, I mean I knew this was a problem as

soon as I saw the letter.

Q. Problem in the sense that it very well could be a basis for disapproval?

A. Yes.

Q. Okay. Well, had a decision been made prior to this time that it would be a basis for disapproval? In other words, I believe the instructions and other documents that we've looked at indicate that the DCSs were to be filled out in such a manner that they matched the allocations in the ACR.

So I mean, at the time this letter came in, was it fairly clear that it was going to be a basis for disapproval or rather was it something that, you know, might well be disapproval, was open to consideration, and let's review this issue?

MR. CRAWFORD: Objection, best evidence.

THE WITNESS: In my mind, and again I do recall that there were, you know, a lot of correspondence again which I have not reviewed. But no, I knew that this was going to be -- you know, when I reviewed it, it was going to be a basis for disapproval.

BY MR. STOUCK:

Q. Because a decision had been made prior to

this time that the DCSs had to match the allocations?
A. Yes. And I think we were clear -- or as I recall we were clear in that whether in the general or specific instructions. I mean it certainly would not have been a surprise to anyone.
MR. STOUCK: Let's mark this as No. 88, please.
(Brownstein Exhibit No. 88 was marked for identification.)
BY MR. STOUCK:
Q. Okay. Here is a letter that has been marked as Exhibit No. 88, Mr. Brownstein. This is from Linda Strand, contracting officer, to Mr. J. M. Buchheit, Yankee Atomic Electric Company. And it looks like it's dated December 1, 1992, with a received stamp a couple of days or a few days later.
Anyway this is the response to Exhibit No. 87, right? It looks like that?
A. Yes. I just want to a chance to read it.
Okay.
Q. This is a response to the prior exhibit; is that right?
A. Yes.
Q. What involvement did you, Alan Brownstein, have in the preparation of this letter?

would have forwarded it over to you somehow?
A. Yes.
Q. You're not directly cc's on this one that I can tell?
A. Right.
MR. STOUCK: And let's then mark this one as No. 91, please.
(Brownstein Exhibit No. 91 was marked for identification.)
BY MR. STOUCK:
Q. Before I show you that -- the next exhibit is a response. But, before I show you that, do you recall what happened after this resubmittal came in?
MR. CRAWFORD: Objection, best evidence.
THE WITNESS: Well, as I testified before, we disapproved, they wrote us a letter. And we went back and gave them our views. We never approved it. I don't know if the next -- the contract laid out a series of steps.
To the best of my recollection, you know, if there was a disapproval, they could resubmit it. If there was a second disapproval, there could be a meeting with the contracting officer. And I think the next step was they could appeal it. So there were a series of steps that were gone through.

answered.

THE WITNESS: What I told you was I don't have a specific recollection that there was a draft that I submitted above me. And I just frankly don't recall at April 8, '93, whether I -- what stage a draft that my staff or contractors had developed. I just don't recall or if there was one.

BY MR. STOUCK:

Q. Or if there was one?

A. I just don't recall that.

Q. Okay. This is what was sometime ago marked as Exhibit 1 to your deposition. This is a copy of the Federal Register material including the standard contract. I've only got two copies of this.

MR. CRAWFORD: I'll look on with him.

MR. STOUCK: All right.

BY MR. STOUCK:

Q. You referred in your testimony a few minutes ago, Mr. Brownstein, to sort of what happens after DCSs are disapproved. Do you recall that?

A. Yes.

Q. If I could direct your attention to a section of this that deals with that which I believe is on page 1. Do you have it?

A. Yes.

Q. Okay.
A. Well, I'm looking at --
Q. I think it's article 5 B 2.
A. Right.
Q. Take a look at that for a minute.
A. Okay.
Q. Let me just read it into the record so we know what we're talking about here. It says DOE shall approve or disapprove -- I'm sorry, that's the revised schedules.

Under 5 B 1 I guess, the first disapproval, it says DOE shall approve or disapprove such schedules, referring to the delivery commitment schedules, within three months after receipt. In the event of disapproval, DOE shall advise the purchaser in writing of the reasons for such disapproval and request a revised schedule from the purchaser to be submitted to DOE within 30 days after receipt of DOE's notice of disapproval. That's the end of this subparagraph 1.

