IN THE UNITED STATES COURT OF FEDERAL CLAIMS

ORIGINAL

---------------------------------------X
YANKEE ATOMIC ELECTRIC
COMPANY, CONNECTICUT
YANKEE ATOMIC POWER
COMPANY, MAINE YANKEE
ATOMIC POWER COMPANY,

Plaintiffs,

vs.

UNITED STATES OF AMERICA,

Defendant.
---------------------------------------X

CASE NO.
98-126C
98-154C
98-474C

Washington, D.C.

Thursday, June 13, 2002

Deposition of ROBERT ALLEN CAMPBELL

a witness, called for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to notice, the witness being duly sworn, taken at the offices of Spriggs & Hollingsworth, 1350 I Street, N.W., Suite 1010, Washington, D.C, at 9:32 a.m, on Thursday, June 13, 2002, and the proceedings being taken down by Stenotype by CINDY L. SEBO, and transcribed under her direction.

A Yes.

Q Who did you work with at the NRC on sealed sources?

A Mr. Doug Broaddus.

Q Can you spell that for the record, if you know?

A B-r-o-a-d-d-u-s.

Q Okay. Thank you.

Anyone else?

A He was the primary person on sealed sources.

Q And do you know what part of NRC he worked for?

A Office of Nuclear Materials Safety and Safeguards, the Division of Industrial and Medical Nuclear Safety.

Q Now, you testified that in working on sealed sources, one of the things you did was to find a place to put them. Did you find a place to put them; can you tell me about that, please?

A Yes.

Q Okay.

A Early on, we basically took -- I basically found the nearest DOE site and arranged for sources to be transported to the -- to the

nearest facility that was able to accept them.

Q And that would be accepting them for storage?

A Yes.

Q Had any sealed sources actually been disposed of?

MS. HERRMANN: Objection, foundation.

THE WITNESS: We've not disposed of any Greater-Than-Class C sealed sources, no.

BY MR. SKALABAN:

Q And just for the record, just so it's clear, do you understand what I mean when I say disposed of?

A I believe so.

Q Okay. For purposes of the record, can you explain your understanding of what disposing of a Greater-Than-Class C source means?

A Well, disposal would be some kind of permanent place you would put something and never go get it again, as opposed to storage, which is the intent would be to -- to retrieve it one day.

We do not have any Greater-Than-Class C disposal, so the way you framed the question was -- my understanding of Greater-Than-Class C disposal -- since we don't have that, I don't know

what that's going to be.

Q You stated that early on the sealed sources would go to the nearest DOE sites. What were some of those sites that sealed sources would be taken to?

A We sent sources to the Mound Plant in Ohio, the Hanford site in Washington, and the Los Alamos National Laboratory in New Mexico.

Q Are there any other -- are these all DOE sites?

A Yes.

Q Are there any other sites that you can think of that sealed sources were taken to early on?

A Yes. We had one request from the NRC that was for a large source on a piece of medical equipment that actually could be reused. And so we -- I entered into for -- the Department entered into a contract with a company to go remove the source from the medical equipment.

This was a little different, in that most of the time the source was just in a source holder, and that's all there was.

We didn't want to have to deal with this piece of medical equipment, which had a lot of

Q And has the report been published?

A Yes.

Q And when did that report -- that top-to-bottom review, when did that occur?

A Four to six months ago is when it was completed.

Q And what were the reports for recommendations on GTCC waste?

MS. HERRMANN: Objection, foundation.

THE WITNESS: It wasn't specific in terms of Greater-Than-Class C waste. The recommendation was that EM's mission ought to be the cleanup and exposure of sites that EM is responsible for, and anything that fell outside of that narrow definition was fair game to be transferred to someone -- some other part of the Department.

BY MR. SKALABAN:

Q Do you have any understanding of what -- what other area of the Department it would be fair game to transfer GTCC responsibilities to?

MS. HERRMANN: Objection, foundation, speculation.

THE WITNESS: Technically, it could be transferred to any part of the Department of Energy. I don't know that there's anything

stopping that. I do not know what -- I'm not part of the discussions on -- on what's going to happen to the program. So I do not know.

BY MR. SKALABAN:

Q Okay. So you haven't been involved in any conversation -- let me ask this question: Have you been involved in any questions where it was discussed what would happen to the GTCC program in view of the top-to-bottom review?

A Yes.

Q And can you tell me about those conversations, what was discussed?

