IN THE UNITED STATES COURT OF FEDERAL CLAIMS
- - - - - - - - - - - - - - - - - - - - - -x
YANKEE ATOMIC ELECTRIC COMPANY :
(98-126C)(Merow, S.J.) :
CONNECTICUT YANKEE ATOMIC POWER COMPANY :
(98-154C)(Merow, S.J.) :
FLORIDA POWER & LIGHT COMPANY :
(98-483C)(Wilson, J.) :
NORTHERN STATES POWER COMPANY :
(98-484C)(Wiese,J.) :
DUKE POWER, A Division of :
DUKE ENERGY CORP. CERTIFIED COPY
(98-485C)(Sypolt,J.) :
INDIANA MICHIGAN POWER COMPANY :
(98-486C)(Hodges, J.) :
SACRAMENTO MUNICIPAL UTILITY DISTRICT :
(98-488C)(Yock, S.J.) :
SOUTHERN NUCLEAR OPERATING COMPANY, :
et al. :
(98-488C)(Yock, S.J.) :
COMMONWEALTH EDISON COMPANY :
(98-621C)(Hewitt, J.) :
BOSTON EDISON COMPANY :
(99-447C)(Allegra, J.) :
GPU NUCLEAR, INCORPORATED :

(00-440C) (Bush, J.) :
WISCONSIN ELECTRIC POWER COMPANY :
(00-697C) (Merow, S.J.) :
POWER AUTHORITY OF THE STATE OF NEW YORK :
(00-703C) (Damich, J.) :
OMAHA PUBLIC POWER DISTRICT :
(01-115C) (Bush, J.) :
NEBRASKA PUBLIC POWER DISTRICT :
(01-116C) (Sypolt, J.) :
TENNESSEE VALLEY AUTHORITY :
(01-249C) (Bruggink, J.) :
Plaintiffs, :
v. :Discovery
THE UNITED STATES, :Judge:
Defendant. : (Judge
- - - - - - - - - - - - - - - - - - - - -xSypolt).

McLean, Virginia
Wednesday, May 1, 2002

Deposition of RONALD A. MILNER, a witness, called for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to notice, the witness being duly sworn by CATHERINE S. BOYD, a Notary Public in and for the Commonwealth of Virginia, taken at the offices of Shaw Pittman, LLP, 1650 Tysons

A. Um-hm.

Q. And you disagree that that was an intention of DOE at or about this time?

MR. SHULTIS: Objection. Mischaracterizes the prior testimony.

Calls for calls for a legal conclusion.

BY MR. TOMASZCZUK:

Q. I didn't mean to mischaracterize your testimony.

I understood it to be that you did not agree with that statement.

A. I did not recall that that was a goal at that time.

Q. Okay. Having read it, do you now recall that that was a goal?

A. I don't recall whether that language was in the final Mission Plan.

Q. Okay. Even if it wasn't, was that a goal of DOE at or about this time?

MR. SHULTIS: Objection -- asked and answered.

THE WITNESS: I don't recall it.

BY MR. TOMASZCZUK:

Q. The text of this paragraph goes on to

state subsequently, the acceptance rate will be equal to or greater than the actual discharge rate of spent fuel each year.

At or about this time, did DOE intend that the acceptance rate would be equal to or greater than the actual discharge rate of spent fuel each year?

MR. SHULTIS: Objection. Calls for a legal conclusion.

Also Mr. Milner is not a 30(b)(6) witness.

THE WITNESS: I didn't recall that.

BY MR. TOMASZCZUK:

Q. The next page of this document, 2-2, under the heading waste acceptance schedule, and this paragraph states that the department has prepared a waste acceptance schedule which specifies in the aggregate the quantities of commercial nuclear waste that the program will accept beginning in 1998.

This schedule is presented in Table 2-1, and then turning to Table 2-1 whenever you're ready --

(The witness reviewed the document.)

BY MR. TOMASZCZUK:

A. Correct.

Q. And why do you think the data would have come from that office?

A. That was the organization specifically responsible for repository planning.

Q. Now that office doesn't exist at least in that name anymore today, does it?

A. No, it does not.

Q. Looking at Milner 2, can you tell me where within the organization it appears?

A. The closest semblance to that organization would be in Exhibit 2 what's labeled the Yucca Mountain site characterization office.

