it's less binding on the utility than it was on the department.

BY MR. TOMASZCZUK:

Q. There is a discussion, Mr. Milner, at the second page of the '95 APR and ACR which I want to direct your attention to.

And in particular, ask you to look at the paragraph that begins at the bottom of page 2, and it would appear to suggest that there was a delay in issuing the '93 ACR and APR, right?

A. Apparently so.

Q. And were you, do you have any knowledge as to why that '93 ACR and APR was delayed?

A. No, I don't.

Q. But in any event, the text goes on to indicate that that information was, is combined with this '95 APR/ACR, right?

A. That's correct.

Q. And it goes on to state that the department has decided to, in the interests of easing its administrative burdens, it has decided to issue a consolidated APR/ACR report for '94 and subsequent years?

A. Correct.

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - - - - - x

YANKEE ATOMIC ELECTRIC COMPANY, (98-126C) :
CONNECTICUT YANKEE ATOMIC POWER COMPANY (98-154C) :
MAINE YANKEE ATOMIC POWER COMPANY (98-474C) :
FLORIDA POWER & LIGHT COMPANY (98-483C) :
NORTHERN STATES POWER COMPANY (98-484C) :
DUKE POWER, A Division of DUKE ENERGY CORP. (98-485C) :
INDIANA MICHIGAN POWER COMPANY (98-486C) :
SACRAMENTO MUNICIPAL UTILITY DISTRICT (98-488C) :
SOUTHERN NUCLEAR OPERATING COMPANY, et al., (98-614C) :
COMMONWEALTH EDISON COMPANY (98-621C) :
BOSTON EDISON COMPANY (99-447C) :
GPU NUCLEAR, INCORPORATED (00-440C) :
WISCONSIN ELECTRIC POWER COMPANY, (00-697C) :
POWER AUTHORITY OF THE STATE OF NEW YORK (00-703C) :
OMAHA PUBLIC POWER DISTRICT (01-115C) :
NEBRASKA PUBLIC POWER DISTRICT (01-116C) :
TENNESSEE VALLEY AUTHORITY (01-249C) :

Plaintiffs, :

v. :

UNITED STATES OF AMERICA, :

Defendant. :

- - - - - - - - - - - - - - - - - - - - x

Certified Copy

Washington, D.C.

Friday, May 3, 2002

Continued Deposition of RONALD MILNER, a witness herein, called for examination by counsel for

A. Not this specific language. I have reviewed it after the contract was final, after the registered notice was final.

Q. You're familiar with the concept of the Department having the right to grant priority to shut down reactors?

MR. SHULTIS: Objection as to characterization.

THE WITNESS: I'm familiar with that, yes.

BY MR. NESLIN:

Q. It states here that, in the second sentence, this type of priority is necessary to prevent reactors from waiting 20 or 30 years to be commissioned -- decommissioned after they've finished generating electricity. Do you understand that DOE had a goal of avoiding reactors from experiencing such delays?

MR. SHULTIS: Objection, Mr. Milner is not a 30(b)(6) witness.

THE WITNESS: My recollection was that the Department preferred not to prohibit giving priority to shutdown reactors.

BY MR. NESLIN:

Q. Well, this paragraph states that certain commenters had recommended that a provision allowing

for such priority be deleted, that the Department had not accepted that recommendation because again it states that this type of priority is necessary to prevent reactors from waiting 20 or 30 years to be decommissioned after they finish generating electricity.

And, again, my question is, was avoiding that kind of delay a goal or objective of the Department?

MR. SHULTIS: Objection, same objection.

THE WITNESS: No, and again, my recollection of the situation is that the Department preferred not to preclude the ability to give some priority to shutdown reactors. But of course we are reading from the preamble to the rule and discussing how comments were addressed.

BY MR. NESLIN:

Q. That's correct. Did the Department have any interest in the timely decommissioning of shutdown reactors?

A. It did.

MR. SHULTIS: Same objection.

