IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - - -)
YANKEE ATOMIC ELECTRIC COMPANY )
(98-126C)(Merow, S.J.) )
CONNECTICUT YANKEE ATOMIC POWER ) Volume IV
COMPANY ) Washington, D.C.
(98-154C)(Merow, S.J.) ) Tuesday
MAINE YANKEE ATOMIC POWER COMPANY) May 7, 2002
(98-474C)(Merow, S.J.), et al., )
Plaintiffs, )
v. ) ORIGINAL
THE UNITED STATES, )
Defendant. )
- - - - - - - - - - - - - - - - - -)

Continued Deposition of RONALD A. MILNER, a witness herein, called for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to agreement, the witness being duly sworn by CHERYL A. LORD, a Notary Public in and for the District of Columbia, taken at the offices of SPRIGGS & HOLLINGSWORTH, 1350 I Street, N.W., Washington, D.C., at 9:30 a.m., Tuesday, May 7, 2002, and the proceedings being taken down by Stenotype by CHERYL A. LORD, RPR, CRR, and transcribed under her direction.

approval of DCSs, yes.

BY MR. TOMASZCZUK:

Q. Right. Can I direct your attention to the document with the Bates page number 0385 on it about a third of the way through. And if I could direct your attention, Mr. Milner, to the double asterisks on the right-hand side of the page and the notation that appears there.

A. Yes.

Q. Do you know who placed that language on this DCS form?

A. Specific person, no, I don't know who that would have been.

Q. Do you recall any discussions with any OCRWM personnel concerning this language?

A. In general terms, yes. It certainly was the program office opinion that delivery date was conditioned upon having an operational facility, be it a storage or a depository.

Q. Do you know who drafted this language?

A. Specifically, no, I don't.

Q. Similar language appears in the cover letter on the previous page, 0384, the bottom of the first paragraph.

A. Yes.

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - - - - -)
YANKEE ATOMIC ELECTRIC COMPANY )
(98-126C)(Merow, S.J.) ) ORIGINAL
CONNECTICUT YANKEE ATOMIC POWER )
COMPANY )
(98-154C)(Merow, S.J.) ) Volume I
MAINE YANKEE ATOMIC POWER COMPANY) Washington, D.C.
(98-474C)(Merow, S.J.) ) Tuesday
Plaintiffs, ) May 7, 2002
v. )
THE UNITED STATES, )
Defendant. )
- - - - - - - - - - - - - - - - - - - -)

Deposition of RONALD A. MILNER, a witness herein, called for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to agreement, the witness being duly sworn by CHERYL A. LORD, a Notary Public in and for the District of Columbia, taken at the offices of SPRIGGS & HOLLINGSWORTH, 1350 I Street, N.W., Washington, D.C., at 3:48 p.m., Tuesday, May 7, 2002, and the proceedings being taken down by Stenotype by CHERYL A. LORD, RPR, CRR, and transcribed under her direction.

A. Fine by me.
Q. Okay. And also, if I ask you a question and it occurs to you subsequently, perhaps when we're looking at another exhibit or what have you, that the answer was incomplete -- your prior answer was incomplete or inaccurate in some way, can you let me know so that we get a true and accurate record?
A. Certainly.
Q. Thank you.
Mr. Schecter was asking you about a schedule for accepting wastes at the repository. And there was one answer I didn't quite understand, and I wanted to go over it.
I believe you were talking about the facility would have an ability to take a canister out of a transportation overpack and place a canister in a storage overpack and that this might accelerate the ability of the repository to accept fuel.
Did I understand that correctly?
A. Well, what I was speaking of was, some of the fuels certainly will arrive at the repository site in dual-purpose canisters. That canister has the ability to be removed from its transport overpack and placed into a storage overpack.
Certainly there's a relatively -- in

relative terms, a simple matter.

Q. All right. And that's something you're planning to do, the department is planning to do with the repository, to accept the canister fuel and put it into storage overpacks?

MR. SHULTIS: Objection. Mr. Milner is not a 30(b)(6) witness.

A. My understanding is that we're planning on having the capability to accept canisters, canistered fuel. There will be certainly an ability to store some fuel aboveground for some period of time. I didn't intend to characterize that as the department's plan to do that initially.

BY MR. SKALABAN:

Q. But it's what you expect to happen?

MR. SHULTIS: Objection, calls for speculation.

