answered.

A. Well, to me it doesn't say that. I would infer from that.

BY MR. SKALABAN:

Q. In the next paragraph, is the department again encouraging Yankee Atomic to swap?

A. Appears to be, yes.

Q. Do you know what the department intended by the phrase here, quote: The department is willing to assist Yankee Atomic in this process --

MR. SHULTIS: Objection, calls --

Q. -- end quote?

MR. SHULTIS: Objection, calls for speculation. The document speaks for itself.

A. I don't believe anything was specifically intended by saying that other than if Yankee Atomic felt that in some manner the department could be of assistance in arranging a swap, the department would be willing to do what it could.

BY MR. SKALABAN:

Q. To help Yankee Atomic obtain those swaps?

A. Yes.

Q. In the last paragraph, the department is stating that: As we discussed during our negotiations, submittal of an acceptable DCS does not

preclude Yankee Atomic's right under the contract should the department subsequent to rule making grant such priority under article -- under the articles of the contract?

A. M-hm.

Q. Do you see that part, sir?

A. I do.

Q. Does that indicate that Yankee Atomic would not be bound by acceptable DCSs, that this would be contingent upon future events?

MR. SHULTIS: Objection, calls for speculation, asks for a legal conclusion, lack of foundation.

A. In my personal opinion, I think what's intended here is that if through the rule-making process provisions of the contract were changed, then Yankee could submit a new DCS and not be bound by the previously approved one.

BY MR. SKALABAN:

Q. So this is providing some qualification of the DCS process, is it not?

MR. SHULTIS: Objection, asked and answered.

A. No, I don't believe it is. I think what this is saying to me is that if the contract were

ultimately changed through the rule-making process, then new DCSs could be submitted, which would be consistent with that new provision of the contract.

BY MR. SKALABAN:

Q. Well, the contract at that time already provided the department the ability to grant priority for shutdown plants?

A. The contract did not preclude the department's ability to do that.

Q. Well, it gave them an affirmative grant of authority to do that if they wanted to; isn't that correct?

MR. SHULTIS: Objection, calls for a legal conclusion.

A. I guess my recollection of the words is that the department may afford priority.

BY MR. SKALABAN:

Q. And so there -- wasn't the issue to be addressed whether rule making wasn't a change to the contract, it was whether or not priority would be available for Yankee?

MR. SHULTIS: Objection, calls for a legal conclusion, asks for speculation, and mischaracterizes the document.

A. In my personal opinion, the contract

ultimately changed through the rule-making process, then new DCSs could be submitted, which would be consistent with that new provision of the contract.

BY MR. SKALABAN:

Q. Well, the contract at that time already provided the department the ability to grant priority for shutdown plants?

A. The contract did not preclude the department's ability to do that.

Q. Well, it gave them an affirmative grant of authority to do that if they wanted to; isn't that correct?

MR. SHULTIS: Objection, calls for a legal conclusion.

A. I guess my recollection of the words is that the department may afford priority.

BY MR. SKALABAN:

Q. And so there -- wasn't the issue to be addressed whether rule making wasn't a change to the contract, it was whether or not priority would be available for Yankee?

MR. SHULTIS: Objection, calls for a legal conclusion, asks for speculation, and mischaracterizes the document.

A. In my personal opinion, the contract

provided for priority based on oldest fuel first. I think in totality, what this paragraph is saying is that -- it's suggesting that Yankee should submit DCSs based on current allocations, encouraged Yankee to exercise exchange rights, indicated the department would be willing to assist whatever Yankee would like to do, but that ultimately, if the rule making changed a provision of the contract away from oldest fuel first, then Yankee could submit -- well, new DCSs, whatever.

BY MR. SKALABAN:

Q. I understand your answer.

I guess what I'm trying to probe at this point in time is, the contract already provided that the department may grant priority. So the issue is not a change in the contract language itself. It was the issue of whether the department should or should not exercise that provision and grant authority.

Isn't that a more accurate characterization of the issue at that time?

MR. SHULTIS: Objection. The document speaks for itself, calls for a legal conclusion, asked and answered.

A. No, I don't believe so. I believe the contract provided for oldest fuel first. It did not

preclude some priority for shutdown.

BY MR. SKALABAN:

Q. What would be the effect if the rule making that's being discussed in this letter and the other letters we've seen -- what would be the effect if the department never carried through with that rule making on Yankee Atomic's DCSs?

MR. SHULTIS: Objection, calls for a legal conclusion, asks for speculation, and vague.

THE WITNESS: Yeah.

A. I mean, I don't understand the question.

BY MR. SKALABAN:

Q. I think it's fair to say that in view of the letters we've been seeing, the department has told Yankee Atomic that they're going to carry through a rule making on the priority for shutdown reactor issue?

MR. SHULTIS: Objection.

BY MR. SKALABAN:

Q. Do you agree with that?

A. Appears to be the case, yes.

Q. And there's nothing in your recollection as the director of office of storage and transport which makes you think otherwise?

A. Don't understand.

Q. There's nothing to your recollection at
this time -- you were the director of office --
director of the office of storage and transport, and
during this time, you have no recollection of
anything other than the fact that Yankee Atomic was
being told there was going to be a rule making to
address this?

A. Yeah. I certainly recall -- in fact in
one of these letters, I think I saw it that Yankee
Atomic preferred not to have a rule-making process,
and I can only speculate the reasons, but certainly
under a rule-making process, you solicit the views of
all interested parties, and you reflect essentially
the majority views in that rule making, and I can
only assume that Yankee would have felt it was in the
minority and not received its intended objective in
the rule making, but I do recall Yankee preferring
not to go through the rule-making process.

Q. Okay. But my question was about what the
department was telling Yankee. And if we look here
at the very first part of the very first paragraph,
it says: The department has not determined whether
priority will be accorded to shutdown reactors. The
department intends to address further the issue of
priority acceptance for shutdown reactors through the

public process of rule making.

And the document also states that: As we discussed during our negotiations, submittal of acceptable DCSs does not preclude Yankee Atomic's rights under the contract should the department subsequent to rule making grant such priority.

I mean, in view of those statements, the department is clearly telling Yankee Atomic, is it not, that there's going to be a rule making on whether or not to grant shutdown priority?

MR. SHULTIS: Objection. The document speaks for itself, calls for speculation, and asked and answered.

A. Yeah. I think I stated that before, that that's what's said here to me, m-hm.

BY MR. SKALABAN:

Q. Okay. And so what would be the effect, then, if there is no rule making after the department is telling Yankee Atomic that they can resubmit based on the results of that rule making?

MR. SHULTIS: Objection, calls for speculation, asks for a legal conclusion.

A. I guess in my opinion sitting here the -- if Yankee had submitted and gotten approved DCSs based on no priority for shutdown reactors and either

a rule making was not undertaken on priority or if a rule making had been undertaken and no change to the contract was made, then those DCSs would stand. If as a result of rule making the contract changed, then Yankee had the ability to submit DCSs based on the change to the contract.

BY MR. SKALABAN:

Q. But I mean, it's fair to say given these statements in this letter that the department is telling Yankee Atomic its going to do a rule making?

MR. SHULTIS: Objection. The document speaks for itself.

A. Yeah, I think it says that, but I don't think it tries to judge the outcome of the rule making.

BY MR. SKALABAN:

Q. Okay. Understanding that they're not judging the outcome of the rule making, it's telling Yankee Atomic that there's going to be a rule making, and depending on the results of that rule making, their schedule may change?

MR. SHULTIS: Objection, assumes facts not in evidence.

A. I don't know.

BY MR. SKALABAN:

Q. Is that a fair characterization?

A. Yeah. I think that's probably fair, saying that if the contract were amended and that amendment somehow affected the method by which priority was granted -- or allocation was granted, then, yeah, the schedule would change.

Q. And so my question is, after telling Yankee Atomic that there's going to be a rule making and that that rule making may affect its DCSs or its schedule, then what is the effect if the department doesn't follow through with what it told Yankee Atomic it's going to do and have a rule making?

MR. SHULTIS: Objection, calls for speculation, asks for a legal conclusion.

A. Yeah. I can't judge what the effect would be, because to do so, I'd say have to judge -- at least make some projection as to what the outcome of the rule making would be. The outcome of the rule making may ultimately end up with no effect, or it may have some effect.

BY MR. SKALABAN:

Q. Now, on page 2 in the last paragraph, it says: If an acceptable year one DCS is not received within 30 days, the contracting officer will issue a decision regarding the status of Yankee Atomic to

and, the notwithstanding the age of the SNF and/or HLW, do those not indicate that the department can grant priority regardless of the OFF ranking?

MR. SHULTIS: Objection, calls for a legal conclusion, asked and answered.

A. Yeah. As I stated, to me, I read that that it does not preclude the department from granting priority, but does not require it.

BY MR. SKALABAN:

Q. Okay. So under the terms of the contract, the department could grant priority regardless of oldest fuel first?

MR. SHULTIS: Objection, calls for a legal conclusion, asked and answered.

A. In my opinion, yes.

BY MR. SKALABAN:

Q. Okay. So I guess to get back to my original question before we looked back at the contract, the department could in this rule making that was discussed in your letter of June 16, 1984, and was also discussed in the previous letters from the contracting officer -- the department could grant shutdown priority without actually modifying the language of the contract?

MR. SHULTIS: Objection, calls for a legal

conclusion, asked and answered.

A. Well, again, in my opinion, I read that contract language as not requiring but allowing. If a change were to be made basically stating that -- or require that priority be given shutdown reactors, in my engineer's opinion again, that language would have to be modified somewhat to require priority be given rather than simply permit it.

BY MR. SKALABAN:

Q. Well, I -- if it's permitted by language of the contract, and we saw -- we've just gone through little subpart A and little subpart B where it had the except language to OFF and the notwithstanding to age language that we just looked at, is it not a pretty clear indication that if the department wants to -- under the existing language, it may -- priority may be accorded -- it may -- if it wants to, the department could grant priority without changing any language in the contract?

MR. SHULTIS: Same objection, calls for a legal conclusion, contract speaks for itself, asked and answered.

A. I guess in my opinion, if priority were to be granted to shutdowns, without any change in the contract language, I don't know how you would deal

with the converse argument, then, from nonshutdown utilities that the contract also states that priority -- or the acceptance ranking should be based on oldest fuel first.

BY MR. SKALABAN:

Q. So I guess I'm just -- I don't understand your -- or don't understand the import of your testimony.

Do you not read subpart A as creating an exception to OFF and subpart B also confirming that notwithstanding the age of the spent fuel, in other words OFF, the department has the ability to grant discretion under the existing terms of the contract?

MR. SHULTIS: Same objection, asks for a legal conclusion, the contract speaks for itself, asked and answered.

A. My opinion, the contract permits the potential of priority for a shutdown reactor. It's also my opinion that to do so would require some language modification of the contract. The reason that I just stated, which is, I don't know how you would address the converse argument from nonshutdown reactors, it's that they were in -- the contract states acceptance priority shall be accorded to oldest fuel first.

came to that recognition, that there was a need for coordination?

A. Well, it would infer from this memo it was Mr. Plummer.

Q. Do you know prior to the time of this memo, dated January 27, 1995, were there any discussions in RW about accepting GTCC waste as part of RW's waste management program?

A. I can't remember -- I can't recall any specific meetings or discussions. I guess I do recall in general terms discussions which essentially focused on the idea that greater than class C was not required to be disposed of in a repository.

Q. And who -- do you recall who those discussions were with?

A. I can only recall just vaguely in general terms having such discussions. No, I can't recall who I had them with.

Q. And why were those discussions being held?

Was there a question in people's mind or a doubt in people's mind whether or not GTCC would have to be taken by RW as far as a waste program?

A. Actually, no. The nature of the discussions I recall were basically either in response to a question from somebody within the

program or perhaps even somebody from environmental management simply informing them that there was no requirement for RW, DOE -- RW.

Q. Did you make that decision, or did someone else?

A. I did not make that decision. I guess the program held that position stemming from -- I guess language in the NWPA, which indicated that the program would dispose of high-level waste that NRC had determined required disposal in the deep geologic repository, and NRC had not made that determination.

Q. Do you remember anyone in particular on RW who was -- may have studied this question or may have --

A. No, no.

Q. Now, I don't want to cover the same ground that was covered before, and I recall your answer being -- about this February 8, 1995, meeting being that you communicated to the office of environmental management RW's position that GTCC was not RW's responsibility.

I mean, is that what you recall you testified to?

A. Yes. I recall I guess having a meeting with Mr. Plummer and stating that. Whether it was a

A. Well, I don't really understand what that particular excerpt is saying. I guess my general understanding is that the NRC had not determined whether or not GTCC required disposal in an OCRWM repository. I think this particular exhibit was the one that the other day I could not at all figure out what it was an excerpt from.

BY MR. SKALABAN:

Q. Okay. Well, let's just take a brief look at the contract, Exhibit 3. There's a definition section, and it begins on page 16600 of the Federal Register. And there's an article one, definitions. There's a No. 12, which defines the term high-level waste.

Do you see that?

A. Yes.

Q. And in subpart B, it says: In effect the term high-level waste means, quote: The other highly radioactive material that the commission consistent with existing law, comma, determines by rule requires permanent isolation.

What is your understanding of that provision I just quoted for you that's here on this Exhibit 3?

MR. SHULTIS: Objection, calls for a legal

conclusion.

A. Well, I guess in my opinion, that would say that if the NRC determines by rule that a particular material requires permanent isolation, then --

BY MR. SKALABAN:

Q. -- then it's covered by the contract?

A. -- it's covered by the contract.

Q. And, permanent isolation, that means -- does that mean to you disposal in a geologic repository?

MR. SHULTIS: Same objection.

A. Not necessarily.

BY MR. SKALABAN:

Q. What do you understand permanent isolation to mean?

A. Permanently isolate the material from whatever, presumably the public, the biosphere, whatever. It doesn't really state what it means there.

Q. Isn't permanent --

A. Permanent isolation could potentially be in a different type of repository, a different repository or different type of repository than what's envisioned under the act.

Q. Okay. So -- but disposal in a geologic repository such as the one that RW is developing would constitute permanent isolation?

MR. SHULTIS: Calls for a legal conclusion.

A. Disposal of a material in geologic repository contemplated under the act certainly constitutes permanent isolation. The converse is not necessarily true, that permanent isolation denotes disposal in the deep geologic repository contemplated under the act.

Q. Again, this is relating to Exhibit 79. Hopefully this will give you a little more context. I'd like to mark as Exhibit 101, and it is -- I can represent to you that this was printed out, I believe, this week from the NRC Web site.

(Milner Exhibit No.101 was marked for identification.)

MR. SHULTIS: Are we still going to be looking at Exhibit 79?

MR. SKALABAN: Yeah. We may refer back to it.

MR. SHULTIS: Okay.

MR. SKALABAN: So it's okay to keep that

Right?

A. Yes.

Q. Well, at the point in time when DOE is performing, isn't the effect of this regulation to require disposal in a geologic repository if there's no alternative available?

MR. SHULTIS: Objection, calls for a legal conclusion, asks for speculation.

A. Well, again, in my opinion, it would appear to be the case, but again I don't think it indicates anything as to timing.

BY MR. SKALABAN:

Q. Well, what -- well, if it doesn't indicate anything to you on timing, I mean, are we talking about a situation where GTCC waste, assuming there's no alternative disposal sites approved by the commission, that GTCC waste is going to sit around in reactor sites for a hundred years?

MR. SHULTIS: Objection, assumes facts not in evidence, calls for speculation.

A. No, I didn't intend to infer anything close to that from what I said. The fact of the matter is that the department or at least the program doesn't address that.

BY MR. SKALABAN:

Q. So if -- when the department starts performing presumably in 2010, if there's no alternative disposal site proposed and approved by the commission, it's going to consider taking GTCC waste in your opinion?

MR. SHULTIS: Objection, calls for a legal conclusion, asked and answered.

A. Well, let me go to the matter of timing again.

To me, you seem to be inferring that when we begin accepting waste in the year 2010 that you can infer from the NRC regulation that at that time we'd begin accepting GTCC, and I'm saying in my opinion I don't think you can infer that.

By the same token, there's certainly not been any discussion or intent that GTCC would sit at a reactor site for a hundred years either. The department has simply not addressed that. This program has certainly not addressed that at this point.

BY MR. SKALABAN:

Q. As a matter of policy, wouldn't it be desirable to see that the GTCC waste goes somewhere when the department begins performing, that it goes either to the repository, or alternatively, if an

leave GTCC sit at a reactor site long after all of the spent fuel has been removed from that reactor site.

MR. SKALABAN: Off the record.

(Recess.)

MR. SKALABAN: Back on the record.

BY MR. SKALABAN:

Q. We were just looking at the definition of -- standard contract of high-level waste, and in particular the provision about other highly radioactive material that the commission consistent with existing law determines by rule requires permanent isolation.

Would you agree that there's some ambiguity in the application of that definition of high-level waste when it's applied to the NRC regulation that we've just been looking at, which requires disposal in a geologic repository in the absence of an alternative?

MR. SHULTIS: Objection, calls for a legal conclusion, asks for speculation.

A. I guess it's my understanding that the NRC has not determined that GTCC requires disposal in the Yucca Mountain repository.

BY MR. SKALABAN: