Q. But is it fair to say that they've determined that it requires disposal in a geologic repository in the absence of alternatives?

MR. SHULTIS: Objection, calls for a legal conclusion.

A. In my opinion, yes, it does.

BY MR. SKALABAN:

Q. So given that it requires disposal in a geologic repository, in the absence of an alternative, doesn't that create some question whether or not this definition of high-level waste then applies to GTCC waste?

MR. SHULTIS: Calls for a legal conclusion, assumes facts not in evidence.

A. I guess my personal opinion, there's some ambiguity.

BY MR. SKALABAN:

Q. There's some questions when you apply this contract definition to the existing regulation?

MR. SHULTIS: Same objection.

A. In my mind.

BY MR. SKALABAN:

Q. In your mind, there's some question whether this contract definition then requires GTCC disposal under the contract?

MR. SHULTIS: Same objections.
A. No. I -- my understanding at this point in time is that it does not require disposal in a geologic repository such as Yucca Mountain.
BY MR. SKALABAN:
Q. But this provision of the contract could be interpreted to require that.
It's susceptible to that interpretation?
MR. SHULTIS: Objection, calls for a legal conclusion, asks for speculation.
A. I don't know that I -- let me say that in my opinion, it doesn't preclude that.
BY MR. SKALABAN:
Q. So while your reading of it is in view of that NRC regulation GTCC is not covered by the contract, but that is a plausible alternative interpretation of this reading of the contract that GTCC waste is covered in the contract?
MR. SHULTIS: Same objections, mischaracterizes prior testimony.
A. Well, I don't think any of the definitions in view of the NRC regulation necessarily preclude it. In terms of whether this is a plausible interpretation, I don't know.
BY MR. SKALABAN:

approximately '94 and '95 that the department issued its first notice -- I think it was a notice of rule making -- about the uncertainties of the 1998 date; is that right?

MR. SHULTIS: Objection, assumes facts not in evidence. I think it mischaracterizes prior testimony.

A. I don't recall the dates there.

Are you referring to the notice of inquiry?

BY MR. SKALABAN:

Q. Yes.

A. I don't recall what that date was. That's roughly the right time frame.

Q. Well, again, given that in approximately the '95 time period the department initiated notice of inquiry, wouldn't that create some substantial problems for a swap market to develop if there were a serious question about DOE was performing in 1998?

MR. SHULTIS: Calls for speculation.

A. I guess sitting here at this point, my opinion would be -- and I don't remember specifically thinking about it at the time, but, yeah, I think in my opinion, it would be a hindrance. I don't know that it would be a significant hindrance. My

assumption would be that if a utility for whatever reason needed to move itself up in the queue, it would need to do that regardless of whether the department began accepting in '98 or in 2010.

BY MR. SKALABAN:

Q. But if the utilities were considering exchanging amongst themselves, wouldn't it be very important for them to know whether the department was going to be begin in 1998 or 2010?

MR. SHULTIS: Same objection.

A. I've always held the personal belief that it was important that the utilities have the best estimate available as to when we would start operation.

BY MR. SKALABAN:

Q. Well, different utilities might have dramatically different storage needs in 1998 and 2010.

Isn't that a fair assumption?

A. Yeah, I think that would be fair.

Q. So if there's uncertainty whether the department is going to perform in '98 or 2010, that could have a large effect on whether they would be willing to swap, don't you think?

A. Potentially, m-hm.

Q. If I could call your attention briefly to Milner 60, in particular the position statement draft on page 3.

The second sentence says: The projected CRWMS acceptance capacity is currently anticipated to exceed the industry annual SNF discharge rate in the year 2010 or when a repository begins operations, period. At that time, DOE will revisit this issue and consider granting acceptance priority to shutdown reactors.

Now, recognizing that this is a preliminary draft and that it appears to be from a contractor, does that indicate to you that the department at this time would consider more favorably granting acceptance priority to shutdown reactors at a time when the industry's annual discharge rate had exceeded?

A. It does not.

Q. Why not?

A. Well, two things. The wording in this draft statement first of all indicates that it would be considered at that time. To me it gives no indication of whether that would be a more favorable consideration or not.

But then secondly, this is a preliminary

draft of a contractor work product, which would simply be input to the department's decision-making process.

Q. Well, from December 29, 1992, forward, did the department ever take the view that it would consider granting acceptance priority when the discharge rate is exceeded?

MR. SHULTIS: Objection. Mr. Milner is not a 30(b)(6) witness.

A. Well, in my recollection, the department never took the view that it would grant priority to shutdown reactors once a certain rate was reached or exceeded. And I think I had testified earlier that in a number of points throughout the history of the program, the department addressed the issue of priority to shutdown reactors and usually addressed the issue in discussions with industry representatives.

And generally, I think the majority opinion was -- discussions on the part of the utility side was that priority should not be afforded to shutdown reactors.

(Discussion off the record.)

BY MR. SKALABAN:

Q. Well, if it could be shown that granting

priority to a shutdown reactor would not adversely
impact an operating utility in the sense that that
operating utility would not be required -- or no
operating utilities would be required to rerack or
build dry storage because of some accelerated
priority for a shutdown, in that instance, would it
make sense for the department to grant priority?

MR. SHULTIS: Objection, assumes facts not
in evidence, also calls for speculation.

A. Well, I think that the view held by a
large number of utilities were that any priority
afforded a shutdown reactor would adversely affect
them.

BY MR. SKALABAN:

Q. But if it could be demonstrated that it
wouldn't -- that it wouldn't require any excess cost
to be incurred for on-site storage to any operating
utility, would that be an important consideration in
the department's mind as to whether to grant
acceptance priority or not?

MR. SHULTIS: Same objection, asked and
answered.

A. Again, I think if it could be
demonstrated -- in that sense demonstrated to all of
the contractor holders as well as the department that

there was no adverse effect, and I wouldn't limit that to the need or not need -- or no need for building additional storage, just a general if everybody agreed that, yes, it was demonstrated that there was no adverse effect whatsoever in anyone's mind, then, yeah, that would have made sense.

I don't -- I can recall of nothing that was ever said, demonstrated, whatever, that went along those lines. I think it remains the position of quite a number of utilities to this day that any priority for shutdown reactors would adversely affect a utility.

BY MR. SKALABAN:

Q. Well, wouldn't the answer to the question on whether there would be an adverse impact to other purchasers -- wouldn't that be influenced to a very large extent by how great the acceptance rate is if the -- if, for example, there's a steady state rate of 3,000 MTUs, as opposed to, say, 400 MTUs, there would be a lot less need to build or to allow for additional storage at operating reactor sites?

Do you agree with that?

MR. SHULTIS: Calls for speculation.

A. I would agree with a part of the statement that said, if you -- well, if you up the acceptance

rate and utilities had no need for additional storage at the lower rate, certainly the higher rate they wouldn't need either.

And perhaps I misunderstood your question, but --

BY MR. SKALABAN:

Q. Okay. I guess what I'm driving at is, how great the steady state acceptance rate is would have a large impact on whether or not other purchasers would be impacted by a grant of priority if the department's performing in a rate such as 3,000 MTU.

It's accepting a lot more spent fuel from purchasers than if it's accepting rate at 400; is that right?

MR. SHULTIS: Asked and answered.

A. Well, I think in my opinion, a number of the contractor holders hold the view that regardless of what the acceptance rate is, any priority to a shutdown reactor would adversely impact them.

And if I can try to think of a hypothetical example.

If utility X had an allocation of a hundred MTUs in a given year and the overall acceptance rate was 500 MTUs for that year, if the department doubled that acceptance rate to a thousand

MTUs in that particular year, potentially utility X might expect that their allocation would increase to 200. And therefore, you know, likely their view would be that they were adversely impacted even though the rate were doubled.

BY MR. SKALABAN:

Q. I guess what I'm driving at, there's plenty of room in their spent fuel pool, that utility -- and the overall acceptance rate is, say, 3,000 MTU, and they can see in view of that acceptance rate that they're not going to have to add additional storage under that rate, and they have excess room, they're not going to be adversely affected economically if there's a grant of priority?

MR. SHULTIS: Objection, assumes facts not in evidence, calls for speculation, asked and answered.

A. I mean, we're both sitting here trying to get into the mind of a hypothetical utility, and if a utility's only view of adverse impact was whether or not they had to build additional storage, then I suppose that utility would deem that there was no adverse impact, but I no way can try to believe that I know what every utility's definition of adverse impact is.

BY MR. SKALABAN:

Q. Well from the department's perspective, if there was no -- if it could be shown that there's no economic impact to other utilities, in other words, because of this grant of priority, the other utilities are not going to have to add some additional storage facilities, they're not going to have to incur those costs, what other adverse impacts would there be that the department would be concerned about?

MR. SHULTIS: Same objections, including asked and answered.

A. Well, to characterize adverse impacts that the department would be concerned about, I think our concern more related to the allocation in our view under the contract specified oldest fuel first. To change that really would require I think the agreement on certainly the bulk of the contract holders.

BY MR. SKALABAN:

Q. But can you think of any other adverse economic -- I mean, any other adverse impacts other than economics?

MR. SHULTIS: Same objections, asked and answered.

A. Well, I can only speculate that a utility might be concerned if -- might perhaps be concerned about the reaction of its PUC or its post- -- that there may be a negative reaction for them giving up what might be viewed as a quicker removal of the spent fuel from that site, be it shutdown or operating reactor.

BY MR. SKALABAN:

Q. Now, while we have the contract still out, we looked and spent some time talking about the DCS instruction 2.7, which required the utility purchasers to follow the allocations in the ACR; is that correct?

We looked at that earlier?

A. Right.

Q. And I believe I asked you about what was the authority that the department based that instruction on, and I believe you referred me to different provisions in the contract, is that right, the ACR?

A. Well, I think I referred -- reference in the contract not to specific provisions but the ones that reference the ACR -- APR. Excuse me.

Q. Well, I'd like you to take a look at the contract section -- it's the page of the Federal

A. Well, I can only speculate that a utility might be concerned if -- might perhaps be concerned about the reaction of its PUC or its post- -- that there may be a negative reaction for them giving up what might be viewed as a quicker removal of the spent fuel from that site, be it shutdown or operating reactor.

BY MR. SKALABAN:

Q. Now, while we have the contract still out, we looked and spent some time talking about the DCS instruction 2.7, which required the utility purchasers to follow the allocations in the ACR; is that correct?

We looked at that earlier?

A. Right.

Q. And I believe I asked you about what was the authority that the department based that instruction on, and I believe you referred me to different provisions in the contract, is that right, the ACR?

A. Well, I think I referred -- reference in the contract not to specific provisions but the ones that reference the ACR -- APR. Excuse me.

Q. Well, I'd like you to take a look at the contract section -- it's the page of the Federal

Register 16601. And in the article five, part B, delivery commitment schedule, it says on the top of column three: The purchaser shall submit to DOE the delivery commitment schedules which shall identify all SNF and/or HLW that the purchaser wishes to deliver to DOE beginning 63 months thereafter.

Do you see that, sir?

A. I do, yes.

Q. What was your understanding of that part of this provision of the contract?

MR. SHULTIS: Objection, calls for a legal conclusion.

A. I guess my personal interpretation is that they would in fact submit DCSs which were consistent with their allocation.

BY MR. SKALABAN:

Q. If it says that the purchaser shall submit DCSs which shall identify all the SNF and/or HLW the purchaser wishes to deliver -- if the purchaser is required to by the instruction to, say, only submit up to the level of their allocation in MTUs, they can't then provide or can't identify -- they can't -- or more specifically, they're precluded from identifying all of the SNF that they may wish to deliver?

MR. SHULTIS: Objection, calls for a legal conclusion.

A. Yeah. In my personal opinion, I would read that -- I don't know that you can read any provision of the contract separate and apart from other provisions of the contract. And I guess I would be reading that in conjunction with the prior article, which talks about DOE issuing an annual acceptance priority ranking and an annual capacity report, which delineates our receiving capacity.

And in reading those two together, in my personal opinion, I think you would not -- I can't see a reason why you would infer that you would submit a DCS which was greater than your allocation.

BY MR. SKALABAN:

Q. Well, the language, all SNF and/or HLW that they wish to deliver, that language in that provision is -- it's not tied to an ACR allocation, is it?

MR. SHULTIS: Objection, calls for a legal conclusion, asked and answered.

A. In my opinion, it is. I mean, I guess if I were to read that provision -- you know, hypothetically if I were to read that provision separate and distinct from any other provision in the

contract, I could conceivably read that as requiring the utility to deliver that fuel to the repository.

BY MR. SKALABAN:

Q. All the fuel that it wishes to deliver?

A. To the repository.

MR. SHULTIS: Same objections.

BY MR. SKALABAN:

Q. So it can conceivably be read to allow the utility to identify all the fuel that it wishes to deliver, aren't the DCS instructions in effect changing the terms of the contract?

MR. SHULTIS: Objection, calls for a legal conclusion, mischaracterizes prior testimony.

A. Yeah, I think you are mischaracterizing my response.

I was saying a hypothetical that if you read that provision separate and apart from anything else in the contract, you could probably infer any number of things. But I think you read one provision in the contract in conjunction with other provisions. And to me you read that in conjunction with annual capacity report limitations and allocations.

BY MR. SKALABAN:

Q. Well, I guess what -- yeah, I definitely don't want to mischaracterize your prior answers.

Thank you for clarifying.

But there's nothing in this provision B 1 that references an annual capacity report. It does talk about a priority ranking, but there's nothing about the annual capacity report in the DCS provision.

MR. SHULTIS: Objection. The document speaks for itself, asked and answered.

A. Unless I'm totally remembering wrong, I believe the contract does reference annual capacity reports and annual priority rankings.

BY MR. SKALABAN:

Q. I'm just talking about this provision B 1.

MR. SHULTIS: Same objections.

A. I believe I've responded to that already.

BY MR. SKALABAN:

Q. Okay. So it's your view that this provision that purchasers shall submit to DOE the delivery commitment schedules which identify all SNF that they wish to deliver is tied to the annual capacity report?

A. That's my view.

Q. And in your view, it's not susceptible to another interpretation?

MR. SHULTIS: Same objection, asked and

answered, mischaracterizes prior testimony.

A. In my view, no.

MR. SKALABAN: I'd like to mark as Exhibit I believe it's 102 --

(Milner Exhibit No. 102 was marked for identification.)

MR. SKALABAN: This is a document entitled, U.S. Department of Energy, Office of Civilian Radioactive Waste Management, nuclear waste technical review board, full board meeting, subject, update on the multipurpose canister concept, presenter, Ronald A. Milner, and it's dated July 11th, 1994.

MR. SHULTIS: Actually -- I'm sorry. It says, January 11th.

MR. SKALABAN: Thank you. January 11th, 1994.

BY MR. SKALABAN:

Q. Do you remember giving this presentation?

A. Vaguely, I do, yeah.

Q. Can you tell me about what the purpose of the presentation was?

A. No. My recollection, it was just what the subject says, to update the TRB on the multipurpose

therefore, would provide some impetus or motivation for the department or others to develop an MPC system.

Q. And so these listed under that bullet point -- these are advantages of an MPC system, whether it's developed by the department or by others?

A. Yes.

Q. And you agree that these are advantages of the system, of an MPC canister system?

A. My personal opinion -- well, I didn't read all of them, but, yeah, I would agree those are advantages.

Q. Are there any major disadvantages of canisters, of using canisters in the program that you're aware of?

A. Certainly a disadvantage that it -- I could see would be that if ultimately no canister could be simply placed in a waste package and in the repository, then the department would have to open those canisters and repackage that fuel, which would probably to some degree increase the handling on DOE's part that would be required.

Certainly if there were widespread use of a canister system that ultimately could not be used

for disposal, you've created a fairly large secondary waste stream to deal with canisters.

Q. Any other disadvantages that you can think of?

A. Not offhand, no.

Q. And at this point, if I understand -- again I don't want to -- I want to make sure I'm correctly testifying -- or correctly representing your prior testimony -- at least currently the department's plans are to accept canister systems and to dispose of them if possible?

A. Certainly the department plans to accept canister systems. The department certainly hopes to be able to dispose of those. Obviously, we would prefer not to have to open them and create another waste stream.

MR. SKALABAN: Let me go ahead and mark this. I believe we're on Exhibit 102; is that correct?

MR. SHULTIS: 103.

MR. SKALABAN: Thanks.

(Milner Exhibit No. 103 was marked for identification.)

BY MR. SKALABAN:

MR. SHULTIS: Objection, calls for a legal conclusion, also asks for speculation.

A. In my personal opinion, if the canister contained nothing but standard fuel, I don't see any reason why that canister would be delayed.

BY MR. SKALABAN:

Q. And if it contained some failed fuel but the canister system was licensed to handle that failed fuel and it was licensed to store it and it was licensed to transport that failed fuel, would there be any reason that that canister would be delayed?

MR. SHULTIS: Objection, calls for a legal conclusion and asks for speculation.

A. My personal opinion, if that canister were licensed for storage and transport failed fuel, that could still potentially delay that canister.

BY MR. SKALABAN:

Q. And why would that be?

MR. SHULTIS: Same objections.

A. If that canister were not licensed for disposal, therefore, requiring the department to open that canister, depending on the nature of the failure, that may or may not require special handling.

BY MR. SKALABAN:

Q. So that would again depend -- in your view, in your opinion, it would depend on the disposal facility's ability to process that failed fuel?

MR. SHULTIS: Same objections.

A. Yeah. It would depend on the nature of the failure and whatever requirement there may be for special handling.

BY MR. SKALABAN:

Q. Do you know a Mr. Ivan Stewart?

A. Yes, I do.

Q. Can you tell me who Mr. Stewart is?

A. I believe -- he certainly was -- I believe he still is an employee of Nuclear Assurance Corporation.

Q. Let me ask you, have you had occasion to work with Mr. Stewart?

A. Yes.

Q. What's your professional opinion of him?

MR. SHULTIS: Objection, relevance.

A. My personal opinion, I think he's a good engineer. It's been some time since I've seen Mr. Stewart.

BY MR. SKALABAN:

say that it's true today, yes.

Q. It's something that you're -- I guess will be studying probably in the near future?

A. Correct.

Q. And do you agree with this statement: It will depend on the availability of technologies that are certified by the NRC prior to the start of CRWMS operations and the needs of the individual purchasers?

A. Correct.

Q. And what is your understanding of that clause there, the mix will -- in essence the mix of casks and canisters will depend in part on the needs of the individual purchasers?

A. I think it's -- I believe it's the program's view -- it's certainly my view that individual utilities will make decisions on storage based on their own individual needs and economics studies. And I suppose it's conceivable that if a true multipurpose canister system -- and maybe now is a good time to make a distinction since we've been talking about multipurpose canister systems, but what we've really been talking about in terms of what's in existence are dual-purpose storage systems transport, but if a true multipurpose canister system is

developed, that's one that's considered by the NRC for storage, transport, and disposal, were available, it still could be decided by an individual utility not to use that system.

So therefore that would -- individual utility needs would certainly affect the mix. Some utility for whatever its own individual needs -- maybe it's economics. Maybe there are other considerations -- may not utilize all the technologies available.

Q. I just want to pick up on something you said.

You said we'd been talking about what are dual-purpose canister systems?

A. M-hm.

Q. Isn't it possible that the canisters such that are utilized in the NAC SDC (sic), NAC MPC could be licensed for storage -- I mean, licensed for disposal, which would make them a multipurpose canister system?

A. It's conceivable that they could, yes. I don't know that any of them have submitted an application for certification yet, but I know of no reason why that couldn't ultimately happen.

Q. And in this -- going back to this

nuclear shipments within the country. I don't know that there's been large number of shipments from reactors to government facilities. There certainly has been some small amounts of that that I'm aware of, at least within this country.

Q. And has there been a lot of shipments of foreign fuel?

I mean, are you aware that spent fuel has been shipped in large quantities in foreign countries?

A. Yes.

Q. In fact, I believe countries such as Britain, France, Japan, and Russia reprocess spent fuel, don't they?

A. France and Britain reprocess spent fuel. Germany, Japan, I believe others ship their fuel to one of those two countries for reprocessing or have in the past at least.

Q. So in view of that, there's been substantial amounts of spent fuel transportation shipments abroad?

A. Yes.

Q. Would you have any reason to disagree with an opinion that through 1998 more than 100,000 MTUs of spent fuel has been shipped by road, rail, and sea

outside of the United States?

A. I certainly don't recall the number, but I don't have any reason to disagree with that.

Q. And in view of the history of spent fuel transportation in this country and the substantial body of spent fuel transportation abroad, would the sort of history and experiences of those -- of that spent fuel transportation have been something that DOE would have drawn upon if it had performed in 1998?

MR. SHULTIS: Objection, calls for speculation.

BY MR. SKALABAN:

Q. Well, let me say this, I mean, that history of transportation here and abroad, is that something that DOE draws upon now in planning its spent fuel transportation program?

A. I'm not sure I understand what you mean by, draw upon.

Q. I mean, in the history and experience within this country and abroad, does RW use any of that information and experience --

A. Well, we're certainly aware of experiences and shipments that have been accomplished in other countries, yeah. In terms of for example casks, I

outside of the United States?

A. I certainly don't recall the number, but I don't have any reason to disagree with that.

Q. And in view of the history of spent fuel transportation in this country and the substantial body of spent fuel transportation abroad, would the sort of history and experiences of those -- of that spent fuel transportation have been something that DOE would have drawn upon if it had performed in 1998?

MR. SHULTIS: Objection, calls for speculation.

BY MR. SKALABAN:

Q. Well, let me say this, I mean, that history of transportation here and abroad, is that something that DOE draws upon now in planning its spent fuel transportation program?

A. I'm not sure I understand what you mean by, draw upon.

Q. I mean, in the history and experience within this country and abroad, does RW use any of that information and experience --

A. Well, we're certainly aware of experiences and shipments that have been accomplished in other countries, yeah. In terms of for example casks, I

don't know that any of the casks used for shipments have been certified by the United States Nuclear Regulatory Commission, but certainly we're aware of what's been done and utilize that information.

Q. Would you agree with the opinion that with sufficient advance planning, DOE could develop the casks or casks for nonstandard fuel, failed fuel, and GTCC waste and obtain the necessary licenses from the NRC --

MR. SHULTIS: Objection, calls for speculation, asks for a legal conclusion.

BY MR. SKALABAN:

Q. -- to perform in 1998 if it had been able to do so?

MR. SHULTIS: Same objection.

A. Transport casks, you're referring to?

BY MR. SKALABAN:

Q. M-hm.

A. Certainly transport casks could have been developed and in fact I believe were developed that were certified by the NRC for transport of spent fuel. I guess in my recollection, I don't know of any that had been developed for failed fuel or GTCC. I can't offhand at this point -- I have no reason to believe at this point that that couldn't have been

A. No, I don't.
Q. It also reflects that in the interim the director encouraged Yankee to exercise a contractual right to exchange allocations with other interested utilities; is that correct?
A. Correct.
Q. And that is in fact what the department did?
A. I believe so, yes.
Q. On the second page, a few bullet points down under the department's position is that, colon, there's a provision -- well, can you tell me what you understand what's being talked about in this first -- the first bullet point under, the department's position is that, and I'm referring to the part that it says the contract provides a priority may be granted?
MR. SHULTIS: Objection, calls for a legal conclusion.
A. Well, in my opinion, I believe that that particular bullet is responding to the first bullet under the section that's labeled Yankee's position. Yankee's position was that they believed that priority acceptance was provided for in the contract, and I think this states that the department's

position was that it may be granted, that it was not required to be granted, but that to grant priority to shutdowns would adversely impact other utilities.

BY MR. SKALABAN:

Q. Here you wrote to the director of the program that the grant of shutdown priority in Yankee would adversely impact other utilities, quote, due to the legal limit on acceptance capacity prior to repository operations, unquote.

Do you see that part?

A. I see that.

Q. What do you mean by that?

A. That particular parenthetical referred to the 10,000 metric-ton capacity limit prior to the start of the repository operation on an MRS.

Q. Here you seem to be linking the fact that it would adversely impact other utilities to the statutory capacity limits, but I believe in other testimony you at least indicated or I understood you to indicate that granting shutdown priority would just as a general matter adversely impact other utilities.

A. Well, with the capacity limit, it would certainly impact -- adversely impact other utilities. In my personal opinion, is that even without the

position was that it may be granted, that it was not required to be granted, but that to grant priority to shutdowns would adversely impact other utilities.

BY MR. SKALABAN:

Q. Here you wrote to the director of the program that the grant of shutdown priority in Yankee would adversely impact other utilities, quote, due to the legal limit on acceptance capacity prior to repository operations, unquote.

Do you see that part?

A. I see that.

Q. What do you mean by that?

A. That particular parenthetical referred to the 10,000 metric-ton capacity limit prior to the start of the repository operation on an MRS.

Q. Here you seem to be linking the fact that it would adversely impact other utilities to the statutory capacity limits, but I believe in other testimony you at least indicated or I understood you to indicate that granting shutdown priority would just as a general matter adversely impact other utilities.

A. Well, with the capacity limit, it would certainly impact -- adversely impact other utilities. In my personal opinion, is that even without the

capacity limits, under almost any acceptance rate, it would adversely impact other utilities.

Q. Well, why add this parenthetical, then, in your letter to the director?

A. I don't specifically recall why it was added there, but it's certainly true, and --

Q. So the situation -- I mean, is it fair to say that if the legal limits on acceptance capacity were not there, there may be opportunities where shutdown priority would not adversely impact other utilities?

MR. SHULTIS: Objection, calls for speculation, document speaks for itself.

A. In my opinion I guess I have to go back to what's each individual utility's definition of an adverse impact, and you and I may determine is or is not an adverse impact might be completely different for another utility if we were utility representatives.

BY MR. SKALABAN:

Q. Okay. And the concurrence chain on the side indicates that this memo was circulated to a wide variety of people and they concurred in it?

MR. SHULTIS: Objection, mischaracterizes the document.