IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - -x

YANKEE ATOMIC ELECTRIC :
COMPANY, :
Plaintiff, : Case No. 98-126C
v. : Senior Judge
: Merow
THE UNITED STATES, :
Defendant. :

- - - - - - - - - - - - - - - -x

Washington, D.C.
Wednesday, April 21, 1999

Deposition of NANCY H. SLATER, a witness herein, called for examination by counsel for Plaintiff in the above-entitled matter, pursuant to agreement, the witness being duly sworn by JAN A. WILLIAMS, a Notary Public in and for the District of Columbia, taken at the offices of Spriggs & Hollingsworth, 1350 I Street, N.W., Washington, D.C., at 10:10 a.m., Wednesday, April 21, 1999, and the proceedings being taken down by Stenotype by JAN A. WILLIAMS, RPR, and transcribed under her direction.

because that was the primary goal of that group, was to achieve some type of consensus.

And, if consensus was achieved, then the results would have been communicated ultimately to all the utilities and to the Department of Energy.

Q. What do you mean by consensus, does that mean everyone agrees or most people agree, what do you mean by consensus?

A. Consensus is not unanimity, I think you know that. I would say my personal opinion is, if you have 50 percent of the group that says yes and 50 percent that says no, obviously you don't have consensus. I have no hard-and-fast line at which I believe you achieve consensus.

Q. Somewhere between a simple majority and unanimity?

A. Yes.

Q. One of things you said you worked on with that group was looking at certain issues with respect to the standard contract. What sort of issues would the group have looked at?

A. The group, in fact, would have looked at issues like shutdown reactors, priority for shutdown reactors, the group looked at oldest

fuel first. Those are the two that come to mind immediately.

Q. Let's start with priority for shutdown reactors. How did the group come to address that issue?

A. Priority for shutdown reactors in the opinion of the group was an equity issue. To afford priority to a shutdown reactor was to impede the ability of another utility to deliver. And the group was very divided in terms of whether a shutdown priority should be provided.

Q. What was the circumstance in which the group took up this issue?

A. The group had embarked upon an effort to identify areas of the standard contract that it believed could use some clarification.

Q. How did it identify those issues?

A. It reviewed the standard contract and asked itself did it clearly understand the terms and conditions.

Q. What was your role in that process?

A. My role would have been to perform the review as well and to advise them. And I was responsible for drafting an issue paper that

would present both sides of an argument.

Q. Do you recall which issues you identified as those warranting clarification?

A. No, I don't. I do recall that it was a rather long list.

Q. And the priority for shutdown compliance issue was one of those on the list?

A. Yes.

Q. And the oldest fuel first issue was another one on the list?

A. Yes.

Q. So you wrote up an issue paper on the priority for shutdown compliance issue?

A. Yes.

Q. What would go into that issue paper?

A. The issue paper would have addressed the benefits associated with granting priority to shutdown reactors in terms of the benefits to the shutdown reactor. It would have also addressed the downside to doing that in terms of equity to other utilities and potential delays in their ability to deliver waste. This was very much an industry equity issue.

Q. Do you recall, was there any attempt to look at whether giving priority to shutdown

plants would be more efficient for the system as a whole?

A. Would you clarify that in terms of effort by whom?

Q. Lead to lower costs for all utilities.

A. But effort by whom, utilities? Are you asking me was there an effort by utilities?

Q. Yes, to look at that issue?

A. I don't recall honestly.

Q. You said the group was sharply divided on the priority for shutdown plants issue. What was the line of division?

A. If you're shutdown, obviously you're not generating more fuel. Your financial liability is fixed in a sense. If you're operating, your financial liability is not fixed. If shutdown reactors deliver first, that meant that an operating reactor might have to add additional storage capacity over and above what they had anticipated adding.

Q. I sort of had in mind something else. Who was on each side of the issue, whether or not there was a priority for shutdown plants?

A. Shutdown reactors were on the yes, let's have priority, and operating reactors were

on the no.

Q. And there weren't any exceptions to that, there were no operating plants that favored giving priority to shutdown plants?

A. I don't recall that specifically. But my recollection is that it was very heavily weighted.

Q. What was the time frame that you were looking at this issue?

A. This would have been the '86, '87 time frame.

Q. There weren't many shutdown plants then, were there?

A. That's right.

Q. How many approximately do you recall?

A. There might have been two or three.

Q. And everybody else was operating and didn't think those two or three should get priority?

A. Well, I'm not sure I could say everybody, but the majority.

Q. Do you recall if there were spokespeople on sort of the two sides of that issue within the group?

MS. SULLIVAN: I'd like to ask a

Q. Let me make sure I understand. So you would try to go to each side in this dispute and tell them as objectively as you could what the other side was really talking about?

A. Uh-huh, yes.

Q. Do you recall, were there any particular areas of misunderstanding, where in your sort of objective presentation you would try to make a distinction?

A. I do recall that there was concern among the shutdowns or potentially shutdown reactors that this would not be a simple exchange but might involve the exchange of some remuneration as well.

Q. Was that, in fact, the view of the utilities that were proposing exchanges instead of priority, that there would be money as well as exchanges in kind?

A. No, I don't recall that.

Q. The utilities in this '86, '87 time frame were simply talking about exchanging the slots themselves?

A. Right.

Q. On this priority for shutdown plants issue in the '86 or 87 time frame, was there any

Q. Let me make sure I understand. So you would try to go to each side in this dispute and tell them as objectively as you could what the other side was really talking about?

A. Uh-huh, yes.

Q. Do you recall, were there any particular areas of misunderstanding, where in your sort of objective presentation you would try to make a distinction?

A. I do recall that there was concern among the shutdowns or potentially shutdown reactors that this would not be a simple exchange but might involve the exchange of some remuneration as well.

Q. Was that, in fact, the view of the utilities that were proposing exchanges instead of priority, that there would be money as well as exchanges in kind?

A. No, I don't recall that.

Q. The utilities in this '86, '87 time frame were simply talking about exchanging the slots themselves?

A. Right.

Q. On this priority for shutdown plants issue in the '86 or 87 time frame, was there any

interaction between your group and the Department of Energy on this issue?

A. Yes.

Q. What was the nature of that interaction?

A. Informal technical exchanges with the logistics and utility interface branch on a variety of issues including that issue.

Q. Were you involved in those informal exchanges personally?

A. Yes.

Q. Who would you have talked to at DOE?

A. Alan Brownstein.

Q. When you say you had informal technical exchanges with Mr. Brownstein, what do you mean by a technical exchange?

A. Not debating legislative history, not debating organizational policy, strictly addressing the technical merits of the issue, the mechanistic aspects of the issue.

Q. What do you recall Mr. Brownstein saying on this issue in that time frame?

A. I recall that Mr. Brownstein expressed his opinion that this was very much an industry driven issue, that, if the industry decided as an

industry that shutdown reactors should have priority, given the statement in the contract may grant, the department would be willing to consider that.

Q. Mr. Brownstein reviewed the language saying that DOE may give priorities as giving DOE complete discretion to do it or not?

A. I don't believe I would characterize it that way. I would characterize it as the flexibility to grant priority; if the industry achieved consensus, that that was what the industry wanted, because it was an industry equity issue.

Q. Mr. Brownstein understood the priority for shutdown plants issue to be an industry equity issue also?

A. Yes.

Q. Other than your discussions with Mr. Brownstein, did you discuss the priority for shutdown plants issue with anyone else at DOE in the '86 to '87 time frame?

A. I don't recall that I did.

Q. What would you have been telling Mr. Brownstein during these discussions?

A. What I did tell Mr. Brownstein is that

Q. Did you recall, did any of these people take the priority for shutdown plants side?
A. Yes.
Q. Who would that have been?
A. Mr. Kadak and Mr. Grube.
Q. Their plants were shut down?
A. I don't recall if they were shut down at the time or if they were in the process of shutting down, I don't recall, I would have to go back and look.
Q. But they were either shut down or in the process?
A. Or in the process, it was looming on the horizon.
Q. And everybody else didn't anticipate shutting down and so they were on the against priority for shutdown plants?
A. In general.
Q. Now, you said the utility group didn't reach consensus on the priority for shutdown plant issue in the '86, '87 time frame. What happened to that issue while you were with EEI?
A. During the time I was with the utility group, I don't believe we did close on that issue. And I don't know whether they closed on

that issue while I was in the fossil side of the house.

Q. And, if an issue didn't close, it just kind of hung there, what happened to it?

A. Perennial, it could be argued forever.

Q. Do you have an understanding if that group ever did reach closure on the issue?

A. Yes, I do. Following my coming to the Department of Energy, I was told by Steve Kraft who was the director that they had produced an issue paper, the bottom line of which was priority should not be granted to shutdown reactors. I have not seen that paper.

Q. Do you recall when you would have had that discussion with Mr. Kraft?

A. In the '91 or '92 time frame.

Q. Do you recall how that issue came up in your discussions with Mr. Kraft?

A. No, I don't.

Q. Another issue that you mentioned that you worked with with the high level waste working group was the oldest fuel first issue?

A. Yes.

Q. By the way, let me go back. Has the Utility Nuclear Waste Management Group, has that

when I came to DOE, I wrote the letter that answered the question yet again for one of the utilities.

Q. Which way did you answer the question?

A. Burned in a U.S. reactor.

Q. Just to rephrase, DOE agreed that, as long as the fuel is burned in a U.S. reactor, it was considered fuel of domestic origin?

A. Domestic origin, right, right.

Q. Do you recall the utility working group looking at the issue of the rate at which DOE would accept spent fuel?

A. Not really. And only in the sense that whatever DOE came up with the utilities obviously wanted more.

(Slater Exhibit No. 2 was marked for identification.)

BY MR. SHAPIRO:

Q. Ms. Slater, if you would take a look at a document that we've had marked, Slater Exhibit 2. Do you recognize this document?

A. Let me look through it.

Yes, I do.

Q. Can you tell us what the document is?

A. You'll remember that I said that there

when I came to DOE, I wrote the letter that answered the question yet again for one of the utilities.

Q. Which way did you answer the question?

A. Burned in a U.S. reactor.

Q. Just to rephrase, DOE agreed that, as long as the fuel is burned in a U.S. reactor, it was considered fuel of domestic origin?

A. Domestic origin, right, right.

Q. Do you recall the utility working group looking at the issue of the rate at which DOE would accept spent fuel?

A. Not really. And only in the sense that whatever DOE came up with the utilities obviously wanted more.

(Slater Exhibit No. 2 was marked for identification.)

BY MR. SHAPIRO:

Q. Ms. Slater, if you would take a look at a document that we've had marked, Slater Exhibit 2. Do you recognize this document?

A. Let me look through it.

Yes, I do.

Q. Can you tell us what the document is?

A. You'll remember that I said that there

were issues that were identified based on review that both DOE and the utility group believed needed to be resolved. Some of the issues were coincident, some were not.

And this represented the utility group's effort to not only request a clarification but influence the outcome of the clarification because only the contracting officer had the ability to opine on the standard contract.

Q. Now, you'll see in the last page of this document that it's signed by Mr. Kraft. Do you recall, would you have written this document for him?

A. No, I would not.

Q. Were you involved in the creation of this document?

MS. SULLIVAN: Do you need to take time to review the document before you answer any further questions?

THE WITNESS: Yes, I was involved.

BY MR. SHAPIRO:

Q. What was the nature of your involvement?

A. Explaining issues to the individuals

130:
performance, canister weights, you would have to have a different canister for consolidated fuel in terms of how you would handle it mechanically.

Q. How about the issue above that, as to whether nonfuel components would be accepted if they were not integral to the SNF?

A. I don't remember the particulars of that issue.

Q. Would that have been referring to greater than class C waste?

A. I don't recall that it did. The issue of greater than class C waste, I assume that you understand that the NRC has said that, if it is determined that it requires geologic disposal, it may be disposed of in a repository. But to my knowledge no one has performed an analysis that says it must be disposed of in a deep geological repository.

The issue on should a clear definition of failed fuel be provided in Appendix E, that's an efficiency issue. If you receive a canister in a repository, you really want to know whether the fuel has failed and whether you're going to, if you open the canister, contaminate the entire

A. For example, one of the issues was related to how much information would be requested from the utilities at the time DOE accepted the waste in terms of the SNF content of the fuel and other parameters.

It would have been very simple for the department to say you must measure it because that gives me great confidence. That would have been expensive and perhaps unnecessary, particularly given that the Nuclear Regulatory Commission accepts a calculational basis for determining that information.

So, based on economics and the fact that the less expensive mechanism for obtaining the information is appropriate, we decided we would not require measurements of fuel prior to delivery.

Q. What about on issues such as priority for shutdown plants, how would economics impact resolution of that issue?

A. From the DOE perspective, to my knowledge my understanding was that there were no impacts. Now, if you're looking at the utility perspective, they have tremendous impacts, because the person who is bumped out of the queue

by the shutdown reactor has to do something with that fuel he was planning to deliver.

And that generally speaking means that he's got to add additional storage capacity. That's not cheap. That was why the Department of Energy basically said that was an equity issue and it needed to be resolved among the utilities.

And the utilities had one heck of a time doing it. But I do believe that the utilities in the end did reach a consensus position that said there should be no priority for shutdown reactors.

Q. Do you recall anything else about that utility consensus viewpoint?

A. If I'm not mistaken, there was something, I believe the utilities did put something in writing. I don't believe it was formal, I believe it was informal. I can't specifically recollect where you would find it or who has it.

Q. When you say informal as opposed to formal, what do you mean?

A. Not in a letter on letterhead.

Q. Focusing back on this sentence, the

by the shutdown reactor has to do something with that fuel he was planning to deliver.

And that generally speaking means that he's got to add additional storage capacity. That's not cheap. That was why the Department of Energy basically said that was an equity issue and it needed to be resolved among the utilities.

And the utilities had one heck of a time doing it. But I do believe that the utilities in the end did reach a consensus position that said there should be no priority for shutdown reactors.

Q. Do you recall anything else about that utility consensus viewpoint?

A. If I'm not mistaken, there was something, I believe the utilities did put something in writing. I don't believe it was formal, I believe it was informal. I can't specifically recollect where you would find it or who has it.

Q. When you say informal as opposed to formal, what do you mean?

A. Not in a letter on letterhead.

Q. Focusing back on this sentence, the

paragraph we've been talking about in Slater Exhibit 6, the one after talking about recommended resolution being based on economics, it then says, from the DOE perspective, it is the economics of providing an efficient waste management system to accommodate the industry as a whole. What did you understand that sentence to mean?

A. I understood that sentence to mean we have an obligation under the contract to the utility industry as a whole that our obligations are not to be met for one utility at the expense of another, that each utility is entitled to precisely the same treatment under the contract with no favoritism. That's about the sum of it.

Q. Would part of that effort also mean trying to minimize costs for utilities generally as a whole?

A. You mean minimize the cost of the system?

Q. Minimize the cost of the system or minimize let's say also spent fuel storage costs for the industry as a whole?

A. No, I do not recall personally ever having as a goal in mind minimizing spent fuel

storage costs for utilities. What I do recall having in mind is that utilities pay the cost of that program. And, to the extent that what we do is financially responsible and safe, meets all our goals and objectives, and we do it at a cost savings, that's a good idea.

But it's as a whole, because the cost savings on the program are passed along to every utility, not a specific utility, not just those who might have spent fuel storage, not just those who have independent spent fuel storage, the utility industry as a whole.

Q. In addition to being an author of this document, Mr. Jones and Mr. Cole, did they have any role with you in the ACR issue resolution process?

A. Yes.

Q. What was their role?

A. They served as technical consultants. If I were to -- I think I'll use an example that we had used before. Failed fuel is a good one.

I had the ability to go to my consultants and say what are my options for determining the degree to which fuel has failed and at what point does it become ridiculous to do

and assumes that delivery would commence in 1998, January 31, '98.

If 1998 were not the year when delivery commenced, utilities would have submitted DCS's for 1998. The question was do they get to go back now and revise their DCS's or are they just overcome by events, are they calendar year specific or year one, is it 1998 or year one.

Q. Year one of what?

A. Of any range of dates. So, if it were year one, no one would have to revise anything. If it's 1998, do I make them go back and revise all their DCS's, do I -- if they have to go back and revise their DCS's, can I revise a DCS or would I have to treat it as an exchange in a given year. So there were procedural questions about that, and that's what this issue is discussing.

Q. You say year one, you mean year one of DOE's acceptance of spent fuel under the waste acceptance system?

A. Yes.

Q. The instructions for the delivery commitment schedules, did they require utilities to not request delivery of more spent fuel than

was provided for in their allocation in the published annual priority report?

A. Yes, that would have been the basis for rejection of the DCS.

Q. Was there any discussion of that instruction at this meeting?

A. I don't specifically recall that.

Q. You don't specifically recall that instruction being discussed at any such meetings?

A. No, because I know that, when I was on the utility side, we clearly understand that you weren't supposed to go ask for more than you were entitled to.

Q. What was the point then of the delivery commitment scheduling process if everyone was entitled to a certain amount and everyone knew what that amount was and you couldn't ask for more than that amount? Couldn't DOE have just written -- they knew what the delivery commitment schedules were going to be requesting, didn't they? What was the point of the process?

A. Again, because it's not as clear as you think it is, if there were no DCS exchange process, you might perhaps be correct. But, assuming that people could exchange positions in

You have a DCS for every year. And the amount you put in the DCS for one year is the amount that you're allocated for that year. So there was confusion about how many DCS's did they have to submit for all ten years, could they submit for all ten years if they wanted to.

The questions from the industry were all over the map. Some people thought they didn't have to, some people thought they did. It was just confusion.

Q. Was part of this issue also the notion that the delivery commitment schedules called for the utility not to request more than their allocation; the utilities' statement of how much spent fuel they would like to deliver, if they had complete flexibility, it was constrained by their allocation?

A. Right, absolutely. That was an implicit assumption. And, when I was in the utility side of the business, it was always understood that the DCS's were not to be completed for more than what you had as an allocation.

Q. And DOE shared that understanding?

A. And DOE shared that understanding.

A. As a matter of fact, with my consultants I don't like leaving things open-ended. And so I want a game plan in place for precisely how we're going to do this, how long it's going to take, what's anticipated, so it's a work scope. And then theoretically the contractor lives to whatever is in this work scope, schedule, budget, deliverables, content.

Q. So this is a work scope for what?

A. It's a task management plan which is a work scope for developing the internal review criteria; in other words, for developing the mechanism by which we would review DCS -- proposed DCS exchanges and to determine whether or not they were to be approved.

Q. If you turn to the first page of what's called the preliminary draft and the second paragraph, if you would read that, does that paragraph represent DOE's position as to the general criteria it would use as to whether or not it would approve the proposed exchange?

A. Can you give me a moment to read it, please.

Q. Sure.

A. That is my understanding, yes.

Q. How did DOE come up with that criteria? Basically the focus is on the transportation system capabilities and projected available acceptance capacity?

A. Again, when someone -- if you were to go to the APR and you were to draw a line, if your capacity for the first year is 300 MTU, you know precisely theoretically the type fuel you're looking at, where it is, where you have to go to look at it, you can make a guess at how many casks you're going to have to get to accept the fuel.

If you start changing the type of fuel, you change -- that's the two-to-one ratio, PWR, BWR, you change the number of casks that may be required. If you're not planning on that, you can't be there all dressed up with your party dress on to accept twice the amount of fuel.

If you have licensed a cask for a particular heat load, everything that is delivered to us must be in compliance with what's called a certificate of compliance. It's got to meet the licensing conditions of the NRC. You would want to look at what they were proposing to deliver and determine whether or not that cask

could accept that type of fuel.

Let's see. In terms of the other items that are here, location, let's assume for the sake of discussion that your first year's deliveries were heavily weighted in the Southeast and then all of a sudden somebody exchanged in the Northeast and you had planned on an intense transportation campaign in the Southeast. You now have to make arrangements.

It's not as simple as when a utility in South Carolina finishes and it goes to North Carolina and there's an economy there of cask movement. Now he's up the East Coast someplace else and there's transit time, time for loading.

And so you may have lost the opportunity to load more fuel given that the number of casks will likely be limited. So I would say that the largest number of impacts would be transportation related.

Q. Who at DOE came up with these criteria, the transportation and the other one being listed as available acceptance capacity for the overall waste management system, was that something that you came up with?

A. Available acceptance capacity would

have been something that was discussed in waste acceptance and was again something that was understood by both utilities and DOE. The capacity doesn't exist, you can't allocate it.

Transportation impacts would have been developed by the transportation division within DOE and its transportation support at the M&O.

And the way this would work is that waste acceptance -- DOE would talk to transportation and say we're contemplating doing this. The contractors would then discuss the same things and then would feed back to the person requesting the work which would have been waste acceptance. But this is integration.

Q. Do you recall at this point how the terms of this particular paragraph got put together, I mean who told the M&O contractor that these are the kinds of criteria that you should put in your statement of work?

A. I don't believe that anyone told the M&O contractor that these are the types of terms you should put in your work. I believe that what is more likely to have happened is the contractor was asked what are the types of operations that could be impacted by varying the type of fuel,

the quantity of fuel, delivery dates, delivery locations, okay.

And I think that's why this is a preliminary draft, because the contractor would have come back and said this is our first impression, do you think it's complete, have we left anything out, should we put something in that really is moot. So I think that's more likely.

(Discussion off the record.)

(Slater Exhibit No. 16 was marked for identification.)

THE WITNESS: Okay. Let me have a moment to review this.

BY MR. SHAPIRO:

Q. Ms. , Slater you've just been handed what's been marked as Slater Exhibit 16. After you've had a chance to review it, if you could tell us if you recognize it.

A. Yes, I do.

Q. Can you tell us what it is?

A. Well, once you have a proposed process in place, you're going to run some test cases to see how the process drives. And what we did was to construct a number of sample exchanges. And