IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - X

YANKEE ATOMIC ELECTRIC :
COMPANY, :
Plaintiff, : Case No. 98-126C
v. : Senior Judge
: Merow
THE UNITED STATES, :
Defendant. :

- - - - - - - - - - - - - - - X

Washington, D.C.
Thursday, April 22, 1999

Continued deposition of NANCY H. SLATER, a witness herein, called for examination by counsel for Plaintiff in the above-entitled matter, pursuant to agreement, the witness being previously duly sworn, taken at the offices of Spriggs & Hollingsworth, 1350 I Street, N.W., Washington, D.C., at 2:10 p.m., Thursday, April 22, 1999, and the proceedings being taken down by Stenotype by JAN A. WILLIAMS, RPR, and transcribed under her direction.

Q. Let me point you to a particular page of the document, page 3. The top paragraph on that page, in the middle of that paragraph, there's a sentence that begins approved DCS's are the basis for the establishment of the transportation system performance requirements. Do you see that?

A. Yes.

Q. And then he says, once this baseline system is established, the ability to approve/disapprove an exchange request should be very straightforward and involves answer to the simple question can we accomplish this new proposed delivery using the system that we designed for the original delivery?

A. Yes.

Q. Does that statement in Mr. Vance's memorandum, Slater Exhibit 17, is that consistent with your understanding of how RW was intending the exchange process to work?

A. I'm not going to speak for everyone in RW, but I will speak for myself. And it is consistent with my understanding of how that process would work.

As we discussed yesterday, it is

possible, if two utilities exchange slots in the queue, one owning a PWR, one owning a BWR, that twice as much fuel could be delivered. That would obviously affect transportation because you could conceivably need twice as many casks.

And you might have to procure additional casks. There's a lead time on procurements. And so it would conceivably be possible, if enough exchanges were submitted, to entirely disrupt the transportation operation. You might not have sufficient resources allocated to perform the actual acceptance and transportation.

Q. You said you were speaking for yourself, not necessarily all of RW.

A. Yes.

Q. Are you aware of anyone in RW who had a different view of how the exchange process would work?

A. Not specifically.

Q. Generally are you aware?

A. Not generally either.

Q. To the best of your understanding, is the view that you have with respect to this concept of the exchange process, is it consistent

with what was generally held at least within the utility interface branch where you worked?

A. At the time this was done, I think I would have been it in that sense. So, when you're asking if it was consistent with the branch's or the division's perspective, it would have been my perspective; and yes, it is consistent with my perspective. So this is not something that I recall anyone having specific decision-making involvement other than me.

Q. Why was the baseline as it was called here the basis system that was being used based upon the delivery commitment schedules as opposed to an expectation of what expected exchange requests would look like?

A. Let me see if I understand the question. At the time this was generated, we had received delivery commitment schedules. Those were absolute quantitative and easily analyzed.

The other involves prediction. And your guess would be equally as valid as my guess as to what exchanges would occur between which utilities. You cannot in my opinion procure, plan for, and operate a system based on that type of projection, particularly when you have in your

with what was generally held at least within the utility interface branch where you worked?

A. At the time this was done, I think I would have been it in that sense. So, when you're asking if it was consistent with the branch's or the division's perspective, it would have been my perspective; and yes, it is consistent with my perspective. So this is not something that I recall anyone having specific decision-making involvement other than me.

Q. Why was the baseline as it was called here the basis system that was being used based upon the delivery commitment schedules as opposed to an expectation of what expected exchange requests would look like?

A. Let me see if I understand the question. At the time this was generated, we had received delivery commitment schedules. Those were absolute quantitative and easily analyzed.

The other involves prediction. And your guess would be equally as valid as my guess as to what exchanges would occur between which utilities. You cannot in my opinion procure, plan for, and operate a system based on that type of projection, particularly when you have in your

hands approved DCS's.

MR. SHAPIRO: Let me show you another document.

(Slater Exhibit No. 18 was marked for identification.)

BY MR. SHAPIRO:

Q. Ms. Slater, you've been handed what we've had marked as Slater Exhibit 18. Do you recognize this document?

A. Not offhand. And I note that the date on it is approximately a year and a quarter before I came to DOE. Would you mind if I took a moment to look at it?

Q. Definitely take a look.

A. Okay.

Q. Now that you've had a chance to review it, do you recognize the document better?

A. Not specifically, no. But I recognize the topics discussed in the document.

Q. Let me ask then at least about the people mentioned in the cover. It says it's a memo from Pat McDuffie. Do you know who Pat McDuffie is?

A. Pat McDuffie was a consultant at PNL, now retired as I understand it.

18 that doesn't seem to be part of the discussion in Slater Exhibit 17?

A. No, I don't have any specific recollection.

Q. Do you have any general recollection?

A. No.

Q. What is your view, do you disagree with the notion expressed in Slater Exhibit 18 that implies that adequate planning in anticipation of potential exchanges on the part of DOE can minimize the impact of exchanges on the transportation system?

A. My personal opinion is that I don't believe that it would be entirely possible to do that.

Q. What you say not entirely possible, what do you mean, it might --

A. You could speculate that at the time any reactor that was shut down would want to exchange. But you could not predict whether the reactors that actually had allocations would be willing to exchange.

So perhaps you could bound what you thought might be the lower bound, but I don't think you could bound the upper bound. You would

also have to look at plants with pool constraints
and see when they might be running out of fuel
and when they might want an exchange.

Q. And that would also impact which plants would be willing to exchange. If they were going to themselves get into a pool constraint situation, such a plant wouldn't want to exchange?

A. That's correct. I do recall discussions among the utilities at the time that, if delivery commitment schedule exchanges were to be accomplished, that, in fact, the exchanges might involve some exchange of money which conceivably could more than pay for a utility's away-from-reactor storage if they were one of the utilities running out of pool space.

MR. SHAPIRO: We've got one more document.

(Slater Exhibit No. 19 was marked for identification.)

BY MR. SHAPIRO:

Q. Ms. Slater, you've been handed what's been marked as Slater Exhibit 19. If you would take a look and tell us if you recognize this document?

allocation because it would be rounded down, we would tell them submit the full allocation because it will likely be rounded up. So we would send it back to them and say you're really entitled to more, resubmit your DCS exchange.

Q. When you say rounded up or rounded down, you mean rounded up to the next full cask?

A. Full cask, right. If they had -- if they were one assembly short in a full cask, then, at the time of acceptance, it was understood that we would permit them to include the additional assembly and debit their next year's allocation for that amount.

Q. We might have covered this yesterday. But, just to make clear, the reason for allowing rounding to a full cask is that it was just more efficient to use full casks rather than partial casks?

A. System efficiencies, yes.

Q. And the reason for that is you have to move the cask anyway so you might as well move it full, it's the same amount of trouble to move it full or half full?

A. Yes.

Q. Let me go back to Slater Exhibit 19,

that page on the transportation issue. Perhaps if you could take a look at that whole page and let me try to rephrase my question. What I'm trying to get at is, by the time this issue got to this level of draft, was the plan still to base the decision on whether or not to approve a proposed exchange of delivery commitment schedules on the transportation plan that would have been created based on the queue as opposed to a transportation plan based on anticipated exchanges?

A. Yes, it would have been based on approved delivery commitment schedules.

Q. Do you recall any discussions or considerations at this stage of the process on transportation plan or acceptance plan or any other plan for that matter being based upon anticipated exchanges as opposed to approved delivery commitment schedules?

A. I don't recall myself having any significant thoughts about that, because my intention was that it be based on approved DCS's. I cannot speak for the transportation people.

Q. You just don't know what was going on

that process. And, because of the changes in hats and the time frames we're talking about, I can't recall who specifically. But our M&O would have also reviewed the DCS's according to the procedure that was drafted and approved and discussed with the utilities. In addition to the contracting officer, Alan Brownstein.

Q. What would Mr. Brownstein's role have been?

A. Consistent with my role to perform the review, I would have made a recommendation and supported it to Mr. Brownstein. And he would have evaluated whether or not he thought my determination was accurate and reasonable.

Q. Anyone else involved?

A. Not that I recall.

Q. Now, you described your initial review of the submitted delivery commitment schedule, if I heard correctly, as a higher level review?

A. Right.

Q. What do you moan by higher level review?

A. To be precise, if you did not have an allocation in the year in which you submitted a DCS, that was a showstopper; if you exceeded your

allocation for that particular year, that was a showstopper; no additional review required because it was a fundamental flaw in the DCS that was submitted.

Q. What else would be involved in your review?

A. Making sure that the appropriate people who could bind the utility did, in fact, sign the DCS because, remember, it's a contract, and that basically the form was complete. If we asked for discharge date, you recall we had the discussion about specific discharge date versus range of discharge dates, at least some discharge date was included in that blank. So a very top level review.

Q. You said the M&O would also do a review. What would be involved in their review that would have been different than the review that you were doing?

A. I don't recall. I believe that, if we went back to the procedure, we could determine that precisely.

Q. When you say the procedure, you're referring to the --

A. DCS review.

you might well expect, I do remember that, very insistent.

Q. And Mr. Buchheit, do you remember his role?

A. Quite the same.

Q. All three of these gentlemen were representatives of Yankee Atomic?

A. I believe so. My recollection on that is fuzzy, but my recollection on the issue is not.

Q. I'm sure you don't remember exactly, but you said the discussion went on and on. Can you tell us generally what was discussed at length?

A. I do recall that again, as you might expect, Yankee's position was that priority for shutdown reactors should be granted. My position was that, although the contract says that we may, the contract does not specifically say that we will, and that it is an industry equity issue.

And I do specifically remember asking the Yankee representatives which specific utility they would like me to remove from the queue in the first year to accommodate them given that the capacity was fixed, particularly given that their

position was that acceptance priority for shutdown reactors was good for the industry.

And I was rather dubious that good for the industry would be good for those utilities that got bumped out of the queue to accommodate them. I do distinctly remember that portion of the conversation. And the conversation just continued in that same vein with no one making any movement on the Yankee side of the table to budge from their initial position.

Q. Did they respond to your inquiry?

A. No, they didn't. And I think, when they continued, I do recall that, when they continued to make the same point, that I encouraged them to go back and come back with the names of two utilities who would be willing to give up their slot in the queue and not ship in the first year or the second year or the third year so that they could ship.

And I do recall there was some laughter around the table because there was a recognition that would be a very difficult thing to do. No one in a room full of utilities was going to raise their hand and say pick me.

I do recall that we discussed DCS

exchanges. But again, you know, that's the same concept, you have to convince another utility to exchange places with you.

Q. What was the nature of the discussion on delivery commitment exchanges?

A. That they should feel free to avail themselves of their contractually provided option, that guidance for engaging in an exchange was available, and that, if they needed any additional clarification, we would be happy to provide it.

Q. Did you have what could be termed the lead role for DOE in these discussions?

A. I don't know that I would precisely call it the lead role so much as the most vocal role.

Q. What role would the contracting officer have had in these discussions?

A. If there were questions about the specific contract provisions as opposed to the specific issue, the contracting officer would have been there to keep us on track, make sure that we were interpreting the contract correctly, everyone was interpreting the contract correctly. And we would have discussed these

fuel that earned you the slot.

So simply going to the APR and drawing a line at 300 MTU wasn't a good way of predicting what you were likely to get, because people who had older plants might decide to put their older plant's fuel in dry storage and might want to empty the pools at some of the younger plants.

So the DCS was intended to provide us with an indication of the age of the fuel, the location of the fuel. Multiplant utilities could deliver from any site as long as they met the conditions established in the standard contract.

So it wasn't as clear as looking at the APR. The DCS was intended to provide a little bit more sound information for planning purposes.

Q. Focusing just on quantity then, the DCS was not intended to indicate what quantity the utility really wanted to deliver, it was limited to the allocation provided in the APR?

A. Right. Now, theoretically they could have delivered -- they could have said, jeez, I don't want to disrupt my operations and I'm not going to deliver at all. But they could not ask for -- they could not have more than what they

were allocated because of the equity issue. There's only so much system capacity. If I accept more from someone else, I accept less from someone else.

Q. And then briefly I want to point your attention to the next sentence on page 2 of Slater Exhibit 20 that says they have the contractual right to exchange allocations with other interested utilities, what was that referring to?

A. That's the DCS exchanges. They have the contractual right to exchange their slot in the queue with someone else in the queue and conceivably either obtain the ability to deliver in a year in which they weren't originally scheduled to deliver or obtain the ability to deliver more than they were scheduled to deliver.

Q. And so the availability of the right to exchange was being offered to the director of the program as another justification as to why it was appropriate to deny the priority request that Yankee Atomic was making, because they had the right to accomplish what they wanted through the exchange process?

A. Yes.

letter itself so he knew what he was likely to be recommending be signed by the contracting officer. And that's what this would have been. So the total concurrence package would have contained both.

Q. So there would be no disconnect between the approval memo and the actual product that went out of the office?

A. Yes. And I cannot determine whose comments these would be on here.

Q. That was going to be one of my questions. There's some handwriting on the second page of Slater Exhibit 21. And you don't recognize that handwriting?

A. No, I don't.

Q. It's not your handwriting?

A. Certainly not mine. Mine would have been an absolutely clean copy. And actually --

Q. Can you tell from the concurrences, does that give you any clue as to whose writing it would have been?

A. No.

Q. Let me point your attention to the last paragraph of this draft letter, the second sentence in that paragraph that says, if an

acceptable year one DCS is not received within 30 days, the contracting officer will issue a decision regarding the status of YAEC's year one allocation. What was meant by that sentence?

A. You would have to question the contracting officer particularly concerning that. My recollection is that, if a utility does not submit an acceptable DCS, one of the concerns I do know, I do recall from the utility days is, if they decided not to submit an acceptable DCS, did that mean that then they were relinquishing their right to an allocation in that year.

And the utility's understanding at the time I was in the industry was that that's precisely what it meant. And this letter stopped short of saying, guys, the contract has requirements, you signed the contract. You need to behave consistent with the contract.

So I don't know precisely what the contracting officer envisioned as the ultimate consequence of not submitting an appropriate DCS. But I recall from the utility days that that's one of the things utilities were concerned about.

Q. So it would have been a fair

interpretation on Yankee Atomic's part on receiving that letter that this is saying submit the delivery commitment schedule we want or we're not going to give you any allocation at all?

A. No. It would be a fair interpretation to say submit the delivery commitment schedule that you were contractually obligated to submit, not the one we want, contractually obligated to submit, or we will have to make a further determination about where we go from here.

Q. Who would have drafted this particular language, would that have been you?

A. It could have been me, it could have been Alan Brownstein, it could have been Beth Tomasoni, it could have been Nick Graham.

Q. Who was Nick Graham?

A. I do not particularly remember drafting that paragraph. Nick Graham supported Beth Tomasoni. He would have been my equivalent, if you will, in terms of I reported to Alan, Nick reported to Beth.

Q. Now, you said the intent of that sentence that we just discussed was to tell Yankee Atomic to submit a delivery commitment schedule consistent with their obligations under

interpretation on Yankee Atomic's part on receiving that letter that this is saying submit the delivery commitment schedule we want or we're not going to give you any allocation at all?

A. No. It would be a fair interpretation to say submit the delivery commitment schedule that you were contractually obligated to submit, not the one we want, contractually obligated to submit, or we will have to make a further determination about where we go from here.

Q. Who would have drafted this particular language, would that have been you?

A. It could have been me, it could have been Alan Brownstein, it could have been Beth Tomasoni, it could have been Nick Graham.

Q. Who was Nick Graham?

A. I do not particularly remember drafting that paragraph. Nick Graham supported Beth Tomasoni. He would have been my equivalent, if you will, in terms of I reported to Alan, Nick reported to Beth.

Q. Now, you said the intent of that sentence that we just discussed was to tell Yankee Atomic to submit a delivery commitment schedule consistent with their obligations under

the contract. Can you tell us what part of the contract you were referring to?

A. I can't recall the specific article number. But, if you go to the standard contract, you will find a section that is labeled delivery commitment schedules.

And under that section you will find that there are certain steps that must be executed by both the department and the purchaser. And there are timetables associated with each of those steps. And that's in there.

(Slater Exhibit No. 22 was marked for identification.)

BY MR. SHAPIRO:

Q. Ms. Slater, you've been handed what's been marked as Slater Exhibit 22. Would you take a look and tell us if you recognize this document?

A. I recognize this generally to be the contract executed by Yankee with the Department of Energy consistent with the standard contract. Knowing that these contracts were subject to individual modifications, for example, payment of fees, the schedule in which fees might be paid, I can't tell you what the particulars are.

because it appears to me that that portion of the letter would have been drafted by the contracting officer or their staff. And I have no knowledge of what led them to those statements.

Q. So you can't point to a clause of the contract from your knowledge and experience working with it that says that the contracting officer gets to resolve those disputes that the parties can't agree upon, that the contracting officer gets to resolve that herself?

A. No, I can't point to anything in the contract that tells me where we go once the utility has repeatedly refused to honor the terms and conditions of the contract.

Q. You said when a utility refuses to honor the terms and conditions of the contract. What term and condition of the contract are you saying that Yankee Atomic wasn't honoring?

A. Submit an acceptable delivery commitment schedule.

MS. SULLIVAN: Give me a chance to object before you answer the question.

BY MR. SHAPIRO:

Q. What part of the contract tells you that Yankee Atomic's delivery commitment

schedules weren't acceptable?

MS. SULLIVAN: Same objection. She can answer as to her opinion.

THE WITNESS: In my opinion I cannot give you a specific section because I haven't looked at this contract in years. I can refer you to the procedures, instructions that were provided to the utilities that were reviewed with the utilities that specifically state that an acceptable DCS is one which does not exceed the individual utility's allocation in a given year.

BY MR. SHAPIRO:

Q. Can you take a look now at the contract and tell me where that would be.

MS. SULLIVAN: Same objection to the extent you're asking for a legal interpretation of the contract.

You can answer the question.

THE WITNESS: You recall that we discussed the identification as part of the ACR issue resolution process, the issue of delivery commitment schedules. Do you recall that? If we need to discuss that again to refresh your memory, I'll be happy to.

One of those issues was delivery

commitment schedules. And primarily the issue there was the need for the department to issue instructions on how to complete the form.

One of the issues associated with completing the instructions to complete the form was what is an acceptable DCS. Those instructions as I believe -- I'm not sure, I believe it was exhibit -- maybe it was seven yesterday. It was my handwritten meeting minutes from the standard contract task force.

I attended the meeting, Dave Zabransky I believe chaired that task force, at which we discussed with the utilities the contents of those instructions. So it was recognized by both the industry and DOE that clarification was required and an effort was embarked upon jointly to develop the instructions for completing the form.

Those instructions were formally issued to the utilities. And I base my definition of an acceptable DCS on that entire package which is not just the original contract, it is the supporting documents that are official including the instructions for completing those forms.

BY MR. SHAPIRO:

opportunity to disapprove the resubmitted schedule?

A. I don't recall.

Q. And then the last point I wanted to ask about on Yankee Atomic's proposed delivery commitment schedule, again on Slater Exhibit 20, where we had talked about the alternative of Yankee Atomic exchanging allocations with other utilities, you had stated that, when you had a face-to-face meeting with Yankee Atomic, that one of your points to them was, if you can come up with two people who are willing not to have a delivery at the first of the year, then we can talk more about Yankee Atomic getting priority. Do you recall that?

A. I recall telling them that I thought they should engage in their contractually provided-for DCS exchange process. I recall asking them if they had made an attempt to do so. I recall them telling me no, they had not.

And I recall asking them who again they would like to bump out of the queue in order to have their slot. And I recall them making the statement that shutdown priority was good for the industry.

And I asked them, since it was good for the industry, which utilities they were considering knocking out of the queue. And I said give me two utilities that you would have removed from the queue.

Q. If I recall correctly, you said that there was laughter at some point in this discussion?

A. Yes.

Q. Laughter because everyone understood that Yankee Atomic wasn't going to be able to find two utilities willing to engage in such an exchange?

A. No. Laughter at some point because I think everyone realized two things. One, that Yankee was completely intransigent about the process and that they were not receptive at all to the idea of DCS exchanges. This is my personal recollection.

So you had a utility sitting across the table who has an option that they prefer not to execute, that they prefer not to even attempt to execute, and that became absurd at some point.

And so, after we had had this exchange back and forth about shutdown priority, DCS

exchanges, shutdown priority, DCS exchanges, it became absurd and people started laughing. And I believe there was also at least on my part a recognition that finding an exchange would be difficult.

Q. What was the basis of your expectation that it would have been difficult for Yankee Atomic to have found a willing exchange partner?

A. In general the utilities that have allocations in the first year are the oldest utilities who were sitting on the most spent fuel and would have likely been running out of pool storage space before others and would have likely been faced with the decision to provide for away-from-reactor storage. And I base it on that.

Q. Was this concern also exacerbated by the recognition in 1993 that it was unlikely that DOE was going to begin accepting spent fuel in 1998?

A. I can't speak for what their concern was based on.

Q. I'm talking about your recognition that it was going to be difficult for Yankee Atomic to find an exchange partner?

A. I don't believe my concern was based on the '98 date. I think it was based more on what -- no matter what the date, that people with allocations at the front of the queue would be likely to want to exercise their ability to deliver on that schedule.

Q. But, if it had been clear in 1993 that DOE was going to start accepting spent fuel in 1998 at the expected rates, that it might have been easier for Yankee Atomic to have found a willing exchange partner?

A. No, I can't make that statement, because I do personally still believe that those utilities who were in the first year would have still wanted to deliver their waste. That's why I say, I think it's year independent. I still believe that.

Q. And the reason for that is that all of those utilities with first year allocations were likely facing pool constraint problems?

A. I believe so.

Q. Finally, we covered the fact that it appeared that you did the initial draft of the letter that was signed by the contracting officer that went to Yankee Atomic on the final denial of