IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - - - - x

YANKEE ATOMIC ELECTRIC :
COMPANY, MAINE YANKEE ATOMIC :
POWER CO., and CONNECTICUT :
YANKEE ATOMIC POWER CO., : Case No. 98-126C
Plaintiffs : 98-474C, 98-154C
-v- : (Senior Judge
: Merrow)
UNITED STATES OF AMERICA, :
Defendant :

- - - - - - - - - - - - - - - - - - - x

ORIGINAL

Washington, D.C.
Thursday, June 13, 2002

Deposition of NANCY SLATER THOMPSON, a witness herein, called for examination by counsel for the Plaintiff in the above-entitled matter, pursuant to notice, the witness being duly sworn, taken at the offices of Spriggs & Hollingsworth, 1350 I Street, N.W., Washington, D.C., at 9:40 a.m., Thursday, June 13, 2002, and the proceedings being taken down in Stenotype by DEBORAH K. WILKINS, RPR, and transcribed under her direction.

have any recollection of how the projections in table 2.2 in the 1990 ACR ultimately got changed to the numbers that are reflected in the 1995 ACR?

A. No, I do not.

Q. You understand it, and I think you testified but I don't want to put words into your mouth, I just will ask a new question, but your understanding is that both the projection of waste acceptance in the 1995 ACR and the lower bounding case in the 1990 ACR both reflect the 10,000 MTU limit on the size of an MRS?

A. Yes, that is my recollection.

Q. Obviously the two ACRs handled that limit a little bit differently, but you just don't recall what the nature of the difference is that the two waste acceptance projections are meant to reflect?

A. No.

MS. SULLIVAN: Objection. The document speaks for itself.

Q. Are you familiar with the term ramp up?

A. Vaguely.

Q. I will tell you what, so I can ask the question, I will explain what I understand ramp up

to mean, the notion that an acceptance rate would not be achieved in the very first year of a facility's operation and that the facility would ramp up to its full performance level.

Does that explanation ring true to your understanding of that term?

MS. SULLIVAN: Objection. Vague.

A. My recollection of ramp up was that it implied an increasing rate of acceptance based on successful experience, demonstrated successful performance, at whatever the starting acceptance rate is.

Q. Looking first at the 1995 ACR, do you have any recollection as to what accounts for the progression of an acceptance rate to 400, 600, 900?

A. I don't recall.

Q. You don't recall why 400 and 600 were picked as opposed to 300 and 700 for that matter?

MS. SULLIVAN: Objection. Argumentative.

You can answer.

A. No, I don't.

Q. And turning back to the 1990 ACR, you don't recall how the progressions from 300 to

I am not an expert on GTCC. The limit of my knowledge on that is the NRC statement that if it is determined that GTCC requires deep geologic disposal that we would certainly have their regulatory approval, would have to go through the regulatory process, but it is conceivable that it could be disposed of in a repository. That decision has not been made.

I am not familiar with the fine points of what GTCC is, nor anyone's plans to handle GTCC, so in short I am telling you that I don't believe I have substantive knowledge on GTCC.

Q. Okay.

A. It would perhaps be helpful if you would walk through these individually so we could do this since I have no pen and paper to make a list with.

Q. Okay.

Going backward, perhaps, in addition to GTCC waste, I mentioned that there is an issue with respect to failed fuel, again my characterization. The government argument is that even if plaintiffs' spent nuclear fuel had otherwise been picked up as fast as plaintiffs claim and their damage claims that plaintiffs

would have been stuck, so to speak, with their failed fuel and would still have incurred lots of costs storing their failed fuel.

MS. SULLIVAN: Objection to the extent the government's position is a legal position.

You can answer as to your opinion or your knowledge.

A. My personal knowledge on the subject of failed fuel is going to center around two points: One, the need to know whether or not what the utilities are sending us is in fact failed because on the receiving end it's nice to know if you have to open a can lid what kind of shape the fuel is in for worker safety and operational reasons; and two, that failed fuel, if my recollection serves me well, was subject to delayed acceptance. In other words, it's not that we weren't going to as the federal government accept failed fuel, but it was possible that failed fuel might be accepted on a delayed basis.

Q. That subject is going to be one I explore more this afternoon.

Going again backward through some of these subjects that I mentioned a minute or two ago, maybe in a little more detail, I think I had

this?

Q. Sure.

A. Thanks.

(Discussion off the record.)

BY MR. SHAPIRO:

Q. Did you say that you thought that Exhibit 8, the one dated March, 1993, might be a draft? It doesn't have the fancy cover that the other versions had.

A. Right. That's what confused me because this doesn't look like the finals that we have, even the one with the fancier artwork for '95.

No clue; it will remain one of life's mysteries.

Q. Turning to Exhibit 7, the May, 1993 version of the 1992 Annual Capacity Report, again I want to ask you about the acceptance waste projections that are on page 4 of this exhibit.

Do you recall how the acceptance waste -- acceptance rate -- waste projections in Exhibit 7 were developed?

A. No.

Q. I want to go back to the most recent ACR, the 1995 one, for a moment.

I believe you testified that those acceptance rates were based in part upon the 10,000 MTU limit on the size of MRS. If that was the concern, why wouldn't it have been appropriate for DOE to accept waste at a faster rate and then have stopped at 10,000 MTU so as to provide more assistance to the utilities who needed waste accepted sooner?

MS. SULLIVAN: Objection, argumentative. Objection, vague. Objection, foundation.

A. My personal opinion, and as we have discussed before, there are numerous factors that would affect the rate at which you would work off delivery of spent fuel from reactor sites, and one of the most important being do you have enough casks in the transportation cask fleet to accept more even if you assumed for a moment that you had a facility that could accept more.

So I'm not entirely sure that you would have had the ability from a transportation cask standpoint to have accepted 10,000 MTU in the first year, for example. What would have prevented you from accepting 10,000 MTU in the first year? Logistically, I don't believe you

could have done it. You didn't have the transportation capacity. That makes a lot of assumptions, again, that we had facility, that we had a license to receive and possess, but ...

Q. To what extent were the waste acceptance projections in the 1995 ACR reflective of a desire by the department to limit its commitments to utilities?

MS. SULLIVAN: Objection, vague. Objection to the extent it calls for a legal conclusion. Objection, foundation.

A. I have no knowledge of anything like that.

Q. You don't recall anybody discussing a desire to have relatively low acceptance projections in the ACR so as to limit the department's commitments to the utilities?

MS. SULLIVAN: Objection to the extent it calls for a legal conclusion. Objection, foundation.

A. No, I do not.

Q. Let's switch subjects to talk about the delivery commitment schedule process. Why don't we turn first to that provision in the contract, which is Exhibit 2. The part that I

department arrives to accept it, by the time they arrive to accept it I have generated more fuel theoretically that could have been included in that range of discharge dates. Am I permitted to extend the upper bound on that discharge date range to include the fuel that will be discharged between now and acceptance.

There were a lot of issues that were associated with this that the utilities and the department in fact discussed, and my recollection is what we had all mutually reached consensus on in terms of our understanding was that it was okay to specify a range of discharge dates, that this was not intended to impose on the utilities a requirement to disclose absolutely every single assembly that they would deliver over the life of the plan, that in fact it was for a particular acceptance year.

Q. Was it your understanding that the utility in their proposed delivery commitment schedule could specify or should specify all of the spent fuel that utility wished to deliver in a particular year?

MS. SULLIVAN: Objection. Calls for a legal conclusion.

You may answer.

A. These discussions are perhaps more fruitful when we use an example to illustrate what we are talking about.

Let's assume that you have 10 MTU that you wish to deliver to me in year 1. You are not required to submit DCSs to me if you choose not to. If you do choose to submit DCSs, I would assume that you would submit for the entire 10 MTU. You may either do it in one DCS and specify a specific discharge date or a range of discharge dates. You may choose to submit 10 DCSs for one MTU each and do the same thing. I don't have an expectation or a requirement in terms of how you do it in the context of one, many or none. I do have an expectation that when you do it, the total, when you total all the DCSs up in terms of the allocation, it will not exceed the allocation to which you are entitled and which is provided in the NCR.

Q. Where is that limitation on the total amount of spent fuel a purchaser may note on their delivery commitment schedule or schedules for a particular year provided for in the contract?

MS. SULLIVAN: Objection to the extent

Does that statement comport with your understanding of how the exchange provision was supposed to work?

MS. SULLIVAN: Objection. Foundation.

A. Yes, it is. It's consistent with my understanding that the exchange process would permit the utilities to alter their slot in the cue. And in the case of Yankee, who had requested priority for shutdown reactor acceptance, the exchange provision which they were encouraged to use would permit them to alter their slot in the cue.

Q. It was the department's belief at least in 1995 that the exchange provision would have worked and actually have enabled a utility like Yankee Atomic to alter their space in the cue?

MS. SULLIVAN: Objection, vague. Objection, compound.

A. Conceptually, yes, the exchange process could result in a utility's ability to alter their slot in the cue.

Q. What about practically?

MS. SULLIVAN: Objection. Vague.

Q. I asked that because you used the word

conceptually. Were you using the word conceptually to distinguish from practically?

A. This will take us back to my utilities' side of the table.

From a practical standpoint, I believe most of the older utilities in my opinion would have been unlikely to engage in exchanges. I believe it would have been possible for Yankee to exchange with some of the younger utilities, but I do seem to recall when asked by me directly whether or not they had attempted to in fact conduct an exchange, the answer was no.

Q. Do you think the Yankee Atomic would have been able to have exchanged with younger utilities because the younger utilities would have had less need for early acceptance of their spent fuel?

MS. SULLIVAN: Objection, vague. Objection, calls for speculation.

A. My opinion, it would be more likely that they could effect a trade with a utility that had made provisions for additional storage or that had no particular need for additional storage.

Q. If Yankee Atomic had actually sought out such exchanges, do you think that they would

have been successful in getting utilities without need for immediate spent fuel acceptance to exchange with them?

MS. SULLIVAN: Objection, calls for speculation. Objection, vague.

A. I think that's so predictive that I couldn't possibly predict the outcome of those conversations. It's within the realm of possibilities.

Q. Did the department have any view as to the likelihood of the success that Yankee Atomic might experience in seeking out exchanges in 1995?

A. I'm not aware of any.

Q. Would it have made sense for the department to tell Yankee Atomic that it could use the exchange provision to optimize their spent fuel acceptance schedule if in fact the department thought that Yankee Atomic wouldn't be successful in attempting to use the exchange provision in that manner?

MS. SULLIVAN: Objection, argumentative. Objection, calls for speculation.

A. I think the letter speaks for itself, it encourages them to avail themselves of contractually mandated privilege, the outcome of

which could not be predicted until the effort had been made.

Q. I will recommend to you, Ms. Slater Thompson, that a few years after this letter was sent Yankee Atomic did make an effort to find exchange partners and that that effort proved unsuccessful, nobody offered to exchange with them. Why do you think Yankee Atomic was unsuccessful in finding exchange partners in -- I believe it was roughly the 1998 time frame.

MS. SULLIVAN: Objection, calls for speculation. Objection to your characterization of the facts as incomplete.

A. I really don't know.

Q. Can you speculate as to why you think that would have been?

A. Without knowing the complete context of the exchange conversations that went on, no.

Q. I will represent to you there really weren't conversations, there was a written request for proposals, and Yankee Atomic didn't get responses back.

MS. SULLIVAN: Is there a question?

Q. You said you wanted to know the context of the discussion; that's the extent of

was perhaps if sufficient financial advantage was gained that it would perhaps result in a profit and an offset in operating costs.

Q. Do you recall, was there ever discussion amongst utilities or within DOE that the exchange provision might not be successful if utilities were sufficiently uncertain as to when DOE will come and start accepting spent fuel from utilities because with such uncertainty utilities cannot make an adequate determination of what their profits or losses would be from such exchanges? Do you recall any consideration of that issue?

MS. SULLIVAN: Objection, compound. Objection, vague.

A. No, not explicitly. No, not deliberately. I don't recall. Nothing like that.

Q. Do you recall the Department of Energy actually working to facilitate exchanges of approved delivery commitment schedules by utilities?

MS. SULLIVAN: Objection, foundation. Objection, vague.

A. Could you define facilitate for me?

Q. In the context, I mean trying to make

A. Practicable is a very broad word, but if, for example, a utility wanted to exchange with another utility with exactly the same age fuel, the same type fuel, reasonably close locations, the same number of MTU, I would say that would be practicable. I don't think it was the department's intention, nor mine, to hinder that process.

Q. Would it be reasonable to say that the department intended to minimize the number of proposed exchanges that it would have to disapprove?

MS. SULLIVAN: Objection, vague.

A. I don't think we had a specific intention to minimize or maximize. I think it was our intention to accommodate, to the extent practicable, all reasonable requests to exchange.

Q. Let's switch subjects to failed fuel, something that I think you mentioned briefly before. I believe that you mentioned before that you had at least a vague recollection of an understanding that acceptance by the department of failed fuel might be delayed. Am I remembering that correctly?

A. Correct.

Q. Why would acceptance of failed fuel be delayed?

MS. SULLIVAN: Objection to the extent it calls for a legal conclusion. Objection, vague.

You may answer.

A. I believe, again I am absolutely not sure about this, but I believe there were operational issues in terms of the ability to handle canisters that contained failed fuel at the repository. I believe there were issues about defining how failed failed is before it's failed. There were transportation issues. The industry had questions, as did we, and I don't recall many specifics about that issue, honestly.

Q. That was going to be one of my next questions. What was the nature of your work at DOE in failed fuel?

MS. SULLIVAN: Objection, vague.

A. The only involvement I can recall on failed fuel was in the context of whether or not failed fuel had been adequately defined and whether or not the definition was clear. Other than that, I don't recall doing much on failed fuel.

A. I don't remember considering that at all. I don't remember considering the issue at all. The issue never came up.

Q. The issue of not delaying the acceptance of failed fuel from shutdown reactors didn't come up?

MS. SULLIVAN: Objection. Vague.

A. The issue in the context in which I understand you are going to put it, which is that all a utility has left to deliver is failed fuel, I don't remember ever contemplating that issue.

Q. Was it generally understood when you were in the waste acceptance division that a utility would be delivering failed fuel roughly contemporaneously with other spent fuel then?

MS. SULLIVAN: Objection, vague.

A. I believe it was my understanding that failed fuel was subject to delayed acceptance, and therefore it would have been unlikely that they would have been delivering standard fuel at the same time they were delivering failed fuel.

Q. Was it your understanding that the utility would complete delivery of standard fuel and then have some amount of delay before it delivered its failed fuel?

fuel I'm coming to get given it will not exceed the allocation that the particular utility has gained for that year.

Q. I'm assuming something, and let me just make sure it's true. When you were in the waste acceptance division at DOE, no one actually submitted a proposed final delivery commitment schedule to you during that time, did they?

A. No.

Q. Theoretically, I guess, they could have, but they weren't due during that time?

A. They were not due.

Q. I think one of the things that you just said was that the amount of spent fuel on the final delivery commitment schedule couldn't be greater than the utility's allocation as set out, I suppose, in the Annual Capacity Report and reflected in the delivery commitment schedule. Where is that limitation contained in the contract?

MS. SULLIVAN: Objection to the extent it calls for a legal conclusion.

A. Again, I cannot give you a specific citation in the contract.

Q. It's just your general recollection

that that's how the process was supposed to work?
A. That's my knowledge of the process.
MR. SHAPIRO: Why don't we go off the record for a minute.
(Discussion off the record.)
(A recess was taken from 3:35 p.m. to 3:45 p.m.)
MR. SHAPIRO: One more.
(Thompson Deposition Exhibit No. 11 was marked for identification.)
BY MR. SHAPIRO:
Q. Ms. Slater Thompson, we have handed you what's been marked as Exhibit 11, it's titled a Review Record, and it has a date of February 9 of 2000.
Do you recognize this document?
MS. SULLIVAN: I think the witness needs a moment to look at it.
MR. SHAPIRO: Sure.
MS. SULLIVAN: The document appears to be excerpts of a larger document because the Bates numbers are not in order to the last portion of the document, and I recognize the title of the document as being a much larger document.
MR. SHAPIRO: What I will represent to