acceptance division and see if they have come up then in some manner or another subsequently within the regulatory division.

A. Okay.

Q. Acceptance by DOE of spent fuel and dual purpose canisters, has that issue come up at all since you left the waste acceptance division?

MS. SULLIVAN: Objection. Vague.

A. No. No. I have not touched that issue in my capacity in the regulatory group.

Q. Has the issue of acceptance of spent fuel in MESCs come up since you left the waste acceptance division?

MS. SULLIVAN: Objection. Are you asking in her personal experience or within DOE?

MR. SHAPIRO: Her personal experience.

MS. SULLIVAN: Okay.

A. The only recollection I have of MESCs is that before I left the waste acceptance group that that was considered a nonstandard waste form, and then after leaving the waste acceptance group I've never dealt with that issue again.

BY MR. SHAPIRO:

Q. Are you aware that the department's current plan for Yucca Mountain is to accept spent

issues that relate to you. I am sure we will have to deal with Ms. Sullivan and the government on that, but except for that possibility I don't think we will have further questions for you.

A. I understand. Thank you.

MS. SULLIVAN: I have a couple questions.

EXAMINATION

BY MS. SULLIVAN:

Q. Ms. Thompson, do you recall your testimony in response to some questions from Mr. Shapiro as to whether you had any knowledge as to what the approved DCSs would be used for?

A. Yes, I do, and I believe I had indicated to him that I didn't have a real knowledge of what others were using those for.

Q. Sitting here today, do you have an understanding as to what aspects of the program would use approved DCSs for planning purposes?

A. I think it would be safe to say that the transportation group would probably find the most utility in the DCSs.

Q. Do you have or have you ever had responsibility for transportation planning for the program?

A. No.

Q. Ms. Thompson, while you were in the waste acceptance division, do you recall disapproving delivered commitment schedules delivered by utilities?

A. Yes.

Q. Given your testimony that delivery commitment schedules are largely for planning purposes only, why would you disapprove a delivery commitment schedule?

A. There could be multiple administrative reasons like the DCS not signed, signed by a person not identified as having ability to sign, but primarily for exceeding their allocation for a particular year.

Q. And do you have an understanding as to the effect of the utility's failure to submit a DCS in a year in which they have an allocation?

A. Yes. I believe it was always our intent that if a utility failed to submit a DCS in that year that it would be a waiver of their desire to deliver, and we would have reallocated that capacity to the next utility or utilities in the cue.

Q. I believe Mr. Shapiro has asked you

previously today about the provision of the Standard Contract or whether there was a provision of the Standard Contract that told purchasers that they were limited in their DCSs to the allocation set forth in the ACR.

Other than in the Standard Contract, is there another place that purchasers were informed that they were limited to the amount set forth in the ACR when submitting their DCSs?

A. I am positive it's in the DCS instructions.

Q. Could you turn to Exhibit 10, please, to your deposition.

Are these the DCS instructions to which you are referring?

A. Yes.

Q. Could you point to me where in these instructions purchasers were informed that they were limited to the amounts set forth in the ACR?

A. Give me a minute.

Q. Sure.

A. Page 2, number 7E, the last sentence.

Q. Could you read that for me, please?

A. Exceeding the allocation will result in disapproval of the DCS.

Q. Thank you.

While you were in the waste acceptance division at DOE, what was your understanding of the effect of the DCSs with regard to DOE's performance in 1998, if DOE had begun performance in 1998?

MR. SHAPIRO: Objection. Vague.

Q. Do you want me to clarify the question?

A. Please.

Q. I believe you testified that in your opinion the DCSs were for planning purposes only. While you were in waste acceptance, did you ever have an understanding as to the role of the DCSs if DOE had started performance in 1998?

MR. SHAPIRO: Objection. Vague.

A. My understanding of the role of the DCSs, if we had begun to accept in 1998, is that those individuals who had submitted DCSs and had them approved for year 1, which the question you are posing would be 1998, those would be the utilities that I would expect to receive FDSs from, and they would be the utilities that would deliver in that year.

Q. I am not sure whether Mr. Shapiro

asked you this specific question. Is it your understanding that the final delivery schedules submitted by purchasers and approved by DOE would be binding on the parties?

A. Are you asking me for my personal opinion?

Q. Yes.

A. My personal opinion is that given that the FDSs are submitted a year before actual acceptance is to start that they are supposed to include the actual reactor, the actual age, discharge date of the fuel, and that that's the basis on which we actually begin to mobilize the system to come get it, yes.

Q. And one final question with regard to multi-element sealed canisters, or MESCs, that we discussed. Do you have an understanding as to whether, while you were in the waste acceptance division, those were considered a standard waste form?

A. My recollection is that they were not.

MS. SULLIVAN: Thank you.

MR. SHAPIRO: I just have a couple follow-up questions for you.

EXAMINATION

intention.

Q. Can you point me to a part of the contract for the DCS instructions that leads to that result?

MS. SULLIVAN: Objection to the extent it calls for a legal conclusion.

A. No, I can't at this time.

Q. Ms. Sullivan also asked you about the delivery commitment schedule instructions. Can you point me to a provision in the contract that calls for or even permits DOE to issue instructions to utilities as to how to complete the delivery commitment schedule form?

MS. SULLIVAN: Objection to the extent it calls for a legal conclusion.

A. No, at this point I can't point you to a provision in the contract.

Q. Do you have any understanding of the basis on which the delivery commitment schedule form instructions were issued?

MS. SULLIVAN: Objection to the extent it calls for a legal conclusion.

A. Actually, from sitting on the utilities side of the table, the utilities had asked if we would work with them to provide them

with a better understanding of how to complete the form. This was a cooperative effort, mutually agreed to by both sides. That's why we took the time once we had drafted instructions to go back over and discuss the instructions with them and get comments.

Q. Did you view the DCS instructions as guidance to utilities as to how to fill out their delivery commitment schedule forms or did you view the instructions more directly as requirements for how the forms must be filled out by utilities?

MS. SULLIVAN: Objection to the extent it calls for a legal conclusion.

You may answer.

A. I view the DCS instructions as my expectations for what it would take in completing these forms in order for me to approve a DCS. For example, if I told them, which I did on page 2, section 7, section E, that if they exceeded their allocation I would disapprove the DCS, I view that as an instruction.

Actually, that point is also made clear on page 5, item number 2.5, that says: The total quantity of SNF designated for delivery must not exceed the allocation in the ACR.

Exceeding the allocation will result in disapproval of the DCS (S).

This is Exhibit 10.

Q. Do you recall whether you ever disapproved a proposed delivery commitment schedule for any reason other than the proposed schedule exceeding a utility's allocation of spent fuel acceptance?

A. No, I don't.

Q. I am not sure that -- maybe I didn't ask the question quite clearly enough.

You don't recall whether you did or you recall that you didn't disapprove any for any other reason?

A. I do not recall whether I disapproved additional DCSs for reasons other than having exceeded the acceptance allocation.

Q. We have been talking about you approving or disapproving delivery commitment schedule forms submitted by utilities. Technically, wasn't it the contracting officer who was doing the approval or disapproval?

A. Yes, but as the contracting officer's technical representative, it was my responsibility by virtue of my signature to make a

Exceeding the allocation will result in disapproval of the DCS (S).

This is Exhibit 10.

Q. Do you recall whether you ever disapproved a proposed delivery commitment schedule for any reason other than the proposed schedule exceeding a utility's allocation of spent fuel acceptance?

A. No, I don't.

Q. I am not sure that -- maybe I didn't ask the question quite clearly enough.

You don't recall whether you did or you recall that you didn't disapprove any for any other reason?

A. I do not recall whether I disapproved additional DCSs for reasons other than having exceeded the acceptance allocation.

Q. We have been talking about you approving or disapproving delivery commitment schedule forms submitted by utilities. Technically, wasn't it the contracting officer who was doing the approval or disapproval?

A. Yes, but as the contracting officer's technical representative, it was my responsibility by virtue of my signature to make a

recommendation.

Q. And as a practical matter, you were in fact the person who was approving or disapproving; wouldn't that be a fair statement?

A. Well, I can't make that statement. That's to imply that the contracting officer had no role whatsoever and did no review.

Q. Did the contracting officer ever disagree with one of your recommendations concerning the approval or disapproval of a proposed delivery commitment schedule?

A. Not that I recall.

Q. Did the contracting officer ever question one of your recommendations to approve or disapprove a proposed delivery commitment schedule?

A. Not that I recall.

Q. Did the contracting officer ever question any of your recommendations that you made in your role as COTR?

MS. SULLIVAN: Objection. Vague.

A. That's a lot of history and a lot of time. Unless you can be more specific, I am not sure I can answer that question.

Q. I am just asking for your

recollection. Do you recall any instance when the contracting officer questioned a recommendation?

MS. SULLIVAN: Objection. Vague.

A. I recall instances where the contracting officer and I discussed issues related to implementation of the Standard Contract including, for example, the DCS instructions. I don't recall specifically that the contracting officer ever took serious objection, significant -- ever had a significant objection to my recommendations.

Q. What was the nature of your discussion with the contracting officer concerning the delivery commitment schedule instructions?

A. We would have -- I don't recall the specific nature of the discussions, but I recall having discussed the fact that collaboratively the industry -- and we believed that there was a greater chance of the industry completing their DCSs accurately and having them approved on the first try if they clearly understood our expectations for what it took to successfully complete a DCS. I remember being told that that was a good idea.

I remember transmitting the DCS