wanted to make sure we could accommodate that.

Q. Okay. To your knowledge, was the objective of having a rate that would meet the generation rate, did that objective ever change over time?

MR. SHULTIS: Objection, asks for a legal conclusion.

THE WITNESS: I think we tried to maintain that as an objective and that sort of became institutionalized with this 3,000 metric tons per year, you know, acceptance capability for one repository, and again when the second one would come online with an additional 3,000 metric tons, then we'd be able to reduce the backlog. That remained a planning objective or assumption for a number of years but got seriously set back when Congress I believe in 1987 pretty much put the second repository program on hold. So, at that time we sort of had to regroup and figure out what we were going to do.

BY MR. EIDUKAS:

Q. Looking again at the schedule in Exhibit 5, it provides for schedules for the first and second repository, but there's no acceptance schedule in this

clarification as to what is present in Exhibit 6 for this deposition, is what is present here, those portions here, are they from the June 1985 mission plan that you worked on?

A. I believe so, yes.

Q. If you could turn to page 3. It's titled Chapter 1 Introduction and that section appears to go through page 13 that we added to this document. Is this the chapter that you testified to earlier as being the author of?

A. Yes.

Q. If you could turn to pages 6 and 7, and in particular on page 7 there's a section that starts: "The following specific program objectives have been established to implement the provisions of the Act. They evolve from the previously mentioned policy goals."

And then the third objective listed here says, "To insure the acceptance of waste for disposal by January 31, 1998 in accordance with the acceptance schedule provided for in the DOE standard disposal contracts and in conformance with the Act."

My question is: When you wrote this section, what did you mean by "the acceptance schedule provided for in the DOE standard disposal contracts"?

MR. SHULTIS: Objection, calls for a legal conclusion.

THE WITNESS: This is on page 7 with the introductory sentence that says, again, "The following specific program objectives have been established." So, again, this was an objective for the program. It was a goal or a target. And we identified the five objectives. One of our objectives was to insure the acceptance of waste. It says for disposal by January 1998. Again, this is one of our objectives.

"In accordance with the acceptance schedule provided in DOE standard disposal contract." My understanding was that the contracts that the government entered into with the utilities at some point in the future would have more detailed schedule information, and I believe that was to be provided after, you know, later. It was to come after this mission plan and when those specific schedules were developed, that's what we would -- that's what the

government would target to meet.

BY MR. EIDUKAS:

Q. The language you used here does say that "the acceptance schedule provided for in the DOE standard disposal contracts" and I would just, if you could tell me, what it is, what are you referring to in the contracts in this passage?

MR. SHULTIS: Objection, calls for legal conclusion.

THE WITNESS: Again, I was not the person that worked directly on the standard disposal contracts. My understanding was that they were to -- I'm trying to think of the terms. There were going to be documents issued later in the late 1980s or early 1990s and I think they were related to -- and these are documents I'm not familiar with -- the annual capacity report, annual priority rankings that were to be -- I think they were going to be negotiated with utilities and those would become the specific schedules that the government would try to meet in terms of accepting spent fuel.

BY MR. EIDUKAS:

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
-----------------------------------------x
YANKEE ATOMIC ELECTRIC COMPANY :
(98-126C)(Merow, S.J.) :
CONNECTICUT YANKEE ATOMIC POWER COMPANY :
(98-154C)(Merow, S.J.) :
MAINE YANKEE ATOMIC POWER COMPANY :
(98-474C)(Merow, S.J.) :
FLORIDA POWER & LIGHT COMPANY :
(98-483C)(Wilson, J.) :
NORTHERN STATES POWER COMPANY :
(98-484C)(Wiese, J.) :
DUKE POWER, a Division of DUKE ENERGY CORP.:
(98-485C)(Sypolt, J.) :
INDIANA MICHIGAN POWER COMPANY :
(98-486C)(Hodges, J.) :
SACRAMENTO MUNICIPAL UTILITY DISTRICT :
(98-488C)(Yock, S.J.) :
SOUTHERN NUCLEAR OPERATING COMPANY, et al. :
(98-614C)(Merow, S.J.) :
COMMONWEALTH EDISON COMPANY :
(98-621C)(Hewitt, J.) :
BOSTON EDISON COMPANY :
(99-447C) (Allegra, J.) :
GPU NUCLEAR, INCORPORATED :
(00-440C)(Bush, J.) :
WISCONSIN ELECTRIC POWER COMPANY :
(00-697C)(Merow, S.J.) :
POWER AUTHORITY OF THE STATE OF NEW YORK :VOLUME
(00-703C)(Damich, J.) : II
OMAHA PUBLIC POWER DISTRICT :
(01-115C)(Bush, J.) :
NEBRASKA PUBLIC POWER DISTRICT :Discovery
(01-116C)(Sypolt, J.) :Judge:
TENNESSEE VALLEY AUTHORITY :(Judge
(01-249C)(Bruggink, J.) :Sypolt)
Plaintiffs, :PAGES
v. :242 - 396

THE UNITED STATES, :

Defendant. :

-----------------------------------------X

Deposition of Victor W. Trebules, Jr.

Washington, DC

Thursday, April 18, 2002

Reported by: Denise Dobner Vickery, RMR, CRR

JOB NO. 144459

April 18, 2002

9:30 A.M.

Deposition of Victor W. Trebules, Jr., held at the offices of:

Jenner & Block
601 13th Street, NW
12th Floor
Washington, DC 20005

Pursuant to notice, before Denise Dobner Vickery, a Registered Merit Reporter, Notary Public of the District of Columbia.

document. Although I never read through it or contributed to the development of it.

BY MS. HEWITT:

Q. Do you have an understanding of the term emplacement rate?

MR. SHULTIS: Objection, vague.

THE WITNESS: My understanding of the term emplacement rate would be the rate at which we would emplace spent nuclear fuel in the underground portion of the geologic repository.

BY MS. HEWITT:

Q. Do you have an understanding of the term design receipt rate?

MR. SHULTIS: Same objection.

THE WITNESS: Again, my understanding of the term design receipt rate is the rate at which spent fuel would be received at the repository at primarily the surface handling buildings, which would come in either by rail or truck.

BY MS. HEWITT:

Q. Is the design receipt rate the same thing as the design acceptance rate?

MR. SHULTIS: Same objection.

THE WITNESS: I think under certain conditions it can be. Under other conditions it doesn't have to be. For example, the -- I'm sorry. Could you give me that question again, the two terms?

BY MS. HEWITT:

Q. Design receipt rate and acceptance rate.

A. Okay. The acceptance rate could be dependent on the facilities that the system may have. For example, you could be receiving at an MRS facility and at a repository. Okay. The design receipt rate could apply to either one of those facilities, particularly the repository, and the emplacement rate is obviously the emplacement rate only at the repository.

Q. Is the emplacement rate the same thing as the design receipt rate?

MR. SHULTIS: Objection. Asked and answered.

THE WITNESS: Again, it could be, but it doesn't have to be. You can receive rate at a certain -- you could receive spent fuel at a certain rate with the surface facilities of the repository.

You could put spent fuel in storage above ground. You could emplace underground at a different rate. Obviously then you'd have an accumulation of spent fuel at the storage facilities above the repository or you could be reducing the backlog. They don't have to be the same. They could be independent. Although if you reach steady state operation, ideally they're very close, if not identical.

BY MS. HEWITT:

Q. When I use the term OCRWM, do you have an understanding of what that term is?

A. Yes, I do.

Q. Were you ever involved in OCRWM's efforts to design a repository?

MR. SHULTIS: Objection, vague.

THE WITNESS: I think I would have to answer yes.

BY MS. HEWITT:

Q. What was the extent of your involvement?

A. Again, my primary role over the past 10 years or so has been in the planning, budgeting and scheduling part of the program of the OCRWM program,

A. Obviously when we had a two-repository system, the receipt rate for the system in total was higher than a single repository system or in, again, referring to Exhibit 8, I believe the waste acceptance schedule we were just talking about, this shows a significant delay in the operation of the second repository. So yesterday in the earlier documents, the earlier exhibits and mission plan documents, we had a combination of the two repositories which had a receipt rate much greater than what this latest version would show.

Q. You're absolutely correct. My question was a little bit unclear. It wasn't very specific. I'm going to further narrow it.

At any time during your tenure at the DOE program, was the design receipt rate for the single repository other than 3,000 MTU on an annual basis?

A. You said at any time during my? I believe basically the nominal design receipt rate target -- again, this was a target; this was an objective -- on an annual basis was 3,000 metric tons.

Q. And that's also what you refer to as the

steady state rate?

A. That's correct.

Q. When you use the term nominal, what do you mean by nominal?

A. Nominal in my jargon typically means like an average or a design number that you try to meet. You know, it usually implies a certain degree of precision. You know, you could say 3,000 plus or minus 20 metric tons, you know, but nominal, when you say nominally 3,000 metric tons, it could vary. In some years it could, depending on the truck and train shipments, it could be 2,980. Next year it could be 3,022, but we sort of average that out over the operation of the facility and say the nominal rate of 3,000 metric tons.

Q. And I believe you testified earlier that the 3,000 annual MTU steady state rate corresponded to the discharge rate by utilities; is that correct?

MR. SHULTIS: Objection, calls for -- mischaracterizes prior testimony.

THE WITNESS: Yeah. I believe I said yesterday that we had two overriding design objectives, you know, two goals. One was to initiate operations

adequacy reports that DOE issues; is that correct?
A. Input into the fee adequacy report.
Q. And what kind of input do you provide to the fee adequacy report?
A. I work on the Yucca Mountain cost and schedule and plans. So I'm right now responsible for coordinating the input of the Yucca Mountain part of the fee adequacy report in the total system life cycle cost.
Q. Are you familiar with the actual fee adequacy reports that DOE issues?
A. Yes.
Q. Do acceptance rates factor into that report?
MR. SHULTIS: Objection, calls for a legal conclusion.
THE WITNESS: I believe the answer is yes. It's a fairly complicated analysis that needs to be prepared, but I believe acceptance rates are one of the parameters that needs to be evaluated.
BY MS. HEWITT:
Q. And how do the acceptance rates affect the fee adequacy analysis?

MR. SHULTIS: Objection, vague.

THE WITNESS: This may be a rather long, complicated answer. But basically the fee adequacy analysis, which is required by the Nuclear Waste Policy Act, is analysis that the Secretary of the department has to conduct to evaluate whether the one mill per kilowatt hour fee is judged to be sufficient to cover the total cost of the program.

(Mr. Stouck entered.)

To do that, we prepare what's called a total system life cycle cost analysis, which looks at the cost of basically the facilities we have to build to accept fuel. That would include the surface facilities of the repository, the underground facilities of the repository, the waste package that the waste would be disposed in, the transportation system, equipment needed to move the waste, and we have to estimate the cost of that and balance that against the incoming money from the one mill per kilowatt hour.

And you have to relate the timing of those facilities and when they need to be online to be able to accept the waste. And since there's a time related

cost of money depending upon when you build and construct and have facilities in operation, in that sense it relates to the waste acceptance rates.

BY MS. HEWITT:

Q. You mentioned that the total system life cycle cost analysis -- and is that also called the TSLCC analysis?

A. That's the common acronym to describe it; that's correct.

Q. You testified that that analysis comprises cost of the system, which include the facilities; is that right?

A. That's correct.

Q. And when you use the term facilities, are you referring to facilities that would store or dispose of the waste? What do you mean by facilities when you used that term in your prior answer?

A. Generally it's meant to include the waste handling surface facilities at the repository location, the underground area of the repository in which the waste will be placed, and another major component which may or may not fall under the term facilities is the

waste package that the spent fuel elements will be placed in for disposal underground. That's a major cost contributor.

Q. So, is it fair to say that when you use the term facilities, you are not including possibility of an MRS in that term?

MR. SHULTIS: Objection, mischaracterizes prior testimony.

THE WITNESS: At one time in the program's evolution, we did include I believe the cost of an MRS facility, but over the past 10 years or so when Congress never acted or we were never able to get an MRS facility authorized, we haven't included it in our TSLCC estimates.

BY MS. HEWITT:

Q. So, the acceptance rates that are used in the TSLCC estimates reflect an acceptance rate of a repository; is that correct?

A. That's correct.

MR. SHULTIS: Object.

THE WITNESS: That's correct.

BY MS. HEWITT:

Q. And has that been the case since you've been working on TSLCC reports?

A. I think, as I just said, I've been working on the program for quite a while, and at one point we did include estimates that had an MRS, but over the past 10 years or so we have not included that. It's just been focused on repository facilities.

Q. And what is the purpose of the TSLCC and fee adequacy reports?

A. The fee adequacy report -- fee adequacy assessment is required by the Nuclear Waste Policy Act to determine on a periodic basis whether or not the one mill per kilowatt hour fee is still judged to be sufficient to cover the cost of the program.

Q. And are these reports submitted to Congress?

A. Yes.

Could we take a break?

Q. Yes, absolutely.

(Recess, 10:48 to 10:56 a.m.)

BY MS. HEWITT:

Q. I just have a couple of more questions, Mr. Trebules.

they would be producing 3,000 metric tons per year. I don't think I ever got into those kind of considerations.

BY MR. NESLIN:

Q. Well, sir, if the objective was that utilities would not have to add additional storage after 1998, wasn't that objective intended to apply either at a gross or at an individual level? You understand my question?

MR. SHULTIS: Objection, vague, and I think he's answered the question.

MR. NESLIN: No.

BY MR. NESLIN:

Q. You may answer, sir.

A. Again, our objective was to try to accept once we reached the steady state operation of 3,000 metric tons, which we thought would be about the generation rate from the utilities as a whole, and I believe we were assuming that up until we reached that point, it was the utilities' responsibility in the aggregate to provide for the storage of the fuel up to 1998 and to continue to add storage up until the time we reached

that 3,000 metric tons per year.

So we didn't look at -- at least I never looked at individual utilities' capabilities. We just assumed that they would, you know, provide the required storage until we reached that steady state operation. Now, I think your question says now beyond that some utilities might be generating more and not have additional capability. Others may have additional storage capability that they may not need and they were going to try to mix and match. Okay.

But as far as my involvement in the planning process went, I never got into those kind of considerations when we put together our plans, which were, you know, plans sort of in the aggregate.

Q. Do you recall in your work on the planning documents any consideration of exchanges and shutdown reactors?

MR. SHULTIS: Objection, asked and answered. Calls for speculation.

THE WITNESS: Again, I don't remember specifically considering exchanges. I know there were discussions on trying to respond to what I thought were

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

-----------------------------------------X

| | |
|---|---|
| YANKEE ATOMIC ELECTRIC COMPANY | :VOLUME |
| (98-126C)(Merow, S.J.) | : I |
| CONNECTICUT YANKEE ATOMIC POWER COMPANY | :Discovery |
| (98-154C)(Merow, S.J.) | :Judge: |
| MAINE YANKEE ATOMIC POWER COMPANY | :(Judge |
| (98-474C)(Merow, S.J.) | :Sypolt) |
| Plaintiffs, | : |
| v. | : |
| THE UNITED STATES, | :PAGES |
| Defendant. | :1 - 160 |

-----------------------------------------X

Deposition of Victor W. Trebules, Jr.

Washington, DC

Thursday, April 18, 2002

Reported by: Denise Dobner Vickery, RMR, CRR

JOB NO. 144559

April 18, 2002

2:15 P.M.

Deposition of Victor W. Trebules, Jr., held at the offices of:

Spriggs & Hollingsworth
1350 I Street, NW
Ninth Floor
Washington, DC 20005-3305

Pursuant to notice, before Denise Dobner Vickery, a Registered Merit Reporter, Notary Public of the District of Columbia.

been general discussions, we haven't -- the program itself hasn't really recently focused a lot of attention on transportation activities.

BY MR. STOUCK:

Q. Okay. But is it your understanding that if and when the program ever starts accepting spent fuel hopefully by 2010, that the program will operate in such a way as to maximize efficiency or promote efficiency through the use of, among other things, shipping campaigns in a manner that you testified to a few minutes ago? Is that your understanding of how it's going to work in the future, regardless of whether it's written down in a formal plan or not as of today?

MR. SHULTIS: Objection, calls for speculation.

THE WITNESS: Yeah. I would not quite say it the way you did. I would say that ~~would be~~ our objective would be to try to operate the system in such a fashion, but, you know, we're subject to constraints in the outside forces that may not allow us to operate, you know, in the ultimate efficient mode. We'd have to accommodate a lot of different concerns.

Victor Trebules

In the U.S. Court of Federal Claims

---------------------------------x

Yankee Atomic Electric Co., :
et al :
: NO. 98-126C
v. : 98-154C
: 98-474C
United States of America :

---------------------------------x

April 19, 2002

DEPOSITION OF:

Victor W. Trebules, Jr.

a witness, called by counsel pursuant to notice, commencing at 9:00 a.m., which was taken at Spriggs and Hollingsworth, 1350 I St., NW, Washington, DC

# Victor Trebules



agree that at the time that you were working on the plan in 1984 and 1985 it was an objective of the spent fuel program that that program be operated in an economically efficient manner?

MR. SHULTIS: Objection as to "economically efficient." It's vague.

A. I believe we said words to that effect in the mission plan, that's correct.

Q. Why was that an objective?

A. To the best of my recollection, I think we used phrases like fiduciary responsibility. People working in the program felt that they had an obligation to try to execute the program efficiently and effectively.

Q. Why was that an objective?

A. We knew the program was going to cost a lot of money over its lifetime.

I guess it's my opinion that the people felt they ought to try to be efficient in carrying out that program.

Q. Let's pull out the mission plan which I think is exhibit six, if you would, please.

A. Okay.
Q. Take a look at page six, please, which is Bates CE14813. It's a listing of goals and objectives. We discussed this earlier.
Number four, do you see that? "The program must be conducted in a cost effective manner with full cost recovery."
Do you see that?
A. Yes.
Q. What does "full cost recovery" mean?
MR. SHULTIS: Objection to the extent it's calling for a legal conclusion.
A. It was my understanding that the Nuclear Waste Policy Act had a provision that the owners and generators of the spent nuclear fuel and the radioactive waste would pay for the cost of the program. It would not be funded by taxpayer money. It would be funded by the owners and generators of the waste.
The Act initially established a rate of one mill per kilowatt hour for the nuclear utilities which would go into a nuclear waste fund

and the government would draw on that money plus any other monies, for example monies for the disposal of defense high level waste, and that would cover the cost of the program.

Q. Is that concept of full cost recovery related to the objective of economic efficiency?

MR. SHULTIS: Same objection.

A. To the best of my understanding, it is.

Q. What's the relationship, if you would just explain that?

MR. SHULTIS: The same objection.

A. Not being an economist, I guess I would explain it in more or less layman's terms.

The people working in the program knew they had a source of funds, that was the nuclear waste fund, and any appropriations to cover the disposal of defense high level waste.

They wanted to conduct the activities, the scientific characterization, the design and the engineering aspects essentially at minimum cost, do the necessary, minimum necessary, but sufficient work to develop the facilities, the geologic

depository and the transportation system to manage and dispose of the radioactive waste.

Q. Is it your understanding at the time of this mission plan, at the time this mission plan was written, these words we've been looking at, is it your understanding that this objective of economic efficiency was a requirement for the program?

MR. SHULTIS: Objection to the degree it's calling for a legal conclusion.

A. I don't ever remember back then some 16, 17, 18 years ago it being described as a requirement.

My recollection is, as exhibit six states, it was a policy goal that guided DOE's implementation of that program.

I don't ever remember the terms requirement when it came to conducting the program in a cost effective manner.

Q. Let's turn to page 37. Under mission 3.1.4, mission and objectives, do you see that?

A. Yes.