IN THE UNITED STATES COURT OF FEDERAL CLAIMS

-----------------------------------------------x

| | |
|---|---|
| YANKEE ATOMIC ELECTRIC COMPANY | : |
| (98-126C)(Merow, S.J.) | : |
| CONNECTICUT YANKEE ATOMIC POWER COMPANY | : |
| (98-154C)(Merow, S.J.) | : |
| MAINE YANKEE ATOMIC POWER COMPANY | : |
| (98-474C)(Merow, S.J.) | : |
| FLORIDA POWER & LIGHT COMPANY | : |
| (98-483C)(Wilson, J.) | : |
| NORTHERN STATES POWER COMPANY | : |
| (98-484C)(Wiese, J.) | : |
| DUKE POWER, a Division of DUKE ENERGY CORP. | : |
| (98-485C)(Sypolt, J.) | : |
| INDIANA MICHIGAN POWER COMPANY | : |
| (98-486C)(Hodges, J.) | : |
| SACRAMENTO MUNICIPAL UTILITY DISTRICT | : |
| (98-488C)(Yock, S.J.) | : |
| SOUTHERN NUCLEAR OPERATING COMPANY, et al. | : |
| (98-614C)(Merow, S.J.) | : |
| COMMONWEALTH EDISON COMPANY | : |
| (98-621C)(Hewitt, J.) | : |
| BOSTON EDISON COMPANY | : |
| (99-447C) (Allegra, J.) | : |
| GPU NUCLEAR, INCORPORATED | : |
| (00-440C)(Bush, J.) | : |
| WISCONSIN ELECTRIC POWER COMPANY | : |
| (00-697C)(Merow, S.J.) | : |
| POWER AUTHORITY OF THE STATE OF NEW YORK | :VOLUME |
| (00-703C)(Damich, J.) | : I |
| OMAHA PUBLIC POWER DISTRICT | : |
| (01-115C)(Bush, J.) | : |
| NEBRASKA PUBLIC POWER DISTRICT | :Discovery |
| (01-116C)(Sypolt, J.) | :Judge: |
| TENNESSEE VALLEY AUTHORITY | :(Judge |
| (01-249C)(Bruggink, J.) | :Sypolt) |
| Plaintiffs, | :PAGES |
| v. | :1 - 241 |

THE UNITED STATES, :

Defendant. :

-----------------------------------------x

Deposition of Victor W. Trebules, Jr.

Washington, DC

Wednesday, April 17, 2002

Reported by: Denise Dobner Vickery, RMR, CRR

JOB NO. 144458

April 17, 2002

9:32 A.M.

Deposition of Victor W. Trebules, Jr., held at the offices of:

Jenner & Block

601 13th Street, NW

12th Floor

Washington, DC 20005

Pursuant to notice, before Denise Dobner Vickery, a Registered Merit Reporter, Notary Public of the District of Columbia.

nuclear fuel would be taken by the Department of Energy?

MR. SHULTIS: Objection. It asks for a legal conclusion, vague, asks for speculation.

THE WITNESS: Yeah. I do not know what the parties had intended in terms of the rate of waste acceptance. If you're referring to the utilities, I do not know that.

BY MR. EIDUKAS:

Q. Okay. Do you know what the DOE intended with respect to the rate of waste acceptance?

MR. SHULTIS: Objection, asks for a legal conclusion, speculative.

THE WITNESS: I would have to answer that as follows. I know what the plans were that the Department of Energy was working on to develop the facilities because I was primarily responsible for developing those plans. We had planned or our objective was to try to have the facilities, primarily the repository, online in operation by 1998. But, again, those were plans.

BY MR. EIDUKAS:

Q. And I'm sorry, were you done with your answer?

A. Yes.

Q. Okay. When you're referring to working on those plans in that answer, what time frame are you talking about?

A. The early schedules that we prepared indicated that we had hoped to have the repository in operation by 1998, but we clearly I guess the word would be identified caveats or issues or uncertainties associated with that because we, again, as I had indicated before, we recognized the schedules were optimistic and success oriented was the phrase we used to describe them. And we had also identified, as I think I indicated before, schedules for the MRS facility, if that were to eventually be authorized by Congress, that showed that that could go into operation at least by 1998, perhaps a year or two earlier.

Q. Okay. I think -- well, I think I may have misphrased my question. What I was trying to get at was: What was the time frame that you were working on the plans you had referred to? Are you referring to the mission plan, or is this something earlier than

that?

A. It was the mission plan again. We worked on that in 1984, and I think we published it after a round of public review and comment. I think we published it in June of 1985.

Q. Okay. And I think you said that you personally at least were primarily involved in the planning for the designing of the facility. Did I understand you correctly?

A. No, not the design. I was responsible for developing the overall plan, which included design, included some of the siting issues, some of the permitting issues, some of the institutional issues that we had to deal with, as well as the bulk of the activity at that time, though, was the scientific programs that we had to conduct.

Q. Okay. Do you have knowledge as to he what rate of acceptance of spent fuel the repository was designed to operate at this time?

MR. SHULTIS: Objection, asks for legal conclusion.

THE WITNESS: Again, going back to the

mission plan of some 17 years ago, we had put in the mission plan what were called waste acceptance schedules, which were again planning targets of what we thought the system could do if it were developed, you know, in total as we had laid it out. Starting in 1998 with one repository operating. We had laid out what we thought were practical waste acceptance rates.

What I mean by that is it allowed for a ramp-up. I think the number that we started with was for the first repository, for example, 400 metric tons and then it increased. I don't remember the other numbers, but it increased 400 to 600 up to a rate of about 3,000 metric tons per year for a single repository, but at that time we also had authorization to pursue a second repository. That was a provision in the Nuclear Waste Policy Act that we laid out waste acceptance schedules for that two-repository system.

BY MR. EIDUKAS:

Q. Do you have any knowledge about whether there were waste acceptance schedules prepared or proposed prior to the mission plan?

MR. SHULTIS: Objection, asks for

Do you know was that the intent of the DOE at the time?

MR. SHULTIS: Objection, asks for legal conclusion. Mr. Trebules is not a 30(b)(6) witness, asks for speculation.

THE WITNESS: Again, as I understand your question, did I understand that to be the intent of DOE at the time. I don't believe I worked in the program at that time.

BY MR. EIDUKAS:

Q. When you worked in the program, do you know whether or not it was the intent of DOE to receive fuel at a rate beginning in 1998 that no utility would have to add any further storage facilities?

MR. SHULTIS: Same objections and relevance.

THE WITNESS: When I started working in the program on the mission plan, I remember that we discussed the objective of reaching waste acceptance rates that would preclude the utilities from having to provide additional on-site storage. That was our objective or planning target.

I believe what happened early on was that when we sent the draft mission plan out for public review and comment, we got a number of comments that said our schedules were too optimistic and we, I believe, revised those schedules in the actual document that went out in June of 1985 to the point where it didn't quite meet the intent of the words described here.

We started out as best as I could remember with a number like 400 metric tons in 1998, and we incorporated a ramp-up period that after four or five years or so we would eventually get up to about 3,000 metric tons a year, which we believed was the accepted spent fuel generation rate of the nuclear power plants at that time.

And it was over that ramp-up period that we hoped to get to the point where we would preclude the utilities from having to provide additional on-site storage. And then when the second repository came into operation, then we could, when that one reached full capacity, be able to reduce the backlog.

So, again, I'm speculating that when this

was written that was the intent, but that was changed after we got comments on those early draft versions of the mission plan. We adjusted those waste acceptance schedules a bit.

BY MR. EIDUKAS:

Q. Okay. Do you know whether or not it was the intent of the parties to the standard contract when they entered those contracts back in 1983 that fuel would be received at the repository at a rate that no utility would have to add any further storage facilities either on-site or at another location?

MR. SHULTIS: Objection, asks for a legal conclusion, calls for speculation.

THE WITNESS: As I think I heard your question, did I know the intent of the parties to the contract. Again, if you're referring to the utilities, I do not.

BY MR. EIDUKAS:

Q. Okay. Do you know whether or not the DOE had an intent -- had this intent when they entered into the standard contracts with the utilities?

MR. SHULTIS: Objection, asks for a legal

THE WITNESS: Again, I'm not familiar with the provisions of the contract that, as these words indicate, that included the development of a waste acceptance schedule. I was involved in the subsequent development of the waste acceptance schedules that we used for planning purposes, which we put in the following version of the mission plan that got published in June of '85.

BY MR. EIDUKAS:

Q. Okay.

A. But I'm not clear at all as to the relationship of that to the contract, to the provisions of the contract.

Q. Okay. So if you'll just turn to the back side of that page you're looking at, there is a Table 2-1 Waste Acceptance Schedule.

A. Right.

Q. Did you have any involvement in preparing this particular schedule?

A. As best as I could recollect, I believe I did and, as I indicated, this is -- if I could refer back to the previous --

Q. Sure.

A. -- version that you gave me. The previous document.

Q. You're looking at page 2-3 is the table in that?

A. Yeah. I noted very quickly some changes. For example, in the previous exhibit, okay, if you note that this one began with acceptance rates for the first repository starting at 1800 metric tons, okay, for five years. Then it ramped up to 3,000 metric tons. Again, as best as I could recollect, upon reflection of this ramp-up rate, it was determined that was probably optimistic and unrealistic.

So, in Exhibit 5 that you just gave me, if you note the difference in the first repository acceptance rates, it started out at 400 metric tons, a much lower rate, a gradual ramp-up to 3,000 metric tons. And as I think I've previously indicated in some of my earlier answers, you know, my recollection of the first waste acceptance schedule we published started at 400 metric tons. So I am familiar with the ones in Exhibit 5, but I wasn't familiar with the ones in Exhibit 4.

Q. Okay. Talking about the schedule in exhibit -- strike that.

I think you said that the ramp-up period was revised downward in the schedule in exhibit -- between the schedule in Exhibit 4 and the schedule in Exhibit 5. You said it started at 400 rather than the 1800 metric tons that's set forth in Exhibit 4, and I think you characterized it in order to make it more realistic or probable.

My question is whether or not it's your opinion that the schedule set forth in Exhibit 5 is a realistic schedule?

MR. SHULTIS: Objection, calls for characterization. Legal conclusion.

THE WITNESS: Let me try to correct one thing you said. You said the ramp-up period was revised downward. It's the ramp-up rate that was revised downward.

BY MR. EIDUKAS:

Q. Thank you. That's correct.

A. I think I recollect discussions, you know, back again some 16, 17 years ago where people looked at

bringing a nuclear facility online like the waste receiving facilities of a repository and recognizing that it needs a gradual ramp-up rate before it reaches its full capacity steady state operations. And when we compared the numbers in Exhibit 4 to Exhibit 5, as we just discussed, you know, the ramp-up rate in Exhibit 5 is more gradual and I think in many people's minds, particularly the engineers that were working on it at the time, probably more realistic.

Q. Okay. Who did you have those discussions with, if you can recall?

A. Again, the only names I remember at the time the people I was talking to were people like Charlie Head, who was my immediate supervisor, who is the name indicated in this cover letter to provide comments to. He was, you know, back then he was the one that I talked to most of the time about the work on the mission plan.

Q. Referring to the acceptance schedule in Exhibit 5 that you have in front of you, how was that prepared?

MR. SHULTIS: Objection, vague.

BY MR. EIDUKAS:

Q. And what I mean by how was it prepared, I don't mean how was it typed. I mean, how were these numbers decided upon? How was this schedule developed?

MR. SHULTIS: Objection, vague. Asks for a legal conclusion.

THE WITNESS: As best as I could remember, we had two overriding goals or objectives that we were trying to meet. One was to begin waste acceptance in 1998. The other was to reach a rate for which the amounts of additional at-reactor storage would be minimal or zero.

As Table II-1 in Exhibit 5 shows, in the second column, the annual spent fuel generation rate, these were numbers that we got from the Department of Energy's Energy Information Administration. Based on their analysis of the nuclear power plants in operation and the expected amount of spent fuel that they'd be generating, and as you can see in this table, the numbers start at in 1998 at 2,700 metric tons. They go up a little bit. They approach 3,000 metric tons.

So, for the first 10 years of operation, our target was sort of to reach an acceptance rate of about 3,000 metric tons, which would be more than the generation rate from all the nuclear plants.

We did recognize, though, at that time we still had a backlog, which is shown in column 4, you know, of over 40,000 metric tons that already was in storage. So, again, our two objectives or goals were to try to begin, as you know, as soon as possible, you know, 1998 or as soon as possible thereafter. And as we indicated before, those were what we characterize as optimistic schedules and reach an acceptance rate of 3,000 metric tons, which would preclude the utilities from having to provide any additional on-site storage.

Then when we got a second repository in operation, again, this is shown in Table 2.1 in column 6, a second repository would come into operation about a half a dozen years after the first, and we expected that to ramp-up faster because we would have experience from operating the first repository. And when those two repositories were then operating in tandem, at that point then we'd be able to start reducing the backlog,

which is indicated in the column on the far right.

You know, eventually to the point where we'd between the two repositories accommodate all the expected spent fuel, which at that time was still judged to be 140,000 metric tons.

BY MR. EIDUKAS:

Q. Okay. So, just looking at the -- let's take the first repository acceptance rate that starts at 400 and ramps up to 3,000 and then stays at 3,000 until it looks like 2025 or 2026 where it goes to has 100 and then stops.

I guess, how were those numbers actually -- how did you actually come up with those numbers? Was there a source or a basis for the actual numbers you have here in this for that schedule?

MR. SHULTIS: Objection, vague.

BY MR. EIDUKAS:

Q. I mean, do you understand what I'm asking? I mean, in other words, is this representing a physical limitation that was projected or recognized? Were these numbers picked out and then the idea was to design repository around them? I guess what I'm

trying to get at what, I guess, first the source for these numbers?

A. Okay.

MR. SHULTIS: Objection, compound.

THE WITNESS: It's a compound answer. It's somewhat complicated, but again my recollection is that going back to the Nuclear Waste Policy Act, which indicated that the country planned on developing two repositories, and there were various reasons for that, but the plan was to develop two repositories. And based on the projections at the time, again, the source that I'm familiar with is the Department of Energy's Energy Information Administration, which projected we'd have a total of about 140,000 metric tons of spent nuclear fuel to accommodate or dispose of.

There was a provision in the law that said the first repository could not emplace more than 70,000 metric tons until the second repository goes into operation, and I think there were various reasons for that. But that was sort of a guideline that we used that said the first repository should be designed, if the geology permits, to accommodate 70,000 metric tons

and then the other 70,000 metric tons would go in a second repository.

It was that in combination with what I indicated earlier that the objective was to get an acceptance rate of about 3,000 metric tons, which at that time was the anticipated annual spent fuel generation rate from the nuclear power plants in operation. So if you just do the math, you have a capacity for repository of 70,000 metric tons divided by 3,000 metric tons per year. That would indicate that that repository would operate for about 25 years as this table shows.

And then the second repository would be in operation. Again, a capacity of about 70,000 metric tons, at about 3,000 metric tons per year. That one would operate for about 25 years, and the sum of those two would accommodate all the anticipated spent fuel to be generated by the nuclear power plants in operation at that time.

BY MR. EIDUKAS:

Q. Okay. Referring to -- I think other witnesses have called it the steady state rate or the

maximum rate. The 3,000 that's carried out for the most of the years on this schedule for the repository. Does that represent a limitation on how fast the repository was designed to accept waste?

MR. SHULTIS: Objection, calls for legal conclusion.

THE WITNESS: I'm not quite sure how to answer your question. You said does it. You could design the repository to operate in a number of different ways, and if money or schedule ~~or~~ were no object, you could increase its capacity. Although you complicate the operations.

I believe we again established various goals or objectives and operating parameters which we thought were reasonable based on the experience to date because you also had to consider, for example, the transportation requirements to service these repositories. And in 3,000 metric tons per year, that equates to a large number of truck shipments or, you know, somewhat lesser number of train shipments. And, again, you're looking for the reasonable accommodation of all these interrelated factors.

But I think my earlier answer is still pertinent that the overriding objectives were, again, to develop two repositories. The first with the capacity suggested by the Nuclear Policy Act of 70,000 metric tons with an acceptance rate that would accommodate the expected spent fuel generation rate from nuclear power plants in operation. So when you balance all those design factors, you know, for the engineering solution, you get something I think that was represented at the time by the parameters in this Table 2.1 in Exhibit 5.

Let me point out, though, that this is not our current approach because there have been subsequent actions by Congress which essentially have postponed any work on the second repository. So we knew at the time when we published the mission plan back in the '84-'85 time frame that there were a lot of things beyond our control and, again, this was just a plan. These were just objectives we were trying to meet, and we knew we'd have to accommodate a lot of, you know, prohibitions and hiccups as we began to execute the program.

any discussion. To my recollection, at that time I'm sure the answer was yes, but I don't remember any of the details of the discussions. I mean, again, I was fairly new to the program back in 1984. My primary involvement was on developing the numbers that went in the waste acceptance schedule that seemed to make sense, you know, from an operational standpoint.

Again, meeting the two criteria talked about before. You know, beginning in 1998 trying to get up to an acceptance rate that would preclude the utilities from having to add additional on-site storage. In looking at the combination of the two repositories, that would eventually reduce the backlog and accommodate all the waste. I'm sure there were discussions, but if there were discussions, I don't remember the details of them, you know, at this time.

BY MR. EIDUKAS:

Q. And when you were working, to the extent you were working on developing these waste acceptance schedules, did you view yourself as trying to meet a requirement that waste be taken as expeditiously as practicable as set forth as an obligation in the

contract? Did you have that in your mind when you were developing these schedules?

MR. SHULTIS: Objection, asks for a legal conclusion. Asks for speculation.

THE WITNESS: I'm trying to remember, you know, again, what was in my mind back at that time. I honestly don't remember if we in the planning group, you know, looked upon that as a, as you say, as a requirement. We're trying to establish what we thought were possible schedules, you know, based on assumptions, strategies, objectives that we thought we could meet. Again, they were -- we were concerned about those becoming fixed dates. We were concerned about that. We put caveats in there.

Some of this documentation shows, you know, we said the schedules may change, you know, as other developments occur. I remember fairly clearly the concern of some people -- and I'd have a hard time remembering exactly who the people were, but the answer that I came up with to address that was incorporating key words in our explanation of the waste acceptance schedules as illustrative. You know, they were

examples. They were ways the system could be operated.

You know, we put in words like that to sort of caveat, you know, being overly committal on what we thought we could do. And as you saw the words in some of these other documents, it said that the schedules may change, you know, and if they change, you know, we will have to change.

So, back to your original question, did I consider it as a requirement we were trying to meet? I don't believe so. It was a planning objective more than anything, and I think -- even as this cover letter that transmitted Exhibit 5 and I think I was involved in writing this. The one that starts off "Dear Recipient."

BY MR. EIDUKAS:

Q. Okay. I see that.

A. Signed by Mike Lawrence.

Q. Yes.

A. It states right in the first paragraph that: "The purpose of this report is to provide an informational basis sufficient to permit informed

decisions to be made in carrying out the repository program and the research development demonstration programs required under the Act." Again, it was an informational basis sufficient for decision making. So we didn't want to, you know, overly commit or prescribe to anything.

You know, we knew there were a lot of issues that we would deal with. And, in fact, I think as we discussed before, if you compare Exhibit 4 to Exhibit 5, there were significant changes just from that early draft to this May 1984 draft. I mean, we were making changes, you know, in response to comments, you know, and the development of the planning activities at that time.

Q. Okay. In referring to that letter, when you talked about the document being provided as an informational basis that would allow use of people to rely or make decisions upon it, who are you referring to as making those decisions?

A. It would have primarily been the decision-makers in the Department of Energy, you know, who are charged by Congress with responsibility for

acceptance schedule, but also an acceptance program ranking by utility and fuel element." So we anticipated that these waste acceptance schedules would continue to evolve, you know, would change based on, you know, new or updated information.

The next sentence goes on to read: "The schedule will serve as a planning base, which will be updated annually, with responsible latest projections." So, again, we anticipated that they would be updated.

Q. To stop you there, that sentence that you referred to is that "The schedule will serve as a planning basis, which will be updated annually in response to the latest projections of nuclear power growth." Is that connected to the objective you stated that the schedule was intended to ramp up and then to meet the generation rate?

MR. SHULTIS: Objection, looking for a legal conclusion.

THE WITNESS: My recollection is that the main reason we said "The schedule will serve as a planning basis, which will be updated annually in response to the latest projections," the projections

that we were monitoring closely were the EIA projections, the Energy Information Administration projections. And I believe at the time the Nuclear Waste Policy Act was passed, those projections indicated there were would be 140,000 metric tons of spent fuel generated. And if I can look back quickly to Exhibit 4 here.

BY MR. EIDUKAS:

Q. Sure.

A. Again, when the Act was passed in the end of 1982, the number was 140,000 metric tons, which divided by two was the basis for the 70,000 metric ton limit. By the time this draft of the mission plan was published in December of '83, those projections had already fallen to 133,000 metric tons, and one of the factors obviously was Three Mile Island in 1977 I think. You know, that the number of power plants under construction was dropping. Some were being canceled.

And let me just look here. Well, this one still says 133,000 metric tons. But, you know, we thought that the total amount of spent fuel to be generated might continue to decrease. You know, so we