IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| YANKEE ATOMIC ELECTRIC COMPANY<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | No. 98-126C<br>(Senior Judge Merow) |

DEFENDANT'S MOTION FOR JUDGMENT BASED UPON PARTIAL FINDINGS

Pursuant to Rule 52(c) of the Rules of the Court of the Federal Claims, defendant, the United States, respectfully requests that the Court enter judgment against the plaintiffs in these three cases, which have been consolidated for trial.[1] As the Government demonstrates below, plaintiff has been fully heard concerning its claims against the United States, and the Government is entitled to judgment as a matter of law with respect to those claims.

INTRODUCTION

Rule 52(c) allows for the entry of judgment upon partial findings at the close of a party's case if that party has been fully heard and the Court finds that the party is not entitled to judgment as a matter of law. Yankee Atomic has made a detailed presentation of its claims, through 14 fact witnesses, five expert witnesses, and numerous documentary exhibits and has been fully heard. As a matter of law, the plaintiff cannot prevail on the record presented in support of its claims for damages resulting from the Department of Energy's ("DOE") partial

[1] The Government requests that this motion be deemed applicable to Yankee Atomic Electric Co. v. United States, No. 98-126C, Connecticut Yankee Atomic Power Co. v. United States, No. 98-154C, and Maine Yankee Atomic Power Co. v. United States, No. 98-474C (collectively, "the Yankees").

breach of the Standard Contract For Disposal Of Spent Nuclear Fuel And/Or High Level Radioactive Waste ("Standard Contract"). The Court should, therefore, enter judgment for the Government with respect to all of the Yankees' claims.

SUMMARY OF ARGUMENT

As the causal basis for its damages claim, Yankee Atomic asks the Court to accept the theory and model of one of its experts, Mr. Frank Graves, regarding a hypothetical system of exchanges that allegedly could have developed had DOE begun spent nuclear fuel ("SNF") acceptance in 1998. Based upon this theory, the Yankees ask the Court to find that, if DOE had begun performance in 1998, all of the fuel would have been removed from Yankee Atomic's pool by 1999, Connecticut Yankee's pool by 2001, and Maine Yankee's pool by 2002, and to award damages based upon this purported fact. These "fuel out dates" calculated by Mr. Graves present the causal link to assessing approximately $550 million in damages against the Government. Without Mr. Graves' model, the Yankees cannot establish any causal link between DOE's breach and the extended wet pool costs, ISFSI construction costs, and ISFSI operations costs that they claim. Based upon the lack of any contemporaneous evidence supporting Mr. Graves' theory of exchanges – and, in fact, because of significant uncontroverted evidence contradicting the theory of exchanges – the Government requests that the Court find as a matter of law and fact that the theory and the model upon which it is based are simply too speculative to support the award of damages here.

## ARGUMENT

### I. THE COURT'S RULE 52(c) STANDARD

RCFC 52(c) provides that, during trial, the Court may enter judgment against a party when it determines that, under controlling law, an issue must be decided against that party. RCFC 52(c) states, in relevant part:

> If during a trial a party has been fully heard on an issue and the court finds against the party on that issue, the court may enter judgment as a matter of law against that party with respect to a claim or defense that cannot under the controlling law be maintained or defeated without a favorable finding on that issue, or the court may decline to render any judgment until the close of all the evidence.

The applicable standard is not whether the plaintiff has made a prima facie case, as it would be for a directed verdict motion in a jury trial. Cooper v. United States, 37 Fed. Cl. 28, 35 (1996). Instead, because this Court serves "as both the trier of fact and the trier of law," RCFC 52(c) "permits the judge to weigh evidence and does not require that the judge resolve all credibility determinations in favor of the plaintiff." Id.

The Rules Committee Note to RCFC 52(c) states, in part, that "judgments as a matter of law may be entered against both plaintiffs and defendants and with respect to issues or defenses that may not be wholly dispositive of a claim or defense." "A plaintiff who has had full opportunity to put on his own case and has failed to convince the judge, as trier of the facts, of a right to relief, has no legal right . . . to hear the defendant's case." Howard Indus. v. United States, 126 Ct. Cl. 283, 289-90, 115 F. Supp. 481, 484-85 (1953).

## II. THE YANKEES HAVE THE BURDEN OF PRESENTING SUFFICIENT EVIDENCE TO ESTABLISH THAT AN AWARD OF DAMAGES CAN BE BASED UPON THE HYPOTHETICAL EXCHANGES MODEL THAT MR. GRAVES CREATED FOR THIS LITIGATION

### A. The Yankees Cannot Support Their Exchanges Theory Solely Through A Hypothetical Model Based Upon Speculation

As set forth in the Government's previously filed motion *in limine* to exclude the testimony of Mr. Graves altogether, the rulings of this Court and the United States Court of Appeals for the Federal Circuit in various Winstar cases must guide the Court's evaluation of the model that Mr. Graves created, a model that serves as the causal link to all of the Yankees' claimed damages. In the Winstar cases, the plaintiffs' claims for expectancy damages are claims for lost profits. These claims are often based solely upon the opinion and damages model presented by experts and nothing more. In response to motions for summary judgment on these lost profits claims, the Court has ruled that damages claims based upon such models cannot meet the requirement to prove damages with "reasonable certainty."

In Fifth Third Bank of Western Ohio v. United States, 55 Fed. Cl. 223 (2003), the Court ruled that plaintiff's model was "speculative as a matter of fact and law." Id. at 241. This ruling was based upon finding that the model assembled by Fifth Third's expert "failed to account for any real world events" other than the profitability of one of the thrifts involved, ignored the presence of competitors, and failed to identify "any specific investments or opportunities" the thrift would have pursued absent FIRREA. Id. For the Court, "the most outstanding flaw [was] the assumption that the But-for-Bank would, even if it could, engage in the same type of activities without identifying any specific investments or opportunities, and that these activities

would produce the same results (discounted to be conservative) as the actual business activities in which plaintiff engaged." Id.

Similarly, in Southern National Corp. v. United States, 57 Fed. Cl. 294 (2003), the Court again found that plaintiff's claim for lost profits could not withstand the Government's motion for summary judgment because the claim was based solely upon the speculative model created by plaintiff's expert. Id. at 304-06. The Court found that the model failed to account for specific activities that Southern National would have undertaken but for the enactment of FIRREA. Id. It reiterated that "the Court of Claims and, later, the Federal Circuit, have adhered to a basic tenet governing expectancy damages: A claimant must present sufficient evidence to prove that the amount of its lost profits was reasonably certain." Id. at 306. As with the lost profits cases discussed above, the Yankees' damages theory – predicated upon accelerated performance under the Standard Contract – requires evidentiary support outside of Mr. Graves' litigation-inspired opinions. Otherwise, the Yankees have failed to meet their burden of proof on causation.

B. The Yankees Must Also Support Their Exchanges Theory With Contemporaneous Documents, Not *Post Hoc* Expert Testimony In Conflict With The Contemporaneous Documentation

In addition, Mr. Graves' opinion must be analyzed within the well-established legal premise that contemporaneous documents have far greater probative value than post hoc self-serving trial testimony. In United States v. Gypsum Co., 333 U.S. 364, 402 (1948), the United States Supreme Court reversed and remanded a trial court's decision because its fact-finding was "clearly erroneous" and not supported by contemporaneous evidence. The Court held that when trial testimony "is in conflict with contemporaneous documents we can give it little weight." Id. at 396.

The common-sense principle illustrated in Gypsum has been employed repeatedly in this Circuit. In Alaska Pulp Corp. v. United States, 59 Fed. Cl. 400 (2003), this Court recently reaffirmed this principle, finding that expert witness testimony regarding the effect of a Government breach of contract upon the company's behavior was not only unsupported, but was contradicted by contemporaneous documentation, rendering the testimony valueless:

> The best evidence we have to go on are Plaintiff's own contemporaneous assessments of TTRA's impact. For instance, a December 3, 1992, letter intended for "interested friends" concedes, "[t]o date there has been no impact on cash from the comparability add-on, however the possibility is always present." Facsimile from Mr. Woodbury to Mr. Ishiyama, with attached sample letter (Dec. 4, 1992). APC made the same assessment for the year 1993. It is well established that such a contemporaneous assessment has greater evidentiary value than conflicting post hoc expert testimony.

Id. at 418 (citations omitted). Similarly, in Montgomery Coca-Cola Bottling Co. v. United States, 222 Ct. Cl. 356, 369-74, 382, 615 F.2d 1318, 1325-27, 1332 (1980), the Court of Claims reversed the trial judge's findings of fact where those findings were "in conflict with the objective documentary evidence of the plaintiff's business operation," admonishing that "subjective intent testimony of the plaintiff can only be seriously considered to the extent it is consistent with the objective evidence." Id. at 373, 615 F.2d at 1327.

This principle that the Court should rely on contemporaneous documents over otherwise unsupported trial testimony, and particularly over conflicting contemporaneous documentation, is well-established in numerous additional decisions by this Court and the United States Court of Appeals for the Federal Circuit. See, e.g., Applied Companies v. United States, 144 F.3d 1470, 1474-75 (Fed. Cir. 1998) (granting motion for summary judgment based upon documentary evidence supporting Government's contention belied only by affidavit); Burns v. Secretary of

DHHS, 3 F.3d 415, 417 (Fed. Cir. 1993) (contemporaneous medical records given greater credence than petitioner's inconsistent statements); Cucuras v. Secretary of DHHS, 993 F.2d 1525, 1528 (Fed. Cir. 1993) ("oral testimony in conflict with contemporaneous documentary evidence deserves little weight"); James A. Mann, Inc. v. United States, 210 Ct. Cl. 104, 116-20, 535 F.2d 51 (1976) (branding contractor's statements as "an afterthought" because they were "inconsistent with its [contemporaneous] acts and conduct").[2]

## III. THE YANKEES HAVE FAILED TO SATISFY THEIR BURDEN OF ESTABLISHING THAT, ABSENT THE DEPARTMENT OF ENERGY'S PARTIAL BREACH, EXCHANGES WOULD HAVE OCCURRED IN PRECISELY THE MANNER THAT MR. GRAVES PREDICTS

### A. The Evidence Demonstrates That Mr. Graves' Model Goes To The Fact Of Damages, Not To The Quantum Of Damage

The only evidence upon which the Yankees base their claims that industry-wide exchanges would have occurred – and would have resulted in the Yankees receiving fuel out dates up to 20 years earlier than under the schedule developed using the mechanisms set forth in the Standard Contract – is the trial testimony of Mr. Graves. Indeed, the Yankees have presented no

[2] See also Argus, Inc. v. Eastman Kodak Co., 801 F.2d 38, 42 (2d Cir. 1986) (on summary judgment, finding that the "failure of a business management to note at the time what is later claimed by its lawyers to have been a mortal commercial wound weighs heavily against such a claim"), cert. denied, 479 U.S. 1088 (1987); Interstate Gen. Gov't Contractors v. West, 12 F.3d 1053, 1060 (Fed. Cir. 1993) (conclusory, self-serving assertion from contractor's witness that "if it had not been for this delay ... we would have finished it six months earlier" is "legally insufficient to prove causation"); Morganti National, Inc. v. United States, 49 Fed. Cl. 110, 125, 131, 137, 138 (2001) (repeatedly crediting contemporaneous record over conflicting trial testimony), aff'd, 36 Fed. Appx. 452 (Fed. Cir. 2002); Ellison v. United States, 25 Cl. Ct. 481, 499 (1992) (contemporaneous records given more weight than subsequent testimony); Wilner v. United States, 23 Cl. Ct. 241, 261 n.15 (1991) (court branded damages calculations as "suspect" because plaintiff's expert relied solely upon "conversations with plaintiff" and stated that, "[w]ithout contemporaneous documentation to support the number of hours claimed, this item is speculative").

contemporaneous documents that show that exchanges would have occurred in the manner and to the extent predicted by Mr. Graves. Instead, significant evidence has been adduced – both pre- and post-litigation – that the exchanges upon which the Yankees' entire damages claims hinge never would have occurred in the manner and to the extent needed to clear Yankee Atomic's wet pool by 1999, Connecticut Yankee's wet pool by 2001, and Maine Yankee's wet pool by 2002. In fact, this Court has admitted significant probative evidence that demonstrates that the exchange theory posited by Mr. Graves is nothing more than a litigation-driven theory intended significantly to increase the damages allegedly attributable to DOE's partial breach of the Standard Contract.

In its June 28, 2004 order, this Court indicated that "[w]hether Graves' opinion goes to the fact of damage, the amount of damages, or a combination thereof, will be explored at trial." Order, at 11 (June 28, 2004). As the Court is well aware, the party seeking damages has the burden of establishing the fundamental facts of liability, causation, and resultant injury. Wunderlich Contracting Co. v. United States, 173 Ct. Cl. 180, 199, 351 F.2d 956, 968-69 (1965). "'For a damage to be direct" and, therefore, recoverable, "there must appear no intervening incident . . .; the cause must produce the effect inevitably and naturally, not possibly nor even probably.'" Ramsey v. United States, 121 Ct. Cl. 426, 101 F. Supp. 353, 357 (1951) (quoting Myerle v. United States, 33 Ct. Cl. 1, 27 (1897)). A plaintiff "cannot escape the burden of proving that the losses sought to be avoided were caused, or would have been caused, by defendant's breaches." Affiliated Foods, Inc. v. Puerto Rico Marine Mgmt., 645 F. Supp. 838, 840 (D.P.R. 1986).

In this case, the Court has already ruled that DOE partially breached the Standard Contract by failing to begin accepting spent nuclear fuel by January 31, 1998, and has found the Government liable for that breach. Yet, that finding does not automatically result in a finding that resultant injury occurred. See Indiana Michigan Power Co. v. United States, 60 Fed. Cl. 639 (2004) (after finding liability in spent nuclear fuel case, finding that the partial breach had not yet caused any damages). Before the Court can find that the Yankees suffered resultant injury or damage from DOE's partial breach, it must first find that the breach "caused" the Yankees to incur their claimed damages. See Wunderlich, 173 Ct. Cl. at 199, 351 F.2d at 968-69.

Mr. Graves' testimony makes clear that his opinion touches only upon the fact of damage – that is, the fact that DOE's partial breach caused the Yankees to suffer damage – but does not provide any information regarding the amount of damages. That is, Mr. Graves' testimony is solely related to causation. As part of this effort, Mr. Graves indicated that the primary application of his model was to determine the "fuel out date" for each of the Yankees. Tr. 903:18-23. This fuel out date provides a cutoff, according to Mr. Graves, after which all costs should be attributable to damages. Tr. 905:18-906:7; see also Tr. 3329:9-3330:24 (Dr. Wise's testimony that the existence of damages is dependent upon the fuel out dates contained within the Graves model). Significantly, Mr. Graves does not quantify any damages. Tr. 907:21-23.[3]

---

[3] The fact that Mr. Graves' model attempts to establish the fact of damage and not the quantum of damage is highlighted by the testimony presented concerning the benefits to the Yankees of promptly decommissioning their facilities and the fact that such decommissioning could not be completed if spent fuel remained in the wet pool. See, i.e., Tr. 2401:23-2406:9 (benefits of prompt decommissioning to Connecticut Yankee). Indeed, given the extended fuel out dates under an oldest fuel first acceptance schedule – even under Mr. Graves' accelerated rate – the Government believes that the Yankees would have constructed ISFSIs and moved their spent fuel to dry storage in order to promptly decommission their wet pools in the non-breach world. If true, any damages associated with ISFSI construction and operations would not have

In its order denying the Government's motion *in limine* to exclude the testimony of Mr. Graves, the Court referenced the Federal Circuit's decision in Energy Capital Corp. v. United States, 302 F.3d 1314 (Fed. Cir. 2002), for the proposition that damages may be based upon "reasonable inferences based upon the evidence." Order, at 6 (June 28, 2004). Based upon the evidence that has been presented at trial, Energy Capital is inapplicable here. In denying the Government's motion *in limine* in this case, this Court noted that, in Energy Capital, evidence had been adduced concerning incentives to first mortgagees that would, by reasonable inference, have resulted in the profits to the plaintiff. Order, at 6. Here, the Yankees have presented no evidence, outside of the factually unsupported testimony of Mr. Graves, that exchanges would have occurred in the "but for" world. Indeed, not only did the Yankees not obtain agreements to exchange delivery commitment schedules ("DCSs"), or even acceptance allocations, with other contract holders, the three Yankees themselves failed to agree to exchanges among themselves. These facts render any assertion of a viable exchange market untenable.

In addition, the Energy Capital decision focused upon whether lost profits damages or reliance damages were the correct measure of damages in the case. Id. at 1319. However, in this case, like the Court's recent holding in Columbia First Bank v. United States, 60 Fed. Cl. 97 (2004), the base fact of injury is in dispute, and resolution of that dispute is the factual predicate for any award of damages. See Columbia First Bank, 60 Fed. Cl. at 102 ("[t]he causation in fact requirement prevents plaintiff's recovery for any losses not proven to have occurred at all").

---

been caused by DOE's breach. Only the expedited fuel out dates modeled by Mr. Graves result in the significant and excessive damages sought by the Yankees here.

Finally, in Energy Capital, the Government urged the adoption of a *per se* rule that no new business venture could be awarded lost profits. Id. at 1324. The Court refused the Government's invitation to apply a blanket prohibition against lost profits, but still required that the plaintiff establish causation, foreseeability, and reasonable certainty prior to awarding damages. Id. at 1326. Indeed, the Court stated that the evidentiary hurdles associated with recovering lost profits for a new venture remained high. Id. at 1328. Even under Energy Capital, the Yankees have a high burden of establishing damages with reasonable certainty. See Columbia First Bank, 60 Fed. Cl. at 101 (setting forth test for lost profits). To the extent that damages are available to the Yankees based upon the hypothetical and speculative Mr. Graves' model, they have not met that burden here.

### B. In Developing His Model, Mr. Graves Did Not Seek Any Testimonial Or Documentary Evidence Supporting His Conclusion That Exchanges Would Have Occurred In The Manner And To The Extent Required By His Model

Mr. Graves' model lacks any support in the record for the fundamental assumption that exchanges would have occurred in the manner and to the extent required for the Yankees' spent nuclear fuel to be removed by 2002. In fact, the existence of supporting evidence appears to have been an irrelevant consideration to Mr. Graves in the preparation of his model. For example, in preparing his model, Mr. Graves failed to review any of the Yankees' historical or planning documents to determine whether the rate and resulting fuel out dates that he assumed were consistent with the Yankees' estimates of when they expected their fuel would be removed by DOE. Tr. 921:17-922:10. Mr. Graves failed to examine any Yankee documents that express concerns surrounding the viability of exchanges in the non-breach world. Id. Mr. Graves did not speak to any Yankee employee in formulating his theory of exchanges upon which his entire

model either rises or falls. Tr. 988:13-17. Surprisingly, in formulating his model that results in the expedited removal of the Yankees' spent nuclear fuel, Mr. Graves did not consult with representatives of any of the utilities that he assumes trade away those early year allocations. Tr. 988:13-17. Further, though Mr. Graves' model is built upon the basic assumption that other contract holders would have been willing to exchange acceptance allocations with the Yankees by selling away their early acceptance allocations, Mr. Graves never asked other contract holders whether they would, in fact, have been willing to trade down in the queue. Tr. 988:18-989:10.

Mr. Graves failed to consider the risk that sellers might face absent DOE's partial breach by giving up early allocations in exchange for allocations in the later years of the program. Tr. 974:10-16. He failed to consider political implications associated with the exchange marketplace that his model creates. Although Mr. Graves acknowledges that the Standard Contract allows only the exchange of approved DCSs, Tr. 868:19-24, Mr. Graves failed to consider the DCS submittals that the Yankees made, Tr. 877:6-15, or that the remainder of the nuclear utility contract holders made. As the "Exchanges" provision of the Standard Contract makes clear, contract holders do not exchange acceptance allocations, but instead exchange DCSs. 10 C.F.R. § 961.11, Art. V.E. Accordingly, if the Yankees were going to exchange positions in the SNF acceptance queue with other contract holders, both they and the other contract holders would have to obtain approvals of DCSs that they submitted seeking acceptance of specific amounts of SNF in specific years. Yet, the only DCSs for which any of the three Yankees obtained approvals were in amounts consistent with the 900 Metric Tons Uranium ("MTU") rate that DOE

had identified in the 1991 Annual Capacity Report ("ACR").[4] DX28.002 to .011; 29.002 to .003; 30.011, 30.013, 30.018, 30.020. In the "real" world of 1992, none of the Yankees acted in a manner or obtained the types of DCSs that would be necessary to support the amounts of exchanges necessary under Mr. Graves' exchanges model to allow the Yankees to have all of their SNF removed from their facilities by 1999, 2001, and 2002, respectively. In fact, the Yankees have not established that any of the other Standard Contract holders obtained or attempted to obtain DCSs that satisfy the acceptance allocation amounts that Mr. Graves needs to support his model. This lack of "real" world evidence, or contemporaneous actions by any of the Yankees or the nuclear utility industry, consistent with the assumptions upon which Mr. Graves' model is based preclude reliance upon that model as anything other than litigation-created speculation inconsistent with the actual state of affairs as they existed in 1992.

Additionally, nearly all of the information that Mr. Graves considered in formulating his model was gathered after the exchange market that he contemplates supposedly would have occurred. As a result, his model presents a purely retrospective view of the world as it would allegedly exist "but for" DOE's partial breach and does not accurately depict the information upon which both DOE and the utilities were operating in the early 1990s. Mr. Graves admits that

---

[4] Initially, Yankee Atomic had submitted DCSs seeking DOE's agreement to accept more SNF from Yankee Atomic than permitted by the 1991 ACR under a strict "oldest fuel first" allocation system, seeking instead DOE's agreement to grant Yankee Atomic's SNF priority in acceptance based upon Yankee Atomic's status as a shutdown reactor. DX30.002, 30.003, 30.005. However, in response to DOE's objections, Yankee Atomic submitted new DCSs in accordance with the 1991 ACR and did not pursue any objections through the Standard Contract's "Disputes" clause. See DX30.010, 30.013, 30.017. As for Connecticut Yankee and Maine Yankee, neither of those contract holders ever submitted a DCS that did not conform with the allocations contained in the 1991 ACR, and neither of them ever complained about those allocations as constituting a breach of the Standard Contract. See DX28.002, 28.004, 28.006, 28.008, 28.010, 28.012, 28.013, 29.002.

the market for acceptance allocations in the "but for" world would have developed in the 1992 or 1993 time frame, before much of the information critical to his model would have been available. Tr. 968:16-970-1. Mr. Graves relies only upon a post-breach 1999 system requirements document in selecting the rate of SNF acceptance that DOE allegedly would have satisfied in the "but for" world. Tr. 923:17-23. Mr. Graves determined the capacities of contract holders' spent fuel pools based upon a spent fuel storage requirements document published in 1995. Tr. 944:20-945:1, 1010:19. Mr. Graves then determined total discharges based upon NAC discharge information that was current as of 1998 or 1999. Tr. 945:3-7. In a model that is driven by a definition of "must move fuel" that incorporates five-year cooled fuel from shutdown reactors, Mr. Graves assumed plant status as it existed in 1998 in determining the number of plants that possessed shutdown "must move" fuel. Tr. 948:22-24. This assumption added nearly 3,000 MTUs of "must move" fuel that did not constitute "must move" fuel when the 1991 ACR was published. Even Mr. Graves admitted that, if the spent fuel from prematurely shutdown facilities were omitted from his "must move fuel" definition, the 1991 ACR rate "would have been closer to the must move forecast you would have had 6, 8 years before my analysis." Tr. 1017:18-1018:2.[5] The retrospective, results-oriented model that he created simply does not reflect the "but for" world that he purports to model.

### C. The Evidence Adduced At Trial Contradicts Mr. Graves' Assumption That The Exchanges That Underlie His Model Would Have Occurred

Contrary to Mr. Graves' assumptions, the evidence demonstrates that other contract holders would not have been willing to trade away their early acceptance allocations to allow the

[5] Mr. Graves also assumed ISFSI status as of 1998. Tr. 953:5-8.

Yankees to rid themselves of their spent fuel on an accelerated basis. In fact, the Yankees themselves doubted the viability of any accelerated removal based upon industry-wide exchanges. Had Mr. Graves considered the available evidence, he would have seen a letter dated February 4, 1992, from Dr. Andrew Kadak, President and CEO of Yankee Atomic, to Dr. John Bartlett, Director of the Office of Civilian Radioactive Waste Management, in which Mr. Kadak indicated that "exchanges may not be practically available, or if they are, the competition for making such exchanges among utilities with concerns over site decommissioning and other issues will make them economically unattractive." DX146, at 2.

Likewise, had Mr. Graves considered the available evidence, he would have seen a letter dated June 10, 1993, from Mr. J.M. Buchheit, Senior Nuclear Fuels Engineer for Yankee Atomic, to Ms. Beth Tomasoni, Contracting Officer, complaining that "[s]wapping all our allocations is not possible since your acceptance schedules only cover the first ten years. These swaps, if ever possible, would not address the fundamental problem of storing spent fuel on site for 25 years after shutdown." DX30.008, at 2.

Had Mr. Graves talked to the Yankees or the other contract holders before formulating his model, he would have discovered that, in both 1992 and 1998, Yankee Atomic actually attempted, unsuccessfully, to exchange acceptance allocations. Mr. Bennett testified that Yankee Atomic requested proposals from "quite a few" utilities regarding exchanges of allocations in 1998. Tr. 2409:20-24. Only one utility responded affirmatively to Yankee Atomic's request. Tr. 2416:19-24. As Mr. Bennett testified, many utilities declined to exchange acceptance allocations with Yankee Atomic. See Tr. 2416:25-2419:3; see also DX269, 273, 284, & 286 (letters from Consolidated Edison, Northern States Power Company, Boston Edison and Consumers Energy,

respectively, declining Yankee Atomic's invitation to exchange acceptance allocations); see also Tr. 2938:10-14, 2946:17-19 (Mr. Whittier testifying that Maine Yankee did not exchange with Yankee Atomic in the 1992/1993 time frame). Finally, significant evidence exists that the exchanges theory is simply a litigation-driven position that seeks to significantly increase the liability of DOE. See, i.e., DX262, 287, 363.

Absent Mr. Graves' hypothetical model of exchanges, the Yankees have presented absolutely no evidence that DOE would have removed all of their SNF by 1999, 2001, and 2002, respectively. Absent that finding, the Yankees have not presented any basis for establishing that any of their claimed damages would not have also been incurred in the "but for" world that would have existed without DOE's partial breach. Given that, absent Mr. Graves' speculative hypothetical model, the Yankees have no basis for proving that any costs claimed in this litigation are an incremental result of DOE's breach, they have failed to prove causation for any of their claimed costs. Accordingly, the Government is entitled to judgment against the Yankees.

## CONCLUSION

For the foregoing reasons, the Government respectfully requests that the Court grant its motion for judgment based upon partial findings.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

s/ David M. Cohen
DAVID M. COHEN
Director

s/ Harold D. Lester, Jr.
HAROLD D. LESTER, JR.
Assistant Director
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tele: (202) 305-7562
Fax: (202) 307-2503

OF COUNSEL:

JANE K. TAYLOR
Office of General Counsel
U.S. Department of Energy
1000 Independence Ave., S.W.
Washington, D.C. 20585

KEVIN B. CRAWFORD
JOHN C. EKMAN
HEIDE L. HERRMANN
R. ALAN MILLER
RUSSELL A. SHULTIS
MARIAN L. SULLIVAN
Commercial Litigation Branch
Civil Division
Department of Justice
Washington, D.C. 20530

August 2, 2004

Attorneys for Defendant

CERTIFICATE OF SERVICE

I hereby certify that on this 2nd day of August 2004, a copy of foregoing "DEFENDANT'S MOTION FOR JUDGMENT BASED UPON PARTIAL FINDINGS" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ Harold D. Lester, Jr.