# EXHIBIT 10

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

\- - - - - - - - - - - - - - - - - x

YANKEE ATOMIC ELECTRIC COMPANY; : Case Nos. 98-126C,
CONNECTICUT YANKEE ATOMIC POWER : 98-154C, 98-474C,
COMPANY; MAINE YANKEE ATOMIC : 98-483C, 98-484C,
POWER COMPANY; FLORIDA POWER & : 98-485C, 98-486C,
LIGHT COMPANY; NORTHERN STATES : 98-488C, 98-614C,
POWER COMPANY; DUKE POWER, a : 98-621C, 99-447C,
Division of DUKE ENERGY CORP.; : 00-440C, 00-695C,
INDIANA MICHIGAN POWER COMPANY; : 00-703C, 01-115C,
SACRAMENTO MUNICIPAL UTILITY : 01-116C, 01-249C

\- - - - - - - - - - - - - - - - - X

(Caption continued on the next page)

Deposition of LAKE H. BARRETT, VOLUME 4

Washington, D.C.

Wednesday, May 8, 2002

9:31 a.m.

Job No.: 11792-10

Pages: 826 through 1103

Reported by: Diane Gomez, RPR

COPY

DISTRICT; SOUTHERN NUCLEAR :
OPERATING COMPANY, et al.; :
COMMONWEALTH EDISON COMPANY; :
BOSTON EDISON COMPANY; GPU :
NUCLEAR, INCORPORATED; WISCONSIN :
ELECTRIC POWER COMPANY; POWER :
AUTHORITY OF THE STATE OF NEW :
YORK; OMAHA PUBLIC POWER DISTRICT;:
NEBRASKA PUBLIC POWER DISTRICT; :
and TENNESSEE VALLEY AUTHORITY, :
Plaintiffs :
v. :
THE UNITED STATES, :
Defendant :
- - - - - - - - - - - - - - - - - X

A A support role.
Q And please describe that support role.
A We've done technological issues with the Nuclear Regulatory Commission to facilitate and support vendors getting certifications. An example of would be burn-up credit. We've submitted topical reports to the NRC which all vendors can use. So we play a support role to certifications.
Q The actual approval or certification comes from the NRC alone, correct?
A For health and safety purposes, yes.
Q What do you mean by "for health and safety purposes"?
A The NRC evaluates and approves based upon public health and safety. They do not on economics or interchange issues or other things like that. An example would be under the contract on the DOE accepting this as an acceptable waste form, there are issues such as size, loads, and things like that need to be worked out, which we have not done. So we have approval, DOE has approval for receipt as well as the NRC for health and safety.

(Deposition Exhibit Barrett 50 was marked for identification and retained by Counsel.)

Q Mr. Barrett, the court reporter has handed you Exhibit 50, which bears Bates CTR-040-0568 through 0583. It's dated April 26, 1995, and it's from T.J. Glauthier, G-l-a-u-t-h-i-e-r, Associate Director, Natural Resources, Energy, and Science; and Charles Curtis, Undersecretary, Department of Energy. Do you have that document before you?

A I do.

Q And do you see on the second page the distribution includes a copy going to Daniel Dreyfus?

A Yes.

Q Now, on April 26, 1995, you reported to Mr. Dreyfus, did you not?

A Correct.

Q Do you recall earlier today you I believe indicated that on, I don't know if you used the term "frequent," but perhaps regularly you deal, in your capacity as deputy director, with the Office of Management and Budget?

A Yes.
Q And --
A Well, excuse me. Primarily as the acting director.
Q Primarily as the acting director?
A Yeah. Sometimes I do.
Q And would you have dealt with the Office of Management and Budget in 1995 in connection with the issues addressed in Exhibit 50?
A In a nonpolicy sense.
Q So you would have dealt with the Office of Management and Budget in connection with these issues, correct?
A In a nonpolicy sense.
Q Now, the memorandum, it's on the letterhead of the Executive Office of the President, Office of Management and Budget. Do you see that?
A I see that.
Q Who is T.J. Glauthier, if that's how you state it?
A Yeah, T.J. Glauthier.
Q Who was he?

A At that time he was the associate director of natural resources and energy and science within the OMB.

Q And Mr. Charles Curtis, who the memorandum is also from, was an official with the Department of Energy, correct?

A He was the Undersecretary at that time.

Q Do you know why Mr. Curtis issued a memorandum on April 26th, 1995, on letterhead of the Office of Management and Budget?

MS. HERRMANN: Objection. Speculation.

A No.

Q Would that have been unusual based on your experience in the office?

A Not unusual. I'm not sure this is a final. I don't see any initials on it. I'm not sure this is issued.

Q Have you ever seen another memorandum in which Undersecretary of the Department of Energy issued a memorandum on letterhead of the Office of Management and Budget?

A What?

Q Are you familiar with any other situation in which an official of the Department of Energy issued a memorandum on letterhead of the Office of Management and Budget?

A You used the word "issued." I'm not sure this is issued. Usually I'm used to seeing a little curlicue, a signature, something with it. This may be issued.

Q But assuming it was issued, are you aware of any other instance in which an official of the Department of Energy issued a memorandum on letterhead of the Office of Management and Budget?

A I don't know of any, but it's -- I would think it's not uncommon.

Q Well, assuming this memorandum was, in fact, issued, why do you believe that Mr. Curtis would have issued a memorandum on the letterhead of the Office of Management and Budget?

MS. HERRMANN: Objection. Speculation.

A The first name on there is T.J.'s, not Charlie's. So this was a joint activity. So whose letterhead it is, it's going to be one or the other.

T.J. is first. That's probably why it's on his letterhead, but I'm speculating because I don't know.

Q Can you turn to page two, Bates number 0571.

A I'm sorry, 05 -- mine's cut off. So it's the second page?

Q Second page, yes.

A Okay. I'm there.

MR. MACDONALD: Fourth page of the document.

THE WITNESS: Says page two on the bottom?

MR. MACDONALD: Yes.

Q Under Issues in the first paragraph, will you take a moment to read that.

A Yes.

Q Have you read the first paragraph?

A Yes.

Q Is the first paragraph consistent with your understanding?

A When you said the first -- I haven't read -- you says issues. The first paragraph, not down to "expectation for waste"?

Q No. My question is with respect to this statement: When the nuclear waste policy was enacted, policy act was enacted, it was envisioned that the department would have a repository available for permanent waste disposal in 1998, and the department entered into contracts with the utility to begin accepting waste in 1998 on that basis. Is that statement consistent with your understanding?

A Yes.

MS. HERRMANN: Objection. Foundation, calls for a legal conclusion.

A Yes.

Q On page three could you please turn to the first paragraph on the top of the page. Do you see that?

A Yes.

Q Why would continued on-site storage of spent fuel threaten the orderly operation of the nation's civilian nuclear reactors?

MS. HERRMANN: Objection. Foundation.

You can take time to read it if you need to.

THE WITNESS: Yeah.

A You're referring to a phrase in this paragraph?

Q I'm looking at the last sentence of the first full paragraph on page three. Do you see that?

A The last sentence. I see the last sentence.

Q And my question is how or why would the continued on-site storage of spent fuel threaten the orderly operation of the nation's civilian nuclear reactors?

MS. HERRMANN: Objection. Foundation.

A The example of this would be the Prairie Island situation.

Q And please explain to me that example.

A Where due to local state -- state law they had difficulty getting storage and may have to shut the reactor down.

Q Are there any other situations that you're familiar with which at-reactor storage could threaten the orderly operation of nuclear reactors?

A No specific ones.

Q Do you believe that to be generally a concern?
A Yes.
Q Do you recall I asked you about an Upton Bill, U-p-t-o-n, the last session of this deposition?
A Vaguely.
Q Could you please turn to what's marked as page one, Bates number 0579 of this exhibit.
MS. HERRMANN: The next page in our copy, right, counsel?
A Policy options, option one?
Q Yes, that's the page.
A I see it.
Q It's Option 4. I'm sorry.
A Option 4?
Q Yes. The bottom of the page is Bates number 0579.
MS. HERRMANN: Our Bates numbers are cut off so we're going to need a better reference.
MR. CAYNE: It's Option 4.
A Yes, I see the page.
MS. HERRMANN: For the record, a good

number of these pages are numbered page number one and page number two, so that's not going to help.

A Just so you know, ten minutes from now I need to go.

Q It's 3:45.

A Oh, I'm a whole hour off. Sorry about that.

MS. HERRMANN: Wishful thinking.

Q I'd like to turn your attention to towards the bottom of the page there's a paragraph that begins "start of waste acceptance." Do you see that?

A Yeah, I see the paragraph.

Q Would you please read that.

A Okay.

Q Have you read that passage?

A Yes.

Q Now, the reference to the storage facility here is to an interim storage facility, correct?

MS. HERRMANN: Objection. Foundation.

A That's my understanding.

Q And just for the record, let me just read the statement so it's clear what we're talking about.