The paragraph reads "Start of waste acceptance: The Upton/Towns Bill mandates a storage facility in 1998, but this appears infeasible. More realistic estimates are that a storage facility could be available in five to seven years after legislation is passed, depending on the degree of procedural streamlining included in the law. Assuming passage of legislation 1995, therefore acceptance could begin from 1999 to 2003." Do you see that? That's the statement you're referring to, correct?

A Yes.

Q Earlier on your office believed that an interim storage facility could be up and running within three-and-a-half years of the start of construction, correct?

MS. HERRMANN: Objection. Speculation.

A I don't recall three-and-a-half years.

Q You do not recall testifying in this deposition that at an earlier point in time you believed that it would take less than five to seven years to get an interim storage facility up and running?

A All depends on the infrastructure and degree of streamlining, etc. The shortest I think I've ever said was four under some -- some circumstances which I don't remember the details. But generally -- I've never said less than four. You can do it in three and a half. That's the licensing phase or something, to put it in context. But go ahead. I mean, what's the -- what's the question? If you're saying three and a half, I don't think you can do it in three and a half.

Q My question is do you agree with the statement at page Bates 0579 that a realistic estimate of the amount of time that it would take to get an interim storage facility up and running would be from five to seven years after the enactment of authorizing legislation?

MS. HERRMANN: Objection. Speculation.

A Could be four, could be five, could be seven. All depends on a lot of things.

Q Would an MRS facility be an interim storage facility within the meaning of this paragraph on 0579?

MS. HERRMANN: Objection. Foundation.

A It would be very similar.

Q Is that what was in mind?

MS. HERRMANN: Objection. Foundation. Speculation.

A The Upton/Towns Bill was straight storage. An MRS was more than straight storage. It was an integral part of the system.

Q Turn to page -- it's a section that on the top of the page it states "supporting initiatives for policy options."

A We're going back in the document or forward?

Q It's --

MR. MACDONALD: Third-to-the-last page.

Q -- third-to-the-last page.

A I see that page.

Q And can you take a moment to read this portion of the memorandum. And to put it into context for you, I'm going to specifically ask you about, on the following page, the section on policy considerations. Why don't you read this memorandum, this portion of the memorandum so that you can respond

to the questions I have on that section.
A Am I supposed to read B or A?
Q I'm focusing on Subsection B.
A Oh, I'm sorry, I'm doing A.
I've read B.
Q Okay. Now, under page 0581.
A Tell me which one.
Q That's the first page with "supporting initiatives for policy actions." Do you see that?
A Yes.
Q In 1995, in April 1995 was the multipurpose canister program still in force, or had you terminated it already?
A It's my recollection it was still there in early '95.
Q And as you discussed earlier, the multipurpose canister program would have been intended to mitigate at least some of the harm suffered by utilities as a result of the delay in acceptance of spent nuclear fuel, correct?
A Correct.
Q Well, why, as reflected in this Exhibit 50,

was it also believed that -- by the department and the Office of Management and Budget that additional payments would be required to be made to the utilities to supplement the provision of multipurpose canisters?

MS. HERRMANN: Objection. Foundation.

A It doesn't say that. It says it could be. You know, if this option were adopted you could do that to additionally compensate them for the delays.

Q Because I thought when you explained the multipurpose canister program, that would have been a stand-alone proposal, to compensate the utilities?

A That was a -- that was a stand-alone proposal, but what this is referring to, I believe, is this would be in addition to the multipurpose canisters. It says right there, These payments would supplement the multipurpose canisters.

Q You indicated that the multipurpose canister program was intended to mitigate the harm suffered by the utilities, correct, as a result of the acceptance delays?

A Yes.

Q Why was the department in 1995 considering

the possibility of supplementing the provision of multipurpose canisters to utilities with additional payments reflected in the proposal on page 0581 and 0582 of Exhibit 50?

MS. HERRMANN: Objection. Foundation. Speculation.

A It would be my understanding that many utilities were not particularly satisfied that the multipurpose canisters being supplied were sufficient to cover the delays and wanted more. And this was our -- an option that we were looking at that we could provide more. An example is one you said earlier, we talked about earlier was that the multipurpose canisters did not cover the construction costs that on-site reactors would have to do.

Q And would the payments reflected in the proposal set forth at page 581 have covered such construction costs?

A Could have been used for that.

Q That would have been one of the purposes, correct?

A Could have been, yes.

Q For what other purposes would the payments reflected at page 051 have been used?

MS. HERRMANN: Objection. Foundation.

A I don't know.

Q Well, rather than giving me all the purposes, what other purposes can you think of? Can you think of any other purposes?

MS. HERRMANN: Same objection.

Q Other than construction?

A Well, if it was a payment in terms of cash, utilities could do with it what they wished to do in conjunction with the PUCs.

Q In conjunction with the?

A Public utility commissions.

Q How would the amount of the payments have been determined?

MS. HERRMANN: Objection. Foundation, speculation.

A That's a complexity that's there and one of the reasons why we never did it.

Q On the next page, page 0582.

MS. HERRMANN: Can we get a title on the

top, please?

MR. CAYNE: The first entry is Legislative Implications.

MR. MACDONALD: The second-to-the-last page.

A The next-to-the-last page?

Q Yes. You said a moment ago the payments weren't made because of the complexity of determining the amount. Do you recall that statement?

A Yeah, I recall the statement. I shouldn't have made it.

Q You didn't mean to indicate that the department didn't make the payments because it didn't believe that it had an obligation to mitigate or rectify the harm sustained by the utilities as the result of the delay in acceptance, did you?

MS. HERRMANN: Objection. Foundation, calls for a legal conclusion. Objection to the extent it mischaracterizes prior testimony.

A Cash payments are extremely complicated, and this was not pursued beyond the preconceptual discussion that you see here.

Q But it was not pursued, if I understand your testimony, because of the difficulty in determining the amount of the cash payments as opposed to a determination by the department that it didn't have an obligation to rectify the harm suffered by the utilities as a result of the acceptance delays, correct?

MS. HERRMANN: Objection. Foundation, calls for a legal conclusion.

Q Correct?

MS. HERRMANN: Same objections.

A I don't know how to answer that question, because you had so many things mixed in it. I don't know how to answer that question.

Q If I understand your testimony, the department basically threw up its hands and said, It's too complicated for to us figure out how much we should pay each utility, so we're not going to pursue this proposal. Would that be a correct statement?

MS. HERRMANN: Objection. Mischaracterizes prior testimony.

A No, it would not be, because the amount

that one would pay is probably one of the more easy things to do, and that is very complicated in itself. So there are many issues involving direct payments, of which determining what amounts to whom and when is a very complicated one, but that is probably less complicated than the source of funds and the other things discussed in this statement.

So I did say that, but that's a lesser item. Although that is a major item. I have nothing to do -- in my statement on that, my remark had nothing to do regarding obligations or anything else that revolved through contractual matters.

Q Do you see under Policy Consideration it says "mitigates the perceived problems of utilities 'having to pay twice for storage'"? Do you see that?

A I see that.

Q What is that?

MS. HERRMANN: Objection. Foundation, speculation.

A I believe what the authors were trying to do here was find a way to provide resources back to the utilities that were having to spend resources due

to the fact that we didn't pick the fuel up, through storage or whatever, while they were -- operating utilities, not shut down ones -- were still paying money into the waste fund. The ones who were operating claimed they were paying twice; once to pay the waste fund and once to do with storage. So we were trying to figure a way to cover some of the storage costs that would alleviate the utilities to have to, quote, pay twice.

Q Under the statute the utilities were supposed to pay into the waste fund, and at that point it became the obligation of the Department of Energy to store and dispose of the spent fuel, correct?

MS. HERRMANN: Objection. Calls for a legal conclusion.

Q Correct?

MS. HERRMANN: Same objection.

A Repeat the question again.

Q The problem of the utilities having to pay twice for storage arose because under the Nuclear Waste Policy Act it was the intention of Congress that the utilities pay once into the nuclear waste fund,

ok



ACKNOWLEDGMENT OF DEPONENT

I, LAKE H. BARRETT, do hereby acknowledge that I have read and examined the foregoing testimony, and the same is a true, correct and complete transcription of the testimony given by me and any corrections appear on the attached Errata sheet signed by me.

6/27/02 (DATE)

[signature] (SIGNATURE)