# EXHIBIT 11

# EXHIBIT 11

## Plaintiff's Counter Designations to Defendant's Counter Designations

**VICTOR TREBULES**

**<u>April 17, 2002</u>**

59:18-60:14

106:14-107:6

124:2-18

151:11-152:10

161:12-162:9

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
```
--------------------------------------------x
YANKEE ATOMIC ELECTRIC COMPANY               :
(98-126C)(Merow, S.J.)                       :
CONNECTICUT YANKEE ATOMIC POWER COMPANY      :
(98-154C)(Merow, S.J.)                       :
MAINE YANKEE ATOMIC POWER COMPANY            :
(98-474C)(Merow, S.J.)                       :
FLORIDA POWER & LIGHT COMPANY                :
(98-483C)(Wilson, J.)                        :
NORTHERN STATES POWER COMPANY                :
(98-484C)(Wiese, J.)                         :
DUKE POWER, a Division of DUKE ENERGY CORP.  :
(98-485C)(Sypolt, J.)                        :
INDIANA MICHIGAN POWER COMPANY               :
(98-486C)(Hodges, J.)                        :
SACRAMENTO MUNICIPAL UTILITY DISTRICT        :
(98-488C)(Yock, S.J.)                        :
SOUTHERN NUCLEAR OPERATING COMPANY, et al.   :
(98-614C)(Merow, S.J.)                       :
COMMONWEALTH EDISON COMPANY                  :
(98-621C)(Hewitt, J.)                        :
BOSTON EDISON COMPANY                        :
(99-447C) (Allegra, J.)                      :
GPU NUCLEAR, INCORPORATED                    :
(00-440C)(Bush, J.)                          :
WISCONSIN ELECTRIC POWER COMPANY             :
(00-697C)(Merow, S.J.)                       :
POWER AUTHORITY OF THE STATE OF NEW YORK     :VOLUME
(00-703C)(Damich, J.)                        :  I
OMAHA PUBLIC POWER DISTRICT                  :
(01-115C)(Bush, J.)                          :
NEBRASKA PUBLIC POWER DISTRICT               :Discovery
(01-116C)(Sypolt, J.)                        :Judge:
TENNESSEE VALLEY AUTHORITY                   :(Judge
(01-249C)(Bruggink, J.)                      :Sypolt)
               Plaintiffs,                   :PAGES
v.                                           :1 - 241
```

THE UNITED STATES, :

Defendant. :

------------------------------------------X

Deposition of Victor W. Trebules, Jr.

Washington, DC

Wednesday, April 17, 2002

Reported by: Denise Dobner Vickery, RMR, CRR

JOB NO. 144458

Q. I'm sorry. You had said that you recall there being discussions regarding whether or not accepting one spent fuel element in 1998 would comply with the Nuclear Waste Policy Act.

My question was whether or not you personally reached a conclusion as to whether or not accepting only one spent fuel element in 1998 would comply with the act?

MR. SHULTIS: Same objection.

THE WITNESS: I'm not quite sure how to answer that because at the time I was, you know, a fairly low level staff person. I was given an assignment. So I'm not sure if my conclusion would have mattered much. I mean, I'm not trying to be frivolous, but I don't know that I consciously thought of the implications of that at the time. I mean --

BY MR. EIDUKAS:

Q. Have you -- I'm sorry. I was going to ask you whether or not you have since come to such a conclusion or thought about the implications.

MR. SHULTIS: Same objections and relevance.

THE WITNESS: I think I would personally feel that one could argue since the Act was not specific, if we only accepted one fuel assembly, you know, we met the intent of the words. However, I also would be sympathetic to the additional phrase in here that where it says, "However, we did not believe that that meets the intent of the Act."

I believe the intent of the Act was for the government to develop the facilities to solve the nuclear waste problem, which isn't accepting just one assembly, and we were to develop the facilities. And we were trying to do that as expeditiously as we could, you know, to really deal with the overall problem of the accumulation of spent fuel.

BY MR. EIDUKAS:

Q. Okay. And was there ever a schedule or plan developed that called for only receiving one spent fuel element in 1998?

MR. SHULTIS: Objection, calls for speculation. It's vague.

THE WITNESS: I don't ever remember developing a schedule that only called for one assembly

and not have them generate or not have them have to add any on-site storage.

Q. I think you said when you started, someone gave you that language or told you that language. Do you know who it was?

MR. SHULTIS: Object.

THE WITNESS: I don't remember specifically, but it's similar to what, you know, appeared in that other exhibit.

BY MR. EIDUKAS:

Q. Robert Morgan?

A. And that became sort of a program -- again, it was a program objective that we were trying to meet.

Q. Okay. Do you know why that was a program objective?

MR. SHULTIS: Objection, calls for speculation.

THE WITNESS: Yeah. I would be speculating. I mean, I'm inclined to answer and say that, you know, we were trying to accommodate the utilities, who are in fact our customers. That's what the program was designed, you know, to deal with, which

is the spent fuel being generated by nuclear power plants. And we knew it would be a financial burden for them to add on-site storage. So we were trying to develop a program, again, to accept waste in 1998, but again with all the caveats that that was optimistic and success oriented.

BY MR. EIDUKAS:

Q. Okay. And just again while we were comparing the acceptance schedule in Exhibit 4, the December 1983 draft, and the waste acceptance schedule in Exhibit 5, the 1984 draft, you said the ramp-up rate was revised down between Exhibit 4 and Exhibit 5, but the steady state rate or the maximum rate is 3,000 in both documents, correct?

A. That's correct.

Q. Okay.

A. Steady state rate is 3,000 in both documents.

Q. So that remained a constant at this point in time as to what was planned for the repository's acceptance rate to be?

A. That's my recollection, that's right.

Q. Okay. Focusing on Exhibit 5, it's like the

wanted to make sure we could accommodate that.

Q. Okay. To your knowledge, was the objective of having a rate that would meet the generation rate, did that objective ever change over time?

MR. SHULTIS: Objection, asks for a legal conclusion.

THE WITNESS: I think we tried to maintain that as an objective and that sort of became institutionalized with this 3,000 metric tons per year, you know, acceptance capability for one repository, and again when the second one would come online with an additional 3,000 metric tons, then we'd be able to reduce the backlog. That remained a planning objective or assumption for a number of years but got seriously set back when Congress I believe in 1987 pretty much put the second repository program on hold. So, at that time we sort of had to regroup and figure out what we were going to do.

BY MR. EIDUKAS:

Q. Looking again at the schedule in Exhibit 5, it provides for schedules for the first and second repository, but there's no acceptance schedule in this

ESQUIRE DEPOSITION SERVICES
1020 19TH STREET, NORTHWEST
SUITE 620
WASHINGTON, D.C. 20036

ERRATA SHEET

Case Name: Yankee Atomic Electric Co., et al. V. The United States
Witness Name: Victor W. Trebules, Jr.
Deposition Date: April 17, 2002
Job No.: 144458

Page No. Line No. Change

Page 13, Line 17, change "Fish" to "Fission"; Page 14, Line 11, change "Fish" to Fission"; Page 15, Line 4, change "Whitewater" to "Light Water"; Page 17, Line 19, change "technical" to "executive"; Page 33, Line 1, change to read "...one which was our.."; Page 33, Line 3, place a period after "that.", delete "where", start new sentence with "We"; Page 56, Line 11, change "field" to "fuel"; Page 64, Line 16, change "Al" to "Alan"; Page 82, Line 11, change "in" to "and"; Page 98, Line 3, change to read "...would be more than..."; Page 102, Line 10, change "or" to "were"; Page 117, Line 5, change "ground" to "round"; Page 126, Line 17, change "overview" to "for review"; Page 138, Line 12, change "1994" to "1984"; Page 153, Line 14, change "change" to "changed"; Page 168, Line 4, delete "fold"; Page 192, Line 1, change "1995" to "1985"; Page 205, Line 15, change "50,000" to "15,000"; Page 226, Line 16, change "When" to "Then" and delete "in here"; (Cont'd on 241a)

Signature Victor W. Trebules, Jr. Date 5-20-02

ERRATA SHEET (CONTINUED) Page 241a

Witness Name: Victor W. Trebules, Jr.

Page 226, Line 17 and 18, bring Line 18 up to Line 17, should be incorporated as same paragraph, should read as "...Waste Negotiator. When Congress created..."; Page 236, Line 13, change "WIP" to "WIPP"; Page 188, Line 10, delete "past or"; Page 188, Line 16,change "a" to "not".

Signature Victor W. Trebules Jr. Date 5-20-02

MR. SHULTIS: Objection, calls for legal conclusion. Document speaks for itself.

THE WITNESS: My recollection is just as we wrote it. We had developed some program objectives, you know, which we felt would be responsive to insure that we meant to implement the provisions in the Nuclear Waste Policy Act. We tried to summarize them in these five key areas that are identified on this page 7.

BY MR. EIDUKAS:

Q. Okay. Did you understand the objectives of the program to be different than what the Act required?

MR. SHULTIS: Objection, calls for legal conclusion, speculation.

THE WITNESS: My understanding was that the objectives we wrote that we established would be responsive to the Nuclear Waste Policy Act. Again, the primary one was to construct the repository as indicated here. We also had the authority to make a proposal to Congress for a monitored retrievable storage facility. One of our targets, as I indicated before, was to begin the system by 1998 to begin to

accept spent fuel.

There was a provision for at-reactor storage if that was determined to be needed, and the fifth one, we felt we had a responsibility to efficiently manage the resources of the program, particularly the money from the Nuclear Waste Fund. We highlighted those. We said those were our main program objectives, and if we did these efficiently, we would be responsive to the provisions of the Act.

BY MR. EIDUKAS:

Q. Earlier in your testimony, you testified that the language that you wrote in the sections that you worked on in the mission plan had to be approved by your supervisor. Is that an accurate restatement of what you had testified to earlier?

A. Yes.

Q. Okay. Do you recall having -- strike that.

Could you say, again, at the time you wrote this chapter of the mission plan who was your immediate supervisor? Was that Charlie Head at this time or was this -- I have the name in my notes -- Mr. Easterling at this time?

plants, other than, you know, it talked about the environmental problem that had to be resolved with nuclear waste in general. You know, it said that it's going to be the policy of the nation to deal with that and that's why they passed the Nuclear Waste Policy Act.

BY MR. EIDUKAS:

Q. Okay.

A. There may have been a reference to continuing the orderly operation of nuclear power plants. I just don't remember one.

Q. Okay. I guess maybe what I'm referring to is the part that talks about continuing to dispose of the waste. Was it your understanding that the Act didn't just require that the Department of Energy begin accepting waste in 1998 and then stop; that there had to be continuation of waste acceptance until all the waste was accepted?

MR. SHULTIS: Objection, calls for a legal conclusion.

THE WITNESS: It was my understanding that the Act was intended to deal with the problem and the

problem is not just to begin, but, you know, to resolve the problem, which is why we focused on the waste acceptance schedules we did, which had beginning, you know, as an objective in 1998 in trying to reach a level that would, as I said before, preclude the utilities from having to add additional storage and ultimately reducing the backlog that was already -- that would have already been accumulated until it was all placed in, you know, in a repository.

BY MR. EIDUKAS:

Q. Okay. Why don't we go on and let's turn to the page 17. This is Section 2.3 The Improved Performance Plan. Is this the section that you were referring to earlier that Mr. Isaacs' authored that you had referred to earlier in your testimony?

A. Yes.

Q. Okay. And, again, could you explain what -- strike that.

And, again, this is an addition or a change from the April 1984 draft mission plan that we looked at earlier, correct?

A. Yes.