IN THE UNITED STATES COURT OF FEDERAL CLAIMS

```
- - - - - - - - - - - - - - - - - - -)
YANKEE ATOMIC ELECTRIC COMPANY       )
(98-126C)(Merow, S.J.)               )
CONNECTICUT YANKEE ATOMIC POWER      )
COMPANY                              )
(98-154C)(Merow, S.J.)               ) Volume I
MAINE YANKEE ATOMIC POWER COMPANY)     Washington, D.C.
(98-474C)(Merow, S.J.)               ) Tuesday
               Plaintiffs,           ) May 7, 2002
               v.                    )
THE UNITED STATES,                   )
               Defendant.            )
- - - - - - - - - - - - - - - - - - -)
```

CERTIFIED COPY

Deposition of RONALD A. MILNER, a witness herein, called for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to agreement, the witness being duly sworn by CHERYL A. LORD, a Notary Public in and for the District of Columbia, taken at the offices of SPRIGGS & HOLLINGSWORTH, 1350 I Street, N.W., Washington, D.C., at 3:48 p.m., Tuesday, May 7, 2002, and the proceedings being taken down by Stenotype by CHERYL A. LORD, RPR, CRR, and transcribed under her direction.

speculation.
A. I'm certainly not an expert in that area, but I don't know of any.
BY MR. SKALABAN:
Q. And having worked in the office of storage and transportation in OCRWM and now as its chief operating officer, have you ever heard anyone express the opinion that within OCRWM that failed fuel couldn't be moved or would be technically infeasible to move?
A. No.
Q. Are you aware of any current OCRWM plans to defer the acceptance of failed fuel?
MR. SHULTIS: Objection, calls for a legal conclusion.
A. I guess my understanding of the current situation -- and I think that's provided for under the standard contract -- that the failed fuel is back further in the queue.
BY MR. SKALABAN:
Q. Okay. Maybe we can take a look at that. If you could please take out Milner Exhibit 3. And in particular, article six on Milner Exhibit 3, criteria for disposal, page 16602, if you could take a look at article 6 A, 2 B.

fuel for purposes of the schedule.

BY MR. SKALABAN:

Q. Whether it would be technically feasible to accept that spent fuel?

A. On the currently agreed-to schedule.

Q. Do you have an understanding of what would happen if the department thought it wasn't technically feasible to do it at that point in time on the currently agreed-to schedule?

MR. SHULTIS: Objection, vague, calls for a legal conclusion. Mr. Milner is not a 30(b)(6) witness.

A. I guess in my opinion if the department determined that it wasn't technically feasible on the schedule and since we've already stated that we would accept it, it would move back in the queue.

BY MR. SKALABAN:

Q. Well, does this read to you more like just a basic operational provision, whereas the department is going to look at the individual case, if it can't accommodate it at that time, it's going to move it back a little bit?

A. That's the way I would read it.

MR. SHULTIS: Asked and answered.

BY MR. SKALABAN:

Q. This doesn't suggest to you that failed fuel is going to be put back years later in the queue, does it?

MR. SHULTIS: Objection, asked and answered, calls for a legal conclusion.

A. I couldn't say on that. It would depend on the nature of the fuel.

BY MR. SKALABAN:

Q. Well, assuming that there was an NRC-licensed container for that failed fuel, would the department then accept it upon the currently agreed schedule?

MR. SHULTIS: Objection, calls for speculation, asks for a legal conclusion.

A. I guess in my opinion, if for that specific failed fuel, if there were an NRC-certified container, the NRC said, yep, that particular fuel is okay to move in that container, then, yes.

There's all kinds of failed fuel. You can have a fuel rod that goes -- the cladding is slightly unzipped, or it can have it totally failed and a bunch of pellets laying at the bottom of the pool. That's the extreme case, of

course.

BY MR. SKALABAN:

Q. And in the extreme case, do you know whether or not the technology has been developed to put that into a safe, licensed container?

MR. SHULTIS: Objection, calls for a legal conclusion.

A. I don't know. That would be a utility operation responsibility in any event.

BY MR. SKALABAN:

Q. But it's possible that that kind of situation would be dealt with?

A. As an engineer, I like to think that most things are technically feasible.

Q. And you have no reason to believe that it wouldn't be technically feasible to develop a safe, NRC-licensed container to handle that extreme situation you posited?

MR. SHULTIS: Objection, calls for a legal conclusion.

A. I can't think of any.

MR. SKALABAN: Can we go off the record a

Page 42

fuel for purposes of the schedule.
BY MR. SKALABAN:
Q. Whether it would be technically feasible to accept that spent fuel?
A. On the currently agreed-to schedule.
Q. Do you have an understanding of what would happen if the department thought it wasn't technically feasible to do it at that point in time on the currently agreed-to schedule?
MR. SHULTIS: Objection, vague, calls for a legal conclusion. Mr. Milner is not a 30(b)(6) witness.
A. I guess in my opinion if the department determined that it wasn't technically feasible on the schedule and since we've already stated that we would accept it, it would move back in the queue.
BY MR. SKALABAN:
Q. Well, does this read to you more like just a basic operational provision, whereas the department is going to look at the individual case, if it can't accommodate it at that time, it's going to move it back a little bit?
A. That's the way I would read it.
MR. SHULTIS: Asked and answered.

Page 43

BY MR. SKALABAN:
Q. This doesn't suggest to you that failed fuel is going to be put back years later in the queue, does it?
MR. SHULTIS: Objection, asked and answered, calls for a legal conclusion.
A. I couldn't say on that. It would depend on the nature of the fuel.
BY MR. SKALABAN:
Q. Well, assuming that there was an NRC-licensed container for that failed fuel, would the department then accept it upon the currently agreed schedule?
MR. SHULTIS: Objection, calls for speculation, asks for a legal conclusion.
A. I guess in my opinion, if for that specific failed fuel, if there were an NRC-certified container, the NRC said, yep, that particular fuel is okay to move in that container, then, yes.
There's all kinds of failed fuel. You can have a fuel rod that goes -- the cladding is slightly unzipped, or it can have it totally failed and a bunch of pellets laying at the bottom of the pool. That's the extreme case, of

Page 44

course.
BY MR. SKALABAN:
Q. And in the extreme case, do you know whether or not the technology has been developed to put that into a safe, licensed container?
MR. SHULTIS: Objection, calls for a legal conclusion.
A. I don't know. That would be a utility operation responsibility in any event.
BY MR. SKALABAN:
Q. But it's possible that that kind of situation would be dealt with?
A. As an engineer, I like to think that most things are technically feasible.
Q. And you have no reason to believe that it wouldn't be technically feasible to develop a safe, NRC-licensed container to handle that extreme situation you posited?
MR. SHULTIS: Objection, calls for a legal conclusion.
A. I can't think of any.
MR. SKALABAN: Can we go off the record a

Page 45

second?
(Whereupon, at 5:08 p.m., the taking of the instant deposition adjourned.)

Ronald A. Milner
Signature of the Witness
SUBSCRIBED AND SWORN to before me this 24th day of May, 20 02.

Pat L. Austin
Notary Public
My Commission Expires: 5/14/06

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - - - - - - -)
YANKEE ATOMIC ELECTRIC COMPANY )
(98-126C)(Merow, S.J.) )
CONNECTICUT YANKEE ATOMIC POWER )
COMPANY ) Volume II
(98-154C)(Merow, S.J.) ) Washington, D.C.
MAINE YANKEE ATOMIC POWER COMPANY) Wednesday
(98-474C)(Merow, S.J.) ) May 8, 2002
Plaintiffs, )
v. 
THE UNITED STATES, )
Defendant. )
- - - - - - - - - - - - - - - - - - - - - -)

CERTIFIED COPY

Continued Deposition of RONALD A. MILNER, a witness herein, called for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to agreement, the witness being duly sworn by CHERYL A. LORD, a Notary Public in and for the District of Columbia, taken at the offices of SPRIGGS & HOLLINGSWORTH, 1350 I Street, N.W., Washington, D.C., at 9:20 a.m., Wednesday, May 8, 2002, and the proceedings being taken down by Stenotype by CHERYL A. LORD, RPR, CRR, and transcribed under her direction.

It's hypothetical. I don't know. You'd have to know what the situation was to say what you do.

Q. But if there was an NRC canister system that was fully licensed to transport that failed fuel, you would still anticipate that there be could a problem with accepting the waste on an agreed-upon schedule?

A. I think there's a potential of that, yes, again, depending on the nature of the failure, what it looks like.

Q. And that's based on disposal problems?

A. Well, it's based on the ability to move that fuel from the transport pack -- transport cask to a waste package and then place it. You know, for example, if the requirement was that you had to physically put this in a hot cell and deal with it, that's a different matter than unloading a standard fuel assembly.

Q. How likely do you think that kind of a situation may arise, that you would have a failed fuel assembly that the NRC has blessed in effect for transportation in a licensed canister that you would be technically unable to dispose of it in a repository?

MR. SHULTIS: Objection, calls for speculation.

A. I don't think I said that we were technically unable to dispose of it. It was a question of, do you handle that in the normal queue, or do you have to make provision for special handling of it.

To me it's not a question of whether you're disposing of it. It's just a question of, you have to delay receipt of that until you make special arrangements to handle it.

BY MR. SKALABAN:

Q. Is the department making any plans at the current time to handle failed fuel at the disposal facility?

MR. SHULTIS: Objection. Mr. Milner is not a 30(b)(6) witness, calls for -- I think it also calls for a legal conclusion.

A. Again, I guess in my opinion, if you had failed fuel that was not badly failed -- not a very good term of art -- but it probably would not require heroic special handling, and if you do, then I think you're going to have to be able to deal with that on a case by case. Certainly it would be sufficient for handling that, but again depending on the nature of

the failure, does that bring your receipt line to a stop, for example, to handle that one particular piece of fuel.

So, yes, the repository would be able to handle failed fuel, but what does that do to the receipt system. And I don't know that we have -- we have certainly asked the utilities in -- I believe we asked the utilities in the RW 859 form something about failed fuel.

I don't know that we -- the department -- have a very, very good handle on all the failed fuel, the nature of the failed fuel. I'm not sure even the utilities themselves would know exactly what they have in the way of failed fuel in their pools until they do an in-depth check.

BY MR. SKALABAN:

Q. Who's looking at the failed fuel, the integrating failed fuel into the acceptance and disposal system at DOE?

A. Well, that would be part of the overall design effort that's being done by our M and O contractor.

Q. I mean, is it fair to say that for the -- in general you're envisioning that most failed fuel would be accepted and taken without problems, but

there may be a few exceptions that would require an individual careful study?

MR. SHULTIS: Objection, mischaracterizes the prior testimony.

MR. SKALABAN: I'm not trying to mischaracterize. I just want to make sure I understand it.

MR. SHULTIS: Calls for speculation.

A. I mean, I just simply don't know, because I don't feel that I have a handle on how much failed fuel is out there, what are the nature of the failures. If you have a fuel assembly that has one or more pins that have pinhole leaks in them, that's not necessarily a large problem. If you've got very badly unzipped cladding, that could be a problem.

BY MR. SKALABAN:

Q. And how so?

MR. SHULTIS: Objection, asked and answered.

A. Again, you know, this is pure speculation, because I don't know the nature of the failed fuel.

BY MR. SKALABAN:

Q. Sure.

But I guess I'm just trying to explore -- in your mind you're drawing a distinction between

Q. And I believe you testified earlier that that was -- even though the MPC program had been canceled, that that was a positive that came out of it, is that industry did look and develop this technology?

A. In my opinion, that was a positive, yeah.

Q. And I mean, if it's not going to be compatible with the waste management system that RW is developing, then that wouldn't be a positive, would it?

A. That would be a negative. That's right.

Q. And so I mean as you sit here today, are you aware of any DOE plans to cut off that kind of technology from the system and not integrate it into the system?

MR. SHULTIS: Objection, asked and answered.

A. I think the department is certainly considering that it may have to open those canisters.

BY MR. SKALABAN:

Q. So at this point in time, there's a possibility in your mind that the DOE is not going to integrate multipurpose canisters into its system?

A. I think that's a mischaracterization. We're certainly going to be able to integrate and

handle multipurpose canisters. The decision as to whether or not that canister gets disposed of in the repository is not the department's decision. That's the Nuclear Regulatory Commission's decision.

Q. I see. Again, I'm not trying to mischaracterize. I'm trying to understand.

A. Yeah.

Q. And again -- so if I understand correctly, I mean, it's your understanding, I mean, as COO of OCRWM, that the system is going to accept those kind of canisters.

It's just a matter of whether or not for disposal the NRC will let you dispose of them as is or in an overpack, I guess?

A. Correct.

Q. You're not planning to go just cut that technology off and kind of leave the utilities hanging so to speak?

A. No.

MR. SKALABAN: I'd like to mark as Milner Exhibit 96 the 1992 annual capacity report.

BY MR. SKALABAN:

Q. And Mr. Milner, if you can look at this, and also Milner 51, which is the 1995 annual capacity report, and Milner 42. So the numbers are 42, 51,

and 96.

(Milner Exhibit No.96 was marked for identification.)

BY MR. SKALABAN:

Q. And Mr. Milner, before we start on these documents, I want to ask you a followup about what we just talked about. And I understand your testimony to be it's not the department's intent to not accept this kind of multipurpose canister technology that's being implemented by utilities.

It plans to accept those kind of waste packages?

A. That's correct.

MR. SHULTIS: Objection, calls for a legal conclusion.

BY MR. SKALABAN:

Q. And if you weren't going to do that, that would potentially create some very serious problems for the industry, wouldn't it?

MR. SHULTIS: Objection, calls for speculation.

A. If we were not going to accept multipurpose canisters, I think it would certainly cause some problems for the utilities. They would

Q. Is that a fair characterization?
A. Yeah. I think that's probably fair, saying that if the contract were amended and that amendment somehow affected the method by which priority was granted -- or allocation was granted, then, yeah, the schedule would change.
Q. And so my question is, after telling Yankee Atomic that there's going to be a rule making and that that rule making may affect its DCSs or its schedule, then what is the effect if the department doesn't follow through with what it told Yankee Atomic it's going to do and have a rule making?
MR. SHULTIS: Objection, calls for speculation, asks for a legal conclusion.
A. Yeah. I can't judge what the effect would be, because to do so, I'd say have to judge -- at least make some projection as to what the outcome of the rule making would be. The outcome of the rule making may ultimately end up with no effect, or it may have some effect.
BY MR. SKALABAN:
Q. Now, on page 2 in the last paragraph, it says: If an acceptable year one DCS is not received within 30 days, the contracting officer will issue a decision regarding the status of Yankee Atomic to

BY MR. SKALABAN:

Q. Well, what language would you think would be required to change these provisions on OFF and shutdown that we've just been looking at little part A, little part B?

What change would be needed for the department to have the ability if it wanted to grant priority?

MR. SHULTIS: Same objection. Objection, calls for speculation, asks for a legal conclusion, asked and answered.

A. I don't know. I would have to spend some time looking at the language and conferring with the contracting officer, attorneys, et cetera.

BY MR. SKALABAN:

Q. Now, going back to the document we were originally talking about, Milner 62, the letter from you dated June 16, 1994, in the very last paragraph of the attachment under the heading, question No. 2, and again, the ending Bates No. 0327, this letter from you states: While article six, B 1, B of the standard contract provides that the department may -- and may is underscored -- grant priority acceptance to shutdown reactors, when you said this here, isn't that -- isn't that indicating that the contract as it

assumption would be that if a utility for whatever reason needed to move itself up in the queue, it would need to do that regardless of whether the department began accepting in '98 or in 2010.

BY MR. SKALABAN:

Q. But if the utilities were considering exchanging amongst themselves, wouldn't it be very important for them to know whether the department was going to be begin in 1998 or 2010?

MR. SHULTIS: Same objection.

A. I've always held the personal belief that it was important that the utilities have the best estimate available as to when we would start operation.

BY MR. SKALABAN:

Q. Well, different utilities might have dramatically different storage needs in 1998 and 2010.

Isn't that a fair assumption?

A. Yeah, I think that would be fair.

Q. So if there's uncertainty whether the department is going to perform in '98 or 2010, that could have a large effect on whether they would be willing to swap, don't you think?

A. Potentially, m-hm.

there was no adverse effect, and I wouldn't limit that to the need or not need -- or no need for building additional storage, just a general if everybody agreed that, yes, it was demonstrated that there was no adverse effect whatsoever in anyone's mind, then, yeah, that would have made sense.

I don't -- I can recall of nothing that was ever said, demonstrated, whatever, that went along those lines. I think it remains the position of quite a number of utilities to this day that any priority for shutdown reactors would adversely affect a utility.

BY MR. SKALABAN:

Q. Well, wouldn't the answer to the question on whether there would be an adverse impact to other purchasers -- wouldn't that be influenced to a very large extent by how great the acceptance rate is if the -- if, for example, there's a steady state rate of 3,000 MTUs, as opposed to, say, 400 MTUs, there would be a lot less need to build or to allow for additional storage at operating reactor sites?

Do you agree with that?

MR. SHULTIS: Calls for speculation.

A. I would agree with a part of the statement that said, if you -- well, if you up the acceptance

rate and utilities had no need for additional storage at the lower rate, certainly the higher rate they wouldn't need either.

And perhaps I misunderstood your question, but --

BY MR. SKALABAN:

Q. Okay. I guess what I'm driving at is, how great the steady state acceptance rate is would have a large impact on whether or not other purchasers would be impacted by a grant of priority if the department's performing in a rate such as 3,000 MTU.

It's accepting a lot more spent fuel from purchasers than if it's accepting rate at 400; is that right?

MR. SHULTIS: Asked and answered.

A. Well, I think in my opinion, a number of the contractor holders hold the view that regardless of what the acceptance rate is, any priority to a shutdown reactor would adversely impact them.

And if I can try to think of a hypothetical example.

If utility X had an allocation of a hundred MTUs in a given year and the overall acceptance rate was 500 MTUs for that year, if the department doubled that acceptance rate to a thousand

MTUs in that particular year, potentially utility X might expect that their allocation would increase to 200. And therefore, you know, likely their view would be that they were adversely impacted even though the rate were doubled.

BY MR. SKALABAN:

Q. I guess what I'm driving at, there's plenty of room in their spent fuel pool, that utility -- and the overall acceptance rate is, say, 3,000 MTU, and they can see in view of that acceptance rate that they're not going to have to add additional storage under that rate, and they have excess room, they're not going to be adversely affected economically if there's a grant of priority?

MR. SHULTIS: Objection, assumes facts not in evidence, calls for speculation, asked and answered.

A. I mean, we're both sitting here trying to get into the mind of a hypothetical utility, and if a utility's only view of adverse impact was whether or not they had to build additional storage, then I suppose that utility would deem that there was no adverse impact, but I no way can try to believe that I know what every utility's definition of adverse impact is.

for disposal, you've created a fairly large secondary waste stream to deal with canisters.

Q. Any other disadvantages that you can think of?

A. Not offhand, no.

Q. And at this point, if I understand -- again I don't want to -- I want to make sure I'm correctly testifying -- or correctly representing your prior testimony -- at least currently the department's plans are to accept canister systems and to dispose of them if possible?

A. Certainly the department plans to accept canister systems. The department certainly hopes to be able to dispose of those. Obviously, we would prefer not to have to open them and create another waste stream.

MR. SKALABAN: Let me go ahead and mark this. I believe we're on Exhibit 102; is that correct?

MR. SHULTIS: 103.

MR. SKALABAN: Thanks.

(Milner Exhibit No. 103 was marked for identification.)

BY MR. SKALABAN:

capacity limits, under almost any acceptance rate, it would adversely impact other utilities.

Q. Well, why add this parenthetical, then, in your letter to the director?

A. I don't specifically recall why it was added there, but it's certainly true, and --

Q. So the situation -- I mean, is it fair to say that if the legal limits on acceptance capacity were not there, there may be opportunities where shutdown priority would not adversely impact other utilities?

MR. SHULTIS: Objection, calls for speculation, document speaks for itself.

A. In my opinion I guess I have to go back to what's each individual utility's definition of an adverse impact, and you and I may determine is or is not an adverse impact might be completely different for another utility if we were utility representatives.

BY MR. SKALABAN:

Q. Okay. And the concurrence chain on the side indicates that this memo was circulated to a wide variety of people and they concurred in it?

MR. SHULTIS: Objection, mischaracterizes the document.

which fuel the utility shipped to us.
Q. How so?
A. Utilities verbally -- I don't recall anything in writing -- but I think utilities verbally indicated to us that if they placed fuel in dry storage, they would more likely give us fuel out of spent fuel pool than pull it out of dry storage.
Q. I see. If I can call your attention to Bates No. HQ 0013570, and it's a page entitled, dry storage requirements, 1998 to 2002.
A. Yes.
Q. In the I guess the third paragraph, it says: There are eight shutdown reactors prior to 1998. No additional reactors shut down during the period 1998 to 2002. The annual maintenance cost at each of these reactors is assumed to be 4.5 million.
Do you know where the 4.5 million figure came from?
A. No, specifically I don't. I vaguely recall at some point in time that utilities were basically asked what their costs were. Whether that is the basis of this figure, I don't know.
Q. Okay. Do you have any reason to believe it's -- or it's an accurate estimate?
I mean, do you believe it's an accurate



estimate at the time?
A. I don't know.
Q. Just don't know.
Why was the department looking for this information about the number of shutdown reactors and the annual maintenance cost of those reactors?
MR. SHULTIS: Objection, asked and answered.
A. The department was interested in the status of reactors and storage, and certainly we had been interested in utility cost.
BY MR. SKALABAN:
Q. And part of your interest in utility cost was to help promote efficiency in the overall system and at the individual reactor sites?
A. Yeah.
MR. SHULTIS: Asked and answered.
A. It had been a goal of the department to minimize those costs to the extent possible, looking at the industry as a whole.
MR. SKALABAN: Mr. Milner, I have no further questions.
THE WITNESS: Okay.
MR. SHULTIS: I don't have any redirect.
MR. SKALABAN: Great.



MR. SHULTIS: Off the record.
MR. SKALABAN: We are concluded.
(Whereupon, at 6:02 p.m., the taking of the instant deposition ceased.)

Ronald A. Milner
Signature of the Witness
SUBSCRIBED AND SWORN to before me this 29th day of May, 20 02.

[illegible]
Notary Public
My Commission Expires: 5/14/06



CERTIFICATE OF COURT REPORTER
UNITED STATES OF AMERICA )
DISTRICT OF COLUMBIA )
I, CHERYL A. LORD, the reporter before whom the foregoing deposition was taken, do hereby certify that the witness whose testimony appears in the foregoing deposition was sworn by me; that the testimony of said witness was taken by me in machine shorthand and thereafter transcribed by computer-aided transcription; that said deposition is a true record of the testimony given by said witness; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this deposition was taken; and, further, that I am not a relative or employee of any attorney or counsel employed by the parties hereto, or financially or otherwise interested in the outcome of this action.

CHERYL A. LORD
Notary Public in and for the
District of Columbia
My Commission expires April 30, 2006