# Exhibit 2

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - - - x

YANKEE ATOMIC ELECTRIC :
COMPANY, et al., :
Plaintiffs, :
v. : Case No.
THE UNITED STATES, : 98-126C-987 4C
Defendant. :

- - - - - - - - - - - - - - - - - - x

Washington, D.C.
Wednesday, May 8, 2002

Deposition of THOMAS WOOD, a witness herein, called for examination by counsel for Plaintiffs Yankee Atomic, Maine Yankee and Connecticut Yankee, in the above-entitled matter, pursuant to notice, the witness being duly sworn by CYNTHIA R. SIMMONS, a Notary Public in and for the District of Columbia, taken at the offices of Spriggs & Hollingsworth, 1350 I Street, N.W., Washington, D.C., at 2:00 p.m., Wednesday, May 8, 2002, and the proceedings being taken down by Stenotype by CYNTHIA R. SIMMONS, RMR, CRR, and transcribed under her direction.

Department of Energy agree with your assessment?
A. I think that they agreed with the technical facts that the costs were significant, yes.
(Exhibit No. 2 was marked for identification.)
BY MR. KRNCEVIC:
Q. I've handed you what's been marked as Exhibit 2, if you can just take a brief look at that and let me know when you're ready.
A. Okay.
Q. Could you please identify Exhibit 2?
A. Exhibit 2 is a study entitled, Spent Fuel Acceptance Scenarios Devoted to Shutdown Reactors: A Preliminary Analysis.
I believe that this was done at the request of Jeff Williams, if I remember correctly.
Q. And Jeff Williams was?
A. DOE.
Q. DOE, okay. And this was authored by you and other members of PNNL?
A. Yes.
Q. Do you remember your specific instructions from Jeff Williams when you commissioned this study?
MR. LESTER: Objection to foundation.
THE WITNESS: I don't remember any detail.

I'm sure that they were to better understand the implications of a decommissioning priority for the system and the feasibility of the decommissioning priority.

BY MR. KRNCEVIC:

Q. If you know, why would they want to know that information?

MR. LESTER: Objection, foundation.

THE WITNESS: Well, our previous work had indicated that the cost associated with failure to decommission in a timely fashion were substantial and that it constituted a compelling reason to accept fuel in something other than an oldest fuel first pattern.

And so they wanted to understand how it would work.

BY MR. KRNCEVIC:

Q. Did they indicate to you what purpose they might use a report like this for?

A. Not beyond that general sort of discussion, no.

Q. I'd like to draw your attention to the executive summary which is on page Roman numeral III.

And as an executive summary will do, it summarizes two types of scenarios that were analyzed

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

\- - - - - - - - - - - - - - - - - - - - X

YANKEE ATOMIC ELECTRIC COMPANY, :(98-126C)

CONNECTICUT YANKEE ATOMIC POWER COMPANY :(98-154C)

MAINE YANKEE ATOMIC POWER COMPANY :(98-474C)

FLORIDA POWER & LIGHT COMPANY :(98-483C)

NORTHERN STATES POWER COMPANY :(98-484C)

DUKE POWER, A Division of DUKE :ENERGY CORP. (98-485C)

INDIANA MICHIGAN POWER COMPANY :(98-486C)

SACRAMENTO MUNICIPAL UTILITY DISTRICT :(98-488C)

SOUTHERN NUCLEAR OPERATING COMPANY, :et al., (98-614C)

COMMONWEALTH EDISON COMPANY :(98-621C)

BOSTON EDISON COMPANY :(99-447C)

GPU NUCLEAR, INCORPORATED :(00-440C)

WISCONSIN ELECTRIC POWER COMPANY, :(00-697C)

POWER AUTHORITY OF THE STATE OF :NEW YORK (00-703C)

OMAHA PUBLIC POWER DISTRICT :(01-115C)

NEBRASKA PUBLIC POWER DISTRICT :(01-116C)

TENNESSEE VALLEY AUTHORITY :(01-249C)

Plaintiffs, : v.

UNITED STATES OF AMERICA, : Defendant.

\- - - - - - - - - - - - - - - - - - - - X Washi

Friday, May 3, 2002

Continued Deposition of RONALD MILNER, a witness herein, called for examination by counsel for

it would have been.

BY MR. NESLIN:

Q. Sitting here today can you think of a way of which approving authority to shut down a reactor would have adversely affected a system?

A. The federal system, I can not, no.

Q. Any other reasons why the Department would be unwilling to grant priority to a shutdown reactor?

MR. SHULTIS: Objection, Mr. Milner is not a 30(b)(6) witness. Calls for speculation.

THE WITNESS: I can't think of any. In my opinion, the chief one would be equity. I can't think of any others.

(Milner Exhibit No. 59 was marked for identification.)

BY MR. NESLIN:

Q. Mr. Milner, Exhibit 59 is a report by S.R. Rod, Pacific Northwest Laboratory, entitled, Cost Estimates of Operating Onsite Spent Fuel Pools After Final Reactor Shutdown.

A. Uh-huh.

Q. Now I note on page HQR-025-0904, under the distribution list, you're listed as a recipient of this report. Do you recall this report?

A. No, I don't specifically recall this

report.

Q. Do you recall the Department or its contractors looking at the cost of shutdown reactors having to continue to operate on-site spent fuel pools?

A. I do.

Q. What do you recall about that?

A. In very general terms I do recall at least one, probably more of our contractors looking at estimating the cost. I vaguely recall one or two estimates being prepared by a contractor, in essence their own estimate. I seem to recall one or two estimates prepared by the contractor pretty much solely based on input from the utilities.

Q. Do you recall which contractors were involved?

A. Beyond PNL, no offhand I don't.

Q. And this was work done at the direction of the Department?

A. Correct.

Q. Subject to the Department's control and input?

A. Well, subject to the Department's direction.

Q. If we could turn to page HQR0250876?

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - x

YANKEE ATOMIC ELECTRIC COMPANY; : Case Nos. 98-126C,
CONNECTICUT YANKEE ATOMIC POWER : 98-154C, 98-474C,
COMPANY; MAINE YANKEE ATOMIC : 98-483C, 98-484C,
POWER COMPANY; FLORIDA POWER & : 98-485C, 98-486C,
LIGHT COMPANY; NORTHERN STATES : 98-488C, 98-614C,
POWER COMPANY; DUKE POWER, a : 98-621C, 99-447C,
Division of DUKE ENERGY CORP.; : 00-440C, 00-695C,
INDIANA MICHIGAN POWER COMPANY; : 00-703C, 01-115C,
SACRAMENTO MUNICIPAL UTILITY : 01-116C, 01-249C

- - - - - - - - - - - - - - - - X

(Caption continued on page two)

Deposition of UNITED STATES DEPARTMENT OF ENERGY

By and through its designee

DAVID K. ZABRANSKY

Washington, D. C.

Friday, April 26, 2002

8:38 a.m.

Job No.: 11792-9

Pages 1 - 230

Reported by: Joan V. Cain

document before you?

A Yes, I do have it before me.

Q Have you ever seen this document before, Mr. Zabransky?

A I've not seen it before today.

Q The bottom of this document indicates it was prepared by Martin Marietta Energy Systems, Inc., at the Oak Ridge National Laboratory. Are you aware whether Martin Marietta was one of the DOE subcontractors as of 1991?

A Well, it also says it was prepared by Science Applications International Corporation, and, personally, I'm not aware of the contractual relationship between those two companies and DOE as of 1991.

Q The document states that it was prepared for the DOE Chicago Operations Office Transportation Project Office of OCRWM; is that correct?

A No, it doesn't say that.

Q It does not say that it was prepared for, in the middle of the page, the U.S. Department of Energy Chicago Operations Office, Transportation

Project Office, and the Office of Civilian Radioactive Waste Management?

A It says that. It doesn't say "of the civilian."

Q What is the Department of Energy Chicago Operations Office, Transportation Project Office?

A I do not know.

Q Never heard of that designation?

A I may have heard of it. I don't know what it is or if it still exists.

Q But this document was also prepared for the Office of Civilian Radioactive Waste Management; is that correct?

A That's what it says, yes.

Q Please take as much time as you would like to review the document, and I'm going to ask you some questions about page 6 of the document. After you've had a minute to review it, please let me know.

A Okay. I've reviewed it in general.

Q So that we're clear on the record, we're now looking at page CTR-001-2199 of Zabransky

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

\- - - - - - - - - - - - - - - - - - - - X
YANKEE ATOMIC ELECTRIC COMPANY :
(98-126C)(Merow, S.J.) :
CONNECTICUT YANKEE ATOMIC POWER COMPANY :
(98-154C)(Merow, S.J.) :
MAINE YANKEE ATOMIC POWER COMPANY :
(98-474C)(Merow, S.J.) :
Plaintiffs, :
v. :
THE UNITED STATES, :
Defendant. :
\- - - - - - - - - - - - - - - - - - - - X

Washington, D.C.
Wednesday, May 22, 2002

Continued deposition of THOMAS POLLOG, a witness herein, called for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to agreement, the witness having been previously duly, taken at the offices of Spriggs & Hollingsworth, 1350 I Street, N.W., Washington, D.C., 20005-3305, at 9:40 a.m., Wednesday, May 22, 2002, and the proceedings being taken down by Stenotype by JAN A. WILLIAMS, RPR, and transcribed under her direction.

Q. And that answer holds true for both currently and back in the time period when the systems rate studies were being done?

A. That's true currently. I feel I can't give you a good answer for the time period when the systems rate studies were being done because it's not something I discussed on any regular basis with the employees who were around then and working on this. And we have had great turnover since then and I don't know -- I just don't know what their opinions would have been.

Q. Fair enough. How about the '90, '91, time period, would your answer hold true for that time period?

A. Same answer. There were a lot of people that were working on this that I was not familiar with what their views were and I would not feel comfortable speculating as to what their opinions were as to what rate we should be accepting at.

Q. How about when you came back to work in waste acceptance at the end of '96, does your answer hold true for the time period of '96 forward?

MR. CRAWFORD: Objection to the extent it calls for speculation.

THE WITNESS: Yes.

BY MR. SKALABAN:
Q. Do you know why DOE wanted -- I assume a contractor wouldn't prepare a report like this in this Exhibit 30 without a request from DOE to prepare a report like this?
A. True.
Q. Do you know why DOE would want or wanted information on cost estimates of operating on-site spent fuels after final reactor shutdown?
A. I don't know why guidance was given to PNL to prepare this report. I certainly had no advance knowledge that they were doing it or was not asked to provide any input as to whether we should or should not do it.
Q. Do you suspect any reason why PNL may have been asked to prepare this report for DOE?
MR. CRAWFORD: Objection to the extent it calls for speculation.
THE WITNESS: No.
MR. SKALABAN: Exhibit 31, can you please mark that.
(Pollog Exhibit No. 31 was marked for identification.)
BY MR. SKALABAN:
Q. Mr. Pollog, I'll represent to you that my

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - - - X

YANKEE ATOMIC ELECTRIC :
COMPANY, :
Plaintiff, : Case No. 98-126C
v. : Senior Judge
: Merow
THE UNITED STATES, :
Defendant. :

- - - - - - - - - - - - - - - - - - X

Washington, D.C.
Friday, June 4, 1999

Deposition of CHRISTOPHER A. KOUTS, a witness herein, called for examination by counsel for Plaintiff in the above-entitled matter, pursuant to notice, the witness being duly sworn by MARY GRACE CASTLEBERRY, a Notary Public in and for the District of Columbia, taken at the offices of Spriggs & Hollingsworth, 1350 I Street, N.W., Washington, D.C., at 10:00 a.m., Friday, June 4, 1999, and the proceedings being taken down by Stenotype by MARY GRACE CASTLEBERRY, RPR, and transcribed under her direction.

were planning on developing the facility is that we would build pads as we needed them in any one year. We would anticipate that and build the pads ahead of time so we would have the casks -- the space available on the pads for the casks. Just to reiterate, these came right out of the legislation. This was something that we designed the facility to based on what was in the legislation or the proposed legislation.

MR. GREENE: Do you want to take a break?

MR. PETRIE: Sure.

THE WITNESS: Okay.

(Mr. Shapiro exits deposition room.)

(Recess.)

(Kouts Exhibit No. 9 was marked for identification.)

BY MR. GREENE:

Q. Have you seen this document before, what's been marked as Exhibit 9?

A. I don't believe I have, no.

Q. The cover page indicates that this was prepared by the management and operating contractor, and the date is August 17th, 1993. Do you recall who the contractor was at that

time?
A. It would have to be TRW.
Q. Do you recall whether you were asked to provide or actually did provide any information that might have been used in this study?
A. At this time, 1993, my duties did not really coincide with anything associated with this report, so I don't remember providing anything associated -- any information associated with it to the authors.
Q. What were you doing at this time?
A. That's when I was working as a senior person on strategic planning-related issues and so forth.
Q. Would the rate at which fuel was going to be placed at the repository not be part of strategic planning?
A. Not really, no. Not that I recall.
Q. Directing your attention to page 9, Roman numeral ix, the first paragraph of the bullet point references the current discharge rate of reactors. Do you recall any studies or data being done about the discharge rates of reactors at any time while you were working at the OCRWM?

A. I don't recall any specific studies. My sense is that there were some studies that were underway because we monitored the amount of spent fuel that was through the RW-859 forms that were sent out to utilities. So my sense is that analysis of that information was done and, therefore, there must have been some reports written about discharge rates.

Q. Who would have supervised these reports or commissioned the reports?

A. Probably our systems people or our waste acceptance people and their contractor support.

Q. And at this time, who would that have been?

A. Waste acceptance was still probably Alan Brownstein. Systems at that point in time, I would have to think about that. I can't place the individual who would be working systems at that point.

Q. Do you understand what the term throughput rate refers to?

A. Yes.

Q. What does it refer to?

A. It refers to the amount of fuel that we

would pick up and process through the waste management system.

Q. Do you recall any discussions or conversations at OCRWM that talked about the link between the throughput rate and the discharge rate for reactors?

A. Quite honestly, no.

Q. Well, the first paragraph that we were referencing says that 2,000 MTUs per year is approximately comparable to the current discharge rate of reactors and that a matching throughput rate does little to catch up with and requires many years of operation before SNF from shutdown reactors is picked up. In your experience, is that a fair statement?

A. It seems like a reasonable statement, assuming that 2,000 metric tons per year is correct. My recollection is that for a typical PWR reactor, assuming that there is a residence time of three years in the reactor, that you replace about a third of the core a year, which is roughly around 30 to 35 tons, depending on the amount of reactors, PWRs and BWRs out there, that's probably a reasonable number to me.

Q. But in terms of the premise that if

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

----------------------------X

YANKEE ATOMIC ELECTRIC :
COMPANY, CONNECTICUT YANKEE :
ATOMIC POWER COMPANY, MAINE :
YANKEE ATOMIC POWER COMPANY, :
Plaintiffs, :
v. : No. 98-126C
UNITED STATES OF AMERICA, : 98-154C
Defendant. : 98-474C

----------------------------X

Eugene, Oregon
Monday, June 25, 2002

Deposition of ROBERT L. MORGAN, a witness herein, called for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to notice, the witness being duly sworn by DEBORAH SOLHEIM, Oregon Certified Shorthand Reporter, at 9:25 a.m., June 25, 2002, and the proceedings taken down by DEBORAH SOLHEIM, CRR, with computer-aided transcription and prepared under her direction.

recommendations for modifications to the standard contract.

A. Okay. I believe by April 9th of 1984 I was no longer there.

Q. Okay. That was going to be one of my questions.

Do you recall, during the time that you were there, recommendations from Weston or from anyone else about modifications to the standard contract?

A. No. I don't recall.

Q. Okay. I think you told me earlier today that you didn't recall that there were any changes to the standard contract that were made.

A. That's correct.

Q. And now this is a different question about whether there were recommendations for changes. You don't recall that either.

A. No.

Q. All right. Let's go off the record for one second.

(Discussion off the record.)

BY MR. STOUCK:

Q. This one I'm not going to mark yet and may not mark at all. But take a look at this. This is a document called Spent Fuel Storage Requirements, an

update of another document that's referenced there, dated January 1983.
And my question for you is, do you know -- do you recognize this document? Do you know what it is?
A. I do not recall this specific document.
Q. Do you recall there being studies done by DOE of the requirements of commercial utilities for storage of their spent nuclear fuel on site?
A. Yes. Evidently this was initiated by the Assistant Secretary of Nuclear Energy as part of the program. If this thing is dated January '83, it had to be turned on before that. And that would be when it was under Shelby Brewer.
Q. Right. Why do you say evidently was initiated by the Assistant Secretary of Nuclear Energy?
A. Because of the date.
Q. Okay.
A. If the report came out in '83, January '83, somebody had to turn it on earlier; right?
Q. Yes. Do you know whether reports of this type were prepared periodically?
A. I think that we used some of the field offices and some of the information from the industry as to what the discharge rates were going to be from nuclear reactors. NAC Corporation in Atlanta was one, I think,

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

YANKEE ATOMIC ELECTRIC COMPANY,) (98-126C) (Merow, S.J.), )
et al., ) )
Plaintiffs, ) )
vs. ) )
THE UNITED STATES, ) )
Defendant. ) ____________________________________)
full caption on page 187

DEPOSITION OF PATRICK MC DUFFIE

VOLUME II, PAGES 185 - 431

TAKEN ON

TUESDAY, MARCH 19, 2002

VICTORIA MELEKIAN

CSR NO. 6996

A. We talked a lot with Mary Lee Payton. I don't remember Nancy Slater. I don't remember.

Q. You don't recall sitting here today for whom that briefing was prepared?

A. No, I don't.

Q. Time to move on, Mr. Mc Duffie, unless you want to add to or comment on your answers?

A. Move on.

Q. Let's have you review and have the court reporter mark as Mc Duffie 26 a memorandum from you to Mr. Langstaff and N. Montgomery dated April 13th, 1992.

(Mc Duffie Exhibit 26 was marked for identification by the reporter and is attached hereto.)

THE WITNESS: Could someone explain what's written in here? I can't read it.

BY MR. TOMASZCZUK:

Q. The handwritten language in the middle of the first page appears to read copy of PNL proposed contract changes.

A. Okay. The title. Proposed contract. All right. There they are. 1, 2 -- 24.

Q. What is this document?

A. We had discussed over and over again how can we resolve the 32 issues without a contract change and

concluded in general a contract change would be required and probably be shortest to go through the rule-making process rather than negotiate the changes for each and every one of the contract holders. Alan asked if I would draft up a proposed contract reflecting the changes and send it to him for staffing and review. Now, I don't know whose comments -- there are handwritten comments throughout the document. I don't know whose they are.

Q. It's not your handwriting?

A. No.

Q. Mr. Brownstein asked you to prepare this memorandum?

A. Yes.

Q. Do you know why he's not identified as a recipient of the memo?

A. No. Because it went to Nancy Montgomery. I think she worked in Brownstein's office at that time.

Q. Do you know whether her married name is Nancy Montgomery or Nancy Slater?

A. I have no idea. I just remember Nancy Montgomery. Yes. I'd refer you to 1886, line 19. Does that look familiar? It doesn't say high-level waste, does it?

Q. In line 19, there's no --

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - - - - - -x

YANKEE ATOMIC ELECTRIC COMPANY :
(98-126C)(Merow, S.J.) :
CONNECTICUT YANKEE ATOMIC POWER COMPANY :
(98-154C)(Merow, S.J.) :
FLORIDA POWER & LIGHT COMPANY :
(98-483C)(Wilson, J.) :
NORTHERN STATES POWER COMPANY :
(98-484C)(Wiese,J.) :
DUKE POWER, A Division of :
DUKE ENERGY CORP. :
(98-485C)(Sypolt,J.) :
INDIANA MICHIGAN POWER COMPANY :
(98-486C)(Hodges, J.) :
SACRAMENTO MUNICIPAL UTILITY DISTRICT :
(98-488C)(Yock, S.J.) :
SOUTHERN NUCLEAR OPERATING COMPANY, :
et al. :
(98-488C)(Yock, S.J.) :
COMMONWEALTH EDISON COMPANY :
(98-621C)(Hewitt, J.) :
BOSTON EDISON COMPANY :
(99-447C)(Allegra, J.) :
GPU NUCLEAR, INCORPORATED :

(Brownstein Exhibit No. 50 was marked for identification.) ^

BY MR. NESLIN:

Q. Mr. Brownstein, you're being handed what's been marked as Exhibit 50 to your deposition.

It's an August 30, 1988 letter from Mr. B.M. Cole to Joseph Sutey with an attachment titled, "Delivery Commitment Schedule Processing, Approval, and Management Control System" stamped as Bates Numbers PNL-098-1106 through 1126.

Are you familiar with these documents?

(The witness reviewed the document.)

THE WITNESS: I vaguely recall seeing this.

BY MR. NESLIN:

Q. Was this work undertaken at your direction?

A. As I testified previously, PNL did, did a number of pieces of work, some at my direction, and some that they pursued on their own consistent with work tasks that we gave them.

This was probably done at my direction.

Q. The upper right of the attached document, there is a date August 30, 1988, and then Rev 4.

Would that to your mind refer to Revision 4?

A. Yes.

Q. Did you typically comment on different drafts and revisions?

A. It could have gone one of two ways. It could have been because I commented on it and went through it, or because they went through their internal reviews before it was presented to DOE and went through revs.

It could have been either way.

Q. What was your practice as they were preparing work that you requested them to do, going through different drafts?

Was it your practice to provide input to them to review drafts?

A. It depended on time associated with a particular product.

If there was some time urgency, I would review an early draft.

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

\- - - - - - - - - - - - - - - - x

YANKEE ATOMIC ELECTRIC :
COMPANY, et al., :
Plaintiffs, :
v. : Case No.
THE UNITED STATES, : 98-126C-987 4C
Defendant. :

\- - - - - - - - - - - - - - - - x

Washington, D.C.

Wednesday, May 8, 2002

Deposition of THOMAS WOOD, a witness herein, called for examination by counsel for Plaintiffs Yankee Atomic, Maine Yankee and Connecticut Yankee, in the above-entitled matter, pursuant to notice, the witness being duly sworn by CYNTHIA R. SIMMONS, a Notary Public in and for the District of Columbia, taken at the offices of Spriggs & Hollingsworth, 1350 I Street, N.W., Washington, D.C., at 2:00 p.m., Wednesday, May 8, 2002, and the proceedings being taken down by Stenotype by CYNTHIA R. SIMMONS, RMR, CRR, and transcribed under her direction.

Q. I know this is a big document. To assist
you I can limit the areas I'm going to ask you
questions about. They'll all be in section 2 and 3.
A. Okay.
Q. Okay. I actually lied. I just wanted to
point out that under the acknowledgments they
recognize, this is Exhibit number 5, recognizes, T.W.
Wood who originally recognized the need for this
study and instigated its initiation.
Are you familiar with this report at all?
A. Yes.
Q. Could you just read the title of Exhibit
5?
A. At-Reactor Spent Fuel Storage Requirements
With and Without Acceptance Rights Trading.
Q. Were you involved at all in the
preparation of this report?
A. Not in the preparation. I was involved in
the scoping or formulation of the problem that led to
this report.
Q. When you say scoping and formulation of
the problem, what specifically does that entail?
A. The issues raised in summary fashion in
the earlier documents we discussed really were
analyzed in more depth here. I was consulted about

the motivation for the study and the essential features of the problem when this study was being put together.

Q. Is this a study that PNNL undertook on its own?

A. No.

Q. Was it commissioned by the Department of Energy?

A. Yes.

Q. To what extent did you offer consultation on this?

A. I don't remember the details of the process. I know that I was aware of the conduct of the study and generally had access to the authors.

Q. Do you know what the motivation of this study was?

MR. LESTER: Objection, foundation.

THE WITNESS: I guess I had better since it was my idea. The motivation was to understand more thoroughly and more precisely how a market in spent fuel acceptance rights would affect the economics and logistics of the spent fuel management problem at reactors and at DOE.

BY MR. KRNCEVIC:

Q. Would it be fair to say that the

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

YANKEE ATOMIC ELECTRIC COMPANY, )
et al., )
)
Plaintiffs, )
vs. ) No. 98-126C
UNITED STATES, )
Defendant. )

DEPOSITION OF ROBERT W. McKEE

May 23, 2002
Richland, Washington

assigned to the Washington, D.C., office of Battelle in late 1985 through 1980 -- midway through '87. I don't know. April or May or something like that.
Q. So you were actually in Washington?
A. I was actually in Washington.
Q. What was the time period again?
A. November '85 through April or May '87, I believe. And Tom Wood was the manager of that office at that time, and I worked with Tom.
Q. So Tom Wood is listed as one of the coauthors in addition to you on this document.
A. Right. Right.
Q. Who is J.M. Reilly?
A. Willy, he was a -- as I recall, an economist, but I -- I really don't -- he's a -- listed as a principal author.
Q. Is that how you listed -- the order of the names is by --
A. Well, unless they are alphabetical.
Q. So you would be the second most important author?
A. Well --
Q. And who is M.R. LeBlanc?
A. I don't remember.
Q. What does that mean, "Controlled Distribution

Only"?
A. Within -- it was a DOE term. And I don't -- I guess I don't really know. I assumed it was for closely held within DOE.
Q. Do you recall who in DOE you prepared this document for?
A. I can't. I can't remember. I can't -- I have -- I have an awful time at this age remembering names in any context.
Q. Okay. No problem.
Well, why don't we turn to Page 1.
A. Okay.
Q. And in the introduction it talks about the Nuclear Waste Policy Act --
A. Okay.
Q. -- 1982. And it states, you know, "The Nuclear Waste Policy Act of 1982 establishes procedures for siting, developing, and financing a permanent disposal system for spent nuclear fuel and high-level radioactive waste."
Now, after the Nuclear Waste Policy Act, did you conduct various studies on how it could be implemented?
A. Yes. And provided information to DOE's Office of -- Office of Civilian Radioactive Waste? Is