IN THE UNITED STATES COURT OF FEDERAL CLAIMS

YANKEE ATOMIC ELECTRIC COMPANY,

Plaintiff,

v.

UNITED STATES OF AMERICA,

Defendant.

No. 98-126 C
(Senior Judge Merow)

Filed electronically: November 17, 2004

# YANKEE ATOMIC'S INITIAL POST-TRIAL LEGAL BRIEF

JERRY STOUCK
Spriggs & Hollingsworth
1350 I Street, N.W., Ninth Floor
Washington, D.C. 20005
(202) 898-5800
(202) 682-1639

Counsel for Plaintiff,
YANKEE ATOMIC ELECTRIC COMPANY

Of Counsel:

Robert L. Shapiro
SPRIGGS & HOLLINGSWORTH

November 17, 2004

# Table of Contents

Page

I. BREACH OF CONTRACT DAMAGES ........ 1

A. Basic Damages Principles. ........ 2

B. The Evidence Establishes Foreseeability. ........ 4

C. The Evidence Establishes Causation. ........ 5

D. The Evidence Establishes Reasonable Certainty. ........ 12

E. Damages for GTCC Waste Storage Costs. ........ 16

F. The Good Faith and Fair Dealing Claim. ........ 21

G. The Government's Rule 52(c) Motion Must Be Denied. ........ 22

H. Appropriate Treatment of Future Damages. ........ 29

I. Partial Versus Total Breach and Election of Remedies. ........ 36

II. JUST COMPENSATION FOR THE TAKING OF YANKEE ATOMIC'S REAL PROPERTY ........ 38

# Table of Authorities

**Page**

## Cases

*Ace-Federal Reporters, Inc. v. Barram*, 226 F.3d 1329 (Fed. Cir. 2000) ....................................13

*Aktiebolaget Bofors v. United States*, 139 Ct. Cl. 642, 153 F. Supp. 397 (1957)..........................35

*Alvin Ltd. v. United States Postal Service*, 816 F.2d 1562 (Fed. Cir. 1987)...........................11, 17

*Auer v. Robbins*, 519 U.S. 452 (1997) ..........................................................................................18

*Bass Enterprises Production Co. v. United States,* 133 F.3d 893 (Fed. Cir. 1998).......................39

*B-E-C-K Constructors v. United States*, 215 Ct. Cl. 793, 571 F.2d 25 (1978).............................10

*Bluebonnet Savings Bank, FSB v. United States,* 266 F.3d 1348 (Fed. Cir. 2001)................ passim

*Central States, Southeast & Southwest Areas Pension Fund v. Hunt Truck Lines, Inc.*, 296 F.3d 624 (7th Cir. 2002) ..........................................................................34

*Chain Belt Co. v. United States*, 127 Ct. Cl. 38, 115 F. Supp. 701 (1953).....................................7

*Christensen v. Harris County*, 529 U.S. 576 (2000).....................................................................18

*Cienega Gardens v. United States*, 38 Fed. Cl. 64 (1997), *vacated on other grounds*, 162 F.3d 1123 (Fed. Cir. 1998) ..............................................................7

*Cities Services Helex, Inc. v. United States*, 211 Ct. Cl. 222, 543 F.2d 1306 (1976)....................35

*Coast Federal Bank, F.S.B. v. United States*, 48 Fed. Cl. 402 (2000)............................................4

*Commonwealth Edison Co. v. United States*, 56 Fed. Cl. 652 (2003) ......................................4, 22

*Creek v. Village of Westhaven*, 80 F.3d 186 (7th Cir. 1996) .......................................................33

*David Nassif Associates v. United States*, 214 Ct. Cl. 407, 557 F.2d 249 (1977) ........................12

*David Nassif Associates v. United States*, 226 Ct. Cl. 372, 644 F.2d 4 (1981) ............................12

*Devlin v. Johns-Manville Corp.*, 495 A.2d 495 (N.J. Super. Ct. Law Div. 1985)........................33

*District of Columbia Redevelopment Land Agency v. Thirteen Parcels of Land,* 534 F.2d 337 (D.C. Cir. 1976)...........................................................................39

*Energy Capital Corp. v. United States*, 302 F.3d 1314 (Fed. Cir. 2002).................................3, 14

*Epic Metals Corp. v. H.H. Robertson Co.*, 870 F.2d 1574 (Fed. Cir. 1989) ................................35

*Essex Electro Engineers, Inc. v. Danzig*, 224 F.3d 1283 (Fed. Cir. 2000) ............................10, 22

*Estate of Berg v. United States*, 231 Ct. Cl. 466, 687 F.2d 377 (1982) ........................................2

*Firestone Tire & Rubber Co. v. United States*, 195 Ct. Cl. 21, 444 F.2d 547 (1971) ..........................................................................................................11, 20

*Gaston & Associates, Inc. v. United States*, 27 Fed. Cl. 243 (1992) ...........................................20

*General Warehouse Two, Inc. v. United States*, 181 Ct. Cl. 180, 389 F.2d 1016 (1967) ..........................................................................................................20

*Glendale Federal Bank, FSB v. United States*, 239 F.3d 1374 (Fed. Cir. 2001)............................9

*Gould, Inc. v. United States*, 935 F.2d 1271 (Fed. Cir. 1991) .....................................................17

*Guzowski v. Hartman*, 849 F.2d 252 (6th Cir. 1988).................................................................34

*Hendler v. United States*, 952 F.2d 1364 (Fed. Cir. 1991) ..........................................................38

*Home Savings of America, F.S.B. v. United States*, 57 Fed. Cl. 694 (2003) ................................4

*Hughes Communications Galaxy v. United States*, 271 F.3d 1060 (Fed. Cir. 2002) .................2, 3

*In re Kellet Aircraft Corp.*, 186 F.2d 197 (3d Cir. 1950) ............................................................8

*Indiana Michigan Power Co. v. United States*, 57 Fed. Cl. 88 (2003) ..........................................5

*Indiana Michigan Power Co. v. United States*, 60 Fed. Cl. 639 (2004) .......................6, 31, 32, 34

*Jackson v. Johns-Manville Sales Corp.*, 727 F.2d 506 (5th Cir. 1984) .......................................33

*Ketchikan Pulp Co. v. United States*, 20 Cl. Ct. 164 (1990)........................................................8

*Kimmel v. Iowa Realty Co.*, 339 N.W.2d 374 (Iowa 1983) ........................................................33

*King v. Provident Life & Accident Insurance Co.*, 23 F.3d 926 (5th Cir. 1994) ..........................34

*Koby v. United States*, 53 Fed. Cl. 493 (2002) ..............................................................................8

*Lindley v. Hamilton*, 883 F.2d 360 (5th Cir. 1989)......................................................................33

*Locke v. United States*, 151 Ct. Cl. 262, 283 F.2d 521 (1960) ........................................... passim

*Loretto v. Teleprompter Manhattan CATV Corp.,* 458 U.S. 419 (1982).....................................38

*Macke Co. v. United States*, 199 Ct. Cl. 552, 467 F.2d 1323 (1972).....................................11, 17

*Maine Yankee Atomic Power Co.*, 225 F.3d 1336 (Fed. Cir. 2000), *aff'g*, *Yankee Atomic Electric Co. v. United States*, 42 Fed. Cl. 223 (1998) ....2

*Massachusetts Bay Transportation Authority v. United States*, 129 F.3d 1226 (Fed. Cir. 1997) ....2

*Mechanical Wholesale, Inc. v. Universal-Rundle Corp.*, 432 F.2d 228 (5th Cir. 1970) ....14

*Metric Constructors, Inc. v. National Aeronautics & Space Administration*, 169 F.3d 747 (Fed. Cir. 1999) ....10, 20

*Moore v. Hannon Food Service, Inc.* 317 F.3d 489 (5th Cir.), *cert. denied*, 124 S. Ct. 76 (2003) ....18

*Northern Helex Co. v. United States*, 207 Ct. Cl. 863, 524 F.2d 707 (1975) ....3

*Northern Helex Co. v. United States,* 225 Ct. Cl. 194, 634 F.2d 557 (1980) ....14

*Peter Kiewit Sons' Co. v. United States*, 109 Ct. Cl. 390 (1947) ....20

*Roedler v. Department of Energy*, 255 F.3d 1347 (Fed. Cir. 2001) ....11, 28

*San Carlos Irrigation & Drainage District v. United States*, 111 F.3d 1557 (Fed. Cir. 1997) ....2, 35

*Skip Kirchdorfer, Inc. v. United States*, 6 F.3d 1573 (Fed. Cir. 1993) ....38

*Specialty Assembling & Packing Co. v. United States*, 174 Ct. Cl. 153, 355 F.2d 554 (1966) ....10

*Super Valu Stores, Inc. v. Petersen*, 506 So. 2d 317 (Ala. 1987) ....14

*T.C. Bateson Construction Co. v. United States*, 162 Ct. Cl. 145, 319 F.2d 135 (1963) ....8

*Tennessee Valley Authority v. United States*, 60 Fed. Cl. 665 (2004) .... passim

*Thanet Corp. v. United States*, 219 Ct. Cl. 75, 591 F.2d 629 (1979) ....17

*Thermo Electron Corp. v. Schiavone Construction Co.*, 958 F.2d 1158 (1st Cir. 1992) ....12

*Thomas v. Contoocook Valley School District*, 150 F.3d 31 (1st Cir. 1998) ....34

*United States v. 10,031.98 Acres of Land,* 850 F.2d 634 (10th Cir. 1988) ....39

*United States v. Seckinger*, 397 U.S. 203 (1970) ....20

*Washington Public Power Supply System v. Pittsburgh-Des Moines Corp.*, 876 F.2d 690 (9th Cir. 1989) ....................34

*Wells Fargo Bank, N.A. v. United States,* 88 F.3d 1012 (Fed. Cir. 1996) ....................5

*Western Alaska Contractors, J.V.*, ASBCA No. 46033, 95-1 BCA para. 27,392 (Dec. 30, 1994) ....................8

*Wynfield Inns v. Edward Leroux Groups, Inc.,* 896 F.2d 483 (11th Cir. 1990) ....................37

*Yankee Atomic Electric Co. v. United States*, 42 Fed. Cl. 223 (1998)....................29

*Yankee Atomic Electric Co. v. United States,* No. 98-126, 2004 WL 1535686 (Fed. Cl. June 28, 2004).................... passim

*Yankee Atomic Electric Co. v. United States*, No. 98-126, 2004 WL 1535688 (Fed. Cl. June 28, 2004).................... passim

## Statutes

Nuclear Waste Policy Act of 1982, 42 U.S.C. § 10222(a)(5)(B) (2000)....................1

## Other Authorities

9 Arthur L. Corbin, *Corbin on Contracts,* § 946 (interim ed. 2002) ....................33

11 Arthur L. Corbin, *Corbin on Contracts*, §§ 997-98 (interim ed. 2002)....................5

3 Dan B. Dobbs, *Law of Remedies* §12 (2d ed. 1993) ....................7

III E. Allen Farnsworth, *Farnsworth on Contracts*, § 12.14 (1990)....................4

Restatement (Second) of Contracts § 202 (1981) ....................11, 17

Restatement (Second) of Contracts § 204 (1981) ....................10

Restatement (Second) of Contracts § 205 (1981) ....................22

Restatement (Second) of Contracts § 236 (1981) ....................33

Restatement (Second) of Contracts § 344 (1981) ....................9

Restatement (Second) of Contracts § 347 (1981) ....................2, 3, 7

Restatement (Second) of Contracts § 350 (1981) ....................7, 9

Restatement (Second) of Contracts § 351 (1981) ....................4

Restatement (Second) of Judgments §§ 18, 19, 24(1), 26 (1982)................................32, 33, 35, 36

## Regulations

Disposal of Radioactive Wastes, 54 Fed. Reg. 22578 (May 25, 1989) (codified at 10 C.F.R. Part 61) ........................................................................................................19

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| YANKEE ATOMIC ELECTRIC COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | : | No. 98-126 C<br>(Senior Judge Merow) |

**YANKEE ATOMIC'S INITIAL POST-TRIAL LEGAL BRIEF**

Plaintiff Yankee Atomic Electric Company ("Yankee Atomic") submits the following Initial Post-Trial Legal Brief.[1] Part I addresses Yankee Atomic's claim for breach of contract damages. Part II addresses Yankee Atomic's takings claim.

## I. BREACH OF CONTRACT DAMAGES

This case presents a straightforward claim for breach of contract damages. As required by the Nuclear Waste Policy Act of 1982 § 302 ("NWPA"), the Department of Energy ("DOE") entered into contracts with all nuclear utilities, under which, in return for very substantial fees, DOE assumed financial responsibility for storage and disposal of commercial spent nuclear fuel ("spent fuel") and high-level radioactive waste ("HLW") "beginning not later than January 31, 1998." 42 U.S.C. § 10222(a)(5)(B) (2000). Yankee Atomic has already paid all required fees under its contract with DOE (the "Contract"), but, nearly seven years after the 1998 "start" date, has received no performance in return from DOE.

[1] The post trial legal briefs in each of the three Yankee cases are substantially identical, but minor factual differences (for example, rerackings in the Connecticut Yankee and Maine Yankee cases, but not in this case) result in minor differences in the briefs, as does the fact that references in each brief are to the proposed findings in each respective case.

Because the government's liability for breaching Yankee Atomic's Contract has been established, *Maine Yankee Atomic Power Co.*, 225 F.3d 1336 (Fed. Cir. 2000), *aff'g Yankee Atomic Electric Co. v. United States*, 42 Fed. Cl. 223 (1998), trial focused on the damages Yankee Atomic has incurred (and continues to incur) as a result of the breach.[2] Because of DOE's breach, Yankee Atomic has incurred very substantial costs to construct a new on-site storage facility – an Independent Spent Fuel Storage Installation, or "ISFSI" – for its spent fuel and HLW (together, "SNF"), and Yankee Atomic will continue to incur costs to operate the ISFSI for an indefinite period of time into the future until (if ever) DOE performs and removes the SNF. The breach also required Yankee Atomic to incur the costs of operating its spent fuel pool for an extended period of time.

A. Basic Damages Principles

The cardinal principle for determining damages in a breach of contract case is that sufficient damages should be awarded "'to place the injured party in as good a position as he or she would have been had the breaching party fully performed.'" *Hughes Communications Galaxy v. United States*, 271 F.3d 1060, 1066 (Fed. Cir. 2002) (quoting *San Carlos Irrigation & Drainage Dist. v. United States*, 111 F.3d 1557, 1562-63 (Fed. Cir. 1997)); *accord Bluebonnet Sav. Bank, FSB v. United States,* 266 F.3d 1348, 1355 (Fed. Cir. 2001); *Massachusetts Bay Transp. Auth. v. United States*, 129 F.3d 1226, 1232 (Fed. Cir. 1997); *Estate of Berg v. United States*, 231 Ct. Cl. 466, 687 F.2d 377, 379 (1982); *see* Restatement (Second) of Contracts § 347 cmt. a (1981) (Rest. 2d Cont.) ("Contract damages are ordinarily based on the injured party's expectation interest and are intended to give him the benefit of his bargain by awarding him a sum of money that will, to the extent possible, put him in as good a position as he would have

---

[2] Trial was consolidated with two other cases, *Connecticut Yankee*, No. 98-154 and *Maine Yankee*, No. 98-474.

been in had the contract been performed."). The Court has already applied that cardinal principle in its Order of June 28, 2004, which recognized that pre-breach and future damages are available in this case because to preclude such damages, as a matter of law, "may well not adequately compensate plaintiffs and restore them to the position they would have been in but for the breach." *Yankee Atomic Elec. Co. v. United States*, No. 98-126, 2004 WL 1535688, at *3.

These "benefit of the bargain" or "expectation" damages can include both mitigation expenses incurred by the non-breaching party, and that party's costs of arranging alternatives to the breaching parties' required performance. *See* Rest. 2d Cont. § 347, cmt. a, b (expectation measure includes costs to "arrange a substitute transaction" and "costs incurred in a reasonable effort, whether successful or not, to avoid loss"); *Hughes Communications Galaxy*, 271 F.3d at 1067-68 (affirming award for additional costs of "cover" transactions); *Bluebonnet Sav. Bank,* 266 F.3d at 1355-56. The damages incurred by Yankee Atomic are of this type – because DOE has failed to remove its SNF, Yankee Atomic had to implement alternative SNF storage arrangements, and has done so in a reasonable way. Here again, the Court has already acknowledged the governing legal standard. *See* Order of Aug. 29, 2003 at 3 ("the issue with respect to mitigation of damages is grounded in a determination as to reasonable commercial judgment on the part of plaintiff.") (citing *Northern Helex Co. v. United States*, 207 Ct. Cl. 863, 883, 524 F.2d 707, 718 (1975).

Under settled law, expectation damages like those incurred by Yankee Atomic should be awarded where (1) the damages were reasonably foreseeable to the breaching party, (2) the breach caused the damages, and (3) the damages may be estimated with reasonable certainty. *See Energy Capital Corp. v. United States*, 302 F.3d 1314, 1320 (Fed. Cir. 2002); *Bluebonnet Sav. Bank*, 266 F.3d at 1355; *Home Sav. of Am., F.S.B. v. United States*, 57 Fed. Cl. 694, 726

(2003); *Coast Fed. Bank, F.S.B. v. United States*, 48 Fed. Cl. 402, 408 (2000), *modified on other grounds*, 49 Fed. Cl. 11 (2001). The evidence in this case establishes all three of these elements, and Yankee Atomic therefore should be awarded the damages it seeks and thus made whole for the DOE breach.

B. The Evidence Establishes Foreseeability

"Foreseeability is a question of fact. . . ." *Bluebonnet Sav. Bank,* 266 F.3d at 1355. It may be established by showing that the breaching party actually foresaw the consequences of the breach, *see* III E. Allen Farnsworth, *Farnsworth on Contracts*, § 12.14, at 245-46 & n.18 (1990) ("the term *foreseeable* must be taken to include *foreseen*"), or that the consequences were foreseeable "in the ordinary course of events." Rest. 2d Cont. § 351 (2)(a). In the latter event, "the test is an objective one based on what [the promisor] had reason to foresee." *Id.* cmt. a.

Under either test, the trial evidence established that Yankee Atomic's damages were foreseeable in the event of a DOE breach. Overwhelming evidence showed that an important purpose of both the NWPA and the DOE SNF contracts that implement that statute – a purpose well-understood by DOE – was to prevent contracting utilities from having to incur additional costs of on-site storage of SNF after January 31, 1998. *See* PFF ¶¶ 51, 61. This purpose of avoiding additional on-site SNF storage facilities is essentially undisputed, and has already been relied upon by this Court and others. For example, *Commonwealth Edison Co. v. United States,* 56 Fed. Cl. 652, 667 (2003), most of which this Court "adopted here" in its Order of June 26, 2003, noted that "[t]he deposition testimony of several DOE officials involved with the SNF program supports plaintiff's assertion that the intent of the NWPA and the parties was to avoid the construction by utilities of additional at-reactor storage." That same testimony is in the trial record here. *E.g.*, 6/28/04 Dep. Desig. 4/22/02 Barrett, at 55-56; *id*. at 59:4-11; 7/14/04 Dep. Desig. 5/01/02 Milner at 73:20-22; Tr. 3682:12-3683:19 (Morgan). Similarly, in *Indiana*

*Michigan Power Co. v. United States*, 57 Fed. Cl. 88, 99 (2003), the Court found "uniform support" in the summary judgment record for the conclusion that "Congress and the parties anticipated that [DOE] would collect fuels at a rate sufficient to eliminate the need for additional storage capacity on site. . . ."

Where an avowed purpose of the contract at issue is to help utilities *avoid* building additional on-site SNF storage facilities, and DOE's breach of that contract has led a utility to incur costs to *build* additional on-site storage facilities, *a fortiori* those costs are a foreseeable consequence of the breach. This Court recognized as much in its Order of June 28, 2004:

> As noted in *Tennessee Valley Authority* [*v. United States*, 60 Fed. Cl. 665, 674 n.10 (2004)], 'the intent of the NWPA and the parties to the Standard Contract was to avoid the construction by utilities of additional at-reactor storage after January 31, 1998.' DOE's failure to perform under the Standard Contract thus has led to the very thing the NWPA and the Standard Contract were designed to forestall, *i.e.*, the construction of dry storage facilities for spent nuclear fuel at nuclear power electricity generating plants. . . .

2004 WL 1535688, at *7. *Cf. Wells Fargo Bank, N.A. v. United States,* 88 F.3d 1012, 1023 (Fed. Cir. 1996) (profits on transactions lost due to a breach are reasonably foreseeable when the "purpose of the contract . . . was for the plaintiff to make profits on the subject of the contract".)

C. <u>The Evidence Establishes Causation</u>

Causation, like foreseeability, is a question of fact. *Bluebonnet Sav. Bank,* 266 F. 3d at 1356. Although various verbal formulations of the causation standard have been articulated, none fits all cases. *See* 11 Arthur L. Corbin, *Corbin on Contracts*, §§ 997-98 (interim ed. 2002). The unifying concept is that "such damage be allowed as, in the judgment of fair men, directly and naturally resulted from the breach of the contract." *Locke v. United States*, 151 Ct. Cl. 262, 283 F.2d 521, 524 (1960). Thus, causation is established if the breach is a "substantial factor" in

the increased costs. *E.g., Bluebonnet Sav. Bank,* 266 F. 3d at 1356 (causation established where breach was a "substantial factor in Bluebonnet's increased financing costs . . .").

Yankee Atomic has established requisite causation for its SNF storage damages. Even before trial, this Court recognized that because of DOE's actions and inaction in the 1990s, "the utilities had at minimum a good idea that the deadline [of January 31, 1998] would not be met in 1994, 1996 at the latest," Order of June 28, 2004, 2004 WL 1535688, at *6, and the Court also noted that "'[d]efendant made statements in 1987 and 1989 suggesting that DOE might not meet the 1998 deadline' (citations omitted)." *Id.* at *6 n.8 (quoting *Indiana Michigan Power Co. v. United States*, 60 Fed. Cl. 639, 649 n.22 (2004)). The trial evidence not only confirmed these early indications of DOE's default, *see, e.g.,* PFF ¶¶ 90-92, but also underscored something else the Court recognized pre-trial – the *requirement* of an appropriate response by Yankee Atomic, to assure that its nuclear waste would be stored in a sensible way until (if ever) DOE fulfilled its obligations to remove the SNF, *see* PFF ¶¶ 97-100; *cf.* Order of June 28, 2004, 2004 WL 1535688, at *6 ("Should plaintiffs have waited until [January] 31, 1998 and then decided what to do with their nuclear waste? The court thinks not.").

Thus, the Court has already essentially recognized that the costs Yankee Atomic has incurred (and continues to incur) to provide for extended on-site storage of its SNF meet the legal standard for damages causation in this context. In its Order of June 28, 2004, the Court relied upon Judge Lettow's decision *Tennessee Valley Authority,* 60 Fed. Cl. 665, where "the court held that the utility was 'justified, indeed obligated, to take steps to minimize its losses in light of DOE's imminent non-performance.'" 2004 WL 1535688, at *6 (citation omitted). The Court's June 28 Order thus recognized the relationship between causation and mitigation, quoting the Restatement's articulation of the applicable black letter principle: "Once [a] party

has reason to know that performance by the other party will not be forthcoming, he is expected to take such affirmative steps as are appropriate in the circumstances to avoid loss by making substitute arrangements or otherwise." *Id.* (quoting Rest. 2d Cont. § 350 cmt. b). Plainly, Yankee Atomic's response to the unmistakable early evidence of DOE's default was "appropriate in the circumstances." Causation is therefore established.

Moreover, Yankee Atomic's judgment to pursue dry storage – and myriad subsidiary judgments concerning the timing and details of dry storage implementation – were eminently "reasonable," which is the well-settled mitigation standard. *See* PFF ¶¶ 100-102 (recounting that dry storage was the best way to store Yankee Atomic's SNF given DOE's impending and now actual default). The reasonableness standard is universally recognized. The Court of Claims applied that standard more than fifty years ago in *Chain Belt Co. v. United States*, 127 Ct. Cl. 38, 115 F. Supp. 701 (1953), a case much like this one where the injured party, prior to but in anticipation of the government's breach, had to arrange an alternative to the government's performance. In language equally applicable here, the *Chain Belt* court explained:

> [P]laintiff was under an obligation to avoid by a reasonable effort any damages which it should have foreseen and, having done so, it may recover as damages the expense incurred in such reasonable effort to avoid harm . . . . It makes no difference whether the breach has already occurred, or where . . . it is merely impending under circumstances such that it was not reasonable for plaintiff to expect defendant to prevent the harm.

*Id*. at 714. *See* 3 Dan B. Dobbs, *Law of Remedies* §12(6)(2), at 127 (2d ed. 1993) ("Dobbs") ("[T]he plaintiff's damages are adjusted upwards to reflect all the reasonable costs he incurs in attempting to avoid losses, whether or not he was successful in doing so."); Rest. 2d Cont. § 347 cmt. c (costs incurred in reasonable efforts to avoid loss are recoverable "whether successful or not"); *Cienega Gardens v. United States*, 38 Fed. Cl. 64, 79 (1997) ("[w]hether or not an attempt

to mitigate damages is successful, the non-breaching party may recover for injury incurred during such mitigation as long as the attempt was reasonable"), *vacated on other grounds*, 162 F.3d 1123 (Fed. Cir. 1998).

As these authorities reflect, and as is implicit in the "reasonableness" standard, costs of mitigation are recoverable whether or not the effort is successful. Here, the mitigation effort was successful – as Yankee Atomic CFO Tom Bennet testified, without contradiction, "[b]ased on all of the studies, the first and general conclusion is that dry fuel storage is less expensive than wet," Tr. 1815:23-25. Accordingly, there can be no question that Yankee Atomic's dry storage costs for its SNF are reasonable and hence recoverable. *See Ketchikan Pulp Co. v. United States*, 20 Cl. Ct. 164, 166 (1990) (reasonableness of the injured party's mitigation action is "judged by the facts and circumstances at the time the action is taken"); *id*. (injured party does not have to undertake extraordinary efforts to "ferret out the single best situation which will absolutely minimize the breaching party's damages"); *In re Kellet Aircraft Corp.*, 186 F.2d 197, 198 (3d Cir. 1950) ("[w]here a choice has been required between two reasonable courses, the person whose wrong forced the choice can not complain that one rather than the other was chosen."); *Western Alaska Contractors, J.V.*, ASBCA No. 46033, 95-1 BCA para. 27,392 (Dec. 30, 1994) ("[i]t was the Government which caused the problem. It cannot now dictate how the other party should have responded.")

Finally, as the Court has also previously noted, "[d]efendant would have the burden of proof as to any such failure to mitigate assertion." Order of August 29, 2003 (citing *T.C. Bateson Constr. Co. v. United States*, 162 Ct. Cl. 145, 319 F.2d 135, 140 (1963); *Koby v. United States*, 53 Fed. Cl. 493, 496 (2002)). In light of the applicable mitigation and other damages law discussed above, the facts presented at trial foreclose the government from carrying its burden to

show that Yankee Atomic's dry storage costs are *not* reasonable and "appropriate in the circumstances." *See* Order of June 28, 2004, 2004 WL 1535688 at *6 (quoting Rest. 2d Cont. § 350 cmt. b.).

To establish causation, Yankee Atomic is not required to establish exactly when DOE would have removed its SNF in the non-breach world. What matters to causation in this case is *that* DOE would have removed Yankee Atomic's SNF in a reasonable time frame starting in January 1998, not precisely *when* DOE would have done so. DOE's fundamental performance obligation under the Contract was to remove Yankee Atomic's SNF, and DOE has not done so. The costs Yankee Atomic has incurred as a result, to arrange on-site storage, "directly and naturally resulted from th[at] breach." *Locke*, 283 F.2d at 524. Indeed, as the Federal Circuit has repeatedly explained, "'[o]ne way the law makes the non-breaching party whole is to give him the benefits he expected to receive had the breach not occurred.'" *Bluebonnet Sav. Bank*, 266 F.3d 1355 (quoting *Glendale Fed. Bank, FSB v. United States*, 239 F.3d 1374, 1380 (Fed. Cir. 2001) (citing Restatement (Second) of Contracts § 344 (a) (1981)). Here, the benefit that Yankee Atomic expected to receive was that DOE would remove its SNF in a timeframe that would allow it to avoid additional on-site storage costs. *See* PFF ¶¶ 53, 59-63, 95. Yankee Atomic did not receive that expected Contract benefit, Yankee Atomic reasonably incurred costs as a result, and compensation for those costs is now necessary to make Yankee Atomic whole.

Yankee Atomic was fully entitled to expect that DOE would remove its SNF in time to avoid additional on-site SNF storage costs. Overwhelming evidence – well known throughout the nuclear industry – showed that both DOE and the contracting utilities long understood and intended, consistent with the purpose of the NWPA, that DOE would remove utility SNF beginning not later than January 31, 1998 on a schedule that was robust, efficient and calculated

to help utilities avoid additional on-site storage costs after that date. *See* PFF ¶¶ 59-63, 69, 81-84, 89. Moreover, as explained below, the legal standard governing DOE's performance obligation under the Contract *required* DOE to remove SNF on a reasonable schedule consistent with the purpose of the NWPA and the intent of the parties contracting under it.

Because the Contract does not prescribe any particular schedule for DOE's acceptance of SNF, "[a]s the court found in its June 26, 2003 Order, DOE was to commence pickup at a *reasonable* rate no later than January 31, 1998." Order of June 28, 2004 at 9, No. 98-126, 2004 WL 1535686 at *6 (denying motions *in limine*) (emphasis added). This requirement of a reasonable rate for DOE's performance reflects well-settled law that, where a contract is missing a term addressing a significant issue, the court must enforce a reasonable term. *See, e.g.,* Rest. 2d Cont. § 204. For example, *Essex Electro Eng'rs, Inc. v. Danzig*, 224 F.3d 1283, 1291 (Fed. Cir. 2000), held that if a contract does not specify a time for performance, the government must perform within a reasonable time. *Accord B-E-C-K Constructors v. United States*, 215 Ct. Cl. 793, 571 F.2d 25, 31 (1978); *see Specialty Assembling & Packing Co. v. United States*, 174 Ct. Cl. 153, 355 F.2d 554, 565 (1966).

In the present case, of course, the Contract is not entirely silent on scheduling matters. Explicit Contract terms, including that DOE would take title to SNF "as expeditiously as practicable," and the provisions for exchanges of acceptance slots and for priority acceptance of SNF from shut down plants, *see* PFF ¶¶ 80, 88, demonstrate that the parties intended to provide for an efficient schedule. *See, e.g.*, *Metric Constructors, Inc. v. National Aeronautics & Space Admin.*, 169 F.3d 747, 753 (Fed. Cir. 1999) (contract interpretation should "give[] effect to all its terms and leav[e] no provision meaningless"). In addition, substantial trial evidence showed that DOE was actively planning, after enactment of the NWPA but before DOE recognized that it

would not meet the 1998 deadline, to remove SNF from utilities on a schedule that was effective and efficient. *See* PFF ¶ 75. This powerful evidence of contractual intent is entitled to great weight. *See, e.g. Alvin, Ltd. v. United States Postal Serv.,* 816 F.2d 1562, 1566 (Fed. Cir. 1987) (quoting *Macke Co. v. United States*, 199 Ct. Cl. 552, 467 F.2d 1323, 1325 (1972)) ("'how the parties act under the arrangement, before the advent of controversy, is often more revealing than the dry language of the written agreement by itself'").

Federal Circuit precedent also dictates that "reasonable" in this case means consistent with the purpose of the NWPA and the contemporaneous understandings of DOE and the contracting utilities. In *Roedler v. Department of Energy,* 255 F.3d 1347, 1352 (Fed. Cir. 2001), which involved one of the same Standard Contracts involved here, the Court instructed: "[f]or determination of contractual and beneficial intent when, as here, the contract implements a statutory enactment, it is appropriate to inquire into the governing statute and its purpose." *Roedler* thus embraces the "fundamental precept of common law that the intention of the parties to a contract control its interpretation." *Firestone Tire & Rubber Co. v. United States*, 195 Ct. Cl. 21, 444 F.2d 547, 551 (1971). "'[I]f the principal purpose of the parties is ascertainable it is given great weight.'" *Alvin Ltd.,* 816 F.2d at 1565 (quoting Rest. 2d Cont. § 202(1)).

The purpose of the Contract here was to require DOE to remove Yankee Atomic's SNF, and the parties intended that DOE would do so in a robust and efficient way. Costs Yankee Atomic has incurred for extended on-site storage of SNF were legally caused by DOE's failure to remove the SNF in accordance with that contractual purpose and intent, *regardless* of precisely when DOE would have done so. As the Court of Claims explained long ago, "[t]he defendant who has wrongfully broken a contract should not be permitted to reap advantage from his own wrong by insisting on proof which by reason of his breach is unobtainable." *Locke*, 283

F.2d at 524. *See also David Nassif Assocs. v. United States*, 214 Ct. Cl. 407, 557 F.2d 249, 259 n.6 (1977) (finding that, although office building lease documents did not clearly address the subject, "it is a fair inference to say that what the parties had in mind was a cafeteria of a size reasonable under all the circumstances"), *David Nassif Assocs. v. United States*, 226 Ct. Cl. 372, 644 F.2d 4, 7 (1981) (after trial on question of "reasonable" size for cafeteria, assessing evidence of "what was intended"); *Thermo Electron Corp. v. Schiavone Constr. Co.*, 958 F.2d 1158, 1164 (1st Cir. 1992) (determining reasonable time for performance "on the basis of all the evidence") *see generally* Yankee Atomic's Opposition to Defendant's Motion for Summary Judgment Regarding the Rate of Spent Fuel Acceptance, filed October 28, 2002, at 56-65 (addressing issues involved determining a reasonable schedule for DOE performance in the non-breach world).

Ultimately, of course, Yankee Atomic did present evidence showing the date that DOE would have completed removal of Yankee Atomic's SNF had DOE performed its Contract obligations. *See* PFF ¶ 86. That evidence consisted of expert analysis and opinions of Mr. Graves, which relied upon and was consistent with DOE spent fuel program documents and with testimony from Mr. Mills, Dr. Bartlett and Mr. Stuart concerning what the parties intended to be, and what would be, a reasonable and efficient SNF removal schedule in the non-breach world. *See* PFF ¶¶ 59-63, 64, 69, 71-77. Certainly that evidence bolsters the other evidence showing that Yankee Atomic's damages were caused by DOE's breach, but proof of the precise date DOE would have removed Yankee Atomic's SNF is not necessary to make the causation showing.

D. <u>The Evidence Establishes Reasonable Certainty</u>

Reasonable certainty is also a question of fact. *See Bluebonnet Sav. Bank,* 266 F.3d at 1356-58. The standard is well-established: "[c]ertainty is sufficient if the evidence adduced enables the court to make a fair and reasonable approximation of the damages." *Locke*, 283 F.2d

at 524. Thus, "[i]f a reasonable probability of damage can be clearly established, uncertainty as to the amount will not preclude recovery." *Id.*; *accord Bluebonnet Sav. Bank*, 266 F.3d at 1356-57; *Ace-Federal Reporters, Inc. v. Barram*, 226 F.3d 1329, 1333 (Fed. Cir. 2000).

Yankee Atomic's damages proof easily meets the "fair and reasonable approximation" standard. First, the majority of Yankee Atomic's damages claim is based on actual expenses already incurred. *See* PFF ¶ 137. Indeed, Yankee Atomic has already spent over $100 million to implement dry storage. There is nothing "approximate" about those damages. Second, Yankee Atomic's expert, Dr. Wise, calculated damages using well-accepted economic principles, *see* PFF ¶¶ 155-57, and based almost entirely on reliable cost data obtained from Yankee Atomic's books and records or estimated by its experienced executives. *See* PFF ¶ 144. Indeed, virtually all of Yankee Atomic's claimed damages amounts, including both actual past and projected future damages amounts, are derived directly from cost data set forth in P1726YA, a cost estimate of the type Yankee Atomic regularly prepares in a rigorous way in the ordinary course of business. *See* PFF ¶¶ 144-146. To the very great extent that Yankee Atomic's damages are derived directly from P1726YA, determining the damages amounts involves no issues beyond those routinely addressed by Yankee Atomic through its normal accounting and cost estimating processes.

Yankee Atomic's damages are in three categories, comprising costs of ISFSI construction, ISFSI operations and wet pool operations. *See* PFF ¶¶ 139-142, 152. Yankee Atomic's costs for ISFSI construction and ISFSI operations are tracked, estimated (if future) and coded in its periodic cost estimates as "Phase 6" costs. *See* PFF ¶ 146.c. Yankee Atomic's wet pool related costs are similarly tracked, estimated (if future) and coded as "Phase 2" costs. *See* PFF ¶ 146.c. As set forth in P1726YA, these costs are actuals (if past), and (if future) the same

type of reliable projections that Yankee Atomic uses in its business planning and periodic rate cases before the Federal Energy Regulatory Commission ("FERC"). *See* PFF ¶¶ 146-148. These actual and estimated costs are far more "reasonably certain" than the future lost profits of a new venture upheld in *Energy Capital Corp. v. United States*, 302 F.2d 1314 (Fed. Cir. 2002), which were projected to occur in a "but for" world, not in the actual, "breach" world where Yankee Atomic has *already* incurred, and is continuing to incur, its damages. Indeed, the Federal Circuit (and other courts) regularly approve awards of lost future profits damages – based not just on future events, but on what *would* have happened in the future if the past had gone differently – that involve far more uncertainty than Yankee Atomic's future costs of operating and decommissioning its already-constructed ISFSI, let alone Yankee Atomic's already-incurred past costs for ISFSI construction and wet pool operations. *Energy Capital Corp.,* 302 F.3d at 1334; *Northern Helex Co. v. United States,* 225 Ct. Cl. 194, 634 F.2d 557, 564 (1980); *Locke*, 283 F.2d 521; *Mechanical Wholesale, Inc. v. Universal-Rundle Corp.*, 432 F.2d 228, 231 (5th Cir. 1970); *Super Valu Stores, Inc. v. Petersen*, 506 So. 2d 317, 326-30 (Ala. 1987).

Likewise, the three components of Yankee Atomic's damages calculation that are not derived from P1726YA, the comprehensive cost estimate the company prepared according to its usual procedures, are also reliable. First, Dr. Wise applied certain "offsets" for non-breach world costs. In every instance, however, both the appropriateness and estimated amount of those offsets were reviewed and agreed by Yankee Atomic executives, and in most instances the estimates were prepared by those same executives. *See* PFF ¶¶ 149-150; *see* Tr. 7285:12-24 (Jewell-Kelleher); Tr. 3356:7-14 (Wise); Tr. 3370:3-13 (Wise). Second, Dr. Wise also obtained costs from before 1999 from highly reliable sources – Yankee Atomic's books and records, and

the prior PriceWaterhouseCoopers expert report and workpapers, and these costs were fully audited by the government to the same extent as the costs derived from P1726YA. *See* PFF ¶ 154.

The third component of Yankee Atomic's damages calculation not drawn from P1726YA is the date its spent pool would be empty in the non-breach world, which is not itself an item of cost, but determines the period over which wet pool operations costs are included in Yankee Atomic's damages. Wet pool related damages are the costs Yankee Atomic has been required to incur to operate its spent fuel pool for the additional period beyond the date the pool would have been emptied to DOE in the non-breach world, until the date the pool in fact was emptied to the ISFSI in the breach world. *See* PFF ¶ 142. The former date, as used in Yankee Atomic's damages claim, was obtained not from P1726YA but from the determination of Mr. Graves as to when the pool would be empty if DOE had performed as required. *See* PFF ¶¶ 86, 142. That determination, and Mr. Graves' underlying analysis and opinion, also were highly reliable, and indeed provided the only evidence presented at trial of a specific non-breach world pool-empty date. *See* pp. 27-29, below.

Thus, incorporation of these elements into Yankee Atomic's overall damages claim, which is based overwhelmingly on actual and projected cost data from P1726YA, simply underscores that the overall claim is a "fair and reasonable approximation" of Yankee Atomic's damages. And of course the fact that certain cost items have been challenged does not make the claimed damages uncertain – it only makes them contested, and for reasons set forth in Yankee Atomic's rebuttal evidence at trial, there is not even any real contest concerning the amount of these damages.

E. <u>Damages for GTCC Waste Storage Costs</u>

In response to the government's pre-trial summary judgment motion on GTCC waste, Yankee Atomic thoroughly briefed the legal principles applicable to two issues: (1) whether the Contract's definition of HLW encompasses GTCC waste, and (2) regardless, whether if DOE had performed its Contract obligations as required beginning not later than January 31, 1998, DOE, in picking up Yankee Atomic's spent fuel, also would have fulfilled its undisputed separate statutory obligation to pick up Yankee Atomic's GTCC waste. *See* Yankee Atomic's Opposition to Defendant's Motion for Partial Summary Judgment Regarding Plaintiff's Greater Than Class C Radioactive Waste Arguments, filed October 29, 2002 ("Prior GTCC Waste Brief"). As the Court recognized in denying the government's motion, how these two issues impact Yankee Atomic's damages claim implicates material questions of fact. Order of June 26, 2003 at 3-4. Rather than reiterate the entire legal landscape, Yankee Atomic respectfully refers the Court to its prior brief, and emphasizes here how the trial evidence convincingly supports not only Yankee Atomic's legal position on the two issues identified above, but also Yankee Atomic's entitlement to recover the part of its claimed damages attributable to extended on-site storage of its GTCC waste.

The evidence confirmed Yankee Atomic's pretrial showings that GTCC waste is covered by the Contract and that DOE would have picked it up along with the spent fuel had DOE performed its Contract obligations as required beginning by 1998.

First, the Contract expressly covers –

> other highly radioactive material that the Commission, consistent with existing law, determines by rule requires permanent isolation.

P1YA at Art. I.12.(b) (Contract). As explained in Yankee Atomic's Prior GTCC Waste Brief, at 3-14, this Contract provision covers Yankee Atomic's GTCC waste because that material is

highly radioactive, a fact confirmed at trial, *see* PFF ¶ 114, and because the NRC's 1989 Rule unambiguously requires permanent isolation of GTCC waste in the absence of an NRC-approved alternative disposal path, which does not exist, facts also confirmed at trial, *see* PFF ¶ 122.

Yankee Atomic is mindful of the Court's pre-trial view that "it appears that, at present, defendant has the better argument as to the lack of a *contract* obligation for defendant to dispose of GTCC." Order of June 26, 2003 at 4; *see also* May 13, 2004 Pretrial Conference transcript, at 82:23-83:4 ("[R]ight now I think the stronger argument is that it is not covered by the contract, but I am not ruling it out."). But that was before the Court heard the very substantial, and uncontroverted, evidence showing (1) that an important purpose of the Contract, and the NWPA it implements, was to provide a solution for the disposal of all the utilities' highly radioactive waste that needed disposal in a repository, PFF ¶¶ 115-117, 120, and (2) that, accordingly, DOE has long planned to dispose of the utilities' GTCC waste in the NWPA repository, PFF ¶¶ 119, 125. As noted above in a related context, "how the parties act under the arrangement, before the advent of controversy, is often more revealing than the dry language of the written agreement by itself." *Macke Co.*, 467 F.2d at 1325.

The Contract's purpose also strongly supports construing the Contract's definition of HLW to cover GTCC waste, particularly in view of the NRC's affirmative requirement that the waste be permanently isolated, *i.e.*, disposed of in a repository. *See, e.g.*, *Alvin Ltd.*, 816 F.2d at 1565 ("'if the principal purpose of the parties is ascertainable it is given great weight.'") (*quoting* Rest. 2d Cont. § 202(1)); *Gould, Inc. v. United States*, 935 F.2d 1271, 1274 (Fed. Cir. 1991) ("'a contract must be so construed as to effectuate its spirit and purpose . . . .'") (citation omitted); *Thanet Corp. v. United States*, 219 Ct. Cl. 75, 591 F.2d 629, 633 (1979) (contract should be read as a whole and interpreted in accord with its spirit and purpose).

Second, the government presented no evidence that suggests that NRC's 1989 Rule is ambiguous. This is important because the government relies virtually entirely on extra-textual statements made by NRC when it proposed the Rule to suggest that the Rule does not require permanent isolation. Such statements are legally irrelevant, because the regulation is unambiguous on its face. *See Christensen v. Harris County*, 529 U.S. 576, 588 (2000) ("In *Auer* [*v. Robbins*, 519 U.S. 452 (1997)], we held that an agency's interpretation of its own regulation is entitled to deference. . . . But *Auer* deference is warranted only when the language of the regulation is ambiguous."). A situation similar to that here arose in *Moore v. Hannon Food Service, Inc.* 317 F.3d 489, 496 (5th Cir.), *cert. denied*, 124 S. Ct. 76 (2003). There, in "declin[ing] to extend *Auer* deference to the [Labor] Secretary's interpretation, because [the regulation] is unambiguous," the Fifth Circuit rejected a purported "ambiguity" that was "found only by contrasting the regulation's language with the Secretary's interpretation." *Id*. at 497. As the court explained:

> Under *Christensen*, this approach is backwards. The presence or lack of ambiguity in a regulation should be determined *without reference* to proposed interpretations . . . .

*Id.* at 496-97 (emphasis added).

Here, the regulation on its face requires permanent isolation unless NRC approves an alternative, and *there is no such alternative*. PFF ¶ 122. Far from showing ambiguity, the trial evidence – from the NRC's own contemporaneous memorandum authorizing publication of the 1989 Rule, P1613, to the statements of technical experts working for DOE, P1157 at 0308 (contractor document); *see* Tr. 4443:18-21 (Huizenga) (referring to authors of P1157 as "the technical experts") – shows that people in the industry understand that the Rule *requires* permanent isolation of utility GTCC waste in the present circumstances. *See* PFF ¶ 122.a. The

trial evidence also clearly shows that DOE has never attempted, and has no plans to attempt, to obtain an exception to the Rule's requirement of repository disposal for GTCC waste. *See* PFF ¶ 122.b.

Application of the Rule's unambiguous terms, rather than reliance on extra-textual interpretation, is especially appropriate here because there is no consistent NRC interpretation of the 1989 Rule: when the NRC published the final Rule in 1989, it explained that the Rule "would obviate any need" to classify GTCC waste as HLW and "achieve[s] the same purpose" as formally declaring the waste to be HLW. Disposal of Radioactive Wastes, 54 Fed. Reg. 22578, 22579 (May 25, 1989) (codified at 10 C.F.R. Part 61). The NRC Rule can only achieve the "same purpose" if it indeed requires permanent repository isolation where, as here, there is no approved alternative. *See* YA's Prior GTCC Waste Brief at 9-11 (further illustrating lack of any consistent NRC interpretation); *see also* PFF ¶ 115.g ("permanent isolation" means repository disposal).

Third, to the extent any ambiguity exists, it rests entirely in the Contract itself – *i.e.* whether the Contract's definition of HLW covers highly radioactive GTCC waste where the NRC has determined that the waste requires permanent isolation in the absence of an approved alternative. The trial evidence overwhelmingly establishes that construing the Contract to cover such waste is a *reasonable* interpretation (even if other interpretations might also be reasonable), as shown by the opinion of a FERC Administrative Law Judge that "there is a reasonable likelihood that GTCC waste . . . is covered in the Standard DOE contract," P471, by an internal analysis prepared for DOE by technical experts working for DOE, P1157 (contractor document), and by the beliefs of leaders and long-standing participants in the nuclear industry, including Dr.

Andrew Kadak (now a Presidentially-appointed member of the Nuclear Waste Technical Review Board) and Mr. Mills, among others. *See* PFF ¶ 120.

Because this construction is reasonable, the Contract necessarily covers GTCC waste under the doctrine of *contra preferendum. See United States v. Seckinger*, 397 U.S. 203, 210 (1970) ("[a]mong these principles [of federal contract law interpretation] is the general maxim that a contract should be construed most strongly against the drafter, which in this case was the United States"); *Metric*, 169 F.3d at 752 (construing latent ambiguity in contract against the drafter); *Firestone Tire & Rubber*, 444 F.2d at 551 ("the drafting party [] must bear the risk of any contractual uncertainty, ambiguity or inequitable consequence") (citation omitted); *Gaston & Assocs., Inc. v. United States*, 27 Fed. Cl. 243, 249 (1992) (adopting contractor's reasonable interpretation of an ambiguous clause). Under this rule, "[i]f the contract is reasonably susceptible of two differing interpretations, that interpretation placed on the contract by the nondrafting party will prevail." *General Warehouse Two, Inc. v. United States*, 181 Ct. Cl. 180, 389 F.2d 1016, 1019 (1967). Further, *contra preferendum* applies with particular force where, as here, the government enjoyed superior bargaining power in the negotiations. *See, e.g., Seckinger*, 397 U.S. at 216 (holding "[t]his principle is appropriately accorded considerable emphasis in this case because of the Government's vast economic resources and stronger bargaining position in contract negotiations"); *Peter Kiewit Sons' Co. v. United States*, 109 Ct. Cl. 390, 418 (1947) ("[t]his rule is especially applicable to Government contracts where the contractor has nothing to say as to its provisions").

Even if the Contract did not cover GTCC waste, the government has not established that any reduction in damages is warranted. As the Court observed in denying the government's summary judgment motion on GTCC waste issues, "defendant proposes to utilize the continued

presence of GTCC at plaintiff's reactor site to eliminate or reduce the damages that plaintiff attributes to the failure to remove SNF and/or HLW." Order of June 26, 2003 at 4. Yet the government advanced no evidence suggesting that GTCC waste would have remained at Yankee Atomic's site even if DOE had removed the spent fuel on a reasonable schedule beginning in January 1998. In contrast, Yankee Atomic presented overwhelming evidence that DOE would have removed the GTCC waste at the same time it removes spent fuel. *See* PFF ¶¶ 128, 124-127. The government "concede[s] that it has a statutory obligation to dispose of GTCC . . . ." *See* Order of June 26, 2003 at 4. Moreover, DOE has long planned to manage utility GTCC waste in conjunction with utility spent fuel, and uncontroverted evidence – including DOE program plans and white papers; testimony from Lake Barrett, the long time leader of DOE's SNF program from 1993-2003; and the trial testimony of the government's own witness on technical and nuclear industry issues, Mr. Abbott, among other evidence – demonstrates that DOE would have removed the GTCC waste at the same time as the spent fuel. *See* PFF ¶¶ 120, 123.

There is thus no basis to deny any of Yankee Atomic's claimed damages because of GTCC waste. The evidence is overwhelming, and in significant respects uncontroverted, that if DOE had performed its Contract obligations as required, Yankee Atomic's GTCC waste would be gone and there would be no need to continue storing it on-site.

F. The Good Faith and Fair Dealing Claim

Yankee Atomic's good faith and fair dealing claim has rested primarily on the government's positions that (1) approved delivery commitment schedules ("DCS") are binding on DOE and contracting utilities including Yankee Atomic, (2) DOE's Contract obligations are limited to accepting SNF described in an approved DCS, and (3) DOE's DCS instructions, D28.01, D29.01, D30.01, properly required contracting utilities to fill out DCSs only in strict accordance with the allocations set forth in DOE's 1991 ACR. These positions, if accepted,

would have deprived Yankee Atomic of its justified expectations under the Contract, and thus would have violated the implied contractual duty of good faith and fair dealing. *See* Rest. 2d Cont. § 205 cmt. a. (duty of good faith "emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party"); *Commonwealth Edison Co.*, 56 Fed. Cl. at 665 ("The court agrees that DOE's use of the 1991 ACR to limit the amount of SNF requested by the utilities in their DCS submissions may be a breach of defendant's duty of good faith and fair dealing . . . . [because it] does not appear to the court to be consistent with the 'justified expectations' of plaintiff . . . .")

The Court, in its pretrial rulings, has already rejected the government's positions that the few approved DCSs are binding and represent the limit of DOE's Contract obligations. *See* Order of June 26, 2003 (denying summary judgments motions); *Commonwealth Edison Co.*, 56 Fed. Cl. at 663; Order of June 28, 2004, 2004 WL 1535686 (denying motions *in limine*). Those rulings pave the way for the Court to find that the government, by advancing its now-discredited positions, was violating its contractual duty of good faith and fair dealing. Yankee Atomic has therefore set forth appropriate proposed findings related to this claim, *see* PFF ¶¶ 129-135, so that the Court may now confirm its pretrial rulings on a full evidentiary record. Based on these facts, the Court should find, as *Commonwealth Edison Co.* indicates, that the government breached its contractual duty of fair dealing. *Essex Electro Eng'rs, Inc.*, 224 F.3d at 1291 ("Every contract . . . imposes an implied obligation 'that neither party will do anything that will hinder or delay the other party in performance of the contract'.") (citation omitted).

G. The Government's Rule 52(c) Motion Must Be Denied

After Yankee Atomic presented its case the government filed a motion for judgment under Rule 52(c), contending that the Court need not hear the government's case because, even if all of Yankee Atomic's evidence were accepted, Yankee Atomic would not be entitled to any

relief for the reasons stated in the motion.[3] The Court directed the government to go forward with its case, Tr. 3443, and "decline[d] to render any judgment until the close of all the evidence." RCFC 52(c). The Court nonetheless suggested addressing the Rule 52(c) motion "with the post-trial submissions." *See* Tr. 6318-19.

The motion should now be summarily denied. As Yankee Atomic explains in this brief and in the accompanying proposed findings of fact, it is entitled to the relief it seeks on its contract and takings claims on the basis of *all* the evidence presented at trial, including that presented during the government's case. Logic dictates that the same result is required if the Court considers only Yankee Atomic's affirmative evidence, before the government presented any evidence of its own. In other words, this entire brief together with Yankee Atomic's proposed findings is responsive to the Rule 52(c) motion, because if the Court accepts Yankee Atomic's arguments and proposed findings, the government's motion requesting judgment in its favor necessarily fails. The Rule 52(c) motion should also be summarily denied because it is largely (if not entirely) a rehash of arguments the government made in its pretrial motion to preclude the testimony of Mr. Graves, arguments that Yankee Atomic has already rebutted and the Court has already rejected decisively. *See* Order of June 28, 2004, 2004 WL 1535686; Yankee Atomic's Opposition to the Government's Motion *In Limine* to Preclude Frank C. Graves Expert Testimony Regarding Exchanges, filed April 16, 2004 ("Prior Graves Brief"). Despite these deficiencies, in view of the Court's suggestion of a response Yankee Atomic reiterates briefly here the reasons why the government's arguments in its motion are completely without merit.

---

[3] Though the government's motion requests judgment "with respect to all of the Yankees' claims," *see* p. 2, it appears to address only Yankee Atomic's breach of contract claim.

The government's Rule 52(c) motion rests on two related assertions, both of which are flatly wrong. First, the government contends that "[w]ithout Mr. Graves' model, the Yankees cannot establish any causal link between DOE's breach and the extended wet pool costs, ISFSI construction costs, and ISFSI operations costs that they claim." Motion at 2; *see id.* at 16 ("Given that, absent Mr. Graves' speculative hypothetical model, the Yankees have no basis for proving that any costs claimed in this litigation are an incremental result of DOE's breach, they have failed to prove causation for any of their claimed costs."). Second, the government suggests that Yankee Atomic's evidence showing what reasonable Contract performance by DOE would have been in the non-breach world is "based solely upon the opinion and [] model presented by [Mr. Graves] and nothing more." Motion at 4. In particular, the government alleges "the lack of any contemporaneous evidence supporting Mr. Graves' theory of exchanges – and, in fact, . . . significant uncontroverted evidence contradicting the theory of exchanges . . . ." *Id.* at 2.

Addressing these points in reverse order, the allegedly contradictory evidence, which consists of documents showing Yankee Atomic's inability to arrange exchanges in the 1990's, *see* Motion at 14-16, has already been rejected by the Court as having no probative value on whether exchanges would have occurred in the non-breach world:

> Defendant's contract breach . . . prevented the very market the government assails as speculative – the lack of real market data on the sale of allocation slots for the storage of spent nuclear fuel. By partially breaching the contract, defendant cannot exclude Graves' opinion on the grounds that there is no market data. *There is no market data because the government's breach thwarted this possibility.*

Order of June 28, 2004, 2004 WL 1535686 at *4 (denying motions *in limine*) (emphasis added).

The government's suggestion that Mr. Graves' analysis and opinions are unsupported by other evidence is also wrong. As noted above, substantial and largely undisputed trial evidence showed that both DOE and the contracting utilities intended, consistent with the purpose of the NWPA, that DOE would pursue an efficient and robust SNF pickup schedule. Yankee Atomic also presented substantial evidence (in addition to the Graves model) showing what a reasonable acceptance rate, schedule and timeframe would have been for DOE's pickup of SNF, assuming DOE commenced performance by January 1998 as the Contract required. *See* PFF ¶¶ 59-63, 64, 69. Yankee Atomic presented this evidence of the parties' intent, and of what a reasonable schedule for DOE's performance would have been in the non-breach world, through witnesses who had first hand experience with the NWPA and the Standard Contracts, and with issues of SNF transportation, storage and disposal in the DOE spent fuel program and elsewhere, including Loring Mills, John Bartlett and Ivan Stuart. *See* PFF ¶¶ 30-31, 35. Yankee Atomic also presented a large number of documentary exhibits, primarily from DOE's own files, supporting its position on a reasonable and efficient SNF pickup schedule. *See, e.g.,* PFF ¶¶ 61, 75, 119.

Ultimately, this evidence was relied upon and built upon by Mr. Graves, who provided an analysis and opinions regarding what the results would have been if DOE had commenced performance by January 31, 1998, and then proceeded according to a reasonable SNF acceptance schedule. *See id.* ¶¶ 32, 85-87. But the government's contention that Mr. Graves provided the *only* evidence of what a reasonable DOE performance schedule would have been disregards the bulk of the evidence Yankee Atomic presented on this issue. In addition, virtually every government witness, including Mr. Milner, Mr. Zabransky and Mr. Morgan, endorsed the use of exchanges to help optimize the SNF removal schedule, *see* PFF ¶ 83, a view also set forth in

numerous DOE documents, *see, e.g.*, P31 at 16592; P145; D297YA; D299YA; P286YA, attachment at 2. *See also* Order of June 28, 2004, 2004 WL 1535686 at *5 (denying motions *in limine*) ("Annual aggregate acceptance amounts used [by Mr. Graves] were found to be reasonable by Dr. Bartlett and supported by the opinion of Ivan Stuart, and also contained in a DOE planning document. . . . [P]laintiffs' position is not fiction. Approval of exchanges is supported by deposition testimony . . . . Factors used in reaching Graves' conclusions are 'real world' figures.").

It is revealing that, in attempting to stretch Mr. Graves' opinions to fit the theory of its motion, the government argues that "Mr. Graves' testimony makes clear that his opinion touches only upon the *fact* of damage . . . [not] the *amount* of damages. That is, Mr. Graves' testimony is solely related to causation." Motion at 9. To say that Mr. Graves' opinion is "solely related to causation," however (even assuming that were true), is very different than saying that Yankee Atomic's causation evidence is *solely from* Mr. Graves. It is not.

In fact, although as noted previously Mr. Graves' testimony certainly bolsters Yankee Atomic's causation proof, that testimony goes primarily not to causation, but to the reasonable certainty element of Yankee Atomic's damages proof. In deciding to build its ISFSI, Yankee Atomic did not consult Mr. Graves or rely on his model. Yankee Atomic built the ISFSI because, beginning at least by the early 1990s, Yankee Atomic knew that DOE would not meet the 1998 start date and would not (indeed, could not) thereafter remove its SNF on a reasonable schedule. *See* PFF ¶¶ 91-93, 97-100 (discussed above at p. 6-8); *see also* Order of June 28, 2004, 2004 WL 1535688 at *6 ("DOE had an obligation to take actions necessary to be ready to commence performance starting at the end of 1998 [*sic*, should be "starting by January 31, 1998]"). Yankee Atomic could have avoided building its ISFSI if DOE followed *any*

"reasonable" SNF pickup schedule, whether that led to the final removal of Yankee Atomic's fuel in 1999, or 2003 or 2007. *See* PFF ¶¶ 102, 106. As explained above, *see* pp. 9-12, Yankee Atomic was entitled to reasonable performance, and causation follows from any reasonable schedule.

Thus, Mr. Graves' calculation of the specific non-breach world SNF removal date is not necessary to the causation analysis, but, strictly speaking, only to a determination of when Yankee Atomic's "wet pool related" damages began to accrue. By definition, that damages component consists of costs incurred to run the spent fuel pool during the period from the date it would have been emptied to DOE in the non-breach world until it actually was emptied to the ISFSI. Because the length of that period affects only the amount and not the fact of Yankee Atomic's damages, Mr. Graves' bottom line conclusion regarding the non-breach world pool empty date must be judged by the "fair and reasonable approximation" standard, which it easily meets. *Locke*, 283 F.2d at 524.

The government's attacks on Mr. Graves' testimony are ironic because the government never advanced its own model of a reasonable schedule, despite repeated suggestions from the Court that the government do so. The Court's Order of June 28, 2004, denying the government's motion to preclude Mr. Graves' testimony, solicits such competing evidence: "Defendant may by cross-examination and *presentation of a competing theory* explore the facts it disputes" 2004 WL 1535686 at *5 (emphasis added); "while *the government may present contrary evidence*, plaintiffs' position is not fiction," *id.* (emphasis added); "The government does not suggest any other rate [than 3000 MTU] would be reasonable," *id.* at *6; "Graves' opinion will be offered to show when DOE would have completed removing plaintiffs' fuel absent the DOE's breach . . . – to which *the government offers no alternative model,*" *id.* at *7 (emphasis added).

In addition, in its February 2004 pretrial submissions, the government had outlined four separate acceptance "scenarios" as alternatives to the DOE performance schedule set forth in Yankee Atomic's pretrial submissions. Yankee Atomic moved *in limine* to preclude the government from offering evidence of its alternative scenarios at trial, but the Court denied that motion. Order of July 9, 2004. In so ruling, the Court again virtually invited the government to present its alternative scenarios, in the interest of compiling a full record:

> To avoid, if possible, the need for any further trial proceedings in these three cases, it may be preferable for the trial record to be inclusive with respect to matters such as SNF removal on the basis of oldest fuel first, with or without exchanges, or with or without campaigns. However, that is a matter for further consideration as the trial progresses.

*Id.* at 8-9. Despite all these entreaties, and despite the Court's separate pretrial ruling (noted above) that the Contract required DOE to pick up SNF at a "reasonable" rate, the government elected at trial to present no evidence at all of what it believed would be a reasonable, specific date for DOE to have removed Yankee Atomic's SNF in the non-breach world. The *only* evidence of such a date was presented by Mr. Graves. And that date was the output of a rigorous economic model, which as the Court has recognized rested on "'real world' figures," Order of June 28, 2004, 2004 WL 1535686 at *5, and also relied on DOE's own planning documents and on the consistent testimony and opinions of Mr. Mills, Dr. Bartlett and Mr. Stuart, *id*. *See also* PFF ¶¶ 85-86.

In these circumstances, the Court, in determining Yankee Atomic's damages, should find as a fact that the specific DOE pickup schedule supported by Yankee Atomic's witnesses and exhibits, and ultimately set forth in Mr. Graves' opinions, is reasonable and consistent with "the governing statute and its purpose." *Roedler*, 255 F.3d at 1352. As the Court explained, quoting venerable authority, in its Order of June 28, 2004: "In estimating damages, the Court of Claims

occupies the position of a jury under like circumstances; and all that the litigants have any right to expect is the exercise of the court's best judgment *upon the basis of the evidence provided by the parties*." 2004 WL 1535686 at *3 (citations omitted) (emphasis added).

At bottom, the government's Rule 52(c) motion rests on a fundamentally false premise, namely that Yankee Atomic is proposing that DOE would have followed some kind of "expedited" SNF removal schedule in the non-breach world. *See* Motion at 12. The government goes so far as to suggest that use of exchanges "would have resulted in the Yankees receiving fuel out dates up to 20 years earlier than under the schedule developed using the mechanisms set forth in the Standard Contract." *Id.* at 7. But the Court has already correctly determined that "the Standard Contract . . . does not contain or create a SNF acceptance rate." *Commonwealth Edison Co.,* 56 Fed. Cl. at 663; *see id.* ("This [delivery commitment schedule] mechanism does not create a contractually binding obligation for either party"). Accordingly, as the Court also has recognized, "there is presently no schedule to adjust." *Yankee Atomic Elec. Co. v. United States*, 42 Fed. Cl. 223, 234 n.6 (1998). And there is certainly no evidence that, if DOE had commenced performance by January 1998, DOE would have *delayed* accepting Yankee Atomic's SNF for up to 20 years. That concept is nothing more than a figment of the government's imagination. It is not reasonable, and it certainly is not consistent with the overwhelming and essentially uncontroverted evidence of the understanding and intent held by DOE and the contracting utilities at the time the NWPA was enacted and the Contract was entered into.

H. Appropriate Treatment of Future Damages

From the outset of the damages phase of this case, Yankee Atomic has framed its claim as one for "minimum" damages, meaning those damages it will incur if DOE removes Yankee Atomic's SNF beginning in 2010 in a single campaign. *See* PFF ¶ 136. Yankee Atomic put

forward this "minimum damages" claim for two related reasons. First, early on the Court made clear that it did not want to try the issue of when DOE might ultimately remove Yankee Atomic's spent fuel. *See* May 4, 1999 Hearing Transcript at 25:20-21 ("COURT: As you see, I'm trying to avoid having a trial on when they are going to actually pick it up."). Second, because DOE has long made known that it will not be performing until 2010 at the earliest, *see* PFF ¶ 164; Tr. 5882:6-5883:7 (Abbott), Yankee Atomic's claim for damages only until that date at once underscores the "reasonable certainty" of the claimed future damages and eliminates the possibility of a windfall.

The Court recognized these merits of Yankee Atomic's approach in its Order of June 28 2004, 2004 WL 1535688, which rejected (among other things) the government's motion to preclude evidence of future damages: "As at the earliest, DOE will not be prepared to commence performance until 2010, evidence of damages established with reasonable certainty based on the failure to perform until that time whether they are incurred or projected, so long as they are reasonably certain and caused by prior breaches will not be precluded." 2004 WL 1535688, at *2. Moreover, as explained above, the trial evidence established that the future component of Yankee Atomic's minimum damages claim (i.e., ISFSI operations costs from July 2003 to 2010, plus ISFSI decommissioning and other end-of-life costs), *see* PFF ¶¶ 138, 141, satisfies the legal tests of foreseeability, causation and reasonable certainty. In these circumstances, allowing pursuit of damages resulting from DOE's failure to perform until 2010 is not only fair and sensible, it is also more efficient for the litigants and the Court than piecemeal damages proceedings, particularly given the inordinately long lead time and complex pretrial proceedings in these substantial cases.

Expressly "reserved for further consideration" in the Court's Order of June 28, 2004 was Yankee Atomic's request "that the court make it clear that plaintiffs may maintain a subsequent action to recover damages not sought in the present action." 2004 WL 1535688, at *3; *see* Yankee Atomic's Opposition to Government Motion *In Limine* To Exclude evidence of Future Damages, filed June 11, 2004, at 7-9 (addressing right to bring future actions for post-2010 damages). The Court should address that issue now, and make clear that Yankee Atomic can return to court in the future to pursue damages that will accrue (or other appropriate relief) if, contrary to the assumption underlying Yankee Atomic's minimum damages claim, DOE does not pick up Yankee Atomic's SNF until sometime after 2010 (or perhaps never).

Consistent with the cardinal principle of contract damages that Yankee Atomic be made whole, there are only two options for the treatment of post-2010 damages: either they are awarded in the present action, or they are awarded in a future action (or actions). Of these options, reserving Yankee Atomic's right to pursue post-2010 damages later is far preferable as a matter of law, equity and sound judicial management. Indeed, awarding post-2010 damages in the current action presents the same potential difficulties that led Yankee Atomic to frame its minimum damages claim in the first place. Although it appears unlikely that DOE will pick up Yankee Atomic's SNF beginning in 2010, exactly when after that date DOE will do so can be difficult to prove. *See Indiana Michigan,* 60 Fed. Cl. at 647 ("Testimony and other evidence that we considered at trial did not establish a credible basis for choosing a year other than 2010.").

In addition, although Yankee Atomic has reasonably estimated its post-2010 annual ISFSI operations costs as comparable to such costs in the 2008-10 timeframe, *see* PFF ¶ 158, the history of steeply-escalating and unforeseen new costs in the nuclear industry, *see* PFF ¶ 156.c, suggests that recovery on the basis of that estimate will undercompensate Yankee Atomic.

Despite this difficulty, Yankee Atomic is requesting the Court to find as a fact that its post-2010 annual ISFSI operations costs will be at least $6.5 million per year, comparable to such costs in 2008-10, *see* PFF ¶ 158. It is appropriate that the Court make such a finding, given that Yankee Atomic disclosed this proposed finding in its pretrial submissions, and particularly in view of the time and effort both parties have spent in this case in discovery, audit proceedings and trial of damages issues including this one. If DOE commences performance soon after 2010, this finding may obviate the need for renewed litigation by facilitating resolution of Yankee Atomic's claim for a few more years of damages. However, given rising costs and the very real prospect that DOE's performance will be delayed long beyond 2010, this finding is no substitute for a clear and explicit ruling by the Court that Yankee Atomic may return to court to seek post-2010 damages if in the future it becomes appropriate and necessary to do so.

As the Court observed in its June 28, 2004 Order, the opinions of both Judge Lettow in *TVA* and Judge Hodges in *Indiana Michigan* "recognized the right of the respective utilities to bring separate actions for damages for future breaches." 2004 WL 1535688, at *1. A comparable ruling is appropriate and important in this case, in order to assure that Yankee Atomic will be made whole in the increasingly likely event that DOE does not commence performance until significantly after 2010.

Although it is generally the case that a final judgment extinguishes all transactionally related claims, *see, e.g.,* Rest. Judg. 2d §§ 18, 19, 24(1), 26 (1982), there are a number of exceptions to this general rule. *See id*. §26. Most appropriate here are the exceptions described in Restatement (Second) of Judgments §26(1)(b) and (e). Subsection 1(e) applies where:

> For reasons of substantive policy in a case involving a continuing or recurrent wrong, the plaintiff is given an *option* to sue once for the total harm, both past and prospective, or to sue from time to time for the damages incurred to the date of suit . . ."

*Id.* (emphasis added). This exception is applicable to SNF cases like this one asserting a partial breach, and was properly invoked in *TVA,* because "[a] claim for damages for partial breach is one for damages based on only part of the injured party's remaining rights to performance." *TVA*, 60 Fed. Cl. at 677 (quoting Rest. 2d Cont. § 236(2)). Thus, the non-breaching party "may elect to regard the breach as partial, proceed with his own performance, sue for the partial injury, and maintain a second suit in case a further breach occurs." 9 Arthur L. Corbin, *Corbin on Contracts* § 946, at 720 (interim ed. 2002).

Other courts also recognize the permissibility of a second suit in circumstances like those presented here. For example, in *Creek v. Village of Westhaven*, 80 F.3d 186 (7th Cir. 1996), the court (per Judge Posner) held that, because an event necessary for plaintiff to estimate his damages had not occurred at the time a prior action was initiated, a second suit could be appropriately maintained when the damages became sufficiently concrete. *Id.* *See also Jackson v. Johns-Manville Sales Corp.*, 727 F.2d 506, 519 (5th Cir. 1984) (plaintiff's suit for asbestosis injury arising from exposure to asbestos would not preclude later suit for damages should plaintiff develop cancer), *overruled on other grounds by Lindley v. Hamilton*, 883 F.2d 360 (5th Cir. 1989); *Devlin v. Johns-Manville Corp.*, 495 A.2d 495, 502 (N.J. Super. Ct. Law Div. 1985) (same); *Kimmel v. Iowa Realty Co.*, 339 N.W.2d 374, 379 (Iowa 1983) (Rest. 2d Judg. §26 (1)(e) permitted second suit for money damages after first suit ordering reformation where losses to plaintiff had not matured at time of first action).

Subsection 26(1)(b) of the Restatement (Second) of Judgments provides that *res judicata* will not preclude a subsequent suit when "[t]he court in the first action has expressly reserved the plaintiff's right to maintain the second action." In *TVA*, the court appropriately applied this exception as well, and expressly reserved *TVA*'s right to return to court at a later time to prove

additional damages that occurred beyond the year of trial (which was the point through which TVA elected to prove its damages in that case). *TVA*, 60 Fed. Cl. at 678. This exception also would be applicable to any future suit by Indiana Michigan (along with subsection 1(e)), because in that case the court also expressly reserved Indiana Michigan's right to sue for damages at a later point. *Indiana Michigan*, 60 Fed. Cl. at 664 ("When Indiana Michigan can show that it has incurred costs related to defendant's breach, plaintiff may have causes of action that are not speculative."). Similarly, this exception should be applied here.

Decisions from a number of federal appeals courts confirm that this Court may, by expressly reserving certain issues in its judgment, preserve those issues for litigation at a later time. *See Central States, Southeast & Southwest Areas Pension Fund v. Hunt Truck Lines, Inc.*, 296 F.3d 624, 629 (7th Cir. 2002) ("[u]nder a generally accepted exception to the *res judicata* doctrine, a litigant's claims are not precluded if the court in an earlier action expressly reserves the litigant's right to bring those claims in a later action") (citations omitted) (alteration in original); *Thomas v. Contoocook Valley Sch. Dist.*, 150 F.3d 31, 43 (1st Cir. 1998) ("When a court . . . reserves a question for further adjudication, the ensuing judgment does not generally bar subsequent determination of that question"); *King v. Provident Life & Acc. Ins. Co.*, 23 F.3d 926, 928-29 (5th Cir. 1994) (reservation in previous judgment prevents *res judicata* effect); *Washington Pub. Power Supply Syst. v. Pittsburgh-Des Moines Corp.*, 876 F.2d 690, 699 (9th Cir. 1989) (no preclusion where first court reserved issue in its judgment); *Guzowski v. Hartman*, 849 F.2d 252, 255 (6th Cir. 1988) ("It is well established that the sustaining of a motion to dismiss for insufficiency of the complaint serves as an adjudication on the merits *unless* the court specifies otherwise."). *Cf. Epic Metals Corp. v. H.H. Robertson Co.*, 870 F.2d

1574, 1576 (Fed. Cir. 1989) (recognizing that a consent judgment may reserve certain issues for subsequent litigation).

In similar contexts, the Federal Circuit and before it the Court of Claims also have recognized the right of plaintiffs to bring successive suits for the recovery of damages. *See Cities Services Helex, Inc. v. United States*, 211 Ct. Cl. 222, 543 F.2d 1306 (1976) (each failure to pay for helium deliveries gave rise to additional action for damages); *San Carlos Irrigation & Drainage Dist. v. United States*, 23 Cl. Ct. 276, 281-82 (1991), *aff'd*, 111 F.3d 1557 (Fed. Cir. 1997) (each failure to open flood gates gave rise to new claims for damages); *Aktiebolaget Bofors v. United States*, 139 Ct. Cl. 642, 153 F. Supp. 397, 399 (1957) (new action arose each time government improperly exported guns in violation of licensing agreement). Here, there are particularly compelling reasons for allowing Yankee Atomic and other SNF plaintiffs to pursue future damages in future proceedings. As set forth above and as the court agreed and elaborated further in *TVA,* "'the damages issues arising from the failure by [DOE] to dispose of [SNF] under the Standard Contract present a unique legal setting' that justifies the Court's issuing an order, pursuant to either [Rest. 2d. Judg.] Paragraph 26(1)(b) or 26(1)(e), preserving [a plaintiff's] right to maintain future actions." *TVA,* 60 Fed. Cl. at 677 (citation omitted); *see id.* at 677-78 (recounting unique legal setting).

The Court therefore should enter such an Order in this case. In doing so, the Court also should address two related issues noted by the *TVA* court. First, when the Court enters judgment it should retain jurisdiction to hear claims for post-2010 damages attendant to the ongoing breach, at least pending Federal Circuit resolution of the appropriate manner of handling future damages in SNF cases. Although the *TVA* court deferred the issue of retaining jurisdiction, 60 Fed. Cl. at 678 n.17, that case is at a much earlier stage; here, final judgment is near and the issue

must be faced. Although pursuit of future damages under an exception to the final judgment rule set forth in Restatement (Second) of Judgments § 26 is a recognized, logical and fair way to proceed, there is perhaps some risk that the Federal Circuit will prescribe a different approach to future damages in SNF cases. In that event, unless the Court has retained jurisdiction, there again is some risk that Yankee Atomic may lose its right to recover post-2010 damages.

The Court will not have to retain jurisdiction for long. Although it is unclear whether the § 26 issues will be addressed in the pending *Indiana Michigan* appeal, and perhaps unlikely since Indiana Michigan did not raise the issue (it was raised in an *amicus* brief submitted by 22 other spent fuel plaintiffs, including the three Yankees), the § 26 issues will be raised and presumably resolved no later than the appeal in this case. At that point, if the Federal Circuit affirms the approach advocated here, there will no longer be a need for retained jurisdiction.

Second, in entering an Order preserving Yankee Atomic's right to pursue post-2010 damages in a future case, the Court also should address the statute of limitations issue, as did the *TVA* court. 60 Fed. Cl. at 678. That issue is likely to be raised on appeal of the § 26 issues in this case, and the Federal Circuit should have the benefit of this Court's ruling. In *TVA*, citing substantial case law holding that "'a claim does not accrue until the claimant has suffered damages,'" 60 Fed. Cl. at 678 (citations omitted), the court ruled that "TVA's future claims for its future damages should . . .be considered to accrue for purposes of the statute of limitations at the time such damages are incurred," *id*. That conclusion is correct and should also be adopted here.

I. Partial Versus Total Breach and Election of Remedies

In its Order of June 28, 2004, addressing damages issues, the Court rejected the government's position that Yankee Atomic had already made an election of remedies, precluding pursuit of restitution or other total breach relief. 2004 WL 1535688, at *3-5. The Court ruled

instead that a "final" election only need be made "at some point prior to final judgment," *id.* at *5, citing caselaw noting that "an election of remedies is generally made after a verdict but prior to judgment." *Id.* (citing *Wynfield Inns v. Edward Leroux Groups, Inc.,* 896 F.2d 483, 488 (11th Cir. 1990)).

Throughout this litigation, Yankee Atomic's preferred remedy has been the recovery of damages for a partial breach, and it still is. For reasons set forth in this brief and the accompanying proposed findings of fact, the Court should award Yankee Atomic the minimum damages it claims for DOE's partial breach, and reserve Yankee Atomic's right to later pursue damages that will accrue (or other appropriate relief) if DOE does not pick up its SNF in 2010. The government's position, however, appears to be that Yankee Atomic should recover zero damages in this case. Although Yankee Atomic believes such an outcome would be ludicrous, in view of the government's position Yankee Atomic respectfully reserves its right to make a final election of remedies "after a verdict but prior to judgment," which in this case means after the Court issues a decision on damages but before entering judgment (which the Court should not do until Yankee Atomic makes its final election).

If, contrary to Yankee Atomic's position, the Court were to reject some or all of Yankee Atomic's claimed minimum damages, and/or refuse (or fail) to effectively reserve Yankee Atomic's right to later pursue post-2010 damages or other relief, Yankee Atomic in response could conceivably elect to pursue restitution or other relief, and as the Court ruled pre-trial, Yankee Atomic would have the right to do so before final judgment. Pursuant to the Court's Order of June 28, 2004, the parties had the opportunity to present evidence addressed to such alternative remedies, and the trial record contains all evidence necessary for the Court do so. *See* PFF ¶ 1.

## II. JUST COMPENSATION FOR THE TAKING OF YANKEE ATOMIC'S REAL PROPERTY.

Yankee Atomic fully briefed the legal principles bearing on its just compensation claim for the taking of its real property in its responses to the government's motion for summary judgment on the takings claim and the government's more recent motion *in limine* regarding takings damages. *See* Yankee Atomic's Opposition to Defendant's Motion for Summary Judgment Upon Count III of Plaintiff's Complaint (Re Takings), filed Dec. 16, 2002 ("Takings SJ Brief"); Yankee Atomic's Opposition to Defendant's Motion *In Limine* Regarding Takings Damages, filed April 16, 2004 ("Takings Damages Brief"). As the Court recognized in denying both government motions, ""[t]aking issues are normally fact intensive and require evidentiary proceedings for their resolution." Order of June 26, 2003 at 5; *See* Order of May 19, 2004 at 2 ("Plaintiffs taking claim remains viable"). Rather than fully reiterate the applicable legal principles, Yankee Atomic, after briefly summarizing those principles, simply shows here that the trial evidence established its taking claim as well as the amount of just compensation due.

Government-caused occupation of private property for public use constitutes a *per se* Fifth Amendment taking. *Loretto v. Teleprompter Manhattan CATV Corp.,* 458 U.S. 419, 434-35 (1982) (holding *per se* compensable taking occurred where law required landlord to permit placement of cable facilities on apartment buildings); *accord, Skip Kirchdorfer, Inc. v. United States*, 6 F.3d 1573, 1582 (Fed. Cir. 1993) (holding that physical occupation of property constituted a taking); *Hendler v. United States*, 952 F.2d 1364, 1378 (Fed. Cir. 1991) (same). In such circumstances, the Fifth Amendment mandates compensation "without regard to whether the [government] action achieves an important public benefit or has only a minimal economic impact on the owner." *Hendler,* 952 F.2d at 1375. *See generally* Yankee Atomic's Takings SJ Brief at 15-18.

Here, the government has taken the land on which Yankee Atomic's ISFSI sits for a public purpose, namely the storage of spent fuel and GTCC waste. *See* PFF ¶¶ 162-163. The storage of this nuclear waste on Yankee Atomic's property will be for an indefinite period of time, perhaps permanently, given the uncertainty of when, if ever, DOE will complete its Yucca Mountain repository or otherwise be ready to remove and dispose of the waste. *See* PFF ¶ 164. Yankee Atomic is therefore entitled to just compensation measured by the fair market value of the land taken. "The just compensation for a permanent taking is generally the fair market value of the property . . . ." *Bass Enters. Prod. Co. v. United States,* 133 F.3d 893, 895 (Fed. Cir. 1998). *See generally* Yankee Atomic's Takings Damages Brief at 8-9.

Uncontroverted testimony from Yankee Atomic executive Mr. Bennet shows that the land under Yankee Atomic's ISFSI which the government has taken is approximately 12 acres in size, and has a fair market value of $9600. *See* PFF ¶¶ 165-166. As the property owner, it is axiomatic that Yankee Atomic can offer such testimony. *See, e.g., United States v. 10,031.98 Acres of Land,* 850 F.2d 634 (10th Cir. 1988); *District of Columbia Redevelopment Land Agency v. Thirteen Parcels of Land,* 534 F.2d 337, 338 (D.C. Cir. 1976). Moreover, "[a]n owner, because of his ownership, is presumed to have special knowledge of the property and may testify as to its value. He may offer such testimony *without further qualification* [and] *is entitled* to the privileges of a testifying expert." *10,031.98 Acres of Land,* 850 F.2d at 636 (emphasis added) (citation omitted); *see id.* at 639 n.4 (corporate owners of land can offer testimony regarding land value through a designated corporate officer). 850 F.2d at 639, 639 n.4. Indeed, there is a "policy in favor of permitting owners to testify as to the value of condemned property" because the owner "stands to gain or lose the most from the tribunal's determination of the value of his property." *Thirteen Parcels of Land,* 534 F.2d at 138.

Accordingly, the evidence at trial establishes both that Yankee Atomic's property was taken and the value of the "just compensation" due for that taking.

## CONCLUSION

For the reasons set forth above and in Yankee Atomic's accompanying Post-trial Proposed Findings of Fact, the Court should enter judgment for Yankee Atomic for damages on its breach of contract claim in the amount of $184,970,154 and for just compensation on its Takings claim in the amount of $9600.

Dated: November 17, 2004

Respectfully submitted,

s/ Jerry Stouck
JERRY STOUCK
Spriggs & Hollingsworth
1350 I Street, N.W., Ninth Floor
Washington, D.C. 20005
(202) 898-5800
(202) 682-1639

Counsel for Plaintiff,
YANKEE ATOMIC ELECTRIC COMPANY

Of Counsel:

Robert L. Shapiro
SPRIGGS & HOLLINGSWORTH