IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| YANKEE ATOMIC ELECTRIC COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 98-126C<br>(Senior Judge Merow) |

DEFENDANT'S INITIAL POST-TRIAL BRIEF[1]

Pursuant to this Court's order dated September 21, 2004, defendant, the United States, respectfully submits its initial post-trial brief.

SUMMARY OF ARGUMENT

The Yankees have created a damages claim wholly based upon a house of cards. The Yankees seek payment of more than $550 million, while also demanding DOE's continuing performance under the "Standard Contract For Disposal Of Spent Nuclear Fuel And/Or High-Level Radioactive Waste" ("Standard Contract"), and the right to seek additional damages, even though they have collectively paid less than $150 million into the Nuclear Waste Fund. To reach the ultimate damages that they have presented to the Court, the Yankees need the Court to engage in a multi-step process and accept every single "factual" prerequisite upon which their claims are based. If the Court rejects even one of the assumptions in the series of improbabilities that the Yankees have proposed, the elements that they need to prove causation and resultant damage fail, and the Court cannot award any damages because the Yankees elected not to present any alternative damages scenarios. As a result, the Yankees have placed their recovery of any

[1] The Government requests that this post-trial brief also be deemed applicable in Connecticut Yankee Atomic Power Co. v. United States, No. 98-154C, and Maine Yankee Atomic Power Co. v. United States, No. 98-474C.

damages upon the gamble that this Court will adopt virtually every factual assumption that they and their experts have made in this litigation.

The Yankees' damages claim first requires the Court to find that DOE was obligated to accept spent nuclear fuel ("SNF") from contract holders beginning in 1998 at a specific five-year ramp-up rate that they selected for this litigation[2] followed by a 3,000 Metric Tons Uranium ("MTU") annual SNF acceptance rate. However, none of those rate assumptions actually appear in the Standard Contract, and the evidence and applicable case law do not support the imposition of the Yankees' litigation-driven rate.

If the Court accepts their arguments regarding the acceptance rate, the Yankees next need the Court to accept either that a hypothetical economic "exchanges" model accurately establishes that the Yankees would have moved forward in the contract's SNF acceptance queue through a series of unidentified and undefined hypothetical exchanges of SNF acceptance allocations, as modeled by their expert, Mr. Frank Graves, or that DOE was obligated to provide them with priority in the acceptance of their SNF because of their status as shutdown reactors.

As for the hypothetical exchanges, assuming the applicability of these minimum mandatory "ramp-up" and annual acceptance rates, Mr. Graves attempts to establish the date by which DOE "would have" removed all of each of the Yankees' SNF, based upon a series of unidentified hypothetical "exchanges" of SNF acceptance allocations between unidentified contract holders. His theoretical model ultimately concludes that, based upon these unidentified hypothetical series of exchanges, had DOE begun SNF acceptance by January 31, 1998, it would

---

[2] Specifically, the Yankees need the Court to impose into the Standard Contract an obligation upon DOE to accept exactly 1,200 MTUs of SNF in 1998; 1,200 MTUs in 1999; 2,000 MTUs in 2000; 2,000 MTUs in 2001; and 2,700 MTUs in 2002.

have removed all of Yankee Atomic's SNF from its facility by 1999, all of Connecticut Yankee's by 2001, and all of Maine Yankee's by 2002. However, Mr. Graves' model is entirely based upon economic theory, not upon evidence adduced at trial. Indeed, in creating his model, Mr. Graves failed to speak with any utility, including the Yankees, and further failed to review any historical documents from the Yankees that call into question his underlying theoretical premise.

As for priority, the Yankees' arguments that DOE would have provided, or was obligated to provide, them with priority as a shutdown reactor based upon a contract clause granting DOE the discretion to grant priority are simply unsupported by the record in this case. Indeed, the record establishes that DOE has consistently rejected all requests for priority and that the nuclear utility industry generally opposes any grant of priority for shutdown reactors. The Yankees have completely failed to show that, even if DOE granted priority, its SNF would have been removed by the dates that Mr. Graves selected or by any other dates from which damages could be calculated under the evidence presented at trial.

If the Court does not accept the Yankees' assertions that an exchanges market or priority would have resulted in the acceptance of all of the Yankees' SNF by 1999, 2001, and 2002, the Yankees cannot establish causation for their claimed damages, having elected not to present any evidence that the costs that they incurred for dry storage construction, continuing wet storage, or continuing dry storage were "caused" by DOE's delay without reference to those dates. The only evidence that the Yankees have offered regarding the reasons for their decisions to build dry storage and the reasons that DOE is obligated to pay their storage costs is based upon the assumption that DOE was obligated to remove their SNF by the dates that they have specified. Because the evidence and the contract language do not support their assertions, this Court, if it

rejects any of the foundations upon which their causation analysis is based, need not proceed further.

Even assuming that the Court adopts Mr. Graves' hypothetical exchanges model results or grants the Yankees priority, before the Court can award the Yankees damages, it must accept additional assumptions that the Yankees make. For example, the Yankees assert that the Government was somehow obligated to accept all of their Greater-Than-Class-C radioactive waste ("GTCC"), even though neither the Nuclear Waste Policy Act, 42 U.S.C. §§ 10101-10270, nor the Standard Contract require DOE to accept GTCC, and that DOE would have accepted that GTCC on the same schedule as SNF, even though it was not contractually obligated to do so. The Court must also find that DOE was obligated to accept all of the Yankees' failed fuel on the same schedule as its "standard" fuel, even though the Standard Contract permits DOE to remove failed fuel from the acceptance queue and accept it at a later date. The Yankees would have to incur significant costs for their indefinite storage of GTCC and failed fuel (including security and other operations and maintenance costs) regardless of DOE's delay, and the Yankees cannot place themselves in a better position than they would have been absent the breach by shifting those costs to the Government.

The Yankees' decision to pursue an "all or nothing" judgment predicated upon unusually favorable factual premises can be explained by reference to the significant evidence adduced at trial. Once a lower acceptance rate is accepted, as the Yankees did prior to this litigation, or once Mr. Graves' early (and unsupported) fuel-out dates and priority are rejected, the evidence shows that each of the Yankees assumed lengthy non-breach storage obligations and that each would have constructed the dry storage facilities for which they now seek reimbursement. Because they

have failed to establish that their claimed damages were caused by DOE's delay or were incremental to DOE's delay, the Yankees have no basis to recover any damages in this litigation.

## DISCUSSION

### I. THE YANKEES BEAR THE BURDEN OF PROVING EVERY ELEMENT OF THEIR DAMAGES CLAIMS, INCLUDING LIABILITY, CAUSATION, AND RESULTANT DAMAGE

#### A. The Yankees Bear The Burden Of Proving All Elements Of Their Damages, Including The Fact Of Damage, By Preponderant Evidence

To recover damages, a plaintiff "must prove the requirements for an award of damages by a preponderance of the evidence," and these "requirements include: causation, foreseeability, and reasonable certainty in the amount of damages." Alaska Pulp Corp. v. United States, 59 Fed. Cl. 400, 413-14 (2004). According to the precedent of this circuit, the Yankees bore the burden of introducing clear proof that they were injured as a direct result of DOE's delay in accepting their SNF. Myerle v. United States, 33 Ct. Cl. 1, 27 (1897). The venerable decision in Myerle continues to represent the binding standard of this circuit. Glendale Federal Bank v. United States, 239 F.3d 1374, 1382 (Fed. Cir. 2001) (non-breaching party may recover reliance "damages for any losses actually sustained as a result of the breach"). Further, the "measure of damages to be applied in the particular case is irrelevant until the claimant has established the fact of losses that were the natural and proximate result of the breach of contract." Willems Indus., Inc. v. United States, 155 Ct. Cl. 360, 376, 295 F.2d 822, 831 (1961). "Absent tangible proof of damages, [a party] may not recover for an alleged injury." Roseburg Lumber Co. v. Madigan, 978 F.2d 660, 667 (Fed. Cir. 1992).

B. The Yankees Cannot Establish Causation Or Resultant Damage Through Speculation

In analyzing whether the Yankees have met their burden of proof, this Court is guided by the well-established rule that damages claims must be certain and not speculative to warrant a remedy. San Carlos Irrigation & Drainage Dist. v. United States, 111 F.3d 1557, 1563 (Fed. Cir. 1997). Indeed, "contract law precludes recovery for speculative damages." Id. This Court has held that damages based upon speculative expectations "are not recoverable in a common-law suit for breach of contract." Northern Helex Co. v. United States, 207 Ct. Cl. 862, 886, 524 F.2d 707, 720-21 (1975); accord Standard Havens Prods., Inc. v. Gencor Indus., Inc., 953 F.2d 1360, 1375 (Fed. Cir. 1992); see Wells Fargo Bank, N.A. v. United States, 88 F.3d 1012, 1021-23 (Fed. Cir. 1996), cert. denied, 520 U.S. 1116 (1997). The principles disallowing the award of speculative damages are "especially true in suits against the United States for the recovery of common-law damages." Northern Helex, 207 Ct. Cl. at 886, 524 F.2d at 720; accord Wells Fargo, 88 F.3d at 1020 (quoting Northern Helex).[3]

The Yankees bear the burden of establishing that their claimed damages are not speculative, remote, or unforeseeable. Quiman, S.A. de C.V. v. United States, 39 Fed. Cl. 171, 183 (1997), aff'd, 178 F.3d 1313 (Fed. Cir. 1999). They further bear the burden of establishing reasonable certainty as to each item within their damages claims. Wells Fargo Bank, 88 F.3d at 1023; see also Restatement (Second) of Contracts § 352 cmt. a ("[a] party cannot recover

[3] To be recoverable, damages also must be direct and not the result of any intervening incident. See Ramsey v. United States, 121 Ct. Cl. 426, 434, 101 F. Supp. 353, 357 (1951). "For a damage to be direct there must appear no intervening incident . . . ; the cause must produce the effect inevitably and naturally, not possibly nor even probably." Id. at 434, 101 F. Supp. at 357. "There must not be two steps between cause and damage." Myerle, 33 Ct. Cl. at 27.

damages for breach of a contract for loss beyond the amount that the evidence permits to be established with reasonable certainty"). If these burdens are not met, damages cannot be awarded.

## II. THE YANKEES FAILED TO PROVE THEIR BASIC ASSUMPTION THAT DOE WAS OBLIGATED TO ACCEPT SNF AT AN ANNUAL RATE OF 3,000 MTUs OR AT A SPECIFIC "RAMP-UP" RATE FOR THE FIRST FIVE YEARS OF SNF ACCEPTANCE UPON WHICH THE YANKEES' DAMAGES CLAIMS RELY

### A. The Yankees Have Failed To Establish That DOE Was Obligated To Accept SNF At A Rate Sufficient To Preclude Additional At-Reactor Storage And To Accept Some "Backlog" Of Utility-Stored SNF

One of the base assumptions that underlies all of the Yankees' damages claims is that DOE was obligated to accept SNF beginning in 1998 at an annual rate of 3,000 Metric Tons Uranium ("MTU"), after a short five-year "ramp-up" period. The Yankees appear to contend that DOE contractually obligated itself to accept SNF and/or HLW at a rate that (1) would eliminate the need for utilities to provide additional on-site storage after January 31, 1998, and (2) would work off the backlog of SNF and/or HLW already stored by utilities up until that deadline. They assert that, to meet this goal, DOE would have to accept SNF at a rate of 3,000 MTUs per year, after a short five-year "ramp-up" period. In his hypothetical exchanges model, which forms the basis of the Yankees' efforts to establish causation for their alleged damages, Mr. Graves assumes that DOE was obligated to accept SNF at this 3,000 MTU rate. The Yankees' basic assumptions are wholly in error and unsupported by either the Standard Contract or the NWPA.

The evidence is completely contrary to the Yankees' assertions that DOE was required to create an acceptance rate that satisfied the Yankees' two-part "test." As the Court is aware, DOE published the Standard Contract at issue here as a "proposed rule" in the Federal Register. PFOF

12. In response to that proposed rule, several nuclear utilities and industry groups submitted comments, requesting, among other things, that DOE place into the Standard Contract an obligation requiring DOE to accept SNF at some pre-determined minimum rate or to adopt as contractual obligations the acceptance rates that would be identified in the statutorily-required Mission Plan. PFOF 25, 27, 30, 32. Although "[a]ll comments received by DOE in response to its proposed rule of February 4, 1983, both at the public hearing and the written comments received thereafter, were carefully reviewed and fully considered in the formulation of this final rule," 48 Fed. Reg. 16,590, 16,590 (Apr. 18, 1983), DOE declined to agree to such requests. In the final Standard Contract that it promulgated in the Federal Register, DOE intentionally excluded the creation of any contractual obligations to meet any pre-determined acceptance rate. PFOF 55-58.

Instead of agreeing to a specific minimum acceptance rate or creating standards that would obligate DOE to satisfy a minimum rate, the Standard Contract creates a contractual mechanism for the development of a specific acceptance schedule that establishes, in essence, a two-phase process. First, the Standard Contract's schedule terms seek to obtain the agreement of the parties to a specific schedule for the acceptance of an individual contract holder's SNF and HLW. Pursuant to the terms of the Standard Contract, DOE was to issue, beginning not later than July 1, 1987, "an annual capacity report [("ACR")] for planning purposes," identifying "projected annual receiving capacity" at any DOE facilities and annual acceptance ranking for acceptance of contract holders' SNF and/or HLW for the first 10 years "following the projected commencement of operation of the initial DOE facility." 10 C.F.R. § 961.11, Art. IV.B.5(b). Subsequently, beginning on April 1, 1991, DOE was to issue "an annual acceptance priority

ranking" ("APR") for receipt of the contract holders' SNF, "based on the age of SNF and/or HLW as calculated from [its] date of discharge." Id., Art. IV.B.5(a).

Second, the contract holder, "[a]fter DOE has issued its proposed acceptance priority ranking" on April 1, 1991, and no earlier than January 1, 1992, would submit a delivery commitment schedule ("DCS") identifying "all SNF and/or HLW the [contract holder] wishes to deliver to DOE beginning sixty-three (63) months thereafter," for DOE's approval or disapproval. 10 C.F.R. § 961.11, Art. V.B.1. If DOE approves the DCS, the parties have effectively agreed and defined the amount of SNF that DOE will accept from that contract holder 63 months later. Id. If DOE disapproves the first DCS submission, the contract holder is entitled to make a second DCS submission, again for DOE's approval or disapproval. Id. If DOE approves the second DCS submission, the parties have, as stated above, effectively defined the amount of SNF that DOE will accept from that contract holder 63 months later. Id. If DOE disapproves the second submission, DOE responds with its own proposed schedule, which the contract holder may accept or, alternatively, may attempt to negotiate with DOE, with a right to appeal to the Energy Board of Contract Appeals if the disagreement cannot be resolved through negotiation. Id., Art. V.B.2 & XVI.A; see McDonnell Douglas Corp., ASBCA No. 26747, 83-1 BCA ¶ 16,377, at 81,421 (1983) (boards of contract appeals "[h]istorically and traditionally" assumed jurisdiction over non-monetary "disputes as to the interpretation of contract provisions and determination of the rights and obligations of the parties under the provisions of the contract").

Nothing in those terms creates an obligation upon DOE's part to accept SNF at a rate that (1) would eliminate the need for utilities to provide additional on-site storage after January 31, 1998, and (2) would work off the "backlog" of SNF. In fact, the Yankees can identify absolutely

no contractual language in the Standard Contract creating any such obligation. Further, the integration clause in the Standard Contract, Article XXII.A, expressly precludes reading any unwritten "agreement" into the contract: "Any representation, promise, or condition not incorporated in this contract shall not be binding on either party," and "[n]o course of dealing or usage of trade or course of performance shall be relevant to explain or supplement any provision contained in the contract." PFOF 63 (DX 6, 7, & 8, Art. XXII.A). The Yankees' proposed requirement for a rate that precludes additional at-reactor storage and reduces the "backlog" of SNF violates standard rules of contract interpretation. As this Court recently recognized in another SNF case in response to the same argument that the Yankees are raising, "[n]one of the demanded terms is found in the contract; and it is clear that the parties shared no meeting of the minds regarding those terms, as was made clear to all during contract negotiations." Florida Power & Light Co. v. United States, No. 98-483C, slip op. at 9 n.12 (Fed. Cl. Oct. 14, 2004) (unpublished).

Further, it is clear that, even if the Court were to accept parol evidence to determine whether the contract contains any such obligation, the Yankees consistently understood that it did not. In interpreting the requirements of a contract, the behavior of parties before the "advent of controversy" is often more revealing than the contract language alone. Omni Corp. v. United States, 41 Fed. Cl. 585, 591 (1998). "A principle of contract interpretation is that the contract must be interpreted in accordance with the parties' understanding as shown by their conduct before the controversy." Julius Goldman's Egg City v. United States, 697 F.2d 1051, 1058 (Fed. Cir. 1983), cert. denied, 464 U.S. 814 (1983). Here, the history of the notice-and-comment rulemaking itself is extremely clear in evidencing that DOE did not obligate itself to satisfy the

Yankees' two-part test and that the nuclear utilities were well aware of that fact. PFOF 25, 27, 30, 32, 55-58. Further, in the Yankees' own internal documents from 1983 and 1984, soon after the Standard Contract was executed, the Yankees indicated that DOE had not obligated itself in the contract to satisfy a minimum performance rate, and some of their witnesses testified at trial that they understood that DOE had never agreed to satisfy any specific rate of acceptance. PFOF 70.a-.f. Further, in submitting DCSs to DOE in the early 1990s, none of the Yankees ever complained that the acceptance rates upon which DOE had requested the contract holders base their DCSs were somehow inappropriate or in conflict with the requirements of the Standard Contract. PFOF 107, 109, 111, 115. To the contrary, Yankee Atomic requested that DOE grant it priority in SNF acceptance because of its status as a shutdown reactor, but never asserted that the rates that DOE had identified for SNF acceptance were too low. PFOF 111-115. The Yankees' "understanding" that DOE had some minimum acceptance rate obligation was created after disputes about timely SNF acceptance began. The contemporaneous evidence should preclude any reading of the Yankees' two-part test into the Standard Contract.

B. The Yankees Have Failed To Establish That An Annual Acceptance Rate Of 3,000 MTU Is Necessary To Satisfy The Requirements To Which The Yankees Contend DOE Obligated Itself Or That DOE Ever Obligated Itself To Satisfy A 3,000 Rate

Even if the Yankees could establish the existence of the two-part requirement (eliminating additional at-reactor storage, and accepting some "backlog"), they failed to establish at trial that an annual steady-state rate of 3,000 MTU is necessary to satisfy that "requirement." Having established that the annual generation rate of SNF is approximately 2,000 MTUs per year, Tr. 712:9-18, 770:10-12, 1151:5-6, they offered no evidence at trial that an acceptance rate

of 2,100 MTUs would not satisfy the alleged two-part requirement that they identified. In fact, the Yankees' own witnesses testified that an annual SNF acceptance rate well below 3,000 MTU could satisfy this two-part requirement. Tr. 712:16-18 (Bartlett); Tr. 909:15-25 (Graves); see Tr. 382:3-12 (Mills). On its face, an acceptance rate anywhere from 2,001 MTUs or above would seem to satisfy that alleged requirement, yet the Yankees presented no testimony to establish the reasons that a 3,000 MTU rate was, in fact, the only acceptable acceptance rate. The absence of this evidence precludes any finding that some annual rate lower than 3,000 MTU would be insufficient to meet this unwritten requirement.

During trial, the Yankees appeared to assert that the 3,000 MTU rate is somehow mandatory because it has appeared in numerous DOE planning documents. However, the documents upon which the Yankees rely to evidence DOE's eventual "intent" to accept 3,000 MTUs of SNF annually depend upon the existence of an operational repository. PFOF 71. Yet, the Standard Contract does not require DOE to begin SNF acceptance at a repository. To the contrary, the language of the Standard Contract explicitly contemplates that DOE may accept SNF either at a repository or at "such other facility(ies) to which [SNF] and/or [HLW] may be shipped by DOE prior to its transportation to a disposal facility." PFOF 50; see 10 C.F.R. § 961.11, Art. I.10. In fact, between the proposed rule and the final rule, the definition of the type of "facility" to which DOE could deliver SNF was expanded to expressly state, in accordance with the [NWPA], that there may be an interim storage facility (or facilities) which DOE may utilize prior to emplacement in a repository." 48 Fed. Reg. 16590, 16591 (Apr. 18, 1983). As we discussed in prior briefing upon summary judgment, pursuant to the rationale of the United States Court of Appeals for the District of Columbia Circuit in Indiana Michigan

Power Co. v. Department of Energy, 88 F.3d 1272 (D.C. Cir. 1996), DOE was not obligated to have an operational repository by January 31, 1998, precluding any argument that DOE was somehow obligated to accept SNF at the rates it had anticipated for SNF acceptance at a repository. Because DOE was entitled to accept SNF at a facility other than a repository, the Yankees' reliance upon planning documents relating to SNF acceptance at a repository is meaningless.

Further, the planning documents upon which the Yankees rely uniformly and expressly indicate that they are "not contractually binding," that they do not establish acceptance rates that create mandatory obligations, and that they were only for planning purposes. PFOF 71, 73, 79. Each Annual Capacity Report issued between 1987 and 1990 expressly advised contract holders that, in 1991, but not before, DOE would begin publishing firm individual utility acceptance schedules in accordance with the contracts, including shipment allocations. PFOF 80. Although the Yankees appear to rely in part upon the 1985 Mission Plan and its drafts to establish DOE's "intent" to accept SNF at a 3,000 annual rate, several commenters, prior to the promulgation of the final Standard Contract, had requested that DOE add a contract provision obligating itself to accept SNF at whatever rates were identified in the Mission Plan. PFOF 30-31. However, DOE intentionally declined to create any such obligation. PFOF 54-58.[4] The Yankees have identified

[4] Importantly, the 1985 Mission Plan upon which the Yankees rely was created pursuant to a statutory requirement for submission to Congress. 42 U.S.C. § 10221(b)(3) After DOE submitted the 1985 Mission Plan and a 1987 Mission Plan Amendment to Congress, Congress enacted the 1987 amendments to the NWPA, presumably after considering DOE's Mission Plan submissions and evaluating the state of DOE's program. As it was entitled to do, Congress significantly modified the scope of the program at that time, limiting DOE's focus for development of a repository to one site, Yucca Mountain, and establishing linkages between a Monitored Retrievable Storage ("MRS") facility and a repository. 42 U.S.C. §§ 10133, 10161-69. The Yankees' reliance upon documents prepared for Congress that relate to possible

no language in which DOE somehow agreed or even suggested that the acceptance rates in any planning documents which DOE issued were contractually binding or constituted anything other than DOE's hopes and goals for its program.

In National By-Products, Inc. v. United States, 186 Ct. Cl. 546, 405 F.2d 1256 (1969), the Court of Claims recognized that, "[b]efore a representation can be contractually binding, it must be in the form of a promise or undertaking . . . and not a mere statement of intention, opinion, or prediction." Id. at 558-59, 405 F.2d at 1263. In a dispute involving whether the Government had contractually agreed that it would built a right-bank levee, the Court in National By-Products determined that, although the Government's representative had represented during contract negotiations "that in its then view the right-bank dike would eventually come into being," such "a representation, without more, would not indicate the Government's commitment to build it, or its guarantee that it would be built." Id. at 570-71, 405 F.2d at 1270. "Rather, the representation would simply mirror the Government's current belief, opinion or prediction, even its fervent hope that this would occur," which could not constitute a contractual obligation upon the Government's part. Id. at 571, 405 F.2d at 1270; see id. at 570, 575, 405 F.2d at 1269, 1272 ("we attribute the Corps' activity in later acting as a catalyst for local action to provide right-bank protection to its public-minded concern with the problem . . . and not to any feeling of *contractual* liability" (italics in original)); see Commercial Metals Co. v. United States, 176 Ct. Cl. 343, 349 (1966) ("the Railroad's historical practice – which has not been incorporated in any

---

circumstances and scenarios that could have existed prior to congressional review of and action upon those pre-amendment planning documents does not support its argument that DOE has somehow obligated itself to accept SNF at a 3,000 MTU rate, regardless of whether a repository is available.

written pronouncement for the information of the public – could not modify the plain language of the sales contract between the plaintiff and the Railroad . . . ."); Branhill Realty Co. v. Montgomery Ward & Co., 60 F.2d 922, 923 (2d Cir. 1932) (although parties discussed lessee's use of leased premises as chain store, lessee "did not bind itself so to do" in the contract, so that lessee "might, at its option, use them either for a chain store or for any lawful purpose"). Because DOE has never obligated itself to satisfy a 3,000 MTU acceptance rate, the Court cannot incorporate such a requirement into the Standard Contract.

### C. The Yankees Have Failed To Establish That The Standard Contract Required DOE To Adopt The Specific "Ramp-Up" Rate Upon Which The Yankees Rely

The Yankees also rely upon a specific ramp-up rate that they appear to contend that DOE was obligated to satisfy: specifically, DOE would accept exactly 1,200 MTUs of SNF in 1998; 1,200 MTUs in 1999; 2,000 MTUs in 2000; 2,000 MTUs in 2001; and 2,700 MTUs in 2002. The Yankees' expert witness, Mr. Graves, relies upon this specific ramp-up rate in conducting his hypothetical exchanges model, which will be discussed below, and the results of his model are completely dependent upon the use of this "ramp-up rate." PFOF 190. The only testimony regarding the reasons for using this ramp-up rate came from Mr. Graves, who testified that he used it because it appeared in DOE documents. Tr. 780:6-13; 783:9-784:7. However, the ramp-up rates upon which Mr. Graves relied were not developed by DOE, but, instead, were included in legislation that was pending in Congress for the construction of a centralized interim storage facility that was never enacted. PFOF 125. The 1999 document from which Mr. Graves took these "rates" were mandated by the proposed legislation, id., and, accordingly, were not used to "plan" DOE's actual performance.

Further, numerous documents containing numerous alternative ramp-up rates were contained in other DOE documents, including actual planning documents. See PFOF 74, 125.c. The Yankees failed to establish at trial that DOE was obligated under the terms of the Standard Contract to accept SNF at the "ramp-up" rates that Mr. Graves identified or under any of the alternative ramp-up rates identified in other DOE planning documents. Interestingly, Mr. Graves initially modeled other lower ramp-up rates, but he did not include those ramp-up rates in his final opinion. PFOF 125.b. Because they failed to present any evidence that DOE was obligated to accept SNF under the ramp-up rates upon which Mr. Graves relied, they cannot use those in his hypothetical exchanges model.

### D. To The Extent That The Court Finds It Necessary To Define A Rate Of SNF Acceptance For The Standard Contract, Nothing In The Standard Contract Precluded DOE From Performing At A Minimal Rate

#### 1. At Most, The Acceptance Schedule To Which DOE Could Be Held To Perform Could Not Exceed The Rates Contained In The DCSs That It Approved

As will be explained below in our discussion of Mr. Graves' hypothetical model, this Court need not define the specific minimum rate of SNF acceptance under which DOE could have performed without breaching the Standard Contract. Mr. Graves' hypothetical model is wholly dependent upon a specific "ramp-up" rate and a 3,000 MTU annual rate of SNF acceptance. Except for their unsupported theory that DOE would have given them priority in SNF acceptance, the Yankees base the entirety of their causation evidence upon Mr. Graves' hypothetical model. Without that model, and without their theory of priority acceptance, they have failed to present any evidence of causation for any of their claimed damages. Accordingly, once the Court rejects the Yankees' unsupported argument that the Standard Contract requires a

specific "ramp-up" rate and a 3,000 MTU annual acceptance rate, it will not need to identify the specific rate of acceptance to apply to this contract because the Yankees' proof of causation for any damages will have failed.

Nevertheless, to the extent that the Court finds it necessary to define a specific rate of SNF acceptance applicable to the Standard Contract, the maximum rate that it can identify should be by reference to the DCSs that the Yankees submitted and DOE approved. In its June 26, 2003 decision upon the Government's motion for summary judgment, the Court placed the issue of the meaning and effect of the DCSs in issue for trial in this case. In its decision, the Court relied upon this Court's decision in Commonwealth Edison Co. v. United States, 56 Fed. Cl. 652 (2003), in which the Court found that "plaintiff's submission and defendant's acceptance of the proposed DCSs did not create a contractually binding obligation for either party." Id. at 666. However, to the extent that DCSs were not "contractually binding," that fact does not render the submission of DCSs meaningless. To the contrary, under the acceptance mechanism of the Standard Contract, a contract holder had to submit a DCS to DOE for a specific amount of SNF 63 months in advance of the date upon which it wanted DOE to accept that amount of SNF. 10 C.F.R. § 961.11, Art. V.B.1. Under the Standard Contract, if the contract holder did not submit that DCS in a timely manner, the contract holder would not have satisfied the contract prerequisites and requirements for scheduling SNF deliveries and acceptances.

Although the Yankees and numerous other contract holders submitted DCSs in this case that DOE approved, the Yankees appear to believe that, regardless of those submissions, they had some right to some greater acceptance of SNF beginning in 1998. Yet, they failed to present any evidence at trial regarding how they, or any other contract holder, would have been able to

convince DOE, in 1998, to accept significantly more SNF than that identified in previously approved DCSs. Under their theory of the contract, had DOE begun SNF acceptance in 1998, all of the previously approved DCSs would have been worthless, and DOE would somehow have accepted SNF in substantially greater quantities than those to which it previously had agreed. In essence, the Yankees simply read the 63-month notice requirement in the acceptance schedule contract provisions out of the contract, in violation of standard contract interpretation principles. See Gould, Inc. v. United States, 935 F.2d 1271, 1274 (Fed. Cir. 1991).

Under the Yankees' theory, DOE will magically know when each contract holder wants SNF accepted, without regard to the DCSs that the contract holders submit; each contract holder's desires will magically correspond to the "oldest fuel first" requirements of the Standard Contract; DOE will have no problems simply taking SNF from every contract holder when each wants acceptance, regardless of space, capacity, staffing, or transportation limitations or notice; and DOE will have no problem with the significant financial repercussions and waste that it will suffer if a contract holder is not prepared to deliver SNF to DOE when DOE arrives at the contract holder's site with the appropriate transportation casks contemplated by the Standard Contract. By reading the DCS process out of the Standard Contract, the Yankees have eliminated the only mechanism that would allow the parties to plan for, and commit themselves to, actual performance under the Standard Contract. Without enforcement of the DCS provisions, the Standard Contract cannot function. The Yankees' attempts to obtain damages based upon acceptance obligations that far exceed any commitments that DOE made when approving DCSs 63 months before SNF acceptance was to commence are unsupported.

2. Because Of The Manner In Which The Contract's Schedule Provisions Grant DOE The Discretion To Define The Schedule, Any Damages Award Should Be Based Upon The Minimum Schedule That DOE Could Have Selected

The Yankees have argued in the past that, because the Standard Contract does not identify a minimum mandatory acceptance rate, the Court's role is to identify a "reasonable" rate for inclusion in the Standard Contract, and the Yankees suggest that the 3,000 MTU rate they propose is "reasonable." However, because the Standard Contract does not contain the requirements that the Yankees have suggested, the acceptance rates that they have proposed lack any basis. Further, and importantly, because of the manner in which the acceptance schedule mechanism in the Standard Contract is drafted, this Court may not simply identify a rate that it believes "reasonable" and incorporate it into the contract. In light of the manner in which the acceptance schedule contract provisions in this contract were written, DOE can, at best, be held responsible for failing to accept SNF at the minimum rate at which it could have performed its obligations in accordance with the Standard Contract.

The Standard Contract's schedule terms provide DOE with the option of selecting any one of numerous potential acceptance scenarios, subject only to review by the EBCA for abuse of discretion, the schedule terms act as a form of "alternative contract." "An alternative contract is one in which a party promises to render some one of two or more alternative performances [any] one of which is mutually agreed upon as the bargained-for equivalent given in exchange for the return performance by the other party." 11 A. Corbin, Corbin on Contracts § 1079, at 394 (interim ed. 1979); see Restatement of Contracts § 344 cmt. a, at 565 (1932) ("[a]n alternative contract is one wherein A promises B some one of two or more alternative performances"). "A

promise of one of several alternative performances will give the choice of alternatives, unless the contrary is stated, to the person who is to render the performance." 11 W. Jaeger, Williston on Contracts § 1407, at 592 (3d ed. 1968); see 11 A. Corbin, supra, § 1079, at 394 ("[t]he choice among these alternatives, the power of election, is usually given to the promisor"). In such circumstances, "he has power to discharge his contractual duty by performing either alternative." 11 A. Corbin, supra, § 1079, at 394; see Restatement of Contracts § 344 cmt. a, at 565 (1932) ("[t]he option may be given to A, in which case he has power to discharge his duty by performing either alternative").

If the promisor breaches its obligations under the alternative contract, the measure of damages is not an amount that the promisee or the Court determines is most attractive or most reasonable of the possible alternative methods of performance that the promisor could have elected, but instead is the "least valuable," or least costly to the promisor, of the possible alternative performances:

> The damages to which the promisee would be entitled in case of breach of such a promise would be based on the least valuable of the alternative performances. . . . A promise to give any one of a thousand specified things as the promisor may choose, though it cannot be enforced specifically, is not too indefinite to have a clear meaning, and the promisee's damages would be the value of the least valuable of the one thousand things. The same is true of a promise to perform whenever within a specified period of time the promisor may choose.

1 R. Lord, supra, § 4:24, at 557-58 (emphasis added). The Restatement of Contracts succinctly defines this rule as follows:

> The damages for breach of an alternative contract are determined in accordance with that one of the alternatives that is chosen by the party having an election, or, in case of breach without an election,

> in accordance with the alternative that will result in the smallest recovery.

Restatement of Contracts § 344, at 565 (1932) (emphasis added); see Koby v. United States, 53 Fed. Cl. 493, 501 (2002) ("general rule is that, unless the contract specifically preserved the right of election for the promisee, 'in the case of breach without an election (of alternatives), [damages] (shall be) in accordance with the alternative that will result in the smallest recovery'" (quoting In the Matter of Community Med. Ctr., 623 F.2d 864, 867-68 (3d Cir. 1980)) (brackets and parentheses in original); Branhill Realty, 60 F.2d at 923 ("[w]here a promisor has agreed to alternative performances, in case of breach without an election, the damages are measured by the alternative that will result in the smallest recovery"); 11 W. Jaeger, supra, § 1407, at 593 (where "no choice has been made" between the various alterative methods of performance, "either expressly by the promisor or automatically by the terms of the contract or by law, the measure of damages . . . is the value of the alternative least onerous to the defendant" (emphasis added)); see also White v. Delta Constr. Int'l, Inc., 285 F.3d 1040, 1043 (Fed. Cir. 2002) ("damages for breach of contract shall place the wronged party in as good a position," but not a better position, "as it would have been in, had the breaching party fully performed its obligation" (emphasis added)).[5]

"The *ratio dicendi* for this rule is that the court may not place the promisee in a better position than had the contract been performed – it presumes that the promisor had bargained for

[5] "An inconsistent and, it seems, erroneous rule has been laid down in a few cases which hold that if the promisor fails to make an election the promisee thereupon has the option." 11 W. Jaeger, supra, § 1407, at 594. However, this minority view is incorrect. Id.; see Community Med. Cntr., 623 F.2d at 868 (explaining that minority view "has garnered scholarly approval in only one situation – where the contract itself contains language granting the promisee the right to elect remedies"). Any grant of election of remedies to the utility plaintiffs would eliminate the discretion that the Standard Contract grants to DOE.

the flexibility of the alternatives and, therefore, should be liable for no more than the least expensive alternative he could have chosen." Koby, 53 Fed. Cl. at 501; see Liberty Bank v. Talman Home Mortgage Corp., 877 F.2d 400, 407 n.10 (5th Cir. 1989) ("[t]he rationale for this rule is simply: the promisor is held liable only for the cost of the least expensive alternative he could have chosen 'as a recognition of the flexibility which had been bargained for by the party in breach'"). To the extent that the Court determines that acceptance schedules have not already been defined through DCSs and that it must define the appropriate manner in which acceptance schedules, for purposes of evaluating plaintiffs' damages claims, should be identified, the Court must identify schedules that account for DOE's flexibility, absent an agreement to a particular DCS, to have selected among numerous SNF and HLW acceptance scenarios and apply the rule of alternative contracts that any plaintiff's damages for DOE's failure to accept SNF and/or HLW must be based upon "the value of the alternative least onerous to the defendant." 11 W. Jaeger, supra, § 1407, at 593.

In this case, the Standard Contract provides a specific mechanism for defining the schedule of SNF acceptance, requiring the contract holder to submit DCSs and Final Delivery Schedules ("FDSs") if it wants to define specific acceptance rights, the Government's review of those DCSs and FDSs, the Government's eventual identification of a proposed schedule if it does not approve of the contract holder's request, and the contract holder's right to challenge DOE's proposed schedule at the EBCA. 10 C.F.R. §§ 961.11, Arts. V.B & XVI.A. If the process proceeds to the stage in which DOE identifies the DCS or FDS amount to the contract holder, that selection is subject to review by the EBCA only for abuse of discretion. See 10 C.F.R. § 961.11, Art. XVI.A; see also Reservation Ranch v. United States, 39 Fed. Cl. 696, 714 (1997)

("when the parties to a contract vest one party with the discretion to make a critical factual determination under the contract, this court narrowly reviews that determination to ascertain whether that discretion was arbitrarily or capriciously exercised"), aff'd, 217 F.3d 850 (Fed. Cir. 1999). Because the Standard Contract provides DOE with broad discretion in determining the acceptance schedule for the Standard Contract, the acceptance schedule mechanism is essentially an "alternative contract" provision, and this Court cannot determine a "reasonable" schedule, substituting its views for the agency's, but instead can, at best, identify the minimum schedule under which DOE could have accepted SNF without breaching the Standard Contract. Because the Standard Contract does not contain any performance standards or requirements, other than a start date for the acceptance of SNF, DOE's discretion in identifying an acceptance schedule is extremely broad, including the right to select a slow rate of SNF acceptance. Here, to the extent that the Court finds it necessary to decide the rate of SNF acceptance applicable to this contract, it would need to identify a minimal mandatory rate. Since the Yankees presented no evidence to support any findings regarding that rate, they have failed to satisfy their burden of proof.

## III. THE YANKEES HAVE FAILED TO ESTABLISH WITH ANY CREDIBLE EVIDENCE THAT, THROUGH EXCHANGES OF APPROVED DELIVERY COMMITMENT SCHEDULES, DOE WOULD HAVE BEEN OBLIGATED TO ACCEPT ALL OF THEIR SNF BY 1999, 2001, AND 2002, RESPECTIVELY

### A. The Yankees' Causation Analysis Is Dependent Upon Mr. Graves' Hypothetical Exchanges Model

The predicate upon which the Yankees base their damages is the assumption that, assuming a specific "ramp-up" rate and a continuing annual acceptance of 3,000 MTUs, the Yankees would have exchanged SNF acceptance allocations with other contract holders and moved earlier in the acceptance queue. Although the Standard Contract provides that DOE will

initially allocate acceptance positions in its SNF acceptance queue based upon the age of the various contract holders' SNF, 10 C.F.R. § 961.11, Art. VI.B.1, it also provides that contract holders can "exchange approved delivery commitment schedules with parties to other contracts with DOE for disposal of SNF and/or HLW; *provided*, *however*, that DOE shall, in advance, have the right to approve or disapprove, in its sole discretion, any such exchanges." 10 C.F.R. § 961.11, Art. V.E (italics in original; underlining added). Using a hypothetical "exchanges" model created by their expert, Mr. Graves, the Yankees conclude that, through the use of exchanges, Yankee Atomic's final fuel-out date would have been in 1999, Connecticut Yankee's would have been in 2001, and Maine Yankee's would have been in 2002. PFOF 129. These fuel-out dates are substantially earlier than under the general rates of acceptance applied within the "oldest fuel first" acceptance queue. PFOF 127-128. In determining whether its specific requested damages were caused by DOE's failure to complete accepting the Yankees' SNF, the Yankees ask this Court to evaluate causation using these earlier fuel-out dates based upon "exchanges."

### B. As A Matter Of Law, A Hypothetical Model Must Have Adequate Factual Evidentiary Support

In determining whether a hypothetical model provides sufficient basis for an award of damages, the Court must determine whether the plaintiff has established a realistic and complete "but for" world. Dolphin Tours, Inc. v. Pacifico Creative Serv., Inc., 773 F.2d 1506, 1512 (9th Cir. 1985) ("[i]n projecting free market profits, antitrust plaintiffs are not entitled to assume favorable aspects of an anticompetitive market"); Restatement (Second) of Contracts § 347(c). Where, as here, plaintiffs attempt to prove that they have suffered damages using a computer

model of the hypothetical "but for" company premised upon a number of critical assumptions, the "failure to establish the reasonableness of these assumptions is fatal" to the damage claim. Southern Pac. Communications Co. v. AT&T, 556 F. Supp. 2d 825, 1076 (D.D.C. 1982), aff'd, 740 F.2d 1011 (D.C. Cir. 1984); see Kidder, Peabody & Co. v. IAG Int'l Acceptance Group N.V., 28 F. Supp. 2d 126, 133-34 (S.D.N.Y. 1998) (calculations based upon "series of assumptions and projections" prevent lost profits from being reasonably certain). Plaintiffs' damages models may not be based upon mere speculation or hypotheticals. Home Sav. of Am. v. United States, 57 Fed. Cl. 694, 727 (2003) (appeal pending) (citing Franklin Fed. Sav. Bank v. United States, 55 Fed. Cl. 108 (2003), & Willems Indus., Inc. v. United States, 155 Ct. Cl. 360, 295 F.2d 822 (1961)).

This Court has repeatedly rejected as inherently speculative expert models that lack evidentiary foundation, finding that the proof upon which a plaintiff relies in such models "must be rooted in fact" and that "[a] claim whose basic structural components lack such factual foundation is simply speculation." Castle v. United States, 48 Fed. Cl. 187, 206 (2000), aff'd in part, rev'd in part, 301 F.3d 1328 (Fed. Cir. 2002). A plaintiff's damages model must "be based on sufficient factual evidence, must use assumptions and calculations that are moored in that factual evidence, and must be credible." Columbia First Bank, FSB v. United States, 60 Fed. Cl. 97, 107-08 (2004); see Shockley v. Arcan, Inc., 248 F.3d 1349, 1362 (Fed. Cir. 2001) (plaintiff must supply "adequate evidence to enable the fact-finder to responsibly estimate future losses based on sound economic models and evidence, not pure guesswork").

In Fifth Third Bank v. United States, 55 Fed. Cl. 223 (2003), the Court rejected the plaintiff's damages model, explaining that the model failed because it created a certain result

"without identifying any specific investments or opportunities" that would have allowed the plaintiff to obtain the modeled result:

> Plaintiff's model ignores the presence of competitors similarly unfettered by the breaching provisions of FIRREA. But the most outstanding flaw is the assumption that the But-for-Bank would, even if it could, engage in the same type of activities without identifying any specific investments or opportunities, and that these activities would produce the same results (discounted to be conservative) as the actual business activities in which plaintiff engaged. The court agrees with defendant that this deficiency renders plaintiff's model speculative as a matter of fact and law.

Id. at 241 (emphasis added); see Shockley, 248 F.3d at 1363-64 (rejecting accounting expert's model because underlying assumption lacked factual underpinnings and, therefore, any basis in economic reality); Oiness v. Walgreen Co., 88 F.3d 1025, 1029-30, 1032 (Fed. Cir. 1996) (rejecting model where damages rested upon unsupported assumptions "fraught with speculation," plaintiff's expert "offered no sound economic reasoning to support his assumption," and expert's "projections lacked evidentiary support"), cert. denied, 519 U.S. 1112 (1997); accord Southern Nat'l Corp. v. United States, 57 Fed. Cl. 294, 305 (2003); see also Glendale Fed. Bank, FSB v. United States, 43 Fed. Cl. 390, 399 (1999) ("The court believes that plaintiff's lost profits model suffers from serious defects, which undercut the basis for using it as a credible model for ascertaining lost profits . . . ."), aff'd in relevant part, vacated in part, 239 F.3d 1374 (Fed. Cir. 2001); Suess v. United States, 52 Fed. Cl. 221, 228 (2002) (rejecting damages model as "premised on unrealistic assumptions").

The Supreme Court is in accord. Specifically, the Supreme Court has held that expert opinion cannot sustain a judgment when the opinion "is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render

the opinion unreasonable." Brooke Group Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S. 209, 242 (1993). Where expert testimony is speculative, it is not competent proof, and such testimony contributes "nothing to a 'legally sufficient evidentiary basis.'" Weisgram v. Marley Co., 528 U.S. 440, 454 (2000) (citing Brooke Group, 509 U.S. at 242). As the Supreme Court instructed, while "[e]xpert testimony is useful as a guide to interpreting market facts, . . . it is not a substitute for them." Brooke Group, 509 U.S. at 242; see Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 594 n.19 (1986) (expert opinion evidence "has little probative value in comparison with the economic factors.").

The decisions of courts outside this Circuit support the conclusion that hypothetical expert models which lack evidentiary support must be rejected. The United States Court of Appeals for the Eighth Circuit has held that deficiencies in the foundation of an expert's opinion resulted in conclusions that were "mere speculation." Concord Boat Corp. v. Brunswick Corp., 207 F.3d 1039, 1057 (8th Cir. 2000). Similarly, in Virgin Atlantic Airways Ltd. v. British Airways PLC, 69 F. Supp. 2d 571 (S.D.N.Y.1999), aff'd, 257 F.3d 256 (2d Cir. 2001), the district court held that "an expert's opinion is not a substitute for a plaintiff's obligation to provide evidence of facts that support the applicability of the expert's opinion to the case." Id. at 579-80; see Elkind v. Liggett & Meyers, Inc., 635 F.2d 156, 170-172 (2d. Cir.1980) (rejecting expert testimony on the price at which the market would have valued the stock if there had been disclosure as hypothetical and "entirely speculative"); Callahan v. A.E.V., Inc., 182 F.3d 237, 257 (3d Cir. 1999) (hypothetical "but for" calculations "usually rely upon unrealistic *ex ante* assumptions about the business environment, such as assumptions of perfect knowledge of future demand, future prices, and future costs that tend to overstate the plaintiff's damages claim").

C. Instead Of Evidentiary Support, Mr. Graves' Model Is Founded Upon An Unrealistic Economic Theory Of A Perfectly Competitive Exchanges Market

1. To Reach The 1999, 2001, And 2002 Fuel-Out Dates That They Desire, The Yankees Require A Perfectly Competitive Exchanges Marketplace

Mr. Graves' model is not premised upon any investigation that he undertook concerning the willingness of nuclear utilities to exchange acceptance allocations with other utilities, concerning the obstacles to exchanges that might exist, or concerning the reasons that no exchanges requests were ever submitted to DOE for approval. Before preparing his model, Mr. Graves failed to contact any utility – and even failed to speak with the Yankees – to determine the viability of or evidentiary foundation for an exchanges market that might have developed absent DOE's delay in beginning SNF acceptance. PFOF 130, 143. Indeed, Mr. Graves admitted that his model does not set forth what would have happened had DOE timely performed. PFOF 141. Instead, Mr. Graves' model is based entirely upon the application of economic theory following from assumptions that a market for exchanges of SNF acceptance allocations, absent DOE's delay in beginning SNF acceptance, would have been analogous to a perfectly competitive market guided by the "invisible hand." See PFOF 142, 144-145. To obtain the 1999, 2001 and 2002 fuel-out dates for the Yankees, any exchanges market must be consistent with the economic theory of perfect competition underlying Mr. Graves' model. PFOF 146. Any deviations would delay the projected fuel-out dates. PFOF 153, 159, 161-164, 176-177.

The principle of the "invisible hand" theory, which was first proclaimed by Adam Smith, "holds that in selfishly pursuing only his or her personal good, every individual is led, as if by an invisible hand, to achieve the best good for all," Tr. 4259:4-7 (quoting P. Samuelson & W.

Nordhaus, Economics (15th ed. 1995)), resulting in a perfectly competitive marketplace. PFOF 142. Consistent with a perfectly competitive market, Mr. Graves assumes that all entities with SNF acceptance allocations would have participated in the exchanges market and that no utilities would have rationed that participation. PFOF 144. Mr. Graves further assumes that market participants would have had perfect information available to them, that the market would have negligible transaction and information costs, that decision-making concerning market participation would have been driven solely by economic considerations, that all utilities trading down in the acceptance queue would have been price takers, and that the market would have had sufficiently numerous participants. PFOF 144. These assumptions are all consistent with the "invisible hand" theory and perfect competition. PFOF 142, 144; see Federal Trade Comm'n v. Elders Grain, Inc., 868 F.2d 901, 907 (7th Cir. 1989) (model of perfect competition implies infinite number of sellers, identical costs, a perfectly homogeneous product, and perfectly informed buyers); A.A. Poultry Farms, Inc. v. Rose Acre Farms, Inc., 881 F.2d 1396, 1397 (7th Cir. 1989) (describing perfect market in which concentration is low, product is fungible, and where price approaches marginal cost).

2. Courts Have Not Supported The Theory That, In The Real World, Marketplaces Are Perfectly Competitive

Courts have rejected the application of economic models premised upon perfectly competitive marketplaces. "No market fits the economist's model of perfect competition." Elders Grain, 868 F.2d at 907. As the United States Supreme Court has recognized, "[t]here is no reason for believing that the marketplace of ideas is free from market imperfections any more than there is to believe that the invisible hand will always lead to optimum economic decisions in

the commercial market." Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of N.Y., 447 U.S. 557, 592 (1980). "'[I]n the real economic world rather than an economist's hypothetical model,' the latter's drastic simplifications generally must be abandoned." Illinois Brick Co. v. Illinois, 431 U.S. 720, 742 (1977) (quoting Hanover Shoe, Inc. v. United Shoe Machinery Corp., 392 U.S. 481 (1968)).

The district court's holding in Honorable v. Easy Life Real Estate Sys., 100 F. Supp. 2d 885 (N.D. Ill. 2000), is instructive here. In analyzing a model premised upon perfect competition, the district court found that the conditions which must exist to support a "perfect" market are theoretical, not real:

> [E]conomic theories that imply that market prices are efficient, thus beneficial for consumers, presuppose that consumers are informed, markets are competitive, and the costs of making transactions are not excessively burdensome. To produce theoretical equilibrium, neoclassical economics in fact assumes *perfect* information, *perfect* competition, and *no* transaction costs, among other idealizations. But these assumptions must be relaxed, and perhaps, ultimately replaced, if economic theory is to have any application to what happens in actual markets.

Id. at 888-89 (italics in original). Indeed, the court concluded that, if perfect market conditions "fail to obtain to a sufficient degree, even the rough efficiency of the market outcome can no longer be presumed," and "the conclusion (that markets are efficient) no longer follows from the premises." Id. at 889; see Image Tech. Services, Inc. v. Eastman Kodak Co., 903 F.2d 612, 617 (9th Cir. 1990) ("market imperfections can keep economic theories about how consumers will act from mirroring reality"); United States v. Realty Multi-List, Inc., 629 F.2d 1351, 1368 (5th Cir. 1980) (perfect competition is theoretical concept as all markets subject to varying degrees of imperfections); United States v. E.I Du Pont & De Nemours & Co., 118 F. Supp. 41, 49 (D. Del.

1951) ("[w]e start . . . with recognition that all practicable forms of competition are 'imperfect,' and that the 'perfect competition' of economic theory is academic.").

### 3. The Analyses That Mr. Graves Decided To Ignore, And The Yankees' Own Past Analyses, Conflict With The "Perfect Competition" Fuel-Out Dates Upon Which The Yankee Now Rely

An early draft of Mr. Graves' expert report demonstrates the difficult alternative to perfect competition that the Yankees faced in this case. In preparing his analysis, Mr. Graves modeled intra-utility swaps between only the three plaintiffs in this case: Yankee Atomic, Connecticut Yankee, and Maine Yankee. PFOF 146. Inserting that intra-utility exchange assumption into the Graves model, the three Yankees would not be able to require DOE to remove all of their SNF until 2011, nine years later than Mr. Graves eventually estimated in his "perfect competition" model.[6] PFOF 146. Studies of exchange alternatives that the Yankees themselves conducted likewise extend fuel-out dates beyond those that Mr. Graves projects. PFOF 146. At trial, the Yankees offered no estimate of what their fuel-out dates would have been had the exchanges market, absent DOE's delay, failed to perform as Mr. Graves projected. PFOF 147.

### 4. The Requirement That Contract Holders Obtain DOE's Discretionary Approval Of Any Exchange Request Belies A Perfect Market

Under the Standard Contract, contract holders may not merely exchange approved DCSs at their own whim. The "Exchanges" provision of the Standard Contract requires that contract holders must seek DOE's approval of any exchange request and that DOE, "in its sole

[6] Under the intra-utility model, and applying the acceptance rate that Mr. Graves assumes, Yankee Atomic can have its SNF removed by 1998, but Connecticut Yankee and Maine Yankee cannot obtain removal until 2007 and 2011. PFOF 146.

discretion," may approve or disapprove that request. PFOF 138 (DX 6, 7, & 8, Art. V.E). Any requirement of Government approval to complete transactions in a market is antithetical to a perfectly competitive market guided by the invisible hand. PFOF 149. The fact that the Standard Contract provides DOE with the "sole discretion" to approve or disapprove exchange requests bars, as a matter of law, a finding that Mr. Graves' model accurately establishes the contractual fuel-out dates for the Yankees.

For Mr. Graves' model to succeed, DOE would have to exercise its "sole discretion" in favor of approval of every single exchange request submitted. PFOF 150. Yet, DOE would have no obligation to do so. The Standard Contract does not contain, and DOE has not developed, any standards or factors that DOE is required to consider in exercising its discretion, PFOF 139, rendering its ability to disapprove exchange requests extremely broad, if not unfettered. See Brinson v. Linda Rose Joint Venture, 53 F.3d 1044, 1049 (9th Cir. 1995) (in response to claim of breach of good faith and fair dealing, providing extremely broad and deferential review to contracting party's decision, which was within its "sole discretion" pursuant to contract language, to ensure that court did not "add a term to the Contract" that was not otherwise there).[7]

In light of this extremely broad discretion, and given that no contract holder has ever submitted an exchange request to DOE for approval, this Court, as a matter of law, cannot base a damages award upon an assumption that DOE would have approved every single exchange

[7] It could be argued that the manner in which Article V.E of the Standard Contract is written precludes any duty of good faith and fair dealing as it applies to DOE's decision to approve or disapprove any particular exchange request. See Big Horn Coal Co. v. Commonwealth Edison Co., 852 F.2d 1259, 1267 (10th Cir. 1988) ("it is possible to so draw a contract as to leave decisions absolutely to the uncontrolled discretion of one of the parties and in such a case the issue of good faith is irrelevant") (quoting Tymshare, Inc. v. Covell, 727 F.2d 1145, 1153 (D.C. Cir. 1984)). Nevertheless, the Court need not resolve that issue here.

request.[8] In Marketing & Management Information, Inc. v. United States, 62 Fed. Cl. 126 (2004), this Court recently considered a plaintiff's claim that, because it was "foreseeable" that the Government "would have" exercised two option years if it had not breached the contract at issue, the Court should include the two option years in its damages award. There, the contract provided the Government with, as the Court described it, "sole discretion" to decide whether to exercise the two option years and that, as a result, it "would have been under no contractual obligation" to exercise its discretion in favor of extending the contract. Id. at 130. Citing to the Federal Circuit's decision in Hi-Shear Tech. Corp. v. United States, 356 F.3d 1372 (Fed. Cir. 2004), this Court recognized that "[t]he plain import of the Federal Circuit's decision is that, as a matter of law, damages for unexercised option years are unrecoverable." Marketing, 62 Fed. Cl. at 131. Accordingly, the Court limited the plaintiff "to damages flowing from the base period," finding that "breach damages for the two option years would be inherently speculative." Id. at 130-31. It concluded that, "[b]ecause the defendant and plaintiff were only bound for the three-year base period, awarding damages . . . for the two option years would result in putting plaintiff in a better position than had the agency simply completed its three-year obligation." Id. at 130.

The same rationale applies to the discretion that DOE would have in reviewing exchange requests. Like option clauses, DOE's right to approve or disapprove exchange requests is, under the plain language of the contract, "in its sole discretion." PFOF 138. Neither before nor since

---

[8] Indeed, the mere fact that DOE has the discretion to disapprove exchange requests renders the Yankees' hypothetical exchange model speculative. See San Carlos Irrigation, 111 F.3d at 1563 ("[t]oo many contingencies – including, most importantly, the discretion of the agency to dispose of excess water – exist in the causal chain from the government's breach to the asserted lack of water.").

the partial breach of contract at issue here has any contract holder ever submitted an exchange request to DOE, PFOF 193A, and the Standard Contract does not contain any criteria or factors that limit or define DOE's exercise of its discretionary decision to approve, or disapprove, exchange requests. PFOF 138. The Yankees have not identified any criteria that the Court could use in evaluating what DOE "would have been" required to do had it been presented with exchange requests in exercising its sole discretion. In accordance with the Marketing & Management Court's analysis, the Court cannot base a damages award upon speculation about the manner in which DOE might have exercised its discretion in response to exchange requests.

Further, in this particular case, the evidence adduced at trial belies the contention that a perfectly competitive exchanges market would have existed absent DOE’s delay in beginning SNF acceptance. Even though DOE has not yet developed criteria for its review of exchange requests, it is clear from the testimony at trial that not every exchange request would automatically be approved. PFOF 139. In fact, a variety of factors might affect DOE's decision to approve or disapprove any exchange, including the proposed exchange's adverse effect upon other contracting parties; the availability of transportation casks and waste packages; the availability of trained DOE personnel, utility personnel, and safety personnel along the transportation route; the location of the pickups; the amount of fuel included in the exchange; receiving facility infrastructure; the type of fuel assemblies involved; and whether the fuel involved was failed fuel. PFOF 139. It would be impossible to provide a blanket approval for exchanges. PFOF 139. Instead, any proposed exchanges would need to be evaluated upon an exchange-by-exchange basis.

In addition, the effect of DOE's veto power would be amplified in any exchanges market because each of the Yankees must engage in multiple trades, through a sequence of trades, to achieve the results that Mr. Graves' model generates. PFOF 151. Since utilities' decision-making (in Mr. Graves' world) is dependent upon each utility's ability to avoid additional storage costs, the Yankees might not be able to avoid additional storage costs if DOE were to disapprove a single exchange request anywhere along the sequence of exchanges, given that the Yankees' ultimate fuel-out dates and their ability to obtain exchanges at particular low costs are completely dependent upon the interplay between each of the exchanges. PFOF 151.a-.c. Accordingly, rejection of a single exchange request would threaten every other transaction in the sequence. PFOF 151.c. Because the Yankees presented no credible evidence that DOE would approve every single exchange request, regardless of its cost to the DOE program, their exchanges model, which depends upon approval of every request, cannot form the basis for a causation finding or damages award.

5. Contrary To The Assumptions Of The Perfect Market, There Would Be A Limited Number Of Participants In The Actual Exchanges Market, And Those Participants Would Act Strategically

Unlike a perfectly competitive market with an "infinite number of sellers having identical costs," Elders Grain, 868 F.2d at 907, any exchanges market would have a limited number of participants. PFOF 152. Even with his assumption that all utilities with allocations would participate, Mr. Graves estimates that there would be only 20 to 40 participants in the market in each of first five years. PFOF 152. In fact, given that there are utilities that likely would not have participated in the exchanges market, see PFOF 192 & 193, Mr. Graves' estimate of 20 to

40 participants overstates market participation. When the possibility of rationing[9] available allocations is considered – a possibility that even Mr. Graves accepts, PFOF 178.b – the number of participating allocations would decrease even further.

As a result of the limited number of participants, utilities with early allocations that lack avoidable costs (as defined by Mr. Graves) could act strategically. PFOF 155. Although his model does not account for strategic behavior by market participants, Mr. Graves recognized that the potential for strategic behavior exists. PFOF 155. Yankee Atomic also recognized that a trading utility would "exploit his situation and maximize his price." PFOF 155.

Additionally, although Mr. Graves assumes in his theoretical market that sellers have uniform costs (PFOF 169.g), the actual exchanges market lacks sellers with "identical costs," as evidenced by the Yankees' claims in this litigation. The three Yankees have wildly diverging claims related to the cost components contained in Mr. Graves' model, contrary to Mr. Graves' assumption that they are uniform. See PFOF 201. For example, although Yankee Atomic is seeking damages totaling \$84 million for the costs associated with the construction of a 16-cask ISFSI, Maine Yankee constructed an ISFSI four times the size for only \$6 million more, while Connecticut Yankee constructed a 40-cask facility for \$73.8 million (or nearly \$10 million less). PFOF 201. Mr. Graves' cost assumptions once again bring to mind that Supreme Court's admonition that drastic oversimplifications of an economists theoretical model generally must be abandoned.

---

[9] "Rationing" is the concept that utilities, to the extent that they might participate in an exchanges market, might "ration" that participation or offer only a percentage of their available allocations in any given year.

6. Non-Economic Factors Would Play A Significant Role In Any Exchanges Market, Contrary To Mr. Graves' Assumptions

Unlike a perfectly competitive market in which participants act solely based upon economic concerns, participation in an exchanges market would affected by non-economic factors. PFOF 161. In preparing his model, Mr. Graves did not consider the effect of societal or political opposition to exchanging away early allocations for later year allocations. PFOF 162. He did not consider how an exchange program would be designed and politically validated. PFOF 162. Nor did he consider the possibility that congressional delegations, governors, or local politicians may prefer removal of SNF, even if its on-site storage was not increasing a utility's operating costs, over the trading away of early year allocations. PFOF 162.

Significant evidence was presented that demonstrates that utilities are not driven solely by economic concerns when dealing with SNF-related issues. For example, the industry as a whole opposed priority for shutdown reactors, even though shutdown reactors would incur a disproportionately high amount of potentially avoidable costs. PFOF 191.a-.b. Likewise, though Maine Yankee identified utilities that could accept and store its SNF without incurring additional storage costs, all of the utilities that it approached refused to accept the SNF, even though Maine Yankee would provide compensation. PFOF 165.a. Political factors were identified as a reason that other utilities rejected off-site storage. PFOF 165.a.

Yankee Atomic attempted to arrange intra-utility exchanges with co-owners of other New England reactors. PFOF 191.c. Although Yankee Atomic identified significant savings to its co-owners if Yankee Atomic's SNF was removed by 2000, none of Yankee Atomic's co-owners agreed to exchange allocations they possessed. PFOF 191.c. Thereafter, Yankee Atomic

approached co-owners of Connecticut Yankee and Millstone regarding the potential benefits to be gained from exchanges, including benefits associated with the recovery of damages in this litigation. See PFOF 191.d. Despite tangible litigation-oriented benefits that could be obtained regardless of DOE performance, none of these co-owners agreed upon exchanges. PFOF 191.d.

Additional examples of utilities recognizing non-economic factors pervade the evidence that was presented at trial:

- In 1993, Maine Yankee concluded that proposed exchanges with Yankee Atomic would neither delay Maine Yankee's final fuel out date of 2018 nor have a "significant operational impact" upon Maine Yankee. However, Maine Yankee never agreed to exchange of SNF allocations with Yankee Atomic. Tellingly, Maine Yankee's analysis recognized non-economic considerations that were not included – specifically, that the "assessment does not include sociopolitical factors in evaluating a potential exchange." PFOF 191.e.

- Yankee Atomic recognized that "political wrath" came with trading away an early acceptance slot. PFOF 191.h.

- In connection with the Yankee Atomic's 1998 attempts to exchange allocations with 13 utilities, several utilities refused upon political grounds. Yankee Atomic's second RFP to those utilities included promises of confidentiality and flexibility that would "allow [utilities] to cancel the deal if it becomes politically untenable." PFOF 191.g.

- Connecticut Yankee's decision to continue storing 82 assemblies of SNF at the GE Morris facility in Illinois – at a yearly cost of $1.5 million – belies the contention that utilities seek economic efficiency when dealing with SNF. Connecticut Yankee could transfer the 82 assemblies back to its ISFSI and place them in three dual purpose casks at a cost of $5.2 million. PFOF 191.g. In so doing, Connecticut Yankee could recoup its upfront investment based upon the elimination of these GE Morris storage costs in less than four years. PFOF 191.i. However, despite the efficiency gains to be had, Connecticut Yankee entered into an agreement with the Town of Haddam not to seek the return of those assemblies. PFOF 191.i.

- Significant additional documentary evidence exists supporting the non-economic considerations that would have driven participation in any exchanges market. See PFOF 191.j.

The Government also presented evidence that state regulators might prohibit regulated utilities from giving up their places in the acceptance queue established by the Standard Contract. PFOF 191.k. Customers of nuclear utilities also might oppose delaying SNF shipments off-site, instead preferring to see SNF removed from their neighborhoods as soon as possible. PFOF 191.k. Further, anti-nuclear activists might oppose delaying shipments of SNF off-site. PFOF 191.k. Yet, Mr. Graves' model is premised upon the false assumption that nuclear utilities are driven solely by financial considerations in determining whether to participate in his exchanges market. PFOF 162. Mr. Graves' theory that nuclear utilities' non-economic concerns would have played no role in any utility's decision to trade down in the acceptance queue is wholly contradicted by the evidence.

7. An Exchanges Market Would Have High Transaction And Information Costs, Contrary To Mr. Graves' Market

Unlike the theoretical market that Mr. Graves modeled, the exchanges market would have high transaction and information costs. PFOF 156-158. The exchanges market has very different characteristics from a commodities or stock market with a single posted price, PFOF 156, and, since costs vary across the industry, there is no market price for an allocation. PFOF 157, 201. The exchanges market is further complicated by the fact that a utility does not need to analyze only a single trade when it analyzes potential prices. Instead, a utility must analyze the entire sequence of trades needed to achieve the desired outcome. PFOF 158. Indeed, when a lone utility offered to exchange 8.5 MTUs of SNF allocations with Yankee Atomic for $850,000, one of the problems that Yankee Atomic identified with the trade was the difficulty in valuing the transaction. PFOF 157.

8. Contrary To The Perfect Competitive Market, The Exchanges Market Would Lack Perfect Information

The evidence adduced at trial and the procedural history of these cases belies a market in which participants readily share pricing and cost information. Indeed, each of these cases is governed by protective orders, and witnesses in the Yankee trial demonstrated significant concerns regarding the disclosure of pricing information to individuals outside of the protective order. PFOF 160. In an industry in which cost information is considered propriety, the model's assumption of perfect information is unattainable.

D. An Analysis Of Analogous Markets Belies Mr. Graves' Model

1. Analogous Markets Are Imperfect

As Mr. Graves recognized at trial, reference to analogous markets is instructive in determining whether the Graves model accurately depicts the hypothetical exchanges market. PFOF 168. In American Society of Composers, Authors and Publishers v. Showtime/The Movie Channel, Inc., 912 F.2d 563 (2nd Cir. 1990), the appellate court noted that, "since there is no competitive market in music rights, the parties and the Court lack any economic data that may be readily translated into a measure of competitive pricing for the rights in question." Id. at 577. As a result, the Court held that, "[o]f necessity, then, we must look to very imperfect surrogates, particularly agreements reached either by these parties or by others for the purchase of comparable rights." Id. (citing Amusement & Music Operators Assn. v. Copyright Royalty Tribunal, 676 F.2d 1144, 1155-57 (7th Cir.), cert. denied, 459 U.S. 907 (1982)).

The evidence adduced at trial shows that the purportedly analogous markets that Mr. Graves identified have failed to achieve either perfection or the level of participation that Mr.

Graves has projected for the exchanges market. At trial, Mr. Graves identified two markets that he believed are similar to the exchanges market that he modeled: (1) water rights markets and (2) the emissions allowance market. PFOF 168. Unlike Mr. Graves' model of perfection, actual trading in water markets fell short of perfect competition. PFOF 168.a. More significantly, participation in water markets fell far short of 100 percent participation that Mr. Graves projected in the exchanges market. In one analysis, participation in the water rights market never exceeded 50 percent and was as low as 27 percent of all potential participants in any year. PFOF 168.a. Likewise, while water pollution trading markets have worked in the real world, they do not look like the textbook ideal that Mr. Graves modeled, PFOF 168.b, because the objectives of polluters are often not limited to simple cost minimization and, as a consequence, the results that follow from a model focusing upon cost minimization, such as Mr. Graves' model, do not always hold. PFOF 168.b.

In the case of emissions allowances, participation in the market lagged as a result of over-compliance within the utility industry to reduce emissions, fewer purchases of emissions credits, and lower prices than projected for those credits.[10] PFOF 168.c. Among other reasons, over-compliance occurred because the concept of purchasing the "right to pollute" was viewed pejoratively in local communities. PFOF 168.d. As a result, local utilities had political incentive to bring their generating stations into compliance through retrofitting. PFOF 168.d. Additionally, ratepayers were willing to pay increased costs for retrofitting facilities to comply

[10] Mr. Graves modeled the emissions allowance market prior to the commencement of trading within that market. His forward-looking model overstated actual participation, as well as the market prices for the allowances. PFOF 168.f.

with the Clean Air Act, even though costs associated with purchasing emissions credits were less, rendering retro-fitting economically inefficient. PFOF 168.e.

### 2. Analogous Markets Took Time To Develop And Maximize Participation

Mr. Graves' assumption that the exchanges market would have developed perfectly before DOE began accepting SNF on January 31, 1998, PFOF 176, is not supported by Mr. Graves' reference to analogous markets. Trading programs outside of Mr. Graves' hypothetical exchanges model generally have been disappointing relative to the efficiency gains that have been claimed for them, and the disappointment is particularly severe in the early years before the programs really develop. PFOF 185. The early results from the trading of emissions were disappointing, and the actual savings were much less than the potential savings. PFOF 186. Although the evidence demonstrates that markets take time to develop, Mr. Graves does not distinguish between the early years and the late years of SNF acceptance, which is inconsistent with his experience in other markets. PFOF 187.

The evidence concerning the exchanges market is in accord with experiences in analogous markets. For a robust exchanges market to develop, utilities must have confidence in the schedule of what they are buying and selling, and that level of confidence cannot be gained until DOE is well along to accepting SNF. PFOF 184. The assumption that the exchanges market and the acceptance program will be perfect instantaneously is controverted by the evidence and by common sense.

E. Additional Evidence Adduced At Trial Belies Mr. Graves' Theoretical Market

1. Mr. Graves' Model Assumes Contractual Obligations That Do Not Exist

Outside of the inapplicability of Graves' model of a perfectly competitive market, additional evidence adduced at trial fails to support his underlying theories. In analyzing the Yankees' claims, this Court must look to the wording of the contract and determine how the parties defined their respective rights and obligations before assessing the Yankees' claims with respect to those rights and obligations. See County of Suffolk, N.Y. v. United States, 26 Cl. Ct. 924, 926 n.2 (1992). Mr. Graves' hypothetical exchanges model improperly assumes the existence of several contractual obligations that simply do not exist.

First, Mr. Graves' model assumes that DOE has a contractual obligation to accept the Yankees' SNF in a manner that is "economically efficient" for the Yankees. In fact, the Standard Contract contains no efficiency requirement, requiring instead that allocations for SNF acceptance be made under an "oldest fuel first" acceptance queue. PFOF 53 (DX 6, 7, & 8, Art. VI.B.1). Second, Mr. Graves' model assumes incorrectly that DOE must accept the Yankees' "Must-Move Fuel" at a particular point in time. However, the term "Must-Move Fuel" is a Yankee-created fiction. PFOF 126.b. "Must-Move Fuel" is not defined in the Standard Contract and is not contained anywhere in its provisions, and, accordingly, it is not an obligation that DOE was ever required to satisfy. PFOF 126.b. Third, the Graves model also assumes that DOE would have continued SNF acceptance at a particular rate – a particular "ramp-up" rate and a continuing annual rate – that is neither specified nor identified in the Standard Contract (see PFOF 64) and may not be "imposed" on DOE. See Smithson, 847 F.2d at 794. Indeed, as

previously discussed, at the time of contracting, DOE rejected requests by the utilities to put rates similar to that which Mr. Graves uses into the Standard Contract. PFOF 55-58.

Finally, Mr. Graves' model ignores the fact that contract holders do not exchange acceptance allocations, but can only exchange "approved delivery commitment schedules." PFOF 138 (DX 6, &, & 8, Art. V.E). Yet, DCSs need not be submitted until 63 months before a requested SNF or HLW acceptance date. PFOF 189. Further, and importantly, under the Standard Contract, DOE is required to project, to the extent available, its future SNF and HLW acceptance plans for "ten (10) years following the projected commencement of operation of the initial DOE facility." PFOF 187.a (DX 6, 7, & 8, Art. IV.B.5.b). Accordingly, at best, approved DCSs will only look forward 10 years into the future.

Under Mr. Graves' assumed acceptance rate, only Yankee Atomic has all of its acceptance allocations arise within the first ten years of the DOE acceptance program. PFOF 187.b. Under that same rate, both Connecticut Yankee and Maine Yankee possess allocations in Years 11 through 14 of the acceptance program. PFOF 187.b. For Connecticut Yankee to obtain complete acceptance by 2001 and Maine Yankee by 2002, each would be required to exchange away allocations from 2008-2011 for allocations in 2001 and 2002. PFOF 129.b. However, under the Standard Contract, DOE would not have identified those allocations or published any documents assigning those allocations during the time periods when Mr. Graves assumes those allocations would be exchanged. PFOF 187.a. The Yankees could not be exchanging "approved DCSs" when the acceptance allocations for those later years had not even yet been published.[11]

---

[11] If an slower acceptance rate than the one that Mr. Graves has selected were read into the Standard Contract, all three of the Yankees would be required to exchange allocations beyond the time period governed by the 1991 ACR and APR, as set forth in the Standard Contract.

Yankee Atomic recognized the problems associated with trading acceptance allocations that did not yet exist. In a September 7, 1995 letter from Dr. Kadak to OCRWM, Dr. Kadak noted that "more than half of the spent fuel at Rowe does not even have a current queue allocation position that can be swapped." PFOF 188. He therefore concluded that "over half of Yankee's spent fuel is presently unswappable." PFOF 188. Mr. Grube likewise testified that Yankee Atomic could not exchange allocations that it did not yet possess under the Standard Contract. PFOF 188.

Additionally, many utilities, including Yankee Atomic, chose not to submit DCSs for the entire 10 year period covered by the ACR and APR. PFOF 189. Under the Standard Contract, utilities are "not required . . . to submit DCSs for the full ten year DCS process." PFOF 189. Dr. Kadak recognized that the "reality is that Yankee and other utilities are not able to exchange allocations that have neither been requested nor approved." PFOF 189. The Yankees cannot exchange rights they do not possess under the Standard Contract. However, the Graves model is premised upon an exchange of rights that would not have even existed under that contract. As a matter of law and fact, Mr. Graves' model fails analysis.

This is not the first time that Mr. Graves has provided testimony that conflicts with the substantive evidence adduced at trial. In United States v. Ohio Edison Co., 276 F. Supp. 2d 829 (S.D. Ohio 2003), Mr. Graves provided testimony upon behalf of Ohio Edison in a case involving questions concerning whether 11 construction projects undertaken at Ohio Edison's Sammis plant constituted "modifications" that, under the Clean Air Act, required Ohio Edison to comply with new air quality standards. Id. at 833. Mr. Graves was hired to counter the

---

PFOF 129.a-.b.

Government's evidence that Ohio Edison anticipated that each of the 11 projects would significantly increase net emissions, bringing it within the purview of the Act. Id. at 878. The district court rejected Mr. Graves' opinion, finding that the evidence adduced at trial contradicted Mr. Graves' testimony. Id. at 879. Among other contradictions, the evidence demonstrated that the purpose of the construction projects was to increase the operating lives and reliability of the units and decrease the length of outages. Id. at 834. In fact, Ohio Edison ultimately obtained those goals, while also increasing emissions of sulphur dioxide, nitrogen oxides and particulate matter. Id. at 834. The court also noted that Mr. "Graves did not, and cannot, explain why a rational decisionmaker, such as Ohio Edison, would expend substantial amounts of money on the projects and justify these costs by predicted fewer outages, if the utilization of the units was not expected to rise." Id. at 879. The court also rejected Mr. Graves' opinion as a matter of law, finding that Mr. Graves' contention that preconstruction emissions estimates are impossible to construct conflicts with the requirements of the Act and that his opinion, therefore, "is entitled to little, if any, weight." Id. at 880, (citing Thorn v. Itmann Coal Co., 3 F.3d 713, 719 (4th Cir.1993)); and Kaiser Steel Corp. v. Director OWCP, 748 F.2d 1426, 1430 (10th Cir.1984)). This Court should reach a similar conclusion based upon Mr. Graves' disregard of the evidence here.

2. The Yankees' Exchanges Theory Is Litigation-Inspired

As a matter of law, and as the district court recognized in Southern Pacific Communications Co. v. American Telephone & Telegraph Co., 556 F. Supp. 825 (D.D.C. 1982),"[i]n an effort to keep speculation in check, a number of courts have distinguished between damage claims based upon reasonable business plans actually developed and adopted by

businessmen and claims based upon made-for-trial speculation about what different business decisions the plaintiff might have made under different circumstances." Id. at 1084.[12] Mr. Graves' model fits the "made-for-trial speculation" of which the Southern Pacific pejoratively speaks. The Yankees' hypothetical exchanges model is not based upon any pre-existing business plan, but instead is the pure fabrication of its hired expert. Yankee Atomic engaged in limited pre-litigation analyses of exchanges, and the documents pre-dating this case uniformly question the viability of exchanges. PFOF 134. Yankee Atomic repeatedly questioned the viability of exchanges as a solution to its SNF storage issues. PFOF 134. Yankee Atomic also repeatedly expressed its opposition to exchanges upon the grounds that it should not have to pay for rights that it believed it should obtain for free under the priority provision of the Standard Contract. PFOF 135.

Significantly, Yankee Atomic did not approach utilities outside of New England concerning exchanges until after this litigation was commenced. PFOF 165.c-.d. While Yankee Atomic engaged in limited pre-litigation analysis of exchanges, neither Maine Yankee nor Connecticut Yankee investigated or expressed any interest in exchanges prior to this litigation. PFOF 132. Further, none of the Yankees relied upon exchanges theories in planning their long-term SNF storage needs. PFOF 132.

The Yankees' post-litigation efforts to seek exchanges are even more telling. Specifically, the analyses conducted in the time period surrounding this litigation expressly recognize the benefits of the exchanges theory upon damages that could be awarded in this case.

---

[12] Further, beyond proof of an actual business plan, plaintiffs must show that such actual business plan was reasonable and that plaintiffs had an actual intention and ability to implement it. Southern Pac. Communications, 556 F. Supp. at 1084 n.328.

PFOF 136.a-.b. These benefits included the acceleration of "DOE's removal liability from 27 years to 3 years," the enhancement of "Yankee's recovery of all its fuel storage costs from DOE," an increase in the "probability that DOE will agree to negotiate a 'solution,'" and the bolstering of "CY's current damage claim in Court which might result in a cash award, in which NU would share." PFOF 136.b-.c. One exhibit even noted that "exchanges could prove to be a vital tool in our DOE lawsuits by demonstrating that spent fuel could be removed from a site at a much earlier date. . . . [w]ith early removal, we could show that we have been damaged more and sooner than we otherwise would have under DOE's current schedule." PFOF 136.d. Of the eight post-complaint exhibits that did not specifically reference the litigation benefits of the exchanges theory, four were copied to the Yankees' attorney in this litigation. PFOF 136.e.

The fact that Mr. Graves' model is a litigation-inspired theory is significant as a matter of fact and law. As a matter of fact, the litigation-driven conclusions that drove the Yankees' damages to $550 million cannot be trusted. As a matter of law, the litigation driven exchanges model should be rejected.

3. The Model Is Improperly Retrospective And Assumes Definitive Knowledge Within The Industry That Would Not Have Existed

The Yankees' hypothetical exchanges model presumes that all contract holders would have a high level of specific certainty and definitive knowledge of the future. After assuming the existence of efficient Government performance in the non-breach world, Mr. Graves then assumes that all contract holders would act in their own best interests based upon that perfect knowledge. The problems of such an assumption are obvious:

> By modeling a 'but for' company whose investment decisions are determined . . . with perfect knowledge of future demand and

> future costs rather than on any business plan that [plaintiff] actually adopted, [plaintiff's] hypothetical model avoids any element of management fallibility. The 'but for' company never makes mistakes in planning or building its [business]. To permit damages to be awarded on the basis of such an idealized business plan would open . . . defendants to virtually unlimited damage claims based upon whatever after-the-fact scheme plaintiffs, or their lawyers and economists might conjure up. Such conjectures about what plaintiffs might have thought of doing at an earlier time provide no meaningful measure of damages actually suffered by plaintiffs.

Southern Pac. Communications, 556 F. Supp. at 1083 (citations omitted; emphasis added). "The model merely represents an after-the-fact conjecture about what [plaintiffs] might have considered doing in the 'but for' world created by [plaintiffs'] economists and computer experts." Id. at 1083.

Indeed, the model's construction is entirely retrospective. In determining how a perfectly competitive and efficient market would have behaved in the early 1990s, the time period in which any exchanges market would have developed, PFOF 195, Mr. Graves entirely relies upon inputs that were not available to "would have been" market participants at the time. Mr. Graves uses a 1995 DOE report to determine storage capacities of the wet pools maintained by every nuclear utility.[13] PFOF 196.a. To determine the inventory of SNF in each utility's wet pool, Mr. Graves referred to a study that Nuclear Assurance Corporation ("NAC") prepared in the 1998/1999 time frame. PFOF 196.c. In determining whether an operational ISFSI existed that

[13] Although Mr. Graves relies upon information available in 1998 for certain inputs to his model, the Graves model does not account for any reracks that were performed by utilities between 1995 and 1998. In fact, Mr. Graves did not investigate whether any reracks performed during this time period were performed regardless of DOE's breach of contract. Instead, he assumed that any reracks performed during this time period were related to the breach. PFOF 196.b.

would be available for additional storage of SNF, Mr. Graves looked to ISFSI status as of 1998. PFOF 196.e. Finally, in determining whether a utility was permanently shut down, Mr. Graves relied upon operational status as of 1998. PFOF 196.e. As a result of this assumption, Mr. Graves' list of shutdown reactors includes eight utilities, including Connecticut Yankee (which shut down in 1996) and Maine Yankee (which shut down in 1997) that were not shut down in the early 1990s, the time at which Mr. Graves' economic decision-making for his economics model allegedly would have been made. PFOF 196.e.

Mr. Graves also assumes that Maine Yankee and Connecticut Yankee, which did not shut down until 1997 and 1996, would have traded their allocations in 1998, 1999 and 2000 for cash and allocations in 2001 and 2002. PFOF 197. However, had Mr. Graves run his model in 1995 – three years after the market allegedly would have begun developing – Maine Yankee and Connecticut Yankee, as operating utilities with operating reactors, would have been purchasers of early-year allocations, not sellers as Mr. Graves projected. PFOF 198-200. Both Connecticut Yankee and Maine Yankee would have had been in full pool situations and, therefore, would have been modeled as utilities seeking to trade up in the acceptance queue. PFOF 198. Mr. Graves' model results in Maine Yankee and Connecticut Yankee earning a profit from the early year sales of allocations. PFOF 200. In the real – not retrospective – world, both Maine Yankee and Connecticut Yankee would have been buyers, not sellers, and no profits would have been obtained.[14] PFOF 200.

---

[14] A second issue arises with respect to the retrospective nature of Mr. Graves' model. Connecticut Yankee decided to shutdown on December 4, 1996, approximately 13 months before DOE was to begin SNF acceptance. Maine Yankee did not decide to shutdown until August 1997, five months before DOE's acceptance program was to have begun. As a result, both facilities would have been late arrivals to the exchanges marketplace. Depending upon the date

4. Mr. Graves Failed To Identify Any Utilities That Would Have Traded With The Yankees

Mr. Graves does not identify a single contract holder with which the Yankees would have exchanged DCSs. PFOF 172-173. Mr. Graves also fails to identify a single utility that would have agreed to trade down in the acceptance queue. PFOF 172-173. Indeed, not a single Maine Yankee or Connecticut Yankee employee testified that either utility would have agreed to trade down in the acceptance queue as Mr. Graves' model projects. PFOF 165.f. "Plaintiff bears the burden to establish clear proof that it was injured as a direct result of defendant's alleged breach." Quiman, 39 Fed. Cl. at 183. The Yankees' failure to show that they would have found a partner for each of the exchanges that they propose renders their claim speculative, particularly since they have not even attempted to identify any particular partners in a universe of limited partners. See id. at 183, 185 (finding plaintiff's damage claim speculative because it failed to identify any potential customers who would have purchased plaintiff's serum absent the breach). The fact that no contract holder has ever entered into an agreement to exchange DCSs, so that no records of previous exchanges transactions exist upon which forecasts of exchanges (and the prices of such exchanges) can be reliably based, renders it even more speculative. See, e.g., Chain Belt Co. v. United States, 127 Ct. Cl. 38, 115 F. Supp. 701, 716 (1953); Kidder, Peabody, 28 F. Supp. 2d at 131; Wood Products, Inc. v. CMI Corp., 651 F. Supp. 641, 653 (D. Md. 1986); E. Farnsworth, Farnsworth on Contracts § 12.8, at 841 (1982).[15]

---

upon which Maine Yankee's SNF was to be accepted, further exchanges based upon Maine Yankee's status as a shutdown reactor may have been untimely under the Standard Contract.

[15] The fact that the Yankees attempted to generate interest in exchanges, but failed, adds nothing to its hypothetical model. See Kidder, Peabody, 28 F. Supp. 2d at 136 n.6 ("IAG's alleged discussions with First Boston concerning the possibility of future transactions (beyond

5. Mr. Graves' Model Does Not Account For Risk

Mr. Graves' failure to recognize risk in an industry that is required to make reasonable and prudent business decisions is fatal to his model's application here. PFOF 178. Instead of anticipating uncertainties with the DOE waste acceptance program or risks to utilities trading down in the queue that might affect participation, Mr. Graves assumes that the DOE program has a "little headroom" to deal with any variability in annual rates, as well as sufficient capacity to stay ahead of the "must move" problem as he defines it. PFOF 179. As a result, he contends that any risk or uncertainty will not affect his perfect market. PFOF 179.

However, in the first four years of the DOE program, there is no "headroom" in DOE's acceptance program. PFOF 180. The lack of any "headroom" to accommodate risk and uncertainty in the first four years is significant because, under Mr. Graves' model, all three Yankees obtain allocations in the first four years of the program, and Connecticut Yankee and Yankee Atomic both receive sufficient allocations to remove all of their SNF in the first four years. PFOF 181. In the fifth year of acceptance – the year in which Maine Yankee purportedly has its SNF removed completely – only 500 MTUs of "headroom" exists. PFOF 182. Applying the Graves acceptance rate, the 500 MTUs of "headroom" in the fifth year of the program represents only 18 percent of the total allocations available in that year. PFOF 182.

Since the availability of "headroom" in the DOE acceptance program is the only mechanism that exists in the Graves model to accommodate risk, the model necessarily fails to account for risk in the relevant years for the Yankees. PFOF 183. Mr. Graves admits that any

---

the June 1994 whole loan sale) does not furnish certainty with respect to its ability to find partners with whom to do future deals").

potential for delay in out-year waste shipments would diminish the willingness of utilities to trade down in the acceptance queue, and would make it impossible for the three Yankees to have their SNF fully removed by 2002. PFOF 177. Moreover, because the model assumes that utilities obtain and use allocations in the exact year in which space constraints are reached, PFOF 154, the model places operating utilities in overly risky positions. Indeed, Mr. Graves did not consider the potential costs associated with shutting down an operating utility if its pool runs out of space. PFOF 183.

6. Additional Incorrect Assumptions Render The Model Even More Speculative

Beyond these speculative and/or incorrect assumptions, the Yankees' hypothetical exchanges model ignores the effect of the contract holders' continuing storage obligations for Greater Than Class C low-level radioactive waste ("GTCC") and failed fuel upon prospective traders, PFOF 206-207; the speculative, unsupported, and contradictory nature of the "costs" identified by Mr. Pennington, which Mr. Graves uses to support his "but for" world and the economic decisions that nuclear utilities would make in reliance upon those costs;[16] the total system costs that must be borne by utilities, PFOF 203.a-.c; the availability of reracking as an alternative to ISFSI construction, PFOF 204; and various logistical issues, particularly the incorrect assumption that every utility can load a 10 MTU rail cask for every off-site shipment of SNF, PFOF 204.

---

[16] Under Mr. Pennington's analysis, Yankee Atomic's ISFSI should have cost $20.5 million, not the approximately $84 million they seek from this Court. PFOF 201. Additionally, the inputs to Mr. Graves' model assume uniform costs across the industry. PFOF 169.g. If that were true, Yankee Atomic's 16 cask ISFSI should have cost $22.5 million when compared proportionately to the ISFSI costs incurred by Maine Yankee for its 64-cask ISFSI. See PFOF 201.

The numerous speculative and/or incorrect assumptions upon which Mr. Graves bases his hypothetical exchanges model render that model worthless. The Yankees failed to present any viable evidence that they should receive hundreds of millions of dollars in additional damages based upon the pure speculation contained in Mr. Graves' model.

## IV. THE YANKEES' ALTERNATIVE CLAIM THAT THEY WOULD HAVE HAD EARLY FUEL-OUT DATES BECAUSE DOE WOULD HAVE GRANTED THEM PRIORITY AS SHUTDOWN REACTORS IS UNSUPPORTED BY ANY EVIDENCE

As an alternative to their theory that, through exchanges of acceptance allocations with other nuclear utilities, DOE would have accepted all of their SNF by 1999, 2001, and 2002, the three Yankee plaintiffs allege that the Court should find that DOE was obligated to provide, or would have provided, priority in acceptance to their SNF. Although Article VI.B.1(a) provides that "acceptance priority shall be based upon the age of the SNF and/or HLW . . .," it contains an exception to that general rule: "Except as may be provided for in subparagraph (b) below . . . ." 10 C.F.R. § 961.11, Art. VI.B.1(a). Subparagraph (b) of Article VI.B.1 defines that exception: "Notwithstanding the age of the SNF and/or HLW, priority may be accorded any SNF and/or HLW removed from a civilian nuclear reactor that has reached the end of its useful life or has been shut down permanently for whatever reason." Id. (emphasis added). However, this provision provides DOE with the discretion, not the obligation, to provide a contract holder with a shutdown reactor priority in the SNF acceptance queue. See Huston v. United States, 956 F.2d 259, 262 (Fed. Cir. 1992) ("[w]hen, within the same statute, Congress uses both "shall" and "may," it is differentiating between the mandatory and discretionary tasks"); Green v. Gen. Services Admin., 220 F.3d 1313, 1318 (Fed. Cir. 2000) (agency had discretion to permit

employee to withdraw from separation agreement because regulation uses the word "may"); Hubbard v. Merit Systems Prot. Board, 205 F.3d 1315, 1320 (Fed. Cir. 2000) (words such as "may" show intent to provide broad discretion).

In its response to the motion *in limine* regarding priority that we filed earlier in this litigation, the Yankees argued that, although DOE had discretion in deciding whether to grant priority, the purposes of the Standard Contract and the NWPA – to preclude additional at-reactor storage at every reactor site – would essentially require DOE to grant priority. However, as previously discussed, no such requirement exists in the Standard Contract or the NWPA. Further, even if the Yankees could rely upon DOE's various planning documents to create some kind of binding obligations, none of those documents suggest that DOE ever expected to attempt to preclude at-reactor storage at every reactor site. The only planning documents to which the Yankees have referred identify a goal of attempting to preclude additional at-reactor storage "in the aggregate," not individually. PFOF 71.g. The Yankees' attempt to stretch the suggestions contained in DOE's planning documents far beyond their actual language lacks any support.

Further, the testimony at trial firmly established that the Yankees have never believed that DOE is obligated to exercise its discretion to grant them priority. As previously discussed, in interpreting the requirements of a contract, the behavior of parties before the "advent of controversy" is often more revealing than the contract language alone, Omni, 41 Fed. Cl. at 591, and a "principle of contract interpretation is that the contract must be interpreted in accordance with the parties' understanding as shown by their conduct before the controversy." Julius Goldman's Egg City, 697 F.2d at 1058. Here, both the former President of Yankee Atomic and one of its senior employees testified at trial that they clearly understood that the priority provision

did not require DOE to grant any shutdown reactor, including the Yankees, priority. PFOF 113. Twice in 1992 and again in 1996, Yankee Atomic requested priority from DOE, but, in making that request, never identified (either to DOE or in its internal memoranda) any view that DOE was somehow obligated to grant Yankee Atomic's request to satisfy the goals of the NWPA or for any other reason. See, e.g., PFOF 112, 119.c. To the contrary, Yankee Atomic indicated that priority was "consistent with Yankee's desire," DX 35 (internal Yankee memo from Mr. Buchheit to Mr. Grube (9/25/92)) (emphasis added), without any mention of an obligation upon DOE to grant that priority. Further, in the decommissioning studies that the Yankees have performed in the past, the Yankees have never assumed priority for shutdown reactors. See PFOF 118. The Yankees' current interpretation of the priority provision conflicts with their pre-litigation interpretation.

The Court also indicated in response to our motion *in limine* that DOE's discretion in denying priority to the Yankees would have to have been exercised reasonably and rationally. Order, at 3 (June 28, 2003). "[W]hen the parties to a contract vest one party with the discretion to make a critical factual determination under the contract, this court narrowly reviews that determination to ascertain whether that discretion was arbitrarily or capriciously exercised." Reservation Ranch, 39 Fed. Cl. at 714. However, as previously explained, this Court cannot base a damages award upon a belief that DOE "would have" exercised its discretion in a certain way. See Marketing & Management, 62 Fed. Cl. at 130-31. Even if it could, the evidence at trial in this case confirmed that DOE's consistent position in rejecting priority for shutdown reactors has been wholly reasonable. A large number of utilities have been opposed to priority for shutdown reactors, PFOF 112.b, 116.b, which the Yankees have always understood, PFOF 116, and DOE

has declined to grant priority to shutdown reactors in part because "[t]he industry's consensus position was that no priority should be afforded to shutdown reactors," DX 149 at 1; see Tr. 672:22-673:2, 4084:13-17, and because of the inequities that would result in allowing some utilities to move forward in the acceptance queue while pushing others back. PFOF 112. Yankee Atomic attempted to convince industry representatives to support priority, but eventually acknowledged that "a consensus could not be reached by utilities" regarding whether DOE should grant priority to shutdown reactors. PFOF 116. At trial, the Yankees did not elicit any testimony that DOE denied requests for priority for any other reasons. Clearly, DOE's consistent exercise of discretion in denying priority has not been arbitrarily or capriciously exercised. Accordingly, the Yankees have failed to prove that DOE was obligated to grant them priority acceptance and cannot base an increased damages award upon the priority provision.

In any event, even if they established that DOE was obligated to grant priority, the Yankees failed to present any testimony or evidence that the grant of priority in SNF acceptance would have resulted in SNF acceptance dates for the Yankees as early as those depicted in Mr. Graves' exchanges model. As established at trial, there are more than a dozen shutdown reactors, each of which would have the right, under the Yankees' theory, to receive priority status in SNF acceptance. Tr. 948:25-949:11, 4056:8-15. It is unclear from the evidence of record when DOE could accept all shutdown reactor SNF under any particular rate of SNF acceptance and which shutdown reactors would receive priority over other shutdown reactors. The Yankees have failed to establish that DOE was required to conclude SNF acceptance by the specific dates that the Yankees have identified in their causation analysis.

## V. WITHOUT MR. GRAVES' EXCHANGES MODEL OR DOE'S GRANT OF PRIORITY, THE YANKEES HAVE NOT ESTABLISHED CAUSATION FOR THEIR CLAIMED DAMAGES

### A. Without The Fuel-Out Dates That Mr. Graves' Model Generated, The Yankees Have Failed To Establish That Their Annual SNF Storage Costs Were Caused By DOE'S Breach

Without the speculative fuel-out dates that Mr. Graves' theoretical model projects generates, the Yankees have failed to establish any causal link to its continuing annual SNF storage costs and DOE's partial breach of the Standard Contract. The annual operations and maintenance ("O&M") costs that a nuclear utility incurs do not generally depend upon the amount of SNF that the utility possesses. As long as the utility possesses some SNF, it will have to incur the same O&M costs. PFOF 272A. Absent reliance upon an "exchanges" theory, it is clear that, under either the SNF acceptance schedule of 3,000 MTUs that the Yankees argue is mandatory or the acceptance schedule that DOE published in the 1991 Annual Capacity Report ("ACR"), none of the Yankees would yet have had all of their SNF removed from their facilities under an "oldest fuel first" acceptance queue, even if DOE had begun SNF acceptance on January 31, 1998. See PFOF 127, 128, 131.a-.c. Accordingly, even if DOE had timely performed the Standard Contract, the Yankees would still be incurring the O&M costs that they now seek to have the Government pay. Because these costs are not incremental to DOE's partial breach, the Yankees cannot recover them in this litigation.

### B. Without The Fuel-Out Dates That Mr. Graves' Model Generated, The Yankees Have Failed To Establish That They Would Not Have Built Dry Storage Regardless Of DOE's Delay

Absent the specific fuel-out dates that Mr. Graves' hypothetical exchanges model generates, each of the Yankees has failed to establish that, had DOE begun SNF acceptance in

1998, they would not have constructed the same dry storage facilities ("ISFSIs") for that SNF for which they seek to recover in this litigation. The only evidence that the Yankees presented at trial regarding causation for ISFSI construction was that, because DOE did not accept SNF from Yankee Atomic, Connecticut Yankee, and Maine Yankee by 1999, 2001, and 2002, respectively, the Yankees would not have needed to go to dry storage. Absent those fuel-out dates, the Yankees did not establish whether they would have gone to dry storage or, importantly, whether the delay caused any incremental increase in the scope or size of an ISFSI that they would have constructed anyway. To be recoverable, damages must be direct and not the result of any intervening incident. See Ramsey, 121 Ct. Cl. at 434, 101 F. Supp. at 357. "For a damage to be direct there must appear no intervening incident . . . ; the cause must produce the effect inevitably and naturally, not possibly nor even probably." Ramsey, 121 Ct. Cl. at 434, 101 F. Supp. at 357; see Myerle v. United States, 33 Ct. Cl. 1 (1897) ("[t]here must not be two steps between cause and damage"). Further, the plaintiff has the burden of proving causation for all of its damages. Alaska Pulp, 59 Fed. Cl. at 413-14.

In their planning documents, each of the Yankees assumed that, even absent any delay by DOE, they would need to store their SNF for many years. In its planning documents, Yankee Atomic repeatedly assumed that it would construct an ISFSI while assuming timely performance by DOE. See PFOF 283-285. For example, in February 1992, Yankee Atomic's decommissioning study assumed 19 years of SNF storage in an ISFSI and DOE performance beginning in 1998, PFOF 284, and, soon thereafter, a second decommissioning study, again assuming timely performance by DOE, confirmed Yankee Atomic's plans to construct an ISFSI

by June 30, 1996, where its SNF would be stored until 2018. PFOF 285.[17] Similarly, Connecticut Yankee, in a 1992 planning document, set forth its understanding that, assuming timely SNF acceptance by DOE, it would still need to store its SNF through 2019. PFOF 287. Maine Yankee likewise anticipated incurring future SNF storage costs through 2018, assuming that DOE began acceptance in 1998. PFOF 289.

In making decisions concerning its long-term SNF storage needs, none of the Yankees assumed fuel-out dates predicated upon exchanges or priority, even in connection with studies that assumed DOE performance beginning in 1998. See PFOF 132. In fact, not a single Yankee document contains projected fuel-out dates consistent with either Mr. Graves' exchanges theory or with Mr. Graves' acceptance rate under an OFF schedule. Yankee Atomic assumed fuel-out dates as late as 2030, Connecticut Yankee as late as 2018, and Maine Yankee as late as 2018, all assuming timely DOE performance. PFOF 131.a-.c. The evidence demonstrates that, even with DOE performance beginning in 1998, the Yankees assumed that they would be required to store their SNF well into the future and that they made decisions based upon those understandings. PFOF 131.a-.c.

Once the Yankees elected to permanently shutdown, their decisions to construct ISFSIs all were predicated upon the desire to decommission their nuclear reactors and wet storage pools promptly.[18] PFOF 292. Prompt decommissioning involves the decontamination and

---

[17] Likewise, in both its October 1994 and March 1995 decommissioning studies, again assuming timely DOE performance, Yankee Atomic set forth its plan to transfer its SNF to dry storage by January 1, 2000 where it would remain until through 2018. PFOF 286.

[18] Connecticut Yankee decided to build dry storage construction as part of a settlement agreement with the Connecticut Department of Public Utilities and several other parties. DX 740 (FERC Rate Case Settlement).

dismantlement of the plant structures in the short term, while delayed decommissioning prolongs most activities until all the SNF has been removed from the site. PFOF 290. Through prompt decommissioning, the Yankees sought to reduce their decommissioning costs and, most importantly, to eliminate uncertainty regarding their ability to dispose of the low-level radioactive waste ("LLW") that they possess. PFOF 292, 293. LLW disposal was identified by all three Yankees as a significant concern in the decommissioning process, particularly because the LLW disposal site in Barnwell, South Carolina – which is the only LLW disposal option that the Yankees have for at least some of their LLW – is scheduled to close in 2008. PFOF 293.c(i)-(iii). Further, Barnwell's availability as a disposal site for LLW was and is susceptible to political influence, having closed to out-of-compact facilities, like the Yankees, in 1994 and 1995. PFOF 293.c. The dismantlement of the nuclear reactor and the spent fuel pool generates a significant amount of LLW. PFOF 293.g. To be able to dispose of all LLW, the SNF assemblies must be removed from the wet pool so that the pool itself can be dismantled. PFOF 290. As a result, if the Yankees were unable to decommission their wet fuel pool promptly and, instead, were required to wait until the projected dates upon which DOE would have removed all SNF absent the delay in SNF acceptance, the Yankees potentially would lack a location at which to dispose of the LLW generated in a delayed decommissioning scenario. PFOF 293.a.-.c. In fact, because of the lack of an available LLW disposal site when Yankee Atomic shutdown, Yankee Atomic initially pursued delayed decommissioning, but quickly revisited that decision when Barnwell reopened to Yankee Atomic. PFOF 293.c(iii). The importance that the availability of

Barnwell as a LLW disposal site has played in the Yankees' decommissioning decision-making evidences its effect upon the Yankees' decisions to build ISFSIs.[19]

Further, prompt decommissioning is less costly than scenarios that involve longer time horizons. PFOF 292. Prompt decommissioning allows the utility to utilize current employees who are familiar with the facility to support the decommissioning effort, reducing costs that otherwise would be incurred in connection with hiring and training new staff in a delayed decommissioning scenario. PFOF 295. Additionally, by moving SNF from the wet pool to dry storage, the Yankees allowed themselves to use decommissioning techniques, such as the use of demolition explosives, that cannot be used while SNF is in the spent fuel pool, further reducing the costs and risks associated with decommissioning. PFOF 291. One of the specific reasons that Yankee Atomic planned to transfer its SNF to dry storage by June 30, 1996, was to allow decommissioning activities to proceed unhindered by spent fuel pool restrictions. PFOF 291. The significant savings associated with prompt decommissioning are clear in the decommissioning studies prepared upon behalf of the three Yankees. See PFOF 292.

---

[19] LLW disposal costs also represent a significant portion of the total cost of decommissioning, and those costs have tended to increase over time. In February 1992, Yankee Atomic estimated that the total cost of LLW disposal to be $22,340,000. PFOF 293.d(i). Three months later, the estimated costs of LLW disposal had nearly doubled to $43,682,000. PFOF 293.d(i). Likewise, in 1992, Connecticut Yankee estimated that the cost of LLW disposal, not including the associated packaging and shipping costs, would be $57,785,000. PFOF 293.d(ii). By December 1996, estimates of LLW disposal costs had increased to $61,265,000. PFOF 293.d(ii)-(iii). Finally, in August 1993, Maine Yankee estimated that, LLW disposal costs, exclusive of packaging and shipping costs, would total $78.9 million. PFOF 293.d(iii). Four years later, that estimate had risen to $83.3 million. PFOF 293.d(iii). The former President and Chief Executive Officer of Yankee Atomic, Dr. Kadak acknowledged the significant benefits associated with retiring the LLW obligations early. PFOF 293.

In fact, the decisions of each of the Yankees to shut down their nuclear power plants years before their licenses for those plants was to expire and to construct dry storage to facilitate prompt decommissioning were voluntary business decisions. When the Yankees executed their Standard Contracts, their plant licenses extended into the 2000s. PFOF 273, 277, 280. Each of the Yankees decided to shutdown prematurely to save the Yankees' ratepayers hundreds of millions of dollars. PFOF 276, 279, 282. Likewise, the decision to decommission promptly also stood to save ratepayers for the Yankees hundreds of millions of dollars. PFOF 292. To obtain these savings, the Yankees each needed to remove the SNF from their wet pools and incur costs associated with the construction of ISFSIs. PFOF 290. Now, having saved their ratepayers hundreds of millions of dollars based upon their business decisions, the Yankees seek to pass the only liability incurred – the increased costs associated with ISFSI construction – to the Government. As noted above, a party seeking damages for breach "must show, not only that he has suffered a loss, but also that it would not have been incurred, but for the wrongful act of his adversary . . . ." Fawick, 149 Ct. Cl. at 637 (emphasis added) (quoting Osage Oil, 287 F. at 852); see San Carlos Irrigation, 111 F.3d at 1563 ("[a] plaintiff must show that but for the breach, the damages alleged would not have been suffered"). Costs that the Yankees incurred as a result of voluntary business decisions were not incurred "but for" DOE's breach and, therefore, are not recoverable.

The Yankees may contend that, even if they would have constructed a dry storage facility regardless of DOE's delay, the ISFSI that they constructed could have been smaller than the ones that they needed because of the delay. However, they elected not to present any evidence at trial that would allow the Court to identify whether that assertion is true. Further, they presented no

evidence that would allow the Court to quantify the increase in size of the ISFSIs that the delay created or the incremental amount of the costs associated with that increased size. If the Court declines to accept their speculative and unsupported premise that DOE was obligated to remove all of their SNF by 1999, 2001, and 2002, their calculated decision not to present such evidence simply means that they failed to prove that DOE's delay imposed any incremental costs upon them. See Fawick, 149 Ct. Cl. at 637. This gamble was of the Yankees' own making and provides no basis for any type of damages award. Because they failed to prove any incremental costs in ISFSI construction because of DOE's delay, they are entitled to no recovery for this effort.[20]

## VI. EVEN IF THE COURT ACCEPTS MR. GRAVES' FUEL-OUT DATES, MANY OF THE YANKEES' DAMAGES ARE NOT RECOVERABLE

### A. Assuming That The Court Accepts All Of The Premises Underlying The Yankees' Damages Claims, The Yankees Still Are Required To Prove That Each Of Their Alleged Costs Were Incremental To The Breach, Are Adequately Supported, Are Reasonably Certain, And Are Reasonable In Amount

Even assuming that the Court accepts all of the premises underlying Mr. Graves' hypothetical exchanges model or that the Government was somehow obligated to grant priority to all of the Yankees' SNF, the Yankees still have the burden of proving that each of their claimed damages is recoverable with admissible evidence. Even assuming the correctness of Mr. Graves' fuel-out dates, the Yankees must establish that each of the claimed damages is incremental to DOE's partial breach, and that, had there been no delay, the Yankees would not

[20] Both Maine Yankee and Connecticut Yankee have also claimed as damages the costs associated with reracking their wet fuel pools. As will be discussed below, regardless of whether the Court accepts Mr. Graves' fuel-out dates, those costs are not related to DOE's partial breach and should be denied.

have to have incurred those costs. Willems Indus., 155 Ct. Cl. at 376, 295 F.2d at 831 (damages must be caused by the breach). The Yankees also must provide appropriate documentary or other support from their records to establish their damages claims. Roseburg, 978 F.2d at 667 (plaintiff must provide adequate support for claimed costs). Finally, the Yankees must establish that their alleged damages are not speculative. San Carlos, 111 F.3d at 1563 (plaintiff may not recover speculative damages). If the Yankees fail to meet their burden with regard to any particular claimed damage, they cannot recover that claimed damage, and the Yankees cannot place upon the Government the burden of disproving a presumption that each of their damages are adequately supported and reasonably certain. See Quiman, 39 Fed. Cl. at 183. The burden of proof in this case is upon the Yankees.

### B. The Yankees' Claims For "Past Damages" That Pre-Date DOE's Breach Are Not Recoverable As A Matter Of Law

The Court in this case has already determined that the Department of Energy breached the Standard Contract on January 31, 1998, when it failed to begin acceptance of the nuclear utilities' SNF and/or HLW by that date. See Maine Yankee Atomic Power Co. v. United States, 225 F.3d 1336, 1343 (Fed. Cir. 2000) (DOE's failure to "begin accepting nuclear waste no later than January 31, 1998" constituted "breach of the contract"); see Yankee Atomic Elec. Co. v. United States, 42 Fed. Cl. 223, 236 (1998) ("DOE's failure to begin disposal services by January 31, 1998 remains an unauthorized breach of Article II [of the Standard Contract]"), aff'd sub nom. Maine Yankee Atomic Power Co. v. United States, 225 F.3d 1336 (Fed. Cir. 2000). As we previously explained in our motion *in limine* regarding pre-breach damages, "breach of contract damages are measured from the date of the breach." Lucente v. International Bus. Machines

Corp., 310 F.3d 243, 262 (2d Cir. 2002) (applying New York law) (emphasis added); see Reynolds v. United States, 141 Ct. Cl. 211, 220, 158 F. Supp. 719, 725 (1958) ("[t]he time when performance should have taken place is the time as of which damages are measured"). Pursuant to this Court's past decision, the Yankees' damages would be measured from January 31, 1998, the date of the breach.

As we also explained in that motion *in limine*, the non-breaching party, when faced with a breach, must make an election: to treat the breach as total, effectively terminating the contract, or "continue his performance and sue for partial breach." S&R Corp. v. Jiffy Lube Int'l, Inc., 968 F.2d 371, 376 (3d Cir. 1992). In awarding damages for breach of contract, a fact-finder therefore has to "differentiate between a total or material breach on the one hand and a partial breach on the other, and to measure damages, if any, according to the nature of the breach." Lovink v. Guilford Mills, Inc., 878 F.2d 584, 587 (2d Cir. 1989).

Here, the Yankees' decision to continue the contract after the Government's breach and insist upon the Government's performance of its obligations has at least two consequences. First, because the Government's contractual obligations were not discharged as a result of the Yankees' suit for partial breach, it did not discharge the Government's obligation to accept and dispose of the Yankees' SNF. Second, it limited the Yankees' recovery of damages to those for partial breach. However, the Yankees seek damages that precede the actual partial breach of contract in this case. Although the Yankees appear to contend that its claim for damages incurred prior to the partial breach are predicated upon an alleged "anticipatory" breach by DOE, "a breach by repudiation alone can only give rise to a claim for total breach . . .," effectively ending any further performance obligations by the contracting parties. Restatement (Second) of Contracts § 253

cmt. b (emphasis added). A party cannot seek damages for a total breach based upon anticipatory repudiation and, at the same time, seek continued performance of the contract. Restatement (Second) of Contracts § 236 cmt. b (1981). Further, "an anticipatory breach cannot be predicated on a partial breach of the contract . . . ." City of Fairfax, Va. v. Washington Metro. Area Transit Auth., 582 F.2d 1321, 1331 (4th Cir. 1978) (emphasis added), cert. denied, 440 U.S. 914 (1979); see 4 A. Corbin, Corbin on Contracts § 972, at 901 (1951) ("there seems to be no authority for saying that, for such a partial anticipatory repudiation, an action for damages can be at once maintained"); see Lucente v. IBM Corp., 310 F.3d 243, 262 (2d Cir. 2002) (precluding award of pre-breach damages in response to partial breach based upon theory of anticipatory partial breach, finding that "damages for breach of contract are to be measured *from the date of the breach*.").

Here, the Yankees' decision to proceed under a partial breach theory following DOE's breach on January 31, 1998, and not to declare the Standard Contract at an end following some earlier alleged anticipatory repudiation clearly indicates that Yankee elected to waive any anticipatory repudiation theory. Had Yankee elected to proceed based upon anticipatory repudiation prior to January 31, 1998, and sought to recover damages accruing from the date of the repudiation, Yankee would have had to file its suit at that time and, further, would have to have elected to consider the Standard Contract at an end, eliminating both parties' further performance obligations. However, Yankee waited until the time for DOE's performance under the Standard Contract had passed and then sued for partial breach because it did not want to discharge DOE's obligation to accept the Yankees' SNF. Having made this election, Yankee cannot now attempt to claim damages both for a partial breach of contract on January 31, 1998,

and for an anticipatory total breach of contract at some point earlier than January 31, 1998, while at the same time seeking to enforce DOE's continuing performance obligations under the Standard Contract.

Because the Yankees elected to pursue a partial breach theory in its 1998 suit, they cannot recover damages for costs they incurred prior to DOE's breach on January 31, 1998. See Franconia Associates, 536 U.S. at 143 (party treats an anticipatory repudiation as a present breach "by filing suit prior to the date indicated for performance," but, otherwise, "breach would occur when . . . [the repudiating party's] responsive performance become[s] due"); Cities Service Helix, Inc. v. United States, 211 Ct. Cl. 222, 543 F.2d 1306, 1313 & n.16 (1976) (once party elects to continue repudiated contract, he retains "only a claim for damages for partial breach"); Dunkin Donuts of Am., Inc. v. Minerva, Inc., 956 F.2d 1566, 1571 (11th Cir. 1992) (franchisee who continued performance after learning of material breach could not seek damages for total breach, and his damages were limited to those for partial breach); Pinewood Realty Ltd. P'ship, 223 Ct. Cl. at 104, 617 F.2d at 215 ("[i]f the injured party ignores the breach, and continues to perform, it has . . . only retained its claim for damages for partial breach").

To the extent that the Yankees attempt to argue that their pre-breach activities were intended to mitigate the anticipated breach, their recharacterization of their costs does not affect the result. A plaintiff cannot simply evade the rule barring recovery of damages for an anticipatory "partial" breach by renaming the damages as the costs of mitigation. See Middleton v. United States, 175 Ct. Cl. 786, 792 (1966). In Reliance Cooperative Corp.v. Treat, 195 F.2d 977 (8th Cir. 1952), the court addressed the obligation to mitigate where one party's anticipatory repudiation went unaccepted by the non-breaching party. The court held that no duty to mitigate

existed, even though the defendant had repudiated the contract. Id. at 982. The court provided two reasons for this rule. First, the court looked to limit the harm visited upon the non-breaching party, finding that "to require the innocent party to make an immediate purchase or sale upon receipt of notice of the other's repudiation would encourage such repudiation on the part of the seller or of the buyer as the market rose or fell." Id. at 983 (citations omitted). Second, the court analyzed the potential effects of mitigation upon the breaching party where the repudiation had not been accepted and performance was, instead, still demanded. Specifically, the court noted that "the immediate action of the innocent party might not have the effect of mitigating his damages, but might, on the other hand, enhance them." Id. (citing Williston On Contracts, Rev. Ed. Vol. 5, § 1397).

A large portion of the pre-breach damages that Connecticut Yankee and Maine Yankee are seeking in this litigation are the costs associated with reracking their wet pools. These pre-breach costs are illustrative of the concern that a party might enhance its damages through pre-breach mitigation. In this case, Connecticut Yankee seeks $8.3 million and Maine Yankee seeks $10.3 million for reracking efforts performed in the mid-1990s. Tr. 2780:17-18 (Thomas); 2307:6-15 (Bennet). In support of these claims, both cast their reracking efforts as mitigation of DOE's impending breach of contract – that is, that both reracked in anticipation of future space constraints that would have resulted from DOE's failure to begin SNF acceptance in 1998.

However, the reracking efforts by both Connecticut Yankee and Maine Yankee ultimately proved unnecessary, as both utilities shut down their reactors prior to 1998. Since they shutdown prematurely, neither Connecticut Yankee nor Maine Yankee actually needed to rerack their pools, at least not as a result of DOE's anticipated partial breach. To the extent that they would

have had sufficient wet pool space to continue operations until DOE was obligated to begin accepting their SNF, they could have waited to incur those reracking costs to ensure that they would be necessary. See Standard Fed. Bank v. United States, No. 95-478C, slip op. at 17 (Fed. Cl. Oct. 12, 2004) (unpublished opinion) ("plaintiff has pointed to no reason why plaintiff was compelled to take action immediately, rather than wait until the need was clear, [several] years hence, before making the decision" to conduct activity). Had they waited until the date of breach – the time upon which the duty to mitigate commences – neither facility would have reracked their pools. The pre-breach "mitigation" in which Maine Yankee and Connecticut Yankee allegedly engaged served only to enhance their damages here and provide a clear example of why courts have barred pre-breach damages.[21]

To the extent that the Yankees claim that costs incurred – including reracking costs that, as a matter of fact, did not have to be incurred – prior to DOE's partial breach are recoverable under principles of mitigation, the Yankees' arguments cannot resurrect its claims for pre-breach damages. Contract obligations are reciprocal. Because no pre-breach obligation to mitigate exists, costs incurred pre-breach for "mitigation" are not recoverable. Further, because no doctrine of anticipatory partial breach exists, the Yankees are not entitled to any of the costs that

---

[21] With regard to their reracking costs, it is clear that Connecticut Yankee and Maine Yankee both reracked their wet fuel pools because they expected to run out of wet pool space before 1998. Specifically, before they shut down their nuclear reactors, Connecticut Yankee anticipated that it would run out of available pool space in 1995 or 1996, and Maine Yankee anticipated that it would run out of space in 1996. PFOF 327-328. Both performed their reracking activities in 1996. Id. Because they were expected to run out of storage space before 1998, the Yankees have failed to establish that their decisions to rerack their wet fuel pools two to three years before DOE was to begin SNF acceptance from them are in any way related to DOE's delay. Accordingly, the Yankees failed to prove causation for these costs.

they incurred or committed themselves to incur prior to January 31, 1998, as those costs cannot be viewed as having been "caused" by the actual partial breach.

C. The Yankees Should Not Be Permitted To Recover Future Damages In This Litigation

In a motion *in limine* filed prior to trial, we explained that, in a partial breach case, a plaintiff "is entitled to maintain an action for damages sustained from breaches up to the time of the institution of the action, and the judgment does not preclude a further action by him for a breach occurring after that date." Restatement (Second) of Judgments § 26 cmt. g, at 241 (1982) (emphasis added); see Kaiser v. Northwest Shopping Ctr., Inc., 587 S.W.2d 454, 457 (Tex. Civ. Ct. 1979) (suggesting that, under Texas state law, plaintiffs seeking damages for partial breach may recover damages incurred through date of filing the pleading). However, the plaintiff is barred from recovering damages for his injury beyond the date of the complaint if he has elected to treat the breach as partial. See id. (in partial breach case, plaintiff can "sue from time to time for the damages incurred to date of suit" (emphasis added); 9 A. Corbin, Corbin on Contracts § 956, at 747 (interim ed. 1979) (plaintiff in partial breach case may recover for breaches "only to the date of the writ").[22]

---

[22] Alternatively, other courts, including this one, have found that damages may be recovered under a partial breach to the extent that they were incurred by the time of trial. In Coughlin v. Blair, 41 Cal. 2d 587, 262 P.2d 305 (1953), the California court held that, "[i]f the breach is partial only, the injured party may recover damages for non-performance only to the time of trial and may not recover damages for anticipated future non-performance." Id. at 598, 262 P.2d at 311, quoted in May v. Morganelli-Heumann & Assocs., 618 F.2d 1363, 1367 n.2 (9th Cir. 1980); see Indiana Michigan Power Co. v. United States, 60 Fed. Cl. 639, 648 (2004) ("[d]amages for partial breach of contract are measured by costs incurred between the breach and the date of trial"), appeal pending, No. 04-5122 (Fed. Cir.); Quick v. American Steel & Pump Corp., 397 F.2d 561, 564 (2d Cir. 1968) ("we see no reason not to apply the usual rule that contracts to pay money in instalments are breached one instalment at a time"); see also Tennessee Valley Authority v. United States, 60 Fed. Cl. 665, 678 (2004) (finding in spent nuclear fuel case

In its June 28, 2004 order denying our motion *in limine*, the Court permitted the Yankees to present evidence that it should be allowed to recover damages through 2010, given that, here, "defendant admits it will not commence performance until 2010," Order, at 2 n.2, and that, in light of this admission, "there is no risk of windfall" and "no possibility that future government performance will ameliorate or eliminate expenditures caused by defendant's failure to take actions necessary to commence performance in 1998 and perform through 2010." Order, at 3. However, as the evidence at trial established, the Government has not admitted that there is no set of circumstances under which DOE might be able to begin SNF acceptance prior to 2010. As Mr. Kouts testified, the possibility of congressional action that would allow DOE to begin accepting SNF prior to that date exists, and legislative proposals have been introduced in Congress in the past that, had they been enacted, would have permitted DOE to begin SNF acceptance earlier than 2010. PFOF 314. Accordingly, the Yankees' assertions that it is without doubt that DOE will not accept any SNF prior to 2010 are unfounded.

Because DOE is obligated to continue its performance of the Standard Contract, and because it is possible that DOE could begin performance prior to 2010, the Yankees' claims for future damages are speculative. If, in fact, the Court awards the Yankees future damages, to and including 2010, but DOE is able through some type of congressional action to begin accepting SNF prior to 2010, it is unclear whether DOE could ever recoup the windfall that the Yankees had received. Further, the notion that plaintiffs can recover future damages in partial breach cases would create endless discovery regarding DOE's "current" and up-to-the-minute plans and

---

that, pursuant to Restatement (Second) of Judgments § 26(1)(b) & (e), plaintiff cannot recover future damages for partial breach).

expectations about the future. By limiting damages to those previously incurred, which can be independently verified and audited, the Court eliminates the possibility of windfalls, of speculation, and of costly and endless discovery into speculation about future events. Because they elected to pursue only a partial breach claim, the Yankees' future damages claims should be denied.

### D. The Fact That The Yankees Possess GTCC Waste And Failed Fuel, Which They Are Responsible For Storing Indefinitely, Precludes A Finding That No Continuing Storage Costs Or Dry Storage Construction Costs Would Have Been Incurred Absent DOE's Delay

#### 1. As Long As The Yankees Must Store GTCC Waste And Failed Fuel, They Will Have To Incur Continuing Storage Costs

Even assuming that Mr. Graves' model appropriately establishes fuel-out dates of 1999, 2001, and 2002 for the three Yankee plaintiffs, that fact alone does not establish causation for all of the Yankees' alleged increased storage and ISFSI construction costs allegedly resulting from DOE's SNF acceptance delay. As previously discussed, a plaintiff seeking damages from the Government must prove that the costs that it seeks to recover were caused by the Government's breach and would not have been incurred absent that breach. That is, any damages that a plaintiff recovers must be incremental to the breach. Here, the Yankees claim that all of the costs associated with their continued storage of SNF are the Government's responsibility. Yet, because they are responsible for the indefinite storage of their GTCC waste and failed fuel, they cannot pass to the Government those costs that they would have incurred regardless of DOE's delay. As the testimony at trial established, so long as the Yankees have to store any GTCC waste or failed fuel on-site, they will be required to incur significant costs for that storage that are duplicative of the costs that they would have to incur if they were storing GTCC waste, failed

fuel, and "standard" SNF. PFOF 208, 272A; Tr. 5558:15-24, 5560:18-5561:9. The removal of all standard SNF from the Yankees' sites will not eliminate the costs that they would otherwise have to incur to store their GTCC waste and failed fuel indefinitely. They cannot recover those non-incremental costs in this litigation.

2. The Yankees Have Not Established That GTCC Waste Is Covered By The Standard Contract

The Yankees claim that GTCC waste is actually covered by the Standard Contract, and that DOE is required to dispose of it on the same schedule as SNF, because the NRC has defined GTCC waste as HLW. The Yankees' argument is wrong.

The Low-Level Radioactive Waste Policy Amendments Act of 1985 ("LLRWPA"), Pub. L. No. 99-240 (codified at 42 U.S.C. §§ 2021b-2021i), rather than the NWPA, makes the disposal of GTCC a Federal responsibility. 42 U.S.C. § 2021c(b). However, as this Court recognized in its June 26, 2003 order, the LLRWPA does not identify any specific deadlines by which DOE must act to accept or dispose of GTCC waste. It further does not establish any specific deadlines by which DOE must enter into agreements with commercial utilities regarding their payment of the costs associated with the acceptance and disposal of their GTCC waste.

The LLRWPA also requires DOE to study and identify the options for insuring that "the beneficiaries of the activities resulting in the generation of [GTCC] bear all reasonable costs of disposing of such wastes." Id. § 2021c(b)(3)(E). The NRC has stated that "it is likely that a separate fund, similar to the HLW Nuclear Waste Fund, would be established to provide for payment of disposal costs by the generators of GTCC wastes, either as an advance fee or as a charge upon waste receipt." 54 Fed. Reg. 22,578, 22,580 (May 25, 1989). To date, DOE has

not established a mechanism for recovering the costs of accepting and disposing of GTCC waste and, further, has not made any definitive determinations regarding the long-term disposal of GTCC waste. At trial, the Yankees did not establish that they had paid any fees for the disposal of GTCC waste.

Despite the fact that DOE's obligations to accept and dispose of GTCC waste are explicitly governed by the LLRWPA, the Yankee plaintiffs assert that DOE is obligated to accept and dispose of their GTCC waste under the NWPA because GTCC waste is "high-level radioactive waste." The NWPA defines “high-level radioactive waste” as follows:

> (A) the highly radioactive material resulting from reprocessing of spent nuclear fuel, including liquid waste produced directly in reprocessing and any solid material derived from such liquid waste that contains fission products in sufficient concentrations; and
>
> (B) <u>other highly radioactive material that the [Nuclear Regulatory] Commission, consistent with existing law, determines by rule requires permanent isolation.</u>

42 U.S.C. § 10101(12) (emphasis added).

In response to the Court's June 26, 2003 order in this case, which reserved the issue of whether the NRC has determined "by rule" that GTCC waste is "other highly radioactive material" that requires "permanent isolation," the Yankees have offered nothing new that would somehow establish that the NRC's prior pronouncements disclaiming any "requirement" that DOE dispose of GTCC waste in "permanent isolation" are ineffective. It is clear that, in its published final rules, the NRC has <u>never</u> "required" DOE to dispose of GTCC in "permanent isolation," has left DOE with the discretion to determine the most appropriate manner in which to recommend disposing of GTCC, and has affirmatively interpreted its own rules as <u>not</u> turning

GTCC waste into HLW. See, e.g., 53 Fed. Reg. 17,709, 17,710 (May 18, 1988) ("[s]ince the possibility of using [an intermediate disposal] facility is left open, the Commission is not now determining that the [GTCC] wastes, even if highly radioactive, do in fact 'require permanent isolation;' accordingly, the NWPA definition of HLW does not apply"); 54 Fed. Reg. 22,578, 22,279 (May 25, 1989) ("GTCC wastes would not be classified as HLW under these amendments," emphasizing that "these amendments preserve DOE's flexibility to pursue either one of these alternatives" [permanent isolation in a repository or intermediate disposal methods]); id. at 52,582 ("[t]he rule identifies one approved method [for GTCC disposal] if DOE so desires, but allows DOE to plan and develop an alternative method if DOE so desires, subject to Commission approval"). As a result, the NRC plainly did not "determine, by rule," that GTCC waste requires permanent isolation or that GTCC waste is highly radioactive.

Further, the NRC recently issued a final rule concerning the licensing requirements for the interim storage of GTCC waste. See 66 Fed. Reg. 51,823 (Oct. 11, 2001). In this final rule, the NRC responded to two commentors who believed that the definition of GTCC waste should be changed, one proposing that GTCC be classified as SNF and the other that it be reclassified as HLW. Id. at 51,827. The NRC responded by stating that "[t]he NRC believes, at this time, that defining all GTCC waste as spent fuel or high-level waste . . . could lead to confusion and inefficiency." Id. at 51,828. It determined that, "[i]f GTCC waste is defined as spent fuel or high-level waste, DOE would be required to dispose of this waste in a deep geologic repository (e.g., Yucca Mountain) and would not have the flexibility to explore potentially more efficient disposal plans." Id. The final rule authorized the storage of GTCC waste in interim storage facilities, rather than requiring emplacement in a deep geologic repository. Id. at 51,825. In

addition, the final rule reemphasized that, although "GTCC is generally unsuitable for near-surface disposal at low-level waste (LLW)," it is still "considered as LLW," not highly radioactive material. Id. at 51,823.[23]

Given that the NWPA defines HLW as “other highly radioactive material that the [NRC] . . . determines by rule requires permanent isolation,”42 U.S.C. § 10101(12), the NRC’s interpretation of whether it has determined GTCC to constitute HLW would be entitled to substantial deference. “[S]ubstantial deference is given to the agency’s interpretation of its own regulations unless ‘it is plainly erroneous or inconsistent with the regulation.’” Westberry v. Principi, 255 F.3d 1377, 1382 (Fed. Cir. 2001) (quoting Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 512 (1994)). Deference is especially appropriate where Congress has explicitly delegated to the NRC the responsibility for making the highly technical determination of what constitutes HLW. See Glaxo Operations UK Ltd. v. Quigg, 894 F.2d 392, 399 (Fed. Cir. 1990)

---

[23] Although it would be inappropriate for the Court to consider parol evidence in interpreting the meaning of rules published in the Federal Register, to the extent that the Court accepts any evidence from the Yankees regarding their beliefs about the meaning of the NRC's rules, the Court should equally consider that the NRC recently reiterated its position that GTCC waste has not been defined as HLW and that the definition of HLW should not be changed to include GTCC waste. By letter dated October 24, 2000, Andrew Kadak, the former President and Chief Executive Officer of Yankee Atomic Electric Company, informed the NRC that "[t]he issue of Greater Than Class C (GTCC) waste has been an open issue for many years," that "[i]t appears that what everyone understands is required, namely disposal in a geological repository, is not being implemented due to a technicality in the regulations and law," and that the "lack of designation [by the NRC of GTCC waste as HLW] prevents the Department of Energy from taking this [GTCC] waste from shutdown nuclear plants in the process of decommissioning." PFOF 217. Mr. Kadak informed the NRC that "[a] one sentence definition [by the NRC] stating that GTCC is high level nuclear waste should clear this long standing issue and provide DOE the basis for accepting GTCC waste." PFOF 217. On May 21, 2001, in response to that letter, the NRC informed Mr. Kadak that “the NRC has decided, consistent with past decisions, not to classify GTCC as HLW” and referred Mr. Kadak to the LLRWPA as the source of DOE’s responsibilities for GTCC, rather than the NWPA or the Standard Contract. PFOF 213.d.

("Significant deference is due to an agency's technical expertise when Congress has explicitly or implicitly delegated to the agency the making of scientific determinations."). See generally Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 843-44 (1984) (holding that deference should be given to agency regulations when Congress expressly delegates to an agency the authority to make a particular determination).

3. The Yankees Have Historically Understood That GTCC Waste Is Not Covered By The NWPA Or The Standard Contract

To the extent that the Court considers extrinsic evidence to interpret the NRC's rules, it is clear that the Yankees have always understood that GTCC waste is not covered by the NWPA or the Standard Contract. Dr. Kadak, former President and CEO of Yankee Atomic, admitted that GTCC waste had not been designated as HLW by the NRC. PFOF 217. Mr. Grube, who testified for the Yankee plaintiffs as to the contractual intent of the parties, admitted that while the Yankees hoped that the definition ultimately would be broadened, they read the NWPA to exclude GTCC waste. PFOF 216. Certainly, if the Yankees believed that GTCC was covered by the Standard Contract, they would not have requested its reclassification, as they did in 1996. See PFOF 218. Indeed, Connecticut Yankee specifically stated in its 1998 FERC filing that "there is no existing regulation requiring that DOE remove and dispose of GTCC waste" and "that even if DOE accepts such waste for disposal in a spent fuel repository, it is not reasonable to assume that it will do so without assessing further fees." PFOF 219.a. Even Dr. Bartlett, the Yankees' paid expert and former director of the Office of Civilian Radioactive Waste Management, admitted that GTCC waste, by definition, is not high-level radioactive waste, that

the NRC has not required permanent isolation of GTCC waste, and that the Standard Contract does not cover GTCC waste. PFOF 222-223.

4. The Yankees Have No Legal Basis For Asserting That DOE "Would Have" Accepted GTCC Concurrently With The Plaintiffs' SNF

Despite NRC's clear and unambiguous declaration that GTCC waste does not constitute HLW, the Yankees have argued that, even if not obligated to do so, DOE would have accepted and removed SNF and GTCC waste concurrently and, therefore, should be held liable for failure to remove the Yankees' GTCC waste. However, this argument is pure speculation. Further, we know of no precedent that would allow the Yankees to recover damages based upon the Government's failure to provide a service in a specific time frame and manner that the Government had no contractual obligation to provide. A claim for damages based upon the Government's failure to remove GTCC waste would amount to an alternative claim for damages pursuant to the LLRWPA. It is the LLRWPA, not the NWPA, that establishes the Federal responsibility for the disposal of GTCC waste. However, this Court lacks jurisdiction to entertain such a claim. The LLRWPA is not a "money mandating" statute that confers a substantive right to recover money damages and, hence, would permit the Court to consider this claim pursuant to the Tucker Act, 28 U.S.C. § 1491(a)(1). See Testan v. United States, 424 U.S. 392, 398 (1976). As discussed above, the Government has not entered into contracts with the plaintiffs for the acceptance and/or disposal of the plaintiffs' GTCC waste, and the plaintiffs have not paid any monies to DOE under the LLRWPA for the disposal of their GTCC waste. Until, at a minimum, the plaintiffs have paid for GTCC waste disposal under the LLRWPA, they have no

basis for seeking damages for the Government's "failure" to accept and dispose of their GTCC waste.

Further, because DOE is not under an obligation to dispose of GTCC waste pursuant to the contract that is the basis of this lawsuit, DOE's failure to accept that waste cannot be the basis of an award of damages for breach of that contract. Consequential, or "special," damages for breach of contract "are those claimed to result as a secondary consequence of the defendant's non-performance." 3 D. Dobbs, Dobbs Law of Remedies § 12.4(1), at 62 (2d ed. 1993). They are distinguished from general damages, "which are based on the value of the performance itself, not on the value of some consequence that performance may produce." Id. The following example distinguishes between general damages, which may be recovered against the Government in an appropriate case, and consequential damages, which can never be recovered against the Government:

> For example, if the defendant contracts to supply feed for cattle and fails to do so, general damages would be based on the value of the feed itself and might be calculated by giving the plaintiff the difference between the contract price and the market value. Consequential damages, in contrast, might be based on the loss of cattle from starvation, or diminished profits because the cattle could not be properly fattened before selling them.

3 D. Dobbs, supra, § 12.4(1), at 62-63. As we established above, the Standard Contract itself does not obligate the Government to accept or dispose of the plaintiffs' GTCC waste. Further, the plaintiffs had no "contract" or agreement requiring DOE to accept their GTCC waste beginning January 31, 1998. Consequently, the Government's alleged failure to accept and dispose of the plaintiffs' GTCC at the same time that it should have performed its obligations under the Standard Contract is, at best, a consequential damage that is not recoverable.

The factual evidence presented at the trial of this matter made clear that DOE has not yet decided how it will dispose of GTCC waste, and that any assumption that GTCC waste will be disposed of in the Yucca Mountain repository is pure speculation. Before any decision can be made as to the disposal of GTCC waste, an Environmental Impact Statement must be completed. See, e.g., PFOF 225. Such an EIS has not been completed, and consequently, no decision has been made with regard to the disposal of GTCC waste. See PFOF 226-229. Moreover, contrary to the Yankees' arguments, it is not at all clear that it would even be possible to dispose of commercial utility generated GTCC waste in the Yucca Mountain repository. The Yankee plaintiffs did not establish that they have paid the Government any fees for the disposal of their GTCC waste. See PFOF 234. The Yucca Mountain repository is not being designed for the disposal of commercial utility GTCC waste. PFOF 236-237; see PFOF 238. No analyses have been performed to determine whether placing GTCC waste in the "backfill spaces," a hypothetical alternative offered by the Yankee witnesses, is technically possible. PFOF 244-247.

In its June 26, 2003 order, this Court noted that "Plaintiff asserts the evidence will show that the Department of Energy would not leave GTCC on a reactor site after removing all SNF and/or HLW." Despite their promises, the Yankees have proven no such thing. The testimony heard at trial makes clear that DOE has not yet decided how it will dispose of GTCC. Therefore, as the Yankees have recognized, they will be required to store their GTCC onsite for "a long, long time." PFOF 240.

4. The Yankees Are Responsible For The Indefinite Storage Of Their Failed Fuel

The Standard Contract provides three broad classifications of fuel: (1) Standard Fuel; (2) Nonstandard Fuel; and (3) Failed Fuel. 10 C.F.R. § 961.11, App. E, ¶ A. Although DOE is required to accept and dispose of failed fuel and nonstandard fuel under the Standard Contract, DOE is not obligated to accept them under the same schedule as standard fuel. Instead, DOE is entitled to remove other than standard fuel (including failed fuel) from the "oldest fuel first" priority ranking for acceptance of SNF and, at its discretion, to place it at the end of the acceptance queue for all contract holders' SNF. Id. Art. VI.A.2(b).

All three of the Yankee plaintiffs possess failed fuel, pursuant to the Standard Contract. PFOF 264. Failed fuel may, depending upon the nature of the failure, have to be treated with greater consideration than standard fuel, because such failed fuel potentially is more dangerous to the operators and could contaminate a facility. PFOF 266. DOE must determine the technical feasibility of disposing of failed or nonstandard fuel on a case-by-case basis, once the condition of a given assembly is known. PFOF 268. To the extent the Yankees have encapsulated their failed fuel, “Previously Encapsulated Assemblies” remain failed fuel pursuant to paragraph B.6.b. of Appendix E of the Standard Contract. PFOF 262.

If it is determined that failed fuel requires special handling, its acceptance by DOE may be delayed, as permitted by the Standard Contract. PFOF 272. Thus, "but for" DOE's delay in beginning SNF and/or HLW acceptance, the Yankees would still have been required to store failed and nonstandard fuel for a potentially indefinite period of time and, therefore, cannot recover costs resulting from their storage of failed fuel. Fawick, 149 Ct. Cl. at 637.

The Yankees also possess canisters, also known in the industry as "multiple element sealed containers" ("MESCs"), that they have elected to use for the dry storage of their SNF, failed fuel, and GTCC waste. PFOF 301. No provision of the Standard Contract requires DOE to accept or dispose of MESCs. MESCs are not SNF, as defined by the Standard Contract. See PFOF 302 (DX 6, 7, & 8, Art. I(18)). Nor are MESCs HLW, as defined by the Standard Contract. See id., Art. I(12). As a result, MESCs are not currently an acceptable waste form pursuant to the Standard Contract. PFOF 303.

Before DOE could modify the Standard Contract to make MESCs an acceptable waste form, further technical analysis would be required. PFOF 308. For instance, DOE would be required to analyze whether such canisters are directly disposable or whether, instead, they will need to be reopened and repackaged upon receipt at the repository. PFOF 309. Even assuming that DOE ultimately will modify the Standard Contract to include MESCs, DOE has not decided upon what schedule MESCs would be accepted. PFOF 310. Therefore, it is possible that the Yankee plaintiffs will be in possession of their MESCs, and the SNF, failed fuel and GTCC waste stored therein, for an indefinite period of time. Thus, even in the absence of DOE's delay in beginning acceptance of SNF and/or HLW, the Yankees would still have to store these items, and cannot recover damages for their storage costs.

## VII. TO THE EXTENT THAT THE YANKEES HAVE ESTABLISHED THAT ALL OF THEIR DAMAGES WERE CAUSED BY DOE'S PARTIAL BREACH, THE DISPROPORTION BETWEEN THE YANKEES' FEE PAYMENTS AND THE IDENTIFIED DAMAGES WARRANTS A REDUCTION IN THE GOVERNMENT'S LIABILITY

If, in fact, the breach here is only "partial" but results in the astronomical damages that the Yankees have alleged, the Court should exercise its discretion to limit the Yankees' damages.

The Restatement (Second) of Contracts provides that "[a] court may limit damages for foreseeable loss by excluding recovery for loss of profits, by allowing recovery only for loss incurred in reliance, or otherwise if it concludes that in the circumstances justice so requires in order to avoid disproportionate compensation." Restatement (Second) of Contracts § 351(3) (1981).[24] "It is not always in the interest of justice to require the party in breach to pay damages for all of the foreseeable loss that he has caused." Id. § 351(3) cmt. f. "There are unusual circumstances in which it appears from the circumstances either that the parties assumed that one of them would not bear the risk of a particular loss or that, although there was no such assumption, it would be unjust to put the risk of a particular loss or that, although there was no such assumption, it would be unjust to put the risk on that party." Id. One of those circumstances is where there is an extreme disproportion between the price paid and the damages sought:

> One such circumstance is an extreme disproportion between the loss and the price charged by the party whose liability for that loss is in question. The fact that the price is relatively small suggests that it was not intended to cover the risk of such liability.

Id. These limitations "are more likely to be imposed in connection with contracts that do not arise in a commercial setting." Id.

Although this provision of the Restatement has rarely been applied, the circumstances of this case warrant its application. Here, although Yankee Atomic has paid a total of approximately $22 million (both its one-time fee and its quarterly fees) into the Nuclear Waste

---

[24] The United States Court of Appeals for the Federal Circuit recently held that "[t]he Restatement of Contracts is recognized as an appropriate source of authority in contract cases." Hansen Bancorp, Inc. v. United States, 367 F.3d 1267, 1308 n.9 (Fed. Cir. 2004) (citing Mobil Oil Exploration v. United States, 530 U.S. 604, 608 (2000)).

Fund, see Tr. 1555:9-14, 1556:13-14, 1557:2-4, 1558:4 (Bennet), it seeks damages here of more than $191 million, the right to return to seek additional damages in the future, and DOE's obligation eventually to accept Yankee Atomic's SNF. Similarly, Connecticut Yankee and Maine Yankee have paid approximately $41 million and $65 million into the NWF, see DX 802, Tr. 2304:10-19 (Bennet), Tr. 2736:22-2737:4 (Thomas), but seek current damages of more than $197 million and $159 million, respectively, as well as the right to seek additional damages and DOE's performance of its contract obligations. It is impossible at this point in time to define the limits of the Yankees' claimed damages or the actual costs to the Government not only of the damages that the Yankees will seek, but also of the actual performance that DOE must provide. There is a massive disparity between the amount of the Yankees' payment obligations and the apparent value of DOE's disposal services, as indicated by the amount of the Yankees' damages. Yet, it was the Yankees' ratepayers, not Federal taxpayers, who received the benefit of the Yankees' generation of nuclear power. This huge disparity between the amount of monies paid and the value of the disposal services is not one that the taxpayers should have to shoulder. To the extent that the Court finds that the Yankees have established that all of their claimed damages were caused by DOE's delay, the Court should exercise its authority under section 351(3) of the Restatement to limit any awarded damages in the interests of justice.

## VIII. THE YANKEES HAVE IDENTIFIED NO BASIS UPON WHICH THEY CAN RECOVER FOR A TAKING OF THEIR REAL PROPERTY

### A. The Yankees Have Not Identified Any Basis For A Taking Of Their Real Property Because Any Rights To Require DOE To Accept Their SNF And/Or HLW Were Created Through The Standard Contract

"The Court of Claims taught that the concept of a taking has limited application when rights have been voluntarily created by contract." Home Sav., 51 Fed. Cl. at 494. "Interference with contract rights generally gives rise to a breach claim because the parties' rights emanate from the contract, and not from a 'taking' for public use." Id. (citing Sun Oil Co. v. United States, 215 Ct. Cl. 716, 572 F.2d 786, 818 (1978)). "[W]hen the government is a party to a contract, . . . the contract 'gives rise to the expectation either that the contract will be performed or that the non-breaching party will have available to it a contract-based remedy." Id. at 495 (quoting Castle, 48 Fed. Cl. at 218; see LaVan v. United States, 382 F.3d 1340, 1351-52 (Fed. Cir. 2004) (dismissing takings claim arising from contract); FDIC v. United States, 342 F.3d 1313, 1320 (Fed. Cir. 2003) (same) (affirming Bailey v. United States, 53 Fed. Cl. 251, 256-57 (2002)).

"In analyzing a takings claim, a court must first determine what [property right] was taken." Branch v. United States, 69 F.3d 1571, 1575 (Fed. Cir. 1995). Here, despite its attempt to categorize its takings claim as a taking of its real property, the "property right" about which Yankee actually complains is its "right" to have DOE begin acceptance of SNF and/or HLW by January 31, 1998. The NWPA does not create any such obligation upon DOE to accept or dispose of any particular utility's SNF or HLW, but, instead, authorized the Secretary of Energy "to enter into contracts with any person who generates or holds title to [SNF] of domestic origin," through which the Secretary would create such an obligation towards a particular utility's SNF or

HLW. See 42 U.S.C. § 10222(a)(1) (emphasis added). The Yankees failed to introduce any evidence at trial that they had any "right" to SNF acceptance outside the context of the Standard Contract. Accordingly, any remedy for the Government's delay in accepting the Yankees' SNF and/or HLW must be pursued through the remedies provided through the Yankees' contracts. The Yankees' apparent argument that their current takings claims – for a taking of its "real property" – is unrelated to their Standard Contracts with DOE is meritless.[25] Like the SNF-

---

[25] In its June 26, 2003 order denying the Government's motion for summary judgment upon the Yankees' takings claims, the Court referenced the Federal Circuit's decision in Cienega Gardens v. United States, 331 F.3d 1319 (Fed. Cir. 2003), as potentially supporting a contract holder's right to pursue both a takings claim and a breach of contract claim. This Court recently addressed the application of Cienega Gardens and concluded that a takings claim is not permitted when the contract at issue is with the Government and the Government is the breaching party in Allegre Villa v. United States, 60 Fed. Cl. 11 (2004). As the Court explained in Allegre, the plaintiffs in Cienega Gardens had entered into loan agreements with third parties that were insured by the Department of Housing and Urban Development. The Government subsequently restricted the plaintiffs' prepayment rights in those contracts. Because their contracts were with third parties, the plaintiffs in Cienega Gardens were not in privity with the Government and, therefore, had no contract claim against the Government. Consequently, the plaintiffs in Cienega Garden were allowed to proceed upon a takings theory because they had no contract with the Government upon which to base a breach of contract claim and had property rights that were created outside of a contractual relationship with the Government. That is, the Government had "taken" the plaintiff's contract rights with a third party. Conversely, because the plaintiff in Allegre Villa had a contract with the Government and was in privity of contract with the Government, this Court required it to pursue the breach of contract claim and dismissed its takings claims:

> Because their contracts were with private lenders, plaintiffs in Cienega Gardens and Chancellor Manor were not in privity with the Government; thus, no contract claim against the Government was available to address the subsequent prepayment limitations by the Government. The present action, in contrast, involves plaintiffs that entered into contracts directly with the Government, and such contracts provide a remedy for the later prepayment restrictions.

Allegre Villa, 60 Fed. Cl. at 19. Applying the analysis of Allegre Villa to the facts of this case, the Yankees' takings claims fail. The Yankees are seeking to recover damages based upon rights

related takings claim in Southern Nuclear Operating Co. v. United States, No. 98-614C, slip op. at 5 (Fed. Cl. Apr. 7, 2004) (unpublished opinion), this claim should be dismissed.

B. To The Extent That The Yankees Believe That DOE's Non-Acceptance Of The Yankees' GTCC Waste Creates A Taking, The Yankees Have Identified No Property Right To Removal Of Their GTCC Waste

In its June 26, 2003 order denying the Government's motion for summary judgment, the Court indicated that, assuming that GTCC waste is not covered by the Standard Contract, "a continued presence of GTCC on plaintiff's site despite defendant's statutory obligation to dispose [o]f it could, conceivably, form the basis for a taking claim." Order, at 5 (June 26, 2003). At trial, the Yankees identified no basis upon which a continued presence of GTCC waste on their sites could ever constitute a "taking." Any obligation of DOE eventually to accept the Yankees' GTCC waste will derive from a statute, the LLRWPAA. Although that statute provides that the Federal Government "shall be responsible for the disposal" of GTCC waste, 42 U.S.C. § 2021c(b)(1)(D), the LLRWPAA sets no deadline for DOE's acceptance or disposal of GTCC waste. Further, the Yankees did not establish at trial that they have yet entered into any contract or other agreement with DOE to accept their GTCC waste or that they have paid any compensation to DOE for that privilege. PFOF 234; see PFOF 209-214. Accordingly, the Yankees have identified no statute that requires DOE to accept their GTCC waste at any particular time, and, therefore, they cannot identify any failure upon DOE's part to act in a timely manner to accept that waste.

Further, even if they had identified some DOE violation of a statutory duty, they still would have no basis for pursuing a takings claim. The Supreme Court has been clear that a

---

that they obtained solely through their contracts with DOE: a right to acceptance of SNF.

"mere unilateral expectation or an abstract need is not a property interest entitled to protection" under the Fifth Amendment, Webb's Fabulous Pharmacies, Inc. v. Beckwith, 449 U.S. 155, 161 (1980), "even if they are entirely plausible expectations of economic benefit." National Educ. Ass'n-R.I. v. Retirement Bd., 172 F.3d 22, 29 (1st Cir. 1999). Accordingly, no entity has a property right in that rule of law. "[T]he law itself, as a rule of conduct, may be changed at the will or even the whim, of the legislature, unless prevented by constitutional limitations." Fern v. United States, 908 F.2d 955, 959 (Fed. Cir. 1990) (quoting Munn v. Illinois, 94 U.S. 113 (1876)); see Branch, 69 F.3d at 1577-78 ("[i]If every time a man relied on existing law in arranging his affairs, he were made secure against any change in legal rules, the whole body of our law would be ossified forever'") (quoting L. Fuller, The Morality of Law 60 (1964)); Pittman v. Chicago Bd. of Educ., 64 F.3d 1098, 1104-05 (7th Cir. 1995) ("A statute is not a commitment by the legislature never to repeal the statute. . . . Statutes would be ratchets, creating rights that could never be retracted or even modified without buying off the groups upon which the rights had been conferred"), cert. denied, 517 U.S. 1243 (1996). "Because Congress has the right to modify or terminate a federal program, the benefits of such a program do not constitute a property interest protected by the Fifth Amendment." Members of the Peanut Quota Holders Ass'n, Inc. v. United States, 60 Fed. Cl. 524, 529 (2004). Here, the only basis upon which DOE will have an obligation to accept any of the Yankees' GTCC waste is pursuant to the LLWPAA, but the Yankees do not have a property right in that rule of law. To the extent that the Yankees are relying upon the LLWPAA as creating a right to GTCC waste acceptance by a date certain, they have failed to identify any "property right" upon which to maintain a takings claim.

### C. Assuming That The Yankees Have Established A Taking Of Their Real Property, They Failed To Establish The Fair Value Of That Property

Even if the Yankees have established a taking of their real property, they have failed to establish any recoverable damages for that taking. Although the Yankees have suggested that they are seeking damages for a permanent taking of their real property, they also presume that DOE will eventually accept their SNF. As a result, they have not alleged facts sufficient to support a permanent taking, but, instead, have alleged a temporary taking.

"A temporary taking," rather than a permanent taking, "occurs when what would otherwise be a permanent taking is temporally cut short," and the "essential element of a temporary taking is a finite start and end to the taking." Wyatt v. United States, 271 F.3d 1090, 1097 n.6 (Fed. Cir. 2001); see Heydt v. United States, 38 Fed. Cl. 286, 305 (1997) ("temporary taking . . . denies a landowner all use of his property for a finite period of time"), appeal dismissed, 194 F.3d 1329 (Fed. Cir. 1999). Because the Yankees allege that DOE will eventually take their SNF, they have alleged that there will be an "end to the taking," creating an alleged taking "for a finite period of time" or a temporary taking. Although "[t]he just compensation for a permanent taking is generally the fair market value of the property taken," the "recovery for a temporary taking is generally the rental value of the property." Bass Enterprises Production Co. v. United States, 133 F.3d 893, 895 (Fed. Cir. 1998); see Heydt, 38 Fed. Cl. at 305 (temporary taking "requires just compensation in the form of the fair rental value of the property"). "In the temporary takings situation, rental value is seen as an appropriate measure because the property is returned to the owner when the takings ends, and the Government, therefore, should only pay for its use of the property." Pettro v. United States, 47 Fed. Cl. 136, 151 (2000). Yet, the

Yankees have disclaimed any effort to establish or recover the fair rental value of their real property, and the Court granted the Government's motion *in limine* upon the fair rental value claim by order dated May 19, 2004. Because the Yankees have failed to pursue the only damages that are recoverable for a temporary taking, they have failed to meet their burden of proving this claim.

## IX. THE YANKEES FAILED TO INTRODUCE ANY EVIDENCE THAT DOE ACTED WITH A SPECIFIC INTENT TO HARM THEM, PRECLUDING THEIR CLAIMS FOR BREACH OF A DUTY OF GOOD FAITH AND FAIR DEALING

The Yankees' assertion that the Government breached the covenant of good faith and fair dealing by failing to take appropriate action to meet its contractual commitment to begin accepting their SNF by January 31, 1998, is nothing more than that: an assertion. Even if this claim could survive independently from its breach of contract claim,[26] the Yankees presented

[26] Although "[e]very contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement," Restatement (Second) of Contracts § 205, "[t]he obligation of good faith . . . is not an 'independent source of duties for parties to a contract.'" Allstate Fin. Corp. v. Utility Trailer of Ill., Inc., 936 F. Supp. 525, 529 (N.D. Ill. 1996) (quoting Beraha v. Baxter Health Care Corp., 956 F.2d 1436, 1443 (7th Cir. 1992)). "Rather, it guides the construction of explicit terms of an agreement." Allstate, 936 F. Supp. at 529 (emphasis added). "The implied covenant is limited to assuring compliance with the express covenants or promises of the contract, and cannot be extended to create obligations not contemplated in the contract." Kucharczyk v. Regents of Univ. of Calif., 946 F. Supp. 1419, 1432 (N.D. Cal. 1996); see State of Alaska v. United States, 35 Fed. Cl. 685, 704 (1996) ("implied obligation of good faith and fair dealing must attach to a specific substantive obligation, mutually assented to by the parties"), aff'd, 119 F.3d 16 (Fed. Cir. 1997), cert. denied, 1108 (1998). "[S]uch generalized obligations as not interfering with the other party's performance, or failure to act in good faith, must have a contract performance referent to have any relevance." C.B.C. Enterprises, Inc. v. United States, 24 Cl. Ct. 1, 5 (1991). There must be a "nexus alleged between the Government's allegedly tortious breach of these implicit conduct obligations and any express term of the contract." Id.; see Village on Canon v. Bankers Trust Co., 920 F. Supp. 520, 534 (S.D.N.Y. 1996) (duty of good faith "does not create any new contractual rights" other than those expressly stated in the contract itself, "nor does it provide an independent basis for recovery"); Asco-Falcon II Shipping Co. v. United States, 32 Fed. Cl. 595, 598 (1994) ("defendant only had a duty to render a decision

absolutely no evidence to support this theory. As the United States Court of Appeals for the Federal Circuit held in Am-Pro Protective Agency, Inc. v. United States, 281 F.3d 1234 (Fed. Cir. 2002), the presumption that the Government acted in good faith can only be overcome by "clear and convincing evidence" of bad faith, which "has been equated with evidence of some specific intent to injure the plaintiff." Indeed, allegations of bad faith have generally arisen in instances involving "fraud" or "quasi-criminal wrong-doing" by Government officials. Id. at 1240.

To establish that the Government's delay in performance was in bad faith, the Yankees had to present "clear and convincing evidence" equivalent to what is necessary to establish that DOE's conduct was "motivated alone by malice," Gadsden v. United States, 78 F. Supp. 126, 128 (Ct. Cl. 1948), "designedly oppressive," Struck Construction Co. v. United States, 96 Ct. Cl. 186, 222 (Ct. Cl. 1942), or "actuated by animus toward the plaintiff," Librach v. United States, 147 Ct. Cl. 605, 612 (1959), cited in Kalvar Corp. v. United States, 543 F.2d 1298, 1302 (Ct. Cl. 1976), and Am-Pro Protective Agency, 281 F.3d at 1240. Here, the Yankees did not present any evidence, let alone "clear and convincing evidence," to indicate that the Government's delay in accepting the Yankees' SNF was in bad faith. PFOF 321-322. When performance of the contract at issue is highly regulated, where the contract involves disposal of nuclear waste, and where performance was initially contemplated to require over 15 years of preparation and many more years to complete, the Government's delay in performance cannot be said to be in bad faith. The

within a reasonable time if it had an explicit contractual obligation to take some action on the applications"); Heagy v. United States, 12 Cl. Ct. 694 (1987) (no breach of contract can exist unless it is based upon actual requirement contained in the contract), aff'd, 848 F.2d 1244 (Fed. Cir. 1988). To prevail upon its claim for a breach of the duty of good faith and fair dealing, the plaintiff must identify an express requirement within the contract that DOE breached.

Yankees' claims premised upon the duty of good faith and fair dealing should be dismissed. See Am-Pro Protective Agency, 281 F.3d at 1240 ("the requirement of 'well-nigh irrefragable' proof [] sets a high hurdle for a challenger seeking to prove that a government official acted in bad faith"); Caldwell & Santmyer, Inc. v. Glickman, 55 F.3d 1578, 1581 (Fed. Cir. 1995) ("contractor can overcome [the presumption that the government acts in good faith] only if it shows through 'well-nigh irrefragable proof' that the government had a specific intent to injure it"); Sanders v. United States Postal Service, 801 F.2d 1328, 1331 (Fed. Cir. 1986) ("there is a strong presumption in the law that administrative actions are correct and taken in good faith"); Torncello v. United States, 681 F.2d 756, 770 (Ct. Cl. 1982) (Government "is assumed always to act in good faith, subject only to an extremely difficult showing by the plaintiff to the contrary").

## X. TO THE EXTENT THAT THE COURT AWARDS CONNECTICUT YANKEE OR MAINE YANKEE ANY DAMAGES, THE GOVERNMENT SHOULD BE ALLOWED TO RECOVER THE ONE-TIME FEES THAT THEY HAVE NOT YET PAID

As previously discussed, "[o]ne of the basic principles of contract damages is that 'damages for breach of contract shall place the wronged party in as good a position as it would have been in, had the breaching party fully performed its obligation.'" Bluebonnet Sav. Bank, F.S.B. v. United States, 339 F.3d 1341, 1344-45 (Fed. Cir. 2003) (quoting Massachusetts Bay Transp. Auth. v. United States, 129 F.3d 1226, 1232 (Fed. Cir.1997)). "Thus, the non-breaching party should not be placed in a better position through the award of damages than if there had been no breach." Id. (citing White v. Delta Constr. Int'l, Inc., 285 F.3d 1040, 1043 (Fed. Cir. 2002)). "[T]he non-breaching party 'should on no account get more than would have accrued if

the contract had been performed.'" White, 285 F.3d at 1043 (quoting DPJ Co. v. FDIC, 30 F.3d 247, 250 (1st Cir.1994)).

Each contract holder is responsible for paying a separate fee for the disposal of the SNF and/or HLW that it had generated prior to April 7, 1983: "For SNF, or solidified high-level radioactive waste derived from SNF, which fuel was used to generate electricity in a civilian nuclear power prior to April 7, 1983, a one-time fee will be assessed." 10 C.F.R. § 961.11, Art. VIII.A.2 (emphasis added). This fee for SNF generated prior to April 7, 1983 "shall not be subject to adjustment, and the payment thereof by the Purchaser shall be made to DOE as specified in paragraph B of this Article VIII." Id. (emphasis added). Paragraph B of Article VIII provides each contract holder with three options for the payment of the fee for the disposal of SNF generated prior to April 7, 1983. PFOF 317. Pursuant to one of the options, Option 2, the contract holder would satisfy its financial obligation "in the form of a single payment anytime prior to the first delivery, as reflected in the DOE approved delivery commitment schedule . . .," plus interest. Id., Art. VIII.B.2(b). Both Connecticut Yankee and Maine Yankee elected to pay their one-time fee pursuant to Option 2. PFOF 318. To date, neither Connecticut Yankee nor Maine Yankee has paid that fee. PFOF 318.

Before DOE began accepting Connecticut Yankee's and Maine Yankee's SNF, Connecticut Yankee and Maine Yankee would first have been required to pay the entirety of their one-time fee pursuant to Article VIII.B.2(b). Because Connecticut Yankee and Maine Yankee now seek damages for DOE's failure to begin accepting their SNF and seek to be placed in the financial position in which they allegedly would have been had DOE timely begun SNF acceptance, DOE should be entitled to recover the amount of Connecticut Yankee's and Maine

Yankee's unpaid one-time fees (plus the interest calculated from April 7, 1983, as identified in Article VIII.B.2(b) of the Standard Contract) before the Court requires DOE to pay any damages for DOE's delay in performance – that is, the Court should require the satisfaction of the condition to DOE's obligation to accept Connecticut Yankee's and Maine Yankee's SNF before awarding them damages. If the Court were to require DOE to pay damages for failing to begin acceptance of Connecticut Yankee's and Maine Yankee's SNF, but failed to allow DOE to recover the monies that it would have received had it timely begun SNF acceptance, the Court would place Connecticut Yankee and Maine Yankee in a better position than they would have been in had there been no breach, see Bluebonnet Savings Bank, 339 F.3d at 1345, given that they would be compensated for DOE's delay but would not have to disgorge the monies that they would have paid for timely performance. The amount of the unpaid fees is undisputed: Connecticut Yankee's one-time fee obligation is $48,726,402.11, PFOF 319, Maine Yankee's one-time fee is $50,393,966.03, PFOF 320, and interest runs from April 7, 1983, at the rate identified in Article III.B.2(b).

Even if the Court did not allow the Government to recover the entire unpaid fee, the Court should allow DOE to recoup the one-time fee against any judgment in Connecticut Yankee's or Maine Yankee's favor. The Supreme Court and the Federal Circuit have long recognized the Government's common law right to offset or recoup debts owed to the Government against contract payments and damages due to the debtor. The right of offset was first recognized by the Supreme Court in United States v. Munsey Trust Co., 332 U.S. 234, 239 (1947), in which the Court held that the "government has the same right which belongs to every creditor, to apply the unappropriated moneys of his debtor, in his hands, in extinguishment of the

debts due to him." Consistent with the Supreme Court's decision in Munsey Trust, the Court of Claims similarly recognized the Government's right of offset in Madden v. United States, 178 Ct. Cl. 121, 371 F.2d 469, 473 (1967), in which the Court held that the Government's right to offset debts owed to it against damages awarded to the debtor for an equitable adjustment of contract was superior to an attorney's lien.

Since the invocation of the common law doctrine of offset in Munsey Trust and Madden, the Government's right to offset or recoup contractual debts owed to it has been sustained in numerous decisions. See, e.g., First Federal Savings & Loan Assoc. v. United States, 58 Fed. Cl. 139, 165 (2003) (Government's right to offset damages can be raised as a "defense or argument in mitigation" during the damages phase of proceedings); Cecile Industries, Inc. v. Cheney, 995 F.2d 1052, 1054 (Fed. Cir. 1993) (Debt Collection Act of 1982, 31 U.S.C. § 3716, does not abrogate or constrict "the Government's long-standing common law right to offset contract debts against contract payments"); Project Map, Inc. v. United States, 203 Ct. Cl. 52, 486 F.2d 1375, 1376 (1973) (Government could withhold amounts owed to a contractor under a contract when the contracting officer had found that plaintiff was overpaid on two other contracts, even though the determination of overpayment was on appeal before the Board of Contract Appeals); Sinclair Oil Corp. v. United States, 291 F.3d 822, 828 (Fed. Cir. 2002) (proceeds received by a purchaser of gasoline from its settlement with a refiner would offset the gasoline purchaser's asserted refund from a DOE fund).[27]

---

[27] Offsets are permissible whether the Government is seeking to recoup or to setoff contractor debts. "Recoupment" is "a demand asserted [by a defendant] to diminish or extinguish the plaintiff's demand that arises out of the same transaction forming the basis of the plaintiff's claim," while a "setoff" "arises out of a transaction extrinsic to the plaintiff's claim." In re Gober, 100 F.3d 1195, 1207 (5th Cir. 1996) (emphasis added); see REW Enters., Inc. v. Premier Bank,

The Government's common law right to offset contractual debts owed to the Government against contract payments due to the debtor (and damages awarded to a plaintiff) is consistent with the contractual principle that damages for breach of contract cannot place the plaintiff in a better position than it would have been in had there been no breach. The offset doctrine thus mandates that damages for breach of contract be reduced by the amount of contractual debts owed by a plaintiff to the Government to prevent unjust enrichment. "To derive the proper amount for the damages award, the costs resulting from the breach must be reduced by the costs, if any, that the plaintiffs would have experienced absent a breach." Bluebonnet, 339 F.3d at 1345 (emphasis added). Accord LaSalle Talman Bank v. United States, 317 F.3d 1363, 1366 (Fed. Cir. 2003) ("damages due to the breach are subject to offset or mitigation by the benefits of the actions taken after the breach").

In this case, to the extent that the Court awards any damages to Connecticut Yankee or Maine Yankee, their damages should be reduced by the amount of their unpaid one-time fees (plus interest calculated in accordance with Article VIII.B.2(b)) pursuant to the Government's common law right of offset. See Munsey Trust Co., 332 U.S. at 239; Cecile Indus., 995 F.2d at 1054-55; Sinclair Oil, 291 F.3d at 828. If the Court did not require recoupment of this unpaid fee, it would place Connecticut Yankee and Maine Yankee in a better position than had DOE performed the Standard Contract, contrary to established precedent.

---

N.A., 49 F.3d 163, 170 (5th Cir. 1995) (recoupment involves recovery of "part of a claim upon which one is sued" by means of a "counterclaim arising out of the same transaction"); Vari-Build, Inc. v. City of Reno, 622 F. Supp. 97, 99 (D. Nev. 1985) ("claim in recoupment must concern matters arising out of the same transaction that is the basis for the plaintiff's claim for relief"); Black's Law Dictionary 1275 (6th ed. 1990) ("[r]ecoupment is a purely defensive matter growing out of transaction constituting plaintiff's cause of action and is available only to reduce or satisfy plaintiff's claim . . .").

CONCLUSION

For the reasons outlined above, the Government respectfully requests that the Court enter judgment in the Government's favor.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

s/ David M. Cohen
DAVID M. COHEN
Director

s/ Harold D. Lester, Jr.
HAROLD D. LESTER, JR.
Assistant Director
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tele: (202) 305-7562
Fax: (202) 307-2503

OF COUNSEL:

JANE K. TAYLOR
Office of General Counsel
U.S. Department of Energy
1000 Independence Ave., S.W.
Washington, D.C. 20585

KEVIN B. CRAWFORD
JOHN C. EKMAN
HEIDE L. HERRMANN
R. ALAN MILLER
RUSSELL A. SHULTIS
MARIAN L. SULLIVAN
SONIA ORFIELD
STEPHEN FINN
Commercial Litigation Branch
Civil Division
Department of Justice
Washington, D.C. 20530

November 18, 2004

Attorneys for Defendant

CERTIFICATE OF FILING

I hereby certify that, on this 18th day of November 2004, a copy of foregoing "DEFENDANT'S INITIAL POST-TRIAL BRIEF" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ Harold D. Lester, Jr.