CORRECTED COPY
IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| YANKEE ATOMIC ELECTRIC COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 98-126C<br>(Senior Judge Merow) |

DEFENDANT'S PROPOSED FINDINGS OF FACT[1]

I. THE ORIGINAL PROVISIONS OF THE NUCLEAR WASTE POLICY ACT

1. On January 7, 1983, the Nuclear Waste Policy Act of 1982 ("NWPA"), Pub. L. 97-425, 96 Stat. 2201 (codified at 42 U.S.C. §§ 10101-10270 (1982)), was enacted. The bases for Congress' passage of the NWPA included statutory findings that the public health and safety necessitated that the Government provide a solution for the permanent storage and disposal of spent nuclear fuel ("SNF") and high-level radioactive waste ("HLW"), but that the costs of the interim and permanent storage and disposal of SNF and HLW were the responsibility of those entities that created the SNF and HLW. 42 U.S.C. §§ 10131(a)(4)-(5) (1982). The NWPA defined SNF as "fuel that has been withdrawn from a nuclear reactor following irradiation, the

1 The Government requests that these proposed findings also be deemed applicable in Connecticut Yankee Atomic Power Co. v. United States, No. 98-154C, and Maine Yankee Atomic Power Co. v. United States, No. 98-474C. In this set of proposed findings of fact, we have often referenced the admitted trial exhibits and testimony that support the Government's proposed findings. "DX __ at __ (bates number)" refers to defendant's exhibit number __, and page number __. "PX __ at __ (bates number) refers to the plaintiff's exhibit number and page number. "Tr. __ (witness name)" refers to the portion of the trial transcript and the testifying witness. "(Witness name) Dep. (date) ___ " refers to the deposition testimony excerpts admitted by the Court.

constituent elements of which have not been separated by reprocessing." Id. § 10101(23). It defined HLW as

> (A) the highly radioactive material resulting from the reprocessing of spent nuclear fuel, including liquid waste produced directly in reprocessing and any solid material derived from such liquid waste that contains fission products in sufficient concentrations; and
>
> (B) other highly radioactive material that the [Nuclear Regulatory] Commission, consistent with existing law, determines by rule requires permanent isolation.

Id. § 10101(12).

2. In its statement of the statutory purposes underlying the NWPA, Congress identified the following four objectives: developing repositories to ensure the protection of the public and the environment from the hazards posed by SNF and HLW; establishing Federal responsibility and policy for the disposal of SNF and HLW; defining the relationship between the Federal Government and state governments regarding SNF and HLW disposal; and establishing

> . . . a Nuclear Waste Fund, composed of payments made by the generators and owners of such waste and spent fuel, that will ensure that the costs of carrying out activities relating to the disposal of such waste and spent fuel will be borne by the persons responsible for generating such waste and spent fuel.

Id. § 10131(b).

3. As originally enacted, the NWPA required the Secretary of Energy ("the Secretary"), within 180 days of the statute's enactment, to issue guidelines for the siting of repositories. 42 U.S.C. § 10132(a) (1982). The Act defined a "repository" as "any system licensed by the [Nuclear Regulatory] Commission that is intended to be used for, or may be used for, the permanent deep geologic disposal of [HLW] and [SNF], whether or not such system is

designed to permit the recovery, for a limited period during initial operation, of any materials placed in such system." Id. § 10101(18).

4. The Secretary was to recommend three sites to the President by January 1, 1985, for further site characterization studies. Id. § 10132(b)(1)(B). After receiving the Secretary's recommendations, the President had 60 days to approve or disapprove of a candidate site for characterization. Id. § 10132(c). The NWPA provided that the Secretary, "as he determines necessary," could continue to identify and study additional sites to determine their suitability for site characterization, in accordance with procedures similar to those outlined above. Id. § 10132(d) (now repealed). The NWPA referred to each of these activities as "preliminary decision making activit[ies]." Id. § 10132(e) (now § 10132(d)).

5. The NWPA further provided that, when site characterization was completed, the Department of Energy ("DOE") would decide whether to recommend approval of the site to the President. By March 31, 1987, the President was to submit to Congress a recommendation of a site for the first repository, 42 U.S.C. § 10134(a)(2)(A) (1982) (now amended), and, by March 31, 1990, was to submit "a recommendation of a second site from any sites already characterized that the President considers qualified for a construction authorization for a second repository." Id.[2] Within 60 days of the submission of the President's recommendation to Congress, a state or Indian tribe in which the recommended site was located could submit a notice of disapproval to Congress. Id. § 10135(b). The site would be disapproved unless, within 90 days of continuous

---

[2] The NWPA provided that the President could extend these deadlines by "not more than 12 months" if, before March 31, 1986, for the first site and March 31, 1989, for the second site, he "determines that such extension is necessary" and "transmits to the Congress a report setting forth the reasons for such extension." 42 U.S.C. § 10134(a)(3) (1982) (now amended).

legislative session, Congress passed a joint resolution overriding the notice of disapproval. Id. § 10135(c). If the site recommendation was not approved, the President was to submit to Congress, "not later than 1 year after the disapproval of such recommendation, a recommendation of another site for the first or subsequent repository." Id. § 10134(a)(3) (now amended).

6. The NWPA also provided that, within 90 days of the site selection, the Secretary would apply to the Nuclear Regulatory Commission ("NRC") for authority to construct the repository. Id. § 10134(b). In turn, the NRC was to act upon the application for the first repository by January 1, 1989, and for the second repository by January 1, 1992, or within three years of the submission of each application, whichever was later. Id. § 10134(d) (now amended).

7. In addition to this process for the siting of a repository, the Secretary was to "prepare a comprehensive report, to be known as the mission plan, which shall provide an informational basis sufficient to permit informed decisions to be made in carrying out the repository program and the research, development, and demonstration programs required under this chapter." 42 U.S.C. § 10221(a) (1982). The mission plan was to include, among other things,

> (1) an identification of the primary scientific, engineering, and technical information . . . with respect to the siting and construction of a test and evaluation facility and repositories;
>
> (2) an identification of any information described in paragraph (1) that is not available because of any unresolved scientific, engineering, or technical questions, or undemonstrated engineering or systems integration, a schedule including specific major milestones for the research, development, and technology demonstration program required under this chapter and any additional activities to be undertaken to provide such information,

> a schedule for the activities necessary to achieve important programmatic milestones, and an estimate of the costs required to carry out such research, development, and demonstration programs;
>
> (3) an evaluation of financial, political, legal, or institutional problems that may impede the implementation of this chapter, the plans of the Secretary to resolve such problems, and recommendations for any necessary legislation to resolve such problems;
>
> * * *
>
> (7) a description of known sites at which site characterization activities should be undertaken . . .;
>
> * * *
>
> (9) an estimate of (A) the total repository capacity required to safely accommodate the disposal of all [HLW] and [SNF] expected to be generated through December 31, 2020, . . ., (B) the number and type of repositories required to be constructed to provide such disposal capacity; (C) a schedule for the construction of such repositories . . .;
>
> (10) an estimate, on an annual basis, of the costs required (A) to construct and operate the repositories anticipated to be needed . . .; (B) to construct and operate a test and evaluation facility, or any other facilities, other than repositories . . .; and (C) to carry out any other activities under this chapter; and
>
> (11) an identification of the possible adverse economic and other impacts to the State or Indian tribe involved that may arise from the development of a test and evaluation facility or repository at a site.

42 U.S.C. § 10221(a) (1982) (emphasis added). The Secretary was to provide a draft mission plan to the states, affected Indian tribes, the NRC, and other Federal Government agencies within 15 months of the date of the NWPA's enactment. Id. § 10221(b)(1). The Secretary was to obtain those entities' comments, revise the draft mission plan in response to them, and, within 17

months of the NWPA's enactment, provide the appropriate committees of Congress with the mission plan. Id. § 10221(b)(2)-(3).

8. In addition, the NWPA separately provided that the Secretary should "prepare and update, as appropriate, a project decision schedule that portrays the optimum way to attain the operation of the repository involved, within the time periods specified in this part." Id. § 10134(e)(1) (now amended). "Such schedule shall include a description of objectives and a sequence of deadlines for all Federal agencies required to take action, including an identification of the activities in which a delay in the start, or completion, of such activities will cause a delay in beginning repository operation." Id. However, "[a]ny Federal agency that determines that it cannot comply with any deadline in the project decision schedule, or fails to so comply, shall submit to the Secretary and to the Congress a written report explaining the reason for its failure or expected failure to meet such deadline . . . ." Id. § 10134(e)(2) (now amended).

9. Congress also included in the NWPA provisions allowing the Secretary to study the possibility of creating Monitored Retrievable Storage ("MRS") facilities, with Congress finding that "long-term storage of high-level radioactive waste or spent nuclear fuel in monitored retrievable storage facilities is an option for providing safe and reliable management of such waste or spent fuel." 42 U.S.C. § 10161(a)(1) (1982). By July 1, 1985, the Secretary was to "complete a detailed study of the need for and feasibility of, and shall submit to the Congress a proposal for, the construction of one or more monitored retrievable storage facilities for high-level radioactive waste and spent nuclear fuel." Id. § 10161(b)(1). The proposal was to "include, for the first such facility, at least 3 alternative sites and at least 5 alternative combinations of such proposed sites and facility designs . . . ." Id. § 10161(b)(4). However, the NWPA provided that

any MRS facility that Congress might authorize in response to the Secretary's proposal could not "be constructed in any State in which there is located any site approved for site characterization under section 10132 of this title." Id. § 10161(g).[3]

10. In addition, the NWPA provided that the Secretary would enter into contracts with the owners and generators of SNF of domestic origin for "the acceptance of title, subsequent transportation, and disposal of such [SNF]." 42 U.S.C. § 10222(a)(1) (1982). The contracts had to "provide for payment to the Secretary of fees . . . sufficient to offset expenditures" described elsewhere in the statute. Id. The NWPA also required that the contracts with the SNF owners and generators provide as follows:

> Contracts entered into under this section shall provide that –
>
> (A) following commencement of operation of a repository, the Secretary shall take title to the high-level radioactive waste or spent nuclear fuel involved as expeditiously as practicable upon the request of the generator or owner of such waste or spent fuel; and
>
> (B) in return for the payment of fees established by this section, the Secretary, beginning not later than January 31, 1998, will dispose of the high-level radioactive waste or spent nuclear fuel involved as provided in this subtitle.

[3] In the NWPA, Congress also provided that DOE could create a program for interim SNF and HLW storage in other than a permanent repository "to provide for the utilization of available spent nuclear fuel pools at the site of each civilian nuclear power reactor to the extent practical and the addition of new spent nuclear fuel storage capacity where practical at the site of such reactor . . .," 42 U.S.C. § 10151(b)(1) (1982), or for the establishment of Federally-owned interim storage facilities. Id. § 10151(b)(2); see id. §§ 10151-57. This interim storage program would involve interim storage contracts separate from the Standard Contract at issue in this case, to be funded through a separate interim storage fund. Id. § 10156(a). No utility ever entered such a contract. The possibility of an interim storage facility, to be funded through a separate interim storage fund, expired on January 1, 1990. Id.

42 U.S.C. § 10222(a)(5). The NWPA did not identify any other requirements for the contracts specified by 42 U.S.C. § 10222(a)(5).

11. The NWPA also "established within the Department of Energy an Office of Civilian Radioactive Waste Management ["OCRWM"]," which would be headed by a Director responsible "for carrying out the responsibilities of the Secretary" under the NWPA. 42 U.S.C. § 10224(a)-(b) (1982).

## II. THE DEPARTMENT OF ENERGY'S PROMULGATION OF THE "STANDARD CONTRACT FOR DISPOSAL OF SPENT NUCLEAR FUEL AND/OR HIGH-LEVEL RADIOACTIVE WASTE" THROUGH NOTICE AND COMMENT RULEMAKING IN THE FEDERAL REGISTER

### A. The Proposed Rule

12. On February 4, 1983, DOE, in furtherance of its obligations pursuant to the NWPA, 42 U.S.C. § 10222, published a notice of proposed rulemaking in the Federal Register, proposing terms for the "Standard Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste" ("Standard Contract") mandated by the NWPA, 42 U.S.C. § 10222. See 48 Fed. Reg. 5458 (Feb. 4, 1983). The proposed "scope" of the Standard Contract provided for the acceptance and disposal of SNF from civilian nuclear power reactors pursuant to the NWPA:

> This Contract applies to the acceptance by DOE of spent nuclear fuel (SNF) and/or high-level radioactive waste (HLW) from civilian nuclear power reactors and with respect to such material, establishes the fees to be paid by the Purchaser for the services rendered hereunder by DOE. The services provided to the Purchaser by DOE under this contract are related to **disposal** of SNF and/or HLW of domestic origin from civilian nuclear power reactors. . . .

48 Fed. Reg. 5458, 5462 (Feb. 4, 1983) (emphasis added). The term "disposal," as referenced in the proposed scope of the Standard Contract, referred to emplacement in a permanent repository:

> The term "Disposal" means the emplacement in a repository of high-level radioactive waste, spent nuclear fuel, or other highly radioactive waste with no foreseeable intent of recovery, whether or not such emplacement permits recovery of such waste.

48 Fed. Reg. 5458, 5462 (Fed. 4. 1983) (Art. I.9). Similarly, the term "DOE facility" in the proposed Standard Contract referred to a facility for disposal, in a permanent repository, of the SNF and/or HLW:

> The term "DOE Facility" means a facility operated by or on behalf of DOE for the purpose of disposing of spent nuclear fuel and/or high level radioactive waste.

48 Fed. Reg. 5458, 5462 (Feb. 4, 1983) (Art. I.11).

13. As required by the NWPA, the proposed rule contained a mechanism for defining each contract holder's financial obligations under the Standard Contract. Specifically, DOE proposed that each entity which entered into the Standard Contract would pay fees to the Secretary, for deposit into the Nuclear Waste Fund ("NWF"), in the following forms and amounts: (1) a one-time fee for SNF generated or fuel in-core prior to April 7, 1983, and (2) continuing quarterly fees for SNF generated on or after April 7, 1983, in an amount of 1.0 mil per kilowatt-hour (or as otherwise adjusted) on electricity generated by the contract holder's nuclear power reactor. 48 Fed. Reg. at 5464 (Art. VIII).

14. The proposed Standard Contract also provided a mechanism for determining both the order in which, and the rate at which, the various contract holders' SNF would be accepted. As for the order of SNF acceptance, the Standard Contract required DOE to issue an "acceptance

priority ranking" ("APR") of SNF and/or HLW, through which SNF and/or HLW would receive acceptance priority based generally upon its age:

> Acceptance Priority Ranking. Delivery commitment schedules for SNF and/or HLW may require the disposal of more material than the annual capacity of the DOE disposal facility (or facilities) can accommodate. The following acceptance priority ranking will be utilized:
>
> (a) Except as may be provided for in paragraph (2) below, acceptance priority shall be based upon the age of the SNF and/or HLW as calculated from the date of discharge of such materials from the civilian nuclear power reactor to the date specified for transportation by DOE in the delivery commitment schedule. DOE will first accept from Purchaser the oldest SNF and/or HLW for disposal in the DOE facility.

However, as an exception to the requirement to accept the oldest SNF and/or HLW first, the next paragraph of the proposed rule provided DOE with the discretion to grant priority to SNF and/or HLW removed from a reactor that had shut down permanently:

> (b) Notwithstanding the age of the SNF and/or HLW, priority may be accorded any SNF and/or HLW removed from a civilian nuclear power reactor that has reached the end of its useful life or has been shut down permanently for whatever reason.

48 Fed. Reg. 5458, 5464 (Feb. 4, 1983) (Art. VI.B.3) (emphasis added).

15. Although the proposed Standard Contract itself did not identify a specific rate at which DOE would accept contract holders' SNF, it provided for DOE's issuance of documents for planning purposes to assist in the eventual definitization of the specific rate and order of SNF acceptance and disposal:

> 5. DOE shall annually provide to the Purchaser pertinent information to support waste disposal program cost projections, project plans and progress reports.

> 6. Beginning on April 1, 1991, DOE shall issue an annual acceptance priority ranking for receipt of SNF and/or HLW at the DOE repository. This priority ranking shall be based on the age of SNF and/or HLW as calculated from the date of discharge of such material from the civilian nuclear power reactor. The oldest fuel or waste will have the highest priority for acceptance, except as provided in paragraph B.3 of Article VI of this contract.

48 Fed. Reg. 5458, 5463 (Feb. 4, 1983) (Art. V.B.5 & Art. V.B.6) (emphasis added).

16. The proposed contract further provided that, following DOE's issuance of planning documents, rates of SNF acceptance, as well as the specific order of SNF acceptance from particular contract holders, would be defined through the contract holders' submission of, and DOE's approval of, delivery commitment schedules ("DCSs"):

> . . . The SNF and/or HLW shall be specified in a delivery commitment schedule as provided in Article IV below. The disposal services to be provided by DOE under this contract shall commence not later than January 31, 1998 and shall continue until such time as all SNF and/or HLW from the civilian nuclear power reactors specified in Appendix "A", annexed hereto and made a part hereof, has been disposed of as provided for in this contract.

48 Fed. Reg. 5458, 5462 (Feb. 4, 1983) (emphasis added). Specifically, in describing the purpose of the DCS in the preamble to its proposed rule, DOE stated that the procedures to be followed in defining any particular contract holder's allocations for SNF acceptance for any given year included the contract holder's obligation to describe the SNF that it would deliver to DOE, followed by submission of a DCS and of a final delivery schedule ("FDS"):

> *Article IV – Delivery of SNF and/or HLW* – Sets forth the procedures to be followed by Purchaser, including the requirement that the Purchaser describe the waste material to be delivered to DOE, the furnishing of a delivery commitment schedule 63 months prior to the specified delivery date, and a final delivery schedule which Purchaser submits 12 months prior to delivery. In case of an

> emergency DOE may, subject to prior approval, accept a Purchaser's waste material before the scheduled delivery date.

48 Fed. Reg. 5458, 5459 (Feb. 4, 1983) (italics in original; emphasis added).

17. In Article I.7 of the proposed Standard Contract, the term "delivery commitment" was defined as the SNF and/or HLW that a contract holder would deliver to DOE in a given year:

> The term "Delivery Commitment" means a promise by the Purchaser to deliver spent nuclear fuel and/or high-level radioactive waste to the DOE within a specified year.

48 Fed. Reg. 5458, 5462 (Feb. 4, 1983) (Art. I.7). The proposed contract provided that, after DOE had issued its proposed acceptance ranking, the contract holder was required to submit DCSs at least 63 months before the proposed delivery date:

> Delivery commitment schedule(s), in the form set forth in Appendix B, annexed hereto and made a part hereof, for delivery of SNF and/or HLW shall be furnished to DOE by Purchaser. After DOE has issued its proposed acceptance ranking, described in paragraph B.6 of Article V of this contract, the Purchaser shall submit delivery commitment schedule(s) at least sixty-three (63) months prior to the delivery date specified therein. DOE shall approve or disapprove such schedules within three (3) months after receipt. In the event of disapproval, DOE shall advise the Purchaser in writing of the reasons for such disapproval and request a revised schedule from the Purchaser, to be submitted to DOE with thirty (30) days after receipt of DOE's notice of disapproval. Purchaser shall have the right to adjust the quantities of SNF and/or HLW + or - 20%, and the delivery schedule +2 months, up to the submission of the final delivery schedule.
>
> In addition, the Purchaser may change the specific assemblies to be delivered so long as the SNF meets the acceptance criteria of the contract. These adjustments shall be subject to DOE's prior written approval, which approval shall not be unreasonably withheld.

48 Fed. Reg. 5458, 5463 (Feb. 4, 1983) (Art. IV.B).

18. The proposed Standard Contract also provided for the contract holders' subsequent submission of Final Delivery Schedules ("FDSs"), which would serve to take the annual allocation defined in a DCS and further refine it to reflect as closely as possible the month(s) and day(s) upon which SNF acceptance would occur in that year:

> Final delivery schedule(s), in the form set forth in Appendix C, annexed here and made a part hereof, for delivery of SNF and/or HLW covered by an approved delivery commitment schedule(s) shall be furnished to DOE by Purchaser. The Purchaser shall submit to DOE final delivery schedules not less than 12 months prior to the delivery date specified therein. DOE shall approve or disapprove final delivery schedule within forty-five (45) days after receipt. In the event of disapproval, DOE shall advise the Purchaser in writing of the reasons for such disapproval and shall request a revised schedule from the Purchaser, to be submitted to DOE within thirty (30) days after receipt of disapproval.

48 Fed. Reg. 5458, 5463 (Feb. 4, 1983) (Art. IV.C).

19. Nowhere in the proposed Standard Contract did DOE say that it would accept at a rate equal to the annual generation rate of SNF plus some additional quantity necessary to eliminate the backlog of SNF that would accumulate by January 31, 1998. Nor did DOE say that it would accept SNF at a rate sufficient to eliminate the need to construct additional storage facilities.

20. The proposed rule provided that written comments had to be submitted by March 7, 1983. 48 Fed. Reg. at 5458.

B. <u>Comments Upon The Proposed Rule</u>

1. <u>Industry Involvement In Drafting The Standard Contract Terms</u>

21. The nuclear utilities and their industry representatives were very involved in the drafting of the Standard Contract and its terms. Almost immediately after the act was signed into

law, industry groups began working upon drafting comments to DOE regarding the contracts that DOE was to enter with industry. Tr. 344:11-14; 345:9-18; 472:22-474:14 (Mills).

22. Industry representatives met with DOE on January 19 and 20, 1983, to discuss the proposed Standard Contract. Tr. 344:15-345:2 (Mills); DX 398; DX 400. At that meeting, or shortly after it, DOE provided a pre-publication draft of the Standard Contract to industry representatives. Tr. 481:11-20 (Mills); DX 398 at TVP0041066-1102.

23. Industry representatives also provided written comments upon early drafts of the proposed contract that were later incorporated into the draft Standard Contract that was published in the Federal Register. Tr. 476:3-24 (Mills); DX 399 at TV0041024-1034; DX402.

24. After publication of the proposed Standard Contract in the Federal Register, industry representatives again provided a substantial number of suggestions to DOE for inclusion in the Standard Contract. Tr. 350:12-351:22; 490:9-24 (Mills). Many of the suggestions made by industry representatives were incorporated by DOE into the final Standard Contract. Tr. 357:3-8; 478:2-9; 487:19-488:11(Mills, concerning DX 402); DX 402 at TV1321-23.

ii. <u>Rate Of SNF And HLW Acceptance</u>

25. DOE received numerous comments in response to the proposed rule. Tennessee Valley Authority ("TVA") stated that "a commitment to do no more than start accepting deliveries by 1998 is empty and meaningless without setting forth some reasonable minimum rate of acceptance which corresponds to the purposes of the Act." DX 2.063 at ARC0010537. TVA recognized that, "[o]f course, under the priority ranking system in the draft contract, it would be difficult at the time contracts are executed to give each Purchaser assurances of delivery acceptance at any specific rate," but suggested that "[t]his could, however, be done on an

industry wide basis." Id. TVA suggested that DOE add a contract provision to provide that "DOE shall start accepting delivery of SNF or HLW not later than January 31, 1998, at not less than the annual rate [at which] SNF and/or HLW is then being produced from civilian nuclear power plants covered by contracts . . . ." Id.

26. Similarly, Edison Electric Institute ("EEI"), an association of investor-owned utilities, and the Utility Nuclear Waste Management Group ("UNWMG"), a consortium of 43 utilities with specific interests relating to nuclear waste management, expressly recognized that "the contract may not be the appropriate place to commit DOE to a specific, numerical receiving rate." DX 2.034, Attachment at ARC0010334. In his testimony at trial, Mr. Mills confirmed this understanding regarding the inability to create a definite schedule at the time the contracts were signed. As Mr. Mills explained:

> [B]ecause there would be an allocation assigned to different contracts and different years, the amount of information that was available at that time to actually put down a definitive schedule was just not available, nor was there a really good understanding of the mechanism of how we would actually transfer this particular material.

Tr. 376:16-22 (Mills). Yankee Atomic agreed that the Standard Contract was not the appropriate place to commit DOE to a specific numerical receiving rate. Tr. 3798:10-19 (Grube).[4]

---

[4] Mr. Rudy Grube was called to testify by the Government. Mr. Grube was employed by Yankee Atomic from 1967 to 1998, serving as the director of the fuel management department. Tr. 3784:11-20 and 3789:11-13. Mr. Grube's responsibilities included administering YA's Standard Contract with DOE. Tr. 3785:19-24. Mr. Grube testified that his organization also provided fuel management services for Maine Yankee Atomic Power Company ("Maine Yankee"), tr. 3786:2-10, and, for a brief period of time, provided the same services to Connecticut Yankee Atomic Power Company ("Connecticut Yankee"). Tr. 3787:17-20.

27. However, EEI and UNWMG, like several individual utilities, stated that the Standard Contract should contain a requirement that "DOE will design its facilities with the capacity to receive SNF/HLW at a rate commensurate with the amount of SNF/HLW then being generated together with the accumulated backlog of SNF/HLW." DX 2.034, Attachment at ARC0010334. EEI and UNWMG suggested the inclusion in the Standard Contract of the following language, intended to add an additional obligation upon DOE beyond that imposed by the proposed rule:

> WHEREAS, DOE recognizes that its ability to take delivery of spent nuclear fuel and/or high-level radioactive waste must be commensurate with the amount of such fuel and waste then being generated together with the amount of such fuel and waste previously generated, and consistent with its obligation to take title to such fuel and waste as expeditiously as practicable upon the request of the owner or generator of such fuel and waste.

Id. at ARC0010335.[5] Yankee Atomic also agreed with this recommendation. Tr. 3798:6-9 (Grube).

28. In the cover letter to its comments, EEI recognized that "[n]o priority is given to utilities who may need to ship SNF to DOE in order to keep their facilities operating (although DOE can, in its discretion, take 'emergency deliveries'). Nor is any consideration given to the size of a Purchaser's SNF inventory." DX 2.034 at ADM0020276.

29. In its comments upon the proposed rule, Yankee Atomic Electric Company ("Yankee Atomic") stated that "[w]e endorse the comments prepared by the Edison Electric Institute in cooperation with representatives of the utility industry, including Yankee." DX 2.023

---

[5] Each of the Yankees were members of EEI and had representatives on the UNWMG task force. Tr. 457:20-458:7 (Mills).

at ADM00200195. Yankee was represented at the meetings of EEI in which the topics that became EEI's comments on the proposed contract were discussed. Tr. 3796:14-17 (Grube).

30. Florida Power & Light Company, in its written comment, stated that DOE should create a mandatory obligation that would require DOE to accept SNF and HLW at the rates identified in the Mission Plan, once that plan was approved by Congress:

> The [NWPA] specifically requires the Department of Energy to prepare a Mission Plan detailing a schedule for the construction of repositories and their capacities (Section 301). It is proposed that once this Mission Plan has been approved by Congress (18 months after the enactment of the [NWPA]), it becomes the standard by which contract performance by the DOE is judged. It is suggested that Article V B (3) be modified to include the statement:
>
> > "Should the DOE fail to meet the schedule and capacities detailed in the approved 1984 DOE Mission Plan, because of Force Majeure or other causes, DOE shall, to the extent permitted by the [NWPA], as it may be amended from time to time, bear the reasonable and necessary incremental costs of storage or alternative disposal incurred by the Purchaser."

DX 2.043, Attachment 1 at ARC0010439 (Testimony & Comments of Michael Cook, VP, Florida Power & Light).

31. In its written comments, Consolidated Edison Company of New York suggested that the Mission Plan might provide a basis for defining DOE's performance, but requested that, in any event, DOE keep contract holders informed of DOE's views, "as they develop," of a schedule of performance under the Standard Contract:

> As this contract provides for considerable pre-payments over a period of nearly two decades, it would be most helpful if DOE's performance was as precisely defined as possible. Presentation by DOE of the "Mission Plan", in the Spring of next year, may provide such an opportunity. In any event, the Purchasers should

> be kept informed of DOE's views, as they develop, concerning the detailed schedule of its performance under the contract.

DX 2.072 at ARC0010642.

32. Others commented that DOE should submit to an obligation to have a permanent repository in place by January 31, 1998, or, in the alternative, that DOE obligate itself in the Standard Contract to accept SNF and HLW, beginning no later than January 31, 1998, at a rate commensurate with that which would be expected if a repository were operational by January 31, 1998. DX 2.017 at ARC0010216. EEI and UNWMG requested that DOE modify the proposed Standard Contract to read that "[t]he services to be provided by DOE under this contract shall commence on a schedule consistent with the commencement of disposal services [i.e., in a repository] not later than January 31, 1998 . . . ." DX 2.034 at ARC0010342-43. Additionally, others requested an express contractual provision tying the repository to a January 31, 1998 date. DX 2.036 at ARC0010414.

33. Yankee Atomic and Vermont Yankee Atomic Power Company requested that DOE expressly obligate itself in the Standard Contract to "use its best and most expedient efforts to construct and operate a disposal facility as soon as possible." DX 2.023 at ARC0010250; DX 2.070 at ARC0010632-33. They stated that "DOE should not have 1998 as a goal but rather as an outer limit." Id. They requested "that DOE include in this contract, best effort commitments to meet a progress schedule that results in operation of a waste disposal facility before the 1998 deadline." Id. Yankee Atomic acknowledged that this language was not incorporated into the final contract. Tr. 3806:1-10 (Grube).

34. Many commenters suggested that the proposed contract requirement for DOE to provide reports regarding acceptance information beginning in 1991 was insufficient to allow the contract holders to plan for their future SNF interim storage needs. EEI and UNWMG stated that DOE instead should issue an annual report, beginning in 1984 (after submission of the Mission Plan to Congress), "setting out its schedules, projected receiving rates, and projected allocations for all purchasers," with the report "cover[ing] at least 10 years of repository operation." DX 2.034 at ADM0020301 (emphasis added); see DX 2.012 at ADM002.0111 (reports beginning in 1984 "are necessary to provide Northern States Power Company with an adequate planning horizon for interim storage"). Others suggested that, "[t]o assist in planning, DOE should provide in its reports 10 year forward projections of its receiving capacity and purchaser allocations of that capacity." DX 2.069 at Attachment ARC0010627 (emphasis added).

iii. Comments Regarding Delivery Commitment

35. Northern States Power Company ("NSP") stated that "[t]he context of the contract is inverted." DX 2.012 at 1 (ARC0010164)(emphasis in original). The proposed rule provided that "[t]he term 'Delivery Commitment' means a promise by the Purchaser to deliver spent nuclear fuel and/or high-level radioactive waste to the DOE within a specified year." 48 Fed. Reg. 5458, 5462 (Feb. 4, 1983) (Art. I.7). NSP stated that, "[r]ather than a context of spent fuel 'delivery commitments' as a binding obligation placed upon the utility, the contracts should be restated as in terms of 'acceptance commitments' as a binding obligation placed upon DOE." DX 2.012 at ARC0010164.

36. Public Service Company of Colorado commented that "[t]he [proposed] standard contract requires utilities to commit to spent nuclear fuel delivery schedules more than five years

in advance of delivery, with the option of extending the delivery commitment date by only two months." DX 2.016, attachment at ARC0010210 (emphasis added). It suggested that "[s]uch a restriction on delivery scheduling is entirely unwarranted" and that "[l]ong term waste delivery schedules (5 to 8 year advance projections) should specify waste deliveries to later years as actual plant operations become known." Id.

37. EEI and UNWMG suggested that the "definition of 'Delivery Commitment' (Article I.7) is unnecessary and should be deleted," since the term "'Delivery Commitment Schedule' is described in detail in Article IV.B and Appendix B," and since the definition of "Delivery Commitment" "adds nothing and could be inconsistent with Article IV.B and Appendix B" of the Standard Contract. DX 2.034, attachment at ARC0010336.

38. Others requested deletion of the "Delivery Commitment" definition, stating that "[d]efining this as a 'promise' introduces ambiguity as to whether this is a contract commitment or a non-binding planning arrangement," and suggested that "[t]he 'Delivery Commitment Schedule' described in Article IV.B is the applicable term." DX 2.069, attachment at ARC0010625 (comments of Middle South Services, Inc.).

39. Northeast Utilities, the managing agent for Connecticut Yankee, Tr. 2594:21-25 (Mellor), recognized that, in the proposed rule, "DOE is requiring that utilities firm their delivery commitment five years prior to delivery and allows only minor changes within that five year period." DX 2.026 at ARC0010267 (emphasis added).

40. Mississippi Power & Light Company stated as follows in its comments:

> Article I, Definition 7 – The definition of "Delivery Commitment" is unnecessary and should be deleted. Article IV.B and Appendix B describe in detail the "Delivery Commitment Schedule." If the

> definition must remain we suggest it be revised as follows: ". . . within a specified year, and a promise by DOE to receive such deliveries within a specified year in accordance with Article IV.B."

DX 2.032, attachment at ARC0010303 (emphasis in original).

41. Yet another commercial utility commented that the DCS provision, requiring submission 63 months in advance of delivery, was "much too restrictive," recognizing that "[t]his commitment should be eliminated or, as a minimum, the flexibility to the Purchaser should be increased" by, as one suggestion, "reducing the commitment leadtime to 36 months . . . ." DX 2.066 at ADM022.0513 (emphasis added); see DX 2.080 at ADM002.0610 ("[i]t should not be necessary to submit firm (within + or - 20%) commitment schedules sixty-three (63) months prior to the delivery date").

42. Cleveland Electric Illuminating Company requested that the "Delivery Commitment Schedule" be changed "for the sake of additional clarification" to "Preliminary Delivery Commitment Schedule." DX 2.017 at ARC0010215.

43. EEI's comments also recognized the importance of having DOE receive DCSs from all contract holders for a given year at the same time:

> If DOE is to be able to establish a reasonable planning basis for its delivery commitments, it should receive proposed delivery commitment schedules from all purchasers at the same time and covering the same time frame. Unless delivery commitment schedules are submitted on a consistent basis, DOE will not be able to plan on a consistent basis. Retaining the 63 month timetable, all purchasers should submit delivery schedules by July 1 covering any deliveries they wish to make during the fiscal year commencing 63 months later.

DX 2.034 at ADM002.0290.

iv. Exchanges

44. EEI, in its comments, also noted that Article IV.B of the proposed contract "allows the Purchaser to 'change the specific assemblies to be delivered so long as the SNF meets the acceptance criteria of the contract.'" DX 2.034 at ADM002.0292. EEI suggested that this provision be made "more explicit" to allow "exchanges among and within utilities." Id. EEI requested inclusion of the following paragraph:

> E. Exchanges
>
> Purchaser shall have the right to determine which SNF and/or HLW is delivered to DOE, provided that Purchaser complies with the requirements of Article V.A.2(b) as to such SNF and/or HLW. Purchaser shall have the right to exchange approved delivery commitment schedules with parties to other contracts with DOE for disposal of SNF and/or HLW, provided that DOE shall have the right to approve such exchanges, based upon the feasibility of necessary transportation arrangements, which approval shall not be unreasonably withheld.

Id. at ADM002.0293. Several individual utilities also requested that a provision permitting exchanges of allocations be added to the contract. See, e.g., DX 2.012 at ADM002.0109 (comments of Northern States Power Co.); DX 2.015 at ADM002.00133 (comments of Consumers Power Co.); DX 2.018 at ADM002.00173 (comments of Gulf States Utilities); and, DX 2.033 at ADM002.0264 (comments of Portland General Electric).

v. Other Comments

45. EEI and UNWMG also suggested that "[t]he definition of 'DOE Facility' (Article I.11) should be broadened to include destinations other than the repository." DX 2.034, attachment at 4-5 (ARC0010336-37). They stated that "[t]he contract does not recognize the possibility that DOE might send SNF/HLW to an intermediate location (such as a monitored

retrievable storage facility) before it goes to a repository" and that, "[t]o accommodate this, the definition of 'DOE Facility' should be broadened." Id.; see DX 2.014 (ADM002.0125) (change to contract language "would implicitly recognize DOE's option to reprocess SNF or to utilize Monitored Retrievable Storage prior to permanent disposal"); DX 2.069 (ADM002.0570)("[t]his change would recognize the possibility of DOE shipping SNF/HLW to an intermediate storage facility such as a monitored retrievable storage facility").

46. The nuclear industry "discouraged" the inclusion of the priority provision in the contract. DX 2.034 at ADM0020307 (in comments upon proposed rule, EEI stated that it did not support priority to shutdown reactors and recommended that the provision be deleted); Tr. 438:20-439:3; Tr. 495:6-11 (Mills: EEI "did not support the allocation of priority"). Operating reactors were concerned that the granting of priority would interfere with the ability of operating reactors to move "as much fuel from each of their reactors" as possible or move particular fuel when needed. Tr. 439:13-24 (Mills).

47. Many commenters suggested a change to the proposed language to provide that, if DOE disapproved a contract holder's DCS and the contract holder did not accept the alternate schedule that DOE identified in response, "the contract could provide for mandatory negotiation among the parties to arrive at an acceptable schedule." DX 2.0134 at ADM002.0115.

C. The Final Rule

48. On April 18, 1983, DOE issued the Standard Contract as a final rule. 48 Fed. Reg. 16590 (April 18, 1983).

49. The final rule, as promulgated, made several important modifications to the Standard Contract set forth in the proposed rule. First, although the proposed rule provided that "services provided to the Purchaser by DOE under this contract are related to **disposal** of SNF," 48 Fed. Reg. 5458, 5462 (Feb. 4, 1983) (emphasis added), that "disposal" was defined as emplacement in a permanent repository, id., and that such "disposal" services would begin by January 31, 1998, id., the final Standard Contract eliminated any requirement for DOE to begin SNF "disposal" in a permanent repository by January 31, 1998. Id. Instead, the final Standard Contract only required DOE to begin SNF acceptance by January 31, 1998, after the commencement of "facility" operations:

> This contract applies to the delivery by Purchaser to DOE of SNF and/or HLW of domestic origin from civilian nuclear power reactors, acceptance of title by DOE to such SNF and/or HLW, subsequent transportation and, with respect to such material, establishes the fees to be paid by the Purchaser for the services to be rendered hereunder by DOE. The SNF and/or HLW shall be specified in a delivery commitment schedule as provided in Article V below. The services to be provided by DOE under this contract shall begin, after commencement of facility operations, not later than January 31, 1998 and shall continue until such time as all SNF and/or HLW from the civilian nuclear power reactors specified in Appendix A, annexed hereto and made a part hereof, has been disposed of.

10 C.F.R. § 961.11, Art. II (emphasis added).

50. The "facility" to which the final Standard Contract refers is either a permanent repository to be constructed pursuant to the NWPA or such other facility to which SNF might be shipped by DOE prior to its transportation to a permanent repository:

> The term "DOE facility" means a facility operated by or on behalf of DOE for the purpose of disposing of spent nuclear fuel and/or high-level radioactive waste, or such other facility(ies) to which

> spent nuclear fuel and/or high-level radioactive waste may be shipped by DOE prior to its transportation to a disposal facility.

Id. § 961.11, Art. I.10 (emphasis added). As the preamble to the final rule expressly recognized, the final Standard Contract would not obligate DOE to have an operational permanent repository by January 31, 1998:

> The definition of "DOE facility" (Article I.10) was expanded to expressly state, in accordance with the Act, that there may be an interim storage facility (or facilities) which DOE may utilize prior to emplacement in a repository.

48 Fed. Reg. 16590, 16591 (Apr. 18, 1983).

51. Likewise, the final Standard Contract retained the language of the proposed rule allowing DOE the discretion to accord priority for SNF and/or HLW from reactors that have been shut down. 10 C.F.R. § 961.11, Art.VI.B.1.b.

52. The final Standard Contract retained the fee requirements identified in the proposed rule, requiring contract holders to pay the one-time fee for waste generated prior to April 7, 1983, and continuing quarterly fees in the amount of 1.0 mill per kilowatt-hour on electricity generated. 10 C.F.R. § 961.11, Art. VIII.

53. As for the order of SNF acceptance, the final Standard Contract retained the proposed rule's intention to provide SNF acceptance priority among contract holders upon an "oldest fuel first" basis, 10 C.F.R. § 961.11, Art. VI.B.1, and, like the proposed rule, provided for DOE's issuance of an acceptance priority ranking beginning April 1, 1991. 10 C.F.R. § 961.11, Art. IV.B.5.a.

54. As for identification of the rate of SNF acceptance, although the proposed rule stated that DOE would "annually provide to the Purchaser pertinent information to support waste

disposal program cost projections, project plans and progress reports," 48 Fed. Reg. 5458, 5463 (Feb. 4, 1983), the final Standard Contract provided, "at the request of a substantial number of commenters," 48 Fed. Reg. 16590, 16592 (Apr. 18, 1983), that DOE would issue an annual capacity report "for planning purposes" beginning no later than July 1, 1987 to set forth information regarding "the projected annual receiving capacity for the DOE facility(ies)" for the 10 years following the projected commencement of the initial DOE facility:

> Beginning not later than July 1, 1987, DOE shall issue an annual capacity report <u>for planning purposes</u>. This report shall set forth the projected annual receiving capacity for the DOE facility(ies) and the annual acceptance ranking relating to DOE contracts for the disposal of SNF and/or HLW including, to the extent available, capacity information for ten (10) years following the projected commencement of operation of the initial DOE facility.

10 C.F.R. § 961.11, Art. IV.B.5.b (emphasis added).

55. In the final Standard Contract, DOE did not adopt TVA's request that DOE add a provision to require DOE to "start accepting delivery of SNF or HLW not later than January 31, 1998, at not less than the annual rate [at which] SNF and/or HLW is then being produced from civilian nuclear power plants covered by contracts . . . ." <u>See</u> DX 6, 7, 8. Nor did DOE adopt YA's request that DOE adopt a schedule that provided for the beginning of waste acceptance prior to January 31, 1998. Tr. 3806:1-10 (Grube).

56. Similarly, DOE did not adopt EEI's request to add a contract clause to require DOE to accept SNF and/or HLW "commensurate with the amount of such fuel and waste then being generated together with the amount of such fuel and waste previously generated . . . ." <u>See</u> DX 2.034 at ARC0010335; Tr. 3798:20-3799:11 (Grube).

57. DOE denied the requests, made by several utilities in the rulemaking, to include an acceptance rate in the Standard Contract "[b]ecause of the uncertainties." Specifically, DOE did not know at that time what the acceptance rate would be or could be, in part because DOE "had no conceptual design of facilities." Tr. 3626:23-3627:13 (Morgan: "We were looking at three different media. One was basalt, one was tuff, and one was salt. And there's no question that the activities in a salt dome would be much less of a construction problem than in other media. And you could actually run the drifts faster in a salt media"). DOE believed that, "because of the uncertainties of the program . . . the NRC licensing process characterization, the R&D and other activities, . . . it was not prudent to put an acceptance rate in the contract." Tr. 3693:23-3694:6 (Morgan); see Tr. 3694:12-21 (Morgan: further explanation regarding the uncertainties associated with the program, including the fact that "NRC had not identified the requirements for licensing"); Tr. 3635:13-17 (Morgan: at the time of contract formation, "[i]t was premature" to include an acceptance rate in the contract); Tr. 3635:19-23 (Morgan: "Again, because of the status of the program . . . I felt it was inappropriate to – for us to commit to any receipt rates at that time"). The Standard Contract addressed the "manner in which DOE would accept spent nuclear fuel from the utilities" and "an acceptance rate that would be negotiated with DOE at a later point in time." Tr. 3657:4-12 (Morgan); see Art. IV and V; Tr. 3668:1-3 (Morgan: the scheduling process "was defined in the contract.").

58. DOE did not adopt Florida Power & Light Company's request that DOE add a contract clause obligating DOE to accept SNF and/or HLW under "the schedule and capacities detailed in the approved 1984 DOE Mission Plan . . . ." DX 2.043, attachment at 1 (ARC0010439).

59. The final Standard Contract also deleted some provisions from the proposed rule regarding the DCSs, but with the intention only of eliminating redundant provisions. As the "Sectional Analysis of Contract" portion of the final rule provided, DOE's intention was to retain the purpose of the DCSs, as had been defined in the proposed rule:

> The definition of "delivery commitment" which appeared in the proposed rule (48 FR 5462, Article I.7) has been deleted as this aspect is adequately covered in the contract itself (See Articles IV and V).

48 Fed. Reg. 16590, 16591 (Apr. 18, 1983). Accordingly, adopting the purpose of the DCSs from the proposed rule, the final Standard Contract established a procedure through which, after DOE's issuance of the 1991 Annual Capacity Report ("ACR") and Acceptance Priority Ranking ("APR"), contract holders would be required to begin submission of DCSs (beginning January 1, 1992) for any SNF and/or HLW that they wanted DOE to accept 63 months later:

> 1. Delivery commitment schedule(s), in the form set forth in Appendix C annexed hereto and made a part hereof, for delivery of SNF and/or HLW shall be furnished to DOE by Purchaser. After DOE has issued its proposed acceptance priority ranking, as described in paragraph B.5 of Article IV hereof, beginning January 1, 1992 the Purchaser shall submit to DOE the delivery commitment schedule(s) which shall identify all SNF and/or HLW the Purchaser wishes to deliver to DOE beginning sixty-three (63) months thereafter. DOE shall approve or disapprove such schedules within three (3) months after receipt. In the event of disapproval, DOE shall advise the Purchaser in writing of the reasons for such disapproval and request a revised schedule from the Purchaser, to be submitted to DOE within thirty (30) days after receipt of DOE's notice of disapproval.

> 2. DOE shall approve or disapprove such revised schedule(s) within sixty (60) days after receipt. In the event of disapproval, DOE shall advise the Purchaser in writing of the reasons for such disapproval and shall submit its proposed schedule(s). If these are not acceptable to the Purchaser, the parties shall promptly seek to negotiate mutually acceptable schedule(s). Purchaser shall have the right to adjust the quantities of SNF and/or HLW plus or minus (+/-) twenty percent (20%), and the delivery schedule up to two (2) months, until the submission of the final delivery schedule.

10 C.F.R. § 961.11, Art. V.B (emphasis added).

60. Unlike the proposed rule, the DCS submission provision of the final Standard Contract included a requirement that, if a contract holder found a DCS that DOE proposed to be unacceptable, "the parties shall promptly seek to negotiate mutually acceptable schedule(s)." Id. The final Standard Contract also included a "Disputes" clause, the purpose of which was to provide a mandatory administrative mechanism for the resolution of contract disputes arising under the contract:

> Except as otherwise provided in this contract, any dispute concerning a question of fact arising under this contract which is not disposed of by agreement shall be decided by the Contracting Officer, who shall reduce his decision to writing and mail or otherwise furnish a copy thereof to the Purchaser. The decision of the Contracting Officer shall be final and conclusive unless within ninety (90) days from the date of receipt of such copy, the Purchaser mails or otherwise furnishes to the Contracting Officer a written appeal addressed to the DOE Board of Contract Appeals (Board). . . .

10 C.F.R. § 961.11, Art. XVI.A (emphasis added).[6]

[6] In its comments upon the proposed Standard Contract, EEI recognized that the Disputes clause would function to resolve any differences between the parties concerning DCSs. DX 2.034 (ADM002.0291).

61. In response to a request from several commenters, DOE added a provision to the final Standard Contract states that contract holders "shall have the right to exchange approved delivery commitment schedules with parties to other contracts with DOE for disposal of SNF and/or HLW; *provided*, *however*, that DOE shall, in advance, have the right to approve or disapprove, in its sole discretion, any such exchanges." 10 C.F.R. § 961.11, Art. V.E (italics in original, underlining added).

a. Even though commenters had requested that DOE limit its discretion to disapprove exchange requests, seeking to require DOE to base any disapproval "upon the feasibility of necessary transportation arrangements, which approval shall not be unreasonably withheld," DX 2.034 at ADM002.0293, DOE did not adopt this request, instead making its right to approve or disapprove an exchange request "in its sole discretion." 10 C.F.R. § 961.11, Art. V.E.

b. Because the Standard Contract requires only that the ACR contain information only for the first ten years following projected commencement of operation of the initial DOE facility, 10 C.F.R. § 961.11, Art. IV.B.5(b), contract holders, including Yankee Atomic Electric Company, have acknowledged that the ten-year constraint upon approved DCSs prohibits exchanges beyond the ten-year period. DX 4 at FER0023138; DX 5 at EDB0023134.

62. The final Standard Contract, like the proposed rule, contained (1) language providing for the submission of FDSs after the submission and approval of DCSs and (2) a new sentence that required the parties "promptly [to] seek to negotiate mutually acceptance schedules" if the FDS that DOE was willing to approve was unacceptable to the contract holder:

> Final delivery schedule(s), in the form set forth in the Appendix D, annexed hereto and made a part hereof, for delivery of SNF and/or HLW covered by an approved delivery commitment schedule(s) shall be furnished to DOE by Purchaser. The Purchaser shall submit to DOE final delivery schedules not less than twelve (12) months prior to the delivery date specified therein. DOE shall approve or disapprove a final delivery schedule within forty-five (45) days after receipt. In the event of disapproval, DOE shall advise the Purchaser in writing of the reasons for such disapproval and shall request a revised schedule from the Purchaser, to be submitted to DOE within thirty (30) days after receipt of DOE's notice of disapproval. DOE shall approve or disapprove such revised schedule(s) within sixty (60) days after receipt. In the event of disapproval, DOE shall advise the Purchaser in writing of the reasons for such disapproval and shall submit its proposed schedule(s). If these are not acceptable to the Purchaser, the parties shall promptly seek to negotiate mutually acceptable schedule(s).

10 C.F.R. § 961.11, Art. V.C.

63. The final Standard Contract contained an integration clause, precluding reliance upon any representation, promise, or condition not expressly incorporated into the contract:

> This contract, which consists of Articles I through XXII and Appendices A through G, annexed hereto and made a part hereof, contains the entire agreement between the parties with respect to the subject matter hereof. Any representation, promise, or condition not incorporated in this contract shall not be binding on either party. No course of dealing or usage of trade or course of performance shall be relevant to explain or supplement any provision contained in this contract.

10 C.F.R. § 961.11, Art. XXII.A.

64. The final Standard Contract did not contain any language requiring DOE to accept fuel at a rate equal to the annual generation rate of SNF plus an amount sufficient to work off the backlog of fuel that would have accumulated by January 31, 1998, or at any specific numerical acceptance rate. See 10 C.F.R. § 961.11.

D. Comments And Testimony Regarding The Final Rule

65. The nuclear industry believed that, while the final Standard Contract did not cover all of the things that should be covered in a commercial contract, "it was a reasonable representation of what we were going to be able to depend on in the disposition of spent fuel and high-level waste." Tr. 356:15-19 and 356:24-357:2 (Mills). Although the contract did not resolve all of the issues that industry would have like to have resolved in the contract, the "final rule did include many of the comments that [the industry] had offered." Tr. 357:3-8 (Mills).

66. In a presentation that the Yankees' witness, Mr. Mills, made to members of industry on May 5, 1983, Mr. Mills explained that,

> [w]hen DOE opens its door in 1998, or whenever, it will have a limited capacity that needs to be allocated over the contract holders. DOE may be able to receive about 3,000 tons a year during the initial operation. But there will be about 60,000 tons of spent fuel available for delivery. On what basis will the limited available space be allocated over all contract holders? Should it be based on age of spent fuel, only? Will allocations be transferable? We urged DOE to provide a reasonable mechanism for this allocation in the contract. Of course, this will take effect 15 years from now. So it is likely that some improvement will be made between now and then. But as we understand it, DOE will provide individual allocations to contract holders. Once an annual allocation is assigned, contract holders will be permitted to substitute other spent fuel and swap allocations to mesh with operating needs. If one company can accommodate its spent fuel longer than another, it may be able to swap its allocation space with another organization. It is important to have an allocation procedure that treats all purchasers on a reasonably equitable basis.

PX 458 at YDK024128 (emphasis added); see Tr. 360:3-361:8 (Mills). Mr. Mills testified that this statement was an accurate statement of his remarks at the conference and reflected his understanding at the time. Tr. 361:9-13 (Mills). In this presentation, Mr. Mills expressed no

understanding that DOE would or was required to accept SNF at a rate equal to the generation rate plus some additional amount necessary to work off the backlog of SNF that would accumulate by January 31, 1998. PX 458.

67. Maine Yankee signed its contract on June 6, 1983. DX 6.

68. Yankee Atomic signed its contract on June 22, 1983. DX 7.

69. Connecticut Yankee signed its contract on June 30, 1983. DX 8.

70. When they executed the Standard Contract, each of the Yankees understood that the Standard Contract did not obligate DOE to accept SNF at any minimum rate and that, other than obligating DOE to begin SNF performance from the industry by January 31, 1998, it did not contain additional performance standards that DOE was obligated to satisfy:

a. At the informational meeting held in December 1983 with the nuclear industry, a representative of the nuclear industry, Mr. Mills, explained that, in the contract, DOE had promised to take SNF "at some unspecified rate" in the future and that the industry expected to initiate a petition for rulemaking in the future to define contractually additional performance assurances:

> In return for the money within the contracts, DOE has promised that it will take the nuclear waste some unspecified day, at some unspecified rate, hopefully starting in 1998. The DOE promise must be carried out, and it is our task as contract holders to do everything we can to assure that it is achieved.
>
> * * *
>
> We were never under an illusion that we would get a fair and equitable contract with DOE, with firm commitments and detailed performance standards, with penalties for non-performance. We were not really looking for that, however, there were many concerns expressed by the utilities that were not resolved, as we

> believed equitably during the contract generation process. Because several concerns were not handled satisfactorily, we fully expect to see a petition initiated for rule-making to achieve a more reasonable understanding on several issues. The money question is not involved. It is a matter of some of the performance assurances, to include some of the things we heard this morning which were not embodied in the contract.

DX 1 at SNP0118490.

b. In an October 19, 1983 memorandum regarding "potential issues to be resolved in a [future] rulemaking proceeding on the DOE contract," YA's Senior Fuels Manager, Mr. Buchheit, explained that there are no specific performance standards in the contract and that the contract should be amended to incorporate attendant dates and receiving rates:

> DOE's only requirement in the present contract is to take fuel by January 31, 1998. There are no specific performance standards. DOE is required to publish a mission plan in April 1984 which is to be approved by Congress. It is generally agreed that some statement concerning the mission plan should be incorporated into the contract with attendant dates. Also, the contract should be changed to incorporate receiving rates into the 1998 schedule.

DX 92A at YDK045590. When asked about this statement, Mr. Grube, YA's Director of Fuel Management, testified, "Well, it always felt a bit strange to have a contract without quantities listed, but that was not going to happen" because DOE would not agree to it. Tr. 3813:24-3814:1.

c. In a January 20, 1984 memorandum regarding the potential petition for rulemaking that Mr. Mills discussed in his December 1983 remarks (previously identified), Mr. Buchheit reiterated this understanding:

> The Contract should provide additional performance standards to assess DOE's progress toward meeting the goals established by the Nuclear Waste Policy Act. Presently, there are no performance

> standards. Even though DOE is required to commence accepting spent fuel no later than January 31, 1998, the Contract is so vague it could be interpreted that, if DOE accepts one fuel assembly, it will meet its obligation.

DX 92 at YDK023771. Mr. Grube agreed that this statement was consistent with Yankee Atomic's concerns about the Standard Contract at the time. Tr. 3815:17-19.

d. In a May 17, 1983 memorandum summarizing the provisions of the NWPA, Mr. Grube did not mention or identify the existence of any requirements regarding the minimum rate at which DOE was required to accept SNF and/or HLW from utilities. DX 102.

e. Mr. Grube agreed that the contract does not include a mandatory minimum rate of acceptance, and that it does not identify a given quantity of SNF and HLW that would be accepted in any given year. Tr. 3800:16-23.

f. Mr. Buchheit agreed, during his testimony at trial, that there is no requirement for a specific rate of acceptance in the Standard Contract. Tr. 4589:1-8. Mr. Buchheit also agreed that there is "no provision in the contract that requires DOE to use an acceptance rate of 3,000 MTU per year." Tr. 4589:9-12. Mr. Buchheit agreed that there is "nothing in the Standard Contract that requires DOE to relieve the utilities of their reactor storage costs." Tr. 4589:13-16.

## III. DOE'S ISSUANCE OF A STATUTORILY REQUIRED MISSION PLAN, WHICH THE INDUSTRY UNDERSTOOD WAS NOT CONTRACTUALLY BINDING

71. In June 1985, DOE issued a Mission Plan, PX 95, pursuant to the requirements of 42 U.S.C. § 10221 for "submission to the appropriate committees of the Congress." 42 U.S.C. § 10221(b)(3). Although the Mission Plan contained potential acceptance rates based upon

various assumptions regarding the availability of two repositories and a Monitored Retrievable Storage ("MRS") facility, these rates were not intended to be contractually binding or to create some obligation upon DOE to satisfy some particular acceptance rate, regardless of whether the assumptions in the Plan proved accurate:

a. In his cover letter providing the Mission Plan to Congress, Mr. Ben Rusche, Director of OCRWM, stated that the purpose of this plan was to "provide an informational basis sufficient to permit informed decisions to be made in carrying out the repository program and the research, development, and demonstration programs required under this chapter." PX 95 at HQ0005266 (emphasis added); see 42 U.S.C. § 10221 (1982). In the Mission Plan, DOE projected, for informational purposes, that an initial permanent repository would begin operations in 1998 and that a second permanent repository would commence operations in 2006. PX 95 at HQ0005305 ("Assumptions About Geologic Repositories, A. Number of Repositories, Two"); id. ("Table 2-2 shows a schedule that is based on the current estimated emplacement capacities of the two planned geologic repositories, one of which is currently authorized"). The 1985 Mission Plan also described an improved performance system that would include a Monitored Retrievable Storage ("MRS") facility that could start receiving SNF in 1996, two years ahead of the first repository (although DOE recognized that it lacked statutory authority to pursue this approach absent congressional approval of the MRS proposal to be submitted pursuant to section 10161), which would "service[] the first repository." PX 95 at HQ0005304, HQ0005308-09.

b. Studying an assumption that it would have two repositories and an MRS, DOE projected in the Mission Plan, in Tables 2-2 and 2-3, that it could potentially accept SNF at the following rates:

| | Authorized System | | Improved System |
|---|---|---|---|
| Year | First Repository MTU | Second Repository | MTU |
| Pre-1998 | | | 2,200 |
| 1998 | 400 | | 3,000 |
| 1999 | 400 | | 3,000 |
| 2000 | 400 | | 3,000 |
| 2001 | 900 | | 3,000 |
| 2002 | 1,800 | | 3,000 |
| 2003 | 3,000 | 400 | 3,000 |
| 2004 | 3,000 | 400 | 3,000 |
| 2005 | 3,000 | 400 | 3,000 |
| 2006 | 3,900 | 400 | 3,900 |
| 2007 | 4,800 | 400 | 4,800 |
| Total | 21,600 | | 34,900 |

PX 95 at 26-27 (HQ0005306-07). However, these acceptance rates were not intended to be contractually binding, see, e.g., PX 95 at HQ0005305, and DOE had declined the utilities' request to include in the Standard Contract a provision making the acceptance rates identified in the 1985 Mission Plan binding. See DX 2.043, Attachment 1 at ARC0010439.

c. Mr. Rusche, the Director of the program when the Mission Plan was issued, see PX 95; Tr. 3719:11, never viewed the information in the Mission Plan as constituting contractually binding obligations:

> I think mission plan means there was a mission to be accomplished that was broadly described in the Act, and this was an attempt at documenting an approach and a plan toward moving in that direction. . . . It wasn't a contract.

Tr. 3721:25-3722:6; Tr. 3728:24-3729:2 (Rusche: when asked about the schedules set forth in the Mission Plan and whether he considered them to embody contractual requirements, Mr. Rusche said, "Goodness, no."). As Mr. Rusche testified, too many unknowns existed in 1985 to allow DOE to make any commitment regarding a minimum mandatory acceptance rate:

> Because there were yet to be determined countless parameters that could affect [] the timing, the cost, the location, the circumstances. About the only thing we could really deal with is what you did at the beginning, whether it's the start of the process, that is how the utilities can handle their fuel, what kind of circumstances we were going to have to deal with at the site, at their site, but having no real definition of whether we were going to have one repository or two, where they were going to be located, whether we were going to have an MRS, were all factors . . ..

Tr. 3729:4-15.

d. In the Mission Plan, DOE expressly represented that "[i]t should be emphasized that this schedule is only an approximation of how the system may operate and is subject to considerable variation" and that "DOE will further define and specify the system acceptance parameters as the program progresses." PX 95 at HQ0005309; <u>see</u> Tr. 4723:9-17 (Milner: "there were acceptance rates assumed in the Mission Plan as examples of how the – the program <u>might</u> be operated" (emphasis added)). Further, in the Mission Plan, DOE advised Congress that it would not begin to publish firm waste acceptance schedules until 1991, as follows:

> Under the terms of the contracts for disposal services that have been signed between the DOE and the utilities, an annual capacity report with projected annual receiving capacities and rankings will be issued by the DOE beginning in 1987. In 1991, the DOE will begin to publish firm waste acceptance schedules for individual reactors, including shipment allocations.

PX 95 at HQ0005309. The "firm acceptance schedules" referenced in that statement referred to "the schedules that DOE was committing to accept the waste." Tr. 4725:13-17 (Milner, who was responsible for developing and issuing the Mission Plan, tr. 4718:7-10). Accordingly, in the Mission Plan, DOE pointed to the 1991 ACR as the document by which firm acceptance schedules would be established.

e. In section 2.7 of the 1985 Mission Plan, DOE expressly represented that the estimated schedule contained in it, based upon particular assumptions, was only an approximation of the how the system "<u>may</u> operate," that it was subject to considerable variation, and that actual acceptance rates had not yet been determined as follows:

> These schedules are <u>for illustrative purposes only</u> at this time. The amount of Defense waste to be disposed of in the repository, and <u>the actual acceptance rates, have not yet been determined by the DOE</u>.
>
> * * *
>
> It should be emphasized that <u>this schedule is only an approximation of how the system may operate and is subject to considerable variation</u>. The DOE will further define and specify the system acceptance parameters as the program progresses.

PX 95 at HQ0005308-09 (emphasis added).

f. In section 2.4 of the 1985 Mission Plan, DOE explained that, although the baseline assumption of the Mission Plan was that the repository would be built on schedule, a substantial delay in the repository would require DOE to pursue contingency approaches, with potentially significant effects upon DOE's SNF acceptance capabilities:

> [A]ll those involved in, and concerned about, these activities recognize that this program is highly controversial; involved in it are a number of important constituencies with widely varying views of how, when, and whether elements of the program should be carried out. . . .
>
> * * *
>
> The baseline program assumption, of course, is that the repository is built on schedule. Should the repository be substantially delayed, one of two contingency approaches would be pursued. If the MRS facility is authorized by Congress and constructed, it can begin to accept spent fuel in a timely manner and package and store it (up to the authorized storage-capacity limit) until a repository becomes operational. . . .
>
> If site characterization shows that none of the candidate sites for the first repository are suitable or should successive notices of disapproval be made and upheld, the DOE has two main contingency plans. If an MRS facility has been authorized and constructed, it can accept spent fuel on or ahead of schedule, packaging and storing it (up to the authorized storage-capacity limit) until the "second" repository is authorized (which, of course, would then become the first repository) and becomes operational. <u>If an MRS facility has not been authorized, spent fuel will continue to be stored at reactor sites in spent-fuel pools and possibly in dry storage</u>.

PX 95 at HQ0005299-300 (emphasis added); <u>see</u> PX 95 at HQ0005300 ("Should no repository be constructed and an MRS facility no be authorized, utilities would continue to be responsible for storing the spent fuel at reactor sites."). The possibility that DOE could not construct either an MRS or a repository was one of the contingencies evaluated in the Mission Plan. Tr. 4722:11-14 (Milner).

g. Earlier drafts of the Mission Plan contained similar waste acceptance schedules based upon DOE's then-current program plans, including the development of two repositories. PX 636 at CTR0421069 ("The Mission Plan . . . defin[es] the program objective,

strategy, and current program plans . . ..") (emphasis added) and CTR0421072. In Section II, Program Strategy, of the December 1983 draft Mission Plan, DOE stated that it would not begin publishing firm acceptance schedules until 1991:

> A. Waste Acceptance Schedule
>
> This Waste Acceptance Schedule will serve as a planning base which will be updated annually in response to the latest projections of nuclear power growth. The schedule will eventually be further developed to show not only the aggregate acceptance schedule, but also an acceptance priority ranking by utility and fuel element. Under the terms of the utility contracts for disposal services, an annual capacity report with projected annual receiving capacities and rankings will be issued by the Department for planning purposes, beginning in 1987.
>
> The disposal contracts with the utilities specify that priority will be given to the oldest spent fuel or high-level waste. In 1991, DOE will begin publishing firm individual utility acceptance schedules in accordance with the contracts, including shipment allocations.
>
> * * *
>
> While the Department's aggregate acceptance rate during the initial five years is set to prevent, in the aggregate, the need for utilities to provide additional on-site storage after 1998, it is possible that an individual utility may face a need for expanded storage due to the timing of its shipment allocation. The planning basis assumes that, after 1998, individual utilities who actually realize this need will arrange for the right to ship spent fuel to the Department from a utility who is next in the queue in shipment allocation (subject to prior approval by the Department based on submittal of a request no less than six months prior to the scheduled delivery date.

PX 636 at CTR0421071-73 (emphasis added). DOE did not intend this schedule to reflect contractual obligations or intent. Tr. 3644:15-20 (Morgan: "[a]s required by the Act, section 3, it was an informational document, clearly not contractual. . . . It represented the goals and what we would like to accomplish relative to specific activities."); Tr. 3651:18-25 (Morgan).

72. On May 27, 1986, the Secretary nominated five sites for site characterization, one each in Mississippi, Texas, Utah, Nevada, and Washington. 51 Fed. Reg. 19783-84 (June 2, 1986). According to a 1987 Senate report, "[d]efinitive decisions" by DOE, including this one, served "to focus intense concern and criticism on the program." S. Rep. No. 100-152, at 6 (Sept. 1, 1987).

73. In the 1987 Mission Plan Amendment, which DOE submitted to Congress in June 1987, DOE recommended deferral of the date contemplated for operation of the first repository from 1998 to 2003, with the second repository becoming operational by 2023:

> As already mentioned, several important milestones have been achieved. However, the experience gained in achieving those milestones and advances in the technical planning of the program, coupled with a decrease in the budget for fiscal year 1987 and uncertainty about fiscal year 1988, have led the DOE to reassess and rebaseline the program for the first repository and to revise its schedule (see Table 1). The new schedule shows a 5-year extension of the date for waste acceptance at the first repository, from 1998 to 2003. (As explained later, the DOE could nonetheless start accepting waste in 1998 at an MRS facility).[7]

DX 12 at HQR0031634. Further, in the 1987 Mission Plan Amendment, DOE stated that, "[l]ike the schedule in the 1985 Mission Plan, the schedule presented here is <u>only an approximation</u> of how the system may operate and is <u>subject to considerable variation</u>." DX 12 at HQR0031687 (emphasis added). Again, these acceptance rates were not intended or understood to be contractually binding. DOE also represented in the 1987 Mission Plan Amendment the importance of the Annual Capacity Report that would be issued in 1991:

---

[7] The ability to start accepting waste in 1998 at an MRS facility was dependent upon congressional authorization. <u>See</u> 42 U.S.C. § 10161(b)-(c) (1982).

> Under the terms of the contract that has been signed between the DOE and the owners and generators of spent fuel and high-level waste, an annual capacity report with projected annual receiving capacities and rankings will be issued by the DOE for planning purposes beginning in 1987. In 1991, the DOE is required to begin publishing annual acceptance priority rankings for spent-fuel receipt by the DOE. Beginning January 1, 1992, the utilities are to submit to the DOE for approval delivery commitment schedules based on these rankings. These schedules will form the basis for final delivery schedules to be submitted by the utilities not less than 12 months before the actual delivery dates.

DX 12 at HQR0031687.

74. In the 1985 Mission Plan and the 1987 Mission Plan Amendment, DOE included a "ramp-up" rate that would allow DOE to begin SNF acceptance at a lower pace than the pace at which it eventually hoped to accept SNF. PX 95 at HQ0005306; DX 12 at HQR0031688. The reason for a "ramp-up" period was to allow DOE to learn from its experience as the system matured, and DOE expected to bring on "additional capability in a measured fashion as opposed to trying to do a maximum amount on day one." Tr. 3452:25-3453:6 (Kouts). A ramp-up rate would ensure that DOE would not tax its facilities at the maximum rate at which it eventually expects to accept SNF until it has had a learning curve. See Tr. 3452:19-24 (Kouts).

75. After the issuance of the Mission Plan and the Mission Plan Amendment, the nuclear industry continued to lobby DOE for the inclusion of a "qualitative standard" for the rate of acceptance in the Standard Contract, indicating its understanding that no acceptance rate obligations existed in the contract. In an April 28, 1987 letter to the contracting officer, Mr. Steven Kraft of UNWMG wrote that the contract should be amended to incorporate a minimum acceptance rate obligation to "provide greater protection and certainty" to contract holders, as follows:

> The performance standards should be based on DOE's rate of receiving spent fuel. <u>The requirements of article 4, section B, paragraph 1, should be interpreted, clarified or amended to include the following: Commencing no later than January 31, 1998, DOE shall accept at an annual rate not less than the annual rate at which SNF is being discharged from civilian nuclear power reactors, subject to this and other such contracts with DOE</u>. By no later than January 31, 2008, DOE shall have satisfied all SNF which has been discharged from such reactors and has been stored for at least five years.
>
> <u>Rationale: The Act nowhere prohibits DOE from providing a reasoned explanation of the meaning of the January 1998 date for receiving spent fuel</u>. At present, the contract merely states that DOE's services shall begin after commencement of facility operation not later than January 31, 1998 . . . . Art. II. This language could conceivably be read to permit DOE to accept a single fuel assembly in 1998 and no more until decades later. Such an interpretation would do an injustice to the spirit, if not the letter, of the Nuclear Waste Policy Act.
>
> <u>While the contract is very clear in establishing the purchaser's obligation to make payments, it does not explicitly recite the standards for DOE's performance in accepting spent fuel from purchasers</u>. If DOE fails to commence receipt of significant amounts of spent fuel by January 31, 1998, the purchasers, including many members of UNWMG, could be subject to substantial expense and considerable operational constraints.
>
> * * *
>
> Accordingly, <u>UNWMG proposes that DOE provide for a minimum receiving rate for SNF, an annual receiving rate not less than the rate at which SNF is being discharged, and that DOE commit to accept the entire backlog of SNF over a ten-year period</u>. These commitments would provide greater protection and certainty to the purchasers. The obligation of contract holders to pay money to DOE is fixed, clear and ongoing. In return, it is reasonable and appropriate to establish standards for DOE's performance.

DX 109 at YDK038347-48 (emphasis added).

## IV. THE 1987 AMENDMENTS TO THE NUCLEAR WASTE POLICY ACT

76. On December 22, 1987, after DOE had submitted the 1985 Mission Plan and the 1987 Mission Plan Amendment to Congress, Congress amended the NWPA "to redirect the program for the management and disposal of spent nuclear fuel and high-level radioactive waste under the [NWPA]." S. Rep. No. 100-152, at 1 (Sept. 1, 1987). The Senate Committee on Energy and Natural Resources reported, in considering legislation to amend the NWPA, that "[t]he schedules included in the NWPA have proven to be overly ambitious," and that "[t]his has been largely due to the need to provide additional time for completion of necessary technical work and additional time for public participation." Id. at 5. The Committee reported that, "[i]n the four and a half years since passage of the NWPA, it has become clear that the program laid out in the Act will take longer to complete than was anticipated and that completion will be at much greater cost." Id. It further reported that, "[i]n addition to cost and schedule considerations, a number of other circumstances have changed since passage of the NWPA," including that, "as we approach major decision points in the nuclear waste program, there will be great potential for political opposition . . . ." Id.

77. The 1987 amendments to the NWPA directed DOE to characterize a single site, at Yucca Mountain in Nevada, for development of a single permanent repository and to terminate activities at all other sites. 42 U.S.C. § 10172(a). The 1987 amendments also authorized the Secretary to site, construct, and operate one, but only one, MRS facility. 42 U.S.C. § 10162(b). However, the 1987 amendments provided that the Secretary could not select a site for that MRS "until the Secretary recommends to the President the approval of a site for development as a repository under section 10134(a)." 42 U.S.C. § 10164(b). Further, Congress provided that

"construction of [the MRS] facility may not begin until the Commission has issued a license for the construction of a repository under section 115(d)." 42 U.S.C. § 10168(d)(1). Finally, it also provided that "the quantity of [SNF] at the site of such facility at any one time may not exceed 10,000 metric tons of heavy metal until a repository under this Act first accepts [SNF]." Id. § 10168(d)(3).[8]

78. In a July 19, 1994 letter from Dr. Andrew C. Kadak, President and CEO of Yankee Atomic, to Alan Brownstein at the Department of Energy, Yankee Atomic recognized the "linkage" established in the 1987 amendments to the NWPA between the existence of an MRS and a repository and that, absent an operational repository, the upper limit upon DOE acceptance of SNF or HLW is 10,000 MTU. DX 15 at YDK009254. In his letter, Dr. Kadak stated as follows:

> We believe DOE must introduce legislation in Congress (1) to unilaterally establish one or more non-power reactor interim storage sites; (2) to revoke the linkage mandated in the 1987 Amendments Act between the MRS and the repository; and (3) to eliminate the 10,000 MTU capacity limitation on the MRS.

Id. Congress has never rescinded the NWPA's 10,000 MTU limitation or the linkage between the MRS and the repository.

---

[8] The 1987 amendments to the NWPA also established the Office of the Nuclear Waste Negotiator. 42 U.S.C. § 10242(a). That office was to seek to enter into negotiations with states and Indian tribes to "attempt to reach a proposed agreement" with them through which a state or Indian tribe "would agree to host a repository or [MRS] facility with such State or reservation." Id. § 10243(a). The authorization for that office expired in 1994, id. § 10250, without any agreements with any states or Indian tribes.

V. DOE'S ISSUANCE OF ANNUAL CAPACITY REPORTS BETWEEN 1987 AND 1990 DID NOT CREATE BINDING MINIMUM ACCEPTANCE RATES

79. Beginning in 1987, in compliance with the NWPA and the language of the Standard Contract, DOE issued an Annual Capacity Report ("ACR"). Each of these ACRs expressly stated that, "[a]s specified in the Contract, the ACR is for planning purposes only and thus is not contractually binding on either DOE or the Purchasers." DX 16 at HQR0012713, DX 17 at HQR0012617, and DX 18 at HQR0012494; see also DX 16 at HQR0012708 ("projections in this initial report are based on current plans and best available information; they are not contractually binding").

80. Each ACR issued between 1987 and 1990 advised contract holders that, beginning in 1991, DOE would issue a firm waste acceptance schedule which would be the basis for the submission of delivery commitment schedules ("DCSs") by the purchasers, containing the following, or substantially similar, language:

> Beginning in 1991, the ACR acceptance ranking will be converted into an Annual Priority Ranking for receipt of SNF/HLW. In 1992, based on this priority ranking, the Purchasers will submit to DOE for approval, Delivery Commitment Schedules identifying the SNF/HLW that Purchasers propose to deliver to the DOE waste management system (WMS). Once approved, these schedules will become the basis for Final Delivery Schedules to be submitted by the Purchasers not less than 12 months before the date of DOE's anticipated acceptance of title to the SNF/HLW and subsequent transport to a DOE facility.

DX 16 at HQR0012713, DX 17 at HQR0012618, and DX 18 at HQR0012494; Tr. 3910:7-3911:10 (Mr. Pollog's testimony that these statements comported with his understanding of the role of the 1991 ACR).

81. The nuclear utility industry understood the significance of the 1991 ACR in the development of acceptance schedules for individual contract holders, as members of UNWMG were advised in an June 24, 1987 memorandum, as follows:

> OCRWM's concept and planned approach on the Annual Capacity Report (ACR) were summarized by Mr. Mongeon based on April contacts with OCRWM on this matter. It was indicated that the ACR is essentially OCRWM's allocation of the aggregate waste acceptance rate among individual utilities on a yearly basis. OCRWM will issue the first ACR in July, 1987, which will cover the ten year period from 1998 to 2007. This first ACR and the next three ACRs issued annually through 1990 are not contractually binding. While developing the first ACR, OCRWM and their contractor (PNL) compiled a list of contractual and technical issues identified as important to the report's acceptability. Although the Utilities will be asked to formally comment on this list of issues, OCRWM would also like assistance from the industry through an informal interchange to resolve satisfactorily as many of these contractual and technical issues as feasible. <u>This will improve the acceptability of future ACRs before they become contractually binding in 1991</u>.

DX 109 at YDK038298 (emphasis added).

82. The 1987 ACR contained the following admonitions by DOE, warning contract holders that the waste acceptance schedule was uncertain and presumed both a repository and an MRS in 1998:

> DOE acknowledges that uncertainty with regard to the waste acceptance schedule and the integrated [waste management system ("WMS")] derives, in part, from decisions yet to be made by Congress. DOE has presented the appropriate issues to Congress in the form of the <u>OCRWM Mission Plan Amendment</u>.
>
> * * *
>
> The waste acceptance schedule presumes Congressional approval of DOE's MRS proposal and reflects DOE's plans to integrate an MRS facility into the WMS to begin waste acceptance in 1998.

DX 16 at HQR0012714-15 (1987 ACR, ¶¶ 1.2.1 & 1.2.2) (footnotes omitted). Again, the 1987 ACR also notified contract holders that the projections of future events and rates were only projections and were "not contractually binding." DX 16 at HQR0012708; see DX 16 at HQR0012713.

83. The 1988 ACR contained the following admonitions by DOE, warning contract holders of delays in the availability of a repository:

> Article II of the Contract, indicates that "these services to be provided by DOE under this Contract [acceptance of title, subsequent transportation, and disposal of SNF and/or HLW] shall begin after the commencement of facility operations, not later than January 31, 1998 . . ." DOE recognizes that, under current conditions, operations of and waste acceptance at a DOE facility probably cannot begin in 1998. The delay in the repository schedule, first noted in the OCRWM Mission Plan Amendment published in June 1987 and the conditions imposed on the siting and construction of an MRS facility by the Nuclear Waste Policy Amendments Act of 1987 (Amendments Act) make it unlikely that DOE will be able to start accepting SNF significantly before 2003. As recognized in the draft Mission Plan Amendment, earlier waste acceptance would require additional Congressional action or an acceleration of the system development schedule by some other means. Under current conditions, the owners and generators of SNF will continue to be responsible for storing their spent fuel until acceptance by DOE.
>
> * * *
>
> The Amendments Act directs that ". . . the quantity of spent nuclear fuel or high-level radioactive waste at the site of such a [MRS] facility at any one time may not exceed 10,000 metric tons of heavy metal until a repository under this act first accepts spent nuclear fuel or solidified high-level radioactive waste . . ." Should the start of repository operations be delayed for any reason, waste acceptance at the MRS is to be limited to 10,000 MTU. The maximum capacity of the MRS is limited to 15,000 MTU by the Amendments Act.

DX 17 at HQR0012620-23 (1988 ACR, ¶¶ 2.1 & 2.2) (footnotes omitted).

84. Prior to the issuance of the 1990 ACR, DOE prepared a report to Congress from the Secretary of Energy titled "Reassessment of the Civilian Radioactive Waste Management Program," dated November 1989. PX 101. As a result of the reassessment detailed in this report, DOE determined that the repository would not be able to open until 2010, but that the MRS should open by 1998. PX 101 at EDB-001-1463; Tr. 4730:11-18 (Milner).

85. The 1990 ACR contained "upper bounding" and "lower bounding" schedule projections for SNF and/or HLW acceptance by DOE. For purposes of simplicity, the "upper bounding" projection contained a shorter ramp-up, a 3,000 MTU per year receipt rate, and 24,000 MTU total acceptance for the first 10 years of WMS operation. DX 18 at HQR0012497-99. The "lower bounding" projection contained a lower receipt rate and longer ramp-up (400, 600, 875 MTU per year), and a 7,375 MTU total acceptance for the first 10 years of WMS operation. Id. The 1990 ACR also contained the following admonitions by DOE:

> The two waste acceptance schedule projections used in this ACR are representative of the bounding cases for a WMS configuration authorized by the Nuclear Waste Policy Amendments Act of 1987 (Amendments Act), which includes an MRS facility. The upper bounding case is representative of the receipt rate of a WMS that is not restricted by MRS storage capacity limits of 10,000 MTU before repository operations and a maximum of 15,000 MTU at any time as imposed by the Amendments Act. This case is also not restricted by the MRS site selection and construction schedule linkages with the repository as imposed by the Amendments Act. The lower bounding case represents a receipt rate that would be in compliance with the Amendments Act restrictions on storage limits at an MRS before a repository starts operation. However, this case assumes removal of the schedule linkages with the repository imposed by the Amendments Act.

DX 18 at HQR0012496 (emphasis added). The 1990 ACR also expressly represented that the information in the 1990 ACR was "not contractually binding on either DOE or the Purchasers." DX 18 at HQR0012494.

86. In a memorandum to Dr. John Bartlett, Director, OCRWM, dated December 21, 1990, Ronald A. Milner, then Associate Director for Storage and Transportation, informed Dr. Bartlett that the 1990 ACR was for planning purposes only and would be replaced "by a contractually binding annual acceptance priority ranking report" in April 1991:

> The ACR is required to project both the annual receiving capacity of the waste management system and the annual acceptance ranking of contract holders for ten years following projected commencement of facility operations. The information in the ACR is for planning purposes only and is scheduled to be replaced as required by the contract by a contractually binding annual acceptance priority ranking report in April 1991.

DX 130 at EDB0011518.

87. Each of the ACRs issued between 1987 and 1990 also requested written comments, "specifically from the Purchasers," regarding the content of the ACRs. DX 16 at HQR0012714, DX 17 at HQR0012619, and DX 18 at HQR0012495. The 1988 and 1990 ACRs contained a section for DOE responses to the comments submitted by the Purchasers. DX 17 at HQR0012627-31 and DX 18 at HQR0012509. Moreover, DOE also met with industry representatives to obtain "consensus positions" upon various issues related to the Standard Contract, through a process which came to be known as the "ACR Issue Resolution Process." DX 20 and 21. Mr. Milner communicated to Dr. Bartlett in 1991 that "the 1991 ACR includes an update on the progress of the cooperative interactions between [DOE] and Contract holders to

address issues of mutual concern arising from implementation of the contract." DX 23 at EDB0011765.

A. 1991 Acceptance Priority Ranking

88. Pursuant to Art. VI.B.5.a of the Standard Contract, DOE issued its first official Acceptance Priority Ranking in April 1991. PX 92. "It is, simply speaking, a ranking from earliest to latest of all discharges of commercial spent fuel from utilities and some other non-utility contract holders." Tr. 3921:18-22 (Pollog); Tr. 3921:22-24 (Pollog: "It ranks [] basically starting with the earliest of first discharge coming first and the last discharge at the end of the queue."). The source of the information that is set forth in the APR are the RW-859 data forms that each of the contract holders are asked to submit periodically describing their fuel discharge information. Tr. 3922:2-14. An excerpt of this information was set forth in the 1991 ACR and provided the basis for the allocations set forth in the 1991 ACR. Tr. 3920:17-22, 3922:15-3923:25.

89. Under the "oldest fuel first" ("OFF") allocation method that the contract required for distribution of SNF acceptance positions, "Purchasers earn acceptance capacity based on date of discharge of their fuel. The earlier you discharge the fuel, the earlier you'll get an allocation, so it ranks it from first to last, with the earliest discharges getting the earliest allocations in the acceptance queue." Tr. 3919:20-3920:2 (Pollog); see Tr. 3820:16-19 (Grube: "oldest fuel first" allocation method "simply establishes your place in the queue based upon the discharge date of your fuel. Oldest fuel gets the top priority.").

90. As Mr. Milner, then Associate Director for Storage and Transportation, informed Dr. John Bartlett, Director, OCRWM, in a memorandum, dated April 15, 1991, "[t]he publication

of the APR begins the contractually binding waste acceptance process. The APR will be used in conjunction with waste acceptance rates to be published in the 1991 Annual Capacity Report (ACR) as the basis for purchasers to submit delivery commitment schedules (DCS) beginning in January 1992 for the department's approval. In turn, purchasers will have the opportunity to exchange approved DCSs, also subject to departmental approval." PX 629 at HQR0011531.

B. The 1991 Annual Capacity Report

91. In December 1991, DOE issued its "Annual Capacity Report" for that year, noting that "[a]lthough the 1990 ACR indicated that it would be the last ACR published, DOE has elected to continue publication of the ACR after discussions with the Purchasers." DX 24 at HQR0012362. Like prior ACRs, it provided that, "[a]s specified in the Standard Contract, the ACR is for planning purposes only and thus is not contractually binding on either DOE or the Purchasers." DX 24 at HQR0012362-63.

92. However, the acceptance rate set forth in the 1991 ACR was significant because it was the last ACR that would be issued prior to the contract holders' submission of DCSs beginning January 1, 1992. See 10 C.F.R. § 961.11, Art. V.B.1. In that regard, the 1991 ACR provided that, "[b]eginning in January 1992, the Purchasers may submit Delivery Commitment Schedules (DCS) to DOE identifying the range of SNF that the Purchasers propose to deliver to the Federal Waste Management System (FWMS) beginning sixty-three months thereafter." DX 24 at HQR0012362. It also stated that "[t]he Purchasers' allocations for each delivery year are presented in Tables A.1 through A.10 in Appendix A, and should be used as the basis for submitting DCSs." Id.; see DX 24 at HQR0012368 ("[t]hese allocations are the basis for DCS submittals").

93. OCRWM created the acceptance allocations specified in the 1991 ACR[9] with the knowledge that no permanent repository would be available by January 31, 1998, and to be "consistent with the 10,000 MTU storage capacity limit contained in the NWPA for an MRS facility before a repository starts operation." DX 24 at HQR0012365. When DOE issued the 1991 ACR, it assumed that an MRS would be operational in the system by 1998. The MRS had a capacity limit of 10,000 metric tons, and the ramp-up and acceptance rate was designed so that DOE would not exceed that amount before the repository was anticipated to begin operation. Tr. 4742:2-11 (Milner); Tr. 4737:22-25 (Milner); Tr. 3907:10-14 (Pollog). DOE anticipated that it would receive relief from the "construction linkage" in the NWPA that tied the operation of the MRS to the receipt of construction authorization for the repository. Tr. 4020:13-18 (Pollog).

94. Based upon anticipated limitations for the projected capacity for the first ten years, DOE identified an 8,200 MTU acceptance, at the rates identified below and stated as follows:

[9] Contrary to Dr. Bartlett's testimony that the 1991 ACR was prepared by the contracting office, Tr. 732:1-4 (Bartlett), Mr. Pollog and Mr. Milner both testified that the 1991 ACR was prepared by OCRWM. Tr. 3906:10-13 (Pollog); Tr. 4714:2-3 (Milner). The contracting office only had a "minor role" in the preparation of the 1991 ACR, providing comments upon the draft that was circulated for comment and sending the report out under the signature of the contracting officer. Tr. 3906:14-3907:3 (Pollog).

The waste acceptance projections used in this ACR are representative of a FWMS [Federal Waste Management System] configuration authorized by the NWPA, which includes a Monitored Retrievable Storage (MRS) facility. Article II of the Standard Contract specifies that "The services to be provided by DOE under this contract shall begin, after the commencement of facility operations, not later than January 31, 1998 . . . ." DOE recognizes that, under current conditions, waste acceptance at a DOE facility can begin in 1998 only if the Federal Government is able to consummate a timely agreement, which is enacted into Federal law, with a host State or Indian Tribe for the siting of an MRS facility. The Office of the Nuclear Waste Negotiator, the head of which is a representative of the Federal Government appointed by the President, is actively seeking a State or Indian Tribe willing to host an MRS facility or geological repository.

The acceptance rates in Table 2.1 do not reflect the MRS facility schedule linkages with the repository development that were imposed by the NWPA, but are consistent with the 10,000 MTU storage capacity limit contained in the NWPA for an MRS facility before a repository starts operation. These acceptance rates assume commencement of facility operations in 1998. If the current linkages between MRS facility construction and repository construction authorization are maintained, it is estimated that commencement of facility operations and initial acceptance of SNF by DOE could not start until at least 2007.

Operation of the FWMS with the waste acceptance rates presented in Table 2.1 would result in the receipt of 8,200 MTU of SNF at the MRS facility during the first ten years of operations. This table provides only an approximation of the system throughput rates and is subject to change depending on the system design and configuration and Congressional action regarding the conditions for the siting of an MRS facility. DOE will further define and specify the system operating and waste acceptance parameters as the program progresses and inform the Purchasers accordingly at the earliest feasible time. . . .

TABLE 2.1

Projected Waste Acceptance Rates for Spent Nuclear Fuel

| Year | | SNF (MTU) |
|---|---|---|
| 1998 | | 400 |
| 1999 | | 600 |
| 2000 | | 900 |
| 2001 | | 900 |
| 2002 | | 900 |
| 2003 | | 900 |
| 2004 | | 900 |
| 2005 | | 900 |
| 2006 | | 900 |
| 2007 | | 900 |
| | TOTAL | 8,200 |

DX 24 at HQR0012365-66 (emphasis added).

95. Table 3.1 in the 1991 ACR set forth specific allocations for each contract holder derived by applying the list of "oldest fuel first" from the 1991 APR to the rate of SNF acceptance in Table 2.1 of the 1991 ACR. DX 24 at HQR0012370. A blank for any give year on table 3.1 indicated that the utility did not have an allocation for that year. Tr. 3915:18-24. Table 3.1 presents allocations for only 10 years because the Standard Contract directs that DOE shall set forth "the first 10 years worth of receiving allocation, or allocations for each purchaser." Tr. 3916:23-3917:4.

96. The Yankees' expert witness, Dr. Bartlett, testified that, while he was Director of OCRWM, he believed that the rates in the 1991 ACR were "achievable" and "reasonable." Tr. 706:22-707:5. On December 27, 1991, Dr. Bartlett signed the memorandum approving the 1991 ACR for publication. DX 23 at EDB0011765.

97. Although Dr. Bartlett testified that, during his tenure, DOE was planning upon annually accepting 3,000 MTU of SNF soon after 1998, Tr. 609:20-23, that testimony conflicts with the contemporaneous evidence. First, on December 27, 1991, Dr. Bartlett signed the memorandum approving the 1991 ACR for publication, DX 23 at EDB0011765, an ACR that did not any annual acceptance rate above 900 MTU per year. Second, other witnesses testified that, when the 1991 ACR was issued, DOE was not planning to accept SNF at a 3,000 MTU rate, given that acceptance was anticipated to be at an MRS rather than a repository. Tr. 3909:7-17 (Pollog); Tr. 4742:2-11 (Milner). Third, the Yankees have identified no documents issued during Dr. Bartlett's tenure in which DOE evidenced any expectation of accepting SNF beginning in 1998 at an annual rate of 3,000 MTUs.

C. The 1992 Through 1995 Annual Capacity Reports

98. The 1992 ACR, which was issued in May 1993, contained the same acceptance rates as the 1991 ACR. DX 26 at HQR0012324. The 1992 ACR also provided that, "[d]uring the first ten years following projected commencement of the Civilian Radioactive Waste Management System (CRWMS) operation, the total quantity of SNF that could be accepted is projected to be 8,200 MTU." DX 26 at HQR0012319. It stated that "[t]his is consistent with the storage capacity licensing conditions imposed on an MRS facility by the NWPA." Id. The ACR also stated that, "[a]s specified in the Standard Contract, the ACR is for planning purposes only and, thus, is not contractually binding on DOE or the Purchasers." DX 26 at HQR0012321-22.

99. In 1995, DOE issued a combined APR and ACR to "establish[] the order in which the Department allocates the projected acceptance capacity for commercial [SNF]" and to "appl[y] projected nominal acceptance rates for the system to the priority ranking in the APR,

resulting in individual allocations for the owners and generators expressed in metric tons per uranium (MTU)." DX 27 at CTR0020140. The 1995 ACR contained substantially similar SNF acceptance rates as the 1991 and 1992 ACRs, identifying a projected nominal waste acceptance rate of 8,200 MTUs for the first 10 years of SNF acceptance:

Table 1. Projected Nominal Waste Acceptance Rates for Spent Nuclear Fuel

| Year | SNF (MTU) |
|---|---|
| Year 1 | 400 |
| Year 2 | 600 |
| Year 3 | 900 |
| Year 4 | 900 |
| Year 5 | 900 |
| Year 6 | 900 |
| Year 7 | 900 |
| Year 8 | 900 |
| Year 9 | 900 |
| Year 10 | 900 |
| TOTAL | 8,200 |

DX 27 at CTR0010143; see DX 26 at HQR0012324 and DX 24 at HQR0012366. The 1995 ACR also contained the following statement:

> The ACR (see Appendix B) applies a 10-year projected nominal waste acceptance rate to the APR, resulting in individual capacity allocations. In the previous ACR, the projected nominal acceptance rate was based on the assumption of SNF acceptance beginning in 1998 at a Monitored Retrievable Storage facility prior to repository operations. Due to the uncertainty associated with the date of commencement of operation of the waste management system, the annual nominal waste acceptance rates are presented by year(s) of operation of the system rather than by specific calendar year(s). The projected nominal acceptance rates also reflect the capacity limit imposed by the Act on such a storage facility prior to repository operations. These projected nominal waste acceptance rates are presented in Table 1. The Department will continue to process DCS submittals on an annual basis.

DX 27 at CTR0020142-43 (emphasis added). The 1995 ACR also provided that, "[a]s specified in the Standard Contract, the ACR is for planning purposes only and, thus, is not contractually binding on either DOE or the Purchasers." DX 27 at CTR0020140. However, it also provided that "[t]hese capacity allocations, as listed in the ACR, form the basis for the Purchasers' submittal of Delivery Commitment Schedules (DCS)." Id.

## VI. DELIVERY COMMITMENT SCHEDULES

### A. DOE's DCS Submission Instructions

100. In March 1992, the DOE contracting officer issued a letter to each of the contract holders, including Connecticut Yankee, Maine Yankee, and Yankee Atomic, along with instructions for the submission of DCSs. DX 28.001, 29.001, & 30.001; Tr. 3916:18-22 (Pollog: purpose of DCS instructions was to inform Standard Contract holders how to complete DCSs). Although contract holders had the option to seek approval of any acceptance amount they wanted, subject to the right to exercise the "Disputes" provision of the Standard Contract, Arts. V.B and XVI, see, e.g., Tr. 4929:4-10 (Kadak), the contracting officer recommended that "[t]he allocations in the 1991 Annual Capacity Report (ACR) should be the basis for the DCS submittals." E.g., DX 28.001 at HQR0012146; Tr. 4149:4-16 (Zabransky, testifying regarding his understanding, while at Wisconsin Electric Power Company, of the contracting officer's instructions). The accompanying instructions provided that purchasers could "begin submitting to the Department of Energy (DOE) Delivery Commitment Schedules (DCS) that identify all spent nuclear fuel (SNF) the Purchasers plan to deliver to DOE beginning 63 months thereafter." E.g., DX 28.001 at GPE0010064. The instructions stated that "[t]he DCS provides the Purchasers with the opportunity to inform DOE of their plans for utilizing their allocations of

projected Federal waste management system (FWMS) acceptance capacity." Id. They further provided that, "[f]or each allocation listed in the 1991 ACR (or subsequent ACRs, as appropriate), a Purchaser must submit at least one DCS for that allocation at least 63 months prior to the date that the allocation occurs (e.g., if a Purchaser has an allocation in 1998, a DCS must be submitted for that allocation by September 30, 1992)." Id. These instructions were consistent with the original intent of the Standard Contract and were necessary for proper implementation of the waste management system.

101. The DCS instructions provided that the contract holders' DCS submissions were to be based upon the allocations set forth in the applicable ACR. DX 28.001 at GPE0010065 (Para. 7(a): "The 1991 ACR applied a 10 year projected waste acceptance rate to the 1991 ACR for planning purposes, resulting in individual Purchaser allocations. The Purchaser's allocations for each delivery year (for a 10 year period) are presented in the 1991 ACR and are the basis for Purchasers submitting DCSs to DOE for approval."). Further, the DCS instructions provided that, "[d]ue to the limited annual acceptance capacity of the [Federal Waste Management System], only DCSs submitted by purchasers with an allocation in the delivery year will be considered for approval." Id.

102. The DCS instructions that the DOE contracting officer distributed to the contract holders were developed pursuant to a cooperative effort with the nuclear utilities, whereby DOE discussed the proper completion of a DCS with utility representatives, drafted the DCS instructions based upon those discussions, and then discussed the draft instructions with utility representatives and obtained their comments upon them. Nancy Slater Dep. 6/13/02, 158:18-160:3. No contract holder protested the instructions. See Tr. 4149:4-16.

103. As Maine Yankee, Connecticut Yankee and Yankee Atomic recognized in internal memoranda, and consistent with the contract, a contract holder's failure to submit a DCS at least 63 months before a proposed SNF and/or HLW acceptance date would result in the contract holder's loss of its SNF and/or HLW allocation contained in the ACR/APR. DX 33, DX 34 at YDK009170, and DX 35 at YDK037423.

104. Yankee Atomic understood that Yankee Atomic "could make whatever request it wanted to in its DCS submissions," but that "DOE had the authority to approve or disapprove that DCS." Tr. 4929:4-10 (Kadak).

105. Both the contract holders and DOE understood that an approved DCS represented a binding commitment by the parties to deliver and accept the amount of SNF set forth on a DCS in a given year:

a. Yankee Atomic understood that the purpose of a DCS was "to define the amount of material that would be available for delivery in a particular year in the future," Tr. 3818:17-19, and that DOE had an obligation to accept the amount of spent fuel identified on a DCS. Tr. 3819:2-6 (Grube); Tr. 4928:12-16 (Kadak: "the approved DCS committed DOE to accept the spent fuel identified in that DCS. . . . If they approved it, that would have been our expectation."); <u>see also</u> Tr. 3818:23-3819:1.

b. YA's expert witness, Dr. Bartlett, agreed that "[a] DCS is an agreement between the utility and the Government that services will be performed." Tr. 675:1-4.

c. Mr. Milner, Mr. Pollog, and Mr. Zabransky all testified at trial that they understood an approved DCS to be "binding commitments." Tr. 4761:14-15, 4789:11-16, 4789:23-24 (Milner); Tr. 3953:23-3954:7, 3970:12-16 (Pollog); Tr. 4113:24-4114:7, Tr. 4116:5-

12 (Zabransky, testifying regarding his understanding while he was employed by Wisconsin Electric Power Company and was responsible for the completion of DCSs upon behalf of Wisconsin Electric). Mr. Pollog testified that it was DOE's "official position" that the DCSs were binding. Tr. 3954:8-11.[10]

106. DOE stopped processing DCSs in early 1997. Tr. 4146:3-4 (Zabransky). The decision "to stop processing was based upon a belief that the DCSs were binding commitments, and we should not enter into binding commitments that we know we couldn't meet at that point in time." Tr. 4150:25-4151:4 (Zabransky).

B. Connecticut Yankee's Submission Of DCSs And FDSs

107. Connecticut Yankee understood and accepted the contracting officer's instructions regarding the submission of DCSs because it submitted DCSs for the allocations set forth in the 1991 to 1995 ACRs, pursuant to those instructions. Connecticut Yankee provided no contemporaneous documentation or testimony at trial to demonstrate that Connecticut Yankee protested its allocations set forth in the 1991 ACR or protested the direction to use the allocations set forth there in the preparation of its DCSs.

a. By letter dated September 25, 1992, Northeast Utilities, on behalf of Connecticut Yankee, submitted a DCS for delivery of 64.16 MTU of SNF in 1998. DX 28.002.

[10] When asked, "[I]sn't that position [that DCSs are binding commitments] something that has been made up entirely for this litigation?," Mr. Pollog testified, "Not to my knowledge, it's not [] hasn't been made up for this litigation." Tr. 3954:12-16.

By letter dated March 10, 1993, DOE notified Northeast Utilities that it had approved this DCS. DX 28.005.[11]

b. By letter dated September 29, 1993, Northeast Utilities, on behalf of Connecticut Yankee, submitted a DCS for delivery of 22.21 MTU of SNF in 1999. DX 28.006. By letter dated March 24, 1994, DOE notified Northeast Utilities that it had approved this DCS. DX 28.009.[12]

c. By letter dated September 28, 1994, Northeast Utilities, on behalf of Connecticut Yankee, submitted a DCS for delivery of 19.73 MTU of SNF in 2000. DX 28.010. By letter dated January 18, 1995, DOE notified Northeast Utilities that it had approved this DCS. DX 28.011.

d. By letter dated September 28, 1995, Northeast Utilities, on behalf of Connecticut Yankee, submitted a DCS for delivery of 21.5 MTU of SNF in 2001. DX 28.012.

e. By letter dated September 30, 1996, Northeast Utilities, on behalf of Connecticut Yankee, submitted a DCS for acceptance of 13.0 MTU of SNF in 2002. DX 28.013. By letter dated March 13, 1997, Beth A. Tomasoni, the DOE contracting officer, informed Lee O. Hill, Northern Utilities Service Company, predecessor in interest to Connecticut Yankee, that DOE "is not able at this time to approve your DCS submittal" and that, "[c]onsequently, the

---

[11] DOE initially raised questions regarding who was authorized to bind Connecticut Yankee and the crane capacity indicated for CY's facilities. DX 28.003. After these issues were resolved, DOE approved the DCS for delivery of 64.16 MTU by Connecticut Yankee in 1998. DX 28.004 and 28.005.

[12] Again, DOE raised a question regarding who was authorized to bind Connecticut Yankee in the submission of DCSs. DX 28.007. After this issue was resolved, DOE approved the DCS. DX 28.008 and 28.009.

Department hereby waives until further notice the contract requirement that you provide a revised schedule within 30 days." DX 28.016.

f. By letter dated January 9, 1997, Northeast Utilities, on behalf of Connecticut Yankee, submitted a final delivery schedule for SNF to be accepted in 1998. DX 28.014. By letter dated March 13, 1997, Beth A. Tomasoni, the DOE contracting officer, informed Lee O. Hill, Northern Utilities Service Company, that DOE "is not able at this time to approve your FDS submittal" and that, "[c]onsequently, the Department hereby waives until further notice the contract requirement that you provide a revised schedule within 30 days." DX 28.015.

g. By letter dated September 26, 1997, Northeast Utilities, upon behalf of Connecticut Yankee, submitted a DCS for acceptance of 20.16 MTU of SNF in 2003. DX 28.017. By letter dated January 13, 1998, Beth A. Tomasoni, the DOE contracting officer, informed Lee O. Hill, Jr., Northeast Utilities Service Company, that DOE "is not able at this time to approve your DCS submittal" and that, "[c]onsequently, the Department hereby waives until further notice the contract requirement that you provide a revised schedule within 30 days." DX 28.018.

108. Connecticut Yankee never requested that DOE grant it priority acceptance pursuant to the provision in Article VI.B.1(b) of the Standard Contract, which provides DOE the discretion to accord priority acceptance to SNF generated at permanently shut down reactors.

C. <u>Maine Yankee's Submission of DCSs And FDSs</u>

109. Maine Yankee understood and accepted the contracting officer's instructions regarding the submission of DCSs because it submitted DCSs for all of the allocations set forth

in the 1991 ACR, pursuant to those instructions. Maine Yankee provided no contemporaneous documentation or testimony at trial to demonstrate that Maine Yankee protested its allocations set forth in the 1991 ACR or protested the direction to use the allocations set forth there in the preparation of its DCSs.

a. In a September 11, 1992 memorandum, Mr. Buchheit made the following recommendation regarding MY's DCS submissions:

> There are other reasons for submitting for all allocations shown in the ACR. The standard contract permits exchanges of delivery allocations among purchasers; however, only purchasers with approved DCSs are permitted to exchange allocations. Also, <u>an approved DCS represents a more tangible commitment on DOE's part to accept Maine Yankee spent fuel and may provide needed leverage if we attempt to make DOE responsible to pay for on-site storage should their fail to meet their 1998 contractual commitment</u>.
>
> We therefore recommend that Maine Yankee submit DCSs for all of the allocations showing in the 1991 ACR.

DX 161 at MOF034232 (emphasis added). Mr. Buchheit, who prepared MY's DCSs as part of the work he did for Maine Yankee related to the Standard Contract, Tr. 4589:10-18, Tr. 4590:6-8, recommended that Maine Yankee submit DCSs for all of the first ten years of allocations. Tr. 4647:15-25. Maine Yankee submitted those DCSs, and DOE approved those DCSs. <u>Id.</u>

b. By letter dated September 29, 1992, Maine Yankee submitted to DOE DCS "for the spent fuel to be shipped in accordance with the allocations specified in the 1991 Annual Capacity Report." DX 29.002. These DCSs sought acceptance of 26.3 MTU of SNF in 1999; 57.9 MTU of SNF in 2000; 27.2 MTU of SNF in 2001; 50.6 MTU of SNF in 2003; 26.2 MTU of SNF in 2005; and 28.2 MTU of SNF in 2006. <u>Id.</u> By letter dated December 22, 1992,

DOE notified Maine Yankee that it had approved these DCSs. DX 29.003. Maine Yankee did not submit to DOE any DCSs for acceptance of SNF and/or HLW in 1998, 2002, 2004, 2007, or any year after 2007.

110. Maine Yankee first requested that DOE grant it priority acceptance, pursuant to Article VI.B.1(b) of the Standard Contract, in 1998. DOE has not granted this request for priority acceptance.

a. By letter dated May 11, 1998, Maine Yankee submitted a final delivery schedule for SNF to be removed in 1999. DX 29.005. In the letter that accompanied the FDS submission, Maine Yankee acknowledged that the amount of SNF it asked that it be allowed to deliver pursuant to the FDS was larger than the DCS DOE had approved for 1999, but requested that DOE approve the FDS, pursuant to the priority for shutdown provision of the contract. Id. By letter dated June 15, 1998, Beth A. Tomasoni, the DOE contracting officer, informed Michael E. Thomas, Maine Yankee, that DOE "is not able at this time to approve your FDS submittal" and that, "[c]onsequently, the Department hereby waives until further notice the contract requirement that you provide a revised schedule within 30 days." PX 301MY.

b. In response to an inquiry from a third party in its 1998 rate case proceeding before the Federal Energy Regulatory Commission, Maine Yankee prepared an assessment stating that DOE could ship all of its fuel in 27 months, beginning in 1998. PX294MY. This assessment was based, in part, upon the "unrealistic" assumption that Maine Yankee would receive preferential acceptance from DOE based upon its status as a shutdown reactor. Tr. 6250:17-6251:6 (Jordan).

c. None of MY's decommissioning studies assumed that Maine Yankee would be granted priority for shutdown reactors to enable Maine Yankee to finish delivering its fuel before 2018 to DOE. See, e.g., DX 196 at MPA010848 (Maine Yankee 1993 decommissioning study).

D. Yankee Atomic Electric Company's DCS Submissions

111. Yankee Atomic understood from the contracting officer's instructions that, even though the contracting officer wanted contract holders to adhere to the allocations identified in the 1991 ACR, it was entitled to request different allocations in its DCS submissions. It chose, initially, to submit DCSs for allocations that were different from those set forth in 1991 ACR, in an attempt to obtain priority acceptance of its SNF, pursuant to Article VI.B.1(b) of the Standard Contract relating to priority for SNF generated at shutdown reactors.

a. By internal memorandum dated September 25, 1992, Mr. Buchheit recommended that Yankee Atomic deviate from the allocations in the 1991 ACR and submit DCSs seeking acceptance of all of YA's SNF in the first three years of FWMS operation, as follows:

> DOE's instructions for DCS submittal specify that the quantity which DOE will accept must not exceed allocations specified in the December 1991 annual capacity report, or ACR. Along with year one, DCSs can also be submitted for any of succeeding year's allocations listed in the ACR. We recommend that Yankee deviate from DOE's instructions to comply with ACR allocations and request that DOE accept all of Yankee's spent fuel in the first three years of WMS operation.
>
> The Standard Contract for Disposal of Spent Nuclear Fuel/High Level Radioactive Waste requires that purchasers who have allocations for spent fuel disposal in the 1991 ACR in the first year of WMS operation, currently considered by DOE to be 1998, must

> submit a DCS for this allocation to DOE by no later than September 30, 1992. <u>Failure to do so will result in Yankee losing [sic] its place in the queue; i.e. Yankee would have no allocation rights in year one</u>. . . .

DX 35 at YDK037423 (emphasis added). Yankee Atomic pursued this strategy of accelerated acceptance because of YA's shutdown status at this point in time. Tr. 4649:2-9 (Buchheit). Yankee Atomic understood, in pursuing this strategy, that DOE might reject YA's or any non-complying DCSs. Tr. 3823:12-14 (Grube).

b. In another undated memorandum, Mr. Buchheit urged the submission of DCSs because they were a contractual requirement:

> Whether or not DOE is capable of accepting the fuel is immaterial. We are required contractually to submit the schedule and should do so to avoid any potential question of breach later on.

DX 33; <u>see</u> Tr. 4652:14-17 (Buchheit).

112. Yankee Atomic repeatedly sought priority acceptance of its SNF, but DOE denied its requests based upon the opposition to the grant of priority from the rest of the nuclear industry:

a. Yankee Atomic first requested priority acceptance in a letter from Dr. Kadak to Dr. Bartlett, dated February 4, 1992. DX 146. In that letter, Yankee Atomic explained that, pursuant to DOE's published schedules and an "oldest-fuel-first" acceptance queue, Yankee Atomic estimated that DOE would not accept the last of Yankee Atomic's fuel until 2020 at the earliest. DX 146 at YDK009071. As Yankee Atomic explained, "[a]ssuming plant shutdown in 2000, Yankee's objective is to complete decommissioning by 2007, including shipment of all spent fuel by 2005. This goal is clearly not achievable without DOE granting

Yankee priority ranking in the shipping queue." Id. at YDK009072; see Tr. 4881:2-7 (Kadak: Yankee Atomic could not complete decommissioning by 2005 unless DOE granted priority); Tr. 4665:11-21 (Buchheit: Yankee Atomic projected that, without a grant of priority, DOE would not remove Yankee Atomic's SNF for 21 years after DOE began acceptance, based upon the rates set forth in the 1991 ACR).

b. By letter dated April 6, 1992, Dr. Bartlett denied YA's request for priority acceptance, explaining that "[t]he industry's consensus position was that no priority should be afforded to shutdown reactors." DX 149 at YDK009010; see Tr. 672:22-673:2 (Bartlett); Tr. 675:25-676:2 (Bartlett: "most utilities were opposed to priority for shutdowns.").

c. Yankee Atomic again sought priority with the submission of its DCSs. On or about September 25, 1992, Yankee Atomic submitted three DCSs to DOE for SNF acceptance in the years 1998, 1999, and 2000, seeking acceptance of amounts of SNF in excess of the amounts that the 1991 ACR/APR allocated to Yankee Atomic for the years 1998, 1999, and 2000. DX 30.002; Tr. 3825:25-3826:2 (Grube: acknowledging that amounts set forth in YA's DCSs did not comply with ACR). YA's stated objection to the acceptance allocations contained in the 1991 ACR/APR was not that it identified an overall acceptance rate that was either too low or contrary to the Standard Contract, but, instead, that DOE should have provided Yankee Atomic with priority because it was a shutdown reactor:

> Please note that because the Yankee Nuclear Power Station is permanently shutdown and to facilitate decommissioning, we are requesting that DOE accept all of the spent nuclear fuel in storage at the station over a three year period starting in 1998 as indicated on the DCSs.

Id. DOE disapproved the three DCSs that Yankee Atomic submitted, finding that, although its ACR allocation for the year 1998 was 9.84 MTU, Yankee Atomic had submitted a DCS for SNF acceptance of 34.8 MTU in 1998. DX 30.004. Similarly, although its allocations for 1999 and 2000 were for 10.09 MTU and 9.65 MTU respectively, Yankee Atomic sought acceptance of 45.1 MTU in 1999 and 47.1 MTU in 2000. Id.

d. On January 7, 1993, Yankee Atomic resubmitted its DCSs, with a proposed acceptance allocation of 34.8 MTU for 1998, 45.1 MTU for 1999, and 47.1 MTU for 2000, and again informed DOE that it requested priority acceptance based upon its status as a shutdown reactor. DX 30.005. Again, DOE disapproved YA's DCS and informed Yankee Atomic that it could not grant its request for priority at that time. DX 30.006.

e. After a further exchange of correspondence and a meeting to negotiate the issuance of revised DCSs, DX 30.007 and 30.008, DOE issued a final denial of Yankee Atomic's request for priority by letter dated July 15, 1993, from the contracting officer to Mr. Buchheit. In that denial, DOE explained that it would not grant Yankee Atomic's request for priority because the grant of priority to Yankee Atomic would affect other Standard Contract holders. DOE's denial was based upon the inequity to other contract holders. DX 30.009 at HQR0060784 ("Since acceptance capacity at this time will be limited in any given year and this issue accordingly affects utilities' positions in the delivery queue, it is viewed primarily as an equity issue."); see also Tr. 4082:20-25 (Pollog: "It's an equity issue amongst the parties. Whenever we grant somebody some earlier capacity, we're taking it from somebody else. So the party that's losing that capacity, you know, I'm not sure they're going to be quite as reasonable when they're losing that allocation.").

113. Yankee Atomic understood that DOE had the unilateral right to decide if a purchaser should be granted priority acceptance, pursuant to the priority provision. Tr. 4872:20-4873:1 (Kadak); Tr. 3817:18-23, 3808:7-10 (Grube: provision does not guarantee that DOE will afford priority to shutdown reactors). Yankee Atomic also understood that there is no contractual requirement that DOE remove all SNF from a contract holder's facility before the contract holder begins decommissioning. Tr. 3817:24-3818:4 (Grube).

114. DOE has never granted priority acceptance of the SNF generated by any shutdown reactor pursuant to this provision. Tr. 4081:25-4082:19, 4084:2-4084:17 (Pollog); Tr. 4903:22-4904:1 (Kadak).

115. Yankee Atomic did not appeal the contracting officer's denial of its repeated requests for priority through the appeal process set forth in the Standard Contract. Tr. 3840:9-14, 3840:23 (Grube); Tr. 4668:24-4669:13 (Buchheit).

116. Yankee Atomic recognized and understood that the nuclear utility industry was opposed to the grant of priority acceptance for its SNF:

a. In its initial request for priority to Dr. Bartlett, Yankee Atomic acknowledged that "the issue of priority has undergone review and that a consensus could not be reached by utilities through the ACR process." DX 146 at YDK009072.

b. To resolve various issues regarding contract implementation, DOE and the Utility Nuclear Waste Management Group ("UNWMG") initiated a series of discussions commonly referred to as the "ACR issue resolution process." Tr. 4120:1-4121:6 (Zabransky). One of the issues considered during the ACR Issue resolution process was whether priority should be granted to shutdown reactors. Tr. 4121:7-14 (Zabransky). The members of UNWMG

could not develop a consensus position regarding the issue because there were members of the industry who opposed the granting of priority as well as members who supported it. Tr. 4121:10-21 (Zabransky). Representatives of Yankee Atomic made presentations to industry members, advocating priority for shutdown reactors, but the industry did not reach agreement regarding the issue. Tr. 4122:4-15 (Zabransky); see DX 147 (memorandum prepared by Rudy Grube, dated February 13, 1992, regarding Mr. Mills' statements regarding the industry views on the grant of priority); DX 203 (January 25, 1994 memorandum from Dr. Kadak to Mr. Grube regarding industry opposition); Tr. 3852:1-3 (Grube, discussing DX 203).

c. One other utility affirmatively declined to support Yankee Atomic's continuing attempts to secure priority through legislative initiatives. DX 403. As Commonwealth Edison explained, "preferential acceptance by the DOE of the volume of spent fuel now stored by currently shutdown reactors and not including ComEd's Dresden 1 facility, would delay acceptance of any spent fuel from then operating reactors by 18 to 24 months. In my view, such a direct effect on operating reactors is unacceptable." Id. at CEP0080529.

117. After DOE denied its request for priority acceptance, Yankee Atomic submitted DCSs that accorded with the allocations Yankee Atomic was granted in the 1991 through 1995 ACRs:

a. By letter dated July 26, 1993, Yankee Atomic submitted a DCS for 1998 that complied with the allocation contained in the ACR (9.8 MTU of SNF), but stated that it was doing so "under protest and only because of concern that failure to file as mandated by DOE will result in Yankee losing its place in Year 1 of the DOE acceptance schedule." DX 30.010. This DCS for 1998 was approved by DOE. DX 30.011.

b. By letters dated September 23, 1993, September 30, 1994 and September 27, 1995, Yankee Atomic submitted DCSs for 1999, 2000 and 2001 that comported with its allocations set forth in the ACR. DX 30.012, 30.014, and 30.019. In each of these letters, Yankee Atomic reiterated its position that DOE had the authority to grant priority to Yankee Atomic based upon its status as a shutdown reactor, but acknowledged DOE's position that granting priority acceptance to shutdown reactors raised issues of equity among all Standard Contract holders. Id. Yankee Atomic's DCS submissions for 1999, 2000 and 2001 were approved by DOE. DX 30.013, 30.018 and 30.020.

c. On or about January 31, 1997, Yankee Atomic submitted a FDS for SNF to be removed in 1998. DX 30.021. By letter dated March 11, 1997, Beth A. Tomasoni, the DOE contracting officer, informed J.M. Buchheit, Yankee Atomic, that DOE "is not able at this time to approve your FDS submittal" and that, "[c]onsequently, the Department hereby waives until further notice the contract requirement that you provide a revised schedule within 30 days." DX 30.022.

d. On or about September 26, 1997, Yankee Atomic submitted a DCS for acceptance of 9.4 MTU of SNF in 2003. DX 30.023.

e. On or about January 23, 1998, Yankee Atomic submitted a FDS for SNF to be removed in 1999. DX 30.024.

118. Despite Yankee Atomic's repeated requests for priority acceptance, none of Yankee Atomic's decommissioning studies or other storage studies assumed that Yankee Atomic would be granted priority for shutdown reactors to enable Yankee Atomic to deliver its fuel any more quickly to DOE. DX 159 at YSB003497 (assumed that DOE would not accept last of

Yankee Atomic's fuel until 2021); DX 160 at YDK042326 (September 1992 storage study prepared by Yankee Atomic estimated that the last of Yankee Atomic's fuel would be removed by DOE in 2018); see Tr. 1721:18-20 (Bennett: DX 159 does not assume that Yankee Atomic would receive priority for shutdown reactors). Yankee Atomic's submission to FERC in support of a rate case similarly assumed that DOE would not grant priority to Yankee Atomic based upon its shutdown status and that, as a result, Yankee Atomic would continue to hold its fuel until 2018. DX 152 at YDK016757; see Tr. 7721:7-7724:3 (Mr. Mellor's testimony about DX 152).

119. Yankee Atomic understood that, pursuant to the rates set forth in the 1991 through 1995 ACRs, its SNF would not be accepted for 20 years after the beginning of waste acceptance, absent a grant of priority acceptance. Contemporaneous documents establish that YA's planning documents establish that Yankee Atomic planned to construct a dry storage facility based upon the rates set forth in the 1991 through 1995 ACRs:

a. According to an analysis performed to update the 1992 decommissioning study:

> The timing for Yankee SNF acceptance was determined from the DOE acceptance priority ranking published in May 1993. This document provides an oldest fuel first listing of all SNF discharges from domestic reactors, tabulating the aggregate discharge for every individual discharge. It shows that when Yankee ceased operation in October 1991, approximately 24,000 MTU of SNF had been discharged [from all commercial utilities]; therefore, on an oldest fuel first basis, 24,000 MTU of SNF will have to be accepted by the [DOE] before all Yankee SNF will be removed from the Rowe site. Attached is a projected schedule showing SNF acceptance beginning in 1998, and it refers to an attachment. Using the rates described above for projecting Yankee's acceptance rate, it will take until the end of 2018 before all spent fuel is removed from the site.

DX 218 at YDK007546; see Tr. 4639:18-22 (Buchheit: "Based upon the contract requirement of oldest fuel first, DOE would have to accept 24,000 MTU of SNF from all reactors before Yankee Atomic's fuel would all be accepted.").

b. By letter dated January 7, 1993, Yankee Atomic informed DOE that, if DOE did not grant priority for the acceptance of Yankee Atomic's SNF pursuant to the priority for shutdown reactors provision, Yankee Atomic would build an ISFSI to store its fuel until DOE completed acceptance:

> Our analysis of the acceptance schedule included in the most recent annual capacity report (ACR), published by DOE, and assuming increased acceptance rates thereafter, indicates that it would take more than 20 years beyond the 1998 acceptance date to remove all of the spent fuel from our site. Storing spent fuel on-site for an extended period after a plant has shut down or could be dismantled is not what Congress had in mind when it passed the Waste Policy Act. A delay of this magnitude would, for Yankee, necessitate the construction of dry storage facilities for holding Yankee's SNF pending DOE acceptance. The costs of such construction and maintenance during that period are estimated at $56.5 M in 1992 dollars.

DX 30.005 at YDK009075; see Tr. 3829:1-7 (Grube: through this letter, Yankee Atomic informed DOE that, if OFF were followed, Yankee Atomic would have to build an ISFSI).

c. By letter dated June 18, 1996, Yankee Atomic once again urged DOE to grant priority as a method by which Yankee Atomic could avoid incurring alleged costs of $70-90 million to build a dry storage facility to store its fuel. PX 291YA at YDK010230 ("By enabling the contractors to implement priority, an unnecessary cost on the order of $70 to 90 million (the amount needed to build a storage facility and store the fuel at the Yankee site for this added period) can be avoided."); see PX 292YA at HQ0017246 (letter from Dr. Kadak to Beth

Tomasoni again reiterating "the $70-90 million cost of not granting priority acceptance of spent fuel from the Rowe plant. DOE's anticipated delay will increase this cost even further").

120. Yankee Atomic provided no testimony or other evidence regarding the date by which its fuel would have been removed pursuant to the grant of priority for its fuel. The only causation evidence provided by Mr. Graves focuses upon the exchange of allocations. Tr. 807:1-4 (Mr. Graves' opinion that "it's the swaps mechanism that would have operated in the nonbreach world . . . ."). In explaining why he did not make the priority for shutdown reactors the focus of his analysis, Mr. Graves stated that "it wouldn't be efficient to just concentrate on one kind of must-move and, in effect, ignore the other." Tr. 806:3-25.

VII. 2004 ANNUAL CAPACITY REPORT/ANNUAL PRIORITY RANKING

121. On July 28, 2004, DOE issued the 2004 ACR/APR and asked utilities to submit new DCS forms, based upon DOE's anticipated ability to accept SNF at a repository in 2010. PX 1952 & 1953. The acceptance rates in the 2004 ACR/APR for SNF acceptance at a repository are as follows:

| YEAR | RATE (MTU/YR) |
|---|---|
| | |
| 2010 | 400 |
| 2011 | 600 |
| 2012 | 1200 |
| 2013 | 2000 |
| 2014 | 3,000 |
| 2015 | 3,000 |
| 2016 | 3,000 |
| 2017 | 3,000 |
| 2018 | 3,000 |
| 2019 | 3,000 |

PX 1952 at 2. The difference between the rates in the 2004 ACR and the 1991 through 1995 ACRs is attributable to the fact that DOE is planning to accept waste from the contract holders for delivery directly to the repository, rather than an MRS. Tr. 4075:18-25 (Mr Pollog: explaining that "[t]he 1991 ACR was based upon having a MRS . . . in the Waste Management System. The 2004 ACR assumes that there will be no MRS in the Waste Management System. . . . The 2004 [ACR] would assume that the spent fuel was being transported from the reactor right to the repository.").

## VIII. FACTS RELATING TO THE GRAVES EXCHANGES MODEL, THE YANKEES' SOLE BASIS FOR ESTABLISHING CAUSATION FOR DAMAGES IN THIS CASE

### A. The Graves Exchanges Model Is A Causation Model, Not A Damages Model

122. Before they calculate their damages in these cases, the Yankees assume that DOE would have removed all of the SNF from the Yankee Atomic site by 1999, from the Connecticut Yankee site by 2001, and from the Maine Yankee site by 2002. To establish that DOE would have removed their SNF by those specific dates, the Yankees rely exclusively upon the exchanges model that their expert witness, Mr. Graves, presented. Tr. 906:3-907:20 (Graves); Tr. 3211:4-15 (Wise: Dr. Wise's damages calculations tied directly to the fuel-out dates projected by Mr. Graves); Tr. 3211:16-3212:11 (Wise: only after the fuel-out dates projected by Graves does Dr. Wise attribute storage costs to DOE's breach); Tr. 3329:9-3330:16 (Wise: agreeing that the existence and amount of wet pool damages in his opinions are dependent upon the non-breach fuel-out dates that he assumed).

123. The Yankees' fuel-out dates upon which their damages claims are founded are based upon the Graves model. See Tr. 3035:15-3036:4 (Smith: told to assume 6/30/02 fuel-out date, though he could not remember by whom); Tr. 2407:24-2408:23 (Bennett: identifying Graves' model as source for fuel-out dates assumed at trial).

124. The Graves model does not quantify the Yankees' damages, but, instead, only identifies the fuel-out date for each of the three Yankees. Tr. 907:21-23 (Graves).

125. In his model, Mr. Graves assumes that, during the first five years of SNF acceptance, DOE was obligated to accept from the Standard Contract holders as a collective

whole 1,200 MTUs of SNF in 1998; 1,200 MTUs in 1999; 2,000 MTUs in 2000; 2,000 MTUs in 2001; and 2,700 MTUs in 2002. Tr. 698:14-21 (Bartlett); Tr. 778:19-25 (Graves).

a. This "ramp-up rate" was taken from a 1999 DOE document that identified a potential ramp-up rate for a "centralized interim storage facility," PX 254 at HQO.19990112.0001.0021; Tr. 924:13-17 (Graves), assuming SNF acceptance beginning in 2010. PX 254 at HQO.19990112.0001.0021; Tr. 924:7-9 (Graves). The ramp-up rates upon which Mr. Graves relied were not developed by DOE, but, instead, were included in legislation that was pending in Congress for the construction of a centralized interim storage facility that was never enacted. Tr. 3454:9-3457:15, 3458:20-3459:2 (Kouts); Tr. 3473:13-17 (Kouts: in his opinion, the rates set forth by Congress "from a technical perspective . . . for the first 2 years, these [rates] were somewhat ambitious").

b. Although Mr. Graves modeled other ramp-up rates, including ones that provided for less acceptance in the early years, he did not include these ramp-up rates in his final opinion. Tr. 928:3-10 (Graves).

c. DOE's planning documents have employed a multitude of different ramp-up rates. For example, in a December 1983 draft of the Mission Plan that would eventually be submitted to Congress pursuant to 42 U.S.C. § 10221(b)(3), DOE identified a ramp-up rate of 1800 MTU per year for the first five years of system operations. PX 636 at CTR0421072. In the 1985 Mission Plan actually submitted to Congress, DOE set forth a ramp-up rate of 400, 400, 400, 900, 1800 for the first five years of system operations at the authorized system. PX 95 at HQ0005306. In the 1987 Mission Plan Amendment submitted to Congress and in the 1987 ACR, DOE set forth a ramp-up rate of 1200 per year for the first five years of program

operations. DX 12 at HQR0031688; DX 16 at HQR0012717. The 1991 through 1995 ACRs contained a ramp-up rate of 400, 600, 900, 900, and 900. DX 24 at HQR-001-2366; DX 26 at HQR-001-2324; DX 27 at CTR-002-0143. In its 2002 technical baseline document relating to operations at the Yucca Mountain permanent repository, DOE employed a ramp-up rate of 400, 600, 1200, 2000, 3000 in the first five years. DX 664 at HQR2390054. The Yankees did not elicit any testimony at trial that DOE was obligated to satisfy a particular minimum ramp-up rate.

126. In his model, Mr. Graves assumes that, in 2003 and every subsequent year, DOE was required to accept SNF from the Standard Contract holders at a steady-state rate of 3,000 MTUs. Tr. 698:14-21 (Bartlett); Tr. 778:19-25 (Graves).

a. Although Mr. Graves testified that he selected this rate because it was the "commonly recurring size for the steady-state rate that [he] observed in the documents [he] had available," Tr. 782:7-9 (Graves), these program documents were all from the 1983 to 1990 period or were studies describing the design of the Yucca Mountain repository. Tr. 781:20-782:6 (Graves).

b. Although he testified that a 3,000 MTU rate would satisfy his definition of "must move fuel," which was a term that he created for this litigation and which is not contained in the Standard Contract (DX 6,7, 8), Mr. Graves did not analyze the effect that a lower acceptance rate, such as an annual acceptance rate of 2,100 MTU, would have upon his identified "must move" fuel. Tr. 910:1-5 (Graves). Nor did Mr. Graves analyze the effect of a ramp-up rate of 400, 600, and 900 MTUs beginning in 1998, ultimately ramping up to 3,000 MTUs, would have upon his "must move fuel" model. Tr. 918:7-10 (Graves).

127. Applying Mr. Graves' ramp-up rate and steady state rate to an "oldest fuel first" acceptance queue, DOE would not have removed the last of Yankee Atomic's SNF from its site until 2007. Tr. 891:1-6 (Graves). Applying the acceptance rate identified in the 1991 ACR, DOE would not have removed the last of Yankee Atomic's SNF from its site until at least 2018. See, e.g., DX 150 at YDK006433.

128. Applying Mr. Graves' ramp-up rate and steady state rate to an "oldest fuel first" acceptance queue, DOE would not have removed the last of Connecticut Yankee's and Maine Yankee's SNF from their sites until 2011. Tr. 904:19-24 (Graves). Applying the 1991 ACR rate, DOE would not have removed the last of Connecticut Yankee's and Maine Yankee's SNF until at least 2018. Tr. 7544:10-18 (Graves); DX 196 at MPA010848 (Maine Yankee); DX 157 at CDB000159 (Connecticut Yankee assuming shutdown in 2007 and final acceptance of its SNF 12 years later).

129. After applying the theoretical exchanges market modeled by Graves, Yankee Atomic moves its final fuel-out date earlier in time from 2007 to 1999 (Tr. 825:10-19 (Graves)); Connecticut Yankee moves its final fuel-out date earlier in time from 2011 to 2001 (Tr. 825:24-25 (Graves)), and Maine Yankee moves its final fuel-out date earlier in time from 2011 to 2002. Tr. 825:25-826:1 (Graves).

a. Applying the acceptance rate upon which Mr. Graves relies, to have all of its fuel removed by 1999, Yankee Atomic would need to obtain all of its allocations in 1998 and 1999 from contract holders willing to exchange those rights for acceptance dates as far away as 2007. Tr. 7544:25-7545:10 (Graves: discussing identical analysis for Connecticut Yankee). If the acceptance rate contained in the 1991 ACR rate is utilized instead of the rates that Mr. Graves

assumes, contract holders exchanging with Yankee Atomic would be required to exchange allocations in the first two years of the program for Yankee Atomic allocations as far away as 2018. DX 150 at YDK006433.

b. Applying the acceptance rate upon which Mr. Graves relies, for Connecticut Yankee to have all of its fuel removed by 2001 and Maine Yankee to have all of its fuel removed by 2002, Connecticut Yankee and Maine Yankee would need to obtain all of their 2001 and 2002 allocations from contract holders willing to exchange rights in those two years in exchange for acceptance dates as far away as 2011. Tr. 7544:25-7545:10 (Graves). If the acceptance rate contained in the 1991 ACR rate is utilized instead of the rates that Mr. Graves assumes, contract holders exchanging with Connecticut Yankee and Maine Yankee would be required to exchange allocations in 2001 and 2002 for allocations as far away as at least 2018. DX 157 at CDB000159 (Connecticut Yankee); DX 196 at MPA010848 (Maine Yankee).

## B. The Fuel-Out Dates That Mr. Graves Selects For The Three Yankees Are Unsupported By Yankee Planning Documents

130. In determining when DOE would have removed the Yankees' SNF from their sites, Mr. Graves did not review any Yankee documents to determine whether his projected fuel-out dates were consistent with the Yankees' estimates as to when they thought their fuel would be removed. Tr. 921:17-24 (Graves).

131. Mr. Graves' fuel-out dates of 1999 for Yankee Atomic, 2001 for Connecticut Yankee, and 2002 for Maine Yankee are unsupported by any historical company documents.

Mr. Graves' pre-exchange fuel-out dates of 2007 for Yankee Atomic and 2011 for Connecticut Yankee and Maine Yankee under the "oldest fuel first" queue likewise are unsupported by Yankee documents:

a. In its planning documents that assume timely DOE performance under the Standard Contract, Yankee Atomic assumed fuel-out dates between 2018 and 2030. See Tr. 4644:9-21 (Buchheit) (2018); DX 150 at YDK006433 (2018 fuel out date); DX 158 at YDK016045 (same); DX 160 at YDK042326 (any ISFSI must be capable of storing SNF until at least 2018); DX 162 at YOF049705 (for purposes of exchanges with New England reactors assumes 2019 fuel-out date); DX 146 at YDK009071 (2020 and 2030 fuel out dates projected, depending upon rate of acceptance); DX 15 at YDK009257 (26 years needed to remove Yankee Atomic's SNF from site).

b. Connecticut Yankee consistently estimated a 2018 final fuel-out date, assuming timely DOE performance under the Standard Contract. See DX 157 at CDB000159 (1992 Decommissioning Study), DX 87 at YDK041801 (estimating 19-26 year acceptance period).

c. Maine Yankee consistently estimated a 2018 fuel-out date, assuming timely DOE performance. See DX 743 at MPA023490; DX 196 at MPA010848.

132. In addition to the lack of any historical documents that set forth the fuel-out dates that Mr. Graves projects, neither exchanges nor priority were relied upon by any of the Yankees in their decommissioning studies or other planning documents. See, e.g., Tr. 1708:6-1709:18 (Bennett); see also Tr. 2945:1-22 (Whittier: assuming exchanges in decommissioning studies would have "been toward the optimistic side of the spectrum.").

C. Exchanges Are A Litigation-Driven Theory

133. Prior to this litigation, neither Maine Yankee nor Connecticut Yankee investigated or expressed any interest in exchanges:

a. Only one document exists from either Maine Yankee or Connecticut Yankee upon the issue of exchanges that pre-dates this litigation: that is, an analysis of potential exchanges between Maine Yankee and Yankee Atomic. DX 592.

134. While Yankee Atomic engaged in limited pre-litigation analysis of exchanges, documents that provide substantive opinions concerning exchanges question the viability of exchanges. See DX 156 at YDK008474 (identifying "one of many 'catches'" to intra-utility exchanges); DX 30.008 at FER0023138 (swaps, "if ever possible, would not address the fundamental problem of storing spent fuel on site for 25 years after shutdown"); DX 34 at YDK009169 ("by no means did swapping offer a solution to our problems"); DX 593 at YDK021781 (proposing to use rejection of exchanges by sister utilities in arguments with DOE); DX 30.010 at HQR-006-0778 ("[b]ecause there is significant pressure from state officials and others to see to it that individual utilities deal with their own problems first, we anticipate a great deal of difficulty in accomplishing such exchanges."); DX 005 at EDB0023133 (when DOE begins acceptance it will be "difficult, if not impossible, to make swapping arrangements"); DX 146 at YDK009072 ("although the contract permits "exchanges" as a potential means to provide permanently shutdown reactors a way to remove spent fuel from their sites, these exchanges may not be practically available, or if they are, the competition for making such exchanges among utilities with concerns over site decommissioning and other issues will make them economically unattractive."); id. (goal of shipping fuel by 2005 "clearly not achievable

without priority acceptance); DX 153 at YDK006155 ("Dr. Kadak expressed concern over the availability or cost of such exchanges. Hence, reliance upon allocation exchanges to reduce SNF storage length (and cost) would be both unwise and economically unconservative.").

135. Prior to this litigation, Yankee Atomic repeatedly expressed its opposition to exchanges. See Tr. 3836:12-19 (Grube). Among other issues, Yankee Atomic did not want to pay for rights that it believed it should obtain for free under the priority provision of the Standard Contract, Article V.B.2. Tr. 3836:24-3837:4 (Grube); DX 30.008 at FER0023138.

136. The analyses conducted in the time period surrounding the litigation with DOE expressly recognize the benefits of the exchanges theory upon damages that could be awarded in this case:

a. This Court admitted eleven exhibits created by the Yankees that were prepared at or near the beginning of this litigation upon the issue of exchanges. See DX 262 (12/12/97); DX 263 (1/12/98); DX 264 (1/14/98); DX 267 (2/19/98); DX 271 (3/4/98); DX 272 (3/4/98); DX 282 (5/5/98); DX 283 (5/5/98); DX 285 (5/18/98); DX 287 (5/30/98); and DX 363 (undated).

b. Four of the five "benefits" associated with an exchange between Yankee Atomic and Connecticut Yankee referenced in DX 262 are litigation-oriented, including the acceleration of "DOE's removal liability from 27 years to 3 years," an enhancement of "Yankee's recovery of all its fuel storage costs from DOE," and an increase in the "probability that DOE will agree to negotiate a 'solution.'" DX 262 at YDK009826.

c. A proposed swap between Northeast Utilities – a 49 percent owner of Connecticut Yankee – and Connecticut Yankee likewise would "bolster[] CY's current damage

claim in Court which might result in a cash award, in which NU would share." DX 287 at YDK008776.

d. In DX 363, it is concluded that, while the "need to exchange places in the DOE delivery queue appears to be moot" because of DOE's breach of contract, "exchanges could prove to be a vital tool in our DOE lawsuits by demonstrating that spent fuel could be removed from a site at a much earlier date." DX 363 at YDK009405. "With early removal, we could show that we have been damaged more and sooner than we otherwise would have under DOE's current schedule." Id.

e. The remaining exhibits largely address Yankee Atomic's 1998 attempts to exchange allocations with other utilities, and half of these were copied to the Yankees' counsel of record in this litigation. See DX 267, DX 271, DX 272, DX 282 (all copied to Mr. Stouck).

137. Yankee Atomic attempted to use this litigation to obtain exchanges with other contract holders. Only one entity responded that it might be willing to engage in an exchange with Yankee Atomic, and that entity did so, at least in part, because of the potential benefits to Yankee Atomic in this litigation DOE. DX 274 at VAP-0001000.

D. Requirement Of DOE Approval Under The Standard Contract

138. Under the Standard Contract, DOE – in its sole discretion – has the right to approve or disapprove any exchange request. DX 6, 7, & 8, Art.V.E. The Standard Contract does not contain any criteria or factors that limit or define DOE's exercise of its discretion to approve or disapprove exchange requests. Id. Only DCSs that have been submitted and approved by DOE may be exchanged. Id.

139. DOE has not yet established criteria for the approval or disapproval of exchanges. Tr. 3639:16-3640:10 (Morgan); Tr. 4140:4-11 (Zabransky). However, the following criteria might affect DOE's decision to approve or disapprove any exchange: adverse effect upon other contracting parties (Tr. 4142:10-15 (Zabransky)); availability of transportation casks and waste packages (Tr. 4140:12-4141:3 (Zabransky); Brownstein Dep. 4/11/02, 564-576; Tr. 4140:12-4141:3 (Zabransky: BWR reactors and PWR reactors require different transportation containers so approval of any trades between such reactors could turn upon availability of transportation casks and waste packages)); availability of trained DOE personnel, utility personnel, and safety personnel along the transportation route (Tr. 4141:7-21 (Zabransky)); the location of the SNF to be accepted (Tr. 4141:16-21 (Zabransky)); the amount of SNF included in the exchange; receiving facility infrastructure; the type of fuel assemblies involved; whether the fuel involved was failed fuel; and whether approval would delay acceptance from another contract holder. Brownstein Dep. 4/11/02, 564-576.

140. It is impossible to provide a blanket approval for exchanges. Tr. 4139:24-4140:11 (Zabransky).

E. The Graves Model Of The Exchanges Market Is Predicated Upon The Economic Theory Of Perfect Competition Within A Market Guided By The Invisible Hand

141. Mr. Graves' model does not set forth what would have happened in the non-breach world, had DOE timely begun SNF acceptance from contract holders. Tr. 862:12-17 (Graves). The model is not a structural photograph or description of what would have transpired in the non-breach world. Tr. 862:12-17 (Graves).

142. Instead of modeling what would have happened absent a breach, Mr. Graves' model assumes that the exchanges market would be analogous to a perfectly competitive market and depicts what such an exchanges market would look like. See Tr. 4251:23-4252:3 (Fischel); Tr. 824:15-24 (Graves: model founded upon the theory that the invisible hand of market efficiency will operate in exchanges market); Tr. 4251:23-4252:21 (Fischel: concept of "invisible hand" consistent with a perfectly competitive market). The principle of the invisible hand theory, first proclaimed by Adam Smith, "holds that in selfishly pursuing only his or her personal good, every individual is led, as if by an invisible hand, to achieve the best good for all," resulting in perfectly competitive markets. Tr. 4259:4-7 (Fischel: quoting P. Samuelson & W. Nordhaus, Economics (15th ed. 1995).

143. In creating his model of a perfectly competitive exchanges marketplace, Mr. Graves did not contact any utility representative to determine whether utilities would have participated in the exchanges market, or under what conditions utilities would have participated, in the non-breach world. Tr. 988:13-24 (Graves). Mr. Graves also did not speak to any of the Yankees in formulating his theoretical model. Tr. 988:16-17 (Graves).

144. The assumptions underlying Mr. Graves' theoretical exchanges market are consistent with a perfectly competitive market. Tr. 4254:10-21 (Fischel). See Tr. 859:3-13 (Graves: total and complete participation by all entities with acceptance allocations in the exchanges market), Tr. 990:10-20 (Graves: model assumes market participation by DOE, as a holder of certain quantities of SNF in the acceptance queue); Tr. 1000:21-1001:9; 815:12-23 (Graves: model assumes perfect information concerning the avoidable costs faced by each utility); Tr. 857:25-858:22 (Graves: low transaction costs); Tr. 4255:12-16 (Fischel: perfect

market has low information and transaction costs); Tr. 967:2-7, 987:6-12, 814:1-11, 988:22-989:6 (economic considerations drive market participation); Tr. 984:24-985:3 (Graves: market in which all utilities willing to trade down are price takers that cannot alter the price at which allocations are traded); Tr. 855:8-12, 985:1-3 (Graves: marginal bidder's willingness to pay sets costs of swaps); Tr. 7562:10-14 (Graves: slots are fungible); Tr. 7536:14-22 (Graves: testimony attempting to establish that there were numerous potential participants in the market).

145. Mr. Graves assumes that requirement of Government approval of exchanges will not affect the transactions within that market. Tr. 7532:17-7533:6 (Graves).

F. A Perfect Market Is Needed To Establish Damages For All Three Yankees

146. The only way in which all three Yankees obtain accelerated acceptance through exchanges – and damages based upon that accelerated acceptance – is through the operation of the perfectly competitive exchanges market that Mr. Graves modeled. In connection with the preparation of his report, Mr. Graves modeled intra-utility swaps between Yankee Atomic, Connecticut Yankee and Maine Yankee. Tr. 928:11-19 (Graves). Imposing an intra-utility exchange assumption upon the Graves model results in vastly different fuel-out dates for the three Yankees. Tr. 930:4-9 (Graves). Under the intra-utility model – applying Mr. Graves' acceptance rate – Yankee Atomic's SNF can be removed by 1998, but Connecticut Yankee's and Maine Yankee's SNF cannot be removed until 2007 and 2011. Tr. 1025:19-20 (Graves); see also DX 156 at YDK008473-74 (Yankee Atomic analyzing exchanges with Connecticut Yankee, Maine Yankee, Boston Edison and Northeast Utilities resulting in 2000 fuel-out date for Yankee Atomic); DX 162 (analysis of trades between Yankee Atomic its eight owners resulting in end-of-year 2001 fuel-out date for Yankee Atomic); DX 592 at MOF027749 (exchange with Maine

Yankee accelerates Yankee Atomic's fuel-out date to 2000); id. at MOF027750 (exchanges between Yankee Atomic, Connecticut Yankee, Vermont Yankee, Pilgrim and Millstone result in 2000 fuel-out date for Yankee Atomic); DX 262 at YDK009827 (exchanges between Yankee Atomic and Connecticut Yankee accelerates Yankee Atomic's fuel-out date to the third year of DOE acceptance); DX 287 at YDK08776 (exchanges between Connecticut Yankee and Millstone accelerate Connecticut Yankee's fuel-out date up to either the fifth or eighth year of DOE acceptance, depending upon rate).

147. At trial, the Yankees offered no estimate of what their fuel-out dates would have been if the non-breach exchanges market failed to perform as projected by Mr. Graves' model or if DOE implemented a different rate of acceptance.

### G. The Evidence Demonstrates That Any Exchanges Market Would Lack The Requisite Qualities Of A Perfectly Competitive Marketplace

#### i. The Requirement Of DOE Approval Is Inconsistent With A Perfectly Competitive Market

148. The evidence demonstrates that any exchanges market would not exhibit perfect competition characterized by the invisible hand. Tr. 4252:3-8 (Fischel: market proposed by Graves fundamentally different from type of perfectly competitive market characterized by invisible hand). When markets do not meet the characteristics of the invisible hand, it is inappropriate to use the invisible hand as a model for those markets. Tr. 4256:23-4257:2 (Fischel).

149. In a perfectly competitive private market, there is no requirement of Government approval to transact. Tr. 4254:23-4255:4 (Fischel). Government approval, by its very nature,

leads to market imperfections, is antithetical to the concept of the invisible hand (Tr. 4254:23-4255:4 (Fischel)), and, by definition, discourages potential trades. Tr. 4328:11-16 (Fischel). See also Tr. 4261:10-14 (Fischel: invisible hand cannot exist in situation where parties can act pursuant to economic self-interests, but where the trade might not occur because DOE has veto power); Tr. 4267:15-4268:9 (Fischel: requirement of Government approval affects market even where approval cannot be unreasonably withheld).

150. In advocating for a market characterized by perfect competition, Mr. Graves ignored the contractual requirement of Government approval altogether. Tr. 4260:20-23 (Fischel); see Tr. 4260:24-4261:9 (Fischel: Mr. Graves' model assumes that every transaction in the economic self-interests of the buyer and the seller ultimately occurs; in actual exchanges market, possibility exists that parties can agree to transact but DOE might disapprove trade).

151. The effect of the Government's veto power is made more significant because each of the Yankees has to engage in multiple exchanges, through a sequence of exchanges, to achieve the results generated by Mr. Graves' model. Tr. 7544:25-7545:10 (Graves).

a. For example, to have all of its fuel removed in 2001, Connecticut Yankee must find trading partners willing to trade allocations that they possess in 2001 for allocations that Connecticut Yankee possesses from 1998-2000 and from 2002-2011, assuming Mr. Graves' rate of acceptance. Tr. 7544:25-7545:23 (Graves).

b. If Connecticut Yankee is unable to trade away its 2011 allocations, it cannot avoid at-reactor storage costs until 2011, regardless of how many allocations it ultimately receives in 2001. Tr. 7545:24-7546:24 (Graves).

c. If, anywhere along the sequence of exchanges, the Government disapproves one of the exchange requests, Connecticut Yankee might not be able to avoid additional storage costs, threatening every other transaction in the sequence. Tr. 4270:4-14 (Fischel); Tr. 7556:5-16 (Graves).

ii. A Limited Number Of Market Participants Is Inconsistent With The Development Of A Perfectly Competitive Market

152. Unlike a perfectly competitive market, any actual exchanges market would have a limited number of participants that must transact. Tr. 4255:6-11 (Fischel); see Tr. 7527:24-7528:2 (Graves: estimating only 20 to 40 potential participants in the market in each of first five years); DX 15 at YDK009256 (Yankee Atomic estimating 246 acceptance campaigns from 43 customers in first 10 years of DOE's program); Tr. 7561:1-11 (Graves: number of participants further affected by the fact that the allocations possessed by each potential participant vary); Tr. 4273:17-22 (Fischel: while, mathematically, there may be a significant number of potential exchanges that could occur, there are not a significant number of potential trading partners). A total of 76 Standard Contracts have been executed, limiting the universe of potential exchange partners. See DX 24 at HQR0012370. Further, only some of the 76 Standard Contract holders would have allocations in the early years of the acceptance program, further limiting the universe of potential exchange partners. Id.

153. Because of the small number of participants, any refusal by contract holders to trade down in the acceptance queue would affect the Yankees' fuel-out dates. Tr. 940:1-5 (Graves: if half of the utilities assumed to be trading down in the acceptance queue refused to participate in exchanges market, fuel-out dates projected by Mr. Graves would be deferred, and

the costs associated with the exchanges would increase); see Tr. 940:21-941:2 (Graves: eliminating half of contract holders willing to trade down in acceptance queue could eliminate more than half of the total tradable allocations for those early years).

154. Moreover, since Mr. Graves' model assumes that contract holders with "must move" SNF obtain allocations in the exact year in which the SNF becomes "must move," Mr. Graves' model fails to account for the possibility that contract holders with future "must move" fuel requirements might retain early year allocations or might seek to trade up in the acceptance queue themselves. Tr. 984:9-21 (Graves).

iii. Market Participants Would Behave Strategically, In Contravention To A Perfectly Competitive Market

155. As a result of the limited number of participants, contract holders willing to trade down in the queue could act strategically. Tr. 4273:17-4277:12 (Fischel); Tr. 985:4-13 (Graves: potential for strategic behavior exists); Tr. 4273:17-4274:11 (Fischel: exchanges market unlike large and liquid markets in which no single entity can affect the terms at which transactions occur); DX 272 at YDK045575 (Yankee Atomic recognized that a trading utility would "exploit his situation and maximize his price").

iv. Any Exchanges Market Would Have High Transaction And Information Costs

156. Unlike a perfectly competitive market, the exchanges market would have high transaction and information costs. Tr. 4277:18-4280:5 (Fischel). This is because the exchanges market has very different characteristics from a commodities or stock market with a single posted price. Tr. 4278:9-10 (Fischel); Tr. 4295:12-20 (Fischel); see also Tr. 4277:21-4278:8 (Fischel: discussing wheat market and stock market in which prices can be readily ascertained and in

which there is no negotiation over price – market participants either accept or reject the market price).

157. There is no market price for an allocation. Tr. 4278:9-15 (Fischel); see also Tr. 4295:12-20 (Fischel: no single price exists at which every utility is willing to transact). When a lone utility offered to exchange 8.5 MTUs of SNF allocations with Yankee Atomic for $850,000 (Tr. 2420:1-12 (Bennett)), one of the problems that Yankee Atomic identified with the proposed exchange was the difficulty of valuing the transaction. Tr. 5801:21-5803:3 (Quinn).

158. The exchanges market is further complicated because a contract holder must analyze the entire sequence of exchanges needed to achieve the desired outcome. Tr. 4278:10-15 (Fischel). Before a contract holder makes any exchanges, it needs to know that it can trade away all of its out-year allocations. Tr. 7546:1-9 (Graves); Tr. 987:6-20. If, for example, Connecticut Yankee executes trades for allocations possessed from 1998 through 2009, but is unable to trade away its allocations in 2010 and 2011, it would not be able to avoid SNF storage costs, rendering all other trades valueless. Tr. 7546:10-17 (Graves). This, too, was a problem identified with the proposed 8.5 MTU exchange. Tr. 5801:21-5803:17 (Quinn).

159. Since the transaction and information costs are high and because the outcome is uncertain, the entire sequence of trades might unravel if some or all of the trades fail to occur. Tr. 4280:1-5 (Fischel).

v. Any Actual Exchanges Market Would Lack Perfect Information

160. Perfect information concerning the costs associated with operations, maintenance, research, design, construction, and procurement costs related to SNF storage does not, and would not, exist. For example, each of the SNF cases in this Court is governed by a protective order to

preclude the free flow of cost information from one contract holder to another, and various plaintiffs have expressed strong concerns that other plaintiffs should not learn their cost information. See, e.g., Southern Nuclear Operating Co., Inc. v. United States, No. 98-614C, Docket Entry #72; Indiana Michigan Power Co. v. United States, No. 98-486C, Docket Entry #35. Moreover, testimony demonstrated significant concerns regarding the disclosure of pricing information to individuals outside of the protective order. Tr. 1140:12-1141:18 (Pennington); Tr. 1747:22-1748:8 (Bennett); Tr. 5539:18-5440:1 (argument during Mr. Abbott's direct examination); 5699:2-8 (argument during Mr. Abbott's cross-examination); Tr. 1781:11-13 (argument during Mr. Bennett's cross-examination); Tr. 1271:4-16 (Collier: utilities might not want to release pricing information).

vi. Exchanges Market Participants Would Be Guided By Non-Economic Concerns

161. Unlike a perfectly competitive market, in which market participants are guided solely by their economic self-interest in transacting (Tr. 4255:17-4256:2 (Fischel)), in any exchanges market non-economic considerations would be motivating factors for potential participants. Id.; see, e.g., Tr. 2421:6-16 (Bennett).

162. As a result, non-economic factors need to be taken into account in determining what the non-breach exchanges market would have looked like, and how the market would have developed. Tr. 4255:20-4256:2 (Fischel); see also Tr. 980:25-981:11 (Graves: model does not consider impact of societal or political opposition to exchanges); Tr. 983:5-19 (Graves: testifying that he did not consider possibility that congressional delegations, governors, or local politicians may prefer removal of SNF, even if its on-site storage was not increasing a utility's

costs, over the trading away of early year allocations); Tr. 981:6-11 (Graves: did not evaluate how system would be designed and politically validated).

163. If local communities and ratepayers are anxious to dispose of the SNF because they are afraid of it, do not want it, think that SNF is a pollutant, or think that there is potential for accidents, the contract holder with the high priority might behave in an economically inefficient but still completely rational manner by retaining early year allocations, regardless of whether such allocations were needed to eliminate or reduce storage costs. Tr. 4280:19-4281:16 (Fischel). This is particularly true where a utility has the ability to recover any increased costs through the rate base. Tr. 4281:6-16 (Fischel); see also Tr. 4281:17-22 (Fischel: noting that ratepayers might prefer to pay slightly higher rates in exchange for not having SNF around longer than it would have been had the sellers simply took advantage of their higher priority in the OFF queue).

164. If non-economic concerns entered a utility's analysis concerning the possibility of trading down in the queue, the entire market would unravel, as the trades that Mr. Graves posits based only upon economic considerations will not occur. Tr. 4282:3-16 (Fischel).

165. Significant evidence was presented that non-economic factors govern utility behavior on SNF-related issues:

a. Maine Yankee identified utilities that could accept and store Maine Yankee's SNF without incurring additional storage costs. Tr. 2896:22-2897:25 (Whittier). Even though these identified utilities would be compensated by Maine Yankee and could therefore generate revenue from the transaction, no utility has ever agreed to store Maine Yankee's SNF. Tr. 2896:22-2897:25 (Whittier). Maine Yankee concluded that "the acceptance of Maine Yankee

spent fuel at another reactor site would undoubtedly be viewed negatively by the host state or country." DX 129 at MPA0035265; DX 133 at MOF024136 (same). See also DX 160 at YDK042334 (Yankee Atomic study concluding that off-site storage had "significant economic and political problems.").

b. Though Yankee Atomic offered to compensate utilities for any exchanges, no utility agreed to exchange with Yankee Atomic. See Tr. 5806:9-18 (Quinn); Tr. 2429:24-2430:5 (Bennett); Tr. 3848:21-3849:2 (Grube).

c. Prior to this litigation, Yankee Atomic attempted to arrange intra-utility exchanges with co-owners of other New England reactors that stood to benefit financially from an early fuel-out date for Yankee Atomic. Yankee Atomic identified significant savings associated with decommissioning if Yankee Atomic's SNF was removed by 2000. DX 162. For example, Northeast Utilities – then co-owners of Yankee Atomic, Connecticut Yankee, and Millstone reactors – stood to save $18.6 million in decommissioning costs. DX 162 at YOF049705. New England Power ($14.5 million), Boston Edison ($4.6 million), and Central Maine Power ($4.6 million) also stood to save significant sums. Id. Despite the savings, no co-owner of Yankee Atomic agreed to exchange allocations. Tr. 5790:11-25 (Quinn). See also Tr.5776:18-5777:16 (Quinn: two co-owners of Connecticut Yankee stood to obtain no benefit from exchange with Yankee Atomic and those owners might block any exchange).

d. In or about 1998, Yankee Atomic once again confronted co-owners with the potential benefits to be gained from agreeing to exchanges. Specifically, Yankee Atomic cited potential benefits associated with the recovery of damages in this litigation as a reason to agree to exchange allocations among co-owners of New England reactors. See DX 262 at

YDK009826 (benefits of trade with Connecticut Yankee included the enhancement of "Yankee's recovery of all its fuel storage costs from DOE," a potential "exchange fee" from Yankee Atomic to Connecticut Yankee, and the increased "probability that DOE will agree to negotiate a "solution"" with Yankee Atomic). Despite these litigation-oriented benefits, Connecticut Yankee failed to exchange with Yankee Atomic. Tr. 5778:9-11 (Quinn); see DX 262 YDK009826 (indicative of non-economic issues faced by nuclear utilities, memo identified "State of Connecticut" as obstacle to exchanges).

e. In the early 1990s, Maine Yankee studied the technical feasibility of exchanges with Yankee Atomic. DX 592. Though it was concluded that the proposed exchanges would neither delay Maine Yankee's final fuel-out date nor have a "significant operational impact" upon Maine Yankee (DX 592 at MOF027747), Maine Yankee never agreed to exchange any SNF allocations. Tr. 5790:11-14 (Quinn). Moreover, Maine Yankee noted that the "assessment does not include sociopolitical factors in evaluating a potential exchange." DX 592 at MOF027748.

f. While operating concerns (and before decisions permanently to shut down their reactors had been made or contemplated), neither Maine Yankee nor Connecticut Yankee agreed to exchange allocations with Yankee Atomic, even though the exchanges would have allowed Yankee Atomic to have its SNF removed by DOE by 2001 and would not have delayed the final acceptance date for either Maine Yankee or Connecticut Yankee. DX 592 at MOF027747-48; DX 156 at YDK008473; Tr. 2946:17-19 (Whittier); Tr. 3877:20-25 (Grube). Indeed, not a single Maine Yankee or Connecticut Yankee employee testified that either utility would have agreed to trade down in the acceptance queue as Mr. Graves' model projects.

g. In connection with the Yankee Atomic's 1998 attempts to exchange allocations with 13 utilities, several utilities refused upon political grounds. See DX 271 at YDK009745. Yankee Atomic's second RFP for exchange proposals included a modified structure from the first RFP based upon these non-economic concerns. Tr. 2424:10-22 (Bennett); DX 283 at YDK009705 (offering added protections including confidentiality and flexibility that would "allow [utilities] to cancel the deal if it becomes politically untenable"); id. at YDK009706 (offering to enter into contingent sale that hinges upon "consent of state regulators"); see also DX 34 at YDK009169 ("many utilities may be restricted from swapping because of political or other pressures and that by no means did swapping offer a solution to [Yankee Atomic's] problem").

h. Yankee Atomic believed that "political wrath" came with trading away an early acceptance slot. DX 272 at YDK045575; see DX 285 at YDK009752 (Yankee Atomic noting that "presumably an intra-state swap is politically doable" for both Yankee Atomic (with Pilgrim) and Connecticut Yankee (with Millstone)); DX 287 at YDK008776 (State of Connecticut not disadvantaged by intra-state exchange); Tr 2427:14-19 (Bennett: analyzing exchanges between Northeast Utilities Millstone units and Connecticut Yankee: "[s]ince the swaps are with another Connecticut plant, the state is not disadvantaged"). See also DX 129 at MPA035270 (Maine Yankee recognizing political considerations related to SNF storage).

i. Connecticut Yankee currently stores 82 assemblies of SNF at the GE Morris facility in Illinois. Connecticut Yankee currently pays GE Morris $1.5 million per year for that storage. Tr. 5496:7-5497:1 (Abbott). Instead of continuing to incur these costs, Connecticut Yankee could transfer the 82 assemblies back to its ISFSI and place them in three

storage casks at a cost of $5.2 million. Tr. 5497:4-13 (Abbott). After the up-front investment of $5.2 million, Connecticut Yankee could recoup its GE Morris storage costs in less than four years. Although storage of the 82 SNF assemblies at the GE Morris facility is economically inefficient when compared to the return of those assemblies to Connecticut Yankee for on-site storage at the ISFSI, Connecticut Yankee has entered into an agreement with the Town of Haddam not to seek the return of those assemblies. Tr. 5501:23-5502:4 (Abbott); Tr. 5713:5-15 (Abbott: acknowledging that he did not consider political factors in reaching opinion concerning assemblies stored at G.E. Morris).

j. In a letter dated August 4, 1994, ten members of the Massachusetts Congressional Delegation signed a letter to the Secretary of Energy urging that DOE accept Yankee Atomic's SNF upon a priority basis as a shutdown facility. PX0796 at CNU004392-93. In March of 2001, governors from the states of Connecticut, Maine, New Hampshire, and Vermont and from the Commonwealth of Massachusetts signed a letter to the Secretary of Energy urging an "expeditious resolution" of the Yucca Mountain review process. PX1617. Likewise, Governor Angus King, State of Maine, entered the debate concerning the disposal of GTCC waste in 2001. PX1795 at HQR-164-0042-0043.

k. State regulators might prohibit regulated utilities from giving up their places in the acceptance queue established by the Standard Contract. Tr. 5749:10-14 (Quinn). Customers of nuclear utilities also might oppose delaying SNF shipments off-site. Tr. 5749:15-18 (Quinn). This is because customers might want to see SNF removed from their neighborhoods as soon as possible. Tr. 5749:19-22 (Quinn). Anti-nuclear activists might oppose delaying shipments of SNF off-site. Tr. 5751:3-5752:4 (Quinn).

vii. The Financial Benefits Associated With Exchanges Are Overstated By Mr. Graves

166. The Graves model assumes that allocations only have value through 2001, after which the available allocations exceed demand and are, therefore, free. Tr. 828:20-25 (Graves). This narrow window provides contract holders with only four years in which to generate revenue from the exchanges market. Tr. 7553:11-23 (Graves).

167. Even in the years in which contract holders can earn revenue from exchanges, the benefits are small in comparison to the amount of revenue generated daily by an operating nuclear reactor. Tr. 966:18-967:4, 827:25-828:4 (Graves: in the first year of the program, model estimates revenues of approximately $146.4 million industry-wide ($122,000/MTU times 1200 MTUs), in second year, total revenue drops to $70 million ($59,000/MTU times 1200 tons)); Tr. 827:23-828:4, 7554:4-7 (Graves: in last year in which allocations have value, the 2,000 MTUs of allocations generate approximately $26 million in revenues industry-wide ($13,000/MTU times 2,000 MTUs)); compare Tr. 7555:1-16 (Graves: estimating that an operating 1,000 megawatt reactor will generate between $720,000 and $1,000,000 in revenue a day).

viii. Analogous Markets Have Fallen Far Short Of Perfect Competition

168. The two markets that Mr. Graves identifies as similar to the exchanges market that he modeled – water rights markets and the emissions allowance market (Tr. 842:9-16 (Graves: emissions allowances); 845:9-18 (Graves: water rights)) – did not perform consistently with the assumptions underlying the Graves model:

a. Unlike Mr. Graves' model of perfection, actual trading in water markets fell short of perfect competition. Tr. 4288:22-4289:4 (Fischel). Participation in effluent trading markets fell far short of 100 percent participation that Mr. Graves projected in the exchanges market. In one analysis, participation in the water rights market never exceeded 50 percent and was as low as 27 percent of all potential participants in any year. Tr. 4349:13-17 (Fischel).

b. Likewise, while water pollution trading markets have worked in the real world, they do not look like the textbook ideal modeled by Graves. Tr. 4290:10-16 (Fischel). This is because the objectives of polluters are often not limited to simple cost minimization and, as a result, the results that follow from a cost minimizing model such as Mr. Graves' model do not always hold. Tr. 4291:1-5 (Fischel).

c. In the case of emissions allowances, there was over-compliance within the utility industry to reduce emissions. Tr. 1005:7-16 (Graves). Over-compliance resulted in fewer participants in the market, (Tr. 1004:8-15, 1005:7-10 (Graves)), and lower prices than Mr. Graves projected for those credits. Tr. 1003:25-1005:6 (Graves: forecasted price of $300-400 per ton; actual price between $100-200 per ton).

d. Over-compliance in the emissions market occurred because the concept of purchasing the "right to pollute" was viewed pejoratively in local communities. Tr. 1008:2-1009:9 (Graves). As a result, local utilities had political incentive to bring their generating stations into compliance through retro-fitting. Tr. 1006:10-20 (Graves).

e. Additionally, ratepayers were willing to pay increased costs for retrofitting facilities to bring them into compliance with the Clean Air Act, even though the costs associated with purchasing emissions credits were less, rendering retro-fitting economically inefficient.

Tr. 1006:10-20 (Graves).

f. Mr. Graves modeled the emissions allowance market prior to the commencement of trading within that market. Tr. 1003:25-1004:3 (Graves). His forward-looking model overstated actual participation and the market prices for the allowances. Tr. 1004:4-1005:10 (Graves).

### H. The Graves Model Is Not A Trading Model, But, Rather, Is A Sequencing Model

169. The Graves model is a theoretical economic sequencing model. Tr. 767:2-7 (Graves). The theoretical model attempts to determine the sequence of removal of SNF that would reduce overall costs for utilities that are bearing, what Mr. Graves assumes to be, avoidable SNF storage costs associated with "must-move" fuel. Tr. 766:5-9 (Graves); Tr. 807:7-22 (Graves: model reallocates acceptance rights amongst the utilities that require SNF removal under "must move" definition that Mr. Graves applies, and away from utilities that lack "must move" fuel).

a. The model begins with an assumption concerning the supply of DOE allocations, upon an MTU basis. Tr. 765:23-766:4 (Graves). The "supply" in the Graves model is an assumed acceptance rate implemented by the DOE program. Tr. 7549:13-23 (Graves).

b. The model then seeks to identify which utilities were facing increased storage costs associated with SNF that could be reduced or eliminated through the removal of SNF from the utility's site. Tr. 766:13-23 (Graves).

c. The identities of utilities facing such increased storage costs, as measured by Mr. Graves, are identified based upon two sets of assumptions, depending upon the operational status of the utility.

i. For operating utilities, the Graves model attempts to determine the years in which the utility runs out of existing storage space in its wet pool, less full core reserve, a condition that Mr. Graves terms as a "full pool situation." Tr. 767:8-768:7 (Graves). Once a "full pool situation" occurs, the model characterizes the utility as being in a "must move" fuel situation. Tr. 768:2-7 (Graves).

ii. The model assumes that, if that operating utility is unable to transfer its "must move" SNF to DOE in the year in which that SNF becomes "must move," the utility will be forced to construct an ISFSI for the storage of its "must move" SNF. Tr. 817:13–818:8 (Graves). The model then assumes certain costs associated with the construction, loading, operations and maintenance, and decommissioning of that ISFSI. Tr. 817:13–818:8 (Graves).

iii. With respect to shutdown reactors, the model assumes that all SNF in a shutdown reactor's wet pool becomes "must move" fuel five years after the ceases operations. Tr. 768:8-24 (Graves). This assumption is based upon a provision in the Standard Contract that requires all SNF to cool for five years before it can be accepted by DOE. Tr. 768:12-14 (Graves); DX 6, 7 & 8 at Appendix E.

iv. The model assumes that, if a shutdown utility is unable to transfer all of its SNF to DOE five years after shutdown, the shutdown utility will continue to store SNF in its wet pool. Tr. 768:8-21 (Graves). The model then assumes certain costs associated with the

continued operation and maintenance of the shutdown reactor's wet pool. Tr. 768:15-21 (Graves). Yankee Atomic, Connecticut Yankee, and Maine Yankee all are considered shutdown reactors by the Graves model. Tr. 856:19-20 (Graves).

d. Once the utilities with "must move" fuel are identified, the model assumes that these utilities will have a preference over utilities without "must move" fuel to have their waste handled first by DOE. Tr. 769:11-14 (Graves).

e. Identifying which utilities have "must move" fuel in a particular year is the first step toward ultimately determining the economic sequence of removal obtained by the model. Tr. 769:11-17 (Graves). To determine which utilities obtain allocations in any given year, the Graves model places the utilities in an economic sequence based upon an arithmetic exercise designed to determine each utility's willingness to pay for DOE allocations and rank them upon that willingness to pay. Tr. 818:9-22 (Graves).

f. Specifically, the model applies assumptions concerning avoidable "must move" storage costs for operating and shutdown reactors (Tr. 815:16-23 (Graves)), and the total metric tons of SNF that must be removed in order to eliminate those storage costs. Tr. 814:15-815:11 (Graves).

g. In determining storage costs attributable to"must move" SNF, the model includes fixed cost assumptions across the industry associated with the continued storage of "must move" SNF for both operating and shutdown facilities. Tr. 834:23-25 (Graves: assumes each utility expends $8.0 million per year for wet pool O&M); Tr. 819:14-25 (Graves); Tr. 1087:25-1088:8 (Pennington: assumes each utility expends $6.4 million for ISFSI construction); Tr. 1106:20-24 (Pennington: assumes each utility expends $3.5 million per year

for ISFSI operations and maintenance); Tr. 1105:5-9, 1093:13-1094:7, 1097:10-14 (Pennington: assumes each utility expends $1.127 million per cask placed upon the ISFSI, including cask decommissioning); Tr. 1100:24-1101:23 (Pennington: assumes each utility expends between $4.5 and 5.5 million for crane upgrades).

h. The model then ranks utilities based upon which utilities have highest avoidable costs/metric ton of "must move" SNF. Tr. 813:21-25 (Graves); 814:22-815:11 (Graves).

i. The output of this calculation sets forth each utility's willingness to pay. Tr. 852:3-8 (Graves). This calculation generally results in utilities that possess higher amounts of "must move" SNF to have significantly lower willingness to pay. Tr. 819:23-820:3 (Graves).

j. The model distributes the DOE allocations to the ranked utilities in descending order based upon their willingness to pay, stopping when the total DOE allocations for any year are depleted. Tr. 820:4-821:1 (Graves).

k. In distributing allocations for "must move" fuel, the model does not limit the award of allocations solely to "must move" fuel; instead, each utility obtains sufficient allocations to remove all "must move" fuel from the facility, as well as any additional SNF allocations needed to completely fill the transportation cask. Tr. 7567:18-23 (Graves).

l. After the yearly allocations are depleted, the economic sequence model starts its calculations over and re-ranks the utilities for allocations available the following year based upon the same arithmetic exercise. Tr. 821:1-822:1 (Graves).

170. Over the first four years of the program, only contract holders that have avoidable SNF storage costs, as assumed by Mr. Graves, obtain DOE allocations through the exchanges

market. Tr. 920:24-921:3 (Graves: rate of acceptance below cumulative amount of "must move" fuel for first four years).

171. In 2002, contract holders that have "must move" SNF obtain the first 2,200 MTUs of the 2,700 total MTUs available under Mr. Graves' acceptance rate. Tr. 974:6-9 (Graves).

172. While Mr. Graves' model assumes that utilities that lack avoidable storage costs, but that possess allocations within the first five years of the DOE waste acceptance program, trade down in the acceptance queue, Mr. Graves fails to identify any utility that would have agreed to trade out of early queue positions in exchange for positions later in the acceptance queue. Tr. 875:15-21 (Graves). Mr. Graves' model is unconcerned with which utilities even possess acceptance rights in any particular year. Tr. 873:23-874:9 (Graves). Instead, the model is only concerned with which utilities obtain allocations in any particular year. Tr. 846:14-847:25 (Graves).

173. The Graves model does not allow this Court to identify which utilities would have presented requests to exchange approved DCSs to DOE for approval that would have allowed each of the three Yankees to accelerate the removal of SNF from their wet pools. Tr. 873:25-874:5 (Graves).

174. In addition to establishing the economic sequence of waste removal, the Graves model purports to determine the price that will be paid by utilities trading up in the acceptance queue in the first five years of DOE's acceptance program. Tr. 827:23-828:4 (Graves). Since the number of DOE allocations increases each of the first five years, the price of the allocations decreases over this time period. Tr. 7553:18-25 (Graves).

175. By 2002, the supply of DOE allocations under Mr. Graves' acceptance rate exceeds the demand for slots associated with "must move" fuel. Tr. 7553:18-23 (Graves). At that time, the price of each DOE allocation upon a per MTU basis is assumed to drop to zero. Tr. 7554:22-25 (Graves); Tr. 828:24-25 (Graves).

I. The Development Of A Perfect Exchanges Market By The First Year Of DOE Acceptance Is Unsupported And Unrealistic

176. Beginning in the first year of DOE waste acceptance, Mr. Graves' exchanges marketplace has achieved full participation by all utilities and has reallocated all acceptance rights to facilities with "must move" demands. Tr. 4288:2-16 (Fischel); Tr. 984:9-15 (Graves: model does not assume retention of early year allocations); Tr. 984:9-21 (Graves: model assumes that no utilities either choose not to participate or choose to ration participation); Tr. 974:1-16 (Graves: model assumes that all allocations in first four years of the program – and approximately 80 percent in the fifth year – are reallocated to utilities with "must move" SNF in the exchanges market).

177. If the market did not develop perfectly by 1998, the fuel-out dates for the three Yankees would be delayed. Tr. 974:22-976:1 (Graves: any delay in out-year waste shipments would push back the Yankees' fuel-out dates).

178. However, the civilian nuclear power industry is required to make reasonable and prudent business decisions. Tr. 2244:20-2245:4 (Heider).

a. By assuming the development of a perfectly competitive market that achieves maximum efficiency in the first year of the DOE program, Mr. Graves fails to account for real or perceived risk that utilities might face trading out of early-year acceptance slots.

Tr. 974:10-16 (Graves).

b. Utilities would not have confidence that such perfect circumstances were going to obtain within the DOE program. Tr. 860:12-14 (Graves). These confidence problems would exist and likely would "cause people to ration their participation." Tr. 860:14-18 (Graves).

179. Instead of anticipating uncertainties with the DOE waste acceptance program or risks to utilities trading down in the queue that might affect participation, Mr. Graves assumes that the DOE program has a "little headroom" to deal with any variability in annual rates, and sufficient capacity to stay ahead of the "must move" problem as he defines it. Tr. 973:16-25 (Graves). As a result, he does not believe that any risk or uncertainty will affect his perfect market in the "non-breach" world. Tr. 973:16-25 (Graves).

180. However, in the first four years of the DOE program, as modeled by Mr. Graves, there is no "headroom" in DOE's acceptance program. Tr. 974:2-5 (Graves).

181. The lack of any "headroom" to accommodate risk and uncertainty in the first four years is significant because, under Mr. Graves' model, all three Yankees obtain allocations in the first four years of DOE's program, and Connecticut Yankee and Yankee Atomic both receive sufficient allocations to remove all of their SNF in the first four years. Tr. 825:10-826:1 (Graves).

182. In the fifth year of acceptance – the year in which Maine Yankee has its SNF removed completely – only 500 MTUs of "headroom" exists Tr. 974:6-9 (Graves). Applying the Graves' acceptance rate, the 500 MTUs of "headroom" in the fifth year of the program represents only 18 percent of the total allocations available in that year. Tr. 974:6-9 (Graves).

183. Since no "headroom" exists in the first four years of the program – and only nominal "headroom" exists in the fifth – the Graves model does not take into account any risk that utilities which trade down in the queue in the first five years might face in the non-breach world giving up those early year allocations in exchange for allocations later in time. Tr. 974:10-16 (Graves); see also Tr. 974:17-975:1 (Graves); Tr. 978:9-22 (Graves: model does not account for the possibility that system may take longer to process fuel shipments than set forth in Graves' acceptance rate); Tr. 979:9-22 (Graves: model does not consider possibility that utilities will not be able to load the casks as quickly or as consistently as his model projects). Indeed, Mr. Graves did not consider the potential costs associated with shutting down an operating reactor if its pool were to run out of space. 965:17-966:6 (Graves).

184. For a robust exchanges market to develop, utilities must have confidence in the schedule of what they are buying and selling. That level of confidence cannot be gained until DOE is well along to picking up spent fuel. Tr. 5822:4-5823:13 (Quinn); Tr. 5824:1-6 (Quinn); see also Tr. 4208:22-4209:7 (Zabransky: "in a mature situation, where this is no longer a big deal, where trading uranium, trading pollution offset credits becomes a routine thing as it did, that when moving nuclear fuel around the country or leaving it in one state or another state isn't a big deal anymore, this could be a normal exchange process").

J. Analogous Markets Have Taken Time To Develop

185. Trading programs outside of the hypothetical exchanges market generally have been disappointing relative to the efficiency gains that have been claimed for them, and the disappointment is particularly severe in the early years before the programs really develop.

Tr. 4351:10-23 (Fischel); see also Tr. 4287:18-4288:1 (Fischel: discussing difficulties associated with trading in early years of any program).

186. The early results from the trading of emissions were disappointing. Tr. 4285:10-12 (Fischel). In the early years of the emissions market, the actual savings were much less than the potential savings. Tr. 4286:22-25 (Fischel).

186A. Though the evidence demonstrates that markets take time to develop, Mr. Graves' model does not distinguish between the early years and late years. Tr. 4288:2-16 (Fischel). Instead, it assumes the market and the acceptance program will be perfect instantaneously. Tr. 4288: 4-5 (Fischel). This is not consistent with the experience in other markets. Tr. 4288:15-16 (Fischel).

### K. Additional Evidence Belies Mr. Graves' Depiction Of The Exchanges Market

#### i. The Exchanges Modeled By Mr. Graves Could Not Have Occurred

187. The exchanges projected by the Graves model could not have occurred under the Standard Contract because the out-year allocations the Yankees need to trade to remove all of their SNF by 2002 would not have existed by that date:

a. Under the Standard Contract, DOE is required to project, to the extent available, its future SNF and HLW acceptance plan for "ten (10) years following the projected commencement of operation of the initial DOE facility." DX 6, 7 &8, Article IV.B.5.b. Accordingly, at best, approved DCSs will only look forward 10 years into the future.

b. Under Mr. Graves' acceptance rate, only Yankee Atomic has all of its acceptance allocations arise within the first ten years of the DOE acceptance program. Tr. 891:1-

6 (Graves). In contrast, under that same rate, both Connecticut Yankee and Maine Yankee possess allocations in Years 11-14 of the acceptance program. Tr. 904:19-24 (Graves).

c. To obtain acceptance by 2001 for Connecticut Yankee and 2002 for Maine Yankee, each would be required to exchange away approved DCSs from 2008-2011 for allocations in 2001. Tr. 7545:24-7546:9 (Graves). However, under the Standard Contract, those rights would not have existed as they exceed the ten-year scope of the initial APR and ACR.

d. Under a lower acceptance rate, all of the Yankees would be required to exchange approved DCSs rights well beyond the time period governed by the ACR and APR. See, e.g., DX150 at YDK006433; DX196 at MPA010848; DX 157 at CDB000159.

188. Yankee Atomic recognized the problems associated with trading approved DCSs that did not yet exist. In a September 7, 1995 letter from Dr. Kadak to OCRWM, Dr. Kadak noted that "more than half of the spent fuel at Rowe does not even have a current queue allocation position that can be swapped." DX 5 at EDB0023133-34. He therefore concluded that "over half of Yankee's spent fuel is presently unswappable." Id.; see Tr. 3837:13-3838:7 (Grube: Yankee Atomic's DCSs only covered the first ten years (through 2007) and because Yankee Atomic would have had allocations through 2018 it was impossible to swap allocations that did not already exist); DX 363 at YDK009405 (because of the limitations in the Standard Contract, "it may not be possible to set a schedule for exchanges beyond the 10 year period unless contract modifications are made").

189. A second problem associated with exchanges is the fact that many contract holders, including Yankee Atomic, chose not to submit DCSs for the entire ten-year period covered by the ACR and APR. DX 5 at EDB0023134. Under the Standard Contract, Dr. Kadak

noted that contract holders are "not required . . . to submit DCSs for the full ten year DCS process." Id. The "reality is that Yankee and other utilities are not able to exchange allocations that have neither been requested nor approved." Id.; See DX 6, 7 & 8 at V.B.1 (requiring DCSs to be submitted 63 months before proposed delivery).

ii. The Yankees' Projected Fuel-Out Dates Depend Upon Mr. Graves' Rate Of Acceptance

190. The fuel-out dates that Mr. Graves projects for the Yankees are entirely dependent upon the acceptance rate that Mr. Graves selected for his model. If the rate of acceptance differs from the rate that Mr. Graves chose, the fuel-out dates projected for the Yankees would not have been met – even in Graves' perfectly competitive market. Tr. 916:3-11 (Graves).

iii. Evidence Demonstrates A Lack Of Cooperation In The Industry On SNF Issues

191. Despite Mr. Graves' economic theory that presupposes an industry goal to maximize efficiencies and minimize at-reactor storage costs, the evidence demonstrates that nuclear utilities have not worked together to achieve an outcome for SNF acceptance that minimizes or eliminates at-reactor storage costs.

a. For example, the industry has consistently rejected an acceptance regime based upon granting priority acceptance rights to shutdown reactors. See DX147 at YDK037850; DX 34 at YDK009170 (upon issue of priority, "Yankee was clearly in a minority position, being one of only a few shutdown reactors, and it was unlikely we would get any support on priority from operating reactors."); DX 30.007 at HQR-009-0130 ("Since majority of reactors are not shut down, it is not surprising for that same majority to oppose priority treatment for those few who are."); DX 30.008 at FER0023138 ("we feel that in an open rulemaking

process, Yankee's contractual rights . . . would be trampled by the vast majority who could care less about retired reactors"); DX 593 at YDK021780 ("unless [other utilities] see our cause as their cause, they are not going to lift a finger to help us. Nor would we if we were in their shoes.").

b. Yankee Atomic failed in its argument even though it attempted to show that granting priority would result in little, if any, delay in acceptance of SNF or increased cost to operating reactors. See, e.g., DX 403 at CEP0080527 (Commonwealth Edison recognized "potentially significant economic burden" facing shutdown reactors, but concluded that, "notwithstanding this impact upon you and the other similarly situated owners, I cannot endorse the preference you recommend and will oppose it being incorporated as a part of our 1995 congressional initiative."); DX 403 at CEP0080527-28 (even though ComEd had a shutdown reactor, ComEd "cannot endorse a recommendation that would likely transfer costs from shutdown nuclear plants . . . to those that continue to operate. Total industry cost has little meaning to me under such circumstances."); DX 30.007 at HQR-009-0130 (April 28, 1993 letter to DOE from Yankee Atomic, recognizing self-interested behavior of operating utilities: "it is not surprising for that same majority to oppose priority treatment for those few who are"); DX 34 at YDK009170 (DOE was informed that "Yankee was clearly in a minority position, being one of only a few shutdown reactors, and it was unlikely we would get any support from operating reactors"); DX 593 at YDK021780 (from memorandum to Dr. Kadak: "The goal is priority acceptance. If we put it to a vote now, we run a bigger risk that most utilities will oppose us. . . . Asking people to give up their space in the lifeboat – while assuring them that they won't be impacted – will probably not work.").

iv. Many Contract Holders Would Not Have Participated In The Exchanges Market

192. Many utilities would not have participated in the exchanges market. Tr. 5827:9-16 (Quinn: even if there is confidence in the program, swaps will only occur among some of the utilities); Tr. 991:4-15 (Graves); Indiana Michigan Power Co. v. United States, 60 Fed. Cl. 639, 642 (2003) (Indiana Michigan – an entity with early year allocations – had an order entered by this Court based upon the retention of its allocations, not upon any exchanges down in the acceptance queue); Tr. 991:4-7 (Graves: Mr. Graves' model assumes Indiana Michigan and Commonwealth Edison trade down in acceptance queue); Tr. 5799:11-5800:9 (Quinn: Consumers Energy informed Yankee Atomic that it would be re-allocating its acceptance rights internally, to its prematurely shutdown Big Rock Point reactor); Tr. 5790:23-25, 5806:9-18; 5812:21-5813:1 (Quinn: numerous utilities rejected Yankee Atomic's request to exchange allocations); Tr. 5791:13-5792:1 (Quinn: Maine Yankee and Connecticut Yankee failed to exchange any allocations with Yankee Atomic even though, at the time they were approached concerning exchanges, the exchanges would not have altered the final fuel-out dates for either utility); Tr. 683:21-685:23 (Bartlett: testifying on direct examination that he recalled meetings with utility representatives at which utility representatives stated that they were "very interested" in exchanges, Dr. Bartlett – an expert witness for the Yankees – could not recall a single utility that expressed this interest); Tr. 4743:6-16 (Milner: even though responsibilities included attending meetings with utility representatives with Dr. Bartlett, could recall no meetings at which utility representatives expressed "great interest" in pursuing exchanges).

193. At this time, no other plaintiff in the spent fuel cases is relying upon a theory of exchanges that would redistribute the acceptance allocations industry-wide. Indeed, attorneys for at least 12 plaintiffs have expressly disavowed such a theory. Yankee Atomic Electric Co. v. United States, No. 98-126C, Transcript of Hearing, June 14, 2001, 57:8-17 (counsel for Southern Nuclear, Georgia Power and Alabama Power), 66:13-67:1 (counsel for Florida Power and Light, Duke Power, Northern States Power, Indiana Michigan, Boston Edison, GPU Nuclear, Power Authority of New York, Omaha Public Power District and Nebraska Public Power District), and, 62:24-63:9 (Mr. Stouck noting that operating utilities involved in litigation with DOE "are not even talking about swaps.").

193A. No contract holder has ever submitted an exchange request to DOE. Tr. 4137:15-19 (Zabransky).

L. Mr. Graves' Model Suffers From Operational Deficiencies

i. The Model Is Improperly Retrospective

194. The Graves model is retrospective and does not represent the market as it would have existed in the early 1990s.

195. To the extent a market for exchanges would have developed, it would have developed in the 1992 time frame when DCS rights were being created. Tr. 969:1-970:1 (Graves: early 1990s time period consistent with need to engage in planning years before facilities hit full-pool situations); Tr. 968:6-15 (Graves: if utility projects wet pool limitations, it would need to know a few years in advance whether it has slots in the acceptance queue – otherwise, it would need to begin planning alternative storage options).

196. In determining the quantity of "Must Move" fuel and the economic sequence of acceptance, Mr. Graves does not analyze information available to DOE and the industry in the early 1990s. Instead, the model was created with the benefit of perfect hindsight.

a. In determining spent fuel storage requirements industry wide, Mr. Graves relied upon a DOE report published in 1995 that set forth the then-current storage capacities of nuclear utilities wet pools. Tr. 772:2-11 (Graves); 944:24-945:2 (Graves).

b. The Graves model does not account for any reracks that were performed by utilities between 1995 and 1998. Tr. 970:4-7 (Graves). Mr. Graves assumed that any reracks performed during this time period were related to the breach. Tr. 970:8-21 (Graves). Mr. Graves did not conduct any analysis to determine the motivations of each utility that reracked during this time period to determine whether the rerack was unrelated to the breach. Tr. 970:22-25 (Graves).

c. Mr. Graves next determined the inventory of SNF in each utility's wet pool using a document prepared by Nuclear Assurance Corporation ("NAC") in the 1998/1999 time frame. Tr. 944:24-945:8 (Graves).

d. In determining whether an operational ISFSI existed that would be available for additional storage of SNF, Mr. Graves looked to ISFSI status as of 1998. Tr. 953:5-8 (Graves).

e. In determining whether a utility was shut down, Mr. Graves relied upon operational status as of 1998. Tr. 948:22-24 (Graves). The list includes eight utilities that contributed an additional 2500-2600 MTUs of "must move" fuel due to their premature shutdowns in the mid-to-late 1990s. Tr. 951:19-952:3 (Graves).

ii. As Evidence Of The Model's Retrospective Nature, At The Inception Of The Market In The Non-Breach World, Maine Yankee And Connecticut Yankee Would Have Been Purchasers Of Early Year Allocations, Not Sellers As Depicted By Mr. Graves

197. Under Mr. Graves model, which treats Maine Yankee and Connecticut Yankee as shutdown reactors, Maine Yankee and Connecticut Yankee trade out of allocations they possess from 1998-2000 in exchange for cash and allocations in 2001 and 2002. Tr. 825:24-826:4 (Graves).

198. Had Mr. Graves performed his analysis prior to Maine Yankee's and Connecticut Yankee's decisions to shutdown in 1998, both would have had full wet pools and would have been modeled as utilities seeking to trade for earlier SNF acceptance in the acceptance queue. Tr. 7575:9-7576:10 (Graves).

199. Indeed, both Maine Yankee and Connecticut Yankee likely would have had a high willingness to pay for early year allocations had the model been run prior to shutdown. Tr. 7577:3-14 (Graves).

200. Mr. Graves' model results in Maine Yankee and Connecticut Yankee earning a profit from the early year sales of allocations. In the actual non-breach world, both Maine Yankee and Connecticut Yankee would have been buyers, not sellers, and no profits would have been obtained. Tr. 7575:9-7576:10 (Graves).

iii. The Cost Assumptions Underlying Mr. Graves' Model Are Unreasonable

201. The cost assumptions upon which Mr. Graves relies are unreliable because they assume uniform costs across the industry and because they bear no relation to the actual costs allegedly incurred by the Yankees. For example, applying the cost components from Mr. Graves'

model, the Yankee Atomic ISFSI should have cost $20.5 million (Tr. 1154:2-14 (Pennington)); instead, it cost $83.8 million. (Tr. 3249:4-6 (Wise); Tr. 1569:13-23 (Bennett). Likewise, the actual costs differ significantly by facility. Compare Tr. 3249:4-6 (Wise: $84 million for 16 cask Yankee Atomic facility) and Tr. 3260:10-12 (Wise); Tr. 2770:11-16 (Thomas: $89.4 million for 64 cask Maine Yankee facility), and Tr. 3254:21-23 (Wise); Tr. 2662:9-14 (Heider: $78.3 million for 43 cask ISFSI at Connecticut Yankee).

iv. Allocations Never Would Be Cost-Free

202. Any exchanges market would never have allocations available at no cost. Tr. 5824:24-5825:9 (Quinn: if one utility has something another utility wants, the utility trading down in the queue will want something in return); DX 272 at YDK045575 (costs associated with incursion of "political wrath").

v. Mr. Graves' Model Fails To Account For Total System Costs

203. In creating a model that purports to maximize efficiencies, Mr. Graves omits a key economic variable:

a. The Graves model does not account for total system costs and does not seek to minimize such costs. Tr. 954:18-21 (Graves); see Tr. 958:18-19 (Graves: model lacks component that reduces transportation costs directly); Tr. 955:5-16 (Graves).

b. Since the Standard Contract is premised upon the ability of the Government to recover all of its costs from utilities – including transportation, handling, construction and development costs – any model should consider these costs as well. Tr. 4300:22-4302:7 (Fischel); see 42 U.S.C. § 10131(B)(4).

c. This factor is significant because a model that incorporates such costs might arrive at different results if cost minimization truly is the goal of the DOE program. Tr. 4300:22-4302:17 (Fischel).

vi. Mr. Graves Incorrectly Assumes That Every Nuclear Utility's SNF Will Be Transported By 10 MTU Rail Casks

204. The economic sequence that results from Mr. Graves' model is incorrectly premised upon the use of rail casks as the sole method of transportation from every nuclear reactor. Tr. 1403:4-22 (Stuart). Contrary to Mr. Graves' assumption, many utilities could not have shipped SNF by rail and would have needed to use smaller truck casks. DX 319 at NAC000884-87 (listing capabilities of utilities to handle or otherwise utilize large, rail transport casks). Yankee Atomic, for example, submitted DCSs requesting acceptance by trucks, not by rail. See DX 30.002 at YDK008924; DX 35 at YDK037423; see also DX 140 at MOF022984 (Yankee Atomic "will have difficulty accommodating large dry cask designs due to limited crane capacity and other factors."); DX 201 at YDK013744 (same).

vii. Mr. Graves Ignores Reracking As An Alternative To ISFSI Construction

205. For operating reactors that have reached "full pool situations," Mr. Graves assumes that a nuclear utility's only means of obtaining additional storage space for its SNF is through the construction of an ISFSI. Tr. 899:8-900:4 (Graves). In determining the sequence of removal, the model does not consider the ability to rerack at a lower cost. Tr. 899:21-22 (Graves).

viii. Mr. Graves' Model Fails To Account For GTCC Or Failed Fuel

206. Mr. Graves' model accounts for the exchange of quantities of SNF, regardless of whether SNF is considered failed fuel. Tr. 963:24-964:3 (Graves). Mr. Graves assumes that failed fuel will be treated as standard fuel and will be accepted upon the same schedule as that of standard fuel. Tr. 963:24-964:3 (Graves). However, as will be identified below, DOE is not obligated by the Standard Contract to dispose of failed or non-standard fuel according to the same schedule as Standard Fuel. DX 6, 7, & 8, Art. VI.A.2(b) ("for any SNF which has been designated properly as other than Standard Fuel, as that term is defined in Appendix E [to the Standard Contract], the [contract holder] shall obtain delivery and procedure confirmation from DOE prior to delivery"). If failed fuel is not accepted upon the same schedule as standard SNF, the Yankees would be unable to obtain the removal of all SNF from their sites by the dates that Mr. Graves projected. Tr. 965:9-16 (Graves: discussing GTCC).

207. Mr. Graves also does not model exchanges for Greater Than Class C radioactive waste ("GTCC"). Tr. 963:17-19 (Graves). As will be identified below, GTCC is low-level radioactive waste that is not covered by the NWPA or the Standard Contract, but that nuclear utilities generate through their production of nuclear power and must store. Because Mr. Graves' model does not include exchanges of GTCC waste, it does not consider the effects that the presence of GTCC waste will have upon whether a facility can avoid costs associated with wet pool operations and maintenance, ISFSI construction, or ISFSI operations and maintenance. Tr. 964:9-15 (Graves).

208. The presence of GTCC and failed fuel is significant because, to the extent that a utility must continue to monitor and hold failed fuel or GTCC at its site, it cannot avoid the storage costs upon which the economic sequencing model is based. Tr. 965:14-16 (Graves).

IX. FACTS RELATING TO THE STORAGE AND DISPOSAL OF GREATER-THAN-CLASS-C RADIOACTIVE WASTE

A. DOE'S Responsibility To Dispose Of GTCC Waste Arises From The Low-Level Radioactive Waste Policy Amendments Act Of 1985, And Not From The NWPA Or The Standard Contract

209. Greater-Than-Class-C radioactive waste ("GTCC") is a form of low-level radioactive waste that contains concentrations of certain radioactive nuclides that exceed the concentration limits established by the NRC for Class C waste. See 10 C.F.R. § 61.55 & Tables. GTCC from nuclear reactors comes from metal components in the reactor that absorb neutrons during the reactor's operation and become irradiated as well as from other sources. Examples include the inside of the core shroud that surrounds the nuclear core, control rods, and the support plates that hold the reactor core in place. See Tr. 2330:13-23 (Bennett); Tr. 3687:14-22 (Morgan).

210. The Low-Level Radioactive Waste Policy Amendments Act of 1985 ("LLRWPA"), Pub. L. No. 99-240 (codified at 42 U.S.C. §§ 2021b-2021i), governs the disposal of GTCC. The LLRWPA states that the Federal Government "shall be responsible for disposal of . . . any other low-level radioactive waste with a concentration that exceed the limits established by the [Nuclear Regulatory] Commission for Class C radioactive waste, as defined by section 61.55 of title 10, Code of Federal Regulations, as in effect on January 26, 1983." 42 U.S.C. § 2021c(b)(1)(D); see DX 15 at YDK009258.

211. The LLRWPA also requires DOE to study and identify the options for insuring that "the beneficiaries of the activities resulting in the generation of [GTCC] bear all reasonable costs of disposing of such wastes." 42 U.S.C. § 2021c(b)(3)(E). The LLRWPA does not identify any specific deadlines by which DOE must act to accept or dispose of GTCC waste. See 42 U.S.C. §§ 2021b-2021j; see also Tr. 4958:6-10 (Kadak). Nor does the LLRWPA identify any specific deadlines by which DOE must enter into agreements with commercial nuclear utilities regarding their payment of costs associated with acceptance or disposal of GTCC.

212. Both the NWPA and the Standard Contract define HLW as:

> (A) the highly radioactive material resulting from reprocessing of spent nuclear fuel, including liquid waste produced directly in reprocessing and any solid material derived from such liquid waste that contains fission products in sufficient concentrations; and
>
> (B) other highly radioactive material that the [Nuclear Regulatory] Commission, consistent with existing law, determines by rule requires permanent isolation.

42 U.S.C. § 10101(12); DX 6, 7, & 8, Art. I(12) (emphasis added).

213. The NRC has not "determined by rule" that GTCC requires permanent isolation. On at least four occasions, the NRC has publicly declined to define GTCC as HLW:

a. In a proposed rule, "Disposal Of Radioactive Wastes," 53 Fed. Reg. 17,709 (May 18, 1988), the NRC stated that "[s]ince the possibility of using [an intermediate disposal] facility is left open, the Commission is not now determining that the [GTCC] wastes, even if highly radioactive, do in fact 'require permanent isolation;' accordingly, the NWPA definition of HLW does not apply." Id. at 17,710 (emphasis added).

b. In a final rule, "Definition of the Term High-Level Radioactive Waste," 54 Fed. Reg. 22,578 (May 25, 1989), the NRC again emphasized that the final formulation of the rule was "in lieu of a revision of the definition of high level radioactive waste (HLW)," 54 Fed. Reg. at 22,578; that "GTCC wastes would not be classified as HLW under these amendments," id. at 22,579-80; and that "the Part 61 amendments would obviate the need to reclassify certain GTCC wastes as HLW." Id. at 22,579.

c. In a final rule concerning the licensing requirements for the interim storage of GTCC, 66 Fed. Reg. 51,823 (Oct. 11, 2001), the NRC stated that "defining all GTCC waste as spent fuel or high-level waste . . . could lead to confusion and inefficiency." Id. at 51,826. The NRC further determined that, "[i]f GTCC is defined as spent fuel or high-level waste, DOE would be required to dispose of this waste in a deep geologic repository (e.g., Yucca Mountain) and would not have the flexibility to explore potentially more efficient disposal plans." Id. The final rule authorized the storage of GTCC in interim storage facilities. Id. at 51,825. In addition, the final rule reemphasized that, although "GTCC is generally unsuitable for near-surface disposal as low-level waste (LLW)," it is still "considered as LLW," not highly radioactive material. Id. at 51,823.

d. By letter dated May 21, 2001, Richard A. Meserve, Chairman of the Nuclear Regulatory Commission, responded to an October 24, 2000 letter from Andrew Kadak, the former President and Chief Executive Officer of Yankee Atomic Electric Company, stating that "the NRC has decided, consistent with past decisions, not to classify GTCC as HLW." DX 85. Mr. Meserve further stated as follows:

> First, nothing in the classification of waste as GTCC prohibits DOE from fulfilling its responsibilities to dispose of these wastes under the Low-Level Radioactive Waste Policy Amendments Act (LLRWPA), of 1985. Second, as you know, the Commission requires that GTCC be disposed of in a geologic repository unless ". . . proposals for disposal of such waste in a disposal site licensed pursuant to [10 CFR Part 61] are approved by the Commission." 10 CFR 61.55(a)(2)(iv). Although NRC agrees that it is an undesirable outcome for utilities to continue to store GTCC waste after the spent fuel is removed from reactor sites, health and safety and the environment will be protected under the current waste classification because storage can be safely accomplished until disposal occurs. Therefore, the NRC believes that this matter is not one of health and safety, but an administrative matter of when DOE will fulfill its obligations under the LLRWPAA.

Id. (emphasis in original).

214. Accordingly, GTCC is not a waste form that DOE is required to accept pursuant to the Standard Contract because the Nuclear Regulatory Commission has determined not to classify GTCC as high-level waste or to require deep geological disposal or permanent isolation for GTCC. See also Alan Brownstein Dep. 4/9/02, 195:1-25 - 197:1-17; Susan Klein Dep. 4/25/02, 437:22-438:21; 445:1-6.

215. DOE never considered amending the Standard Contract to include GTCC as material to be disposed of pursuant to DOE's obligations under the Standard Contract. Susan Klein Dep. 4/25/02, 451:18-452:18.

B. The Yankee Plaintiffs Recognized That DOE Has No Responsibility For Their GTCC Pursuant To The Standard Contract

216. The Yankee plaintiffs have historically interpreted the NWPA's definition of HLW to exclude GTCC waste. Specifically, the Yankees believe that, pursuant to the NWPA, "HLW is defined as the highly radioactive material resulting from reprocessing of spent nuclear

fuel, including liquid waste produced directly in reprocessing and any solid material derived from such liquid waste." DX 102 at YDK013699; Tr. 3810:10-3811:5 (Grube). While the Yankees may have hoped, ultimately, for this definition to be broadened, they read the NWPA to exclude GTCC waste. Tr. 3810:21-3811:5 (Grube).

217. The Yankee plaintiffs have historically recognized that DOE has no responsibility for their GTCC pursuant to the Standard Contract. On October 24, 2000, Dr. Kadak, former President of Yankee Atomic, sent a letter upon behalf of the nuclear utilities to the NRC, informing it as follows:

> The disposal of Greater Than Class C (GTCC) waste has been an open issue for many years. It appears that what everyone understands is required, namely disposal in a geological repository, is not being implemented due to a technicality in the regulations and law. The Department of Energy is charged with the disposal of spent nuclear fuel and other high level radioactive waste generated through the operation of nuclear plants. GTCC clearly fits the latter category but it has not been so designated by the Nuclear Regulatory Commission. This lack of designation prevents the Department of Energy from taking this waste from shutdown nuclear plants in the process of decommissioning. The net result is that when the department begins taking spent fuel from these sites, the utilities will be left with spent fuel like casks containing GTCC further delaying site release.
>
> It appears that the remedy simply requires reconciling the present NRC requirements for the disposal of Greater Than Class C waste in a geological repository with those of DOE that at present have no link with this requirement in their taking of this material. A one sentence definition stating that GTCC is high level nuclear waste should clear this long standing issue and provide DOE the basis for accepting GTCC waste.

DX 86 at GPE0010123 (emphasis added).

218. In addition to asking the NRC to reclassify GTCC, Yankee Atomic also urged DOE to request that the NRC classify GTCC waste as high-level radioactive waste, indicating its understanding that GTCC was not yet so classified. In a September 25, 1996 letter from Mr. Grube to Mr. Barrett, Yankee Atomic expressed its belief that provision should be made for interim storage and disposal of GTCC waste. DX 243. Yankee Atomic further expressed its belief that DOE should request the NRC to classify GTCC as high-level waste, to allow for disposal of GTCC in the repository. Id. at YDK022943.

219. The Yankee plaintiffs' position that DOE is obligated to accept their GTCC under the Standard Contract is inconsistent with their position in administrative proceedings before the Federal Energy Regulatory Commission ("FERC"):

a. Before FERC, Connecticut Yankee stated "that there is no existing regulation requiring that DOE remove and dispose of GTCC waste" and "that even if DOE accepts such waste for disposal in a spent fuel repository, it is not reasonable to assume that it will do so without assessing further fees." In re Connecticut Yankee Atomic Power Company, Docket #ER97-913-000, 84 FERC ¶ 63,009, at 65,125, 1998 WL 656747, at **46 (Aug. 31, 1998) (Initial Decision). Connecticut Yankee also submitted the testimony of Robert A. Isakson to FERC, in which Mr. Isakson stated that "10 C.F.R. [§] 61.55(a)(2)(iv) does not mandate that all GTCC waste is to be permanently isolated." DX 87 at YDK041809.

b. Maine Yankee, Connecticut Yankee, and Yankee Atomic each submitted to FERC a decommissioning cost study in support of their respective cases pending before FERC. Each of these decommissioning cost studies was supported by sworn testimony submitted to FERC. MY's decommissioning cost study stated that "the costs of the disposal of

GTCC, unlike that of spent fuel, is not covered by DOE's 1 mil/kWhr surcharge." DX 88 at GPE0010167 ("Decommissioning Cost Analysis for Maine Yankee Atomic Power Station," 14, ¶ 3 (Oct. 1997), submitted in In re Maine Yankee Atomic Power Company, Docket # ER98-570-00). CY's study assumed that the "Greater Than Class C waste disposal cost is not covered by the accrual of funds under the DOE's 1 mil/kWhr fuel surcharge." DX 89 at COF003033 ("Decommissioning Cost Study for Connecticut Yankee Nuclear Power Plant," 33 (Dec. 1996), submitted in In re Connecticut Yankee Atomic Power Company, Docket # ER97-913-000). YA's study stated that "the cost for GTCC waste disposal is assumed not to be covered by the [Nuclear] Waste Fund." DX 90 at YDK006647 ("Decommissioning Cost Study for Yankee Nuclear Power Station," 20 (March 21, 1995), submitted in In re Yankee Atomic Electric Company, Docket # ER95-835-00).

220. At the time of the formation of the Standard Contract, the Yankees understood that the definition of high-level waste set forth in the Nuclear Waste Policy Act of 1982 did not include GTCC radioactive waste. Tr. 3810:14-3811:2 (Grube); DX 102 at YDK013699 (memo from Mr. Grube to Mr. Soucy titled "Nuclear Waste Policy Act Fact Memorandum Sheet").

221. The DCSs submitted by Yankee Atomic in 1992 did not include any allocations for GTCC waste. Tr. 3834:7-11 (Grube).

222. Dr. Bartlett, former director of the Office of Civilian Radioactive Waste Management and the Yankees' testifying expert, admitted that GTCC waste, by definition, is not high-level radioactive waste and that the Standard Contract does not cover GTCC waste. Tr. 722:15-23 (Bartlett).

223. Dr. Bartlett acknowledged that the NRC has not required permanent isolation of GTCC waste and that GTCC waste has not been part of the design basis for the spent nuclear fuel repository. Tr. 723:8-13 (Bartlett).

C. DOE Has Not Yet Decided How It Will Dispose Of GTCC Waste

224. DOE has not yet decided how or when it will dispose of GTCC waste generated by nuclear utilities. Tr. 4378:2-16 (Huizenga, 2000-02); Tr. 4982:18-4983:15 (Bubar, 2002-2003); Robert Campbell Dep. 6/13/02, 76:11-19; 6/14/02, 393:3-9; 1/29/03, 565:14-25.

225. Before a decision can be made regarding how DOE will deal with commercial utility-generated GTCC waste, an Environmental Impact Statement must be completed. DOE must examine all of the options for disposal of GTCC waste, as well as the effects of each option upon the health and welfare of the public. Any decision regarding the ultimate disposal of commercial utility-generated GTCC waste would be based upon these analyses. Tr. 4982:18-4983:15 (Bubar).

226. Without an Environmental Impact Statement, a decision regarding the location at which nuclear utility-generated GTCC can be disposed cannot be made. Tr. 4989:8-23 (Bubar).

227. As of 2002, preparation of an Environmental Impact Statement for GTCC waste disposal had not yet begun. Tr. 4380:20-23 (Huizenga).

228. As of December 2003, preparation of an Environmental Impact Statement for GTCC had not yet begun. Tr. 4983:16-19 (Bubar). DOE had not begun the public scoping process required by the applicable regulations and had not yet determined the options that would be considered in the Environmental Impact Statement. Tr. 4984:19-4985:25 (Bubar).

229. DOE has not identified any location for the disposal of GTCC. Robert Campbell Dep. 6/13/02, 20:15 - 21:1.

D. DOE Does Not Currently Plan To Dispose Of Commercial Utility-Generated GTCC Waste In The Yucca Mountain Repository

230. GTCC radioactive waste is not one of the waste materials that DOE will accept pursuant to the Standard Contract. Tr. 3460:15-18 (Kouts).

231. Presently, DOE lacks the authority to dispose of GTCC radioactive waste in the permanent repository being developed pursuant to the NWPA, although Congress could provide for that in legislation. Susan Klein Dep. 4/25/02, 491:4-16; 437:1-5. Because it is not high-level radioactive waste, disposal of GTCC radioactive waste in the repository would require a change in existing legislation. Id.; Tr. 3460:23-3461:10 (Kouts); see DX 642 ("Absent such a Commission determination, the Department is not authorized under the NWPA to accept the GTCC waste for disposal in any geologic repository.").

232. The NRC has recognized that "additional legislation may be needed by DOE to provide for payment of disposal costs for above Class C wastes, or to authorize receipt of such wastes for disposal at a repository." 53 Fed. Reg. at 17,710.

233. The fees paid by the Yankee plaintiffs to the Nuclear Waste Fund are solely for the disposal of plaintiffs' SNF and HLW. These fees cannot be used for, and do not cover, the costs of disposal of plaintiffs' GTCC waste. See 42 U.S.C. § 10222(d) (Secretary "may make expenditures from the Waste Fund . . . only for purposes of radioactive waste disposal activities under subchapters I and II of this chapter"); see also Alabama Power Co. v. United States Dep't of Energy, 307 F.3d 1300 (11th Cir. 2002) (limiting use of NWF monies).

234. The Yankee plaintiffs did not present any evidence that they have paid the Government any fees for disposal of their GTCC waste pursuant to the Low-Level Radioactive Waste Policy Amendments Act of 1985.

a. Yankee Atomic assumed that payment for the disposal of GTCC waste was not covered by the Nuclear Waste Fund. DX 218 at YDK007541 (memo updating 1992 decommissioning study); Tr. 4638:1-10 (Buchheit).

b. In selecting a spent fuel scenario for use in its 1994 Decommissioning Cost Estimate, Yankee Atomic assumed "that the cost of GTCC LLW disposal is not paid from the Waste Fund and will be borne by Yankee." DX 220 at YDK006960; DX 362 ("Attached is a page from the Decommissioning Cost Study Update which states that the cost of GTCC waste disposal is assumed not to be covered by the Waste Fund."); DX 218 at YDK007541 ("It is assumed that payment for disposal is not covered by the Waste Fund."); DX 213 at GPE0010621; Tr. 4637:7-4638:10 (Buchheit).

c. In developing the cost estimates to be used in its 1992 Decommissioning Cost Study, Connecticut Yankee also assumed that the cost for GTCC disposal was not covered by the Waste Fund. DX 157 at CDB000192.

235. A fee structure would have to be developed to pay the additional costs associated with the disposal of GTCC waste in the repository. Tr. 3460:23-3461:10 (Kouts).

236. DOE is not designing the Yucca Mountain repository to accept GTCC radioactive waste generated by commercial nuclear facilities. Tr. 3460:19-22 (Kouts). Because DOE is not currently planning to dispose of GTCC radioactive waste in the repository, GTCC is not included in DOE's technical baseline documents for the repository. Tr. 3596:8-3597:1 (Kouts); DX 664.

237. The only commercial high-level radioactive waste that DOE plans to dispose of in the Yucca Mountain repository is the high-level radioactive waste that resulted from reprocessing at the West Valley site in New York. Tr. 3467:13-24 (Kouts); DX 664 at HQR2390055.

238. The Yankee plaintiffs understand that DOE has not decided to dispose of GTCC waste in the Yucca Mountain repository. In his letter dated January 3, 1995, J.K. Thayer, Vice President and Manager of Operations for Yankee Atomic, admitted to having misstated DOE's position upon the GTCC issue. Emphasizing the importance of the matter to Yankee Atomic, Mr. Thayer indicated his hope that DOE would ultimately decide to accept Yankee Atomic's GTCC waste for near-term temporary storage. However, Mr. Thayer stated:

> I understand the DOE has not concluded that GTCC waste should be co-located with spent fuel in the final repository. Rather, the DOE's assessment of the GTCC program strategy has strongly suggested the DOE should consider such a co-location. The input received during stakeholder meetings, which I understand are planned for the very near future, along with engineering studies already performed and the available reassessment reports, will be molded into a revised GTCC waste program strategy.

DX 793 at HQR0051281; see also DX 242 at YDK016089 (acknowledgment by Dr. Kadak that DOE was not planning to dispose of GTCC waste in the repository). Through this letter, Yankee Atomic requested near-term temporary storage for its GTCC. Tr. 4942:9-12 (Kadak). Yankee Atomic's request was never granted. Id. at 13-16.

239. In the Draft Mission Plan Amendment issued in September 1991, approved by Dr. Bartlett while he was Director of the Office of Civilian Radioactive Waste Management, DOE indicated that it was not then planning to accept commercial GTCC waste for disposal in the spent fuel repository. DX 141 at HQR0030800 and HQR0030999.

240. The Yankees understand that the repository is not being designed to accept GTCC waste and that, absent a legislative remedy, they will be required to store GTCC onsite for "a long, long time." DX 602 at YOF036215-16; Tr. 4944:4-4945:18 (Kadak); see also DX 242 ("The GTCC issue needs rather immediate attention since they are not now planning either to store it at the interim facility or to dispose of it at the repository.").

E. It Is Unknown Whether Disposal Of GTCC Waste In The Yucca Mountain Repository Is Technically Possible

241. The Yucca Mountain repository is currently limited by statute to accept no more than 70,000 metric tons of high-level waste materials for disposal. Tr. 3591:23-3592:1 (Kouts). Assuming that current applications for license extensions are granted, DOE projects that 130,000 metric tons of spent fuel will be generated. Tr. 3601:10-3602:2 (Kouts). It is unclear how many additional reactors will be licensed in the future. Assuming Congress lifts the current limit, the emplacement of low-level radioactive waste in the repository could take up the space that would otherwise be used for high-level radioactive waste generated in the future. Tr. 3591:20-3593:18 (Kouts).

242. Before DOE could make a technical determination as to whether DOE could dispose of nuclear utility GTCC waste in the Yucca Mountain repository, DOE must analyze, among other things, the amount of waste, the transportation effects associated with moving the waste to the repository, and the assumptions associated with where the waste might be placed spatially within the repository. Tr. 4382:14-4383:17 (Huizenga).

243. Before it could decide whether to dispose of GTCC radioactive waste in the Yucca Mountain repository, DOE would have to analyze the space limitations within that facility. Tr. 3461:11-14 (Kouts).

244. DOE could not simply place commercial utility-generated GTCC radioactive waste in the "backfill spaces" or "drifts" of the repository, without some kind of packaging and without additional analyses to ensure that Environmental Protection Agency ("EPA") standards are met. Without having performed these analyses, DOE does not know whether GTCC waste could be disposed of in the backfill spaces of the repository. Tr. 3463:8-3464:1 (Kouts).

245. DOE is not currently planning to put any kind of material in the backfill spaces. Tr. 3464:2-11 (Kouts). The emplacement of GTCC waste in the repository drifts would most likely require the drilling out of additional drifts. Tr. 3464:12-3465:16 (Kouts).

246. As the repository is currently being designed, DOE's placement strategy calls for a space of only 10 centimeters between the waste packages and the drifts. Tr. 3554:12-15 (Kouts).

247. Before it could decide whether to dispose of GTCC radioactive waste in the Yucca Mountain repository, DOE would have to determine how such waste would be packaged, where it would be packaged, and whether the surface facilities, as they are currently being designed, are capable of handling the waste. Tr. 3461:15-3462:4 (Kouts).

248. Assuming that GTCC radioactive waste could, theoretically, be disposed of in the Yucca Mountain repository, DOE would be required to perform a variety of additional technical analyses for the disposal of GTCC waste in the repository and supplement its submission to the Nuclear Regulatory Commission. Tr. 3460:23-3461:10 (Kouts).

F. Each Of The Yankees Possess GTCC Waste

249. Maine Yankee has been storing GTCC waste at its site "from the beginning." Tr. 6908:4-5) (Meisner).

250. Yankee Atomic possesses GTCC waste, which has been cut into pieces and placed into containers, dimensionally similar to fuel assemblies, which are placed in canisters. Tr. 1568:2-1569:23 (Bennett); see also DX 362; DX 218 at YDK007540-41.

251. Connecticut Yankee possesses GTCC waste, which, like Yankee Atomic's GTCC waste, has been cut into pieces to be placed into fuel-assembly-sized canisters, and placed in storage canisters. Tr. 2330:13-2332:1 (Bennett).

G. The Yankee Plaintiffs Cannot Fully Decommission Until Their GTCC Is Taken Off-Site

252. Until the Yankees plaintiffs' GTCC waste is removed from the Yankees' sites, the Yankees will not be able to completely decommission their facilities. Tr. 4958:19-23 (Kadak); see DX 15 at YDK009258 (delayed acceptance of GTCC waste would have "a significant impact on our ability to complete decommissioning of the Yankee Rowe plant . . .").

253. The Yankees have admitted that "[t]he ability to complete the dismantling of the Yankee plant depends as much on the removal of GTCC waste as it does on the timely removal of spent fuel to interim storage facilities." DX 793 at HQR0051281.

H. Commercial Utility Generated GTCC Waste Can Be And Is Being Stored Safely And Securely At Reactor Sites, Pending Future Disposal

254. A sealed source is a form of GTCC radioactive waste that consists of a small capsule of radioactive material in a large metal-shielded container, which ensures that only the appropriate amount of radioactivity can escape. Tr. 4387:18-4388:23 (Huizenga).

255. Within recent years, DOE has accepted orphaned or abandoned sealed source GTCC waste for storage at the Los Alamos National Laboratory in New Mexico. Tr. 4376:2-16 (Huizenga).

256. DOE has accepted orphaned or abandoned sealed sources at the request of the Nuclear Regulatory Commission, for security and safety reasons, especially where small operations no longer have a use for nuclear material and do not have a clear understanding of how the material should be stored. Tr. 4376:17-4377:5 (Huizenga).

257. The concerns expressed by the NRC regarding sealed sources were related to Homeland Security, because sealed sources were sometimes stored at unlicenced facilities or at facilities experiencing financial problems. Tr. 5040:15-5041:22 (Bubar). The NRC's concern with regard to dirty bombs and other terrorist-type events was an issue related to sealed source GTCC waste, and not nuclear utility generated GTCC waste. Tr. 4509:12-4510:2 (Huizenga).

258. DOE has not accepted nuclear utility generated GTCC waste for storage because that material is being safely and securely stored at the nuclear power plants. Tr. 4377:10-18 (Huizenga); see DX 583 at HQR0540043 ("This small volume of GTCC low-level waste is being managed safely under the standards and regulations of the Environmental Protection Agency and the Nuclear Regulatory Commission. The issue, therefore, is not one of safety considerations for continued storage of GTCC low-level waste, but of ultimately providing for safe disposal of such waste.").

259. The Graves model accounts for only the exchange of spent nuclear fuel, and not high-level waste or GTCC waste. Tr. 963:13-23 (Graves).

## X. FACTS RELATING TO THE STORAGE AND DISPOSAL OF OTHER THAN STANDARD FUEL, INCLUDING FAILED FUEL

260. The Standard Contract requires each contract holder to classify its SNF and/or HLW accurately, prior to delivery to DOE. It provides that "Purchaser shall use reasonable efforts, utilizing technology equivalent to and consistent with the commercial practice, to properly classify Spent Nuclear Fuel (SNF)." DX 6, 7, & 8, Art. VI.A.1(b) & App. E, ¶ A.1.

261. The Standard Contract provides for three fuel category identifications: (1) Standard Fuel; (2) Nonstandard Fuel; and (3) Failed Fuel. DX 6, 7, & 8, App. E, ¶ A.1. The Standard Contract further provides for three sub-classifications of Failed Fuel: (1) Class F-1: Visual Inspection (assemblies with visual evidence of structural deformities or damage to cladding or spacers which may require special handling); (2) Class F-2: Radioactive "Leakage" and (3) Class F-3: Previously Encapsulated Assemblies (assemblies encapsulated by Purchaser prior to classification). DX 6, 7, 8 App. E, Para. B.6.

262. Paragraph B.6(b) of Appendix E of the Standard Contract, "Previously Encapsulated Assemblies," states:

> Assemblies encapsulated by Purchaser prior to classification hereunder shall be classified as Failed Fuel--Class F-3. Purchaser shall advise DOE of the reason for the prior encapsulation of assemblies in sufficient detail so that DOE may plan for appropriate subsequent handling.

DX 6, 7, & 8, App. E, ¶ B.6(b).

263. DOE's obligation to dispose of SNF pursuant to the Standard Contract extends to other than Standard Fuel. DX 6, 7, & 8, Art. VI.A.2(b). However, DOE is not obligated by the Standard Contract to dispose of failed or non-standard fuel according to the same schedule as

Standard Fuel. Rather, the Standard Contract provides that, "for any SNF which has been designated properly as other than Standard Fuel, as that term is defined in Appendix E [to the Standard Contract], the [contract holder] shall obtain delivery and procedure confirmation from DOE prior to delivery." DX 6, 7, & 8, Art. VI.A.2(b). The Standard Contract further provides that "DOE shall advise Purchaser within sixty (60) days after receipt of such confirmation request as to the technical feasibility of disposing of such fuel on the currently agreed to schedule and any schedule adjustment for such services." DX 6, 7, & 8, Art. VI.A.2(b); see Tr. 4131:5-4132:18 (Zabransky); DX 702 at YAE001402 (Yankee acknowledgment that DOE may defer acceptance of failed fuel).

264. All three of the Yankee plaintiffs possess failed fuel, pursuant to the Standard Contract. Maine Yankee has at least 47 spent nuclear fuel assemblies that would be considered failed fuel pursuant to the Standard Contract. Tr. 3155:18-3156:12 (Meisner); see also DX 256 at MPA022575; DX 259 at COF006179-82; DX 354. Connecticut Yankee possesses fuel rods that are leaking. DX 266 at COF006431. Yankee Atomic possesses fuel rods that are severely damaged, some of which have broken into two pieces. Tr. 3857:20-3858:2 (Grube); see also DX 240 at YDK023008; DX 519; DX 574. These fuel rods are considered “grossly failed” fuel. Tr. 3858:3-10 (Grube). Yankee Atomic placed mesh bags around some of their broken fuel rods, to catch uranium pellets that had fallen out. Tr. 3859:20-3860:8 (Grube). In fact, Ivan Stuart, the Yankees’ technical expert, testified that all three Yankee plaintiffs have grossly failed fuel. Tr. 1421:17-23 (Stuart).

265. Because of restrictions upon the placement of failed fuel assemblies within a single canister, a maximum of four failed fuel assemblies may be loaded into any one canister. Tr. 3171:21-3172:10 (Meisner).

266. Failed fuel may, depending upon the nature of the failure, have to be treated with greater consideration than standard fuel, because such failed fuel potentially is more dangerous to the operators and could contaminate a facility. Tr. 720:25-721:17 (Bartlett).

267. Once failed or nonstandard fuel is identified by the utility and its condition described, DOE, before it can provide "delivery and procedure confirmation," must look at the available receipt facilities and equipment to verify that there are no issues associated with receiving the fuel. Tr. 4133:25-4134:11 (Zabransky).

268. To determine the "technical feasibility" of disposing of failed or nonstandard fuel, DOE must examine the physical capabilities at the facility and ensure that the facility has been licensed and analyzed for handling fuels in the condition described by the utility. Tr. 4134:12-22 (Zabransky). This determination must be made on a case-by-case basis, once the condition of a given assembly is known. Tr. 4134:23-4135:9 (Zabransky). This case-by-case analysis will take place after DOE has been asked by a utility to look at a specific type of failed fuel. Tr. 4135:10-16 (Zabransky).

269. After a utility has requested delivery and procedure confirmation from DOE for a specific instance of failed fuel, pursuant to the Standard Contract, DOE shall advise the utility within 60 days as to the technical feasibility of disposing of the fuel on the currently agreed to schedule, and any schedule adjustment for such services. DX 6, 7, 8 Art. VI.A.2(b); Tr. 4219:15-23 (Zabransky).

270. The special handling that may be required for acceptance of failed fuel includes more than just mechanical handling. Given the design of the Yucca Mountain repository, the integrity of the cladding itself may become a handling problem and must be analyzed. Tr. 4234:7-23 (Zabransky). There are also potential concerns with lack of spacers, torn grid straps, and any failures that might affect the overall integrity of an assembly. Until the repository is licensed and the capabilities of the facility are determined, DOE cannot know whether these concerns will be problematic for the acceptance of failed fuel. Tr. 4235:1-15 (Zabransky).

271. While DOE is obligated to accept failed fuel pursuant to the Standard Contract, DOE intends to make the decision regarding the order of acceptance of failed fuel based upon a utility's identification and description of the fuel, as required by the Standard Contract. Ronald Milner Dep. 5/7/02, 42:6-43:8, 5/8/02, 52:8-53:19; DX 6, 7, 8 Art. VI.A.1(b) & 2(a).

272. If failed fuel requires special handling, its acceptance by DOE may be delayed, as permitted by the Standard Contract. Ronald Milner Dep. 5/7/02, 40:12-19; 41:8-42:1, 42:6-25; 5/9/02, 52:8-53:19; Nancy Slater Dep. 6/13/02, 61:18-62:20.

272A. Yankee Atomic will incur the same operating and maintenance costs for the storage of SNF no matter how much SNF it is storing.

a. By letter dated April 25, 1994 to Daniel Dreyfus, then Director of OCRWM, Dr. Kadak admitted that the costs of operating a dry storage facility are independent of the size of that facility. Specifically, in a letter requesting that YA be granted priority acceptance because of its shutdown status, Dr. Kadak wrote:

> [B]ecause the operating costs for an at-reactor storage facility are largely independent of the capacity, maintaining the required infrastructure to support such a facility at the Yankee site for our

> relatively small quantity of SNF cannot be justified when the alternative of moving the SNF to another location exists within the parameters of our contract.

PX 285YA at HQR0110102. At trial, Dr. Kadak acknowledged that the "at-reactor storage facility" to which he was referring in the letter was an ISFSI on YA's site. Tr. 4900:15-18. Dr. Kadak confirmed his understanding that "the operating costs of such a facility [are] largely independent of the size of that facility . . . largely due to the security and the requirements for inspection." Tr. 4900:19-23; see Tr. 4900:24-4901:7 (Kadak: as long as there's some waste in the storage facility, the same operating costs would have to be incurred).

b. In a January 7, 1993 letter to the contracting officer requesting accelerated acceptance through the grant of shutdown priority, Mr. Buchheit explained:

> [B]ecause the operating costs for an at-reactor SNF storage facility (mini-MRS) are largely independent of the capacity of the facility, maintaining the required infrastructure and personnel to support a mini-MRS at Yankee site for Yankee's relatively small quantity of SNF cannot be justified when the alternative of moving the SNF to another location exists within the parameters of our contract.

DX 30.005 at YDK009076; see Tr. 4659:5-8 (Buchheit: the operating costs of a dry storage facility are independent of its size).

## XI. FACTS RELATING TO THE YANKEES' DECISIONS TO CONSTRUCT DRY STORAGE FACILITIES, WHICH WERE UNRELATED TO THE BREACH

### A. Each Of The Yankees Made A Business Decision To Shut Down Prematurely

#### i. Yankee Atomic

273. Yankee Atomic's original 40-year operating license was granted in 1960 and was not scheduled to expire until July 2000. DX 159 at YSB003465.

274. In response to the NRC's concerns about the safety of its reactor vessel, Yankee Atomic shut its plant down in October 1991. Tr. 2673:18-2674:8 (Heider); see Town of Norwood, Massachusetts v. Federal Energy Regulatory Commission, 80 F.3d 526, 528 (D.C. Cir. 1996).

275. After conducting a study that showed that the costs of restarting the plant and operating it through the remainder of its operating license exceeded the value of the energy that the plant would produce, Yankee Atomic's board of directors elected to close the plant permanently in February 1992, more than eight years before the expiration of its 40-year operating license, based on "economics." Tr. 1557:15-1558:19 (Bennett); see Town of Norwood, Massachusetts, 80 F.3d at 528.

276. Yankee Atomic elected to shutdown its plant before the expiration of its licensed operating life to save costs for its ratepayers. Tr. 1558:5-19 (Bennett); see Town of Norwood, Massachusetts, 80 F.3d at 528; see also Yankee Atomic Elec. Co., 65 F.E.R.C. ¶ 63,001, at 65,005 (1993) (ALJ Decision). Yankee Atomic estimated a total savings of $116 million to its customers based upon the decision to shutdown permanently. DX 246 at COF024030.

ii. Maine Yankee

277. Maine Yankee's original 40-year operating license was granted in 1968 and was not scheduled to expire until October 2008. Tr. 2736:4-6 (Thomas); Tr. 6239:11-18 (Jordan).

278. In August 1997, due to cable separation issues, Maine Yankee decided to permanently cease operations. Tr. 2739:10-20 (Thomas); see also Maine Yankee Atomic Power Company, 85 F.E.R.C. ¶ 61,122, at ¶ 61,559 (1998) (Order).

279. Maine Yankee determined that it would be more cost-effective to permanently shut down its facility than it would be to pay the cost of repair and continue operation. Tr. 2737:10-2641:20 (Thomas). Maine Yankee estimated that it would cost $190 million to replace its steam generators and involve a three year lead time for the necessary repairs. Tr. 2739:2-5 (Thomas). The decision to shutdown was made from a ratepayer point of view; that is, Maine Yankee determined that its ratepayers would be better served by a decision to cease operations. Tr. 2741:9-20 (Thomas).

iii. Connecticut Yankee

280. Connecticut Yankee's original 40-year operating license was not scheduled to expire until 2007. DX 156 at YDK008473; Tr. 3878:5-11 (Grube).

281. On December 4, 1996, Connecticut Yankee decided to retire its Haddam Neck nuclear generating unit with 10 years remaining on its operating license. DX 471 at GPE0021106.

282. Connecticut Yankee's decision to retire its plant was based on a 1996 study which showed that the retirement of the Haddam Neck nuclear plant and replacement of its power with power from other sources would save the ratepayers as much as $130 million. DX 471 (August 1998 FERC ALJ Decision) at GPE0021107.

B. The Yankees Understood That They Would Incur Extended SNF Storage Costs Regardless Of DOE's Delay

i. Yankee Atomic

283. Well before DOE indicated that it would be unable to begin SNF acceptance in 1998, Yankee Atomic understood that it would incur, and planned to incur, SNF storage costs

well into the future, even assuming timely performance by DOE, and planned for construction of dry storage facilities based upon those expectations. It explored dry storage in the early 1990's, in part, because it was projected to lose the full core reserve in its spent fuel pool by April 2000, several months prior to the expiration of Yankee Atomic's operating license. DX 140 at MOF022989, MOF022997.

284. In its February 1992 Decommissioning Cost Study,[13] Yankee Atomic planned to keep its SNF in wet storage for 30 months after expiration of its operating license in July 2000, at which time its SNF would be transferred to dry storage where it would remain for 19 years, assuming timely DOE performance. DX 159 at YSB003465, YSB003478; DX 160 at YDK042326 (assuming timely DOE performance, ISFSI must operate until 2018); id. at YDK042406-07 (recommendation that, if priority and exchanges are not obtained, Yankee Atomic should pursue dry storage).

a. Yankee Atomic assumed that, beginning in 1998, DOE would remove its SNF at the rate of acceptance that DOE had published in the 1991 ACR until the opening of a repository in 2010. DX 159 at YSB003497; Tr. 1704:21-1706:3 (Bennet).

b. Yankee Atomic assumed that DOE would remove the last SNF from its site in 2021. DX 159 at YSB003497; Tr. 1705:21-1706:3 (Bennet).

---

[13] In the decommissioning cost studies submitted to the Federal Energy Regulatory Commission ("FERC"), the Yankees describe their decommissioning plans and assumptions for the purpose of seeking to establish a just and reasonable rate for electricity to charge to ratepayers. 18 U.S.C. § 824d; 18 C.F.R. § 35.1 (2004); Tr. 1714:18-1715:9 (Bennett).

c. Yankee Atomic assumed that, at least for the first ten years of SNF acceptance, DOE would accept Yankee Atomic's SNF on an "oldest fuel first" acceptance queue basis. Tr. 1708:18-25 (Bennet).

d. Yankee Atomic did not assume that DOE would accord it priority in the acceptance of SNF because of its status as a shutdown reactor or that it would otherwise obtain accelerated acceptance of its SNF. Tr. 1709:3-18 (Bennet).

285. Later in 1992, after deciding to shut down permanently, Yankee Atomic planned to keep its SNF in wet storage until June 30, 1996, at which time its SNF would be transferred to dry storage casks where the assemblies would remain for up to 23 years, assuming timely DOE performance. DX 150 at YDK006389-90, YDK006408, YDK006433 (2018); DX 152 at YDK016757 (testimony by Mr. Mellor before FERC); Tr. 1716:7-22, 1720:1-15 (Bennet); Tr. 7722:12-22, 7723:23-7724:3 (Mellor).

a. Yankee Atomic assumed that, beginning in 1998, DOE would remove its SNF pursuant to the acceptance rates published in the 1991 ACR. DX 150 at YDK006433; DX 152 at YDK016757 (testimony by Mr. Mellor before FERC); Tr. 1720:16-1721:4 (Bennet); Tr. 7722:12-7723:4 (Mellor).

b. Yankee Atomic assumed that DOE would accept its SNF on an "oldest fuel first" basis during the first 10 years of SNF acceptance and did not assume that it would obtain any accelerated acceptance. Tr. 1721:5-16 (Bennet); Tr. 7728:4-17 (Mellor); DX 150 at YDK006389.

286. As of both October 1994 and March 1995, Yankee Atomic, assuming that DOE would begin acceptance of its SNF in 1998 and complete acceptance in 2018 in accordance with

the schedule published in the 1991 ACR, planned to transfer its SNF to dry storage by January 1, 2000, where it would remain until its SNF was completely removed by DOE by the end of 2018. DX 214 at YDK007868, YDK007875, YDK007891 (October 1994 Decommissioning Cost Study); DX 90 at YDK006632, YDK006648 (March 1995 Decommissioning Cost Study); see DX 397 at YDK007545-46 (assuming construction of ISFSI and DOE acceptance from 1998-2018).

ii. Connecticut Yankee

287. Well before DOE indicated that it would be unable to begin SNF acceptance in 1998, Connecticut Yankee understood that it would incur, and planned to incur, SNF storage costs well into the future, even assuming timely performance by DOE, and planned for construction of dry storage facilities based upon those expectations. In August 1992, as indicated in its August 1992 Decommissioning Cost Study, Connecticut Yankee planned to store its SNF through 2019, assuming that DOE would begin accepting SNF in 1998 in accordance with the schedule published in the 1991 ACR. DX 157 at CDB000159, CDB000185, CDB000192, CDB000196, CDB000205.

iii. Maine Yankee

288. Well before DOE indicated that it would be unable to begin SNF acceptance in 1998, Maine Yankee understood that it would incur, and planned to incur, SNF storage costs well into the future, even assuming timely performance by DOE, and planned for construction of dry storage facilities based upon those expectations. In 1991, Maine Yankee sought requests for proposals from eight dry cask vendors based upon the limited storage space in its wet pool. DX 140 at MOF022985, MOF022989.

289. In August 1993, before it decided to cease operations permanently, Maine Yankee, assuming that DOE would begin SNF acceptance in 1998 at a Monitored Retrievable Storage facility prior to opening a permanent repository in 2010 and would accept SNF on an "oldest fuel first" basis, planned to keep its SNF in wet storage until 2018. DX 196 at MPA010822, MPA010832, MPA01083, MPA010848, MPA010864 (August 1993 Decommissioning Cost Study); Tr. 2810:5-2812:12 (Thomas); see DX 197 (Maine Yankee memo regarding rationale for assumption of SNF removal by 2018).

C. The Yankees' Decisions To Construct Dry Storage Facilities Resulted From Their Decommissioning Goals, Which Were Derived From Their Need To Store Their SNF For An Extended Period Of Time, Not From DOE's Delay

290. A nuclear utility, after its reactor ceases operation, must decommission its reactor before its site can be used for other purposes. Tr. 2404:20-2405:4 (Bennet); DX 236 at CDB000082; DX 152 at YDK016746. A utility with a shut down nuclear reactor has two decommissioning options: (1) prompt decommissioning, which involves the decontamination and dismantlement of the plant structures in the short term, or (2) delayed decommissioning, which prolongs most activities until all the SNF has been removed from the site. See, e.g., DX 88 at GPE0010131-32; DX 89 at COF003001-02; DX 150 at YDK006388-89; Tr. 1560:1-25, (Bennet); Tr. 2742:19-2743:17 (Thomas). In order to decommission the entire facility, the Yankees believed that they must remove their SNF from the wet pool. Tr. 2402:4-7 (Bennet).

291. The presence of SNF in the spent fuel pool precludes decommissioning techniques, such as the use of demolition explosives, which cannot be used while the SNF is in a spent fuel pool because of the potential loss of spent fuel pool integrity or in physical damage to the SNF, while placing SNF in dry storage allows decommissioning activities to proceed

unimpeded. DX 741 at GPE0050476; DX 370 at MIR000557; DX 266 at COF006435, COF006439; DX 256 at MPA022595 (use of explosives instead of diamond wire cutting results in savings of $33.7 million); DX 236 at CDB000119; DX 157 at CDB000196; DX 88 at GPE0010189; Tr. 1563:20-1565:4, 1635:13-1636:19, 1768:23-1770:2 (Bennet); Tr. 7717:3-16 (Mellor); Tr. 2147:19-2151:22 (Heider); Tr. 2819:16-2821:21 (Thomas). In 1992, Yankee Atomic planned to transfer all of its SNF to dry storage by June 30, 1996, in part, so that decommissioning activities could proceed unhindered by spent fuel pool restrictions. DX 150 at YDK006408.

292. The Yankees believed that prompt decommissioning is significantly less costly than scenarios that involve longer time horizons for decommissioning, saving the utility potentially tens of millions of dollars, and the Yankees relied upon that fact in selecting prompt decommissioning. DX 150 at YDK006389; DX 159 at YSB003465-66; DX 157 at CDB000159; DX 236 at CDB000083; DX 89 at COF003004 (estimating approximately $165 million savings with prompt decommissioning); DX 196 at MPA010871 (estimating nearly $40 million savings with prompt decommissioning); DX 107 at CDB000344 (Connecticut Yankee concluding in 1987 that decommissioning should be done at least overall cost through "immediate dismantlement"); Tr. 1561:18-1562:11 (Bennet); Tr. 2743:20-24, 2744:19-2745:4 (Thomas).

293. Prompt decommissioning minimizes the significant risk that, with delayed decommissioning, the Yankees would be unable to dispose of the low-level radioactive waste ("LLW") that exists in the nuclear reactor, and the Yankees relied upon that fact in selecting prompt decommissioning. DX 150 at YDK006394; DX 159 at YSB003509; Tr. 1561:1-13, 1562:12-1563:19 (Bennet); DX 88 at GPE0010134; Tr. 2745:18-2746:5 (Thomas).

a. Decommissioning requires disposition of the LLW that was generated as a result of the nuclear reactor's production of nuclear power. See, e.g., DX 157 at CDB000206-07; DX 150 at YDK006443-44.

b. LLW disposal is a significant concern in the decommissioning process. DX 370 at MIR000556-58; DX 783 at MPA022468-69, MPA022474; DX 266 at COF006435 (Connecticut Yankee study noting ISFSI construction reduces LLW disposal risks); DX 246 at COF024034 ("significant dismantlement activities cannot proceed without sustained access to low level radioactive waste disposal facility); Tr. 1562:12-1563:11 (Bennet); Tr. 2748:13-20; 2752:3-6, 2813:24-2814:13, 2818:10-20 (Thomas); Tr. 3168:24-3170:19 (Meisner).

c. The availability of a LLW disposal site is a particular concern to the Yankees because the LLW disposal site in Barnwell, South Carolina, where each of the Yankees must send at least some LLW, is subject to policy changes, having closed to out-of-compact facilities in 1994 and 1995. DX 370 at MIR000556-7 (availability of LLW disposal site "is essential to the completion of decommissioning"); DX 266 at COF006462; Tr. 7714:22-7717:1 (Mellor); Tr. 4630:12-4632:4 (Buchheit); Tr. 2816:1-23, 2818:21-2819:8 (Thomas); Tr. 1575:7-1576:22, 1723:9-19, 1729:10-22 (Bennet); Tr. 3162:10-22 (Meisner).

i. Barnwell's long-term availability is uncertain and is scheduled to close to waste producers, like the Yankees, in 2008. DX 370 at MIR000556; DX 266 at COF006462; Tr. 1562:12-1563:11, 1574:16-1576:15 (Bennet); Tr. 2817:4-2818:9 (Thomas); Tr. 3160:14-18 (Meisner). However, Barnwell could close at any time and is currently scheduled to stop accepting waste from out-of-compact states in 2008. DX 266 at COF006462; Tr. 2817:8-11 (Thomas).

ii. Each of the Yankees possess some LLW for which, if it were not able to send its LLW to Barnwell, there is no currently available or currently anticipated disposal location. DX 266 at COF006462; DX 370 at MIR000556.

iii. Because of the lack of an available LLW disposal site, Yankee Atomic was once forced to pursue the delayed dismantlement decommissioning option. DX 214 at YDK007874; DX 150 at YDK006394; DX 152 at YDK016739-40, YDK016746-53; DX 246 at COF024034; Tr. 1722:9-13, 1723:6-1724:3 (Bennet).

d. LLW disposal costs represented a significant portion of the total cost of decommissioning:

i. Yankee Atomic: In 1992, Yankee Atomic estimated that the total cost of decommissioning would be $204,478,600, with the cost of LLW disposal estimated to be $22,340,000. DX 159 at YSB003486, 3510. Three months later, after to deciding to shut down permanently, Yankee Atomic estimated that the total cost of decommissioning would be $232,135,000, with the cost of LLW disposal representing $43,682,000 of that total. DX 150 at YDK006448. In October 1994, Yankee Atomic estimated that LLW disposal costs were at least $42 million, out of a total decommissioning expense of $341,170,689. DX 214 at YDK007865-7, YDK007877.

ii. Connecticut Yankee: In 1992, Connecticut Yankee estimated that out of the total decommissioning cost of $309,113,000, the cost of LLW disposal, exclusive of packaging and shipping costs, would be $57,785,000. DX 157 at CDB000209. Four years later, out of an estimated decommissioning cost of $426,700,000, Connecticut Yankee estimated that

LLW disposal costs, exclusive of packaging and shipping costs, would be $61,265,000. DX 89 at COF003004, COF003048.

iii. Maine Yankee: In August 1993, Maine Yankee estimated that, out of a total decommissioning cost of $316,622,600, LLW disposal costs, exclusive of packaging and shipping costs, would total $78.9 million. DX 196 at MPA010871. Four years later, Maine Yankee estimated increased decommissioning costs of $508,221,000, and increased LLW disposal costs, exclusive of packaging and shipping costs, totaling $83.3 million. DX 88 at GPE0010192.

e. The cost of LLW disposal has tended to increase over time. Tr. 1733:17-1734:4 (Bennet); Tr. 4631:20-4632:4 (Buchheit); Tr. 2815:5-19 (Thomas); DX 266 at COF006435.

f. Because of the increasing costs as well as the uncertain nature of future LLW disposal, the Yankees were motivated to dispose of their LLW as soon as possible. Tr. 1729:19-1730:20 (Bennet); Tr. 7714:18-7717:2 (Mellor); Tr. 2816:11-2819:11 (Thomas).

g. While a significant amount of LLW is generated by the dismantlement of the spent fuel pool, very little, if any, is generated by the demolition of a dry storage facility. DX 370 at MIR000556; DX 266 at COF006435, COF006439, COF006461-62, COF006465-66; Tr. 7714:22-7717:1, 7731:12-19 (Mellor); Tr. 4630:12-4632:4 (Buchheit); Tr. 2815:1-4, 2819:9 - 11 (Thomas).

294. Prompt decommissioning eliminates the risks associated with the continued presence of a long-term hazard, and the Yankees relied upon that fact in selecting prompt decommissioning. DX 150 at YDK006389; DX 159 at YSB003465-6; Tr. 1561:18-1562:11

(Bennet); DX 157 at CDB000159; DX 236 at CDB000083; DX 89 at COF003002; DX 196 at MPA010824; Tr. 2745:24-25 (Thomas).

295. Prompt decommissioning allows the utility to utilize the individuals who are familiar with the nuclear facility to support the decommissioning effort, and the Yankees relied upon that fact in deciding to pursue dry storage. DX 150 at YDK006389; DX 159 at YSB003465-66; Tr. 1561:1-8 (Bennet); DX 157 at CDB000159; DX 236 at CDB000083; DX 89 at COF003002; DX 196 at MPA010824; Tr. 2745:5-17 (Thomas).

296. Prompt decommissioning facilitates the re-use of the Yankees' sites. See DX 335 at YOF049432 (ISFSI more compatible with new gas-fired power plant than continued wet storage at Connecticut Yankee); DX 341 at GPE0011060 (ISFSI "increase[s] the possibility for future use of Connecticut Yankee site."); DX 342 at GPE0011063-64 (noting execution of agreement for development of new fast-fired power plant upon Connecticut Yankee's site); DX 152 at YDK016746; Tr. 2404:20-2405:4 (Bennet: presence of SNF in wet pool hindered development of new power plant on-site).

D. Economics Favors Dry Storage Over The Long Term

297. Analysis of the relative economics of wet storage versus dry storage involves a comparison of (1) higher operations and maintenance costs and the characteristically low initial capital expenditures of wet storage with (2) the lower operations and maintenance costs and characteristically high initial capital expenditure of dry storage. DX 370 at MIR000562; DX 266 at COF006421; Tr. 1757:20-1758:16, 2399:1-2401:11 (Bennet); Tr. 4931:24-4934:17 (Kadak); Tr. 7719:23-7721:6 (Mellor); Tr. 2750:6-2752:2 (Thomas).

298. Because the annual operating costs of maintaining a spent fuel pool are greater than the operating costs of storing SNF dry, the economics tend to favor dry storage as the storage period gets longer. DX 228 at YDK008374 (wet storage considerably more expensive than dry); Tr. 4934:6-17 (Kadak); Tr. 1757:20-1758:16, 2399:1-2401:11 (Bennet); Tr. 2751:12-2752:2 (Thomas).

299. Each of the Yankees performed studies comparing the costs associated with wet and dry storage:

a. Yankee Atomic

i. In a September 1992 study, Yankee Atomic assumed that its storage facility must be capable of operation at least until 2018, when DOE was scheduled to accept the last SNF from Yankee Atomic after beginning SNF acceptance in 1998. DX 160 at YDK042326; Tr. 2268:10-2276:11 (Heider).

ii. After concluding that storage would be required through 2018, the study recommended that Yankee Atomic begin the process of developing a custom concrete dry ISFSI system. DX 160 at YDK042405.

iii. In 1994, Yankee Atomic updated the 1992 study, still assuming that DOE would begin SNF acceptance in 1998 with a final fuel-out date of 2018. DX 218 at YDK007540-41. That study likewise concluded that dry storage was less expensive than continued wet storage. DX 218 at YDK007541.

b. Connecticut Yankee: Connecticut Yankee had at least two studies performed concerning cost comparisons of wet storage versus dry storage options. See DX 266,

DX 741. The later of the two studies showed an economic advantage to dry storage. DX 741 at GPE0050057-0059.

c. Maine Yankee: In November 1997, Raytheon Corporation completed a study for Maine Yankee that compared the overall costs of wet versus dry storage. DX 256. The study estimated that the cumulative costs of the two storage options became equal no later than the year 2008, after which time wet storage costs exceed costs associated with dry storage. DX 256 at MPA022598; see DX 268 at MPA009716 (costs of wet storage exceed those of dry storage by 2008).

## XII. FACTS RELATING TO THE YANKEES' DECISION TO STORE THEIR SNF IN CANISTERS

300. Pursuant to the Standard Contract, the Yankees are responsible for "all preparation, packaging, required inspections, and loading activities necessary for the transportation of SNF and/or HLW to the DOE facility." 10 C.F.R. § 961.11, Art. IV.A.2(a). Consequently, it is the responsibility of each of the Yankee plaintiffs to prepare its SNF and/or HLW for transport and disposal, which includes loading their fuel in NRC-approved containers. Id.

301. Each of the Yankee plaintiffs have elected to use dry storage for the long-term storage of their SNF, failed fuel, and GTCC:

a. Yankee Atomic elected to use the NAC-MPC storage system, designed by NAC International, for the storage of its SNF, failed fuel, and GTCC at its independent spent fuel storage installation ("ISFSI"). The NAC-MPC storage system uses a canister that holds 36 assemblies, which is then placed within a concrete storage cask. See DX 404 at YDK029229.

A canister, such as the one used by the NAC-MPC storage system, is also known in the industry as a multiple element sealed container ("MESC").

b. Connecticut Yankee elected to use the NAC-MPC storage system, designed by NAC International, for the storage of its SNF, failed fuel, and GTCC at its ISFSI. CY's NAC-MPC storage system also uses a MESC that holds 26 assemblies, which is then placed within a concrete storage cask. See DX 801A.

c. Maine Yankee elected to use the NAC-UMS storage system, designed by NAC International, for the storage of its SNF, failed fuel, and GTCC at its ISFSI. MY's NAC-UMS storage system uses a MESC that holds 24 assemblies, which is then placed within a concrete storage cask. See DX 801.

302. No provision of the Standard Contract requires that DOE must accept or dispose of MESCs. MESCs are not SNF, as defined by the Standard Contract. See DX 6, 7, 8 Art. I(18). MESCs are not HLW, as defined by the Standard Contract. See id., Art. I(12).

303. MESCs are not currently acceptable waste forms pursuant to the Standard Contract. Tr. 4124:12-17 (Zabransky). See DX 6, 7, 8 Appendix E; DX 198 at GPE0010596.

304. Acceptance by DOE of canistered fuel for disposal would require a change in the Standard Contract. Tr. 3599:19-3600:8 (Kouts); Tr. 4126:9-14 (Zabransky).

305. When each of the Yankees made the decision to use a storage/transportation system (at their respective ISFSIs) that required a MESC, each made that decision with the knowledge that the MESCs were not covered by the Standard Contract. During the ACR Issue Resolution Process in the late 1980s and early 1990s, Issue 023 was defined as follows: "Should Appendix E be amended to include multiple-element sealed containers (MESCs) as either

standard or nonstandard fuel?" PX 81 at CTR0011703; Tr. 4129:16-4130:13 (Zabransky). Contracting utilities recognized that MESCs were not covered by the Standard Contract's definition of "previously encapsulated fuel" and that an amendment to the Standard Contract would be necessary for DOE to accept MESCs. Tr. 4130:10-13 (Zabransky).

306. Until a waste package design has been certified by the NRC for use in the repository, it is speculation whether any canister being used by the utilities can be used for disposal in the repository. Tr. 3598:6-11 (Kouts).

307. In response to requests by contract holders, DOE in 2000 or 2001 began drafting criteria for the acceptance of canistered fuel in the repository. DOE reiterated that MESCs were not an acceptable waste form pursuant to the current contract and that contract holders would be required to seek modification of their contracts for the acceptance of MESCs. The draft criteria were never formalized. Tr. 4068:6-4069:9 (Pollog).

308. Before the Standard Contract could be modified to make MESCs an acceptable waste form, further technical analysis would be required. Based upon the design of the repository and the licensing process, there may be restrictions upon DOE's ability to receive certain types of canisters under certain conditions that must be factored into the development of such a contract modification. Tr. 4126:9-23 (Zabransky).

309. One of the issues that must be analyzed before the Standard Contract can be modified to make MESCs an acceptable waste is whether the canister is directly disposable or whether, instead, it will need to be reopened and repackaged upon receipt at the repository. Tr. 4128:5-12 (Zabransky).

310. Assuming the Standard Contract is modified to include MESCs, DOE has not decided upon what schedule MESCs would be accepted. Tr. 4128:13-17 (Zabransky).

311. Before a schedule for the acceptance of MESCs can be determined, DOE must acquire the license for the repository and determine whether there are any technical limitations upon DOE's ability to open cans or facility limitations upon the number of cans that can be opened at once. Tr. 4128:18-4129:2 (Zabransky).

312. If the Standard Contract is not amended to include MESCs as an acceptable waste form, the utilities will be required to remove their fuel onsite and place it in DOE-provided transportation casks. Tr. 4130:14-4131:4 (Zabransky).

313. According to the current design of the Yucca Mountain repository, there will be a facility where a MESC can be reopened, in order to remove the fuel inside for disposal. However, this activity is not being considered as a normal throughput activity. Tr. 4188:12-25 (Zabransky).

XIII. FACTS REGARDING THE DATE BY WHICH DOE ANTICIPATES IT WILL BE ABLE TO BEGIN SNF ACCEPTANCE FROM THE CONTRACT HOLDERS

314. DOE has publicly announced in the past that it "currently anticipates" the availability of a repository in 2010 and that it will be able to begin SNF acceptance at that time. PX 1952; DX 664; see Tr. 3486:4-9 (Kouts); Tr. 3978:20-22 (Pollog); Tr. 4169:16-19 (Zabransky). Nevertheless, circumstances could change that would allow or require DOE to perform prior to 2010. Specifically, Congress could enact legislation requiring DOE to construct and accept waste at a centralized interim storage facility in advance of the completion of Yucca Mountain. Tr. 3459:3-8; Tr. 3474:19-24; Tr. 3476:4-18 (testimony of Mr. Kouts regarding the

ability to deploy a facility "fairly rapidly" that would only store fuel). Congress has considered legislation that provided for these actions in the past. Tr. 3455:11-3459:2; see PX 254 at 15. Alternatively, Congress or the Nuclear Regulatory Commission could mandate that Federal funds be expended to purchase casks for storage of SNF for national security reasons, if circumstances warranted such action. Tr. 3459:15-3460:7. Congress could enact other laws, such as permitting SNF to be stored at other locations temporarily, that would allow DOE to begin SNF acceptance prior to 2010.

315. Congress continues to monitor issues related to the storage of SNF at nuclear utilities for reasons of national security:

> The Committee is not questioning the current safety and security of spent nuclear fuel stored at commercial sites in accordance with Nuclear Regulatory Commission criteria. The Committee does, however, believe that the safety and security of these materials will be enhanced the sooner they are placed in the underground repository at Yucca Mountain. After the events of September 11, 2001, the Committee believes it is more essential than ever to move aggressively to get the Yucca Mountain repository licensed, built, and operating at the earliest possible date.

PX 1889 at PA-227415 (H.R. Rep. 108-212).

316. Several nuclear utilities, including Indiana Michigan, have argued that DOE is not likely to perform at Yucca Mountain in 2010, but, rather, will be delayed by the licensing process. See, e.g., Indiana Michigan Power Co. v. United States, 60 Fed. Cl. 639, 643 (2004).

## XIV. NEITHER CONNECTICUT YANKEE OR MAINE YANKEE HAVE PAID THE ONE-TIME FEE OWED PRIOR TO THE BEGINNING OF WASTE ACCEPTANCE

317. Article VIII(B) of the Standard Contract, which was included in each of the Yankees' Standard Contract, included the following contract language:

2. For SNF discharged prior to April 7, 1983, and for in-core burned fuel as of 12:00 A.M. April 7, 1983, the Purchaser shall, within two (2) years of contract execution, select one of the following fee payment options:

(a) Option 1 – The Purchaser's financial obligation for said fuel shall be prorated evenly over forty (40) quarters and will consist of the fee plus interest on the outstanding fee balance. The interest from April 7, 1983, to date of the first payment is to be calculated based upon the 13-week Treasury bill rate, as reported on the first such issuance following April 7, 1983, and compounded quarterly thereafter by the 13-week Treasury bill rates as reported on the first such issuance of each succeeding assigned three-month period. Beginning with the first payment, interest is to be calculated on Purchaser's financial obligation plus accrued interest, at the ten-year Treasury note rate in effect on the date of the first payment. In no event shall the end of the forty (40) quarters extend beyond the first scheduled delivery date as reflected in the DOE-approved delivery commitment schedule. All payments shall be made concurrently with the assigned three month period payments. At any time prior to the end of the forty (40) quarters, Purchaser may, without penalty, make a full or partial lump sum payment at any of the assigned three month period payment dates. Subsequent quarterly payments will be appropriately reduced to reflect the reduction in the remaining balance in the fee due and payable. The remaining financial obligation, if any, will be subject to interest at the same ten-year Treasury note rate over the remainder of the ten year period.

(b) Option 2 – The Purchaser's financial obligation shall be paid in the form of a single payment anytime prior to the first delivery, as reflected in the DOE approved delivery commitment schedule, and shall consist of the fee plus interest on the outstanding fee balance. Interest is to be calculated from April 7, 1983, to the date of the payment based upon the 13-week Treasury bill rate, as reported on the first such issuance following April 7, 1983, and compounded quarterly thereafter by the 13-week Treasury bill rates as reported on the first such issuance of each succeeding assigned three-month period until payment.

(c) Option 3 – The Purchaser's financial obligation shall be paid prior to June 30, 1985, or prior to two (2) years after contract execution, whichever comes later, in the form of a single payment and shall consist of all outstanding fees for SNF and in-core fuel

> burned prior to April 7, 1983. Under this option, no interest shall be due to DOE from April 7, 1983, to the date of full payment on the outstanding fee balance.

DX 6, 7, & 8, Art. VIII.B.2; see 10 C.F.R. § 961.11, Art. VIII.B.2.

318. Although Yankee Atomic elected to pay its one-time fee pursuant to Option 3 and has already paid the entirety of that fee, Tr. 3942:17-18, both Connecticut Yankee and Maine Yankee elected to pay their one-time fees pursuant to Option 2, requiring them to pay the entirety of that fee "prior to the first delivery, as reflected in the DOE approved delivery commitment schedule . . . ." Tr. 3942:19-3943:1; Tr. 3943:10-15; DX 6 & 8, Art. VIII.B.2. To date, neither Connecticut Yankee nor Maine Yankee have paid their one-time fee. Tr. 3942:19-3943:7; Tr. 3943:10-19; DX 802.

319. The principal amount of the one-time fee that Connecticut Yankee owes is $48,726,402.11. DX 802. As of June 30, 2004, Connecticut Yankee's outstanding one-time fee, with accrued interest calculated pursuant to Article VIII.B.2, is $153,430,144.65. DX 802; Tr. 3943:2-7 (Pollog).

320. The principal amount of the one-time fee that Maine Yankee owes is $50,393,966.02. DX 802. As of June 30, 2004, Maine Yankee's outstanding one-time fee, with accrued interest calculated pursuant to Article VIII.B.2, is $159,058,215.74. DX 802; Tr. 3943:16-19 (Pollog).

## XV. FACTS RELATING TO THE YANKEES' BAD FAITH CLAIM

321. The Yankees did not introduce any evidence or testimony at trial that any individual within the Department of Energy or any other Federal agency had a specific intent to injure the Yankees in negotiating, drafting, or implementing the Standard Contract.

322. The Yankees did not introduce any evidence or testimony at trial that any individual within the Department of Energy or any other Federal agency delayed accepting the Yankees' SNF and/or HLW because of a specific intent to injure the Yankees.

XVI. FACTS RELATING TO THE YANKEES' TAKINGS CLAIMS

323. The Yankees did not introduce any testimony or evidence at trial that, prior to their execution of the Standard Contract, DOE had any obligation to accept or dispose of any of their SNF or to accept it by any particular date.

324. Any obligation that DOE has to accept and dispose of the Yankees' SNF and/or HLW was created pursuant to the Standard Contract. See 42 U.S.C. § 10222(a).

325. Prior to trial, the Yankees abandoned their claims for damages under the Fifth Amendment to the United States Constitution seeking to recover the fair rental value of their real property, and, at trial, they introduced no evidence of the fair rental value of any of their real property.

326. The only evidence that Yankee Atomic and Connecticut Yankee introduced to establish the fair market value of their real property lacks any proper foundation. Tr. 1681:5-1688:13 (Bennet: testifying, over defendant's objection, regarding value of Yankee Atomic's real property based upon his review of tax assessment records); PX 1729YA; Tr. 2387:1-2389:7 (Bennet: testifying, over defendant's objection regarding value of Connecticut Yankee's real property based upon his review of real property appraisals that others had performed, but in which he had not had any involvement); PX 1729CY (real property appraisals admitted, even though appraisers did not testify at trial).

## XVII. THE COSTS OF THE YANKEES' RERACKING ARE NOT RELATED TO THE BREACH

### A. Maine Yankee

327. Maine Yankee's re-racking was performed in 1996 to avoid the loss of full core reserve in Maine Yankee's spent fuel pool that year. Therefore, the reracking would have been performed notwithstanding the breach. Tr. 5430:20-5434:21; 5437:10-11 (Abbott - Slide 27).

a. There was an operational need for Maine Yankee to maintain or reserve space in the spent fuel pool for 217 assemblies ("full core reserve") so that it could offload all of the assemblies from the core. Tr. 5430:20-5431:20 (Abbott - Slide 27); 6229:6-18 (Jordan).

b. In 1992, Maine Yankee concluded that it would lose full core reserve capability in its spent fuel pool "after the cycle 15/16 refueling outage in 1996." In that report, Maine Yankee estimated that it would only have 152 spaces available in which to offload fuel at that point in 1996. Tr. 5431:21-5432:1; 5432:6-23 (Abbott - Slide 27); DX 151.

c. In 1993, Maine Yankee concluded that it would lose full core reserve capability in its spent fuel pool "after the cycle 15/16 refueling outage in 1996." In that report, Maine Yankee estimated that it would only have 164 spaces available in which to offload fuel at that point in 1996. Tr. 5431:21-5432:1; 5432:24-5434:2 (Abbott - Slide 27); DX 189. See also DX 204.

d. Even under the best circumstances, the maximum amount of spaces it was projecting to have in its pool by 1998 was 96, or 121 spaces less than what was necessary to preserve full core reserve capability. Tr. 5432:2-3 (Abbott - Slide 27).

e. Under its license, Maine Yankee had the ability to place a temporary rack with a capacity to hold 121 assemblies in the cask laydown area of its spent fuel pool. Maine

Yankee claims that it could have avoided the loss of full core reserve in the non-breach scenario by the use of a temporary rack with a capacity of only 30 assemblies. Tr. 2850:11-13; 2870:17-2871:14 ; 2872:5-8 (Whittier). Maine Yankee's claim includes a non-breach credit of $115,000 to its damage claim based upon the cost of this temporary rack. Tr. 5435:7-8 (Abbott - Slide 28); 2875:13-23 (Whittier).

f. However, the temporary rack did not have enough spaces to resolve Maine Yankee's storage problem. Moreover, it would have cost more than the $115,000 that Maine Yankee credited to its claim to design a temporary rack with sufficient space and that could be fitted into the cask laydown area of Maine Yankee's spent fuel pool. Placing a temporary rack in the cask laydown area also would have been operationally risky because it would have made it impossible to move fuel out of the spent fuel pool. Tr. 6235:3-24 (Jordan). Therefore, the use of the temporary rack was not a viable or plausible solution to Maine Yankee's loss of full core reserve in the non-breach scenario. Tr. 5434:22-5437:14 (Abbott - Slides 28 and 29).

B. <u>Connecticut Yankee</u>

328. Connecticut Yankee's re-racking was performed in 1996. Tr. 2307:1-5 (Bennet-CY). The reracking would have been performed notwithstanding the breach. Tr. 5493:1-5496:3 (Abbott-Slide 45).

a. The reactor core at Connecticut Yankee held 157 assemblies. PX 286CY at B20 of 50. Connecticut Yankee reserved space in the wet pool for 157 assemblies ("full core reserve") in order to offload all of the assemblies from the core in the event maintenance needs to be done on the reactor vessel. Tr. 5430:20-5431:20; 5492:22-5493:3 (Abbott-Slide 45).

b. In 1992, Connecticut Yankee concluded that it would lose full core reserve capability in its spent fuel pool in 1995 or 1996. Tr. 5493:5-5494:3 (Abbott-Slide 45).

c. In an internal design change request for performing the re-racking, Connecticut Yankee concluded that it would lose full core reserve capability in its spent fuel pool after the cycle 19 refueling outage in 1996. Tr. 5494:4-5496:3 (Abbott-Slide 45); PX 286CY at A1 of 1 (states that loss of full core reserve capability will occur after the Cycle 19 refueling outage); PX 287CY at 5-19 (states that the Cycle 19 refueling will occur in September 1996).

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

s/ David M. Cohen
DAVID M. COHEN
Director

s/ Harold D. Lester, Jr.
HAROLD D. LESTER, JR.
Assistant Director
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tele: (202) 305-7562
Fax: (202) 307-2503

OF COUNSEL:

JANE K. TAYLOR
Office of General Counsel
U.S. Department of Energy
1000 Independence Ave., S.W.
Washington, D.C. 20585

KEVIN B. CRAWFORD
JOHN C. EKMAN
HEIDE L. HERRMANN
R. ALAN MILLER
RUSSELL A. SHULTIS
MARIAN L. SULLIVAN
SONIA ORFIELD
STEPHEN FINN
Commercial Litigation Branch
Civil Division
Department of Justice
Washington, D.C. 20530

November 22, 2004

Attorneys for Defendant

CERTIFICATE OF FILING

I hereby certify that, on this 22th day of November 2004, a copy of foregoing "CORRECTED COPY DEFENDANT'S PROPOSED FINDINGS OF FACT" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ R. Alan Miller