IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| YANKEE ATOMIC ELECTRIC COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | No. 98-126 C<br>(Senior Judge Merow)<br><br>Filed electronically: January 13, 2005 |

YANKEE ATOMIC'S RESPONSE TO
THE GOVERNMENT'S POST-TRIAL LEGAL BRIEF

JERRY STOUCK
Spriggs & Hollingsworth
1350 I Street, N.W., Ninth Floor
Washington, D.C. 20005
(202) 898-5800
(202) 682-1639

Counsel for Plaintiff,
YANKEE ATOMIC ELECTRIC COMPANY

Of Counsel:

Robert L. Shapiro
SPRIGGS & HOLLINGSWORTH

January 13, 2005

## Table of Contents


**Page**

I. The Court Should Reject The Government's "Schedule Issue" Arguments – Again..........4

II. The Court Should Reject The Government's Criticisms Of Mr. Graves – Again...............8

III. The Government's Causation Arguments Are Factually And Legally Wrong..................16

IV. The Yankees Have Met Their Burden Of Proof To Show Damages................................23

V. The Court Should Reject The Government's Shutdown Priority Arguments – Again......24

VI. The Court Should Reject The Government's Arguments On Pre-Breach And Future Damages – Again..........................................................................................................26

VII. The Court Should Reject The Government's GTCC Waste Arguments – Again. ............29

VIII. The Government's Failed Fuel And Multi-Purpose Canister Arguments Are Contractually And Factually Wrong......................................................................37

IX. The Court Has No "Discretion" To Deny The Yankees The Damages They Have Incurred, And No Reason To Deny Those Damages........................................................41

X. The Court Should Reject The Government's Objections To The Yankees' Takings Claims – Again. ..............................................................................................................43

XI. The Government's Good Faith And Fair Dealing Argument Is Legally And Factually Wrong. ..........................................................................................................................47

XII. The Government Has No Right To Collect, Or Even Claim, Pre-1983 Fees. ...................49

# TABLE OF AUTHORITIES

**Page**

## Cases

*Allegre Villa v. United States,* 60 Fed. Cl. 11 (2004) .................... 44

*Am-Pro Protective Agency, Inc. v. United States*, 281 F.3d 1234 (Fed. Cir. 2002) .............. 47, 48

*Armijo v. United States*, 229 Ct. Cl. 34, 663 F.2d 90 (1981).................... 46

*Bass Enterprises Production Co. v. United States*, 133 F.3d 893 (Fed. Cir. 1998).................... 47

*B-E-C-K Constructors v. United States,* 215 Ct. Cl. 793, 571 F.2d 25 (1978).................... 5

*Bluebonnet Savings Bank, F.S.B. v. United States*, 339 F.3d 1341 (Fed. Cir. 2003).................... 41

*Branhill Realty Co. v. Montgomery Ward & Co.*, 60 F.2d 922 (2d Cir. 1932) .................... 6

*Brinson v. Linda Rose Joint Venture*, 53 F.3d 1044 (9th Cir. 1995) .................... 9

*Brooke Group, Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209 (1993).................... 13

*Chain Belt Co. v. United States*, 127 Ct. Cl. 38, 115 F. Supp. 701 (1953).................... 17, 36

*Cienega Gardens v. United States*, 194 F.3d 1231 (Fed. Cir. 1998) .................... 45

*Cienega Gardens. v. United States*, 331 F.3d 1319 (Fed. Cir. 2003) .................... 45

*Commonwealth Edison Co. v. United States*, 56 Fed. Cl. 652 (2003).................... 1, 2, 4, 6

*Demutiis v. United States*, 48 Fed. Cl. 81 (2000) .................... 31

*Dolphin Tours, Inc. v. Pacifico Creative Service, Inc.*, 773 F.2d 1506 (9th Cir. 1985) ......... 13, 14

*Energy Capital Corp. v. United States*, 302 F.3d 1314 (Fed. Cir. 2002).................... 11, 28, 35

*Essex Electro Engineers, Inc. v. Danzig*, 224 F.3d 1283 (Fed. Cir. 2000) .................... 49

*Fawick Corp. v. United States*, 149 Ct. Cl. 623, 1960 WL 8478 (1960).................... 21

*Florida Power & Light Co. v. Westinghouse Electric Corp.*, 826 F.2d 239 (4th Cir. 1987)........ 44

*Franconia Associates v. United States,* 536 U.S. 129 (2002).................... 45

*Gadsden v. United States,* 111 Ct. Cl. 487, 78 F. Supp. 126 (1948) .................... 48

*Hendler v. United States*, 952 F.2d 1364 (Fed. Cir. 1991) .................... 46

*Hi-Shear Technology Corp. v. United States*, 356 F.3d 1372 (Fed. Cir. 2004).................... 24

*Hughes Communications Galaxy, Inc. v. United States*, 271 F.3d 1060 (Fed. Cir. 2001) ........ 6, 22, 41

*Indiana Michigan Power Co. v. United States,* 57 Fed. Cl. 88 (2003) ........ 6

*International Ore & Fertilizer Corp. v. SGS Control Services, Inc.*, 38 F.3d 1279 (2d Cir. 1994) ........ 42

*Kalvar Corp., Inc. v. United States,* 211 Ct. Cl. 192, 543 F.2d 1298 (1976) ........ 48

*Ketchikan Pulp Co. v. United States*, 20 Cl. Ct. 164 (1990) ........ 27

*Knotts v. United States,* 128 Ct. Cl. 489, 121 F. Supp. 630 (1954) ........ 48

*Librach v. United States,* 147 Ct. Cl. 605, 1959 WL 7633 (1959) ........ 48

*Locke v. United States*, 283 F.2d 521 (Ct. Cl. 1960) ........ 12

*Long Island Savings Bank, FSB v. United States,* 60 Fed. Cl. 80 (2004) ........ 17

*Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419 (1982) ........ 45, 46

*McKay v. United States*, 199 F.3d 1376 (Fed. Cir. 1999) ........ 46

*Minnesota v. NRC,* 602 F.2d 412 (D.C. Cir. 1979) ........ 44

*Mobil Oil Exploration & Producing Southeast, Inc. v. United States*, 530 U.S. 604 (2002) ........ 35

*Myerle v. United States*, 33 Ct. Cl. 1, 1800 WL 2024 (1897) ........ 24

*National By-Products, Inc. v. United States*, 186 Ct. Cl. 546, 405 F.2d 1256 (1969) ........ 6

*Northern Helex Co. v. United States*, 225 Ct. Cl. 194, F.2d 557 (1980) ........ 28

*Orange Cove Irrigation District v. United States*, 28 Fed. Cl. 790 (1993) ........ 39

*Pacific Far East Line, Inc. v. United States*, 184 Ct. Cl. 169, 394 F.2d 990 (1968) ........ 39

*Perini Corp. v. Greate Bay Hotel & Casino, Inc.*, 610 A.2d 364 (N.J. 1992) ........ 42

*Porter v. Resor*, 415 F.2d 764 (10th Cir. 1969) ........ 46

*Ramsey v. United States*, 121 Ct. Cl. 426, 101 F. Supp. 353 (1951) ........ 24

*Reliance Cooperage Corp. v. Treat*, 195 F.2d 977 (8th Cir. 1952) ........ 17, 26

*Roedler v. DOE*, 255 F.3d 1347 (Fed. Cir. 2001) ........ 47

*Roseburg Lumber Co. v. Madigan*, 978 F.2d 660 (Fed. Cir. 1992) ........ 14

*San Carlos Irrigation & Drainage District v. United* States, 111 F.3d 1557 (Fed. Cir. 1997) ..... 21, 24, 41

*Shockley v. Arcan, Inc.*, 248 F.3d 1349 (Fed. Cir. 2001) ..... 12

*Skip Kirchdorfer, Inc. v. United States*, 6 F.3d 1573 (Fed. Cir. 1993) ..... 46

*Southern California Edison Co. v. United States,* 226 F.3d 1349 (Fed. Cir. 2000) ..... 30

*Southern Nuclear Operating Co. v. United States*, No. 98-614C (Fed. Cl. Apr. 7, 2004) ..... 44

*Southern Nuclear Operating Co. v. United States*, No. 98-614C (Fed. Cl. Dec. 20, 2004) ..... 29

*Struck Construction Co. v. United States,* 96 Ct. Cl. 186, 1942 WL 4411 (1942) ..... 48

*Tal'Wi-Wi Ranches v. United States*, 156 Ct. Cl. 700 (1962) ..... 46

*Tennessee Valley Authority v. United States*, 60 Fed. Cl. 665 (2004) ..... 17, 26

*Tretina Printing, Inc. v. FitzPatrick & Associates, Inc.*, 640 A.2d 788 (1994) ..... 42

*Trinidad Bean & Elevator Co. v. Frosh*, 494 N.W.2d 347 (Neb. Ct. App. 1992) ..... 18

*Turner Construction Co. v. United States*, 367 F.3d 1319 (Fed. Cir. 2004) ..... 30

*United States v. Ohio Edison Co.*, 276 F. Supp. 2d 829 (S.D. Ohio 2003) ..... 15, 16

*United States v. Winstar Corp.*, 518 U.S. 839 (1996) ..... 35, 47

*Weisgram v. Marley Co.*, 528 U.S. 440 (2000) ..... 13

*Willems Industries, Inc. v. United States*, 155 Ct. Cl. 360, 295 F.2d 822 (1961) ..... 23

*Yankee Atomic Electric Co. v. United States*, 42 Fed. Cl. 223 (1998) ..... 43, 44

*Yankee Atomic Electric Co. v. United* States, No. 98-126, 2004 WL 1535686 (Fed. Cl. June 28, 2004) ..... passim

*Yankee Atomic Electric Co. v. United* States, No. 98-126, 2004 WL 1535687 (Fed. Cl. June 28, 2004) ..... passim

*Yankee Atomic Electric Co. v. United* States, No. 98-126, 2004 WL 1535688 (Fed. Cl. June 28, 2004) ..... passim

**Statutes**

42 U.S.C. § 10222(a)(4) (2000) ..... 7

42 U.S.C. § 2021c(b)(1) (2000) ..... 32

**Regulations**

48 Fed. Reg. 16590 (Apr. 18, 1983) .......... 25

**Other Authorities**

3 Dan B. Dobbs, *Law of Remedies*, § 12.2 (2d ed. 1993) .......... 36

24 Richard A. Lord, *Williston on Contracts* § 66:74 (4th ed. 2002) .......... 35

Restatement (Second) Contract § 204 (1981) .......... 5

Restatement (Second) of Contract § 205 (1981) .......... 39, 49

Restatement (Second) Contract § 350 (1981) .......... 16, 18, 27

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| YANKEE ATOMIC ELECTRIC COMPANY,<br>Plaintiff,<br>v.<br>UNITED STATES OF AMERICA,<br>Defendant. | No. 98-126 C<br>(Senior Judge Merow) |

**YANKEE ATOMIC'S RESPONSE TO**
**THE GOVERNMENT'S POST-TRIAL LEGAL BRIEF[1]**

Under the post-trial briefing schedule established by the Court, the government's initial post-trial brief represents the government's own best view of the case in light of all the trial evidence. In that context, it is notable that the government devotes most of its brief (about 60 pages, from pp. 7-73, except pp. 58-64) to arguments that the Court already rejected in its pretrial rulings:

-- that the Yankees' contracts (each, a "Contract") with the Department of Energy ("DOE") "provide[ ] a specific mechanism for defining the schedule" for acceptance of spent nuclear fuel and high-level radioactive waste ("HLW") (collectively, "SNF"), Initial Gov't Br. at 22. *See Commonwealth Edison Co. v. United States*, 56 Fed. Cl. 652, 663 (2003), "adopted here" by Order of June 26, 2003 (rejecting government's theory that Contracts contain a "mechanism" for defining SNF pickup schedule);

---

1 This brief responds to the government's initial post-trial brief on behalf of all three Yankee plaintiffs, and, accordingly, should also be deemed applicable to *Connecticut Yankee Atomic Power Co. v. United States*, No. 98-154C and *Maine Yankee Atomic Power Co. v. United States*, No. 98-474C.

-- that the Contracts "provide DOE with the option of selecting any one of numerous potential acceptance scenarios," Initial Gov't Br. at 19. *See Commonwealth Edison*, 56 Fed. Cl. at 667 (rejecting theory that DOE may select schedule, and concluding instead that "[t]he court will, as it is required to do, determine the missing acceptance rate term in further proceedings" (citation omitted));

-- that DOE's Contract obligations are limited to acceptance of spent fuel described in an approved delivery commitment schedule ("DCS"), Initial Gov't Br. at 17 ("the *maximum* rate that [the Court] can identify should be by reference to the DCSs that the Yankees submitted and DOE approved"). *See Commonwealth Edison,* 56 Fed. Cl. at 663 (rejecting government's theory);

-- that the Court should disregard entirely the analysis and opinions of Frank Graves, because for various reasons his model is not "perfect," *see* Initial Gov't Br. at 30, and because the Yankees have provided no evidence of any actual exchange of DOE acceptance allocations, *id*. at 23-24. *See* Order of June 28, 2004, 2004 WL 1535686 at *5-*7 (denying motions *in limine*) (rejecting government arguments);

-- that the Yankees' pre-breach and future damages are precluded as a matter of law, Initial Gov't Br. at 64-73. *See* Order of June 28, 2004, 2004 WL 1535688 (denying motion *in limine*) (rejecting government's arguments);

Because the government's brief dwells on these rejected arguments, the government never comes to grips with the basic facts giving rise to the Yankees' damages claims. Those facts are straightforward and essentially undisputed:

-- beginning in the early 1990s, it became well known in the nuclear industry that DOE would not begin Contract performance by the 1998 deadline imposed by the Contracts, or likely

for many years thereafter, *see, e.g.,* Yankee Atomic Post-Trial Proposed Findings of Fact ("YAPF") 91-96;

-- DOE in fact did not meet the 1998 deadline; it currently projects 2010 as the earliest date it will perform, and most informed observers expect a much later start-date, *see, e.g., id.* 90, 164;

-- each of the Yankees has had to store its SNF on site for an extended period of time – at least twelve-years longer than if DOE had timely performed, given DOE's conceded twelve-year "delay." *see, e.g., id.* 96-112;

-- upon due deliberation, the Yankees determined to provide for extended on-site SNF storage by first (at Connecticut Yankee and Maine Yankee only) expanding their spent fuel pools through reracking and by constructing a dry storage facility, *see, e.g., id.* 96-105; Connecticut Yankee's Post-Trial Proposed Findings of Fact ("CYPF") 96-99 (re dry storage), 117 (re reracking); Maine Yankee's Post-Trial Proposed Findings of Fact ("MYPF") 118-123 (re reracking); and

-- each of the Yankees has already spent many tens of millions of dollars on their on-site SNF storage arrangements, and will be required to spend enormous additional sums to operate the dry storage facilities until (if ever) their SNF is removed by DOE, *see, e.g.,* YAPF 139-145, 156-159.

The government's brief does not address these crucial damages facts. And, largely for that reason, the government's legal discussion is completely misguided. The government does not mention foreseeability or reasonable certainty, two of the three legal elements the Yankees must establish in order to recover their damages. *See* Yankee Atomic's Initial Post-Trial Legal Brief ("Initial YABr.") at 3-5, 12-15. As for causation – the third element the Yankees must

establish – the government's brief addresses the issue without so much as acknowledging the most relevant damages facts, namely that Yankee Atomic has already spent more than $100 million to implement dry storage (and Connecticut Yankee and Maine Yankee have spent nearly as much), because each company determined that dry storage was the best way to store their SNF for an extended period, as is clearly required. Rather than address these crucial – and undisputed – facts, which go directly to the question of what *caused* the Yankees to incur these damages, the government's causation discussion focuses on the contours of the government's Contract obligations and the details of Mr. Graves' economic sequence model. *See* Initial Gov't Br. at 7-23, 23-53, 58-71.

The Yankees address below the hodge-podge of largely-discredited arguments that the government has offered in attempting to avoid the compelling damages facts and the real legal issues.

I. <u>The Court Should Reject The Government's "Schedule Issue" Arguments – Again.</u>

In the first major section of its brief the government reprises its pretrial motion on the rate of acceptance issue. It argues first, in various ways, that no contract provision requires DOE to accept SNF on any particular schedule. *See id.* at 7-23. The government is correct on that point, as the Court recognized in its June 26, 2003 Order "adopt[ing] here" most of *Commonwealth Edison Co.*, 56 Fed. Cl. 652. *See id.* at 663 ("the Standard Contract, including specifically the ACR and DCS process, does not contain or create a SNF acceptance rate"). But the implication the government draws from this contractual silence – that the Contract therefore confers "discretion" on DOE to define or select among alternative acceptance schedules, *see* Initial Gov't Br. at 23, such as a schedule limited to accepting SNF on approved DCSs, *id.* at 16-19, or, presumably, no schedule at all – is simply wrong.

Under the correct rule of law, "[a]s the court [also] found in its June 26, 2003 Order, DOE was to commence pickup at a *reasonable* rate no later than January 31, 1998." Order of June 28, 2004 at 9, No. 98-126, 2004 WL 1535686, at *6 (denying motions *in limine*) (emphasis added). The government's brief strikingly neglects to acknowledge this controlling ruling, or the governing legal principle it adopted. Instead, the government notes only that the Yankees "have argued" that "because the Standard Contract does not identify a minimum mandatory acceptance rate, the Court's role is to identify a 'reasonable' rate . . ." Initial Gov't Br. at 19. True again as far as it goes, but of course the reason the Yankees have made that argument is that given the Contract's silence, governing precedent – and indeed black letter law – *require* the Court to enforce a reasonable rate. *E.g., B-E-C-K Constructors v. United States,* 215 Ct. Cl. 793, 571 F.2d 25, 31 (1978) ("It is well settled that where a time is not fixed in a contract for performance of an obligation, performance within a reasonable time, dependent upon the circumstances applicable, is required."); *see* Restatement (Second) of Contracts § 204 (1981) ("Rest. 2d Cont."). As noted above, the Court has already embraced this rule of law in these very cases. And as the Yankees explained in their opening brief, a "reasonable" SNF acceptance schedule in this case means a schedule consistent with the Contract terms (*e.g.,* those providing for exchanges and shutdown priority), consistent with the parties' pre-litigation conduct, and consistent with the purpose of the Contract and the underlying statute (the Nuclear Waste Policy Act, "NWPA") as shown by the contemporaneous understandings of DOE and the contracting utilities. *See* Yankee Atomic's Initial Post-Trial Legal Brief ("Initial YABr.") at 10-12.

The government's only response on this point is the same response it has previously given and the Court has previously rejected: "because of the manner in which the acceptance schedule mechanism in the Standard Contract is drafted, this Court may not simply identify a

rate that it believes 'reasonable' and incorporate it into the contract." Initial Gov't Br. at 19. The Yankees will not repeat here all the reasons why the Court was correct to reject that argument (as did Judge Hewitt in *Commonwealth Edison*, 56 Fed. Cl. 652, and Judge Hodges in *Indiana Michigan Power Co. v. United States,* 57 Fed. Cl. 88, 96 (2003) ("Here, the contract term is missing entirely.")), and instead refer the Court to Yankee Atomic's Opposition to Defendant's Motion for Summary Judgment on the Rate of SNF Acceptance, filed October 28, 2002 (Yankee Atomic's "Rate Motion Opp.").[2]

The government's new arguments, based on the concept of "alternative contracts," do not help the government because the DOE Contracts are not of that type. *See* Initial Gov't Brief at 19-22 ("The Standard Contract's schedule terms provide DOE with the option of selecting any one of numerous potential acceptance scenarios . . ."). As the government notes, an alternative contract "is one wherein A promises B some one of two or more alternative performances." *Id.* at 19 (quoting Rest. 2d Cont. § 344 cmt. a). Here the Contracts, being *silent* as to schedule, do not "promise" the Yankees even one particular alternative. Rather, silence prevails and the Court must enforce a reasonable acceptance schedule.[3]

---

[2] Enforcement of a reasonable schedule in the circumstances of this case, where the Contract is silent, is different from the attempts to enforce specific terms not found in the contract documents or otherwise agreed between the parties, as was involved in new cases the government cites like *National By-Products, Inc. v. United States*, 186 Ct. Cl. 546, 405 F.2d 1256 (1969) and *Branhill Realty Co. v. Montgomery Ward & Co.*, 60 F.2d 922 (2d Cir. 1932).

[3] Regardless of the rule applicable to alternative contracts, outside that context, as here, contract damages are frequently awarded based on government performance in the non-breach world that was *not* the "least costly to the promisor." *See, e.g., Hughes Communications Galaxy, Inc. v. United States*, 271 F.3d 1060 (Fed. Cir. 2001) (affirming damages of $102 million based on NASA's launch of five satellites in non-breach world, although government expert projected between one and six launches – and the contract did not expressly require any number of launches).

Because the government continues to rely particularly on DCSs as imposing a limitation on DOE's Contract obligations, *see* Initial Gov't Br. at 17-18, 22-23, it bears repeating here that those forms, like the other tools provided in the Contract explicitly for "planning purposes," were designed to help plan for SNF acceptance scheduling *in the context of an operating SNF removal program.* However, in the "breach" world these planning tools cannot operate effectively. For example, a key function of DCSs – to provide a basis for exchanges that would make DOE's acceptance schedule more efficient – does not occur in the breach world because, as the Court recognized in a pretrial ruling and the trial testimony confirmed, given DOE's breach there is nothing to exchange. *See* Order of June 28, 2004, 2004 WL 1535686, at *4 ("Defendant's . . . breach prevented the very market the government assails as speculative . . ."); Tr. 864:9-865:11 (Graves); Tr. 2469:5-21 (Bennet) ("nothing to exchange"); *see generally* Yankee Atomic's Rate Motion Opp. at 28-30 (discussing the Contract's schedule planning tools).[4]

Outside the context of a functioning SNF program, the only possible use of the DCSs would be to limit DOE's contract obligations. That is not what DCSs were designed for. Indeed, the government cannot plausibly maintain that when the Yankees submitted DCS forms as DOE instructed, they thereby knowingly *limited* DOE's obligations to acceptance of only a fraction of their SNF, rather than all of it as the Contracts explicitly require. P1YA, Art. II ("The services to

---

[4] Even if DOE's spent fuel program were operational, the Contracts' delivery and acceptance planning tools would not work mechanistically or flawlessly as drafted. The NWPA required the Contracts to be signed by June 30, 1983, less than six months after the NWPA became law. *See* 42 U.S.C. § 10222(a)(4) (2000). "DOE's promulgation of the Standard Contract in so short a time resulted in a number of significant problems remaining unresolved." D109 at YDK038346; *see* Tr. 375:20-378:15 (Mills) (schedule issues were "not fully fleshed out" in the Contracts and "needed to be fleshed out" later). DOE, having recognized a number of open issues in its first ACR, *see* P52 (1987 ACR) at 13-15, subsequently initiated (but later abandoned) a formal "Issue Resolution Process" with utilities in an effort to resolve these issues. *See* P60 (1991 ACR) at 10-11.

be provided by DOE under this contract shall . . . continue until such time as all SNF and/or HLW from the civilian nuclear power reactors specified in Appendix A . . . has been disposed of.”).

In the breach world, the DCSs submitted in the early 1990s are meaningless. DOE admitted as much when it issued a new ACR in July 2004 and solicited new DCS forms. *See* Yankee Atomic's Response to the Government's Proposed Findings of Fact (“Response to GPF”) at pp. 5-6. Indeed, the instructions for completing the original DCS forms that DOE had distributed in 1992 made clear that the forms would need to be redone if the program did not start receiving SNF in 1998. *See* P1953 at 2, ¶ 7(a). And now, given the current status of DOE's program, the recent 2004 DCSs are meaningless also, a fact DOE conceded in a letter to utilities dated December 1, 2004 (*see* Exhibit A):

> [R]ecent developments relating to the FY 2005 budget along with other issues have led the Department to conclude that the resumption of the DCS process was premature.
>
> The Department thanks you for your response to its initial request for DCS planning information. Enclosed with this letter are any original DCS forms that you may have submitted with your response. After the Department has determined a revised date for the initial operation of the Yucca Mountain repository, it will resume the DCS process in accordance with the provisions of the Standard Contract.

## II. The Court Should Reject The Government's Criticisms Of Mr. Graves – Again.

The second major section of the government's brief contains a broadside attack on the analysis and opinions offered by Mr. Graves concerning what a reasonable schedule of spent fuel acceptance would have been in the non-breach world. For the most part the government, rather than offering legal objections to Mr. Graves' testimony, simply attempts to discredit the testimony by voicing substantive criticisms. Yankee Atomic answers the government's

criticisms comprehensively in its response to the government's proposed findings. As shown there, Mr. Graves himself answered most of the government's criticisms, and on every point the government raises Mr. Graves provided the more reliable and convincing testimony. *See e.g.*, Response to GPF 141-156, 168-178, 186 and at pp. 13-14.

The government's brief also repeatedly mischaracterizes Mr. Graves' testimony. For example, the government asserts that Mr. Graves assumes perfect competition, Initial Gov't Br. at 28-29, that he assumes universal participation by contracting utilities in the market for SNF allocation exchanges, *id*. at 29, and that he also assumes that "DOE would have approved every single exchange request," *id.* at 32-33. Each of those assertions is wrong. As Mr. Graves explained at trial, markets are rarely if ever perfectly competitive, *see* Response to GPF 142 and at pp. 13-14, and his model would produce essentially the same results if only half the contracting utilities participated (or requested and obtained approval for exchanges), *see* Response to GPF 153. The government also offers no persuasive reason why market forces would not prevail, or why utilities would not eagerly participate in exchanges that reduced their costs.[5]

At bottom, the government seemingly misunderstands what Mr. Graves' economic sequence model purports to show. The model does not purport to be a "photograph" of the non-breach world; Mr. Graves admitted that. *Id.* at p. 28; *see* Tr. 862:15-17 (Graves) ("I'm not offering my analysis as a structural photograph or description of exactly what would have

[5] Contrary to the government's assertion, *see* Initial Gov't Br. at 32-33, *Brinson v. Linda Rose Joint Venture*, 53 F.3d 1044 (9th Cir. 1995), does not support the theory that the Contract's clause giving DOE "sole discretion" to approve exchanges precludes reliance on exchanges in determining a reasonable SNF acceptance schedule. In *Brinson*, the court applied a "sole discretion" clause to reject a challenge to the *manner* in which a seamen's bonus was calculated. *Id.* at 1049. The decision does not remotely suggest that the clause would allow the shipping company to refuse to calculate any bonus at all.

transpired"). Rather, Mr. Graves' model portrays a *reasonable* SNF acceptance schedule in the non-breach world. What is important is not the photographic details but the big picture, and as Mr. Graves' explained in the same passage, the big picture is unmistakably clear:

> "[G]iven a program of a reasonable size, . . . there's an enormous opportunity to pursue that program efficiently by allowing swaps or by utilities arranging for deals amongst themselves, for intermediaries arising who will provide brokerage services. And the value of that is extremely high. And it's extremely simple to develop both the proof and the mechanisms for the – to show that that's worthwhile.
>
> Given that, I think an economic solution something like mine would occur. Whether or not it occurred through an auction mechanism that used the same pricing algorithm as I have shown is really not relevant.
>
> All I'm saying is there is so much compelling economic attraction to pursuing an efficient solution and so little barrier to doing so, that something like that would have been a reasonable thing. . . . And that not only is . . . good for the utilities, it's good for the program.

Tr. 863:2-23 (Graves). This testimony succinctly answers all the government's attempts to nit-pick the details of Mr. Graves' model.

Although the government offers various case citations in its discussion of Mr. Graves' testimony, in essence the government makes only two legal points. First, the government argues that Mr. Graves' conclusions are "inherently speculative" because they "lack evidentiary foundation." Initial Gov't Br. at 25; *see* id. at 24-27, 43-54. Second, the government argues that the Court should reject Mr. Graves' model because it is analytically unsound or rests on dubious economic principles. *See id.* 29-42. These arguments do not raise any fundamental legal objection to Mr. Graves' testimony; rather, they take issue with the evidentiary support and economic principles on which his analysis and model are built.

The government raised substantially the same "legal" arguments before trial, and the Court rejected them in its pretrial ruling denying the government's motion to preclude Mr. Graves' testimony. *See* Order of June 28, 2004, 2004 WL 1535686 (denying motions *in limine*). Finding the circumstances here comparable to those in *Energy Capital Corp. v. United States*, 302 F.3d 1314 (Fed. Cir. 2002), the Court noted that "Graves' opinion is not based on 'unsupported speculation,'" but on "real world" facts. 2004 WL 1535686, at *5 (quoting *Energy Capital*, 302 F.3d at 1329). As the Court recognized even from the pretrial record:

> [H]ere, at least some of the costs have been incurred, SNF quantities are ascertainable, and both parties have projections of acceptance rate, delivery schedules, and quantities. . . . Pool capacities, inventories, and reactor discharge rates for all the spent fuel facilities in the United States were obtained from DOE publications and from Mr. Malone. Annual aggregate acceptance amounts used were found to be reasonable by Dr. Bartlett and supported by the opinion of Ivan Stuart, and also contained in a DOE planning document. . . .

*Id.* As set forth fully in the Yankees' objections to the government's proposed findings, the trial evidence confirmed, and amplified, the substantial factual foundation underlying Mr. Graves' analysis and model. *See, e.g.,* YAPF 61-87; Response to GPF 122-125.

The Court has also previously (and forcefully) rejected the government's assertion, *see* Initial Gov't Br. at 37-39, that the absence of exchanges in the "breach" world has significance. As the Court put it, "[b]y partially breaching the contract, defendant cannot exclude Graves' opinion on the grounds that there is no market data. There is no market data because the government's breach thwarted this possibility." 2004 WL 153686, at *4; *see id*. at *3 ("Proof of damages need not always specify transactions that would have occurred but for the breach.") (citations omitted); *id*. at *4. The Court's analysis and conclusion on this point are likewise consistent with *Energy Capital*, as well as substantial other case law. *See* 302 F.3d at 1327 ("'where the defendant itself has wrongfully prevented the [market] from coming into existence

and generating a track record,'" to the extent there exists uncertainty in the but-for model, "'the risk of uncertainty must fall on the defendant whose wrongful conduct caused the damages'") (quoting *Mid-America Tablewares, Inc. v. Mogi Trading Co.*, 100 F.3d 1353, 1366 (7th Cir. 1996)); *see also Locke v. United States*, 283 F.2d 521, 524 (Ct. Cl. 1960) ("The defendant who has wrongfully broken a contract should not be permitted to reap advantage for his own wrong by insisting on proof which by reason of his breach is unobtainable").

The Court further recognized even before trial that Mr. Graves' model is based on "fundamental economic principles of market supply and demand and cost avoidance." Order of June 28, 2004, 2004 WL 1535686, at *7. Thus, "[d]efendant's objections are to the application of facts to Graves' economic principles and methodology," *id*. at *5, rather to the economic principles or methodology themselves. The largely factual criticisms that the government is advancing now, post-trial, are no different. But the trial evidence overwhelmingly establishes that when the foundational facts that the Yankees proved – concerning a reasonable acceptance rate, a reasonable "ramp-up" rate, the efficiencies both parties would gain by swaps, and the like – are applied to Mr. Graves' economic principles and methodology, his resulting conclusions are sound, credible and reliable. They also are essentially uncontroverted, because the government never presented any competing model of a "reasonable" non-breach world acceptance schedule. In short, there is no remaining legal dispute over the reliability of Mr. Graves' testimony, and to the extent factual disputes exist, the trial evidence requires the Court to resolve them decisively in the Yankees' favor.

The new cases the government cites do not support its attacks on Mr. Graves; indeed, many of them actually support the Yankees. For example, in *Shockley v. Arcan, Inc.*, 248 F.3d 1349, 1363 (Fed. Cir. 2001), *see* Initial Gov't Br. at 25-26, the expert *admitted* "that his

determination that [plaintiff] would have sold 80,000 units per year . . . was an assumption without factual underpinnings. Rather, [the expert] testified that he based his opinion on the number of sales that [plaintiff] told him to assume it would have made." *Dolphin Tours, Inc. v. Pacifico Creative Service, Inc.*, 773 F.2d 1506 (9th Cir. 1985); *see* Initial Gov't Br. at 24, which reversed a summary judgment that was based on purportedly inadequate expert testimony, supports Yankee Atomic. In that case the appellate court concluded, similar to the situation here, that "Dolphin has presented evidence from which a jury could reasonably estimate the amount of Dolphin's injury without speculation if Dolphin's damage evidence were filled in by testimony at trial and by [documentary evidence] which the record indicates [is] available to Dolphin." 773 F.2d at 1513.

The government cites *Weisgram v. Marley Co*., 528 U.S. 440 (2000), for the proposition that "speculative" testimony "is not competent proof" and "contributes 'nothing to a "legally sufficient evidentiary basis."'" *See* Initial Gov't Br. at 27 (quoting 528 U.S. at 454 (citation omitted)). What *Weisgram* actually says, however, is that "*[i]nadmissible evidence* contributes nothing to a 'legally sufficient evidentiary basis.'" 528 U.S. at 454 (citation omitted) (emphasis added). The government does not even suggest that Mr. Graves' testimony is inadmissible. Nor could it; the Court rejected that argument prior to trial. The other Supreme Court decision the government cites, *Brooke Group, Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209 (1993), simply explained, as the government notes, that "expert opinion cannot sustain a judgment when the opinion 'is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable.'" *See* Initial Gov't Br. at 26-27 (quoting 509 U.S. at 242). Here, Mr. Graves' testimony is amply supported by validating facts that render his opinions *reasonable*, not unreasonable.

Contrary to the government's absurd suggestion that courts typically reject economic theory, *see* Initial Gov't Br. at 29-30, the cases the government cites merely require reasonable application of economic principles. Indeed, cases cited elsewhere in the government's brief rely heavily on economic theory to support their holdings. *See, e.g.*, *Dolphin Tours*, 773 F.2d at 1511 ("In using this [appropriate] approach [to establish lost profits], Dolphin must presume the existence of rational economic behavior in the hypothetical free market."); *Roseburg Lumber Co. v. Madigan*, 978 F.2d 660, 668 (Fed. Cir. 1992) (relying on "the record as well as normative economic behavior" to reject damages claim).

The government's assertion that "the Yankees' exchanges theory is litigation-inspired," Initial Gov't Br. at 46-48, is true in a sense. Prior to this case, the Yankees never had occasion to analyze what acceptance schedule DOE would follow in the non-breach world. Going back to the early 1990s, what the Yankees used in their decommissioning cost estimates and spent fuel storage studies was their "analysis" of DOE's acceptance schedule *given* the increasing likelihood DOE would not begin SNF acceptance by January 1998. *See, e.g.,* Response to GPF 283-291. The pejorative gloss the government puts on Mr. Graves' "litigation-inspired" analysis is unwarranted.

It also bears repeating that the government has never articulated any position at all on what a reasonable schedule for SNF acceptance would be in the non-breach world. Instead, under various rubrics (*i.e.*, contractual mechanism, alternative contract, DOE discretion), the government has advanced a variety of acceptance schedules that are patently unreasonable. In essence, the government's position is that even if the DOE SNF removal program were operating exactly as Congress designed it, and exactly as DOE and the contracting utilities understood and intended it would work, the program would be a colossal flop – and virtually all contracting

utilities would have to construct costly dry storage facilities either now or in the future. There is no legal or factual support for that conclusion, and the Court should reject it.

Finally, the government's *ad hominem* attack on Mr. Graves, based on his testimony in *United States v. Ohio Edison Co*., 276 F. Supp. 2d 829 (S.D. Ohio 2003), *see* Initial Gov't Br. at 45-46, is both unfounded and ironic. To the extent the court in that case found that Mr. Graves had made a "mistake," it was precisely the same mistake the government is making in this case. The situation in *Ohio Edison* was opposite to the situation presented here. As the court explained it, "Graves failed to offer any independent calculation of emissions; rather, his testimony consists of an attempt to discredit the calculations obtained by the Government's expert, Dr. Rosen." *id*. at 878. Because Dr. Rosen's opinions were based on substantial record evidence, *id*. at 879-80, and his "approach [was] a reasonable method," *id.* at 880, the court found that "Dr. Rosen made a reasonable calculation as to the effect of heat rate improvements on emissions." *Id*. In contrast, "Graves essentially testified that heat rate improvement was impossible to quantify and, therefore, Rosen's methodology was flawed." *Id.* ("Graves, at best, challenges the precision with which the predictions . . . were made").

Ultimately in *Ohio Edison*, the court concluded that Mr. Graves' testimony was contrary to the applicable legal standard:

> Fundamentally, the law does require such . . . estimates and predictions. An expert's opinion, which essentially contradicts the language or premise of the law, is entitled to little, if any, weight. . . . To the extent Graves contends that such estimates are impossible to construct, his opinion essentially conflicts with the law.

*Id.*

In the present case, Mr. Graves' testimony is consistent with the governing legal standard, which requires the Court to determine a "reasonable" SNF acceptance schedule. In

contrast the government, which persuaded the court in *Ohio Edison* to disregard expert testimony that did not meet the applicable legal standard, does not even propose any alternative "reasonable" schedule here. Thus, to the extent it is relevant, *Ohio Edison* supports the Yankees. In *Ohio Edison*, "the Court f[ound] Dr. Rosen's conclusion to be persuasive; the criticisms offered by Graves [were] insufficient to cast doubt on the findings." *Id*. at 881. So here, the Court should find Mr. Graves' conclusion to be persuasive; the criticisms offered by the government are "insufficient to cast doubt on [his] findings."

III. The Government's Causation Arguments Are Factually And Legally Wrong.

The government next asserts the Yankees have failed to establish the causation element of their damages claims. *See* Initial Gov't Br. 58-64. Again the government's arguments are predominantly factual.

The government first claims that the "fuel-out" dates provided by Mr. Graves constitute the totality of the causation evidence presented by the Yankees. *Id*. at 59. The same argument was advanced in the government's Rule 52(c) motion, and is addressed in that context in Yankee Atomic's initial post-trial brief (at pp. 26-29). This government causation argument is simply wrong. As noted in their opening briefs, the Yankees did not consult with Mr. Graves – or contemplate his "fuel-out" dates – before developing and ultimately implementing dry storage. *See* Initial YABr. at 26. Rather, as shown at trial, the reason the Yankees implemented dry storage was that beginning in the early 1990s, it became increasingly clear that DOE would not accept SNF by January 1998 as the Contract required, and likely would not do so not for many years thereafter. *See e.g.,* YAPF 97, 91-94.

In a word, the Yankees "covered" by arranging a partial substitute for DOE's performance, or "mitigated" by seeking to avoid the even greater costs of long-term wet storage of its SNF. *See* Rest. 2d Cont. § 350 cmt. a.-h. (referring interchangeably to "mitigation" and

"substitute performance"); *Long Island Sav. Bank, FSB v. United States,* 60 Fed. Cl. 80, 90 (2004) (in a *Winstar* case, capital injections prompted by breach were both "mitigation" and "substitute performance"). The government now expressly concedes that "economics tends to favor dry storage as the storage period gets longer," GPF 298. That concession explains why the government does not argue that the Yankees' implementation of dry storage was other than "reasonable," which is the governing legal standard in the mitigation context. *See* Initial YABr. at 7-8. Because the trial record also demonstrates affirmatively that the Yankees' implementation of dry storage was a reasonable response to DOE's impending (and ultimately actual) breach, causation is established – without regard to Mr. Graves' "fuel-out" dates, much less in sole reliance on them.

Notably, the government's causation discussion does not address mitigation law and cites no mitigation cases. Those authorities, however, as explained in Yankee Atomic's initial brief at 6, actually *required* the Yankees to attempt to "take steps to minimize its losses in light of DOE's imminent non-performance." Order of June 28, 2004, 2004 WL 1535688, at *6 (quoting *Tennessee Valley Authority v. United States*, 60 Fed. Cl. 665, 674 (2004)). The government, having conceded that "economics tend to favor dry storage," cannot avoid the legal consequence of that concession – namely that the Yankees "w[ere] under an obligation to avoid by a reasonable effort any damages which it should have foreseen." *Chain Belt Co. v. United States*, 127 Ct. Cl. 38, 115 F. Supp. 701, 714 (1953).[6]

[6] In its separate discussion of pre-breach damages, the government asserts there is no pre-breach duty to mitigate, citing one old case applying Missouri law, *Reliance Cooperage Corp. v. Treat*, 195 F.2d 977 (8th Cir. 1952). Initial Gov't Br. at 68-70. But even under the government's view of *Reliance* (*i.e.*, no duty to mitigate), where a non-breaching party does mitigate, the resulting costs are compensable. Nothing in *Reliance* suggests that if the buyer there had actually engaged in a cover transaction, it could not recover its resulting costs. In any event, the government's interpretation of *Reliance* is contrary to *Chain Belt*, to this Court's pretrial ruling on pre-breach damages, and to the Restatement. *See* Initial YABr. at 6-8; Rest. 2d

The government's second factual argument on causation is that company "planning documents" purportedly show that "each of the Yankees assumed that, even absent any delay by DOE, they would need to store their SNF for many years." *See* Initial Gov't Br. at 59. The documents the government cites consist of decommissioning cost and spent fuel storage studies, and related documents, prepared from the early 1990's forward. *See* GPF 283-289. But the "planning" in those documents was for SNF storage in the *breach world*, and specifically, planning for how to pay for SNF storage for the extended period beyond 1998 that seemed increasingly likely as the 1990s progressed. *See* Response to GPF 283-86. As Mr. Bennet testified: "[f]or funding purposes, we had to look at a fairly significant worst case type of outcome so that we had to [have] funding to be able to store fuel during that delay period." Tr. 1705:17-20.

DOE had announced in its 1989 "Reassessment" report to Congress, P101, that the Yucca Mountain repository could open in 2010 at the earliest, and subsequent planning by the Yankees took account of that fact. For example, Yankee Atomic's May 1992 decommissioning costs study – one of the "planning documents" cited by the government – assumes a "rate of spent fuel removal by DOE [that] is based on the lower rate of fuel acceptance published by DOE in the [1990 ACR] until the opening of a repository in 2010. Thereafter, accelerated shipment . . . is

Cont. § 350 cmt. b ("Once a party has reason to know that performance by the other party will not be forthcoming, . . . he is expected to take [] affirmative steps . . . to avoid loss by making substitute arrangements"). Moreover, the common law rule invoked in *Reliance* was limited to contracts for the sale of goods, was changed even in that context by § 2-610(a) of the U.C.C., and was flawed because it mis-incentivized non-breaching parties. *See, e.g., Trinidad Bean & Elevator Co. v. Frosh*, 494 N.W.2d 347, 353-54 (Neb. Ct. App. 1992). Finally, it would have been patently unreasonable for Yankee Atomic to not begin dry storage implementation until January 1998, as the government suggests, because its costs (and thus the government's damages liability) inevitably would have been higher. *Cf.* Order of June 28, 2004, 2004 WL 1535688 at *6 ("Should plaintiffs have waited until [January] 31, 1998 and then decided what to do with their nuclear waste? The court thinks not").

assumed until 2018 until the last SNF is removed by DOE." D150 at 48. The 1990 ACR used a "lower bounding" acceptance rate that begins in 1998 and ramps up to only 900 MTU per year, based on the potential availability in 1998 of an interim storage facility. P59 at 7. That projection never came to fruition. *See* Response to GPF 84, 93. More generally, for lack of any better information the Yankees, in their decommissioning cost studies and other SNF planning documents, relied on spent fuel acceptance assumptions provided by DOE. *See, e.g.*, YAPF 92; Response to GPF 283-298; Tr. 2296:8-11 (Bennet); Tr. 2295:19-24 (Bennet); D397 at DK 007545-46.

The government's insistence that the cited Yankee documents all assume "timely performance by DOE," Initial Gov't Br. at 59, is simply wrong. The documents assume what DOE told the Yankees to assume, despite what they already knew, namely that DOE would not be removing their SNF anytime soon. *See* Response to GPF 284. The use of a 1998 start-date in these "planning documents" reflects only that that was what was required, not what the Yankees believed. *See, e.g.,* D173 at 2 (October 1992 memo: "The current DOE schedule and federal law, which require DOE to begin taking SNF in 1998 must be viewed as optimistic. Any delay of this schedule favors the dry ISFSI options . . . . "); *see also* Response to GPF 283-286.

The government states that "[i]n making decisions concerning its [sic] long-term storage needs, none of the Yankees assumed fuel-out dates predicated upon exchanges or priority" and "not a single Yankee document contains projected fuel-out dates consistent with either Mr. Graves' exchanges theory or with Mr. Graves' acceptance rate under an OFF schedule." Initial Gov't Br. at 60. That is true, and it is not surprising – the Yankees were not planning for SNF removal in the *non-breach* world, which is where exchanges would occur and the acceptance rate

determined by Mr. Graves (and supported by DOE planning documents) would be followed. As Mr. Bennet's testified at trial:

> [T]he assumptions that were made here [in the decommissioning cost studies], and I think I framed them as unreasonable assumptions, we were being forced to make as a result of the circumstances, were assumptions that we specified to prepare our funding plan and to ensure that we had adequate funds available to move the fuel to dry storage and store it for quite some time.
>
> We did not at all believe that this was what DOE should do under the contract or that it was what was required under the contract. These were just assumptions that we were forced to make to ensure adequate funding under our FERC regulation.

Tr. 1842:16-1843:2 (Bennet).

The government's third fact-bound argument on causation is that "[o]nce the Yankees elected to permanently shutdown, their decisions to construct ISFSIs all were predicated upon the desire to decommission their nuclear reactors and wet storage pools promptly." Initial Gov't Br. at 60. The government notes that prompt decommissioning would address uncertainty over disposal options for the low-level radioactive waste ("LLW") generated during decommissioning, *id.* at 61, and that prompt decommissioning is "less costly," *id*. at 62. The government never explains what these matters have to do with damages causation. The answer is, "nothing." Because of DOE's breach, the Yankees have to store their SNF on-site for an extended period – at least twelve additional years (reflecting DOE's delayed start from 1998 to 2010), and likely much longer. Given the need for that extended on-site storage, the Yankees reasonably determined that dry storage was a better option than wet storage – and the

government now agrees. *See* GPF 298 ("economics tend to favor dry storage"). Prompt decommissioning is a separate matter.[7]

The government's real argument has nothing to do with what motivated – that is, caused – the Yankees to implement dry storage (or what motivated two of them to rerack first, and then to implement dry storage). What the government is really arguing is that the Yankees have not suffered any damages at all resulting from DOE's breach, because even if DOE had performed as required, the Yankees' SNF would have remained on site for a very long time and their SNF storage costs thus would have been essentially the same in the non-breach world as in the breach world – hence, no damages. *See* Initial Gov't Br. at 58. This "zero damages" position, which the government attempts to dress up as a "causation" issue, is completely untenable for several different reasons. First, it necessarily relies upon the same niggardly view of DOE's Contract obligations – namely, that DOE has no real obligations – that the Court has already rejected in this case, in *Commonwealth Edison* and in *Indiana Michigan*.

Second, the government's zero damages theory sidesteps and ultimately disregards the largely undisputed evidence showing what, in fact, *motivated* the Yankees' decisions to rerack and to implement dry storage. Those decisions were motivated by the companies' clear recognition of DOE's impending default, and the consequent need to take steps to assure the safe

---

[7] The government is not helped by the cases it cites in discussing prompt decommissioning, *Fawick Corp. v. United States*, 149 Ct. Cl. 623, 1960 WL 8478 (1960) and *San Carlos Irrig. & Drainage Dist. v. United States*, 111 F.3d 1557 (Fed. Cir. 1997). *See* Initial Gov't Br. at 63. In *Fawick,* the plaintiff unreasonably failed to mitigate. *See* 1960 WL 8478, at *9 ("[i]t seems strange indeed that plaintiff should have imposed a $100,000 loss on itself rather than pay the $20,000"). In *San Carlos*, damages were rendered speculative by numerous contingencies, most importantly the government's discretion to divert water away from plaintiff's use, which discretion was conferred by express contract language providing for the supply of water "upon terms to be fixed by the Secretary [of Interior]." 111 F.3d at 1563. No similar circumstances exist in this case.

and cost-effective long-term storage of their SNF. The cause-and-effect relationship to DOE's breach is confirmed by evidence showing that if DOE reversed course and took convincing steps to perform by 1998, Yankee Atomic, for example, under its "phased" contract with NAC International, could also "stop, rethink or change course." *See* YAPF 107; *see also* MYPF 97. Causation is also confirmed by direct testimony from the Yankees' witnesses that absent the DOE breach, the companies would not have converted to dry storage. *See, e.g.,* YAPF 106; CYPF 103. Testimony of that type was held to establish causation in *Hughes Communications Galaxy*, 271 F.3d at 1067 (affirming this Court's ruling that "specifically credited testimony of Hughes' witnesses that Hughes would not have developed the HS-601 [a substitute satellite] if the Government had not breached the LSA [Launch Services Agreement]").

Nor can the government plausibly deny that the Yankees could have and would have *avoided* their reracking and dry storage costs if DOE had performed on *any* reasonable schedule. A reasonable schedule would have begun by January 1998. Overwhelming evidence shows that a reasonable schedule would have included an acceptance rate, after a brief ramp-up period, of approximately 3000 MTU per year. *See, e.g.,* YAPF 68-78. In order to begin performing by January 1998 at a rate that promptly ramped-up to 3000 MTU per year, DOE would have had to engage in substantial planning throughout the 1990's. DOE would have been readying a repository or storage facility for operation in 1998, developing and procuring transportation casks, and building transportation infrastructure. If DOE had been actively working to develop such a program in the 1990s, the Yankees' contemporaneous behavior also would have been different. Rather than planning and incurring enormous costs for additional and extended on-site SNF storage, the Yankees would have strived to avoid those costs – and they would have been

able to, provided that DOE actually did perform and remove the Yankees' SNF in a reasonable time frame beginning in 1998.

There is absolutely no evidence to suggest that if DOE had begun picking up SNF in 1998 and had picked-up SNF thereafter on a reasonable schedule – a schedule consistent with the purpose of the NWPA, and the original intent and understandings of both DOE and the contracting utilities – the Yankees' SNF would have remained on their sites for long enough to require each of them to expend well over $100 million to implement and operate dry storage. In fact, the government does not even claim that such a schedule would be a "reasonable" one, and could not make that claim, particularly given that the only evidence presented at trial of what a reasonable schedule would have been was the evidence the Yankees presented.

IV. <u>The Yankees Have Met Their Burden Of Proof To Show Damages.</u>

A theme in the government's initial brief, articulated in a short early section, *see* Initial Gov't Br. at 5-7, is that "[t]he Yankees bear the burden of establishing that their claimed damages are not speculative, remote, or unforeseeable." *Id*. at 6. As a matter of fact the Yankees have clearly met that burden here. The Yankees damages are concrete, and there is absolutely nothing speculative (or unforeseeable) about them. *See* Initial YABr. at 4-15. And the Yankees have provided compelling proof, and indeed the only evidence, of what a "reasonable" schedule for DOE performance would have been in the non-breach world, consistent with the original understanding and intent of DOE and the contracting utilities. *See id*. at 27-29.

As a matter of law, the cases the government cites are unhelpful to it on the burden of proof. In some, unlike here, the plaintiff had not incurred any actual damages. For example, in *Willems Industries, Inc. v. United States*, 155 Ct. Cl. 360, 295 F.2d 822, 831-32 (1961), the government as purchaser failed to cover (or incur the expense of cover) after the breach, and the

evidence also showed that market prices dropped below the contract price. *Cf. Hi-Shear Tech. Corp. v. United States*, 356 F.3d 1372, 1378-79 (Fed. Cir. 2004), cited in Initial Gov't Br. at 33 (denying claimed lost profits under a requirements contract, because there was no indication the government required the goods the foregone sale of which gave rise to the claimed lost profits). In other cases cited by the government, there was no evidence at all linking the claimed damages to the breach. *See, e.g., San Carlos Irrig. & Drainage Dist. v. United* States, 111 F.3d 1557, 1563 (Fed. Cir. 1997) ("SCIDD's allegations do not show that the malfunction of the spillage was the 'but for' cause of its injury."). Here, the evidence is overwhelming that the reason the Yankees reracked and built dry storage – the "but for" cause of those expenditures – was DOE's impending and now actual breach. A third class of cases cited by the government involve "remote" or "indirect" damages. *E.g., Ramsey v. United States*, 121 Ct. Cl. 426, 434, 101 F. Supp. 353, 357 (1951) ("'For a damage to be direct there must appear no intervening incident'" (citation omitted)); *Myerle v. United States*, 33 Ct. Cl. 1, 1800 WL 2024 (1897) ("There must not be two steps between cause and damage."). Here, the government does not even allege, and could not plausibly allege, that there is an "intervening incident" or "two steps" between DOE's breach and the Yankees' reracking, dry storage or other damages.

## V. The Court Should Reject The Government's Shutdown Priority Arguments – Again.

The Contract provision on shutdown priority is one of the tools available to DOE to help it implement a reasonable schedule for SNF acceptance that would allow utilities to avoid on-site SNF storage costs of exactly the type giving rise to the Yankees' damages claims here. *See, e.g.,* YAPF 89. The government's only response in its brief is to reiterate arguments regarding the shutdown priority provision that not only were largely rejected in the Court's pretrial ruling, *see* Order of June 28, 2004, 2004 WL 1535687 (denying summary judgment on shutdown priority

issue), but that mischaracterize both Yankee's position and the pertinent evidence. In addition to wrongly asserting that the Yankees contend DOE was "obligated" to grant shutdown priority, Initial Gov't Br. at 54-56, the government argues the trial evidence showed that the Yankees "never believed" that DOE was obligated to or would grant priority, *id*. at 55, and that DOE acted properly in not granting shutdown priority to the Yankees (or any other shutdown utility), *id.* at 56. The short answer is that the evidence the government cites, as well as the arguments it makes, all concern the "breach" world.

In contrast to the government's current litigation arguments, DOE itself has long recognized the value of the shutdown priority provision, not only in the statement it made in refusing to delete the provision from the Contracts (*i.e.,* "[t]his type of priority is necessary to prevent reactors from waiting 20 or 30 years to be decommissioned after they finish generating electricity," 48 Fed. Reg. 16590, 16593 (Apr. 18, 1983), *see* YAPF 89, but also in studies DOE conducted addressing shutdown priority. For example, P152 is an October 1989 report (and a "contractor document") entitled "Spent Fuel Acceptance Scenarios Devoted to Shutdown Reactors: A Preliminary Analysis." It analyzed a "class of acceptance schemes in which the acceptance capacity of the [DOE program] is allocated principally to shutdown commercial power reactors" and reached a conclusion virtually identical to the Yankees' position here on the relationship between shutdown priority and exchanges: "[i]n the sense that the[se] alternative allocations are more economically efficient than OFF, however, they approximate the allocations that could result from free exchange of acceptance rights among utilities." *Id.* at iii, HQ0013953. Hence, under that DOE study, as under the Yankees' position on shutdown priority, such priority would only be invoked to the extent the "free exchange of acceptance rights among utilities" did not achieve an "economically efficient" acceptance schedule. *See* YAPF 89.

VI. The Court Should Reject The Government's Arguments On Pre-Breach And Future Damages – Again.

Without acknowledging the Court's forceful rejection of the same arguments in its pretrial ruling, *see* Order of June 28, 2004, 2004 WL 1535688, the government contends that the Yankees' "pre-breach" and "future" damages are precluded by law because the Yankees have claimed a partial breach. Initial Gov't Br. at 65-73. In addition to the June 28 Order, the Yankees once again refer the Court to the extensive prior briefing leading to that Order. *See* Yankees' Opposition to Government Motion *In Limine* to Exclude Evidence of, And to Strike, Pre-Breach Damages and Restitution Claims, filed April 23, 2004; Yankee Atomic's Opposition to Government Motion *In Limine* to Exclude Evidence of Future Damages, filed June 11, 2004.

On pre-breach damages, the *only* thing new in the government's initial post-trial brief is citation to a 1952 decision applying Missouri law, *Reliance Cooperage Corp. v. Treat*, 195 F.2d 977 (8th Cir. 1952), which we addressed above. *See infra,* pp. 17-18 & n.6. Based on *Reliance* (and not citing *Chain Belt*, except elsewhere on a different point, *see* Initial Gov't Br. at 51), the government contends that the reracking costs Connecticut Yankee and Maine Yankee incurred prior to 1998 are not recoverable because they were unnecessary:

> Since they shut down prematurely, neither [company] actually needed to rerack their pools, at least not as a result of DOE's anticipated partial breach. . . . Had they waited until the date of breach – the time upon which the duty to mitigate commences – neither facility would have reracked their pools.

Initial Gov't Br. at 69-70.

This hindsight assessment – which essentially would require the Yankees to ignore DOE's impending breach and forego mitigation opportunities – is both contrary to the governing legal standard and impractical. As set forth in this in Court's ruling on pre-breach damages, 2004 WL 1535688, at *6-*8, and in *TVA,* 60 Fed. Cl. at 674, and as explained more fully in the

Yankees' initial briefs, *see, e.g.,* Initial YABr. at 6-8, it is black letter law that a non-breaching party is "expected" to "avoid loss by making substitute arrangements or otherwise," "[o]nce [that] party has reason to know that performance by the other party will not be forthcoming." Rest. 2d Cont. § 350 cmt.b. Moreover, the reasonableness of the non-breaching party's mitigation action is "judged by the facts and circumstances at the time the action is taken." *Ketchikan Pulp Co. v. United States*, 20 Cl. Ct. 164, 166 (1990). Here, "judged by the facts and circumstances at the time," DOE's impending breach required Connecticut Yankee and Maine Yankee to rerack to avert loss of full core reserve and the consequent shut-down of their respective plants, *see e.g.,* CYPF 114-119, and the uncontroverted trial evidence shows that both companies actually put off the rerack decision as long as they could in an effort (ultimately unsuccessful) to avoid the need to rerack. *See* CYPF 118; MYPF 107, 123. Under these circumstances, for the companies not to have reracked when they finally did would have been patently *unreasonable*. *See infra,* pp. 17-18 above & n.6.

Regarding future damages, the government at least acknowledges the Court's pretrial ruling, Initial Gov't Br. at 72, but only to disagree with the Court's statement there that "'defendant admits it will not commence performance until 2010.'" *Id.* (quoting 2004 WL 1535688, at *1 n.2). Citing nothing but Mr. Kouts' testimony about "the possibility of congressional action that would allow DOE to begin accepting SNF prior to [2010]," and its own GPF 314 ("circumstances could change that would allow or require DOE to perform prior to 2010"), the government contends that "it is *possible* that DOE *could* begin performance prior to 2010" and therefore "the Yankees' claims for future damages are speculative." *Id.* (emphasis added); *see* Tr. 3475:7-17 (Kouts) ("[D]epends on what that legislation directed. If it provided

certain relief from various aspects of procedural considerations from the NRC, from NEPA and so forth, then, yes, that's certainly possible.").

Of course, anything is "possible". But the evidence overwhelmingly favors the Court's conclusion that "there is no risk of windfall," see Order of June 28, 2004, 2004 WL 1535688 at *2, over Mr. Kouts' speculative "possibility" that DOE will perform prior to 2010. Indeed, as mentioned above, in a recent letter to utilities even DOE disavowed that it could open the repository by 2010. *See* DOE letter dated December 1, 2004, attached at Exhibit A ("[T]he resumption of the DCS process was premature. . . . After the Department has determined a *revised date for the initial operation* of the Yucca Mountain repository, it will resume the DCS process. . . .") (emphasis added). Stated directly, the Yankees' future damages for ISFSI operations until 2010 far surpass the standard of "reasonable certainty" that makes them recoverable now. And the Yankees' damages for future decommissioning and dismantlement of their ISFSIs are entirely certain to occur, and have been since the ISFSIs were built. The Federal Circuit (and other courts, including this one) regularly award lost future profit damages – based not just on future events, but on what *would* have happened in the future if the past had gone differently – and those damages involve far more uncertainty than any of the Yankees' future damages until 2010 in this case. *E.g., Energy Capital Corp.,* 302 F.3d at 1324; *Northern Helex Co. v. United States*, 225 Ct. Cl. 194, 634 F.2d 557, 564 (1980).

Considering DOE's established record of delay and default, and particularly given how wasteful and unfair it would be to require the Yankees to re-litigate the damages they are more than "reasonably certain" to incur between now and 2010, there is no reason for the Court to depart from its pretrial conclusion that, practically speaking, "there is no risk of a windfall," and, thus, no reason to disallow future damages from now until 2010. *See also Southern Nuclear*

*Operating Co. v. United States*, No. 98-614C (Fed. Cl. Dec. 20, 2004) at 2 (order granting recognition of subsequent damages) (relying on "DOE's repeated past representations that performance of its SNF disposal obligation will commence in 2010" to allow evidence of damages claimed "as a result of the breach of contract represented by DOE's performance delay until 2010").

VII. The Court Should Reject The Government's GTCC Waste Arguments – Again.

The government contends that the Yankees' damages resulting from DOE's breach should be reduced in a substantial (but unspecified) way, because even if DOE had removed the Yankees' spent fuel, the companies "are responsible for the indefinite storage of their GTCC waste and failed fuel" and they therefore "cannot pass to the Government those costs that they would have incurred regardless of DOE's delay." Initial Gov't Br. at 73. Regarding GTCC waste, this contention rests on two subsidiary arguments: (1) GTCC waste is not covered by the Contracts, *id.* at 74-79; and (2) the substantial trial evidence showing that DOE would have taken the Yankees' GTCC waste at the same time it removed their spent fuel should be disregarded because it is "pure speculation" or is tied to unrecoverable consequential damages, *id.* at 79-81. Neither of these arguments is new, and the Yankees again refer the Court to the extensive prior briefing of GTCC waste issues. *See* Initial YABr. at 16 (*citing* Yankee Atomic's 10/29/02 "Prior GTCC Waste Brief"). And evidence from the recent trial not only fails to support the government's arguments, it refutes them.

GTCC Waste is Covered By The Contracts. As explained in the Yankees' initial briefs, *see. e.g.,* Initial YABr. at 18-19, Supreme Court authority requires the Court to disregard the government's contractual arguments because they rest almost exclusively on NRC statements outside of the 1989 regulation itself. And to the extent the government uses those NRC remarks to interpret the terms of the Yankees' *Contracts* with DOE, deference to the government's

interpretation is also inappropriate, not only because of *contra preferendum, see id*. at 19-20, but because as a matter of law the government's self-serving interpretation is unreliable. *See, e.g., Southern California Edison Co. v. United States,* 226 F.3d 1349, 1357 (Fed. Cir. 2000) (a party to a government contract "should reasonably expect to be on equal legal footing with the government should a dispute over the contract arise. If courts were generally to adopt a principle of deference to an agency's contract interpretation, such deference could lead the courts to endorse self-serving post-hoc reinterpretations of contracts that an agency might offer in the context of a litigation"). The government offers no response to *contra proferentem*, which plainly applies here and which the Court could refuse to apply only if it found the Yankees' contract interpretation to be unreasonable. *See Turner Const. Co. v. United States*, 367 F.3d 1319, 1321 (Fed. Cir. 2004) ("when a dispute arises as to the interpretation of a contract and the contractor's interpretation of the contract is reasonable, we apply the rule of *contra proferentem* . . .").

In any event, the Contract language does not support the government's persistent assertions that for GTCC waste to fit the Contract definition of HLW, the NRC must designate GTCC waste as HLW under NRC regulations or must issue a rule that *irrevocably* requires DOE – with no possibility of exception – to dispose of GTCC waste in a repository. *See* Yankee Atomic's Prior GTCC Waste Br. at 3-4, 8-9, 13 (addressing these points).[8] On its face, the Contracts' coverage is triggered merely by an NRC Rule that "requires" repository disposal, and the 1989 regulation unambiguously requires such disposal where (as here) no alternative exists.

---

[8] The government's brief misleadingly implies that the 2001 NRC rulemaking addressed storage of GTCC waste at utilities as an alternative to DOE disposal. *See* Initial Gov't Br. at 76-77. That rulemaking did nothing of the kind: it addressed a licensing option for the storage of spent fuel and GTCC waste at ISFSIs. *See* Yankee Atomic's Prior GTCC Br. at 11-12 (further addressing the 2001 rulemaking).

This construction is not inconsistent with NRC statements, featured prominently in the government's brief, to the effect that NRC wished to "'preserve DOE's flexibility'" to explore the possibility of an intermediate depth disposal option if DOE chose to. Initial Gov't Br. at 76 (citation omitted). Contract coverage for GTCC waste does not depend upon NRC *forever* requiring that such waste be buried in a repository, and thus foreclosing future options – it depends only on the current existence of an NRC Rule that "requires" permanent isolation. The 1989 NRC Rule is such a rule, given the *current* absence of any alternative disposal path. *See* Yankee Atomic's GTCC Waste Br. at 9. And the time to determine what the NRC requires is when contract performance was due – January 31, 1998. Then, as now, there was no approved alternative to repository disposal.

Ultimately, the government's interpretation of the NRC's 1989 Rule is not reasonable. The government's reading necessarily changes "must" to "may," since the regulation would not actually require anything. The government's interpretation also renders the 1989 NRC rulemaking meaningless, because DOE would not be required to dispose of GTCC waste in a repository even if DOE *never* develops another disposal alternative. Nonsensical interpretations of regulations, such as the government's, are disfavored. *See, e.g., Demutiis v. United States*, 48 Fed. Cl. 81, 89 (2000) ("construing the regulation in the fashion that defendant contends would essentially render it a nullity . . . . Such a disembowling construction of a regulation is disfavored and runs counter to the legal maxim *lex non patitur absurdum*, *i.e.*, the law does not suffer an absurdity") (footnote omitted), *affirmed as modified,* 281 F.3d 1373 (Fed. Cir. 2002).

The government's arguments concerning the Low-Level Radioactive Waste Policy Amendments Act of 1985 ("LLRWPAA") were fully answered in the prior summary judgment briefing. *See, e.g.,* Yankee Atomic's Prior GTCC Waste Br. at 22-23. As explained there, the

LLRWPAA does not preclude, and is not in conflict with, the Contracts' coverage of GTCC waste. *Id*. That Act imposes a direct, affirmative statutory duty on DOE to dispose of GTCC waste: "The Federal Government *shall be responsible for* the disposal of – [GTCC waste]." 42 U.S.C. § 2021c(b)(1) (2000). DOE's stated policy in its 1987 Report to Congress under the LLRWAA is to accept GTCC waste when needed, *see, e.g*. YAPF 125, and the trial evidence shows that such acceptance would be needed (and was planned for by DOE) when DOE removes all the spent fuel from a shutdown utility, YAPF 126; *see also* YAPF 119, 123.

The government's assertion that the Yankees have offered "nothing new" supporting the Contracts' coverage of GTCC waste, Initial Gov't Br. at 75, is a strange view of the overwhelming trial evidence showing that 1) the purpose of the Contracts and the NWPA support construing the Contract to cover GTCC waste, YAPF 115-117, 2) DOE has long-planned repository disposal of GTCC waste along with spent fuel, YAPF 119, and 3) experts in the industry understand that the 1989 NRC Rule requires repository disposal of GTCC waste, YAPF 122.

The government's assertion that the "Yankees have always understood that GTCC waste is not covered by the NWPA," Initial Gov't Br. at 78, is simply untrue and badly distorts the trial evidence. That evidence reflects only that DOE *asserted* that GTCC waste disposal will require an additional fee, and that the resolution of whether such a fee would have to be paid was uncertain. *E.g.*, Response to GPF 216-218. Far from showing agreement with the government's position, the trial evidence merely confirms what the summary judgment record also showed, *see* Yankee Atomic's Prior GTCC Waste Br. at 14-20 – namely, that the Yankees had to plan for and deal with the uncertainty surrounding this potential fee. *See, e.g.,* Response to GPF 218-19.

The government also inaccurately asserts that Mr. Grube – a former employee of Yankee Atomic – "admitted" that GTCC waste falls outside of the Contracts. See Initial Gov't Br. at 78. Mr. Grube's testimony, elicited by the government, shows that despite acknowledged uncertainty surrounding the issue, he believed the Contracts cover this waste:

> Q. So is it fair to say then that, at this time, you believed that GTCC was not classified for disposal in Yucca Mountain?
>
> A. There apparently was some cloudiness about the definition. I would say it had been my belief, based upon the definition in the waste contract, that Greater Than Class C was actually high-level waste. It wasn't crystal clear perhaps, but I would read it to be included in the contract definition of high-level waste.
>
> Q. Okay. So you thought then that GTCC was within the definition of the standard contract, is that –
>
> A. That was my belief, yes.

Tr. 3856:21-3857:9 (Grube). Other trial testimony similarly shows that the Yankees have not agreed with the government's current interpretation of the Contracts. *See, e.g.*, Tr. 1837:17-20 (Bennet) ("We consider GTCC waste to be high-level waste under the contract . . . . the NRC has declared it as requiring permanent isolation."); *see also* Tr. 4947:13-16 (Kadak) ("the responsibility for GTCC is clearly DOE's, but the definition, if you connect the dots, okay, it will lead one to conclude it has to go into a repository . . . .").

The government also repeats its arguments that the Yankees took an inconsistent position before FERC. *See* Initial Gov't Br. at 78. Those arguments also were fully answered in the prior GTCC briefing. *See* Yankee Atomic's Prior GTCC Waste Br. at 14-20. Tellingly, the government does not cite *any* trial testimony supporting its inconsistent-position theory, even though numerous Company witnesses knowledgeable about these FERC proceedings, including Mr. Mellor, Mr. Bennet, Dr. Kadak, and Mr. Thomas, all testified at trial. The trial evidence

simply shows that given DOE's statements and the resulting uncertainty over whether there might be an additional fee for GTCC waste disposal, the Yankees conservatively provided for a further fee for GTCC waste disposal in their FERC submissions. *See,* P1929 at 80-81 (Connecticut Yankee brief to FERC) (regarding the possibility of an additional GTCC waste disposal fee, "the proper remedy in the face of such *uncertainty* is to allow present recovery of these funds, subject to early termination of decommissioning payments or refund should the contingency come to pass.") (emphasis added); Response to GPF 219.

<u>DOE Would Have Picked Up GTCC Waste With Spent Fuel</u>. Even apart from the Contract, and contrary to the government's cry of "pure speculation," Initial Gov't Br. at 81, overwhelming factual evidence demonstrates that DOE, more likely than not, would have accepted the small quantities of GTCC waste at each Yankee site if it were otherwise removing the Yankees' spent fuel. This evidence includes the testimony of Lake Barrett, the long-time leader of DOE's spent fuel program, who admitted that "[w]hen all extraneous legal matters are finally resolved my expectation is the greater-than-Class C waste will go at the same time, contemporaneously, at the same time [as spent fuel]." (6/28/04) Dep. Desig. 5/15/02 Barrett, at 395:18-396:4; *see also id.* at 400:9-17 & 397:9-10 ("at the end of the day, I believe that [GTCC waste] should go at the same time"); *see also* YAPF 118-120, 124-127 (discussing substantial other evidence showing that DOE would have removed GTCC waste at the same time it removed spent fuel). Tellingly, the government does not even *propose* a finding that DOE would have refused to accept GTCC waste from shutdown reactors if it were removing the spent fuel, and certainly no evidence supports such a conclusion.

In contrast, the factual evidence and arguments the government does advance are unpersuasive. The government's insists that an environmental impact statement is necessary

before DOE can make any decision on how to dispose of GTCC waste, Initial Gov't Br. at 81, but this is immaterial because there is no evidence suggesting that DOE could not and would not have completed any necessary, preliminary work to accept GTCC waste if it had a program in place to accept spent fuel. The government's assertion that "it is not at all clear that it would even be possible" to dispose of utility GTCC waste in the repository, *id.*, is not even remotely credible in view of the reams of DOE reports and documents going back many years showing that DOE can – and, at least until this litigation arose, had long planned to – dispose of utility GTCC waste at the repository. YAPF 119; *see also* YAPF 123, 127 and Response to GPF 237 (showing that Mr. Kouts' testimony was not credible). The government's further assertion, Initial Gov't Br. at 79, that the Yankees are making a claim under the LLRWPAA, and that the Court lacks jurisdiction to hear and decide it, is simply wrong. The Yankees are not pursuing a claim under the LLRWPAA; they seek damages that flow from the government's breach of the DOE Contracts. *See* Yankee Atomic's Prior GTCC Waste Br. at 20-23 (further addressing this government contention).

The government next asserts that the Yankees are seeking consequential damages, and that those are never recoverable against the government. Initial Gov't Br. at 80. The government cites no authority for the supposed *per se* ban on consequential damages, and there is none. To the contrary, the government is bound to ordinary contract law principles, *e.g., United States v. Winstar Corp.*, 518 U.S. 839, 895 n.39 (1996), including contract law principles governing damages issues, *e.g.*, *Mobil Oil Exploration & Producing Southeast, Inc. v. United States*, 530 U.S. 604 (2002). Lost profits, which are plainly recoverable against the government, *see, e.g., Energy Capital Corp.*, 302 F.3d at 1324-25, are a form of consequential damages. *See* 24 Richard A. Lord, *Williston on Contracts*, § 66:74 at 754 (4th ed. 2002) ("It is widely accepted,

as a general rule, that profits lost by the buyer as a result of the seller's breach . . . are recoverable as consequential damages.") Indeed, the lost profits awarded in *Chain Belt*, which resulted from the government's failure to remove equipment from the premises it sold plaintiff, *see* 115 F. Supp. at 714-715, were consequential rather than direct damages since the contract provision involved there was not aimed at promoting profits, but simply required the government to remove its equipment. Consequential damages are no less recoverable when they take the form of increased expenses. *See* 3 Dan B. Dobbs, *Law of Remedies*, § 12.2(3) at 42 (2d ed. 1993) ("[C]onsequential damages are often identified with lost profits. However, the two terms are not equivalent. Some consequential damages claims are based on added expenses, not on lost profits as such.") *see also* Yankee Atomic's Prior GTCC Waste Br. at 23-24. And if the Court agrees that GTCC waste is covered by the Contracts, then the Yankees' damages for extended storage of such waste are not consequential at all, but arise directly from DOE's breach.

The trial evidence establishes that (1) in view of both DOE's breach and its longstanding plans to dispose of GTCC waste at the repository, the Yankees reasonably decided to include its GTCC waste in the ISFSIs they built (with transport-ready containers) for the long-term storage of spent fuel, *see* YAPF 105; CYPF 102; MYPF 95, and, conversely, (2) if DOE had accepted the Yankees' spent fuel, there would have been no need to arrange for the on-site storage of GTCC waste because DOE also would have taken that material, *see, e.g.*, YAPF 123, 125-26, 128. On these facts, whether the costs the Yankees claim for extended storage of GTCC waste are viewed as direct damages or consequential damages, those costs were reasonably incurred and are recoverable here.

Finally, the government significantly exaggerates the potential consequences of its arguments on the Yankees' damages claims. The government contends that the costs to store GTCC waste indefinitely would have been "duplicative of" the costs the Yankees have incurred to store their SNF. Initial Gov't Br. at 73. This is patently wrong and unsupported by any credible evidence – but it does speak volumes about the government's true motive for advancing arguments on GTCC waste that are factually and legally untenable. If the Yankees had to store only GTCC waste on-site, they plainly would not have built large, multi-cask ISFSIs. Tr. 6905:12-6909:7 (Meisner); Tr. 7156:1-11 (Heider). And the operations and maintenance costs necessary to store GTCC waste alone are significantly less than the costs to store spent fuel. Tr. 6909:8-6911:21 (Meisner); Tr. 7159:21-7161:23 & 7164:14-17 (Heider). The costs for GTCC waste-only storage are set forth in the Yankees' GTCC waste-only storage budgets, D535 (Yankee Atomic), D494 (Connecticut Yankee), D789 (Maine Yankee), which are entirely uncontroverted and thus represent the maximum possible impact of the government's far-fetched theories on the Yankees damages claims. *See also* Response to GPF 272A; Tr. 6905:12-6911:21 (Meisner); Tr. 7155:13-7164:17 (Heider).

## VIII. <u>The Government's Failed Fuel And Multi-Purpose Canister Arguments Are Contractually And Factually Wrong.</u>

<u>Failed Fuel</u>. Positing that the Contracts give DOE "discretion" to indefinitely postpone the acceptance of failed fuel, the government contends that the Yankees were required to store their failed fuel "for a potentially indefinite period of time," and therefore cannot recover damages for the costs of storing failed fuel. Initial Gov't Br. at 82-83. This made-for-litigation argument is a pure fabrication – it is unsupported by the language of the Contracts, and contrary to substantial evidence showing that the Yankees' failed fuel could have and would been accepted by DOE on the same schedule as other spent fuel. Indeed, in 1984, consistent with the

Yankees' interpretation of the Contract, DOE acknowledged in a letter to the utilities that: "[f]ailed fuel canned in a container provided by or approved by the Department also will be subject to the *same scheduling procedures* as other spent fuel." P989 (emphasis added). This early, pre-dispute evidence of DOE's understanding alone disposes of the government's current litigation argument.

The government does not quote from the Contract, which is not surprising because the terms "discretion," "indefinite deferral," or "at the end of the acceptance queue," or anything remotely like them, cannot be found in the Contract. The Contract instead provides:

> DOE's obligation for disposing of SNF under this contract also extends to other than standard fuel; however, for any SNF which has been designated by the Purchaser as other than standard fuel . . . the Purchaser shall obtain delivery and procedure confirmation from DOE prior to delivery. DOE shall advise Purchaser within sixty (60) days after receipt of such confirmation request as to the *technical feasibility* of disposing of such fuel on the currently agreed to schedule and any *schedule adjustment* for such services.

P1YA, Art.VI.A.2.(b) (emphasis added). Under this provision, the schedule for a failed or "other than standard" assembly would only be adjusted if it were *technically infeasible* to dispose of it on the planned schedule. Moreover, the Contract language does not allow for long-term or indefinite deferral. Rather it provides only for a "schedule adjustment"– which clearly implies a modest tweaking, *i.e.*, an *adjustment* – in the planned schedule.

The Contract also specifically provides for the manner in which failed fuel would be timely accepted, requiring that DOE provide purchasers with written procedures for cask loading, "including specifications on Purchaser-furnished canisters for containment of failed fuel." P1YA Art. IV.B.2.(a). It was well-known at the time of Contract formation that the acceptance of failed fuel would not be an issue. *See* Response to GPF 263. As DOE explained in 1983, when presented with the issue of who should pay for the failed fuel canisters, "[o]ne

commenter requested that the Department provide the containers for failed fuel at no cost to the utilities. This was rejected because the furnishing of such containers is part of the *normal* utility cost for the operation of its spent fuel storage basin." P31, at 16597 (emphasis added); *see* Tr. 3157:21-3159:25 (Meisner) (Maine Yankee used "absolutely no special handling equipment" for failed fuel; it simply grappled and moved its failed fuel assemblies just like any other assembly and loaded them into damaged fuel cans within the dual-purpose canisters). *See* Response to GPF 263.

There is no evidence that it would have been technically infeasible for DOE to dispose of failed fuel on the same schedule as intact fuel. The evidence advanced by the government suggests, at most, that a damaged assembly *that is not placed in a damaged fuel canister* might theoretically present some issues for DOE. *See e.g.*, GPF 270. But any such assemblies have been, and in the non-breach world would have been, placed in damaged fuel cans – as the Contracts expressly contemplate.[9] Thus, even assuming, *arguendo*, that the government's Contract interpretation is correct – and it is not – it is immaterial because the evidence shows that DOE could easily handle the Yankees' failed assemblies, and there would be no reasonable basis to defer acceptance. *Pacific Far East Line, Inc. v. United States*, 184 Ct. Cl. 169, 394 F.2d 990, 998 (1968) ("A party vested with contractual discretion must exercise his discretion reasonably and may not do so arbitrarily or capriciously."); *Orange Cove Irrigation Dist. v. United States*, 28 Fed. Cl. 790, 800-01 (1993) (similar); *see* Rest. 2d Cont. § 205 cmt. a ("Good faith performance or enforcement of a contract emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party.").

9 The Yankee Utilities have *not* included the costs of placing their failed fuel assemblies in damaged fuel cans as part of their damages because these costs would also have been incurred in the non-breach scenario.

Canistered Fuel. Positing that SNF in multi-purpose canisters is not covered by the Contracts, the government similarly asserts that "it is possible" that the Yankees will be in possession of their canisters "for an indefinite period of time" and "would still have to store these items, and cannot recover damages for their storage costs." Initial Gov't Br. at 83. The government's argument makes no sense. The Yankees placed their SNF in multi-purpose canisters because of DOE's impending and now actual breach. Because that was a reasonable response, indeed an abundantly sensible one, the cost of the canisters is recoverable as damages. *See* Initial YABr. at 7-8 (addressing recovery of mitigation and alternative-to-performance costs); YAPF 103 (noting, *inter alia*, that the Yankees' canisters were designed to DOE's own specification for multi-purpose canisters that DOE had published in the 1990s).

The government's argument is also wrong even on its own terms. The Contracts should be construed to cover SNF in NRC-licensed canisters. The Contracts specify that DOE shall begin acceptance, "and shall continue until such time as *all* SNF and/or HLW from the civilian nuclear power reactors [specified in the contract] has been disposed of." P1 (YA Contract), Art. II (emphasis added). Further, DOE is responsible for providing casks that are "suitable for use at the Purchaser's site." *Id.* at Art. IV.B.2. Indeed, DOE itself has represented to the Governor of Maine that assurances that DOE would take Maine Yankee's SNF, if placed in multi-purpose canisters, "*already exist under the terms of the contract* for disposal that the Department has with Maine Yankee Atomic Power Company. The contract covers the acceptance, transport, and disposal of all spent nuclear fuel from the Maine Yankee reactor, regardless of the condition of the spent nuclear fuel." P1013 (emphasis added). DOE's systems requirement document for the program, which directs the designers of the program, also states that the program will take dual-purpose canisters from the utilities, P843 at 12, a fact not mentioned in the government's brief.

And trial testimony from the government's own witnesses further confirms that the facilities at Yucca Mountain are being designed with the capability to handle commercial canisterized fuel. Tr. 7812:9-25 (Kouts); *see* Response to GPF 237.

Finally, because the Yankees decision to place their SNF in NRC-licensed dual-purpose canisters was a reasonable one, if DOE should actually refuse to accept these canisters when (if ever) DOE finally performs, then the additional delay and resulting repackaging costs would only serve to *increase* the Yankees damages. That would be a matter to address in a future damages action, not the present one.

IX. <u>The Court Has No "Discretion" To Deny The Yankees The Damages They Have Incurred, And No Reason To Deny Those Damages.</u>

The government's remarkable suggestion, with no citation of judicial authority, that "the Court should exercise its discretion to limit the Yankee's damages," Initial Gov't Br. at 83, is contrary not only to controlling precedent, but to the guiding principle of contract damages, which is "'to award damages sufficient to place the injured party in as good a position as he or she would have been had the breaching party fully performed.'" *Hughes Communications Galaxy*, 271 F.3d at 1066 (quoting *San Carlos Irrig. & Drainage Dist*., 111 F.3d at 1562-63). Ironically, the government itself relies on this very principle in a different section of its brief. *See* Initial Gov't Br. at 93 ("One of the basic principles of contract damages is that 'damages for breach of contract shall place the wronged party in as good a position as it would have been in, had the breaching party fully performed its obligation.'" *Bluebonnet Sav. Bank, F.S.B. v. United States*, 339 F.3d 1341, 1344-45 (Fed. Cir. 2003) (quoting *Mass. Bay Transp. Auth. v. United States*, 129 F.3d 1226, 1232 (Fed. Cir. 1997))).

The sole (and obscure) authority the government does cite – a part of section 351 of the Restatement (Second) of Contracts, which is addressed to foreseeability, and primarily comment

f. to that section – has no application here. First, as reflected in the illustrations to comment f., the provision in question applies at most to limit excessive *consequential* damages of a *type* the breaching party could not reasonably have foreseen. Here, the Yankees' damages are direct, not consequential, and are of a type that was not only foreseeable by DOE but actually foreseen by it. *See* Initial YABr. at 4-5. Second, even where consequential damages are concerned, and even where the basis the government asserts for invocation of § 351(3) is present, namely, "there is an extreme disproportion between the price paid and the damages sought," Initial Gov't Br. at 84, no discretionary damages reduction is warranted (or "just") where the damages at issue were clearly foreseeable. As the Second Circuit explained in *International Ore & Fertilizer Corp. v. SGS Control Services, Inc.*, 38 F.3d 1279, 1284-85 (2d Cir. 1994), which involved $500,000 in damages for breach of a contract to inspect a ship's cargo hold for a $220 fee:

> The fact that SGS charged a seemingly low fee relative to potential liability hardly suggests that the parties failed to contemplate SGS's bearing the risk of a negligent inspection. . . . SGS is a professional organization . . . . fully aware that a negligent inspection may cause the loss of an entire cargo. That is why parties to sales of goods to be transported by sea require such [inspections]. We see no reason whatsoever, therefore, why SGS is not liable for Interore's consequential damages as a result of its breach.

*Id.* (citation omitted). The Second Circuit did not mention comment f. to § 351, but the District Court decision it criticized was one of the extremely rare cases that does mention it.[10] *See Perini Corp. v. Greate Bay Hotel & Casino, Inc.*, 610 A.2d 364, 381-82 (N.J. 1992), *overruled on other grounds by Tretina Printing, Inc. v. FitzPatrick & Assocs., Inc.*, 640 A.2d 788 (N.J. 1994) ("Few

[10] *International Ore* did not actually reinstate full damages on the contract claim only because plaintiff failed to cross-appeal on that claim. *See* 38 F.3d at 1281 ("Interore would ordinarily be entitled to full damages. However, there has been no cross-appeal. . . .").

cases have mentioned § 351(3) in dicta; fewer still have actually relied on that section in limiting damages.").

Here, as in *International Ore,* the damages incurred as a result of the DOE's breach are precisely those which the Yankees sought to avoid by entering into the Contracts, namely on-site spent nuclear fuel storage costs. Those storage costs should have been, and in fact were, foreseen by the government at the time it entered the Contracts. *See* Initial YABr. at 4-5. As in *International Ore*, the government here cannot be heard to contend that damages should be reduced because they supposedly are out of proportion with the Yankees' fees under the Contracts. DOE knew precisely what the Yankees were paying for.

X. The Court Should Reject The Government's Objections To The Yankees' Takings Claims – Again.

The government raises two arguments against the Yankees' taking claims. Each has already been substantially rejected by the Court, and is simply wrong as a matter of both fact and law.

The government first argues that the Yankees cannot recover for a taking because the property rights the Yankees claim were taken arise solely from the Contracts at issue. That is wrong. As the Yankees demonstrated in prior briefing, *see, e.g.,* Yankee Atomic's Opposition to Defendant's Motion for Summary Judgment Upon Count II of Plaintiff's Complaint (Re Takings), filed Dec. 16, 2002 ("YA Takings SJ Brief"), and as the Court noted in its Order of June 26, 2003 at 5, the Yankees' takings claims are *not* based upon rights that arise from the Contracts. Indeed, this Court previously recognized that the Yankees' takings claims are distinct from their contract claims when it held that "no contract clause purports to cover or redress an alleged taking of real property. Therefore, plaintiff's taking claim is not converted into a claim arising under the contract . . ." *Yankee Atomic Elec. Co. v. United States*, 42 Fed. Cl. 223, 236

(1998), *aff'd sub nom. Maine Yankee Atomic Power Co. v. United States*, 225 F.3d 1336 (Fed. Cir. 2000).

What has been taken here is the Yankees' unfettered fee-simple ownership of the real property underlying the ISFSIs, on which they have been required by the government to store SNF, in contravention of expectations of the parties predating by decades the NWPA and the LLRWPAA. *See, e.g.,* MYPF 141 (GTCC), 179 (all radioactive wastes); Response to GPF 323-24; *see also Florida Power & Light Co. v. Westinghouse Elec. Corp.*, 826 F.2d 239, 244, 245-48 (4th Cir. 1987) ("It was plainly recognized that without the assurance of a safe method of disposal, no utility would have prudently considered the hazard of constructing a nuclear power plant."); *Minnesota v. NRC,* 602 F.2d 412, 413-19 (D.C. Cir. 1979) ("It was anticipated, when most of the nuclear power plants now in operation in the United States were licensed, that spent fuel would be stored at the reactor site only long enough to allow the fuel assemblies to cool sufficiently to permit safe shipment off-site for reprocessing (the extraction from the rods of usable uranium and plutonium) or permanent disposal. Spent fuel storage capacity at these plants is therefore limited."). Thus, the cases cited by the government holding that there can be no takings claim where the property right claimed arises out of a government contract, Initial Gov't Br. at 86-89, are inapt. *See, e.g., Allegre Villa v. United States,* 60 Fed. Cl. 11, 18 (2004) ("plaintiffs have rested this claim on a contract right to prepayment that was substantially limited by subsequent legislation. Given that contract right, plaintiffs' recovery lies in a theory of breach, not takings"); *Southern Nuclear Operating Co. v. United States*, No. 98-614C, slip op. at 5 (Fed. Cl. Apr. 7, 2004) (plaintiff alleged that '"DOE's failure to commence disposal and, its announcement that it will not begin to dispose of SNF before 2010, at the earliest, took the

companies' *vested property rights as expressed and implied in, and arising from, the Standard Contracts*.'" (emphasis added)).

Where (as here) the taking involves a physical invasion of real property as a result of government conduct, plaintiff can recover for a taking even if the invader is not the government itself. *See Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 434-35 (1982) (*per se* taking occurred when government permitted physical occupation of plaintiffs' property by cable company); *see also Cienega Gardens. v. United States*, 331 F.3d 1319, 1328-30 (Fed. Cir. 2003) ("in abrogating the Owners' contractual prepayment rights, the statutes intentionally defeated the Owners' *real property rights to sole and exclusive possession*" by requiring continued occupancy of the property by tenants paying below-market rents (emphasis added)). Indeed, established takings jurisprudence requires the Court to uphold the Yankees' takings claims and award appropriate just compensation.

*Cienega Gardens,* 331 F.3d 1319, is particularly instructive, as the Court noted in its June 26, 2003 Order at 5 (noting that in *Cienega Gardens*, "the Federal Circuit held that a continued restriction on property owners' right to control their property resulted in a taking requiring compensation."). In *Cienega Gardens*, prior proceedings had established that the government had no contractual obligation to allow prepayment of the underlying private mortgages. *See Cienega Gardens v. United States*, 194 F.3d 1231 (Fed. Cir. 1998). The Federal Circuit nevertheless held that the government's *failure to accept* prepayments constituted a taking because it prevented the property owner/mortgagors from making unencumbered use of their property. 331 F.3d at 1328-30. Although *Cienega Gardens* involved a regulatory taking, it shows that government *inaction* alone – even apart from any government contract – can work a taking. *See Franconia Assocs. v. United States,* 536 U.S. 129, 143-44 (2002) (claim in similar

case arose not from statutory restrictions on prepayment but only from HUD's later *refusal* to accept a prepayment). Combining that principle with *Loretto*'s holding that any physical occupation of real property is a *per se* taking, 458 U.S. at 432, establishes that DOE has taken the Yankees' property here. Indeed, DOE has deliberately elected to use the Yankees' property to store SNF, which is a public responsibility. *See* YA Taking SJ Br. at 15-18.

The government's second argument – that any taking should be considered temporary rather than permanent, and the Yankees' failure to establish the rental value of the property taken is fatal to their takings claims – was, again, previously briefed extensively. *See* Yankee Atomic's Opposition to Defendant's Motion *In Limine* Regarding Takings Damages, filed April 16, 2004 at 3-8. As noted in that briefing, the Court of Claims long ago recognized that a taking that is "to be expected for the indefinite future . . . constitute[s] a permanent taking." *Tal'Wi-Wi Ranches v. United States*, 156 Ct. Cl. 700 (1962) (¶¶ 25-26 of decision); *see also Armijo v. United States*, 229 Ct. Cl. 34, 663 F.2d 90, 93 (1981); *Porter v. Resor*, 415 F.2d 764, 765 (10th Cir. 1969). Moreover, the Federal Circuit has recognized that the distinction between a permanent and temporary physical occupation refers to the "nature of the intrusion" rather than its "temporal duration." *Skip Kirchdorfer, Inc. v. United States*, 6 F.3d 1573, 1582 (Fed. Cir. 1993). Thus, for example, the Federal Circuit has found that the presence of monitoring wells on property constitutes a permanent taking, even if the duration of the presence of the wells is only a few years. *See Hendler v. United States*, 952 F.2d 1364, 1376-77 (Fed. Cir. 1991); *McKay v. United States*, 199 F.3d 1376, 1381-82 (Fed. Cir. 1999). This Court, in fact, has already recognized that "defendant's argument and authorities are inapplicable" in connection with its rejection of the government's motion *in limine* to exclude evidence of the fair market value of

the taken property based on the argument that this case presents only a temporary taking. *See* Order of May 19, 2004 at 2.

The evidence is clear that the storage of SNF in large concrete containers at the Yankees' ISFSIs is of indefinite duration, and could go on forever. *See* MYPF 180-183. Accordingly, the taking here is appropriately considered "permanent" and, therefore, the proper measure of damages is the fair market value of the taken property, not its rental value. *See Bass Enters. Prod. Co. v. United States*, 133 F.3d 893, 895 (Fed. Cir. 1998). The Yankees presented uncontroverted evidence regarding the fair market value of their taken property, and are entitled to just compensation in that amount. *See* YAPF 166-67; CYPF 181; MYPF 185.

XI. The Government's Good Faith And Fair Dealing Argument Is Legally And Factually Wrong.

Relying principally on *Am-Pro Protective Agency, Inc. v. United States*, 281 F.3d 1234 (Fed. Cir. 2002), the government asserts that the Yankees can establish a breach of the duty of good faith and fair dealing implied in the Contracts only if they show, by "'clear and convincing evidence,'" that DOE acted in "bad faith, which 'has been equated with evidence of some specific intent to injure the plaintiff.'" Initial Gov't Br. at 92 (quoting *Am-Pro*, 281 F.3d at 1240). Although that may be the rule when a plaintiff alleges "bad faith" conduct by a governmental official in the performance of non-contractual official duties, the Yankees' claim for breach of an implied *contractual* duty is governed by a different rule, namely, that "a contract with the United States is to be construed and the rights and duties of the parties determined by application of the same principles of law as if the contract were between private individuals. *Roedler v. DOE*, 255 F.3d 1347, 1351 (Fed. Cir. 2001) (*citing Mobil Oil*, 530 U.S. at 608); *see Winstar,* 518 U.S. at 895 n.39.

Although *Am-Pro* arose in a government contract setting, the gravamen of the claim involved there – "duress" by the contracting officer, *see* 281 F.3d 1240-41 – was not a claim *on* the contract. Earlier Court of Claims cases cited in *Am-Pro* and by the government here also are not controlling, either (1) because they are not contract cases, *e.g., Gadsden v. United States,* 111 Ct. Cl. 487, 78 F. Supp. 126 (1948), cited in Initial Gov't Br. at 92 (wrongful discharge case; demurrer overruled); *Knotts v. United States,* 128 Ct. Cl. 489, 492, 121 F. Supp. 630, 631 (1954) (*cited in Am-Pro*, 281 F.2d at 1239) (wrongful discharge case holding that presumption of good faith was overcome); (2) because they do not do not mention any heightened substantive or procedural standard, but simply find a violation of the implied contractual duty of good faith, using appropriate language to describe the offending conduct, *e.g., Struck Construction Co. v. United States,* 96 Ct. Cl. 186, 222, 1942 WL 4411 (1942), cited in Initial Gov't Br. at 92 (government conduct evading contract terms, to contractor's detriment, was "designedly oppressive . . . it fell below the standard of good faith"), or (3) because, in two cases involving alleged abuse of discretion in terminating for convenience, talk of heightened standards was pure *dicta* as no abuse of discretion was found, *Librach v. United States,* 147 Ct. Cl. 605, 612, 614, 1959 WL 7633 (1959) ("record is devoid of any evidence" that contract was canceled for reason "other than an honest mistake based upon incomplete data"); *Kalvar Corp., Inc. v. United States,* 211 Ct. Cl. 192, 201, 543 F.2d 1298, 1303 (1976) ("[m]ere error on the part of the Government . . . . is insufficient to overcome the presumption of regularity inherent in the invocation of the termination for convenience"), both cited in Initial Gov't Br. at 92.

Here, the Yankees' claim for breach of the implied contractual duty is a claim *on* the contract. In this context, the common law contract rule, made applicable to the government by *Winstar* and *Mobil Oil*, is well-established: "[e]very contract imposes upon each party a duty of

good faith and fair dealing in its performance and its enforcement." Rest. 2d Cont. § 205; *see id.* cmt. d ("[s]ubterfuges and evasions violate the obligation of good faith in performance even though the actor believes his conduct to be justified."). More specifically, "every contract . . . imposes an implied obligation 'that neither party will do anything that will hinder or delay the other party in performance of the contract.'" *Essex Electro Eng'rs, Inc. v. Danzig*, 224 F.3d 1283, 1291 (Fed. Cir. 2000) (citation omitted).

The government also misapprehends the facts giving rise to this claim. It is not based merely on DOE's delay, as the government suggests, *see* Initial Gov't Br. at 92-93, but on DOE's attempt to misuse the DCS process to deny the Yankees' the benefits of their Contracts. By any standard of proof, the trial evidence establishes that DOE did that knowingly and willfully. *See, e.g.,* YAPF 129-134. In fact, Mr. Vance's uncontroverted testimony establishes that DOE misused the DCS process "with some specific intent to injure" SNF plaintiffs including the Yankees – namely, the specific intent to limit their damages claims – thus establishing a breach of the implied contractual duty even under the incorrect legal standard proffered by the government:

> I was told at that time specifically from Alan Brownstein that the lower rate was going to be used. The decision had already been made. And the reason for that was that it was obvious at that point that '98 was not going to be met and that they desired to limit the liability to purchasers.

Tr. 7622:2-8 (Vance); *see* Tr. 3995:12-3997:21 (Pollog) (DOE stopped processing DCS submittals in late 1996/early 1997; and DOE apparently believed that may limit liability).

XII. <u>The Government Has No Right To Collect, Or Even Claim, Pre-1983 Fees.</u>

The last section of the government's brief reiterates its argument that, even though DOE has not yet performed, the "pre-1983" deferred Contract fees of Connecticut Yankee and Maine Yankee should be paid to the government or offset from the respective damages awards. Initial

Gov't Br. at 93-97. Connecticut Yankee and Maine Yankee addressed this argument fully in their response to the government's motion seeking leave to assert these counterclaims, and will not repeat here all the reasons why that motion should be denied and the proposed counterclaims rejected. *See* Response of Connecticut Yankee to Defendant's Motion for Leave to File Amended Answer and Counterclaims, filed September 24, 2004 (though the caption mistakenly states that response was filed October 15, 2004) ("Counterclaim Opp.").

The Yankees will reiterate here that the government's suggestion that absent payment of the deferred fees now, a damages award to Connecticut Yankee and Maine Yankee will place them in a better position than had no breach occurred, *see, e.g.,* Initial Gov't Br. at 94-95, is ridiculous. Had no breach occurred, their SNF would be *gone.* That circumstance would in all events be vastly superior to their current predicament. Under the terms of their Contracts, that circumstance (i.e., DOE performance) also would require the companies to pay their deferred fees and they would gladly do so. But to offset the one-time fees now, while leaving the SNF in place, not only would be unfair and contrary to the Contract terms, but effectively would penalize Connecticut Yankee and Maine Yankee for electing a partial breach remedy. Requiring payment of the deferred fee now, while leaving the SNF in place, also would take away whatever contractual incentive DOE might have to perform and actually earn its fee in the future. *See* Counterclaim Opp. at 2.

The Yankees also add here that uncontroverted trial testimony confirms that payment of the deferred fee now, in the absence of DOE performance, is not required by the Contract and is completely unreasonable. *See, e.g.,* Tr. 7017:6-15 (Bennet) ("Q: . . . [C]an you please tell us why CY has not paid the pre-'83 fee [?] A: DOE has not performed. And under the contract, we're not obligated to pay until they do perform. Secondarily, in an instance where a contractor

is not performing, I think it would be imprudent to even consider paying until such time as performances commences. . . “); Tr. 7182:11-7183:17 (Thomas) (similar, including at 7183:5-17: “I don’t regard it would be a good business decision to pay a contractor who’s gone years beyond what we expected for performance and make some full payment . . . . [and] I would expect that our regulators may come to the same conclusion. And that could lead to potential disallowances or other penalties . . . . So I don’t think it’s feasible for us to pay the . . . pre-’83 spent fuel trust obligation at this point in time.”).

## CONCLUSION

For the reasons set forth above and in the Yankees’ other post-trial submissions, the government’s proposed factual findings and its legal arguments provide no basis for awarding the Yankees’ less than the full amount of damages they claim in these cases.

Dated: January 13, 2005

Respectfully submitted,

s/ Jerry Stouck

JERRY STOUCK
Spriggs & Hollingsworth
1350 I Street, N.W., Ninth Floor
Washington, D.C. 20005
(202) 898-5800
(202) 682-1639

Counsel for Plaintiff,
YANKEE ATOMIC ELECTRIC COMPANY

Of Counsel:

Robert L. Shapiro
SPRIGGS & HOLLINGSWORTH