**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| YANKEE ATOMIC ELECTRIC COMPANY,<br>Plaintiff,<br>v.<br>UNITED STATES OF AMERICA,<br>Defendant. | No. 98-126 C<br>(Senior Judge Merow)<br><br>Filed electronically January 13, 2005 |

# YANKEE ATOMIC'S RESPONSE TO THE GOVERNMENT'S PROPOSED FINDINGS OF FACT

JERRY STOUCK
Spriggs & Hollingsworth
1350 I Street, N.W., Ninth Floor
Washington, D.C. 20005
(202) 898-5800
(202) 682-1639 (facsimile)

Counsel for Plaintiff,
YANKEE ATOMIC ELECTRIC COMPANY

Of Counsel:

Robert L. Shapiro
SPRIGGS & HOLLINGSWORTH

Dated: January 13, 2005

## Table of Contents

Page

I. Government Proposed Findings Regarding Schedule Issues Reflect Rejected Legal Arguments....2

II. Government Proposed Findings Regarding Graves' Economic Sequence Model Are Either Immaterial or Without Merit ....12

III. Government Proposed Findings Regarding GTCC Waste Are Without Merit....32

IV. Government Proposed Findings Regarding Other Than Standard Fuel Are Without Merit....44

V. Government Proposed Findings Regarding Plaintiffs' Decisions to Use Dry Storage in Light of DOE's Failure to Remove Their SNF Are Without Merit....47

VI. Government Proposed Findings Regarding Plaintiffs' Use of Dry Storage Canisters Are Without Merit....58

VII. Government Proposed Findings Regarding Year of Anticipated DOE Performance Are Without Merit ....61

VIII. Government Proposed Findings of Fact Regarding a Bad Faith Claim is a Straw Man ....61

IX. Government Proposed Findings Regarding Taking Claims Are Without Merit....61

X. Government Proposed Findings Regarding Plaintiffs' Reracking Projects Are Without Merit....62

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| YANKEE ATOMIC ELECTRIC COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | No. 98-126 C<br>(Senior Judge Merow)<br><br>Filed electronically January 10, 2006 |

**YANKEE ATOMIC'S**
**RESPONSE TO THE GOVERNMENT'S**
**PROPOSED FINDINGS OF FACT**

Yankee Atomic submits the following response to the government's post-trial Proposed Findings of Fact ("GPF").[1] Most of the government's proposed findings can be efficiently addressed in categories, and the Yankees' response is organized accordingly. Plaintiffs also provide some additional responses to a number of the individual government proposed findings. However, plaintiffs will not burden the Court with a comprehensive recitation of every disagreement and criticism they have with the government's proposed findings, especially since many of the proposed findings are immaterial. The absence of such a comprehensive treatment should not be interpreted as agreement with either the substance or materiality of the government proposed finding to which individual responses are not provided.

[1] As the government filed one set of proposed findings of fact applicable to this case and to *Connecticut Yankee v. U.S.*, No. 98-154C and *Maine Yankee v. U.S.*, No. 98-474C, this response should be deemed applicable to all three cases.

## I. Government Proposed Findings Regarding Schedule Issues Reflect Rejected Legal Arguments

The government devotes a substantial portion of its proposed findings to repetition of legal arguments regarding the rate of spent fuel acceptance that this Court rejected. In particular, the government still maintains that the parties' Contract provides mechanisms to set the rate and sequence of spent fuel acceptance. *See* GPF 14-15, 53-54. Of course, this Court has already rejected these arguments in its Order of June 26, 2003. Similarly, the government continues to maintain that the Contract's Disputes Clause, *see* P1YA, Art. XVI.A., is available to resolve disputes between the parties concerning DCSs. GPF 60, 100. But in *Maine Yankee v. U.S.*, 225 F.3d. 1336, 1340 (Fed. Cir. 2000), the Federal Circuit made clear that the Disputes Clause is only applicable where the contract "also provides a specific administrative remedy for a particular dispute." And no such administrative remedy is available to address DCS disputes.

The government sets out a number of proposed findings for the proposition of law that the approved DCSs create "binding" obligations between the parties that presumably limit DOE's obligations to pick up plaintiffs' spent fuel to the amounts set out in those DCSs. *See, e.g.,* GPF 71.d., 80, 81, 86, 90, 105. This Court rejected that interpretation of the parties' Contracts in its June 26, 2003 Order adopting most of *Commonwealth Edison Co. v. United States*, 56 Fed. Cl. 652 (Fed. Cl. 2003). Moreover, the trial record is replete with evidence indicating that the parties did not view the DCSs as creating binding, much less limiting, commitments for DOE's acceptance of utilities' spent nuclear fuel and high-level radioactive waste (together "SNF"):

- Nancy Slater Thompson, the Technical Representative for DOE's Contracting Officer during the period when DCSs began, testified unequivocally that DCSs were not intended or understood by the contracting parties to be binding, *see* July 7, 2004 Designated

Deposition Testimony at Ex. 11: Dep. 6/13/02 at Tr. 94:16-95:18 (explaining that it was recognized “that not only was the ACR for planning purposes only, but that in fact their DCSs were for planning purposes . . .”); *id.* at Tr. 95:25-96:16 (“I don't know how one would perceive a DCS as anything other than for planning purposes.”); *id.* at Tr. 98:9-21 (“[DCSs] were for planning purposes only and in fact were completed in such a way that not much but planning could be done based on the information contained in them. In addition, given the fungibility of the DCSs, that's why there is a final delivery schedule which is somewhat more than a planning document. And I do recall siting across the table from numerous utility representatives, clearly recognizing that the DCSs were for planning purposes, and they in fact did not view themselves as binding themselves to deliver specifically what was described on the DCS.”); *id.* at Tr. 98:22-99:6 (agreeing that no one “within DOE. . . thought that the delivery commitment schedules were binding on either industry or the department.”); *id.* at Tr. 109:3-110:13 (stating that approved DCSs are not binding).

- Testimony at trial further indicates that DCSs were not intended or understood by the contracting parties to be binding: Tr. 4159:2-4160:16 (Zabransky) (stating that approved DCSs “support[ing] operations beginning in 1998 [are not] valid for use supporting operations in 2010” in light of the new ACR and DCS Instructions issued by DOE in July 2004 (*see* P1952, P1953).); Tr. 3953:23-3956:20 (Pollog) (testifying that Alan Brownstein, a DOE official who “had principal responsibility for the DCS process,” had the view in 1990-1991 that “the DCS was not binding if a [DOE] facility hadn’t commenced operations in 1998.”); *see also* Tr. 4002:13-4004:14 (Pollog) (agreeing that during his deposition he testified that DOE personnel held the view “[DCSs] submitted

and approved by the Department pursuant to these instructions . . . did not create any binding obligations.").

- P295MY (3/4/92 Letter from DOE to Maine Yankee with Instructions for Completing the Appendix C DCSs) at 1 (explaining "[t]he DCS provides the Purchaser with the opportunity to *inform the Department of plans* regarding its allocations of projected Federal waste acceptance capacity"), at ¶7(c) ("The annual acceptance rates in the 1991 ACR provide an approximation of the FWMS acceptance capacity and are for planning purposes. The process described herein assumes that the FWMS will be able to accept the Purchasers' SNF beginning in 1998 according to the acceptance rate reflected in the ACR. *In the event that such circumstances change, all DCSs previously approved by DOE may need to be reevaluated by DOE and the Purchasers.*") (emphasis added).
- D30.018 (6/14/95 Letter from DOE to Yankee Atomic approving Yankee Atomic DCSs) ("[t]he proposed delivery date [in the approved DCS] is *dependent upon* the existence of an operational repository or an interim storage facility constructed under the act.") (emphasis added).
- The ACRs upon which the DCSs were to be based pursuant to the instructions distributed by DOE make clear that they cannot support binding commitments. Consistent with the Contract language that ACRs are for "planning purposes," *see* P1MY at Art. IV.B.5(b) (Maine Yankee's 6/6/83 Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste), each ACR issued by DOE from 1987-1995 explicitly states DOE's own interpretation that the Standard Contracts do not make ACRs contractually binding, *see e.g.,* D27 (1995 Acceptance Priority Ranking and Annual Capacity Report) at 1.0 ("As specified in the Standard Contract, the ACR is for planning purposes only and,

therefore, is not contractually binding on either the Department or the Purchasers."); *see also* D16 (1987 Annual Capacity Report) at 2 (same); D17 (1988 Annual Capacity Report) at 1 (same); D18 (1990 Annual Capacity Report) at 2 (same); D24 (1991 Annual Capacity Report) at 1 (same); D26 (1992 Annual Capacity Report) at 1-2 (same); P63 (1995 Acceptance Priority Ranking and Annual Capacity Report) at 1 (same).

- Each ACR also states explicitly that its acceptance rate projections are subject to change. *E.g.,* D27 (1995 Acceptance Priority Ranking and Annual Capacity Report) at 4 ("This table [titled, "Projected Nominal Waste Acceptance Rates for Spent Nuclear Fuel"] provides only an approximation of the system throughput rates and is subject to change depending on Congressional action regarding the conditions for the siting, construction, and operation of an interim storage facility, if any, the repository, and the system design and configuration. The Department will further define and specify the system operating and waste acceptance parameters as the Program progresses, and inform the Purchasers accordingly.").

- The July 2004 ACR also states that ACRs are not binding. *See* P1952 (July 2004 Acceptance Priority Ranking and Annual Capacity Report) at 1.0 ("As specified in the Standard Contract, the ACR is for *planning purposes only* and, thus, is *not contractually binding* on either DOE or the Purchasers") (emphasis added).

- The DCS Instructions issued July 28, 2004, *see* P1953, state at ¶7(a):

> The annual acceptance rates in the 2004 APR/ACR provide an approximation of the CRWMS acceptance capacity and are for planning purposes. The process described herein assumes that the CRWMS will be able to accept a Purchaser's SNF beginning in 2010 according to the acceptance rates reflected in the 2004 APR/ACR. DOE recognizes that many Purchasers have submitted and DOE has approved DCSs based upon the January 31, 1998 operations date included in the Standard Contract. Purchasers

> should submit new DCSs based upon the currently planned operation date of 2010. (emphasis added).

- Subsequently, by letters dated December 1, 2004 signed by Mr. Zabransky as Contracting Officer, *see, e.g.*, Exhibit A attached hereto, DOE stated that its "resumption of the DCS process [as reflected in P1953] was premature," and it returned DCS forms submitted in response to P1953 and stated that "[a]fter the Department has determined a revised date for the initial operation of the Yucca Mountain repository, it will resume the DCS process in accordance with the provisions in the Standard Contract."

Plaintiffs provide the following further responses to certain individual findings proposed by the government:

61.b. This proposed subfinding realleging that the minimum period covered by ACRs serves as a maximum period in which spent fuel acceptance allocations can be exchanged misreads the parties' Contract as explained fully below at pp. 15-16.

70. Plaintiffs agree that the parties' Contracts do not set out particular rates for DOE's acceptance of utilities' SNF, minimum, maximum or otherwise. Rather, as set out in plaintiffs' proposed findings, *see, e.g.,* Yankee Atomic Proposed Findings of Fact ("YAPF") 61, the parties recognized that the rate of DOE's acceptance of utilities' SNF should achieve two objectives: to prevent utilities from having to construct or maintain additional at-reactor storage facilities for spent fuel after January 31, 1998, and (2) to accept spent fuel at a rate that permitted DOE to keep up with the rate of production of spent fuel and reduce the existing spent fuel backlog.

71. In this proposed finding concerning the 1985 Mission Plan, P95, the government goes to great lengths to argue that the Mission Plan did not create binding contractual obligations. This argument is a straw man. Plaintiffs have never asserted that the Mission Plan creates contractual obligations. However, the 1985 Mission Plan is persuasive evidence that a

3000 MTU per year acceptance rate "at least" would have been reasonable and consistent with the parties' shared understandings. *See, e.g.,* YAPF 75 and 77.

73. In this proposed finding, the government wrongly asserts that in the 1987 Mission Plan Amendment, D12, "DOE recommended deferral" of the date for operation of the first repository to 2003. In fact, as reflected by the portion of the 1987 Mission Plan Amendment quoted by the government, the document acknowledges that the program was already well behind schedule.

80. The government's characterization of language in ACRs as stating that DOE would issue "a firm waste acceptance schedule" in 1991 is not supported by the language quoted by the government. In the cited language, DOE merely says that "the ACR acceptance ranking will be converted into an Annual Priority Ranking" beginning in 1991. To this day, DOE has not issued a "firm" schedule, and the Contracts are not designed to "set" a schedule at any time.

81. This proposed finding, alleging that the nuclear utility industry understood the significance of the 1991 ACR for the development of acceptance schedules for individual utilities, is vague and misleading. The proposed finding is vague because no particular significance to the 1991 ACR is set out in the proposed finding. Moreover, the language from the utility industry document, D109, quoted by the government merely indicates that certain members of the utility industry were aware of a hearsay description (based on unnamed OCRWM contacts) of "OCRWM's concept and planned approach on the Annual Capacity report."

84. The last sentence of this proposed finding wrongly implies that DOE had determined in the 1989 Reassessment of the Civilian Radioactive Waste Management Program, P101, that a MRS should open by 1998 even though a repository would not be available until 2010. In the

1989 Reassessment, DOE noted its support for the development of an MRS, *see* P101 at 17; however, DOE also acknowledged statutory schedule linkages that would need to be lifted in order to enable the MRS to start operating significantly prior to the repository. *Id.* at 11, 18.

93. The last sentence of this proposed finding alleging that DOE "anticipated that it would receive relief from the 'construction linkage'" in the 1987 NWPA Amendments is incorrect and not supported by the cited evidence. In the cited testimony from Mr. Pollog, he testifies merely that DOE "hoped" that it would receive such relief. Also at trial, Mr. Milner admitted that the DCSs that were submitted following publication of the 1991 ACR, P60, were based on a schedule that was inconsistent with the schedule linkages, therefore, making the DCSs conditional upon the timely approval of the repository (as reflected explicitly on some of the approved DCS forms themselves). Tr. 4765:13-4769:17 (Milner).

97. This proposed finding wrongly attempts to impeach Dr. Bartlett's testimony as a fact witness with a straw man argument. Although Dr. Bartlett testified that DOE was planning to receive utility spent fuel at an annual rate of 3000 MTU, he did not state that DOE was planning to achieve this acceptance rate "soon after 1998" as the government states. Although Dr. Bartlett authorized publication of the 1991 ACR, P60, as noted in the response to GPF 93 above, Mr. Milner admitted that the acceptance rates in that ACR were contrary to the 1987 NWPA Amendments. In fact, DOE was not planning to accept any SNF until 2010. *See* YAPF 92. DOE has cited no evidence for the proposition that DOE was actually planning to receive SNF at the rates set out in the 1991 ACR. Conversely, plaintiffs presented substantial evidence reflecting DOE's actual plans to accept utility spent fuel at a 3000 MTU annual rate. *See, e.g.,* YAPF 75.

100. This proposed finding is disingenuous. In the second sentence, although it correctly notes that the Contracts intended that utilities have the option of seeking approval of any amount of spent fuel acceptance, as noted above, the Disputes Clause is not applicable to disputes between utilities and DOE regarding approval of DCSs. Also, characterization as a "recommendation" of the contracting officer's direction to use the allocations in the 1991 ACR, P60, as the basis for DCS submissions is not a reasonable reading of those instructions. *See, e.g.,* P295MY at 1 and instructions at 2 ("The allocations in the 1991 Annual Capacity Report (ACR) should be the basis for the DCS submittals."). The mandatory nature of DOE's instruction is also shown by Yankee Atomic's experience where DOE refused to accept DCSs that did not conform to the 1991 ACR. *See* GPF 112.b.-e. The last sentence, that the instructions were consistent with the original intent of the Standard Contract is not supported. In fact, the instructions, resulting in uselessly small allocations for utilities, were contrary to the intent of the parties as noted in plaintiffs' proposed findings of fact. *See, e.g.*, YAPF 52-63.

103. This proposed finding, asserting that failure to submit a DCS would result in a utility's loss of a spent fuel acceptance allocation is wrong and not supported by the cited documents. The Contracts say nothing about loss of allocations. And although the Contracts specify that DCS forms should be submitted 63 months prior to the applicable delivery date, that requirement has not yet had effect, since DOE has not yet come close to accepting utility spent fuel and made clear years before distribution of the 1991 ACR and DCS instructions that it would not be accepting spent fuel until at least 2010. *See* Response to GPF 93 above. The memoranda cited by the government merely reflect plaintiffs' repetition of DOE's statements of the government's position regarding the mandatory nature of DCSs. *See, e.g.,* D34 at 2 ("The

Contracting Officer, Tomasoni, indicated that if we don't submit revised DCSs in 30 days, she could mandate an allocation or possibly eliminate our slot in the first year of WMS operation.").

105. As originally contemplated by the parties in their Contracts, in the context of a functioning DOE program, approved DCSs may have created heightened expectations that DOE would pick up at least the amount of SNF set out in the DCS. But nothing in the DCSs or the evidence cited by the government indicates that plaintiffs believed that DCSs set a maximum level of DOE performance consistent with the parties' obligations under the Contracts. Further, as noted in the response to GPF 93, DOE made clear by the time of distribution of the 1991 ACR and DCS instructions that the SNF acceptance would not proceed as originally intended by the Contract, as it would not begin until at least 2010. As also noted above at pp. 2-6, ample evidence indicates that the parties did not intend for DCSs to be contractually binding.

107 and 109. The allegations in these proposed findings that Connecticut Yankee and Maine Yankee respectively "accepted" DOE's DCS instructions is vague. To the extent the allegation is that plaintiffs in any way agreed that the instructions were consistent with the parties' obligations under their Contracts, the allegations are wrong and unsupported. As set out and supported in plaintiffs' proposed findings, *see, e.g.,* YAPF 53-63, the instructions are inconsistent with the parties' understandings of their contractual obligations to the extent that they purport to limit DOE's acceptance of utilities' spent fuel to uselessly small amounts and to the extent they give DOE discretion to determine the rate at which it could accept SNF from utilities.

115. This proposed finding is misleading to the extent it implies that the Standard Contract provides an appeal process for denials of requests for priority acceptance of SNF. As noted above at p. 2, the Disputes Clause does not provide such a remedy through which to obtain

relief for denials of requests for priority acceptance. Moreover as explained by Mr. Grube in his testimony cited by the government, resort to further "appeals" to the DOE contracting officer would have been futile. Tr. 3840:9-23 ("As I understand the disputes article, you go back to the contracting officer and ask her again, or him, her, whatever, and it seemed like a bit of a waste of time when somebody says no. Are they going to come back and say, Hell, no? It didn't seem like a fruitful undertaking.").

116. The allegation in the proposed finding, that Yankee Atomic recognized and understood that the nuclear utility industry opposed the grant of priority acceptance of Yankee Atomic's SNF, is not supported by the cited evidence. The cited evidence, *e.g.,* D146, indicates that the nuclear utility industry could not reach a consensus position on the issue of priority acceptance for shutdown reactors. Moreover, any utility industry position regarding priority for shutdown reactors is of limited significance, since the Contracts provide DOE, and not the utility industry, with discretion to grant priority. *See, e.g.*, P1YA, Art. VI.B.1.(b).

119. The allegation in the proposed finding that Yankee Atomic understood that pursuant to the rates set out in the 1991 through 1995 ACRs, Yankee Atomic's SNF would not be accepted for 20 years after the beginning of waste acceptance absent the grant of priority of acceptance is wrong and not supported by the cited evidence. In fact, as noted in response to GPF 127 below, the acceptance rates in those ACRs do not *ever* provide for the acceptance of all of Yankee Atomic's SNF. The last sentence in the first paragraph of the proposed finding asserting that documents establish that Yankee Atomic planned to construct a dry storage facility based upon the rates in the 1991 through 1995 ACRs is misleading. The totality of the evidence, *see, e.g.,* YAPF 90-106, makes clear that Yankee Atomic decided to use dry storage for its SNF

based on the overall failure of DOE's SNF program, and the ACRs published in 1991 through 1995 reflect that failure.

119b. The implication that Yankee Atomic linked construction of an ISFSI to store its SNF to DOE's refusal to grant Yankee Atomic priority for the acceptance of its SNF is incorrect and not supported by the cited evidence. The cited evidence, and the broader evidence explaining Yankee Atomic's decision to implement dry storage, *see* YAPF 90-106, makes clear that Yankee Atomic's decision was based on the expected overall duration of DOE's failure to pick up Yankee Atomic's SNF.

121. The implication of this proposed finding, that the ACRs published in 1991 through 1995 indicated that DOE was planning to accept SNF at a MRS is wrong and not supported by the cited evidence. As noted in the response to GPF 84 and 93 above, DOE recognized that it has been precluded by statute from constructing a MRS.

## II. Government Proposed Findings Regarding Graves' Economic Sequence Model Are Either Immaterial or Without Merit

Mr. Graves testified in detail regarding his reasonable economic estimate of the sequence of utility spent fuel acceptance that would have occurred absent DOE's breach. Tr. 797-865 and 7503-7537. That testimony addressed all of the criticisms raised by the government in its proposed findings. Importantly, the government did not present an alternative sequence model (based either on economic or other principles). *See* Order of June 28, 2004, slip op. at 11, 2004 WL 1535686 at *7 (inviting such alternative evidence). In its proposed findings, the government has not alleged that, absent DOE's breach, DOE would have completed removal of plaintiffs' spent fuel at any times other than those shown by Mr. Graves' testimony and set forth in plaintiffs' proposed findings of fact. Nor has the government proposed findings to the affect that, absent DOE's breach, exchanges would not have occurred or that DOE would have

accepted spent fuel from utilities in an oldest-fuel-first sequence. The government's failure to offer any such evidence is telling. Instead, the government devotes a remarkably large portion of its proposed findings, GPF 122-208, to criticisms of Frank Graves' economic sequence model. These criticisms are either immaterial or without merit (and frequently both).

First, many of the government criticisms suggest that even absent DOE's breach, problems "might" or "could" have arisen with the formation of a robust market for exchanges. *See, e.g.,* GPF 155 (some utilities with early allocations "could" have acted "strategically"); GPF 154 (some utilities with early allocations "might" retain, rather than exchange, them); GPF 159 (sequences of trades "might unravel"); GPF 161-62 ("non-economic considerations" would be motivating factors for potential participants in a market for exchanges); GPF 163 (local communities and ratepayers "might" cause utilities to behave in an economically inefficient manner); GPF 164 ("if" non-economic factors entered a utility's analysis, the entire market for exchanges would "unravel"). But even taken at face value (and the lack of merit of many of the government's proposed findings will be addressed paragraph-by-paragraph below), these government proposed findings are immaterial. The government does not even propose as findings that any of these possible problems with exchanges would have happened or were even likely to have happened absent DOE's breach.

Second, many of the criticisms are based on the notion that Mr. Graves' economic sequence model depends upon a finding that absent DOE's breach, the market for exchanges would have been characterized by "perfect competition." *See, e.g.*, GPF 142, 144 (model assumes that exchange market would be analogous to a perfectly competitive market); GPF 145, 149 (requirement of government approval of exchanges is inconsistent with perfect competition); GPF 156 (unlike perfectly competitive market, exchanges market would have high transaction

and information costs); GPF 160 (perfect information would not exist). These criticisms are misplaced. Mr. Graves made clear that his opinion that DOE would have completed removing Yankee Utilities' SNF at the times set out in his testimony does not depend on a finding of "perfect competition." Tr. 7522:11–7523:19 (has not "assumed that the spent nuclear fuel trading process would be perfectly efficient, or that I need that in order to understand the outcome of what the trading would probably be like."). Moreover, these criticisms are ineffectual, because the government does not even propose as findings of fact that the various potential market imperfections it identifies would have existed or would have been of sufficient scale to actually preclude the market for exchanges from producing the results shown in Mr. Graves' economic sequence model. In addition, as explained by Mr. Graves, the potential costs of the potential market imperfections noted by the government are likely to be small relative to the approximately two billions dollars in benefits of exchanges for utilities shown by Mr. Graves' analysis. Tr. 7515:20–7517:19.

Third, a number of the government's criticisms are simply areas where additional complexity could have been added to Mr. Graves' model. *See, e.g.,* GPF 203 (complaining that Mr. Graves did not model total system costs); GPF 204 (complaining that Mr. Graves did not model transportation modes other than rail); GPF 205 (complaining that Mr. Graves did not include the possibility of adding spent fuel storage space through reracking in his analysis); GPF 206 (complaining that Mr. Graves did not analyze failed fuel distinctly from other spent fuel); GPF 207 (complaining that Mr. Graves did not model exchanges of GTCC waste); *see also* GPF 154 (complaining that model fails to account for possibility that contract holders might retain early year allocations); GPF 161-64 (arguing that "non-economic" factors "need to be taken into account in determining what the non-breach exchanges market would have looked like"); GPF

172-73 (complaining that Mr. Graves did not identify specific trades or trading utilities); GPF 179-84 (complaining that Mr. Graves did not model risk and uncertainty regarding DOE's performance in the first years of the SNF removal program). Missing from these criticisms, however, is any evidence or claim that the absence of such additional complexities in Mr. Graves' model systematically leads to earlier "fuel out dates" for plaintiffs, a higher damage claim for plaintiffs, or indeed, any material difference in the results of the model. Given the absence of evidence or claims about the materiality of these additional complexities, the government's mere recitation of them should be accorded little, if any, weight.

Fourth, the government argues that the financial benefits to utilities engaging in exchanges of acceptance allocations absent the breach is overstated by Mr. Graves and is relatively small compared with the revenue generated by nuclear utilities for electricity generation. GPF 166-67. The government's argument, however, which focuses on the revenue to be generated by utilities trading away early acceptance allocations (when exchanges are of greatest value), misses the thrust of Mr. Graves' analysis. The benefits to engaging in exchanges include the *billions* of dollars saved in spent fuel storage costs during the entire period of government performance. Tr. 831:19-841:23 (Graves); Graves Demonstrative 84. These benefits also include far fewer trips by DOE to pick up spent fuel (and thus far fewer disruptions to operating reactors) than an oldest-fuel-first acceptance sequence. *Id.* and Graves Demonstrative 91.

Fifth, the government argues that a technical problem with the exchange process would have prevented it from working as set out in Mr. Graves' analysis. GPF 187-89. Specifically, the government argues that allocations for spent fuel acceptance would not have existed for more than 10 years into the future. *Id.* The government misreads the Contracts, *see, e.g.,* P1YA. The

Contracts do not set a 10-year maximum on spent fuel acceptance allocations. Rather, it sets a 10-year minimum for the duration of ACRs. *See* P1YA, Art. IV.B.5.b. In fact, nothing in the contract prevents utilities from proposing and DOE from approving DCSs more than 10 years into the future. It is true that, given its impending breach, DOE operated the DCS process in a manner not to provide acceptance allocations beyond 10 years into the future, and Yankee Atomic recognized this shortcoming in DOE's operation of the program. *See* GPF 188. But this breach-induced behavior provides little guidance as to how the parties' performance under the SNF contracts would have operated absent the government's breach. As set out and supported in plaintiffs' proposed findings of fact, *see, e.g.,* YAPF 81-85, substantial incentives would have influenced both utilities and DOE to cooperate to make sure that the acceptance allocation exchange process worked as intended, to enable utilities to optimize the allocation of waste acceptance capacity to meet individual utility needs.

In addition, a number of the government's criticisms of Mr. Graves' analysis stem from confusion between the breach and non-breach worlds. *See, e.g.,* GPF 131-37 (discussing plaintiffs' planning documents and analyses of potential exchanges of spent fuel acceptance allocations); GPF 165 (noting "non-economic factors" that have discouraged utilities from exchanging spent fuel acceptance allocations in the breach world); GPF 178, 192-93 (discussing hesitance that utilities may have to exchange acceptance allocations in the future). These criticisms are misplaced, because, as noted above and as Graves testified, breach-world incentives differ markedly from those that would have influenced utilities and DOE absent DOE's breach, and the non-breach world incentives would have powerfully influenced utilities and DOE to have made the exchanges process work as intended. Tr. 839:25-841:23 (Graves).

Furthermore, many of the government's criticisms of Mr. Graves' economic sequence model depend primarily on the opinions of Daniel Fischel. The Court should accord Mr. Fischel's opinions little weight, because he was not a credible witness in this case. For example, notwithstanding the Court's clear requirements for advance disclosure of expert opinions, the opinions offered by Mr. Fischel at trial differed sharply from those in his expert witness reports. *See* Tr. 4306:9-4308:9 (comparing two opinions offered at trial to two opinions listed in pre-trial expert witness reports). In addition, Mr. Fischel did not prepare his own expert witness reports; they were prepared by someone else, under his supervision. Tr. 4308:15-20. Indeed, Mr. Fischel spent little time preparing "his" expert witness reports. Tr. 4309:4-19 (probably less than 50, and possibly less than 20 hours were spent on the initial draft of the report). Importantly, Mr. Fischel failed to review many of the basic DOE documents regarding operation of the program and the "schedule issues" to which Mr. Fischel testified, including ACRs, APRs, Total System Life-Cycle Cost studies, Fee Adequacy studies, the 1985 Mission Plan, OCRWM Program Requirements Documents and annual reports. Tr. 4359:8-4360:22. In addition, notwithstanding the requirement provided by the Court's pre-trial Orders and applicable rule to list all documents relied upon in reaching his opinions, Mr. Fischel testified that his opinions were supported by five publications, yet only one of these was disclosed in his expert witness reports. Tr. 4334:16-4339:6.

Similarly, notwithstanding the requirement that the expert list all cases in which he has testified as an expert in the past four years, Mr. Fischel failed to list in his expert witness report a case where he testified at trial in U.S. District Court (indeed, even though this omission was raised at his deposition and Mr. Fischel testified regarding an updated resume provided to plaintiffs a few days prior to his testimony in Court, Mr. Fischel's updated resume also fails to

list this case). Tr. 4340:7-4341:22. This omission is significant, because, in this undisclosed case, Mr. Fischel provided expert testimony supporting a claim for damages (lost earnings damages on behalf of his own firm, Lexecon) which testimony was contrary in various ways to his criticisms of plaintiffs' damage claims. Tr. 4342:4-4344:8. It is also significant that Mr. Fischel lacks experience with utilities in general and nuclear utilities in particular. *See* Tr. 4242:9-4250:10 (recitation of Mr. Fischel's background including no such experience). Indeed, Mr. Fischel's educational background in economics is limited to an undergraduate minor. Mr. Graves, in comparison, has substantial utility and nuclear utility experience. Tr. 742:7-743:17 (Graves). And Mr. Graves has a graduate degree from MIT's Sloan School. Tr. 741:23-742:6.

Plaintiffs provide the following further responses to certain individual findings proposed by the government:

122. This finding is wrong to the extent it claims that plaintiffs rely "exclusively upon the exchanges model" presented by Mr. Graves to establish that DOE would have completed removal of their spent fuel by 1999 for Yankee Atomic, 2001 for Connecticut Yankee and 2002 for Maine Yankee. Mr. Graves' testimony is an important and persuasive part of the proof presented by plaintiffs, but it is not exclusive. As set out in their proposed findings of fact, *see, e.g.,* YAPF 64-89, plaintiffs presented substantial additional evidence setting out what reasonable DOE performance would have been absent the breach, including a reasonable industry-wide acceptance rate, the intent of avoiding the need for additional at-reactor storage, the use of exchanges to enable utilities to optimize their acceptance allocations, and the provision of priority acceptance to permanently shutdown reactors, if necessary, to avoid prolonged storage of spent fuel at reactor sites post-shutdown. Also, as elsewhere recognized by the government,

Mr. Graves did not model exchanges; he presented an economic sequence model to estimate when plaintiffs' spent fuel would have been removed absent the breach. *See* GPF 169.

125. This finding is misleading in that it states that Mr. Graves "assumes" that DOE was "obligated" to accept spent fuel from utilities in particular amounts. First, Mr. Graves did not focus on what DOE was legally "obligated" to do (and the cited evidence does not support the government's contrary contention). Instead, Mr. Graves focused on what reasonable performance would have been. Tr. 777:14-778:10 (Graves). In addition to his own analysis of "must-move fuel," Mr. Graves relied on DOE documents and other evidence as to what reasonable DOE performance would have been absent its breach. Tr. 778:11-785:3 (Graves).

a. The implication that the "ramp-up" rate used in Mr. Graves' economic sequence model comes exclusively from P254, a 1999 OCRWM Program Requirements Document, is wrong. As set out in his testimony, that ramp up rate is also consistent with other DOE documents and Mr. Graves' economic analysis that fixed costs should be used liberally once they are expended. Tr. 783:4-785:3 (Graves). *See also* YAPF 78 noting additional evidence supporting this "ramp-up rate."

127. The second sentence of this proposed finding, alleging that under the acceptance rate in the 1991 ACR, the last of Yankee Atomic's spent fuel would not be removed until at least 2018, is incorrect and not supported by the cited evidence. The 1991 ACR, P60 at 5, only sets out rates of acceptance for the 1998-2007 period and only covers 8,200 MTU of spent fuel. *See also* GPF 91, 94 and 95. Moreover, the total acceptance allocated to Yankee Atomic under that ACR, 56.1 MTU, *see* P60 at 9, would not have been enough to provide for removal of all of Yankee Atomic's 127 MTU of spent fuel on an oldest-fuel-first basis (so the "last" of Yankee Atomic's fuel would never be removed). *See* P207 at B.22, noting Yankee Atomic's inventory

of 127 MTU of spent fuel. The evidence cited by the government, D150, is a 1992 decommissioning cost study performed for Yankee Atomic by a private contractor. That cost study does not purport to interpret DOE's 1991 ACR. The specific page cited by the government notes that the cost estimate for spent fuel storage costs is premised, in part, on an estimate of when DOE would remove the last of Yankee Atomic's spent fuel and that this time estimate is based on "the lower rate of fuel acceptance published by DOE in the Annual Capacity Report until the opening of a repository in 2010. Thereafter, accelerated shipment of YNPS SF is assumed until 2018 . . ." The specific ACR being referred to is not identified, but it does not appear to be the 1991 ACR, as that ACR did not include a "lower rate of acceptance." Instead, the 1992 decommissioning cost study, D150, is likely referring to the 1990 ACR, P59 at 7, which does have a higher and a lower rate of acceptance. *See also* GPF 85. And the decommissioning cost estimate simply reflects a conservative estimate of when DOE might complete removal of Yankee Atomic's spent fuel based upon the ACR rates and DOE's various statements.

128. The second sentence of this finding applies the same conclusion as the second sentence of GPF 127 to Connecticut Yankee and Maine Yankee and is similarly wrong for the reasons noted in response to GPF 127 above. In addition, like D150 noted in response to GPF 127 above, D157 is a 1992 Decommissioning Cost Study prepared for Connecticut Yankee by an independent contractor that does not purport to interpret either DOE's 1991 ACR or the acceptance rates used by Mr. Graves. Likewise, D196 is a 1993 Decommissioning Cost Study prepared for Maine Yankee by an independent contractor. And while that study assumed that DOE would complete removal of Maine Yankee's spent fuel by 2018, the basis for the use of this date is not made clear in the study. And the decommissioning cost estimate simply reflects a

conservative estimate of when DOE might complete removal of Yankee Atomic's spent fuel based upon the ACR rates and DOE's various statements.

129. Subparts a. and b. referencing the 1991 ACR contain the same errors as GPFs 127 and 128 explained above.

131. The implication of this GPF that there is an inconsistency between Mr. Graves' opinions of when plaintiffs' fuel would have been removed absent the breach and the companies' historical documents is wrong and unsupported by the cited evidence. As noted in response to GPF 127 above, the companies' documents reflect plaintiffs' need to deal with DOE's impending breach.

b. and c. The characterizations of the cited decommissioning cost studies as assuming "timely DOE performance" are wrong. The studies assume that DOE performance starts in 1998, but the studies do not purport to determine whether the acceptance rates and sequence used would have been reasonable performance under the parties' contracts.

141. This proposed finding is inconsistent with the cited trial testimony. Mr. Graves' economic sequence model set forth his opinion that an "economic solution something like mine" would have occurred, but his model does not purport to estimate "exactly what would have transpired:"

> Q Mr. Graves, I want to ask how you characterize ultimately what you're trying to show when you – with your ultimate opinion, in terms of the dates upon which each of the three Yankee companies would have had their fuel removed and the cost that Yankee Atomic would have borne for that. Do your models purport to describe exactly what the nonbreach world would have looked like?
>
> A No. I'm not offering my analysis as a structural photograph or description of exactly what would have transpired. What my model shows is – what my models show is that, in the first instance, there is a must-move problem, which has a certain size

> that's quite easy to anticipate and roughly estimate with pretty high accuracy. And any reasonable program has to be scaled at about that level to avoid imposing at-reactor storage cost. So that – and that result doesn't rely on anything except for analysis anybody could have done. The second point is, given a program of a reasonable size, there is an enormously – there's an enormous opportunity to pursue that program efficiently by allowing swaps or by utilities arranging for deals amongst themselves, for intermediaries arising who will provide brokerage services. And the value of that is extremely high. And it's extremely simple to develop both the proof and the mechanisms for the – to show that that's worthwhile. Given that, I think an economic solution something like mine would occur. Whether or not it occurred through an auction mechanism that used the same pricing algorithm as I have shown is really not relevant. All I'm saying is there is so much compelling economic attraction to pursuing an efficient solution and so little barrier to doing so, that something like that would have been a reasonable thing for utilities to expect. And that not only is that good for the utilities, it's good for the program. So I end up seeing no big barriers on any side to going in that direction. But, again, whether the precise processes are the same as I've shown is not part of my testimony. I'm not opining that this is the only way it could be done.

Tr. 862:7-864:3.

142. As reflected in the testimony quoted in response to GPF 141 above, Mr. Graves' economic sequence model does reflect his opinion of what the results would have been for plaintiffs absent the breach. As also explained above, Mr. Graves made clear that his opinion that DOE would have completed removing plaintiffs' SNF at the times set out in his testimony does not depend on a finding of "perfect competition." Tr. 7522:11–7523:19 (has not "assumed that the spent nuclear fuel trading process would be perfectly efficient, or that I need that in order to understand the outcome of what the trading would probably be like."). In this same transcript reference, Mr. Graves explained his understanding of the "invisible hand" concept as reflecting the tendency of markets to arrive at efficient solutions, not one of "perfect competition." *Id.* The government goes on to misstate the "invisible hand" concept as reflected by Mr. Fischel's

testimony, Professor Samuelson's treatise (and for that matter, Adam Smith's *The Wealth of Nations* (1776)). Neither Fischel nor Samuelson nor Smith claimed that the "invisible hand" results in perfectly competitive markets. Rather, Samuelson quotes Smith as follows and analyzes the quote as seeing the "harmony between private interest and public interest:" "By pursuing his own interest [every individual] frequently promotes that of society more efficiently than when he really intends to promote it." P. Samuelson & W. Nordhous, *Economics* (15th Ed. 1995) at 27.

144. Contrary to the parenthetical following the first sentence, Mr. Graves did not assume "total and complete participation by all entities" for purposes of his economic sequence model. Rather, his testimony reflects his belief that "by and large, most utilities would participate." Tr. 859:3-25 (Graves). And even if half of all potentially participating utilities declined to participate, the results of his analysis would not change. *Id*.

151. The government appears to confuse the breach and non-breach worlds. The proposed finding refers to what each plaintiff presently "has" to do as opposed to what would have happened absent DOE's breach.

c. This finding is misleading to the extent it implies that there is a single sequence of transactions that could lead to the results reflected in Mr. Graves' testimony. In fact, Mr. Graves explained in his testimony (and was not disputed by the government in this regard at trial) that literally millions of trading patterns could have been pursued that would have produced the results shown in his economic sequence model. Tr. 874:10-875:14 (Graves). And as Mr. Graves testified in the passage quoted by the government, while "[t]here are ways that you could disapprove things that would block transactions from being worth pursuing, [i]t would be hard to think of why DOE might want to do that." Tr. 7556:5-15.

153. This proposed finding, that "any refusal by contract holders to trade down in the acceptance queue would affect the Yankee's fuel-out dates" also confuses the breach and non-breach worlds. If the government intended to refer to the non-breach world, this proposed finding is wrong and is not supported by the cited evidence. The cited transcript references refer to half of all potential sellers of acceptance allocations refusing to participate, not "any" refusal to participate. In fact, Mr. Graves testified that even if it is assumed that half of all potentially participating utilities would have declined to participate, the results of Mr. Graves' analysis would not change. Tr. 859:3-862:6. More fundamentally, Mr. Graves explained that there is no reason to believe that a substantial portion of utilities would not have participated in the exchanges market absent DOE's breach:

> It's not the case that some utilities win and some lose by participating. Everyone wins by participating in this. You avoid the inconvenience of premature pickups and disruptions at your facility if you don't yet have a must-move situation. And you have the opportunity to gain some money by participating in a sale. Conversely, you obviously benefit if you can move – accelerate your rights and get them to match an early must-move problem. So this is jointly beneficial. It's not something where winners have to compensate losers. There's two kinds of winners out of the process. And that's very auspicious for markets to evolve.

Tr. 859:10-25.

154. This proposed finding, that Mr. Graves' economic sequence model does not account for the possibility that utilities with future must-move fuel requirements might have retained early year allocations or seek to trade up in the acceptance queue absent the breach is not supported by the cited testimony. In that testimony, Mr. Graves states that he did not simulate the possibility that utilities might have retained early allocations. Tr. 984:9-23. As noted above, response to GPF 153, there would have been significant disincentive to doing so.

Moreover, Mr. Graves explains that unless "lots of parties do that, again, it won't fundamentally change the pattern." *Id.*

156. It is true that an exchanges market would have had higher transaction and information costs than a perfectly competitive market. But Mr. Fischel neither quantified those nor testified that they would have prevented an exchanges market from operating in a reasonably efficient manner absent the breach. Conversely, Mr. Graves explained that the cost savings from exchanging would have been both large in nominal terms and large relative to the transaction costs of making such a market work absent the breach, and that for these and other reasons (including the inherent culture and infrastructure in the industry to support exchanges, and the lack of impediments to the market working), he is confident that the market would have worked absent the DOE breach. Tr. 839:25-841:23.

161. This proposed finding alleges that in an exchanges market, "non-economic considerations would be motivating factors." This proposed finding appears to confuse the breach and non-breach worlds, as it literally refers to considerations that "would" be motivating factors, not considerations that "would have been" motivating factors absent the breach. Moreover, it is not clear, and Mr. Fischel's testimony does not clarify, what is meant by "non-economic considerations." Furthermore, the reliance on Mr. Bennet's testimony is misplaced. In this testimony, Mr. Bennet is merely reading an exhibit, D272 (a March 1998 memorandum from Frank Quinn to Mr. Bennet). D272 at 1 refers to possible reluctance of utilities to trade away early slots because of concerns with incurring "political wrath." But this concern is a reflection of the breach world in which DOE had not (and has not) preformed. There is no reason to believe that such concerns would have been significant if DOE had actually performed and would have been taking the necessary steps in order to perform. Indeed, even Mr. Fischel

acknowledged that incentives to trade would have been greater in the non-breach world than they have been in the breach world. Tr. 4333:1-7 (Fischel); *see also* Response to GPF 178b. below.

162. This proposed finding similarly appears to confuse the breach and non-breach worlds. On the one hand, it argues that non-economic factors need to be taken into account in determining what the non-breach world would have looked like. But there is no evidence that the factors mentioned – political opposition to exchanges from various groups – would have been significant, or even existed, in the non-breach world.

164. The proposed finding that if non-economic concerns entered a utility's analysis concerning trading down in the queue, then the entire market would unravel is not supported by the cited evidence. Mr. Fischel does not claim that any consideration of non-economic factors would cause the market to "unravel." He states merely that it "could" cause the market to unravel. Tr. 4281:23-4282:16. Absent evidence that any such non-economic factors would even exist in the non-breach world, this proposed findings is immaterial.

165. The proposed finding that evidence was presented that non-economic factors govern utility behavior on spent fuel-related issues confuses breach and non-breach world. It is also unclear. As noted above in response to GPF 161, it is unclear what the government means by non-economic factors. To the extent the government is referring to political reluctance to exchange acceptance allocations or to move spent fuel in the absence of DOE performance, there is no reason to believe that this reluctance would have existed if DOE had performed and had been taking actions in preparation to perform. *See also* Response to GPF 178b. below.

168. This proposed finding, that the water rights and emission allowance markets have not performed consistently with the assumptions underlying Mr. Graves' economic sequence model, is wrong and not supported by the subparts to the proposed finding. For the most part,

this proposed finding is based on the straw man debunked above that Mr. Graves' economic sequence model depends upon perfect competition. Subpart b. even acknowledges that the "water pollution trading markets have worked in the real world." In fact, Mr. Graves explained well that the water and emissions allowance markets have worked and that their success is analogous to the market for exchanges of spent fuel acceptance allocations that would have formed absent DOE's breach. Tr. 841:24-846:13 (Graves).

169d. This subfinding wrongly asserts that Mr. Graves' economic sequence model assumes that utilities with must-move fuel will have a "preference" to have their waste removed by DOE first over utilities without must-move fuel. The cited transcript reference does not support this assertion. Mr. Graves made clear in his testimony that the economic sequence model identifies the utilities that would bear the greatest avoidable costs from not having their spent fuel removed and concludes that those utilities would have the greatest willingness to pay for spent fuel removal rights. Tr. 814:12-815:11 (Graves).

177. This proposed finding, that if the market for exchanges did not develop perfectly by 1998, the fuel-out dates for plaintiffs would be delayed, is wrong and not supported by the cited transcript reference. The cited transcript references note Mr. Graves' unremarkable acknowledgment that the economic sequence model does not attempt to simulate "disruption," "suspension" or other DOE failures to perform. And as noted above, Mr. Graves explained that perfect competition did not have to develop in the non-breach world in order to produce the results shown by his economic sequence model. *See* Tr. 7522:11–7523:19 (has not "assumed that the spent nuclear fuel trading process would be perfectly efficient, or that I need that in order to understand the outcome of what the trading would probably be like."); Tr. 859:3-862:6

(explaining that results of economic sequence model would not change materially even if half of utilities did not participate).

178.b. The proposed finding that utilities would not have had confidence in the DOE program in the non-breach world and would ration their participation is wrong and not supported by the cited testimony. Concerns with confidence in DOE's performance is a reflection of the breach – DOE's statements and actions (and lack of actions) over most of the years of the program making clear to utilities that it would not get the job done on a timely basis, and perhaps not ever. *See, e.g.*, YAPF 91-94. There is no reason to believe and certainly no evidence, that substantial concerns with the likelihood of timely performance by DOE would be a part of the non-breach world. There were not technical impediments to robust DOE performance. *See*, *e.g.*, Tr. 1376:23-1377:17 (Stuart). In Mr. Graves' testimony cited by the government, he did not, as the government implies, voice an opinion that confidence problems would exist in the non-breach world. Rather, he testified that a core part of his analysis is that "in the nonbreach world, DOE would have set up a program whose capacity and performance quality was sustainable and expected to be sustainable by participants, so that they wouldn't feel any reticence to participate in improving their economic opportunities." Tr. 860:1-861:16. Moreover, Mr. Graves opined that the sort of confidence issues that might have arisen in a reasonable view of the non-breach world would not be material to his analysis: "So I think that the reticence or hesitancy that might occur in the nonbreach world is of the character of a tax or a little extra cost that might be involved, not a decision not to participate. So I think it would have transpired essentially the same way." *Id.*

179-83. The government's allegations regarding "risk" created by the limited "headroom" between the amount of industry-wide must-move fuel and the amount of reasonable

spent fuel acceptance used in Mr. Graves' model misses the mark, because it does not relate to the non-breach world. The acceptance rate used by Mr. Graves in his economic sequence model reflects what reasonable DOE performance would have been absent DOE's breach. *See* YAPF 68-78. Lesser DOE performance, the "risk" of which is the subject of these proposed findings, would be another form of breach of DOE's obligation to provide reasonable performance.

184. The second sentence of this proposed finding, that confidence sufficient to support a robust exchanges market cannot be gained until DOE is well along to picking up spent fuel is wrong and not supported by the cited testimony. The Frank Quinn trial testimony cited is contrary to the proposed finding. Mr. Quinn notes his view of the non-breach world that "if DOE was meeting its milestones and its schedule, you might have confidence in doing a swap before 1998. I think." Tr. 5822:11-19. The deposition testimony from Mr. Quinn read by government counsel at trial did not contradict Mr. Quinn's trial testimony. The deposition testimony noted Mr. Quinn's opinion that he doesn't think a swap market "can happen" in the *breach world* until DOE is well along to picking up spent fuel. Tr. 5823:3:13. Given the extent and duration of DOE's failure to perform, it is reasonable to believe that a greater extent of performance will be necessary to provide confidence sufficient to facilitate swaps of acceptance allocations in the breach world than if DOE had not breached in the first place. Mr. Quinn made this clear later on in his testimony:

> Q. Mr. Quinn, I think we just have one cleanup question right from the end of your direct examination. I want to make sure that an issue didn't get confused. As you may recall, Mr. Ekman read from part of your deposition and noted it, out in the future, the expectation that Department of Energy would have to actually start picking up spent nuclear fuel from utilities before utilities would have enough confidence to exchange allocations. But then you also said that, in the 1990s if DOE was hitting its milestones, that they might have swapped at that point even before Department of

> Energy started picking up spent fuel. Can you explain for us what accounts for that difference in view from those two time frames?
>
> A. Well, it's confidence in the program. If DOE is hitting its milestones and delivering its MPC containers and doing the scheduling and all that other stuff that has to happen well before beginning accepting spent fuel, if you have confidence that everything is going along as planned, then I think it's possible to engage in swaps among some of the utilities. I mean, they don't have to perform. They just have to think they're going to perform. But once they, when they haven't performed, when they failed to perform, you know, you're a little more skeptical and a little less likely to do that.

Tr. 5826:19-5827:21 (Quinn).

186. The evidence supporting this proposed finding, that the early results from the trading of emissions allowances were disappointing, is weak and contradicted by other evidence. The cited testimony from Mr. Fischel is merely his reading of articles by relatively undistinguished authors in undistinguished journals (*e.g.,* the Woodward article cited by Mr. Fischel is by an Assistant Professor at Texas A&M University published in the Journal of Agricultural Economics). Mr. Graves noted that another article by "extremely well-known economists" (the Dean of the Sloan School and the Economics Department Chair at MIT) and published in "probably the most prestigious journal in the profession" reaches "a very different conclusion about the quality of performance of the emission allowance market" – "that this market became extremely efficient rather quickly." Tr. 7517:21-7519:21 (Graves). Mr. Graves went on to explain that a key part of the difference in the analyses among the articles is that those finding less satisfying performance "ignored the strong activity in private trading of allowances and focused almost exclusively on the EPA's auctions itself." *Id.*

186A. This proposed finding's (and Mr. Fischel's) assertion, that Mr. Graves' economic sequence model assumes that the market and acceptance program "will be perfect

instantaneously," is wrong. The errors in the "perfect" allegations have been discussed thoroughly above, and the "instantaneously" allegation is also unsupported by the record. The NWPA was signed into law on January 7, 1983; DOE had more than 15 years from that time to the January 31, 1998 performance due date in the parties' contracts to develop reasonable performance of spent fuel acceptance. Similarly, the Contracts were signed in June of 1983, *see* P1YA, P1CY, P1MY, and consistent with the contracts, DOE started publishing ACRs in June of 1987, *see* P52, and APRs in 1991, *see* P60. Thus, in the non-breach world there were many years for both the DOE acceptance program and the spent fuel acceptance allocations market to develop both prior to January 31, 1998 and prior to the submission of Final Delivery Schedules, which are due 12 months prior to the applicable delivery date. *See e.g.*, P1YA, Art. V.C.

191. This proposed finding's assertion, without support, that Mr. Graves presupposes an industry goal to maximize efficiencies and minimize at-reactor storage costs, is wrong. As discussed above regarding the "invisible hand," Mr. Graves' economic sequence model is based on individual utilities following their own economic self-interests. Subparts a. and b. to this finding noting that some utilities opposed granting priority acceptance to shut down reactors is entirely consistent with such economic self-interest.

192. This proposed finding, that many utilities would not have participated in the exchanges market, is not supported by the cited evidence. The cited evidence all relates to reluctance of utilities to engage in exchanges in the breach world. As explained by the testimony of Mr. Quinn noted in the response to GPF 184 above, it is reasonable to believe that utilities would have behaved differently if DOE had performed. *See also* Response to GPF 178.b. above.

194-200. These proposed findings attempt to criticize the economic sequence model on the grounds that there is a mismatch between the time when trading of acceptance allocations

would have occurred and the data used to develop the model. This argument is misguided, because while the market may have developed in 1992 in the non-breach world, there is no reason to believe that it would have existed in only one year. As noted above, even if only trades for 1998 acceptance are considered, Final Delivery Schedules for such acceptance were not due until 1997. *See* P1YA, Art. V.C. As the government itself acknowledges in GPF 141 and as explained by Mr. Graves in the testimony cited in that proposed finding, his economic sequence model does not attempt to capture a snapshot of what the exchanges market would have looked like. Instead, Mr. Graves' model reasonably estimates the results of reasonable government performance in the non-breach world. And it does so over a number of years. Moreover, Mr. Graves explained that even if the must-move fuel in his model represented by some early shutdowns that might not have been predicted in the early 1990s were removed from consideration, it was still clear that the results of his must-move fuel analysis were valid. *See* Tr. 7506:10-7514:6 (Graves).

201. This proposed finding's complaint that the economic sequence model's cost assumptions are "unreliable" because the model uses uniform costs across the industry misses the mark. Not surprisingly, the government does not allege that changing the cost assumptions in the model, even significantly, would have changed the model's results. In fact, Mr. Graves demonstrated at trial that even if the costs varied by a factor of two, the results of the model would not change significantly. Tr. 851:7-855:12 (Graves). Further, Mr. Graves used reliable cost data for purposes of his model, *see also* YAPF 87, and the government has not presented evidence that any alternate costs data would have been more appropriate for use in the model.

## III. Government Proposed Findings Regarding GTCC Waste Are Without Merit

Although the government advances numerous proposed findings regarding GTCC waste, the government does not even propose a finding that DOE would not have removed the Yankees'

GTCC waste if it had removed the SNF. As such, the government's proposed findings regarding GTCC waste are largely immaterial.

209. GTCC waste as defined by NRC's regulations is a form of low-level radioactive waste. That definition does not preclude the material from being deemed HLW under the parties' Contracts. *See, e.g.*, P1YA, Art. I.12.(b) (definition of HLW in Contracts).

210. This paragraph is a conclusion of law, not a proposed finding of fact. Because the Contracts covers this waste, the implication in the first sentence that the Low-Level Radioactive Waste Policy Amendments Act of 1985 ("LLRWPAA") is the sole source of DOE's obligation to accept and dispose of plaintiffs' GTCC waste is wrong.

211. This paragraph is a conclusion of law, not a proposed finding of fact. The government's characterization of 42 U.S.C. § 2021c(b)(3)(E) is neither complete nor fully accurate.

Contrary to the assumption in the third sentence, that DOE must enter into additional contracts with utilities for GTCC waste disposal, nothing in the LLRWPAA precludes DOE from recovering the costs of GTCC waste disposal through the NWPA and the SNF Contracts. In fact, DOE has already done so, given waste fund surpluses; *i.e.*, utilities have already paid enough to cover GTCC waste disposal.

213. This paragraph, asserting that the NRC has not determined by rule that GTCC waste requires permanent isolation, is a conclusion of law, not a proposed finding of fact and it is wrong. *See* YAPF 122.

a. This NRC statement, claiming that it was not triggering the NWPA's definition of HLW, is legally irrelevant for the reasons explained in Yankee Atomic's post-trial legal briefs and its prior briefing on the GTCC waste summary judgment motion. Moreover, the statement is

not even a fair interpretation of the totality of NRC's statement on the issue. Other NRC statements show that the regulation does indeed presently require permanent isolation of GTCC waste. P1613 at 1 (May 25, 1989 NRC memorandum authorizing publication of the Rule) (the rule "requires disposal of [GTCC] waste in the nation's high level radioactive waste repository . . ."); P1069 at 22582 (1989 Rule comments) ("the Commission believes that the course of action it had proposed – *requiring* geologic repository disposal of GTCC waste, or approved alternative – should be adopted") (emphasis added).

b-d. The various statements in these subparagraphs regarding the classification of GTCC waste as HLW are immaterial because the Contract does not require the NRC to formally designate or otherwise define GTCC waste as high-level waste to bring the waste within the Contract's definition. The third statement (in subparagraph b) supports Yankee Utilities position. It confirms that NRC did not find such a formal classification necessary because the 1989 regulation *requires* permanent isolation where, as here, no disposal alternative exists. In paragraph c., the government is misstating the purpose and effect of the 2001 rule-making, which dealt with utility licensing options, not GTCC waste disposal.

214. This paragraph, asserting that DOE is not obligated to accept GTCC waste under the parties' Contracts, is a conclusion of law, not a proposed finding of fact and is wrong. DOE is required to accept plaintiffs' GTCC waste pursuant to the Contracts. YAPF 115-123.

215. This proposed finding, that DOE never considered amending the Contracts to include GTCC waste, is irrelevant because the Contracts already cover GTCC waste.

216. This proposed finding, that plaintiffs have interpreted the term "HLW" under the Contracts as not to cover GTCC waste, is wrong. The government cites to Mr. Grube's testimony, but omits his salient testimony, elicited during the government's examination, which

reflects that Yankee Atomic recognized the existing uncertainty, but believed the Contract covered this waste:

> Q. So is it fair to say then that, at this time, you believed that GTCC was not classified for disposal in Yucca Mountain?
>
> A. There apparently was some cloudiness about the definition. I would say it had been my belief, based upon the definition in the waste contract, that Greater Than Class C was actually high-level waste. It wasn't crystal clear perhaps, but I would read it to be included in the contract definition of high-level waste.
>
> Q. Okay. So you thought then that GTCC was within the definition of the standard contract, is that –
>
> A. That was my belief, yes.

Tr. 3856:21-3857:9. Other trial testimony further shows that the plaintiffs did not, and have not, agreed with the government's erroneous interpretation of the Contract as not covering GTCC waste. *See, e.g.*, Tr. 1837:17-20 (Bennet) ("We consider GTCC waste to be high-level waste under the contract . . . the NRC has declared it as requiring permanent isolation."); *see also* Tr. 4947:13-16 (Kadak) ("the responsibility for GTCC is clearly DOE's, but the definition, if you connect the dots, okay, it will lead one to conclude it has to go into a repository . . . .").

Importantly, the exhibit cited by the government *pre-dates* the 1989 NRC rule requiring permanent isolation, and the cited testimony from Mr. Grube is limited to that pre-1989 exhibit.

217. This proposed finding, asserting that plaintiffs have recognized that DOE is not responsible for GTCC waste under the Contracts, is wrong and not supported by the cited evidence. First, the cited letter was not even written by plaintiffs – Dr. Kadak was then an MIT professor, not a Yankee Atomic employee. *See* Tr. 4951:8-9 (Kadak) ("I did this as a private citizen"). Second, Dr. Kadak explained in his testimony that "there did not appear to be *clarity* . . . ." Tr. 4951:1-2 (emphasis added). He further testified:

> I went to some meeting where this issue came up again and still nothing had been done about it. And I made a recommendation that, why doesn't the NRC simply, in its regulations, declare it as high-level waste because it will ultimately end up in the repository anyway?
>
> Which is what, which is what I think, I believe it's what the NRC regulations really call for . . .."

Tr. 4951:10-18. Far from showing a recognition that DOE has no contractual responsibility for GTCC waste, this letter simply reflects the reality that the contract language is not as clear as it could be and thus the issue is disputed. *See also* Response to GPF216 above.

218. This proposed finding is wrong. The cited letter (D243) arises from a meeting of high-level spent fuel program officials, including Lake Barrett and Dan Dreyfus, and employees of Yankee Atomic. The letter, and Mr. Grube's testimony regarding it suggest that the spent fuel program took the position at the meeting that NRC needed to formally classify the waste as HLW to dispose of it in the repository. Tr. 3856:14-20 (Grube). At most, D243 simply reflects a practical suggestion by Yankee Atomic to overcome the DOE's concerns – not an admission by Yankee Atomic that formal designation by NRC is necessary for the Contracts to cover this waste.

219. Plaintiffs have not taken inconsistent position before FERC regarding GTCC waste. In Connecticut Yankee's FERC case, Connecticut Yankee noted that it has been DOE's longstanding position that it will impose additional charges for GTCC waste disposal, P1929 at 79-80, and that the company included a GTCC waste fee in its cost estimate not because it agreed with DOE's position, but rather because "the proper remedy in the face of such uncertainty is to allow present recovery of these funds, subject to early termination of decommissioning payments or refund should the contingency come to pass." P1929 at 80-81.

It was reasonable for plaintiffs to conservatively estimate a further fee for GTCC waste disposal given DOE's stated position that a further fee will be assessed. *See* Tr. 1697:5-1698:13 (Bennet) (discussing the importance of being conservative in decommissioning estimates to ensure that adequate funding is available). The companies' cost estimates do not purport to reflect their legal position as to whether or not GTCC waste is covered by the Contracts. Indeed, in the three prior cost estimates cited by the government, an additional GTCC waste fee is identified simply as an *assumption*. *See, e.g.*, D88 at GPE0010166; D89 at 29; D90 at 17. *See also* Prior GTCC Waste Br. at 14-20 (further discussing the government inconsistent-position argument).

220. This proposed finding, asserting that plaintiffs understood that GTCC waste was not covered by the Contracts at the time of their formation is irrelevant and misleading. At the time of contract formation, the parties understood that DOE would remove from utility site all highly radioactive waste that needed disposal in the repository. *See, e.g.*, YAPF 117. Consistent with the understanding, the NRC's 1989 rule brought GTCC waste within the Contract's coverage.

222. Dr. Bartlett did not purport to be an expert in the contracts, Tr. 656:9-24 (Bartlett), or on GTCC waste for that matter. Tr. 722:18-20 (Bartlett) (he is not aware of any statute requiring DOE to somehow dispose of GTCC waste). His current understandings likely come from current DOE pronouncements.

223. Contrary to the implication in this finding, Dr. Bartlett's testimony establishes that GTCC was not a design factor for the repository because it did not need to be – it can be easily accommodated in the repository. The government does not cite the following portion of his testimony:

> Q. And to your knowledge, GTCC has not been a consideration as a basis for the design of the repository, has it?
>
> A. It was under consideration and recognized that the repository *could easily accommodate* what was expected. So it's not been a design factor."

Tr. 723:2-7 (Bartlett) (emphasis added). Dr. Bartlett further testified that he discussed disposing of GTCC waste in the repository with a senior NRC official, and they concurred that it could easily be disposed of there because the expected volume of GTCC waste is so small. Tr. 627:3-628:4 (Bartlett).

224. This proposed finding, that DOE has not decided how to dispose of utility GTCC waste, is wrong. The more credible evidence shows that DOE has long intended and planned to dispose of the GTCC waste along with the spent fuel in the repository, *see, e.g.*, YAPF 119, and that DOE would have accepted the GTCC waste from nuclear utilities if it had been accepting the spent fuel. *See, e.g.*, YAPF 123.

225-228. Paragraphs 225-26 are conclusions of law, not proposed findings of fact. The findings are irrelevant. If DOE had actually been completing the repository or some other facility for spent fuel, DOE readily could have completed an EIS regarding GTCC waste, if one would have been necessary. Further, GTCC waste was already included in the Yucca Mountain EIS. *See* Tr. 3464:17-3465:9 (Kouts).

229. Contrary to the assertion that DOE has not identified any location for disposal of GTCC waste, the evidence – including evidence of a high-level understanding within DOE – shows that DOE intends and plans to dispose of utility GTCC waste in the repository. *See* YAPF 119. Moreover, the cited testimony from Mr. Campbell simply states that DOE does not presently dispose of GTCC waste and that he personally doesn't know where that disposal will be.

230. This finding, that DOE will not accept GTCC waste pursuant to the Standard Contracts is augmentative and wrong. *See* Response to GPF 213 and 214 above and YAPF 115-123.

231-233. These paragraphs concerning DOE authority and funding to dispose of GTCC waste in the repository are conclusions of law, not proposed findings of fact. The cited "evidence" is merely DOE's statement of its legal position. That position is also wrong, as set out in Yankee Atomic's Prior GTCC Waste Brief at 27-28, filed October 29, 2002, and YAPF 123.

This proposed finding is also irrelevant because even if additional authority were needed, the evidence shows that DOE expects to obtain any necessary authority to dispose of GTCC waste along with the spent fuel. (6/28/04) Dep. Desig. 4/25/02 Klein, 499:3-20 (DOE's Rule 30(b)(6) witness on GTCC waste). Moreover, consistent with the policy set forth in the 1987 Report, P1047, the evidence shows that, if DOE had removed the spent fuel, DOE would have accepted plaintiffs' GTCC waste for storage if needed.

The cited NRC statement in GPF 232 is qualified on its face: "*may* be needed."

234. This finding is irrelevant because the Contracts cover GTCC waste. The government's contention that Yankee Atomic took an inconsistent position before FERC is wrong, as previously discussed in the prior GTCC waste briefing, *see* Prior GTCC Waste Brief, filed October 29, 2002, at 14-20.

235. This finding is wrong because GTCC waste is covered by the Contracts and plaintiffs have paid the fees required by the Contracts. Moreover, even if GTCC waste is not covered, nothing precludes DOE from using the Contract's full cost recovery mechanism to recover the disposal costs. Similarly, DOE easily could have developed a fee structure if it

actually had had a repository or other facility for acceptance of spent fuel and GTCC waste in operation by 1998.

236-237. Contrary to the assumption in these proposed findings, the evidence shows that it would be easy to dispose of GTCC waste in the repository from a technical and capacity standpoint.

> – *See* Response to response to GPF 223 above.
>
> – P1840 at HQR1690036 (widely-circulated DOE whitepaper) ("The activated metal already exists as an integral part of spent nuclear fuel assemblies and therefore has been thoroughly analyzed in the geologic repository for SNF/HLW performance models. The metal could be placed in the backfill spaces, according to RW.").
>
> – P1069 at 22580 (1989 Rule-making) (NRC: The amount of projected GTCC waste "is smaller than the anticipated excavated volume of a single emplacement room of a repository, and would not present a significant burden on the capacity of the repository to receive HLW").
>
> – P1089 at 2 (7/23/90 letter from NRC's Bernero to then Director Bartlett) ("We believe that it is much more reasonable now to use the planning assumption that residual capacity at the HLW repository can accommodate much or perhaps all of the GTCC waste").
>
> – P1911 at HQR-164-0053 (March 21, 2002 DOE draft memorandum for the Secretary) (Utility GTCC waste "has a number of similarities to SNF and is best suited for disposal in the proposed repository").

Moreover, the disposal of GTCC waste was included in the Yucca Mountain EIS. *E.g.*, Tr. 3464:17-3465:9 (Kouts).

The cited testimony from Mr. Kouts is not credible; the evidence shows that DOE is planning to use the repository for utility GTCC waste. YAPF 119. Moreover, even Mr. Kouts conceded that GTCC waste "[t]heoretically . . . could" be accepted at Yucca Mountain. Tr. 3460:23-25 (Kouts).

The government generally relies heavily on Mr. Kouts' testimony regarding GTCC waste and the acceptability of NRC-licensed, dual-purpose canisters. The Court should accord Mr.

Kouts' testimony little weight because he was not a credible or reliable witness. For example, Mr. Kouts testified that DOE had commissioned a report from Bechtel that had determined that all of the existing commercial canister systems were not disposable for "a variety of reasons." Tr. 7761:19-7764:23 (Kouts). Mr. Kouts explained that commercial canister systems had "physical compatibility" problems because the larger commercial canisters allegedly couldn't fit in the waste packages for the repository's drifts. Tr. 7762:3-7763:5 ("basically we [would] have to change the design of our repository"). He asserted further that the criticality controls in commercial canister systems would not work in Yucca Mountain "because we couldn't demonstrate that they would be there and avoid criticality in the long term." Tr. 7765:6-19.

When confronted with the Bechtel report, Mr. Kouts conceded that the report actually concluded that most commercial canister systems *are* physically compatible with the repository design. Tr. 7832:21-7833:15. Moreover, the report specifically notes that the NAC Yankee MPC system is compatible with at least one of the waste packages. Tr. 7833:16-7835:4; *see* Tr. 7861:14-24 (Meisner) (based on the report, "there would be no problem disposing of our canisters in one of the DOE canister-disposal canisters"). Cross-examination also uncovered that Mr. Kouts did not know the diameter of the Yankee canisters when he testified that there were "physical compatibility" problems. Tr. 7813:16-7814:11 (Kouts).

Mr. Kouts' testimony on criticality was equally unreliable. The Bechtel report, in fact, had concluded that some of commercial canisters would be suitable for disposal if they received burnup credit. Tr. 7799:4-15 (Kouts); *see* P2045, at ES1 (contractor document). On cross-examination, Mr. Kouts attempted to disavow the Bechtel report – asserting that it had to be redone because DOE allegedly had changed the designs of the criticality controls in its waste packages. Tr. 7820:8-7821:12 & Tr. 7839:17-23 (Kouts). But this fallback position was also

unreliable because Bechtel's analysis had assumed that all of the criticality controls in the commercial canisters would be gone over time. Tr. 7862:4-19 (Meisner) ("the Bechtel report said that even assuming no neutron absorber, no boral in our case, or gadolinium in the DOE's case, that burnup credit would suffice to ensure that there was no . . . criticality"); D2045, at ES1 (contractor document); *see also* Tr. 7841:3-7843:19 (Kouts). Indeed, the Bechtel report was "quite encouraging" about the criticality issue. Tr. 7861:25-7862:3 (Meisner).

Further, Mr. Kouts testified that he believed that DOE would submit its license application for Yucca Mountain by the end of 2004. Tr. 7794:17-22. Mr. Kouts gave that testimony even though he was aware that the Atomic Safety and Licensing Board had rejected DOE's certification of DOE's licensing support network. *See* Tr. 7794:23 – 7796:8. Not surprisingly, DOE did not submit its license application in 2004 and there is no indication that DOE will do so any time soon. Similarly, Mr. Kouts testimony in *Indiana Michigan Power Co. v. United States*, 60 Fed. Cl. 639, 644 (2004) – that DOE would submit its license application in 2004 and that he was "confident" that DOE would perform in 2010 – has been proven to be unreliable.

238. This proposed finding, asserting that plaintiffs understood that DOE has not decided to dispose of GTCC waste in the repository is misleading. Mr. Grumbly's letter to Mr. Thayer represented that DOE's studies had "strongly suggested" that DOE should dispose of utility GTCC waste with spent fuel in the repository, but DOE did not then publically commit to this path. P1139 at 2. Mr. Thayer's letter simply acknowledges DOE's public position.

The government's assertion that DOE did not accept Yankee Atomic's GTCC waste for storage in the mid-90s is not probative of what would have occurred if the spent fuel was being

removed. DOE would have accepted Yankee Atomic's GTCC waste if it was accepting spent fuel. *See* YAPF 123, 126.

240. The implication in this finding, that Yucca Mountain would require special design to accept GTCC waste is wrong. *See* Response to GPF 223. Moreover, the cited letter is only probative of what DOE officials told Yankee Atomic in a meeting in the mid-1990s; it does not establish plaintiffs' position. *See* Tr. 4945:8-11 (Kadak) ("That was my understanding, based on that meeting."). The additional assertion that further legislative authority would be needed to dispose of GTCC waste in the repository is a conclusion of law, not a proposed finding of fact and is wrong.

241. The implication of this paragraph, that there may be space limitations at Yucca Mountain presenting a conflict between storing GTCC waste and spent fuel is not supported by the cited testimony. Mr. Kouts neither opines on Yucca Mountain's capacity nor opines that there is any likelihood that such capacity would be approached by disposal of all SNF there. *See also* Response to GPF 236-37.

242-43. This proposed finding is irrelevant, as these technical issues are not an impediment to DOE's acceptance of plaintiffs' GTCC waste. *See* Response to GPF 236-37; *see also* YAPF 127.

244-246. Contrary to the cited testimony from Mr. Kouts, the evidence shows that DOE can dispose of utility GTCC waste in backfill spaces of the repository. *See* Response to GPF 236-37. The cited testimony simply consists of a series of strawman problems. Indeed, even if it were necessary for DOE to drill an additional drift for GTCC waste, there is no evidence that this would be difficult or problematic.

247-248. These technical issues are irrelevant, as they are not impediments to DOE's acceptance of plaintiffs' GTCC waste. *See* Response to GPF 236-37; *see also* YAPF 127.

254. As phrased, this finding is not fully accurate. Mr. Huizenga testified that "there's a wide range of sealed sources," from pacemakers to large 55 gallon drums used to generate electricity in remote locations. Tr. 4387:18-4388:23. He testified that they are "usually" small capsules in large metal-shielded containers. *Id.*

255-257. DOE's acceptance of sealed sources shows that DOE accepts GTCC waste for storage when the need arises, which is consistent with the policy DOE set forth in its 1987 Report to Congress. *See* YAPF 125. With respect to shutdown utilities, this need to accept their GTCC waste arises when the SNF is being removed. YAPF 126b.

In GPF 256, the government attempts to minimize DOE's actual acceptance of sealed-source GTCC waste by suggesting that DOE's acceptance is limited to "orphaned and abandoned" sources. The cited testimony does not state that DOE's acceptance is so limited, and GPF 257, and the testimony cited therein, shows that DOE has accepted GTCC waste where there was a need to, even if it was not orphaned or abandoned.

258. This proposed finding is misleading and does not follow from the preceding findings. DOE has not accepted utility GTCC waste because the facility for SNF is not close to operational and there is no need to accept GTCC waste so long as utilities must also store their spent fuel. YAPF 126.

## IV. Government Proposed Findings Regarding Other Than Standard Fuel Are Without Merit

263. This proposed finding is a conclusion of law, not proposed findings of fact. As discussed further in Yankee Atomic's post-trial responsive legal brief, at 37-41, the contract does not give discretion to DOE to defer the acceptance of failed fuel.

The evidence overwhelmingly shows that failed fuel placed in a canister for containment of that fuel can be handled like any other SNF assembly, so that "technical feasibility" would not have been an issue.

> – in 1984, consistent with the Yankees' interpretation of the Contract, DOE represented to utilities that it would accept SNF on the same schedule: "[f]ailed fuel canned in a container provided by or approved by the Department also will be subject to the *same scheduling procedures* as other spent fuel." P989 (emphasis added).
>
> – at the time of contract formation, it was well-understood that failed fuel was "not an issue" and that it would be accepted at the same time as intact fuel. Tr. 443:10-446:20 (Mills) ("the understanding was that it would be accepted on the same schedule as unfailed fuel.").
>
> – at the time of contract formation, placing failed fuel in canisters, if needed, was not unusual, but rather part of the normal operating procedures of maintaining a spent fuel pool. P31 at 16597 (DOE comments accompanying the publication of the standard contract in the Federal Register) ("the furnishing of such containers [for failed fuel] is part of the normal utility cost for the operation of its spent fuel storage basin").
>
> – (6/28/04) Dep. Desig. 5/15/02 Barrett, at 394:11-395:17 (former leader of the SNF program, admitting that it is his expectation that DOE would remove Yankee Atomic's failed fuel at the same time as the intact fuel).
>
> – Tr. 1407:22-1408:1 (Stuart) ("My opinion is that . . . there is no technical impediment to the Department picking up and transporting failed fuel. Failed fuel has been transported many times."); *see also id*. at 1408:8-10 ("once the failed fuel is identified and once it is put in a canister, it can be handled just like intact fuel"); Tr. 1414:21 – 1415:4 ("the [damaged fuel] canister can be loaded into the cask directly, just like intact fuel").
>
> – If DOE had an operating spent fuel program in 1998, it would have handled failed fuel, "the same way that they handle intact fuel. They would have taken the can that the fuel was in, that was an NRC approved device, and they would not have given it any more special treatment . . . [than] intact fuel"). Tr. 1421:7-16 (Stuart).
>
> – Tr. 3157:21-3159:25 (Meisner) (Maine Yankee used "absolutely no special handling equipment" for failed fuel; it simply grappled and moved its failed fuel assemblies just like any other assembly and loaded them into damaged fuel cans within the dual-purpose canisters); see *id*. at Tr. 3157:21-25 (in response to question was special handling required to load Maine Yankee's failed fuel from the pool to the ISFSI: "No. Absolutely none.").

– The same tools that are used to pick up a spent fuel assembly can be used to pick up a failed assembly in a canister. Tr. 1415:19-22 (Stuart).

– There is an "entire spectrum" of ways to handle failed fuel, including putting the entire assembly in a canister or placing one or more failed rods into a canister. Tr. 1413:1-1413:22 (Stuart).

– In Europe, failed fuel is regularly and uneventfully handled and moved for reprocessing. Tr. 1417:1-7 (Stuart).

– Tr. 6939:24-6490:8 (Meisner) (regarding the government's litigation assertion that DOE would not take failed fuel: "It's an incredible situation because we're all convinced that, you know, that – we expect the government to act responsibly, prudently, economically and all those things in the business that they conduct. And – and meeting those tests, you would expect that the government would take damaged fuel assemblies on the same schedule as the non-damaged assemblies . . .").

– In transferring its SNF to the ISFSI, both Yankee Atomic and Connecticut Yankee handled its failed fuel by reconstitution and by placing failed assemblies in damaged fuel canisters. Tr. 1622:12-1623:5; 2332:10-20 (Bennet).

– Tr. 4033:24-4034:22 (Pollog) (impeached with prior testimony that he could not state any reason why it would be technically infeasible for DOE to handle failed fuel).

The government's assertion that "Yankee" acknowledged "that DOE may defer acceptance of failed fuel," is based on a response in an e-mail sent to an employee at Yankee Atomic, but it is unclear who even wrote the response section the government relies on. More fundamentally, the response appears to simply report DOE's litigation-inspired position that DOE allegedly won't have facilities for failed fuel and may therefore have to defer the acceptance. There is no statement in this e-mail that DOE contractually has the right to defer the acceptance of Yankee Atomic's failed fuel, and, indeed, Yankee Atomic firmly believes that DOE does not have the right to postpone acceptance of its failed fuel.

265. Mr. Meisner's cited testimony goes to the actual design of the interior basket used inside of Maine Yankee's canisters. The government omits Mr. Meisner's subsequent testimony – in response to Mr. Abbott's theories – which shows that if plaintiffs actually had to store failed

fuel only, they would have conducted the analyses necessary to fully load their canisters, not just use the four corners of the canisters. Tr. 6938:4-6939:21 (Meisner).

272. None of the cited evidence purports to show that it would likely have been technically infeasible for DOE to have accepted plaintiffs' failed fuel on the same schedule as its other spent fuel. Credible persuasive evidence shows that technical feasibility is unlikely to have been an issue in DOE's acceptance of plaintiffs' failed fuel on the same schedules as other spent fuel absent the breach. *See* Response to GPF 263.

272A. If only GTCC waste were being stored, plaintiffs presented uncontradicted evidence that the costs of such storage would be much less than that for their present ISFSI. *See* D535 (Yankee Atomic); D494 (Connecticut Yankee); D789 (Maine Yankee); Tr. 7159:21-7161:23, 7164:14-17 (Heider). Moreover, even if spent fuel is considered the cited evidence does not indicate that the costs of ISFSI operations are completely independent of the amount of spent fuel being stored. Dr. Kadak testified that such costs are merely "largely independent" of the amount of fuel being stored.

## V. Government Proposed Findings Regarding Plaintiffs' Decisions to Use Dry Storage in Light of DOE's Failure to Remove Their SNF Are Without Merit

273-282. Each of the three Yankees shut down its nuclear plant before the end of its licensed-life, as these proposed findings indicate. But the various reasons for those premature shutdowns are neither fully nor accurately described in these proposed findings, and also are not relevant to any of the Yankees' damages claims. The Court need not and should not make findings based on the partial explanations for the premature plant shutdowns contained in these proposed findings.

283-286. These proposed findings wrongly suggest that planning by Yankee Atomic (and the other Yankees) in the 1990s, and the company's planning documents in that period, did

not reflect the company's serious concern – and growing awareness – that DOE could not and would not begin Contract performance by January 1998. The first sentence of GPF 283 says that explicitly, and it is incorrect. In fact, all of Yankee Atomic's planning and planning documents in the 1990s did reflect both concern about and awareness of DOE's impending (and eventually actual) breach. The only "planning" going on in those documents was planning for SNF storage in the *breach world*, and specifically planning for how to pay for on-site SNF storage for the extended period beyond 1998 that seemed increasingly likely as the 1990s progressed. As Mr. Bennet testified: "[f]or funding purposes, we had to look at a fairly significant worst case type of outcome so that we had to [have] funding to be able to store fuel during that delay period." *See also* Tr. 1705:17-20. Tr. 1842:16-25 (Bennet) ("[T]he assumptions that are made here [in Yankee Atomic's decommissioning cost estimates], and I think I framed them as unreasonable assumptions, we were being forced to make as a result of the circumstances . . . . We did not at all believe that this was what DOE should do under the contract or that it was what was required under the contract."); Tr. 1695:22-25 (Bennet) (in contrast, Yankee Atomic's 1980, 1984 and 1989 decommissioning cost studies "all assumed the fuel would be in wet storage and removed by the DOE in about 1 year after plant shut down.").

Indeed, in preparing its decommissioning cost estimates for its 1995 FERC rate case, Yankee Atomic used DOE responses to acceptance rate questions posed by Yankee Atomic's Dr. Kadak (collected in D218; *see* YAPF 92d.,e.). Tr. 2296:8-11 (Bennet) ("[DOE responses to Kadak questions] were the documents we used in preparing the [1995 FERC] rate case . . . ."); Tr. 2295:19-24 (Bennet) (recalling briefing session on decommissioning costs related to spent fuel storage that had come from DOE responses to Kadak questions: "And, in particular, relating the long-term duration of spent fuel storage and the information coming out of the Department of

Energy with regard to their – the situation they found themselves in at Yucca Mountain and the long time of acceptance they were attempting to impose on us."); Tr. 2342:13-23 (Bennet) (same); D218 & Tr. 2277:11-2289:4 (Heider) (reviewing D218); *see* D218 at YDK007572 (DOE response to Kadak Questions 5 and 7 re when DOE expects to begin acceptance and DOE's "best estimate of the shipping schedule": "[DOE] currently projects that the earliest possible date for acceptance of waste for disposal at a repository is 2010," and "The 1992 [ACR] provides the best estimate of the rate at which Yankee Atomic['s] spent nuclear fuel will be accepted during the first ten years of system operation. . . [P]rojections of waste acceptance rates beyond the initial ten-year period of system operation are not meaningful at this time.").

Moreover, a substantial part of Yankee Atomic's planning for extended on-site SNF storage was the development of funding plans to pay for such storage, which the company periodically submitted to the Federal Energy Regulatory Commission ("FERC") in rate case filings. Tr. 1539:17-24 (Bennet) ("[O]ne of the particular circumstances we find ourselves in is needing to plan around funding for what DOE says they will do as part of our regulation by the FERC, which is our chief economic regulator. We have to put forth a cost estimate that will provide for the money to store spent fuel over significant periods of time."); Tr. 1580:10-19 (Bennet) (same). Assumptions that Yankee Atomic used in that context regarding the schedule for DOE's removal of SNF were breach-world assumptions. Tr. 1698:20-1699:4 (Bennet) (" I wouldn't want to condone a sense of reasonableness on the period of storage[,] which we believe was an unreasonable delay caused by DOE. And I didn't want to mistakenly lead you down the path that we told FERC that that delay is reasonable on behalf of DOE. In fact, we've concurred with interveners and others that that's an unreasonable delay."). Those assumptions generally were quite conservative, to help assure that the company would have adequate funding for its

SNF storage needs, and typically the assumptions simply parroted the schedule assumptions used in DOE's own breach-world "planning" documents. Tr. 1842:23-1843:2 (Bennet) ("We did not at all believe that this [ACR-based acceptance rate assumption in Yankee Atomic's FERC filings] was what DOE should do under the contract or that it was what was required under the contract. These were just assumptions that we were forced to make to ensure adequate funding under our FERC regulation.").

Thus, the trial record contains no support for, and substantial evidence refuting, the government's suggestion that Yankee Atomic's planning and planning documents in the breach world reflected the company's understanding of DOE's contract obligations, or of how DOE would have performed in the non-breach world had it commenced performance by January 1998 as the contract requires.

All the documents and other evidence cited in GPF 283-286 are subject to the foregoing objections. Additional responses are provided below.

284. As explained above in the general response to GPF 283-286, the documents the government cites did not "assum[e] timely DOE performance" as this proposed finding states. Rather, these documents reflect Yankee Atomic's awareness and concern about DOE'S impending breach. For example, D159 states at YSB003465: "The overall twenty-one (21) year on-site storage period is dictated by YAEC projections of the availability of the United States Department of Energy (DOE) to accept spent nuclear fuel *at its yet-to-be developed high level waste repository,*" and at YSB003478: "This study *does* consider the constraints that the presence of spent fuel on site may impose on other decommissioning activities due to . . . *the unavailability of DOE to accept the spent fuel inventory stored on site in a timely fashion.*" (emphasis added.) Similarly, the government's summary of the recommendation in D160

(Yankee Atomic's September 1992 Spent Nuclear Fuel Storage Study) at YDK042406-07, that if priority and exchanges are not obtained, Yankee Atomic should pursue dry storage, omits the study's link of that recommendation to DOE's conduct. The study recommends that if priority and exchanges are not obtained, or if pressing the DOE for taking financial responsibility for SNF is unsuccessful, "[Yankee Atomic] should weigh the economic and technical viability of the dry storage system versus continued [spent fuel pool] operation *in light of the (then) current DOE position*," and construct a dry storage facility if it "*is the best alternative at the time.*" D160 at YDK042406-07 (emphasis added).

In addition:

a. This assumption was made in connection with a FERC funding plan. Tr. 1705:17-20 (Bennet) ("For funding purposes, we had to look at a fairly significant worst case type of outcome so that we had . . . funding to be able to store spent fuel during that delay period.").

b. This assumption concerns the breach world. Tr. 1706:16-20 (Bennet) ("Q [by government counsel]: In 1992, when this study [D159] was done, Yankee Atomic expected that it would be storing spent nuclear fuel for 19 years. A: We assumed. We didn't expect. We actually expected potentially an even worse case than that.").

c. This is what Yankee Atomic assumed in its FERC planning, but only for the first 10 years. Tr. 1708:17-20 (Bennet) ("My recollection of the queue, as you're calling it, or the oldest-fuel-first information was that it didn't go out beyond 10 years.").

d. This assumption concerns the breach world. Tr. 1709:11-18 (Bennet) (Q [by government counsel]: "It [D159] doesn't assume exchanges, does it? A: Well, our own internalization of the cost study as part of our testimony in the FERC case is that we believe

exchanges would be possible when the program was going on. . . . [S]o that stands separately from the assumption we had to make here where we didn't rely on those for purposes of funding." As Mr. Bennet explained, "What we believed should happen, meaning the swaps should happen in the contract, was, indeed, different than what we said DOE appeared to be saying they would be doing. And that's because, for funding purposes, if I were to run out of money because, in funding, I relied on that [*i.e.*, swaps and early SNF removal], that would be a bad thing." Tr. 1710:8-13.

285. For reasons explained above, these documents also did not "assum[e] timely DOE performance" as this proposed finding states. For example, D150 [May 1992 Yankee Atomic Decommissioning Cost Study] states at YDK006389-90: "The overall twenty-eight (28) year on-site storage period is dictated by YAEC projections of the availability of the [DOE] to accept spent nuclear fuel at its yet-to-be developed high level waste repository," and, at YDK006408: "These studies do consider the constraints that the presence of spent fuel on site may impose on other decommissioning activities due to the *unavailability of DOE to accept the spent fuel inventory stored on site in a timely fashion*." (Emphasis added.) Moreover, Mr. Mellor's May 1992 FERC testimony (D152) states: "[a]ll of Yankee's previous decommissioning cost estimates assumed that all spent nuclear fuel was removed from the site by DOE in the early stages of decommissioning. . . . In Yankee's testimony supporting the 1989 decommissioning report update, we recognized the potential for a possible slippage of the date on which a DOE spent fuel storage facility would be ready to receive spent nuclear fuel." D152 at YDK016756-57.

In addition, the assumptions addressed in subparagraphs a.-b. of GPF 285 are breach world assumptions. Tr. 1718:3-10 (Bennet) (Yankee Atomic's 1992 decision to construct dry

storage was based upon DOE's breach of contract: "my understanding of the contract is that, by January 31st, 1998, they were supposed to initiate spent fuel pickup. So that's an absolute breach. But all of the actions they took prior to that to not do anything . . . constituted breaches as well, breaches in the responsibility that they had in the contract."). The assumptions the government cites here also were made in connection with Yankee Atomic's FERC funding plans, which dealt with breach-world realities. Tr. 1716:13-22 (Bennet) (Yankee Atomic's May 1992 cost estimate, D150, assumes its spent nuclear fuel would be gone by 2018 "for purposes of the FERC funding plan."); 1720:22-24 (Bennet) ("Q [by government counsel]: So the study [D150] also assumes the lower rate of acceptance in the ACR, correct? A: Yes. For purposes of FERC funding.").

With regard to the government's statements in GPF 285.b. regarding "oldest fuel first," the only "planning" going on in those documents was planning for SNF storage in the *breach world*, and specifically planning for how to pay for SNF storage for the extended period beyond 1998 that seemed increasingly likely as the 1990s progressed. As Mr. Bennet testified: "[f]or funding purposes, we had to look at a fairly significantly worst case type of outcome so that we had to [have] funding to be able to store fuel during that delay period." Tr. 1705:17-20.

286. This is a breach world assumption, as Yankee Atomic stated in D397 (update to 1992 Yankee Atomic cost estimate) at YDK007545-46:

> In light of a DOE February 18, 1994 memorandum from the Secretary of Energy to Director of the OCRWM, in which the Secretary notes 1998 SNF acceptance is unlikely (Attachment 5) and the concern that the ACR Schedules were outdated, Yankee wrote to the Secretary of Energy on April 20, 1994 requesting schedules and other information related to CRWMS acceptance of Yankee SNF. . . .
>
> [In response] DOE did not provide a revised SNF acceptance schedule and hedged on when acceptance was likely to begin. They cited that it was possible that acceptance would not begin until after 1998 assuming 2010 startup of the repository . . . .

As noted above, the full set of DOE/Yankee correspondence to which D397 refers is collected in D218.

287. This proposed finding wrongly suggests that planning by Connecticut Yankee in the 1990s, and in the company's August 1992 Decommissioning Cost Study, D157, did not reflect the company's serious concern – and growing awareness – that DOE could not and would not begin contract performance by January 1998. The first sentence of GPF 287, which says that explicitly, is incorrect and not supported by the cited evidence. Connecticut Yankee's August 1992 Decommissioning Cost Study, D157, states at CDB00196 that: "[T]he assumptions used to construct the current scenario need periodic evaluation as the DOE moves closer to developing a repository for high-level waste." *See also* Tr. 2299:8-13 (Bennet) (at time he joined Connecticut Yankee in 1997, "[w]e saw it [DOE's commencement of spent fuel pickup in 1998 or at a reasonable time thereafter] and I saw it as very unlikely . . . .").

Other Connecticut Yankee documents also reflect that concern. P1444CY (October 1992 "Spent Fuel Storage Strategy") at 12 ("There is less than a 25% probability that DOE will remove fuel from utility sites by 1998)" and at 13 ("There is some likelihood (perhaps 50%) that DOE may begin to remove fuel by 2010"); P1445CY (December 1993 "Update of Spent Fuel Storage Strategy") at 1 ("DOE is not expected to meet its 1998 commitment to begin removing the spent fuel from our nuclear units. There is also no firm date by which DOE is expected to begin this removal."); P1448CY (July 1995 "Spent Fuel Storage Strategy") at 12 (making various recommendations "under the assumption that delays continue to plague DOE's program through 2025"); D89 (December 1996 Connecticut Yankee decommissioning cost study) at 38 ("[A]ssumes that the DOE will begin taking CY fuel in 2006, and will finish by January 1, 2022. The 2006 assumption is based on the possibility that DOE will have access to a centralized

interim storage facility by 2006."); *id*. at 29, 34 (among "major assumptions:" "Spent fuel will remain on-site for approximately 25 years following final plant shutdown," which had just occurred that month).

288-289. These proposed findings wrongly suggest that planning by Maine Yankee in the 1990s, and the company's planning documents in that period, did not reflect the company's serious concern – and growing awareness – that DOE could not and would not begin contract performance by January 1998. The first sentences of GPF 288 and GPF 289 say that explicitly, and they are both incorrect and unsupported by the cited evidence. For example, D197 (August 1993 "Rational[e] for the Assumption that Spent Fuel Will Be Removed from the Maine Yankee Site by end of the Year 2018") states that DOE's then-current plan for implementation of the contract was "the development and operation of a permanent disposal facility (Yucca Mountain, proposed) to be operational by the year 2010." D197 at MIR000130.

Moreover, as set forth more fully in Maine Yankee's Proposed Findings of Fact No. 85c., Maine Yankee understood in the early 1990s that the chance of DOE performing its duties under the contract in a timely manner was "very much in serious jeopardy." Tr. 2735:18-21 (Thomas). *See also* D129 at 2 (December 18, 1990 Memo from Jordan to Whittier re: draft report evaluating long term spent fuel storage options, which was "necessitated by the failure of the DOE to meet its contractual obligation to assume timely control of the spent fuel for placement in a repository.").

The statement in GPF 289 that Maine Yankee assumed in its planning documents that DOE "would accept SNF on an 'oldest fuel first' basis," ignores the statement in D197, that: "Spent fuel and high level waste generators may however, exercise a contractual option exchanging specific delivery commitments with other generators in order to optimize individual

delivery schedules." D197 at MIR000131; *see* Tr. 2947:5-19 (Whittier) (Maine Yankee decided not to undertake exchanges in 1993 because "at that point in time, of course there was considerable uncertainty about whether or not DOE would perform – when it would perform, whether they would ever perform, to take possession of spent fuel of Maine Yankee and others."); *see also* response to GPF 284d. *supra*.

290. The reference in the second sentence to "delayed decommissioning, which prolongs most activities" is unclear and not supported by the cited testimony. The finding appears to refer to SAFSTOR, which delays most decommissioning activities. The last sentence is misleading. In order to complete decommissioning, plaintiffs must remove all SNF from their sites, not just the spent fuel pools. *See, e.g.*, YAPF 27. The last sentence of the proposed finding relates to the breach world, and is subject to the objections stated above in response to GPF 283-286.

291. The last sentence of the proposed finding relates to the breach world, and is subject to the objections stated above in response to GPF 283-286.

293. Although low-level radioactive waste disposal issues were a factor in decommissioning planning for all three Yankees, they ultimately were not a significant factor. *See* Tr. 3164:20-23 (Meisner) ("[T]he availability of a low-level waste site at that point in time [1997] was – was not at all a major determiner in order – in going forward with decommissioning."); Tr. 1722:9-1724:12 (Bennet) (to the same effect). Suggestions to the contrary in this proposed finding, including subparts, are misleading and wrong.

References to the unavailability of the Barnwell site are substantially overstated. Tr. 3169:3-17 (Meisner) ("Q [by government counsel]: So at the time this report [Maine Yankee's post-shutdown decommissioning activities report to the NRC, D783] was written in August of

1997, there was a concern that Maine Yankee might lose access to that site for the disposal of its low-level waste, right? A: Not particularly. No. All this says is we considered the possibility, which is what I was saying just a few minutes ago.").

299.a. and c. The assumptions described in subpart a.i. – iii. are subject to the objections stated in response to GPF 283-286. All the studies described in subparagraphs a. and c. did conclude that economics favors dry storage of SNF.

299.b. The government's reference to D741 as a "study" concerning cost comparisons of wet storage versus dry storage is incorrect and not supported by the evidence. D741 is Bechtel Power Corporation's "Proposal to Connecticut Yankee Atomic Power Company for the Haddam Neck Nuclear Plant Decommissioning Operations Contractor Services and Related Equipment, Materials and Supplies, Book 3, Financial Proposal;" that is, it is a portion of Bechtel's response to Connecticut Yankee's RFP for a "DOC" contract. In D266, Connecticut Yankee's February 1998 Spent Fuel Storage Study, Connecticut Yankee concluded that "[r]eductions in the design and licensing risks and changes in cost estimate assumptions, however, could make dry storage the more favorable option," and recommended that "a decision to continue with wet storage should not preclude the possibility of future dry storage." D266 at COF006420.

As Mr. Bennet testified, "the decision to award dry storage as part of [Bechtel's] contract wasn't just based on their bid information. We had been studying dry storage for quite some time, going back to the studies that were commissioned at the time . . . I came to Connecticut Yankee in 1997. And as such, the consideration of the length of time that we might be facing storing fuel at the site, as well as the economics of being able to complete decommissioning in our fixed-price contract in a reasonable time frame, and award all of that under a single scope, as

well as some additional information we got from the bidding process as to the potential long-term O&M cost savings we would have on wet versus dry storage, gave us enough information to award Bechtel that full scope, and, essentially began executing transfer of fuel – executing the path to dry storage." Tr. 2325:10-2326:2.

## VI. Government Proposed Findings Regarding Plaintiffs' Use of Dry Storage Canisters Are Without Merit

The government asserts 14 proposed findings regarding plaintiffs' use of dry storage canisters. The gist of the government's proposed findings is that the containers in which plaintiffs are storing their SNF are not "covered" by the parties' contracts. It is true that the parties did not originally contemplate that plaintiffs would store their spent fuel in such containers. Indeed, as set forth in plaintiffs' pretrial submissions, the parties intended that DOE's performance would avoid the need for such additional at-reactor storage. *See, e.g.,* YAPF 61. Given DOE's prolonged failure to remove any of plaintiffs' spent fuel, plaintiffs needed to take appropriate action to manage storage of the SNF. *See, e.g.,* YAPF 90-109.

Importantly, in its findings, the government does not allege that the status of the dry storage containers under the parties' contracts makes plaintiffs' decisions to use such containers unreasonable in any way. Therefore, the government's proposed findings (many of which are actually assertions of law, not fact) are not material to resolution of any damages issues in this case.

In addition, plaintiffs provide the following responses to some of the government's specific proposed findings on this issue:

300. This paragraph is a conclusion of law, not a proposed finding of fact. The terms of plaintiffs' contracts are set out in P1YA, P1CY and P1MY, not in 10 CFR § 961.11. The second sentence of the paragraph is wrong and not supported by the cited evidence. Under the

parties' contracts, plaintiffs are responsible for "loading activities necessary for the transportation of SNF and/or HLW to the DOE facility." *See, e.g.,* P1YA, Art. IV.A.2.(a). This provision does not require plaintiffs to prepare their SNF for disposal.

301. The implication of the first paragraph of this proposed finding that spent nuclear fuel is different from failed fuel is unsupported and wrong. Under the parties' contracts, failed fuel is a subset of spent nuclear fuel that DOE is obligated to remove from plaintiffs' sites. *See, e.g.,* P1YA, Art. I.18 and App.E.A.1.

301.a. The last sentence of this paragraph, that dry storage canisters are known in the industry as multiple element sealed containers, is not supported. This term appears to be used almost exclusively by DOE.

302. This paragraph is a conclusion of law, not a proposed finding of fact. The parties' contracts clearly contemplate that SNF would be loaded into containers for removal from plaintiffs' sites by DOE. *See, e.g.*, P1YA, Art. IV.B.2. And while the parties' contracts contemplate that DOE would provide the necessary transportation casks, in light of DOE's failure to perform to date, nothing in the contracts prohibits plaintiffs from providing casks needed for transport of their SNF.

303-304. These paragraphs are conclusions of law, not proposed findings of fact. The cited "evidence" in support of this proposition is merely DOE statements of its legal position. Although GPF 303 refers to the phrase "acceptable waste forms," that phrase is not contained in the parties' contracts. *See, e.g.* P1YA. And notwithstanding the fact that the contracts clearly contemplate acceptance of SNF in containers as explained in response to GPF 302 above, the government has not explained how the parties' contracts presumably make SNF

in dry storage canisters an unacceptable waste form that require a change to the parties' contracts for acceptance.

305. The allegation in this proposed finding, that plaintiffs decided to use dry storage canisters to store their SNF with knowledge that the canisters are not covered by the parties' contracts, is wrong and not supported by the cited evidence. The ACR issue resolution process document merely reflects that an issue existed (as it still does) as to how to deal with the use of dry storage containers under the Standard Contracts. Mr. Zabransky's testimony simply notes his understanding of the issue when he worked for a nuclear utility other than plaintiffs. As set out in plaintiffs' proposed findings, *see, e.g.,* YAPF 103, contrary to the allegation that plaintiffs knew that dry storage containers were not covered by their contracts, plaintiffs determined to use such containers, in part, based on DOE's statements favoring their use. *See also* Tr. 1355:21-1356:15 (Stuart) (noting that DOE Secretary Watkins believed that multipurpose canisters were a "good idea.").

308. This paragraph is a conclusion of law, not a proposed finding of fact, to the extent it implies that the parties' contracts need to be modified for DOE to accept SNF in dry storage canisters.

310-11. The implication of these paragraphs, that the schedule for DOE's acceptance of SNF in dry storage canisters is less certain than that for acceptance of other SNF is wrong. The reality is that DOE has not decided on a schedule for the acceptance of any SNF as reflected as recently as its December 1, 2004 letters stating that its restart of the DCS process was premature. *See* Exhibit A attached hereto.

## VII. Government Proposed Findings Regarding Year of Anticipated DOE Performance Are Without Merit

314. The government is correct in noting the theoretical possibility that DOE could start performance before 2010, but the government's proposed finding does not even allege that this possibility is at all likely. Therefore, this proposed finding is not material. The evidence indicates that DOE is facing great difficulty and is unlikely to start performance by 2010. *See, e.g.,* Tr. 7793:19-7794:6 (Kouts) ("Can I predict that [the repository] will [begin operation in 2010]? No, I can't predict that it will."). And notwithstanding the theoretical possibility of expediting SNF acceptance at a storage-only facility, DOE has no plan for acceptance of utility spent fuel that does not lead to the repository. Tr. 3478:1-4 (Kouts). Indeed, DOE has neither proposed nor considered legislation to facilitate such expedited acceptance. Tr. 3482:3-12 (Kouts).

## VIII. Government Proposed Findings of Fact Regarding a Bad Faith Claim is a Straw Man

321-22. The government appears to argue that plaintiffs have asserted a "bad faith claim." They have not. Plaintiffs have set forth facts supporting their claim that DOE has violated the implied contractual duty of good faith and fair dealing. *See, e.g.,* YAPF 129-32.

## IX. Government Proposed Findings Regarding Taking Claims Are Without Merit

323-26. These proposed findings address legal issues, not proposed findings of fact. The government's responsibility for the disposition of SNF existed prior to the parties' contracts as set out in their legal briefs on this issue. *See, e.g.,* Yankee Atomic's Opposition to Defendant's Motion for Summary Judgment Upon Count III of Plaintiff's Complaint (Re Takings), filed December 16, 2002 at 2-3, 12-14. Indeed, in the legislative history of the NWPA itself, Congress recognized that the disposal of utility waste had been a long-standing federal responsibility. *See*, H.R. Rep. No. 97-491, pt. 1 at 28, 1982 U.S.C.C.A.N. at 3794 ("The failure

of the government to provide a permanent waste disposal facility during more than 30 years of Federal nuclear activities is unmitigated.")

The government's objections noted in GPF 326 to Yankee Atomic's and Connecticut Yankee's evidence of the fair market value of their real property taken by the government were correctly overruled by the Court at trial.

## X. Government Proposed Findings Regarding Plaintiffs' Reracking Projects Are Without Merit

327.a.-f. As demonstrated in Maine Yankee's Proposed Findings 107-110, 117-118, 121, absent DOE's impending breach, Maine Yankee could have and would have been able to avoid the reracking through the use of a small, temporary rack. Contrary to the suggestion in the first sentence of GPF 327, that Maine Yankee's reracking was performed in 1996 "to avoid the loss of full core reserve in . . . that year," Maine Yankee did not expect to lose full-core reserve until May 1997 at the time the rerack was performed. Tr. 2860:15-2861:1 (Whittier). Moreover, Maine Yankee actually started installation of the new racks after the initial shutdown of its reactor in December 1996 and terminated the installation in August 1997 after the decision to permanently shut down the plant. Tr. 2870:8-16, Tr. 2909:21-2911:6 (Whittier). Further, GPF 327.a-f. suggests incorrectly that Maine Yankee relied exclusively on fuel cycle projections performed in 1992 and 1993 to determine when to rerack its spent fuel pool. In fact, Maine Yankee performed such projections "every refueling cycle," including after 1993, to "update [its] future projections." Tr. 2855:9-2856:6, Tr. 2857:22-2860:10 (Whittier). In addition, GPF 327.a-f. suggest incorrectly that Maine Yankee reracked its spent fuel pool independently of and without being mindful of DOE's actions in the late 1980s and through the 1990s. In fact, Maine Yankee structured the reracking in a step-wise manner to be able to stop it in case DOE ultimately indicated an ability to perform. Tr. 2865:23-2866:20 (Whittier).

Additional responses to 327 are provided below:

327.b-d. These proposed findings report the contents of D151 and D189, but are irrelevant to any damages finding in this case. Maine Yankee projections of future pool capacity completed in 1992-1993 do not account for subsequent factual and technical developments that caused an increase in the pool's "capacity factor." Likewise D204, cited in GPF 327.c., is also irrelevant. D204 is a 1994 Maine Yankee projection. Technical improvements in fuel technology allowed smaller reload batches and higher burnups of spent fuel. Tr. 2858:19-2859:17 (Whittier). This allowed for smaller discharges of spent fuel into the pool. Tr. 2859:18-23 (Whittier). In addition, in 1995 Maine Yankee shut down its plant to repair its steam generator tubes. The shutdown caused a one-year, one refueling cycle delay. Tr. 2859:24-2860:14 (Whittier).

327.f. This proposed finding is incorrect. The first two sentences of GPF 327.f. are incorrect because Maine Yankee fuel data projections from January 1993 and January 1996 confirmed that a temporary rack for 30 fuel assemblies would have been sufficient in the period May 1997 through 1998 to maintain full core reserve if DOE had fulfilled its contractual obligations by picking up Maine Yankee fuel beginning in 1998. Tr. 2871:20-2872:10, Tr. 2873:7-24, Tr. 2874:20-2875:12, Tr. 2904:10-2906:17 (Whittier). The last two sentences of GPF 327.f. are incorrect because they are based on an incorrect technical understanding of how a temporary rack would have been used by Maine Yankee. A temporary rack would have been inserted into the pool only if a full core discharge had been necessary. Tr. 2872:22-2873:4, Tr. 2874:9-19 (Whittier). There were two ways that a temporary rack could have been used in a technically feasible and operationally safe manner while maintaining the capability to move fuel out of the pool. Tr. 6258:2-11 (Jordan).

In the first scenario, "[Maine Yankee] would be doing a full core discharge from the reactor vessel going into a following operating cycle where two-thirds of the core is discharged to the spent fuel pool, taking up the remaining spaces in the normal racks, and the one-third core, which is [also] discharged to the spent fuel pool, would go in the temporary rack. What this means is that, . . . when you reload the core, the two-thirds that you put in the normal spent fuel racks would go back into the reactor vessel. You could then transfer the one-third of the core, which is not going back into the reactor vessel, . . . out of the temporary rack and into the normal spent fuel racks, thus freeing up the temporary rack." Tr. 6258:12-6259:1 (Jordan).

In the second scenario, "the reactor vessel itself can be used as a storage mechanism if it's available. And so that even if you discharge fuel to the spent fuel pool and place fuel assemblies in a temporary rack in the cask pit, you could also load those same fuel assemblies back into the reactor core, freeing up the cask pit for shipments to DOE." Tr. 6259:2-8 (Jordan).

328.a.-c. These proposed findings incorrectly suggest that Connecticut Yankee relied exclusively on a Yankee Atomic document, D156, see Abbott's slide 45 (citing D156), to determine when to rerack its spent fuel pool. They also incorrectly imply that Connecticut Yankee did not continually engage in fuel cycle projections through the 1990s. In addition, they suggest incorrectly that Connecticut Yankee reracked its spent fuel pool independently of and without being mindful of DOE's actions in the late 1980s and through the 1990s. In fact, Connecticut Yankee monitored DOE actions, which failed to provide any assurance that DOE could meet its contract obligations to remove spent fuel starting January 1998. As demonstrated in Connecticut Yankee's Proposed Findings 114-118, 124, absent DOE's impending breach, Connecticut Yankee could have and would have been able to avoid the reracking.

Additional responses to 328.a-c are provided below:

328.a. This proposed finding is substantially correct.

328.b. This proposed finding is incorrect and is based improperly on a July 24, 1992 Yankee Atomic document studying possible spent fuel exchanges among New England reactors. *See* D156. That Yankee Atomic document reports dates of "current loss of FCR" for other New England utilities, including Connecticut Yankee. D156 at YDK008475 (Table B); Tr. 4595:22-4599:1 (Buchheit). Mr. Abbott, the government's technical witness, acknowledged that it was not possible to determine how "Yankee Atomic got the information … or derived the [1996] date" and that Yankee Atomic "could have been wrong." Tr. 5620:10-5621:4 (Abbott).

In fact, beginning in October 1992, a series of Connecticut Yankee's own documents projected that, without DOE performance under the contract, its reactor would not lose full core reserve until 2000 or thereafter. P1444CY (at CDB006672; CDB006691), P1445CY (at CDB005938, CDB006705-706), P1448CY (at CDB006668).

328.c. These proposed findings report the contents of P286CY and P287CY, but do not explain the underlying rationale for the fuel cycle projections contained therein. As explained in a part of the technical appendix to Connecticut Yankee's application to the NRC to allow reracking, *see* P287CY, Section 5.0, Attachment 3, "Safety Analysis Report," and at trial, Connecticut Yankee performed these projections on a conservative basis using a 64-assembly batch in 18-month fuel cycles for the sole purpose of calculating the decay heat load for the spent fuel pool. Connecticut Yankee performed the calculation in accordance with the NRC's "Branch Technical Position ASB9-2 'Residual Decay Energy for Light Water Reactors for Long Term Cooling,' Rev. 2, July 1981." Tr. 2612:16-2618:9 (Mellor); P287CY (at 5-1 to 5-21, regarding "thermal hydraulic considerations"). The spent fuel projections that Connecticut Yankee actually used to plan for reracking used the smaller, actual fuel batch sizes of 52 to 56

assemblies. P1445CY (at CDB006706). The 64-assembly batch depicted in P287CY at Table 5.3.1 (at 5-19) was a conservative hypothetical that was used "to maximize the number of assemblies in the spent fuel pool under an 18-month cycle plan. And the number 64 assures that the 1480 slots are filled, including the full core reserve." Tr. 2612:16-2618:9 (Mellor); P287CY (at 5-1 to 5-21, regarding "thermal hydraulic considerations"). Mr. Abbott, the government's technical witness, agreed that these projections "are for calculating the maximum heat load for the pool . . . and not a discharge plan for the plant." Tr. 5637:11-5639:5, Tr. 5628:21-5636:25 (Abbott).

Respectfully submitted,

s/ Jerry Stouck

JERRY STOUCK
Spriggs & Hollingsworth
1350 I Street, N.W., Ninth Floor
Washington, D.C. 20005
(202) 898-5800
(202) 682-1639

Counsel for Plaintiff,
YANKEE ATOMIC ELECTRIC COMPANY

Of Counsel:

Robert L. Shapiro
SPRIGGS & HOLLINGSWORTH

Dated: January 13, 2005