IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| YANKEE ATOMIC ELECTRIC COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 98-126C |
| | ) | (Senior Judge Merow) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

DEFENDANT'S RESPONSE TO PLAINTIFFS' INITIAL POST-TRIAL BRIEFS[1]

Pursuant to this Court's order dated September 21, 2004, defendant, the United States, respectfully submits its response to the plaintiffs' initial post-trial briefs.

SUMMARY OF ARGUMENT

In our initial post-trial brief, we discussed in great detail the significant and insurmountable problems with the Yankees' evidence regarding any causal link between the partial breach by the Department of Energy ("DOE") and the damages that they are claiming. As we established in that post-trial brief, the Yankees have attempted to recover damages of almost four times the amounts that they have paid in fees pursuant to their Standard Contracts, relying upon a single spent nuclear fuel ("SNF") acceptance scenario that is supported only by a speculative hypothetical model of "exchanges" of SNF acceptance allocations that lacks specific detail and is based upon numerous assumed facts in conflict with reality. The Yankees made a conscious decision not to present any alternative damages scenarios and to rest their case, upon which they have the burden of proof, solely upon the SNF acceptance scenario that Mr. Graves presented.

---

[1] The Government requests that this post-trial response brief also be deemed applicable in Connecticut Yankee Atomic Power Co. v. United States, No. 98-154C, and Maine Yankee Atomic Power Co. v. United States, No. 98-474C.

In their own post-trial brief, however, the Yankees have retreated significantly from Mr. Graves' analysis and findings. Even though virtually all of their trial evidence and testimony focused upon establishing that DOE was obligated to remove Yankee Atomic's SNF by 1999, Connecticut Yankee's by 2001, and Maine Yankee's by 2002, and that the incurrence of damages were tied to those "fuel-out" dates, the Yankees now argue that this Court need not decide "fuel-out" dates, or even an SNF acceptance schedule, at all. Instead, they contend, since the Court has already found liability for a partial breach, causation is established, without the need for any further fact-finding. Apparently, the Yankees' entire case now rests upon their contention that the Standard Contract required DOE to accept all of the Yankees' SNF immediately after January 31, 1998, so as to preclude them from having to incur any SNF storage costs.

The Standard Contract does not contain the requirement that the Yankees propose. In fact, in earlier briefing in this case, the Yankees alleged that the SNF acceptance rate that the Standard Contract requires would be fast enough to allow the Yankees to exchange SNF acceptance allocations with other contract holders and, through exchanges, obtain earlier "fuel-out" dates than would otherwise be required under the contract. Now, however, they apparently are arguing – without any admissible support – that the contract actually required even faster acceptance by DOE. The Yankees' new argument would require DOE to abandon the contractually mandatory "oldest fuel first" ("OFF") allocation system for SNF acceptance or, alternatively, would require DOE (to operate under OFF while removing SNF in the time frames that the Yankees now propose) to accept more than 24,000 Metric Tons Uranium ("MTU") of SNF from contract holders in the first two years of the program of SNF acceptance. In making this argument, which depends upon the Court's incorporation into the contract of unwritten

requirements that, at best, are identified as program goals in a few program documents, the Yankees have also misinterpreted the program goals upon which they rely to support their argument. Contrary to the Yankees' assertions, the non-contractual and non-binding program goal to which they refer was never intended to create the kind of acceptance rates or program policy that the Yankees now advocate. Given the wholly unsupported nature of the Yankees' post-trial shift in strategy, the Court should summarily reject their new theory that requires the Court to assume the existence of causation following a determination of breach. Further, given that the Yankees failed to present evidence at trial establishing causation for its claimed damages based upon any acceptance scenario other than the one presented by Mr. Graves, their claims should be dismissed.

## DISCUSSION

### I. AS WE ESTABLISHED IN OUR INITIAL POST-TRIAL BRIEF, THE YANKEES BEAR THE BURDEN OF PROVING EVERY ELEMENT OF THEIR DAMAGES CLAIMS, INCLUDING LIABILITY, CAUSATION, AND RESULTANT DAMAGE

As we explained in our initial post-trial brief, to recover damages, a plaintiff "must prove the requirements for an award of damages by a preponderance of the evidence," and these "requirements include: causation, foreseeability, and reasonable certainty in the amount of damages." Alaska Pulp Corp. v. United States, 59 Fed. Cl. 400, 413-14 (2004). According to the precedent of this circuit, the Yankees bore the burden of introducing clear proof that they were injured as a direct result of DOE's delay in accepting their SNF. Myerle v. United States, 33 Ct. Cl. 1, 27 (1897). The venerable decision in Myerle continues to represent the binding standard of this circuit. Glendale Federal Bank v. United States, 239 F.3d 1374, 1382 (Fed. Cir. 2001) (non-

breaching party may recover reliance "damages for any losses actually sustained as a result of the breach"). Further, the "measure of damages to be applied in the particular case is irrelevant until the claimant has established the fact of losses that were the natural and proximate result of the breach of contract." Willems Indus., Inc. v. United States, 155 Ct. Cl. 360, 376, 295 F.2d 822, 831 (1961). "Absent tangible proof of damages, [a party] may not recover for an alleged injury." Roseburg Lumber Co. v. Madigan, 978 F.2d 660, 667 (Fed. Cir. 1992).

## II. THE YANKEES HAVE FAILED TO ESTABLISH CAUSATION FOR ANY OF THEIR ALLEGED DAMAGES

### A. The Yankees Have Misstated The Test For Determining Causation

According to the precedent of this circuit, the Yankees bear the burden of introducing clear proof that they were injured as a direct result of DOE's partial breach of the Standard Contract. Myerle v. United States, 33 Ct. Cl. 1, 27 (1897); see also Wells Fargo Bank v. United States, 88 F.3d 1012, 1022-23 (Fed. Cir. 1996) (plaintiff can recover lost profits only if it proves damages would have "accrued and grown out of the contract itself, as the direct and immediate results of its fulfillment"); Quiman, S.A. v. United States, 39 Fed. Cl. 171, 183 (1997) (plaintiff bears burden of showing with clear proof that it was injured as direct result of breach), aff'd, 178 F.3d 1313 (Fed. Cir. 1999).

In their post-trial briefs, the Yankees assert that causation is established if they show that the breach is a "substantial factor" in their increased costs. YA Br. 5-6 (citing Bluebonnet Sav. Bank v. United States, 266 F.3d 1348, 1356 (Fed. Cir. 2001)). That test, however, finds its roots in tort law. W. Keeton, et al., Prosser and Keaton on the Law of Torts 266-68 (5th ed. 1984). The well-established contract law test for causation in contract cases before this Court is whether

the claimed damages were "attributable solely to," J.D. Hedin Constr. Co. v. United States, 197 Ct. Cl. 782, 808, 456 F.2d 1315, 1330 (1972), and, thus, "directly related" to, the breach. Wells Fargo, 88 F.3d at 1022; see Southern Pac. Co. v. Darnell-Taenzer Lumber Co., 245 U.S. 531, 533-34 (1918) ("[t]he general tendency of the law, in regard to damages at least, is not to go beyond the first step").

However, even in tort cases, the substantial factor test has not "replaced the need for *each* liable defendant to be a but-for *and* substantial contributor to the indivisible injury," Menne v. Celotex Corp., 861 F.2d 1453, 1461 (10th Cir. 1988), and the courts have made clear that, when the claimed damages could have resulted from multiple factors, the plaintiff "must establish that the breach alone would have been sufficient" to cause the claimed damage and that it would not have occurred "but for" the breach. Point Productions A.G. v. Sony Music Entertainment, Inc., 215 F. Supp. 2d 336, 344 (S.D.N.Y. 2002).[2] This United States Court of Appeals for the Federal Circuit requires application of both tests, even in the tort context. Shyface v. Secretary of Health and Human Servs., 165 F.3d 1344, 1352 (Fed. Cir. 1999). Thus, the "substantial factor" test may only be applied in place of a "but for" test if doing so would "generally yield identical results." Abbott Labs. v. Brennan, 952 F.2d 1346, 1352-53 (Fed. Cir. 1992). Indeed, the Court in Columbia First Bank v. United States, 60 Fed. Cl. 97 (2004), determined that, under the

---

[2] The importation of tort causation principles into contract law, without the limiting doctrines that restrict tort liability in multiple cause situations, would result in a lower causation standard in contract law than in tort law. Even in strict liability tort cases, most jurisdictions apply doctrines of contributory or comparative negligence to limit the tortfeasor's liability to the extent of its own actions and not for damage that resulted from other causes. See generally Parks v. Alliedsignal, Inc., 113 F.3d 1327 (3d Cir. 1997); Coats v. Penrod Drilling Corp., 61 F.3d 1113 (5th Cir. 1995); Pan-Alaska Fisheries, Inc. v. Marine Constr. & Design Co., 565 F.2d 1129 (9th Cir. 1977).

"substantial factor" test, the plaintiff must still prove that the "breaching provisions directly and primarily caused the . . . damages it seeks." Id. at 105.

### B. Regardless Of The Test Applied, The Yankees' Assertion That The Court Should, In Essence, Assume Causation Is Faulty

#### 1. The Yankees' Argument That, Because A Breach Of Contract Exists, The Court Should Simply Assume Causation Is Unfounded

Regardless whether the Court applies the traditional "but for" test or the "substantial factor" test in analyzing causation, the Yankees have failed to establish causation for any of the costs that they are seeking in this litigation. In our initial post-trial brief, we established that the Yankees have based the entirety of their cases upon their position that DOE was required to remove the last of their SNF from their facilities in 1999 (from Yankee Atomic), 2001 (from Connecticut Yankee), and 2002 (from Maine Yankee). To reach these "fuel-out" dates, the Yankees rely solely upon the testimony of Mr. Frank Graves and his hypothetical model of exchanges of SNF acceptance allocations. Yet, as we established in our initial post-trial brief, Mr. Graves' model is based upon pure speculation and, in fact, is often based upon assumed facts that conflict with reality. As we established in our initial post-trial brief, Mr. Graves' model cannot form the basis of a causation finding.[3]

In their initial post-trial briefs, the Yankees appear to have distanced themselves from their sole evidence of causation, barely mentioning Mr. Graves' hypothetical exchanges model or

---

[3] The Yankees alternatively attempted to argue in pre-trial filings that DOE would have provided them with priority in the acceptance of their SNF, pursuant to the provisions of Article VI.B.1(b) of the Standard Contract. As we established in our initial post-trial brief, the Yankees have no basis for making any such argument.

his "fuel-out" dates discussing causation. See YA Br 12.[4] Instead, they identify two factors and assert that, based upon those two factors, "[c]ausation is therefore established." YA Br. 7. First, the Yankees assert that they have established causation because, in 1987, 1989, 1994, or 1996, DOE made statements that provided the utilities with "a good idea" that the January 31, 1998 deadline would not be met. YA Br. 6. Yet, at best, the Yankees' representations only indicate the possibility of a future breach. In any event, as much as the Yankees might want the existence of a breach automatically to create a presumption of causation for any damage alleged, no such presumption exists. The question of causation is separate from the initial question of whether a breach exists, San Carlos Irrig. & Drainage Dist. v. United States, 877 F.2d 957, 959 (Fed. Cir. 1989), and the plaintiff bears the burden of proving both elements by a preponderance of the evidence. Id. The Yankees' attempt merely equate "breach" with "automatic causation" lacks any support.

Second, the Yankees assert that this Court, in its June 28, 2004 order, already determined that the Yankees were entitled to recover their damages for providing extended on-site storage of their SNF and that the Court, in that order, effectively decided causastion. YA Br. 6-7. A review of the Court's June 28, 2004 order indicates no such thing, and, in fact, the Court could not have prejudged the existence of causation before any evidence was submitted. Obviously, regardless of DOE's delay, the plaintiffs would have incurred costs for on-site SNF storage up until the point in time when DOE was obligated to complete the removal of their SNF. "As in all breach

---

[4] With regard to Mr. Graves, the Yankees assert in a conclusory fashion that his testimony "bolsters the other evidence showing that Yankee Atomic's damages were caused by DOE's breach, but [that] proof of the precise date DOE would have removed [the Yankees'] SNF is not necessary to make the causation showing." YA Br. 12.

of contract cases, the proper measure of damages for defendant's breaches is the amount of plaintiff's extra costs directly attributable to said breaches." Boyajian v. United States, 191 Ct. Cl. 233, 423 F.2d 1231, 1235 (1970) (emphasis added). The Yankees are "not entitled to recover 'expenses which would properly have been incurred regardless of the [breach].'" Id., 423 F.2d at 1236 (quoting Saddler v. United States, 152 Ct. Cl. 557, 564, 287 F.2d 41, 415 (1961)).

The issue here, then, is at what point, absent a breach of the Standard Contract, was DOE obligated to have removed all of the Yankees' SNF from their facilities and at what point, absent a breach of the Standard Contract, would the Yankees have otherwise stopped having to pay for the continuing storage of their SNF (and GTCC waste). Absent those findings, this Court cannot determine whether particular costs are "extra" costs that would not have been incurred absent the breach and, therefore, cannot determine causation. The Yankees' assertion that this Court has prejudged causation is unsupportable.

2. The Yankees' Assertion That They Can Establish Causation Without Reference To The Date By Which DOE Was Contractually Obligated To Remove Their SNF Is Unfounded

The Yankees argue that, to establish causation, they "are not required to establish exactly when DOE would have removed [their] SNF in the non-breach world." YA Br. 9. They claim that "[w]hat matters to causation in this case is *that* DOE would have removed Yankee Atomic's SNF in a reasonable time frame starting in January 1998, not precisely *when* DOE would have done so," id., and that, since DOE did not accept all of their SNF in a "reasonable" time frame, they are entitled to a causation finding. Accordingly, it appears that the Yankees' current causation argument is based solely upon its position that DOE was required under the terms of the Standard Contract to remove its SNF "beginning not later than January 31, 1998 on a

schedule that was robust, efficient and calculated to help utilities avoid additional on-site storage costs after that date." YA Br. 9-10. Based upon this purported contract provision, this Court then is asked to simply assume that, had DOE begun SNF acceptance by January 31, 1998, it somehow would have removed all of Yankee Atomic's SNF by 1999, Connecticut Yankee's by 2001, and Maine Yankee's by 2002. The Yankees' efforts to obscure the facts necessary to find causation strongly indicate that absence of any causation for the claimed damages.

As an initial matter, throughout this litigation, the Yankees' arguments regarding the speed at which DOE was required under the Standard Contract to accept contract holders' SNF have focused upon the Yankees' exchanges of SNF acceptance allocations. In their "Pretrial Brief Of Legal Points And Authorities Relied Upon," submitted to the Court on June 30, 1999, the Yankees asserted that the Standard Contract required DOE to pursue an acceptance schedule "that was economically efficient, reasonable, and allowed the utilities to arrange the specific acceptance scheduled themselves, through consensual 'swaps' of sequential acceptance slots" (emphasis added); that, through "swaps," the utilities would be able to "allocate the sequence of removal efficiently among themselves;" and that, through the Standard Contract's "swaps" or exchanges mechanism, or alternatively through the contract's priority provision, the Yankees would have achieved fuel-out dates of 1999, 2001, and 2002. See YA Pretrial Brief, at 10-11, 15 (submitted June 30, 1999). In their post-trial initial brief, however, the Yankees argue that DOE had to accept SNF, apparently without reference to exchanges, at a rate (1) sufficient "to prevent the nuclear utilities from having to construct or maintain additional at-reactor storage facilities for SNF after January 31, 1998; and (2) . . . that permitted DOE to keep up with the rate of production of SNF and reduce the existing SNF backlog." YA PFOF ¶ 61. They assert, without

support, that, "[a]t the time of formation of the Contract, the parties understood that an industry-wide acceptance rate of 3000 MTU per year would be appropriate to accomplish" these objectives. YA PFOF ¶ 62 (emphasis added).

Unfortunately, absent the Yankees' reliance upon exchanges and Mr. Graves, the 3,000 MTU rate upon which the Yankees rely does not achieve the goals that the Yankees have identified. If a strict 3,000 MTU rate was applied to an acceptance queue developed in accordance with the "oldest fuel first" requirement of the Standard Contract, assuming that SNF acceptance began in 1998, and according to the testimony of the Yankees' own expert, Mr. Graves, Yankee Atomic would not have all of its SNF removed until 2007, and Connecticut Yankee and Maine Yankee would not have their SNF removed until 2011. DPFOF ¶¶ 127-128. Yet, the Yankees did not present any evidence at trial to establish that, with "fuel-out" dates of 2007 and 2011, they would not have built dry storage facilities. See, e.g., Def's Response to YA PFOF ¶ 106. Accordingly, even assuming that the Court accepted the Yankees' 3,000 MTU rate argument, the Yankees failed to prove causation under that rate, absent reliance upon Mr. Graves' hypothetical exchanges model.

Further, the 3,000 MTU rate that the Yankees allege "accomplishes" the goal of precluding additional at-reactor storage costs at the Yankees does no such thing. As the Court is aware, since the Standard Contract was an industry-wide contract (see DPFOF ¶ 21), DOE could not begin waste acceptance from all utilities on January 31, 1998. Instead, the Standard Contract contemplates the development of an acceptance queue, which DOE was required to implement in performing its contractual obligations, based upon the age of each contract holder's SNF. See DPFOF ¶¶ 53, 89 (discussing "oldest fuel first" acceptance queue ("OFF")). While the contract

allows DOE to exercise its discretion to accept SNF outside of the OFF queue (see DX 6, 7, 8, at Art. VI.B.3 (priority), Art. V.D. (emergency), Article V.E. (exchanges)), the OFF queue is the contractually mandated order of acceptance. DPFOF ¶¶ 53, 89. Assuming that DOE was required to remove all of Yankee Atomic's SNF by January 1999, DOE, to comply with the OFF requirement in the Standard Contract, would had to have accepted more than 24,000 MTUs of SNF in the first year of SNF acceptance. DX 218 (internal Yankee memo from Mr. Buchheit to Mr. Mellor: "on an oldest fuel first basis, 24,000 MTU of SNF will have to be accepted by the CRWMS before all Yankee SNF will be removed from the Rowe site"). Similarly, as evidenced by adding the total MTUs accepted between 1998 and 2011 identified in Mr. Graves' model, to accept all of Connecticut Yankee's SNF by 2001 assuming no exchanges, DOE, if it also complied with the Standard Contract's OFF requirement, would had to have accepted approximately 36,000 MTUs of SNF in the first four years of the acceptance program. See DPFOF ¶¶ 125, 126, & 128.

The enormous amounts of SNF that DOE would have to accept early in the SNF acceptance program to satisfy the Yankees' proposed yet unwritten "contract requirement" while, at the same time, complying with actual written contract requirements, not only shows the irrelevance of the Yankees' reliance upon a 3,000 MTU acceptance rate, but also evidences the ridiculous nature of the Yankees' argument about this unwritten requirement. The Yankees have not explained how DOE could ever realistically satisfy their unwritten "no additional at-reactor storage" requirement while also satisfying the contract requirement to allocate SNF acceptance positions based upon OFF. "Construction of the terms of a contract . . . should 'avoid absurd and

whimsical results.'" Northwest Marine Iron Works v. United States, 203 Ct. Cl. 629, 493 F.2d 652, 657 (1974) (quoting Anderson v. United States, 203 Ct. Ct. 412, 490 F.2d 921, 928 (1974)).

Most importantly, and as discussed in detail in our post-trial initial brief, the absence of any language in the Standard Contract creating the vague and ill-defined "requirement" to preclude additional at-reactor storage that the Yankees propose destroys the Yankees' argument. Tellingly, the Yankees cannot identify a single contract provision that creates the obligation that they propose. The only contract language to which they have referred is a "Whereas" clause which indicates that DOE should take title to SNF "as expeditiously as practicable," but only "following commencement of operation of a repository." YA Br. 10. Since DOE had no statutory or contractual obligation to have a repository operational by January 31, 1998, see Def's Response to YA PFOF ¶ 49 & Indiana Michigan Power Co. v. Department of Energy, 88 F.3d 1272, 1276 (D.C. Cir. 1996), the Yankees' citation is irrelevant to the Yankees' current damages claims.[5] The Standard Contract also contains an integration clause, which expressly provides that "[a]ny representation, promise, or condition not incorporated in this contract shall not be binding on either party" and that "[n]o course of dealing or usage of trade or course of performance shall be relevant to explain or supplement any provision contained in this contract." DX 6, 7, 8, Art. XXII.A. For the reasons set forth in our post-trial initial brief, the Standard Contract does not contain any requirement that DOE accept SNF at a rate sufficient to preclude

---

[5] Further, "it is standard contract law that a Whereas clause, while sometimes useful as an aid to interpretation, 'cannot create any right beyond those arising from the operative terms of the document.'" Grynberg v. Federal Energy Regulatory Comm'n, 71 F.3d 413, 416 (D.C. Cir. 1995) (quoting Abraham Zion Corp. v. Lebow, 761 F.2d 93, 103 (2d Cir. 1985)).

each and every nuclear utility from having to maintain additional at-reactor SNF storage after 1998, precluding the Yankees' request that the Court presume causation.

The only other evidence to which the Yankees cite to support the existence of their proposed unwritten contract requirement are documents relating to various non-contractual goals of the program over the course of time. However, as we established in our initial post-trial brief, none of those program goals was ever incorporated into the Standard Contract or otherwise made binding against DOE. Accordingly, it would be inappropriate to consider such parol evidence to create additional unwritten contract requirements. See Def. Br. 13-15; see also National By-Products, Inc. v. United States, 186 Ct. Cl. 546, 570-71, 405 F.2d 1256, 1270 (1969) (program goals do not become contractually binding unless in form of contractual promise). Nevertheless, even if the Court considered this parol evidence, the alleged program goal advanced by the Yankees – that DOE obligated itself to preclude all additional SNF storage costs after January 31, 1998 – far overstates DOE's actual program goals. At one point, DOE hoped to be able to accept SNF at a rate that would be sufficient to eliminate out-of-pool at-reactor storage costs "in the aggregate." DX 23 (emphasis added). The Yankees have taken that "goal" and eliminated the "in the aggregate" language, assuming that DOE actually would have increased its acceptance rate to preclude additional at-reactor storage by every individual utility. The Yankees have identified no contemporaneous evidence establishing that DOE ever considered accepting SNF at a rate sufficient to preclude every single utility from requiring additional at-reactor storage.

Further, the cited "program goal" specifically references the elimination of the "need for additional at-reactor, out-of-pool storage starting in 1998" (DX 23 (emphasis added)), a goal that would be inapplicable to the Yankees as shutdown reactors. By focusing upon "need," the

alleged program goal does not support the contention that shutdown reactors, with sufficient storage space in their wet pools, should be prevented from incurring costs for on-site storage after January 31, 1998, in those wet pools. Accordingly, even if the Yankees could take various program goals and turn them into binding contract obligations, their mischaracterization of DOE's past program goals does not provide a basis for the Yankees' litigation theories.

### 3. The Yankees' Causation Argument Renders The Standard Contract's Priority Provision Meaningless

It is well-settled that, "[w]hen interpreting the language of a contract, a court must give reasonable meaning to all parts of the agreement and not render any portion meaningless, or interpret any provision so as to create a conflict with other provisions of the contract." Fortec Constructors v. United States, 760 F.2d 1288, 1292 (Fed. Cir. 1985); see United States v. Johnson Controls, Inc., 713 F.2d 1541, 1555 (Fed. Cir.1983). As discussed above, the Standard Contract obligates DOE to accept SNF upon an OFF basis. However, the Standard Contract allows DOE to grant priority outside the OFF acceptance queue to shutdown reactors. DX 6, 7, 8, Art. VI.B.1.(b). DOE holds the exclusive right to grant priority, and, for reasons discussed in our prior post-trial filings, DOE has never granted priority. DPFOF ¶ 114. Indeed, Yankee Atomic repeatedly sought priority treatment under the Standard Contract and industry support in implementing priority, but it failed in its efforts. See, e.g., DPFOF ¶¶ 117, 119, 191.

Here, instead of arguing priority treatment under the Standard Contract, the three Yankees seek this Court's rejection of the OFF acceptance schedule and the imposition of an acceptance schedule that would preclude any shutdown utility from incurring additional at-reactor storage costs after January 31, 1998. However, imposing the Yankees' "no additional at-reactor storage"

requirement upon DOE would render the permissive priority provision meaningless by forcing DOE to grant priority in SNF acceptance to shutdown reactors, rather than making it a discretionary decision by DOE. This Court should not interpret the Standard Contract to provide acceptance rights to the Yankees that conflict with DOE's unambiguous right to grant – or refuse to grant – priority to shutdown reactors. Since allowing the Yankees to recover under an expedited schedule based upon their shutdown status outside of the priority provision would render the priority provision meaningless, such a finding would be improper as a matter of law.

4. The Yankees' Request That The Court Assume A "Reasonable" Acceptance Schedule, Without Reference To The Deference That The Contract Provides DOE In Creating That Schedule, Is Mistaken

The Yankees' contention that the Court should merely assume the existence of a "reasonable" acceptance schedule, which would have resulted in acceptance of all of the Yankees' SNF by 1999, 2001, and 2002, see YA Br. 10, asks this Court to ignore the provisions within the Standard Contract that grant DOE the right to establish the rate, subject only to review by the Energy Board of Contract Appeals. As we explained in our initial post-trial brief, the SNF acceptance schedule provisions of the Standard Contract create a form of "alternative contract," providing DOE with the right to establish the acceptance schedule subject to a review only for abuse of discretion. Def. Br. 19-23. When contracts of that nature are breached, and no choice between the various available alternatives has yet been made, "the measure of damages . . . is the value of the alternative least onerous to the defendant." 11 W. Jaeger, Williston on Contracts § 1407, at 593 (3d ed. 1968) (emphasis added). Here, to the extent that the Yankees are asking this Court to add a "reasonable" schedule to the Standard Contract, the Court cannot identify a

"reasonable" schedule without reference to the nature of the contract provisions relating to schedule. To the contrary, any effort by the Court to establish a "reasonable" schedule, without identifying "the alternative least onerous to the defendant," would conflict with the nature of this contract. Because the Standard Contract does not create the obligations that the Yankees have asserted, the Yankees' requested "reasonable" schedule certainly does not constitute "the alternative least onerous to the defendant" and, therefore, cannot form the basis of causation for the Yankees' damages.[6]

### C. Any Delay In The Yankees' Fuel-Out Dates Beyond Those About Which Mr. Graves Opined Defeats Causation

#### 1. Any Delay In The Fuel-Out Dates Defeats Causation For The Yankees' ISFSI Construction

The causation evidence associated with the Yankees' damages claims for ISFSI construction, as presented to the Court at trial, was wholly dependent upon the fuel-out dates about which Mr. Graves opined. All of the testimony by the Yankees' witnesses in support of causation for the ISFSI construction was predicated upon those fuel-out dates. See Def's

---

[6] The Yankees also argue that, based upon the United States Court of Appeals for the Federal Circuit's decision in Roedler v. Department of Energy, 255 F.3d 1347 (Fed. Cir. 2001), the Court should implement the purpose of the NWPA in defining the acceptance schedule applicable to the Yankees' damages claims. YA Br. 11. However, as we established in our initial post-trial brief and our responses to the Yankees' proposed post-trial findings of fact, it was not the purpose of the NWPA to ensure that nuclear utilities would not be required to incur additional at-reactor storage costs after January 31, 1998. See also 42 U.S.C. § 10131 (identifying purposes of NWPA). Further, the NWPA only mandated that DOE's contracts for SNF disposal contain two specific provisions, neither of which was a requirement that DOE accept SNF at a rate sufficient to preclude utilities from incurring additional at-reactor storage after January 31, 1998. See 42 U.S.C. § 10222(a)(5). The remaining contract terms were left to DOE's discretion, and, as established in our initial post-trial brief, DOE did not include any such requirement in the Standard Contract. Accordingly, the Yankees' request that the Court refer to the NWPA to create obligations that do not otherwise exist in the Standard Contract does not affect this case.

Responses to CYPFOF ¶ 103, YAPFOF ¶ 106, & MYPFOF ¶ 96. Not a single witness testified that the Yankees would not have constructed dry storage assuming, for example, a 2007 fuel-out date. Absent this evidence, the Yankees have failed to prove that their decisions to pursue dry storage were "caused" by DOE's delay, rather than by a separate decision to pursue dry storage simply because, even without the delay, SNF would remain on their property for several years.

In addition to the absence of evidence from the Yankees establishing causation between DOE's breach and their decisions to pursue dry storage, the evidence affirmatively demonstrates that any delay in the fuel-out dates beyond those that Mr. Graves proposed would have resulted in the construction of ISFSIs by the Yankees, even assuming no delay by DOE. See, e.g., DPFOF ¶¶ 119.c (Yankee Atomic informing DOE that, barring grant of priority, an ISFSI would be constructed); DX 471 (DOE breach added only three years of additional on-site storage); 130-132; and 283-299. Indeed, there is significant evidence that, assuming fuel-out dates under an OFF allocation schedule, each of the Yankees planned to construct an ISFSI and, in fact, would have constructed an ISFSI. DPFOF ¶¶ 283-299. For example, Yankee Atomic's decommissioning studies that assume timely DOE performance all also assume the construction of an ISFSI. See, e.g., DPFOF ¶¶ 284-286. Likewise, Yankee Atomic's goal to decommission its facility by 2007 (DPFOF ¶ 112), the Yankees' desires to promptly generate and dispose of low-level waste at Barnwell (DPFOF ¶ 293.a-d), the Yankees' desires to minimize costs associated with low-level waste disposal (DPFOF ¶ 293.e-h); their desires to utilize existing personnel in decommissioning efforts (DPFOF ¶ 295), and their desires to reduce decommissioning costs (DPFOF ¶ 292), among others, all support the conclusion that, barring an expedited fuel-out date,

the Yankees would have constructed ISFSIs even absent DOE's delay.[7] Additionally, removal of SNF from the wet pool was cited as a requirement for site re-use by both Connecticut Yankee and Maine Yankee. DPFOF ¶ 296. Because the Yankees failed to prove that DOE was contractually obligated to remove their SNF by the dates that Mr. Graves proposed, their claims for ISFSI construction fail for lack of causation.[8]

This Court should reject the Yankees' fall-back position in their trial briefs that marginalize the relevance of Mr. Graves' testimony to their damages claims. The Yankees elected to pursue damages based upon an aggressive acceptance scheme, supported only by Mr. Graves' model. The Yankees presented no evidence of what their damages would have been, or what costs they would have had to have incurred regardless of any delay, had the fuel-out dates mandated by the Standard Contract been "2003 or 2007," YA Br. 27, or any later date. Because the Graves model provides no basis for defining contractually required fuel-out dates, the

---

[7] The Yankees contend that there is "no evidence that, if DOE had commenced performance by January 1998, DOE would have *delayed* accepting Yankee Atomic's SNF for up to 20 years." YA Br. 29 (italics in original). The Yankees goes even further, calling such a concept "a figment of the government's imagination." Id. While causation is defeated assuming any date after 1999 for Yankee Atomic, 2001 for Connecticut Yankee, and 2002 for Maine Yankee (since all of the causation testimony that the Yankees' witnesses offered is based upon those dates), the Government introduced evidence from all three Yankees that demonstrates that each plaintiff assumed that DOE's acceptance could take as long as 20 years. See, e.g., DPFOF ¶¶ 110, 118, 127, 299. A 20-year acceptance schedule under OFF neither is unsupported nor is a figment of the Government's imagination. This contrasts with Mr. Graves' fuel-out dates – a litigation-driven conclusion – that find no support within the Yankees' historical documents. DPFOF ¶ 131.

[8] For the reasons set forth above, the Yankees cannot rely upon the alleged DOE program goal of no additional at-reactor storage after January 31, 1998, to establish causation. Moreover, the evidence demonstrates that the Yankees never assumed that this alleged program goal – which figures prominently in their damages claim – would result in an expedited fuel-out date in the "non-breach" world. See, e.g., DPFOF ¶¶ 110, 118, 127, 299.

Yankees, by virtue of the risky litigation position that they took, have failed to satisfy their burden to prove causation.

2. <u>Any Delay In The Fuel-Out Dates Defeats Causation For Operating And Maintenance Costs</u>

The Yankees' causation for the operation and maintenance ("O&M") costs associated with their wet spent fuel pools, and even their ISFSI O&M costs, are wholly dependent upon the fuel-out dates that Mr. Graves defined. The Yankees' damages expert, Dr. Wise, recognized that the "existence . . . of all of the wet pool damages are dependent on the accuracy of [Mr. Graves'] non-breach fuel-out dates." Tr. 3329:9-14 (Wise). Even the Yankees admit that Mr. Graves "provided the only evidence presented at trial of a specific non-breach world pool-empty date." YA Br. 15. Quite simply, until all SNF would be removed from a site, the same O&M costs would have to be incurred to maintain the remaining SNF. Tr. 767:8-768:7 (Graves). Until the date by which DOE was obligated to remove all SNF arrives, the Yankees could not suffer any incremental O&M costs. Dr. Wise's testimony supports the conclusion that, barring proof of the 1999, 2001, and 2002 fuel-out dates, the Yankees have not established causation for their damages for wet pool O&M. Since it is clear that, under any extended fuel-out dates, DOE would not yet have been obligated – as of 2005 – to have completed removing SNF from any of the Yankees' sites, any award of damages for future O&M costs is unnecessary and, for the reasons discussed in our post-trial initial brief, unwarranted.

D. The Yankees' Efforts To Establish Causation For "Mitigation" Activities By Reference To Actions In The 1980s And Early 1990s, Years Before The Actual Breach Of Contract, Ignores The Nature Of The Breach That The Yankees Are Claiming

1. The Court Has Not Concluded That The Yankees Satisfied Their Burden of Proving Causation For Pre-Breach Or Post-Breach Mitigation

The Yankees claim that they satisfied their causation burden when the Court "recognized the relationship between causation and mitigation" in one of its June 28, 2004 orders. YA Br. 7. The Yankees have misconstrued the Court's order.

In the cited order, the Court was addressing the Government's motion *in limine* in which the Government was seeking to preclude evidence regarding the Yankees' damages that were inconsistent with its partial breach theory. Yankee Atomic Electric Company v. United States, No. 98-126, 2004 WL 1535688, at * 1 (Fed. Cl. June 28, 2004). Thus, the Court was required to decide whether the Yankees should be permitted to present evidence of their pre-breach damages at the trial that was scheduled to begin two weeks after issuance of the Court's order. While noting that the Yankees had not chosen to pursue a single theory of recovery, either partial breach or restitution, the Court concluded that it would not preclude the Yankees from submitting evidence of damages that would be recoverable pursuant to the restitution theory even if it were not recoverable upon a partial breach theory, specifically noting that it was not "prejudging whether or to what extent pre-1998 damages are appropriate or whether restitution may be granted." Id. at *5. The Court also stated that the Yankees would not be precluded from offering evidence regarding their reracking costs, which were incurred prior to 1998, despite the fact that such damages are inconsistent with a partial breach theory because doing so was

inconsistent with the Yankees' duty to mitigate damages. Id. at *7 - *8. Consequently, the Yankees were not precluded from presenting evidence of damages incurred prior to DOE's failure to commence acceptance in 1998. Id.

However, the Court never suggested that, by allowing the Yankees to submit evidence regarding their reracking costs at trial, the Yankees had already established causation. Indeed, in distinguishing the decision in Indiana Michigan, upon which the Government relied to preclude evidence regarding the Yankees' plaintiff's pre-breach damages, this Court specifically stated that the plaintiff in that case had "failed to establish that [DOE's] breach was the reason any costs, either pre- or postbreach were incurred [and that] . . . the [Indiana Michigan] court's discussion and rejection of any damages incurred before December 1998 was *dicta*." Id. at *8. Similarly, in discussing the decision in Tennessee Valley Authority, this Court noted that a utility can establish damages only "to the extent that [the utility] is able to show at trial that it has incurred damages as a result of DOE's failure to act . . . ." Id. at *6 (quoting Tennessee Valley Authority v. United States, 60 Fed. Cl. 665, 674 (2004)). Therefore, far from concluding, as the Yankees suggest, that this Court has already found that the Yankees have established causation simply because the Court decided to allow the Yankees to submit evidence regarding their reracking costs, this Court specifically stated that, to establish their damages, the Yankees must submit evidence that their costs "are reasonably certain and caused by" the breach. Id. at *2 (emphasis added).

2. In Evaluating Pre-Breach Mitigation Claims, The Court Must Recognize That, Prior To An Actual Breach, The Yankees Had No Obligation To Mitigate Their Damages

In prior briefing, we have discussed in detail the reasons that plaintiffs are not entitled to recover pre-breach damages in a partial breach of contract case. Nevertheless, the Court permitted the Yankees to present evidence regarding pre-breach damages. Accordingly, to the extent that the Court considers whether pre-breach damages were "caused" by DOE's later breach, it must place the mitigation concept into proper context. In their post-trial briefs, the Yankees argue that all of their pre-1998 activities were undertaken in an effort to mitigate the effects of DOE's impending breach. YA Br. 8. Yet, as we explained in our initial post-trial brief, the duty to mitigate does not arise until there has been an actual breach of contract. Def. Br. 69-70 (discussing Reliance Cooperative Corp. v. Treat, 195 F.2d 977 (8th Cir. 1952)). Accordingly, to establish that DOE's 1998 breach somehow "caused" the Yankees to incur costs prior to 1998, the Yankees must establish that they were reasonably compelled to incur those costs because of the breach.

However, as we explained in our initial post-trial brief, the pre-breach reracking claims that Connecticut Yankee and Maine Yankee have presented are unrelated to DOE's delay. Def. Br. 69-70 & n.21. To determine whether an attempt at mitigation was appropriate in cases involving post-breach activities, courts consider whether a reasonable person, in light of the known facts and circumstances, would have taken steps to avoid certain damages. Koby v. United States, 54 Fed. Cl. 493, 497 (2002). Nevertheless, plaintiffs must mitigate any potential damages "at the least cost to the defendant." LaSalle Talman Bank, F.S.B. v. United States, 45 Fed. Cl. 64, 111 (1999) (quoting Northern Helex Co. v. United States, 207 Ct. Cl. 862, 524 F.2d

707, 713 (1975)), rev'd on other grounds, 317 F.3d 1363 (Fed. Cir. 2003). This principle applies the general rule that, following a breach, "a party cannot recover damages for loss that he could have avoided by reasonable efforts." Robinson v. United States, 305 F.3d 1330, 1333 (Fed. Cir. 2002) (quoting Restatement (Second) of Contracts § 350, cmt. b) (emphasis in original). The least-cost principle "precludes rewarding a plaintiff for undertaking a form of mitigation that is considerably more costly than other available means of mitigation." LaSalle, 45 Fed. Cl. at 111. "It is a mistake to think that by merely placing the 'mitigation' label on any expense incurred an injured party is entitled to recover it. Plaintiff cannot escape the burden of proving that the losses sought to be avoided were caused, or would have been caused, by defendant's breaches." Affiliated Foods, Inc. v. Puerto Rico Marine Mgmt., 645 F. Supp. 838, 840 (D.P.R. 1986).

As we discussed in our post-trial brief, the decisions by Maine Yankee and Connecticut Yankee to shut down their reactors prematurely in the late 1990s rendered their reracking efforts – and the considerable costs associated with those efforts – unnecessary. Def. Br. 69-70; see Response to CYPFOF ¶ 109-128; Response to MYPFOF ¶ 103-128. The evidence adduced at trial established that Connecticut Yankee and Maine Yankee should have waited to rerack their pools until they needed the space, given that, had they done so, they would never have reracked. See Order, Yankee Atomic, 2004 WL 1535688 at *6 (June 28, 2004).

3. The Yankees' Arguments That Their ISFSI Construction Costs Are Related To An Effort To Mitigate Are Unfounded

For the reasons explained above, the Yankees' ISFSI construction claims, much of which pre-date 1998, fail because they are not tied to DOE's delay. Instead, the costs were incurred as a result of independent decisions to build ISFSIs regardless of DOE's delay. This Court has

recognized that the Yankees cannot recover the cost of building their ISFSIs to the degree that those efforts were more expensive than the wet storage alternative:

> [I]f one accepts the plaintiff's position as to the contract requirement for spent fuel removal, the cost of storage after the assumed removal comprises breach damages. It is assumed that storage costs contract damages would be premised on the extant wet storage facilities in the absence of mitigation activity. Presumably, plaintiff's case is premised on shifting to dry storage as a mitigation activity. If, however, dry storage will cost more than continuing the wet storage which existed when the contract was breached, a question is raised as to the government's liability for this additional cost. . . .

Yankee Atomic Electric Company v. United States, No. 98-126, slip op. at 2-3 (Fed. Cl. Dec. 24, 2003). Further, this Court has addressed the relationship between causation and mitigation:

> Moreover, as the submissions note, factors other than the pure need for spent fuel storage during the breach period are apparently present in a decision to shift to dry storage, so that any dry storage cost in excess of that for continued wet storage, if any, may be attributed to factors other than the government's breach of contract.

Id. at 2. As we have demonstrated numerous times, the Yankees did not build their ISFSIs because of the breach - they chose to build their ISFSIs for reasons that were unrelated to the breach. While the Yankees have argued that their ISFSIs were constructed in an attempt to mitigate damages, it is abundantly clear that the capital investment made by the Yankees in their ISFSIs cannot be justified by their savings in O&M costs.

Specifically, in their proposed findings of fact, Yankee Atomic claims to have incurred annual costs totaling $9.1 million to operate its wet pool (YA PFOF ¶ 142), but also seeks $67.14 million for the cost of operating its ISFSI from June 2003 to 2010 (translating into annual operating costs of $10.3 million). YA PFOF ¶ 141. After 2010, that annual cost of ISFSI O&M

allegedly declines to $6.5 million.[9] Maine Yankee has claimed $4.67 million per year to operate its wet pool (MY PFOF ¶ 159), but also seeks annual ISFSI operating costs of $9.8 million (MY PFOF ¶ 158), declining to $6.85 million after 2010. MY PFOF ¶ 177. Finally, Connecticut Yankee has claimed $10.7 million per year to operate its wet pool (CY PFOF ¶ 157) while seeking ISFSI operating costs of $93.58 (an annual operating cost of $15.6 million) (CY PFOF ¶ 156), declining to $10.2 million after 2010. CY PFOF ¶ 173.

Based upon the difference between the O&M costs for continuing wet pool versus those for ISFSI operations, none of the three Yankees shows a material reduction between the wet pool and ISFSI O&M costs until 2011. Beginning in 2011, the difference between the annual O&M costs for wet storage versus dry storage at Yankee Atomic is $2.6 million per year and at Connecticut Yankee is $.5 million. Dividing the ISFSI capital costs by the annual O&M savings after 2010 reveals that it would take 30 years before Yankee Atomic's O&M cost savings would exceed its capital costs and over 145 years for Connecticut Yankee.[10] There is no break-even point for Maine Yankee because Maine Yankee's alleged ISFSI O&M costs always exceed the annual costs of wet pool O&M. Furthermore, those computations are based upon nominal dollars. Since the relative cost of money spent many years from now is, upon a present-value basis, much less than the money spent in the past and the short-term, the O&M savings are even

---

[9] All three of the Yankees have reserved the right to seek compensation above their current post-2010 ISFSI O&M estimates in future litigation.

[10] Yankee Atomic alleges its ISFSI capital costs were $76.99 million. YA PFOF ¶ 140. $76.99 million divided by $2.6 million/year = 29.61 years. Connecticut Yankee's alleged ISFSI capital costs were $72.16 million. CY PFOF 154. $72.16 million divided by $.5 million/year = 144.32 years.

less when compared upon an actual basis.[11] Moreover, this extended recovery period is required even if one did not wholly accept the Yankees' alleged O&M numbers.[12] Thus, any analysis of the Yankees' damages demonstrates that the construction of their ISFSIs did not successfully mitigate their damages. If the Court were to require the Government to pay the Yankees' ISFSI construction costs, there would be no savings unless the Government fails to accept all of the Yankees' SNF by 2040, or beyond.

## III. THE DAMAGES THAT THE YANKEES SEEK WERE NOT FORESEEABLE AT THE TIME OF CONTRACTING

### A. The Court Must Resolve Foreseeability By Reference To The Actual Terms Of The Standard Contract Itself

In addition to proving causation, the Yankees must also prove that the damages they seek were foreseeable at the time of contracting. "Damages are not recoverable for loss that the party in breach did not have reason to foresee as a probable result of the breach when the contract was made." Restatement (Second) of Contracts § 351(1) (1981). In this Court, the Yankees must establish not only that their claimed damages were "foreseeable to the party in breach at the time of contract formation," but that "both the magnitude and type of damages were foreseeable" as

---

[11] The extent of the impact that a present-value analysis would have upon this computation varies depending upon the particular discount rate assumed, but the number of years required to break-even can only increase.

[12] Applying the analyses of Mssrs. Johnson and Abbot, beginning in 2011, the difference between the annual O&M costs for wet storage versus dry storage at Yankee Atomic is $2.4 million per year, at Maine Yankee it is $2.2 million, and at Connecticut Yankee it is $2.7 million. Tr. 6522:6-11, 6382:2-12, 6607:16-6608:4 (Johnson); Johnson Demonstrative 62a. Applying those annual savings to the Yankees' alleged ISFSI capital costs, means that Yankee Atomic would break even in 32 years ($76.99/2.4), Maine Yankee would break even in 38 years ($83.72/2.2), and Connecticut Yankee would break even in 27 years ($72.16/2.7). YA PFOF ¶ 140, MY PFOF ¶ 157, CY PFOF ¶ 154.

well. Landmark Land Co. v. United States, 256 F.3d 1365, 1378 (Fed. Cir. 2001); see Northern Helex Co. v, United States, 207 Ct. Cl. 862, 524 F.2d 707, 714-15 (1975); Bank United of Texas FSB v. United States, 50 Fed. Cl. 645, 654 (2001), rev'd on other grounds, 2003 WL 22177282 (Fed. Cir. Sept. 22, 2003). The "mere circumstance that some loss was foreseeable, or even that some loss of the same general kind was foreseeable, will not suffice if the loss that actually occurred was not foreseeable." Restatement (Second) of Contracts § 351(1) cmt. a (1981). The Yankees have failed to meet their burden of establishing foreseeability here.

In determining whether the damages that Yankee Atomic seeks were foreseeable, the Court must begin from the premise that "the boundaries of contract liability are determined by the contract itself; the scope of the risks assumed by the defendant delineate the scope of [its] liability," and, therefore, its "liability originates in contract and is thus bounded by contract." 3 D. Dobbs, Law of Remedies § 12.4(5) (2d ed. 1993); see Hi-Shear Tech. Corp. v. United States, 356 F.3d 1372, 1378 (Fed. Cir. 2004) (logical starting point for damages is understanding of breaching party's obligations under contract). As a result, to identify the type of damages that were "foreseeable" here, this Court must look to the language of the Standard Contract and to the scope of DOE's obligations under that contract.

Since the Standard Contract was an industry-wide contract (see DPFOF ¶ 21), DOE could not begin SNF acceptance from all utilities on January 31, 1998. Instead, as previously discussed, the Standard Contract sets forth a mechanism for defining an acceptance queue, which DOE was required to implement in performing its contractual obligations, based upon the age of each contract holder's SNF. See DPFOF ¶¶ 53, 89 (discussing "oldest fuel first" acceptance queue ("OFF")). While the contract allows DOE to accept fuel outside of the OFF queue (see

DX 6, 7, 8 at Art. VI.B.3 (priority), Art. V.D. (emergency), Article V.E. (exchanges)), the OFF queue is the contractual basis upon which the order of SNF acceptance is determined. DPFOF ¶¶ 53, 89. Accordingly, it is the application of the OFF acceptance queue that dictates the scope of DOE's obligations and liabilities and the foreseeability of the Yankees' alleged damages. To the extent that the Yankees argue that they should recover damages based upon a right to priority acceptance for shutdown reactors that could be obtained (a) only through DOE's exercise of discretion, (b) upon a right to exchange SNF acceptance allocations that DOE had the unilateral contractual right to deny, or (c) upon an acceptance scenario that requires the abandonment of SNF acceptance based upon an OFF acceptance allocation, the Yankees have not established how, under the terms of the Standard Contract, DOE could have foreseen that the Yankees would have such expansive rights, in conflict with the terms of the Standard Contract.

It simply was not foreseeable at the time the Standard Contract was executed that OFF acceptance obligations could be converted into priority acceptance requirements that substantially expedite the Yankees' fuel shipments to DOE and, therefore, substantially increase DOE's liabilities without an express grant of priority by DOE.

B. There Is No Contract Requirement Eliminating Additional At-Reactor Storage Costs After January 31, 1998

The Yankees' foreseeability argument hinges upon this Court's adoption of a contractual requirement that DOE accept SNF in a manner that would prevent contracting utilities "from having to incur additional costs of on-site storage of SNF after January 31, 1998." See YA Br. 4. The Yankees argue that, because they each constructed a dry storage facility, and because the Standard Contract's "goal" was to prevent such construction, foreseeability and resultant damage

have been proven. The Yankees' argument fails, however, because, as previously discussed in our initial post-trial brief and above, there is no provision in the Standard Contract that requires DOE to accept SNF in a manner that prevents contracting utilities from incurring additional costs associated with on-site SNF storage after January 31, 1998. See DPFOF ¶ 19. Accordingly, the Yankees cannot establish that, under the terms of the Standard Contract, it was foreseeable at the time of contract award that DOE would be obligated to satisfy such a requirement.

Further, as previously discussed, the Yankees have mischaracterized DOE's past program goals, eliminating the "in the aggregate" limitation upon DOE's hope to eliminate the need for additional out-of-pool at-reactor storage. See DX 23. If the Court considers DOE's actual program goal, rather than the Yankees' modification of it for litigation purposes, the Yankees' foreseeability argument disintegrates when the performance requirements needed to achieve that past program goal are examined in 1983 – at the time of contracting – and, in 1999, when the Yankees' expert reports were prepared. As recently as 1991 – eight years after the alleged program goal was articulated – a rate of only 900 MTUs per year would have, in the aggregate, achieved the program goal. DX 23 (Yankees' expert witness, Dr. Bartlett, approving 1991 ACR and finding that rate of acceptance contained therein would achieve the program goal). As a result, at the time of contract formation, a relatively small rate of acceptance could have achieved the stated program goal (even if the alleged "goal" included shutdown reactors, as the Yankees contend here). However, by 1998, 12 utilities had shutdown prematurely (Tr. 948:25-949:4 (Graves)), including eight reactors that shutdown in the mid- to late 1990s that possessed 2,500 to 2,600 MTUs of SNF in their wet pools. DPFOF ¶ 196.e. Assuming that the program goal advanced by the Yankees dictated DOE's performance obligations, meeting that goal in 1998

would require massive SNF acceptance in 1998. DPFOF ¶¶ 125, 126, & 128; DX 218. Taken even further, if 30 reactors shutdown prematurely this year, the "program goal" advanced by the Yankees would require far higher rates than proposed by the Yankees in this litigation. The imposition of alleged "goals" as contract requirements converts fixed performance obligations into ever-changing performance requirements. The Yankees have not established how the number of shutdown reactors or the scope of the need for SNF acceptance to preclude any additional at-reactor storage in 1998 was foreseeable in 1983.

### C. The Magnitude Of The Yankees' Claims Evidences The Lack Of Foreseeability

As set forth above, the Yankees must establish that “both the magnitude and type of damages were foreseeable.” See Landmark Land, 256 F.3d at 1378; see Northern Helex, 524 F.2d at 714-15; 5 A. Corbin, Corbin on Contracts § 1012, at 88 (1964) (to have been foreseeable, "the injury that occurs must be one of such a kind and amount as a prudent man would have realized to be a probable result of his breach."). Where there is an "extreme disproportion between the loss and the price charged by the party whose liability for that loss is in question, . . . [t]he fact that the price is relatively small suggests that it was not intended to cover the risk of such liability." Restatement (Second) of Contracts § 351(1) (1981). Consistent with that proposition, this Court has rejected lost profits claims upon the grounds that, although foreseeable as a general matter, "the magnitude of damages which the lost-profit models purport to show was not reasonably foreseeable." Bank United of Texas FSB v. United States, 50 Fed. Cl. at 654.

Here, the magnitude of the Yankees' alleged damages in relation to the contract prices that they paid (or that they still must pay) for all of DOE's program costs, including the licensing and construction of Yucca Mountain, the cross-country transportation of Yankee Atomic's SNF, the permanent emplacement of that SNF in Yucca Mountain, and at least 10,000 years of storage and monitoring, demonstrate that the damages sought in these cases were not foreseeable. For example, Yankee Atomic has paid a total of $22 million to DOE. Yet, in this litigation, Yankee Atomic seeks an award of damages through 2010 of nearly $185,000,000 – more than eight times the monies that it has paid to DOE under the Standard Contract – for the construction of dry storage, transportation of SNF less than one mile to the ISFSI, and storage costs through 2010. YAPFOF ¶¶ 4, 136. Yankee Atomic further seeks a finding that it is entitled to recover at least $6.5 million in damages every year beyond 2010 that it stores SNF on-site (YAPFOF ¶ 158) – an amount that adds an additional $22 million to damages, in nominal dollars, ever 3.5 years. In addition to the seemingly unchecked liability, DOE remains obligated to perform under the Standard Contract – DOE still must license and construct Yucca Mountain, still must transport Yankee Atomic's SNF from Massachusetts to Nevada, still must emplace that SNF in Yucca Mountain, and still must store and monitor that SNF for at least 10,000 years. YAPFOF ¶ 164.[13]

[13] Connecticut Yankee has paid $41 million (CYPFOF ¶ 1) and owes another $48.7 million in principal. DPFOF ¶ 319. In this litigation, Connecticut Yankee seeks damages totaling $198 million (CYPFOF ¶ 150), in addition to damages after 2010 accruing at an annual rate of $10.2 million (CYPFOF ¶ 173) and DOE performance of its contractual obligations. Maine Yankee has paid $65 million (MYPFOF ¶ 1) and owes another $50.4 million in principal. In this litigation, Maine Yankee seeks damages totaling $159.7 million (MYPFOF ¶ 152, in addition to damages after 2010 accruing at an annual rate of $6.85 million (MYPFOF ¶ 177) and DOE performance of its contractual obligations.

The magnitude of the Yankees' claims in relation to the amounts that they have paid to DOE belies any contention that their damages were foreseeable.

This Court should find that the Yankees' damages were not foreseeable at the time of contracting – both in type and in magnitude – because the Yankees' damages are predicated upon the imposition of extra-contractual obligations and because the exorbitant amount of the Yankees' claims could not have been foreseen at the time of contracting.[14]

## IV. THE YANKEES HAVE FAILED TO ESTABLISH THEIR ALLEGED DAMAGES WITH REASONABLE CERTAINTY

As previously discussed, the Yankees conclude that "causation follows from any reasonable [acceptance] schedule" and argue that they have established causation regardless of whether this Court finds that DOE would have completed acceptance of the Yankees' SNF in "1999, or 2003 or 2007." See YA Br. 27. Focusing upon causation, the Yankees completely ignore the requirement that their damages be established with reasonable certainty and that they have the burden of proof upon this issue. If this Court does not accept the fuel-out dates that Mr. Graves proposes, the Yankees' entire damages claim fails based upon the Yankees' failure to prove their damages with reasonable certainty.

[14] A separate foreseeability question is raised by the Yankees' decisions to shutdown prematurely. In 1983, Yankee Atomic was licensed to operate until July 2000 (DPFOF ¶ 273), Connecticut Yankee was licensed until 2007 (DPFOF ¶ 280), and Maine Yankee was licensed until October 2008. DPFOF ¶ 277. Even under the Yankees' damages theories, as of 1983, DOE would have had no obligation to accept Yankee Atomic's SNF until at least 2005, Connecticut Yankees' SNF until 2012, and Maine Yankee's SNF until 2013. DOE certainly could not have foreseen in 1983 that the Yankees were going to elect to shutdown prematurely and that such a decision would impose upon DOE SNF storage costs beginning in 1999, 2001 and 2002 (outside of a voluntary decision by DOE to accept SNF upon a priority basis).

To establish damages with reasonable certainty, the Yankees had to establish the dates that DOE was required under the Standard Contract to have finished removing their SNF, absent a delay. At trial, and based solely upon Mr. Graves' model, the Yankees attempted to establish that, absent DOE's delay, DOE would have removed Yankee Atomic's SNF by 1999, Connecticut Yankee's SNF by 2001, and Maine Yankee's SNF by 2002. In their post-trial briefs, however, the Yankees attempt to minimize the risks associated with a rejection of the Graves model by this Court. To that end, the Yankees argue that, "to establish causation, [the Yankees are] not required to establish exactly when DOE would have removed [their] SNF in the non-breach world." See YA Br. 9. The Yankees go even further, contending that they could have avoided building their ISFSIs "if DOE followed *any* "reasonable" SNF pickup schedule, whether that led to the final removal of [the Yankees'] fuel in 1999, or 2003 or 2007." See Yankee Tr. Br. at 27 (italics in original). In attempting to marginalize the relevance of Mr. Graves' testimony to causation, the Yankees ignore the fact that their damages all are predicated upon Mr. Graves' fuel-out dates – a fact they acknowledge when arguing that "the length of that period affects only the amount and not the fact of . . . damages." Id. However, in determining whether the Yankees have established damages with reasonable certainty, the 1999, 2001, and 2002 fuel-out dates are the only dates from which damages can be measured, as none of the Yankees presented evidence of what their damages would have been assuming a fuel-out date of "2003 or 2007" (or any other).[15]

---

[15] The Yankees attempt to make the Government's decision not to advance alternative and, presumably, later fuel-out dates an issue in whether the Yankees have proven their damages. Yet, the burden of proof in this case upon issues of causation, foreseeability, and reasonable certainty all rest upon the Yankees. Alaska Pulp, 59 Fed. Cl. at 413-14. The Yankees have no basis upon which to switch the burden of proof.

As we established in our initial post-trial brief, the Yankees bear "the burden to establish clear proof that it was injured as a direct result of defendant's alleged breach" and that its damages are not speculative, remote, or unforeseeable. Quiman, 39 Fed. Cl. at 183. Further, they have the burden to establish "reasonable certainty" as to each item within its damages claims. Wells Fargo, 88 F.3d at 1023; see Restatement (Second) of Contracts § 352 cmt. a ("[a] party cannot recover damages for breach of a contract for loss beyond the amount that the evidence permits to be established with reasonable certainty"). The Yankees' damages expert, Dr. Wise, recognized that his entire damages model unravels once the fuel-out dates are modified. Upon cross-examination, Dr. Wise admitted that the "existence and amount of all of the wet pool damages are dependent on the accuracy of the non-breach fuel-out dates" that Mr. Graves modeled. Tr. 3329:9-14 (Wise). Dr. Wise further admitted that, if the Court finds that the fuel- out date is later in time, the "additional years of non-breach wet storage would operate as additional offsets that would reduce breach world costs in the damages model." Tr. 3330:5-16 (Wise). Dr. Wise's testimony supports the conclusion that, barring proof of the January 1999 fuel out date, Yankee Atomic has not established its damages with reasonable certainty.

The material effect upon damages of any change in the fuel-out dates is clearly demonstrated with reference to Yankee Atomic's claim. Yankee Atomic seeks damages totaling

---

Nevertheless, while the Government is not obligated to prove alternative acceptance scenarios, significant evidence was introduced that demonstrates that each of the Yankees expected that DOE's timely acceptance schedule would result in the long-term on-site storage of SNF through at least 2018. DPFOF ¶¶ 283-289. Barring a grant of priority and expedited acceptance of SNF, each of the Yankees would have constructed an ISFSI on-site, assuming timely DOE performance (see Tr. 7722:12-22, 7723:23-7724:3, 7728:4-17 (Mellor); DX 152 (FERC testimony); DPFOF ¶¶ 283-289), a course of action that Yankee Atomic, for example, proposed as early as 1992. DPFOF ¶¶ 283-285).

nearly $185,000,000 (YAPFOF ¶ 136), predicated upon the January 1999 fuel out date. YAPFOF ¶ 86. Setting aside the $77 million in ISFSI construction costs incurred as of the date of trial (YAPFOF ¶ 140), Yankee Atomic is seeking nearly $108 million in additional damages associated with extended wet pool operations (after the January 1999 fuel-out date) and with ISFSI operations and maintenance. YAPFOF ¶¶ 141, 142. Accepting Yankee Atomic's latest unsupported causation theory – that it would not have constructed an ISFSI had DOE accepted Yankee Atomic's SNF by 2007[16] – for illustration purposes only, the Government would be entitled to significant offsets and credits assuming this fuel out date. Specifically, Yankee Atomic seeks wet pool related costs of $40.8 million from January 1999 through June 2003 (roughly $9.1 million per year). YAPFOF ¶ 142. If the non-breach fuel-out date is extended to 2007 (and assuming, for the moment, that Yankee Atomic's theory that it would not have constructed dry storage assuming a 2007 fuel out date), the Government would be entitled to a $40.8 million credit through June 2003 and at least another $40 million through mid-year 2007. Additionally, since the SNF would have been on-site through 2007 in the non-breach world, Yankee Atomic could not begin charging the Government for any costs associated with that storage until 2007. As a result, the Government would be entitled to offsets for all ISFSI operations and maintenance costs incurred by Yankee Atomic between June 2003 and 2007 – amounts totaling as much as $40 million dollars. YAPFOF ¶ 141 (Yankee Atomic seeking $67.14 million for ISFSI O&M costs from June 2003 through January 2010, or, roughly, $10.3

---

[16] There is no evidence supporting this proposition. The citations contained within the referenced findings for each of the Yankees were based upon a Graves' fuel out dates. No witness for any of the Yankees testified that, had DOE accepted all of the Yankees' SNF by 2007, that the Yankees would not have constructed ISFSIs. In fact, the evidence demonstrates otherwise. DPFOF ¶ 283-289; Tr. 7722:12-22, 7723:23-7724:3 (Mellor).

million per year ($67.14 million/6.5 years). Similar, sizeable offsets exist for Connecticut Yankee and Maine Yankee.

A finding that the Yankees have established damages with reasonable certainty is contingent upon the Graves fuel-out dates. Any modifications to those dates render the claims speculative and unproven.

## V. THE YANKEES HAVE FAILED TO ACCOUNT IN THEIR DAMAGES ANALYSIS FOR THE COSTS THAT THEY WOULD OTHERWISE HAVE TO INCUR FOR STORAGE OF THEIR GTCC WASTE, PRECLUDING THEIR DAMAGES REQUESTS

### A. The Yankees Have Not Presented Any Basis Upon Which The Court Could Find That The Nuclear Regulatory Commission Has Issued A Rule Which Converts GTCC Waste Into High-Level Radioactive Waste

As we established in our initial post-trial brief, as long as the Yankees have to continue to store GTCC waste and/or failed fuel, they will have to continue to incur significant costs for its storage. Def. Br. 73-74. We further established that DOE is not obligated to accept GTCC waste under the Standard Contract and that it need not accept failed fuel on the same schedule as SNF. Def. Br. 74-83. With regard to GTCC waste, the Yankees acknowledge the initial view expressed by this Court in its June 26, 2003 order that "it appears that, at present, defendant has the better argument as to the lack of a contract obligation for defendant to dispose of GTCC." YA Br. 17. Ignoring the Court's guidance, the Yankees then urge the Court to change its initial view, based upon evidence supposedly adduced at trial. Unfortunately for the Yankees, neither of the facts that it claims to have proven, even if true, has any bearing upon the relevant question of whether DOE is obligated, pursuant to the Standard Contract, to accept the Yankees' GTCC waste for disposal.

First, the Yankees claim to have proven that "an important purpose of the Contract, and the NWPA it implements, was to provide a solution for the disposal of all the utilities' highly radioactive waste that needed disposal in a repository." YA Br. 17 (emphasis added). This assertion is incorrect. The NWPA applies only to SNF and HLW. Both the NWPA and the Standard Contract specifically define HLW as follows:

> (A) the highly radioactive material resulting from reprocessing of spent nuclear fuel, including liquid waste produced directly in reprocessing and any solid material derived from such liquid waste that contains fission products in sufficient concentrations; and
>
> (B) other highly radioactive material that the [Nuclear Regulatory] Commission, consistent with existing law, determines by rule requires permanent isolation.

42 U.S.C. § 10101(12); DX 6, 7, & 8, Art. I(12) (emphasis added). As we discuss in our responses to YAPFOF ¶ 115, CYPFOF ¶ 129, and MYPFOF ¶ 131, none of the statutory excerpts that the Yankees cite support a finding that the NWPA applies to "highly radioactive utility waste other than spent fuel that [does] not otherwise have a disposal path." The only evidence to the contrary is the testimony of Mr. Mills, YAPFOF ¶ 116, in which he testified regarding his understanding of the statutes applicable to the disposal of highly radioactive waste and GTCC waste. That testimony, which is unsupported by any specific statutory language, cannot create a statutory obligation that does not otherwise exist and, further, is inadmissible. See Berry v. City of Detroit, 25 F.3d 1342, 1353 (6th Cir. 1994) ("[i]t is the responsibility of the court, not testifying witnesses, to define legal terms"). In any event, as we discussed in our initial post-trial brief, and as discussed below, the Standard Contract provided a definition for both SNF and for HLW, neither of which includes GTCC waste. The Yankees have not cited, and cannot

cite, to any evidence that the purpose of the Standard Contract or the NWPA was to dispose of GTCC waste.

Second, the Yankees claim to have proven that "DOE has long planned to dispose of the utilities' GTCC waste in the NWPA repository." YA Br. 17. This assertion is also incorrect. As we have discussed at length in DPFOF ¶¶ 224-229, DOE's obligations to dispose of GTCC waste arise under the Low-Level Radioactive Waste Policy Amendments Act of 1985, 42 U.S.C. § 2021c(b)(1)(D), and DOE has not yet determined how, or when, it will dispose of GTCC waste pursuant to that statute. Indeed, no decision can be made regarding the disposal of nuclear utility-generated GTCC waste without the completion of an Environmental Impact Statement ("EIS"), wherein all of the potential disposal options are considered. DPFOF ¶¶ 225-226. DOE has not yet completed an EIS and, therefore, has not identified a location for the disposal of GTCC. DPFOF ¶¶ 227-229. Moreover, contrary to those witnesses that the Yankees produced who believe (without foundation) that DOE will dispose of GTCC waste in the SNF repository (apparently without any compensation to DOE), DOE does not currently plan to dispose of GTCC waste in the SNF repository and, in fact, does not know whether it is even technically possible to do so. DPFOF ¶¶ 230-248. More importantly, even if both of the Yankees' assertions were true – that the purpose of the NWPA was to provide for disposal of all of the plaintiff's waste, and that DOE was planning to dispose of GTCC waste in the SNF repository – DOE still does not have a contractual obligation, pursuant to the Standard Contract, to dispose of the Yankees' GTCC waste.

The Yankees argue that, because the NRC's 1989 Rule is unambiguous on its face, "extra-textual statements made by NRC when it proposed the Rule" are legally irrelevant. The

Yankees' position is nonsensical for several reasons. First, the statements made by the NRC that confirm that GTCC waste is not HLW pursuant to the Standard Contract are in the 1989 Rule. Specifically, in the 1989 Rule the NRC again emphasized, just as it had in the Proposed Rule, that the final formulation of the rule was "in lieu of a revision of the definition of high level radioactive waste (HLW)," 54 Fed. Reg. 22,578 (May 25, 1989); that "GTCC wastes would not be classified as HLW under these amendments," id. at 22,579-80; and that "the Part 61 amendments would obviate the need to reclassify certain GTCC wastes as HLW." Id. at 22,579. The NRC specifically "emphasize[d] that these amendments preserve DOE's flexibility to pursue either one of these alternatives [permanent isolation in a repository or intermediate disposal methods]. Id. at 22,579. Further, the NRC recognized that its rule "did not constrain DOE's ability to 'identify disposal options, financing mechanisms, and the legislation needed to implement them." Id. at 22,581; see id. at 52,582 ("[t]he rule identifies one approved method [for GTCC disposal] if DOE so desires, but allows DOE to plan and develop an alternative method if DOE so desires, subject to Commission approval"). It is plain from the language contained in the 1989 Final Rule that the NRC did not "determine, by rule," that GTCC waste requires permanent isolation or that GTCC waste is highly radioactive.

The Yankees rely upon the very same rule in support of their argument, but attempt to pick and choose which portions of the rule upon which they will rely and which portions of the rule they will urge this Court to ignore. The plaintiffs cannot interpret the rule by reference to only a portion of the rule while rendering the rest of the rule meaningless. See Department of Revenue of Oregon v. ACF Industries, Inc., 510 U.S. 332, 340 (1994) (referring to "elementary canon of construction that a statute should be interpreted so as not to render one part

inoperative"). When the portion of the rule upon which the Yankees rely is read in context with the remaining portions of the rule, it is clear that the NRC has not determined by rule that GTCC waste requires permanent isolation.

Second, the plaintiffs' position that evidence outside the text of the NRC's rule should be excluded is curious, given their heavy reliance upon such extrinsic evidence. Among the extrinsic evidence that they cite in support of their argument that the 1989 Rule required the permanent isolation of GTCC waste is a memorandum generated by a contractor to DOE, the testimony of a company witness, and the opinion of a FERC Administrative Law Judge. YAPFOF ¶ 122. The Yankees do not explain the inconsistency between their argument that "extra-textual" evidence is legally irrelevant and their efforts to bolster their arguments with statements made by individuals who have no authority to speak for the NRC.

Third, it is unclear how the plaintiffs would justify their apparent position that the Court should rely upon statements made by DOE contractors, company witnesses, and FERC Administrative Law Judges while, at the same time, ignoring statements made by the NRC, the body responsible for making the determination in question. The Standard Contract makes clear that the NRC is charged with the responsibility for determining whether GTCC waste requires permanent isolation and, thus, whether GTCC is HLW pursuant to the Contract. DX 6, 7, & 8, Art. I.12 (b). To the extent that the Court looks to evidence outside the language of the NRC's 1989 Final Rule, the Court should certainly also look to other NRC statements in other NRC rules, such as those found in the NRC's 1988 Proposed Rule, 53 Fed. Reg. 17,709 (May 18, 1988) (wherein the NRC stated that "[s]ince the possibility of using [an intermediate disposal] facility is left open, the Commission is not now determining that the [GTCC] wastes, even if

highly radioactive, do in fact 'require permanent isolation;' accordingly, the NWPA definition of HLW does not apply"), and the NRC's 2001 Final Rule, 66 Fed. Reg. 51,823 (Oct. 11, 2001) (wherein the NRC stated that "[t]he NRC believes, at this time, that defining all GTCC waste as spent fuel or high-level waste . . . could lead to confusion and inefficiency" and determined that "[i]f GTCC waste is defined as spent fuel or high-level waste, DOE would be required to dispose of this waste in a deep geologic repository (e.g., Yucca Mountain) and would not have the flexibility to explore potentially more efficient disposal plans"), rather than to the statements offered by the Yankees.

The Yankees argue that, to the extent that any ambiguity exists, it is an ambiguity in the Standard Contract, which should be construed against DOE, pursuant to the doctrine of contra proferentem. YA Br. 20. As we have discussed at length in previous briefing, the doctrine of contra proferentem is inapplicable here because the majority of the terms of the Standard Contract were developed through notice-and-comment rulemaking in the Federal Register. That rulemaking was to "have the effect of developing the contractual terms and conditions under which DOE [would] make available nuclear waste disposal services." 48 Fed. Reg. 5458, 5458 (Feb. 4, 1983) (Notice of Proposed Rulemaking). "DOE determined that it would be most appropriate to develop this proposed standard contract through rulemaking because this process present[ed] the best opportunity for interested persons, particularly the affected parties, to participate in developing the standard contract which [would] be used in DOE's nuclear waste disposal activities." Id. "Although DOE recognize[d] that some situations may require special contractual provisions, DOE intend[ed] to develop and use, to the maximum extent practicable, a standard contract to specify the rights and duties of the parties." Id.; see 48 Fed. Reg. 16,590,

16,597 (Apr. 18, 1983) (Final Rule) (rejecting comments of several commenters that terms of Standard Contract "not be part of the rule itself"). In that manner, DOE would have uniform contract terms that would be interpreted in a uniform manner across the industry, with a special contract provision that would allow for deviations to the uniform contract terms in special circumstances. See 48 Fed. Reg. at 16,597 ("[t]o achieve maximum uniformity in the type of standard contract to be used and, at the same time, to allow for necessary adjustments that may be needed to accommodate the special or unique circumstances of particular Purchasers, we view the deviation procedure of section 961.4 quite reasonable and proper").

This Court's predecessor, the Court of Claims, has clearly held that contract terms that are developed pursuant to notice-and-comment rulemaking and incorporated into an individual contract are interpreted in accordance with the rules applicable to interpreting regulations. In Honeywell, Inc. v. United States, 228 Ct. Cl. 591, 661 F.2d 182 (1981), the Court of Claims considered the meaning of Armed Services Procurement Regulation ("ASPR") § 15-205.34, a contract clause that had been promulgated through notice-and-comment rulemaking in the Federal Register. In response to the plaintiff's argument that the Court should interpret this contract clause, which had been incorporated into the plaintiff's contract with the Government, pursuant to standard contract interpretation principles, the Court recognized that contract clauses promulgated through notice-and-comment rulemaking, but later incorporated into individual contracts, are to be interpreted in a standardized uniform manner, based upon the rules that apply to the interpretation of regulations rather than through the individualized "intent of the parties" to an individual contract:

> Assuming ambiguity in the ASPR, which we do not find, plaintiff would have us invoke the *contra proferentem* rule against defendant for creating the ambiguity. Plaintiff misunderstands the difference between interpretation of a contract clause and interpreting a regulation or statute. In case of the latter, the court's duty is to effectuate the intent of the promulgators of the regulation or statute. A contract clause is construed in order to give it the effect intended by both parties. These are mutually exclusive rules of construction. The fact that a regulation may be incorporated into a contract does not require a different rule for regulation interpretation.

Id. at 596, 661 F.2d at 186 (emphasis added; citation omitted). Accordingly, the Court of Claims rejected the evidence that the plaintiff had submitted from individuals involved in drafting the regulation as irrelevant to the Court's interpretation of the clause's meaning.[17]

The D.C. Circuit applied these same principles, and cited to Honeywell, in determining that the terms of the Standard Contract that were incorporated into the plaintiff's contract at issue in this case are to be interpreted in accordance with regulatory interpretation principles, rather than contract construction principles. Commonwealth Edison Co. v. United States Dep't of Energy, 877 F.2d 1042, 1045 (D.C. Cir. 1989). The Commonwealth Edison court held that, with

[17] Similarly, in Santa Fe Engineers, Inc. v. United States, 801 F.2d 379 (Fed. Cir. 1986), the Federal Circuit considered an allegedly ambiguous "Contract Changes" contract clause in the Veterans Administration's procurement regulations, 41 C.F.R. § 8-7.650-21 (1982) (now repealed), that had been included as Clause G-10 in the plaintiff's contract. Although the Court recognized that one of the general contract interpretation principles "is the general principle of *contra proferentem* where the contractor's reading of an ambiguous contract provision is reasonable in itself," the "difficulty with applying that canon in this case is that G-10 is drawn directly from a procurement regulation adopted by the VA." Id. at 381. Finding that "[o]ur predecessor court [in Honeywell] has held that agency regulations are not governed by the *contra proferentem* principle but rather by deference to the reasonable and consistent administrative interpretation," the Court in Santa Fe found that "[t]his same rule of proper deference has continued to be applied to procurement regulations." Id. (citing Paul E. Lehman, Inc. v. United States, 230 Ct. Cl. 11, 673 F.2d 352 (1982)). Accordingly, it found the plaintiff's reliance "on various canons of contract construction" inapplicable. Id.

regard to the Standard Contract, "[a]lthough the statute specifies that the Secretary must 'enter into contracts' . . ., this is a matter of form rather than content." Id. at 1045. The court, explaining that "[f]ew substances are as extensively regulated as high-level nuclear waste," found that "[t]his is not, in other words, the typical government contracts situation." Id. Further, citing to Honeywell, the court drew upon the rule that "[t]he fact that a regulation may be incorporated into a contract does not require a different rule for regulation interpretation" and found that "deference is owed to DOE's construction" of the Standard Contract's terms. Id.

B. The Yankees' Assertion That, Even If The Standard Contract Does Not Cover GTCC Waste, The Court Should Simply Assume Damage Is Speculative, Unsupported By The Record, And Unfounded

Finally, the Yankees present a burden-shifting argument, insisting that, even if the Standard Contract does not cover GTCC waste, “the government has not established that any reduction in damages is warranted.” The Yankees appear to ignore their burden, as the plaintiffs in a contract case, to prove that DOE was contractually obligated to accept their GTCC waste for disposal starting in 1998, not the defendant’s burden to prove that it was not. It is the plaintiffs' burden to prove that, even in the absence of a contractual obligation, DOE was somehow otherwise obligated to accept their GTCC waste for disposal starting in 1998, not the defendant’s burden to prove that it was not. And, most importantly, it is the plaintiffs' burden to prove that they incurred damages as a result of DOE’s breach of the Standard Contract, not the defendant’s burden to prove that they did not. Absent affirmative proof that they would not have incurred costs for GTCC waste storage absent DOE's breach, and absent proof identifying the incremental costs resulting from DOE's delay in accepting the Yankees' SNF, the Yankees have failed to satisfy their burden of proving causation, foreseeability, and reasonable certainty.

## VI. THE YANKEES' DEFENSE OF THE GRAVES MODEL FAILS TO SUPPORT THE CONTRADICTED AND FUNDAMENTALLY FLAWED ANALYSIS

In our initial post-trial brief, we extensively discussed the factual, legal, and theoretical viability of the Graves model. See Def. Br. 23-54. Only four arguments that the Yankees have raised in their post-trial briefs require a brief response here.

First, the Yankees misstate the significant probative evidence and contrary economic theory that contradict the conclusions reached by Mr. Graves. The Yankees appear to contend that the Government's evidence contradicting the exchanges model is limited to documents that reflect Connecticut Yankee's inability to arrange exchanges in the late 1990s. However, evidence concerning the failed attempts to arrange exchanges by both Yankee Atomic and Connecticut Yankee is probative upon the issue of whether exchanges would have occurred in the manner that the Graves model depicts. Further, the Government's evidence contradicting the exchanges market that Mr. Graves modeled is not limited to the Yankees' failed attempts to obtain exchanges. Among other evidence, the Government established that (i) in preparing his model, Mr. Graves failed to contact any utility to gauge interest in exchanges, including the Yankees (DPFOF ¶ 143); (ii) Yankee Atomic consistently rejected exchanges as a viable option for expedited SNF removal, insisting instead that priority should be granted to it by DOE (DPFOF ¶ 135); (iii) to obtain removal of all SNF from their sites, the Yankees would be required to exchange allocations that did not even exist under the Standard Contract based upon the 10-year limitation of the Annual Capacity Report (DPFOF ¶ 188); (iv) none of the Yankees assumed fuel out dates as early as Mr. Graves, even under analyses that assumed exchanges (DPFOF ¶¶ 131, 283-289); (v) even assuming timely DOE performance, none of the Yankees assumed exchanges

in their planning and decommissioning documents (DPFOF ¶ 132); (vi) the Yankees' interest in exchanges post-dated this litigation, with only one pre-litigation exchanges document existing for either Maine Yankee or Connecticut Yankee (DPFOF ¶ 134); and (vii) significant sociopolitical issues concerning SNF acceptance conflict with an exchanges market. DPFOF ¶¶ 161-165, 192. Likewise, as a matter of economic theory, the Government presented significant evidence that the Graves model, and its depiction of a perfectly competitive exchanges market that developed perfectly by January 31, 1998, was contrary to economic theory and to experiences in analogous markets. DPFOF ¶¶ 191-193A. As a matter of fact and law, the Government established that the model was improperly retrospective and did not accurately depict the behavior of market participants – including Maine Yankee and Connecticut Yankee – during the time period the market would have developed. DPFOF ¶¶ 191-193A.

The problems associated with the Graves model, as a matter of fact, and the legal issues raised as a result, are fatal to the application of the Graves model to damages here. The model simply is without sufficient factual foundation to support an award of damages in this case. As a result, it must be disregarded.

Second, the fact that the breach of contract allegedly "thwarted" the development of market data does not relieve the Yankees of their obligation to prove that the results of the model are more likely than not to have occurred. See YA Br. 24. As an initial matter, the evidence demonstrates that the perfect exchanges market depicted by Mr. Graves would not have developed regardless of the breach. In fact, there is no evidence, other than Mr. Graves' theoretical model, that supports the development of a perfect exchanges market in the first year of DOE's acceptance program. Rather, the evidence, economic theory, and common sense all

contradict Mr. Graves' conclusion. Moreover, exchanges among the Yankees' co-owners, which would have substantially increased the likelihood and amount of recovery against the Government in this litigation in which all co-owners would share, never took place. Not only were no exchanges submitted to DOE, not a single document exists that shows even a passing interest by co-owners in negotiating exchanges. The Government's breach did not preclude exchanges that may have substantially increased the likelihood of a sizeable damages award here. However, such a litigation-driven exchanges market never materialized for the same reasons that would have prevented many utilities from pursuing exchanges at all, and, certainly, from pursuing exchanges in the first year of DOE's program.[18]

Third, the Yankees' contention that "virtually every government witness [and numerous DOE documents] . . . endorsed the use of exchanges to help optimize the SNF removal schedule" fails to support Mr. Graves' model. YA Br. 25. The Yankees are correct that numerous witnesses and documents support the idea that exchanges would have been used in some way by utilities within the DOE acceptance program. However, none of these witnesses or documents – with the exception of Mr. Graves – support the contention that every contracting utility would have participated in the exchanges market and would have placed all of its allocations in that market. None of these witnesses and documents support a finding that the exchanges market would have developed into a perfectly competitive market by January 31, 1998, the first date of

---

[18] The Government also respectfully refers the Court to its discussion of lost profits cases in its post-trial brief. Def. Br. 25-29. In each of those cases, the breach resulted in the company not being able to market a particular good, resulting in allegations of lost profits. However, despite the lack of a market that resulted from the breach, each plaintiff was required to establish its damages with reasonable certainty, not simply argue in favor of damage maximizing assumptions as the Yankees seek to do here. Id. at 25-26.

DOE acceptance under the Standard Contract. None of these witnesses and documents supports the contention that exchanges market would have resulted in the perfect reallocation of SNF acceptance slots by January 31, 1998. And none of the witnesses and documents support a finding that sociopolitical factors and desires to limit risk would have had no effect upon market participation – particularly in the early years of DOE performance. The only finding that the witnesses and documents support is a finding that some utilities would have offered some of their allocations in an exchanges market once DOE acceptance of SNF became predictable and routine. However, none of these contentions support Mr. Graves' model or the expedited fuel out dates upon which the Yankees' damages are based.

Finally, the Graves model is not limited to determining the amount of damages, as the Yankees repeatedly contend. See YA Br. 26. Instead, the model is a causation model that determines the date upon which liability attaches to the Government. Every component of damage flows from the Graves model. Dr. Wise admitted that all of the wet pool damages contained in his analysis are predicated upon the Graves model. Any alteration in those dates extends out in time the date upon which the Government's breach caused the Yankees to suffer any harm. Moreover, without the Graves model and because priority was never granted by DOE, the Yankees are restricted to acceptance under the OFF queue. As the Government has shown – and as is evident from the Yankees' failure to argue causation under any rate of acceptance and the OFF queue – all three Yankees would have constructed dry storage based upon the long-term storage obligations that result from OFF acceptance. The Yankees must rely upon the Graves

model to establish causation because, without the model, the Yankees are left litigating damages under an OFF schedule under which they currently have suffered no harm.[19]

## VII. THE YANKEES HAVE NOT IDENTIFIED ANY BASIS UPON WHICH THEY CAN PROCEED WITH THEIR TAKINGS CLAIMS

In our initial post-trial brief, we established that, with regard to the Yankees' claims for a taking of their real property, the Yankees' claims fail as a matter of law because any rights that they have to require DOE to accept their SNF were created by contract, Def. Br. 86-88, and, therefore, that any rights arising from a breach of that contract arise under the contract. Id. Further, we established that, to the extent that the Yankees are relying upon a statutory right to acceptance of their SNF, they have no property right in the statute and, therefore, may not maintain a taking action based upon it. Def. Br. 88-89. In their own initial post-trial brief, the Yankees appear to ignore these rules of law. Instead, they simply assert that the Government has seized their property. Yet, as explained in our initial post-trial brief, the Yankees, not the Government, own the SNF on the Yankees' sites. The Yankees cannot explain how, absent the Standard Contract, they would have any right to require DOE to accept their SNF. For the reasons set forth in our initial post-trial brief, the Yankees' takings claim should be dismissed as a matter of law.

## VIII. THE COURT SHOULD DENY THE YANKEES' REQUESTS FOR FUTURE DAMAGES

In our initial post-trial brief, we established the reasons that the Court should not award future damages in this case. Def. Br. 71-73. Specifically, we established that, contrary to the

[19] Even if the Yankees are correct that Mr. Graves' model must be analyzed under a "fair and reasonable approximation" standard (YA Br. 27), for all of the reasons discussed above and in our initial post-trial trial brief, the model does not meet that standard.

Court's preliminary understanding of the facts in this case, the possibility of congressional action that would allow DOE to begin SNF acceptance earlier than 2010 exists, DPFOF ¶ 314, and, as a result, the Yankees' assertions that DOE will, without doubt, not be able to remove any of the Yankees' SNF prior to 2010 are incorrect. Further, it is always possible that the Yankees will be able to take advantage of other storage possibilities, such as the Private Fuel Storage initiative currently pending before the Nuclear Regulatory Commission, and move its fuel to another location prior to 2010. The questions raised about future costs in a partial breach case, where the Government will still have to perform the contract despite the amount of money paid in damages, support the concept, discussed in our initial post-trial brief, that damages here should not be awarded for costs not yet incurred.

In their proposed findings of fact and their post-trial brief, the Yankees request that the Court not only award damages through 2010, but also issue an order granting Yankee Atomic the right to recover at least $6.8 million for each year after 2010 that DOE does not finish removing Yankee Atomic's SNF from its site, but providing Yankee Atomic with the right to return to court if its costs exceed that amount in any given year.[20] First, as we explained in our initial post-trial brief, any award of future damages in a partial breach case is inappropriate. Second, in its June 28, 2004 order, this Court expressly excluded damages after 2010 from this litigation and the trial of this matter, finding that "[d]amages attributable to the possibility DOE may not commence performance until after 2010 are not being requested in this litigation, Order, 2004 WL 1535688, at *2 (Fed. Cl. June 28, 2004), and any award of damages post-dating 2010, after

[20] Connecticut Yankee and Maine Yankee also both seek an order allowing them to obtain a specific amount of damages for each year after 2010 that DOE does not accept their SNF, with the right to return to court if their damages exceed that figure.

the Government had no notice that it needed to present evidence at trial regarding that possibility, would be extremely and unfairly prejudicial. Finally, the Yankees' request that the Court order a "minimum" amount of damages that they will be entitled to recover for each year after 2010 that DOE does not accept their SNF, regardless of whether they incur costs in that amount, that the Yankees can elect to seek to recover more than that amount if they so decide, but that the Government is barred from challenging the minimum damages award is unprecedented. The Yankees cite no support for their bizarre proposition, and it should be summarily rejected.

## CONCLUSION

For the reasons outlined above, and those set forth in our post-trial brief, the Government respectfully requests that the Court enter judgment in the Government's favor.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

s/ David M. Cohen
DAVID M. COHEN
Director

s/ Harold D. Lester, Jr.
HAROLD D. LESTER, JR.
Assistant Director
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tele: (202) 305-7562
Fax: (202) 307-2503

OF COUNSEL:

JANE K. TAYLOR
Office of General Counsel
U.S. Department of Energy
1000 Independence Ave., S.W.
Washington, D.C. 20585

KEVIN B. CRAWFORD
JOHN C. EKMAN
HEIDE L. HERRMANN
R. ALAN MILLER
RUSSELL A. SHULTIS
MARIAN L. SULLIVAN
SONIA ORFIELD
STEPHEN FINN
Commercial Litigation Branch
Civil Division
Department of Justice
Washington, D.C. 20530

January 13, 2005

Attorneys for Defendant

CERTIFICATE OF FILING

I hereby certify that, on this 13th day of January 2005, a copy of foregoing "DEFENDANT'S RESPONSE TO PLAINTIFFS' INITIAL POST-TRIAL BRIEFS" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ Harold D. Lester, Jr.