**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| YANKEE ATOMIC ELECTRIC COMPANY,<br>Plaintiff,<br>v.<br>UNITED STATES OF AMERICA,<br>Defendant. | No. 98-126 C<br>(Senior Judge Merow)<br><br>Filed electronically: February 18, 2005 |

**YANKEE ATOMIC'S THIRD POST-TRIAL LEGAL BRIEF**

JERRY STOUCK
Spriggs & Hollingsworth
1350 I Street, N.W., Ninth Floor
Washington, D.C. 20005
(202) 898-5800
(202) 682-1639

Counsel for Plaintiff,
YANKEE ATOMIC ELECTRIC COMPANY

Of Counsel:

Robert L. Shapiro
SPRIGGS & HOLLINGSWORTH

February 18, 2005

## TABLE OF CONTENTS

**Page**

Fact of Damage ........ 1

Causation ........ 2

Foreseeability ........ 11

Reasonable Certainty ........ 15

Burden of Proof ........ 17

Contract Provisions and Arguments ........ 19

Reasonable Schedule ........ 21

GTCC Waste ........ 24

Future Damages ........ 28

Contingency ........ 30

Reracking ........ 31

Vance Testimony ........ 32

# TABLE OF AUTHORITIES

**Page**

## Cases

*Allsup v. Space*, 69 N.M. 353 (N.M. 1961) .......... 28

*Barnes v. United States*, 685 F.2d 66 (3d Cir. 1982) .......... 27

*Berroyer v. Hertz*, 672 F.2d 334 (3d Cir. 1982) .......... 33

*Boston Edison Co. v. United States*, No. 99-447C (Fed. Cl. Feb. 15, 2005) .......... 13, 34

*California Federal Bank v. United States,* 395 F.3d 1263 (2005) .......... 10

*Commonwealth Edison Co. v. DOE*, 877 F.2d 1042 (D.C. Cir. 1989) .......... 25

*Commonwealth Edison Co. v. United States*, 56 Fed. Cl. 652 (2003) .......... 7, 8, 12, 21

*Data General Corp. v. Johnson*, 78 F.3d 1556 (Fed. Cir. 1996) .......... 26

*David Nassif Associates v. United States*, 214 Ct. Cl. 407, 557 F.2d 249 (1977) .......... 5

*G&R Corp. v. American Security & Trust Co.,* 523 F.2d 1164 (D.C. Cir. 1975) .......... 27

*Goodman v. Lukens Steel Co.*, 777 F.2d 113 (3d Cir. 1985) .......... 33

*Halbasch v. Med-Data, Inc.*, 192 F.R.D. 641 (D. Or. 2000) .......... 32

*Hi-Shear Technology Corp. v. United States*, 356 F.3d 1372 (Fed. Cir. 2004) .......... 6

*Honeywell, Inc. v. United States*, 228 Ct. Cl. 591, 661 F.2d 182 (1981) .......... 25, 26

*Hughes Communications Galaxy, Inc. v. United States*, 271 F.3d 1060 (Fed. Cir. 2000) .......... 5

*In re Stone & Webster, Inc.,* 279 B.R. 748 (Bankr. D. Del. May 30, 2002) .......... 30

*Indiana Michigan Power Co. v. United States*, 57 Fed. Cl. 88 (2003) .......... 23, 26

*Indiana Michigan Power Co. v. United States*, 60 Fed. Cl. 639 .......... 10, 30

*Koby v. United States*, 53 Fed. Cl. 493 (2002) .......... 2, 18

*Kuwait Airways Corp. v. American Security Bank, N.A.*, 890 F.2d 456 (D.C. Cir. 1989) .......... 28

*Landmark Land Co. v. United States*, 256 F.3d 1365 (Fed. Cir. 2001) .......... 13, 14

*M & M Towing Co.*, No. CIV.A. 94-3264, CIV.A. 95-1406, 1997 WL 96377 (E.D. La., Mar. 4, 1997) ..... 31

*Maine Yankee Atomic Power Co. v. United States*, 225 F.3d 1336 (Fed. Cir. 2000) ..... 26

*Meyers v. Pennypack Woods Home Ownership Association*, 559 F.2d 894 (3d Cir. 1977) ..... 33

*Northern States Power Co. v. DOE*, 128 F.3d 754 (D.C. Cir. 1997) ..... 5

*Roedler v. United States*, 255 F.3d 1347 (Fed. Cir. 2001) ..... 26

*Southern California Federal Savings & Loan Association v. United States,* 57 Fed. Cl. 598 (2003) ..... 27

*Southern Nuclear Operating Co. v. United States,* No. 98-614C (Fed. Cl. Dec. 20, 2004) ..... 29

*T.C. Bateson Construction Co. v. United States*, 162 Ct. Cl. 145, 319 F.2d 135 (1963) ..... 17

*Tennessee Valley Authority v. United States*, 60 Fed. Cl. 665 (2004) ..... 28, 29

*Toys "R" Us, Inc. v. NBD Trust Co. of Illinois*, No. 88-C-10349, 1995 WL 591459 (N.D. Ill. Oct. 4, 1995) ..... 28

*United States v. Scott*, 243 F.3d 1103 (8th Cir. 2001) ..... 32

*Westfed Holdings, Inc. v. United States,* 55 Fed. Cl. 544 (2003) ..... 27

*Yankee Atomic Electric Co. v. United States*, No. 98-126C, 2004 WL 1535686 (Fed. Cl. June 28, 2004) ..... 21

**Statutes**

42 U.S.C. § 10156(a) (2000) ..... 5, 14

**Other Authorities**

E. Allen Farnsworth, 3 Farnsworth on Contracts § 12.14 (3d ed. 2004) ..... 13

Restatement (Second) of Judgments § 26 (1982) ..... 28, 29

**Regulations**

10 C.F.R. § 61.55 (a)(2)(iv) ..... 24

10 C.F.R. § 72.42 ..... 11

48 Fed. Reg. 22730 (May 20, 1983) ..... 13

48 Fed. Reg. 54391 (Dec. 2, 1983) ..... 14

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| YANKEE ATOMIC ELECTRIC COMPANY,<br>Plaintiff,<br>v.<br>UNITED STATES OF AMERICA,<br>Defendant. | No. 98-126 C<br>(Senior Judge Merow) |

**YANKEE ATOMIC'S THIRD POST-TRIAL LEGAL BRIEF**[1]

The government's second post-trial legal brief ("2d Gov't Br.") advances a wide variety of legal and factual legal arguments in support of the government's position that not one penny of the costs the Yankees have incurred to store their spent fuel and HLW ("SNF") in the wake of DOE's acknowledged contract breach should be awarded here as damages. The government's arguments have no merit, and the Court should be particularly skeptical of the several new "factual" arguments first presented in the government's second post-trial brief, but never explored or even proposed at trial. Those belated arguments distort and/or misuse the record evidence to the point of misrepresenting it.

Fact of Damage

1. The government's zero-damages position is demonstrably wrong. As the Yankees explained at the January 24 hearing, *see* 1/24/05 Tr. at 7903:15-7905:24, even apart from the concrete evidence of enormous damages that the Court heard and saw throughout the

[1] This brief replies to the government's second post-trial brief on behalf of all three Yankee plaintiffs, and, accordingly, should also be deemed applicable to *Connecticut Yankee Atomic Power Co. v. United States*, No. 98-154C and *Maine Yankee Atomic Power Co. v. United States*, No. 98-474C.

seven-week trial, DOE's breach has certainly caused the Yankees to store their SNF for seven extra years (from January 1998 through January 2005), the breach has almost as certainly caused the Yankees to store their SNF for twelve extra years (January 1998 to 2010), and DOE's breach very likely will require the Yankees to store their SNF much longer, perhaps forever. Regardless of the DOE pickup schedule – and indeed, under *any* DOE pickup schedule – the Yankees must store their SNF for these additional lengthy periods due to DOE's "delay."[2] Storing their SNF for twelve or more extra years will cost the Yankees *something*. And whether the necessary extended SNF storage was wet or dry, the trial record shows that that "something" would be in the range of $5 to 10 million per year. *See* P2043a.14 (YA), P2043a.17 (CY), P2034a.20 (MY) (summarizing damages by category, including "ISFSI Operations" and "Wet Pool Related").[3]

The fact of damage arising from DOE's breach cannot be legitimately disputed. Nor can there be a real question whether the Yankees acted reasonably in implementing dry storage, because the government concedes that "economics favors dry storage over the long term." Government Proposed Findings ("GPF") at p. 152. These straightforward conclusions dispose of most of the government's arguments.

Causation

2. Contrary to the government's principal causation argument, the Graves model is sufficient, alone, to establish that the damages the Yankees have incurred and continue to incur

[2] In response to the Court's questioning at the January 24 hearing, *see* 1/24/05 Tr. at 7918:20-7920:16, 8099:20-8100:22, there is no alternative to extended on-site storage, and even if there were, the burden would be is on the government to demonstrate its feasibility: "the breaching party must show that reasonable possibilities for mitigation existed and were ignored." *Koby v. United States*, 53 Fed. Cl. 493, 497 (2002).

[3] In its 2003 pretrial submissions, the government made the outlandish suggestion that the Yankees might avoid these extended storage costs because DOE might remove the Yankees SNF *earlier* in the breach world than it would have in the non-breach world, even though in the breach world DOE starts performance at least twelve years *later* than in the non-breach world. For obvious reasons the government abandoned those imaginary "scenarios" prior to trial.

are legally caused by DOE's breach of contract. The government apparently recognizes this, arguing repeatedly that "[a]bsent this evidence [*i.e.*, the "fuel-out" dates from Graves model], the Yankees have failed to prove that their decisions to pursue dry storage were 'caused' by DOE's delay," 2d Gov't Br. at 17; *see id.* at 18 (same). Thus, the government concedes, under its own logic, that *with* this evidence – *i.e.*, the Graves fuel-out dates – the Yankees *have proved* that their decisions to pursue dry storage were caused by DOE's breach.

Nor can there be any serious question that the Yankees' established those non-breach fuel-out dates, as well as the other material results of the Graves analysis, by far more than the required preponderance of evidence. The Graves model constitutes compelling evidence of what a reasonable pickup schedule would have been had DOE commenced performance by January 31, 1998. Indeed the Graves model, together with the factual evidence upon which it rests (including DOE program documents planning a 3000 MTU per year pickup rate and endorsing exchanges, and the testimony of Mr. Stuart and Dr. Bartlett), stand alone in the trial record as evidence of a reasonable non-breach pickup schedule and, correlatively, reasonable non-breach fuel-out dates for each of the Yankees. As noted at the January 24 hearing, *see* 1/24/05 Tr. at 7927:17-7928:10, Mr. Stuart's largely-uncontroverted testimony that DOE had all requisite technical capability to pick up utility SNF on the schedule depicted by the Graves model is further compelling support for the fact that the schedule Mr. Graves depicts is a reasonable one. But for the breach, DOE could have gotten the job done.

The government's assertion that Yankees have abandoned or "marginalized" Mr. Graves, *see, e.g,* 2d Gov't Br. at 6-7, 18, is simply the government's own rhetorical attempt to marginalize Mr. Graves because the government recognizes the force of his analysis. In contrast to the government's concern about Mr. Graves' testimony, as further evidenced by the inordinate

attention the government devoted to criticizing his testimony in its briefs and closing arguments, the Yankees *embrace* Mr. Graves' analysis. The Yankees have asked the Court to find as facts not only the non-breach fuel-out dates, but also various other components of Mr. Graves analysis. *See* Yankee Atomic Post-trial Proposed Findings of Fact ("YAPF") 86, 64-85; Connecticut Yankee Post-trial Proposed Findings of Fact ("CYPF") 88, 66-87; Maine Yankee Post-trial Proposed Findings of Fact ("MYPF") 79, 57-78. The trial record amply supports those factual findings, and the Court should make those factual findings. The government's laundry list of criticisms of the Graves model, based largely on testimony from Professor Fischel that was not credible, *see* Yankee Atomic's Response to Government Proposed Findings ("RGPF") pp.17-18, and arguments by government counsel that misstate or misapply the law or Mr. Graves' testimony, *see id.* pp. 13-14, 15-16, have no merit and should be rejected.

3. Nonetheless, as the Yankees also explained in their opening brief, determination of damages causation in these cases should focus not on the details of the non-breach world, but rather on what motivated the Yankees, *i.e.,* what *caused* the Yankees, to incur the dry storage and other costs they claim as damages. As a matter of fact – and damages causation is a question of fact, *see* Yankee Atomic's Initial Post-Trial Legal Brief ("Initial YA Br.") at 5 – neither the Graves model nor any other aspect of the non-breach world played any role whatsoever in the Yankees' decisions to implement dry storage (or the decisions of Connecticut Yankee and Maine Yankee to rerack their spent fuel pools). The record is clear that those decisions were made for one reason only, namely the Yankees' need to take responsible measures to store their SNF given DOE's impending and now actual failure to begin removing utility SNF by January 31, 1998, at any rate or on any schedule. *See, e.g.,* YAPF 90-106; CYPF 92-103; MYPF 83-96.

The causation issue is not as complex as the government tries to make it. Under the contracts, DOE was required to provide SNF disposal services beginning by January 31, 1998, and it was also required to provide interim storage for SNF until disposal at a repository is available. *See Northern States Power Co. v. DOE*, 128 F.3d 754, 760 (D.C. Cir. 1997) ("Congress, in other words, directed DOE to assume an unqualified obligation to take the materials by the statutory deadline"). As suggested by a question from the Court at the January 24 hearing, DOE has provided neither SNF disposal services nor interim SNF storage, so the Yankees have been required to undertake the cost of interim storage themselves. Because that response was reasonable – the government does not argue otherwise, having abandoned prior suggestions the Yankees should have maintained their SNF in wet storage – legal causation of Yankee's mitigation damages is established. *See* 1/24/05 Tr. at 7921 (at 7921:13-15, COURT: "I suppose it would save the cost of the government building a storage facility to have you – each utility build one").[4]

As noted in the Yankees' initial brief, Initial YA Br. at 9-12, and as the Yankees also explained at the January 24 hearing, with respect to damages causation in these cases, details of the non-breach world bear primarily on the related issues of what the contracts obligated DOE to do and whether damages incurred *in fact* are legally compensable. We illustrated this point at the hearing by discussing in some detail its application in *Hughes Communications Galaxy, Inc. v. United States*, 271 F.3d 1060 (Fed. Cir. 2001); *David Nassif Associates v. United States*, 214 Ct. Cl. 407, 557 F.2d 249 (1977), after remand, 226 Ct. Cl. 372, 644 F.2d 4 (1981); and *Hi-Shear*

[4] Yankees' counsel misinterpreted the Court's subsequent question as referring to the NWPA's interim storage program authority that expired in 1990. *See* 42 U.S.C. § 10156(a) (2000); *see generally id.* §10151-57. Because the transcript shows that the Court was referring to interim storage after January 31, 1998, as required by DOE's "unconditional" contract obligation, *see* Tr. at 7921-22, counsel's "no" answer should have been "yes."

*Technology Corp. v. United States*, 356 F.3d 1372 (Fed. Cir. 2004). *See* 1/24/05 Tr. at 7910:15-7918:19. Those decisions, and many others, show that in cases such as these the non-breach world – *i.e.*, the hypothetical world in which the government complies with the contract – does not determine ("cause") the behavior of plaintiffs, who have never been to the non-breach world, but rather is a matter for the Court to assess after trial in fashioning a damages remedy.

4. There is no mystery why the government focuses its entire causation discussion on the non-breach world. Given the overwhelming evidence of what motivated the Yankees' to incur their SNF storage damages in the breach world, the only causation arguments available to the government concern the non-breach world. The government makes two causation arguments, neither of which has merit.

(a) First, the government argues that the Yankees have the burden of proof on causation, and have not met that burden, because (1) acceptance of the Graves model is essential to causation, yet (2) the Graves model cannot be accepted, even as preponderant evidence, because it is "based on pure speculation," 2d Gov't Br. at 6, or is otherwise deficient. As the Yankees have explained at length elsewhere, almost every part of this argument is wrong: the Yankees have more than met whatever causation burden they have (an issue addressed further below in ¶ 9), because (1) the Graves model is not essential to proving what a reasonable schedule for DOE pickup of SNF would have been in the non-breach world, (2) substantial other evidence establishes that a reasonable schedule would include a 3000 MTU per year pickup rate, ample exchanges among utilities, and perhaps shutdown priority, and (3) in any event, the Graves analysis and conclusions – including but not limited to the resulting non-breach world fuel-out dates – are reliable and indeed compelling evidence on those issues. *See e.g.,* Initial YA Br. at 12.

(b) The government's other anti-causation argument is that the Yankees would have incurred all the $150 million-plus in costs they each claim here as damages – primarily, they would have built their dry storage ISFSIs – even if DOE had fully and timely performed its contract obligations to *remove* the Yankee SNF. The implausibility of that suggestion, and of the zero-damages result it requires, is exceeded only by the number of different arguments the government makes in attempting to support this path to the zero-damages conclusion, none of which has merit.

(i) The government's "would-have-built-anyway" arguments are of three types. In one category are various arguments that depend on a finding that DOE is not really obligated to pick up all the Yankees' SNF, at least not at any particular time, because, for example, DOE's obligations are limited to approved DCSs, or DOE has discretion to defer pickup of failed fuel, or DOE's obligation to pickup GTCC waste has no time limit. These arguments have all either been rejected by the Court, in its June 26, 2004 Order "adopt[ing] here" most of *Commonwealth Edison Co. v. United States*, 56 Fed. Cl. 652 (2003), or been shown to be without merit in the Yankees' previous post-trial filings. The contracts explicitly require DOE to pick up "all" the Yankees' SNF, *see* P1YA (DOE Contract), Art. IV.B.1., and for reasons the Yankees have previously argued extensively, DOE must do so on a "reasonable" schedule consistent with the purpose of the NWPA and the original understanding and intent of the contracting parties. *See, e.g.,* Initial YA Br. at 10-12.

(ii) A second category of government "would-have-built-anyway" arguments depend on a finding that even if DOE had started contract performance in 1998, it would have taken a very, very long time for DOE to get around to picking up all of the SNF at each Yankee site, such that the SNF would still be there, for example, twenty years later – in 2018 – as

purportedly reflected in Yankee Atomic's "planning documents." Of course, those documents all involved planning for the breach world, not the non-breach world, as the Yankees have previously explained. *See, e.g.* Yankee Atomic's Second Post-Trial Legal Brief ("2d YA Br.") at 18-19. But the government's repeated use of the 2018 date, *see, e.g.,* 2d Gov't Br. at 33-34 n.15; *id.* at 18 n.7; Initial Gov't Br. at 59-60, is telling. The evidence the government cites to support its theory that the 2018 date has something to do with the non-breach world makes clear that Yankee Atomic's portrayal in its documents of a "schedule" leading out to 2018 was based *explicitly* on DOE's 1991 ACR, *see, e.g.,* Tr. 7722:12-22 (explicit reference to ACR), cited in 2d Gov't Br. at 34 n.15. That ACR ramps up only to the unreasonably low acceptance rate of 900 MTU per year, due to the presumed unavailability of the repository in 1998, P60 at 4-5, and as it turned out, even that projected low rate was unduly optimistic. (1991 ACR). *See Commonwealth Edison,* 56 Fed. Cl. at 655 ("The court agrees that DOE's use of the 1991 ACR to limit the amount of SNF requested by the utilities in their DCS submissions may be a breach of defendant's duty of good faith and fair dealing.").

The notion of an elongated, slow, oldest-fuel-first ("OFF") DOE pickup schedule is a red herring. In seven years of litigation, despite lots of government creativity and dozens of non-breach "schedule" theory variations, the government has not produced one piece of evidence or elicited one word of testimony showing that if DOE had commenced performance as required in January 1998, DOE would *in fact* have proceeded thereafter to pick up SNF from utilities at a rate well below 3000 MTU per year and/or in accordance with OFF. There is no such evidence because an elongated, slow, OFF schedule makes no sense – and the government knows it.

A variation on the same theme is the government's assertion that "the evidence affirmatively demonstrates that any delay in the fuel-out dates beyond those that Mr. Graves

proposed would have resulted in the construction of the ISFSIs by the Yankees." 2d Gov't Br. at 17. The only evidence the government cites, however, is the Yankees' breach-world "planning" documents – which show nothing of the kind.[5] Indeed, this government argument is illogical. As noted above, the Yankees' decisions to build dry storage were in no way based on consideration of a non-breach world schedule or pool-out dates. What the government is really proposing is that the Yankees' be required to prove a negative: for Yankee Atomic, for example, that moving the non-breach pool-out date from 1999, as determined by Mr. Graves, to 2000, or 2001, or 2002, etc., would *not* have affected the company's decision to implement dry storage. But the question is non-sensical, because as explained above, the 1999 non-breach pool-out date did not "cause" Yankee Atomic to build dry storage in the first place. The Yankees built dry storage in the *breach* world, because DOE clearly was not performing and without regard to any particular non-breach pickup schedule.

(iii) The government's third "would-have-built-anyway" argument contends that DOE performance or lack of performance had nothing to do with the Yankees' implementation of dry storage, which was done for another reason – to facilitate prompt decommissioning. *See* 2d Gov't Br. at 17. But it is undisputed, or at least cannot reasonably be disputed, that DOE's breach requires the Yankees to store their SNF on-site for an extended

[5] The government also cites D471, the 1998 FERC initial decision involving Connecticut Yankee. *See* 2d Gov't Br. at 17. It is unclear how that document supports the government's argument quoted in the text, but regardless, the government blatantly misrepresents the document as indicating that the "DOE breach added only three years of additional on-site storage." *Id.* What the document says is that there had been a projected three-year "*increase* in the predicted DOE delay." D471 at 63 (emphasis added).

period of at least twelve years (from 1998 to 2010), and very likely longer.[6] Because the parties agree that dry storage was an economically reasonable choice for extended on-site SNF storage, that should resolve the matter. Moreover, the government's acknowledgment that "economics favors dry storage over the long term," GPF at p. 152, refers to the economic advantage of dry SNF storage over wet SNF storage. The government cites no evidence that the economics of decommissioning played any material role in the Yankees' decisions to implement dry storage. But even assuming that a desire to decommission promptly did influence the Yankees' decision to implement dry storage, rather than continue long-term wet storage, absent the breach the Yankees would not have had to make that choice since their SNF would have been gone.

In short, DOE's breach caused some damage arising from the unquestionable need for extended SNF storage, and dry storage implementation was a reasonable response. Therefore, both factually and legally, DOE's breach caused the Yankees to build their ISFSIs. *Cf. California Fed. Bank v. United States,* 395 F.3d 1263, 1267-68 (2005) ("[T]he causal connection between the breach and the loss of profits must be 'definitely established' [but t]he existence of other factors operating in confluence with he breach will not necessarily preclude recovery based on the breach.").

5. The government's causation arguments are riddled with inconsistencies. The government's claim that the Yankees would have built ISFSIs even if DOE were performing conflicts directly with its argument that sealed dry storage containers are not "covered" by the DOE contracts. *See* GPF 302-313. If DOE were performing but sealed containers are not

---

[6] Recent press reports show that DOE officials are now stating that the earliest its repository will open is 2012, in lieu of the 2010 start-date that DOE has been forecasting since its 1989 "Reassessment" report to Congress, P101. *See* Attachment A hereto; *cf. Indiana Michigan Power Co. v. United States*, 60 Fed. Cl. 639, 644-45 (2004) ("Mr. Kouts spoke of 'aggressive management' and believes that 2010 is a 'viable goal.' He was 'confident' that DOE will meet the 2010 deadline.").

"covered," why would the Yankees build dry storage "anyway?" The "would-have-built-anyway" argument also conflicts with the government's claim that when ISFSI costs escalated, the Yankees should have stopped the projects and reverted to wet storage. *See* Government Response to Yankee Atomic Proposed Findings ("GRYAPF") 107. But why would the Yankees do that if there were overriding reasons other than the breach to go dry? At bottom, the government will seemingly advance any argument it can think of to obfuscate the real cause of the Yankees' damages, which is simple: the Yankees incurred the costs they now claim as damages because DOE breached its fundamental contract obligation to *remove* the Yankees' SNF. But for that breach, the Yankees would have incurred none of the costs they now claim as damages. If DOE were performing and actually removing their spent fuel, why in the world would the Yankees build dry storage? *See* Tr. 2328:20-21 (Bennet) ("[T]he construction of an ISFSI is not something that's what I call fun to do.").[7]

Foreseeability

6. The government has no response to – and it therefore simply ignores – the passage the Yankees' quoted in their initial brief from this Court's June 28, 2004 Order, which essentially recognizes the foreseeability of the Yankees' damages, *viz*: "DOE's failure to perform under the Standard Contract thus has led to the very thing the NWPA and the Standard Contract were designed to forestall, *i.e*., the construction of dry storage facilities for spent nuclear fuel at nuclear . . . generating plants." *See* Initial YA Br. at 5, quoting 2004 WL 1535688, at *7.

---

[7] As a minor correction in response to the Court's question at 1/24/05 Tr. 7906:19-21, the licensed life of an ISFSI is 20 years, 10 C.F.R. § 72.42. The design life is 50 years or more. *See, e.g.*, D266 at 17.

The government instead attempts to confuse the foreseeability issue as well, by first positing that DOE's contract obligations were limited by a contractual scheduling "mechanism," *see* 2d Gov't Br. at 27, or by the 1991 ACR's 900 MTU acceptance rate, *id.* at 29, and then arguing that DOE could not foresee that violation of those restrictive obligations would result in damages. The government's contract theories are both wrong (as *Commonwealth Edison* determined) and irrelevant to foreseeability. As explained in the Yankees' initial brief, *see* Initial YA Br. at 4-5, and as the evidence again confirms, because the purpose of the DOE contracts (and the entire NWPA program) was to *remove* utility SNF beginning by January 31, 1998, it was not only foreseeable in 1983 but actually foreseen by DOE that if it failed to perform, the contracting utilities (and/or DOE) would have to make alternate arrangements to deal with the utility SNF.

For example, as the Yankees noted at the January 24 hearing, *see* 1/24/05 Tr. at 7928:11-7930:2, and in addition to the evidence of actual foresight cited in their initial brief, *see* Initial YA Br. at 4-5, DOE foresaw in P633, its 1983 "Mission Plan Strategy" memo, that if the spent fuel program were delayed, alternate arrangements would have to be made for utility SNF. *See* P633 at 2-3; *see* Yankee Atomic's Reply on its Proposed Findings ("YARPF") 60 (discussing P633). Similarly, in P14, DOE's July 1983 brief in the NRC "Waste Confidence Proceeding" – convened to determine if there was sufficient confidence in a solution path for SNF to justify ongoing nuclear utility operations – DOE projected that "a permanent repository will be in operation between 1999 and 2006 or earlier," P14 at 3, but DOE also justified its confidence in a long-term solution for SNF by pointing to the back-up availability of dry storage: "the Department agrees that the availability of the dry storage technique does indeed provide further reasonable assurance of the ability to safely store nuclear wastes at least 30 years beyond the

expiration of reactor operating licenses, if necessary." P14 at 16. *See* 48 Fed. Reg. 22730, 22731 (May 20, 1983), discussed in P14 at 20-21 (NRC proposed Waste Confidence rule; recognizing circumstances in which spent fuel could remain at reactor sites after license expiration but before the availability of geologic disposal). Notably, DOE's 1983 Waste Confidence brief explicitly foresaw the "significant economic advantage" of dry storage, "*particularly* for storage periods after" plant shutdown, since dry storage "rel[ies] on passive methods of heat rejection, [which] have inherently low operating costs," whereas "pool storage typically requires continued facility operations to maintain the temperature and quality of the cooling water." P14 at 19.

The extensive actual foresight reflected in these documents does not mean that DOE and NRC were clairvoyant; it simply reflects the obvious fact that if DOE defaulted on its contract obligations, utilities would have to do *something* with their SNF, and in 1983 informed parties like DOE knew what alternatives would be available, "particularly" for shutdown plants. *Cf. Boston Edison Co. v. United States*, No. 99-447C, slip op. at 20 (Fed. Cl. Feb. 15, 2005) ("fair inference" that breach of a Standard Contract "might engender" a loss supports finding of foreseeable damages).

7. The government's argument that the magnitude of the Yankees' damages was not foreseeable is also wrong. First, as discussed at the January 24 hearing, despite language in *Landmark Land Co. v. United States*, 256 F.3d 1365 (Fed. Cir. 2001), the Federal Circuit's refusal there to reverse this Court's factual finding that one category of reliance damages claimed (relating to the "1983 contribution") was not foreseeable – an issue the court found "admittedly close," *id.* at 1379, even under the clearly erroneous standard – is best understood on the facts of that case as reflecting that damages from the 1983 contribution were of a type, rather than of a

magnitude, that was not foreseeable. *See* 1/24/05 Tr. at 7930:13-7931:17; *see also* E. Allen Farnsworth, 3 Farnsworth on Contracts § 12.14 at 262 (3d ed. 2004) ("The magnitude of the loss need not have been foreseeable . . . ."). In any event, the discussion of this issue in *Landmark Land* was *dicta* because causation for those reliance damages was lacking. *See id.* at 1375.

But regardless of *Landmark Land*, in the present cases the government's loses the "foreseeable magnitude" issue on the facts. As the Yankees also explained at the January 24 hearing, *see* 1/24/05 Tr. at 7931:18-7932:18, although authority for the "Federal Interim Storage" contemplated by section 136(a)(1) of the NWPA, 42 U.S.C. § 10156(a)(1) (2000) expired in 1990, fee schedules for such storage that DOE developed in 1983 established a "full cost recovery" fee of $670 per kg of uranium/fuel. *See, e.g.,* D1 at 87; 48 Fed. Reg. 54391 (Dec. 2, 1983) ($665/kgU). At that rate, storage for Yankee Atomic's 127 metric tons of uranium/fuel (each MTU equal to 1000 kg) would cost more than $85 million. So that magnitude of cost for "interim" SNF storage was actually foreseen by DOE, in 1983.

The government is also wrong to assert, *see* 2d Gov't Br. at 30, that the discrepancy between the Yankees' claimed damages and the smaller amount of contract fees they paid makes the damages magnitude here not foreseeable. It is obvious why the Yankees' contract fees would be significantly lower than the damages they have now suffered: DOE's plan to collect and store SNF in one place, which is what the Yankees' fees helped cover, would plainly be much more cost-efficient than individual utilities incurring separate construction, storage and operating costs for SNF storage, which is what DOE's breach requires. Similarly, the Federal Interim Storage fee schedules cited above recognize explicitly that per-unit SNF storage costs would be much higher for smaller volumes of SNF. *See e.g.,* D1 at 87. Thus, DOE reasonably should have foreseen, and actually did foresee, that costs contracting utilities might have to pay

for individualized on-site "interim" storage of relatively small amounts of SNF would greatly exceed the costs of centralized repository disposal for much larger SNF quantities. *See also* 2d YA Br. at 41-43 (further addressing irrelevance of "discrepancy" between contract fee and damages amounts).

<u>Reasonable Certainty</u>

8. The government apparently recognizes that its accounting witness, Mr. Johnson, and its technical witness, Mr. Abbott, were neither effective nor credible, because the government makes no argument against the reasonable certainty of the Yankees' damages based on the testimony of either of those witnesses. The government thus effectively concedes the reliability of the accounting evidence the Yankees' presented, as to both past costs and future projected costs. *See also* YARPF pp. 28-33 (summarizing severe deficiencies in credentials and credibility of Mr. Abbott and Mr. Johnson).

Instead, similar to the government's position on causation, it claims the Yankees' damages are not reasonably certain based solely on the argument that this issue also turns entirely on the accuracy of the non-breach fuel-out dates determined by Mr. Graves: "If this Court does not accept [those dates], the Yankees' entire damages claim fails based upon the Yankees' failure to prove their damages with reasonable certainty." 2d Gov't Br. at 32. Also similar to its position on causation, the government has completely misstated the significance of Mr. Graves' pool-out dates to the reasonable certainty issue. The bulk of the Yankees' damages consist of the "ISFSI Construction" and "ISFSI Operations" costs associated with dry storage. Putting aside the separate issue of causation, the government does not contend, and could not, that the reasonable certainty of the damages amounts in these two categories depend in any way on Mr. Graves' analysis. Thus, the government makes no argument at all against the reasonable

certainty of damages in these two categories, which constitute about 80% of Yankee Atomic's damages and an even higher percentage of the other two Yankees' damages. *See, e.g.,* P2043a.14 (YA), P2043a.17 (CY), P2043a.20 (MY) (summarizing damages by category).

Rather, the government claims that simply because the amount of damages in the "Wet Pool Related" category does depend on the pool-out date determined by Mr. Graves, a point the Yankees have acknowledged, *see* Initial YA Br. at 27, 15, the entire amount of Yankees' damages claims – including the costs of dry storage construction and operations – are not reasonably certain. In support of that theory, the government suggests possible "offsets and credits," *see* 2d Gov't Br. at 35, that were never aired at trial and are not based on any legitimate record evidence (despite the tens of millions of dollars the government loosely throws around in its brief, *see id.*), because at trial the government never submitted or pointed to any evidence to support this "offset" argument. More importantly, and quite ironically, the "offsets and credits" the government first mentions in its second post-trial brief depend, fundamentally, on a finding about the *specific* non-breach pool-out date for each Yankee company. The government, having based its entire damages defense on the supposed "speculativeness" of Mr. Graves' pool-out dates, or any non-breach pool-out dates, cannot now be heard to advocate "offsets and credits" that depend, necessarily, on establishing *precise* pool-out dates. The government is flatly wrong to claim that the Yankees have not proven the pool-out dates determined by Mr. Graves' analysis – the Yankees have done so, and by far more evidence than the required preponderance. But conversely, the government's failure even to propose, much less establish, the kind of much-later non-breach pool-out dates that are necessary to support its "offsets and credits' argument makes that argument hopelessly speculative.

Burden of Proof

9. The government harps on the issue of burden of proof, particularly with respect to damages causation, both at the outset of and throughout its second legal brief – as if repetition somehow strengthens the argument. *See, e.g.,* 2d Gov't Br. at 3-6, 18-19. As the Yankees' have demonstrated in response, they have proved causation, in the sense of what motivated them to implement dry storage (and to rerack at Connecticut Yankee and Maine Yankee), by overwhelming and largely uncontroverted evidence. The Yankees have also proved more than enough about the non-breach world, both through Mr. Graves (whose testimony alone establishes causation, as explained above) and through other compelling evidence of a "reasonable" non-breach schedule, to demonstrate that the costs the Yankees claim constitute compensable damages. So the government is simply wrong to keep arguing that the Yankees have not met their burden of proof, on causation or any other damages element. *See* 2d Yankee Br. at 16-23.

But the government goes further, and misstates the law applicable to the facts before the Court, in suggesting (albeit in a footnote) that "[t]he Yankees have no basis upon which to switch the burden of proof." *See* 2d Gov't Br. at 33 n. 15. To a very substantial degree, the government's position on damages causation amounts to a failure-to-mitigate defense. Most commonly such a defense argues that opportunities to mitigate were available that the plaintiff did not take, and therefore the plaintiff should recover less or nothing. *T.C. Bateson Constr. Co. v. United States*, 162 Ct. Cl. 145, 319 F.2d 135, 160 (1963). The government's argument here differs slightly because the facts do, but the substance of the argument is the same: although the Yankees implemented dry storage, the government is arguing in substance that they failed to mitigate damages – it claims that dry storage did not avoid any damages, either because the Yankees would have built dry storage even in the non-breach world or because the Yankees

cannot prove that their costs in the non-breach world would have been lower. Therefore, because the dry storage the Yankees implemented failed to mitigate damages, the Yankees should recover nothing.

Under black letter law, the burden to establish a failure-to-mitigate defense rests on the breaching party, here the government, as the Yankees noted in their opening brief and the Court recognized explicitly in its Order of August 29, 2003. *See* Initial YA Br. at 8-9 (quoting August 29, 2003 Order). In the more typical case, that black-letter principle requires that "the breaching party must show that reasonable possibilities for mitigation existed and were ignored." *Koby v. United States*, 53 Fed. Cl. at 497. As applied here, the same principle requires the government to show that the mitigation the Yankees did undertake – dry storage implementation – was not a reasonable response to the breach, because it did not avoid avoidable damages or because it was otherwise not grounded in "reasonable commercial judgment on the part of plaintiff." *See* Order of August 29, 2003 at 3.

Clearly the government has not even begun to make that showing, and there is absolutely no evidence to support such a showing – or even to *suggest* that the Yankees' decisions to implement dry storage were not a reasonable response to DOE's impending and now actual breach. As noted at the January 24 hearing, and even apart from the government's dispositive concession that "economics favors dry storage over the long term," GPF at p. 152, the cost figures the government mentions in its second post-trial brief in an attempt to impugn the cost-effectiveness of dry storage – figures plucked from the Yankees' damages claim, since the government never presented or pointed to cost evidence on this issue at trial – are the wrong figures. The government mixes total operating costs with incremental wet storage costs, and mixes actual dry storage costs with the historical estimates on which the Yankees' decisions to

implement dry storage were based. *See* 1/24/05 Tr. at 8125:20-8127:17. This Court should reject this belated, confused and wholly inadequate attempt to rewrite history and show that the Yankees failed to act reasonably in the face of DOE's breach.

In short, the government is simply wrong that there is "no basis upon which to switch the burden of proof." 2d Gov't Br. 33 at n.15. But ultimately the burden of proof issue is not dispositive in this case because Yankees have amply proved with compelling evidence that DOE's breach caused the damages they have incurred, both factually and legally.

<u>Contract Provisions and Arguments</u>

10. The government's insistence that strict adherence to the contract terms can decide this case is not only wrong, but disingenuous – the government's own arguments play fast and loose with the actual contract language. For example, the government's repeated assertion that the contracts require, or "mandate," that DOE adhere to an "OFF" pickup schedule, *see, e.g.,* 2d Gov't Br. at 11; 1/24/05 Tr. at 8012:6 ("contractually mandated . . . OFF"), 8020:19-20 ("mandated sequence of performance"), is not what the contracts say. Instead, as discussed at the January 24 hearing, *see* 1/24/05 Tr. at 8119:21-8121:22, the contracts provide that each utility would submit delivery commitment schedules ("DCSs") that identify "*all SNF* and/or HLW" that the utility "*wishes to deliver* to DOE" beginning sixty-three later. P1YA (Contract), Art. V.B.1 (emphasis added). In the context of a functioning SNF program, the DCS process thus would accommodate the same economic forces that drive Mr. Graves' analysis, since different utilities would "wish to deliver" differing amounts of SNF, depending on such circumstances as the amount of on-site storage capability they have available and the rates of spent fuel discharge they expect in future periods.

A different contract provision, *see* P1YA at Art. VI.B.1., indicates that OFF is a kind of first-order default ranking, in the event utilities "wish to deliver" more aggregate SNF "than the annual capacity of the DOE disposal facility (or facilities) can accommodate." But as the Yankees have also explained, and the evidence shows, the scheduling provisions of the DOE contracts were not fully thought through in 1983, which is another reason the literal contract language cannot be dispositive. *See* 2d YA Br. at 7 n. 4. Ultimately, as the Yankees have further explained, OFF is best viewed at most as an initial allocation of acceptance slots, which could have been – and would have been – rearranged through exchanges into a sensible and efficient pickup schedule that would have benefited both contracting parties. *See, e.g.,* YAPF 79, 85. Notably in that regard, DOE drafted the contracts to provide for "*delivery commitment* schedules," in which utilities would make commitments to *deliver* specified quantities of SNF to DOE, and DOE could thus be assured that its capital-intensive SNF program would be fully and optimally utilized – also consistent with Mr. Graves' economic analysis.

While purporting to insist on strict adherence to the contract terms, the government also casually disregards another material contract provision, namely the explicit and statutorily-required DOE "start-date" of January 31, 1998. Unable to honor that contract provision, the government simply dismisses it: "since the Standard Contract was an industry-wide contract (see DPFOF 21), DOE could not begin waste acceptance from all utilities on January 31, 1998." 2d Gov't Br. at 10; *see id.* at 27 (identical statement). That may be an accurate description of DOE's capabilities given its breach, but the fact remains that each DOE contract *mandates* that DOE begin acceptance of SNF from *each* contracting utility on or before January 31, 1998. To satisfy that obligation DOE presumably would have had to have begun operating its SNF

disposal program prior to 1998, as the parties expected when they entered into the contracts. *See, e.g.,* YAPF 78.c.

Finally, the government's insistence on strict adherence to the contract cannot be taken seriously because the only place the government purports to follow the contract is in its litigation arguments. Clearly DOE has not honored the contract outside that context. And despite counsel's arguments, there is no reason to believe that DOE will adhere to the government's litigation arguments – for example, that following an OFF schedule is mandatory – when (and if) performance does begin.[8]

<u>Reasonable Schedule</u>

11. Though the government has never taken a position on – and requests no factual findings about – what a "reasonable" pickup schedule would have been had DOE begun contract performance by January 31, 1998, the government does occasionally intimate in its briefs that "OFF" might be a reasonable schedule, and that 900 MTU per year as set forth in the 1991 ACR might be a reasonable pickup rate "in the aggregate." The trial evidence not only fails to support those suggestions, but requires factual findings to the contrary.

As explained by Mr. Graves and summarized at the January 24 hearing, *see* 1/24/05 Tr. at 7964:20-7973:6, OFF is not a reasonable schedule. For example, assuming the reasonable industry-wide pickup rate that DOE has long planned to achieve (and still plans to achieve) – 3000 MTU per year – for DOE to follow an OFF pickup sequence would leave 53 nuclear plants

[8] The government's reference to the contracts' integration clause, *see* 2d Gov't Br., is unavailing. An integrated agreement can nevertheless have a missing or "open" term, as the Yankees explained in a prior brief, *see* Yankee Atomic's opposition, filed October 28, 2002, to the government's motion for partial summary judgment on the rate of acceptance ("YA Rate Motion Opp.") at 63-64, and as the Court recognized in adopting *Commonwealth Edison* and in later noting that, in such circumstances, "DOE was to commence pickup at a *reasonable* rate no later than January 31, 1998." Order of June 28, 2004 at 9, No. 98-126C, 2004 WL 1535686 at * 6 (Fed. Cl. June 28, 2004) (emphasis added).

nationwide with unserved "must-move" fuel, totalling 393 plant-years with unserved must-move fuel, as opposed the situation after exchanges, as shown by Mr. Graves, where only 10 plants would have small amounts of must-move fuel in 14 unserved years. *See* Tr. 833:2-835:25 (Graves); 1/24/05 Tr. at 7969:20-7970:8; Graves Demonstrative 84. Similarly, with exchanges as depicted by Mr. Graves (and resulting acceptance "campaigns"), there are 25 plants that DOE would have to visit only one time and only 5 that DOE would have to visit as many as 5 times, whereas under an OFF schedule, without exchanges, the situation is reversed – there would be only one or two sites that DOE could visit but once, and almost 20 sites that DOE would have to visit five times. *See* Tr at 836:1-841:23; 1/24/05 Tr. at 7972:3-7972:16; Graves Demonstrative 92. This data not only shows the substantial benefits of exchanges, it shows that OFF is simply not reasonable.

Nor is the "schedule" set out in the 1991 ACR a reasonable one. Despite the cryptic suggestion in one document that a 900 MTU per year pickup rate could avoid additional nuclear utility at-reactor spent fuel storage "in the aggregate," D23 at 2, no witness on either side could explain how that could possibly be, and Mr. Graves' analysis shows that it *cannot* possibly be. *See* 1/24/05 Tr. at 7960:5- 7960:22 (discussion by counsel); Tr. 786:23-788:7, 7506:10-7514:6 (Graves). Indeed, the government's witness Mr. Pollog, when asked at his deposition if the rates in the 1991 ACR were "sufficient in the aggregate to avoid additional reactor storage," testified "I don't know factually if they were or not, but my belief is most likely not." *See* Tr. at 4042:9-19. Although Mr. Pollogg attempted to revise that testimony at trial, he admitted he never looked at the underlying data he said at his deposition he would need to consult before testifying further on the matter, *id.* at 4042:20-4047:1, 4044:15-20; *see also* 4052:11-17 (D544, reflecting 1991 ACR rates, was prepared solely for this case at DOJ's request). Moreover, as Mr. Pollog

also acknowledged at trial, he testified at his deposition that the 2650 MTU per year rate shown in the 1987 ACR could satisfy "each purchaser's storage needs," but *only* if exchanges were to occur, *see* Tr. at 4047:2-4048:14 – testimony flatly inconsistent with the notion that 900 MTU per year could also satisfy utility needs even assuming exchanges.

At bottom, there is no credible or adequate evidence to support – or even explain in a minimal way – how the 900 MTU rate could satisfy utility SNF storage needs "in the aggregate" or in any other way. Mr. Graves' analysis powerfully demonstrates the contrary, and the government's failure to present anything but isolated snippets of evidence on this issue speaks volumes about the government's own view of the matter – which is also well reflected in Mr. Pollog's deposition testimony, before his attempted and ultimately unsuccessful revisions at trial.

12. Like the causation issue, the reasonable-schedule issue is actually quite straightforward. The 3000 MTU acceptance rate is supported by overwhelming evidence, including, but not limited to, DOE's own planning documents right up to the present time. *See, e.g.,* P1952; *see also Indiana Michigan Power Co. v. United States*, 57 Fed. Cl. 88, 97-99 (2003) (adopting 3000 MTU rate on summary judgment; "We have not attempted to discuss here the entire record support for DOE's intended 3,000-ton annual rate of delivery, but the evidence shows clearly that such a rate was the minimum needed to meet those [contract] objectives" – *i.e.*, "to prevent additional on-site storage after 1998 and to begin to eliminate the accumulated backlog of SNF and/or HLW on-site.").

And exchanges clearly make good sense, both for utilities and for DOE. In addition to the powerful economic forces that Mr. Graves has shown would have motivated utilities, but for the breach, to engage in exchanges, as the Court observed at the January 24 hearing, "[i]t's kind of intuitive also that, when DOE gets around to doing this project, that they're not going to want

to go back and visit plants repeatedly for small quantities separated over long distances. . . . There's no question that you would want to minimize the amount of trips that you're making." 1/24/05 Tr. 8070:2-6, 16-18. In light of the Court's question whether "DOE could also control the exchanges," 1/24/05 Tr. at 7967:8-16, it is also worthwhile to observe that, although the government is wrong to contend that DOE has "discretion" to dictate a pickup schedule for use in these damages proceedings, in an operating SNF removal program DOE would have the ability (as well as the incentive) to encourage utilities to arrange efficiency-enhancing exchanges. *See id.* at 7968:12-24. And of course DOE also could promote the efficiency of the program by giving priority to SNF at shutdown plants.

In contrast to the Yankees' strong showing of what a reasonable SNF pickup schedule would have been had DOE commenced performance in 1998, the government still offers nothing but the fantastic suggestion that the Yankees and presumably all other contracting utilities would have had to build expensive dry storage facilities even if DOE were performing as intended. That suggestion is neither reasonable nor supported in any credible way by the record evidence, and the Court should reject it.

<u>GTCC Waste</u>

13. As explained at the January 24 hearing, *see* 1/24/05 Tr. at 7974-7980, the dispositive point demonstrating that GTCC waste fits the definition of "HLW" under the DOE contracts is the requirement in the 1989 NRC Rule that GTCC waste must be disposed of in a geologic repository – *i.e.*, permanently isolated – unless proposals for disposal of such waste in another licensed disposal site are "approved" by the NRC. *See* 10 C.F.R. § 61.55 (a)(2)(iv). The requirement in the final Rule that any alternative to repository disposal of GTCC waste actually be approved by the NRC, as opposed to the language of NRC's proposed rule, which required

only that a "proposal" for alternative disposal have been "made" to the NRC, *see* 1/24/05 Tr. at 7974:5-7978:11, reflects the NRC's responsibility to assure that some other safe and appropriate disposal path actually be *in place* before DOE could be allowed to avoid taking GTCC waste to the NWPA repository. And because no such alternative disposal site has been "approved," as the NRC Rule unambiguously requires, the "unless" clause of the Rule is inoperative and GTCC waste is covered by the DOE contracts under the plain contract language defining "HLW." *See* 1/24/05 at 7981:5-7983:9 (noting that government has abandoned all arguments re GTCC waste other than its reliance on the "unless" clause of the NRC Rule); 8130:17-8131:8 (same, rebutting government's denial that its briefs abandon other arguments).

14. Acknowledging (at least implicitly) that the Yankees' contract interpretation argument is reasonable, and thus binding under the doctrine of *contra preferentem*, the government argues in its second post-trial brief that *contra preferentem* does not apply here, citing *Honeywell, Inc. v. United States*, 228 Ct. Cl. 591, 661 F.2d 182 (1981) and *Commonwealth Edison Co. v. DOE*, 877 F.2d 1042 (D.C. Cir. 1989). *See* 2d Gov't Br. at 41-44. The short answer to this argument, and its premise that the Court should construe the Yankees' contracts under regulatory interpretation principles rather than contract interpretation principles, is that the Court already rejected that premise in this very case by adopting *Commonwealth Edison*, 56 Fed. Cl. 652. There Judge Hewitt, while rejecting the government's proposed construction under either interpretative standard, *see id.* at 661-62, nevertheless invoked contract interpretation principles, *see id.* at 662-63. *See* Yankee Atomic's opposition, filed October 28, 2002, to the government 's motion for partial summary judgment on the rate of acceptance ("YA Rate Motion Opp.") at 36-42 (detailing arguments against application of regulatory interpretation principles).

The Federal Circuit also applied contract interpretation principles in these cases in *Maine Yankee Atomic Power Co. v. United States*, 225 F.3d 1336, 1341 (Fed. Cir. 2000), noting that although the government's proposed interpretation of the Delays Clause "may be a possible interpretation and application of the provision, it is neither plausible nor persuasive, and certainly is not preferred." Had the Federal Circuit applied regulatory interpretation principles in *Maine Yankee*, as the government now proposes, it would have had to defer to the government's "possible interpretation." In fact, the government is judicially estopped from arguing for regulatory treatment of the DOE contracts, because the government succeeded in thwarting Yankee Atomic's request for mandamus relief from the D.C. Circuit by arguing that the parties' relationship is contractual, not regulatory. Judicial estoppel prevents a party that succeeds in making an argument to a court from asserting a contrary position later. *See, e.g., Data Gen. Corp. v. Johnson*, 78 F.3d 1556, 1565 (Fed. Cir. 1996).

In contrast to these controlling rulings, the point the government relies upon was *dictum* in *Honeywell,* since the court there found no contract ambiguity. *See* 661 F.2d at 186 ("Assuming ambiguity in the ASPR, which we do not find . . . "). Moreover, because standard government contracts incorporate provisions originally adopted as regulations, the government's reading of *Honeywell* would make *contra preferentem* inapplicable *per se* in standard government contract cases, contrary to the precedents applying that doctrine cited in the Yankees' initial brief, *see,e.g.,* Initial YA Br. at 20, and, indeed, contrary to the fundamental principle that "a contract with the United States is to be construed and the rights and duties of the parties determined by application of the same principles of law as if the contract were between private individuals." *Roedler v. United States*, 255 F.3d 1347, 1351 (Fed. Cir. 2001) (addressing another DOE "Standard Contract"); *see Indiana Michigan Power Co*., 57 Fed. Cl. at 96 ("We

interpret the Standard Contract according to established contract principles, aided in this case by evidence of congressional intent.").

15. Finally with respect to GTCC waste, the government complains that the Yankees' "present a burden-shifting argument," which the government claims is improper. *See* 2d Gov't Br. at 44. But the Yankees' have proved all the items the government lists on that page, and have proved in particular 1) that if DOE were performing as required it would have removed the GTCC waste (primarily because the contracts require that, but even if they did not); (2) that DOE has not removed the GTCC waste; and (3) that the Yankees have therefore incurred reasonable costs for on-site GTCC waste storage. *See, e.g.,* YAPF 124-28, 105. The Yankees have therefore satisfied their burden to establish their GTCC waste storage damages, so which party bears the burden is beside the point.

Nonetheless, given the Yankees' *prima facie* proof outlined above, and given that "any reduction in damages," 2d Gov't Br. at 44, would benefit the government, the government should bear the burden of establishing any reduction from those damages. *See Westfed Holdings, Inc. v, United States,* 55 Fed. Cl. 544, 560 (2003) ("Defendant may offset plaintiff's damages with any benefit plaintiff retained from the expenditures or with any losses that defendant can prove that plaintiff would have incurred if there had been no breach"); *Southern Cal. Fed. Sav. & Loan Ass'n v. United States,* 57 Fed. Cl. 598, 639 (2003) ("[t]he Government has the burden of proving offsets"); *Barnes v. United States*, 685 F.2d 66, 69 (3d Cir. 1982) ("The party seeking to reduce the amount of damages shown to a reasonable certainty has the burden 'of producing evidence to show the proper reduction.'") (citation omitted); *G&R Corp. v. American Sec. & Trust Co.,* 523 F.2d 1164, 1176 (D.C. Cir. 1975) (defendant has the burden of proving an offset), *overruled other grounds by Kuwait Airways Corp. v. American Sec. Bank, N.A.*, 890 F.2d 456

(D.C. Cir. 1989); *Allsup v. Space*, 69 N.M. 353, 362 (N.M. 1961) (same); *Toys "R" Us, Inc. v. NBD Trust Co. of Illinois*, No. 88-C-10349, 1995 WL 591459, at *49 (N.D. Ill. Oct. 4, 1995) (the burden to prove an appropriate discount rate could be the defendant's because "[w]hile the plaintiff has the burden of proving its damages, the reduction in damages due to present value, somewhat like damage mitigation requirements, benefits the defendant").

In any event, even if the government's theory that DOE would strand small quantities of GTCC waste at the Yankee sites – contrary to DOE's undisputed obligations under the Low Level Radioactive Waste Amendments Act of 1985 – were not completely implausible (as well as contrary to the persuasive evidence the Yankees produced at trial, that DOE would pick up the GTCC waste with the spent fuel), the maximum impact of the government's far-fetched GTCC waste theories on the Yankees' damages claims is set forth in the Yankees' respective GTCC waste-only storage budgets. D 535 (YA), D494 (CY), D789 (MY).

<u>Future Damages</u>

16. In their opening brief the Yankees explained why the Court should explicitly invoke the provisions of Restatement (Second) of Judgments § 26 (1982) that allow pursuit of future damages in a separate future case, as Judge Lettow did in *Tennessee Valley Authority v. United States*, 60 Fed. Cl. 665 (2004). *See* Initial YA Br. at 29-36. The government's responsive brief is completely *silent* on this issue, *see* 2d Gov't Br. at 49-51 (addressing other "future damages" issues, but not this one) – showing that the government has no answer to the Yankees' arguments, and thus confirming that the Court should adopt the Yankees' position and explicitly invoke the applicable Restatement provisions.

When the Yankees' counsel noted the government's silence on this issue at the January 24 hearing, *see* 1/24/05 Tr. at 7941:5-18, government counsel gave another disingenuous

response – he stated that of course the government has taken a position of future damages, it has argued that such damages are not available in a suit for partial breach. *Id.* at 8102:16-8103:11. But that is a different point, and certainly does not represent the government's agreement that the Yankees can come back in a later case to claim, and recover, damages that may accrue after 2010. On that issue the government's briefs are silent, and the furthest government counsel would go at the hearing was to acknowledge that the Yankees could "seek" future damages in a future case. *Id.* at 8105:4-6 ("[T]hey are entitled to seek any future costs they incurred . . . at a later point in time.").

The government's arguments are not only disingenuous but inadequate. The Yankees are concerned, and legitimately so, that when they come back to "seek" future damages in a future case, the government will argue at that time that the Yankees have improperly split their claims and the later suits are barred by claim preclusion arising from the judgments in this case. The government's unwillingness to take a clear and explicit position now that would estop it from arguing claim preclusion later makes it all the more important that the Court explicitly invoke Restatement (Second) of Judgments § 26, as the *TVA* court did. The Yankees acknowledge the Court's Order on this issue in the *Southern* case, *see Southern Nuclear Operating Co. v. United States,* No. 98-614C (Fed. Cl. Dec. 20, 2004), (order granting recognition of subsequent damages), but respectfully request that in these cases the Court be even more explicit about the applicability of the pertinent subsections of Restatement (Second) of Judgments § 26 – both to prevent the government from arguing claim preclusion in a later case, and to be sure that the issue is cleanly presented to the Federal Circuit on appeal.

In the same vein, the Court should make the factual findings the Yankees' have requested regarding their annual "steady-state" ISFSI operations costs in years after 2010. Contrary to the

government's assertion, *see* 2d Gov't Br. at 50, the Yankees are not seeking to "recover" those post-2010 damages in this case, but only to help establish an alternative position if later suits for future damages are ultimately not allowed. Given DOE's recent official abandonment of the 2010 start-date for the program, in favor of (for now) 2012, *see* note 6 above & attachment A hereto, it is certain the Yankees will incur damages beyond the "minimum damages" sought here, and therefore imperative that the Court take all appropriate steps to facilitate recovery of those damages in a "just, speedy and inexpensive" manner.

Contingency

17. The government's objections to the Yankees' use of "contingency" in projecting their future damages is legally and factually wrong. Not only is there no legal rule against the use of contingency, but factually, including contingency amounts is actually required in order to help assure that projected future damages are a "reasonably certain," as the Yankees evidence clearly shows. *See, e.g.,* YAPF 155. The Court's rejection of contingency in *Indiana Michigan Power Co. v. United States*, 60 Fed. Cl. at 639, simply reflected the Court's broader finding that Indian Michigan's future costs were not reasonably certain, as well as that utilities' apparently improper use of contingency as a fudge-factor to account for "unknown items." *Id.* at 661-62. In contrast, where, as in the Yankee cases, the contingency claimed is conceptually sound (because it accounts for "known unknowns," *see, e.g.,* MYPF 174 c.), and is supported by solid evidence (including retrospective tracking of contingency for the purpose of periodically revising future projections, *see, e.g.,* YAPF 155 b. & d.), the contingency amounts must be deemed an integral part of the damages that plaintiffs *will* incur. For example, in *In re Stone & Webster, Inc.,* 279 B.R. 748, 801 (Bankr. D. Del. May 30, 2002), the court approved the addition of a 5.7 percent contingency to Maine Yankee's total cost to complete decommissioning work, concluding that

contingency "is a reasonable and appropriate part of Maine Yankee's damages award." *Id.* at 801. The court found that "[i]ncluding contingency as a real cost of decommissioning is . . . an acknowledged practice within the industry" and that "practice in the industry has demonstrated that a certain percentage of contingency is required to account for unexpected costs . . . it is a 'known unknown.'" *Id.* *See also In re M & M Towing Co.*, No. CIV.A. 94-3264, CIV.A. 95-1406, 1997 WL 96377, *5 (E.D. La., Mar. 4, 1997) (application of fifteen percent contingency to damages award for repairs not yet made found appropriate); *see generally* Yankee Atomic's Response to Government Additional Findings ("YARGAF") 24-26.

Reracking

18. The government's second post-trial makes no new legal arguments concerning the reracking damages incurred by Connecticut Yankee and Maine Yankee. It simply repeats the government's broadside against pre-breach damages, and the government's complaint that hindsight allegedly shows these rerackings were "unnecessary." *See* 2d Gov't Br. at 22-23. The Yankees have previously shown that the government's pre-breach damages arguments are both unsupported and wrong, *see* 2d YA Br. at 17 n.6, 26-27, and that these companies' reracking decisions were reasonably made based on circumstances at the time the decisions were made – including the expectation of continued plant operations – which is the applicable mitigation standard, *see id.* at 26-27.

The government's remaining objections to the reracking damages are fact-bound complaints limited to the causation issue – there is no dispute that the rerackings occurred, or about what they cost – and as the Yankees also explained at the January 24 hearing, *see* 1/24/05 Tr. at 7993:5-7996:14, Connecticut Yankee and Maine Yankee have by far the better causation evidence. In contrast to the government's hindsight assessment that Connecticut Yankee's

reracking later became "unnecessary," that company's documentary record from the early 1990's onward clearly shows both that its SNF storage pool would run out of space a couple of years after 1998, and that the company proceeded deliberately (and hence "reasonably") in deciding to rerack the pool given DOE's impending breach. *See* CYPF 114-124 . The government's factual attack on Maine Yankee's reracking damages relies on outdated and incorrect company projections of when its pool would fill up. GPF 327 b. & c.; *see* MYPF 116. As the 1990's progressed those projections were overtaken by events – like outages and longer "burnup" periods for spent fuel – and replaced by later projections that clearly show, as trial testimony also confirmed, that absent DOE's breach Maine Yankee could have and would have avoided reracking by use of an inexpensive temporary rack. *See* MYPF 116-117.

Vance Testimony

19. The government "moves" to strike the impeachment testimony of Mr. Vance, and proposed finding of fact no. 132, on the ground that it should not be used as "substantive evidence." *See, e.g.,* GRYAPF 132. The only reason the government offers for restricted consideration of this evidence is the alleged lack of "proper notice" and an "opportunity to depose Mr. Vance." DRPFF 132. These arguments are inconsequential. The Yankees properly offered this testimony to impeach Mr. Pollog on a non-collateral matter and the Court properly admitted that testimony. By definition, non-collateral impeachment testimony must bear on a substantive issue in the case. *United States v. Scott*, 243 F.3d 1103, 1107 (8th Cir. 2001) ("While impeachment by contradiction is a well-recognized way of attacking a witness's credibility, contradiction offered through the testimony of another witness is customarily excluded unless it is independently relevant or admissible."); *see Halbasch v. Med-Data, Inc.*, 192 F.R.D. 641, 649-50 (D. Or. 2000) ("It is the rare case where an attack on a witness's

credibility cannot be linked to some substantive element of a claim."). Once properly admitted (as it was here), there is no reason for the Court to refuse to fully consider the evidence. *See id.*, 192 F.R.D. at 649-50.

Even more fundamentally, the Court has broad discretion to receive and consider testimony regardless of whether the witness was disclosed on a pretrial witness list. *See Berroyer v. Hertz*, 672 F.2d 334, 338 (3d Cir. 1982) ("[I]t is clear that exclusion of critical testimony by unlisted witnesses is disfavored . . . .") (internal quotation omitted; alteration in original). Here, the Court should fully consider Mr. Vance's testimony because there is good cause to do so.[9] First, this evidence was newly-discovered: the Yankees learned of the evidence for the first time during trial, when Mr. Vance approached the Yankees' counsel and told him that Mr. Pollog's testimony regarding the 1991 ACR rates was not true. Tr. 6467:1-15. Appropriately, therefore, the government does not allege that the Yankees acted in bad faith. Second, the government does not – and cannot – articulate any actual prejudice that was caused by the lack of deposition or disclosure. At trial, the Yankees' counsel fully disclosed what Mr. Vance was going to testify to ten days before he took the stand. Tr. 6467:1 – 6469:13. As the Court recognized, the government "ha[d] notice of the situation now and can – it won't be a surprise, let's put it that way." Tr. 6474:7-9. Third, the government could – and did – extensively cross-examine Mr. Vance. Tr. 7626:10 – 7641:10. Fourth, the receipt of this testimony in no way disrupted the trial. In short, there are good, indeed exceptional, reasons to

[9] Courts have considered such factors as: "(1) the prejudice or surprise in fact of the party against whom the excluded witness would have testified, (2) the ability of that party to cure the prejudice, (3) the extent to which waiver of the rule against calling unlisted witnesses would disrupt the orderly and efficient trial of the case or of other cases in the court, and (4) bad faith or willfulness in failing to comply with the court's order." *Meyers v. Pennypack Woods Home Ownership Ass'n*, 559 F.2d 894, 904-05 (3d Cir. 1977), *overruled on other grounds by Goodman v. Lukens Steel Co.*, 777 F.2d 113 (3d Cir. 1985).

fully consider this evidence, and no good reason not to. *See Berroyer,* 672 F.2d at 338-39 (affirming admission of testimony from a witness that the proponent had not disclosed on its pre-trial witness list).

In fact, both the credibility and the probative value of Mr. Vance's testimony are enhanced substantially by the fact that the other party to the conversation he testified about, Mr. Brownstein, is a DOE employee and was deposed extensively in these cases. If any part of Mr. Vance's testimony were untrue, the government surely would have brought Mr. Brownstein to Court to say so. But Mr. Vance's testimony is not untrue, and indeed Mr. Zabransky similarly agreed both at deposition and trial in these cases that liability concerns – "the Department was trying to minimize its obligations to utilities," Tr. 4166:16-18 – motivated DOE to use the low 900 MTU rate in the 1995 ACR. *See* Tr. 4166:7-4167:16 (Zabransky).

Because the government's defense of more than 60 spent fuel contract cases depends importantly on the low rates in the 1991 ACR (and the 1995 ACR), and because Mr. Vance's testimony confirms that those low rates are little more – and perhaps nothing more – than a litigation ploy, it would be a travesty if the Court were to overlook Mr. Vance's credible testimony and thereby embolden the government to parade the same litigation-tainted, low-rate arguments in dozens of other SNF cases. *Cf. Boston Edison Co. v. United States*, slip op. at 4-5 (discussing suspension of DCS process in mid-1990's, but not mentioning DOE's liability-avoidance motivation).

CONCLUSION

For the reasons set forth above and in the Yankees' other post-trial filings, the Court should enter judgment for each of the Yankees for the damages they claim.

Respectfully submitted,

Dated: February 18, 2005

s/ Jerry Stouck

JERRY STOUCK
SPRIGGS & HOLLINGSWORTH
1350 I Street, N.W., Ninth Floor
Washington, D.C. 20005
(202) 898-5800
(202) 682-1639 (Fax)

Counsel for Plaintiff,
YANKEE ATOMIC ELECTRIC COMPANY

Of Counsel:

Robert L. Shapiro
SPRIGGS & HOLLINGSWORTH