IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| YANKEE ATOMIC ELECTRIC COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 98-126C |
| | ) | (Senior Judge Merow) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

# DEFENDANT'S POST-TRIAL REPLY BRIEF[1]

Pursuant to this Court's order dated September 21, 2004, defendant, the United States, respectfully submits its post-trial reply brief. Because of the extensive post-trial briefing that has already been filed in this case, we have elected in this brief not to reply to every argument contained in the plaintiffs' previously filed post-trial response brief or raised at oral argument. Instead, we respectfully refer the Court to our prior post-trial briefing, which establish that, at the trial of this matter, the plaintiffs ("the Yankees") failed to prove that they have yet incurred any damages "but for" the Department of Energy's delay in beginning spent nuclear fuel ("SNF") acceptance.

## DISCUSSION

### I. AS WE ESTABLISHED IN OUR PRIOR BRIEFING, THE YANKEES WERE REQUIRED TO ESTABLISH THAT, BUT FOR THE GOVERNMENT'S DELAY, THEY WOULD NOT HAVE INCURRED THEIR ALLEGED INJURIES

As we established in our prior briefing, the Yankees bore the burden of establishing clear proof that they were injured as a direct result of the delay by the Department of Energy ("DOE")

[1] The Government requests that this post-trial reply brief also be deemed applicable in Connecticut Yankee Atomic Power Co. v. United States, No. 98-154C, and Maine Yankee Atomic Power Co. v. United States, No. 98-474C.

in accepting their SNF. Myerle v. United States, 33 Ct. Cl. 1, 27 (1897). The well-established contract law test for causation in contract cases before this Court is whether the claimed damages were "attributable solely to," J.D. Hedin Constr. Co. v. United States, 197 Ct. Cl. 782, 808, 456 F.2d 1315, 1330 (1972), and, thus, "directly related" to, the breach. Wells Fargo Bank v. United States, 88 F.3d 1012, 1022 (Fed. Cir. 1996); see Southern Pac. Co. v. Darnell-Taenzer Lumber Co., 245 U.S. 531, 533-34 (1918) ("[t]he general tendency of the law, in regard to damages at least, is not to go beyond the first step").

In their initial post-trial briefs, the Yankees asserted that they were required only to show that DOE's delay was a "substantial factor" in causing their damages. Yankee Initial Post-Trial Brief, at 5-6. Since we filed our post-trial reply brief, in which we explained that the "substantial factor" test does not differ in substance from the "but for" tests that the United States Court of Appeals for the Federal Circuit has historically required for establishing causation, the Federal Circuit issued a decision that has clarified that the "but for" test, not the "substantial factor" test, is still the required burden for a plaintiff to prove causation. California Federal Bank v. United States, 395 F.3d 1363, 1367-68 (Fed. Cir. 2005). Accordingly, to the extent that the Yankees are arguing that DOE's delay was a "substantial factor" in causing their damages, but have not proven that those costs would not have been incurred "but for" DOE's delay, the Yankees have failed to meet their burden of proving causation.

## II. THE YANKEES' ASSERTION THAT THEY WERE REQUIRED TO BEGIN MITIGATING DAMAGES PRIOR TO THE GOVERNMENT'S PARTIAL BREACH OF CONTRACT LACKS SUPPORT

As we have previously established, generally, "breach of contract damages are measured from the date of the breach." Lucente v. International Bus. Machines Corp., 310 F.3d 243, 262

(2d Cir. 2002) (applying New York law) (emphasis added); see Reynolds v. United States, 158 F. Supp. 719, 725 (Ct. Cl. 1958) ("[t]he time when performance should have taken place is the time as of which damages are measured"). The Yankees claim that, even though the Court has held that the partial breach of contract at issue here occurred on January 31, 1998, the Yankees were required to begin mitigating their damages before that partial breach. Yankee Response Brief, at 17. We agree that, once a breach of contract occurs, the non-breaching party is obligated to attempt to mitigate its damages and that, "[a]s a general rule, a party cannot recover damages for loss that he could have avoided by *reasonable efforts*." Robinson v. United States, 305 F.3d 1330, 1333 (Fed. Cir. 2002) (emphasis in original). However, the duty to mitigate only "arises upon defendant's breach of the contract." Koppers Co. v. Aetna Cas. and Sur. Co., 98 F.3d 1440, 1448 (3d Cir. 1996) (applying Pennsylvania law). Contrary to the Yankees' assertions, that duty does not exist prior to the breach. While mitigation costs may be recoverable in a breach of contract action, costs incurred prior to a breach, when no duty to mitigate exists, are not incurred solely as a consequence of the breach. At best, such "mitigation" costs might be incurred in anticipation of the possibility that the other party might breach the contract. That mitigation cannot be viewed as directly "caused" by DOE's future anticipated breach.

In fact, it seems clear that, even though they disclaim any reliance upon an "anticipatory repudiation" theory, all of their pre-breach damages claims presuppose a repudiation upon which they were entitled to rely. Of course, because they are suing only for a partial breach of contract, rather than a total breach, they cannot rely upon an anticipatory repudiation to define the date by which damages should run, given that "an anticipatory breach cannot be predicated on a partial breach of contract . . . ." See City of Fairfax, Va. v. Washington Metropolitan Area Transit

Auth., 582 F.2d 1321, 1331 (4th Cir. 1978) (emphasis added), cert. denied, 440 U.S. 914 (1979). Nevertheless, the Yankees assert that they, in essence, are entitled to take statements made prior to the due date for performance, elect not to treat them as a repudiation (thereby declaring the contract in total breach and ending both parties' continuing contract performance obligations), yet still retain the same rights to pre-performance damages as if they had declared the contract in total breach as of the date of the anticipatory repudiation. The Yankees' theory essentially eliminates the requirement that the non-breaching party make an election – either to treat the contract as in total breach or to await further contract performance – in response to an anticipatory repudiation.

"When one party to a contract materially breaches his duties under the contract, the other party may proceed in one of two ways." S&R Corp. v. Jiffy Lube Int'l, Inc., 968 F.2d 371, 376 (3d Cir. 1992). "He can either consider the contract terminated and sue for total breach, or he can continue his performance and sue for partial breach." Id. A claim for partial breach is one for damages based upon "only part of the injured party's remaining rights to performance," while a claim for damages for total breach is "one for damages based on all of the injured party's remaining rights to performance." San Carlos Irrigation & Drainage Dist. v. United States, 23 Cl. Ct. 276, 279 (1991) (citing Restatement (Second) of Contracts § 236(2) (1979)), aff'd, 111 F.3d 1557 (Fed. Cir. 1997). Consequently, the damages recoverable for a partial breach of contract are necessarily less than those recoverable for a total breach. Roboserve, Inc. v. Kato Kagaku Co., 78 F.3d 266, 279 (7th Cir. 1996).

Aside from the different measure of damages applicable to a partial and total breach, these claims can be distinguished upon the basis of the remedies that they provide to an injured

party. A plaintiff's decision to continue a contract after a material breach and initiate an action for damages for partial breach is not "without consequences." PVI, Inc. v. Ratiopharm, 253 F.3d 320, 325 (8th Cir. 2001). A "total breach justifies termination of the contract and damages for complete failure of performance," but a "partial breach does not." Lovink v. Guilford Mills, Inc., 878 F.2d 584, 587 (2d Cir. 1989); see Pinewood Realty Ltd. P'ship v. United States, 617 F.2d 211, 215 (Ct. Cl. 1980) ("[i]f the injured party ignores the breach, and continues to perform, it has waived its right to terminate the contract, and has only retained its claim for damages for partial breach"); Hansen Bancorp, Inc. v. United States, 53 Fed. Cl. 92, 100 (2002) ("[a] breach by non-performance gives rise to a claim for damages for total breach only if it discharges the injured party's remaining duties to render such performance"), vacated and remanded on other grounds, 367 F.3d 1297 (Fed. Cir. 2004).

An anticipatory repudiation is a "renunciation of a contractual duty *before* the time fixed in the contract for performance." Franconia Assocs. v. United States, 536 U.S. 129, 143 (2002) (emphasis in original). It "entails a statement or voluntary affirmative act indicating that the promisor will commit a breach when performance becomes due." Id. An anticipatory repudiation of a contract constitutes a breach of contract that "generally gives rise to a claim for damages for total breach even though it is not accompanied or preceded by a breach by non-performance." Restatement (Second) of Contracts § 253(1) cmt. a; see Wisconsin Power & Light Co. v. Century Indem. Co., 130 F.3d 787, 793 (7th Cir. 1997) ("disclaimer of a contractual duty is a breach of contract even if the time specified in the contract for performing the duty has not yet arrived").

The United States Court of Appeals for the Federal Circuit recognizes two forms of repudiation. First, at common law, an anticipatory breach occurs "when one party to [a] . . . contract absolutely refuses to perform his contract, and before the time arrives for performance distinctly and unqualifiedly communicates that refusal to the other party . . . ." United States v. DeKonty Corp., 922 F.2d 826, 828 (Fed. Cir. 1991) (quoting Dingley v. Oler, 117 U.S. at 499-500). Under that form of repudiation, the "mere assertion that the party will be unable, or will refuse to perform his contract, is not sufficient; it must be distinct and unequivocal absolute refusal to perform the promise, and must be treated and acted upon as such by the party to whom the promise was made . . . ." DeKonty, 922 F.2d at 828 (quoting Dingley v. Oler, 117 U.S. at 503); see Tretchick v. Department of Transp., 109 F.3d 749, 752 (Fed. Cir. 1997).

More recently, the Federal Circuit adopted a second and more modern form of repudiation, "in which reasonable grounds support the obligee's belief that the obligor will breach the contract." Danzig v. AEC Corp., 224 F.3d 1333, 1337 (Fed. Cir. 2000), cert. denied, 532 U.S. 995 (2001). Under these circumstances, "the obligee 'may demand adequate assurance of due performance' and if the obligor does not give such assurances, the obligee may treat the failure to do so as a repudiation of the contract." Id. at 1337-38 (quoting Restatement (Second) of Contracts § 251 (1981)).

In any event, an anticipatory repudiation of a contract constitutes a total breach "only if the promisee 'elects to treat it as such.'" Franconia, 536 U.S. at 143 (emphasis added). Repudiation "gives the promisee the right of electing either to treat the declaration as *brutum fulmen*, and, holding fast to the contract, to wait till the time for [the promisor's] performance has arrived, or to act upon [the renunciation] and treat it as a final assertion by the promisor that he is

no longer bound by the contract." Roehm v. Horst, 178 U.S. 13, 13 (1900). Therefore, to recover damages for an anticipatory repudiation, the injured party must "elect to treat" the repudiation as a total breach. Franconia, 536 U.S. at 143; see Cities Service Helex, Inc. v. United States, 543 F.2d 1306, 1313 (Ct. Cl. 1976) (contractor must make election in response to anticipatory breach either (1) to view the contract as concluded or (2) to continue contract performance and retain "only a claim for damages for partial breach").

"[A] breach by repudiation alone can only give rise to a claim for total breach . . .," effectively ending any further performance obligations by the contracting parties. Restatement (Second) of Contracts § 253 cmt. b (emphasis added). A party cannot seek damages for a total breach based upon anticipatory repudiation and, at the same time, seek continued performance of the contract. Restatement (Second) of Contracts § 236 cmt. b (1981). Indeed, "as a general rule a repudiation justifies an immediate action for a total breach." Calamari & Perillo, Contracts § 12-11 (2d ed. 1977). As previously discussed, "an anticipatory breach cannot be predicated on a partial breach of the contract . . . ." City of Fairfax, 582 F.2d at 1331 (emphasis added), cert. denied, 440 U.S. 914 (1979); see 4 A. Corbin, Corbin on Contracts § 972, at 901 (1951) ("there seems to be no authority for saying that, for such a partial anticipatory repudiation, an action for damages can be at once maintained").

Here, the Yankees did not elect to treat any statements that DOE made prior to January 31, 1998, as an anticipatory repudiation of the Standard Contract. Instead, they elected to require DOE to continue its contract performance. Their main support for their right not to elect to declare their contract in total breach while, at the same time, to be entitled to rely upon DOE's pre-breach representations to justify the incurrence of damages is the Court of Claims' decision in

Chain Belt Co. v. United States, 115 F. Supp. 701 (Ct. Cl. 1953).[2] Yet, as we have previously explained, the Chain Belt decision does not establish the Yankees' rights to pre-breach damages here. First, Chain Belt involved a total, not a partial, breach of contract that occurred prior to the due date for the Government's remaining performance under the contract at issue there. Id. at 706-07. As a result, Chain Belt does not support the existence of anticipatory repudiation in a partial breach case – something that the Yankees do not allege here. Second, Chain Belt does not support an award of pre-breach mitigation damages without the existence of an anticipatory repudiation. While the Court never used the term "repudiation" in its order, it found, as a matter of fact, that at the time the plaintiff began the removal of the Government's machinery in November 1946, the Government was physically unable to remove the equipment by December 10, 1946, a process that would take the "better part of . . . 90 days" to complete. Id. at 705. Since the contract could not be performed as a matter of fact based upon the amount of time needed to complete performance as compared with the amount of time remaining to perform, the contract necessarily was repudiated at the time the mitigation efforts were commenced. As a result of the repudiation, the breach date moved forward in time to the date of the repudiation. All mitigation efforts after that repudiation were post-breach, not pre-breach, and were, therefore, recoverable.

In the present cases, however, the Yankees have elected to continue their contract performance. They cannot both get the benefit of continued contract performance and, at the same time, recover pre-breach damages in reliance upon pre-breach representations that the

---

[2] As the Court is aware, in Indiana Michigan Power Co. v. United States, 60 Fed. Cl. 639 (2004), appeal pending, No. 04-5122 (Fed. Cir. docketed July 26, 2004), this Court rejected that identical argument in finding that pre-breach damages were not recoverable as a matter of law and explained the reasons that the Chain Belt decision did not involve an award of pre-breach damages. Id. at 649-50 (discussing Chain Belt).

Yankees would otherwise, prior to recovering damages, have to elect to view as an anticipatory repudiation of the contract.

## III. CONTRARY TO THE YANKEES' EXPRESSED CONCERNS, THE GOVERNMENT HAS REPEATEDLY EXPRESSED ITS POSITION THAT, IN A PARTIAL BREACH CASE, FUTURE DAMAGES ARE NOT IMMEDIATELY RECOVERABLE, BUT MAY BE RECOVERED IN FUTURE POST-INCURRENCE SUITS

In these three cases, the Court previously determined that the Government partially breached its contracts with the Yankees on January 31, 1998. As the Court is well aware, we have repeatedly explained that, in a partial breach case, a plaintiff "is entitled to maintain an action for damages sustained from breaches up to the time of the institution of the action, and the judgment does not preclude a further action by him for a breach occurring after that date." Restatement (Second) of Judgments § 26 cmt. g, at 241 (1982) (emphasis added). At closing arguments, the Yankees expressed concern that the Government has never made clear its position regarding future damages in these three cases. Yet, as we have previously explained, if a non-breaching party elects to treat a breach as a partial breach, "he is entitled to maintain an action for damages sustained from breaches up to the time of the institution of the action, and the judgment does not preclude a further action by him for a breach occurring after that date." Restatement (Second) of Judgments § 26 cmt. g, at 241 (1982) (emphasis added); see Arnone v. Chrysler Corp., 148 N.W.2d 902, 905 (Mich. Ct. App. 1967) (barring recovery of future damages for partial breach or breach of divisible contract); Kaiser v. Northwest Shopping Ctr., Inc., 587 S.W.2d 454, 457 (Tex. Civ. Ct. 1979) (suggesting that plaintiffs seeking damages for partial breach may recover damages incurred through date of filing pleading); 28 Am. Jur. 2d: Damages § 488 ("[i]f the breach of an entire contract is only partial, the plaintiff can recover only such

damages as he or she has sustained, leaving prospective damages to a later suit in the event of further breaches"). As this Court recognized in Indiana Michigan, the plaintiff in a partial breach case – awarded damages only through the date of the complaint or, in that case, through the date of trial – may return to court in the future if, and when, it incurs damages from future partial breaches of the Standard Contract. Indiana Michigan, 60 Fed. Cl. at 664.

As a result, nothing prevents the Yankees from suing in 2010 based upon a partial breach, or partial breaches, occurring in 2005 or 2006 (or any other future year), rendering all costs incurred after this trial post-breach for the purposes of any future litigation. The ability to sue for actual costs incurred at some future date eliminates the need to engage in speculation concerning the quantum of the Yankees' alleged future damages and the risk of any windfall that would result if this Court awards future damages for costs not ultimately incurred by the Yankees. Of course, the Government's position regarding future damages depends upon the Court's treatment of future damages in this litigation. If the Court awards damages to the Yankees into the future as part of this case, the Yankees, contrary to their explicit request, cannot then return to this Court when they incur more money in the future than they anticipated and complain that they should be awarded additional sums beyond those that the Court has already awarded. The inconsistency in the Yankees' position regarding future damages – seeking an award of future damages with the right to seek supplementation of that award if the Yankees so choose – is the only factor creating any confusion regarding the Government's position as to a future damages award.

## IV. THE TESTIMONY OF SCOTT VANCE WAS IMPROPER IMPEACHMENT TESTIMONY AND IS NOT ADMISSIBLE AS SUBSTANTIVE EVIDENCE

At closing argument, the Yankees defended their reliance upon the alleged impeachment testimony of Scott Vance as substantive evidence in this case by arguing that, once admitted, testimony offered for impeachment purposes only becomes substantive evidence upon which they can rely. The Yankees are incorrect for two reasons.

First, as this Court recognized at trial, impeachment evidence, unlike substantive evidence, need not be disclosed prior to trial. Tr. 6472:11-19. In addressing whether purported impeachment testimony was properly excluded by the trial court, the United States Court of Appeals for the Eighth Circuit determined that any analysis regarding the need for pre-trial disclosure of a witness should turn upon whether the witness was offering impeachment or rebuttal testimony. Martinez v. Union Pac. R.R. Co., 82 F.3d 223 (8th Cir. 1996). Specifically, the Eight Circuit noted that "[i]mpeachment is an attack on the credibility of a witness, whereas rebuttal testimony is offered to explain, repel, counteract, or disprove evidence of the adverse party." Id. at 227 (citing Sterkel v. Fruehauf Corp., 975 F.2d 528, 532 (8th Cir.1992)). In affirming the trial court's exclusion of the previously undisclosed witnesses, the Court found that the testimony was substantive in nature, not impeachment. Id. In so holding, the Court noted the lack of any prior disclosure, finding that the "primary purpose of the pretrial witness disclosure rule is to give parties notice of who will be called to testify, thereby avoiding unfair surprise or prejudice at trial." Id. (citation omitted).

The preclusion of unfair surprise or prejudice is a central tenet of the Federal Rules of Civil Procedure. Indeed, the Supreme Court has noted that, based upon the Federal Rules of

Civil Procedure, "civil trials in the federal courts no longer need be carried on in the dark." Hickman v. Taylor, 329 U.S. 495, 501 (1947); see DeBiasio v. Illinois Central R.R., 52 F.3d 678, 685-86 (7th Cir. 1995) (noting that Federal Rules of Civil Procedure do not require pretrial disclosure of evidence used "solely for impeachment purposes."). Here, Mr. Vance never was disclosed as a witness prior to trial. Moreover, based upon the Yankees' representation that he was an impeachment witness (see Tr. 6466:9-10 (Stouck: "It's impeachment"); Tr. 7618:22-24 (Shapiro: "Mr. Vance, since you're called as an impeachment witness . . . .")), this Court declined to allow any deposition of Mr. Vance prior to his testimony. Tr. 6472:11-19. The Yankees should not be allowed to assert admissibility for impeachment purposes to avoid the disclosure requirements that this Court's rules and the Federal Rules of Civil Procedure require and, only later, to assert that the admission of the evidence was for substantive purposes. Any substantive use of Mr. Vance's testimony significantly prejudices the Government.

Second, the testimony that Mr. Vance provided was not proper impeachment testimony and should be stricken. In allowing Mr. Vance to testify, this Court left open any objections to his testimony if the Yankees attempted to use it as substantive evidence. Tr. 7624:20-23. In arguing that the Court should allow Mr. Vance to provide impeachment testimony at trial, Mr. Stouck identified two issues upon which Mr. Vance would testify: (i) that "Mr. Pollog had very little to do with the 1991 ACR" and (ii) that "everybody" in the DOE knew that GTCC was "going to the repository." Tr. 6467:1-6468:3. Upon examination, however, Mr. Vance made no mention of Mr. Pollog's involvement or lack of involvement in preparing the 1991 ACR. Tr.

7618:11-7622:19 (Vance). He also presented no testimony concerning GTCC waste.[3] Id. Indeed, he did not impeach the testimony of any Government witness. As a result, his testimony is not proper impeachment testimony and should be stricken as a result.

V. COUNSEL FOR PLAINTIFFS' STATEMENTS AT CLOSING ARGUMENTS CONCERNING HIS OTHER CLIENTS LACKS EVIDENTIARY SUPPORT

In defending Mr. Graves' model upon rebuttal, counsel for the plaintiffs argued at closing that utilities would have to "shut down their plants" to deliver SNF to DOE and that many of his other clients with lawsuits pending before the Court have half-empty pools and would support exchanges. Both of these contentions lack any evidentiary support, and the second contention is belied by the record.

First, there is no evidence that operational utilities would need to shut down their reactors to deliver SNF to DOE. In fact, Ivan Stuart, the Yankees' expert witness concerning loading and transportation issues, never testified that utilities would be required to shutdown their reactors to deliver SNF to DOE. There also is no evidentiary support for the contention that Mr. Graves' model results in utilities with half-empty pools trading down in the queue for the benefit of other utilities. Indeed, Mr. Graves' model only seeks to keep utilities at full core reserve. As a result, utilities that are near, but not above, full core reserve will be modeled as sellers in the first five years of DOE acceptance. See DPFOF ¶ 169 (describing Mr. Graves' economic sequencing model). Mr. Graves made no attempt to identify utilities with significant available wet pool space and to model only those utilities as sellers. See, e.g., DPFOF ¶ 143 (Mr. Graves failed to

[3] In any event, such testimony would not have been impeachment testimony. Any testimony contradicting the Government's evidence concerning the disposition of GTCC waste would have been rebuttal in nature and, therefore, would have required disclosure.

contact any utilities to determine interest in participation). Moreover, since Mr. Graves failed to model any actual exchanges, this Court cannot identify which utilities trade away early allocations and, therefore, which participating utilities lack space restrictions in their wet pools in the manner described by counsel for the Yankees.

Second, counsel for plaintiffs' statement is contradicted by counsel's refusal to identify a single client that he represents which, because of "half-empty pools," would have participated in the exchanges market by trading down in the acceptance queue.[4] Since damages are tied to the commencement of acceptance by DOE, any representation that a utility would have voluntarily delayed acceptance in the "but for" world necessarily increases the amount of time that the utility trading away its earlier acceptance rights would be required to store its own SNF (either on its site or at another facility for which it would be responsible) and delays the time at which costs being incurred could be considered to result from DOE's delay. Of course, the Yankees could have called utility witnesses to testify that they would have participated in such an exchanges market, particularly true given that counsel for the plaintiffs in these three cases represents several other utilities before this Court. However, the Yankees did not call any supporting witness from another utility to testify that the other utility, absent a delay, would have exchanged its earlier acceptance rights so that DOE would not have been obligated to begin SNF acceptance from that utility until later than identified in the Annual Capacity Report ("ACR") and Acceptance Priority Ranking ("APR") SNF acceptance allocations. Instead, the Yankees elected not to present any such testimony and decided to rely exclusively upon Mr. Graves' theoretical

---

[4] Further, there is no evidence in the record of these cases supporting the conclusion that local communities would oppose multiple off-site shipments of SNF by DOE or small shipments by DOE in the first five years of the program.

model to establish their case. The Yankees' failure to identify any supportive market participant is telling. Barring the identification of which of his clients would have traded down in the acceptance queue and which of his clients would have found DOE performance to be hindrance to their operations, counsel for the Yankees' unsupported statements should be disregarded.

Third, there is substantial evidence in the record that contradicts the assertion that utilities would have traded with the Yankees based upon the lack of impending storage problems. For example, as set forth in the Government's proposed findings, both Maine Yankee and Connecticut Yankee, as operating utilities, failed to exchange allocations with Yankee Atomic before either of them had decided to shut down their reactors, even though the proposed exchange allegedly would have had no effect upon the operations of Maine Yankee or Connecticut Yankee. See DPFOF ¶¶ 165.e-f.

## VI. CONTRARY TO THE YANKEES' CONTENTION UPON REBUTTAL, "OLDEST-FUEL-FIRST" IS THE CONTRACTUALLY MANDATED ACCEPTANCE SEQUENCE

The Yankees' contention during rebuttal that the "oldest fuel first" ("OFF") acceptance sequence merely is a "fallback" contract provision upon which DOE could rely only if contract holders requested commitments by DOE to accept more SNF in a particular year than the program could accommodate, Tr. 8120:24-8121:1, and that OFF is simply a "first level default" if DOE cannot accept every piece of SNF that the contract holders otherwise want DOE to accept in a given year, Tr. 8121:4, misstates the terms of the Standard Contract. As we have discussed extensively in our prior briefing, the Standard Contract expressly provides that "[t]he oldest fuel or waste will have the highest priority for acceptance," subject to exceptions identified elsewhere in the Standard Contract. 10 C.F.R. § 961.11, Art. IV.B.5(a); see id., Art. VI.B.1(a) ("DOE will

first accept from Purchaser the oldest SNF and/or HLW for disposal in the DOE facility," subject to exceptions identified in other Standard Contract provisions). In fact, in its June 24, 2004 order, this Court recognized that OFF is the contractually mandated sequence for DOE performance, subject to exceptions contained within the Standard Contract.

Even the preamble to the publication of the final Standard Contract, which was contained in the Federal Register notice containing the final Standard Contract on April 18, 1983, reaffirmed that the Standard Contract acceptance allocations were to be based upon the age of contract holders' SNF, not upon some other allocation method, and implicitly rejected the position that the Yankees are now making:

> Article VI.B.3 establishes two priorities for acceptance of SNF and/or HLW – one based on the age of the SNF/HWL and the second for SNF/HLW from permanently shutdown reactors. Nine commenters stated that no priority is given to utilities who may need to ship SNF to DOE in order to keep their facilities operating, nor is any consideration given to the size of a Purchaser's SNF inventory. They suggested that an allocation system be established whereby half of the receiving capacity to be allotted would be based on the age of SNF/HLW and the remaining half on Purchaser's share of the industrywide inventory. DOE has not adopted this recommendation because by the time the repository commences operation, utilities will have made adequate preparations to provide on-site storage in order to ensure continued plant operations. . . .

48 Fed. Reg. 16590, 16592 (Apr. 18, 1983).

In addition, counsel for the Yankees' comments that the OFF sequence appears <u>after</u> the sections relating to the DCS process, Tr. 8120:24-25, is incorrect. In fact, the second sentence of the DCS section of the Standard Contract, Article V.B, begins with the statement that, "[a]fter DOE has issued its proposed acceptance priority ranking, as described in paragraph B.5 of

Article IV hereof," purchasers, such as the Yankees, may begin the DCS submittal process. See, e.g., DX 6, 7, & 8 at Art. V.B.1. The Yankees ignored this provision altogether, instead arguing that the OFF acceptance provisions appear after the DCS process in contractual sequence. They do not. Instead, as we have discussed in detail in our proposed findings of fact and our prior post-trial briefing, the OFF sequence establishes the basis for the DCS process and is reflected in the DCS provision of the Standard Contract.

## VII. THE YANKEES HAVE FAILED TO ACCOUNT FOR THE EFFECT OF FAILED FUEL IN THEIR "BUT FOR" DAMAGES

The Yankees acknowledged during closing arguments that, pursuant to Article VI.A.2(b) of the Standard Contract, the Yankees must specifically identify their failed fuel and seek delivery confirmation from DOE before DOE accepts the failed fuel.[5] Tr. 7990:16-22. The Yankees further acknowledged that the same clause of the Standard Contract grants DOE the right to adjust its acceptance schedule for failed fuel. Tr. 7990:22-25. Notwithstanding this admission, the Yankees argued, without support, that "[a]t most what would have been at issue, if DOE was performing, would be a modest adjustment of the schedule." Tr. 7990:23-25.

As an initial matter, the word "modest" does not appear anywhere in the Standard Contract. There is no language in Article VI, or anywhere else in the Standard Contract, that limits DOE's discretion to adjust the acceptance schedule as much as necessary to ensure that failed and other nonstandard fuel is handled safely and properly and that it can be properly accommodated in the disposal facility. The Yankees have identified no basis upon which to

---

[5] In our prior briefing, we have addressed the Yankees' failure to account for the need to continue storing their Greater-Than-Class-C radioactive waste and do not repeat that discussion here.

reinterpret the Standard Contract to add a limitation upon DOE's discretion to adjust the schedule for acceptance of failed and nonstandard fuel to only "modest" adjustments.

The Yankees' belief that they know how much the acceptance schedule could need to be adjusted is particularly curious, given that this unsupported assertion flies in the face of the testimony of the current DOE contracting officer for the Standard Contract, Mr. Zabransky. Mr. Zabransky explained that, to determine the "technical feasibility" of disposing of failed or nonstandard fuel, DOE must examine the physical capabilities at the disposal facility and ensure that the facility has been licensed and analyzed for handling fuels in the condition described by the utility. Tr. 4134:12-22 (Zabransky). This determination must be made on a case-by-case basis, once the condition of a given assembly is known. Tr. 4134:23-4135:9. Nothing in Mr. Zabransky's testimony suggested that schedule adjustments for failed or nonstandard fuel for technical reasons would always be only "modest" in nature.

Counsel for the Yankees argued that "[t]here's just nothing to suggest that, if DOE were performing, that there would have been a technical feasibility issue with the failed fuel." Tr. 7992:17-20. This argument is directly contrary to the testimony of the Yankees' own expert witness, Dr. Bartlett, who admitted that failed fuel may, depending upon the nature of the failure, have to be treated with greater consideration than standard fuel, because such failed fuel potentially is more dangerous to the operators and could contaminate a facility. Tr. 720:25-721:17 (Bartlett).

All three Yankees have already admitted that they possess failed fuel. The Standard Contract specifically instructs DOE to determine the technical feasibility of disposing of such fuel on the published schedule and to adjust the schedule, if necessary. Although the Yankees

identify the testimony of Messrs. Meisner and Stuart that failed fuel is "no problem" and is "transported routinely," Tr. 7992:7-20. the Yankees have missed the point. None of the Yankees' witnesses said that it would be "no problem" to dispose of failed fuel in the Yucca Mountain repository, given that no one has ever done it before. As Mr. Zabransky testified, given the design of the Yucca Mountain repository, the integrity of the cladding itself may become a handling problem, and must be analyzed. Tr. 4234:7-23 (Zabransky). There are also potential concerns with lack of spacers, torn grid straps, and failures that might affect the overall integrity of an assembly. Until the repository is licensed and the capabilities of the facility are determined, DOE cannot know whether these concerns will be problematic for the acceptance of failed fuel. Tr. 4235:1-15 (Zabransky). Accordingly, the Yankees cannot establish that, absent DOE's delay, their failed fuel would not require any special handling and that DOE was required to accept it according to the same schedule as standard fuel.

"In a breach of contract case, the plaintiff bears the burden of proving that injury occurred as a result of the breach," Haynes v. United States, 61 Fed. Cl. 788, 790 (2004), and that "the causal connection between the breach and the [injury] is 'definitely established.'" California Fed. Bank v. United States, 395 F.3d 1363, 1368 (Fed. Cir. 2005) (quoting LaVan v. United States, 382 F.3d 1340, 1351 (Fed. Cir. 2004)). Here, the Yankees cannot establish that, pursuant to its rights under the Standard Contract, DOE would not have been entitled to defer its acceptance of the Yankees' failed and/or nonstandard fuel. Accordingly, they have no basis for seeking damages assuming that DOE was obligated to accept all of their failed fuel without reference to DOE's right to defer that acceptance.

## VIII. UNDER THE STANDARD CONTRACT, THE CONTRACTING OFFICER OBTAINS THE RIGHT TO DETERMINE THE SCHEDULE UPON WHICH DOE WILL ACCEPT THE CONTRACT HOLDER'S SNF, SUBJECT ONLY TO A REVIEW FOR ABUSE OF DISCRETION

In our previous post-trial briefing, we discussed the manner in which any determination of the schedule pursuant to which the Court should award damages in these three cases is dependent upon the least onerous schedule that DOE could have selected in beginning its SNF acceptance obligations. This position is supported by the manner in which the Standard Contract's schedule provisions were written.

Under the terms of the delivery commitment schedule provisions in the Standard Contract, the definitization of specific acceptance schedules is not, in the final analysis, wholly dependent upon the parties' ability to "agree" to an acceptance schedule. To the contrary, the Standard Contract provides that, if the parties are unable to agree upon an acceptance schedule, DOE gains the discretion to make that determination, subject only to review for abuse of discretion. Specifically, if DOE disapproves the contract holder's second DCS submission, DOE is to "advise the [contract holder] in writing of the reasons for such disapproval and shall submit its [DOE's] proposed schedule(s)." 10 C.F.R. § 961.11, Art. V.B.2. If the schedule that DOE proposes is unacceptable to the contract holder, the contract holder, following further negotiation, is entitled to seek review of DOE's discretionary decision at the Energy Board of Contract Appeals ("EBCA"), pursuant to the Standard Contract's "Disputes" clause. Id., Arts. V.B.2 & XVI; see McDonnell Douglas Corp., ASBCA No. 26747, 83-1 BCA ¶ 16,377, at 81,421 (1983) (describing boards of contract appeals' historical authority to decide non-monetary issues).[6]

[6] The schedule terms of the Standard Contract establish a process by which SNF acceptance commitments are made. If DOE disapproves the contract holder's second DCS

The EBCA's review of DOE's discretionary decision would not be de novo, but, instead, the "contracting officer's discretionary authority [could] be overturned only by a showing that it was arbitrary, capricious or otherwise an abuse of discretion." Rapid City Indian Health Advisory Bd. of Directors, ASBCA No. 26641, 83-1 BCA ¶ 16,311, at 81,084 (1983); see United States Fidelity & Guaranty Co. v. United States, 230 Ct. Cl. 355, 365-70, 676 F.2d 622, 628-31 (1982); Fraas Surgical Mfg. Co. v. United States, 215 Ct. Cl. 820, 828-29, 571 F.2d 34, 39 (1978).[7] If the parties are at any time unable to reach an agreement regarding the acceptance schedule for a particular contract holder's SNF or HLW identified in a DCS for a particular year, DOE is entitled to select the acceptance schedule that it will adopt for that contract holder's SNF and/or HLW, subject only to the limited review permitted by the "Disputes" clause.

---

submission, DOE "shall submit its [own] proposed schedule(s)," and, if the contract holder does not find that schedule acceptable, "the parties shall promptly seek to negotiate mutually acceptable schedule(s)." 10 C.F.R. § 961.11, Art. V(B)(2). The Standard Contract's "Disputes" clause provides that "any dispute concerning a question of fact arising under this contract which is not disposed of by agreement shall be decided by the Contracting Officer," followed by an appeal, if necessary, to the EBCA. Id., Art. XVI(A). This type of Disputes clause, which mirrors the Disputes clauses contained in many Government contracts prior to the Contract Disputes Act, 41 U.S.C. §§ 601-22, "is something more than a dead letter to be revived only at the convenience or discretion of the contractor." United States v. Joseph A. Holpuch Co., 328 U.S. 234, 239-40 (1946). It "is controlling as to all disputes 'concerning questions arising under this contract' unless otherwise specified in the contract," "[n]o court is justified in disregarding its letter or spirit," and "[s]olely through its operation may claims be made and adjudicated as to matters arising under the contract." Id.

[7] As one of the boards of contract appeals has explained, where a challenge to an agency's decision under a contract "tests the validity of the Contracting Officer's exercise of his judgment and discretion in a matter which by the terms of the contract itself is made discretionary with him," and the board is "reviewing a contractually-provided judgmental decision of the Contracting Officer," the board's review is limited to whether the contracting officer's discretionary decision was in bad faith, was unreasonable, or was arbitrary or capricious. Thomas W. Yoder Co., VABCA No. 997, 74-1 BCA ¶ 10,424, at 49,250-51 (1974). Were the board to engage in a de novo review of the discretionary decision, it would infringe upon the contracting officer's "legal right to exercise his discretion." Id.

This provision within the schedule terms of the Standard Contract is critical to any evaluation of damages to be awarded in these cases. Because the Standard Contract's schedule terms provide DOE with the option of selecting any one of numerous potential acceptance scenarios, subject only to review for abuse of discretion, the schedule terms act as a form of "alternative contract," which we discussed in detail in our prior post-trial briefing.

## IX. THE YANKEES FAILED TO ESTABLISH ANY BASIS FOR THEIR CLAIM OF A BREACH OF DUTY OF GOOD FAITH AND FAIR DEALING

The Yankees appear to disclaim that they are relying upon any "bad faith" by DOE to establish their claim for breach of the duty of good faith and fair dealing. See Yankee Response Brief, at 47-49. In any event, they have presented no "clear and convincing evidence" sufficient to create "some specific intent to injure the plaintiff," Am-Pro Protective Agency, Inc. v. United States, 281 F.3d 1234, 1240 (Fed. Cir. 2002), precluding a bad faith claim. In fact, the only evidence to which the Yankees refer to attempt to support their good faith claim is that of Scott Vance. Yankee Response Brief, at 49. As we previously discussed, Mr. Vance's testimony is not admissible for the purposes for which the Yankees have cited it. Further, it is unsupported by any contemporaneous or subsequent written evidence or testimony.

Since the Yankees and the Government filed their post-trial response briefs, the Federal Circuit has addressed the implied covenant of good faith and fair dealing in Centex Corp. v. United States, 395 F.3d 1283 (Fed. Cir. 2005). That decision is not final. Moreover, the Court in Centex did not purport to overrule its previous decisions with regard to the presumption that the Government acts in good faith and the weighty burden associated with proving otherwise. In addition, the Yankees' breach of the implied covenant of good faith and fair dealing essentially is

based upon alleged failure to act – that is, its failure to begin accepting the Yankees' SNF. More specifically, the Yankees refer to DOE's failure to meet the contractual deadline for accepting fuel and DOE's alleged attempt to avoid its contractual obligations. As we have discussed in our prior briefing, all of the Yankees' allegations are, in essence, allegations that DOE partially breached the Standard Contract through its delay in accepting SNF. A partial breach of an express contractual promise does not implicate the implied covenant of good faith and fair dealing. Finally, and more importantly, the Court in Centex found that Congress had deprived plaintiff of the benefits of its contract with the Federal Savings and Loan Insurance Corporation. In this case, the Yankees allege a partial breach of the contract. The Yankees still expect DOE to accept all of their SNF for disposal. In other words, while there has been a delay in DOE's performance, the Yankees will reap the benefits of their contracts. DOE has not purposefully robbed the Yankees of the benefits of its bargain, and it certainly has not acquired the benefits for itself. The Yankees' contribution to the Nuclear Waste Fund is intact, and DOE will perform its obligations.

## CONCLUSION

For the reasons outlined above, those set forth in our prior post-trial briefing, and those that the Government set forth at closing argument on January 24, 2005, the Government respectfully requests that the Court enter judgment in the Government's favor.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

s/ David M. Cohen
DAVID M. COHEN
Director

s/ Harold D. Lester, Jr.
HAROLD D. LESTER, JR.
Assistant Director
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tele: (202) 305-7562
Fax: (202) 307-2503

OF COUNSEL:

JANE K. TAYLOR
Office of General Counsel
U.S. Department of Energy
1000 Independence Ave., S.W.
Washington, D.C. 20585

KEVIN B. CRAWFORD
JOHN C. EKMAN
HEIDE L. HERRMANN
R. ALAN MILLER
RUSSELL A. SHULTIS
MARIAN L. SULLIVAN
SONIA ORFIELD
STEPHEN FINN
Commercial Litigation Branch
Civil Division
Department of Justice
Washington, D.C. 20530

February 22, 2005

Attorneys for Defendant

## CERTIFICATE OF FILING

I hereby certify that, on this 22nd day of February 2005, a copy of foregoing "DEFENDANT'S POST-TRIAL REPLY BRIEF" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ Harold D. Lester, Jr.