No. 98-126C
(Senior Judge Merow)

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

YANKEE ATOMIC ELECTRIC COMPANY,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

# DEFENDANT'S BRIEF CONCERNING THE EFFECT OF *INDIANA MICHIGAN* UPON THE DAMAGES THAT MAY BE CONSIDERED IN THIS LITIGATION

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

HAROLD D. LESTER, JR.
Assistant Director
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Telephone: (202) 305-7562
Facsimile: (202) 307-2503

OF COUNSEL:

JANE K. TAYLOR
Office of General Counsel
U.S. Department of Energy
1000 Independence Avenue, S.W.
Washington, D.C. 20585

KEVIN B. CRAWFORD
JOHN C. EKMAN
HEIDE L. HERRMANN
RUSSELL A. SHULTIS
MARIAN E. SULLIVAN
Commercial Litigation Branch
Civil Division
Department of Justice
Washington, D.C. 20530

December 6, 2005

Attorneys for Defendant

TABLE OF CONTENTS

CASES PAGE

SUMMARY OF ARGUMENT ..... 1

DISCUSSION ..... 3

I. THE *INDIANA MICHIGAN* DECISION PRECLUDES THE YANKEES' EFFORTS TO RECOVER DAMAGES THAT POST-DATE THE FILING OF THEIR COMPLAINTS IN THIS COURT ..... 3

II. ALTHOUGH THE *INDIANA MICHIGAN* DECISION ALLOWS FOR THE POSSIBILITY OF RECOVERABLE MITIGATION DAMAGES BEGINNING MAY 25, 1994, NONE OF THE YANKEES' ALLEGED PRE-1998 DAMAGES WERE CAUSED BY DOE'S DELAY ..... 6

III. *INDIANA MICHIGAN* DOES NOT ALTER THE YANKEES' OBLIGATION TO ESTABLISH CAUSATION ..... 11

A. Even After *Indiana Michigan*, The Yankees Still Must Establish That DOE Was Obligated To Accept SNF At A Rate Sufficient To Preclude Additional At-Reactor Storage And To Accept Some "Backlog" Of SNF ..... 11

B. To Obtain "Past" Damages, The Court Still Must Find That Mr. Graves' Hypothetical Exchanges Model Accurately Reflects Industry-Wide Behavior In The "But For" World ..... 12

C. The Yankees Failed To Prove That Priority For Shutdown Reactors Would Have Been Granted By DOE ..... 14

CONCLUSION ..... 15

# TABLE OF AUTHORITIES

CASES PAGE(S)

Coughlin v. Blair,
41 Cal. 2d 587, 262 P.2d 305 (1953) .................... 4

Indiana Michigan Power Co. v. United States,
60 Fed. Cl. 639 (2004), aff'd, 422 F.3d 1369 (Fed. Cir. 2005) .................... passim

Indiana Michigan Power Co. v. United States,
422 F.3d 1369 (Fed. Cir. Sept. 9, 2005),
reh'g denied (Fed. Cir. Nov. 25, 2005) .................... passim

Newman-Green, Inc. v. Alfonzo-Larrain,
490 U.S. 826 (1989) .................... 5

Standard Federal Bank v. United States,
No. 95-478C, slip op. (Fed. Cl. Oct. 12, 2004) .................... 10

MISCELLANEOUS

Restatement (Second) of Judgments § 26(e) .................... 4, 5, 6

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| YANKEE ATOMIC ELECTRIC COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 98-126C |
| | ) | (Senior Judge Merow) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

DEFENDANT'S BRIEF CONCERNING THE EFFECT OF *INDIANA MICHIGAN* UPON THE DAMAGES THAT MAY BE CONSIDERED IN THIS LITIGATION[1]

Pursuant to this Court's order dated September 12, 2005, defendant, the United States, respectfully submits this brief concerning the effect of the decision rendered in Indiana Michigan Power Co. v. United States, 422 F.3d 1369 (Fed. Cir. Sept. 9, 2005), reh'g denied (Fed. Cir. Nov. 25, 2005), upon the damages which may be considered for an award in this litigation.

SUMMARY OF ARGUMENT

Although the Federal Circuit's decision in Indiana Michigan significantly affects the scope of damages that may be considered for an award to the plaintiffs, Yankee Atomic Electric Company ("Yankee Atomic"), Connecticut Yankee Atomic Power Company ("Connecticut Yankee"), and Maine Yankee Atomic Power Company ("Maine Yankee") (collectively, the "Yankees"), the fundamental question underlying any causation determination – that is, whether the Yankees are entitled to any damages at this time – are unaffected by Indiana Michigan. To award the Yankees any of the past damages that they seek from the Government, and that are allowable under Indiana Michigan, this Court still must accept the two underlying factual

---

[1] The Government requests that this brief also be deemed applicable in Connecticut Yankee Atomic Power Co. v. United States, No. 98-154C, and Maine Yankee Atomic Power Co. v. United States, No. 98-474C.

premises of the Yankees' damages claims. First, this Court must find that the Department of Energy ("DOE") was contractually obligated to accept spent nuclear fuel ("SNF") from contract holders beginning in 1998 at the specific and precise five-year ramp-up rate that the Yankees selected for this litigation and that DOE was contractually obligated to follow this specific ramp-up rate by accepting 3,000 Metric Tons Uranium ("MTU") of SNF annually each year thereafter. Second, after adopting the Yankees' proposed acceptance rate, the Court must find either that the Yankees' hypothetical economic "exchanges" model that its expert created for this litigation accurately depicts the Yankees' movement to the front of the Standard Contract's SNF acceptance queue or that DOE was obligated to provide the Yankees, but potentially no other shutdown reactors, with priority in the acceptance queue because of their status as shutdown reactors. To adopt either of these arguments, the Court must ignore the evidence that focuses upon the contractual requirements for DOE to accept SNF in accordance with the "oldest-fuel-first" acceptance queue set forth in the Standard Contract, upon the absence of any nuclear utility that appears willing to move back in the acceptance queue to allow the Yankees to move forward in that queue, upon the wholly speculative nature of Mr. Frank Graves' exchanges model, and upon the absence of any evidence regarding the manner in which "priority" for shutdown reactors would provide the Yankees with the fuel-out dates that they have identified. Any finding that the "oldest-fuel-first" acceptance requirement governs this case would establish that the Yankees have incurred no damages to date, given that they would have incurred all costs that they are now attempting to charge to the Government regardless of any delay by DOE.[2]

---

[2] Issues relating to the acceptance of Greater-Than-Class-C low-level radioactive waste and failed fuel, set forth in the Government's post-trial briefs, likewise are unaffected by the Indiana Michigan decision. The Government stands upon its briefs concerning those issues.

Quite apart from the causation questions that are central to any liability determination here, the Federal Circuit's decision in Indiana Michigan affects the scope of damages that the Yankees may be awarded in two fundamental ways. First, any "future" components of the Yankees' claims are barred as a matter of law by Indiana Michigan, 422 F.3d at 1376-78. Applying the rationale of Indiana Michigan to the Yankees' claims, the Yankees cannot obtain any damages in this action that post-date the filing of their complaints, all three of which were filed in 1998. Second, the Yankees may, as a matter of law, recover costs incurred between May 25, 1994, and January 31, 1998, only to the extent that they establish causation and that the pre-1998 costs mitigated damages. Id. at 1374-75. Because the Yankees failed to establish causation and mitigation for their pre-1998 damages, those costs are precluded as a matter of fact.

## DISCUSSION

### I. THE *INDIANA MICHIGAN* DECISION PRECLUDES THE YANKEES' EFFORTS TO RECOVER DAMAGES THAT POST-DATE THE FILING OF THEIR COMPLAINTS IN THIS COURT

In the original proceedings before the trial court in Indiana Michigan Power Co. v. United States, 60 Fed. Cl. 639 (2004), aff'd, 422 F.3d 1369 (Fed. Cir. 2005), the plaintiff, Indiana Michigan Power Company ("IMP"), had asserted that it was entitled to recover damages beginning in 1989 (based upon its alleged belief in 1989 that DOE would partially breach the contract in 1998) and extending approximately 40 years beyond the 1998 partial breach. Like the Yankees in these three cases, IMP did not assert that DOE had committed a total breach of the Standard Contract, but instead claimed only that DOE had partially breached that contract.

This Court, after an extensive trial upon IMP's damages claims, found that the nature of IMP's breach claim – a partial, rather than total, breach – affected its ability to recover future damages.

This Court found that, unlike a claimant in a total breach case, a partial breach claimant cannot recover damages into the future that it had not yet incurred. Id. at 648. Instead, this Court, relying in part upon a California court decision, Coughlin v. Blair, 41 Cal. 2d 587, 262 P.2d 305 (1953), found that the partial breach claimant was limited to those damages that it had incurred as a result of partial breaches up to the "date of trial." Indiana Michigan, 60 Fed. Cl. at 648. This Court also found that the partial breach claimant was entitled to return to court as it incurred damages in response to future partial breaches. Id.

On appeal to the Federal Circuit, IMP challenged the trial court's holdings regarding a partial breach claimant's ability to recover future damages in a single action, arguing that a partial breach claimant should be permitted to recover damages beyond the date of trial and that the claimant should not have to return to court to seek additional damages after they have been incurred. In our response to IMP's future damages argument, we informed the appellate court that, according to section 26 of the Restatement (Second) of Judgments, a partial breach claimant, unlike a total breach claimant, cannot recover future damages for future partial breaches that it anticipates will occur, but that the partial breach claimant may return to court in the future after it has actually incurred those costs. We also identified two different applications of this rule: the rule espoused in section 26 of the Restatement (Second) of Judgments, allowing a partial breach claimant to recover damages incurred by the date that it filed its complaint, and that espoused in the California court decision upon which this Court had relied, allowing recovery of damages incurred through the time of trial.

In its decision, dated September 9, 2005, the Federal Circuit agreed that, in a partial breach case, future damages are not recoverable. It found that, instead, a partial breach claimant may "sue from time to time for the damages incurred to the date of suit," defined as "the time of the institution of the action." Indiana Michigan Power Co. v. United States, 422 F.3d 1369, 1377 (Fed. Cir. 2005) (quoting Restatement (Second) of Judgments § 26(e) & cmt. g (1982)). Although the Court did not expressly discuss the distinction between the California court's "date of trial" rule for a partial breach damages award and the Restatement's "institution of the action" rule, the appellate court expressly found that the grievance at issue "falls within [the Restatement (Second) of Judgments] subsection (e)'s exception," id. at 1378, which expressly limits damages in a partial breach case to those "incurred to the date of suit," Restatement (Second) of Judgments § 26(e) (1982), or "damages sustained from breaches up to the time of the institution of the action." Id. § 26 cmt. g, at 241 (quoted in Indiana Michigan, 422 F.3d at 1377). IMP sought panel rehearing of a portion of the future damages aspect of the appellate court's decision, but IMP's petition for rehearing was denied on November 25, 2005.

Under Indiana Michigan, the Yankees may not recover damages that post-date the filing of their complaints in this case.[3] See Indiana Michigan, 422 F.3d at 1376-78 (adopting the rule set forth in Restatement (Second) of Judgments § 26(e)). The jurisdiction of this Court is determined by reference to the partial breaches existing upon the date that the complaints in these three cases were filed. See Newman-Green, Inc. v. Alfonzo-Larrain, 490 U.S. 826, 830 (1989). The Yankees here seek damages not only for partial breaches that had already occurred

[3] Yankee Atomic's complaint was filed on February 18, 1998, Connecticut Yankee's complaint was filed on March 4, 1998, and Maine Yankee's complaint was filed on June 2, 1998.

by the time that they filed their complaints, but also for partial breaches that allegedly occurred and resulting damages allegedly incurred after they filed their complaints. Yet, the Yankees each seek to recover damages far into the future, speculating about costs that they not only had not incurred by the time that they filed their complaints, but also about costs that they still have not incurred. Under the breach of contract theory that the Yankees elected to pursue – a partial, rather than total, breach of contract theory – the damages that they may recover in this action are limited to those that were incurred by the time that they filed their complaints. Restatement (Second ) of Judgments § 26(e). Further, it is the Yankees' burden to establish in this litigation the costs that they seek here were incurred by the time that they filed their complaints and are not related to post-complaint partial breaches or activities.[4]

## II. ALTHOUGH THE *INDIANA MICHIGAN* DECISION ALLOWS FOR THE POSSIBILITY OF RECOVERABLE MITIGATION DAMAGES BEGINNING MAY 25, 1994, NONE OF THE YANKEES' ALLEGED PRE-1998 DAMAGES WERE CAUSED BY DOE'S DELAY

In its decision in Indiana Michigan, the appellate court not only resolved the recoverability of future damages in these SNF partial breach cases, but also set forth standards for reviewing claims for damages that pre-date the January 31, 1998 deadline for DOE to begin

[4] Of course, in addition to establishing the timing of their incurred costs, the Yankees must establish that any incurred costs were actually caused by DOE's delay. Because the Yankees' exchanges and priority theories are without merit and because the "oldest-fuel-first" acceptance queue set forth in the Standard Contract defines the order in which DOE was contractually obligated to accept nuclear utility SNF, damages for the Yankees would not begin to accrue until the final fuel out dates dictated by the rate of SNF acceptance that the Court adopts for purposes of evaluating damages claims. To the extent that the Court needs to reach these issues to resolve the Yankees' claims for damages accrued by the dates upon which they filed their complaints, application of the "oldest-fuel-first" provision of the Standard Contract establishes that the Yankees would have incurred the same costs that they are now claiming regardless of DOE's delay.

accepting SNF. Although the Government argued in Indiana Michigan that pre-breach mitigation damages were *per se* unrecoverable in a partial breach case, the Federal Circuit disagreed. It found that its previous "breach-of contract cases have dealt only with the duty to mitigate damages incurred after a total breach." Indiana Michigan, 422 F.3d at 1375. It further held, however, that "[w]e see no reason why efforts to avoid damages in contemplation of a partial breach should not also be recoverable," id. (emphasis added), stating as follows:

> Section 350, comment b of the Restatement of Contracts advises that "[o]nce a party has reason to know that performance by the other will not be forthcoming, . . . he is expected to take such affirmative steps as are appropriate in the circumstances to avoid loss by making substitute arrangements or otherwise." Indiana Michigan is "not precluded from recovery . . . to the extent that [it] has made reasonable but unsuccessful efforts to avoid loss." Id..

Indiana Michigan, 422 F.3d at 1375. It determined that, "[h]ence, mitigation damages are available for pre-breach costs should the obligee elect to treat the obligor's breach as partial, while pre-breach damages for anticipatory breach are available should a party elect to treat the obligor's breach as total." Id.

The Federal Circuit then defined the date upon which the nuclear utilities were obligated to begin mitigating damages: "[i]t is beyond debate that because the government unequivocally announced in 1994 that it would not meet its contractual obligations beginning in 1998, the utilities were in fact obligated to take mitigatory steps" at that time. Id. Specifically, the appellate court found that, on May 25, 1994, "DOE announced that it would not begin SNF collection until 2010 because its planned storage repository would not be ready until then." Id. at 1372. Although IMP had argued before the trial court that DOE had made announcements in 1987 and 1989 that led it to believe that DOE would not begin accepting SNF by 1998, "six

years before the 1994 Notice of Inquiry announced DOE's inability to begin timely SNF collection," see id. at 1376, the Federal Circuit identified the May 25, 1994 date as the date upon which "the utilities" were "obligated to take mitigatory steps." Id. at 1375.

Under the rationale of Indiana Michigan, and only after establishing causation, the Yankees may potentially recover pre-breach costs dating back to May 25, 1994, to the extent that those costs constituted reasonable mitigation of damages. Indiana Michigan, 422 F.3d at 1374-75. As a matter of fact, however, any characterization of the Yankees' pre-1998 costs as "mitigation" does not allow recovery here. As discussed in the Government's post-trial briefs and proposed findings of fact, the vast majority of the Yankees' alleged pre-1998 damages relate to the decisions of Connecticut Yankee and Maine Yankee to rerack their wet pools. Specifically, Connecticut Yankee seeks $8.3 million and Maine Yankee seeks $10.3 million for reracking efforts performed in the mid-1990s. Tr. 2780:17-18 (Thomas); 2307:6-15 (Bennet).[5] In support of these claims, both Connecticut Yankee and Maine Yankee cast their reracking efforts as mitigation of DOE's impending breach of contract – that is, both reracked in anticipation of future space constraints that would have resulted from DOE's failure to begin SNF acceptance in 1998.

However, the claims for reracking costs fail for three reasons – the first of which springs directly from the Indiana Michigan decision. First, in tying the obligation to mitigate to DOE's May 25, 1994 Notice of Inquiry, the Federal Circuit necessarily indicated that the Government possesses an obligation to pay for actual mitigation efforts incurred as a result of DOE's May 25,

---

[5] "Tr. ___" refers to the trial transcript in this case. "PFOF ¶ ___" refers to the proposed findings of fact that the Government filed with its post-trial brief.

1994 announcement, to the extent that those efforts were caused by the Government's delay. However, Connecticut Yankee's and Maine Yankee's decisions to rerack occurred – and certain costs associated with both reracking projects were incurred – before May 25, 1994. For example, the evidence demonstrates that Maine Yankee made the decision to rerack its wet pool in the 1991/1992 time frame. Tr. 2899:5-16 (Whittier). Likewise, Connecticut Yankee issued its request for proposal for its reracking project in 1993 (see DX217, at 1-2), and Russell Mellor testified at trial that he was aware as early as 1991 that he would need to become educated concerning the procedures and costs of Connecticut Yankee's reracking project because he was going to have to provide testimony concerning that project. Tr. 2622:7-2623:1 (Mellor). Pursuant to Indiana Michigan, because the obligation to mitigate damages did not begin until May 25, 1994, these reracking projects that began prior to that date cannot reasonably be found to constitute mitigation caused by DOE's 1994 Notice of Inquiry or DOE's partial breach.[6]

Second, and without regard to this aspect of the Federal Circuit's Indiana Michigan decision, the factual evidence demonstrates that both Connecticut Yankee and Maine Yankee reracked their wet fuel pools because they expected to run out of wet pool space before 1998. As the Federal Circuit recognized, "[t]he presence of a duty to mitigate does not perforce make the pre-breach costs incurred by [the nuclear utility] to store its SNF recompensable; [the utility] must prove foreseeability, causation, and reasonableness." Indiana Michigan, 422 F.3d at 1376. Before they shut down their nuclear reactors, and when they made their decisions to rerack, Connecticut Yankee anticipated that it would run out of available pool space in 1995 or 1996,

---

[6] As discussed in our post-trial briefing, mitigation is a duty, not a right, and, pursuant to Indiana Michigan, the Yankees' duty did not arise until May 25, 1994.

and Maine Yankee anticipated that it would run out of space in 1996. PFOF ¶¶ 327-328. Indeed, the 1995 and 1996 dates upon which the two utilities were expected to run out of space in their wet pools explain why they began activities for the reracks in the early 1990s, prior to any duty to mitigate damages. Ultimately, both utilities performed their reracking activities in 1996, before they made a decision permanently to shut down. Id. Because they were expected to run out of storage space before DOE was to begin acceptance from utilities in 1998, any reracking decisions were unrelated to DOE's delay in accepting SNF. Indeed, the reracking efforts would have been needed to belay both Connecticut Yankee and Maine Yankee through DOE's first SNF acceptance from each facility.

Third, the reracking efforts by both Connecticut Yankee and Maine Yankee ultimately proved unnecessary, as both utilities shut down their reactors prior to 1998. Because they shut down prematurely, neither Connecticut Yankee nor Maine Yankee actually needed to rerack their pools, at least not as a result of DOE's breach. To the extent that they would have had sufficient wet pool space to continue operations until DOE was obligated to begin accepting their SNF, they could have waited to incur those reracking costs to ensure that they would be necessary. See Standard Fed. Bank v. United States, No. 95-478C, slip op. at 17 (Fed. Cl. Oct. 12, 2004) (unpublished opinion) ("plaintiff has pointed to no reason why plaintiff was compelled to take action immediately, rather than wait until the need was clear, [several] years hence, before making the decision" to conduct activity). Had they waited, neither facility would have reracked its pool. The pre-breach "mitigation" in which Maine Yankee and Connecticut Yankee allegedly engaged served only to enhance their damages here. As a result, those costs are

unrecoverable. Accordingly, the Yankees failed to prove causation for these pre-1998 costs or the reasonableness of these alleged mitigation activities.

Finally, both Maine Yankee and Yankee Atomic incurred pre-1998 costs associated with their Independent Spent Fuel Storage Installation ("ISFSI") projects. However, the evidence demonstrates that, had DOE commenced performance in 1998 under an oldest-fuel-first queue – regardless of the acceptance rate applied to that queue – all three Yankees would have constructed dry storage facilities to reduce costs and to facilitate, among other things, their decommissioning efforts. Therefore, as with the post-1998 ISFSI costs, any costs incurred by Maine Yankee and Yankee Atomic pre-1998 for their ISFSIs would have been incurred even if DOE had performed its contractual obligations. As a result, these pre-1998 costs are not recoverable here.

## III. *INDIANA MICHIGAN* DOES NOT ALTER THE YANKEES' OBLIGATION TO ESTABLISH CAUSATION

### A. Even After *Indiana Michigan*, The Yankees Still Must Establish That DOE Was Obligated To Accept SNF At A Rate Sufficient To Preclude Additional At-Reactor Storage And To Accept Some "Backlog" Of SNF

As discussed at length in the Government's post-trial briefs, to establish causation, the Yankees must prove that DOE was obligated to accept SNF beginning in 1998 at an annual rate of 3,000 MTU, after a short five-year "ramp-up" period. At trial, the Yankees appeared to contend that DOE contractually obligated itself to accept SNF at a rate that (1) would eliminate the need for utilities to provide additional on-site storage after January 31, 1998, and (2) would work off the backlog of SNF and/or HLW already stored by utilities up until that deadline. However, the evidence presented at trial is contrary to the Yankees' assertions that DOE was contractually required to create an acceptance rate that satisfied the Yankees' two-part "test."

Indeed, the Yankees identified no contractual language in the Standard Contract creating any such obligation, and significant evidence was presented of DOE's rejection of that precise language during contract formation.

Likewise, the Yankees failed to establish at trial that an annual steady-state rate of 3,000 MTU is necessary to satisfy that alleged contractual "requirement." The Yankees' own witnesses testified that an annual SNF acceptance rate well below 3,000 MTU could satisfy this two-part requirement. Tr. 712:16-18 (Bartlett); Tr. 909:15-25 (Graves); see Tr. 382:3-12 (Mills). Moreover, the Yankees presented no testimony to establish the reasons that a 3,000 MTU rate was, in fact, the only acceptable acceptance rate. The absence of this evidence precludes any finding that some annual rate lower than 3,000 MTU would be insufficient to meet this purported unwritten requirement. To the extent that the Yankees have failed to establish the existence of an unwritten contractual obligation or performance under a 3,000 MTU rate of acceptance, they have failed to meet their burden of establishing causation for all past costs.

### B. To Obtain "Past" Damages, The Court Still Must Find That Mr. Graves' Hypothetical Exchanges Model Accurately Reflects Industry-Wide Behavior In The "But For" World

The Yankees' entire damages claim is predicated upon a finding that, through the use of exchanges, Yankee Atomic's final fuel-out date would have been in 1999, Connecticut Yankee's would have been in 2001, and Maine Yankee's would have been in 2002. See PFOF ¶ 129. As this Court is aware, these fuel-out dates are substantially earlier than they would be under the general rates of acceptance applied within the "oldest fuel first" acceptance queue set forth in the Standard Contract. PFOF ¶¶ 127-128. Indeed, under either the SNF acceptance schedule of 3,000 MTUs that the Yankees argue is mandatory or the acceptance schedule that DOE

published in the 1991 Annual Capacity Report ("ACR"), none of the Yankees would, as of today, have had all of their SNF removed from their facilities under an "oldest fuel first" acceptance queue, even if DOE had begun SNF acceptance on January 31, 1998. See PFOF ¶¶ 127, 128, 131.a-.c.

As this Court is well-aware, Mr. Graves' model is based entirely upon the application of economic theory following from assumptions that a market for exchanges of SNF acceptance allocations, absent DOE's delay in beginning SNF acceptance, would have been analogous to a perfectly competitive market guided by the "invisible hand." See PFOF ¶¶ 142, 144-145. Any deviations from an economic theory of perfect competition would delay the projected fuel-out dates. PFOF ¶¶ 153, 159, 161-164, 176-177. Moreover, to accept the Yankees' exchanges theory, this Court must find that the exchanges market would have developed perfectly before DOE ever began accepting SNF on January 31, 1998. PFOF ¶ 176. However, as discussed in the Government's briefs, trading programs generally have been disappointing relative to the efficiency gains that have been claimed for them, and the disappointment has been particularly severe in the early years before the programs really develop. PFOF ¶ 185. Instead, for any robust exchanges market (no less for a perfect market) to develop, utilities must have confidence in the schedule of what they are buying and selling. Such a high level of confidence cannot be gained until DOE is well along to accepting SNF having demonstrated its ability to consistently accept SNF at a particular rate upon an established schedule. PFOF ¶ 184. The Yankees' assumption that the exchanges market and the acceptance program will be perfect

instantaneously is controverted by the evidence and by common sense.[7] However, without the Court's adoption of those assumptions, the Yankees' past damages claims fail since each still would possess SNF upon their sites under any rate of acceptance.

### C. The Yankees Failed To Prove That Priority For Shutdown Reactors Would Have Been Granted By DOE

As an alternative to their theory that, through exchanges of acceptance allocations with other nuclear utilities, DOE would have accepted all of their SNF by 1999, 2001, and 2002, the Yankees allege that the Court should find that DOE was obligated to provide, or would have provided, priority in acceptance to their SNF. However, as discussed in the Government's post-trial briefs, DOE lacked any obligation to grant priority to shutdown reactors. Indeed, a large number of utilities have been opposed to priority for shutdown reactors, PFOF ¶ 112.b, 116.b – a fact which the Yankees have always understood, PFOF ¶ 116 – and DOE has declined to grant priority to shutdown reactors in part because "[t]he industry's consensus position was that no priority should be afforded to shutdown reactors," DX 149 at 1; see Tr. 672:22-673:2, 4084:13-17, and because of the inequities that would result in allowing some utilities to move forward in the acceptance queue while pushing others back. PFOF ¶ 112. Yankee Atomic attempted to convince industry representatives to support priority, but eventually acknowledged that "a consensus could not be reached by utilities" regarding whether DOE should grant priority

---

[7] Further, as discussed in our post-trial briefing, the Yankees have not identified a single contract holder that was or is willing to move back in the acceptance queue, either pursuant to a contract with the Yankees or for purposes of their own lawsuits against the United States. The Yankees have also not explained how, given that only approved delivery commitment schedules ("DCSs") may be exchanged and that approved DCSs would be available, at most, 10 years into the future, their exchanges model is viable, even in a speculative world.

to shutdown reactors. PFOF ¶ 116. Priority for these three shutdown reactors simply has not been proven. Once again, without Mr. Graves' perfect exchanges market or a grant of priority, the Yankees have failed to establish any causal link for its past damages claims.

## CONCLUSION

For the reasons outlined above and in the Government's pre-trial and post-trial briefing in these cases, the Government respectfully requests that the Court enter judgment in the Government's favor.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

s/ David M. Cohen
DAVID M. COHEN
Director

OF COUNSEL:

JANE K. TAYLOR
Office of General Counsel
U.S. Department of Energy
1000 Independence Ave., S.W.
Washington, D.C. 20585

KEVIN B. CRAWFORD
JOHN C. EKMAN
HEIDE L. HERRMANN
RUSSELL A. SHULTIS
MARIAN E. SULLIVAN
Commercial Litigation Branch
Civil Division
Department of Justice
Washington, D.C. 20530

s/ Harold D. Lester, Jr.
HAROLD D. LESTER, JR.
Assistant Director
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tele: (202) 305-7562
Fax: (202) 307-2503

December 6, 2005

Attorneys for Defendant

CERTIFICATE OF FILING

I hereby certify that, on this 6th day of December 2005, a copy of foregoing "DEFENDANT'S BRIEF CONCERNING THE EFFECT OF *INDIANA MICHIGAN* UPON THE DAMAGES THAT MAY BE CONSIDERED IN THIS LITIGATION" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ Heide L. Herrmann