On February 4, 1983, DOE, in furtherance of its obligations pursuant to the NWPA, 42 U.S.C. § 10222, published a notice of proposed rulemaking in the Federal Register, proposing terms for the "Standard Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste" ("Standard Contract") mandated by the NWPA, 42 U.S.C. § 10222. See 48 Fed. Reg. 5458 (Feb. 4, 1983). Although the proposed Standard Contract itself did not identify a specific rate by which DOE would accept contract holders' SNF, it provided for DOE's issuance of documents for planning purposes to assist in the eventual definitization of the specific rate and order of SNF acceptance and disposal. 48 Fed. Reg. 5458, 5463 (Feb. 4, 1983) (Art. V.B.5 & Art. V.B.6) (emphasis added). The proposed contract further provided that, in 1991, DOE would publish acceptance rates that would begin the process of establishing DOE's contractual obligations of acceptance under the contract.[5]

Prior to 1991, DOE discussed a number of scenarios under which it could meet its contractual obligation of beginning acceptance of SNF by January 31, 1998. These included a 1983 draft mission plan and a 1995 mission plan. Both of these documents contemplated performance beginning by January 31, 1998, at one Federal repository, followed by a second Federal repository, with a total aggregate acceptance rate of 6,000 MTU. In 1987, DOE concluded that because a repository would not open by January 31, 1998, DOE would not be able to rely upon such a facility to begin performance under the Standard Contract. As an alternative, DOE sought and received Congressional approval to begin performance of the Standard Contract

[5] DOE's reason for excluding an express term regarding a rate of acceptance was based upon the uncertainties that DOE knew it was facing in Federal waste disposal activities that were to occur before January 31, 1998. App. at 4-6.

at an interim storage site referred to as a monitored retrievable storage system ("MRS").[6] Based upon assumed acceptance of SNF at an MRS beginning in 1998, DOE published its 1991 ACR which set forth acceptance rates through the first 10 years of contract performance. The rate of acceptance contained in the 1991 ACR were: 400 MTU in 1998, 600 MTU in 1999, then 900 MTU each year until 2007.[7]

In September 1995, DOE officially recognized that it would not be able to open an MRS by January 31, 1998 and, instead, assumed that it would begin performance at a Federal repository beginning in 2010. App. at 1-3. By doing so, DOE further acknowledged that it could not satisfy its contractual obligation to begin performance under the Standard Contract. Accordingly, any planning documents generated after September 1995 do not reflect contemplation of a "but for" world relevant to measuring damages in this case. Consequently, contrary to PG&E's assertion that it is "a highly probative DOE document," DOE's 2004 ACR is simply not relevant to the Court's inquiry in this matter because it contemplates DOE's

---

[6] In the "but for" world, DOE was not obligated to begin the acceptance of SNF at a permanent Federal repository, but rather could have begun acceptance at an MRS facility. In <u>Indiana Michigan Power Co. v. United States</u>, 88 F.3d 1272 (D.C. Cir. 1996), the United States Court of Appeals for the District of Columbia held that the Government's obligation to begin the disposal of spent nuclear fuel and high-level waste by January 31, 1998 was not conditioned upon the existence of a permanent Federal repository. <u>Id.</u> at 1277. As a result, DOE's plans in the actual world to perform at Federal repository at a particular rate of acceptance simply have no bearing upon DOE's performance obligations in the "but for" world.

[7] Further, the Government disagrees with PG&E's assertion that reasonableness is the "applicable legal standard for DOE's performance given that PG&E's contract is silent on the issue." Pl. Mot. at 4. The Standard Contract is not silent on the issue of DOE's obligation to accept SNF. Rather, as we discussed above, and as we will show at trial, the Standard Contract provides for a contractual mechanism for the development of the schedule and rate of acceptance – a mechanism that DOE utilized in the early 1990s.

performance beginning 12 years after 1998, and DOE performance beginning with a repository and not an MRS.

Further, even if the 2004 ACR/APR were somehow relevant in this case, it does not follow that all documents issued after January 2004 are relevant and, therefore, discoverable. As discussed above, because all documents created after January 31, 1998 by definition contemplate performance after DOE was obligated to begin industry-wide performance under the Standard Contract, documents issued after this date simply are not relevant for purposes of establishing either the Government's liability in this case or PG&E's damages. PG&E's broad assertion that all documents that post-date its amended complaints are relevant, regardless of their subject matter or relationship to the issues in this case, is incorrect.

C. The Burden Imposed By PG&E's Open-Ended Discovery Requests Is Unnecessary And Irrelevant

By its motion, PG&E seeks to have the Department of Justice micro-manage DOE's waste disposal program, continuously requesting that DOE produce documents created by DOE in connection with its continuing program, even though these documents would lack any relevance to DOE's obligations in the "but for" world or in the quantification of PG&E's damages. PG&E simply is engaging in a fishing expedition that is not reasonably calculated to lead to the introduction of admissible evidence in this case. Indeed, PG&E has not even suggested when discovery should end in this case and, instead, cryptically suggests that the Court should "allow discovery of documents and fact subsequent to [January 28, 2004], subject to applicable Court Rules." Pl. Mot. at 6. PG&E's lack of any reasonable cut-off date for discovery in this case belies the tenuous position that it now seeks to advance.

Case 1:04-cv-00074-ECH Document 111 Filed 12/14/2005 Page 17 of 18

D. The Government Has Not Selectively Produced Post-2004 Documents

Finally, PG&E's contention that the Government has somehow acknowledged that documents that post-date January 28, 2004, are relevant to issues in this case because the Government has placed certain post-January 2004 documents on its privilege log simply is erroneous. Pl. Mot. at 5, n.1. The Government prepared its privilege log in this case before the United States Court of Appeals for the Federal Circuit resolved the scope of trials in spent nuclear fuel cases in Indiana Michigan Power Co. v. United States, 422 F.3d 1369 (Fed. Cir. 2005). In Indiana Michigan, the Federal Circuit held that a plaintiff in an SNF case that alleges a partial, rather than a total, breach of contract is limited "to those costs incurred prior to the date of its suit." Id. at 1376-77. The Federal Circuit's decision in Indiana Michigan puts to rest any issue that documents that post-date PG&E's 2004 complaint are relevant to the damages issues in this case.[8] PG&E's allegations that the Government's past compliance with discovery demands relating to issues that were not yet resolved by the appellate court somehow requires the Court and the Government to reevaluate discovery after such guidance is issued is simply unfounded.

---

[8] PG&E also appears to imply that the Government has taken inconsistent positions with respect to its willingness to accept an SNF plaintiff's supplementation of its complaint to recover damages that post-date the plaintiff's initial complaint. Pl. Mot. at 5. Although the Government anticipates that it will address this issue in more detail in its reply to PG&E's response to strike portions of Brad Cornell's expert report, the Government has consistently maintained that, although an SNF plaintiff may seek leave to file a supplemental complaint to obtain damages that post-date its complaint, the Court has discretion to deny such leave, particularly where it would prejudice the Government. Unlike in Wisconsin Electric Power Co. v. United States, No. 00-00697 (Fed. Cl.), where fact discovery currently is continuing, here, fact discovery has already closed, and the Government would be significantly prejudiced should PG&E seek leave to file a supplemental complaint at this late stage in the litigation.

CONCLUSION

For the foregoing reasons, the Government respectfully requests that the Court deny PG&E's motion for clarification or reconsideration.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/ Harold D. Lester, Jr.
HAROLD D. LESTER, JR.
Assistant Director

OF COUNSEL:

JANE K. TAYLOR
Office of General Counsel
U.S. Department of Energy
1000 Independence Ave., S.W.
Washington, D.C. 20585

SCOTT DAMELIN
SHARON SNYDER
JOSHUA E. GARDNER
TODD J. COCHRAN
Civil Division
Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530

s/John C. Ekman by Joshua E. Gardner
JOHN C. EKMAN
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, NW
Washington, D.C. 20530
Tel: (202) 353-0897
Fax: (202) 307-2503

December 14, 2005

Attorneys for Defendant

# APPENDIX

/RW-0479

# *Analysis of the Total System Life Cycle Cost of the Civilian Radioactive Waste Management Program*

U.S. DEPARTMENT OF ENERGY
OFFICE OF CIVILIAN RADIOACTIVE WASTE MANAGEMENT

SEPTEMBER 1995

00635

PLAINTIFF'S EXHIBIT
PX-20

PA-176202

# 1. INTRODUCTION AND SUMMARY

## 1.1 Purpose and Scope

This report documents the findings of a comprehensive analysis of the total system life cycle cost (TSLCC) of one concept for the Civilian Radioactive Waste Management System (CRWMS). Its purpose is to provide a cost estimate to aid in financial planning, to provide policy makers information to use in determining the course of the program, and to provide a system cost estimate as one of the inputs for assessing the adequacy of fees being paid by waste generating sources. The scope of the concept reflects one approach to waste management based on the program's most current plans, strategies, and policies [References 1-3]. However, since this estimate spans almost 90 years, the concept should be viewed as a surrogate to the system that will ultimately be developed.

Numerous scenarios could have been selected for cost analysis. The scenario used in this analysis is a one-repository system without interim storage. Yucca Mountain was assumed as the location for the repository since it is the only one that the Department is authorized by law to characterize, but this does not constitute a predecision on the determination of Yucca Mountain as an acceptable site for the repository. The final repository may not actually be located at Yucca Mountain. We are aware of current legislation which prohibits emplacement in the first repository of a quantity of spent fuel containing in excess of 70,000 metric tons of heavy metal or a quantity of solidified high level radioactive waste resulting from the reprocessing of such a quantity of spent fuel until such time as a second repository is in operation. Previous TSLCC analyses have also costed a two-repository system with interim storage (Monitored Retrievable Storage) and varying quantities of spent nuclear fuel. However, there is no advantage in estimating costs for additional scenarios including a two-repository system with interim storage since we do not have current cost information or designs for a second repository and interim storage.

In order to conduct the cost analysis, numerous assumptions were required for system components and operational procedures where decisions have not yet been made. It is well understood that assumptions are critical to the resulting cost estimate. Changes in assumptions could greatly influence the resulting estimate, either upward or downward. Assumptions forming a basis for this TSLCC are described in the remainder of Section 1.

This TSLCC estimate should not be interpreted as a final estimate. It is a snapshot at this time based upon numerous assumptions. Nor should the assumptions used in this analysis be interpreted as Office of Civilian Radioactive Waste Management (OCRWM) or Department of Energy (DOE) policy. The program is in the early stages of development and design concepts for items such as the repository surface facility, underground layouts, and waste packages are very preliminary. The techniques used to estimate the total system cost are appropriate to this limited level of design development and entail a corresponding level of uncertainty.

This TSLCC report is not a fee adequacy report. Fee adequacy depends on other data and assumptions about funding and revenues, interest and inflation rates, as well as annual expenditure

Table 1-1 Summary of TSLCC 1995
(in Millions of 1994 Dollars)

| Cost Category | Total Cost |
|---|---|
| Repository | 18,764 |
| Waste Acceptance, Storage & Transportation | 10,094 |
| Other Development & Evaluation | 3,513 |
| Payments Equal to Taxes (PETT) [1] | 308 |
| Benefits | 417 |
| Total [2] | $33,096 |

[1] An additional $38 million of PETT is included in the Repository cost category (work breakdown structure element 1.2.10).
[2] Total may not add due to rounding.

Orders case [References 5-6], adjusted for reactor cancellations in late 1994, and encompass the SNF inventory from all commercial U.S. reactors. Waste stream modeling assumes pickup of Oldest-Fuel-First, with priority allocations in accordance with the ACR. Estimated quantities of HLW are based on the Department of Energy's Integrated Data Base [Reference 6]. While little additional HLW is expected to be generated at DOE sites in the future, quantities of HLW canisters may vary due to uncertainties in the planned processing and vitrification of the wastes.

Near term (1995-2000) costs reflect detailed estimates of work scope defined in the CRWMS Program Plan, [References 1-3]. Beyond the year 2000, costs reflect project estimates for additional site characterization, repository design, construction, operation, caretaking, closure and decommissioning; and development and operation of a transportation and storage system for SNF and HLW. Estimates reflect the Program Approach and conceptual design data for emplacing robust waste packages in an engineered geological repository.

This 1995 TSLCC estimate provides a snapshot of the total system cost to implement the program approach. It represents the best judgement of total costs for a scenario selected by DOE management to satisfy the long-term objective of waste disposal in a geologic repository. It also reflects the recent restructuring of program and project activities to focus on near-term interim milestones, leading to planned acceptance and emplacement of spent nuclear fuel in a geologic repository beginning in 2010. As a necessity, this estimate makes assumptions for decisions that have not yet been made. It assumes technical findings of site suitability, and results of technical investigations that will not be complete for several years. The assumptions utilized to develop this estimate are generally consistent with the Program Approach.

**Tennessee Valley Authority v. U.S. No. 01-249C July 14, 2005**

**Heritage Reporting Corporation**

**Page 2078 to Page 2330**

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

*HERITAGE REPORTING CORPORATION*
*1220 L Street, N.W.*
*Suite 600*
*Washington, DC 20005*
*Phone: 202-628-4888*
*FAX: 202-371-0935*

4

Page 2206

Q. Mr. Morgan, could I ask you to turn to what is marked as Defendant's Exhibit 0.347?
A. Yes, I have that document.
Q. Okay. Mr. Morgan, do you recognize this to be a copy of the Edison Electric Institute's comments on the standard contract, the draft standard contract?
A. Yes.
Q. Do you recall reviewing this set of comments at the time it was submitted?
A. Do I recall receiving this?
Q. No, my question, do you recall reviewing this document?
A: It's still -- I still didn't hear the question.
Q. My question was whether you recalled reviewing this document.
A. Yes, I reviewed this document.
Q. Thank you. Mr. Morgan, what is your understanding as to what the Edison Electric Institute is?
A. The Edison Electric Institute is an association of electric generating companies, and I believe that they are a Washington lobbying group.
Q. Thank you. Mr. Morgan, would you please

Page 2207

turn to page eight of the letter from EEI?
A. Page eight?
Q. Yes. And, Mr. Morgan, I would like to read a portion of that first paragraph into the record and then ask you a question. The paragraph begins, "Although the contract is generally comprehensive and complete, there are two significant issues on which the proposed contract is silent, DOE performance standards and purchaser remedies. Article II states that the disposal services shall commence not later than January 31st, 1998, a provision consistent with the Nuclear Waste Policy Act. However, no other milestones are included, nor does the contract commit DOE to accept any given quantity of SNF/HLW." Do you see where I've read, Mr. Morgan?
A. Yes, I see that.
Q. Mr. Morgan, do you recall the concern from EEI that is raised in the portion of the paragraph that I just read?
A. Yes, I recall this concern.
Q. And could I direct your attention to two pages later in the document, the second page of the attached detailed comments, do you have that page in front of you, Mr. Morgan?
A. Yes, I do.

Page 2208

Q. And that second paragraph on that page reads, "The contract should include a recognition that DOE will design its facilities with the capacity to receive SNF/HLW at a rate commensurate with the amount of SNF/HLW then being generated, together with the accumulated backlog of SNF/HLW. We believe that DOE should be able to take delivery of SNF/HLW equal to that year's generation, plus a reasonable share of the backlog. While the contract may not be the appropriate place to commit DOE to a specific numerical receiving rate, DOE should recognize at least qualitatively the need to have adequate annual receiving capacity to handle industry needs. This would be consistent with the direction of Section 302(a)(5) of the Act that DOE take title to SNF/HLW as expeditiously as practicable upon request of the generator or owner. A new clause should be added." And then, Mr. Morgan, if you turn the page, the clause reads, "Whereas DOE recognizes that its ability to take delivery of spent nuclear fuel and/or high-level radioactive waste must be commensurate with the amount of such fuel and waste then being generated, together with the amount of such fuel and

Page 2209

waste previously generated, and consistent with its obligation to take title to such fuel and waste as expeditiously as practicable upon the request of the owner or generator of such fuel and waste." Mr. Morgan, do you recall reviewing the material that I just read from EEI's comments on the draft standard contract?
A. Yes, I recall that.
Q. Mr. Morgan, did DOE consider this request by EEI for a qualitative description of the rate of acceptance to be included in the contract?
A. We considered it and rejected it.
Q. And why was it rejected?
A. Because of the uncertainties of the program that I mentioned earlier; and it was impossible for me to commit to a given rate with the unknowns that we were facing. The Nuclear Waste Policy Act did not include an acceptance rate, and so we were well within what we felt was the law that was passed by Congress.
Q. Mr. Morgan, would you please turn your attention now to what's marked as Defendant's Exhibit 5.063?
A. Yes, ma'am.
Q. Mr. Morgan, do you recognize this document

5

Page 2210

to be TVA's comments on the standard contract?
A. This document that I have does not have a cover letter on it, and so I can't say whether this was addressed to me, but I do know that we've reviewed comments from TVA.
Q. And if I could direct your attention to the first page of the exhibit, I believe the fourth line down in the first paragraph reads, "TVA believes a separate contract should be made for each reactor unit." Do you see that?
A. No, I don't. This is on page -- the first page?
Q. The first page under general comments, the fourth line in that first paragraph.
A. Yes.
Q. "TVA believes."
A. Yes.
Q. Okay. Does that provide any insight as to whether these were TVA's comments on the contract?
A. I don't understand that question, I'm sorry.
Q. I'm being inartful, and I apologize. You said that it doesn't have a cover letter, but you do recall receiving comments from TVA that were reviewed, is that correct?

Page 2211

A. That is correct.
Q. Okay. But without a cover letter, you don't know whether these were TVA's comments?
A. I can't, you know, say whether these were TVA comments sent to me, and, again, it's been a long time since I looked at some of these records.
Q. Well, let me ask you this, do you agree that there are statements with regard to, that mention TVA in them, in this document?
A. Yes.
Q. Mr. Morgan, would you please turn to page five of this document?
A. Yes.
Q. And I direct your attention to the middle of that page, and I'm going to read a section into the record that begins, "In addition, a commitment to do no more than start accepting deliveries by 1998 is empty and meaningless without setting forth some reasonable minimum rate of acceptance which corresponds with the purposes of the Act. Of course, under the priority ranking system in the draft contract, it would be difficult at the time contracts are executed to give each purchaser assurances of delivery acceptance at any specific rate. This could, however, be done on an industry

Page 2212

wide basis. Accordingly, the following DOE responsibilities should also be added to Section B of Article V: DOE shall start accepting delivery of SNF or HLW not later than January 31st, 1998 at not less than the annual rate of SNF and/or HLW is then being produced from civilian nuclear power plants covered by the contract with DOE for disposal of SNF and/or HLW.
After January 31st, 1998, DOE shall be prepared to accept delivery of SNF and/or HLW produced prior to set date on a schedule sufficient to provide for delivery consistent with decommissioning plans for purchasers, nuclear power plants specified in Appendix A."
Mr. Morgan, do you recall reviewing the provision or the request and the comments that I just read?
A. I recall reviewing these comments, and they were denied.
Q. And why were they denied?
A. It would be unconscionable for me as a program director to make commitments that held the government responsible for things that I was not sure that we could meet because of the uncertainties of the program that I discussed earlier. I don't know

Page 2213

how else to say it, but it is not, it was not required by Nuclear Waste Policy Act, and we did not include it.
Q. Mr. Morgan, would you now look at Defendant's Exhibit 28, please?
MS. SULLIVAN: Your Honor, I understand that Defendant's Exhibit 28 has already been admitted into evidence.
THE COURT: Yes, on the 21st of June.
MS. SULLIVAN: Thank you, Your Honor.
BY MS. SULLIVAN:
Q. Mr. Morgan, I'd like you to turn to the third page of this document, which is titled, "Summary of Disposition of Major TVA Comments."
A. Yes.
Q. Do you have that in front of you?
A. Yes.
Q. And I'd like to read the comment and the response and then ask you a question.
"Comment: The contract should address at least the minimum duties DOE must perform in return for payments to the Nuclear Waste Fund.
"Response: DOE made little in the way of substantive changes defining their responsibilities. The second recital was changed by adding the phrase

6

CERTIFICATE OF SERVICE

I hereby certify that on this 14th day of December, 2005, a copy of foregoing "DEFENDANT'S RESPONSE TO PLAINTIFF'S MOTION FOR CLARIFICATION OR RECONSIDERATION ON DISCOVERY RESTRICTION" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/Joshua E. Gardner

# EXHIBIT 4

00001

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

----------------------------------:
PACIFIC GAS & ELECTRIC COMPANY, :
:
Plaintiff, :
:
vs. : No. 04-074C into
: which has been
UNITED STATES OF AMERICA, : consolidated No.
: 04-075C
Defendant. :
----------------------------------:

Washington, D.C.

Thursday, September 22, 2005

Deposition of:

W. JOHN ARTHUR, III

called for oral examination by counsel for Plaintiff, pursuant to notice, at Greenberg, Traurig, L.L.P., 800 Connecticut Avenue, Northwest, Suite 500, Washington, D.C., before Shari R. Broussard, a Notary Public in and for the District of Columbia, beginning at 9:41 a.m., when were present on behalf of the respective parties:

00173

Q The ones over to the right report up to the Office of the Principal Deputy Director and ultimately the Office of the Director?

A That's correct.

Q I see. Directly?

A Correct.

Q As you do?

A Correct.

Q So with respect to Exhibit 6, again, I realize this is not in your line, but on page two just as a little background, you see in the last line there that the transportation planning at that time apparently was still predicated on the beginning of shipments in 2010? Do you see that, bottom right on page two?

A Correct.

Q And am I correct that that is not at present the planning basis that the Department is operating on, the 2010 start date?

A You are correct. At that time when this briefing was given 2010 was the target date and, you know, we did have a delay on license

00174

application, as I mentioned earlier, in December of '04 and we had not re-established an opening date for the repository.

Q Right. Thank you.

Now, take a look at page six quickly. The title of the page is "Fiscal Year 2004 Budget and Key Activities" and then halfway down almost under "Fiscal Year 2004 Key Activities" the fifth bullet there is "Engage cask vendor industry regarding design and fabrication activities." Do you see that?

A I see that bullet, yes.

Q Do you have an understanding of sort of generally what that is that they're talking to the cask vendor industry?

MS. HERRMANN: Objection. Foundation.

THE WITNESS: I didn't prepare this slide, but I assume it has to do with transportation casks.

BY MR. STOUCK:

Q Do you know whether that activity is ongoing at the current time?