# In the United States Court of Federal Claims

No. 98-126C
(Filed July 29, 2009)

*******************************

| | |
|---|---|
| YANKEE ATOMIC | * |
| ELECTRIC COMPANY, | * |
| Plaintiff, | * |
| | * |
| v. | * |
| | * |
| THE UNITED STATES, | * |
| Defendant. | * |

*******************************

## ORDER[1/]

This matter is before the court on: (1) Defendant's Motion for an Order Properly Narrowing the Scope of Issues to be Considered by the Court Upon Remand; (2) Defendant's Motion *in Limine* (to Preclude Plaintiffs From Adducing Evidence at the Remand Proceeding Related to how the Yankees Would Have Stored Their SNF/HLW had DOE Performed at the 1987 ACR Rates, Under the OFF Principle); (3) Defendant's Motion to Strike (the Expert Report Attached to Plaintiff's Opposition to the Government's Motion to Narrow the Scope of Issues to be Considered Upon Remand); and (4) Yankee Atomic's Motion to Compel (Compliance with January 30, 2009 Order contained within Yankee Atomic's Opposition to the Government's Motion to Narrow the Scope of Issues to be Considered on Remand).

## Background

The Federal Circuit's August 7, 2008 Opinion in *Yankee Atomic Co. v. United States*, 536 F.3d 1268 (2008) affirmed-in-part and reversed-in-part *Yankee Atomic Co. v. United States*, 73 Fed. Cl. 249 (2006), and remanded the matter to the

---

[1/] This shall also be deemed applicable in *Connecticut Yankee v. United States*, No. 98-154 C and *Maine Yankee v. United States*, No. 98-474 C. These parties are referred to collectively as "the Yankees."

undersigned to reassess causation of certain awarded costs. The mandate issued on October 24, 2008.[2]/ This court requested the parties file a status report indicating any further proceedings considered to be appropriate and a proposed schedule for any proceedings so indicated.

From the submissions, the parties differ in several regards.

## 1.  Scope of remand

The Yankees' Status Report filed December 10, 2008, defined issues on remand as narrow, limited to causation for the discrete costs previously awarded for dry storage and for reracking. Additional discovery, including expert testimony on exchanges in a hypothetical non-breach world, would not be significant according to the Yankees, and the court may and should also use the evidentiary record from the 2004 trial. Neither accounting issues nor the reasonable certainties of the amounts awarded need to be revisited. "Nor is there any need to revisit a great many other issues that were addressed and resolved at the 2004 trial, and not disturbed – or even challenged – on appeal." (Pls.' Status Rpt. 2.) A schedule was proposed, culminating in a mini-trial of approximately three days in the summer of 2009.

The government concurs that remand is limited. "[T]he issues to be resolved on remand from the Federal Circuit are circumscribed to issues of causation" (Def.'s Status Rpt. 6, 9) and "should primarily involve the submission of supplemental expert reports by the parties and depositions of those experts."

In its January 7, 2009 Order, the court stated its then-perceived scope of the remand was:

1.  Causation for the pre-breach reracking costs of Maine Yankee ($10,069,018) and Connecticut Yankee ($8,350,893).

---

[2]/According to the publically-available Federal Circuit docket sheet, the government filed a Motion to Recall Mandate on October 27, 2008 and a Motion for Reconsideration of the Circuit's October 24, 2008 Order denying its motion for an enlargement of time to file a petition for panel rehearing and/or a petition for rehearing *en banc*. The government nevertheless recognizes that the Federal Circuit's decisions in *Yankee Atomic* and *Pacific Gas & Electric Co. v. United States*, 536 F.3d 1282 (Fed. Cir. 2008) are currently binding.

The record also shows that the reracks were reasonable even though early closure of some facilities rendered some of the efforts unnecessary. The Yankees are "'not precluded from recovery . . . to the extent that [they have] made reasonable but unsuccessful efforts to avoid loss.'" *Id.* (quoting Restatement (Second) of Contracts § 350 comment b). Because the rerack efforts were reasonable, foreseeable, and caused by the Government's partial breach, their ultimate success and usage is irrelevant. Accordingly, this court affirms the trial court's findings that the Yankees' rerack decisions were "commercially reasonable" and "foreseeable to DOE at the time of contracting." *Yankee I*, 73 Fed. Cl. at 279, 283.

Causation, the remaining pre-breach mitigation factor, presents more difficulty for the Yankees. As explained in section II above, the trial court must apply the contract rate when assessing causation under the substantial factor test. Thus, although this court affirms the Court of Federal Claims' findings with respect to the foreseeability and reasonableness prongs of the pre-breach mitigation damages test, it must nevertheless remand as to causation. In particular, the Court of Federal Claims must apply the Standard Contract acceptance rate in evaluating whether the Government's partial breach of contract was a substantial factor in causing the Yankees to rerack. [citing 536 F.3d at 1276-77].

2. Causation for expenses for a dry storage facility at Maine Yankee ($65,705,536.00 through 2002), Connecticut Yankee ($25,803,986.00 through 2001) and Yankee Atomic ($32,863,366.00 through 2001). "In sum, the trial court had an obligation to determine the SNF and HLW acceptance rate under the Standard Contract and apply that rate in determining the substantial cause of the Yankees' costs." 536 F.3d at 1274.

(Order Setting Status Conference 4-5.)

The court's Scheduling Order required the exchange of Remand Statements. In response to the Yankees' Statement, the government filed its Motion for an Order Properly Narrowing the Scope of Issues to be Considered by the Court Upon Remand. The government and the Yankees seek to avoid the consideration of issues newly raised or previously rejected and not appealed.

The Yankees contemplate pursuing three areas that are beyond the scope of the remand according to the government.  The government seeks to argue that GTCC must be included in the SNF acceptance rate, a position the Yankees assert was not made previously and is beyond the scope of the mandate.

### a.  But-for loading costs

The Yankees agreed that their incurred costs claims should be reduced by $12,839,770, which represented the combined costs that they would have incurred to load SNF from their spent fuel pools into DOE casks if DOE had performed. Honoring that concession which resulted from the court-ordered audit process and post-trial briefing, the court deducted that amount from damages awarded and Yankees did not appeal.

### b. Crane upgrades

Connecticut Yankee and Maine Yankee also agreed that their claims should be further reduced by $1,669,731, the combined estimated costs to upgrade the cask handling cranes at their facilities to handle loading to DOE casks, costs that Connecticut Yankee and Maine Yankee acknowledged at trial they would have incurred had DOE performed.  (Tr. 3277:3-8 ("the company has also agreed that the crane upgrade that is included in our damages estimate currently is something that also would have occurred in the non-breach world . . . ."); Tr. 3278:6-9; Tr. 3011:23-3012:8.)

As with the loading costs, Connecticut Yankee and Maine Yankee agreed to these deductions and did not challenge the court's adjustments on appeal.  As a result, according to the government, they should not be allowed to retract them.

### c.  Wet pool O&M costs

Unlike DOE loading costs and crane upgrade offsets that were conceded at trial, Yankee Atomic's[3] claim for $16,709,742 in costs relating to the operation and maintenance ("O&M") costs of its wet pool for 2000 and 2001 and $312,000 in NRC fees were sought unsuccessfully at trial.  To seek a recovery of these costs, Yankee Atomic apparently plans to introduce evidence from trial expert witness Frank Graves, showing the results of his exchanges model based upon the application of the 1987 ACR rates.

At trial, Yankee Atomic admitted that it was entitled to wet pool O&M costs only if its pool was empty by January 1999.  In its 2006 decision, the court reasoned that Yankee Atomic's pool would not have been emptied by January 1999, even if DOE timely commenced performance under the Standard Contract, accordingly, Yankee Atomic still would have needed its pool to store SNF and HLW through at least the end of 2001, the end of the time period for which Yankee Atomic claimed O&M costs in this litigation, and would have thus incurred the resulting O&M pool costs through that date.  No appeal was taken from the denial of the wet pool cost claim.  *Yankee Atomic*, 536 F.3d at 1272 ("[T]he Yankees raise just one issue, requesting entry of partial (rather than final) judgment under Court of Federal Claims Rule 54(b) and retention of jurisdiction over the Yankees' claims for future damages from the Government's continued failure to perform.").

According to the government, the rationale Yankee Atomic gives for trying to resurrect its wet pool cost claim is that the court's rejection of Mr. Graves' 1999 date was based, at least in part, on market uncertainty about DOE's performance.  That uncertainty for the hypothetical non-breach world is now eliminated with the Federal Circuit's remand to assume "full government performance."

The Yankees also argue alternatively, that to the extent that exchanges would not have been available, the priority for shut down reactors provided in the Standard Contract would have been used.

---

[3] Connecticut Yankee and Maine Yankee do not seek to relitigate the denial of their wet pool expenses.

**d.  GTCC**

In its attempts to defeat causation, the government argues that GTCC must be integrated into the 1987 ACR rates, thus reducing utility allocations.   Stated differently, the government contends the Yankees must establish causation under the hypothetical non-breach world of the 1987 acceptance capacity schedule ("ACS") process which includes adding GTCC to the stream of DOE pick-ups from utilities.

**Discussion of issues on remand**

These differences in the scope of the upcoming remand proceedings fall into two issue categories.  Issues are categorized as either tried, resolved and not appealed, and issues not previously raised, tried or remanded.

**1.  New matters**

The offsets for DOE loading costs and crane upgrades are matters that were conceded at trial.  Their re-injection makes them new matters.  The Federal Circuit neither reviewed nor addressed these matters either expressly or implicitly.  These costs adjustments were "clearly implicated in [this court's] initial decision" and, therefore, were within the scope of the court's initial judgment.  *Tronzo v. Biomet, Inc.*, 236 F.3d 1342, 1349 (Fed. Cir. 2001).  Given that the Yankees did not challenge the adjustments on appeal, the court's adjustment of awarded costs for dry storage and for reracking, by the amount of the cask loading and crane upgrade costs, became the law of the case.  Therefore, the Yankees' attempted recovery of the cask loading and crane upgrade costs is outside the parameters of the Federal Circuit's mandate and not properly before this court on remand.

Concerning GTCC, the court's recollection is that the government argued vigorously that GTCC was not encompassed by the Standard Contract, that the parties did not intend that it would have been picked-up with the SNF, and that it was likely GTCC would remain at shut-down plant sites requiring facilities for its storage.  Mr. Graves' exchange theory did not contemplate that GTCC would remain on-site thus necessitating dry storage in the non-breach world.  The government did not argue that the acceptance rate it then touted, the 1991 ACR rate, required adjustment if GTCC was accepted.  With the extensive trial record, the parties are certainly free to refresh the court's recollection otherwise.  However, it appears that the Yankees would like

to retract the concession regarding loading and crane up-grade costs and the government seeks a second chance to assail GTCC by arguing it would have impacted whatever acceptance rates were eventually chosen. These issues were all implicated in the initial decision, not raised on appeal, and are precluded absent extraordinary circumstances. *See McDonnell Douglas Corp. v. United States*, 567 F.3d 1340, 1353 n.4 (Fed. Cir. 2009) ("[U]nder the law of the case doctrine, 'it is not improper for a court to depart from a prior holding if convinced that it is clearly erroneous and would work a manifest injustice.'"(citing *Arizona v. California*, 460 U.S. 605, 619 (1983)).

## 2.  Matters previously decided and not within scope of remand

A "'party will not be permitted to argue before [the appellate court],'" and, by analogy, in any subsequent remand, "'an issue on which it has lost and on which it has not appealed, where the result of acceptance of its argument would be a reversal or modification of the judgment rather than an affirmance.'" *Granite Mgmt. Co. v. United States*, 416 F.3d 1373, 1378 (Fed. Cir. 2005) (citing *Radio Steel & Mfg. Co. v. MTD Prods., Inc.*, 731 F.2d 840, 844 (Fed. Cir. 1984)). Also, a party that failed to appeal an issue to the appellate court and served only as appellee in appellate proceedings "may not 'attack the [original trial court] decree with a view either to enlarging his own rights thereunder or of lessening the rights of his adversary.'" *El Paso Natural Gas Co. v. Neztsosie*, 526 U.S. 473, 479 (1999) (quoting *United States v. American Railway Express Co.*, 265 U.S. 425, 435 (1924)).

The mandate rule precludes reconsideration of any issue within the scope of the judgment appealed from – not merely those issues actually raised on appeal. Whether labeled as the mandate rule, the doctrine of law of the case or waiver, analysis is guided by *Engel Industries, Inc. v. Lockformer Co.,* 166 F.3d 1379 (Fed. Cir. 1999). "Unless remanded by this court, all issues within the scope of the appealed judgment are deemed incorporated within the mandate and thus are precluded from further adjudication." Thus, "[a]n issue that falls within the scope of the judgment appealed from but is not raised by the appellant in its opening brief on appeal is necessarily waived." 166 F.3d at 1383.

The court must comply with the mandate. "Interpretation of an appellate mandate entails more than examining the language of the court's judgment in a vacuum." *Exxon Chemical Patents, Inc. v. Lubrizol Corp.*, 137 F.3d 1475, 1483 (Fed.

Cir. 1998).  The appellate opinion must be read in the context of the underlying opinion and judgment to discern properly the nature of its remaining tasks.  *Amado v. Microsoft Corp.*  517 F.3d 1353, 1360 (Fed. Cir. 2008) (citing *Exxon Chem.*, 137 at 1483).  Although relief may not be granted beyond the scope of the mandate, the lower court may act on "matters left open by the mandate."  *In re Sanford Fork & Tool Co.*, 160 U.S. 247, 256 (1895).  *See also Gould, Inc. v. United States*, 67 F.3d 925, 928 (Fed. Cir.1995) (explaining that the considerable deference that must be afforded to an appellate mandate stands in close relation to the "law of the case" doctrine, which obligates a lower court on remand to follow the decision of the reviewing court, provided such decision does not conflict with subsequently controlling authority).

Mandate constraints are "to prevent the relitigation of issues that have been decided and to ensure that trial courts follow the decisions of appellate courts." *Jamesbury Corp. v. Litton Indus. Prod., Inc*., 839 F.2d 1544, 1550 (Fed. Cir. 1988).

In *Glass v. United States*, 53 Fed. Cl. 33 (2002), *aff'd,* 63 Fed. App'x 486 (2003), the law of the case doctrine precluded plaintiffs from resuscitating any issue of their standing to assert breach of contract claims as direct rather than third party beneficiaries of the contract.  The Federal Circuit reversed a finding of third party beneficiary status, stating the shareholders were at most incidental beneficiaries of the contract; they had no enforceable contract rights.  As direct party beneficiary status was within the scope of the Federal Circuit's direction on remand, the law of the case doctrine precluded its consideration on remand.  By failing to raise an issue that was ripe for appeal, plaintiffs waived their right to resuscitate the issue. Allowing plaintiffs to now raise the direct party issue would create a judicial diseconomy, permit piecemeal litigation, and reward plaintiffs for urging affirmance of their third party status, only to lose and then seek to raise an issue that already was decided against them. 53 Fed. Cl at 35.  *See Tronzo*, 236 F.3d at 1348-49 (explaining that once a contested issue is addressed by the trial court, that issue is ripe for challenge on appeal and if a party fails to challenge the issue on appeal, the appellate court's mandate acts to preclude the party from raising that issue on remand).

"It is 'familiar doctrine that a lower court is bound to respect the mandate of an appellate tribunal and cannot reconsider questions which the mandate has laid to rest.'" *Northern Helex Co. v. United States*, 225 Ct. Cl. 194, 197, 634 F.2d 557, 560 (1980) (quoting *FCC v. Pottsville Broadcasting Co*., 309 U.S. 134, 140 (1940)).

However, a lower court may resolve "matters left open by the mandate." *Lake Pleasant Group v. United States*, 40 Fed. Cl. 647, 653 (1998) (quoting *In re Sanford Fork & Tool Co.*, 160 U.S. 247, 256 (1895)).

The scope of a mandate is not, however, always clear. *Engel Indus.*, 166 F.3d at 1383 (citing *Laitram Corp. v. NEC Corp.*, 115 F.3d 947, 951 (Fed. Cir.1997)). *See also Doe v. United States*, 463 F.3d 1314, 1327 (Fed. Cir.2006) ("The Doe plaintiffs should have raised the issue of the distinction between their holiday pay claim and their overtime pay claim before [liability was reversed on appeal]. Because they did not, the issue was waived.").

The mandate rules do not apply here, the Yankees assert, because the law has changed since the initial trial decision. When this case was tried in 2004, damages included future "minimum damages" through 2012. Because damages included future damages, it was entirely appropriate that the future costs of loading to DOE casks and upgrading the crane should be taken to avoid a windfall. In *Yankee Atomic,* the Federal Circuit upheld the undersigned's determination not to offset from damages the selected fee option under the Standard Contract – that is the utility pays all accumulated fees owed to DOE at the time of the initial pick-up by DOE, as that was an obligation that had not yet matured. According to the Yankees, the same principle applies to the deferred loading costs.

While the principle is the same, as confirmed by the recent Federal Circuit opinion in *Carolina Power*, it is not new law. *Indiana Michigan* parsed claims into cost incurred with future claims thereafter. Supplemental briefing was ordered and received. Although damages were limited to incurred costs through 2000 and 2001 in supplemental briefing by the parties, the Yankees do not point to any request to retract their prior concessions in this regard. And, in other cases, future costs of loading to DOE casks were not deducted from mitigation damages. *TVA v. United States*, 69 Fed. Cl. 515 (2006) (rejecting government's argument that delayed costs of loading to DOE casks should be deducted from awarded damages) (citing *Indiana Michigan*, 422 F.3d at 1373); *Sacramento Mun. Utility Dist. v. United States*, 70 Fed. Cl. 332, 372 (2006) (reciting utility's position that current offset for future costs of loading to DOE would be speculative), *aff'd in part, rev'd in part, and remanded*; 293 Fed. App'x 766 (Fed. Cir. 2008); *PG&E v. United States*, 73 Fed. Cl. 333, 415-16 (2006) (same), *aff'd in part, rev'd in part, and remanded*, 536 F.3d 1282 (Fed. Cir. 2008); *So. Nuclear v. United States*, 77 Fed. Cl. 396, 450 (2007), *appeal docketed*,

No. 2008-5020 (Fed. Cir. Jan. 3, 2008); *Sys. Fuels*, *Inc. v. United States*, 78 Fed. Cl. 769, 797 (2007) (characterizing DOE loading costs as deferred); *Dairyland Power Co-op. v. United States*, No. 04-106C, 2008 WL 5122339 (Fed. Cl. June 20, 2008)(describing utility's position that cost is deferred); *Carolina Power & Light Co. v. United States*, 82 Fed. Cl. 23, 52 (2008) (same), *aff'd in part, vacated in part, and remanded*. No. 2008-5108, 2009 WL 2151328 (Fed. Cir. July 21, 2009); *Dominion Resources*, *Inc. v. United States*, 84 Fed. Cl. 259, 278 (2008) (same), *appeal docketed*, No. 2009-5031 (Fed. Cir. Dec. 30, 2008).  The underlying principle that the one-time fee was a deferred obligation that should not be deducted from damages, was argued successfully by the Yankees.  The same analysis applies to the avoided loading costs.  *Carolina Power*, 2009 WL 2151328, at *5 (citing *Yankee Atomic*, 536 F.3d at 1281).

The Yankees also justify their attempts to reassert these issues reasoning that the court's prior decision was "vacated" both by the Federal Circuit and subsequently by the undersigned on October 28, 2008.  The judgment was vacated; the court's opinion remains except to the extent reversed or remanded by the Federal Circuit.  Indeed, the Yankees stated as much in their Status Report.  "Nor is there any need to revisit a great many other issues that were addressed and resolved at the 2004 trial, and not disturbed – or even challenged – on appeal." (Pls.' Status Rpt. 2.)

The court concludes that these issues are precluded by the Federal Circuit's mandate and by the law of the case.  In the alternative, the court declines to find extraordinary circumstances that would allow these issues to be raised on remand.  However, the parties may proffer on the matters presented.  The form of any proffers and/or any cross-examination will be addressed subsequently.

## 3.  Additional evidence

According to the government, causation for dry storage and re-rack costs are the only proper issues before the court on remand, with causation being the application of the 1987 ACR rates to evaluate whether DOE's partial breach was a substantial causal factor in reracking and building dry storage, and comparing those properly established costs to the costs of the actions that the utilities would have taken in the non-breach world had DOE performed at the 1987 ACR rates.  While asserting the Yankees' causation burden was not met on the existing record, the government would end the inquiry and enter summary judgment in its favor on the

existing record.  If the court were to allow additional evidence, however, it should "primarily involve the submission of supplemental expert reports by the parties and depositions of those experts."  (Def.'s Status Rpt. 9.)

According to the government, the Yankees' position on remand is based on a different theory, one not previously pursued.  Citing *First Federal Lincoln Bank v. United States*, 518 F.3d 1308 (Fed. Cir. 2008), the government reasons this new theory may not be raised initially on remand.

In *First Federal*, a *Winstar* case, the thrift requested breach damages of future lost profits or the lost value of the thrift.  The court awarded damages on a different theory, the value of the deposits during a certain period of time, a measure of damages not advanced by the thrift or by the government.  Because the plaintiff thrift did not seek damages for lost franchise value at trial or on appeal, and because there was no record evidence that would support a value of those deposits as of the date of the breach, and there was no testimony connecting the data to the actual loss suffered, the Federal Circuit reversed, but did not remand.  518 F.3d at 1318-19.

Here, the situation is different in that the Yankees' mitigation or expectation damages theories remain as the template to compare appropriately-established costs in the breach world less any costs that would have been incurred in the hypothetical non-breach world.  The Federal Circuit's mandate requires the application of the 1987 ACS process[4] in formulating any costs that may have been incurred in this non-

---

[4]The "iterative process" of "annual capacity reports (ACRs) beginning no later than July 1, 1987, setting forth projected yearly receiving capacity for government nuclear waste storage facilities. . . [and] annual acceptance priority rankings (APRs) to identify the order in which SNF and HLW would be collected from various parties, based on a first-in, first-out queue model. . .[and] a delivery commitment schedule (DCS) to identify the spent fuel ready for delivery beginning sixty-three months after the DCS submission . . . [is] referred to [as the] the acceptance capacity schedule or ACS process."  *Carolina Power*, 2009 WL 2151328, at *1 (citing *PG&E*, 536 F.3d at 1286). *PG&E* held that the Standard Contract required DOE to accept SNF in accordance with "the 1987 ACR process."  536 F.3d at 1292.  The ACS process includes "all post-formation conduct in relation to the language of the contract."  *Id*. at 1290.  The 1987 ACR process includes the 1987 Mission Plan Amendment ("MPA").  The 1987 ACR lists the acceptance rates for the years 1998 to 2007.  The 1987 ACR refers in several instances to the June 1987 OCRWM Mission Plan Amendment which lists acceptance rights through 2038.  *See Consol. Edison Co. of N.Y. Inc. v. United States*, Nos. 2003-2622C & 2004-33C, slip op. at 2, n.1 (Fed. Cl. May 18, 2009). The acceptance rates in the
(continued...)

breach world.  This number then is subtracted from the breach-world costs to arrive at the net damages caused by DOE's partial breach.  In other words, the remand ordered is not to apply a new damages model such as lost profits versus mitigation damages; rather the remand is to reassess or refactor one of the components of this comparative equation.  If the government's position were correct, then the Federal Circuit could well have concluded that the Yankees failed to meet their burdens in this regard and reversed with no remand.

Moreover, the Federal Circuit recently rejected essentially the same argument in *Carolina Power & Light Co. v. United States*, No. 2008-5108, 2009 WL 2151328 (Fed. Cir. July 22, 2009), reversing the trial court's assessment of mitigation damages based on a non-breach world rate of 3000 MTU, using the 2004 ACR.  Noting that, as in the case *sub judice,* the June 1987 ACS process was not argued by either party, the Federal Circuit declined the government's request not to remand to allow the utility to establish damages under the 1987 rates, having already had that opportunity once at trial.  The Federal Circuit also rejected the utility's attempt to avoid remand in view of the "slight" difference between the 2004 ACR rates used by the trial court and the 1987 ACS process selected in *PG&E*, the net costs under the 1987 ACS process being at least as much as under the 2004 rate.  The Federal Circuit remanded, because the required inquiry is a "profoundly factual endeavor" involving charts and analysis that had not been tested through discovery and cross-examination.  "Though, as Progress Energy points out, the practical equivalency of the 1987 and 2004 rates may well be a matter that can be tested by fairly simple arithmetic, it is nonetheless a factual issue properly within the purview of the trial court."  2009 WL 2151328, at *4.

_____

[4]/(...continued)
1987 ACR are for SNF, not HLW.  The footnote to Table 2.1 ("Illustrative Waste Acceptance Schedule for the First 10 Years of Facility Operation" taken from the June 1987 OCRWM Mission Plan Amendment, Appendix F, Table F-1) states "[t]he waste acceptance schedule for HLW is not included since the Mission Plan Amendment does not specify acceptance of HLW during the 10-year period covered by this report."  HLW, at that time, referred to West Valley reprocessing material and to defense waste.  (PX 99 at 61-63.)  GTCC was not yet defined as requiring permanent isolation, thereby bringing it within the contract scope, until 1989.  *See Yankee Atomic*, 536 F.3d at 1277 (stating that GTCC was not SNF).  Similarly, the 1987 ACR's provision that, to the extent that HLW or other materials are eventually added to the acceptance queue, the priority listings in that document would be adjusted in future ACRs, does not apply to the subsequent requirement that GTCC required permanent isolation.

In *Adelson v. United States*, 782 F.2d 1010 (Fed. Cir. 1986), the Federal Circuit's previous remand placed no limitation on whether the record could be reopened for additional evidence, a decision reserved to the trial court's "sound discretion." 782 F.2d at 1012. *See State Industries, Inc. v. Mor-Flo Industries, Inc.*, 948 F.2d 1573, 1577 (Fed. Cir. 1991) ("Absent contrary instructions, a remand for reconsideration leaves the precise manner of reconsideration – whether on the existing record or with additional testimony or other evidence – to the sound discretion of the trial court." (citing *Adelson*)).

"[W]here findings are infirm because of an erroneous view of the law, a remand is the proper course unless the record permits only one resolution of the factual issue." *Pullman-Standard v. Swint*, 456 U.S. 273, 292 (1982) (citing *Kelley v. S. Pac. Co.*, 419 U.S. 318, 331-32 (1974)); *accord Winters v. Gober*, 219 F.3d 1375, 1380 (Fed. Cir. 2000) (denying a litigant an opportunity to present relevant evidence to the trier of fact under a new standard "is inconsistent with general principles of fairness"); *Baginsky v. United States*, 697 F.2d 1070, 1074 (Fed. Cir. 1983) (the normal practice is to remand to allow the trial court to reconsider issue under the proper legal standard); *Adams v. United States*, 230 Ct. Cl. 628, 680 F.2d 746 (1982) (remanding for factual determinations following reversal).

Accordingly, the court on remand will allow for limited additional evidence in addition to reliance on and specific discernment of existing record evidence. Whether all the remanded costs in the hypothetical non-breach world can be determined by application of evidence already in the record, or whether additional evidence (in addition to argument and parsing of record evidence in support of the parties' respective positions) is needed, has not been determined.

Without record evidence about the Yankees' condition with full Government performance, the Court of Federal Claims could not perform the necessary comparison between the breach and non-breach worlds and thus could not accurately assess the Yankees' damages. *See Glendale Fed. Bank, FSB v. United States*, 239 F.3d 1374, 1380 (Fed. Cir. 2001) (instructing that plaintiffs bear the burden of demonstrating "what might have been"); *Bluebonnet Sav. Bank FSB v. United States*, 67 Fed. Cl. 231, 238 (2005) ("[B]ecause plaintiffs in this case are seeking expectancy damages, it is incumbent upon them to establish a plausible 'but-for' world.").

- 13 -

536 F.3d at 1273 (explaining that "the Yankees had the burden to prove the contractual acceptance rate and apply that rate before suggesting that the Government's breach was a substantial factor in causing the Yankees' claimed expenses," and the Yankees must provide "an express timetable for removal of the Yankees' waste in the event the Government had kept its bargain" – more than "estimates or assumptions"); 536 F.3d at 1274 ("Accordingly, this court vacates and remands with instructions that the Court of Federal Claims apply the Standard Contract acceptance rate identified in *Pacific Gas* to assess causation.").

## 4.  Motion in Limine

Defendant's Motion *in Limine* seeks to preclude the Yankees from adducing evidence at the remand proceedings related to how they would have stored their SNF/HLW if DOE had performed at the 1987 ACR rates, under the OFF principle. The Motion emanates from the government's recent RCFC 30(b)(6) deposition notice for which the Yankees allegedly failed to produce a knowledgeable witness on one of several designated topics.

The government's 30(b)(6) Notice on May 11, 2009 included a request for a corporate designee to testify regarding, among other matters, all actions that the Yankees would have undertaken to store, manage, handle, transport and dispose of their SNF and HLW if DOE had commenced performance in 1998 at the rates set forth in the 1987 ACR, assuming the Oldest Fuel First ("OFF")  principle.

The Yankees' designee, Mr. Wayne A. Norton, President and Chief Executive Officer of all three Yankees, testified repeatedly in the ensuing deposition that he was not aware of any analysis that was done as to that possibility, and that if that hypothetical had been a reality, an analysis would have been done.  His response was the same for dry storage as well as reracking costs.  The Yankees contend the companies did not have specific knowledge on the 1987 ACR/OFF subject and were and are not obligated to undertake analysis on this hypothetical.

The government responds that the Yankees did not move for a protective order prior to the deposition, and if they had, the court's resolution of issues presented could have prevented the expenditure of resources in an unfruitful deposition.  Also, the presentation of a corporate designee who could not provide substantive response to the topic countered counsel's representation that Mr. Norton could so testify.

The Yankees represent that while they "do not intend to offer testimony or evidence at the remand proceeding that is contrary to or in addition to Mr. Norton's deposition testimony regarding the actions the Yankees would have undertaken to store their spent fuel under a 1987 ACR/OFF schedule, the Yankees do intend to present evidence of what they would have done had the government performed at the 1987 ACR acceptance rates and an *adjusted* OFF sequence (*i.e.*, a sequence adjusted by exchanges).  (Pls.' Resp. Mot. *in Limine* 4.)

An appropriate sanction is preclusion of a contrary position on remand, the government insists "to prevent the Yankees from prejudicially surprising the Government with any such evidence at the remand trial proceeding that the Court has scheduled for August 2009."

The Yankees' response is that predicting what Yankees would have done in the 1987 ACR world under strict OFF principles is "not a relevant issue in this remand proceeding."  (*Id.* at 1.)  No analysis was conducted.  A witness fulfills his or her duties by testifying as to his or her personal knowledge at the time.  Discovery is for facts not contentions or legal theories.  The government's objection is that the witness did not go further and analyze whether the Yankees would have built dry storage.  But as the Yankees cite, "'designation as a Rule 30(b)(6) deponent does not require [the witness] to conduct detailed independent investigations beyond what is reasonably known to the company.  That, in essence would be to investigate Plaintiff's case for him."  (*Id.* at 3, (citing *Banks v. Office of the Senate Sergeant-at-Arms*, 241 F.R.D. 370, 375 (D.D.C. 2007) (a witness fulfills his responsibility as a 30(b)(6) deponent once he speaks of what he personally knew and what others in the organization did or might know.").)

Mindful of the position of the parties, the government's Motion *in Limine* is **deferred** until such time, if any, that contrary testimony or evidence is proffered on remand or at any other proceeding in this matter.

This is not to preclude the introduction of evidence in addition to reference and reliance on evidence already in the record.  If the Yankees intend to rely solely on exchange models to establish causation for their dry storage and reracking decisions and costs to establish a "contractually-defined hypothetical world," that is their choice, but the court is not limiting evidence or argument.

While the Yankees may well be correct that generally a 30(b)(6) witness is not required to hypothesize, here, the Yankees have the burden of proving a hypothetical world – a hypothetical world is by definition not factual; the issue is more complex. The court previously ruled that DOE would have followed the OFF sequence with exchanges which would have been approved and would have occurred in the hypothetical non-breach world, a finding that was not appealed or reversed by the Federal Circuit.[5]  The Federal Circuit's mandate that the court calculate the Yankees' damages using the 1987 ACS process did not overturn or otherwise disturb this court's prior ruling on exchanges.  536 F.3d at 1274.  Accordingly, the Yankees assert, application of pure OFF is not relevant.  The Federal Circuit, however, questioned this court's use of exchanges as possibly ignoring OFF sequencing.  *Id*. As exchanges are based on the OFF sequencing, OFF could not be "ignored." Initial acceptance allocations were based on OFF; the utility could deliver any otherwise eligible fuel to DOE so long as the fuel had cooled at least five years.  OFF allocations could be exchanged between utilities, subject to DOE's approval. Approved exchanges would not have contravened the Standard Contract.

The government previously complained that any testimony concerning what the Yankees would have done under the 1987 ACR "would not be probative" and the Yankees had to rely on contemporaneous documents and evidence.  The Yankees' Statement of Claimed Issues on Remand and Notice of Issues to be Addressed represents that "[t]he Yankees will present testimony confirming that had DOE performed at the 1987 ACR acceptance rate leading to the pool empty dates noted above, or even years later, the Yankees would not have built the ISFSIs."  (Def.'s Mot. re: Scope at App. A14-15.)

The Yankees also argue the government's motion to narrow the issues is one for summary judgment but absent the required proposed findings.  The government also failed to serve its "notice of issues to be addressed, which identifies any issues to be resolved on remand other than those in plaintiffs' notice, and outlines the government's position on all issues identified in both notices." (Ord. Jan. 30, 2009 ¶ 2.) The government insists that it has complied.  The government's motion recited it "incorporate[s] our response to the Yankees' statement, pursuant to the Court's January 30, 2009 scheduling order, in which we identify and discuss the issues and claims that are properly before the court on remand." (Mot. re: Scope 2.)  If at any

---

[5]The government did not disagree that exchanges would occur.  (Def.'s Resp. to PPFF at 72.)

remand or other proceeding, the scope of the government's compliance is exceeded, the Yankees may object and the matter will be addressed at that time.

## 5.  Motion to Strike Graves' expert report

Defendant's Motion to Strike the Expert Report Attached to Plaintiff's Opposition to the Government's Motion to Narrow the Scope of Issues to be Considered Upon Remand seeks to strike Frank Graves' expert report on the application of exchanges under the hypothetical non-breach world of the 1987 ACS process – full government performance.  Several reasons are given: (1) it was submitted to support claims not properly before the court; (2) Graves was not or has not been qualified as a witness in this remand proceedings; (3) the report is inadmissable hearsay; (4) the Scheduling Order required expert reports be exchanged between counsel, not filed with the court; and (5) although Mr. Graves testified at trial as an expert, his report was not admitted into evidence.  The government also reiterates that Graves' expert opinion in support of the Yankees' claims for wet pool expenses for 2000 and 2001 was not adopted by this court, the Yankees did not appeal and the Federal Circuit's subsequent selection of one of among several potential reasonable rates does not mean the Yankees  get another bite at the apple.

In turn, the Yankees' Opposition counters that the government mischaracterizes why the report was included in the filing.  The report was attached to illustrate why the wet pool storage costs are properly before the court on remand, to show the impact of the Federal Circuit's selection of a specific rate and to counter the government's assertion that this issue cannot be revisited.  The report is not offered into evidence but merely helps frame the issues before the court.  It is not hearsay because it is not offered to prove the truth of the matters asserted.

The expert report, as now filed as an attachment to a brief, is not evidence in this proceeding and may not be cited as such.  The reports of experts may subsequently be offered in evidence in connection with their testimony or even to serve as direct testimony subject to cross-examination.  As such, it is concluded that no need exists to strike the attachment and defendant's Motion to Strike is **DENIED.**

All remaining pretrial motions are **DENIED** or **DEFERRED**, except to the extent granted herein.

IT IS SO ORDERED.


s/ James F. Merow
James F. Merow
Senior Judge