Then paragraph 2, subparagraph 2 starts, quote, DOE shall approve or disapprove such revised schedules within 60 days after receipt. In the event of disapproval, DOE shall advise the purchaser in writing the reasons for such disapproval and shall

submit its proposed schedules. If these are not acceptable to the purchaser, the parties shall promptly seek to negotiate mutually acceptable schedules.

So that's apparently the process that was going on in these letters we've been looking at most recently, Exhibits 89 and 90, right?

A. Yes.

Q. Do you know what would happen, after the resubmission and the redisapproval the second time, if the parties were not able to negotiate mutually acceptable schedules?

MR. CRAWFORD: Objection to the extent it calls for a legal conclusion.

THE WITNESS: Well, I believe they could have done several things. I believe they could have appealed it to the Board of Contract Appeals or they could have sued.

BY MR. STOUCK:

Q. Okay. Anything else, any other course of action that was open to them?

MR. CRAWFORD: Objection, overbroad and vague.

BY MR. STOUCK:

Q. Or to the department I guess in that

eventuality?

MR. CRAWFORD: Objection, overbroad.

THE WITNESS: I don't understand the question really.

BY MR. STOUCK:

Q. You don't understand the question?

A. No.

Q. What don't you understand?

A. What you're --

Q. Well, I'm just asking, if the parties weren't able to come to an agreement here at the end of the day, you said they could go to the Board of Contract Appeals or they could sue. I was just asking if there was any other option available either to the utility --

A. Not with -- within the contract and within the system as I understand it, those are the right answers, they could have done other things, they could have gone to their congressman, they could have gone to their senator, they could have gone to the President, they could have taken an ad out in a newspaper. I mean there are a lot of things they could have done. That's why I didn't understand what your question was.

MR. STOUCK: Can you mark this as 92,

followed had it begun to take SNF from purchasers by January 31, 1998, pursuant to the standard contract, right?

A. Yes.

Q. And they gave us more than three. But you're listed as one of the people in response to that question?

MR. CRAWFORD: No. Objection to the foundation to the extent it mischaracterizes what those people being listed are for. And I would encourage you, Mr. Brownstein, to please read the paragraph before that and most particularly go ahead and read the full response.

BY MR. STOUCK:

Q. That's fair enough. And I did not intend to mischaracterize and I accept the objection and I certainly encourage him to read the whole thing and that's a very fair point.

As indicated in the last paragraph that Mr. Crawford called your attention to, you are identified here as an individual that to a varying degree has been involved with and may have knowledge about the schedules DOE has considered, okay. That's what the words say. But, going back to the question, okay?

A. Yes.

Q. Could you testify about the schedule that DOE would have followed had it begun to take SNF from purchasers by January 31, 1998, pursuant to the standard contract?

MR. CRAWFORD: Objection to the foundation and to the extent it calls for speculation.

THE WITNESS: Well, I guess the way I have to answer that is not subsequent to March of '95. In other words, you know, prior to that, sure. But, if you're asking -- I left the area then. So there were some years between March '95 and '98 that others would have been, you know, more familiar with that.

BY MR. STOUCK:

Q. Okay?

A. I mean there's a time dimension to your question.

Q. That's okay, if that's the way you understood it. If the trial of this case took place today, could you testify about the schedule that DOE would have followed had it begun to take SNF from purchasers by January 31, 1998?

MR. CRAWFORD: Same objection.

THE WITNESS: My involvement with the schedule which I have testified at length, you know,

before ended in March of '95. And so, if there were changes to the schedule, you know, subsequent to that time, you know, I would not be the best person.

BY MR. STOUCK:

Q. Would you be able to testify at all today, if the trial were held today? We're talking about -- just to the clear, and I think it's clear, but we're talking about the actual schedule that DOE would have followed if they would have started in '98. Could you testify about that today?

MR. CRAWFORD: I'll object, same objections, and also just based on the fact that he's never been identified as a person who can do that.

BY MR. STOUCK:

Q. That's a fair point and I accept your objection, but I'm asking the question.

A. Here's my concern with your question.

Q. Okay.

A. If the schedule was modified in any way subsequent to March of '95 that would have affected, you know, acceptance in '98, I'm not intimately familiar with that. I was familiar with the schedule, you know, up until the time that I left the area.

Q. Well, let's ask a different question then.

rather is it -- maybe it was a legitimate question, but there was no real reason to address it at the time?

MR. CRAWFORD: Objection to the extent it calls for speculation.

THE WITNESS: From my perspective, you know, I was charged with implementing the contract. We did what was necessary to implement that contract. And I don't think we needed to answer, you know, a broader question.

No one was asking broader questions. I mean there's a lot of good comments in here. Broader questions, you just don't need to do it, no one was really asking, there was not really a demand.

BY MR. STOUCK:

Q. At the time, August of 1991, when the instructions for DCSs were being developed, did you, Alan Brownstein, have a good understanding of what it meant to have an approved DCS?

MR. CRAWFORD: Objection to -- never mind.

THE WITNESS: I had an understanding. Whether it was a good understanding or not, I don't know how to judge that.

BY MR. STOUCK:

Q. Do you believe that you understood the

legal significance of an approved DCS?

MR. CRAWFORD: Objection to the extent it calls for a legal conclusion.

THE WITNESS: I'm not a lawyer.

BY MR. STOUCK:

Q. Well, you're not a lawyer. But at this time you were working on the program and you were working on these matters. And sometimes nonlawyers have understandings of legal things that relate to their jobs. Maybe you did and maybe you didn't, but I don't know that that's responsive to my question. At this time did you have an understanding of the legal significance of an approved DCS?

MR. CRAWFORD: Objection to the extent it calls for a legal conclusion.

THE WITNESS: Probably not, because I don't recall having a discussion with anybody about that.

BY MR. STOUCK:

Q. Okay. What about at some subsequent time prior to the time that you ceased working on these matters? I'm looking for my notes here. I think it was March 1995. Did you have any discussions with anyone that would have given you, Alan Brownstein, an understanding of the legal significance of approved

DCSs?

MR. CRAWFORD: Same objection.

THE WITNESS: Not that I recall.

BY MR. STOUCK:

Q. And subsequent to that, in '95, you have had no such discussions; is that right or is that not right?

MR. CRAWFORD: Same objection.

THE WITNESS: I think I testified earlier that I may have reviewed a DOJ, you know, document, a reply.

BY MR. STOUCK:

Q. In this litigation?

A. In this litigation.

Q. Was that subsequent to the last time we were here in this deposition room?

A. No.

Q. It was prior to that?

A. Yes.

Q. Was it prior to your first deposition?

A. Yes.

Q. Do you know whether it was prior to or after the DOJ document was filed in court or was it a DOJ document that was filed in court?

MR. CRAWFORD: Objection to the extent it

those documents and we'll hash that out. If we prevail, we may have some more questions for you. And we hope we can arrange that.

Other than that I have nothing else for you at this time.

THE WITNESS: Thank you.

EXAMINATION BY COUNSEL

FOR DEFENDANT

BY MR. CRAWFORD:

Q. I have one or two questions relating to some of the prior testimony that you gave to Mr. Stouck the last time in your deposition with him. And it really relates to just one point, and that was some questioning about your use of the term best estimate as far as the schedules that were in the ACRs and the mission plan, the waste acceptance schedules.

And Mr. Stouck asked you a question which was on page 73 of your prior transcript. And it stated, at any particular point in time, if I said what's the best estimate, you would say, well, it's the one that's in the contract or it's the one that's in the mission plan depending on the point in time. And you answered that question, yes, that's correct.

Now, I think it was probably just pure

inadvertence and maybe Mr. Stouck misspoke when he asked the question. But was it your intent to agree with Mr. Stouck, that there was somehow a waste acceptance schedule stated in the contract?

A. I testified previously, several times, that there is no waste acceptance schedule in the contract. So I certainly didn't mean that.

MR. CRAWFORD: That was the reason why I asked the question. And that is really the only -- that's the reason. I just did it as a point of clarification, Jerry. I really have nothing further on that.

THE WITNESS: I did not even catch that in my review.

MR. CRAWFORD: It was simply something that simply jumped out at me and it's the only thing that did. And I think it was probably just misspeaking, because you all had been talking about the ACRs and the mission planning.

MR. STOUCK: Although, as I've said off the record, I think the transcription has generally been very good. I think it may have just been a transcription error.

MR. CRAWFORD: It may not have been. It may have been something that maybe the witness didn't