A There was at least one conversation where the -- it was reported to me that management had discussed the idea of transferring the Greater-Than-Class C program to the Office of Civilian Radioactive Waste Management and the sealed source program to the National Nuclear Security Administration, which is another part of DOE.

Q And who was involved in this conversation besides yourself?

A Susan Rudzinski. She's the current EM22 office director.

Q Was there anyone else involved in that

Whether that's been -- you know, that's the assumption I read into that, is that then you're assuming that that would go to the spent nuclear fuel and high-level waste repository. That decision has not been made. Therefore, transferring that piece or the other pieces of the Greater-Than-Class C to that organization I think are premature until the decisions on disposal are made.

BY MR. SKALABAN:

Q What is the current status of the decision on how to dispose of nuclear utility activated metal GTCC?

MS. HERRMANN: Objection, foundation. Mr. Campbell is not a 30(b)(6) witness.

THE WITNESS: The -- there's not a formal decision-making process in place right now. So the status is I do not believe that anyone is actively pursuing that decision.

BY MR. SKALABAN:

Q So we were -- one question ago we were talking about your concepts or ideas for how to make it work, the transfer of responsibility to OCRWM.

Would one of the ways to make it work be

to declare the high-level waste spent fuel repository as the disposal site for the nuclear utility activated metal and then transfer that responsibility to RW?

MS. HERRMANN: Objection, speculation, relevance.

THE WITNESS: I believe that the Department of Energy needs to do an Environmental Impact Statement under the National Environmental Policy Act, because the decision on where to dispose of Greater-Than-Class C would be a major -- in my opinion, would be a major Federal action. They need to analyze the options, let the public review it, and make a decision.

Once a decision is made about where you would dispose of all Greater-Than-Class C waste or break it up into pieces and dispose of it in different places, then, at that point, I believe you would have enough information to then choose the appropriate organizations to carry out and implement those decisions.

BY MR. SKALABAN:

Q When you were talking to Ms. Rudzinski, did you express to her whether you thought it was a good idea to transfer responsibility for nuclear

question. Was it discussed that there is a disposal site being developed that is capable of handling GTCC waste?

MS. HERRMANN: Objection. It assumes facts not in evidence.

THE WITNESS: No, it was not discussed.

BY MR. SKALABAN:

Q Okay. Let me ask this -- let me try to ask a better question. Do you agree that the Yucca Mountain repository is a disposal site that is being developed that can be used for Greater-Than-Class C waste if the decision is made to put it there?

MS. HERRMANN: Objection, speculation, calls for legal conclusion. Go ahead.

THE WITNESS: The limiting factor for -- if that disposal site is developed and becomes operational, part of that process is applying for a license from the Nuclear Regulatory Commission. That will dictate what can and cannot go into the facility.

So my opinion now of whether I think Greater-Than-Class C could go there is just a guess, because I don't know what the license is going to say. I don't know what exactly we're

going to apply for, so I don't know.

BY MR. SKALABAN:

Q Well, let me ask you this: Do you know of any technical obstacles that would prevent GTCC waste from going into the repository being developed at Yucca Mountain?

MS. HERRMANN: Objection, calls for speculation.

THE WITNESS: Yes.

BY MR. SKALABAN:

Q Okay. And what are those technical obstacles?

A One would be that some Greater-Than-Class C waste are in sealed sources in the form of neutron-generating sealed sources. If you're going to put a lot of spent fuel in a -- in a single location, you don't want to introduce things that generate neutrons into that same environment for criticality concerns.

So that is one problem right there. Most of the sealed sources we deal with are neutron generators. There may be others. That's one I can think of off the top of my head.

Q And putting aside the criticality concerns that arise from neutron-generating sealed

for a decision to be made?

MS. HERRMANN: Objection. Objection, relevance.

BY MR. SKALABAN:

Q Let me ask a better question. Do you think that's a reasonable option for handling the GTCC waste issues?

MS. HERRMANN: Same objection.

THE WITNESS: I -- I -- I will go back to the previous answer. I think that the Department of Energy needs to do an Environmental Impact Statement and decide what it's going to do and then figure out who is going to carry those things out.

The problem with assigning anything that -- to RW in terms of not having made a formal decision is you're presupposing a decision which I've been told is -- is something you shouldn't do with NEPA, decide what you're going to do and then do the NEPA. You're supposed to do the NEPA first and then decide.

So I think that's the problem with that particular -- particularly with RW, because it -- because it introduces a lot of assumptions that people would make, given the narrow scope of what they do.

BY MR. SKALABAN:

Q Is there an element of a catch-22 here? On one hand, you don't know whether the licensing is going to -- could include GTCC waste for the repository; but on the other hand, there's been no NEPA analysis to determine whether it should go into the repository and then you don't know whether to ask for it?

MS. HERRMANN: Objection, vague, compound.

THE WITNESS: I don't believe there's a catch-22. If DOE decided through an Environmental Impact Statement that after looking at the reasonable alternatives and public review and all of that that Yucca Mountain was the alternative that they wanted to pick for spent fuel -- for the nuclear utility activated metal, then that would then dictate, as you implemented that proposed decision, that you would apply -- you'd modify your license application to include that. But, again, that's all supposing that you go through all of those steps.

BY MR. SKALABAN:

Q Let's just talk a moment about the three different sources of GTCC waste that we identified

most utilities. Those are being put into some sort of a storage. And OCRWM has not formally published, to my knowledge, exactly what it is they are and are not going to accept, but I believe it's the assumption that everything that is placed into the canister is -- that those canisters are not going to be reopened again.

But that is simply, I think, a common assumption that enough people make that that's why I believe that to be true. I don't know for sure, but that's -- that's the assumption I believe that I'm making and everyone else is making.

BY MR. SKALABAN:

Q What you say everyone else, you're referring to DOE, people at DOE?

A And of the utilities. I don't believe that the utilities would be packaging up their fuel that way if they thought that that was not how it was going to be accepted.

Q So, to your knowledge -- I mean, that's a commonly shared assumption by utilities and DOE?

A Yes.

MS. HERRMANN: Objection, foundation.

BY MR. SKALABAN:

Q Do you know, are nonfuel-bearing

components considered part of this 1800 cubic meter number at all?

A No, because, again, fuel assemblies are spent fuel. They're not greater than -- you know, anything that is considered spent fuel is labeled and classified as spent fuel. Anything that -- the definition of low-level waste precludes something being spent fuel.

So because the nonfuel bearing component of a spent fuel is spent fuel, then, no, the Greater-Than-Class C would not include that.

Q Now, how about the small pieces of metal that you say can be generated during refueling operations, are they considered part of that -- are they part of that 1800 cubic meter estimate?

A Yes, I believe so.

Q Has there been any discussion about how those are going to be handled? Are they -- have there been any conversations or discussions about whether they're going to be accepted by OCRWM along with the spent fuel?

MS. HERRMANN: Objection, foundation, speculation.

THE WITNESS: I've not -- well, my understanding is that most utilities have handled

didn't --

Q Okay.

A I didn't hand the final -- I didn't review the final piece of -- pieces of paper that went from EM20 to EM1. So I don't know exactly. My assumption is that I've seen that version, but I can't be positive.

Q Okay. Well, we'll work with the last version that you saw --

A Okay.

Q -- which you -- we will work with that as the basis of the questions.

Did they discuss what the different disposal options or alternatives are for nuclear utility activated metal?

A Yes.

Q Okay. Can you identify for me the different disposal options and alternatives for nuclear utility activated metal that were identified in the policy analysis paper?

A Yes. Yucca Mountain or the -- whatever the spent fuel nuclear repository would be was one.

Another alternative was an intermediate depth disposal facility, an example of which we have something called the greater confinement

boreholes at the Nevada test site. It wasn't necessarily recommending those, because it's not an active in-use disposal facility, but they're a good example of what an intermediate depth disposal facility would look like.

So that was listed in there, something along the lines of a greater confinement disposal boreholes.

Another option was storage for decay until the -- I think in 3- or 400 years, the activated metals, there's not nearly -- a significant dropoff in the radiation occurs, and then you're -- the potential is you would have other options that would become available if it wasn't so hot.

BY MR. SKALABAN:

Q I'm sorry. When you say high, you don't mean thermal heat, you mean radioactivity?

A Yes, radioactivity.

Q I'm sorry. Go ahead. Storage for decay, Yucca Mountain, intermediate depth facility. Any others?

A No, I believe that's it.

Q And aside from the concept of greater confinement disposal, were there any other

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

-----------------------------------------X

YANKEE ATOMIC ELECTRIC COMPANY, CONNECTICUT YANKEE ATOMIC POWER COMPANY, MAINE YANKEE ATOMIC POWER COMPANY,

Plaintiffs,

vs.

UNITED STATES OF AMERICA,

Defendant.

-----------------------------------------X

ORIGINAL

CASE NO. 98-126C 98-154C 98-474C

Washington, D.C.

Friday, June 14, 2002

Continued Deposition of ROBERT ALLEN CAMPBELL, a witness herein, called for examination by counsel for the Plaintiffs in the above-entitled matter, pursuant to recess, the witness having been previously duly sworn, taken at the offices of Spriggs & Hollingsworth, 1350 I Street, N.W., Suite 1010, Washington, D.C, at 9:33 a.m, on Friday, June 14, 2002, and the proceedings being taken down by Stenotype by CINDY L. SEBO, and transcribed under her direction.

information, conversation, anything that -- the source of that conversation?

A I do not -- I do not recall specifically where I acquired that information.

Q Do you have a general sense of where you acquired that information?

A I either read it or someone told me that in a conversation, but I do not recall.

Q And you don't recall if that was a conversation with someone from RW?

A No, I don't.

Q Now, what do you think -- when DOE does begin to start taking spent fuel from the nuclear utilities, do you think a disposal path is going to be available when that happens?

MS. HERRMANN: Objection, foundation, speculation.

THE WITNESS: I have no idea.

BY MR. SKALABAN:

Q You don't have any sense at all on whether you think a solution to the problem of storing GTCC waste at reactor sites is going to be remedied by the time DOE begins to perform?

MS. HERRMANN: Same objections, asked and answered.

THE WITNESS: I have no idea.
BY MR. SKALABAN:
Q Is there any kind of concerted effort at DOE to have a storage or a disposal path available for GTCC by the time spent fuel begins to be removed from utility sites?
A Currently, there is no effort to develop a disposal path for Greater-Than-Class C waste. So will there be one in the future? I don't know.
Q Have you been involved in any conversations within DOE about -- aside from your expressing the opinion to Mr. Zabransky that a disposal path needs to be available, have you been involved in any conversations where the strategy -- a strategy has been discussed of having a disposal path available by the time acceptance of spent fuel begins?
A I have stated my opinion on that subject to my management and other people in conversations about the need to do an EIS and the need to move forward. I'm unaware of anyone else implementing any kind of a strategy to implement my opinion.
Q And when you communicated that to management, who are you referring to as your management?

BY MR. SKALABAN:
Q Okay. Let's assume that the Yucca Mountain repository was available in 1998, and in 1998 nuclear utility spent fuel had begun to be removed to that site.
In that scenario, is it your opinion that the Department should then have had a disposal path identified and available for GTCC waste?
MS. HERRMANN: Objection, speculation, relevance.
THE WITNESS: Yes, I think there was ample time between 1985 and 1998 for DOE to determine what disposal path they wanted, had -- if the repository was available, then -- you know, based on the suitability of that repository to dispose of Greater-Than-Class C waste, yes, a path should have been in place.
BY MR. SKALABAN:
Q Do you think -- putting aside politics and funding, from a technical and engineering point of view, is a 13-year period from 1985 to 1998, is that ample time to identify and develop and have available a storage or disposal path for nuclear utility activated metal Greater-Than-Class C waste?
MS. HERRMANN: Objection, speculation,

relevance.

THE WITNESS: In terms of identifying a disposal pathway, yes, I think 13 years is enough time. In terms of the fact that the Government has never developed a disposal facility, other than shallow land burial that quickly, I would say no, that would not be enough time to necessarily have it in place, given the length of time it's taken the Government to open similar facilities.

BY MR. SKALABAN:

Q And what are the other facilities that you're referring to that have taken more than 13 years?

A The Waste Isolation Pilot Plant.

Q How long did it take DOE to develop that?

A Well over 20 years.

Q When did that effort begin, the Waste Isolation Pilot Plant?

MS. HERRMANN: Objection, speculation.

THE WITNESS: I don't recall. I know I've read documents on the history, and I've seen the date. I'm thinking it was in the late '70s, but I'm guessing.

BY MR. SKALABAN:

Q You're aware of -- and I believe we

MS. HERRMANN: Same objection.
THE WITNESS: Well, look at Yucca Mountain. The United States Atomic Energy Commission, the Department of Energy, tested nuclear weapons in the State of Nevada for 30 years.
The State of Nevada is no more open to the Yucca Mountain being a nuclear waste repository after having those activities taking place than they would be without those activities taking place.
BY MR. SKALABAN:
Q If in 1998 the Department is taking spent fuel for either storage or disposal, do you think that the Department would have left GTCC waste at reactor sites when all of the spent fuel has been removed from a reactor site if it had the capability to store or dispose of spent fuel?
MS. HERRMANN: Objection, speculation.
THE WITNESS: I have no -- I have no idea.
BY MR. SKALABAN:
Q Well, do you think that would be a sound policy if you have storage and disposal available for spent fuel, spent fuel is being removed to the

storage or disposal facility, you have
decommissioned reactors that have completely rid
themselves of spent fuel through the available
storage or disposal facilities beginning in 1998,
would that also make sense for the Department to
take the GTCC contemporaneously so that the utility
can finish its decommissioning?

MS. HERRMANN: Objection, vague as to
sound policy and make sense.

THE WITNESS: Without the ability to look
at the policy decision for leaving the
Greater-Than-Class C there, I have no idea whether
it would be a good or a bad policy decision,
because I wouldn't have any knowledge of the
reasons they made such a decision in this
hypothetical situation.

BY MR. SKALABAN:

Q All right. And in view of our scenario
or hypothetical, can you think of any policy
reasons for leaving nuclear utility activated metal
at the site of decommissioned reactors if beginning
in 1998 the Department of Energy has begun and
completed the removal of all of the spent fuel at
the decommissioned reactor site?

MS. HERRMANN: Objection, speculation.

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - - - X

YANKEE ATOMIC ELECTRIC :

COMPANY, et al., :

Plaintiffs, :

v. : Case Nos.

THE UNITED STATES, : 98-126C, 98-154C,

Defendant. : 98-474C

- - - - - - - - - - - - - - - - - - X

ORIGINAL

Washington, D.C.

Wednesday, January 29, 2003

Continued deposition of ROBERT ALLEN CAMPBELL, a witness herein, called for examination by counsel for Plaintiffs Yankee Atomic, Maine Yankee and Connecticut Yankee, in the above-entitled matter, pursuant to notice, the witness being duly sworn by MARY GRACE CASTLEBERRY, a Notary Public in and for the District of Columbia, taken at the offices of Spriggs & Hollingsworth, 1350 I Street, N.W., Washington, D.C., at 9:30 a.m., Wednesday, January 29, 2003, and the proceedings being taken down by Stenotype by MARY GRACE CASTLEBERRY, RPR, and transcribed under her direction.

C Low Level Radioactive Waste Program Management Plan with the identifier DOE-/LLW-257 dated September 1999. Can you tell me what the September '99 document is?

A. Yes.

Q. Please do.

A. It is a -- outlined what the greater than Class C program plans were for managing the program.

Q. And is this the current plan in place?

MS. HERRMANN: Objection, foundation, speculation, asked and answered.

THE WITNESS: No.

BY MR. SKALABAN:

Q. Where can I find the current plan that DOE is using that outlines the strategy for greater than Class C waste?

MS. HERRMANN: Objection, foundation, speculation.

THE WITNESS: You can't.

BY MR. SKALABAN:

Q. Why is that, Mr. Campbell?

A. The current plan is that we were going to do an environmental impact statement and that that process is on hold pending decisions by senior management.

A. I don't know.
Q. I think we are completed for today.
MS. HERRMANN: I just have a couple, just to take care of them now in case we don't come back.
MR. SKALABAN: Okay.

EXAMINATION BY COUNSEL FOR DEFENDANT

BY MS. HERRMANN:
Q. Mr. Campbell, do you make policy for the Department of Energy?
A. No.
Q. Do you make policy for the Office of Environmental Management?
A. No.
Q. Do you make any policy with regard to the storage, disposal or handling of GTCC?
A. No.
MS. HERRMANN: That's it for me.
MR. SKALABAN: Can you read back those three questions to me?
THE REPORTER: "Question: Do you make policy for the Department of Energy?"
"Question: Do you make policy for the Office of Environmental Management?
"Question: Do you make any policy with regard to the storage, disposal or handling of GTCC?"

In the United States Court of Federal Claims

----------------------------------x

| | |
|---|---|
| Yankee Atomic Electric Company | : |
| | : NO. 98-126C |
| v. | : |
| | : |
| United States of America | : |

----------------------------------x

May 6, 2004

DEPOSITION OF:

Robert Campbell

a witness, called by counsel pursuant to notice, commencing at 9:30 a.m., which was taken at Spriggs and Hollingsworth, 1350 Eye St., NW, Washington, DC

manufacturing industries, portable gauges, universities. It's across the spectrum.

Q. Why can't hospitals continue to store their GTCC waste sealed sources?

A. I'm not aware of the fact that they can't.

Q. Why are you picking them up from hospitals?

A. Currently we are picking up sealed sources based on national security reasons and to protect the interests of the United States.

Q. The GTCC sealed sources from hospitals, what do they consist of? Are they pacemakers? What are they?

A. They could be pacemakers. That's not the more common form. Typically they are americium sources that are used in cancer treatment that have been phased out of use.

Q. Are some of these sources accepted because of the financial burden on the licensee?

MS. HERRMANN: Objection, foundation, speculation.

Q. For the licensee to continue to store the source?

A. No.

Q. Is there a significant financial burden for the licensees to continue to store these sources?

MS. HERRMANN: Objection, foundation, speculation.

A. I don't know.

Q. Historically, didn't DOE accept GTCC waste sealed sources because of the financial barred done on the license holder to store them?

MS. HERRMANN: Objection, foundation, speculation.

A. No.

Q. Was there concern that the -- it's always been, to your knowledge, always been for security reasons that the sources were accepted?

A. No.

Q. Why else would the sources be accepted?

A. When the program was run under

environmental management, the main driver was public health and safety.

Q. What do you mean by that? Can you explain that for me further?

A. The issue, in general, was that because there was no disposal pathway for greater than class C sealed sources that that increased the risk that sources would become lost, become stolen, that a licensee would go out of business, become bankrupt, otherwise mismanage the source in such a way that the source might get out into the general public or pose a threat to the public health and safety and typically a threat to the public health and safety is radiation exposure to an unintended radiation exposure consequence or an environmental contamination consequence.

Q. How does the current driver differ?

A. National Security Administration's concern is that radioactive sources could come into the hands of terrorists and be used for malevolent purposes against the interest of the United States.

section of the EIS for?

A. I don't remember.

Q. What do you recall about the EIS section discussing GTCC?

MS. HERRMANN: Objection, vague.

A. The Yucca Mountain EIS has an appendix of other wastes, an inventory of other wastes that had been or might possibly be considered for disposal in Yucca Mountain.

The EIS makes it clear that the EIS is not analyzing the disposal of those wastes. They were just being complete in saying the Department of Energy at various times and in various places has discussed disposing of quite a number of things in Yucca Mountain and it was attempting to summarize those things.

The EIS itself only addressed high level waste and spent fuel. So there's a part of the appendix that discusses greater than class C waste.

Q. Do you have any understanding why that was included in the Yucca Mountain EIS?

MS. HERRMANN: Objection, foundation, speculation and calls for a legal conclusion.

A. My previous answer is my best answer to that question.

They were attempting to summarize all the things that the Department of Energy had ever discussed that would possibly be considered -- had been or were possibly being considered to go there for disposal.

Q. By including them, that's an indication that this is something that may go into the repository, correct?

MS. HERRMANN: Objection, foundation, speculation, calls for a legal conclusion.

A. No. It simply means that it had been discussed. Didn't mean that it would.

Q. My question is not whether it would. That it could be included --

MS. HERRMANN: Same objections.

Q. -- in the Yucca Mountain repository GTCC waste.

A. No, I don't agree with that.
Q. Can you explain why you don't agree with that?
MS. HERRMANN: Same objections.
A. Any organization within DOE can propose that something go to Yucca Mountain. That doesn't mean it could or would or will. It just means that it was proposed.
My understanding was that they were attempting to summarize all the things that were proposed.
Q. Who had proposed GTCC for the Yucca Mountain repository?
A. I don't know.
Q. Is the effect of including the EIS -- including GTCC in a section of the EIS, does that keep open the -- or otherwise reserve the potential for GTCC being disposed of in the repository?
MS. HERRMANN: Objection, foundation, speculation, calls for a legal conclusion.

A. No.

Q. Why include it at all?

MS. HERRMANN: Same objections.

A. Environmental impact statement is a public document and typically the Department tries to be complete in its presentation of the issues, and I believe my best guess as to why that was included is an attempt to be complete.

Q. Complete in what sense?

A. Complete in the sense that you have discussed all the issues surrounding the environmental impacts of Yucca Mountain.

Q. Did you have any involvement in preparing the EIS?

A. No.

Q. Did you have any -- did you do any work with respect to GTCC into the EIS?

A. No.

Q. Did you have any discussions with anyone at OCRWM about why GTCC was included in the EIS?

A. Not that I remember.