Q. That's the office today that's responsible for, primarily responsible for the design of the geologic repository?

A. That's correct.

Q. And that office reports to you, does it not?

A. Yes, it does.

Q. And do you know what that office's plans are with respect to the design of the geologic repository at Yucca Mountain insofar as spent nuclear fuel acceptance rates are

concerned?

MS. HERRMANN: Objection -- vague.

THE WITNESS: Yes, I do.

BY MR. TOMASZCZUK:

Q. And can you tell me?

A. Yes -- receipt at the rate of 400 metric tons in the first year, 600 in the second, 900 in the third, and ramping up.

Q. Four hundred in the first, 600 in the second, 900 in the third, and then what happens after the third year?

A. Then I believe it goes to 1200.

Q. And does it stay at 1200, or does it increase beyond that?

A. It increases beyond that. I believe it increases to 2000.

Q. And does it stay at 2000 or increase or decrease?

A. I don't recall.

Q. So your, your understanding is that the geologic repository that's currently being planned at Yucca Mountain envisions spent nuclear fuel acceptance rate of 2000 metric tons in its fifth year of operation?

A. That's my recollection.

A. To my understanding, yeah.
Q. Was it your understanding that the ACR was intended to lead to contractually binding waste acceptance commitments starting in 1992?
MS. HERRMANN: Objection. Calls for a legal conclusion.
THE WITNESS: My recollection is not so much the timeframe, but yes, they would lead to a binding commitment.
BY MR. TOMASZCZUK:
Q. At the time the ACR was issued, was it binding?
MS. HERRMANN: Objection. Calls for a legal conclusion.
THE WITNESS: My personal opinion was that no, it was not.
As indicated here, it was for planning purposes.
BY MR. TOMASZCZUK:
Q. But the ACR issued for planning purposes in your understanding would lead to a mutually binding commitment on the parties?
MS. HERRMANN: Objection. Calls for a legal conclusion.
THE WITNESS: That would have been my

understanding.

BY MR. TOMASZCZUK:

Q. And is your understanding today?

A. Yes.

(There was a pause in the proceedings.)

MR. TOMASZCZUK: Let's mark as Milner Exhibit 12 the Annual Capacity Report dated June 1987.

(Milner Exhibit No. 12 was marked for identification.)

BY MR. TOMASZCZUK:

Q. Actually, Mr. Milner, before I ask you about that, I had a couple of questions on the OCRWM Executive Committee I forgot to ask you about.

Were there any minutes of the meetings of that committee do you know?

MS. HERRMANN: Objection -- foundation, speculation.

THE WITNESS: None that I can recall. I simply don't know on that one actually.

BY MR. TOMASZCZUK:

Q. Do you know insofar as the meetings

Q. Do you know on what they're based?
A. No, I don't.
Q. Who would know?
A. I don't know.
Q. Is there any basis for them?
MS. HERRMANN: Objection -- vague.
THE WITNESS: I don't know what they're based on.
I don't know.
BY MR. TOMASZCZUK:
Q. Do you know what a utility was to do with this information when it received it from DOE in or about June of 1987?
MS. HERRMANN: Objection. Calls for a legal conclusion.
THE WITNESS: I think the purpose was to provide some information for planning purposes.
BY MR. TOMASZCZUK:
Q. Now the rates were not binding on DOE, is that right?
MS. HERRMANN: Objection. Calls for a legal conclusion.
THE WITNESS: That would be my understanding.

BY MR. TOMASZCZUK:

Q. Were they binding on the purchasers?

MS. HERRMANN: Same objection.

THE WITNESS: I'm not sure I understand that question.

BY MR. TOMASZCZUK:

Q. You understand my question that they were not binding on DOE, but you don't understand my question, which is the same question, as to whether or not they were binding on the purchasers?

A. That's correct.

MS. HERRMANN: Objection -- vague.

BY MR. TOMASZCZUK:

Q. What about it don't you understand?

A. I don't know how a receipt rate would be binding on a utility since this is an aggregate rate.

Q. Would the receipt rate be binding in the aggregate on nuclear utilities?

MS. HERRMANN: Objection. Calls for a legal conclusion.

THE WITNESS: I don't believe it would.

(There was a pause in the

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
- - - - - - - - - - - - - - - - - - - - -x
YANKEE ATOMIC ELECTRIC COMPANY :
(98-126C)(Merow, S.J.) :
CONNECTICUT YANKEE ATOMIC POWER COMPANY :
(98-154C)(Merow, S.J.) :
FLORIDA POWER & LIGHT COMPANY :
(98-483C)(Wilson, J.) :
NORTHERN STATES POWER COMPANY :
(98-484C)(Wiese,J.) :
DUKE POWER, A Division of :
DUKE ENERGY CORP. ORIGINAL :
(98-485C)(Sypolt,J.) :
INDIANA MICHIGAN POWER COMPANY :
(98-486C)(Hodges, J.) :
SACRAMENTO MUNICIPAL UTILITY DISTRICT :
(98-488C)(Yock, S.J.) :
SOUTHERN NUCLEAR OPERATING COMPANY, :
et al. :
(98-488C)(Yock, S.J.) :
COMMONWEALTH EDISON COMPANY :
(98-621C)(Hewitt, J.) :
BOSTON EDISON COMPANY :
(99-447C)(Allegra, J.) :
GPU NUCLEAR, INCORPORATED :

(00-440C)(Bush, J.) :
WISCONSIN ELECTRIC POWER COMPANY :
(00-697C)(Merow, S.J.) :
POWER AUTHORITY OF THE STATE OF NEW YORK :
(00-703C)(Damich, J.) :
OMAHA PUBLIC POWER DISTRICT :
(01-115C)(Bush, J.) :
NEBRASKA PUBLIC POWER DISTRICT :
(01-116C)(Sypolt, J.) :
TENNESSEE VALLEY AUTHORITY :
(01-249C)(Bruggink, J.) :
Plaintiffs, :
v. :Discovery
THE UNITED STATES, :Judge:
Defendant. :(Judge
- - - - - - - - - - - - - - - - - - - - -xSypolt)

McLean, Virginia
Thursday, May 2, 2002

Continued deposition of RONALD A. MILNER, a witness, recalled for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to notice, the witness being duly sworn by CATHERINE S. BOYD, a Notary Public in and for the Commonwealth of Virginia, taken at the offices of Shaw Pittman, LLP, 1650 Tysons

appears on this second page next to the third paragraph and in the third paragraph?
A. It does not appear to be my handwriting, no.
Q. You understand what I'm asking you about?
A. Yes.
Q. The marginalia there?
A. Yes.
Q. Turning back to the discussion set forth in the memo at the first page, second paragraph starts off by saying publication of the APR begins the contractually binding waste acceptance process system.
Is that a true statement in your view?
A. In my view, yes.
MS. HERRMANN: Objection. Calls for a legal conclusion.
BY MR. TOMASZCZUK:
Q. The next sentence says the ACR will be used in conjunction with waste acceptance rates to be published in the 1991 Annual Capacity Report as the basis for purchasers to submit Delivery Commitment Schedules beginning in January 1992 for the department's approval.

Do you know who made the decision to use the 1991 ACR as the basis for purchasers to submit Delivery Commitment Schedules?

A. No, I don't.

Q. Did you make that decision?

MS. HERRMANN: Objection -- asked and answered.

BY MR. TOMASZCZUK:

Q. Did I just ask you that question? I'm sorry if I did.

I thought I asked you if you knew who did, but maybe I misspoke.

Do you know who made the decision to use the 1991 ACRs as the basis for purchasers to submit Delivery Commitment Schedules?

A. No, I don't.

Q. Would Mr. Brownstein have made that decision, or would that have been somebody higher up in the chain than him?

MS. HERRMANN: Objection -- asked and answered.

He told you he doesn't know.

MR. TOMASZCZUK: I asked him a different question.

THE WITNESS: I don't know who would

have made the decision.
Could have been Mr. Brownstein. Could have been the director of the program. Could have been the deputy director of the program.
BY MR. TOMASZCZUK:
Q. You have absolutely no recollection?
A. I have no recollection.
Q. Could it have been a contractor?
A. No, sir.
MS. HERRMANN: Asked and answered.
BY MR. TOMASZCZUK:
Q. It would have had to have been somebody within DOE?
A. That's correct.
MS. HERRMANN: Same objection.
BY MR. TOMASZCZUK:
Q. The last sentence of that paragraph says in turn, purchasers will have the opportunity to exchange approved DCSs also subject to departmental approval.
Was that an accurate statement of the department's position at the time with respect to the exchange of DCSs?
MS. HERRMANN: Objection -- foundation.

Mr. Milner is not a 30(b)(6) witness.

THE WITNESS: In my opinion, that was an accurate statement.

BY MR. TOMASZCZUK:

Q. The next paragraph states in part it is of utmost importance that the information on which the APR is based is accurate and not subject to continual modification.

Why was that of the utmost importance?

A. Well, since the APR played a role in the, an important role in the binding waste acceptance process, if the information that, upon which that was based was not accurate, the APR would not be accurate, the process would not be accurate.

MR. TOMASZCZUK: Want to take a break?

MS. HERRMANN: Sure.

(A recess was taken.)

MR. TOMASZCZUK: Back on the record.

BY MR. TOMASZCZUK:

Q. Mr. Milner, on Exhibit 37, there is a reference in the first page in the second paragraph to a contractually binding waste acceptance process.

Do you see that?

A. Yes.

Q. What is your understanding of that term?

MS. HERRMANN: Objection. Calls for a legal conclusion.

THE WITNESS: My own understanding of it is that begin the process using priority ranking, capacity reporting.

Ultimately utilities would submit and have approved a Delivery Commitment Schedule which would have been the binding agreement.

BY MR. TOMASZCZUK:

Q. Binding on both the government and the utility?

A. Correct.

MS. HERRMANN: Same objection.

BY MR. TOMASZCZUK:

Q. And that understanding that you just articulated is based on your review of the contract, or some other source of information?

A. It would have originally stemmed from my review of the contract, yes.

Q. And have you discussed that view with others at OCRWM?

A. I can't specifically recall, but yes,

I'm sure I did.
Q. Do you recall the details of any such discussions?
A. No. No, I don't.
MR. TOMASZCZUK: Ms. Reporter, I would like to mark as Exhibit 38 a memorandum from W.A. Lemeshewsky dated August 14th, 1991.
Subject is coordination of system through-put rate study.
And then let's also mark at this time as Milner Exhibit 39, a memorandum dated August 30, 1991, by Ronald A. Milner; subject, comments on scenarios for system through-put rate study.
(Milner Exhibits Nos. 38 & 39 were marked for identification.)
BY MR. TOMASZCZUK:
Q. Mr. Milner, do you recall either of these two documents?
A. No, I don't.
Q. It appears to me that some time between April and August of 1991, you left the position of acting associate director for storage and transportation and became the associate director for storage and

transportation?

A. I guess that's true. That sounds like the right timeframe.

Q. All right. At or about this time, were you still working on the MRS team?

A. No.

Q. You had stopped working on the MRS team?

A. That's correct.

Q. As of August 1991?

A. That's correct.

Q. How do you know that?

A. In essence, when, I believe even when I became acting associate director, the MRS team was essentially disbanded, embodied in the storage and transportation group.

Q. Do you know when you became acting director or acting associate director I should say?

A. I don't recall specifically.

Q. All right.

(There was a pause in the proceedings.)

BY MR. TOMASZCZUK:

Q. The second paragraph or second

sentence of your memo dated August 30, 1991, says in pertinent part, "In addition, we have a more general concern that some of the scenarios proposed, while potentially interesting to study, are significantly at odds with current program assumptions, and if taken out of context could be interpreted as evidence of changes in program positions."

And my question, Mr. Milner, is what does that mean?

MS. HERRMANN: Objection -- foundation.

THE WITNESS: Well, I don't recall specifically, but reading further, it appears that some of the scenarios they were studying had a repository start date of much later than 2010.

BY MR. TOMASZCZUK:

Q. And that caused you concern because such positions would be at odds with the then current program assumptions?

A. Yes.

Q. The end of this first paragraph, you state scenarios which suggest removal of the statutory limits on MRS or repository capacity

should also be approached with caution.
Why did you say that?
MS. HERRMANN: Objection -- foundation.
THE WITNESS: Well, the best of my recollection, I believe at that point in time, we were discussing probably several different entities, possibility of one of them volunteering to host the MRS facility, and things such as the statutory limits, the capacity of an MRS were thrown out as items for negotiation, so I would have felt that that was not appropriate to automatically assume that that capacity would be raised.
BY MR. TOMASZCZUK:
Q. Were you concerned that it might adversely affect sensitive negotiations which were then ongoing?
A. Yes.
Q. The memo then goes on to state we would also suggest a more careful look at the issue of the ramp-up rates to be used at the MRS facility as that is the near-term driver for our system requirements.
What ramp-up rates were you suggesting

needed to be looked at more carefully?
MS. HERRMANN: Objection -- foundation.
THE WITNESS: I would assume that I was referring to ramp-up rates in the August 14th memo.
I don't know what they were offhand.
BY MR. TOMASZCZUK:
Q. Can you look at the memo and identify for me what you were suggesting needed to be looked at more carefully?
A. Which memo?
Q. The memo from Mr. Lemeshewsky on which you're, as I understand it, providing comments.
(The witness reviewed the document.)
THE WITNESS: Potentially it was MRS acceptance rates shown on HQR-0593236.
BY MR. TOMASZCZUK:
Q. You're referring to the second bullet on that page, MRS annual acceptance rate limit?
A. Correct.
Q. Start at 1430 and then go to 6,000?
A. Correct.
Q. Those limits were at least at the upper end higher than the limits we have seen in

Mr. Milner is not a 30(b)(6) witness.

THE WITNESS: In my opinion, that was an accurate statement.

BY MR. TOMASZCZUK:

Q. The next paragraph states in part it is of utmost importance that the information on which the APR is based is accurate and not subject to continual modification.

Why was that of the utmost importance?

A. Well, since the APR played a role in the, an important role in the binding waste acceptance process, if the information that, upon which that was based was not accurate, the APR would not be accurate, the process would not be accurate.

MR. TOMASZCZUK: Want to take a break?

MS. HERRMANN: Sure.

(A recess was taken.)

MR. TOMASZCZUK: Back on the record.

BY MR. TOMASZCZUK:

Q. Mr. Milner, on Exhibit 37, there is a reference in the first page in the second paragraph to a contractually binding waste acceptance process.

Do you see that?

A. Yes.

Q. What is your understanding of that term?

MS. HERRMANN: Objection. Calls for a legal conclusion.

THE WITNESS: My own understanding of it is that begin the process using priority ranking, capacity reporting.

Ultimately utilities would submit and have approved a Delivery Commitment Schedule which would have been the binding agreement.

BY MR. TOMASZCZUK:

Q. Binding on both the government and the utility?

A. Correct.

MS. HERRMANN: Same objection.

BY MR. TOMASZCZUK:

Q. And that understanding that you just articulated is based on your review of the contract, or some other source of information?

A. It would have originally stemmed from my review of the contract, yes.

Q. And have you discussed that view with others at OCRWM?

A. I can't specifically recall, but yes,

THE WITNESS: I would have to estimate 40 to 30 -- 30 to 40 percent of my time.

BY MR. TOMASZCZUK:

Q. And that level of activity continued until when?

A. Probably some time later, until 1992 perhaps.

I don't recall precisely -- approximately six months after the administration changed.

Q. When you say the administration changed, you're referring to a Presidential election?

A. Correct.

Q. So six months after a November election roughly?

A. Roughly six months after a January swearing in.

Q. Okay.

A. But very approximate.

(There was a pause in the proceedings.)

BY MR. TOMASZCZUK:

Q. In this memo, under the heading discussion, the last sentence of the first

paragraph states the ACR applies a waste acceptance rate to the APR resulting in individual allocations to the contract holders of FWMS capacity.

Do you know who made the decision to utilize the ACR, in this instance, the 1991 ACR, to apply a waste acceptance rate to the APR?

A. I don't know that there was an individual that made that decision.

It was the process basically. The ACR was simply an annual capacity of the system's acceptance, an estimate without regard to which utilities were first, second and so forth, and how much was the first utility going to deliver and so forth, so as this indicates, the capacities listed in the ACR were applied to the priority ranking in the APR.

The result was that you had a priority listing by utility and by fuel quantity in the different years what the estimated acceptance rate would be.

Q. The memo goes on to state at the bottom of the page, the last paragraph, the 1991 ACR differs from the previously published ACRs for two reasons. First, while the information

now.

MR. TOMASZCZUK: Ms. Reporter, can we mark as Milner Exhibit 41 the 1991 -- give me just a minute. I want the 1991 ACR, but I will need a moment.

THE WITNESS: Okay.

(There was a pause in the proceedings.)

MR. TOMASZCZUK: While we're waiting, why don't we go ahead and use the 1991 and have marked the 1991 APR.

This should be marked as Milner 41.

(Milner Exhibit No. 41 was marked for identification.)

BY MR. TOMASZCZUK:

Q. Mr. Milner, are you familiar with what has been marked as Milner deposition Exhibit 41, the 1991 APR?

A. In general terms, yes.

Q. Was your office responsible for preparing and issuing this?

A. I believe it was.

Q. And what was the purpose of this document?

MS. HERRMANN: Objection -- vague.
THE WITNESS: It was essentially to inform the utilities, inform the utilities of --
BY MR. TOMASZCZUK:
Q. Thank you.
A. Determination as to who would be first, second, third, what the queue would be.
Q. And the discharge data that you were at one time familiar with is contained in this document?
A. These are the actual discharges, yes.
Q. As opposed to projected discharges?
A. Correct.
Q. And how were the projected discharge, how was the projected discharge information compiled by OCRWM or DOE?
MS. HERRMANN: Objection -- foundation.
THE WITNESS: It was compiled from data provided on a form called RW-859 provided by the utilities, individual utilities.
BY MR. TOMASZCZUK:
Q. And on that form, utilities were asked to project their discharge information into the future?

Q. And the same question with respect to 1999 -- the number 600 represents the amount of spent nuclear fuel in the aggregate that would have been or would have had to have been placed in dry storage?

A. No. The number would have been less than 600.

Q. 599 or less?

A. I don't recall what the projections were.

Q. Do you know whether this table is based on any assumptions with respect to reracking?

MS. HERRMANN: Objection -- vague.

THE WITNESS: No, I don't know.

(There was a pause in the proceedings.)

BY MR. TOMASZCZUK:

Q. Can I ask you to look at the ACR, the summary page, Mr. Milner?

(The witness reviewed the document.)

BY MR. TOMASZCZUK:

Q. The end of the first paragraph indicates that the 1991 ACR applies the waste acceptance rates in Table 2.1 to the 1991 APR,

resulting in individual purchaser allocations, right?
A. Correct.
Q. And then further down this paragraph, or in the next paragraph about three quarters of the way down it's stated the annual acceptance rates provide an approximation of the system through-put and are subject to change as the program progresses, correct?
A. Correct.
Q. So that seems to be saying that the rates in the ACR are subject to change?
A. It would seem to say that, yes.
Q. And if that is so, would that not impact the APR?
A. I don't believe it would impact the APR since that was simply a priority ranking.
Q. Well, isn't the 1991 ACR used to develop the allocations in the APR?
A. The allocations I believe to be used for DCS.
Q. Well, I'm sorry. Go back and look at the sentence at the bottom of the first paragraph starting the 1991 ACR applies the waste acceptance rates in Table 2.1 to the 1991

APR.
A. Um-hm.
Q. Resulting in individual purchaser allocations -- what do you understand that sentence to be, to mean?
A. I understand that to mean that it takes the, the priority ranking which is contained in the APR and blends that with the capacity rates contained in the ACR to come up with a priority ranking that does have annual capacities by utility.
Q. All right.
A. Annual acceptance rates by utility.
Q. And if the rates in the ACR change, doesn't that necessarily mean that the APR is subject to change also?
MS. HERRMANN: Objection -- asked and answered.
MR. TOMASZCZUK: Well, it's been asked. I'm not sure it's been answered.
THE WITNESS: Priority doesn't change even if the acceptance rate changes.
Utility that's first in line is still first in line even if the rates change.
BY MR. TOMASZCZUK:

the system to the priority ranking and the APR, resulting in individual allocations for the owners and generators expressed in metric tons of uranium.

Do you have an understanding of what is meant by the phrase nominal acceptance rates in that sentence.

A. No. I don't know.

Q. Did you have any discussions with any OCRWM employees concerning what was meant by that phrase nominal acceptance rates?

A. Not that I recall.

Q. The last sentence of this paragraph states as specified in the standard contract, the ACR is for planning purposes only and thus is not contractually binding on either DOE or the purchasers, right?

That's what it says?

A. That's correct.

Q. Did I understand your testimony earlier, Mr. Milner, to be that the DCSs represented a binding commitment of the parties?

A. That was my opinion, yes.

Q. And the DCSs as indicated by this paragraph, are based on the capacity allocations

as listed in the ACR, right?
A. Correct.
Q. Can you explain to me how it is that if the ACRs which form the basis for the DCSs are not binding, that the DCSs are binding?
MR. SHULTIS: Objection. Calls for a legal opinion.
THE WITNESS: The DCSs were submitted by the utilities to the department based upon the information in the ACR, the allocations.
Then the department would either approve or disapprove those, and if approved, then in my opinion, that became a binding agreement.
A utility could certainly choose to submit a DCS which reflected lower amounts than were contained in the ACR.
BY MR. TOMASZCZUK:
Q. Is there any reason of which you're aware why a utility would do that?
A. None that I know of.
Q. Wouldn't it be in the utility's interest to try and put as much fuel as they could in the DCS to get that fuel moved off site?

MR. SHULTIS: Calls for speculation.

THE WITNESS: If I were a utility fuel manager, I would have.

BY MR. TOMASZCZUK:

Q. Can I ask you to look back at the DCS instructions?

We looked at those this afternoon -- 43.

And in particular, I was going to ask you to look at, Mr. Milner, paragraph 7C.

(The witness reviewed the document.)

BY MR. TOMASZCZUK:

Q. And this paragraph reflects in the first sentence that the rates in the ACR provide an approximation and are for planning purposes, right?

A. Correct.

Q. And then the next sentence, there is an assumption stated that the waste management system will begin acceptance of spent nuclear fuel in 1998, correct?

A. Correct.

Q. And then there is this third sentence in the event that such circumstances change, all DCSs previously approved by DOE may need to be

re-evaluated by DOE and the purchasers.
What was meant by that?
MR. SHULTIS: Objection. Calls for speculation.
THE WITNESS: Well, the program and the department position had always been that acceptance of spent fuel was conditioned upon having the facility available to accept it, and if those conditions changed, DCSs would have to be re-evaluated in terms of start of acceptance.
BY MR. TOMASZCZUK:
Q. So if circumstances changed, the DCSs wouldn't be binding?
MR. SHULTIS: Objection. Calls for a legal conclusion.
THE WITNESS: If there was no facility available to accept the fuel in 1998, which ultimately there was not, then yes, they would have to be re-evaluated.
BY MR. TOMASZCZUK:
Q. Do you know whether the Delivery Commitment Schedules once approved were subject to adjustment plus or minus 20 percent in final delivery schedules?
A. I don't recall that. I simply don't

BY MR. TOMASZCZUK:

Q. I'll delete the reference to the contract in my question.

The DCS spent nuclear fuel information could be adjusted plus or minus 20 percent, right.

A. This is what I read in the contract, that's correct.

Q. Fine. Mr. Milner, were you surprised to see that reference in the contract?

A. That I did not recall it, yes.

Q. Does it change your view about the binding commitment reflected in the DCS?

MR. SHULTIS: Objection. Calls for a legal conclusion.

THE WITNESS: I guess in my interpretation of a commitment, not necessarily.

I think my interpretation of the delivery commitment was that it was a best estimate, good-faith commitment on the quantity and timing, and as I read this, neither the department nor the purchaser -- well, okay -- just the purchaser can adjust it up or down, so it's his option.

I guess I would interpret that to mean

it's less binding on the utility than it was on the department.

BY MR. TOMASZCZUK:

Q. There is a discussion, Mr. Milner, at the second page of the '95 APR and ACR which I want to direct your attention to.

And in particular, ask you to look at the paragraph that begins at the bottom of page 2, and it would appear to suggest that there was a delay in issuing the '93 ACR and APR, right?

A. Apparently so.

Q. And were you, do you have any knowledge as to why that '93 ACR and APR was delayed?

A. No, I don't.

Q. But in any event, the text goes on to indicate that that information was, is combined with this '95 APR/ACR, right?

A. That's correct.

Q. And it goes on to state that the department has decided to, in the interests of easing its administrative burdens, it has decided to issue a consolidated APR/ACR report for '94 and subsequent years?

A. Correct.