BY MR. NESLIN:

Q. That was an interest of the Department's?

A. It was an interest, yes.

Q. The Department, would it be fair to say that the Department had an objective of allowing shutdown reactors to decommission in a timely manner?

MR. SHULTIS: Same objection.

THE WITNESS: Well, again, I think it was more a case that the Department preferred not to preclude that ability.

BY MR. NESLIN:

Q. What do you mean by not preclude that ability?

A. The Department did not as I recall have an objective to give priority to shutdown reactors, it simply preferred not to preclude that ability in the future.

Q. My question isn't about asking granting priority, my question is simply did the Department have an objective of allowing shutdown reactors to decommission in a timely manner?

MR. SHULTIS: Same objection.

THE WITNESS: It did, yes.

BY MR. NESLIN:

Q. And would that remain an objective of the Department's today?

A. I believe so.

Q. If we could turn to page 16606, do you see

capacity for the indicated delivery years.

Is that accurate in your opinion?

A. In my opinion, yes.

Q. The Department would evaluate an exchange request with reference to the systems transportation capabilities?

MR. SHULTIS: Objection, Mr. Milner is not 30(b)(6) witness.

THE WITNESS: In my opinion, yes.

BY MR. NESLIN:

Q. And the system's acceptance capacity for the year in question?

MR. SHULTIS: Same objection.

THE WITNESS: Correct.

BY MR. NESLIN:

Q. Do you recall discussing with others at the Department what criteria that the Department would use in reviewing exchange requests?

A. I don't recall any specific discussions, certainly there were issues that you would have to look at for an exchange request, and I think reading further on in this proposed position statement gives an indication of some of them. If one utility with an approved DCS was intending to ship 20-year-old fuel and an exchange request came through where

another utility was going to ship five-year-old fuel, that would certainly make a difference in our transportation abilities.

Q. And why is that?

A. Younger fuel, hotter fuel.

Q. So that would be a consideration that DOE would look at?

A. Correct.

MR. SHULTIS: Objection, Mr. Milner is not a 30(b)(6) witness.

BY MR. NESLIN:

Q. But the fact that the fuel might involve different ages wouldn't preclude an exchange from being proposed?

MR. SHULTIS: Same objection.

THE WITNESS: Well, in my opinion it wouldn't necessarily preclude it. In the example I gave it could certainly affect the quantity at any one time.

BY MR. NESLIN:

Q. And the fact that -- I didn't wish to cut you off?

A. Using a hypothetical case if the Department had one transport cask available at the time, an unlikely situation, and all of a sudden a

A. No.

(Milner Exhibit No. 53 was marked for identification.)

BY MR. NESLIN:

Q. Mr. Milner, you've been handed what's Exhibit 53 to your deposition. This is a March 31st, 1994 letter from James Blandford to you. And an attachment consisting of a preliminary draft of a document captioned, DCS Exchange Network, Software Recommendation.

Are you familiar with this document?

A. I don't recall it specifically, no.

Q. Cover letter states that the attached report provides a recommendation for software on the DCS Exchange Network which will be a computer-based, menu-driven system providing information on approved Delivery Commitment Schedules for their use in assessing opportunities for DCS exchanges with other purchasers.

Do you recall the DOE or its contractors doing any work on a DCS exchange network?

A. What I recall is in general terms a program considering whether or not it should take an active role in encouraging exchanges or simply react to utility requests. And if it ultimately chose to

take an active role, how might that be accomplished.
Q. Who at the Department was involved in that
consideration?
A. Well, I guess it would have been myself,
members of my staff, the director of the program.
Q. Who on your staff?
A. At this point in time, Alan Brownstein, I
see two staff members, one name crossed out and the
other one, I can't recall what point in time which
one left or which one was there, but one of the two,
either Nancy Slater or Mary Payton were staff
members.
Q. Anyone else?
A. Not that I can recall offhand.
Q. During what period would the Department
have been considering this question?
A. In March 31st, 1994.
Q. Do you, sitting here today do you recall
over what period of time that consideration extended?
A. No, I don't.
Q. And did the Department reach a decision as
to whether it should take an active role in
encouraging exchanges or simply respond to utilities?
MR. SHULTIS: Objection, Mr. Milner's not
a 30(b)(6) witness.

take an active role, how might that be accomplished.

Q. Who at the Department was involved in that consideration?

A. Well, I guess it would have been myself, members of my staff, the director of the program.

Q. Who on your staff?

A. At this point in time, Alan Brownstein, I see two staff members, one name crossed out and the other one, I can't recall what point in time which one left or which one was there, but one of the two, either Nancy Slater or Mary Payton were staff members.

Q. Anyone else?

A. Not that I can recall offhand.

Q. During what period would the Department have been considering this question?

A. In March 31st, 1994.

Q. Do you, sitting here today do you recall over what period of time that consideration extended?

A. No, I don't.

Q. And did the Department reach a decision as to whether it should take an active role in encouraging exchanges or simply respond to utilities?

MR. SHULTIS: Objection, Mr. Milner's not a 30(b)(6) witness.

THE WITNESS: I don't recall the Department ever actually taking a position. In essence it became a moot point because we never received a request.

BY MR. NESLIN:

Q. And is it your understanding that you never received a request in part because of the uncertainties that arose in the 1990s as to when a repository would become operational?

MR. SHULTIS: Objection, calls for speculation.

THE WITNESS: I have no such understanding.

BY MR. NESLIN:

Q. Do you believe that, is it your opinion that the uncertainties and delays associated with the start-up date for a repository had no effect on utilities' actions in deciding whether to submit exchange requests?

MR. SHULTIS: Same objection.

THE WITNESS: No, I don't have that opinion. I have no idea why none were submitted.

BY MR. NESLIN:

Q. In considering how the Department might take an active role, what sorts of actions did you

consider?
A. I recall maintaining a list of approved DCS's and looking at that list versus utilities which we might be aware were running out of pool space which had a lower priority ranking than another which had sufficient pool space.
And, you know, the potential of in essence brokering something between the two utilities.
Q. And do you recall any consideration of developing a computerized system for providing information among utilities on approved DCSes?
A. I do now reading this.
Q. But you don't have any independent recollection beyond this document?
A. No, I don't.
Q. If I could turn you to the first page of the attached draft report. Do you know whether this report was ever finalized?
A. I don't recall whether it was or not. In any event this is a contractor report which would never relate to a position the Department took, simply input data to it.
Q. You say it would never relate to a position?
A. It would never reflect, I'm sorry; not

consider?

A. I recall maintaining a list of approved DCS's and looking at that list versus utilities which we might be aware were running out of pool space which had a lower priority ranking than another which had sufficient pool space.

And, you know, the potential of in essence brokering something between the two utilities.

Q. And do you recall any consideration of developing a computerized system for providing information among utilities on approved DCSes?

A. I do now reading this.

Q. But you don't have any independent recollection beyond this document?

A. No, I don't.

Q. If I could turn you to the first page of the attached draft report. Do you know whether this report was ever finalized?

A. I don't recall whether it was or not. In any event this is a contractor report which would never relate to a position the Department took, simply input data to it.

Q. You say it would never relate to a position?

A. It would never reflect, I'm sorry; not

relate, it would never reflect the Department's position, it would simply input data to it.

Q. The Department would have to subsequently take a separate position which might or might not approve or reflect what the contractor recommended?

A. The Department would take a position based on information from a number of sources including its contractor's input.

Q. I see the last sentence of the second paragraph on this page states that, the next to the last sentence, "Based on the preliminary evaluations of the cost, complexity, maintenance requirements, and the accuracy and timeliness of the information provided through these various options, the Department has decided to develop a PC-based electronic bulletin board system, the DCS exchange network."

A. I'm sorry; what paragraph are you reading from?

Q. The second paragraph under introduction, sir.

A. Okay.

Q. The next to the last sentence. You see it states that the Department has decided to develop a PC-based electronic bulletin board system?

made.

Q. And that would be beneficial to the utilities?

A. Certainly to the utility that would have had to build the dry storage.

Q. Would it also be beneficial to the program?

A. Not necessarily, no.

Q. When you refer to brokering, what do you mean by that?

A. If we had done comparisons and saw a situation where, as I just described, that occurred, I guess one concept might have been that we would contacted both utilities and inquired as to their interest in exchange and trying to bring it about.

Q. Was this concept memorialized or documented in any way?

A. Not that I recall, no.

Q. Do you recall any documents discussing how this brokering might work?

MR. SHULTIS: Objection, asked and answered.

THE WITNESS: Not that I recall other than what we just looked at.

BY MR. NESLIN:

Q. So he would have been your primary contact at the M&O?

A. Correct.

Q. You would have communicated with Mr. Blandford?

A. Correct.

Q. And do you know what Mr. Blandford's doing now?

A. I have no idea.

Q. Do you know where he is located today?

A. No, not at all.

Q. You see the first sentence of the letter states, The attached draft report presents the first set of time phased DCS exchange review criteria to be used by the Department and its contractors in reviewing DCS exchange requests submitted by purchasers.

Do you know, were such exchange review criteria ever adopted by the Department?

MR. SHULTIS: Objection, Mr. Milner is not a 30(b)(6) witness.

THE WITNESS: I don't recall them being adopted, no.

BY MR. NESLIN:

Q. Do you recall work being done by the

Department on review criteria?

A. Yes.

Q. Why did the Department undertake that work?

MR. SHULTIS: Objection, Mr. Milner is not a 30(b)(6) witness. Calls for speculation.

THE WITNESS: My recollection was that we were planning for the possibility of receiving exchange requests and began looking at criteria and ways of what would be the criteria for approving or disapproving them.

BY MR. NESLIN:

Q. So you wanted to be prepared?

A. Correct.

Q. How many exchange requests did you anticipate receiving?

A. I don't think we ever even focused on the potential number, we had no idea.

Q. And who was involved at the Department in attempting to develop review criteria?

A. Well, I guess it would be the same set of people as far as my recollection, if he was involved in the broad term of being aware of the activity going on, the director of the program, the deputy director of the program, myself, members of my staff.

Q. The third from the last sentence states, that in fact since the facility, the waste disposal facility locations and system designs are still being evaluated, it could be argued that there would be no impact to the system of any DCS exchanges at this time. Do you see that language?

MR. SHULTIS: Objection. I don't.

THE WITNESS: I found it here. I'm going to read it in context.

BY MR. NESLIN:

Q. Let me restate my question. This paragraph states that in fact since the facility locations and system designs are still being evaluated, it could be argued that there would be no impact to the system of any DCS exchanges at this time.

Would you agree that there would be no impact to the system of a DCS exchange if as of March 1994 the facility locations and system designs were still being evaluated?

A. I think at that point in time there was no known reason why there would be any impact. For example the designs were early enough along that presumably you could have adjusted designs if there had been any impact. But that can't be said with

certainty because you just simply didn't know.

Q. So if the system could be adjusted at that point to address the requirements of an exchange, did that make it more likely that an exchange would be approved by the Department?

MR. SHULTIS: Objection, Mr. Milner's not a 30(b)(6) witness. Calls for speculation.

THE WITNESS: I guess my personal opinion would be if you could adjust the system design at whatever point an exchange request was received and that change in design didn't impact the system adversely in another way, such as cost or schedule, yeah, that probably would have made it more likely.

BY MR. NESLIN:

Q. Under that circumstance, the Department should approve an exchange?

MR. SHULTIS: Same objections.

BY MR. NESLIN:

Q. In your opinion?

A. Well, that would not have been the sole criteria, I don't believe. But that would certainly have been factored in.

(Milner Exhibit No. 55 was marked for identification.)

BY MR. NESLIN:

foremost questions that need to be answered by the Department in determining whether to approve an exchange request?

MR. SHULTIS: Objection, Mr. Milner's not a 30(b)(6) witness.

THE WITNESS: In my opinion they would be at least two of the more important ones.

BY MR. NESLIN:

Q. Can you think sitting here today of other important considerations?

MR. SHULTIS: Same objection.

THE WITNESS: Not offhand.

BY MR. NESLIN:

Q. So if a proposed exchange wouldn't adversely impact the system's ability to meet the commitments made on other DCS's, and wouldn't adversely affect the designs or procurements of the waste management system elements, is it your opinion it should be approved by the Department?

A. It would be my opinion that it shouldn't be disapproved at that point.

Q. If it weren't disapproved, wouldn't it be approved?

A. No, because there may be other criteria that you would look at.

Department has decided that it would not grant priority to any shutdown reactors?

MR. SHULTIS: Same objection.

THE WITNESS: Well, I think that there has been no final decision as to whether or not, although it is not under active discussion.

BY MR. NESLIN:

Q. And the next sentence states that, "The Department recognizes that granting priority to shutdown reactors invites questions of equity among all owners and generators, and is involved in discussions on this and other issues with contract holders through the Annual Capacity Report issue resolution process."

Do you recall what you meant by questions of equity?

A. Yes. My recollection, the standard contract essentially gave priority to the oldest fuel first, and should that change and the Department decide to give priority to shutdown reactors, that would certainly have equity questions with those who were first, second and third in line on an oldest fuel first basis.

Q. So by equity you mean it would affect other utilities who might be ahead of the shutdown

reactor in the queue?
A. Correct. And certainly there were discussions at that point in time and at various points in time with industry representatives as to whether there was any desire on the part of the industry in general to give priority to shutdown reactors.
Q. Other than --
A. The Department raised that issue a number of times with the industry and the industry consensus always was no.
Q. By consensus, do you mean it was uniform, everyone in the industry took that position or something else?
A. Well, certainly the majority.
Q. Other than the effect on other utilities, were there other reasons that the Department would be unwilling to grant priority to a shutdown reactor?
MR. SHULTIS: Objection, Mr. Milner is not a 30(b)(6) witness.
THE WITNESS: Well, my opinion, yeah, there would be several. Well, if approval somehow adversely -- I can't necessarily think of a situation where that would occur, but if somehow approval or doing that would have adversely affected the system,

you could review lines 1 through 11. Mr. Milner, the second sentence states that the projected CRWMS acceptance capacity is currently anticipated to exceed the industry's annual SNF discharge rate in the year 2010 or when a repository begins operations. Do you see that?

A. Yes, I do.

Q. Was that accurate? Was that accurate as of 1992?

A. That was the projection at that point in time.

Q. And then it goes on to state that at that time the Department would revisit this issue and consider granting acceptance priority to shutdown reactors. Now let me ask, in your opinion would the Department be more likely to grant priority to shutdown reactors once the acceptance rate exceeds the annual spent nuclear fuel discharge rate?

A. I have no idea, no decision had been made on that whatsoever.

Q. Well, if the principal concern in granting priority to a shutdown reactor is equity, meaning the effect on other utilities, that's your view?

A. That's a -- well, I won't call that a principal concern. That's certainly one of the more

important concerns.

Q. Wouldn't the effect on other utilities be alleviated at least in part if the receipt rate of spent fuel exceeded the discharge rate?

MR. SHULTIS: Calls for speculation.

THE WITNESS: No, my personal opinion it may be somewhat alleviated but any time you depart from the queue, so to speak, and grant priority to another utility for whatever reason, you are impacting those higher in the queue.

BY MR. NESLIN:

Q. If the receipt rate exceeds the discharge rate, theoretically -- let me restate the question.

Wouldn't the effect be alleviated or diminished, the effect on other utilities, if the acceptance rate exceeds the discharge rate?

A. In my opinion the effect would be diminished.

Q. There would still be an effect?

A. There would still be an effect.

Q. Because the order is changing?

A. Correct.

Q. But theoretically other utilities should not have to add additional storage as a result of granting priority?

A. They would not have to add additional storage solely because of giving priority. They may still have to add additional storage, which potentially they might not have had to if priority were not given.

MR. NESLIN: Would you read back the witness's last answer.

THE REPORTER: "Answer: They would not have to add additional storage solely because of giving priority. They may still have to add additional storage, which potentially they might not have had to if priority were not given."

BY MR. NESLIN:

Q. Could you explain what you mean by that? What your reasoning is?

A. I guess what I was trying to indicate there, the utility -- I think it's numbers or something that might illustrate it, well, a utility in a particular situation might have been projecting that it would have to add additional storage at a particular location, given their allocation schedule. They may have had to add additional storage even if that allocation schedule and that timing had been carried out.

If the Department were to give priority to

A. They would not have to add additional storage solely because of giving priority. They may still have to add additional storage, which potentially they might not have had to if priority were not given.

MR. NESLIN: Would you read back the witness's last answer.

THE REPORTER: "Answer: They would not have to add additional storage solely because of giving priority. They may still have to add additional storage, which potentially they might not have had to if priority were not given."

BY MR. NESLIN:

Q. Could you explain what you mean by that? What your reasoning is?

A. I guess what I was trying to indicate there, the utility -- I think it's numbers or something that might illustrate it, well, a utility in a particular situation might have been projecting that it would have to add additional storage at a particular location, given their allocation schedule. They may have had to add additional storage even if that allocation schedule and that timing had been carried out.

If the Department were to give priority to

a shutdown reactor and that priority -- well, if the acceptance rate increased and the Department in essence used that delta increase in acceptance rate to give priority to shutdown reactors, or for any other reason, that priority could have otherwise been -- or that delta acceptance rate could have otherwise been given to other utilities. That delta may have been enough to prevent the particular utility from adding dry storage or at least adding as much dry storage.

Q. But the receipt rate exceeds the discharge rate, and if utilities exchange among themselves so that those who need storage can move up in the queue, why should a utility have to add storage?

A. If the exchanges occurred in an optimal manner, that may not have been the case.

Q. Then the concern that you've raised wouldn't apply?

A. Theoretically, yes.

Q. Wouldn't a failure by the Department to accept spent nuclear fuel at a rate equal to the discharge rate increase the effect of granting priority to shutdown reactors on other utilities?

A. I suppose it would.

Q. And that effect on other utilities would

these or similar criteria for making decisions on whether to grant priority to shutdown reactors?

A. No, I don't.

Q. Do you have an opinion sitting here today as to whether these criteria would be appropriate for making that decision?

A. Well, I guess in my view sitting here looking at this today some of these don't appear to be criteria so much as statements of opinion.

Q. Do you disagree with certain of these, sir?

A. I do.

Q. Do you disagree with the first item, that granting priority can be shown to be less costly --

A. I do.

Q. -- to the Department's waste management system?

A. I do.

Q. Why do you disagree with that?

A. Because I can't envision how granting the priority would be less costly.

Q. What would the additional cost be for granting priority?

A. Huh?

Q. What would the additional cost be for

granting priority?

A. I don't know where there would be additional cost. I can't see where the cost would be reduced.

Q. Well, the cost to the utilities in question, the shutdown utility would certainly be reduced?

A. Yes, it would. I think that's what's being reflected in number 3.

Q. And with respect to number 2, item 2, granting priority can be shown to involve a shipment of small enough quantities of spent fuel compared to the overall DOE acceptance rate so as not to jeopardize the timely removal of spent fuel from other sites, or other compensation should be provided.

Do you disagree with that?

A. I do.

Q. And why do you disagree with that?

A. Any amount of fuel that you accepted from a shutdown by granting priority would certainly impact other utilities in the queue.

Q. But this refers to jeopardizing the timely removal of spent fuel from other sites. Would such an impact necessarily jeopardize the timely removal

of spent fuel from other sites?
A. I believe it would. If over some period of time the Department were to -- according to the priority ranking, the ACR of 1995, since that combined both, one utility would expect to have X number of MTUs removed from their reactor within some specified time period. So if a portion of that allocation was given to another reactor, it would not be as timely.
Q. But would a portion of that allocation have to be given to another reactor if in fact the receipt rate exceeded the discharge rate?
A. Certainly.
Q. Why do you say that?
A. Any time there's a finite amount of fuel being accepted, and that finite amount of fuel is allocated amongst the utilities in the queue, whatever that number may be, if you reallocate that, a portion of that, to other utilities farther down in the queue, you're certainly impacting that.
Q. Would you disagree with criterion 3 here that granting priority can be shown to avoid the establishment of an otherwise unneeded reactor site storage facility?
A. I don't completely agree with that.

Q. And how do you disagree with it?

A. If a reactor is shutting down, presumably it has all of its spent fuel stored on site either in the pool or dry storage or a combination thereof. That storage exists when the reactor shuts down. Since no more fuel is being generated by the reactor I'm not sure what additional storage would be established.

Q. Would you agree that it would avoid the need to continue an otherwise unneeded reactor site storage facility?

A. I would.

Q. And the next item states that granting priority can be shown to be clearly cost effective for consumers from the standpoint of timely decommissioning?

A. I would agree with that.

Q. And the last item is that granting priority can be shown to support the national policy of efficient operation of the country's waste management system.

A. I can neither agree or disagree with that. I'm not quite sure what that means.

Q. You don't understand --

A. Correct.

modification to the definition of high-level radioactive waste, is that fair?

A. That's what it appears.

Q. Do you recall the Department considering amending that definition?

A. I don't recall that, no.

Q. If you look at lines 21 and 22, it states as a reason that subsequent to the signing of the contract the NRC has ruled on the disposal of GTCC waste. Do you recall that ruling raising an issue as to the inclusion of GTCC wastes under the definition of high-level radioactive waste in the contract?

MR. SHULTIS: Objection, calls for a legal conclusion.

THE WITNESS: I don't recall.

MR. SHULTIS: Assumes facts not in evidence. Lack of foundation.

BY MR. NESLIN:

Q. The next sentence states that, "Neither the Nuclear Waste Policy Act nor the Nuclear Waste Policy Act Amendments anticipated that the nuclear waste fund or the contract might be required to include disposal of these potential additional waste streams at the 1 mil/kilowatt hour fee.

Do you agree with that?

A. Yes.

Q. And what's the basis of your belief?

A. My recollection of the act and the amendment stated that we would be required to dispose of spent nuclear fuel and high-level radioactive waste resulting from atomic energy/defense activities.

Q. Well, doesn't the contract, though, define high-level radioactive waste to include other highly radioactive material that the commission, consistent with existing law, determines by rule requires permanent isolation?

MR. SHULTIS: Objection, calls for a legal conclusion.

THE WITNESS: In my opinion, it does.

BY MR. NESLIN:

Q. So to the extent that the Commission, consistent with existing law, determines that certain highly radioactive material requires permanent isolation, that material would constitute high-level radioactive waste under the standard contract?

MR. SHULTIS: Same objection, and assumes facts not in evidence.

THE WITNESS: I think we were speaking earlier of the intent of the act, not the intent of

GTCC?

A. My recollection is that Mr. Plummer in that paragraph wanted to know what the OCWRM position on acceptance of GTCC would be.

Q. And did OCWRM have a position on acceptance of GTCC?

MR. SHULTIS: Objection.

THE WITNESS: It did.

BY MR. NESLIN:

Q. What was that position?

MR. SHULTIS: Objection, Mr. Milner is not a 30(b)(6) witness.

THE WITNESS: My recollection was that the program's position was that we were not required to accept GTCC in the repository.

BY MR. NESLIN:

Q. Do you recall what the basis of that position was?

MR. SHULTIS: Same objection, calls for a legal conclusion.

THE WITNESS: No, I don't recall.

BY MR. NESLIN:

Q. Do you recall, was that position documented or memorialized in any particular documents?

A. I don't recall.

Q. Is OCWRM still coordinating with the Office of Environmental Management, GTCC mid level waste program?

A. No.

Q. Why not?

A. I don't know. I can only assume that since the program's position is that we don't accept it, there's not a lot of basis for discussion.

Q. Does the current planning for the permanent repository anticipate that GTCC waste may be disposed there?

MR. SHULTIS: Objection, calls for a legal conclusion.

THE WITNESS: In my recollection, the program planning does not anticipate GTCC being in place in the repository. However the environmental impact statement which we've prepared to accompany the site recommendation to the President I believe did examine the possibility of emplacing GTCC in the repository. I'm not certain but I believe it did.

BY MR. NESLIN:

Q. And do you recall what that environmental impact statement indicated about such emplacement?

MR. SHULTIS: Objection, asked and

answered.

THE WITNESS: No, I don't.

BY MR. NESLIN:

Q. Do you have any understanding of the Department's current position regarding the ultimate disposal of GTCC waste?

MR. SHULTIS: Objection, Mr. Milner's not a 30(b)(6) witness. Calls for a legal conclusion.

THE WITNESS: I believe certainly the program will in essence take, I don't want to call it direction but indications from the NRC. If NRC rules that GTCC should be disposed of in the repository, I believe the program would pursue that.

BY MR. NESLIN:

Q. Is there a reason today why GTCC couldn't be replaced in the repository?

MR. SHULTIS: Same objections, asked and answered.

THE WITNESS: I don't know. I'm not aware of any. Other than sheer volume.

BY MR. NESLIN:

Q. Do you know what the anticipated volume of GTCC is?

A. I don't recall the number but it's quite large. So that certainly would add cost to the

answered.

THE WITNESS: No, I don't.

BY MR. NESLIN:

Q. Do you have any understanding of the Department's current position regarding the ultimate disposal of GTCC waste?

MR. SHULTIS: Objection, Mr. Milner's not a 30(b)(6) witness. Calls for a legal conclusion.

THE WITNESS: I believe certainly the program will in essence take, I don't want to call it direction but indications from the NRC. If NRC rules that GTCC should be disposed of in the repository, I believe the program would pursue that.

BY MR. NESLIN:

Q. Is there a reason today why GTCC couldn't be replaced in the repository?

MR. SHULTIS: Same objections, asked and answered.

THE WITNESS: I don't know. I'm not aware of any. Other than sheer volume.

BY MR. NESLIN:

Q. Do you know what the anticipated volume of GTCC is?

A. I don't recall the number but it's quite large. So that certainly would add cost to the

repository.

Q. Physically could the repository accommodate the volume of GTCC as currently planned?

MR. SHULTIS: Objection, assumes facts not in evidence.

THE WITNESS: The way the repository is currently designed, I don't believe physically it could accommodate it.

BY MR. NESLIN:

Q. Why is that?

A. The repository as currently designed, and that's a conceptual design certainly, has a certain footprint, if you will. A greater footprint would be required if you're going to dispose of GTCC. So you have to, as a minimum, expand that design.

Q. You have to modify the conceptual design for the repository?

A. That's correct.

(Milner Exhibit No. 65 was marked for identification.)

BY MR. NESLIN:

Q. Mr. Milner, Exhibit 65 is a letter signed by you for Ivan Itkin to William Kane dated August 30th, 2000. Sir, do you recall this letter?

A. I do, yes.