A. No, I don't expect it to happen or not to happen. It's an ability.

BY MR. SKALABAN:

Q. Okay. But if I understand your answer, you -- the department's plan is to accept canistered fuel and possibly put it in storage overpacks before it goes in the repository?

MR. SHULTIS: Objection, calls for

speculation.

A. The characterization is that we expect to receive canistered fuel. We expect to have the ability to store -- I don't think you can infer that the plan is it will go directly to storage and then later to a repository.

BY MR. SKALABAN:

Q. And the fuel in the canisters, would that be from canisters from different dry storage systems that different utilities have been implementing across the country?

A. Well, when I say, dual-purpose canister, it's a canister that's been approved by the NRC for both transport and storage, and then they could be utilized in different storage modes.

Q. And what are some of the canisters that you're aware of that have been licensed for dual storage and transportation?

A. I can't recall the designations now. I believe there's at least one or two that have currently been approved, perhaps more.

Q. Such as the NAC, N-A-C?

A. Yeah, I believe that's one of them.

Q. So the canistered fuel would be fuel that different utilities had put in systems like the NAC

multipurpose-canister system or other dry storage vendors?

You have a multipurpose-canister-type system?

A. Correct.

Q. Does the department have any plans to cut those canisters open to dispose of the fuel inside?

MR. SHULTIS: Objection. Mr. Milner is not a 30(b)(6) witness, also calls for speculation, asked and answered.

A. Yeah. It does call for speculation, because that would ultimately be determined as part of the licensing process as to whether those canisters would ever have to be opened up or not.

BY MR. SKALABAN:

Q. Does the department have a current position on how -- whether it thinks it may be cutting them open, cutting the canisters open?

MR. SHULTIS: Same objections.

A. I don't know that they do, no.

BY MR. SKALABAN:

Q. So that just hasn't been decided one way or another, what to do with the canisters that arrive from the utilities at the repository?

A. As I say, ultimately they will be

determined by the NRC as to whether they'll require opening of the canisters.

Q. Is there any reason why you think they might do that?

Wouldn't that -- or actually, strike that.

Wouldn't that possibly implicate safety concerns, to actually open up the canisters, because that would create radiation -- potential radiation exposure?

A. I don't know that that would be any different than opening up a transport cask that has bare spent fuel in it. We do that robotically.

Q. But generally it's a goal, to minimize the amount of handling of bare spent fuel assemblies?

A. Certainly.

Q. That's something the department would plan to do?

A. Would prefer to.

MR. SHULTIS: Objection. Mr. Milner is not a 30(b)(6) witness.

BY MR. SKALABAN:

Q. Do you know whether the department has looked at procuring or developing a disposal overpack that can fit the different canistered fuel?

A. We're still in various stages of waste

inconsistent with the Nuclear Waste Policy Act's schedule linkages as they existed at this time?

A. Sitting here today looking at that, that would be my opinion.

Q. And to your knowledge, the schedule linkages have never been changed. There's -- I'm sorry.

Let me ask a more artful question.

There hasn't been a change in the law removing those schedule linkages?

A. No, there has not.

Q. Mr. Milner, if you could just give me a general overview of how -- as the chief operating officer of OCRWM, how you envision the actual overall process of waste acceptance, transportation, disposal unfolding when it begins in approximately -- as you anticipate in 2010, an overview, just kind of a general overview of the process.

How do you envision that working?

MR. SHULTIS: I'm sorry. Which process?

MR. SKALABAN: The process of the -- well, let's say the real logistical process of sort of waste acceptance, transportation, disposal.

BY MR. SKALABAN:

Q. How do you envision that happening in

2010?

MR. SHULTIS: Vague, but if you can answer.

A. I'll give it a shot if I understand.

BY MR. SKALABAN:

Q. Sure.

A. The department would show up at the gates of the first utility in the queue and begin accepting their waste, taking title to their waste at the utility gate. I believe under contract at least if -- probably not in the legislation, but certainly under the contract, the department's responsibility is to show up at the reactor site with transport cask.

The utility is responsible for loading that cask with their spent fuel, in essence, delivering it back to the gate. The department takes title, transports that to the repository. It would undergo whatever packaging was necessary for replacement in the repository.

If for whatever reason that particular fuel were to be determined to go first into storage, it would be placed in a storage container, but eventually placed in the repository.

Q. How do you at this time -- what are the --

country, isn't it?
A. I don't know.
Q. Okay. So you have no awareness of failed fuel, for example, being handled and moved to hot cells for studying or anything like that?
MR. SHULTIS: Objection, asked and answered.
A. With the possible exception of TMI 2.
BY MR. SKALABAN:
Q. Are you aware of any reasons why failed fuel cannot be moved at the same schedule as regular standard fuel?
MR. SHULTIS: Objection, calls for a legal conclusion, asks for speculation.
A. Well, I think there are certification issues with the NRC. It's my understanding that failed fuel would require some special handling different than nonfailed spent fuel.
BY MR. SKALABAN:
Q. And what kind of special handling are you referring to?
A. I don't know. That would I think ultimately be determined by the NRC.
Q. Would placing failed fuel on a reconfigured fuel assembly be an example of

the kind of special handling that a utility might be able to do to get its failed fuel movable?

Actually, let me back up.

Does the term reconfigured fuel assembly mean anything to you?

Does that ring a bell?

A. I'm familiar with the term reconstituted fuel assembly. I'm not familiar with anybody having put a failed fuel rod back in an assembly. I think you'd have a heck of a time getting it out of the old one.

Q. Okay. But do you have any general sense of what the special handling might be?

A. I can make a guess that the NRC potentially could require some sort of special canistering of failed fuel.

Q. Special canister or special envelope or something of that nature?

A. Yes.

Q. Do you have any reason to believe that that's not technically feasible, to develop that kind of technology?

MR. SHULTIS: Objection, calls for

speculation.

A. I'm certainly not an expert in that area, but I don't know of any.

BY MR. SKALABAN:

Q. And having worked in the office of storage and transportation in OCRWM and now as its chief operating officer, have you ever heard anyone express the opinion that within OCRWM that failed fuel couldn't be moved or would be technically infeasible to move?

A. No.

Q. Are you aware of any current OCRWM plans to defer the acceptance of failed fuel?

MR. SHULTIS: Objection, calls for a legal conclusion.

A. I guess my understanding of the current situation -- and I think that's provided for under the standard contract -- that the failed fuel is back further in the queue.

BY MR. SKALABAN:

Q. Okay. Maybe we can take a look at that. If you could please take out Milner Exhibit 3. And in particular, article six on Milner Exhibit 3, criteria for disposal, page 16602, if you could take a look at article 6 A, 2 B.

speculation.

A. I'm certainly not an expert in that area, but I don't know of any.

BY MR. SKALABAN:

Q. And having worked in the office of storage and transportation in OCRWM and now as its chief operating officer, have you ever heard anyone express the opinion that within OCRWM that failed fuel couldn't be moved or would be technically infeasible to move?

A. No.

Q. Are you aware of any current OCRWM plans to defer the acceptance of failed fuel?

MR. SHULTIS: Objection, calls for a legal conclusion.

A. I guess my understanding of the current situation -- and I think that's provided for under the standard contract -- that the failed fuel is back further in the queue.

BY MR. SKALABAN:

Q. Okay. Maybe we can take a look at that. If you could please take out Milner Exhibit 3. And in particular, article six on Milner Exhibit 3, criteria for disposal, page 16602, if you could take a look at article 6 A, 2 B.

A. 6 A, 2 B.
Q. It's on the first column.
A. M-hm.
Q. And please take all the time you need to look if you want to look up any other sections.
(Pause.)
BY MR. SKALABAN:
Q. Let me ask you, what is your understanding of this paragraph 6 A, 1 -- I'm sorry -- 6 A, 2 little B?
MR. SHULTIS: Objection, calls for a legal conclusion.
A. Okay. In my opinion, at this point reading the paragraph, I would interpret that it means that DOE is, one, saying that it will accept both standard and nonstandard fuel, and nonstandard including failed fuel, that the purchaser will have to obtain delivery and procedural confirmation prior to delivery, and DOE will determine the technical feasibility of disposing of it on essentially the current schedule, which would essentially be the same as standard fuel.
So I would read that to say that we would have to look at each case of nonstandard fuel and determine whether that could be accepted as standard

fuel for purposes of the schedule.

BY MR. SKALABAN:

Q. Whether it would be technically feasible to accept that spent fuel?

A. On the currently agreed-to schedule.

Q. Do you have an understanding of what would happen if the department thought it wasn't technically feasible to do it at that point in time on the currently agreed-to schedule?

MR. SHULTIS: Objection, vague, calls for a legal conclusion. Mr. Milner is not a 30(b)(6) witness.

A. I guess in my opinion if the department determined that it wasn't technically feasible on the schedule and since we've already stated that we would accept it, it would move back in the queue.

BY MR. SKALABAN:

Q. Well, does this read to you more like just a basic operational provision, whereas the department is going to look at the individual case, if it can't accommodate it at that time, it's going to move it back a little bit?

A. That's the way I would read it.

MR. SHULTIS: Asked and answered.

fuel for purposes of the schedule.

BY MR. SKALABAN:

Q. Whether it would be technically feasible to accept that spent fuel?

A. On the currently agreed-to schedule.

Q. Do you have an understanding of what would happen if the department thought it wasn't technically feasible to do it at that point in time on the currently agreed-to schedule?

MR. SHULTIS: Objection, vague, calls for a legal conclusion. Mr. Milner is not a 30(b)(6) witness.

A. I guess in my opinion if the department determined that it wasn't technically feasible on the schedule and since we've already stated that we would accept it, it would move back in the queue.

BY MR. SKALABAN:

Q. Well, does this read to you more like just a basic operational provision, whereas the department is going to look at the individual case, if it can't accommodate it at that time, it's going to move it back a little bit?

A. That's the way I would read it.

MR. SHULTIS: Asked and answered.

BY MR. SKALABAN:

Q. This doesn't suggest to you that failed fuel is going to be put back years later in the queue, does it?

MR. SHULTIS: Objection, asked and answered, calls for a legal conclusion.

A. I couldn't say on that. It would depend on the nature of the fuel.

BY MR. SKALABAN:

Q. Well, assuming that there was an NRC-licensed container for that failed fuel, would the department then accept it upon the currently agreed schedule?

MR. SHULTIS: Objection, calls for speculation, asks for a legal conclusion.

A. I guess in my opinion, if for that specific failed fuel, if there were an NRC-certified container, the NRC said, yep, that particular fuel is okay to move in that container, then, yes.

There's all kinds of failed fuel. You can have a fuel rod that goes -- the cladding is slightly unzipped, or it can have it totally failed and a bunch of pellets laying at the bottom of the pool. That's the extreme case, of

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - - -)
YANKEE ATOMIC ELECTRIC COMPANY )
(98-126C)(Merow, S.J.) )
CONNECTICUT YANKEE ATOMIC POWER )
COMPANY ) Volume II
(98-154C)(Merow, S.J.) ) Washington, D.C.
MAINE YANKEE ATOMIC POWER COMPANY) Wednesday
(98-474C)(Merow, S.J.) ) May 8, 2002
Plaintiffs, )
v. )
THE UNITED STATES, )
Defendant. )
- - - - - - - - - - - - - - - - - -)

ORIGINAL

Continued Deposition of RONALD A. MILNER, a witness herein, called for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to agreement, the witness being duly sworn by CHERYL A. LORD, a Notary Public in and for the District of Columbia, taken at the offices of SPRIGGS & HOLLINGSWORTH, 1350 I Street, N.W., Washington, D.C., at 9:20 a.m., Wednesday, May 8, 2002, and the proceedings being taken down by Stenotype by CHERYL A. LORD, RPR, CRR, and transcribed under her direction.

certainly -- well, overall, we're going to accept failed fuel, so ultimately there will have to be a certified container to move it in. And then I think you just have to deal on a case-by-case basis, what's the nature of the failure, what's it look like, and what kind of handling will it require, and at what point do you do that.

Q. If I understand your testimony from yesterday, in the failed fuel, if there was an NRC-licensed transportation cask -- I'm sorry -- canister system available for it, it would be taken on the same waste acceptance schedule?

A. Well, again, I think -- at least I intended to characterize that that you almost have to look at it on a case by case, what's the nature of the fuel, how badly is it failed, what does it look like, and what kind of handling will that require at the repository receipt facility.

And I guess just to use a hypothetical example, if you have some very, very badly failed fuel, and out of all the assemblies that we will accept, ultimately, if that's the only one that requires that type of handling, do you stop everything and try to deal with that one assembly or do you put it farther back in the queue.

It's hypothetical. I don't know. You'd have to know what the situation was to say what you do.

Q. But if there was an NRC canister system that was fully licensed to transport that failed fuel, you would still anticipate that there be could a problem with accepting the waste on an agreed-upon schedule?

A. I think there's a potential of that, yes, again, depending on the nature of the failure, what it looks like.

Q. And that's based on disposal problems?

A. Well, it's based on the ability to move that fuel from the transport pack -- transport cask to a waste package and then place it. You know, for example, if the requirement was that you had to physically put this in a hot cell and deal with it, that's a different matter than unloading a standard fuel assembly.

Q. How likely do you think that kind of a situation may arise, that you would have a failed fuel assembly that the NRC has blessed in effect for transportation in a licensed canister that you would be technically unable to dispose of it in a repository?

there may be a few exceptions that would require an individual careful study?

MR. SHULTIS: Objection, mischaracterizes the prior testimony.

MR. SKALABAN: I'm not trying to mischaracterize. I just want to make sure I understand it.

MR. SHULTIS: Calls for speculation.

A. I mean, I just simply don't know, because I don't feel that I have a handle on how much failed fuel is out there, what are the nature of the failures. If you have a fuel assembly that has one or more pins that have pinhole leaks in them, that's not necessarily a large problem. If you've got very badly unzipped cladding, that could be a problem.

BY MR. SKALABAN:

Q. And how so?

MR. SHULTIS: Objection, asked and answered.

A. Again, you know, this is pure speculation, because I don't know the nature of the failed fuel.

BY MR. SKALABAN:

Q. Sure.

But I guess I'm just trying to explore -- in your mind you're drawing a distinction between

different types of failed fuel and unzipped cladding, I guess is something that pops in your head as something that could be a problem, and I'm just trying to understand why that --

A. If you have a fuel pin or a fuel rod that the cladding is split wide-open, you know, or are the fuel pellets going to fall out when you try to transfer that, you have to make provision for that.

Q. Wouldn't that be just in a canister?

A. If the canister is also certified for disposal by the NRC, then that's obviously less of a problem.

Q. Okay. And now, as a matter of background, I can represent to you that my clients are using a NAC multipurpose-canister, a Connecticut Yankee and Yankee Atomic-type system.

And assuming a system like that is licensed for storage and disposal, and it's licensed to transport failed fuel, would you anticipate that that kind of system couldn't be accommodated on the normal schedule?

A. If the NRC ultimately determines that that multipurpose-canister does not have to be opened, that it can be disposed as is, then that is no problem.

Q. And that's generally -- would that be generally your opinion with -- in terms of kind of multipurpose-canister systems?
A. I'm not aware at this point in time that the NRC has made any statements as to the disposability of those canisters.
Q. Is the department looking at that?
A. The department is not looking at that, no.
Q. Why not?
A. No. Again, that's a decision that would be made by the NRC. They will determine as part of the licensing process whether or not that canister can be disposed of without being opened or whether they'll have to pull the fuel out of there and move it into the waste-packing facility.
The department's objective when it was working on the MPC, the multipurpose-canister program, whenever it was, in the early '90s, our objective of that effort was to try to spur development of the canister that could be stored, transported, and disposed. I think I testified that we were ultimately directed to cease work on that program, so we have not continued development of an MPC. I'm aware that private vendors are trying to do that.

Q. And I believe you testified earlier that that was -- even though the MPC program had been canceled, that that was a positive that came out of it, is that industry did look and develop this technology?

A. In my opinion, that was a positive, yeah.

Q. And I mean, if it's not going to be compatible with the waste management system that RW is developing, then that wouldn't be a positive, would it?

A. That would be a negative. That's right.

Q. And so I mean as you sit here today, are you aware of any DOE plans to cut off that kind of technology from the system and not integrate it into the system?

MR. SHULTIS: Objection, asked and answered.

A. I think the department is certainly considering that it may have to open those canisters.

BY MR. SKALABAN:

Q. So at this point in time, there's a possibility in your mind that the DOE is not going to integrate multipurpose canisters into its system?

A. I think that's a mischaracterization. We're certainly going to be able to integrate and

and 96.

(Milner Exhibit No.96 was marked for identification.)

BY MR. SKALABAN:

Q. And Mr. Milner, before we start on these documents, I want to ask you a followup about what we just talked about. And I understand your testimony to be it's not the department's intent to not accept this kind of multipurpose canister technology that's being implemented by utilities.

It plans to accept those kind of waste packages?

A. That's correct.

MR. SHULTIS: Objection, calls for a legal conclusion.

BY MR. SKALABAN:

Q. And if you weren't going to do that, that would potentially create some very serious problems for the industry, wouldn't it?

MR. SHULTIS: Objection, calls for speculation.

A. If we were not going to accept multipurpose canisters, I think it would certainly cause some problems for the utilities. They would

have to remove the fuel from those canisters before it could be loaded into a transport cask.

BY MR. SKALABAN:

Q. Could it possibly create -- or do you think it could create problems with getting license -- or license extensions for nuclear power plants, or possibly impact the utilities' ability to implement dry storage at all?

MR. SHULTIS: Objection, calls for speculation, asks for a legal conclusion.

A. My personal opinion, I don't believe that it would cause a problem in terms of implementing dry storage. Again personal opinion, I don't believe that it would affect the ability to get a license renewal, but that's really an NRC realm there.

BY MR. SKALABAN:

Q. And why is that your opinion?

A. Just based on my limited knowledge of the area. I can't particularly envision it would cause a problem in terms of a license renewal. And I can't envision why it would cause a problem with dry storage.

Q. Well, do you think it would cause some heartburn and potential anger from state Public Utility Commissions?

page 6.
A. Okay.
Q. Do you have any reason to believe that the department ever talked about deviating from that instruction and the approval and disapproval process?
MR. SHULTIS: Objection, foundation.
A. I'm not aware of any discussions that had taken place that deviate from the instruction, no.
BY MR. SKALABAN:
Q. Do you know if the pos- -- I mean, was it something even open for discussion, is that maybe there would be cases where a purchaser would be allowed to exceed their allocation?
MR. SHULTIS: Asked and answered.
A. I think I had indicated previously that in a number of points throughout the conduct of the program, there had been discussions and considerations as to whether priority should be given to shutdown reactors. I believe in each case, the final outcome in discussing it with the industry as a whole was that we should maintain the ranking, I guess, if you will, that's specified in the contract, that is, oldest fuel first. Priority should be given on oldest fuel first rather than shutdown.
BY MR. SKALABAN:

A. Exhibit 1 doesn't help me, so at this point in time, I can't really recall.

Q. Do you remember in early 1993 the subject coming up at all that Yankee Atomic was taking issue with the DCS instructions and not submitting DCSs per that instruction?

A. I generally recall that.

Q. What do you generally recall was being said within DOE at that time about this?

A. I think at that point in time as the best of my recollection, the industry in general had made it pretty clear to the department that they wanted to maintain the oldest fuel first as the basis for priority ranking.

Q. You remember anything else about internal DOE discussions about Yankee Atomic's objections?

A. Nothing specific within the department. I certainly remember the industry in general raising equity issues if we gave priority to shutdown reactors.

Q. If you look at page 2 of Mr. Buchheit's letter, in the last paragraph, he says: Storing spent fuel on-site for an extended period after a plant has shut down or could be dismantled is not what Congress had in mind when it passed the waste

A. Yeah. I'm not sure what is really being referred to here. Certainly reducing costs are a goal, but I'm not sure what they're really referring to when they say, consolidating shipping campaigns rather than spread out over a period of time.

BY MR. SKALABAN:

Q. Well, to remove spent fuel from a site, if there were only five shipping campaigns in five years, for example, as opposed to 20 shipping campaigns to the same site spread out over 20 years, wouldn't that likely reduce DOE's cost?

MR. SHULTIS: Objection, calls for speculation.

A. I guess I'm still having a little trouble understanding if what's being referred to is, is it cheaper to -- just to use arbitrary numbers -- ship 500 MTUs of spent fuel in one year versus 500 MTUs of fuel over five years, a hundred per year, without really having any knowledge of what contractual arrangements might be made with the shipper, basically you're paying by the miles and numbers of shipments. And I don't know how that would vary whether you did it all in one year or over five years.

BY MR. SKALABAN: